# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ARNOLD DAY,<br><br>    Plaintiff<br><br>  v.<br><br>KENNETH BOUDREAU, WILLIAM FOLEY, JUDE EVANS, MICHAEL KILL, DAN MCWEENY, JAMES BRENNAN, ANTHONY WATSON, MARTY RADTKE, CITY OF CHICAGO, AND UNIDENTIFIED EMPLOYEES OF THE CITY OF CHICAGO<br><br>    Defendants | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff ARNOLD DAY, by his attorneys LOEVY & LOEVY, sues Defendants KENNETH BOUDREAU, WILLIAM FOLEY, JUDE EVANS, MICHAEL KILL, DAN MCWEENY, JAMES BRENNAN, ANTHONY WATSON, MARTY RADTKE, and UNIDENTIFIED EMPLOYEES OF THE CITY OF CHICAGO, (collectively  "Officer Defendants"), and CITY OF CHICAGO ("City"), and, and states the following:

## INTRODUCTION

1.      In 1994, Arnold Day was wrongfully convicted of the murder and attempted armed robbery of Jerrod Irving—crimes he did not commit—due to the Officer Defendants' unconstitutional behavior. As a result of the Officer Defendants'

egregious misconduct, Mr. Day, an innocent man, was forced to spend 26 years incarcerated for crimes he did not commit.

2.      Mr. Day's conviction was predicated on two false confessions and a fabricated witness statement that were obtained through the Defendants' coercive actions and unconstitutional practices.

3.      The mistreatment Mr. Day suffered at the Defendants' hands represented standard customs, policies, and practices within the Chicago Police Department. Mr. Day is an unfortunate member of the legion of people who have been victimized by certain members of the Chicago Police Department.

4.      Though Mr. Day fought the allegations against him, he was wrongfully convicted for the murder and attempted armed robbery of Jerrod Irving.

5.      For 26 years, Mr. Day worked to prove his innocence. He never wavered and he steadfastly maintained that the Officer Defendants abused and coerced him into signing two false and fabricated confessions.

6.      Finally, in 2017, the Illinois Torture Inquiry and Relief Commission found that Mr. Day's statements about being tortured were credible. On December 18, 2018, Mr. Day's convictions in the Irving case were vacated and the case was dismissed.

7.      On April 4, 2019, the court granted Mr. Day's motion for a certificate of innocence.

8.      Mr. Day now seeks justice for the harm the Defendants have caused him and redress for his loss of liberty and terrible hardship he has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

9.      Mr. Day brings this action pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

10.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 and § 1367.

11.      Venue is proper under 28 U.S.C. § 1391(b). All of the events and omissions giving rise to this claim occurred in this judicial district.

## THE PARTIES

12.      Arnold Day is a 46-year old man who, at the time of his arrest, was 18 years old and resided in Chicago. During his wrongful incarceration, Mr. Day obtained his General Education Diploma and an Associate Degree in Arts from Danville Area Community College. Mr. Day is currently working as a donation attendant for Goodwill Industries.

13.      At all relevant times hereto, Defendants Kenneth Boudreau, William Foley, Jude Evans, Michael Kill, Dan McWeeny, James Brennan, Anthony Watson, Marty Radtke, and other unidentified employees of the City of Chicago ("Officer Defendants") were police officers and otherwise employed by the Chicago Police Department. All are sued in their individual capacities, and acted under color of law

3

and within the scope of their employment during the investigation of the murder at issue.

14.     Defendant City of Chicago is an Illinois municipal corporation. The City of Chicago is or was the employer of each of the Officer Defendants.

### The Murder of Jerrod Irving

15.     On May 17, 1991, just after midnight, a murder occurred at 927 West 54th Street. Jerrod Irving was sitting on the steps when two people approached and shot and killed him.

16.     The Officer Defendants canvassed the area and were able to locate witnesses.

17.     The Officer Defendants took one of the witnesses, Krona Taylor, to the station, where the Officer Defendants interrogated Ms. Taylor for over 12 hours.

18.     At the time of questioning, Ms. Taylor was familiar with Mr. Day and what he looked like, and knew Mr. Day did not commit the crime. At no point did Ms. Taylor identify Mr. Day as being the shooter or otherwise being involved or connected to the murder.

19.     In the weeks that followed the interrogation, Officer Defendants continued to harass and threaten Ms. Taylor.

20.     Finally, unable to coerce fabricated information from Ms. Taylor, the Officer Defendants left her alone.

21.     Notwithstanding the obvious exculpatory value of Ms. Taylor's information—that is, that no one, including Ms. Taylor, had identified Mr. Day as

the perpetrator—the Officer Defendants failed to disclose this information to the prosecutor, and thereby, to the defense.

22.     Rather, on information and belief, any documents memorializing these witness interviews were placed in a separate file, often known in the Chicago Police Department as a "street file," which was not disclosed to the prosecutor or to the defense.

23.     After the Officer Defendants conducted witness interviews, the investigation went cold.

## The Officer Defendants Fabricate Evidence Against Arnold Day

24.     Four months later, in the late hours of September 15, 1991, Rafael Garcia was murdered during an attempted armed robbery. The crime took place outside of Queen Submarine located at 1206 West 51st Street, in Chicago. Reporting officers spoke to the sub shop operator about what he observed and he related that the shooter was a black male named Thomas; the intended victim was an individual named "Snake" who was the passenger in the victim's car; and the shooting had been arranged by a drug dealer named Troy.

25.     While investigating the Garcia murder, the Officer Defendants conducted at least one suspect interrogation. The Officer Defendants interrogated Anthony Jakes, a fifteen-year old teenager who truthfully stated he had no knowledge about the Garcia murder.

26.     Unwilling to accept this response, the Officer Defendants used physically and psychologically abusive tactics during Mr. Jakes' interrogation to fabricate evidence against Mr. Day.

27.     Through threats and violence, the Officer Defendants coerced Mr. Jakes into signing a false statement that identified Mr. Day as the person who attempted to rob and murdered Rafael Garcia.

28.     This was a statement the Officer Defendants knew was false.

29.     The Officer Defendants never disclosed to the prosecutor the unconstitutional manner in which they forced Mr. Jakes to falsely identify Mr. Day as the shooter.

**The Officer Defendants Fabricate More Evidence Against Arnold Day**

30.     After obtaining a false statement against Mr. Day as a way of "resolving" the Garcia murder, the Officer Defendants sought to implicate Mr. Day in the Jerrod Irving murder, which was still unsolved.

31.     To do so, the Officer Defendants coerced yet another person into giving a fabricated statement.

32.     In particular, the Officer Defendants interrogated Ralph Watson during their investigation of the Irving murder. During the interrogation, Mr. Watson told the Officer Defendants he had no knowledge about the homicide.

33.     The Officer Defendants rejected his statement about a lack of knowledge. Through the use of threats and the promise of inducements, the Officer

Defendants unlawfully coerced Mr. Watson into writing a false witness statement identifying Mr. Day as Jerrod Irving's murderer.

34.      This was a statement the Officer Defendants knew was false.

35.      The Officer Defendants never disclosed to the prosecutor the unconstitutional manner in which they obtained Mr. Watson's fabricated witness statement.

**Arnold Day's Arrest**

36.      On the morning of February 4, 1992, the Officer Defendants went to 5234 South Sangamon Street with a warrant to arrest Mr. Day for the murder of Rafael Garcia.

37.      The Officer Defendants went to the basement to locate Mr. Day.

38.      Mr. Day, who was still just a teenager, was frightened by the sudden appearance of yelling officers, and took cover underneath the bed.

39.      The Officer Defendants entered the room with guns drawn and aimed their firearms at Mr. Day, who was unarmed, lying face-down underneath the bed, and dressed only in boxer shorts. Even though Mr. Day was not resisting the officers and was in a submissive posture, the Officer Defendants flipped over the bed and delivered a violent kick to Mr. Day's head.

40.      The Officer Defendants then handcuffed Mr. Day and transported Mr. Day to Area 3.

**The Officer Defendants Abuse Arnold Day and Fabricate Evidence**

41.     The Officer Defendants arrived at Area 3, placed Mr. Day in an interrogation room, and handcuffed him to a ring located on the wall.

42.     The Officer Defendants then entered the room and began interrogating Mr. Day. During the interrogation, the Officer Defendants accused Mr. Day of committing the Garcia and Irving murders; they claimed to have multiple witnesses stating Mr. Day committed the murders; and they demanded Mr. Day confess.

43.     In response to these accusations, Mr. Day asserted his innocence. He told the Officer Defendants he did not know anything about the Irving or Garcia murders.

44.     The Officer Defendants began feeding Mr. Day details about the Irving and Garcia murders.

45.     Mr. Day continued to remain steadfast in his assertion of innocence.

46.     For hours, this cycle continued. During this time, Mr. Day was chained to a wall, and deprived of food, water, access to a bathroom, access to counsel, and the ability to contact a family member.

47.     Notwithstanding Mr. Day's refusal to falsely confess, the Officer Defendants contacted Assistant State Attorney ("ASA") Jason Danielian. The Officer Defendants falsely reported to ASA Danielian that they had a suspect in custody who had knowledge of a murder that had been committed.

48.     On or about 4:30pm, ASA Danielian began interviewing Mr. Day in the presence of the Officer Defendants. ASA Danielian asked Mr. Day about the Irving

murder. When Mr. Day answered honestly and told ASA Danielian he did not know anything about the murder, ASA Danielian left the room.

49.     The Officer Defendants remained in the room with Mr. Day. After ASA Danielian left the room, the Officer Defendants grabbed Mr. Day by the neck. Mr. Day's wrist was still handcuffed to a ring attached to the wall. The Officer Defendants slammed Mr. Day against the wall and began choking Mr. Day.

50.     As the Officer Defendants choked Mr. Day, the Officer Defendants continued to threaten Mr. Day, including stating they would throw Mr. Day out the window if he did not start "cooperating" by parroting back their fabricated stories and falsely confessing. Other Officer Defendants watched silently and made no effort to intervene.

51.     The Officer Defendants commanded Mr. Day to not only confess to the Irving murder, but also confess to the Garcia murder.

52.     In fear for his life and as a result of the Officer Defendants' unlawful coercion, Mr. Day agreed to cooperate. Only then was Mr. Day unhandcuffed from the wall.

53.     Shortly thereafter, ASA Danielian returned to the interrogation room. The Officer Defendants remained in the room. ASA Danielian began to question Mr. Day about the Irving and Garcia murders.

54.     Using the information the Officer Defendants spent hours feeding him, statements the Officer Defendants knew were false, Mr. Day, out of fear and as a result of the Officer Defendants' misconduct, falsely confessed to the murders of

Rafael Garcia and Jerrod Irving. These false confessions were fabricated by the Officer Defendants.

55.     The Officer Defendants never disclosed to the prosecutor the unconstitutional manner in which they obtained Mr. Day's false confessions.

## Mr. Day's Wrongful Conviction

56.     Mr. Day was first made to stand trial for the Garcia murder. In September 1993, a jury acquitted Mr. Day of the murder and attempted armed robbery of Rafael Garcia.

57.     On January 22, 1994, Mr. Day went to trial in order to prove his innocence in the Jerrod Irving murder.

58.     Prior to trial, Mr. Watson, one of the witnesses that the Officer Defendants coerced, notified the State that he wanted to recant his statement. He informed the State that the statement was false and the product of coercion from the Officer Defendants.

59.     As a result, Mr. Watson was not called by the State. Nonetheless, Mr. Watson's fabricated statement featured prominently in the State's case against Mr. Day. Notably, the State elicited testimony from Defendant Boudreau that he used Mr. Watson's false witness statement to obtain Mr. Day's false confession.

60.     The State also did not call any eyewitnesses to trial. Defendant Watson falsely testified that there were no eyewitnesses to the crime, notwithstanding the fact that the Officer Defendants had interviewed at least one witness—Ms. Taylor—about the Irving murder.

10

61.     No reports detailing the unlawful manner with which the Officer Defendants' conducted witness interviews were turned over to the prosecutor or the defense. Consequently, Mr. Day had no way of knowing any witnesses could be called to provide exonerating testimony, including no way of knowing that Ms. Taylor could have exonerated him.

62.     Mr. Day's fabricated confession was also admitted into evidence and used against Mr. Day at trial.

63.     At the close of the trial, Mr. Day was found guilty of murder and attempted armed robbery.

64.     He was sentenced to 60 years in prison for first-degree murder, and 15 years for armed robbery to run concurrently.

**Mr. Day's Exoneration**

65.     Mr. Day never gave up hope that he could prove his innocence, and for two decades he continued to fight.

66.     On October 19, 2011, Mr. Day filed a claim of torture with the Illinois Torture Inquiry and Relief Commission stating that he had been abused by the Officer Defendants. In 2017, the Torture Commission found Mr. Day's claim of torture credible.

67.     In 2017, Mr. Day filed a petition for post-conviction relief. In light of the evidence provided, on December 18, 2018, the judge granted the State's motion to vacate Mr. Day's conviction for the murder of Jerrod Irving.

68.     After 26 years of being locked in a cage, Mr. Day was permitted to walk free as an innocent man.

69.     Once free, Mr. Day filed a petition for a certificate of innocence, and on April 4, 2019, the court granted Mr. Day's petition.

## The City of Chicago's Policy and Practice of Prosecuting Innocent People and Coercing Involuntary Confessions in Violation of Due Process

70.      The Chicago Police Department is responsible for scores of miscarriages of justice like those the Officer Defendants inflicted on Plaintiff by virtue of its policies and practices.

71.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit—numerous of which involve the named Officer Defendants.

72.     These cases include many in which Chicago police officers used the same tactics the Officer Defendants employed against Plaintiff in this case, including: (1) using physically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

73.     At all times relevant hereto, members of the Chicago Police Department, including the Officer Defendants in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to

12

obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Officer Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

74.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Officer Defendants—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned. One such detective was Defendant Boudreau.

75.     Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

76.     The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

13

77.     At all times relevant hereto, members of the Chicago Police Department, including the Officer Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

78.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. The Officer Defendants also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of the Garcia and Irving investigations, including, for example, documents relating to witness interviews.

79.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

80.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Garcia and Irving murders described above.

81.     Additionally, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants. This means that this policy and practice was also in place during the commission and investigation of the Garcia and Irving murder.

82.     In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

83.     Before and during the period in which Plaintiff was falsely charged with the Garcia and Irving murder, and then later convicted of the Irving murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

15

84.     As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

85.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

86.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a)  The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

16

b) The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c) The risks of engaging in tunnel vision during investigation.

d) The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

111. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

112. The City's failure to train, supervise, and discipline its officers, including the Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

113. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They

thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

114.     The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

## Defendant Boudreau's Pattern of Misconduct

115.     In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

116.     That article specifically examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but also for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them. . . . ." Maurice Possley, Steve Mills, and Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, Chicago Tribune, Dec. 17, 2001.

117.     Other examples of Defendant Boudreau's abuses, which are corroborated by sworn testimony, include:

    a.   Boudreau and a partner obtained a murder confession in 1991 from Alfonzia Neal and testified that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal

18

had an IQ in the forties and was incapable of intelligently waiving his *Miranda* rights. Neal was acquitted notwithstanding his signed confession.

b. Marcus Wiggins sued Boudreau alleging Boudreau handcuffed him to a wall and beat him in an interrogation room while questioning him and other youth in a 1991 murder case. Wiggins's mother had been denied access to her son, a thirteen-year-old eighth grader, while he was being interrogated. Six young suspects gave confessions. Two confessions were thrown out on the basis of the "periodic screaming [at the police station] throughout the night," which Boudreau testified he did not hear. The remaining defendants, including two Boudreau interrogated, were acquitted.

c. In 1991, Boudreau and others interrogated fifteen-year-old John Plummer for 36 hours. After being beaten, he falsely confessed to murder.

d. In 1991, Boudreau and others electroshocked Damari Clemon, beat him, and threatened him with a pistol.

e. In 1991, Boudreau and others physically and emotionally abused 15-year old Anthony Jakes in order to coerce a false confession for a murder Jakes did not commit. During the over 16 hours Jakes was held and interrogated, Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang members to kill his family,

tried to burn Jakes with cigarettes, and deprived him of access to food, water, and contact with an attorney of family member. Jakes was convicted of the murder based on his false confession. In 2018 his conviction was vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

f. In November 1992, Boudreau and others coerced Harold Hill, Dan Young, and Peter Williams into providing interlocking confessions to raping and killing a woman. Williams was incarcerated at the time of the crime, and was therefore never charged. But Hill and Young were convicted based on confessions that implicated the undeniably innocent Williams. DNA evidence later exonerated them.

g. In 1992, Clayborn Smith was interrogated for 37 hours in connection with a murder he knew nothing about. When Smith professed his innocence, a detective kicked and punched him, and Boudreau and others threatened to charge his pregnant girlfriend if he did not confess. At one point, the detectives believed they had successfully coerced Smith to confess; but when the ASA entered the room, Smith continued to assert his innocence, whereupon the ASA left and the beating resumed. The same thing happened a second time with another ASA. Again, Smith refused to confess. When that ASA left the room, Boudreau and others resumed the beating. Smith, deprived of both counsel and sleep for an inordinate amount of time, finally signed

20

a false confession.

h. Boudreau featured prominently in the 1993 case against Tyrone Hood and Wayne Washington, having coerced a false confession from Washington. Both men's convictions were later overturned.

i. In December 1993, Boudreau and others "solved" two separate murders with confessions from two intellectually impaired juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any evidence connecting them to the crime, both were acquitted.

j. In 1993, Boudreau's partner beat Richard Anthony, and denied him food, sleep, and access to the bathroom to coerce him into falsely confessing to murder. Boudreau and his partner also beat Anthony's co-defendant, Jerry Gillespie. During his 30-hour interrogation, the detectives prevented Gillespie from contacting an attorney or his family and refused him access to the bathroom. Gillespie eventually gave a false confession.

k. In 1993, Boudreau and another detective interrogated Tyrone Reyna the day after his sixteenth birthday. They refused to let him contact his family and beat him into confessing to a murder he did not commit. Boudreau arrested Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, for the murder even though there was no physical

evidence or eyewitness linking Escamilla to the crime. Boudreau beat Escamilla and threatened to send his pregnant wife to jail if he did not confess. Escamilla falsely confessed after several hours. Morales refused to confess despite being beaten so Boudreau coerced Morales's friend into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified he only gave the statement after he had been beaten for over 20 hours and threatened with prosecution until he falsely implicated Morales.

l.  In 1993, Boudreau and others arrested Emmett White. In an interrogation room, they hit and punched White, threw him to the ground, stepped on his face, and dragged his head across the floor in an attempt to get him to falsely confess.

m.  In 1994, Boudreau and others beat Anthony Williams into falsely confessing to murder and armed robbery.

n.  In 1995, Boudreau was part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in a murder.

o.  In 1995, Boudreau and others interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. The detectives held the men for 30 hours, beat them while they were shackled to the wall, and prevented them from communicating with an attorney or their families. All three defendants were acquitted based largely on

22

evidence that the detectives coerced their confessions.

p. Boudreau placed Antoine Ward in an interrogation room, cuffed him to a bench for prolonged periods, beat him, and denied him access to a bathroom (he eventually urinated on the floor). Boudreau told Ward other witnesses had placed him at the scene of a murder, but that he would let him go home if he signed a statement saying he gave another man a gun. After almost two days, Ward signed the statement Boudreau wrote out, and was convicted of murder.

q. In 1998, Boudreau and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Boudreau and another detective placed a book on his chest and stomach and hit the book with a blackjack to avoid leaving visible marks on Jackson's body. Boudreau and the detective also put a typewriter cover over Jackson's head and cut off his air supply. Jackson eventually confessed to a murder he did not commit.

r. In 1998, Boudreau helped extract a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled the boy did not have the mental capacity to waive his rights and threw out the confession, after which prosecutors dropped the charges.

s. After police officer Michael Ceriale was shot to death in 1998, Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for twenty-four hours, resulting in allegedly

23

incriminating (unwritten and unsigned) statements. The detectives failed to advise Tolliver of his rights and ignored his requests to speak with a lawyer and/or his mother. Boudreau claimed he did not use the protections for minors because 16-year-old Tolliver had claimed to be 18. After two trials, Tolliver was convicted of Ceriale's murder.

t.  In connection with the Ceriale murder, Boudreau and others coerced witness statements to incriminate Tolliver. Among other means, Boudreau intentionally withheld insulin from a diabetic witness for more than a day. When the witnesses later refused to testify at trial consistent with the coerced false statements, the State charged five of them with perjury, and at least one went to jail.

u.  Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging he was framed for a 1998 murder.

v.  Boudreau and others coerced Derrick Flewellen to sign a false confession to a 1999 murder after interrogating him for more than 36 hours, during which the detectives slapped, kicked, punched, and slammed him into the wall before he succumbed. After almost five years in jail, Flewellen was acquitted when DNA tests proved someone else committed the crime.

w.  Fabian Pico was 16-years-old when he gave a self-incriminating statement to Boudreau and another detective that was used to convict him of murder. When Pico moved to suppress the statement on the

24

grounds that police did not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

x.  Boudreau and other detectives beat Jesse Clemon until he signed a written statement (with his left hand because his right hand was injured in the beating). Witnesses in the station heard Clemon screaming and protesting "I didn't do it." Boudreau testified the statement was not coerced; but the judge suppressed it due to the "horrendously oppressive" atmosphere at the station. During the same investigation, Boudreau and others also threatened, beat, and electroshocked Clemon's brother and beat his other brother with a flashlight.

y.  Boudreau and another detective arrested Kilroy Watkins, handcuffed him to the wall of an interrogation room, and choked and punched him to coerce him confess to a six-month-old shooting. After more than 30 hours with minimal sleep and food, Watkins signed a false incriminating statement.

z.  Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, and used violence and threats to coerce his confession. Boudreau participated in this coercion as the "good cop,"

uncuffing Malek and providing him with a hamburger after he had been starved for an extended period. When detectives falsely claimed they obtained an oral confession, Malek filed a federal lawsuit against Boudreau and others.

### Mr. Day's Damages

118.     For over a quarter of a century, Mr. Day was forced to live in a cage and serve out a punishment for crimes he did not commit.

119.     Mr. Day was required to live in conditions that have been described by a judge and watchdog groups as inhumane and damaging to the physical and mental health of prisoners. A constant atmosphere of fear, distrust, and threats of violence from prisoners and staff alike permeated the prison environments. For 26 years, Mr. Day's life was marked by a steady stream of human rights abuses.

120.     During his wrongful incarceration, Mr. Day was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

121.     Mr. Day's 26 years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

122.     Mr. Day must now attempt to make a life for himself outside of prison without the benefit of more than two decades of life experiences, which normally

26

equip adults for the task.

123.     As a result of the foregoing, Mr. Day has suffered tremendous damage, including psychological trauma and emotional damages, all caused by the Defendants' misconduct.

## COUNT I – 42 U.S.C. § 1983

## Coerced and False Confession in Violation of the Fifth Amendment

124.     Each paragraph of this Complaint is incorporated as if restated fully herein.

125.     As described more fully above, all of the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

126.     As described more fully above, the Officer Defendants participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff that caused him to make involuntary and false statements implicating himself in the murder of Rafael Garcia and Jerrod Irving.

127.     The coerced, involuntary, false statement the Officer Defendants fabricated and attributed to Plaintiff was used against him to his detriment in a criminal case.

128.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear

27

innocence.

129.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

130.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago.

131.     At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

132.     These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Officer Defendants who were responsible for interrogating suspects and witnesses in connection with the Garcia and Irving homicide investigation.

133.     Additionally, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police

28

Department under which individuals like Plaintiff, who were suspected of criminal activity, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

134.     Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals who were subjected to actual and threatened physical and psychological violence; (b) individuals who were interrogated at length without the proper protection of their constitutional right to have an attorney present or to remain silent; (c) individuals who were forced to sign false statements fabricated by the police; (d) officers and employees who were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (e) supervisors, with knowledge of permissible and impermissible interrogation techniques, who did not properly supervise or discipline police officers and employees, such that the coercive interrogations continued unchecked.

135.     These widespread practices were allowed to flourish because the

leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue, by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

136. The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

137. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

138. The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confessions at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

139. Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants

who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II – 42 U.S.C. § 1983

### Coerced Confession in Violation of the Fourteenth Amendment

140.     Plaintiff incorporates each paragraph of this pleading as if fully restated here.

141.     In the manner described more fully above, the Officer Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

142.     As described in detail above, the misconduct described in this Count was carried out using techniques of physical and psychological coercion and torture against Plaintiff. This misconduct was so severe as to shock the conscience. It was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

143.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

144.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation,

emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

145.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

146.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

147.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

148.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes,

32

nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

149.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Officer Defendants' misconduct at issue in this case.

150.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

151.    The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT III – 42 U.S.C. § 1983

## Violation of Due Process under the Fourteenth Amendment

152.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

153.    As described more fully above, the Officer Defendants, while acting

33

individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

154.     In the manner described more fully above, the Officer Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

155.     In addition, as described more fully above, the Officer Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

156.     The Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

157.     In a manner described more fully above, the Officer Defendants individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

158.     The destruction and/or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at the trial.

159.     Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

160.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

161.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

162.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that

35

alleged here.

163.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

164.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

165.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

166.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Officer Defendants' misconduct at issue in this case.

36

167.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

168.     The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT IV – 42 U.S.C. § 1983

## Liberty Deprivation in Violation of the Fourth Amendment

169.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

170.     In the manner described more fully above, the Officer Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

171.     In so doing, the Officer Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest continuing for 26 years.

172.     The misconduct described in this Count was objectively

unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

173.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

174.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

175.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

176.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of

officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

177.     Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

178.     Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Officer Defendants' misconduct at issue in this case.

179.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

180.     The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT V – 42 U.S.C. § 1983

### Failure to Intervene

181.     Each paragraph of this Complaint is incorporated as if restated fully herein.

182.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

183.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

184.     These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

185.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

186.      Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to

that alleged here.

187.     The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

188.     The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

189.     Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

190.     Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Officer Defendants' misconduct at issue in this case.

191.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

192.     The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VI – 42 U.S.C. § 1983

## Conspiracy to Deprive Constitutional Rights

193.     Each paragraph of this Complaint is incorporated as if restated fully herein.

194.     After the murders of Rafael Garcia and Jerrod Irving, the Officer Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

195.     Additionally, before and after Plaintiff's conviction, the Officer Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

196.     In this manner, the Officer Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

197.     In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

198.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

199.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

200.     The above-described widespread practices were so well-settled as to

constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

201.     The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

202.     Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

203.     Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Officer Defendants' misconduct at issue in this case.

204.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional

violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

205.     The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VII – State Law Claim

## Malicious Prosecution

206.     Each paragraph of this Complaint is incorporated as if restated fully herein.

207.     The Officer Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

208.     The Officer Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

209.     Statements of the Officer Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Officer Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, withheld exculpatory evidence that would have

demonstrated Plaintiff's absolute innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures.

210.     The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Rafael Garcia and Jerrod Irving murders.

211.     The Officer Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. The Officer Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

212.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

213.     On December 18, 2018, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

214.     As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including psychological injury, and emotional distress.

## COUNT VIII – State Law Claim

## Intentional Infliction of Emotional Distress

215.     Each paragraph of this Complaint is incorporated as if restated fully herein.

216.     The acts and conduct of the Officer Defendants as set forth above were

extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

217. As a direct and proximate result of the Officer Defendants' actions, Plaintiff suffered and continues to suffer emotional distress.

## COUNT IX – State Law Claim

## Civil Conspiracy

218. Each paragraph of this Complaint is incorporated as if restated fully herein.

219. As described more fully in the preceding paragraphs, the Officer Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

220. In furtherance of the conspiracy, the Officer Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

221. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

222. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including psychological injury and emotional distress, as

is more fully alleged above.

## COUNT X – State Law Claim

### *Respondeat Superior*

223.     Each paragraph of this Complaint is incorporated as if restated fully herein.

224.     In committing the acts alleged in the preceding paragraphs, each of the Officer Defendants were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

225.     Defendant City of Chicago is liable as principals for all torts committed by its agents.

## COUNT XI – State Law Claim

### Indemnification

226.     Each paragraph of this Complaint is incorporated as if restated fully herein.

227.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

228.     The Officer Defendants are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

229.     The City of Chicago is responsible for paying any judgment entered against the Officer Defendants. Plaintiff therefore demands judgment against

Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Officer Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff ARNOLD DAY respectfully requests this Court enter a judgment in his favor and against Defendants CITY OF CHICAGO, KENNETH BOUDREAU, WILLIAM FOLEY, JUDE EVANS, MICHAEL KILL, DAN MCWEENY, JAMES BRENNAN, ANTHONY WATSON, MARTY RADTKE, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each Defendant and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendant Officers, and any other relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff ARNOLD DAY hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

<div style="margin-left:40%">

Respectfully submitted,
ARNOLD DAY

By: *s/ Renee Spence*
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Gayle Horn
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)

</div>

spence@loevy.com

Steve Greenberg
GREENBERG TRIAL LAWYERS, LTD.
53 W. Jackson Blvd, Suite 1260
Chicago, IL 60604
(312) 879-9500 (phone)
(312) 650-8244 (fax)
steve@greenbergcd.com