**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| Defendants. | ) | |

# EXHIBIT 4



Transcript of the Deposition of
**Richard A. Leo, Ph.D.**

**Case:** Anthony Jakes v. Kenneth Boudreau; et al.
**Taken On:** June 20, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY JAKES,                    )
                                  )
                Plaintiff,        )
          v.                      )  No. 19 CV 02204
                                  )
KENNETH BOUDREAU, et al.,         )
                                  )
                                  )
                Defendants.       )

          The deposition of RICHARD A. LEO, Ph.D., J.D.,
called by the Defendants for examination, taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken via
videoconference before Enza Cosgriff, Certified
Shorthand Reporter and Registered Professional Reporter,
commencing at 10:01 a.m. on June 20th, 2022.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 2

 1    APPEARANCES (via videoconference):

 2         LOEVY & LOEVY
            MR. RUSSELL AINSWORTH
 3         311 North Aberdeen Street
            3rd Floor
 4         Chicago, Illinois 60607
            Phone:  312.243.5900
 5         E-mail:  russell@loevy.com

 6              On behalf of the Plaintiff;

 7         ROCK FUSCO & CONNELLY, LLC
            MR. PATRICK R. MORAN
 8         MR. PHILIP J. ANDREWS
            333 West Wacker Drive
 9         19th Floor
            Chicago, Illinois 60606
10         Phone:  312.494.1000
            E-mail:  pmoran@rfclaw.com
11                   pandrews@rfclaw.com

12              On behalf of the Defendants.

13         ALSO PRESENT:  Mr. Matt Sandelin, Video Instanter

14                 *    *    *    *    *    *

15

16

17

18

19

20

21

22

23

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 3

1                          I N D E X

2    WITNESS                                    PAGE

3    RICHARD A. LEO, Ph.D., J.D.

4         Examination by Mr. Moran...................  6

5

6

7                       E X H I B I T S

8    LEO DEPOSITION EXHIBIT                      PAGE

9         No. 1....................................  92

10        No. 2....................................  92

11        No. 3....................................  92

12        No. 4....................................  97

13        No. 5.................................... 282

14

15

16

17

18

19

20

21

22

23

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 4

 1      THE VIDEOGRAPHER:  For the record, my name is

 2   Matt Sandelin of Video Instanter.  I'm the video

 3   recording device operator for this deposition.  Our

 4   business address is 134 North LaSalle Street,

 5   Suite 1400, Chicago, Illinois 60602.  This remote

 6   deposition is being video recorded pursuant to the

 7   Federal Rules of Civil Procedure and all other

 8   applicable rules.

 9           This is the deposition of Richard Leo being

10   taken in the matter of Anthony Jakes versus

11   Kenneth Boudreau, et al., Case No. 19 CV 02204 in the

12   United States District Court for the Northern District

13   of Illinois, Eastern Division.  Today's date is

14   June 20th, 2022, and the time is 10:01 a.m.

15           Will the witness please identify yourself for

16   the record by stating your name and location, please?

17      THE WITNESS:  My name is Richard Leo, and I'm

18   located currently in San Francisco, California.

19      THE VIDEOGRAPHER:  Thank you.

20           This deposition is being video recorded at the

21   instance of the defendant and is being taken on behalf

22   of the defendant.

23           Would the participants of this videoconference

24   please introduce themselves for the record by stating

1    your name, location, and who you represent, please?

2         MR. AINSWORTH:  This is Russ Ainsworth --

3         MR. MORAN:  This is Pat -- Go ahead.

4         MR. AINSWORTH:  Go ahead.

5         MR. MORAN:  This is Pat Moran on behalf of the

6    individual police officer defendants, and I am in my

7    office in Chicago.

8         MR. AINSWORTH:  And this is Russell Ainsworth

9    appearing on behalf of the plaintiff.  I'm appearing

10   remotely from Illinois.

11        MR. ANDREWS:  Philip Andrews from Rock Fusco &

12   Connelly appearing remotely.  I'm just observing.

13        MR. MORAN:  I think that's it.

14        THE VIDEOGRAPHER:  Would the court reporter please

15   introduce themselves and please swear in the witness?

16        THE COURT REPORTER:  Enza Cosgriff with Royal

17   Reporting Services.

18                       (Witness sworn.)

19

20

21

22

23

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 6

1  WHEREUPON:

2           RICHARD A. LEO, Ph.D., J.D.,

3  called as a witness herein, having been first duly

4  sworn, was examined and testified via videoconference as

5  follows:

6                    EXAMINATION

7  BY MR. MORAN:

8       **Q.   All right.  Doctor, it looks like we can get**

9  **started.  Can you please state your full -- or not state**

10 **it but just spell your full name for the record, please?**

11      A.   Sure.  R-I-C-H-A-R-D.  My middle name is

12 A-N-G-E-L-O.  My last name L-E-O.

13      **Q.   All right.  And you are the retained expert on**

14 **false confessions for the plaintiff in this case,**

15 **correct?**

16      A.   I am a retained expert, yeah.  I would

17 characterize my expertise more broadly than that,

18 though.

19      **Q.   Well, I understand you may be an expert in**

20 **other areas.  But in this particular case, you're**

21 **offering expert opinions on false confessions, true?**

22      A.   True.  But I'm also offering opinions on

23 police interrogation practices, the psychology of police

24 interrogation, psychological coercion, indicia of

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 7

1  unreliability, techniques that not only cause false

2  confessions based on the scientific research but also

3  cause false confessions to appear true or persuasively

4  true and, thus, increase the risk of wrongful

5  conviction.  So the expertise -- my expertise -- my

6  academic expertise and the expertise that I apply in

7  this case is, in my view, much broader than merely false

8  confessions to police.

9      **Q.   Okay.  No, that's fine.  And those are the**

10  **areas that you are offering opinions on in this case,**

11  **correct?**

12      A.   Those are among the areas, yes.

13      **Q.   Okay.  Obviously we're taking a Zoom**

14  **deposition.  I know you've probably done this many**

15  **times, Doctor.  So just a couple ground rules.  If you**

16  **have any --**

17          **Do you have any materials around you about**

18  **this case?**

19      A.   I do, yes.

20      **Q.   Okay.  And what materials do you have in your**

21  **immediate vicinity about the case?**

22      A.   Well, I -- I -- The materials that are

23  described in the report -- I have the report right next

24  to me.  But the materials that are described from

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 8

1    Pages 2 to 5 in the report are on -- are all in binders.

2    And you can't really see it but to my left and right are

3    book -- bookcases, and on one of those bookcases are the

4    binders of materials printed out that were provided to

5    me or at least most of them.

6        **Q.   Okay.  So those materials, you'd have to go to**

7    **the bookcase and pull the binder in order to access that**

8    **material, right?**

9        A.   Correct.  Correct.  So the only thing I have

10   in front of me now is -- with me is my report --

11       **Q.   Okay.**

12       A.   -- printed out.

13       **Q.   I will ask, Doctor, though, that you refrain**

14   **from pulling anything else besides your report before**

15   **answering a question.  I don't mind that you may need to**

16   **look at something, but I want to know what it is before**

17   **you actually look at it.  Is that fair?**

18       A.   That's fine.

19       **Q.   Okay.  And obviously, since we're on Zoom, you**

20   **have your computer open in front of you.  Are any other**

21   **programs or applications open besides the Zoom function?**

22       A.   I have some e-mails open, which I'm closing

23   right now.  That would be it.  So it's -- it's just you

24   and the e-mail inbox, not anything else open.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 9

1      Q.   Okay.  Good.

2           Now I ask that please -- while we're on the

3      record, please refrain from opening any applications

4      like the e-mail function or whatever where you might be

5      getting information.  Is that fair?

6      A.   Yes.

7      Q.   Okay.  The same thing with cell phones.  I'm

8      sure your cell phone is on you but if you could please

9      not use it during -- while we're on the record.  That --

10     Is that fair?

11     A.   That's fine.  Sure.

12     Q.   Okay.  Good.

13          And finally, Doctor, if you don't understand

14     one of my questions, will you please tell me?

15     A.   Yes.

16     Q.   And if you do answer one of my questions,

17     we're all going to assume that you understood the

18     question.  Is that fair?

19     A.   Yeah, that's fair.

20     Q.   Okay.  Let's see.  You -- Can you tell me what

21     you reviewed in preparation for this deposition?

22     A.   I reviewed my report, and I reviewed some of

23     the pages in the deposition of Snake Robinson.  I

24     reviewed one of the police reports, and I reviewed some

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 10

1 deposition and trial testimony of Detective Boudreau and

2 Kill as well as -- in most conviction testimony as well

3 as testimony by Mr. Jakes.

4 **Q. Okay. And what testimony by Mr. Jakes did you**

5 **review?**

6 A. I believe it was the suppression hearing

7 testimony.

8 **Q. And was it the entire transcript or just parts**

9 **of the transcript?**

10 A. I just reviewed parts of the transcript.

11 **Q. And what were the subjects covered in that**

12 **transcript that you reviewed?**

13 A. Well, the subjects were the interrogation and

14 what he alleges occurred.

15 **Q. Okay.**

16 A. When I say I reviewed part of it, when I

17 review documents for purposes of my initial

18 understanding of a case and in preparation of a report,

19 I usually underline, and so I was just reviewing the

20 things that were significant to me that I had

21 underlined. So it's not like I reviewed one part and

22 not another part. It was just the aspects of his

23 testimony that was the most salient to me at the time.

24 **Q. Okay. And when did you review these materials**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 11

1    in preparation for today?

2        A.   In the last week.

3        Q.   What parts of --

4            You referenced "Snake."  I assume that means

5    Gus Robinson.  What parts of his deposition -- or I'm

6    sorry -- testimony did you -- yeah, deposition I think

7    you said you reviewed.  What parts did you review?

8        A.   There were -- Well, I don't know how to answer

9    your question without giving you page numbers.  It's not

10   like there's ten parts and I can say I reviewed this

11   part, that part, and the other.  So your question is too

12   vague for me to answer.

13       Q.   Can you tell me any of the subjects that were

14   discussed in the testimony you reviewed of Mr. Robinson?

15       A.   Well, yes.  He was asked a number of

16   questions, and he took the Fifth on virtually all of

17   them.  But what he allegedly viewed and what --

18   questions about his testimony and questions about what

19   he was receiving in exchange for his testimony.

20       Q.   Did you draw any inferences from

21   Mr. Robinson's repeated assertions of his Fifth

22   Amendment rights?

23       A.   Well, no, I didn't draw any inferences from it

24   other than he refused to answer a lot of questions that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 12

1   were factually on point, and that seemed a little

2   suspect at times.

3       **Q.   And describe what you mean by "seemed a little**

4   **suspect."**

5       A.   Well, one way of avoiding telling the truth in

6   a deposition is to, in his words, plead the Fifth.  And

7   so when repeatedly asked questions about contradictions

8   in his testimony or between the facts in the case or

9   other -- things he would be receiving in exchange for

10  his testimony, he repeatedly invoked the Fifth.

11      **Q.   Did you get the sense that he was abusing his**

12  **Fifth Amendment rights?**

13      A.   No.

14      MR. AINSWORTH:  And I'll object --

15  BY THE WITNESS:

16      A.   I don't know whether --

17      MR. AINSWORTH:  -- to the form of the question.

18      THE WITNESS:  Sorry.

19  BY THE WITNESS:

20      A.   I don't know whether he was abusing his

21  Fifth Amendment rights, and I'm not here to opine about

22  that.

23      **Q.   Did you get the sense that he did not have a**

24  **good faith basis to believe that his testimony would**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 13

1    incriminate himself?

2        MR. AINSWORTH:  Object to the form of the question.

3            Go ahead.

4    BY THE WITNESS:

5        A.   Okay.  I don't -- Can you repeat the question?

6        Q.   Sure.  Did you get the sense that Mr. Robinson

7    did not have a good faith basis to believe that truthful

8    testimony would incriminate himself?

9        MR. AINSWORTH:  Same objection.

10   BY THE WITNESS:

11       A.   I -- I -- I don't know.

12       Q.   I take it that's something you hadn't

13   considered before I asked the question?

14       A.   Yeah, I'm not here to opine about whether

15   Mr. Robinson did or did not have a good faith basis for

16   invoking the Fifth Amendment.

17       Q.   What made you want to review his testimony in

18   preparation for today given that you had obviously

19   already reviewed it before preparing your report?

20       A.   I wanted to be as prepared as possible for

21   this deposition within the time constraints that I had,

22   and obviously he's a big piece of it.

23       Q.   Right.  But you identified, it looks like,

24   five things -- roughly five things approximately that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 14

1  you chose to review in preparation for today.  Why was

2  Mr. Robinson one of those five?

3       A.   Because I thought you might ask questions

4  about Mr. Robinson as pertains to the opinions in my

5  report.

6       Q.   Is Mr. Robinson's testimony relevant to your

7  report?  Let me -- let me say deposition testimony.

8       A.   Well, potentially relevant.  I discuss

9  Mr. Robinson in a couple places in the report, so yes.

10      Q.   Okay.  Okay.  Which police report -- You said

11 you reviewed a police report.  Which one did you review?

12      A.   I'd have to dig through my -- There's so many

13 materials in this case.  I -- I would have to dig

14 through my file to find it.  Yeah, this is going to take

15 a few minutes because I don't -- I don't know where it's

16 at at the moment.

17      Q.   Well, we'll come back to that.

18           The -- You said you reviewed the -- is it

19 deposition or trial testimony -- I think it was trial

20 testimony of Ken Boudreau and Mr. Kill, Michael Kill, in

21 preparation for today?

22      A.   Yeah.  I'm just going to have to -- If you

23 want me to answer the question, I'm going to have to get

24 the binder off the shelf.  I'm not going to go from

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 15

1    memory here.

2        Q.    Okay.  How about -- Let's see.  Yeah, I mean,

3    I guess as you sit here today, you can't remember any of

4    the subject matter you reviewed related to Ken Boudreau

5    and Michael Kill's trial testimony?

6        A.    No, I thought your prior question was asking

7    me what specifically I had reviewed, and there -- they

8    had given testimony at suppression hearing, at trial, in

9    post-conviction, so I thought you were asking

10   specifically which testimony I had reviewed, and that's

11   why I said I wanted to get the binder off the shelf and

12   then I can tell you with Bates stamp numbers.

13            I do remember the subjects of their testimony,

14   of course.  They were asked about the interrogation of

15   Mr. Jakes.  They were asked about the arrest, the basis

16   for the arrest, the witnesses or alleged witnesses.

17   They're examined directly and then cross-examined.

18       Q.    Okay.  Well, that's -- You know, and to be

19   clear -- and maybe I wasn't clear enough -- I'm not

20   asking you to, you know, recite page number and line

21   number.  I was more interested in approximate -- you

22   know, if you can just give me a generalization of the

23   subjects you were reviewing in preparation for today in

24   that testimony.  That's what I'm looking for.  Is that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 16

1  **something you're able to say?  It sounds like you just**

2  **said it, right?**

3       A.   Yes.  To the best of my memory, yes.  So the

4  issues I'm interested in here that I write about

5  extensively in the report are the ones that I primarily

6  focused on in my review of their testimony and the other

7  testimony that I reviewed: what they allege occurred or

8  didn't occur during the interrogation, the alleged basis

9  for their belief that Mr. Jakes was involved in the

10  crime, the chronology of events according to them.  So

11  it's pretty straightforward why I reviewed their

12  testimony and what I was reviewing.

13       Q.   **Actually, that -- the second part I want to**

14  **ask you about, whether it's straightforward.  I am**

15  **curious why you wanted to re-review the trial testimony**

16  **of Ken Boudreau and Michael Kill.  I said trial but**

17  **it -- you said it was a motion to suppress hearing.  So**

18  **why did you want to --**

19       A.   I may have reviewed the trial testimony too.

20  I obviously wanted to refresh my recollection for what I

21  anticipate will be a very long day of deposition

22  questions.  Since I prepared my report, I've worked on a

23  number of other cases, some of them complex civil cases

24  like this, and so I just wanted to refresh my

Page 17

1  recollection in anticipation of questions that you would

2  ask.

3       Q.    Got it.

4             Okay.  Did you meet with any attorneys in

5  preparation for today?

6       A.    Yeah.

7       Q.    Or meeting -- And that means telephone, Zoom,

8  in person.

9       A.    Yes.

10      Q.    Okay.  And how many meetings did you have?

11      A.    I think two.

12      Q.    When was the most recent?

13      A.    Friday.

14      Q.    Who was it with?

15      A.    Mr. Ainsworth.

16      Q.    Was anyone else --

17            Was this a telephone call?

18      A.    Yes.

19      Q.    Was anyone else on the call?

20      A.    No.

21      Q.    How long did it last?

22      A.    I don't recall.  Between half hour and an hour

23  maybe is my best estimate.  I would have to look at my

24  time sheets.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 18

 1    Q.    It's okay.

 2          And prior -- You said you -- you had another

 3    meeting prior to that one on Friday.  When was that

 4    meeting?

 5    A.    I think it was a month ago or roughly a month

 6    ago.  I think the deposition got rescheduled and we had

 7    a preparation.  Maybe the deposition got rescheduled a

 8    couple times.  I'm not -- I don't remember specifically

 9    if it just got rescheduled once or twice, but we had a

10    phone call prior to its prior scheduling.

11    Q.    Got it.  That was also with Mr. Ainsworth?

12    A.    Correct.

13    Q.    Was anyone else on that call?

14    A.    I don't believe so.

15    Q.    Okay.  And approximately how long do you think

16    it lasted?

17    A.    An hour, hour and a half.

18    Q.    Okay.  Did you do any research for your

19    opinions in this case, whether it's Internet research or

20    any kind of academic research?

21    A.    No.

22    Q.    Did you --

23          You were given obviously a long list of

24    materials by the plaintiff's attorneys in this case,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 19

1    correct?

2        A.   Yes.

3        Q.   All right.  Did you look -- rely on anything

4    outside of the information provided to you by the

5    plaintiff's attorneys in this case for any of your

6    opinions?

7        A.   No.

8        Q.   All right.  Have you followed any of the media

9    accounts -- or coverage, I should say, of Mr. Jakes's

10   case?

11       A.   I have not.

12       Q.   All right.  Approximately how much time do you

13   think you've spent preparing for this deposition?

14       A.   Probably five to ten hours.  Probably closer

15   to five.

16       Q.   Do you feel like you're adequately prepared to

17   testify today about the infor- -- or the opinions

18   contained in your report?

19       A.   Yes.

20       Q.   All right.  By the way, if you decided you

21   needed some additional information based on your review

22   of the -- of what the plaintiff's attorneys had provided

23   to you, could you have asked?

24       A.   I could have asked, yes.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 20

1    Q.   And did you -- did that need arise where you

2   requested additional information other than what is

3   provided -- was provided?

4    A.   I don't believe so.  I believe the materials I

5   was provided were adequate for arriving at the opinions

6   and conclusions I wrote about in the report.

7    Q.   All right.  So I'm going to -- we're going to

8   mark your report, Doctor.  And, you know, you can use

9   the one in front of you.  But for the record, we'll just

10   put it on the screen.  And I'll tell you right now, I've

11   divided your report -- I've separated the CV and the

12   case list.  I know you put it all together in one, but

13   it's kind of a long document so I just separated them

14   into three documents.  Okay?

15    A.   Okay.

16    Q.   All right.  Did I -- Is it up on the screen?

17   It doesn't look like it's up on your screen.

18        Now can you see it?

19    A.   I can, yes.

20    Q.   All right.  Tell me if you want me to scroll

21   through it, Doctor.  It's -- I think it goes -- Let's

22   see.

23        So you see your signature at the last page,

24   Doctor?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 21

1    A.   I do.

2    Q.   And it is 47 pages of the report, correct?

3    A.   Okay.  That -- Yes.

4    Q.   Does that appear to be -- And let me know if

5    there's anything you want to see in addition.  But does

6    this appear to be the report you prepared in this case?

7    A.   It does, yes.

8    Q.   Okay.  Did -- This report contains all of your

9    opinions?

10    A.   Yes, today, yes.

11    Q.   Okay.  As of today.

12         And it contains all of the factual bases for

13    your opinions?

14    A.   Correct.

15    Q.   And all the conclusions you're going to reach

16    in this case?

17    A.   That I have reached, yes.

18    Q.   Okay.  And by the way, do you anticipate

19    adding additional opinions?

20    A.   I -- I do -- do not anticipate adding

21    additional opinions, but sometimes I'm provided with

22    additional materials or new materials, and that's why at

23    the end of the report I mention that I reserve the right

24    to modify or add or change opinions in light of any new

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 22

1    information that I'm provided.

2        Q.   Do you feel you had adequate time to prepare

3    this report?

4        A.   Yes, I thought I had adequate time to prepare

5    the report.

6        Q.   All right.  Did anyone assist you in preparing

7    this report?

8        A.   No.

9        Q.   You have -- And by the way, I know you're a

10   law professor as well as a psychologist.  It sounds like

11   you have an understanding of the requirements of Rule 26

12   of the Federal Rules of Civil Procedure as related to

13   expert reports.  Would that be fair to say?

14       A.   I hope so.  I hope I have an understanding of

15   it.  I don't think it's -- because I'm a law professor

16   as much as just my experience writing these reports in

17   the past.

18       Q.   Right.  Have you actually reviewed the rule to

19   ensure that your reports are consistent with what's

20   required under the rule?

21       A.   I have not reviewed the rule, no.

22       Q.   All right.  I'm going to pull this down for a

23   second, Doctor, and we'll come back to it.

24            And I want to pull up a different one real

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 23

1   quick, which is your CV.

2           And while I'm pulling that up, Doctor, I'm

3   going to ask you a specific question about your CV.

4           Actually, you know what?

5           Here we are.

6           This is your CV, Doctor?

7       A.   Correct.

8       Q.   And this was sent to us.  You can see the

9   date.  It's February of 2022?

10      A.   Yes.

11      Q.   All right.  Has it been updated since

12  February of 2022?

13      A.   Yes.

14      Q.   In what sense?

15      A.   Well, if there was a forthcoming article, I

16  would have added the forthcoming art- -- If there was a

17  forthcoming article that was then published, I would

18  have, if I remembered, changed the description in the

19  articles published to delete "forthcoming" and put the

20  page numbers in.  If there was an award or recognition,

21  I would have added that.  If there was another talk I

22  had given in the interim, I would have added that.  So I

23  think this is 99.9 percent the same as my CV today.  Not

24  a lot has happened in the last four months.  But it

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 24

1   would have been minor updating like that.

2       Q.   Okay.  And as you sit here, can you think of

3   anything that specifically was updated?

4       A.   Not in the last four months specifically, no.

5       Q.   Okay.  It looks like you have -- I'm looking

6   at "Article, Book Chapters and Other Publications," and

7   it looks like you have a book that is about to come

8   out -- I thought I saw -- anticipated to come out in

9   2023; is that accurate?

10      A.   Yes.  Well, it's -- it's being shopped with an

11  agent; so if the agent were to get a contract in 2022,

12  then -- in my experience, books usually take about nine

13  months to a year to come out after the contract has been

14  signed, and so that's why I anticipated, even though I

15  don't have a contract yet, that the book would come out

16  in 2023.

17      Q.   And what is the book about?

18      A.   The book is a history of the Innocence

19  Movement in the American criminal justice system and the

20  problem of wrongful convictions.

21      Q.   Okay.  Is the -- is the manuscript in final

22  form that's being shopped around?

23      A.   Well, it's in semifinal form.  It's a complete

24  manuscript.  When agents shop a book manuscript,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 25

1    sometimes they just shop the proposal and some sample

2    chapters, but a polished version of the manuscript is

3    complete; and then when a publisher gives us a contract,

4    undoubtedly there will be more editing and updating.

5         **Q.   Right.  Understood.**

6              **What I was essentially trying to find out is**

7    **that you have now put it in final form to be shopped --**

8    **I probably should have asked that question instead.**

9    **It's in final form to be shopped around with the**

10   **understanding that whoever offers you a contract, may**

11   **want to do some additional editing?**

12        A.   Correct.

13        **Q.   Okay.  Does this book rely on the 250 cases**

14   **that are identified in Footnote 6 of your report?**

15        A.   No.

16        **Q.   Okay.  Are you using those 250 cases for a**

17   **forthcoming publication at the moment?**

18        A.   Not --

19        MR. AINSWORTH:  Object to the form of the question.

20   BY THE WITNESS:

21        A.   Not --

22        MR. AINSWORTH:  Go ahead and answer.

23        THE WITNESS:  Sorry.  Sorry.

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 26

1    BY THE WITNESS:

2         A.   Not a forthcoming publication, no.

3         **Q.   Okay.   Is there any work in progress going on**

4    **with you and those 250 cases?**

5         A.   Yes.  I need to finish coding those 250 cases,

6    so that would be work in progress, but I have not yet

7    written up an analysis or report based on those 200- --

8    article, rather, based on those 250 cases.

9         **Q.   And where did you obtain these 250 cases?**

10        A.   It's from a variety of sources: electronic,

11   media, and legal database searches.  Sometimes we were

12   aware of these cases through our own work or being

13   contacted by other professors or researchers or learning

14   about them at academic conferences or reading about

15   cases in professional publications or in media

16   documents.  So the first step is just to identify

17   possible cases and then after the cases were identified,

18   to gather documents on the cases, ideally as many

19   documents as possible, and then to analyze whether they

20   met the criteria of what's called proven false

21   confession, which I describe in the report.  So there

22   were a lot more than 250 cases identified for possible

23   inclusion and -- and then they were -- and then the ones

24   that met one or more of the four criteria were included

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 27

1    on the list and then we began the process of coding

2    those cases.

3        **Q.   So is it fair to say you were specifically**

4    **looking for cases involving confessions that you may be**

5    **able to identify is a proven false confession?**

6        A.   Correct.

7        **Q.   All right.  And why were you looking for that**

8    **specific type of case?**

9        A.   Well, it's the most conservative criteria for

10    an article on -- on false confessions.  So there are

11    many cases where there is strong evidence that the

12    confession is false; but for research purposes, we can't

13    say that we can prove this false to a near or absolute

14    certainty.  So by using the more conservative criteria,

15    only the cases that we believe we can prove false to

16    near or absolute certainty do we avoid an argument about

17    whether this really is or is not a false confession.  So

18    we are looking for that category to focus the attention

19    that the article would eventually receive on the

20    findings and not have somebody involved in the case

21    arguing with us about whether this is a false or not

22    false confession.  It's just a more conservative

23    approach to the research subject.

24        **Q.   Got it.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 28

1    **So who decides in reviewing these 250 cases**

2    **whether the confession falls under the category of a**

3    **proven false confession?**

4    A.   Well --

5    MR. AINSWORTH:  Can I just -- Hang on.  Can I just

6    pause here?  Because we're talking about stuff that's

7    not published.  We're talking about stuff that's, you

8    know, work product.  And so, Pat, I've allowed, you

9    know, Dr. Leo to testify thus far.  But is there a -- a

10   basis for asking Dr. Leo about unpublished work product?

11   MR. MORAN:  Yeah.  I -- I mean, we've already gone

12   over this.  I think it's relevant.  I'm not going to

13   debate it right now.  If you want to tell him not to

14   answer, that's up to you.  I prefer not to consume a

15   deposition with debates on whether the questions are

16   appropriate.

17   MR. AINSWORTH:  Well, as you know, I can't just

18   tell him not to answer on the basis of relevance.  You

19   have to stop the deposition.  I have to file a motion

20   for a protective order, and I'd rather not do that.  So

21   perhaps we could move this questioning to the end of the

22   deposition, because I -- I suspect that there will come

23   a point where, you know, you're going to be asking

24   questions about it and I'm going to say, I don't think

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 29

1  this is relevant, and I'm going to want to bring a

2  motion and then I'm going to have to stop the

3  deposition.  So --

4      MR. MORAN:  Well --

5      MR. AINSWORTH:  -- that's my request.

6      MR. MORAN:  All right.  I -- So, you know --

7  BY MR. MORAN:

8      **Q.    Let me ask you this, Doctor:  You have already**

9  **done field studies on cases of false confessions, right?**

10     A.    Correct.

11     **Q.    So you have the study in Oakland where you had**

12  **approximately, what, 125 cases you were looking at?**

13     A.    That study was not a study of false

14  confessions.  So in your prior question, you used the

15  word "field studies."  I don't think that's really the

16  right word to use.  The study that I did for my doctoral

17  dissertation, which involved in part interrogations by

18  the Oakland Police Department, was a field study in part

19  in that I went out into the field and I sat in on and

20  observed interrogations contemporaneously, but that

21  study was a study of police interrogation; it was not a

22  study of false confessions, and so it was not a field

23  study of false confessions.

24     **Q.    Okay.  Have you -- The -- the work you're**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 30

1  doing now on these 250 cases, have you done work like

2  this before where you analyze confessions to determine

3  if they fall into a category of proven false

4  confessions?

5      A.   Yes.

6      Q.   All right.  Who makes -- And this is with

7  respect to the 250 and any other work you've done.  I'm

8  trying to identify proven false confessions.  Who makes

9  the decision that the confession is a proven false

10  confession?

11      A.   The researchers would analyze the data before

12  them and then determine whether in their view one or

13  more of the four criteria were met; and if so, then the

14  case would be included.

15      Q.   Are these researchers that work for you?

16      A.   No.  It would -- it would be me and my

17  coauthors.  So in one of the studies published in 2004,

18  it was me and Professor Steve Drizin of the Northwestern

19  University of law school, and we analyzed a lot of

20  cases, but we included 125 cases in that article of

21  proven false confessions.  So we were the ones who made

22  the decision about which cases met the criteria for

23  inclusion.

24      Q.   Okay.  And in the -- The same question with

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 31

1    the 250 cases --

2        MR. MORAN:  And I'll move on after this, Russell.

3    BY MR. MORAN:

4        Q.    -- who is making the call on those cases as to

5    whether they're proven false confessions?

6        A.    It would be the same answer: the authors of

7    the article.

8        Q.    Okay.  And then obviously, you are one of

9    those authors, right?

10       A.    Correct.

11       Q.    Okay.  Are you at liberty to say who else is

12   an author of this forthcoming work?

13       A.    Well, presumably, Professor Drizin and then

14   one of my former students who helped a lot with the

15   research, Jillian Emmerich.  I think her name is spelled

16   E-M-M-E-R-I-C-H.  And then there is a -- another

17   researcher who is going to help us, we think, analyze

18   the data.  Her name is Amy Schlossberg.  I always forget

19   how to spell her last name.  I -- I don't remember if

20   it's a C or not.  But I think it's

21   S-C-H-L-O-S-S-B-E-R-G.  So if that article goes as

22   anticipated, then there would be four authors on the

23   article.

24       Q.    Okay.  You mentioned that you are in the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 32

1   process of coding.  Tell me, what is coding?

2       A.   Well, we're looking for patterns in the data.

3   So there would be a number of factual questions that we

4   were -- would be interested in each of these cases.  For

5   example, the year of the interrogation, the location,

6   which of the four criteria the proven false confessor

7   met, the type of crime, whether they were convicted or

8   not, the length of the sentence if they were.  So

9   there's many more.  I'd have to look at the coding

10  sheet.  But those are the types of things that we'd be

11  asked to do.

12      Q.   So -- And another way of describing those are

13  different variables, right?

14      A.   Correct.

15      Q.   And you -- And I assume the list of

16  variable -- as you just mentioned, the list of variables

17  is longer than what you just described, right?

18      A.   Correct.

19      Q.   Okay.  Was the same true for the 125 cases you

20  reviewed with Professor Drizin in 2000- -- for the 2004

21  article?

22      A.   If I understand your question correctly, is

23  the list of variables we coded for longer, yes.

24      Q.   Okay.  And essentially, the same process

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 33

1    **though?  You went through and coded a series of**

2    **different variables to help you identify patterns?**

3         A.    Correct.

4         **Q.    Okay.  What other studies have you done**

5    **besides the 2004 study of those 125 cases related to**

6    **proven false confessions -- identifying proven false**

7    **confessions?**

8         A.    We did a study in 1998 on proven false

9    confessions.  That was written about in two separate

10   articles, one of which came out in 2001, which is a

11   little bit more of an in-depth analysis of some of the

12   cases in that article, and then the 2004 article.

13   There's other research and articles on false

14   confessions, but those were the studies so far just on

15   proven false confessions that I have been involved in.

16        **Q.    And is it your preference to only use what you**

17   **would call a proven false confession to identify these**

18   **patterns?**

19        A.    I'm really not sure how to answer that in

20   terms of preference.  It's just a different research

21   strategy.  It's a more conservative research strategy.

22   I wouldn't say it's my preference.  It's just a choice

23   that I might make in one study as opposed to another

24   study.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 34

1        Q.    Have you done studies of confessions that are

2   not in the category of proven false confession where you

3   attempt to identify these patterns similar to what you

4   did with the proven false confessions?

5        A.    Yes.  The 1998 study had some confessions in

6   it that were not proven false confessions.  I've written

7   other articles, particularly on the psychology of

8   interrogation and false confession, that they weren't

9   proven false confessions per se.  So there's -- there's

10  other publications where I've discussed confessions that

11  I or my coauthors believe the weight of evidence

12  overwhelmingly indicates they are false but they don't,

13  strictly speaking, meet the criteria of a proven false

14  confession.

15       Q.    And specifically, what types of patterns are

16  you looking for?

17       MR. AINSWORTH:  Object to the form of the question,

18  also foundation.

19  BY THE WITNESS:

20       A.    Yeah, it depends on which study you're talking

21  about.  But broadly speaking, we're interested in how

22  police investigate or fail to investigate cases that

23  result in false or unreliable confessions.  We're

24  interested in errors that they make.  We're interested

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 35

1    in the psychology that they use and the techniques they

2    use to interrogate.  We're interested in suspects'

3    reactions.  We're interested in the consequences once

4    the confession is elicited.  We're interested in

5    patterns about crimes that are more likely to lead to

6    false confessions or interrogations of crimes that are

7    more likely; other variables, as you say, having to do

8    with the process of interrogation; the decision to

9    confess or falsely confess; the influence techniques

10   that police use: psychological coercion, sometimes

11   physical coercion; how the criminal justice system

12   responds to confessions whether true or false.  These

13   are just some of the issues that we're interested in.

14   There are many more.

15        **Q.   Okay.  These are -- These patterns -- I mean,**

16   **I assume one of the patterns you're -- you -- Let me ask**

17   **it a different way.**

18            **Is one of the patterns you looked for the risk**

19   **factors that you believe are potential or probable**

20   **causes of false confessions?  And you discuss some of**

21   **them in your report.**

22        A.   Yes.  Researchers are interested in looking

23   for risk factors, factors that increase the risk of a

24   particular outcome.  So that would be something that we

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 36

1  are interested in in our research, yes.

2      **Q.   Is your research largely driven by -- in the**

3  **research of these confessions, proven false confessions**

4  **or the group of confessions that you looked at, even**

5  **though they're not technically proven, driven by trying**

6  **to identify these risk factors?**

7      A.   I wouldn't say, as you've asked the question,

8  it's driven by a desire to identify risk factors.  It

9  depends on the article or the book, what the research

10  questions are.  That is one issue.  What techniques are

11  disproportionately involved in interrogations leading to

12  false and unreliable confessions.  But it's not driven

13  by that.  I think that would be a mischaracterization of

14  the corpus of my research in the last three decades --

15  more than three decades.

16      **Q.   So some of what you've identified in the list**

17  **of -- the shorter list of patterns that you looked at**

18  **like psychological techniques, process of interrogation,**

19  **influence techniques, those overlap with the risk**

20  **factors that you've identified in this case, true?**

21      A.   Sometimes they do, yes.

22      **Q.   Okay.  And those inform your decisions to**

23  **identify certain things as a risk factor.  Would that be**

24  **fair to say?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 37

1    A.    Your question is pretty vague, so I don't --

2    **Q.    Well, let me ask reask it.**

3    A.    -- believe anybody can form --

4    **Q.    If it's too vague, I'll -- I'll reask it.  No**

5    **problem.**

6    **The three things identified -- psychological**

7    **techniques, process of interrogation, influence**

8    **techniques -- identifying those things in your research**

9    **informs your decision to identify a particular technique**

10   **or questioning process as a risk factor in potentially**

11   **causing false confessions; is that fair to say?**

12   A.    Again, I just think the way you're wording it

13   is so vague that I don't want to agree with it because I

14   don't fully understand it.  The research that I do, the

15   empirical research, which is part of a much broader body

16   of research, may contribute to a deeper understanding of

17   risk factors.  It just depends.

18   **Q.    What is -- I should probably have you define**

19   **empirical research.  What do you define empirical**

20   **research as?**

21   A.    I would define empirical research as going out

22   into the world and gathering data that are --

23   Conclusions or analyses about a research question is

24   based on that data.  And in the social sciences as well

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 38

1    as in the study of interrogation and confession, there's

2    a range of possible types of data: experiments, going

3    out into the field and observing naturally occurring

4    phenomena, interviewing people involved in the

5    phenomena, studying contemporary or historical documents

6    that bear on a particular phenomena.  Doing surveys

7    would be another form of data gathering or empirical

8    evidence.  So empirical just means going out and

9    gathering data.  And data may come in a variety of

10   different forms, and some data may be more readily

11   available or more relevant for a particular research

12   subject and less so for other research subjects.

13       **Q.   And once you gather that data, the best -- or**

14   **is it -- would it be fair to say the best way for you to**

15   **understand the data and its impact or its ability to**

16   **answer any of your research questions is to do some**

17   **statistical analysis and determine through that analysis**

18   **whether there are patterns in the data that will help**

19   **you answer your questions?**

20       A.   No, I would disagree.  There is in social

21   science qualitative analysis and there is quantitative

22   analysis.  It may be in some studies it's better to do

23   quantitative analysis, and it may be in other studies

24   it's better to do qualitative analysis or that's all you

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 39

1    have.  So there are advantages and disadvantages,

2    limitations to whether it's qualitative or quantitative.

3    I think what -- the way you phrased the question that

4    may be true in some -- in some situations.  It just

5    depends on -- on the study and the data available.

6             Certainly if you're looking for aggregate

7    patterns, then yes, statistical analysis allows you

8    first to describe those patterns, but statistical

9    analysis may not give you a deeper understanding of why

10   those patterns occur.  So I would want to push past the

11   way the question was phrased and not say that's the best

12   way of looking for or analyzing data necessarily.  It

13   may or may not be.

14        **Q.   In your 2004 article with Professor Drizin,**

15   **did you do statistical analysis?**

16        A.   Descriptive statistical analysis, yes, so very

17   basic statistics.

18        **Q.   Okay.  And tell me what you mean by**

19   **"descriptive statistical analysis."**

20        A.   Well, there's -- there's descriptive

21   statistics and then there's inferential statistics.  And

22   descriptive statistics is just describing or quantifying

23   some aspect of what you're studying.  So just to give a

24   hypothetical example, if you have 125 cases and you want

Page 40

1    to look at the racial breakdown, you might say -- you

2    count that and say 70 percent were African-American,

3    15 percent were Caucasian, 5 percent were Asian or

4    Pacific Islander, 2 percent were Native American.  You

5    know, that would be descriptive statistics as opposed to

6    inferential statistics where you're inferring something

7    from the statistics as opposed to just describing the

8    statistics.

9        Q.    What other research methodologies did you use

10   in that 24 -- 2004 article with Professor Drizin?

11       A.    Well, that article was primarily based on

12   analysis of documents, of primary and secondary case

13   materials.  So we, as I had mentioned earlier, tried to

14   gather as many articles as -- or I'm sorry -- as many

15   documents as possible on those cases.  If there were

16   trial transcripts, pretrial transcripts, police reports,

17   published cases, even unpublished cases, media stories,

18   interviews, interrogation tapes and transcripts, so we

19   try to gather as many materials as we could, and then we

20   coded some -- some variables, and then we tallied those

21   and described them in tables that are published in the

22   article, and then we did a more in-depth analysis of

23   some of the cases to illustrate the findings.

24       Q.    Okay.  Well, so one of your conclusions in

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 41

1    that article was that -- related to juveniles, right?

2        A.    Correct.

3        Q.    And that's obviously an issue in this case as

4    well, right?

5        A.    Yes.

6        Q.    And I think you drew a conclusion that a

7    juvenile -- someone's status as a juvenile in and of

8    itself is a risk factor for potentially giving a false

9    confession?

10       A.    I don't know if we drew that conclusion in the

11   article.  I'd have to look at how the article was

12   written up.  But -- but there is substantial research

13   that supports that conclusion that you're stating,

14   that -- that youth and adolescents is what we call a

15   personal risk factor for false confession, that there's

16   a whole series of reasons why people who are under 18

17   are more vulnerable to, more susceptible to, more likely

18   to make or agree to a false confession.

19            What the 2004 study added was not so much the

20   reasons why that occurs but the fact that in this

21   collection of 125 cases, there's a -- juveniles are

22   disproportionately represented relative to their numbers

23   in the population and so they appear to more often

24   falsely confess.  And we also have a body of literature

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 42

1  that expl- -- identifies and explains why that is from a

2  psychological and developmental and social psychological

3  and cognitive perspective.

4      **Q.   So -- And you would agree with me that status**

5  **as a juvenile by itself is not necessarily going to lead**

6  **to a false confession, right?**

7      A.   As you've stated the question, yes.

8      **Q.   Okay.  Is there any way -- I mean, is -- You**

9  **say -- You qualified your answer, so I'd like to know**

10  **why you qualified it.**

11      A.   Because it's a risk factor and -- You know, it

12  would be like saying the fact that somebody has been a

13  chain smoker their whole life, that doesn't necessarily

14  mean they're going to get lung cancer.  Well, no, it

15  doesn't, but it's a risk factor, and we know why it's a

16  risk factor, and lots of people who smoke will get lung

17  cancer.  And lots of juveniles who are coercively

18  interrogated presumably will also falsely confess based

19  on this body of research.

20      **Q.   Do you still have the case materials from the**

21  **2004 article?**

22      A.   Some of them I would have but probably not all

23  of them.

24      **Q.   How about any of the work you did -- any --**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 43

1    for example, the analysis -- any of the statistical

2    analysis you did or any other kind of analysis, do you

3    still have that available for the 2004 article?

4        A.    I don't think that I do.  Back then we

5    didn't -- things weren't as digital and electronic.  So

6    I -- I could search my office, but I don't have it

7    readily available, and maybe I would find it, maybe I

8    wouldn't.

9        Q.    Okay.  Should that kind of material be saved

10   when you -- for articles like that?

11       MR. AINSWORTH:  Object to the form of the question.

12            Go ahead and answer.

13   BY MR. MORAN:

14       Q.    Yeah, you know, that was a bad question.  Let

15   me reask it.

16            That was a peer-reviewed article, right, that

17   2004 article with Professor Drizin?

18       A.    Well, it was in -- it was in a -- Sorry.  Did

19   I speak over anybody?  It was in a law review, so it

20   wasn't the traditional social science peer review.

21       Q.    It was a different type of peer review than

22   what a social scientist would go through in a social

23   scientist type of publication, right?

24       A.    Correct, or a lesser form of peer review, yes.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 44

1      Q.   And in the peer-review process, do you -- for

2  social scientists -- set aside the law review for a

3  second -- do you typically submit the underlying case

4  material with your -- the publication that you want --

5  or the article you want published so whoever is doing

6  the peer review will be able to look at the data, the

7  raw data, and determine as part of the peer-review

8  process whether you are supporting -- or making -- your

9  conclusions are supported?

10      A.   Typically, no.  You know, there -- there might

11  be a lot of raw data.  But, you know, I've peer reviewed

12  dozens of articles and I've written dozens of articles,

13  and no, typically, the convention is not to submit the

14  data along with the article for purposes of peer review.

15  There's often tables and articles that are quantitative,

16  or there might be a coding sheet.  But the underlying

17  data typically is not submitted, no.

18      Q.   Has -- Have your conclusions that you drew in

19  the 2004 article been replicated by anybody else using

20  the same data?

21      A.   Well, when you say "the same data," do you

22  mean the 125 ar- -- cases?  Is that what you mean?

23      Q.   Yes.

24      A.   To my knowledge, nobody has taken those

Page 45

1  125 cases and reanalyzed them.  The 125 cases, the names

2  of those cases are listed in a table in the article with

3  the exception of a few juvenile cases which were

4  anonymously identified.  I'm not aware of anybody who

5  has reanalyzed those 125 cases.

6      **Q.    Did you follow a scientific method in your**

7  **mind when you did the process of analyzing the data for**

8  **the 2004 article with Professor Drizin?**

9      A.    Yes, if I understand your question correctly.

10  In social science, there are methodological and

11  analytical conventions, and we followed those in our

12  analysis of the data.

13      **Q.    What was the -- what was the scientific**

14  **method -- or methodology?  What was scientific about it?**

15  **I know you described doing some form of statistical**

16  **analysis and looking more in depth at certain cases.**

17  **But explain why that is a scientific method.**

18      A.    Well, in social science, we are trained to do

19  qualitative and quantitative analysis of data, and it

20  was just a straightforward collection, descriptive --

21  statistically descriptive discussion and analysis and

22  qualitative analysis of the data.  You know, I don't

23  know what you mean by "scientific" in the way you're

24  asking the question other than to say that this is how

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 46

1    social scientists do research.  This is one type of

2    social science research: qualitative and quantitative

3    analysis of documentary materials.  That's just one type

4    of social science analysis.

5        Q.    So --

6        A.    Another type of social science analysis might

7    be a laboratory recreation.  Another type might be

8    interviewing people and then writing up -- looking for

9    patterns and writing up the analysis; sometimes more

10   statistical, sometimes less.

11       **Q.   So since you said you didn't understand what**

12   **the point of my first -- a part of my question, I want**

13   **to make sure that we're on the same page.**

14            **What do you understand the scientific method**

15   **to be in the social science context?**

16       A.    Well, there's scientific methodology -- social

17   scientific methodologies, and they can be qualitative or

18   quantitative analysis of the data.  And that's what we

19   were doing in the -- in the article.  So when you say

20   "scientific method," it seems a little bit of a misnomer

21   to me because it conjures up an experiment.  And what

22   I'm saying is there are different social science

23   methodologies, including experiments, including analysis

24   of quantitative data, whether descriptively or

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 47

1　inferentially, including case studies or case analysis

2　or aggregate case analysis.  So this is just a social

3　science method or approach to analyzing data.  There

4　isn't one scientific method.

5　　　　Q.　No, I understand that.  I didn't -- I wasn't

6　suggesting that there was.  But -- And whenever you

7　approach any research question, right, you've got a

8　hypothesis, right?

9　　　　A.　Sometimes you have a hypothesis.  Sometimes

10　it's exploratory and you're looking to the data to see

11　what patterns emerged.  There may or may not be a

12　hypothesis.

13　　　　Q.　All right.  And then you gather the data that

14　you're -- you mentioned earlier that you want to

15　aggregate or look at and analyze to determine either the

16　answer to the hypothesis or to find the patterns that

17　are part of the research question, right?

18　　　　A.　Correct.

19　　　　Q.　Okay.  And then using that data, you can

20　either rule in or out whatever the hypothesis is or you

21　can develop more information to answer the research

22　question, right?

23　　　　A.　That's certainly possible, yes.

24　　　　Q.　And all of the techniques that you just

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 48

1  described -- aggregate research or qualitative or

2  quantitative -- those help in reaching those types of

3  conclusions?

4      A.    Depending on the data, yes.

5      Q.    Okay.  So is there a sense that would be the

6  scientific method, right?

7      A.    I wouldn't call it the scientific method.  I

8  would say it's the social scientific approaches to

9  analyzing data, yes, as opposed to the scientific

10  method.

11     Q.    Well, I don't mean to put "the" in quotes.

12  You know, a scientific method.  I mean, all kinds of

13  scientists have different methodologies for answering

14  the questions that they come up with.  But at the end of

15  the day, they have to be able to present it to an

16  audience if they're going to -- if they're going to

17  declare there's conclusions to be drawn here, and the

18  audience should be able to replicate the experiment or

19  whatever the test was to say, yes, these conclusions are

20  valid, right?

21     A.    There's a lot in that question.  The article

22  that we did in 2004 lists all the cases; so yes, if

23  researchers wanted to reanalyze the cases to see if the

24  patterns we said existed or analyses were supported,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 49

1   they could do that, yes.

2       Q.   Okay.  But -- So -- But I don't think that

3   necessarily answered my question.  Do you agree with the

4   premise of what I just asked, or do you want me to have

5   it read back?  I'm not even sure I could say it again.

6       A.   Yeah, I think you'd have to have it read back

7   because when you use the word "audience," you kind of

8   threw me because the audience might be journalists; the

9   audience might be relatives; the audience might be

10  lawyers.  So it's not like the audience tries to

11  replicate what is in the study.  And -- and also, I

12  think, if I remember your question correctly, you were

13  talking about replicating a hypothesis, but I was also

14  telling you that some studies are exploratory.  It's not

15  just -- not all social scientific studies are about

16  testing or replicating hypotheses.

17      Q.   Well, no, I understand that, and maybe I

18  should have clarified.  When I -- You know, from the

19  science perspective, when [sic] an "audience," I mean

20  obviously your peers who would be doing those similar

21  types of studies and be the ones in the position to

22  check your conclusions.  Would you agree with that?

23      A.   I -- I think I would agree with that insofar

24  as it doesn't rely on your prior question.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 50

1      Q.    Yeah, we're only doing one question at a time.

2    Each one stands on its own merits, good or bad.

3           So do you agree with that -- what I just said

4    then?

5      A.    I just want to make sure I understand it.   I

6    think what you're saying -- correct me if I'm wrong --

7    is that my peer group of social science researchers in

8    my field of expertise are the ones who would evaluate

9    the research and be able to replicate it should they so

10   desire.   If that's the question, if I understand it,

11   then yes, the answer is yes.

12     Q.    Okay.  And you as a scientist would want to be

13   able to ensure that your conclusions can -- can be

14   replicated regardless of whether they -- your peers

15   wanted to do this because that's an important part of

16   the process?

17     MR. AINSWORTH:  Object to the form, compound.

18   BY THE WITNESS:

19     A.    Well, I think that oversimplifies.   I think in

20   an ideal world, yes.   But, you know, I -- I did one

21   study where I and my coauthor got a grant from the

22   National Institute of Justice, and one of the conditions

23   of that was that we made the data confidential.   We had

24   to.   So yes, there's -- there's competing values.   But

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 51

1    ideally, the process of social science inquiry is an

2    open and collective process, and ideally data would be

3    available for others to replicate, to further analyze,

4    to validate and verify conclusions, but it's just not

5    that simple because, again, there might be competing

6    considerations.  So I don't want to give an absolute

7    answer here.

8        **Q.    Well, I understand.  You know, there's the**

9    **one-off like you just described where you may be subject**

10   **to a confidentiality agreement or nondisclosure**

11   **agreement based on the nature of the crime.  But more**

12   **often than not, you would describe your methodology in a**

13   **peer-reviewed article because you want your methodology**

14   **to be transparent and known in case another researcher**

15   **wants to challenge your conclusions, true?**

16       A.    We -- Yeah, we always strive to be transparent

17   in our methodology and how we arrived at our conclusions

18   so that if other researchers want to evaluate or learn

19   more, they're able to.  That is -- that is a goal, yes.

20       **Q.    The 125 cases you relied on for the 2004**

21   **article, when you made determinations about proven false**

22   **confessions, are there any cases in which you relied**

23   **solely on media accounts?**

24       A.    No, I don't believe there were any cases in

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 52

1  which we relied solely on media accounts.  Now, I could

2  be wrong.  There was one case, if I'm remembering

3  correctly -- and this was 18 years ago -- where there

4  was a media account of the victim showing up alive after

5  the person had confessed to killing the victim.  We

6  might have relied on the media account in that case

7  or -- exclusively.  I just don't remember.  There may

8  have been other materials available.

9          There were cases of DNA exoneration that were

10  written about in the media, but there were also

11  materials available at that time from the Innocence

12  Project or descriptions by the Innocence Project.  We

13  did our best to gather as many materials as possible.

14  We did not rely on media materials exclusively in my

15  recollection in any of the cases, and we certainly

16  didn't substitute the judgment of the media for our own

17  judgment if there was a story suggesting somebody was

18  innocent.  We did our best to do our own independent

19  evaluation.  But because this was so many years ago, it

20  might be like in the examples I gave you that there was

21  a case here or there where we relied on the facts

22  reported in the media story.  And, of course, they were

23  extensively cited in the article so that anybody who

24  wanted to verify the sources of our data could go back

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 53

1    and do that.

2        **Q.    Would it be fair to say that of that 125**

3    **cases, that you did not have equal information in each**

4    **case?**

5        A.    Correct.

6        **Q.    All right.   Some you had more; some you had a**

7    **lot less, right?**

8        A.    Correct.

9        MR. AINSWORTH:   Object to the form of the question.

10   BY MR. MORAN:

11       **Q.    All right.   And in any type of analysis**

12   **similar to what you did for that 2004 article where**

13   **you're looking at confessions, making a determination**

14   **about proven false confessions, and then looking for**

15   **patterns or risk factors, that is going to be a problem**

16   **for you, that you will always be in a situation where**

17   **you have some cases with more information and some cases**

18   **with less information?**

19       A.    I would say it's -- it's a limitation, yes, or

20   potential limitation.   We ideally want to get as much

21   information as possible.   And there is no perfect data.

22   We do our best with the data in any situation that we

23   can gather.   So yeah, I would say it's a limitation, but

24   I wouldn't say it's necessarily a problem.   It depends

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 54

1   on a lot of other things.

2       Q.   **Well, what would it depend on?**

3       A.   Well, it might depend on the research question

4   you're asking and what -- what you're trying to get at.

5   And so ultimately, the limitations of a data set would

6   be defined by the scope of the research project and the

7   questions that one is trying to answer.  And there might

8   be research projects that are much more narrow in scope

9   where even though some cases one has more information,

10  the existing information is sufficient to answer the

11  research question.

12      Q.   **All right.  So let me ask you this:  Did**

13  **you -- and your article from 2004 with Professor Drizin**

14  **is frequently cited for the conclusions you drew about**

15  **juvenile status being a risk factor; is that fair to**

16  **say?**

17      A.   I think it has been cited.  I don't know how

18  frequently, yes.

19      Q.   **But for that particular proposition, right?**

20      A.   I think it has been cited for that

21  proposition, yes, or supporting an analysis of why age

22  is -- age and adolescence is a risk factor -- personal

23  risk factor for false confession, yes.

24      Q.   **Okay.  And I think you may have actually done**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 55

1    that in your report here in discussing why Mr. Jakes's

2    status as a juvenile was a risk factor in his

3    interrogation?

4         A.   I -- I think I cited -- I'd have to look at

5    the report.  But I think I cited it for the point that

6    juveniles are disproportionately represented in the

7    known studies or universe of proven false confessions.

8         Q.   And one of the points you're trying to make is

9    a cause and effect type of problem where being a

10   juvenile has -- the effect of being a juvenile -- or the

11   cause -- one cause, I should say, potentially a false

12   confession?

13        A.   Yeah.  But I wouldn't use that language.  I

14   think it's better to say that it increases the risk.

15   There's a probabilistic element to this.  So just like

16   not everyone who smokes gets lung cancer, not all

17   juveniles, as you pointed out earlier, who are

18   interrogated give false confessions.  It's -- it's a --

19   it's a tendency or probability.  It's more of a

20   correlation that we -- that we demonstrate in the

21   article, and then there's a whole body of developmental

22   and social and cognitive psychological research that

23   explains why that is.

24        Q.   Right.  And that research is focused on the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 56

1  **physiology and the brain development as people get older**

2  **and where someone might be at the age of 15 or the age**

3  **of 11, right?**

4      A.   It's focused, I think, on cognitive factors

5  and social factors and intellectual factors, part of

6  which involve the development of the brain and the

7  associated psychosocial immaturity of children and

8  adolescents and juveniles.

9      **Q.   And you have a couple times now compared the**

10 **question and answer -- you know the questions I'm asking**

11 **to smoking and smoking causing cancer, right?**

12     A.   Yes.

13     **Q.   Okay.  Have you actually read those studies**

14 **that have been done on whether smoking is a risk factor**

15 **for lung cancer?**

16     A.   In my life, I may have read one or two studies

17 or research written about those studies.  But no, I'm

18 not an expert on that body of research.  And really, I

19 was using that as -- as an example of the concept of

20 risk factor and probability.

21     **Q.   Right.  A very firmly established comparison,**

22 **by the way.  I think very few people dispute that**

23 **smoking is a risk factor for lung cancer, right?**

24     A.   That's my understanding, yes.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 57

1      Q.    Do you know whether in those studies control

2  groups were used?

3      A.    I haven't read these studies, so I'm -- I'm

4  not prepared to comment about them specifically.

5      Q.    Was a control group used for your 2004 article

6  with Professor Drizin?

7      A.    No, there's no control group in that kind of

8  study.

9      Q.    Is it possible --

10           When you analyze confessions and make

11  determinations about risk factors leading to false

12  confessions, do you ever use control groups?

13     A.    I'm not an experimentalist but -- which is to

14  say that the kind of research that I do is primarily not

15  experimental in nature, but there is -- there are other

16  researchers in the field who are experimentalists, and

17  that is a body of research that I rely on; and in that

18  research, I think there are control groups, yes.

19     Q.    So what I would like to do, though, is find

20  out you personally.  When you do your own analysis, do

21  you use control groups?

22     A.    No, control groups are typically done in

23  experiments, so there's no control group that -- that

24  I -- You'd have to ask me which study in particular.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 58

1  But no, typically, in my research, there isn't what

2  you're referring to as a control group.

3       Q.   Are there any techniques you employed to

4  isolate variables and determine whether those variables

5  truly are risk factors?

6       A.   There's no specific technique other than the

7  social science methodologies that I referred to.

8       Q.   How about regression analysis?  Have you ever

9  done that?

10      A.   Yeah, I've done regression analysis before.

11 That's one type of analysis.  I don't know if I've used

12 that in -- Well, yeah, I guess I -- it has -- we have

13 used that in some of the published work.  But yeah,

14 that's -- that's the statistical method that sometimes

15 researchers use in quantitative analysis.

16      Q.   Did you use aggression -- Or I'm sorry.  Did

17 you use regression analysis in the 2004 article with

18 Professor Drizin?

19      A.   No.

20      Q.   Let's see.  You've -- I want to come back to

21 the field studies you did with the Oakland Police

22 Department.  I think there were two other towns nearby

23 in California that you also drew some cases from.  Can

24 you remind me what those are?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 59

1      A.    Yeah, Vallejo and Hayward were two local

2   Bay Area police departments in my doctoral dissertation

3   study in the early 1990s.

4      **Q.    Oh, okay.  And there were -- You identified at**

5   **some point 125 cases from Oakland, and I think 30 cases**

6   **each from Vallejo and Hayward; is that right?**

7      A.    I think it was 122 from Oakland that I sat in

8   on and observed and then 30 from Vallejo and 30 from

9   Hayward where I observed full recordings of

10  interrogations and also analyzed case files, but I

11  didn't sit in on contemporaneously and observe those

12  interrogations.

13     **Q.    Okay.  Did you have access to the actual case**

14  **file?  And I'm going to -- If it's okay with you, I'm**

15  **going to add all of these data sets up.  So you have 122**

16  **plus 60, so you've got 182 altogether from this field**

17  **study, right?**

18     A.    Yes.

19     **Q.    And is it -- is it permissible to add all of**

20  **these up together, or is there a reason we should not do**

21  **that?**

22     A.    No, I -- I added them together in my analysis

23  in the doctoral dissertation and sought all the case

24  materials that were -- that were possible, and I was

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 60

1    provided police reports in those cases.  Obviously I was

2    provided what my research subjects would give me, and I

3    assume they gave me complete access to their files.  I

4    don't know whether that's actually true or not.  But I

5    sought to get as many materials as I could about those

6    cases and that -- because these were cases that were

7    being investigated where there were interrogations.

8    That was primarily the police reports that had been

9    written.

10        **Q.   So do you know what the ultimate outcome was**

11   **with these 182 cases from interrogation to either**

12   **arrest, charge, conviction?**

13        A.   The ultimate outcomes, no.  I was interested

14   in the interrogation process, so I didn't follow those

15   cases to their conclusion.  My recollection is that

16   virtually all of those individuals were arrested and

17   then interrogated custodially, but I did not follow

18   through on whether or not they were convicted or cases

19   were dismissed -- at least I don't recall doing that --

20   or took plea bargains.  I was interested in the

21   interrogation process in that study.

22        **Q.   The data you collected for the 182 cases, was**

23   **that data used in any other professional publications of**

24   **yours?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 61

1      A.   Yes, there were a couple articles that I think

2   were published in 1996 in The Journal of Criminal Law &

3   Criminology.  Those articles are, of course, listed on

4   my curriculum vitae.  I think one of those articles is

5   called Inside the Interrogation Room, and I think the

6   other article is called The Impact of Miranda Revisited

7   or something close to that.  And so those two articles

8   drew on data -- drew on those 182 cases.

9      **Q.   And did the 182 cases that you reviewed inform**

10  **any of your later conclusions as to what risk factors**

11  **may be present for false confessions?**

12     A.   I don't think they directly inform it.  One of

13  the findings to emerge in that study was about length of

14  interrogation, which has since been replicated.  And --

15  and so one of the findings I discuss in the article --

16  I'm sorry -- in the report is that typically most

17  interrogations last a half hour, 45 minutes.  But then

18  when we look at false confessions, of course,

19  interrogations last -- the interrogations leading to

20  false confessions tend to last much longer.  So in that

21  sense, it's relevant.  But this wasn't a -- this wasn't

22  a study of risk factors for false confessions.

23     **Q.   And when you compare -- or when you draw**

24  **conclusions about what a length of an interrogation**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 62

1 **typically is on average, you're comparing many different**

2 **types of crimes that are being investigated, right?**

3      A.   Well, I'm not sure we're comparing them.  That

4 may or may not be the case.  But yes, it might be that

5 there's a study that includes burglaries and robberies

6 and homicides, so it -- it might include interrogations

7 for different crimes, yes.

8      **Q.   And different crimes will be treated**

9 **differently based on severity of crime -- and by**

10 **"treat," I mean by the police -- true?**

11      A.   Yes, that's what we believe, that the more

12 severe crimes tend to gather more attention, yes.

13      THE WITNESS:  I need -- I need a restroom break --

14      MR. MORAN:  Yeah.

15      THE WITNESS: -- if this is a good breaking point.

16      MR. MORAN:  Any time you want, Doctor, we can take

17 a break.  So now is fine.  How much time do you want?

18      THE WITNESS:  Well, typically, five minutes is

19 the -- is the least we take.  So if a five-minute break

20 is okay, I would say five; if people want longer, that's

21 fine too.  But I would recommend five.

22      MR. MORAN:  That's fine with me as long as

23 everybody else --

24      THE VIDEOGRAPHER:  The time is 11- --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 63

1      THE WITNESS:  Okay.

2      THE VIDEOGRAPHER:  Sorry.  The time is 11:19 a.m.

3  We're going off the record.

4                    (A short break was had.)

5      THE VIDEOGRAPHER:  The time is 11:25 a.m.  We are

6  now back on the record.

7  BY MR. MORAN:

8      **Q.   Okay.  Doctor, you know, I meant to ask you a**

9  **couple questions.  And I know -- I need you to confirm**

10  **that you are not relying on these 250 cases cited in**

11  **Footnote No. 6 for your opinions in this case?**

12      A.   I am not.

13      **Q.   Okay.  And why did you include those 250 cases**

14  **in that footnote?**

15      A.   It was just additional information.  I think

16  it was the third citation.  I've thought for many years

17  that I would be able to finish this study sooner.  Some

18  of the cites -- some of the footnotes, you know, whether

19  it's a publication or report, sometimes include multiple

20  sources.  But no, I'm not relying on those 250 cases.

21      **Q.   How many years is that work -- or, I guess,**

22  **study been in progress?**

23      A.   Forever.  Probably ten.

24      **Q.   Is there an end in sight?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 64

1      A.   I certainly hope so.  I'm doing my best.

2      **Q.   Well, that's -- Okay.  So we were talking**

3   **about length of interrogation, I think, when we left**

4   **off.  But I actually want to come back to something.**

5   **When you -- Yeah, let me -- let me go backwards a little**

6   **bit.**

7          **The cases that you have personally analyzed**

8   **for publications that you've -- you know, you've**

9   **written, like the 2004 article with Professor Drizin,**

10  **what -- how many cases do you think in total you've**

11  **analyzed?  And I don't mean like getting cases where you**

12  **are a retained expert and reviewing it or as a retained**

13  **expert.  I mean where you've purposely gone out and**

14  **gathered data as a social scientist to perform the**

15  **functions as a social scientist in drawing conclusions.**

16     MR. AINSWORTH:  Object to the form of the question.

17  You mean like any case he's looked at even if it doesn't

18  meet criteria or things like that?

19     MR. MORAN:  That's -- I think cases that he's

20  looked at and used in publications.  Like we have 125

21  for the article with Professor Drizin.  We have 182,

22  although it's slightly different, for the work he did in

23  Cali- -- early in his career.

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 65

1    BY MR. MORAN:

2        **Q.   Do you understand what I'm talking about,**

3    **Doctor?**

4        A.   I think so.  I would say probably thousands

5    but at least hundreds.

6        **Q.   Okay.**

7        A.   And sometimes there are cases that I consult

8    on and -- and then end up analyzing as part of my

9    research.  So there -- there -- there -- there

10   oftentimes or sometimes at least is an overlap.

11       **Q.   Do you take the cases -- You're, let's say --**

12   **I think I read somewhere that you are retained as an**

13   **expert 60 to 80 times a year; is that accurate?**

14       A.   I think that's accurate.  I think it's going

15   to be less than 60 this year.  But yes, I think that's

16   an accurate average.

17       **Q.   How long has that average been in existence?**

18       A.   Well, I've been working as a consultant or

19   expert witness on cases going back to 1996.  It would

20   have been fewer cases back then.

21       **Q.   Yeah.**

22       A.   But it might have peaked, you know, a decade

23   or so ago.

24       **Q.   Okay.  And in terms of your work as a**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 66

1  **testifying expert, what percentage of it is for criminal**

2  **defendants?**

3      A.   Virtually all the cases I've testified in.  So

4  I -- I would -- I've testified now in almost 400 cases,

5  and I would estimate that 385, 390 of those are criminal

6  cases.

7      **Q.   Okay.**

8      A.   So --

9      **Q.   Let's go --**

10      A.   -- that's the -- that's the norm.  The civil

11  cases are the exception.

12      **Q.   Got it.**

13      **And so let's go -- let's go with that number,**

14  **approximately 400, give or take.  Roughly 15 cases then,**

15  **in your estimation, are civil cases, right?**

16      A.   Yes.

17      **Q.   All right.  In those civil cases, what**

18  **percentage are for the plaintiff who is making a claim**

19  **of either a false confession or fa- -- or wrongful**

20  **conviction, something like that?**

21      A.   I -- Most of them, I think, would be for the

22  plaintiff.  I'd have to review my -- my records.  And

23  there may be less than 15.  And some of the civil cases

24  that I'm thinking of were like habeas cases that were

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 67

1 technically civil but really might be more accurately

2 called criminal, so --

3     **Q.   How about this:  I'll draw the distinction for**

4 **you.  A civil rights lawsuit which a plaintiff is suing**

5 **a municipality or police officers for some violation of**

6 **civil rights and seeking compensation.  How many of**

7 **those cases -- What percentage of your -- Yeah, how many**

8 **of those cases do you have?**

9     A.   I can only recall testifying in one of those

10 cases, though I could be wrong.  So how many of those

11 cases do I have?  Is that what you're asking?  Like am I

12 consulting on?  Those cases typically settle.  I would

13 say at any given time, I probably have five of those

14 cases maybe.

15     **Q.   Okay.**

16     A.   But I could be wrong, you know.  I mean, it

17 could be more.  But I rarely testify in -- at least at

18 trial in civil rights cases, 1983 cases.

19     **Q.   Sure.  And so -- And just to be clear, Doctor,**

20 **what I'm talking about are cases in which you are hired**

21 **to eventually become a testifying expert even though**

22 **your testimony may not have been taken as of today.**

23 **Right?**

24     A.   Okay.

Page 68

1    Q.   Do you understand that?

2    A.   Yes.

3    Q.   Okay.  What percentage of your work as a

4  testifying expert has been on behalf of a police

5  department or police officer or village or city, any

6  municipality, defending a confession?

7    A.   Okay.  So -- so when you say as a testifying

8  expert, I've never testified in a case like that, if

9  that's your question.

10   Q.   That's not my question.

11   A.   If the question is -- Okay.  But the way I

12 think about it is, I am retained as a consultant, and

13 sometimes I end up testifying and sometimes I don't.

14   Q.   So --

15   A.   And those 60 to 80 cases are cases in which

16 I've consulted.  So if -- if the question you're asking

17 is as a consultant and/or testifying expert, then --

18   Q.   Let me clarify for you, Doctor.  Okay?  Just

19 tell me you don't understand and I'll try and -- I'll do

20 my best to fix the question.  And I think the problem

21 is, you're drawing a distinction between testifying and

22 consulting.

23        So you're hired typically to consult with the

24 expectation that if the case proceeds, you may be

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 69

1    required to testify.  Is that fair to say?

2        A.    I may be required to, yes.

3        Q.    Okay.  So I'm looking at the universe of those

4    cases.  And it may be that you have not actually

5    testified yet, or you've had cases in which you were

6    hired and the case settled or was resolved in some way

7    before you were required to testify.  Okay?  Does that

8    help clear up the question?

9        A.    Yes.

10       Q.    Okay.  What percentage of the cases in which

11   you've been engaged as a consultant or retained expert

12   are on behalf of a municipality or police officer

13   defending accusations that a confession was coerced?

14       A.    Zero in the civil rights context.  In the

15   criminal context, there may be a few cases.

16       Q.    What's a few?

17       A.    Zero to five.  There are -- there are

18   occasions where I'm retained by the prosecution.

19       Q.    Okay.  All right.  Would it be fair to say

20   that 99 percent of your work as a retained expert

21   consulting or testifying has been on behalf of

22   individuals alleging that their civil rights were

23   violated or a confession was coerced?

24       A.    Coerced or unreliable or that a witness was

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 70

1  coerced, typically.  I don't know if it's 99 percent but

2  the vast majority, yes.

3      Q.   Okay.  Would it be less than 99 or more?

4      A.   It could be.  It could be 98.  It could be

5  99.7, but --

6      Q.   Because it sounds to me like four out of

7  five -- zero to five out 500 is what we're talking

8  about, right, that you would be representing in the

9  opposite direction, that the village or the police

10 department or the police officer defending against

11 accusations that a confession was coerced or a statement

12 was coerced, right?

13     A.   I'm not sure -- I don't know about the 500

14 denominator.  But yes, it's -- typically I'm contacted

15 either by criminal defense attorneys or public defenders

16 to evaluate the interrogation of whether it was

17 psychologically coercive and/or had risk factors or

18 indications that it was false or unreliable.  In the

19 criminal context and typically in the civil context, I'm

20 retained by plaintiffs, whether it's a 1983 suit or not.

21     Q.   Okay.  So in other words, there's virtually no

22 work in which you're representing -- where you've been

23 called to give opinions or consult for police officers

24 who are defending against accusations that they coerced

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 71

1  a statement or a confession, true?

2       MR. AINSWORTH:  Object to the form of the question.

3  BY THE WITNESS:

4       A.   Yeah, so I -- so I -- you know, I'm not a

5  licensed attorney.  I don't practice law, so I'm not

6  representing.  But yes, those are -- Typically, I don't

7  get involved in those cases.  I don't --

8       Q.   Let me -- let me clarify for you, because I

9  think then -- I may have asked a bad question.

10           I don't mean are you representing in the legal

11  context.  You're called upon as an expert and to give --

12  to consult or give opinions on whether a confession or a

13  statement was coerced.  Have you ever been called upon

14  to do that by police departments, police officers, or

15  villages to defend against accusations that a confession

16  or statement was coerced?

17       A.   Not that I recall.

18       Q.   What is -- And you work obviously at the

19  University of San Francisco law school, right?

20       A.   Right.

21       Q.   Are you currently teaching?

22       A.   Well, I'm on sabbatical this year, but yeah, I

23  do teach every year.  So I return to teaching in August.

24       Q.   Okay.  And prior to your time on sabbatical,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 72

1    how many classes were you teaching?

2         A.   Well, I -- since 2015, I've been teaching

3    three courses a year.  Prior to that, I was teaching

4    four courses a year.

5         Q.   What are the three courses?

6         A.   Well, now they are two sections of criminal

7    procedure investigation and a seminar on police

8    interrogation and confessions.  In the past, I've also

9    taught criminal law and a seminar on wrongful

10   convictions.  So it's a combination of those courses,

11   typically two doctrinal courses, whether it's two

12   sections of criminal procedure or one of criminal

13   procedure and criminal law -- excuse me -- and one

14   seminar, whether it's a seminar on wrongful conviction

15   of the innocent or police interrogation and false

16   confessions.

17        Q.   Do you re- -- Okay.  So what I want to do is

18   ask you about your sources of income.  And obviously,

19   one source of income would be the University of

20   San Francisco law school, right?

21        A.   Correct.

22        Q.   Another source would be publications?

23        A.   Well, yeah, that's true, although I very --

24   make very, very little money on publications, but yes.

Page 73

1    Q.   And obviously, as a consultant or testifying

2  expert, the 5- -- 400 or so cases in which you've

3  been -- Actually, let me back up a second.  Let me ask

4  it a different way.

5         Another source of income is your work as a

6  retained expert?

7    A.   Correct.

8    Q.   Okay.  You had referenced that number 400.  Is

9  that the number of cases you've had or the number of

10  cases in which you've testified?

11   A.   No, that's the number of cases in which I've

12  testified.  I think it's in the 390s.  So approximately

13  400 times I think is what I said.  That's the number of

14  cases going back to 1997 in which I've been qualified

15  and testified either in a pretrial hearing, at trial, or

16  in a post-conviction proceeding.

17   Q.   What is the number of total cases you've been

18  retained as an expert in ma- -- regardless of whether

19  you've testified?

20   A.   That number is over 2,000, and that goes back

21  to 1996.

22   Q.   Do you have any idea on average how much you

23  earn per case?

24   A.   No.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 74

1     **Q.**   **Have you ever tried to find out?**

2     A.   Not per case, no. I mean, most of the cases I

3 do are criminal cases and they don't involve a lot of --

4 typically a lot of time. And then civil cases like this

5 are very time intensive. When I think about my -- what

6 the university calls outside professional activities,

7 which is the activities not being a professor that

8 generate income primarily as a consultant and/or expert

9 witness, I tend to think about -- you know, when asked,

10 what is the -- what is the income? I don't think about

11 income per case or how much money I make per case.

12     **Q.**   **Okay. What is your total income annually?**

13     A.   I'm just going to shut my door real quick.

14 Hold on a second. My -- my income varies. My salary --

15     MR. AINSWORTH: Hang on, Dr. Leo.

16     THE WITNESS: Sorry.

17     MR. AINSWORTH: I'm going to ask that this portion

18 of the deposition be marked confidential. Is that okay,

19 Pat?

20     MR. MORAN: Yeah, that's fine.

21     MR. AINSWORTH: Okay. Thank you.

22       Go ahead, Dr. Leo.

23             (PURSUANT TO AGREEMENT, LINES 23-24

24             ON PAGE 74 THROUGH LINES 1-17 ON

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 75

1            PAGE 77 WERE BOUND UNDER SEPARATE

2            COVER.)

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 77

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   BY MR. MORAN:

19        Q.   Okay.  You have published articles -- or

20   maybe -- yeah, I think the articles -- in the last few

21   years discussing why experts should be allowed to

22   testify related to false confessions, right?

23        A.   I don't know if I've done that in the last few

24   years.  I'm -- I'm sure I've written some stuff about

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 78

1    that.  But are -- Do you want to direct me to an article

2    in particular or articles?

3        Q.    Well, I mean -- Let me -- Let's sort of cut to

4    the chase a little bit.  You acknowledge that you've

5    written those kinds of articles, right?

6        A.    I don't think so.  I mean, I think I've

7    written about expert witness testimony, but I don't

8    think I've written an article just about expert witness

9    testimony.  The context in which that would come up

10   would -- would be that there are safeguards or reforms

11   for minimizing false confessions leading to wrongful

12   convictions.  But I -- I haven't really written very

13   much about that.  And -- and -- and that's why I'm

14   wondering what you're referring to in particular.

15       Q.    Well, there's a 2021 article you wrote with

16   Laura Nirider from Northwestern --

17       A.    Okay.

18       Q.    -- where you discussed why -- the need for

19   experts to address false confessions and how juries are

20   not -- juries and judges and most lawyers are not

21   equipped to readily identify false confessions.  Does

22   that ring an bell?

23       A.    Yeah.  So -- so that's a chapter that was

24   written many years ago for an edited volume that has yet

Page 79

1    to come out.  And I would not have written that section

2    of the article, but I was the third author.  I think

3    Nirider -- Laura Nirider was the first author.  So that

4    jogs my memory a little bit.  But I would have to look

5    at that particular section if you want to ask me any

6    questions about it.  But I think that's a section in the

7    chapter.  I think we were asked to write about that, the

8    chapter, as part of, like, an encyclopedia of psychology

9    and law or encyclopedic volume.

10        **Q.   You know, the one I found was -- the version**

11   **of it I found was cited as a litigation handbook.**

12        A.   Okay.  Yeah.

13        **Q.   Okay.  And that litigation handbook, was that**

14   **a publication for attorneys?**

15        A.   I assume so.

16        **Q.   Okay.**

17        A.   The person who commissioned that is a lawyer

18   and a psychol- -- excuse me -- a psychologist, and I

19   think what he was doing -- this was many years ago -- I

20   think he gathered a bunch of authors and he wanted us to

21   write on law, psychology, and social science topics that

22   are relevant to lawyers and litigators and then asked us

23   to write this chapter.  And, you know, I was the third

24   author on this chapter that was written a long time ago

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 80

1   but still hasn't come out.

2       Q.   **Well, it's essentially a practice guideline,**

3   **right?  It's going to be used by lawyers in how to**

4   **address cases with false confession?**

5       A.   I wouldn't classify it, based on my

6   recollection, as a practice guide because I think at

7   least the chapter that we wrote discusses a lot of

8   academic research.  But the audience, I think, is

9   primary -- primarily lawyers.  That's my understanding.

10  But if -- if I were putting together a practice guide, I

11  would imagine it to be less academic and less discussing

12  of the research and more just telling lawyers how to

13  litigate cases.  And I don't think that chapter or that

14  book does it -- does that.  So I -- I think of it as

15  much more than just a practice guide.

16      Q.   **Okay.  By the way, have you ever litigated a**

17  **case as a lawyer?**

18      A.   No, I have not.  As I mentioned earlier, I am

19  not a licensed attorney.  I didn't take a bar exam.  So

20  no, I've never litigated a case.

21      Q.   **Okay.  And so you have no recollection of**

22  **writing any publication in which you address the need**

23  **for experts to help juries answer questions related to**

24  **false confessions?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 81

1      A.   I recall in my 2008 book, Police Interrogation

2  and American Justice, writing about expert witness

3  testimony as one policy reform, I think I called it,

4  among many others that might, again, minimize wrongful

5  con- -- false confessions leading to wrongful

6  convictions.  It's possible in other contexts that I've

7  written about the value of expert witness testimony.  I

8  think I co-wrote a chapter many years ago in a book

9  about expert witness testimony.  I'd have to

10  double-check.  Some of the articles I've worked with

11  with coauthors.  I think there's been -- not articles

12  but chapters in edited volumes there's been discussion

13  of that.  Typically, I haven't written that up.

14      Q.   **Well, I mean, if your name is on a published**

15  **article, you're --**

16      A.   Correct.

17      Q.   **-- you had responsibility for that article,**

18  **right?**

19      A.   Yeah, yeah.  No, fair enough.  But --

20      Q.   **So --**

21      A.   I'm trying to be responsive to the way you

22  asked the question before.  But yes.

23      Q.   **I get it.**

24           **Would you agree with me that in those**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 82

1  situations, you have a financial interest in advocating

2  for increased use of experts to address questions of

3  false confessions since you --

4       MR. AINSWORTH:  Object to the form -- Oh, sorry.

5  Go ahead.

6  BY MR. MORAN:

7       Q.   Since you obviously make a substantial part of

8  your living as a consulting or testifying expert?

9       MR. AINSWORTH:  Object to the form of the question.

10  It's compound.  It's argumentative.  And I don't know

11  what you mean by the beginning qualifier that you used.

12  BY MR. MORAN:

13       Q.   Go ahead, Doc.

14       A.   No, I -- I -- I wouldn't say that.

15       Q.   Have you --

16            In any -- any situation in which an expert

17  publishes any kind of peer-reviewed article or academic

18  article advocating for the increased use of experts in

19  that particular field has a financial interest in that

20  kind of advocacy, regardless of whether they're

21  intending to make a policy change, as you pointed out,

22  or not, they have a financial interest in advocating for

23  the use of experts?

24       A.   I guess --

Page 83

1      MR. AINSWORTH:  Object --

2 BY THE WITNESS:

3      A.   -- it just depends --

4      THE WITNESS:  Sorry.  Go ahead, Russell.

5      MR. AINSWORTH:  Object to the form of the question.

6 It's assuming facts not in evidence.

7           Go ahead.

8 BY THE WITNESS:

9      A.   I think it just depends.  I mean, it's a very

10 general question.  So I think it just -- I think you

11 need more information to -- I would need more

12 information to answer that.

13     **Q.   All right.  What information would you need?**

14     A.   I'd want to know more about the expert.  I'd

15 want to know more about what they're writing about; what

16 they're advocating for, not advocating for; what

17 qualifications they used.

18     **Q.   Okay.  Advocating for experts to be allowed to**

19 **testify -- to be used and allowed to testify in cases**

20 **involving false confessions.  Does that help you?**

21     A.   Not really.

22     **Q.   Well, tell me why that doesn't help you.**

23     A.   Because it's so -- The question is at such a

24 vague level of generality.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 84

1      Q.   Did you cite any articles in your report

2   discussing juror beliefs?

3      A.   Yes, I believe I did.  There are surveys

4   that -- that show that false confessions are

5   counterintuitive, that people tend to be very skeptical,

6   yes.

7      Q.   Okay.  And part of the point is, that experts

8   are needed to help clear up that problem or that --

9   that -- that misimpression about confessions, right?

10     A.   I didn't say experts were needed, but I do

11  think that it meets the foundations of expert testimony,

12  which is that experts testify about phenomena that are

13  both counterintuitive or outside common knowledge and

14  that are, in a legal sense, prejudicial.  And so it

15  establishes -- those studies establish that this is not

16  common sense how police interrogation works or how and

17  why they would lead to false confessions.

18     Q.   Okay.  And essentially, in that situation,

19  you'd be framing it as a policy question, that experts

20  should be allowed to testify in such cases as a sort of

21  protection against the risk of false confessions, right?

22     A.   Well, that's how I wrote about it in my -- in

23  my book chapter, that this is one of many possible

24  safeguards against false confessions leading to wrongful

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 85

1  convictions, yes.

2       **Q.   Shouldn't that type of chapter then contain a**

3  **disclaimer that the author regularly acts as an expert?**

4       MR. AINSWORTH:  Object to the form of the question,

5  argumentative.

6            You can answer.

7  BY THE WITNESS:

8       A.   I think that in my book I was not advocating

9  for it; I was suggesting it's one policy solution to a

10  complex problem.  There are others.  And I think in my

11  book I describe that I often work as an expert

12  witness --

13       **Q.   Does your --**

14       A.   -- or a consultant.

15       **Q.   Does your -- That particular book you're**

16  **talking about, does it contain any kind of disclaimer**

17  **that you are frequently a -- hired as an expert and have**

18  **a financial interest in -- in advocating for more use of**

19  **experts?**

20       A.   No, it does- -- I don't believe it contains a

21  statement to that effect, that -- that -- what you're

22  calling a disclaimer.  I think it contains a description

23  that I work as a consultant and/or expert witness.  I'd

24  have to go back and look.  The book is 13 years old now.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 86

1  But not -- not the language you're using about financial

2  incentive.

3      Q.   How about your article in I think it's 1999,

4  what do potential jurors know about false confessions --

5  or no, What Do Potential Jurors Know About Police

6  Interrogation Techniques and False Confessions?  You

7  wrote it with Brittany Liu, L-I-U?

8      A.   Correct.  So that's a 2009 article, yes.

9      Q.   And that concludes with a discussion about

10 what experts can provide to help jurors understand,

11 right?

12     A.   I haven't looked at that article in years, but

13 that -- that makes sense that it would provide -- it

14 would discuss that, yes.

15     Q.   Do you want to see the end of it?  I can show

16 it to you.

17     A.   Yeah, I mean, if you're referring to something

18 specific, that would help.

19     Q.   Sure.

20     MR. MORAN:  Russell, I don't know if I sent this to

21 you, but ...  So my apologies in advance.

22 BY MR. MORAN:

23     Q.   Okay.  So this is the article, Doctor.  And

24 you can see the title.  We're looking at it right now.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 87

1      A.    Yeah.

2      MR. MORAN:  And, Russell, this is Bates-labeled Leo

3  Subpoena Response 799.

4      MR. AINSWORTH:  Thank you.

5  BY MR. MORAN:

6      Q.    And I'm going to skip to the end, Doctor,

7  where you discuss expert witnesses.  Okay.  And

8  specifically, the top -- the very first sentence in the

9  last paragraph, "This study offers -- also offers

10  empirical support for the potential value of expert

11  witness testimony in cases involving alleged false

12  confessions."

13           And I don't know that I -- You know, that

14  sentence I think sums up what I'm getting at is -- you

15  know, this is obviously meant to be, it looks like, a

16  peer-reviewed article in which you are making a

17  statement about the value of expert witnesses; agreed?

18      A.    Yeah, potential value, yes.

19      Q.    Okay.  And this is a situation in which you as

20  the author also have a financial interest in being used

21  as an expert witness more often than not regardless of

22  whether that was your intention in writing this article;

23  agreed?

24      A.    I guess I want to know what you mean by

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 88

1    "financial interest."

2         **Q.   Well, you said your top year you made $340,000**

3    **mostly as a consulting expert; and on average, you think**

4    **you've been making 150,000 to 175,000 as a consulting**

5    **expert.  So that to me seems like you have a financial**

6    **interest in the increased use of experts like yourself**

7    **in false confession cases.  Does that clarify it for**

8    **you?**

9         A.   Yeah, I just wouldn't characterize it that

10   way.  I -- I -- I -- I don't think that a sentence like

11   this based on empirical research has anything to do with

12   a financial interest in doing expert work.

13        **Q.   You specifically couched it as a need, though,**

14   **to help juries understand false confessions, right?**

15        A.   Well, it doesn't say "need," but it offers

16   supports for the value of expert testimony in the small

17   number proportionately of cases involving confessions

18   that go to trial.

19        **Q.   Well, I mean, so, for example, the next**

20   **sentence in the paragraph I just read, "Although at the**

21   **general level potential jurors recognized that**

22   **interrogation techniques may be coercive, they also**

23   **perceived the techniques as helpful, in that they likely**

24   **elicit true but not false confessions."**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 89

1      A.    Okay.

2      Q.    "Experts may inform jurors that coercive

3   interrogation techniques can lead to false confessions

4   and how and why they may do so."

5           So I think in -- in reading more sentences

6   from this paragraph, would you agree that this paragraph

7   is advocating for the use of expert witnesses to help

8   juries understand false confessions?

9      A.    I think it's describing the potential value.

10  I wouldn't describe it as advocacy.  If I were writing

11  an advocacy piece, I would have written it differently,

12  and I would have made it the focus of the article, and I

13  would have made arguments about it.  This is -- So I

14  don't think advo- -- I wouldn't characterize this as

15  advocacy.

16     Q.    Okay.  Well, regardless of whether you would

17  personally characterize it as advocacy, do you agree

18  that a person could read this and read it as advocating

19  for the use of expert witnesses?

20     MR. AINSWORTH:  Object to the form of the question,

21  calls for speculation.

22  BY THE WITNESS:

23     A.    That's certainly how you're reading it.  So --

24     Q.    Well, yeah --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 90

1    A.    -- "the study offers empirical support for the

2    potential value," I agree somebody could read that as

3    suggesting there is value in expert witness testimony in

4    disputed interrogation -- disputed confession cases for

5    a jury that is tasked with determining the innocence or

6    guilt of a criminal defendant.

7    **Q.    So, Doctor, all I want to know is, regardless**

8    **of what your intentions were, do you recognize the**

9    **potential here for someone -- Or actually, let me back**

10    **up a second.**

11    **Do you recognize the potential here for a**

12    **conflict of interest in that you are suggesting experts**

13    **like yourself should be hired more for helping juries**

14    **understand false confessions?**

15    A.    I -- I don't believe that I suggested experts

16    should be hired more.  This was a policy discussion.  I

17    didn't argue explicitly for hiring experts.  This is --

18    **Q.    Well, let me just stop you right there because**

19    **that's actually not answering the question.  I**

20    **understand that you may have had a different purpose in**

21    **writing this article.  That's not the question.**

22    MR. AINSWORTH:  Please let -- please let him answer

23    the question.  And so if he's not responsive, then just

24    wait until he's done answering the question; then you

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 91

1  can say, That didn't answer my question.  Here's my

2  question.

3       MR. MORAN:  I would love to, Russell, but I --

4  mostly I have been doing that.  But I want to cut to the

5  chase here because I don't want -- I don't want us to be

6  here seven hours, and I know you don't want to either,

7  but ...

8  BY MR. MORAN:

9       **Q.   Doctor, my point is, regardless of what your**

10  **purpose was, the fact that you are an author here and**

11  **you work as a consulting expert, do you recognize a**

12  **potential conflict of interest exists?**

13       A.   No.

14       **Q.   Okay.  If such a conflict of interest were**

15  **present, would the author be required to include in a**

16  **disclaimer or in some form disclosing the fact that he**

17  **or she has a financial interest in the outcome -- or in**

18  **the -- in the increased use of such experts?**

19       A.   To my knowledge, there would not be -- if

20  you're asking a hypothetical question, there would not

21  be -- if -- there would not be a requirement.  There are

22  some publications that make you declare that you have no

23  financial conflict of interest.  Most, to my knowledge,

24  do not if there was a financial conflict of interest.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 92

 1      Q.   Okay.  By the way, this is Exhibit No. 3 for

 2   the record.

 3           Doctor, we're going to mark -- I don't know if

 4   I did this already -- but your CV as Exhibit No. 2 and

 5   your report as Exhibit No. 1.  Okay?

 6      A.   Okay.

 7      Q.   By the way, when you do the work that you're

 8   hired to do as a consulting expert -- I'll take this

 9   down real quick -- do you have any assistance from

10   anyone in -- in reviewing materials or collecting data

11   that you're ultimately going to use for your

12   conclusions?

13      A.   I just want to make sure I understand your

14   question.  You're talking about when I'm working in my

15   role as a consultant or expert witness, do I rely on any

16   assistance?  And no, I don't have anybody working for me

17   on cases in which I work as a consultant and/or testify

18   as an expert witness.

19      Q.   Okay.  So, for example, you wouldn't use any

20   law students for that kind of work?

21      A.   Correct.

22      Q.   All right.  And what percentage of your

23   time -- your professional time -- or actually, just what

24   percentage of your time is taken up with your consulting

Page 93

1    practice?

2         A.    The aspiration is 20 percent of my workweek.

3    So that's what I aim for, 20 percent of my work time.

4         Q.    And how many hours a week in terms of your --

5    You've broken it down into percentages.  So what is

6    100 percent of your work?

7         A.    I don't know.  I think I work 60 to 80 hours a

8    week, but my kids would tell you it's more than that,

9    and maybe it's less.  I'm not always as efficient as I

10   would like to be.  But that would be my estimate, you

11   know, 60 to 80 hours a week, but, you know, it may be

12   high; it may be low.

13        Q.    Do you hold the view that all interrogations

14   in the United States are highly scripted?

15        A.    No.

16        Q.    Do you hold the view that all interrogations

17   in the United States are deceptive?

18        A.    Not all interrogations, no.

19        Q.    Do you hold the view that interrogations in

20   America are wholly deceptive?

21        A.    When you say "wholly deceptive," what do you

22   mean?

23        Q.    Well, I'm actually quoting you.  So I'm going

24   to have -- Do you understand -- It's from your article

Page 94

1   **with Laura Nirider.  Did I say her name right, Nirider?**

2   **Is it Nirider?**

3       A.   I think she says Nirider.

4       **Q.   Nirider.  Okay.**

5       **So it's -- it's from your article with**

6   **Laura Nirider in which it stated that interrogations in**

7   **America are wholly deceptive.**

8       A.   Yeah, so I -- I -- I -- I don't remember the

9   context in which that statement was made, but I would

10  disagree with just that sentence, that interrogations

11  are wholly deceptive.  And I'll have to go back and look

12  at that chapter and see if in context I agree or

13  disagree.  But if what you're trying to get at is, is

14  every interrogation 100 percent deceptive, no.

15      **Q.   Well, no, I'm asking whether this is a view**

16  **you hold.  I mean, it's -- And you're telling me that it**

17  **is not; is that accurate?**

18      A.   I answered the question.  All I would do is

19  repeat my answer.

20      **Q.   Yeah.  All right.  Well, here, I'll -- I'll**

21  **pull the article up for you.  Where is ...**

22      MR. AINSWORTH:  What's the name of the article,

23  Pat?

24      MR. MORAN:  It is -- I'm going to tell you in just

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 95

1  a second.  I'm pulling it up.  It's got a longer name

2  than what's on here.  It's Interrogative Suggestibility.

3  It's sent to you as an exhibit with his name and

4  Nirider's name.

5        THE WITNESS:  It's a book chapter, yeah.

6        MR. MORAN:  Yeah, it's a book chapter, right.

7  BY MR. MORAN:

8        **Q.   Okay.  And you can see that -- And, Doctor,**

9  **actually, I mean, you've sent us the links to most of**

10 **your works, and this is what usually the cover page**

11 **looks like when you pull it up.  Are you familiar with**

12 **that?  It has this little USF emblem on it and**

13 **designation that it's from the University of**

14 **San Francisco law school.**

15       A.   Right.  So these are downloadable free

16 publications on what's called the Social Science

17 Research Network, and the University of San Francisco

18 law librarians upload them.

19       **Q.   Okay.  So I'm going to jump to the phrase --**

20 **where the phrase is located, Doctor.  But while I'm**

21 **scrolling through the first couple of pages, you can see**

22 **it's Chapter 12 on Interrogative Suggestibility by you,**

23 **Ms. Nirider, and Deborah Davis, right?**

24       A.   Yes.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 96

1      Q.   Okay.  Any reason to believe this is not the

2   chapter that you wrote just from looking at what we're

3   looking at?

4      A.   No.  No, I have no reason -- I -- This looks

5   like you downloaded it from the Social Science Research

6   Network.  This has not yet been published, but it looks

7   like you downloaded correctly the -- what has been

8   posted.

9      Q.   Okay.  So I'm going to go to Page 13.  And

10  actually, it's probably easier if I just do a word

11  search to find the word.  And you see the word popped

12  up, and it's in the middle of the first -- first full

13  paragraph.  And the sentence says, "Interrogation as

14  currently practiced in the U.S. is highly scripted and

15  deceptive process -- a highly scripted and deceptive

16  process."  And I'll just stop right there, Doctor.

17          Does seeing this refresh your recollection as

18  to whether you, you know, were part of the group of

19  authors writing on this subject matter?

20     A.   Yes.

21     Q.   Okay.  And would you agree with me that this

22  is taking a position that interrogations as practiced in

23  the United States is a highly scripted and deceptive

24  process?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 97

1     A.    Yes.

2        Q.    Okay.  And do you hold that belief today?

3     A.    Yes.

4        Q.    Okay.  And then this next paragraph, we just

5   came upon it.  And this is on Page -- let's see -- 19.

6   We're going to call this Exhibit No. 4.  "Other lies are

7   exceedingly consequential as well.  Indeed, as Davis

8   reviewed in detail, interrogation as currently practiced

9   in America is wholly deceptive."

10          Does this refresh your recollection as to

11   being part of the group of authors asserting this

12   proposition?

13     A.    Yes.

14        Q.    Okay.  And do you hold this belief right now?

15     A.    I don't think the word "wholly" shall be

16   there -- should be there.  I'm going to contact the

17   editors and try to get rid of that word, "wholly."  I

18   don't -- I don't recall it there so I appreciate your

19   re- -- your refreshing my recollection.  I would

20   maintain that interrogation in America is highly

21   deceptive, often deceptive, lots of deceptive techniques

22   and strategems.  The problem with the word "wholly"

23   there is that it suggests it's 100 percent deceptive

24   when there can be an interrogation that does not involve

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 98

1  deception.  So I disagree with that as written and

2  be- -- at least with that word, and I will contact the

3  editor and seek to remove that word.

4  **Q.   Okay.  Now, you cited Davis for the**

5  **proposition and also yourself and Skolnick and Leo, I**

6  **guess, and Slobogin.  All those publications support the**

7  **proposition that interrogations currently practiced in**

8  **America is deceptive, and I think you -- you said you**

9  **would replace wholly with highly deceptive?**

10  A.   Right, or just get rid of the word wholly --

11  **Q.   Yeah.**

12  A.   -- W-H-O-L-L-Y.  I think these are all

13  articles that discuss the use of deception during

14  interrogation and that's why they're listed as citations

15  for the point about interrogation being deceptive.

16  **Q.   I guess the point, Doctor, is that you look at**

17  **interrogations in the United States as being deceptive**

18  **in general, although it seems you acknowledge the**

19  **possibility that there may be isolated instances in**

20  **which an interrogation is not deceptive.  Fair to say?**

21  A.   Well, but the way you worded the question, the

22  point is.  I -- I would say what's fair to say is that

23  empirically, based on my research and others research, I

24  would characterize interrogation as highly deceptive in

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 99

1    America the way it's practiced.

2         **Q.    Highly deceptive.  Okay.**

3         A.    Or often deceptive, yes.

4         **Q.    All right.  So -- And I think you -- You know,**

5    **this article elaborates a little bit about that -- or**

6    **I'm sorry -- this book chapter elaborates a little bit**

7    **about that in saying that the interrogator misrepresents**

8    **the purpose of the interrogation, the desire to help the**

9    **suspect, the authority to do so, and the consequences of**

10   **confession versus denial and the nature and implications**

11   **of the evidence and much more.**

12         **Do you agree with that, Doctor?**

13        A.    I agree that that occurs, yes.

14        **Q.    Okay.  As part of the, would you say, highly**

15   **deceptive or often deceptive practice?**

16        A.    Yes, those are the examples of how

17   interrogation can be deceptive.

18        **Q.    What percentage of interrogations in the**

19   **United States currently do you think are deceptive in**

20   **the way this paragraph describes?**

21        A.    I would just be guessing.  I -- I don't have

22   an exact number.

23        **Q.    Is there any way for you to provide that**

24   **information, or is it just a straight out guess?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 100

1        A.    You have to code inter- -- You have to list

2    out all the possible forms of deception and then go

3    through interrogations and determine what percentage

4    contain one or more of those deceptive strat- --

5    strategems.

6        **Q.    Right.  So I guess my question to you is, are**

7    **you in a position to do anything more than just**

8    **100 percent guess at what percentage of interrogations**

9    **in United States are -- would be characterized as highly**

10   **deceptive?**

11       A.    I mean, I can give a professional estimate.

12   So it's not, you know, a matter of a pure guess, but it

13   is speculative.  You know, I've studied thousands and

14   thousands of interrogations, so I would say 50 to

15   75 percent, maybe more, maybe less involve the use of

16   deception one form or another, but there's no study that

17   quantifies it exactly.

18       **Q.    Well, how do you arrive at the 50 to**

19   **75 percent figure if --**

20       A.    I'm just estimating.  I'm just estimating.

21   You asked if it's just a guess, and what I was trying to

22   communicate is, I have been studying the subject for

23   over 30 years.  I've watched thousands of

24   interrogations.  I've read hundreds of articles and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 101

1  books on -- on the subject.  If you want me just to give

2  a general estimate, that would be my general estimate.

3      **Q.   No.  I want you to tell me whether you**

4  **characterize it as a guess or not.  And if it's not a**

5  **guess, what data are you relying on?**

6      A.   I'm relying on all the materials I've reviewed

7  in my entire life to formulate that estimate.

8      **Q.   Okay.  And do you agree that that estimate is**

9  **speculative?**

10     A.   Yes, because there's no precise quantification

11  of the number of deceptive strategems that are used on

12  average in interrogations.

13     **Q.   Okay.  I'm going to take this down for a**

14  **second, Doctor, and come back to it if we need to.**

15         **The -- You identified in various works that**

16  **the -- Actually, you cite to it quite often in your**

17  **report, the Reid technique or the Reid manual for**

18  **conducting interrogations, right?**

19     A.   Yes.

20     **Q.   Is it fair to say that you're highly critical**

21  **of the Reid manual?**

22     A.   I would say sometimes I'm critical of the Reid

23  manual or the Reid method and other times not.

24     **Q.   What is your source for how a detective should**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 102

1    **properly conduct an interrogation?**

2         A.   Well, the -- the Reid manual establishes

3    national standards, and then, of course, there's the

4    law, and then there's the implications from research.

5    So it depends on what you're referring to in your

6    question.  Obviously, it would be improper to conduct an

7    interrogation in any way that violates case law.

8         **Q.   Sure.**

9         A.   Police are trained primarily in the Reid

10   method, although there are other approaches now, and so

11   the Reid manual is often taken as establishing the

12   mainstream interrogation strat- -- standards.  And then

13   there's research that shows things are problematic in

14   the Reid method or other methods.

15        **Q.   So the Reid manual advocates the use of**

16   **deception; is that right?**

17        A.   Yes.  They've changed their tune a little bit

18   over the years, but yes.

19        **Q.   Reid manual advocates the use of minimization**

20   **techniques, right?**

21        A.   Correct.

22        **Q.   And maximization techniques?**

23        A.   Correct.

24        **Q.   The Reid manual advocates attempting to give**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 103

1    the suspect being interrogated a belief in that the

2    confession -- confessing to the crime is beneficial,

3    right?

4         A.   Yes.

5         Q.   These are all criticisms you have in general

6    about interrogations, right?

7         A.   I -- No, I -- I think you're misrepresenting

8    that.  These are not necessarily criticisms.  The Reid

9    manual -- First of all, let's -- let's -- let's talk

10   about minimization, for example.  There are some forms

11   of minimization that communicate based on research

12   implicit suggestions of more lenient treatment in

13   exchange for a confession.  There are other forms of

14   minimization that do not.  So I would be critical of the

15   kinds of minimization that communicate that but not

16   critical of other types of minimization.

17        Q.   Okay.  So you agree that minimization in some

18   context should be allowed to be used during an

19   interrogation?

20        A.   Well, it's not for me to say what should be or

21   shouldn't be allowed.  But I would agree that --

22        Q.   Well --

23        A.   -- minimization -- some forms of minimization

24   do not present a high risk of false confession and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 104

1    others do.

2         Q.    All right.  Did you draw that distinction in

3    your report --

4         A.    I --

5         Q.    -- that some forms of minimization do not draw

6    a high risk of false confession?

7         A.    I -- I don't believe I wrote that specific

8    sentence, no.

9         Q.    What forms of minimization can a detective use

10   without creating a higher risk of a false confession?

11        A.    What I'm thinking of, which I did write in the

12   report, were the low-end inducements, appeals to

13   conscience, appeals to morality, the kinds of

14   minimizations that do not minimize the elements of the

15   crime or suggest that the suspect is less legally

16   blameworthy or that the consequences will be a lower

17   sentence or a lower charge or more favorable treatment

18   in the criminal justice system.

19        Q.    Do you -- Have you ever held the opinion that

20   the Reid technique -- First of all, let's back up a

21   second.

22             Is it proper to call what Reid advocates in

23   its manual the Reid technique?

24        A.    Most people will refer to it as the Reid

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 105

1    technique.  It's obviously a constellation or umbrella

2    term for many techniques.  When referring to it as the

3    Reid technique or the Reid method, it -- you know, it

4    lacks -- that term lacks precision, and so there are

5    times that I've preferred to disaggregate that term and

6    talk about specific Reid techniques or Reid methods.

7    But it's commonly accepted in my field as well as in

8    police -- in police work that there is a Reid technique

9    or a Reid method that is this amalgamation of all these

10   techniques or methods.

11       Q.   So, Doctor, is it okay to use the phrase "Reid

12   technique"?

13       A.   Yeah, it's okay, but I'm just trying to --

14       Q.   You --

15       A.   I'm just trying to explain to you that it --

16   it -- it is a term that is in common use and that

17   includes --

18       Q.   Yeah.

19       A.   -- a lot of separate techniques.

20       Q.   I -- I understand it's in common use, which is

21   part of the reason I asked the question.  But I'll be

22   honest with you, Doctor:  Some of these are going to be

23   easy yes-and-no questions, and you're not going to need

24   to give me the full monty on every, you know, supporting

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 106

1    thought about it, and this will probably shorten the

2    deposition.  Because I think it's noncontroversial to

3    call what Reid -- the manual advocates is the Reid

4    technique.  It's done by lawyers all the time and

5    judges.

6          And my question to you is, do you agree that

7    that is a -- a way it can be described for purposes of

8    our discussion today?

9          A.  Yes.

10         Q.  Okay.  So -- And when you're referring to the

11   Reid manual then, you obviously would be referring to

12   the Reid technique in your report, right?

13         A.  That's one way of characterizing it, yes.

14         Q.  Okay.  And you have said in your report that

15   police officers that are properly trained, and then

16   there's an explanation as to what a police officer might

17   be doing who is properly trained.  That phrase appears

18   multiple times in your report, right?

19         A.  I don't know how many times, but it does

20   appear in the report.

21         Q.  Okay.  And it's -- it's meant to draw a

22   distinction between what a properly-trained police

23   officer would do and what a police officer who is

24   coercing a confession might do, right?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 107

1    A.   Or who is improperly interrogating, yes.

2    **Q.   Right.  And part of the problem with proper**

3  **interrogation is the potential risk of a false**

4  **confession, right?**

5    A.   Correct.

6    **Q.   Okay.  And in each instance in your report in**

7  **which you provide -- or you mention a properly-trained**

8  **detective, is it true that you cite the Reid manual in**

9  **support of that proposition?**

10    A.   If you want me to answer that question, you're

11  going to have to direct me to each instance in the

12  report.  I don't remember.

13    **Q.   How about this, Doctor:  Instead of going**

14  **through each instance in which it appears, if what I'm**

15  **saying is true that you cited the Reid manual in support**

16  **of a proposition as to what a properly-trained detective**

17  **would do, if that is actually borne out by reviewing**

18  **your report, would you have any reason to disagree with**

19  **me then?**

20    A.   No.

21    **Q.   Okay.**

22    A.   As I said before, they set the standards --

23  the national standards for interrogation practice.

24    **Q.   Why do you believe Reid set the national**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 108

1    standards for interrogation practice?

2        A.    This is within the world of policing.  Because

3    their book is treated as the Bible of interrogation,

4    because they've trained the most police, because it's

5    referenced most often.  The manual goes back to the

6    1940s.  They are the most well-known firm.  They ...

7        Q.    It's fine.  I think you've answered the

8    question.

9            So one of your main criticisms of the Reid

10   technique is that it advocates identifying a suspect

11   during the rapport-building part of the Q-and-A session

12   and then employing certain tactics to elicit a

13   confession based on a belief that the suspect is guilty,

14   right?

15       A.    I don't think I said it the way you said it.

16       Q.    I know.  I'm paraphrasing a little bit.  But

17   do you agree with that?

18       A.    Not as stated, no.

19       Q.    Okay.  How would you state it?

20       A.    You're asking me to read your mind.

21       Q.    Well --

22       A.    I would remove --

23       Q.    All right.

24       A.    I would remove the phrase --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 109

1      Q.   No, no, no.

2      A.   -- rapport building from the question.

3      Q.   I'm not going to ask you to read my mind.

4           You have identified misclassification as one

5      of the problems with coerced confessions, right?

6      A.   Yes.

7      Q.   And misclassification is identifying someone

8      who is a suspect even though they're actually innocent,

9      right?

10     A.   It's -- Correct.

11     Q.   And then employing coercive or pressure

12     inducing techniques that are advocated by Reid in order

13     to elicit the confession, right?

14     A.   Yes.

15     Q.   Okay.  And that's kind of in a nutshell, that

16     they've misidentified somebody and now employing tactics

17     that are designed exclusively to get a confession as

18     opposed to get to the truth, right?

19     A.   Yes.

20     Q.   Okay.  The misclassification is based on what

21     you have identified as a no more than 50 percent chance

22     of being able to tell whether someone is being deceptive

23     or telling the truth, right?

24     A.   No.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 110

1      Q.   Okay.  So how did I get it wrong?

2      A.   I don't really know what you're talking about.

3   What I think you're talking about is that there's --

4   that the Reid method trains people to infer whether

5   somebody is lying or telling the truth based on their

6   demeanor, based on their body language, based on how

7   they're sitting, their vocal pitch; and that the studies

8   in the scientific re- -- social scientific research show

9   that people get it right in general about 54 percent of

10  the time; sometimes a little higher.

11          And so what Reid is training people to look

12  for in body language and cues to deception where they

13  say if these things exist, there's a strong likelihood

14  the person is guilty is not supported by the scientific

15  research.  That's my best interpretation of what you're

16  asking about, and that goes to misclassification because

17  the issue there is why do police misclassify innocent

18  suspects as guilty and then subject them to a

19  guilt-presumptive accusatory interrogation?  And I think

20  what you were referring to before is that there's a kind

21  of rush to judgment tunnel vision in the -- in that

22  approach.  Sometimes interrogators following their lead

23  training prematurely arrive at the conclusion in their

24  mind that somebody is guilty and then it turns out the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 111

1  person is innocent, but they've been subjecting them

2  after that misclassification to these guilt-presumptive

3  accusatory methods of interrogation.

4      **Q.   So the -- Basically, it's the -- Reid teaches**

5  **them -- or I should say detectives to read certain signs**

6  **or cues like mannerisms and draw conclusions on whether**

7  **that person is telling the truth, right?**

8      A.   Or lying, correct, based on their --

9      **Q.   Okay.**

10     A.   -- body language and demeanor and

11  mannerisms --

12     **Q.   Okay.**

13     A.   -- and other related things.

14     **Q.   And certainly, it's permissible for a**

15  **detective to also consider what the discussion about the**

16  **particular case has been thus far with the suspect or**

17  **the witness they're interviewing in drawing a conclusion**

18  **on whether they're telling the truth or not, right?**

19     A.   Yes, of course, it's permissible, yes, as a

20  legal matter.

21     **Q.   And is that something that Reid also advocates**

22  **is that detectives should consider also what the witness**

23  **has said about the case or the evidence or involvement**

24  **in -- in the potential crime?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 112

1      A.   I don't know if they use those specific words.

2   But yeah, anything that is relevant to the analysis of

3   whether or not the person committed the crime.

4      **Q.   Right.   Okay.**

5         **In terms of your opinions in this case, is it**

6   **fair to say you are not offering an opinion that Jakes's**

7   **confession -- Mr. Jakes's confession is, in fact, false?**

8      A.   Yes.   That is for the jury to decide, not for

9   me.

10     **Q.   Okay.   And is it true you are not offering an**

11  **opinion that Jakes's confession was, in fact, coerced?**

12     A.   No, I am offering the opinion that his

13  confession was coerced, that it was psychologically

14  coerced if we credit his account of what occurred, that

15  the social -- that the social science research would

16  classify that as coerced, again, if we credit his

17  description of what occurred.   And then I describe in

18  the report the reasons why.   I'm not offering a legal

19  opinion about whether his confession was voluntary or

20  involuntary or if you want to say legally coerced.   I'm

21  just saying, based on his description, if we credit his

22  account, there's no question that account is

23  psychologically and physically coercive.

24     **Q.   Okay.   And that's really a function for the**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 113

1    **jury, though, right, to decide whether that account is**

2    **true or not, right?**

3         A.   Of course.  The jury is -- It's for the jury

4    to adjudicate the facts of the case, not me.

5         **Q.   Right.  So -- And you don't really need an**

6    **expert to say if you believe the plaintiff's version of**

7    **events, then the plaintiff's confession was coerced,**

8    **right?**

9         THE WITNESS:  Sorry, I was --

10        MR. AINSWORTH:  Objection:  foundation.

11        THE WITNESS:  -- was pausing because I thought

12   there might be an objection.

13        MR. AINSWORTH:  Go ahead.

14   BY THE WITNESS:

15        A.   A jury might not know exactly what is meant in

16   the field of research by psychological coercion.  But if

17   it were the case that the jury credited Mr. Jakes's

18   account, then obviously they would know he was

19   physically assaulted because he describes being

20   physically assaulted.

21        **Q.   Right.  So aren't you stepping into the role**

22   **of fact finder if you are going to take a position that**

23   **his confession was coerced if you believe him?**

24        MR. AINSWORTH:  Object to the form of the question,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 114

1  argumentative.

2  BY THE WITNESS:

3     A.   No, because I'm saying there's -- there's two

4  accounts; and if we credit this account, then here is

5  what the social science says.  And if we credit this

6  account, here is what the social science says.  I'm not

7  saying what occurred.  I wasn't there.  I'm not acting

8  like a fact finder.  I have evaluated the evidence and

9  found a lot of reliable evidence in the record that I

10 rely on for my opinions.  But if we don't credit certain

11 things, then I would say, Here is what the social

12 science shows.  So I don't think the -- in my role as an

13 expert in this case I'm substituting or invading the

14 province of the jury or making any factual

15 determinations.

16    **Q.   Okay.  And it's possible that Mr. Jakes could**

17 **have -- Well, in the more generic sense, it's possible**

18 **to have a coerced confession that is actually true,**

19 **right?**

20    A.   Yes, you could have a coerced confession that

21 is true, psychologically coerced, even legally coerced

22 confession that is accurate and factually true.

23    **Q.   And it could be that Mr. Jakes actually was**

24 **involved in this crime, right?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 115

1    A.   Again, that's for the jury to determine, not
2  me.
3    Q.   Right.  And so it's a possibility that he
4  could have been involved in this crime, right?
5    A.   It's a possibility that -- that -- that they
6  could determine that, yes.
7    Q.   And setting aside the physical abuse that
8  Mr. Jakes described -- and I want to set that aside for
9  a minute because I don't think that's a controversial
10 point that that is not allowed, right?
11   A.   Correct.
12   Q.   Okay.  The case law is pretty clear that you
13 can't physically abuse a suspect you're questioning or a
14 witness you're questioning at least from the police
15 officer's perspective and that any such physical abuse
16 would be unconstitutional, right?
17   A.   Correct.
18   Q.   Okay.  So let's set that aside for a second.
19        The other descriptions Mr. Jakes provides of
20 his interrogation, would you agree that at this point in
21 time are constitutionally permis- -- permitted?
22   A.   No.  If you're describing -- If I'm
23 understanding your question correctly, that if we take
24 Mr. Jakes's account and we remove the physical violence

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 116

1  that visited on him that he describes, the rest of what

2  they did is not, if I'm understanding your question,

3  constitutionally or legally permissible.  There are some

4  things that are and some things that aren't.

5      **Q.   Okay.  Is it -- is it constitutionally**

6  **permissible to question Mr. Jakes without a youth**

7  **officer or a guardian present?**

8      A.   My understanding of the constitutional case

9  law is that it is permissible even if it violated local

10  police regulations at the time, yes.  It doesn't per se

11  render a confession constitutionally involuntary.

12      **Q.   And is it constitutionally permissible to use**

13  **minimization or maximization techniques?**

14      A.   So long as those techniques do not in the eyes

15  of a judge reviewing the case rise to the level of a

16  threat or promise or otherwise overbear the will of the

17  suspect being interrogated.

18      **Q.   Is it constitutionally permissible to have**

19  **held Mr. Jakes for 16 hours?**

20      A.   Well, it's not constitutionally impermissible,

21  but it could be -- it could -- it could contribute to

22  the judgment that -- I guess let me put it this way:  It

23  depends on whether that is part of the totality of the

24  circumstances that are judged to overbear his will.  If

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 117

1   not, then it's permissible.  If so, it's not imper- --
2   it's not permissible.
3       Q.   And the totality of the circumstances test
4   that you've just described, that is the test employed to
5   determine whether, according to the Supreme Court, the
6   confession or statement was voluntarily given, right?
7       A.   Correct.
8       Q.   Okay.  And have you criticized that test as
9   well in your -- in your writings?
10      A.   I'm sure I've been critical of that test in my
11  writings, yes.
12      Q.   Okay.  I think you've described it as a
13  checklist that judges use without employing any deeper
14  analysis of the facts?
15      A.   Oftentimes that's true.
16      Q.   Okay.  But that's something you've -- you've
17  written about -- you've taken that position, I should
18  say?
19      A.   Yes, I have taken that position.  I think
20  there's a lot of problems with the so-called
21  voluntariness test, particularly if we're interested in
22  weeding out reliable and unreliable confessions.
23      Q.   Got it.
24           Okay.  So obviously, making an expressed

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 118

1    threat or an implied threat of physical harm to

2    Mr. Jakes would have been impermissible, right?

3         A.    Correct.

4         Q.    Okay.  And as far as questioning Mr. Jakes

5    over a period of 16 hours, that in and of itself is

6    constitutionally permitted, right?

7         A.    Well ...

8         Q.    And I should clarify.  Questioning him in --

9    not 16 hours straight but off and on during that

10   16-hour window.

11        A.    There's no constitutional rule that says you

12   can't question somebody over a 16-hour window, so it's

13   constitutionally permissible so long as it doesn't

14   overbear his will.

15        Q.    And he could be -- It could be a custodial

16   interrogation over a 16-hour window, right, and still be

17   constitutionally permitted?

18        A.    It could be so long as it doesn't overbear his

19   will.

20        Q.    Right.

21             So I want to come back to some of the risk

22   factors that we were talking about earlier.  In your

23   work iden- -- And you've done work identifying risk

24   factors, right?  That's part of what you were doing when

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 119

1   you reviewed a lot of these cases, for example, in the

2   2004 article with Professor Drizin and in some of your

3   other cases -- other articles, right?

4       A.   Yes.  I don't recall if we used the language

5   of risk factors in the 2004 article, but certainly I've

6   written articles and book chapters where we've talked

7   about risk factors or contributed to a discussion of

8   risk factors for false confessions.

9       Q.   Have you -- In any studies that you've been a

10  part of or conducted, have you looked at whether -- have

11  you looked at cases involving true confessions elicited

12  from juveniles and incorporated that data into your

13  analysis?

14      A.   I haven't -- I haven't done a study just on

15  juveniles and true confessions.  There have been --

16  there have been some studies that I think involve true

17  confessions of juveniles, a book by Barry Feld called

18  Kids, Cops, and Confessions.  But I -- I haven't written

19  just about true confessions of juveniles.

20      Q.   Are you aware of anybody who's done a

21  comparison of true confessions and proven false

22  confessions involving juveniles to determine the

23  frequency with which juveniles will give false

24  confessions?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 120

1          A.    I'm going to treat that as two questions.

2     There's no study about the frequency in which juveniles

3     give false confessions.  And the other -- what I -- what

4     I'm taking to be the other part of your question, I'm

5     not aware off the top of my head of any study that

6     compares true juvenile confessions with false juvenile

7     confessions.

8          **Q.    Is it fair to say that you are not able to**

9     **state a frequency with which false confessions are**

10    **elicited?**

11         A.    Yes, it's not scientifically possible to say

12    the frequency with which false confessions are elicited

13    or even the frequency with which true confessions are

14    elicited because there's no national database by the

15    government or private organization from which we could

16    do a random sample to determine what percentage of

17    confessions are true, what percentage of confessions are

18    false.  So it could -- it could be 1 percent are false;

19    it could be 10 percent; it could be higher; it could be

20    something in between.

21         **Q.    Is it true you do not know the rate at which a**

22    **false confession leads to the wrongful conviction of an**

23    **innocent person?**

24         A.    Again, yes, because there's no -- there's no

1  national database from which we could do a random sample

2  to ascertain a precise frequency.  We know that there

3  are hundreds and hundreds of cases in which this has

4  happened, but we don't know the precise frequency.

5      **Q.   Is it true you cannot extrapolate the rate at**

6  **which false confessions occur from experimental studies**

7  **to inform your opinions?**

8      A.   Yes.  We can say in this study this is what --

9  what -- what happened.  Let's say 20 percent of the time

10  this technique led to a false confession, but that

11  doesn't mean necessarily that in the real world

12  20 percent of the time that technique is used it leads

13  to a false confession.  So in that sense, we can't

14  directly extrapolate the percentage from the study to

15  the percentage in the real world.  We don't know.

16      **Q.   You can't extrapolate it at all, right?**

17      A.   Well, it depends on what you mean by

18  "extrapolate."  You know, we have these studies that

19  show deception or minimization causes more false

20  confessions than true confessions in the laboratory.  We

21  can extrapolate and say this is a risk factor; this can

22  lead to false confessions; here is why.  But the precise

23  percentage, we can't say 15 percent in the study means

24  15 percent in the real world.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 122

1          Q.   Have you been critical of -- So the lab- --
2     Let me back up a second.
3               The laboratory studies you're talking about
4     are the ones involving college students who are falsely
5     accused of, for example, striking the Alt key on a
6     computer or something like that, right?
7          A.   That's one laboratory paradigm, yes.
8          Q.   And you're also talking about the one
9     conducted by Dr. Russano in her -- the cheating
10    paradigm, I guess it's called, right?
11         A.   Correct.
12         Q.   Okay.  Have you been critical of those types
13    of studies because they do not adequately rep- --
14    replicate the coercive pressures and high stakes of the
15    interrogations?
16         A.   Sorry.  I'm distracted because somebody is
17    ringing the doorbell below, and I might have a FedEx
18    delivery, but I'm hoping I don't have to sign for it.
19              Well, it depends on what you mean by
20    "critical."  There are limitations to those laboratory
21    paradigms and -- Sorry.
22         MR. MORAN:  Do you need --
23    BY THE WITNESS:
24         A.   There are --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 123

1      MR. MORAN:  Do you need to take a break or ...

2      THE WITNESS:  Yeah, why don't we take a five-minute

3   break.  I'll be right back.  Sorry about this.  If

4   that's okay.  I just want to catch the FedEx driver if I

5   was required to sign.

6      MR. MORAN:  No, it's okay.  Go ahead.

7      THE WITNESS:  Okay.

8      MR. MORAN:  We can take a break any time.

9          Does anyone need a longer break since we're

10  sort of at midday?

11     MR. AINSWORTH:  But we're not really because we're

12  at 10:00 -- you know, it's 10:45 for Dr. Leo.

13     MR. MORAN:  Oh, right.

14     THE VIDEOGRAPHER:  Let me get us off the record.

15          The time is 12:43 p.m.  We are now going off

16  the record.

17                   (A short break was had.)

18  BY MR. MORAN:

19     **Q.   All right.  We're back on the record, Doctor.**

20  **And when we left off, I think you were sort of in the**

21  **middle of answering a question.**

22     MR. MORAN:  And I probably should have it read

23  back, just the question, not the answer.

24                   (Record read as requested.)

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 124

1  BY MR. MORAN:

2      **Q.   And, Doctor, to be clear, this one is a**

3  **yes-or-no question.**

4      A.   I don't think it's a yes-or-no question.  It

5  depends on what you mean by the word "critical."  Yes, I

6  think the methodology is limited, but I also think it's

7  valuable.  It -- Of course a laboratory simulation is

8  not going to replicate what occurs in the real world.

9  The cheating paradigm study I think is better than the

10  Alt-key-type paradigm study.  So -- so I would say yes,

11  I pointed out that these methodologies have limitations.

12  All methodologies have limitations.  I think the use of

13  the word critical can -- can be interrupted as kind of

14  misleading because I have been critical in the sense

15  that it's not perfect, that it's limited, but I haven't

16  been critical in the sense that some people impute to

17  that word "critical."

18      **Q.   Okay.**

19      A.   It's not valuable or helpful or insightful.

20  It's just not perfect.  It's limited, and those

21  limitations teach us things and are important to

22  acknowledge.

23      **Q.   Do you know the frequency with which**

24  **minimization leads to false confessions?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 125

1     A.   Not in the real world, no.

2     **Q.   Do you know the frequency with which**

3  **maximization leads to false confessions?**

4     A.   We don't know the frequency with which any

5  technique leads to false confessions in the real world

6  because, again, we don't have access to all the false

7  confession or true confession cases.  What we do know

8  from the experimental studies is that it leads to a high

9  proportion.  When used of false confessions, it

10  increases the risk.  And we know that those techniques

11  are often present in the real-world documented cases of

12  false and proven false confessions.

13     **Q.   The real-world documented cases that you're**

14  **looking at, those are largely rape or murder convictions**

15  **that were reversed, right?**

16     A.   Well, the first part I would say they're --

17  they're -- they tend to be the more serious crimes.  I

18  know in the Drizin and --

19     **Q.   Sorry.**

20     A.   I hope you're okay.

21          In the Drizin and Leo study, I think it was

22  81 percent were homicide cases.  But when you say

23  "largely reversed," yeah, some of them -- some of them

24  led to convictions where there were reversals and some

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 126

1   of them didn't lead to convictions.

2       Q.   Well, the point is that the data set you're

3   looking at in evaluating of false confessions, proven

4   false confessions, or confessions you think are high

5   probability of being false, are largely from either

6   murder cases or rape cases?  I think you said 81 percent

7   just now?

8       A.   I would say largely for murder cases, yes.

9   And in the DNA cases, largely rape cases, yes.

10      Q.   Okay.  And you're looking -- in that data set,

11  you're looking at convictions that have already been

12  reversed for one reason or another, right?

13      A.   It depends on which database you're referring

14  to.  In the proven false confessions, a lot of times

15  they haven't been convicted.  But in the DNA exoneration

16  database or the National Registry of Exonerations, which

17  we haven't talked about, all of those, yes, involved

18  convictions, and many of those involved reversals or all

19  of them involved reversals.

20      Q.   Okay.  And it sounds like what you -- what

21  you've said in the past is that it's not possible to do

22  a study comparising [sic] on a broader scale

23  interrogations from the real world of true confessions

24  to the data set that you reviewed of what you called

Page 127

1    proven false confessions or probable false confessions

2    that have helped inform your opinions?

3         A.    I'm -- I'm not sure I understand.

4         Q.    Okay.  Well --

5         A.    I said --

6         Q.    -- no, no, no.  Let me -- let me make sure you

7    understand.

8              Is there an ability to compare the data set

9    you've looked at in these different studies of false

10   confessions to true confessions in the real world to

11   determine whether any particular risk factor is present

12   in those confessions and/or creates a high risk of --

13   or -- yeah, what the effect of those risk factors were

14   in those confessions?  Do you understand, or do I need

15   to rephrase?

16        A.    No, I still don't understand.  Sorry.

17        Q.    Okay.  Is there an ability to compare the

18   proven false confessions or probable false confessions

19   that you've relied on to a broader scale of truthful

20   confessions anywhere in the country to determine if any

21   particular factor truly is a risk factor?

22        A.    I think it would be possible to identify true

23   confessions.  That wouldn't necessarily determine

24   whether something was a risk factor or not.  It might

Page 128

1  provide evidence that's consistent or inconsistent with

2  existing findings, and obviously the laboratory studies

3  look at both true and false confessions.  But if we

4  identified criteria for what constituted proven -- I'm

5  sorry -- true confessions and try to identify cases,

6  that's, in theory, a possible study, yes.

7       Q.   Length of interrogations has been identified

8  as a risk factor, right?

9       A.   Yes.

10      Q.   And you have defined length of interrogation

11 to be time in custody regardless of whether the

12 individual is being questioned or not?

13      A.   Yes, the duration of the time period during

14 which they're held and/or questioned for that

15 interrogation session.

16      Q.   And the clock starts ticking, I believe -- I

17 think you -- I read somewhere -- somewhere else you've

18 given testimony of some writing you've given, the clock

19 starts ticking when the person is placed essentially

20 under arrest or in custody for purposes of being

21 questioned?

22      A.   Yeah, for purposes of being questioned.  If

23 somebody is arrested at 11:00 o'clock at night and put

24 into a jail cell and then the police come down at

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 129

1  6:00 in the morning and interrogate or hold -- or hold

2  the person in the interrogation from, say, 6:00 a.m. to

3  11:00, you would say that's five hours; you wouldn't

4  count it from the time of arrest the night before.  It's

5  when the person -- when the police first show up and

6  start questioning the person or holding the que- --

7  person to be questioned.

8      **Q.   Okay.  So in Mr. Jakes's case, the first**

9  **questioning begins later in the afternoon, I think**

10  **roughly 4:30, something like that, but he's brought in**

11  **around noon or 12:30, earlier in the day.  Does that**

12  **sound right?**

13      A.   Yes.

14      **Q.   Okay.  So his -- For purposes of length of**

15  **interrogation being a risk factor, that starts at**

16  **roughly 4:30 in the afternoon?**

17      A.   I would say 12:30 because if you credit his

18  account, he's sort of held for purposes of questioning

19  starting then.  He doesn't perceive he's free to go.

20  He's initially arrested.  But, you know, even if you

21  said 4:30, I think the statement is given at 4:30 to

22  5:00 in the morning.  So even -- Whether it's 12 or 16

23  wouldn't really matter.  That's still a very long period

24  of time.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 130

1      Q.   What's the average interrogation length for a

2  murder case?

3      A.   For a murder case, I don't know.  The studies

4  that look at average length of felony interrogation

5  don't break it down by type of crime as opposed to

6  felony versus -- versus non felony.

7      Q.   Would you agree with me that that particular

8  fact matters?

9      A.   I --

10      Q.   The crime, I should say.

11      A.   Okay.  But I -- I think your question is

12  vague.  Matters --

13      Q.   Okay.  No, no.

14      A.   -- to what end?

15      Q.   We're talking about length of interrogation

16  being a risk factor.  You've identified in your report

17  that two hours is -- I think you mentioned two hours is

18  the norm, and the Reid manual says don't interrogate for

19  more than four hours.  But you're relying on data that

20  combines murder cases with theft cases and other types

21  of felonies that don't rise to the level of murder;

22  agreed?

23      A.   Yeah.  But I didn't say two hours were the

24  norm in the report.  But yes, the -- the finding that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 131

1  most interrogations are 30 minutes or 45 minutes,

2  95 percent are less than two hours rely on felony

3  interrogations that are not broken down by type of

4  crime.

5      Q.    Okay.  Shouldn't your analysis on what is an

6  average length of interrogation be limited to length of

7  interrogation in a similar type of crime such as murder?

8      A.    Not necessarily.  I mean, that might be a more

9  precise comparison if we're looking at murder

10  interrogations.  But we study false confessions across

11  crimes, and we study risk factors across crimes for

12  which people are interrogated.  So it's not obvious to

13  me why, as you phrase in the question, that should be

14  the case.  There may be benefits to doing it.  It might

15  give us more precise information.  But I don't think as

16  you asked the question I agree.

17      Q.    Well, it would tell you that you're comparing

18  apples to apples instead of apples to oranges, right?

19      A.    Well, not necessarily because interrogations

20  follow the same structure regardless of the crime

21  that -- that they're -- So these are techniques that are

22  used across interrogations for different crimes.  So if

23  you're comparing an eight-hour rape interrogation with

24  an eight-hour homicide interrogation, I think it's an

Page 132

1  apples-to-apples comparison.  Or a burglary

2  interrogation, it might -- might be less, but these

3  aren't different fruit.  They're -- they're -- They may

4  be different crimes and that -- the different crimes

5  may, as a general matter, bring more or less police

6  attention, but I don't think it's an apples-to-oranges

7  comparison.

8      **Q.   What percentage of theft or burglary cases are**

9  **involving confessions?**

10     A.   I don't know that anybody knows what

11 percentage of any cases involve confessions.  That data

12 is just not tracked.

13     **Q.   Is any data tracked related to theft in**

14 **burglary confession -- the evidence used in a theft or**

15 **burglary case?**

16     A.   There -- there's the bureau of criminal

17 justice statistics that tracks a lot of evidence about

18 crime in the criminal justice system.  To my knowledge,

19 they do not track anything about burglary or theft

20 interrogations.

21     **Q.   And do you know what the most common form of**

22 **evidence is used in any type of burglary or theft**

23 **criminal prosecution?**

24     A.   I do not know which one is the most common

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 133

1  type of evidence.

2      Q.   **Well, I'm -- I'm not the expert.  I'm asking**

3  **you.**

4      A.   Yeah, no, no, I don't -- I don't know --

5      Q.   **Okay.**

6      A.   -- statistically what is the most common type

7  of evidence.  I know that confession evidence is

8  probably very common in burglary and theft prosecutions.

9  There may be other types of evidence that are more

10  common.

11     Q.   **Why do you think confession is very common in**

12  **burglary and theft prosecutions?**

13     A.   Because confessions are common as a matter of

14  solving crimes in most felony crimes, and so I would

15  think that this is one way burglaries and thefts are

16  sometimes cleared by police and prosecuted by

17  prosecutors.

18     Q.   **I mean, is this something you've actually**

19  **looked at, or are you just sort of speculating right**

20  **now?**

21     A.   I haven't studied just theft cases or burglary

22  cases specifically, so --

23     Q.   **How about any -- any -- any case involving a**

24  **possession-type crime, a theft-type crime, robbery?  Do**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 134

1  **you know the frequency with which confessions are**

2  **used -- or elicited, I should say -- not used but**

3  **elicited in those types of cases?**

4      A.   I do not, and I don't know that anybody does.

5  I don't know that the government tracks that data.

6      **Q.   Okay.  So really, there's no way to say**

7  **whether confessions are frequent in those kind of cases**

8  **or not, right?**

9      A.   Well, it's believed that confessions are a

10  frequent method for solving felony crimes and crimes in

11  general.  The Reid manual says that.  So it's -- it's

12  conventional wisdom, but we can't say how frequently.

13  We can't say -- because the government doesn't track

14  that data.

15      **Q.   Isn't one of the main criticisms of the Reid**

16  **manual that it is not a scientifically-proven**

17  **methodology?**

18      A.   I don't know that -- I can't think of anybody

19  who has used those words, "a scientifically-proven

20  methodology."  I guess a criticism might be that it's

21  not evidence based, that it ignores a lot of the social

22  science research.  I'm not sure that you would ever

23  describe an interrogation method as a

24  scientifically-proven methodology.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 135

1      Q.    Okay.  So do you accept everything in the Reid

2   manual as true?

3      A.    As factually accurate, no.

4      Q.    Okay.  Because one of the things that, you

5   know, you might wonder about is whether in crimes of

6   possession, the prime evidence used to get a conviction

7   is the actual possession of the illegal item such as

8   drugs or a gun in which a confession is completely

9   irrelevant, right?

10     A.    I'm --

11     MR. AINSWORTH:  Objection to the form of the

12  question.

13  BY MR. MORAN:

14     Q.    I didn't -- I didn't hear the answer.

15     A.    Oh.  I'm sure there are cases in which that --

16  that is the case.

17     Q.    Do you hold yourself out as an expert in

18  police procedure?

19     A.    Not police procedure generally, no.  Police

20  investigation as it relates to interrogations and

21  confessions and testimonial evidence gathering, yes.

22     Q.    Okay.  Have you ever participated in a

23  criminal investigation as an investigator?

24     A.    Not as an investigator, no.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 136

1    Q.   The only participation you've had is as an

2  observer of interrogations, true?

3    A.   Correct.

4    Q.   Do you hold yourself out as an expert in any

5  form of medicine?

6    A.   I am not an expert in medicine, no.

7    Q.   Are you a treating psychologist?

8    A.   I am not.

9    Q.   Are you a licensed psychologist?

10   A.   No.  Social psychologists don't get --

11  Research psychologists don't get licenses.  I'm not --

12  Clinical psychologists do.  I'm not -- I'm not a

13  licensed psychologist.

14   Q.   Right.

15         Okay.  So in other -- You're also, I guess --

16  to put a finer point on it, you're also not a clinical

17  psychologist, right?

18   A.   Correct.

19   Q.   Okay.  Any training in ballistics?  Or strike

20  that.

21         Do you hold yourself out as an expert in

22  ballistics?

23   A.   I do not.

24   Q.   Do you hold yourself out as an expert in blood

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 137

1  **spatter or fingerprint analysis?**

2      A.    I do not.

3      **Q.    Do you hold yourself as an expert in**

4  **eyewitness identification?**

5      A.    I do not -- I do not hold myself out as an

6  expert on eyewitness identification, although I've read

7  a substantial amount of literature on that subject.

8  I've taught classes on that subject.  I know a lot about

9  that subject.  But whenever I am contacted by an

10  attorney who is looking for an expert in that subject, I

11  always refer them to more qualified experts in that

12  area.

13      **Q.    So I guess the bottom line is, you agree**

14  **you're not an expert in eyewitness identification?**

15      A.    Compared to the people who spend their lives

16  studying it, no, I'm not an expert.  Compared to the

17  other 99 percent of Americans, I'm an expert.  So it

18  depends on what you mean by "expert."  I would never

19  hold myself out as an expert in court on that subject.

20  But at the university, I would be recognized as a

21  teaching expert in that area.  That's the nuance I was

22  trying to communicate in my prior message.  I am not

23  here nor in any court proceeding or in any case or any

24  deposition have I ever held myself out as an expert in

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 138

1    that area, but I do have expertise in that area.

2        Q.    And have you ever been qualified to testify as

3    an expert in eyewitness identification?

4        A.    I've never -- No, I've never been proffered as

5    an expert on eyewitness identification.

6        Q.    Do you have any -- Do you hold yourself out as

7    an expert in any form of forensic evidence gathering?

8        A.    As I understand you using the term

9    "forensics," no.  And that's why earlier I made the

10   distinction about testimonial evidence.

11       Q.    Right.

12            Do you hold yourself out as an expert in

13   cognitive psychology?

14       A.    No.  I would say my expertise is in social

15   psychology, but social and cognitive psychology are very

16   closely-related fields.  So I don't say I'm a cognitive

17   psychologist or an expert in cognitive psychology but a

18   lot of what I draw on in social psychologist relies on

19   cognitive psychology.

20       Q.    Have you been -- Have your opinions been

21   barred in whole or in part by other courts throughout

22   the United States?

23       A.    That has happened on occasion, yes.  In a

24   small minority of cases, my opinions have been legally

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 139

1  excluded.  I have not been allowed to testify at trial.

2      **Q.  In fact, that was true in a case in Michigan**

3  **where the Michigan Supreme Court found -- or agreed with**

4  **the lower court, I should say, that your opinions**

5  **were -- should have been barred and you were barred**

6  **completely from testifying.  Do you know what case I'm**

7  **talking about?**

8      A.   Yes.  And I'm going to answer that question as

9  briefly as I can.  You're referring to the Kowalski

10  case.

11      **Q.   I am.**

12      A.   And in the Kowalski case, the judge who

13  excluded me was having an affair with the detective who

14  interrogated and got the confession.  She's now in jail

15  because she perjured herself during her divorce.  The

16  effect of her perjury led to a reversal of the Kowalski

17  conviction, and now a different expert has been allowed

18  to testify in that retrial.  But you are correct that

19  the published opinion excluded me and was upheld by

20  Michigan's Supreme Court, even though now on retrial,

21  given that -- those facts, an expert has been in my

22  area, interrogation and confession, has been allowed to

23  testify.

24      **Q.   Yeah, that would be Richard Ofshe?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 140

1      A.    Correct.  O-F-S-H-E.  Yes.

2      **Q.    And he was also limited in what he could offer**

3  **in that case, right?**

4      A.    My understanding is that he is -- he was

5  limited but nevertheless permitted to testify.

6      **Q.    So you cite the Harris case in your report --**

7      A.    Yes.

8      **Q.    -- as a case in which you were allowed to**

9  **testify; is that right?**

10     A.    Yes, you're referring to the case of

11 Nicole Harris in the Seventh Circuit that went to trial,

12 and I was allowed to testify in that case.  That's

13 correct.

14     **Q.    Were you also barred from offering certain**

15 **testimony?**

16     A.    There were 11 opinions in my report, and I was

17 barred from testifying to one of those and permitted to

18 testify on the other 10.  That -- Those were the

19 case-specific opinions.  I was also allowed to provide

20 general testimony.

21     **Q.    Most often, would it be fair to say, you are**

22 **barred from offering testimony on your fit analysis or**

23 **reliability analysis?**

24     MR. AINSWORTH:  Object to the form of the question.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 141

1  BY MR. MORAN:

2      Q.   **Well, Doctor, you look like you don't know**

3  **what I'm talking about, so let me back up a second.**

4      A.   No, it's -- I do know what you're talking

5  about.  It's the way you phrased the question.

6      Q.   **Well, if you don't understand, just let me**

7  **know.**

8      A.   It's not that I don't think I understand.  So

9  you asked most often I'm barred from testifying to the

10  fit analysis?

11      Q.   **So let me -- let me -- Yeah, I'll clarify for**

12  **you.  Okay?**

13          **So your -- there are situations in which you**

14  **could be barred entirely from testifying, right?**

15      A.   Correct.

16      Q.   **And there are situations in which you've been**

17  **barred from testifying in part; and in those situations**

18  **in which you've been barred in testifying from [sic]**

19  **part, the subject matter in which you are not allowed to**

20  **testify is more often than not related to what you**

21  **described as the fit analysis or the fit test; is that**

22  **true?**

23      A.   I haven't done a statistical analysis.  I

24  would say limited as opposed to barred in part.  That's

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 142

1 how I'd characterize it. But yes, there are sometimes

2 when the testimony is permitted with limitations, and

3 sometimes that is a limitation where I'm not allowed to

4 testify about that. I just don't know if that's -- when

5 I am limited, that's the primary reason why, which is

6 what I take you to be asking.

7     Q. **Is -- You've obviously made an effort to look**

8 **for cases in which you and other experts like yourself**

9 **are allowed to testify, to include in your report,**

10 **right?**

11     A. I think you're referring to that footnote --

12 one of the first footnotes in the report --

13     Q. **Yes.**

14     A. -- that says, Here are some cases where

15 experts have been permitted to testify. It looks like

16 it's Footnote 4 on Page 7 of the report.

17     Q. **Yes.**

18     A. Yes. Okay.

19     Q. **Would it be -- I mean, shouldn't you have**

20 **included with your Harris cite that you were not allowed**

21 **to testify as to one of your opinions? The way it reads**

22 **makes it seem like you were allowed to give the full**

23 **amount of your testimony -- or opinion testimony in that**

24 **trial.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 143

1      MR. AINSWORTH:  Object to the form of the question.

2           You can answer.

3    BY THE WITNESS:

4      A.   I -- I -- My thought process was, were these

5    were some cases where the expert was allowed to testify,

6    and that's why the citation is relevant?  In any area of

7    expert testimony, there's going to be -- after you get

8    over the threshold question of admissibility, there's

9    going to be limitations or potential limitations.  So I

10   didn't feel like that was a misleading citation.

11     **Q.   Do you see how it could be misleading, though,**

12   **given that your footnote gives the impression that you**

13   **were allowed to give all of your opinions in Harris?**

14     MR. AINSWORTH:  Same objections.

15   BY THE WITNESS:

16     A.   Let me just review this very briefly.

17          I -- I -- I don't see it as misleading.

18     **Q.   Okay.  Let's come back to -- Or strike that.**

19          **We'll come back to --**

20          **What qualifies you as an expert to compare a**

21   **confession to the evidence in the case to determine if**

22   **there is a fit between the confession and the evidence?**

23     A.   Well, it would just be the -- the basis for my

24   expertise more generally: my research, my training, my

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 144

1    experience, my studies, my knowledge of the field, the

2    studies in the field, my application of that expertise

3    in teaching, in -- in cases that I've written about or

4    worked on.  So it's the same basis for any expert's

5    qualifications: education, experience, research,

6    specialized knowledge, training.

7        **Q.    Have you gotten specialized education in**

8    **police procedure and evidence gathering outside the**

9    **context of interrogations?**

10       A.    No.  If -- if I'm understanding you, you're

11   asking about have I gone through police training.  I

12   have not gone through police training on that outside of

13   interrogation and confessions.

14       **Q.    Any training at all regardless of whether it's**

15   **police training or some other form in which you have**

16   **familiarized yourself with what -- how -- how to make**

17   **sure that evidence matches up with -- in any particular**

18   **case so you can draw a conclusion about the reliability**

19   **of a confession or a statement?**

20       A.    No, I mean, other than academic training and

21   reading academic books and the empirical work on the

22   cases that I've written about in the real world, no, I

23   haven't been through any specific training on the fit

24   method or the fit standard and its application.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 145

1      Q.    And who came up with the fit standard?

2      A.    Well, that term is sometimes attributed to me

3  and Richard Ofshe.  We might have used that language,

4  "the fit standard."  But it reflects a principle that --

5  in police work that predates us that writers and police

6  have talked about comparing a confession statement

7  against evidence long before we used those words.

8      Q.    And were those police officers --

9            When -- when this concept came up long before

10 you, is it your understanding that police officers were

11 trained to do this comparison?

12     A.    I don't know that they were trained.  It

13 was -- My recollection is that it was written about in

14 the manuals that confessions that fit the evidence are

15 corroborated by the evidence and that don't are not.  So

16 I don't know the depth of training from manuals or

17 articles that have written about it, but I know the idea

18 has been around for a long time.  It's one way of

19 assessing the reliability of a confession.

20     Q.    Why is an expert required to compare the

21 evidence to the confession to determine if there is

22 consistency or inconsistency?

23     A.    Well, it's ultimately for a judge to determine

24 whether an expert is required, but the expert draws on

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 146

1   expert knowledge that a layperson wouldn't have,

2   presumably.

3       Q.   Like what?

4       A.   Like the indicia of an unreliable confession,

5   confessions that are unreliable don't match other

6   evidence; they don't lead to new and missing evidence;

7   they contain lots of errors absent contamination;

8   oftentimes the things that I wrote about in the report.

9   An expert might have more insight or draw on a broader

10  basis of knowledge in analyzing the fit between the

11  confession and other evidence.

12          What I've seen often is in criminal cases,

13  police and prosecutors will say, for example, a

14  confession provided details about how a crime occurred;

15  and therefore, it's corroborated.  And, in fact, there

16  is no corroboration.  There were details, but they're

17  not verified.  That's not corroboration.  So sometimes

18  even professionals, police and prosecutors, for example,

19  will confuse a detailed confession for a corroborated

20  confession as if the details corroborate themselves.  So

21  all I'm saying is that an expert drawing on years of

22  knowledge and study in a field of research might bring

23  greater expertise or nuance -- nuance knowledge to that

24  analysis.  But whether it's required in a particular

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 147

1    case would obviously be up for the judge -- the judge to

2    determine.

3         Q.   So what -- what -- what I need to know,

4    though, is what is -- what have -- what is it about your

5    field of study that gives you the ability to look at

6    physical evidence or crime scene evidence or anything

7    like that and say, This evidence doesn't match the

8    statement?

9         A.   Well, I would be relying on the expert

10   judgments of other forensics, right.  You know, if it

11   was DNA evidence, I would be relying on the DNA report.

12   I'm not an expert on DNA or ballistics or on

13   fingerprints.  Experts rely on other experts all the

14   time.  I have no expertise in those areas.  But when

15   you're talking about comparing the fit of a confession

16   to other evidence or to a suspect's knowledge or lack of

17   knowledge, obviously I -- I have experience in that, in

18   my studies and my work.

19        Q.   What about your studies gives you the ability

20   to say that certain evidence fits a suspect's knowledge

21   or lack of knowledge?

22        A.   It's just an analysis that we do in some of

23   our studies and some of our cases.

24        Q.   Well, I understand that you've done this fit

Page 148

1   analysis before.  But what I want to know is what gives

2   you the expert qualification to do it and present it as

3   some sort of expert opinion?  And I'll give you an

4   example.  You've given the opinion that Jakes was in the

5   rear coach house when he -- in the -- in the statement

6   he -- that is attributed to him, his -- his confession,

7   if that's what you want to call it.  It says he saw

8   Mr. Garcia's body from his second -- from his home, I

9   should say.  And you pointed out that that's an

10  impossibility if he's in the back coach house, right?

11      A.   Correct, relying on other information in the

12  case.

13      Q.   Well, the only other information in the case

14  is that he purportedly lived in that back house; and if

15  he's at home, then he would have been in that back

16  house, right?

17      A.   Correct.  And that's where the police went and

18  that's where the aunt lives, and the aunt was his

19  guardian, et cetera, et cetera.  But it's just an

20  application of the --

21      Q.   Well, you don't have to get into that because

22  I have another question.  That's just the setup.

23           The next question is, why are you required as

24  an expert to point that out for a jury?  Can't a jury

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 149

1  draw that conclusion on its own?

2      A.    I don't think that the jury is going to know

3  about the research on this area and how experts evaluate

4  reliability and unreliability of statements.  That's an

5  instance -- you know, one example of what I say is an

6  indicia of unreliability here.

7      Q.    Well, I know, but we're talking about

8  something that is not outside of the juror's knowledge,

9  that -- that -- that being if an impossible fact is

10  contained in the statement or confession, then that

11  could undermine the confession itself, right?

12      A.    Right, but the jury presumably is not going to

13  know about the research on indicia of unreliability and

14  how an expert evaluates likely reliability or

15  unreliability.  That's just an application of the

16  principle.

17      Q.    What other -- what other social science areas

18  rely on this indicia of reliability test that you're

19  talking about?

20      A.    I don't know about other social science areas.

21  My expertise is on interrogation and confessions.  This

22  is how we evaluate it.  So I don't know what other

23  social science areas.  I'm -- I'm sure the same

24  principle would apply in eyewitness testimony --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 150

1      Q.   So --

2      A.   -- in some modification.  But my focus is on

3  interrogation and confessions.  That's -- that's what I

4  work on primarily.

5      Q.   **And who wrote the research on the indicia of**

6  **reliability test?**

7      A.   Well, others have written about it as well.

8  But like I said, the kind of fit standard language comes

9  from articles that Richard Ofshe and I wrote in the

10  1990s, which is just a different way of talking about

11  what other people had talked about prior to us and what

12  police manuals had talked about as well.

13      Q.   **Well, I understand that police manuals may**

14  **have talked about it.  But what I want to know is, who**

15  **is -- who initiated the use of this fit analysis?  Do**

16  **you want to call it fit analysis?  I mean, it sounds**

17  **like you're going back to that.  Is that how we should**

18  **be describing this?**

19      A.   It doesn't matter to me how you describe it.

20      Q.   **Okay.**

21      A.   I think I understand what you're describing.

22  I think what I've been trying to say --

23      Q.   **Wait.  Let me get the question out -- let me**

24  **get the question out first so the record is clear.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 151

1          **What I want to know is, as a -- as a tool --**

2   **it's a meth -- it's a methodology that you employ as a**

3   **false confessions expert in determining the reliability**

4   **of the confession or the statement at issue.  Who**

5   **pioneered this tool for use by social scientists like**

6   **yourself to use in addressing the reliability of a**

7   **false -- of a confession?**

8          A.   I don't know who pioneered it.  It's been

9   around for a long time.  It's been in the literature for

10  a long time.  Richard Ofshe and I came up with that

11  language trying to systemize it a little bit.  That

12  language has been adopted by others.

13         Q.   **What social scientists were using the fit**

14  **analysis prior to you?**

15         A.   I would have to go back and look at articles

16  from the '60s and '70s.  I would say probably

17  Saul Kassin, Lawrence Wrightsman, Philip Zimbardo, a guy

18  named Edwin Driver.  But I would have to do a little

19  research on that.  But what I'm representing to you is

20  this was a common way of thinking about evidence of

21  reliability and unreliability in confessions that

22  predates Richard Ofshe and my work in the 1990 s.

23         Q.   **But you're unable to describe the extent to**

24  **which this was used prior to you and Richard Ofshe**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 152

1    systemizing it?

2         A.    I --

3         MR. AINSWORTH:  Objection to form.

4    BY THE WITNESS:

5         A.    Yeah, I -- I can't give you a percentage.

6         Q.    Okay.  And since -- You've described in your

7    report four key things, I think, as part of your fit

8    analysis, right?

9         A.    You're going to have to direct me to what

10   you're talking about when you say "four key things."

11        Q.    Yeah, I'll -- I'll do that.  It's under the

12   heading Indicia of Reliability [sic].  And you have

13   the -- obviously, you have the report with you, Doctor?

14        A.    I do, yes.  Thank you.

15        Q.    Well, my computer with my report is frozen,

16   so ...

17             Well, one of the things -- And let me see if

18   this refreshes your memory, Doctor.  One of the things

19   you identified is the failure of the police to follow up

20   on potential leads regarding a person named Thomas.

21        A.    Yeah, I'd have to find the place in the

22   report.  I'm sorry.  There was a general session --

23   section on indicia of unreliability.  I thought maybe

24   you were referring to that.  But it sounds like you're

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 153

1  referring to the specific section, which -- I guess when

2  your computer unfreezes -- I think is on Page 36.

3  **Q.  Yes, that's what I'm talking about.  You list**

4  **four main -- main -- main things, I should say, that you**

5  **identify in support of your conclusion that the**

6  **statement is unreliable.**

7  A.  So you're talking about where it says, "Four

8  points stand out here."

9  **Q.  Yes.**

10  A.  Okay.  Those are illustrations, yes.

11  **Q.  Okay.  Are there other points that you did not**

12  **describe in your report that support your conclusion**

13  **that the statement is unreliable?**

14  A.  Well, these are indicia of unreliability.  As

15  I sit here, no.  There might be others that I'm not

16  thinking of.  But these were the main ones I highlighted

17  here that I recall now.  And it looks like there might

18  be five points here that -- at least in my report, it

19  looks like one of the points had a missing bullet point.

20  **Q.  That's all right.**

21  **So let's talk about -- the one about the lead**

22  **related to Thomas.  Do you see that one?**

23  A.  No.

24  **Q.  That there was information from the sub shop.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 154

1  Someone at the sub shop related to a person named

2  Thomas?

3      A.   I -- I don't see -- In any of the five bullet

4  points, I don't see the word "Thomas."

5      Q.   Okay.  It's -- it's at the bottom of Page 36.

6  It's the second -- It's actually under the first bullet

7  point.  Okay?  And it says, "The liquor store employee

8  just east of Queen Submarine who had witnessed the

9  murder told police that the intended victim was 'Snake,'

10  a passenger in Rafael Garcia's car, and that the shooter

11  was 6 feet tall and had the last name of Thomas."

12          Do you see that?

13      A.   Okay.  I'm sorry.  I didn't see that.  Yeah.

14      Q.   Okay.  That is -- I believe you're

15  highlighting that as a failure by the police to follow

16  up on a lead?

17      A.   That's not how I would describe it.  I'm

18  highlighting it as a contradiction between what a

19  witness described and -- and Arnold Day, the height is a

20  mismatch.

21      Q.   So your point here is just that the height is

22  mis- -- mismatch?

23      A.   Yeah.

24      Q.   The shooter was 6 feet tall and that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 155

1  **Arnold Day is not 6 feet tall?**

2      A.   Correct, that it doesn't --

3      **Q.   Okay.**

4      A.   -- fit -- The person who Mr. Jakes implicates

5  as the shooter in his statement, Arnold Day does not

6  physically match the description, at least the height,

7  of the person mentioned by the witness, Thomas.

8      **Q.   Okay.  So why include all the other**

9  **information about Thomas and Snake if it's not relevant**

10 **to your opinion on the fit analysis?**

11     A.   Well, it was relevant to my opinion on the fit

12 analysis.  I'm saying there's a lack of fit between the

13 eyewitness description of the height of the shooter and

14 of -- and Mr. Jakes's description of Arnold Day as the

15 shooter.

16     **Q.   Okay.  And was this -- this eyewitness ever**

17 **located?**

18     A.   I'm not sure if this eyewitness was ever

19 located.

20     **Q.   Okay.  And I think you're getting this from a**

21 **police report; am I correct?**

22     A.   Probably.

23     **Q.   All right.  So I guess the part about a**

24 **potential other suspect, the last name of Thomas, the**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 156

1    fact that there was no investigation related to Thomas

2    is not part of your fit analysis; is that fair to say?

3         A.    I'm sorry.  Can you repeat that question?

4         Q.    Sure.  I read this wrong.  Obviously, you

5    corrected me.  I read this as being support -- You've

6    cited this for the proposition that a potential suspect

7    was not investigated in support of your fit analysis.

8    And my question to you is, is it fair to say that

9    whether the police looked for Thomas or not is not

10   relevant to your fit analysis?

11        A.    Let me just review this real quick.

12              Yeah, it's not about Thomas.  It's about the

13   mismatch between the person implicated by Mr. Jakes,

14   Arnold Day, and the witness description that was -- of

15   the person 6 feet tall and with a different last name.

16        Q.    Okay.

17        A.    So that's the lack of fit, those two things:

18   different last name, different height.

19        Q.    Fair enough.

20              What about -- Just above -- Hang on a second.

21   Just above it, "None of the physical, forensic or

22   circumstantial evidence recovered at the scene was

23   connected in any way to Mr. Jakes."

24              Okay.  What physical or forensic evidence

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 157

1    would you have expected to be recovered connecting

2    Mr. Jakes to the crime if his statement were true?

3         A.   Well, I don't know, but usually there is

4    physical or forensic or some evidence left behind in a

5    murder; and when that's tested, it links usually to the

6    suspect if the suspect is involved in the crime.  But as

7    I sit here today, I just don't recall.

8         Q.   Right.  Well, I guess that's the -- the -- the

9    question.  So you know that Jakes's statement places him

10   as a lookout at the corner and that he runs -- according

11   to the statement, runs away after the shooting -- after

12   four shots are fired.  His involvement as a lookout,

13   what physical or forensic evidence would you expect to

14   be recovered given that description connecting Mr. Jakes

15   to the crime?

16        A.   I guess I would have to look at what evidence

17   was recovered.  I -- I don't -- There's a variety of

18   possibilities.  I don't remember the crime scene --

19        Q.   That's okay.

20        A.   -- investigation well enough to answer that

21   question adequately.

22        Q.   Okay.  So as you sit here today at your

23   deposition, it's not something you can speak to without

24   having an opportunity to review -- stop and review

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 158

1    materials; is that fair to say?

2        A.    Yes.

3        Q.    How about this:  Are you even in a position to

4    say what should be present -- what types of physical or

5    forensic evidence should be present given that you don't

6    have any expertise in those areas?

7        A.    Well, I just don't see how the two halves of

8    your question are connected.  I'm not an expert on

9    ballistics.  I'm not an expert on blood spatter.  I'm

10   not an expert on fingerprints.  But obviously in some

11   cases, you would know that there would be ballistics or

12   blood spatter or fingerprints.  I'm not talking about

13   this specifically.  So just because somebody is not an

14   expert on that doesn't mean they wouldn't know that in

15   some crimes certain types of evidence are left behind,

16   and that may be relevant for analyzing other issues.

17       Q.    Do you know under what circumstances there

18   should be any type of forensic evidence left behind in a

19   shooting?

20       MR. AINSWORTH:  Object to the form of the question.

21   BY THE WITNESS:

22       A.    If there's blood, if there's gunshot residue.

23   I mean, it's such a vague question.  It's hard to

24   answer.  It depends on the crime and the instruments and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 159

1    the location.  There might be broken glass in some

2    crimes.  It just depends.  So I think the cri- -- I

3    think the question is kind of pitched at such a level of

4    vagueness that it's -- it's -- it's hard for me to

5    answer.

6        **Q.   Well, I mean, you either know or you don't**

7    **know what should be left behind.  I mean, you've**

8    **reviewed this case.  You have the information as to what**

9    **Mr. Jakes said and then presumably you would know what**

10   **should be left behind in terms of physical or forensic**

11   **evidence given Mr. Jakes's role as a lookout, right?**

12       MR. AINSWORTH:  Object to the -- object to the form

13   of the question.

14   BY THE WITNESS:

15       A.   I thought your prior question was a general

16   question.  I'm telling you that I would just have to --

17   I would have to refresh my recollection on what evidence

18   was left behind in this case to answer that question.

19       **Q.   Okay.  Circumstantial evidence, how do you**

20   **define it?**

21       A.   Evidence that people argued you can infer a

22   connection between the person who is accused of

23   committing the crime and the evidence --

24       **Q.   Okay.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 160

1  A.  -- from which you can make an inference of

2  guilt, even though it may be a weak inference as opposed

3  to a direct inference.

4  **Q.  All right.  In order to be circumstantial**

5  **evidence, does each piece of circumstantial evidence by**

6  **itself have to be something in which you can draw an**

7  **inference of guilt?**

8  A.  As I would define the term, yes.

9  **Q.  Where did you get your definition?**

10  A.  I -- I don't have a source.  I -- I just would

11  think that if you're going to say there's circumstantial

12  evidence, it would be on a case-by -- it would be on an

13  evidence-by-evidence basis.  I don't understand -- Maybe

14  I just don't understand your question, how you could say

15  something was circumstantial evidence and not

16  circumstantial evidence at the same time.

17  **Q.  Well, and you have evidence that Mr. Jakes was**

18  **in the vicinity at the time the shooting took place,**

19  **right?**

20  A.  I -- I believe so.

21  **Q.  Wouldn't that be circumstantial evidence?**

22  A.  I don't think -- I wouldn't characterize that

23  as circumstantial evidence because a lot of people were

24  in the vicinity at the time.  Presumably Chicago is a

Page 161

1    densely populated city, and so it -- it doesn't -- it's

2    not really very probative to say somebody was in the

3    vicinity.  You have to be more specific than that.

4        **Q.    Well, right.  Exactly.  If he's not in the**

5    **vicinity, that's something you can certainly point to**

6    **and say, well, he wasn't there, and it's a proven fact**

7    **he wasn't there; therefore, he couldn't have committed**

8    **the crime.  That would be an inconsistency, right?**

9        A.    Depending on where, yes.

10       **Q.    Well, at 51 -- at 1208 51st Street in**

11   **Chicago --**

12       A.    Right.  I don't -- I --

13       **Q.    -- September 16th, 1991.**

14       A.    Right.  I thought you meant like if he was in

15   Gary, Indiana, then yes.

16       **Q.    Okay.  So that would be an inconsistency if it**

17   **were true that you could cite to and say he wasn't**

18   **there, so it's impossible for the statement to be true,**

19   **right?**

20       A.    More than an inconsistency, but yes.

21       **Q.    Okay.  Here, though, you cited as an**

22   **inconsistency that none of the circumstantial evidence**

23   **recovered at the scene connected him in any way to one**

24   **of the circumsta- -- pieces of circumstantial evidence,**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 162

1   his -- Jakes's own admission that he was in the vicinity

2   at the time the shooting took place; isn't that --

3        MR. AINSWORTH:  Object to -- object to the form of

4   the question, specifically the word "vicinity."

5   BY MR. MORAN:

6        Q.   Go ahead, Doctor.

7        A.   The sentence you're asking about says evidence

8   recovered at the scene.  That's not evidence recovered

9   at the scene.  And the whole point of this analysis is

10  to compare what he says against other evidence or we

11  can't use what he says as other evidence to compare to

12  what he says.

13       Q.   Oh.  Well, let's break that down.  What

14  circumstantial evidence recovered at the scene would you

15  expect to find given Mr. Jakes's statement that he was a

16  lookout on the corner who ran away after the shots were

17  fired?

18       A.   I would -- I just wasn't thinking about it

19  that way.  I wasn't thinking about evidence that I

20  expect to find.  What we see in false confession and

21  wrongful conviction cases, particularly homicides, is

22  the evidence doesn't link.  So I wasn't thinking about

23  evidence that I would expect to find.

24            And I also wasn't saying that this was false.

Page 163

1   This is for a jury to determine.  I'm just saying, this

2   is an indicator, a potential indicia or indicia of

3   unreliability, but I -- I wasn't thinking about

4   hypothetical possibilities of evidence that I would

5   expect to find.

6           Oftentimes people -- things fall out of

7   people's pockets or fingerprints are left behind.  So

8   you could be a lookout and leave behind other evidence,

9   circumstantial or direct, but I just wasn't thinking

10  about the array of possibilities.  This is a pattern

11  that we see in false confession and wrongful conviction

12  cases --

13      Q.    **Well, okay.**

14      A.    -- and this is present here.

15      Q.    **So --**

16      A.    That's how I was thinking about it.  So you're

17  asking a question that has nothing to do with how I was

18  thinking about it, and I can only explain how I was

19  thinking about it.  Now, we can conjure up

20  possibilities --

21      Q.    **Okay.**

22      A.    -- like I just did.

23      Q.    **Okay.**

24      MR. AINSWORTH:  Let him answer the question, Pat.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 164

1      MR. MORAN:  He's not --

2      MR. AINSWORTH:  Pat, let him answer the question.

3  BY MR. MORAN:

4      **Q.   Listen, I've been very patient, you know,**

5  **letting you answer the questions, but, you know, giving**

6  **me -- going off into a conjuring up things, that's not**

7  **answering the question.  Okay.  I'm sorry, but I don't**

8  **want to be here --**

9      MR. AINSWORTH:  You asked the question, Pat.  I'm

10  sorry.

11      MR. MORAN:  Yeah, I did ask the question, and now

12  it's in the nonresponsive phase.  I'm sorry, but that's

13  where we're at.  You know, I also want to keep us moving

14  here at some kind of a pace.

15  BY MR. MORAN:

16      **Q.   Doctor, my point here -- and I'll be blunt**

17  **with you -- is that you've identified something as an**

18  **inconsistency, which is that none of the physical**

19  **evidence or circumstantial evidence or forensic evidence**

20  **connects Mr. Jakes.  But the fact of the matter is, you**

21  **wouldn't expect to find it at all given his level of**

22  **participation in --**

23                      **(Audiovisual feed failure.)**

24                      **(Discussion off the record.)**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 165

1      THE VIDEOGRAPHER:  Okay.  The time is 1:45 p.m.

2  We're now back on the record.

3      MR. AINSWORTH:  What are we doing, guys?

4      MR. MORAN:  Let's finish that question, and then if

5  you want to take a break since it's, like, hanging out

6  there.

7          Is that -- is that okay with you, Doctor, or

8  -- I mean, it's up to you.  What do you want to do?

9  BY THE WITNESS:

10     A.   Yes.  I think when we got cut off, I was

11  disagreeing with you.  I think I was saying --

12     **Q.   No, I know.**

13     A.   Okay.

14     **Q.   Yeah, what I want --**

15     A.   So do you want me to try to recreate the

16  answer that I gave?  Is that what we're doing?

17     **Q.   No.  No, no, no.  We'll have the -- I'll --**

18  **I'll reask the question just so we can have a clean back**

19  **and forth.**

20     A.   Okay.

21     **Q.   So obviously, the point is that you've**

22  **identified an absence of physical, forensic, or**

23  **circumstantial evidence found at the crime scene**

24  **connecting Mr. Jakes to the crime, but the fact of the**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 166

1  matter is, given his level of participation, you would

2  not expect to find that evidence anyway; isn't that

3  true?

4      A.   And I was disagreeing with you and saying

5  sometimes lookouts leave behind evidence, and so I

6  wasn't expecting that to not be the case necessarily.

7  And then I was, like, saying this is a pattern that we

8  see as an indicia of unreliability in false confession

9  cases.

10     Q.   All right.  So should we continue on now, or

11  do you want -- do you need to take a break?

12     A.   Why don't we go for 13 more minutes, which

13  would be 2:00 p.m. your time, noon my time?

14     Q.   All right.  So have you published any studies

15  in which you've identified these patterns of evidence as

16  to what a lookout might leave behind in order to --

17     A.   Not --

18     Q.   -- in order to support this position in your

19  report?

20     A.   Not -- not on a study specifically on

21  lookouts, no.

22     Q.   Are you aware of any empirical evidence to

23  support your claim that lookouts might leave behind

24  something that they may have dropped connecting them to

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 167

1  the crime to support your claim that there is a pattern

2  supporting what you -- the position you've taken in your

3  report?

4       A.   Well, there are studies that involve a fit

5  test and analysis but not on -- just on lookouts.  And

6  my answer about lookouts was saying this is possible and

7  that's why you could have evidence linking a lookout to

8  a crime.

9       Q.   What -- isn't it -- I mean, do you even know

10 whether it's a remote possibility versus a probable

11 possibility or a probability that Mr. Jakes could have

12 dropped something when he decided to run away?

13      MR. AINSWORTH:  Object to the form of the question.

14 BY THE WITNESS:

15      A.   I -- I -- I don't know what likelihood of

16 possibility that is.  I was merely making the general

17 point that sometimes lookouts leave evidence behind

18 since you were saying -- you -- you were questioning me

19 but also arguing that -- that you wouldn't expect a

20 lookout to leave anything behind, and I was only

21 mentioning that as a possible example.  I mentioned

22 other possible examples.

23      Q.   Why didn't you include in this sentence, this

24 first bullet point, that -- your point that Mr. Jakes as

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 168

1  **a lookout might have left something behind?**

2      A.    I didn't think it was necessary to that point

3  to include it.  The pattern is that -- one of the

4  patterns that you see in false confession cases is

5  there's no physical evidence linking the confessor to

6  the crime, and so I thought that made the point.  I

7  didn't think it was necessary to say that he was a

8  lookout in the confession.

9      **Q.    In any particular case in which you've -- a**

10  **lookout has been at issue that you reviewed, what types**

11  **of physical or forensic or circumstantial evidence has**

12  **the lookout left at the scene?**

13      A.    Off the top of my head -- You know, I've

14  looked at so many cases; I can't think of a case where

15  somebody confessed to a lookout.  I'd have to review

16  records really to answer that question.  So off the top

17  of my head, I just can't think of a case where somebody

18  confessed falsely as a lookout and then go through the

19  exercise of what evidence was left or not left behind.

20      **Q.    Okay.  In the third -- In the second bullet**

21  **point, you identify the certificate of innocence.  Why**

22  **is the certificate of innocence that Mr. Jakes obtained**

23  **years and years later part of the fit test?**

24      A.    Well, I wouldn't say it's part of the fit

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 169

1  test.  I would say that it's just one potential

2  indicator of unreliability.  Obviously this body has

3  adjudicated him as innocent of the offenses he was

4  charged with in the indictment, and I think that's

5  relevant in a kind of totality of the circumstances way

6  when considering the likely reliability or unreliability

7  of his statement.

8      Q.  Do you --

9      A.  Now, again, it's not for me to say it's a

10 false or a true statement.  I'm just saying that these

11 are indicators or potential indicators of unreliability.

12     **Q.  Right.  But this isn't evidence that would**

13 **have been found at the crime scene or expected to match**

14 **or not match the confession.  This is a finding by a**

15 **court decades later as to whether, you know, he's**

16 **innocent or not, right?**

17     A.  Correct.

18     **Q.  And your fit test is intended to match the**

19 **confession with the -- the crime scene evidence to**

20 **determine if the -- the statement or the confession is**

21 **reliable, right?**

22     A.  Yeah, and the suspect's level of knowledge.

23 I'm not saying -- presence or absence of knowledge.  I'm

24 not saying that -- that their finding here is part of

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 170

1    the fit test.  I didn't say that.

2        Q.   **Well, you have it as four things that stand**

3    **out under the section Indicia of Unreliability, right?**

4        A.   Right.  And -- And I -- I think that it is a

5    potential indicia of unreliability, and it's not part of

6    the fit test, although their adjudication may have

7    revolve -- relied on some form of the fit test.

8        Q.   **How do you know?**

9        A.   I -- I don't.  I said may have.  But I didn't

10   represent this as part of my analysis of the fit test.

11   I just said it's -- it's an indicia of unreliability.

12   When --

13       Q.   **Okay.  So --**

14       A.   -- an official body declares somebody

15   innocence -- innocent in American law, it's a pretty big

16   deal.  Our system is --

17       Q.   **So --**

18       A.   -- not set up to identify people as innocent,

19   just not guilty.

20       Q.   **Let -- Let's back up a second.**

21            **The Indicia of Reliability [sic], Section D,**

22   **is this the fit test?  Is this the discussion of the fit**

23   **test?**

24       A.   Yes, but -- but it's not just the fit test.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 171

1      Q.   Okay.  It says in the very first sentence,

2  Anthony Jakes prosecutor-written, prosecutor-edited

3  statement does not bear any of the traditional indicia

4  of reliability that researchers and experts use to

5  assess confession evidence.  And then it follows, It's

6  not supported or corroborated by physical, forensic,

7  medical, or other credible evidence; did not lead to any

8  missing or new evidence; did not contain any nonpublic

9  case facts that only the true perpetrator, but not the

10  police detectives, knew.

11         This is the description of the fit test,

12  right?

13     A.   Yes, in succinct form, yes.

14     Q.   Okay.  So have you read the statute in

15  Illinois that discusses the certificate of innocence --

16     A.   I have --

17     Q.   -- the certificate of innocence statute?

18     A.   I have not.

19     Q.   Okay.  Do you know what -- whether anyone

20  contested Mr. Jakes's petition for a certificate of

21  innocence?

22     A.   I do not.

23     Q.   Do you know what evidence Mr. Jakes relied on

24  to get a certificate of innocence?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 172

1      A.   I -- I -- I don't recall specifically.

2      **Q.   Do you know -- Aren't these important**

3  **questions for you to know the answers to before you rely**

4  **on the certificate of innocence as being an important**

5  **point that stands out in support of your fit test**

6  **analysis?**

7      A.   No.  I would just repeat what I said a moment

8  ago, which is that it's rare when a court or legal body

9  adjudicates somebody as innocent, and that's worth

10  paying attention to.

11     **Q.   Well, I guess that's the point.  You don't**

12  **know what went into that adjudication, do you?**

13     A.   I do not specifically.  I'd have to review it,

14  but I know these things are not determined lightly.  My

15  recollection is the prosecution didn't object it -- to

16  it, but I could be misremembering.  But, you know, I've

17  seen this in other cases.  I've seen them denied in

18  cases that I thought were a false confession.  I think

19  it's an extraordinary legal judgment --

20     **Q.   Okay.**

21     A.   -- not arrived at lightly.

22     **Q.   Yes, I understand that you think it's an**

23  **extraordinary judgment.  But you also haven't read the**

24  **statute, and you don't know what is -- the requirements**

Page 173

1    **are to get it, this -- this certificate of innocence,**

2    **and you don't know what evidence was relied upon.  And**

3    **you do have an understanding that the prosecutor didn't**

4    **object, right?  All of those things --**

5        MR. AINSWORTH:  Objection -- Hold on.  Hold on.

6    Objection.  It's compound, and you're just arguing with

7    the witness.

8            But if you can answer, you can answer.

9    BY THE WITNESS:

10       A.   I think that's accurate, although obviously I

11   do know some of the facts of the case.  I just didn't

12   look at specifically what they relied on in that

13   judgment.

14       **Q.   Okay.  So it turns out that the -- It's not**

15   **just that the prosecutor didn't object.  The prosecutor**

16   **didn't do anything, so it was a completely one-sided**

17   **presentation of evidence uncontested by Mr. Jakes,**

18   **right?**

19       MR. AINSWORTH:  Objection.  That mischaracterizes

20   the evidence.

21   BY MR. MORAN:

22       **Q.   Was it contested?**

23       MR. MORAN:  Well, wait.  Hold on a second.  This is

24   actually important.  Normally I wouldn't argue with

Page 174

1   Russell.

2          But who contested it?

3      MR. AINSWORTH:  It's not that the -- The

4   prosecution did not object to the issuance of the

5   certificate of innocence, which is different from your

6   characterization of the prosecutor's action.  They

7   said -- They -- They did not object to Jakes getting a

8   certificate of innocence --

9      MR. MORAN:  Which --

10     MR. AINSWORTH:  -- which is an important --

11  extremely important point.

12     MR. MORAN:  Yeah, and I said they didn't object,

13  which also implicitly means they did not challenge any

14  of the evidence, right?

15     MR. AINSWORTH:  Are you asking me, or are you

16  asking the doctor?

17     MR. MORAN:  I mean, you -- you took issue with it.

18  So don't you agree that the prosecutor didn't challenge

19  any of the evidence?

20     MR. AINSWORTH:  No.  The prosecution agreed that --

21     MR. MORAN:  Okay.

22     MR. AINSWORTH:  -- that Mr. Jakes was innocent

23  after --

24     MR. MORAN:  All right.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 175

1      MR. AINSWORTH:  -- litigating the post conviction

2  and then dismissing the charges.

3  BY MR. MORAN:

4      **Q.   So, Doctor, there you have it.  So Mr. Jakes's**

5  **petition for a certificate of innocence was not**

6  **contested at all, and, in fact, the prosecutor just said**

7  **they do not object at all, right?  I'm asking you,**

8  **Doctor.  I already know what Russell is going to say.**

9      A.   Right.  So it sounds to me like the question

10  you're asking me is just a factual description.  But

11  before the objection, you were asking -- you were asking

12  an opinion question, not just for the factual

13  characterization, but the lack of a prosecution's

14  objecting.  And what you said in the prior question was

15  it was a completely one-sided presentation, and what I

16  was going to say is that's not necessarily the case.

17  But the fact that the prosecution didn't object didn't

18  mean it was a one-sided pros- -- presentation.  It means

19  that they agreed presumably with -- with the defense's

20  position and it sounds like after an investigation -- a

21  thorough investigation of the evidence.

22      **Q.   Well, so yes, the prosecutor was --**

23          **Or by the way, do you know who the prosecutors**

24  **were?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 176

1      A.   For the -- for the certificate of innocence,

2   no, I don't.

3      **Q.   Do you know whether the decision not to object**

4   **was politically motivated?**

5      A.   No.  No, I -- I don't know if there was any

6   political motivations, if that's what you're asking.

7      **Q.   So the prosecutor -- There's a difference**

8   **between -- and you pointed out already -- a difference**

9   **between being found not guilty and innocence, right?**

10     A.   In -- in our legal system, yes.

11     **Q.   And our legal system is also adversarial,**

12  **right?**

13     A.   Formally, yes.

14     **Q.   And do you have any -- As someone who's been**

15  **involved in reviewing police interrogations and, you**

16  **know, the use of confessions for north of 30 years, do**

17  **you have any problem with the fact that we have a system**

18  **that is designed as an adversarial system?**

19     A.   That's such a broad question.  Do I have a

20  problem?  I think the adversarial system has limitations

21  and -- and it has benefits, but I don't know how to

22  answer a question that's pitched to that level of

23  generality.  That's like the subject of a college

24  lecture.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 177

1        Q.   Well, you could criticize it or not, right?  I

2    mean, that -- that's -- that's kind of the answer,

3    right?  Are you critical of the adversarial system, or

4    do you accept it as one of the best methods we have for

5    finding the truth?

6        A.   I'd say both.  Sometimes it's good.  Sometimes

7    it's not.  But I don't see how that bears on a

8    determination of innocence and --

9        Q.   Well, in this case, you know -- So I'm going

10   to ask you, Doctor.  In this case, we now -- you now

11   know that the petition for a certificate of innocence

12   was not challenged in any adversarial way.  Does that

13   have any effect on your opinion?

14       A.   No, it doesn't have any effect on my opinion

15   because obviously the other side did a thorough

16   investigation of the case and they arrived at their

17   particular conclusion.  The adversarial challenge -- you

18   know, we have two sides challenging something out -- is

19   actually the exception in our system.  Most -- most

20   cases are resolved through negotiation and agreement at

21   least in the criminal justice system of a plea and in

22   civil cases through settlement.

23            And my interpretation of what's been described

24   is the prosecution agreed that he was factually innocent

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 178

1    and there was no need for them to challenge this.  That

2    seems to me as -- as plausible as any other explanation

3    of why they did not put up a challenge.  And I've seen

4    that happen in other cases where there's evidence of

5    innocence as well.

6         **Q.   Okay.  So why do you think the prosecution did**

7    **a thorough investigation prior to -- in the proceeding**

8    **prior to Mr. Jakes seeking a certificate of innocence?**

9         A.   Because that's the way it usually works,

10   because prosecutors in my experience and study and

11   literature, they -- they -- they vociferously defend

12   their convictions.  Oftentimes they're wrongful

13   convictions, even in DNA cases.  They don't -- They

14   don't give up lightly, especially in a case involving

15   murder.  And so that's the pattern that you typically

16   see.  And for --

17        **Q.   Okay.**

18        A.   -- them to not contest it suggests they

19   arrived at -- at the same conclusion.  One of the roles

20   of the prosecutor, as you know, is to be an ambassador

21   or minister of justice, to do the right thing.

22        **Q.   So, Doctor, what I'd like to know is, can you**

23   **point to any particular facts that demonstrate to you**

24   **that the prosecutor actually did a thorough**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 179

1    **investigation?**

2         A.    Not as I sit here today, no.  I'd have to --

3    I'd have to study the materials.

4         **Q.    Okay.  Now, further, in 6- -- in Footnote 64**

5    **at the bottom of the page, you have a sentence about the**

6    **statement of Gus "Snake" Robinson not necessarily being**

7    **corroborative of the coerced statement, right?**

8         A.    Yeah.  So --

9         **Q.    Well, so --**

10        A.    I'm going to have to read this, and we're kind

11   of at the 12:00 o'clock.

12        **Q.    No, that's fine.**

13        THE WITNESS:  Can we take a lunch break or no?

14        MR. MORAN:  No, we can do that.  Not a problem.  So

15   go ahead.  We'll take a break.  How long do you want?

16        THE WITNESS:  Would a half hour be okay with

17   everybody, or does -- I don't -- Does somebody want more

18   than a half hour?

19        THE VIDEOGRAPHER:  Okay.  The time is 2:02 p.m.

20   We're now going off the record.

21                         (A short break was had.)

22        MR. MORAN:  All right.  So we're back on?

23        THE VIDEOGRAPHER:  It is -- Yeah.  The time is 2:38

24   p.m.  We're now back on the record.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 180

1       MR. MORAN:  Okay.  Can you read back the last

2   question, please?

3                       (Record read as requested.)

4   BY MR. MORAN:

5       **Q.   All right.  And sort of to reorient us,**

6   **Doctor, do you see where I was -- that question was**

7   **referencing on Page 36 --**

8       A.   Yes.

9       **Q.   -- Footnote 64?**

10          **Okay.  So you used the phrase "not necessarily**

11  **corroborative," which to me means there is a possibility**

12  **that it is not necessarily corroborative.  Is that**

13  **what -- the point you were trying to make?**

14      A.   Not really.  I -- I didn't see it as

15  corroborative, but it's not for me to make factual

16  determinations, obviously.  So maybe you're focused on

17  the words "not necessarily."

18      **Q.   Yes, I am focused on the words that you chose**

19  **to put in the report, "not necessarily" --**

20      A.   I'm just going to have to pause you for a

21  second.  I'm sorry.  I'm having an interruption here

22  with a child.

23                       (Discussion off the record.)

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 181

1    BY MR. MORAN:

2        Q.   No worries.  I'll reask the question.  If you

3    do need to take a break for any of your kids, that's

4    fine, so ...

5        A.   Thanks.

6        Q.   I want to focus on the words you chose to put

7    in the report "not necessarily."  Why did you --

8        A.   Okay.

9        Q.   -- put "not necessarily" in there if you find

10   that it is not corroborative -- corroborative?

11       A.   Because others might think that it was

12   corroborative.

13       Q.   Okay.  So are you relying on -- or are you --

14   are you suggesting that Gus Robinson's statement should

15   not be considered in the fit analysis?

16       A.   You can consider it in the fit analysis.  I

17   just discount it for a couple reasons.  One is that

18   it's -- or several reasons.  One is what I described in

19   the footnote, his account changes.  He describes in his

20   trial testimony seeing something that Jakes says was a

21   physical impossibility because the newspapers that were

22   blocking the view.  What he describes in his trial

23   testimony was never documented in the police report, as

24   I say in the footnote.  He was given a deal in exchange

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 182

1 for his testimony.  His answers are all over the place.

2 So I don't find it to be corroborative, but I understand

3 that was the prosecution at trial's assertion.

4        **Q.   Okay.  So let's take it -- Let's break it down**

5 **a little bit.  The fact that you note that his story has**

6 **changed at some point and it was not -- some of these**

7 **changes were not documented, the fact --**

8            **First of all, you acknowledge the possibility**

9 **and likelihood that witnesses may change their testimony**

10 **once they hit the witness stand, right?**

11       A.   I would say possibility, but when you say

12 "likelihood," I don't think it's a given.

13       **Q.   No, nothing is a given.  But it is -- it**

14 **happens, right?  Witnesses get on the witness stand and**

15 **aspects of their testimony change, right?**

16       A.   Yes, sometimes witnesses' testimony stays

17 consistent; sometimes it changes.

18       **Q.   Okay.  That doesn't necessarily mean that**

19 **his -- what he's saying is false, agreed?**

20       A.   If -- if you take it out of context, yeah, it

21 doesn't necessarily mean that.  But what he is

22 describing, I thought both Boudreau and Kill said, yeah,

23 if he had described that, we would have put it in the

24 police reports.  So that --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 183

1     Q.   Okay.

2     A.   So that --

3     Q.   Well, that's -- that's sort of a different

4 issue, whether they would have documented something he

5 said.  I --

6     A.   Well, it's in the footnote.  It's in

7 Footnote 64.  I thought it was part of the same issue.

8     Q.   No, it actually --

9     A.   That's why I put it in the footnote.

10     Q.   Well, what I'm asking you about, Doctor, is,

11 do you agree that just because a story may -- or a

12 witness's version of events may change or include an

13 additional fact at trial, that doesn't mean the

14 witness's testimony is false?  Do you agree with me?

15     A.   At that level of vagueness and generality,

16 yes, if that's all you know, but I'm suggesting here

17 there's more than that that's relevant to answering that

18 question, and that's what I was starting to get into.

19     Q.   I know.  You've -- So you're looking at all of

20 this totality of the circumstances, so to speak, putting

21 it all together to say that Mr. Robinson's testimony

22 isn't reliable.  Is that what's happening here?

23     A.   Well, I would say indicia of unreliability.

24 But more specifically, with regard to Robinson -- I

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 184

1  guess I say here in the footnote, ASA Grossman and

2  Boudreau would have documented if what he described

3  occurred.  It's significant when a witness's testimony

4  changes and the prosecutor and -- and -- and the

5  detectives say, Yeah, if he had said that in our initial

6  interview, we would have documented it.  That's not --

7  That's -- That's very different than in my --

8       Q.   It is.

9       A.   -- experience with most witness testimony that

10  changes.

11      **Q.   Well, I -- I will agree with you.  If he**

12  **changes his testimony, that is important stuff to know,**

13  **but I don't think what you've described is a change.**

14  **He's included additional information that was not**

15  **provided.  That's not the same as changing his**

16  **testimony, right?**

17      MR. AINSWORTH:  I'll object to your question as

18  argumentative.  You're just arguing with the witness at

19  this point.

20      MR. MORAN:  I'm not arguing with him.

21  BY THE WITNESS:

22      A.   It could go either way.  You know, one way of

23  changing is including details you didn't put before.

24  It's just a different way of characterizing the same

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 185

1  thing in my opinion.

2      Q.   Well, okay.  So he's added an additional fact

3  that you characterize as changing his testimony, right?

4      A.   Yes.

5      Q.   Okay.  Does it contradict any of his prior

6  statements, this additional fact?

7      A.   That's not the contradiction that I was

8  calling attention to.  It's the other contradictions

9  that are problematic, not that it contradicts the

10  earlier statement, even though it's --

11      Q.   Can you do me a favor and just answer the

12  question I asked?

13      A.   But I -- To answer these questions, I have to

14  provide context.  You're trying to box me into answers

15  that I think would be misleading if repeated without the

16  context.  So --

17      Q.   Look --

18      A.   -- the context is part of the answer.  And as

19  this is a deposition, it's about context, not just about

20  yes-or-no answers.

21      Q.   Actually, it is about yes-or-no answers.

22  There are questions that are just yes or no.  Does he

23  change -- Did he contradict any of his prior statements?

24  Simple.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 186

1    A.   Well --

2    Q.   **Did that additional fact contradict any prior**

3  **statement?**

4    A.   It didn't explicitly contradict a prior

5  statement.

6    Q.   **Did it implicitly contradict a prior**

7  **statement?**

8    A.   Broadly construed, yes, because it's not

9  consistent with a prior statement because it's a

10  significant new detail --

11    Q.   **Okay.**

12    A.   -- that calls into question his prior

13  statements.

14    Q.   **Well, so really what you're -- you're taking**

15  **issue with is the fact that he didn't tell the**

16  **detectives initially this new information and the**

17  **failure to do so calls into question, in your mind at**

18  **least, the reliability of his statement?**

19    A.   The consistency of the statement, yes.

20    Q.   **Okay.  Even though, as we've established, it's**

21  **actually not inconsistent with any of the statements he**

22  **gave the two detectives, right?**

23    A.   It depends on how you define "consistent."

24    Q.   **Okay.  Let's see.  You took issue with the**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 187

1  fact that Gus Robinson, a two-time felon, testified

2  against Mr. Jakes in exchange for dismissal of criminal

3  charges against him.  The issue there is the deal,

4  right?

5      A.   Yes.

6      Q.   Okay.  The fact that Mr. Robinson is a

7  two-time felon, is that something you're relying on as

8  part of the fit analysis?

9      A.   Not as part of the fit analysis, but I -- I

10  think that he has a history and pattern of -- of rule

11  breaking, and -- and it would appear from his deposition

12  lying.  So I think it's a relevant fact.  But no, it's

13  not directly part of the -- it's part of the context.

14  It's not part of the fit test.

15      Q.   Okay.  The history and pattern of rule

16  breaking, that's something that you find relevant?

17      A.   Yes.  I think he's -- It's not for me to

18  decide the truth or the accuracy of his statements.

19  It's for the jury, again.  But -- but I think there are

20  a lot of reasons to question it, and obviously I have to

21  make judgments and opinions based on the evidence before

22  me, and I consider that a relevant fact.  More relevant

23  than the two-time felon is the deal that he got, because

24  as I mention in the subsequent part of the footnote in

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 188

1 the citation, this is what we refer to as incentivized

2 testimony, and it's very common in wrongful conviction

3 cases.  It's a pattern.

4 **Q.   And the fact that he's got incentivized**

5 **testimony does not by itself render his testimony**

6 **invalid, agreed?**

7 A.   If that's all you get of him, yes.

8 **Q.   Okay.  Now, the -- I want to come back to the**

9 **history and pattern of rule breaking.  Is that something**

10 **you believe you as an expert should be allowed to**

11 **testify about for the jury?**

12 A.   No.  I -- I -- I don't -- It's not for me to

13 determine -- the scope of my testimony, but it's not

14 something that I would ordinarily testify about.  I'm

15 trying to give you a more contextual explanation.  I --

16 I don't ...

17 **Q.   Did you consider any inconsistencies of any**

18 **other witnesses in your analysis?**

19 A.   Not in the fit analysis, no.

20 **Q.   Did you consider any inconsistencies that**

21 **Mr. Jakes had in his testimony?**

22 A.   I don't think that's relevant to the fit

23 analysis here, so no, I didn't consider it.

24 **Q.   Well, why isn't it relevant?  Why isn't**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 189

1 whether Mr. Jakes's description of the events are

2 consistent relevant to your analysis?

3      A.   You're going to have to point out which

4 inconsistencies you're talking about.  But what --

5 there -- I didn't find any evidence corroborative of his

6 statement, and his statement, as he describes it, is the

7 product of very abusive coercive interrogation, as you

8 know.  So there wasn't any inconsistency that I thought,

9 aha, this is an indicia of reliability; and therefore,

10 it calls into question his claim of a false and

11 unreliable confession.  Now, if you want to direct me to

12 something specific, then let's talk about that, because

13 I'm not even sure what inconsistencies you're --

14 you're -- you're referring to.

15      Q.   Well, that's -- Okay.  So let me ask you this:

16 Did you find any inconsistencies at all in Mr. Jakes's

17 testimony between the early -- you know, back in -- in

18 1991 for the motions to suppress hearings through his

19 trial testimony and then subsequent post-conviction

20 testimony and deposition testimony?  Did you see

21 anything that stood out to you as inconsistent?

22      A.   If I did at the time I was preparing the

23 report when I reviewed all those documents, I don't

24 remember it now.  I would need to have my recollection

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 190

1    refreshed.  If you point me to specific inconsistencies

2    and refresh my recollection, I'm happy to opine on them,

3    but I don't have a photographic memory, and I didn't

4    review all four sets of testimony, and I don't recall

5    whether anything stood out to me at the time.  But I

6    didn't -- I didn't notice any indicia of reliability in

7    his statements, and that's -- that's what's important to

8    me here.

9        **Q.   You didn't review all of Mr. Jakes's**

10   **testimony?**

11       A.   I did, but I don't have a photographic memory.

12   And I did in preparation for the report.  I didn't in

13   preparation for today's testimony.

14       **Q.   You -- you make the ultimate decision as to**

15   **what goes in your report, right?**

16       A.   Well, of course.

17       **Q.   And you decide whether information is relevant**

18   **or not relevant to your report, right?**

19       A.   Correct, relevant to the reason why I'm

20   retained.

21       **Q.   Okay.  By the way, how many cases have you had**

22   **where you reviewed a confession as a consulting expert**

23   **and determined there are facts supporting reliability**

24   **and that the confession likely was not coerced?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 191

1    A.    Hundreds.  Hundreds.

2    **Q.    What -- Do you end up giving testimony in**

3    **those cases?**

4    A.    For the most part, no.  But we have to break

5    it out.  Okay.  So you said not coerced and evidence

6    that the confession is reliable.  Okay.  So when I am

7    retained to evaluate whether or not in a criminal case I

8    can be helpful -- my expertise can be helpful at a

9    suppression hearing, I -- if I -- if I found that the

10   techniques were not psychologically coercive, not

11   problematic, I would say I can't be helpful to you.  If

12   I found that they were psychologically coercive and I

13   could be helpful but the confession I thought was

14   reliable, I would say I can testify in the suppression

15   hearing but I can't testify at trial.

16   **Q.    Okay.**

17   A.    So -- so there's the two issues.  We have to

18   separate it for your question, coercion and reliability.

19   **Q.    Okay.  And this is a reliability test we're**

20   **talking about, right?**

21   A.    Right.  But you mentioned coercion before, but

22   yeah.

23   **Q.    Right.**

24   A.    Reliability, yes.  Many times -- 80 --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 192

1    85 percent of the cases I work on, I never testify in.

2        Q.   Okay.  So the -- Did you consider Mr. Jakes's

3    history of rule breaking -- his history and pattern of

4    rule breaking, in any of your analysis?

5        A.   No.

6        Q.   Why not?

7        A.   It wasn't relevant to the issues that I was

8    retained to evaluate, and I didn't think there was any

9    evidence that he committed this crime.

10       Q.   Do you consider yourself to be an objective

11   expert in this case?

12       A.   Well, I certainly aspire to be an objective

13   expert, and I do my best to be an objective expert, but

14   I think it's not for me to decide whether I'm an

15   objective expert.  It's for others.  All I can tell you

16   is I do my best to be objective, but I'm not going to be

17   the one to pronounce myself objective or not objective.

18   That's for others to decide.

19       Q.   Okay.  So you are making a suggestion here

20   that Mr. Robinson's testimony should not be believed in

21   this footnote, right?

22       A.   I don't find it corroborative.  Yes, I -- I --

23   I find it suspect, correct.

24       Q.   And that would be a fact finder's

Page 193

1  responsibility, right?

2       A.   Correct.

3       Q.   So why include this --

4            Is this something you expect to be able to

5  testify to in front of the jury, that -- your reasons

6  for thinking Mr. Robinson's testimony shouldn't be

7  believed?

8       A.   No.  It -- it -- it goes to the indicia of

9  reliability analysis.  And some courts allow me to opine

10 about that, and some courts don't.  But for purposes of

11 this case, you know, other than Rule 26 -- or 1983 civil

12 rights cases, it's rare -- and I guess in some

13 post-conviction cases, it's rare that I write a report.

14 And these cases, as you know, require a report and they

15 require the articulation of opinions and the bases for

16 those opinions, and so this is my effort to be

17 comprehensive knowing that there's going to be a

18 deposition and that if I'm allowed at trial to testify

19 about this, should the case go to trial, that a very

20 competent and well-prepared attorney is going to ask me

21 about everything, and so I have to lay it out.  This is

22 relevant to the reliability analysis.  But I'm not

23 putting myself in the role of the jury.  It's for

24 them --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 194

1    Q.   Okay.

2    A.   -- to decide the facts, not me.

3    Q.   Okay.  All right.  Do you agree, though, that

4  your footnote about Mr. Robinson is essentially

5  advocating a credibility determination?

6    A.   I -- I would disagree with that

7  characterization.

8    Q.   Okay.  Why?

9    A.   Because -- I'm not saying he's a credible

10  witness or not a credible witness.  I'm threading the

11  needle more finely than that.  I'm saying I don't find

12  this to be corroborative within the context of the

13  reliability, the fit analysis; and therefore, I don't

14  find it to be an indicia of reliability.  I'm not saying

15  believe or disbelieve.  And as I've said in my answers,

16  it's for the jury to adjudicate these facts, not me.

17    Q.   Yeah, I get that you said that in your

18  answers.  But your premise for the entire footnote is

19  Snake Robinson is not corroborative.  You've kind of

20  corrected using necessarily and switched it to he's not

21  corroborative of Mr. Jakes's coerced statement at trial,

22  because at trial, Mr. Robinson testified that he and

23  Anthony Jakes were at the window of the sub shop and

24  actually viewed the victim before the murder, and then

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 195

1  **you supply additional reasons, right?  Your essential**

2  **point is, he's not reliable -- or he's not**

3  **corroborative, right?**

4      A.   I would say my essential point is that I don't

5  find this to be indicia of reliability.

6      **Q.   Okay.  But you are incorporating a question as**

7  **to whether he should be believed or not in that**

8  **analysis, right?**

9      A.   I'm trying to explain my analysis.  If I tell

10  you again, you're just going to say you've already said

11  it.  It's for the jury to decide, not me.

12      **Q.   I mean, you can say -- Look, it's a separate**

13  **question.  I don't need you to repeat everything.  Just**

14  **say "yes" or "no."**

15          **Are you incorporating a position on whether he**

16  **should be believed in this analysis?**

17      MR. AINSWORTH:  Counsel, objection.  Let him answer

18  the question and then accept that answer.  But if you're

19  just going to argue with him, then we're going to be

20  repeating this over and over again.

21  BY MR. MORAN:

22      **Q.   Well, I mean, this is a simple yes-or-no**

23  **question.  So I -- I think it's --**

24          **Are you suggesting he should not be believed?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 196

1      A.   Sometimes when you say a simple yes or no,

2   it's not a simple yes or no to me.  I am not suggesting

3   he should not be believed.  I am suggesting that based

4   on my expertise and my analysis of the information I

5   reviewed and what I was asked to opine about, I do not

6   find that to be corroborative; and therefore, I do not

7   find indicia of reliability in Mr. Jakes's statement.

8      **Q.   The next bullet point covers Arnold Day's**

9   **statement, right?**

10     A.   Yes.

11     **Q.   Okay.  And you take issue with the fact that**

12  **Arnold Day did not include information about Mr. Jakes**

13  **in his confession, right?**

14     A.   Yes.

15     **Q.   Okay.  And you call that an inconsistent**

16  **statement?**

17     A.   Yes, the statements are inconsistent, and

18  that's an indicia of unreliability in false confession

19  cases, many of which involve multiple false confessions.

20  I think in the 2004 article, 30 percent of the false

21  confession cases had more than one false confessor, and

22  so that stands out here as an indicia of unreliability.

23     **Q.   Okay.  You know, I -- I appreciate all the**

24  **extra information, but this -- these are -- these do not**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 197

1    require context.  They're simple yes-or-no questions.

2    And I -- I do want to be able to finish in time today.

3    So I'm sorry, Doctor.  But if you could please try and

4    answer some of these questions "yes" or "no," that would

5    be helpful.

6              Your point, though, is that by leaving out

7    information in the -- Mr. Day's statement or his

8    confession, that absence of information is inconsistent

9    with Mr. Jakes's statement, right?

10        A.   Correct.

11        Q.   Okay.  Did you find any facts that are

12   inconsistent, not absent from one another, but a fact in

13   Day's statement that was inconsistent with a fact in

14   Mr. Jakes's statement?

15        A.   I would have to review it to refresh my

16   recollection of Mr. Day's statement.  I apologize.

17        Q.   It's okay.  If back when you reviewed this

18   information, you had found a fact that was present in

19   Mr. Day's statement that contradicted a fact present in

20   Mr. Jakes's statement, that's an important piece of

21   information for you in the fit analysis, true?

22        A.   Potentially important, yes.

23        Q.   And that's something you would want to make a

24   note of to include in your report if you actually had

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 198

1  **found something like that?**

2      A.   Yes, but it's possible I did and I just didn't

3  include it in the report.

4      **Q.   Okay.  The fourth bullet point is the**

5  **discussion of Mr. Jakes's inability to see Rafael Garcia**

6  **on the ground from his home in the rear coach house,**

7  **right?**

8      A.   Yes.

9      **Q.   Okay.  Did you consider whether Mr. Jakes**

10  **could have been in the 20- -- or the front house at**

11  **1212 West 51st Street?**

12      A.   Yes, I considered that possibility.  And based

13  on my review of the evidence, I didn't think the

14  evidence supported that, and -- but I considered that

15  possibility.  Again, it's for a jury to decide.  But I

16  thought there were several reasons why he -- several

17  reasons why the evidence strongly suggested he lived in

18  the back house.

19      **Q.   Okay.  Not necessarily --**

20          **Okay.  So what I want to focus on is, what are**

21  **these reasons -- we'll just make a list real quick --**

22  **that you do not believe he was in the front house, 1212**

23  **West 51st Street, when he made the observation of**

24  **Mr. Garcia?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 199

1    A.   Well, the -- the police report, that's where

2  they found him, right, when they went to get him.

3    Q.   **Okay.**

4    A.   That's where his aunt was living.  His aunt

5  was his guardian at the time.  That's where he and she

6  said he lived.  His mother, as I understand it, had

7  moved to Milwaukee.  He hadn't lived in the front house

8  for some time.  I believe there were others who

9  testified that he lived in the back house, but I'm not

10 recalling as I sit here right now.  But those are the

11 primary -- the primary reasons that I concluded based on

12 my analysis of the case materials that I was provided

13 that he lived in the back house.  Now, if the jury

14 determined elsewhere, then that would change the

15 conclusion about physical impossibility.

16   **Q.   Do you know whether Mr. Jakes considered both**

17 **the front and the back part of his home?**

18   A.   My recollection is he considered the back his

19 home, not the front.

20   **Q.   Do you know whether he even had access to the**

21 **front house on September 15th, 1991?**

22   A.   I don't know for certain, but my recollection

23 is he did not.  But I would have to refresh my

24 recollection to be sure.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 200

1      Q.   Do you remember reading the testimony of

2   Denise Harris?

3      A.   Are you talking about the deposition testimony

4   of Denise Harris?

5      Q.   Yes.

6      A.   Yes.  My recollection is that -- that that

7   testimony was 30 years later, and she did not say that

8   initially, more contemporaneous with the crime in the

9   19- -- early 1990s.

10      Q.   Okay.  So you're discounting her deposition

11   testimony?

12      A.   As -- Yes, I am -- I am -- Again, this is for

13   the jury, but I am discounting it because it's not -- my

14   recollection is it's not consistent with the more

15   contemporaneous evidence where she did not say that.

16      Q.   Okay.  You know what she said in her

17   deposition testimony about where Mr. Jakes lived, right?

18      A.   I thought she said in -- in the front house,

19   not the back house.

20      Q.   Right.  And she believed that because she saw

21   him in the front house all the time?

22      A.   Right.  And -- and my recollection is that's

23   not consistent with what she initially said at the time

24   of the crime.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 201

1     **Q.   Do you know if she talked about where**
2  **Mr. Jakes lived at the trial?**

3     A.   I don't recall.  I'd have to review her
4  testimony.

5     **Q.   Did you review any document in which she took**
6  **a position on where Mr. Jakes lived?**

7     A.   If I did review it, it would have been at the
8  time I wrote the report, not in preparation for the
9  deposition.

10     **Q.   Why didn't you mention anything about**
11  **Ms. Harris's testimony in this bullet point or in a**
12  **footnote similar to what you did with Gus Robinson**
13  **suggesting that there's a reason not to give any credit**
14  **to her testimony?**

15     A.   Because I was relying on the more contem- --
16  the -- the -- the evidence of that closer to the time of
17  the crime and she didn't -- I didn't recall her saying
18  that at the time.

19     **Q.   Right.  But if she isn't asked about it and**
20  **doesn't give any information about it, it's not really**
21  **inconsistent with her deposition testimony, right?**

22     MR. AINSWORTH:  Object to the form of the question,
23  argumentative.

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 202

1  BY THE WITNESS:

2      A.   I guess it depends on how you -- how you --

3  what you mean by "inconsistent."  But I would have to

4  review her testimony at the time -- closer in time to

5  the crime to adequately answer that question.

6      **Q.   Okay.  So as of right now, as you sit here**

7  **today, it's a question you cannot answer, right?**

8      A.   Well, I said it depends on how you -- how --

9  how you define consistent.  And then I think you were

10 asking why I didn't put it in a footnote, and that's my

11 best recollection of why I didn't put it in the

12 footnote.

13     **Q.   Because it didn't come up in 1991 --**

14     A.   Correct.

15     **Q.   -- or didn't say anything about it -- where**

16 **Mr. Jakes lived in 1991, right?**

17     A.   Correct.

18     **Q.   All right.  And you don't know as you sit here**

19 **today whether anyone asked her that question?**

20     A.   I'd have to review the record, yes.

21     **Q.   Right.  I understand you have to review the**

22 **record.  But without reviewing it right now, it's a**

23 **question --**

24     A.   I don't remember, correct.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 203

1      Q.   Okay.  The -- So back to the question -- I --
2  I think I asked this question.  I'm not sure if it was
3  answered.  So forgive me for asking a similar question.
4  But do you know whether Mr. Jakes considered both the
5  front and back house his home?
6      A.   My understanding, my best recollection as I
7  sit here today is he considered the back his home, not
8  the front, that he hadn't lived in the front for many
9  years.
10      Q.   Okay.
11      A.   That he lived with his aunt in the back.
12      Q.   Now, we've gone over these four bullet points,
13  and it looks like there's an -- an additional fact in
14  the bullet points which really makes it five points that
15  you are relying on for your fit analysis, true?
16      A.   Well, it looks like there's five bullet points
17  and one bullet point just didn't show up in the report.
18      Q.   Yeah, that's kind of what I'm getting at.
19  Right.  So it looks like the liquor store part should
20  have been a bullet point, right?
21      A.   Correct.  Yeah.
22      Q.   Okay.  So five bullet points.
23           Are there any other points that you relied on
24  besides these five bullet points for your fit analysis

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 204

1  conclusion?

2       A.   Not that I recall as I sit here today, no.

3       **Q.   Is there anything that would help you**

4  **remember?  And feel free to look at your report.**

5       A.   No.  I'd -- I'd have to go back through the

6  materials to see if there's anything else.

7       **Q.   Okay.  In -- Towards the end of this section,**

8  **you write, A hallmark or indicia of reliability is**

9  **evidence that corroborates either a suspect's knowledge**

10 **of non-public crime facts not likely guessed by chance**

11 **(absent discrim-) -- or (contamination) or scientific,**

12 **medical or physical evidence that corroborates the**

13 **confession statement or leads to new missing or**

14 **derivative case evidence.**

15       **Do you see that?**

16       A.   Yes.

17       **Q.   Where did you get that?  You don't have a**

18 **citation for it, so I want to know what the source is.**

19       A.   I could have cited any number of articles that

20 I wrote.  I could have cited the 1998 article, The

21 Consequences of False Confessions.  I could have cited

22 the 2004 article with Steven Drizin.  I did a 2006

23 article in the Wisconsin Law Review, a 2013 article in

24 the Temple Law Review that discussed the fit test and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 205

1    reliability analysis.  So I could have cited any one of

2    those.

3        Q.    All right.  And those -- If I dig those up,

4    those should provide the source material for this

5    definition?

6        A.    Yeah.  They would be appropriate citations.

7    And those articles are listed on my CV and they are

8    downloadable for free on the Social Science Research

9    Network.

10        Q.    Perfect.

11            Let's see.  I want to come back to some of the

12    science questions we were talking about earlier.  We had

13    started talking about things like control groups and

14    then I went off on a tangent somewhere else.  Can you

15    tell me, what is the definition of a statistically

16    significant sample size?

17        A.    No, because -- for so many reasons.  First of

18    all, a -- a sample is usually considered a random

19    collection, and the studies here are not a sample as

20    much as they are a collection of cases.  We have to go

21    and collect the cases.  So they're not really a sample

22    so much as they are a cohort of cases.

23            Secondly, when people use the language

24    "statistically significant," they're not typically using

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 206

1    that in response to sample size.  They're -- they're

2    talking about a correlation between two variables -- or

3    I should say a correlation between a variable and an

4    outcome and saying, through statistical testing, we can

5    rule out the likelihood that this correlation exists by

6    chance to 95, 99 percent certainty.  So that's the

7    meaning of statistical significance.  So I'm not sure

8    what you mean when you say a statistically significant

9    sample size.

10            Now, it -- it could be that that language

11   might refer to something else.  Like if we are trying to

12   predict who's going to win in an election between a

13   republican and a democrat and it's a tight race, you

14   need to have a certain sample size in order to narrow

15   the margin of error.  So it might be that you have to

16   have 1,500 voters randomly sampled before you can say

17   within a 3 percent margin of error, statistically, you

18   know, Trump is going to beat Clinton or whatever.

19        Q.    Okay.  So do you have -- Are you able to

20   account for a margin of error in the -- the work you've

21   done in the cases you've reviewed?

22        A.    We're not making statistical predictions like

23   who's going to win a race, so it's not really relevant

24   to this type of analysis.  There -- there -- there -- In

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 207

1    some of the statistical experimental studies, there will

2    be significance testing, and so they would be -- the

3    authors of the study would be able to say, this

4    correlation we're sure to -- whatever the significance

5    level is put at, which is typically 95 percent or 99, to

6    a 95 or 99 percent certainty, we can say this

7    correlation is not likely due to chance.  That's the

8    closest you can get in this area of research.

9         **Q.    And have you done that kind of analysis in**

10   **determining that a particular risk factor is predictive**

11   **of false confessions?**

12        A.    No, because I don't do -- I haven't really

13   done experimental work.  The experimentalists have done

14   that, and I rely on their research primarily for the

15   risk factor analysis.  But I -- I haven't -- I haven't

16   done controlled experiments.  That's not typically the

17   line of research that I -- I do in this area --

18        **Q.    This would be --**

19        A.    -- that I rely on that research.

20        **Q.    This would be the studies we discussed earlier**

21   **involving college students and the cheating paradigm or**

22   **the pressing the wrong key test?**

23        A.    Correct.

24        **Q.    All right.  Didn't Richard Ofshe -- wasn't he**

Page 208

1  at one point highly critical of these types of tests

2  that rely on college students in simulated environments

3  that don't reflect what it's really like for an

4  interrogation?

5      A.   My recollection is he was particularly

6  critical of the -- the first Alt key paradigm study and

7  maybe subsequent ones as well.  But obviously I'm not

8  Richard Ofshe.

9      Q.   Well, he's a very close collaborator, isn't

10 he?

11     A.   At one time.  He retired 20 years ago, but

12 yes.

13     Q.   Right.  And he -- You actually studied under

14 him --

15     A.   Correct.

16     Q.   -- at the university, right?

17     A.   Correct.

18     Q.   And you wrote papers together once you

19 became --

20     A.   Correct, in the 1990s, yes, and early 2000s.

21     Q.   Okay.  What has changed about these college

22 student tests that make them more reliable than what --

23 the criticisms that Richard Ofshe offered?

24     A.   Well, the criticisms that he offered I thought

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 209

1    were primarily of the Alt key paradigm.  So I would have

2    to describe that.  And I don't recall him making the

3    same criticisms of the cheating paradigm, which is a

4    different laboratory analysis.  So the first study on

5    the cheating paradigm was 2005.  The first study on the

6    Alt key paradigm was 1996.  So what changed in terms of

7    the science and the experimental studies getting better

8    was that paradigm, but I can't speak for Richard Ofshe.

9    Yes, we collaborated on stuff.  Yes, I took a graduate

10   class from him.  He was on my dissertation and then my

11   advisor but that doesn't mean that I agree with

12   everything he says or how he says it.

13        Q.   Okay.  So in terms of --

14             You had described you did some research with

15   empirical data, right?

16        A.   Yes.

17        Q.   And empirical data is the real life data,

18   right?

19        A.   Well, empirical could be any kind of data.  So

20   it could be experimental.  It could be interview.  It

21   could be survey.  I -- I think of it as a -- as a broad

22   category, anything that gets you out of your head and

23   collecting data, even if it's simulated data or if it's

24   real-world data.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 210

1      Q.   Okay.  And the studies you've done with
2  real-world data, that -- those would be counted as
3  empirical studies, right?
4      A.   I would, yes.
5      Q.   And it's your testimony that you don't -- the
6  concept of statistically significant would not be
7  applicable to your real-world studies?
8      A.   I guess it could be if -- it could be in some
9  contexts.  But I thought you were talking about a
10  statistically significant sample, and I was breaking
11  that down.
12      Q.   Right.  So --
13      A.   But it could be -- The concept of statistical
14  significance could -- could be relevant in a study based
15  on real-world data.
16      Q.   So -- And it's your impression that in the
17  studies you've done with the data you've retrieved for
18  like, for example, the 2004 article with
19  Professor Drizin and the 1996 article or the 1998
20  article, those included statistically significant sample
21  sizes?
22      A.   Well, I already told you it's not a sample.
23  It's a collection.
24      Q.   Right.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 211

1      A.    And I already explained that sample sizes, it

2    doesn't really make sense to talk about statistically

3    significant sample sizes unless you're trying to do

4    something like, you know, predict an outcome within a

5    certain margin of error and you need a certain sample

6    size.  So I'm really just left repeating my que- -- my

7    answer from before.

8      **Q.    All right.  Well, let me move past it then.**

9    **Shouldn't you be doing that?  If you're going to**

10   **identify certain risk factors as predictive of false**

11   **confessions, shouldn't you be collecting a statistically**

12   **significant sample size in order to say any particular**

13   **variable is a risk factor?**

14     A.    No, that's not necessary.  The research that

15   I've done contributes to the literature on risk factors.

16   I'm not the one establishing these as risk factors.  I'm

17   just doing studies that add to this.  And, you know, as

18   I said earlier, there's no database.  There's no -- You

19   can't do a random sample of false confession cases.

20   There's no known universe to randomly sample.

21           A limitation in this area, as in a lot of

22   areas of social science and science, is you've got to

23   find the data to answer the research question, and you

24   do the best that you can with what you -- what you can

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 212

1  find.  So there's really no way of putting together a

2  random sample of false confession cases because there's

3  no known universe to randomly sample.

4      **Q.   All right.**

5      A.   And so you can't --

6      **Q.   So --**

7      A.   -- do what you're suggesting.

8      **Q.   Got it.**

9          **So has anyone tried to gather a random**

10  **selection of false confession cases, to your knowledge?**

11      A.   It's not possible.  Not to my knowledge, no.

12  If somebody has tried it, I would want to know how they

13  did it.  You -- you could have -- You could -- You could

14  have somebody say something like, I'm going to look at

15  every tenth wrongful conviction and then -- and -- and

16  see how many false confessions come up, but that's not a

17  random sample because there's a -- there's a process of

18  selection that gets a case classified as a wrongful

19  conviction for the Innocence Project or National

20  Registry of Exonerations.  So you would have to have a

21  fully known universe to sample.  So I don't --

22      **Q.   So random sampling is --**

23      A.   I can't think of anybody who's done it; and if

24  I'm overlooking something, I would want to know how they

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 213

 1  did it.

 2      Q.   So random sampling is impossible in analyzing

 3  the risk factors of false confessions?

 4      A.   It's not impossible in experimental studies

 5  because you can do random assignment.  But it is

 6  impossible in real world studies to do a random

 7  sample --

 8      Q.   Okay.

 9      A.   -- of false confession -- of known false

10  confession cases.

11      Q.   Do the -- the data sets you're working with,

12  are they subject to selection bias?

13      A.   Well, it depends on what you mean by

14  "selection bias."  Obviously you have to select the

15  cases, and that means you have to go out and find them.

16  And of course, we use criteria to -- we -- we sample as

17  broadly as we can to get as many cases as we can and

18  then we apply the criteria.  So there is selection

19  necessarily, but it's not what we typically mean by

20  selection bias.  But there is selection, yes.  You have

21  to go out and find it.

22      Q.   What is selection bias to your knowledge?

23      A.   Well, selection bias I guess would be

24  selecting to -- Selection bias would be selecting --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 214

1    selectively calling information to support your

2    preexisting beliefs.  That's not what we do here.  We

3    have to go out and find these cases.  We have our

4    preestablished criteria.  If the case meets the

5    criteria, we include it.  If it doesn't, we don't.  So

6    there's a difference between selection along preexisting

7    criteria to get a meaningful database and selection

8    bias, which is selecting according to your biases to

9    establish the point you're trying to make.

10        **Q.   Are there any controls you can employ --**

11             **Well, first of all, you acknowledge it's a**

12   **possibility to -- for selection bias to occur without an**

13   **intention, in other words, sort of unconsciously looking**

14   **for cases that support your theory as opposed to**

15   **establishing a criteria and eliminating the bias, right?**

16   **It's a possibility that it can happen?**

17        A.   In all human activity, bias is possible,

18   including the selection bias, yes.

19        **Q.   Okay.  And what are you -- What other controls**

20   **do you have in place to prevent selection bias from**

21   **happening in the cases you select?**

22        A.   Well, usually there's a research team, right?

23   So in the first article, the 2004 article with Drizin,

24   there were the two of us.  We went through everything.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 215

1  We also published the list of the people in the article.

2  The article went through a lesser form of peer review.

3  But those would be the controls.  I mean, I suppose more

4  broadly you could say we're trained researchers, and

5  that might be kind of the background control as well.

6  But those -- those -- those would be the controls and

7  then the review process.

8  **Q.  So do you have any criteria as -- You**

9  **mentioned criteria.  What are the criteria used to**

10  **determine that you're going -- that a case you've**

11  **obtained is going to be used as part of the analysis?**

12  A.   So it would be one of four criteria.  Either

13  you can show the crime didn't occur or that it was

14  physically impossible for the confessor to have

15  committed the crime or there was dispositive or close to

16  dispositive scientific evidence that suggested or

17  established the confession was false or the true

18  perpetrator was identified to a reasonable degree of

19  certainty and, therefore, the confession was false from

20  the non-true perpetrator.

21  **Q.  Okay.**

22  A.   So we --

23  **Q.  So those --**

24  A.   -- would go through those criteria -- We would

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 216

1  try to apply the facts of a particular case as we

2  understood them to those criteria.  If one or more met,

3  it's a proven false confession.

4      **Q.   Okay.  So those are the four categories of**

5  **proven false confessions that you've identified already,**

6  **right?**

7      A.   Yes.

8      **Q.   Okay.  And that's the criteria used to**

9  **determine whether a case is going to be accepted into**

10  **your data set?**

11      A.   Correct.

12      **Q.   Okay.  And do you accept cases into the data**

13  **set that do not meet that proven false confession**

14  **criteria?**

15      A.   Not if the article is exclusively about proven

16  false confessions.

17      **Q.   Okay.  In terms of the -- assessing whether**

18  **certain things fit into one of these four criteria if a**

19  **crime was not committed, that's obviously -- it's got to**

20  **be a rare occurrence with the cases that you review.**

21  **Although it happens, I'm sure, it -- it is not common**

22  **where no crime was committed at all and someone ended up**

23  **confessing to something that never happened?**

24      A.   I don't know how common it is, but I think of

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 217

1    the four categories, I think it or physical

2    impossibility are the least common --

3         Q.    Okay.

4         A.    -- of the four categories.

5         Q.    **So most of your analysis will be devoted to**

6    **the two middle categories, which is the DNA or some kind**

7    **of scientific evidence or -- What was the other one you**

8    **said?**

9         A.    The true perpetrator identified.  I think that

10   -- I haven't looked at the 2004 article recently, but I

11   think that those would be the two -- the majority of the

12   cases would fall into those two categories.

13        Q.    **And I think you acknowledged earlier that some**

14   **of the proven true false conf- -- or I'm sorry -- proven**

15   **false confessions that you have established are people**

16   **who haven't even been convicted yet or the conviction**

17   **has not been overturned?**

18        A.    Correct.

19        Q.    **Okay.  So you've got a situation where you've**

20   **reviewed it and drawn a conclusion that this must be a**

21   **proven false confession but the prosecutor, the jury,**

22   **and potentially the judge reach similar -- or dis- --**

23   **think opposite conclusions about the defendant's guilt,**

24   **right?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 218

1      A.   That's certainly possible.  Obviously judges

2   typically don't opine about that, but you could have

3   that in a -- obviously a bench trial.  And yes, that's

4   certainly possible.  We don't defer to the judgments of

5   juries or judges or prosecutors when analyzing case

6   facts and evidence for inclusion in our study as a

7   proven false confession.

8      **Q.   Are there any standards set to -- in your**

9   **studies to iden- -- to help the people doing these**

10  **analyses arrive at their conclusions?  In other words,**

11  **in order to find that the -- there's -- someone else**

12  **who's taken ownership of the crime, you have to find X,**

13  **Y, and Z; or if there's scientific evidence, you have to**

14  **find X, Y, and Z?  Do you have any standards like that**

15  **that helps govern the process?**

16     A.   To me, that sounds more like formulas.  No, we

17  don't have those, at least not in my articles.  We lay

18  out the criteria as I've laid out here and in the report

19  and then it's to the analysis of the researcher to

20  determine whether or not it fits in a proven -- in the

21  proven false confession category and then to include it

22  or not.

23     **Q.   Do you use confidence intervals in analyzing**

24  **the data?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 219

1      A.   No.  Confidence intervals aren't really

2   relevant to -- to analyzing whether these cases should

3   be included or not, no.  There -- There are other

4   studies where there are confidence intervals, but not --

5   not the kinds of studies that you're referring to here,

6   if I understand your question.

7      **Q.   Right.  Do you -- You do diagnosticity ratios**

8   **in these studies?**

9      A.   I haven't done them, but others have in their

10  studies, yes.

11     **Q.   In the articles that your name is on as one of**

12  **the publishers, was any diagnosticity ratio done in**

13  **analyzing the data?**

14     A.   Not that I can think of off the top of my

15  head.  I was part of a 2010 article that is a

16  comprehensive review of the field called the White

17  Paper, and it summarized a lot of that experimental

18  research.  But I didn't do the actual diagnosticity

19  ratios.  I -- I -- I don't recall being an author on any

20  article where there was -- as opposed to summarizing

21  diagnosticity ratios in other's research, there was

22  original research on diagnosticity ratios.  Now, it's

23  possible I'm not remembering, but I can't think of one

24  as I sit here.

1     Q.   Okay.  In the cases that you have research

2 published with your name on it, has -- And I think we

3 talked a little bit about control groups before.  But

4 are you aware of anyone -- or any -- the use of a

5 control group in any of those papers?

6     A.   There might be a couple studies where I worked

7 with an experimentalist who had a control group, not

8 recently, as part of the experimental design and the

9 study, but most of --

10     Q.   Is it possible -- I'm sorry.  Go ahead.

11     A.   Most -- most of the research and writing I've

12 done has not involved control groups.  It hasn't been

13 experimental research.

14     Q.   Is it possible to use a control group with the

15 data sets that you relied on to publish your research

16 related to false confessions?

17     A.   I -- I -- When you -- I think it would be very

18 difficult to -- It sort of depends on what you're

19 controlling on.  But to find a similar set of cases

20 where everything except one variable is present, that

21 would be very difficult to do in the real world.

22     Q.   Are there other ways -- other tests that can

23 be -- or other analyses that can be employed alongside a

24 control group to account for the presence of multiple

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 221

1  **variables?**

2  A.  Well, that's certainly possible.  You know,

3  I -- I would have to consult with a statistician because

4  you can talk to a statistician about whether or not the

5  numerical size was large enough to run certain

6  statistical tests and whether or not the assumptions

7  that are necessary for those statistical tests were met.

8  But I'm not a statistician.  So I think in theory, it's

9  possible, but I would have to consult with a

10  statistician if I were going to try to do it in practice

11  to make sure that the statistical analysis was sound.

12  **Q.  You have -- I think you agreed earlier that**

13  **there is some statistical analysis performed on the data**

14  **sets used for your research articles?**

15  A.  Correct.  And I said that was descriptive

16  statistics, yes.

17  **Q.  Right.  Are you the one performing that**

18  **statistical analysis, or do you have others help you in**

19  **that?**

20  A.  Both.  But descriptive statistics are

21  relatively straightforward.  You know, for example, you

22  asked about the four categories of proven false

23  confession.  And if we say, you know, 15 percent was

24  number one and 10 percent; 15 percent was number three;

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 222

1  and, you know, number four was 30, you know, that's -- I

2  can do it.  Somebody else can do it.  If I want to do

3  more statistical -- more sophisticated statistical

4  analysis, I would either have to brush up on statistics

5  or hire a statistician or rely on a coauthor who has --

6  who's more statistically advanced than I am.

7      **Q.   You agree with me that the results of your**

8  **research are only good -- as good as the data that you**

9  **have?**

10      A.   Well, I would say the data, the analysis, and

11  how it fits with existing literature.  It might be a

12  little oversimplification, but I think broadly I -- I

13  could agree that -- that the quality of the methods, the

14  quality of the analysis, the quality of the data

15  obviously dictate the quality of the conclusions.

16      **Q.   And if your conclusions about the confess- --**

17  **the confessions you're evaluating are wrong in that --**

18  **in that they aren't really false confessions, do you**

19  **agree that that would affect the outcome of your**

20  **research?**

21      A.   The question is -- is very broad.  So --

22      **Q.   Well, let me be more specific.**

23      A.   Yeah.

24      **Q.   Let's say you analyze a confession to see if**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 223

1    it falls into one of the four categories and you assign

2    it to a category for wit- -- one of the -- one of the

3    categories, like the one that another person is

4    accountable for the crime.  Okay?  That's one of your

5    categories, right?

6         A.    That the true -- Right.  The true perpetrator

7    committed the crime and it wasn't the confessor, yes.

8         Q.    Got it.

9              Let's assume you're wrong about that

10   conclusion in that -- you know, that there is no other

11   perpetrator who committed the crime.  In that situation,

12   reliance on that particular proven false confession

13   would affect the -- have some effect on your overall

14   conclusions in that you would be relying on something

15   that actually wasn't a false confession, right?

16        A.    Yes and no.  It depends on other things.  If

17   one of the 125 cases in the 2004 article were wrong, it

18   wouldn't change probably any of the conclusions.

19   Juveniles are still disproportionately represented.

20   81 percent of the cases or around 81 are still

21   homicides, et cetera, et cetera.  But that's one of 125.

22   Now, if it was a case study and it was just one case,

23   obviously that would have more of an impact, so --

24        Q.    I -- I -- I get that one case by itself may

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 224

1  not significantly impact the outcome.  But the point

2  is -- Well, let me back up a second.

3            The point is you acknowledge the possibility

4  that maybe on your -- your analysis of these proven

5  false confessions, you might have gotten it wrong?

6       A.   I mean, all of us could make errors, of

7  course.  We've done everything possible to make sure we

8  didn't make errors, especially since unlike most

9  academics, you know, we get deposed and questioned in

10  court and people scrutinize our research very closely.

11  But of course human error is possible.  Of course it's

12  possible I made a mistake.

13      Q.   Are you aware of any mistakes that were made

14  in categorizing those confessions as proven false

15  confessions?

16      A.   No, I'm not aware of any mistakes that I've

17  made in categorizing any of the proven false confession

18  cases.

19      Q.   And when you say that you've made every effort

20  to prevent mistakes from happening, I think you said

21  earlier you have a research team.  You have a published

22  list in -- in your article identifying the cases.  Is

23  that what you're talking about?

24      A.   Yeah.  I mean, we -- we have research

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 225

1   assistants that sometimes help us find cases and -- and

2   get us the documents, and sometimes we have

3   conversations with them.  Do they think it meets the

4   criteria?  Why or why not?  But ultimately, me and my

5   coauthors are responsible for the decision, and we make

6   the decision.

7           But in the 1998 article with Richard Ofshe,

8   60 false confessions.  In the 2004 article with

9   Steve Drizin, we have in both of those articles a table,

10  and we say, here they are.  Here is all the confession

11  cases that we are including in this article, and so any

12  researcher can go back and challenge our findings.  The

13  only thing is the juveniles, and there are -- you know,

14  some of the juveniles we don't mention by name, some or

15  all, but --

16      **Q.  Right.  No, I remember.  We talked about that**

17  **already.**

18      A.   Yes.

19      **Q.  So I'm not going to make you go through it**

20  **again.**

21          **What are the -- what are the other controls**

22  **you put into place?  Because you said you do everything**

23  **possible to make sure no mistakes happen.  What else**

24  **besides having a research team and a published list in**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 226

1 the article and oversight from you and other authors?

2    A.    To gather as many relevant case materials as

3 we can and to thoroughly vet the cases to make sure

4 we're not missing anything or overlooking anything that

5 would alter our judgment or conclusion.

6    **Q.    Do you -- I think you mentioned you -- you no**

7 **longer have the raw data for the cases from Oakland and**

8 **Vallejo and Hayward; is that right?**

9    A.    I don't think I have it, but it may be that I

10 do.  I'd have to look for it.  Again, that's not a study

11 of false confessions.  But yes, I may or may not have

12 it.  I don't know where it is if I've got it.  But I may

13 have it if it's --

14    **Q.    Okay.**

15    A.    -- survived many moves since 1991 and 1992.

16    **Q.    And I think you said you -- you're not sure if**

17 **you have the raw data from the 2004 study with Drizin of**

18 **the 125 cases, right?**

19    A.    Correct.

20    **Q.    Okay.  And you're not sure if you even have**

21 **the work product, such as, like, the analysis or the**

22 **notes or the -- the type of materials you would have**

23 **created in conducting the analysis; is that right?**

24    A.    Yeah.  Unless it was electronically saved,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 227

1    yes, I -- I wouldn't have had any notes -- paper notes,

2    yes.

3         Q.   So in terms of -- You know, you obviously put

4    that list in these articles, the 2004 article and the

5    '94 article --

6         A.   '98.  '98.

7         Q.   I'm sorry.  '98 article.  So there's a case

8    list available for anyone else who wants to go along and

9    check your work, right?

10        A.   For criteria of inclusion, yes.

11        Q.   Exactly.

12             Okay.  But one of the problems that someone

13   else using that case list might run into is that you

14   have different case materials for each case that helped

15   you draw your conclusions that someone else may not have

16   and won't know what it was?

17        A.   That's certainly possible, but -- but most of

18   these cases there's materials available, like on Pacer,

19   on Westlaw, on Lexis, on Google.  So a lot of these

20   cases, you can track down a lot of the materials.  But

21   it's -- it's certainly possible that I've -- and likely

22   in some cases that I have materials that people would

23   have to search for.  But in many, if not most of the

24   cases, there's a lot of material available.

Page 228

1         The Innocence Project, the DNA exoneration

2    cases, they have scanned materials on many of those

3    cases.  The National Registry of Exonerations has

4    summaries of the cases which give away where you could

5    get some of those materials.  Sometimes researchers post

6    materials on websites.  The Duke University of Law

7    professor, Brandon Garrett, who I cite many times in

8    this article, he posts a lot of original case materials

9    on false confession cases in his website.

10         So a lot of the materials -- Some of the

11   materials at least are available.  But yeah, it might be

12   I've got some materials that are not easily accessible

13   or require a lot of work to try to track down.

14   **Q.   Well, yeah, I guess the point is, it's not**

15   **necessarily going to be an apples-to-apples comparison**

16   **because the -- even armed with a case list, there's no**

17   **way to ensure that someone reviewing that case list will**

18   **have the same materials that you relied on to draw your**

19   **conclusions, right?**

20   A.   No way to guarantee they have all of them,

21   that's correct.

22   **Q.   And you -- Do you acknowledge that some of the**

23   **sources that you identified, like some of the**

24   **exoneration registries, are -- may be biased?  They'll**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 229

1  **have information that supports the conclusion about**

2  **someone's exoneration, but it may not be the complete**

3  **picture?**

4       A.   I guess it depends on what you mean by

5  "biased" in that question.  I know that the National

6  Registry of Exonerations has criteria, and they say --

7  they say, we are a public registry; if you think we've

8  got it wrong, you tell us and we'll take cases out.  And

9  I think they did take at least one case out, probably

10  more.  So I think they try not to be biased.  I don't

11  know if they are biased.  They may be biased.

12       Q.   **That's --**

13       A.   I'm not sure what you mean by "biased" in this

14  context.

15       Q.   **Okay.  Well --**

16       A.   Yeah.

17       Q.   **-- that's one of the problems with any kind of**

18  **analysis like what you're discussing is that bias can**

19  **exist even without the intention to be biased, right?**

20       A.   Right, right.

21       Q.   **And I think you acknowledged that's human**

22  **nature, right?**

23       A.   Right.  It's part of the human condition, but

24  that doesn't necessarily mean something is biased.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 230

1    Q.   It doesn't, but that's why scientists like

2  yourself put controls in place to ensure that there's a

3  very -- bias is -- is limited to -- as much as possible

4  in reaching your conclusions, right?

5    A.   We do our best, yes.

6    Q.   The Nicole Harris case that you testified in,

7  the verdict was for the defense, right?

8    A.   Correct.

9    Q.   And that was a case in which she alleged that

10  she was coerced into confessing to a crime that she

11  didn't commit?

12    A.   Correct, and that it wasn't a crime, that one

13  of her children had accidently killed the other child,

14  not that it was an intentional murder.

15    Q.   Got it.

16        So is she considered -- is her case considered

17  an exoneration --

18    A.   Well --

19    Q.   -- in any of the registries you mentioned?

20    A.   I don't know if the national registry

21  considers her case an exoneration.  I just have to look

22  it up.  The national registry has different crit- -- An

23  exoneration is not the same as a proven false

24  confession, but, you know, they define the term and then

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 231

1  apply it.  So if she's in their registry, then -- then

2  she's considered an exoneration by their standards.

3       **Q.   Right.  No, I understand.  But we were talking**

4  **about sources for you to get the cases to begin with and**

5  **decide what's going to be categorized as a proven false**

6  **confession or not, and those registries are one of the**

7  **areas you would go to to find cases, right?**

8       A.   Yeah.  So the registry didn't come into

9  existence until 2012.  So it was not relevant to the

10  2004 or 1998 article.  But yes, if I'm doing one of

11  these studies right now, I would certainly look at the

12  registry and I would see cases they categorize as false

13  confessions, and I would not rely on their judgment.  I

14  would try to get materials on the case to determine

15  whether, based on my analysis of those materials, it met

16  our criteria for a proven false confession.

17       **Q.   Did you identify Nicole Harris's confession as**

18  **a proven false confession?**

19       A.   I don't believe so.  I never published it as a

20  proven false confession.

21       **Q.   Well, I -- I'm not saying in a published work.**

22  **But you obviously issued a report in that case, right?**

23       A.   Yeah, I'd have to go back and look at the

24  report.  I've written a lot of reports since then.  My

Page 232

1  recollection is that I did not classify it as a proven

2  false confession, but, you know, I'd have to go back and

3  look.  Memory is imperfect.  If I did, I did, but I

4  don't think I did.

5      **Q.   The allegations she made is that -- or that**

6  **you just described about her case, that a crime wasn't**

7  **committed, it was an accidental death, a cause by one of**

8  **the siblings, that would put her technically in the**

9  **first category you identified of proven false**

10  **confessions, right?**

11      A.   If that is correct, then it would be no crime

12  occurred.  If there was science that could establish no

13  crime occurred, then it would be in the third category.

14  But yeah, I mean, logically, if we credit Nicole

15  Harris's account, we would say, yeah, it was no crime

16  occurred.  It was an accidental killing of one child of

17  the other.  It was not an intentional or unintentional

18  murder of Nicole Harris of the child, if we accept her

19  account or there was objective evidence indicating that.

20      **Q.   In how many of your cases of the data sets you**

21  **rely on for the articles, your published research, are**

22  **you relying on disputed information to draw conclusions**

23  **about a proven false confession?**

24      A.   Well, in most of the cases, there would be

Page 233

1  disputed information unless -- as in what you were

2  describing here with the prosecution not opposing the

3  certificate of innocence, and usually the police

4  continue to insist the person is guilty; the prosecutors

5  continue to insist the person is guilty.

6           This even occurs in DNA exonerations.  Even in

7  DNA exonerations where it's a rape, the only evidence is

8  the seminal fluid.  The seminal fluid dispositively

9  exculpates the person who's convicted and leads to the

10 true perpetrator who has a history of that crime.  So

11 there's oftentimes disputed information, but --

12      Q.  Right.

13      A.  -- the DNA results wouldn't be disputed.

14 There would be a different theory wrapped around the DNA

15 results by the prosecution or the police to explain

16 their position.

17      Q.  **The only question, Doctor, was whether you**

18 **relied on disputed information.  It sounds like that's a**

19 **yes, you do in some cases rely on --**

20      A.  In some cases -- Well, do I rely on disputed

21 information?  No.  But the information is disputed.

22      Q.  **And how do you resolve the conflict over the**

23 **disputed information in determining whether a confession**

24 **should be categorized as a proven false confession?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 234

1    A.    Well, using my best judgment.  If you're going

2    to ask the question at that level of generality, using

3    my best analysis and judgment.

4    **Q.    Okay.  What percentage of the cases in this**

5    **data set from, you know, your false confession public**

6    **research publications involve disputed information about**

7    **the confession itself?**

8    A.    Are you talking about disputed information or

9    disputed judgments?

10   **Q.    No.  Disputed information.  So obviously**

11   **you've got a situation, for example the Nicole Harris**

12   **case, that confession -- you took a position that it was**

13   **a false confession and the other side disputed that**

14   **conclusion.  So what I want to find out is, in how many**

15   **cases that you are deciding is a proven false confession**

16   **involve competing facts where someone is on the opposite**

17   **side saying --**

18   A.    Well, first of all, I don't recall taking the

19   position that it was a false confession.  I recall

20   taking the position that I'm taking here, which is that

21   there were indicia of unreliability, but it's not for me

22   to determine.

23   **Q.    Well, that's a fair point.  That's a fair**

24   **point.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 235

1    A.   But --

2    **Q.   I'll -- I'll rephrase the question for you.**

3    A.   And -- and I don't --

4    **Q.   Well --**

5    A.   I don't -- I'm sorry.  I guess I just want to

6    say, I don't know in the Nicole Harris case -- I'm going

7    to be very brief -- if there were disputed opinions as

8    opposed to disputed facts.

9    **Q.   Okay.  Disputed expert opinions, is that what**

10   **you're talking about?**

11   A.   No.  Disputed inferences from the facts.

12   **Q.   Okay.  Well, either way, what I'm trying to**

13   **find out is, how many of the cases that you've assigned**

14   **or you and your team have assigned as false -- proven**

15   **false confessions required you to resolve factual**

16   **disputes in doing so?**

17   A.   I'm not sure we resolved any factual disputes,

18   but it was our judgment that objectively one of the four

19   categories could be met.  But --

20   **Q.   Well --**

21   A.   -- in many of these cases -- I don't know how

22   many -- many of them there were police and prosecutors

23   to this day on the other side disputing our conclusions.

24   **Q.   Let me back up a second because you**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 236

1  mentioned -- you just said something I want to follow up

2  on.  You -- you phrase it as an analysis in which you

3  determined the -- one of the four categories could be

4  met as opposed -- and now I'm drawing -- I want to

5  follow up on that.  Do you mean to say that your

6  conclusions were this could be a proven false

7  confession?

8       A.   No.  That in our judgment, it was physically

9  impossible or, you know, no crime objectively can

10 establish this occurring.  So not that it could be a

11 proven false confession but that it was a proven false

12 confession.

13      Q.   Are most confessions true?

14      A.   That's the conventional wisdom, that most

15 confessions are true, yes.

16      Q.   Do you agree?

17      A.   That seems like a very reasonable opinion that

18 most confessions are either partially or entirely true.

19      Q.   Okay.  Do you agree that false confessions are

20 rare?

21      A.   I agree they are not the norm.  I don't know

22 how rare they are, but they may be rare depending on

23 what we mean by "rare."

24      Q.   Have you taken the position in the past that

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 237

1 **false confessions are the exception to the rule kind of**

2 **like train wrecks and plane crashes?**

3     A.   Yes, that's how I think of them, that they are

4 the exception, not the common outcome, although, of

5 course, some parts of the country they're far more

6 common than others.

7     **Q.   And do you agree that the person confessing**

8 **sometimes will include half truths or, you know,**

9 **falsehoods in the confession itself in order to paint a**

10 **favorable picture for him or herself?**

11     A.   That sometimes --

12     MR. AINSWORTH:  I'll --

13 BY THE WITNESS:

14     A.   -- occurs --

15     THE WITNESS:  Sorry.  Was there an objection?

16     MR. AINSWORTH:  Yes.  I'll object to foundation on

17 that question.

18         Go ahead and answer.

19 BY THE WITNESS:

20     A.   Yes, that may occur in some confession cases.

21     **Q.   Have you ever heard the phrase "restricted**

22 **range problem"?**

23     A.   If I have, I'm not recalling it right now.

24     **Q.   It's when a phenomenon is so uncommon that you**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 238

1    have a restricted range in which even if you control

2    everything and truly know a true versus false, you

3    cannot -- you cannot truly know a true versus false.

4    Does that make sense?

5        A.   Well, yeah.  But, I mean, if the murder victim

6    shows up alive, you can say with 100 percent certainty

7    the confession to the murder is false regardless of what

8    restricted range --

9        Q.   Well, you've just taken the most absurd

10   situation and applied it across the board.  So yes,

11   obviously, if the murder victim shows up alive, there's

12   a problem with the confession.  I don't think there's

13   any reasonable person who is going to disagree with you.

14   However, you're talking about a much broader scope of

15   cases than just if the person actually killed -- person

16   who is supposed to be dead actually isn't dead and is

17   alive and well.

18            For the broader range, isn't there a problem

19   with the limited information available in which to draw

20   conclusions?

21       A.   No, I would disagree.  I think we have

22   hundreds of documented cases.  We've got dozens of

23   laboratory studies.  We've got a science going back

24   decades.  We've got general acceptance, validity

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 239

1  testing.  We've got a core body of scientific knowledge

2  that's not disputed.  So no, I would disagree with -- as

3  you phrased that.  There are other areas of science

4  where, you know, their -- you don't know how frequently

5  something occurs, but you have many examples of it, but

6  it might occur at a low-base rate; and when it occurs,

7  it has a high consequence.  And we devote a lot of

8  resources to study it, like train wrecks and car

9  accidents and plane crashes.

10      **Q.  Right.  But do those studies incorporate some**

11  **of the analytical tools that you have said are not**

12  **suitable for what you are trying to do?**

13      MR. AINSWORTH:  Objection:  foundation.

14  BY THE WITNESS:

15      A.  Yeah, you're going to have -- you're going to

16  have to get me up to speed on that one.

17      **Q.  Well, you just made the comparison to studying**

18  **plane crashes and train wrecks.  So do you -- Have you**

19  **looked into this in order to ensure that your comparison**

20  **is valid?**

21      A.  It depends on what you mean by looked into it.

22  You were referring to analytical tools earlier and

23  that's what I didn't understand in the context of your

24  question.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 240

1      Q.    Are there any -- any of your scholarly

2   colleagues who disagree with you on whether there's a

3   sufficient data set to draw conclusions about false

4   confessions?

5      A.    To my knowledge, no PhD social scientist who

6   studies this phenomena would agree with that statement.

7   Now, there might be others who are not trained social

8   scientists, who don't have PhDs, who are not trained

9   empirical researchers who might disagree with that,

10  former prosecutors or others who represent themselves as

11  experts but not in the expert research community of

12  trained social science researchers, no, that I'm aware

13  of.

14     Q.    It's your position that the phenomena of false

15  confession -- confec- -- or conviction -- or I'm

16  sorry -- false confessions are what lead to false

17  convictions, right?

18     A.    Well, they're -- It's generally accepted that

19  false confessions are one prominent source or cause, not

20  the only one, not the most common one, but there's no

21  dispute that they are a source or cause of wrongful

22  convictions, yes.

23     Q.    Okay.  Is it fair to say that the information

24  you have about false confessions leading to false

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 241

1  **convictions are inadequate to -- because you cannot**

2  **compare them to correct convictions?**

3      A.   No.

4      **Q.   Why is that?**

5      A.   You don't need to compare false confessions to

6  true confessions to learn something about false

7  confessions.  A lot of social science is descriptive.

8  The way we begin to understand a phenomenon is by

9  isolating examples of it, looking for patterns.  There's

10  a multimethod approach here, as I mentioned earlier.

11  The experiments generate both true and false

12  confessions.  So it seems simplistic to me to say you

13  can't learn about false confessions without comparing

14  them in the real world study to true confessions.

15      **Q.   Well, it would be -- I guess it's not**

16  **really -- That wasn't really my question.  You have**

17  **identified risk factors based on a combination of**

18  **empirical data called from real life confessions that**

19  **you've categorized as proven false confessions and then**

20  **the -- the tests using college students for various**

21  **paradigms, right?**

22      A.   Yeah.  And -- and, again, this is a body of

23  research.  It's not like I created this.

24      **Q.   No, I know.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 242

1      A.    I contribute to it.  But yes, that's the basis

2  for the risk factor analysis, the experimental studies,

3  and the real-world studies.

4      **Q.    Wouldn't the next step be to take a look at**

5  **true confessions or true convictions and determine if**

6  **these risk factors are prevalent on those as well?**

7      A.    That might be valuable research, but I -- I --

8  I'm not sure it necessarily follows -- that's the next

9  step.  There's substantial research establishing these

10  risk factors.  But sure, I mean, that might be a

11  valuable study and -- and a researcher might get on to

12  that at some point.  I'm not arguing that that couldn't

13  be helpful information.  I just don't think it -- the

14  absence of that invalidates the existing research

15  findings.

16      **Q.    Right.  So in any particular case that you're**

17  **reviewing, for example like the present case with**

18  **Mr. Jakes, the best you can say is that a risk factor is**

19  **present and it may have led to Mr. Jakes giving a false**

20  **confession, right?**

21      A.    Well, I'm not sure that's the best, but yes,

22  that risk factors are probabilistic; the more, the

23  greater likelihood.

24      **Q.    All right.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 243

1    A.   Some version of that would be the bottom line

2  conclusion.  I would fill it in a little bit more.  But

3  even if there was the kind of study that you just

4  mentioned that you call the next step study, it wouldn't

5  change the conclusions.  I mean, you would still be

6  saying that it's a probabilistic conclusion, that risk

7  factors just establish probability and then we try to

8  explain why the risk factors establish probability, and

9  really, the next step goes to policy analysis, but

10  nevertheless.

11    **Q.   So -- Well, I mean, you -- you agreed that it**

12  **would be valuable to compare the body of work that you**

13  **are aware of and have done with true confessions.  And**

14  **in what ways would it be valuable?**

15    A.   Well, it could be valuable.  It could give us

16  more or better insight.  It could be that when we

17  compare it to true confessions, we see that some of the

18  risk factors I mentioned in this article are even more

19  salient and poignant and more significant than, say, the

20  experimental research has led us to believe, that

21  juveniles are at even greater risk than we previously

22  thought.

23    **Q.   So --**

24    A.   For example --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 244

1  Q.  So it also could tell you that the status of
2  being a juvenile is no more common -- or no -- no --
3  no -- less prevalent in true confessions than it is in
4  false confessions?
5  A.  That's certainly possible, but we'd have to
6  say in the data.
7  Q.  Right.  And if that were to happen, that would
8  suggest that it's not as much of a risk factor as
9  initially thought, the status of being a juvenile?
10  A.  That would certainly be evidence in the
11  direction of that, yes.  Usually one study doesn't prove
12  anything.  It just adds or subtracts evidence for --
13  Q.  Right.
14  A.  -- existing hypotheses.
15  Q.  And you as researchers of false confessions
16  would want that type of information because it actually
17  would help you zero in on what -- if you were to find
18  that, for example, being a juvenile or minimization
19  techniques or the false evidence ploys are no more or
20  less prevalent in true confessions versus false
21  confessions, it would help you zero in on where you
22  should be looking to identify what truly is causing
23  false confessions, right?
24  A.  Undoubtedly.  More research is always

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 245

1   something that researchers welcome, and we alter our

2   conclusions in light of new research if it contradicts

3   or is inconsistent with existing research.  Science, as

4   you know, is always an expanding area, and we want to

5   learn more and more.  So yes, that could be valuable and

6   it's possible it could be valuable for those reasons.

7   But a lot of these findings are very well established so

8   far, and we can only go on the existing science as it

9   exists today.

10      **Q.   Right.  And as it exists today, I think you've**

11   **already acknowledged that you cannot say what the**

12   **frequency of false confessions are, right?**

13      A.   Correct.  But that doesn't undermine the risk

14   factor analysis.

15      **Q.   True.  You just don't know what weight to give**

16   **the risk factor in any particular case because you have**

17   **no idea what the frequency rate is for any particular**

18   **risk factor in causing a false confession, true?**

19      A.   Well, I guess -- I guess in the experimental

20   studies, we -- we have percentages.  And even in the

21   real-world studies, we can say, you know, what

22   percentage involved a particular technique if we have a

23   record to make an inference about that.  But I thought

24   you were talking about the frequency of false

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 246

1    confessions in the real world.

2         Q.    Yeah.

3         A.    Like if it's 1 percent -- If -- if -- if we

4    imagine hypothetically that 1 percent of all

5    interrogations lead to false confession versus 5 percent

6    versus 10 percent, I don't see how that changes the risk

7    factor analysis.  Whether it's 1 percent or 5 percent or

8    10 percent, our studies so far to date indicate

9    minimization is a risk factor, false evidence is a risk

10   factor, adolescence is a risk factor, right.  So

11   whatever the number is in the real world of the

12   percentage of false confessions -- and it's going to be

13   different in some places than others, right?  Chicago is

14   very well known for false confessions.  Other parts of

15   the country we don't see it as often, right?  So -- so

16   whatever that number is, 25 percent, 5 percent,

17   1 percent, that doesn't affect the risk factor analysis

18   or the evidence for the risk factor analysis that exists

19   today.  That's the connection I'm having a hard time

20   seeing in your question.

21        Q.    So -- Well, so it goes to the weight of what a

22   juror should be considering about evaluating that risk

23   factor.  For example, if a risk factor has a 1 percent

24   chance of leading to a false confession versus a

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 247

1  **10 percent chance of leading to a false confession,**

2  **that's fair information for a juror to know, don't you**

3  **think?**

4      A.   Right.  But I think we're talking about two

5  different things because in the cases where a particular

6  technique is used, the risk of leading to a false

7  confession could be a lot higher than 1 percent even if

8  only 1 percent of the confessions are false.

9      **Q.   Let me ask you this:  Do you agree that risk**

10 **factors are not one-size-fits-all type of risk factors;**

11 **they have to be evaluated based on the facts of the**

12 **case?**

13     A.   What are we evaluating?

14     **Q.   Well, you evaluated -- You evaluate these**

15 **cases all the time, so I think, you know, this is what**

16 **we're talking about.  Not all risk factors will have the**

17 **same effect on every single case, right?**

18     A.   Presumably there will be variation, yes.

19     **Q.   Right.  And one of the varia- -- The**

20 **variations may be caused by the specific facts of any**

21 **case, right?**

22     A.   At a general level, yes.

23     **Q.   So, for example, you could have someone who is**

24 **better equipped to resist minimization or maximization**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 248

1    techniques, right?

2        A.   Correct, that's certainly possible.

3        Q.   **And that's true with all of the risk factors.**

4    **You could, for example, have a juvenile who is although**

5    **a juvenile, in a better -- better equipped to resist**

6    **certain tactics or resist the interrogation itself than**

7    **other juveniles, right?**

8        A.   Yes, certainly.  It still may be that that's a

9    risk factor, but one person may have a stronger

10   personality and last longer than another person, yes.

11       Q.   **Yeah.  So in other words, it goes to the**

12   **weight of the risk factor.  If certain facts exist,**

13   **perhaps that risk factor doesn't carry as much weight in**

14   **that particular case?**

15       A.   That's certainly possible.

16       Q.   **Okay.  Was that a possibility with Mr. Jakes?**

17       A.   Well, I guess in a hypothetical sense, yes,

18   but he just turned 15, and what we know about adolescent

19   development, that's very young for a juvenile.  You

20   know, a lot of these cases involving juveniles are

21   17-year-olds and 16-year-olds.  15 is pretty young, not

22   that developed.  But yeah, it's possible that there's

23   variation across juveniles, even though being a juvenile

24   is a risk factor for the reasons I articulate in the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 249

1    report.

2        Q.   Well, right.  But vulnerabilities associated

3    with risk factors can be mitigated depending on how a

4    person's life experience is; wouldn't you agree?

5        A.   I don't even know how to make sense of that.

6    Mitigated by life experiences --

7        Q.   Sure.  Let me -- I'll -- I'll -- I'll clarify

8    it for you.

9            Your concern, I think as articulated in your

10   report, is that juveniles are -- might seek to please

11   authority figures, are naive, do not look towards future

12   consequence of their actions, are impulsive, right, all

13   of those things?

14       A.   Those are general traits of juveniles,

15   correct.

16       Q.   Okay.  And they may not be able to -- As a

17   result of those things, they may not be able to

18   appreciate the consequences of giving a false

19   confession?

20       A.   Correct.

21       Q.   Okay.  And may not be fully able to appreciate

22   their rights, right?

23       A.   Correct.

24       Q.   So, for example, if they were given Miranda

Page 250

1    **warnings, perhaps they don't know that they can invoke**

2    **those rights at any moment; they don't have to talk to**

3    **the police, things like that, right?**

4        A.    Correct.

5        **Q.    But if you have a juvenile with life**

6    **experiences that taught him or her more about the**

7    **process, they would necessarily be better equipped in**

8    **the interrogation room to not be as naive or not be as**

9    **vulnerable to interrogation tactics, right?**

10       A.    Well, I don't know.  In the example you gave,

11   it might be that somebody, based on their life

12   experience, is in a better position to understand the

13   Miranda warnings, but -- so there would be differences

14   between juveniles.  But still, the -- the core finding

15   about juveniles is the brain development and

16   psychosocial immaturity.  And so while some may be

17   better equipped, they're not adults, and those traits

18   should be present across juveniles.  But some will be

19   more sophisticated, more intelligent, more worldly,

20   perhaps have stronger personalities and be more capable

21   of resisting.  That doesn't undermine the research on

22   the risk factor and the basis for the risk factor.  And

23   of course a jury would have to make its own decision

24   based on the facts in the case.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 251

1     Q.   Well, I'm not suggesting that it undermines

2  the research.  I'm suggesting that the -- Well, let's

3  back up a second.

4         Do you agree that not all juvenile confessions

5  are false confessions?

6     A.   Correct.  Yes.

7     Q.   Okay.  Even if questioned without the presence

8  of a guardian or parent -- or youth officer?

9     A.   Correct.

10     Q.   Okay.  And certain -- certain juveniles may

11  have life experiences that make them distrustful of the

12  police, right?

13     A.   Correct.

14     Q.   And certain juveniles may have life

15  experiences that inform them about certain police

16  procedures and rights they have when they are questioned

17  by the police, right?

18     A.   Correct.  Yes.

19     Q.   Okay.  In your mind, did Mr. Jakes have any of

20  those life experiences?

21     A.   Not that I recall.  Maybe he did, but not that

22  I recall.

23     Q.   Fair enough.

24         Did you review Mr. Jakes's deposition?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 252

1    A.   I did when I was preparing the report, yes.

2    **Q.   Did you review the exhibits to his deposition?**

3    A.   I don't believe so.

4    **Q.   Did you get the exhibits to his deposition?**

5    A.   I don't recall.  I'm not sure I did.

6    **Q.   Okay.  When you were going through his**

7    **deposition and references were made to certain exhibits,**

8    **did you try and find those exhibits?**

9    A.   No.  Obviously I reviewed a lot of materials,

10   so I assumed that the materials that I -- that anything

11   in there that was relevant to my analysis would have

12   been provided in the other materials.  Oftentimes

13   deposition exhibits are duplicative of other materials

14   already provided.

15   **Q.   Well, you would know from reading the**

16   **discussion in the deposition about a certain exhibit**

17   **whether it's something you believe is relevant to your**

18   **opinions, right?**

19   A.   I might know, yeah.

20   **Q.   Okay.  And certainly you must have read**

21   **Mr. Jakes's testimony at trial and in the motion to**

22   **suppress hearings in preparation of writing your report?**

23   A.   Yes.

24   **Q.   Okay.  Mr. Jakes has a criminal record.  He**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 253

1   had a criminal record as of the age of 15 when he was

2   brought in for questioning in this particular case.  Did

3   you know that?

4       A.   I probably did at the time, yeah.

5       Q.   Okay.  Do you know what the extent of the

6   criminal record was?

7       A.   I don't recall.

8       Q.   Or I should say is.

9            Mr. Jakes had been arrested at various points,

10  13 times, for crimes ranging from property-type crimes,

11  vandalism-type crimes, to sexual assault of another

12  minor, armed robbery, and a school -- you know, things

13  that occurred at his school.  Did you -- Is this new

14  information for you, or did you already know this?

15      A.   I don't recall knowing the specific crimes,

16  but I -- I do -- that does refresh me on the arrests.

17      Q.   Okay.  Mr. Jakes admitted at his deposition

18  and during some of his, I think, motion to suppress

19  testimony or trial testimony that he was aware of

20  Miranda warnings as of the day he was brought in for

21  questioning.  Did you know that?

22      A.   Yes.

23      Q.   Mr. Jakes demanded to see a warrant when the

24  police showed up at his home for the murder in question

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 254

1    **in this case.  Did you know that?**

2        A.    Yes, although I thought it was his aunt who

3    was asking, but it may have been Mr. Jakes.

4        **Q.    Okay.  Well, the fact that Mr. Jakes at the**

5    **age of 15 is demanding to see a warrant should tell you**

6    **something about his -- his life experience and knowledge**

7    **related to the police, right?**

8        A.    If he was the one, yes.

9        **Q.    Because that would suggest he's not quite as**

10   **naive as a lot of other 15-year-olds, right?**

11       A.    That's --

12       MR. AINSWORTH:  Object --

13       THE WITNESS:  Sorry.  Go ahead.

14       MR. AINSWORTH:  Object to the form of the question.

15   BY MR. MORAN:

16       **Q.    I'm sorry, Doctor.  I didn't hear your answer.**

17       A.    That's certainly possible with respect to

18   police warrants.

19       **Q.    And it certainly suggests that Mr. Jakes -- or**

20   **Mr. Jakes's prior encounters with police suggest that**

21   **he's had prior instances in which he's been questioned**

22   **by police, right?**

23       A.    It's certainly possible, but just because

24   you've been arrested doesn't mean you've been

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 255

1  interrogated.

2      Q.   Right.  In Mr. Jakes's case, he actually did

3  the juvenile functional equivalent of pleading guilty to

4  one of the sexual assault charges.  There's a special

5  word for it for juveniles.  I can't remember what it is.

6  But essentially, he admitted to culpability of the

7  crime.  Did you know that?

8      A.   If I did when I prepared the report, I didn't

9  recall it today.

10      Q.   Mr. Jakes testified at his deposition about

11  how he does not trust the police because he understands

12  the police to frame people, and this was back in 1991.

13  Did you know that?

14      A.   If that's in his deposition, I would have read

15  that, yes.

16      Q.   These are all facts that are relevant to

17  whether his status as a juvenile is a risk factor -- or

18  the weight to be given that risk factor; would you

19  agree?

20      A.   I don't think in any way these facts undermine

21  the relevance of youth as a risk factor.  The fact that

22  he had been read Miranda warnings before doesn't

23  necessarily mean he really understood those.  The fact

24  that he had been arrested before doesn't change his

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 256

1   psychosocial immaturity.  There's a cluster of traits

2   that go along with being a juvenile.  So yeah, he might

3   have been more street-smart than other juveniles.  He

4   might have heard things or thought of things that would

5   be outside the common experience of most juveniles.  But

6   I don't think it undermines the fact that his age, his

7   lack of life experience still puts him at -- and

8   cognitive development still puts him at greater risk,

9   his low IQ.

10          Q.   **My particular question --**

11          A.   And when you're talking about -- when you're

12  talking about the context of this case and you bring up

13  his background, you're ignoring other things, like his

14  description of the police barging in, throwing him

15  against the wall, the threats in the interrogation --

16          Q.   **Yeah, but that's not the question.  That's not**

17  **what I asked.**

18          A.   No, but this -- this is relevant because

19  you're talking about juvenile as a risk factor and

20  you're suggesting that because he has experience with

21  the criminal justice system, that perhaps we should put

22  less weight on juvenile being a risk factor.  And what

23  I'm saying is, is the situation might mean we should put

24  more weight on being a juvenile -- juvenile risk factor,

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 257

 1  right?  It -- it cuts both ways because he's a juvenile

 2  in a particular situation, first at the house and then

 3  at the police station.

 4      **Q.    Okay.  Well, let's back up a second.  You**

 5  **agree the information is relevant?**

 6      A.    Potentially rel- --

 7      MR. AINSWORTH:  Objection to the form.

 8  BY THE WITNESS:

 9      A.    If by information you mean the information you

10  just walked through.

11      **Q.    Yes, his life experiences with his criminal**

12  **record, his activities that he even wasn't arrested for.**

13  **I mean, he testified to, you know, one of his activities**

14  **with one of his friends was throwing bottles at cars as**

15  **they drove along, things like that.  All of it is**

16  **relevant to the analysis -- one way or the other it is**

17  **relevant to the analysis to whether his status as a**

18  **juvenile should be given more or less weight in whether**

19  **it caused him to give a false confession, agreed?**

20      A.    I'm going to say yes and no, and the reason

21  I'm going to say yes and no is because yes, it's

22  relevant to a jury.  They can make of it what they want.

23  But I'm going to say no because there's no scholarly

24  research that suggests a juvenile with 13 arrests or who

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 258

1   throws bottles at cars is less at risk for making or

2   agreeing to a false confession.

3       **Q.   Well, of course there wouldn't be scholarly**

4   **research --**

5       MR. AINSWORTH:  Hang on.  Let me -- let me -- Hang

6   on, Pat.  Let me just make an objection to foundation to

7   your prior question.  Please continue with your next

8   question.

9       MR. MORAN:  All right.  Thanks.

10  BY MR. MORAN:

11      **Q.   Of course there wouldn't be scholarly research**

12  **on one single case of a kid who had 13 arrests and ended**

13  **up confessing to a crime because that's not a big enough**

14  **data set to even draw conclusions from.  You'd have to**

15  **look at juveniles across the board and determine whether**

16  **their life experiences had any meaningful impact on**

17  **their status as a juvenile and vulnerabilities that**

18  **juveniles have to giving false confessions; isn't that**

19  **right?**

20      A.   Yes.  But I'm not aware of any research that

21  establishes the proposition you're trying to establish.

22  And at the same time, I'm suggesting that it's relevant

23  for the jury if a judge determines it's relevant in

24  their analysis.  But there's no scholarly basis

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 259

1  supporting the premise of your questions that you're

2  trying to get me to agree to.

3      **Q.   Well, don't you agree, though, that**

4  **vulnerabilities can be mitigated or exacerbated?**

5      A.   I think that's a reasonable hypothesis, but

6  there's no studies showing what you're asking me to

7  agree to.

8      **Q.   Yeah, I'm not asking whether studies show it.**

9  **I'm just asking whether it's a possibility, and I think**

10 **you're saying yes, it is a possibility?**

11     MR. AINSWORTH:  Object to the form of the question.

12     MR. MORAN:  Let --

13     MR. AINSWORTH:  What's the question?

14     MR. MORAN:  What is the question here?

15 BY MR. MORAN:

16     **Q.   Is it -- Is Mr. Jakes's life experience with**

17 **the criminal justice system relevant to whether his**

18 **status as a juvenile made him less vulnerable or more**

19 **vulnerable to giving a false confession?**

20     A.   I think in the individual case it's

21 potentially relevant, and it could be potentially

22 relevant in both directions.  It could make him more

23 vulnerable or less vulnerable.

24     **Q.   You identified Mr. Jakes's IQ as a potential**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 260

1    risk factor, right?

2        A.   Yes, if I'm remembering correctly, yes.

3        Q.   He has a 71 IQ?

4        A.   Right.  Thank you.  That's what I thought.

5        Q.   And that's taken from Dr. Culotta's report,

6    the forensic neuropsychologist expert that the

7    plaintiffs retained to test Mr. -- Mr. Jakes, right?

8        A.   I believe so.

9        Q.   In Mr.  Culotta's -- I'm sorry.  In

10   Dr. Culotta's report, did you note that he -- there were

11   findings that Mr. Jakes's personality type is to be

12   confrontational with authority figures?

13       A.   I didn't review it in preparation for today,

14   but I did when I prepared the report.

15       Q.   Okay.  You drew a conclusion that Mr. Jakes is

16   mentally retarded?

17       A.   I think he's in the range of mental

18   retardation.  If I didn't -- if -- I'm not sure I worded

19   that as carefully as I should have.  Typically, mental

20   retardation is 70 or below, and so obviously 71 is above

21   70.  So if I didn't phrase it correctly in the report, I

22   meant close to or in the range of mental retardation.

23       Q.   Okay.  I guess the question then is, do you

24   consider Mr. Jakes to be mentally retarded?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 261

1    A.   I would be relying on the conclusion of the

2  doctor; and if the doctor wrote that in the report, then

3  I would defer to that conclusion.

4    **Q.   Do you know whether that phrase is even used**

5  **anymore to describe people with cognitive difficulties**

6  **or that fall into the low range of IQ, which is 70 to**

7  **75?**

8    A.   Yeah, I think that the DSM-IV used it, but I

9  think it got replaced in the DSM-5, which I think is the

10  current DSM, with the language of intellectual

11  disability and people with intellectual disabilities.

12    **Q.   Did you consult the DSM-5 at all with respect**

13  **to --**

14    A.   No, I didn't.  No, no.  You're asking me a

15  question, and that's my under- -- that's my

16  understanding of the answer to your question.

17    **Q.   Okay.  So this is on -- Take a look at your**

18  **report.  It's on Page -- the very bottom of Page 35.**

19  **And I'm just going to read it to you, Doctor.  "As a**

20  **result of his mental retardation and associated low**

21  **level cognitive and intellectual functioning, Mr. Jakes**

22  **was at greater risk of making or agreeing to a false**

23  **confession, especially in response to physically or**

24  **psychologically coercive interrogation."**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 262

1          **It seems in that sentence that you're -- you**
2   **know, you sort of implied in that sentence is a**
3   **conclusion that he does -- he is mentally retarded.  And**
4   **my question to you is, was that your intention to**
5   **communicate that conclusion?**

6          A.   If it's in Dr. Culotta's report, then yes, and
7   otherwise, I should have been more careful with the
8   language and said as a result of -- as being in the
9   range of mental retardation or as a result of his
10  intellectual de- -- disabilities or severe intellectual
11  disabilities and associated low level cognitive and
12  intellectual functioning.  I mean, we're talking about
13  one point essentially which might be a margin of error.
14  I think the point -- the -- the conclusion holds.  I
15  might have just used different language.  I don't recall
16  if the report, again, categorized him as mental
17  retardation.  If it did, I stand by this.  If it didn't,
18  then I would modify it if I had to rewrite the report.
19  But I think the conclusion still holds.

20         Q.   **Okay.  So question for you is, would -- did**
21  **you do any analysis other than look at Dr. Culotta's**
22  **report to reach the conclusion in that sentence about --**

23         A.   Well, if there were other materials in the
24  record that I reviewed that went to his intellectual or

Page 263

1  cognitive disabilities.  But no, I'm not a clinical

2  psychologist.  I didn't -- I didn't interview him.  I

3  didn't administer any tests.

4        **Q.   Okay.**

5        A.    I didn't consult the DSM-5 or IV.

6        **Q.   Right.  And by the way, did you read**

7  **Dr. Culotta's deposition?**

8        A.    I don't believe so.

9        **Q.   Is that something you'd like to read?**

10       A.    If it's relevant to this analysis, then yes.

11       **Q.   And my -- you know, sort of a footnote, I was**

12  **informed the other day that you have reviewed the -- a**

13  **couple of additional materials since you issued your**

14  **report.  Do you remember what those were?**

15       A.    Yeah, I've reviewed -- I skimmed parts of Gus

16  "Snake" Johnson's [sic] deposition, and I reviewed -- I

17  forgot to mention this at the very beginning of the

18  interr- -- of the deposition.  I reviewed some Chicago

19  Police training materials.

20       **Q.   Do those have -- Are you changing your report**

21  **in any way, shape, or form based on the review of those**

22  **materials?**

23       A.    No.

24       **Q.   Okay.  So did you -- Do you know whether --**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 264

1   what the standards are to make determinations about --

2   or at least in the DSM-IV about mental retardation?

3       A.   Well, I thought -- It's been a while since I

4   looked at that.  But I thought it was two-fold: one, an

5   IQ of 70 or lower and, two, an assessment of the

6   adaptive functioning.

7       Q.   And do you know what Mr. -- Mr. Jakes's

8   adaptive -- the assessment of Mr. Jakes's adaptive

9   functioning, do you know what the conclusions were

10  according to Dr. Culotta?

11      A.   You're going to have to refresh my

12  recollection.

13      Q.   It's okay.

14           Let's put it this way:  If Dr. Culotta did not

15  independently conclude that Mr. Jakes is mentally

16  retarded, would it be fair to say that you are not

17  adopting that opinion either?

18      A.   Correct.  But I would say he's one point off,

19  and substantively everything else stays the same in my

20  opinion, that it doesn't affect -- it doesn't affect my

21  opinion.

22      Q.   Right.  Right.

23           And certainly someone with a 71 IQ could be --

24  And I want to direct your attention to the middle of

Page 265

1    this paragraph on the same page.  You write, "Those with

2    lower IQ, and especially those who fall in the range of

3    around 70 IQ or below, are more easily influenced by

4    others, are more likely to accept blame for negative

5    outcomes, are slower in thinking and processing

6    information, and have more difficulty maintaining focus

7    and attention for long stretches of time."

8              It's possible that someone in that low IQ

9    range of 71 may not exhibit these traits, true?

10        A.   It's possible, but I think it's very unlikely.

11        Q.   For example, Mr. Jakes was assessed as being

12   confrontational and rejecting authority figures by

13   Dr. Culotta?

14        A.   Correct, but --

15   MR. AINSWORTH:  Object to the form of the question.

16             Please continue.

17   BY THE WITNESS:

18        A.   That doesn't really go to slower in thinking

19   and processing information or having more difficulty

20   maintaining focus or attention, so ...

21        Q.   Let's talk about sleep deprivation.  You have

22   assessed Mr. Jakes as being deprived of sleep at the

23   time he signed off on his written statement?

24        A.   Correct.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 266

1  Q. Okay. And that was at, what, 4:30 in the

2 morning?

3  A. Correct.

4  Q. Okay. Do you know what Mr. Jakes's sleep

5 habits were?

6  A. No.

7  Q. Do you know whether he is someone who had a

8 habit of staying out all night?

9  A. I do not.

10  Q. Do you -- Did you become aware of any evidence

11 in your review of the case to give -- that gives you any

12 indication as to Mr. Jakes's sleep habits?

13  A. Not that I recall.

14  Q. All right. Or lifestyle habits that would

15 suggest he was a late-night person as opposed to someone

16 who, you know, went to bed early?

17  A. Not that I recall.

18  Q. The night of the murder in question, Mr. Jakes

19 was out throwing bottles at cars around 10:00 o'clock at

20 night. Do you remember reading that?

21  A. I remember some discussion of that, yes.

22  Q. And that's -- that's actually not a disputed

23 fact. That's something that Mr. Jakes agrees that he

24 was doing. Did you know that?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 267

1       A.    I do now.

2       **Q.    Okay.  So should -- And this kind of applies**

3  **to a couple of things.  But should that information be**

4  **included in your report that Mr. Jakes, you know,**

5  **appears to be someone who stays out late at night and**

6  **therefore, maybe would not have had the effects -- the**

7  **same effects of sleep deprivation that you are**

8  **suggesting he had?**

9       MR. AINSWORTH:  Object to the form of the question.

10  BY THE WITNESS:

11      A.    Because it was 10:00 o'clock at night and he

12  was outside, that affects his circadian rhythm at 4:30

13  in the morning when he was giving the statement?

14      **Q.    Well, sleep deprivation doesn't just show up**

15  **all at once, right?  It occurs over time due to a lack**

16  **of sleep, right?**

17      A.    Correct.  And -- But I don't consider being

18  out at 10:00 at night to be late.

19      **Q.    No.  But for a 15-year-old on a school night,**

20  **that might be a little unusual, don't you think?**

21      A.    It might.  It's --

22      **Q.    It might suggest --**

23      A.    It's very different than 4:30 in the morning.

24      **Q.    It does.  But it also suggests that Mr. Jakes**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 268

1  may have been somebody who actually wasn't going to

2  school a whole lot and was staying out late with his

3  friends even on school nights to entertain themselves?

4      A.   Yeah, we're speculating here.

5      Q.   Are we really speculating, or are we looking

6  at facts in the case that no one disputes?

7      A.   I guess what -- what I mean by speculation is,

8  you know, that somebody who stays out late at night --

9  Maybe in the Midwest 10:00 o'clock is late at night, but

10  it's not here.

11      Q.   Oh, do 15-year-olds stay up past 10:00 o'clock

12  in California?

13      A.   I have 13-year-olds -- I have twin

14  13-year-olds who do all the time, but -- but --

15      Q.   Let me ask you this -- And, you know,

16  anecdotal life experiences aside, it's not someone who

17  is 15 years old up watching TV getting ready for bed or

18  something like that.  He was out and he was engaged in

19  activities that you wouldn't expect from a 15-year-old.

20  He's throwing bottles at cars.  He's getting into chases

21  and arguments and fights on a Sunday night at

22  10:00 o'clock.

23      MR. AINSWORTH:  Objection --

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 269

1  BY MR. MORAN:

2      **Q.   Does that tell you --**

3      MR. AINSWORTH:  -- to the form of the --

4          Go ahead.

5  BY MR. MORAN:

6      **Q.   Does that tell you --**

7      MR. AINSWORTH:  -- the question --

8  BY MR. MORAN:

9      **Q.   -- anything about his lifestyle?**

10     MR. AINSWORTH:  Object to the form of the question.

11  BY THE WITNESS:

12     A.   It might tell me something about his

13  lifestyle -- lifestyle, but it doesn't affect my

14  conclusion that he would have been sleep deprived at

15  4:30 in the morning or 3:30 or 2:30 or 1:30, that his

16  24-hour cycle would have been broken unless he was

17  extremely atypical and went to bed at 5:00 in the

18  morning every night.

19     **Q.   Well, don't you need to know a baseline of**

20  **what his sleep habits are in order to determine the**

21  **effect -- the true effect of sleep deprivation?**

22     A.   I think maybe the full effect, but I think

23  it's a reasonable conclusion that anybody who is up that

24  late is going to experience some sleep deprivation given

Page 270

1  how sleep deprivation is described as a break in the

2  24-hour sleep cycle.

3       MR. MORAN:  Do you want to take a break, Doctor?

4       THE WITNESS:  Speaking of sleep deprivation, let's

5  take a break.  That sounds like a good idea.

6       MR. MORAN:  Why don't we --

7       MR. AINSWORTH:  Do you need a break, Enza?

8       THE VIDEOGRAPHER:  All right.  The time is

9  4:28 p.m.  We're now going off the record.

10                    (A short break was had.)

11      MR. MORAN:  All right.  We're back on?

12      THE VIDEOGRAPHER:  Yeah.  The time is 4:40 p.m.

13  We're now back on the record.

14      MR. MORAN:  All right.  Very good.

15  BY MR. MORAN:

16      **Q.   Doctor, when you were reviewing the**

17  **information at your disposal, how do you resolve**

18  **discrepancies in -- between Mr. Jakes and any of the**

19  **witnesses in deciding which facts to use?**

20      A.   I just evaluated the totality of the evidence

21  and whatever I thought was more supported.  I was trying

22  not to make any factual determinations but say if

23  Mr. Jakes's account is accurate, here is what the social

24  science says; if the detectives' account is accurate.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 271

1   But obviously I had to evaluate the record to explain

2   why somebody like him would have falsely confessed and

3   to make sense of the interrogation techniques.  I think

4   I need to know -- I would need to know more

5   specifically, you know, which disputes you're talking

6   about.  But I did my best analysis of the available

7   evidence in the record.

8        **Q.   Did you ever -- Were there any situations**

9   **where you had to make a judgment call as to what**

10  **direction you would go in with certain facts?  And I**

11  **don't mean between Mr. Jakes and the police because**

12  **that's very, very different.  I mean between Mr. Jakes**

13  **and, say, physical evidence or other types of evidence**

14  **or other witness statements?**

15       A.   Well, we already discussed the Harris

16  depositions and how I thought the -- the evidence closer

17  to trial -- closer to -- to 30 years ago was more

18  relevant.  But I'm not recalling having to go in a

19  particular direction.  I mean, we talked also about Gus

20  "Snake" Johnson [sic] and why -- in that footnote where

21  he was describing something in his trial testimony that

22  didn't really make sense in light of what the prosecutor

23  and detectives said.  So there are factual disputes

24  that, in my review of the evidence, suggests a clear

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 272

 1 | answer, but I'm not trying to be a fact witness.  I'm
 2 | trying to say, based on my review of the available
 3 | evidence, here are my opinions, here is what the social
 4 | science shows.
 5 |      **Q.  Did you find any evidence consistent with any**
 6 | **statement -- any of the lines in Mr. Jakes's**
 7 | **statement -- any of the words, I should say?**
 8 |      A.  I think you -- I think you have to direct me
 9 | to a particular place.  It's -- Your question is so
10 | open-ended.  We just have to go through his statement,
11 | things that are consistent with lines in his report.
12 |      **Q.  No, that's fine.  I'm happy to do that.**
13 |      A.  Or his confession, rather.  So if you want to
14 | put it up and then we can kind of go through lines.
15 |      **Q.  Well, let me ask about a couple of things; and**
16 | **then if you need to -- still need to see it, I'll be**
17 | **happy to do that for you.**
18 |           **Mr. Jakes in his report identified that -- or**
19 | **not his report -- I'm sorry -- in his statement --**
20 |      A.  Statement, yeah.
21 |      **Q.  -- identified that he was told by Little A,**
22 | **Arnold Day, that the person coming out of the sub shop**
23 | **had a wad of cash, a lot of money.  Do you remember**
24 | **reading that?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 273

1      A.   I remember reading a police report about

2   Arnold Day's description -- changing description yes.

3      **Q.   Okay.  Well, specifically in Mr. Jakes's**

4   **statement --**

5      A.   Okay.

6      **Q.   -- that information is -- is contained in**

7   **there.  Did you find any evidence to support the**

8   **contention -- or the -- Mr. Jakes's statement that he**

9   **learned or became aware through Arnold Day that the**

10  **person they were going to stick up had a lot of cash?**

11     A.   Not that I recall.

12     **Q.   Is it -- If that information existed, would it**

13  **be relevant to your analysis?**

14     A.   I don't think it would affect any of my

15  conclusions, no.

16     **Q.   Wouldn't it suggest that a part of Mr. Jakes's**

17  **statement is, in fact, consistent with the evidence?**

18     A.   Well, the -- the interrogation was not

19  recorded, so we don't know how he learned that.  He said

20  that his -- they fed him facts; they educated him about

21  the crime.  And without a record, we can't say who said

22  what, so we can't infer that he independently provided

23  that detail that matched the evidence since the police

24  knew that detail and he's saying he was fed by the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 274

1  police and educated on the case facts.

2      **Q.   Well, let's back up a second.  How do you know**

3  **the police knew that detail as of the moment Mr. Jakes**

4  **gave his statement?**

5      A.   Well, I don't, but I assume that -- that they

6  knew a lot of details and that might have been one of

7  them.

8      **Q.   Right.  But it's important to actually know**

9  **these facts, right, from your perspective because it**

10 **influences whether you are going to reach a conclusion**

11 **that the statement is reliable or not, right?**

12     A.   Right.  But if you -- if you lack a recording

13 of an interrogation, you can't -- you can't pinpoint

14 where the information came from and you can't make the

15 conclusion this -- that this was a nonpublic fact, not

16 likely guessed by chance, that it was not provided to

17 him by the police.  We don't know the origin of that

18 detail included in his statement.  Now, if we had a

19 recording of the interrogation and it came from him and

20 it was a fact he couldn't have learned elsewhere, that

21 would be a different story.

22     **Q.   Well -- And by the way, you -- I think you**

23 **mentioned that the interrogation was unrecorded 28 times**

24 **in your report.  Did you know that?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 275

1    A.   I did not, no.

2    **Q.   I went and counted them up.  According to the**

3 **word counter, it's 28 times.**

4    A.   Okay.

5    **Q.   Why the need to continuously repeat in your**

6 **report that the interrogation was un- -- not recorded?**

7    A.   Well, it's significant for a lot of the

8 analysis.  Obviously I'm trying to be as thorough as

9 possible, and there were a lot of opinions, and it's a

10 long report.  But the absence of a record affects the

11 analysis, just like here.

12   **Q.   You took the position that the officers had**

13 **the ability to record the interrogation?  It says --**

14   A.   Correct.

15   **Q.   -- in the very beginning of your report.**

16   A.   Correct.

17   **Q.   What is the factual basis for that conclusion?**

18   A.   That I was alive in 1991 and that there were

19 handheld tape recorders available and one could have

20 easily purchased them or obtained them and put it on the

21 table and recorded the interrogation.

22   **Q.   So basically, handheld recorders existed on**

23 **planet earth in 1991; and therefore, the police officers**

24 **could have gotten one somewhere?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 276

1    A.    That's correct.  Yes.

2    **Q.    Okay.  Were they provided to the detectives?**

3    A.    I don't know if they were provided or not.  I

4    know in that time period, sometimes police recorded

5    conversations or interviews, even interrogations, though

6    it wasn't required by law.

7    **Q.    And do you know when it became required by law**

8    **to record interview -- interrogations of murder suspects**

9    **in Illinois?**

10    A.    I think around 2003.  That's my best

11    recollection.

12    **Q.    I think it's actually 2004.**

13    A.    Well, I was close.

14    **Q.    Yeah, you were close.  Good job.**

15    **Okay.  So do you know what the practice was in**

16    **1991 in -- across the United States for recording**

17    **interrogations of murder suspects?  Was it common**

18    **practice?  Was it not common practice?**

19    A.    I think it was -- Outside of the state of

20    Alaska and maybe Minnesota, it was common not to

21    record -- perhaps more common not to record, though

22    some -- some interrogators still did record part or all

23    of the interrogation.

24    **Q.    So let's come back to this fact about the**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 277

1    cash.  If it were to become known that no information

2    about this individual carrying a large amount of cash

3    surfaced until much later after Mr. Jakes gave his

4    statement, would you have any way of saying that

5    Mr. Jakes did not originate that information?

6        MR. AINSWORTH:  Object to the form of the question.

7    Object to the lack of the foundation.

8    BY THE WITNESS:

9        A.   I just want to make sure I understand the

10   question, and I'm not sure that I do.  I can reword it,

11   but I think maybe you might want to reword it since --

12       Q.   Fine.

13       A.   -- I don't understand it, yeah.

14       Q.   So if it turns out that the only information

15   about this individual who was murdered carrying a lot of

16   cash did not -- came -- come to the police through a

17   source other than Jakes until after Jakes had given his

18   statement, would you agree then that a reasonable

19   conclusion is that Mr. Jakes originate -- or was the

20   source of information -- independent source of

21   information related to the cash at the time he was being

22   interrogated?

23       MR. AINSWORTH:  Objection:  lacks foundation.

24   Object to the form of the question.  You're assuming

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 278

1  facts not in evidence, and you're missing a -- a piece I

2  think intentionally, Pat.

3      MR. MORAN:  Intentionally?

4      MR. AINSWORTH:  Yes.

5      MR. MORAN:  Well, what do you think I'm

6  intentionally leaving out, Russell, if you're going to

7  make that accusation?

8      MR. AINSWORTH:  The possibility of -- that the

9  information was communicated to Jakes before he talked

10  to the police.

11      MR. MORAN:  Well ...

12      MR. AINSWORTH:  By -- by not -- not as part of the

13  commission of the crime.  The identity of the person who

14  has the information, that you're leaving out.

15      MR. MORAN:  I don't know -- I disagree.  I -- I

16  don't see how it changes the question, but whatever.

17  BY MR. MORAN:

18      **Q.    The point is -- What I'm trying to get at,**

19  **Doctor, is, if you were given evidence that the police**

20  **would not have known about the cash through a source**

21  **other than Jakes prior to Mr. Jakes giving a statement,**

22  **would you have to conclude that the police did not feed**

23  **that particular fact to Mr. Jakes?**

24      MR. AINSWORTH:  Object to the form of the question.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 279

1    Object to the lack of foundation and assumes facts not

2    in evidence.

3    BY THE WITNESS:

4        A.   As you've asked the hypothetical question, it

5    seems true by definition.  What I was thinking before

6    the -- before the objection was contamination is not

7    just by the police.  So for purposes of the analysis, if

8    the police don't contaminate the confession or the

9    suspect but somebody else does -- the media, somebody

10   who witnessed the crime, the true perpetrator -- and the

11   person knows that fact, then it loses its probative

12   value in the fit test analysis.

13           But I think as you asked the question, I think

14   what you're asking is, if the police didn't know the

15   fact, then they couldn't have contaminated it to him,

16   and that seems true by definition because you're asking

17   a hypothetical question.

18       **Q.   Right.  And there's a difference between --**

19           **A confession can be false and not coerced,**

20   **right?**

21       A.   Correct, you can have noncoerced, false

22   confessions, correct.

23       **Q.   Okay.  Speaking of feeding facts, you have**

24   **concluded that at least acco- --**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 280

1          **And by the way, every -- all of your**

2  **conclusions about the interrogation and what the police**

3  **were doing with the exception of a few things that I**

4  **think you are suggesting you learned from the police**

5  **version of events, everything else is based on accepting**

6  **what Mr. Jakes says is true, right?**

7          A.   For purposes of the analysis, to explain how

8  and why he could have made a false confession in this

9  case, I have to by necessity rely on his account.

10  And -- and it's -- Again, I'm not vouching for the

11  facts.  I'm saying if these are the facts, then here are

12  the conclusions that follow.

13          **Q.   Okay.  You have taken a position that,**

14  **according to Mr. Jakes at least, he was fed significant**

15  **information by Detective Kill, right?**

16          A.   I believe so, yes.

17          **Q.   Are you aware if Mr. Jakes testified early in**

18  **his motion to suppress hearing that Mr. Kill did not**

19  **tell him what to say?**

20          MR. AINSWORTH:  Object to the form of the question.

21  BY THE WITNESS:

22          A.   I -- I would have reviewed that at the time I

23  wrote the report, but I don't recall it independently as

24  I sit here.  Of course there's multiple times when he

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 281

1  testified, and my recollection is he did testify that he

2  was fed information.

3      Q.  **Yes, his testimony changed down the road.  But**

4  **initially --**

5      MR. AINSWORTH:  Object to the form of the question,

6  assumes facts not in evidence.

7      MR. MORAN:  Can I finish the question before you

8  yell out these objections?

9  BY MR. MORAN:

10     Q.  **He testified early on that Mr. -- or**

11 **Detective Kill did not tell him what to say, and then**

12 **his testimony changed in subsequent hearings that he was**

13 **told what to say.  Did you know that?**

14     MR. AINSWORTH:  Object to the form of the question,

15 assumes facts not in evidence.

16 BY MR. MORAN:

17     Q.  **Doctor, go ahead.**

18     A.  I reviewed all his testimony including his

19 deposition prior to preparing the report, and so I

20 didn't independently recall that as I sit here today but

21 I'm sure I would have when I reviewed all of the

22 materials to prepare the report.

23     Q.  **Okay.  What is --**

24     A.  If, in fact, that's the case.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 282

1      Q.   If, in fact, that's the case.  And now you're

2   questioning whether that is, in fact, the case?

3      A.   Well ...

4      Q.   I might question it too based on the sound of

5   that objection, right?  I mean, that was loud and ...

6           So do you want to see the testimony?

7      A.   Yes.

8      Q.   Okay.  Give me one second.

9           Okay.  So I'm about to pull it up for you,

10  Doctor.  And for the record, this is Bates-labeled

11  Plaintiff Jakes 018189.  This is testimony taken from --

12  on, I should say, December 2nd, 1992.

13          Oops.  Oh, come on.

14          Okay.  You see what we're looking at,

15  December 2nd, 1992, People versus Anthony Jakes?  Do you

16  see that?  And this will be -- I think it's Exhibit

17  No. 5.

18     A.   Okay.

19     Q.   All right.  So this is the deposition

20  testimony we're looking at.  Not deposition.  Hearing

21  testimony.  Let's see.  And here is the page in

22  question:  Page 80, Line 21, "Did Detective Kill tell

23  you what to say and you said it to the State's Attorney,

24  correct?"  "He just told me to tell them what they

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 283

1   wanted to hear."

2        "QUESTION:  Did he tell you what to say?

3        "ANSWER:  No."

4        Do you see that, Doctor?

5   A.   Yes.

6   Q.   Okay.  Did you consider the -- this testimony

7   at all in your opinions?

8   A.   Yes.

9   Q.   And what weight did you give it?

10  A.   My recollection is that he said prior to that

11  that he was educated about the crime and that the way

12  he's answering this question is, were you specifically

13  told what to say, but he had been prior to that.

14  Q.   Is there --

15  A.   Tell --

16  Q.   Go ahead.

17  A.   And so I -- I guess -- I'm interpreting it as

18  consistent with what he said prior to this, that a

19  script was dictated but not word for word.  This is not

20  inconsistent with my recollection of what he had

21  testified to here and elsewhere.

22  Q.   Is this something that should be accounted for

23  in your report?

24  A.   My recollection is that he was pretty

Page 284

1   consistent about all of this, and read in context, this

2   can be interpreted as consistent with what he said about

3   coaching and feeding.

4        **Q.   Okay.**

5        A.   So I didn't think there was a need to put it

6   in the report.

7        **Q.   Okay.  We'll go through a couple other things**

8   **in your report.**

9            **Here we go.  Okay.  Your report has an**

10  **overview on Page, it looks like, 5 to 6 --**

11       A.   Yeah.

12       **Q.   -- identifying seven -- or eight opinions?**

13       A.   Correct.

14       **Q.   Are those the eight opinions you're offering**

15  **in this case?**

16       A.   Yes.

17       **Q.   Okay.  Are there any other opinions you're**

18  **offering besides what's identified in these eight**

19  **numbered paragraphs?**

20       A.   Not case-specific opinions.  Obviously, as I

21  mentioned earlier, as you know, I say at the end, I

22  reserve the right if new information becomes available.

23  But these are the eight case-specific opinions that I

24  develop in the report.  Usually this kind of testimony

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 285

1   begins with general testimony and then moves to

2   specific.  So the general testimony is, of course,

3   described prior to the case-specific opinions.  But

4   these are the only case-specific -- Based on the

5   materials I've reviewed to date, these are my eight

6   case-specific opinions.

7       Q.   Okay.  And most of the opinions are

8   conditioned on accepting Mr. Jakes's account of what

9   happened?

10      A.   Correct.  Again, I have to evaluate the

11  evidence before me and analyze what follows from it if

12  we credit his account, but it's for the jury to

13  determine whose account gets credited or to what extent.

14      Q.   Okay.  And relying on -- I want you to just

15  consider now the version of events told by the

16  detectives.

17      A.   Okay.

18      Q.   If you -- And you have taken a position

19  that -- I think in Paragraph 6 that even aspects of what

20  they said suggest that there was some leaking of

21  information of non -- nonpublic facts and scripting,

22  right?

23      A.   Let me just read this.

24           Okay.  Yeah, correct.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 286

1      Q.   **What specifically did you read from a**
2   **deposition of one of the detectives that nonpublic facts**
3   **were disclosed?**
4      A.   Well, I don't recall as I sit here today.
5   What I have -- What I'm thinking is the scripting -- the
6   error insertion trick that was used by the prosecutor.
7      Q.   **Okay.  So --**
8      A.   I'm not recalling.  I'd have to -- I just
9   don't recall as I sit here what I was thinking about the
10  police interrogation scripting based on their
11  description of what occurred.
12     Q.   **Okay.  So let's take it one at a time.  And**
13  **we'll tackle the error insertion trick first.  You have**
14  **taken a position --**
15          **Did somebody object or ...**
16     A.   I see -- I'm just looking at the report.  I
17  see what I think I was referring to.  But anyway, I
18  don't want to interrupt your question.
19     Q.   **Well, no, go ahead.  Tell me.  You -- You've**
20  **identified what you believe are leaked nonpublic facts**
21  **that the detectives admitted to.**
22     A.   Okay.  Well, I'm just looking at Page 39 of my
23  report.  Now, maybe -- There were pictures shown to
24  Mr. Jakes.  I don't recall if that's only his account as

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 287

1    I sit here today or if it's his and their account.

2        Q.    Okay.  Do you know what pictures Mr. Jakes

3    says he was shown?

4        A.    Well, yeah, on Page 39, he says what he was

5    shown, but that's -- that's his account.

6        Q.    Okay.  So I believe your discussion of the

7    detectives --

8        A.    Right.

9        Q.    -- version of events starts on Page 43.

10       A.    Correct.  Thank you.

11       Q.    Okay.

12       A.    Yes.

13       Q.    So why don't you take a look at that and tell

14   me where the detectives admitted to disclosing nonpublic

15   facts.

16       A.    Well, in the -- maybe two-thirds of the way

17   through that paragraph, I write, Detective Kill then

18   confronted Mr. Jakes with the alleged facts that

19   Detective Kill said did not match Mr. Jakes's prior

20   account six hours earlier, that Gus "Snake" Robinson

21   said Mr. Jakes approached him to be the lookout, that

22   the three girls had not seen or been present for the

23   homicide, and, in addition, that nobody had heard of

24   Quarter Pound -- it should be pound, I think -- or

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 288

1  Tweety who Mr. Jakes had said was present -- there's a

2  typo -- around the time of the homicide and then told

3  Mr. Jakes -- Or I'm sorry.  That -- that would be it.

4      **Q.   Okay.  That's the area you're talking about,**

5  **when Detective Kill confronted him with what**

6  **Detective Kill was suggesting were inconsistencies based**

7  **on their investigation in what Jakes had said?**

8      A.   Correct.  So those -- I believe those examples

9  would have been taken from the police account.

10     **Q.   Okay.  Is it constitutionally permissible for**

11 **the detectives to confront Mr. Jakes with facts that do**

12 **not add up to his version of events?**

13     A.   Yes, it's constitutionally permissible.  It's

14 not good practice, but it's constitutionally

15 permissible.

16     **Q.   Okay.  And what you understand about good**

17 **practice, where does that come from?**

18     A.   Well, the Reid manual primarily at the time

19 and the general principal in police interrogation that

20 you shouldn't feed facts, that you want to you -- want

21 the suspect to independently provide the information in

22 order to corroborate their knowledge or lack of

23 knowledge, that if you provide it to them and then they

24 regurgitate it back, it loses its probative value and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 289

1   its ability to corroborate the accuracy or the

2   independence of the information being suggested.

3       **Q.    So let's look at the error insertion trick.**

4   **You have identified -- And this is based on the fact**

5   **that there are some typographical errors and corrections**

6   **to Mr. Jakes's statement with Mr. Jakes having initialed**

7   **next to the corrections on his handwritten statement,**

8   **right?**

9       A.    Yes.

10      **Q.    And your view is that is a trick used by**

11  **detectives to make the statements seem more truthful?**

12      A.    Yeah, I mean, it's called the error insertion

13  trick.  I mean, it is a trick.  But, you know, if it

14  were called something else, I would say -- You know, if

15  it was the insertion method.  Right, I'm just calling it

16  the error insertion trick because that's what it's

17  called.  But my view is that ASA Grossman intentionally

18  put in those errors or one of the detectives got

19  Mr. Jakes to correct them in order -- as the Reid manual

20  has said for decades so that they could represent to a

21  court or a jury that this was a voluntary confession

22  because the confessor in the written confession

23  corrected the -- these errors, showing that they were

24  voluntarily doing that.  Now, I recall that ASA Grossman

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 290

1    said no, he didn't do that, but --

2        Q.   Right.  So I guess -- You know let me ask you

3    this question:  The name of the -- the technique that

4    you're citing has a real negative connotation to it,

5    right, because you're saying basically the detectives

6    have intentionally tricked Mr. Jakes?

7        A.   Yes.

8        Q.   Okay.

9        A.   But it may be factually accurate even

10   though -- Just like, you know, the false evidence ploy

11   one might say has a negative connotation too but be

12   descriptively accurate.

13       Q.   Okay.  But the fact of the matter is, the

14   other possibility is that it really was a mistake and

15   Mr. Jakes really did identify it and had it corrected?

16       A.   You know, I --

17       Q.   Right?

18       A.   -- just don't think that's a reasonable

19   inference given that this is a -- this has been

20   recommended for decades and it's happened in so many

21   confessions, especially in Chicago.  And what is the

22   likelihood that given this well-established wide

23   practice recommended in manuals that I've seen over and

24   over and over again that the 15-year-old suspect after

Page 291

1   16 hours was the one who initiated the corrections?  It

2   just seems to defy logic in light of the facts.  Is it

3   theoretically possible?  I guess so.  But it's -- it

4   just seems highly unlikely in my experience.

5        Q.   So -- And this is on Page 20 of your report.

6   You discuss the error insertion trick, but you -- you

7   don't cite the -- the Reid manual; you cite to one of

8   your own papers discussing --

9        A.   Right.

10       Q.   -- the error insertion trick.

11       A.   Correct.

12       Q.   Where in the Reid man- -- Where is the

13   citation to the Reid manual?

14       A.   Well, it's not in the report.  But if you want

15   me to find it, I will.

16       Q.   No, no.  Just -- I want --

17       A.   I have the 1986 edition right here.  If you

18   want me to find it, I'll find it.

19       Q.   No.  I want you to answer this question:  Why

20   didn't you include that reference -- or that citation in

21   your report?

22       A.   Because it was easier just to include my

23   three- or four-page discussion in my book -- my 2008

24   book about it.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 292

1      Q.   Okay.  So let's assume that you're right, that

2  Reid advocates to use a device like this to confirm the

3  truthfulness of -- of the statement, the detectives are

4  supposed to -- or whoever is writing it up is supposed

5  to include some kind of error and see if Mr. Jakes will

6  catch on and change it, right?

7      A.   Yes.

8      Q.   Are you with me so far?  That -- That's the --

9  the technique advocated by Reid is what you're saying?

10      A.   They don't call it the error insertion trick,

11  but yes, it is a technique advocated by them.  I was

12  recently reviewing the 1967 manual, the predecessor to

13  the 1986, and it was there as well.  This is a

14  long-standing technique that they've advocated to create

15  the impression both that the confession is voluntary and

16  that it is reliable.  Why else would the suspect have

17  corrected these trivial errors?  So it is a technique,

18  whatever we call it.  It's long-standing.  It comes from

19  the Reid method.  The Reid firm obviously is Chicago

20  based.  The materials that I reviewed, the -- the

21  training materials, some of those are pretty much out of

22  Reid, not all of them.

23      Q.   Okay.  So assume that Mr. Jakes reads it and

24  makes the correction independently.

Page 293

1      A.   Okay.  Without being prompted by the police,

2   without -- without --

3      Q.   Yes.

4      A.   -- Grossman writing any of this down, he -- to

5   understand your question, he sees the misspellings or

6   typos --

7      Q.   Well, just let me -- let me get the question

8   out, and --

9      A.   Okay.

10     Q.   -- maybe that will make it easier.

11          Yes, they go through the report.  It's read to

12   him as he's reading along, and he independently stops

13   and says that's wrong.  Is it still a trick in that

14   case?

15     A.   Under those set of facts, no, it's not a

16   trick.  It's initiated by him, not by them.  If -- in

17   that hypothetical.  So it's -- it's not an intentional

18   technique that they are using in your hypothetical.

19     Q.   And let's assume it's initiated by them as

20   well.  Now we're going to change the hypothetical.  The

21   detectives read along and they say, Is this -- is this

22   accurate?  And he says, No, that should be changed.  Is

23   that a trick?

24     A.   Well, it might be a technique, but it's not a

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 294

1    trick in that it's not straightforwardly deceptive,

2    right, if they're asking him and they're truthfully

3    asking him whether that's -- I guess it's still a

4    technique in that if -- if -- if they -- I mean, why

5    would they want to know whether or not there was a

6    trivial misspelling?  This technique is about correcting

7    trivial errors.  It's not about, you know, making sure

8    the right witness was present at the crime scene.  It's

9    about spelling the person's name correctly or getting

10   their address right or misspelling the city they live

11   in.

12        **Q.   I understand.  I get that.  I get that**

13   **they're -- your position is that they're including minor**

14   **inaccuracies to see if he will change them.**

15        A.    Right.

16        **Q.   But if he agrees to change them voluntarily,**

17   **isn't it necessary -- whether it's pointed out to him or**

18   **not, doesn't that necessarily mean he's not been**

19   **tricked?**

20        A.    Well, if it's pointed out to him, then I think

21   maybe he hasn't been tricked but he's -- but it's a

22   technique to get him to correct an error that they

23   intentionally inserted into the confession.  Because

24   this was -- if I'm remembering correctly, this was a

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 295

 1   prosecutor-written confession.  He didn't write the

 2   confession.

 3       **Q.    That's right.  So the point is, the fact that**

 4   **a technique may be used does not inherently make it**

 5   **deceptive, right?**

 6       A.    It depends on the technique.  But if -- in

 7   your last hypothetical, if they wrote it up and then

 8   they ask him if it's a mistake and then he says yes and

 9   then he corrects it, if they intentionally inserted the

10   mistake, then it is deceptive.

11       **Q.    Okay.  If they intentionally inserted the**

12   **mistake to see if he would change it voluntarily, your**

13   **position now is that that's a deceptive practice?**

14       A.    It's deceptive in that they are trying to

15   trick him into correcting an error they created in order

16   that it will appear that his statement is voluntary and

17   reliable.  He doesn't know -- He thinks this is just an

18   innocent correction in your hypothetical, but they're --

19   they're scripting the confession to make it appear as

20   something it may not be, so ...

21       **Q.    And it also could be that he could say, I**

22   **don't really care if it's inaccurate; the whole thing is**

23   **false; I'm not going to change it, right?**

24       A.    Well, hypothetically, yes.  But given his

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 296

1  description of the physical violence and his fear of
2  what was going on, that's not what he would say.  But --
3      Q.    Well --
4      A.    -- hypothetically and if we go with the police
5  officer account, yes.
6      **Q.    So when you say it's not what he would say, it**
7  **makes me think that you've drawn a conclusion that his**
8  **version of events is accurate and --**
9      MR. AINSWORTH:  Object to --
10 BY MR. MORAN:
11     **Q.    -- there should be --**
12     MR. AINSWORTH:  Oh, I'm sorry.
13 BY MR. MORAN:
14     **Q.    You've essentially made a credibility**
15 **determination.  Shouldn't you be saying his allegations**
16 **of abuse -- if his allegations of abuse are true, then**
17 **he would have this reasonable fear?**
18     MR. AINSWORTH:  Object to the form of the question,
19 argumentative.
20 BY THE WITNESS:
21     A.    But it's still what he would say given that
22 he's described or made those allegations of abuse.  So
23 it seemed like an implausible hypothetical from his
24 vantage point.  I thought you asked what he would say.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 297

1 But anyway, I'm not --

2     **Q.   Okay.  So --**

3     A.   I'm trying not to make any credibility

4 determinations.  That's not the purpose of my answers.

5     **Q.   You acknowledge that Mr. Jakes could be lying**

6 **about it all, about the abuse and the -- the tactics**

7 **that were used, right?**

8     A.   It's for the jury to decide.  I wasn't there.

9 It's a possibility they could decide that.  That's --

10 that's not what I think the weight of the evidence

11 suggests, but it's not for me to decide, so ...

12     **Q.   And Mr. Jakes certainly would have an**

13 **incentive to saying these things about his interrogation**

14 **in order to have it thrown out, right?**

15     A.   Well, if they were true or false, yes, he

16 would have the same incentive.

17     **Q.   And the -- Right, exactly, to have the**

18 **interrogation no longer be evidence against -- or I'm**

19 **sorry -- his statement no longer be evidence against**

20 **him, right?**

21     A.   Right.  But if he's testifying truthfully, he

22 has the same incentive.  So the incentive cuts both

23 ways.

24     **Q.   The -- And you really have no way of telling**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 298

1  **the difference, do you?  Isn't that true?**

2      A.   Well, I'm -- I can evaluate the evidence in

3  front of me and offer my conclusions; and if the

4  evidence in front of me changes, then I can alter the

5  conclusions, or the jury might come to a different

6  conclusion.  But I did evaluate the materials I was

7  provided and you see my analysis of the indicia of

8  unreliability.

9      **Q.   So --**

10     A.   It's not for me to make those factual

11  determinations.  But in the report, I -- I have to

12  analyze the record in front of me, and there is evidence

13  in the record that I -- inescapably I have to evaluate

14  in order to make the conclusions that I do.

15     **Q.   So you think the evidence weighs in favor of a**

16  **conclusion that he actually was physically abused?**

17     A.   I think it's consistent with a lot of what we

18  know about how the Chicago Police interrogated suspects

19  in crimes like this in the 1980s and 1990s that then

20  later resulted in exonerations or dismissals or

21  certificates of innocence.  So there's a lot --

22     **Q.   Okay.**

23     A.   -- of evidence that -- that this kind of

24  practice occurred in general.  That doesn't mean it

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 299

1    necessarily occurred here.

2        **Q.   Well, let me ask you:  You've now cite --**

3    **you've gone beyond your report --**

4        MR. AINSWORTH:  Well, hang on, Pat.  You asked him

5    a question and he's answering it and then you cut him

6    off and say he's going beyond his report.  That's not

7    fair.

8        MR. MORAN:  I --

9        MR. AINSWORTH:  If you ask him a question and he

10   states --

11       MR. MORAN:  I thought you were done.  Hold on a

12   second.

13   BY MR. MORAN:

14       **Q.   I thought you were done.  Are you done,**

15   **Doctor?**

16       A.   Okay.  I guess I'm done now.

17       **Q.   All right.  So my impression is -- My question**

18   **was, you know, you essentially -- And I'll repeat it --**

19   **I'll rephrase it so you understand exactly what I'm**

20   **talking about.**

21            **Based on your review of the facts in this**

22   **case, have you drawn a conclusion that he more likely**

23   **than not was physically abused?**

24       A.   No, that's for the jury to determine.  I --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 300

1 I -- My understanding is there was some contemporaneous

2 evidence or representation of the abuse shortly after it

3 occurred, but it's -- it's not for me to determine

4 whether this abuse happened or not.  And when I was

5 answering earlier, I was answering more broadly since I

6 thought you were asking a question that was more broad

7 than this specific --

8     **Q.**  **That's okay.**

9     **The injuries that you're talking about**

10 **reflecting abuse, you -- I think you specifically**

11 **identified an injury to Mr. Jakes's back?**

12     A.  Yes.

13     **Q.**  **Do you remember that?**

14     A.  Yes.

15     **Q.**  **Did you read any testimony or find any**

16 **evidence that the injury to Mr. Jakes's back was, in**

17 **fact, from an old injury and was not caused by physical**

18 **abuse by the detectives?**

19     A.  My recollection, which might be incorrect, is

20 that that was argument by the prosecution in the

21 pretrial or trial, so I would have read about it, that

22 it was --

23     **Q.**  **So --**

24     A.  -- the allegation on the other side.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 301

1      Q.   So a doctor testified who saw Mr. Jakes at

2   what was called the Audy Home -- You know what the Audy

3   Home is?

4      A.   Right.  Dr. Lujan.  Wasn't that the juvenile

5   detention house?

6      Q.   Yes.

7           So -- And he gave an opinion that it was an

8   older injury.  Did you consider that fact in your

9   analysis?

10     A.   Yes.  I mean, I reviewed some of that

11  testimony.  I think there was also the representation --

12  if I'm remembering correctly, the public defender had

13  some photos, but the photos are no longer available, so

14  there was countervailing evidence.  But, again, it's not

15  my role to adjudicate this.  Obviously, if what he

16  describes occurred, then it's clear physical abuse; and

17  if it didn't occur, then it -- it -- it -- then it

18  didn't occur.

19     Q.   Well, the point is -- Go ahead.

20     A.   No, but -- I don't want to -- I was --

21     Q.   I get it.

22          So the point is, there are some competing

23  facts here over whether he was physically abused, and

24  the competing fact is not in your report, right?

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 302

1      A.   Correct, because when I'm talking about his

2    descriptions of physical abuse, I'm relying on his

3    descriptions.  And when I'm in the officers' account of

4    what occurred, I'm not talking about the abuse because

5    they say it didn't occur.

6      **Q.   In terms of drawing conclusions about what the**

7    **weight of the evidence is, if you're going to go that**

8    **route, shouldn't you include both sides of the story**

9    **before drawing the conclusion?**

10     A.   Well, he represented that it occurred; and if

11   I'm relying on his account to say this is what the

12   science shows, I have to rely on his account.  And in

13   their account, it didn't occur, and so there was no

14   point in mentioning it because it's a nonissue in their

15   account.

16     **Q.   I want to move over to the inducements you**

17   **discuss, the high-end inducements, extremely high -- or**

18   **explicit high-end inducements.  Would you agree with me**

19   **that there are no explicit high-end inducements in this**

20   **case?**

21     A.   Well, on his account of what occurred, he said

22   there were some extreme threats, and those would be

23   considered a high-end inducement.  I think that he'd be

24   thrown out the window, that he -- he would be framed

Page 303

1  because the cop would say it was in self-defense, that

2  the officer -- I think it was Detective Kill -- had a

3  relationship with a street gang that could harm him or

4  his family, so I would want to review what I wrote about

5  in the threat section, if I'm remembering correctly, but

6  those are high-end inducements.

7      Q.   Okay.  Let's take a look at the -- the threats

8  of the Latin Kings.

9      A.   Yeah, so this is on Page 31 of the report.

10     Q.   Right.  Mr. Jakes, his understanding of the

11  gang environment in the vicinity around where he lives

12  would be relevant to demonstrating whether he truly

13  perceived that as a threat; would you agree?

14     A.   Yes.

15     Q.   Okay.  So if he --

16     A.   And his understanding of the police in the

17  environment as well.

18     Q.   Right.  All of it's relevant, right?  His

19  understanding of gangs, his potential membership in

20  gangs, his knowledge of the police, those are all

21  relevant factors in whether this threat actually had any

22  effect on Mr. Jakes, agreed?

23     A.   I would think so.  It stands to reason, yes.

24     Q.   And if Mr. Jakes actually had some gang

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 304

1   **experience and knew better than to believe that an**

2   **officer would be so friendly with a gang that he can --**

3   **this police officer can actually have the gang go out**

4   **and do these kinds of things, that would suggest that**

5   **Mr. Jakes was not in any way moved by such a threat,**

6   **agreed?**

7        MR. AINSWORTH:  Objection:  lacks foundation, calls

8   for speculation, lacks foundation, and object to the

9   form of the evidence -- or form of the question.

10  BY MR. MORAN:

11       **Q.   Go ahead, Doctor.**

12       A.   I'm not a -- an expert on gangs.  But as part

13  of my research, particularly when I was inside the

14  Oakland Police Department, I went on a lot of

15  ride-alongs.  I didn't just sit in on interrogations.

16  And I spent a lot of time talking to cops for the year

17  that I was there, and I saw a lot of cops interact with

18  gang members and informants or heard them describe it to

19  me.  So some version of this is plausible to me.  I

20  don't know whether it happened, what the exact nature of

21  the threat was or whether it was made, but this is not

22  entirely implausible to me based on my knowledge of

23  police work and how they interact with gang members and

24  informants.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 305

1      And in Chicago, particularly around this time,

2   it's not implausible to me based on what I have read

3   from the historical research on the Chicago Police

4   Department and the Burge era.  So I don't -- I'm not --

5   Again, I'm not a fact witness; but as wild as this may

6   sound in other parts of the country or to non --

7   nonpolice researchers or noncriminal or civil lawyers

8   who work in these cases, some version of this is very

9   plausible to me.

10      **Q.   The -- And you're -- you're basing this on**

11   **just generic research you've done -- or, I guess,**

12   **overall research you've done -- not even research, just**

13   **reading about the Burge area in Chicago?**

14      MR. AINSWORTH:  Object to the form of the question.

15   BY THE WITNESS:

16      A.   Well, when I was in graduate school, one of

17   the areas I took an exam on was the sociology of

18   policing; and in order to pass that exam as part of my

19   PhD, I had to read a lot of literature on policing, some

20   of which is what's called ethnographic, book-length

21   descriptions going back to the 1930s and '40s of

22   researchers who basically hung out with cops and wrote

23   about what it was like to be a cop in -- in that city or

24   in that era.  And subsequent to that, I've read a number

Page 306

1  of books on the Chicago criminal justice system by

2  researchers and writers.  And then I had my own, you

3  know, interactions with police.  And I'm just saying,

4  this is -- without making a judgment about whether it

5  factually did or did not occur, based on all of that,

6  this is not entirely implausible to me.

7       **Q.   Okay.  So let's talk about Mr. Jakes.  I want**

8  **to address something you write about on Page 22:**

9  **Mr. Jakes did not possess cocaine.  "The evidence was**

10 **planted on him by Chicago Police to generate the**

11 **illusion of probable cause to justify his arrest."**

12      A.   Yeah, so -- but this is his account.

13      **Q.   I understand.**

14      A.   His account -- Okay.  Sorry.

15      **Q.   Okay.  That account would you agree is**

16 **implausible?**

17      A.   No, without an explanation.

18      **Q.   Okay.**

19      A.   My understanding is that --

20      **Q.   I'm going to --**

21      A.   -- the substance was not illegal.

22      **Q.   So Mr. Jakes's position, though, is that the**

23 **substance was planted to justify his arrest, right?**

24      A.   Yes.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 307

1    Q.   Okay.  And you obviously must know from

2  teaching criminal procedure that there's only two lawful

3  ways the police can enter a home -- actually three

4  lawful ways the police can enter a home and -- and

5  detain somebody from the home: exigent circumstances, a

6  warrant, or consent to enter, right?

7    A.   Well, there's the public safety -- Yeah, I

8  mean, sure.  There might be --

9    Q.   Okay.

10   A.   -- other exceptions to the warrant

11 requirement, yes.

12   Q.   And you would expect these police officers to

13 know what the rules are as far as the Fourth Amendment

14 go in terms of entering a home and arresting a de- -- a

15 resident of the home, right?

16   A.   I would expect them to know it.  I wouldn't

17 necessarily expect them to follow it.

18   Q.   Right.  So let's assume for a minute that they

19 really were trying to create a false basis for getting

20 into the home.  Under- --

21   MR. AINSWORTH:  That's not -- Go ahead.

22 BY MR. MORAN:

23   Q.   This planting of the drugs would have done

24 nothing to justify entering the home and arresting

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 308

1    **Mr. Jakes, agreed?**

2        MR. AINSWORTH:  Objection -- Hold on.  Objection to

3    the form of the question.  You're talking about the

4    enter as opposed to the arrest, which was -- you're

5    switching your question.

6        MR. MORAN:  No, I'm not.  It's actually combined.

7    It's all in one.  They cannot enter the home and take

8    him.  I mean, it's either way.

9        MR. AINSWORTH:  You talked about the arrest.

10       MR. MORAN:  Both.  I'm talking about both.

11   BY THE WITNESS:

12       A.   It's not implausible to me because they might

13   have entered the home voluntarily but wanted to get him

14   to the station, and that creates a pretext to get him to

15   the station after voluntarily entering the home, if they

16   did voluntarily enter the home.  So it's not implausible

17   to me that they needed to justify why they arrested him

18   and brought him to the station, especially since they

19   didn't find it on him.  And my -- my recollection is

20   that -- God, I have a vague recollection that he was --

21   he was going to go to court later that day so there's no

22   reason why he would have this on him.

23       **Q.   Well, I mean, you're -- I mean, and now you're**

24   **drawing inferences in the other direction.  So let's**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 309

1    just go back to the question.  He says that evidence was

2    planted on him, and you write, "by Chicago Police to

3    generate the illusion of probable cause to justify his

4    false arrest," right?

5        A.   Yes.

6        Q.   The police have said that he came voluntarily,

7    right; that's their version of events?

8        A.   Correct.

9        Q.   And he has said, no, that's not true.  All

10   along he's basically said he was taken out of there

11   against his will, right?

12       A.   Correct.

13       Q.   So how would finding a little packet of

14   potential drugs once they're at the police station

15   justify taking him out of the home before they knew

16   about the drugs?

17       A.   It would justify the arrest, right?  It's

18   probable cause to justify the arrest.  Their account is

19   that he voluntarily agreed to go to the station, I

20   believe.

21       Q.   But the arrest -- what --

22            According to the Chicago Police -- or the

23   detectives, he was given essentially a ticket for the

24   drugs and informed he could leave or wait around to be

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 310

1   **questioned by the detectives working on the murder case,**

2   **right?**

3          A.    Okay.

4          **Q.    Do you remember that?**

5          A.    Yes.

6          **Q.    Okay.  Now, I know Mr. Jakes may dispute that**

7   **contention.  But if what the Chicago Pol- -- if this was**

8   **a false basis to keep Mr. Jakes at the police station**

9   **and essentially conceded, the detectives have, that a**

10  **short time after finding the drugs he would have been**

11  **free to go and, therefore, their pretext for keeping him**

12  **there is no longer valid, right?**

13         MR. AINSWORTH:  Objection to the form of the

14  question.  It's argumentative.

15  BY MR. MORAN:

16         **Q.    Well, I just want to know if you agree with**

17  **me.**

18         A.    I'm sorry.  Can you -- Okay.  So can you

19  restate the question just so I can think this through at

20  this late hour?

21         MR. MORAN:  Can you read it back, please?

22                  (Record read as requested.)

23         MR. AINSWORTH:  And I'll object to the form of the

24  question.  And I've lost whether you're asking the

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 311

1  witness to assume the police version or the -- or

2  Mr. Jakes's version of the facts.  But -- So I'll object

3  to the improper hypothetical.

4       MR. MORAN:  No, I'll clarify.

5  BY MR. MORAN:

6       **Q.   It's -- From the police perspective --**

7            **You know, there is a dispute as to whether**

8  **Mr. Jakes was told he could leave after getting that**

9  **ticket.  Do you know that, Doctor?**

10      A.   My understanding is Mr. Jakes said he was not

11  told he could leave.

12      **Q.   Exactly.  Okay.  But Mr. -- the detectives had**

13  **taken the position that he could leave after he got the**

14  **ticket, right?**

15      A.   Correct.

16      **Q.   Okay.  So by their own admission, the**

17  **detectives have essentially agreed that the drugs that**

18  **were found would not have been a basis to detain him**

19  **after he was issued that ticket, right?**

20      A.   On their acc- --

21      MR. AINSWORTH:  Just object -- object to the form

22  of the question.

23  BY MR. MORAN:

24      **Q.   Yes, on their account.**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 312

 1      MR. AINSWORTH:  There's no drugs bond.

 2  BY MR. MORAN:

 3      Q.   On their account, yes, Doctor.  I -- I didn't

 4  hear your answer.  But were --

 5      A.   Yeah, I think my answer was just on their

 6  account, yes.

 7      Q.   Yeah.  Okay.  What's the point of creating a

 8  false basis to justify Mr. Jakes's arrest?  Is it for

 9  Mr. Jakes in your mind, or is it to explain to the

10  judge, prosecutor, potential jury a basis for having

11  Mr. Jakes at the police station to question him?

12      MR. AINSWORTH:  Objection:  lacks foundation, calls

13  for speculation.

14  BY THE WITNESS:

15      A.   Well, if Mr. Jakes's account is accurate, even

16  if it's -- if they anticipated Mr. Jakes was going to

17  dispute the voluntariness of his presence at the police

18  station or his continued detention at the police

19  station, then it could be pretexual for that reason.

20      Q.   Right.

21      A.   But I think you're asking me to speculate.

22      Q.   Well, it's not really speculation because the

23  information is actionable by the judge or the defense

24  attorney or the prosecutor in terms of establishing

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 313

1   **whether the statement Mr. Jakes gives should be**

2   **suppressed or not.  So if they've agreed to a false**

3   **basis to keep him there that essentially evaporates**

4   **after he gets the ticket, what's the point of the**

5   **deception?**

6        MR. AINSWORTH:  Objection:  calls -- improper

7   hypothetical, calls for speculation.

8   BY THE WITNESS:

9        A.   I guess on their account there is no point.

10  But his account is completely different.  So I guess

11  it -- it depends on whose account we're relying on here.

12       **Q.   Okay.  Let's see.**

13       MR. MORAN:  Can you give me a time on the record

14  real quick?

15       MR. AINSWORTH:  You have 15 minutes left, not that

16  I'm counting.

17       MR. MORAN:  I know you're counting.

18  BY MR. MORAN:

19       **Q.   All right.  So -- Hang on a second.  I'm**

20  **actually almost done.  I think I'll be a little early.**

21            **You -- Have you done empirical research on**

22  **false confessions -- and setting aside the 250 cases --**

23  **since 2004?**

24       A.   Well, yeah, I have done empirical research.

Page 314

1  Now, the only article on proven false confessions, per

2  se, is the one I'm working on with the 250 cases, but

3  you said set that aside.  But yeah, I've done other

4  research, other studies involving false confession

5  cases, yes.

6      **Q.   Okay.  What kind of studies?**

7      A.   Let me -- One study I did was a study of -- I

8  just want to pull up my CV if that's okay just to

9  refresh my recollection.  But one study was a study of

10  460 cases, 110 of which were false confessions, but that

11  was really a study of wrongful convictions not false

12  confessions, per se.  It involved 110 cases that we

13  thought were false confessions.

14      **Q.   Do you still have the raw data for that data**

15  **set?**

16      A.   Well, that is the study I was referring to

17  that was part of a National Institute of Justice funded

18  grant where we had to sign a confidentiality agreement.

19  I couldn't turn over the data.  I -- I don't know if the

20  data could be turned over if it was depersonalized, but

21  I don't think so because I think the National Institute

22  of Justice, the government -- there's an evidentiary

23  privilege which can't be pierced.  So this data was

24  written about in the 2014 article, maybe it was 2013.

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 315

1   Sorry.  I'm looking for it.

2       **Q.   Well, I just need to -- I just wanted to know**

3   **if you still had the data, the raw data.**

4       A.   Yeah, the data exists, but I don't think I can

5   turn it over because of a certificate of confidentiality

6   issued by the government, which is recognized in court

7   and would put me in violation of the terms of the grant

8   proposal.

9                   (Telephone interruption.)

10       THE WITNESS:  Sorry.  Let me turn this off.

11  BY THE WITNESS:

12       A.   So it exists.  I was not the first author of

13  the study.  But my understanding is I couldn't turn it

14  over.

15      **Q.   The total number of known false confession**

16  **cases to date, what is that number?**

17       A.   I would say it's probably around 500 or 600 or

18  700 cases in the literature between published case

19  studies and the Innocence Project data and the National

20  Registry of Exonerations data.

21      **Q.   And that is out of how many cases involving**

22  **confessions --**

23              **First of all, what date range are we talking**

24  **about?**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 316

1    A.   Well, the way I think about it is going back

2  to after Miranda, so the early '70s to the present.  I

3  don't know the number of cases.  The government doesn't

4  tabulate the number of interrogations that they do.

5  Obviously there's a large number of interrogations, but

6  we don't have access to all of those interrogations, so

7  we only learn about the cases that were available -- we

8  are able to access through electronic database searches

9  or through people who contact us with case materials

10  that we can evaluate.

11    **Q.   Okay.  So between the early 1970s and today's**

12  **date, somewhere in the neighborhood of 500 known false**

13  **confessions?**

14    A.   Yeah.  Yeah, that would be my estimate, 500 to

15  700 known false confessions, yes.

16    **Q.   Would it be fair to say that the number of**

17  **confessions overall are going to be in the millions?**

18    A.   I don't know if they're in the millions, but

19  the number of confessions overall would definitely be

20  much higher than the number of known or proven false

21  confessions.

22    **Q.   Between 1970 and today's date, you don't think**

23  **the number of confessions overall are in the millions?**

24    A.   It probably is in the millions.  The way I

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 317

1  thought you meant that question is on a yearly basis,

2  but maybe I misheard you.

3      **Q.   Oh, no, no, no.**

4      A.    But I -- I don't know.  I mean, it seems

5  plausible to me that it would be in the millions, but I

6  don't know.

7      **Q.   Did -- Is there any way --**

8           **Have you ever made an attempt to find out how**

9  **many confessions -- false confessions -- or I'm sorry.**

10 **Let me reask the question.**

11          **Have you ever made an attempt to find out how**

12 **many confessions there are overall in the same date**

13 **range, 19- -- early 1970s through today's date?**

14     A.    You know, I -- I may have initially because,

15 like I think I mentioned earlier, the -- there's an

16 annual report, Bureau of Justice Statistics, that tracks

17 a lot of things in the criminal justice system, but I

18 just -- I don't think that information is tracked.  It's

19 not available.  So I may have at one time; but because

20 it doesn't exist -- or it didn't exist at that time, I

21 haven't since then.  I've never seen in any of the

22 scholarship that I recall anybody cite an authoritative

23 source for how many interrogations occur on a yearly

24 basis or have occurred or how many confessions have

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 318

1    occurred.  So to my knowledge, that information just

2    doesn't exist.

3         **Q.   Well, right, nobody has collected the data is**

4    **what you're saying?  The information exists; it just**

5    **hasn't been gathered up and tabulated, right?**

6         A.   Well, I don't know.  I mean, if -- if -- it's

7    possible that the information existed but has been

8    destroyed.  And, you know, we can no longer

9    reconstruct -- If all the police departments in the

10   country reported all their cases in 1993, that -- they

11   don't have all that information anymore and so there's

12   no way of knowing what occurred in 1993.  Whereas maybe

13   in 2021, it's theoretically possible if there was a

14   clearing house and the government solicited all that

15   information from all 18,000 police departments in the

16   United States.

17        **Q.   By the way, do you -- you know who**

18   **Samuel Gross is?**

19        A.   Yes.

20        **Q.   Is he an authority in this field of false**

21   **confessions and false convictions?**

22        A.   He's a legal authority, and he cofounded the

23   National Registry of Exonerations.  He's a retired law

24   professor who wrote about wrongful convictions and

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 319

1    subsequently exonerations.  He's not a trained social

2    scientist, so he's not the kind of expert who writes

3    about risk factors typically, at least from the

4    standpoint of the psychological research, but he does

5    summarize some of that research when he writes about

6    exonerations.

7        **Q.   He's actually performed analysis of the**

8    **research as well, right?**

9        A.   When you say "analysis of the research" --

10       **Q.   I mean analysis of the data.  Sorry.**

11       A.   Yeah, well, his data, the data from the

12   National Registry of Exonerations, yes.

13       **Q.   And he concluded that we know very little**

14   **about false convictions and why they happen and it's**

15   **something that is very difficult to determine because**

16   **there's not enough information about false convictions,**

17   **right?**

18       A.   That sounds like --

19       MR. AINSWORTH:  Object --

20       THE WITNESS:  Sorry, Russell.

21       MR. AINSWORTH:  Object to the form of the question.

22   I -- You know, if you -- if you have something you want

23   to show the doctor, then go ahead.

24            But --

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 320

1      MR. MORAN:  I think he knows --

2      MR. AINSWORTH:  -- answer if you can.

3      MR. MORAN:  -- what I'm talking about.

4  BY MR. MORAN:

5      **Q.   Go ahead, Doctor.**

6      A.   On the one hand, I've read a lot of

7  Sam Gross's writings and he has made that point.  On the

8  other hand, he's also the person who now is responsible

9  for a registry that lists over 3,000 exonerations since

10  1989.  He has said it's impossible to determine a

11  wrongful conviction in real time, and I think that's

12  just -- that's just false because we have documented

13  lots of wrongful convictions and he has documented lots

14  of wrongful convictions and we all believe that it's the

15  tip of a much larger iceberg.  So this 3,000 number

16  might really be 30,000 or 300,000.  We don't know.  So

17  there's -- there's -- there's something -- there's a

18  kernel in there I agree with, and there's some stuff

19  that I disagree with.

20      **Q.   So --**

21      A.   But regardless, he more than anybody else has

22  documented more wrongful convictions.

23      **Q.   So I'm --**

24      MR. AINSWORTH:  You've got four minutes remaining

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 321

1  in the period just so you know.

2      MR. MORAN:  There you go.  I was just going to say.

3  BY MR. MORAN:

4      Q.   Let me read you what he wrote, and I want to

5  ask you if you can agree with it.

6      A.   Okay.  Can you tell me the cite, the source

7  too?

8      Q.   It's Gross and O'Brien.  You actually wrote a

9  paper.  I think it was the Ohio State Journal of

10 Criminal Law --

11     A.   Okay.

12     Q.   -- in response to it, and then you and

13 Mr. Gross had an exchange of letters that were published

14 in that --

15     A.   Okay.

16     Q.   -- journal as well.

17     A.   Okay.

18     Q.   Does this ring a bell now?

19     A.   Yes, but it's still 12 years ago, but yes.

20     Q.   Okay.  It says, We are limited to those few

21 unre- -- It's talking about false confessions by the

22 way.  We are limited to those few unrepresented cases

23 that happen to come to light.  We have inadequate

24 information about the underlying investigations in those

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 322

1    **cases, and we cannot compare them to correct convictions**

2    **because we know even less about the investigations that**

3    **lead to criminal convictions in general.  Do you agree**

4    **with that statement?**

5         A.    That was prior to the registry formed in 2012.

6    I agree in part that it's very difficult to get a lot of

7    information on some wrongful convictions, but I don't

8    agree that we -- if -- if he's saying that we don't have

9    adequate data to study and understand wrongful

10   convictions --

11        Q.    **Okay.**

12        A.    -- and what is unique about them.

13        Q.    **So one of the issues you took iss- -- you took**

14   **issue with is work in this paper with O'Brien for not**

15   **doing a regression analysis of the data.  Do you**

16   **remember this?**

17        A.    Yeah, my coauthor thought chi-square was, if

18   I'm remembering --

19        Q.    **Yes, that's right.  He used chi-square.**

20        A.    -- was -- was more accurate, and they had a

21   statistical back and forth.

22        Q.    **You wrote -- The letter that was published**

23   **under your name and I guess one of your coauthors**

24   **specifically argued that he should have done regression**

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 323

1    **analysis instead of chi-square.**

2        A.   Okay.  So maybe I got it backwards.  I

3    don't -- I'd have to review it.

4        **Q.   Okay.  Given that you yourself have not done**

5    **regression analysis with respect to the false confession**

6    **data set, why do you believe that Samuel Gross should**

7    **have done that with his data on false convictions,**

8    **which, by the way, also included a subset of false**

9    **confessions?**

10       A.   I don't recall.  I'd have to review that.  You

11   know, that was 12 or 13 or 14 years ago.  I don't recall

12   why we said chi-square instead of regression, so I -- I

13   couldn't answer it without reviewing those underlying

14   materials.

15       MR. MORAN:  All right.  Well, I think I'm done.  So

16   thanks, Doctor, for being patient with me and letting me

17   ask you questions.

18       THE WITNESS:  All right.  Well, thanks to everyone.

19       MR. AINSWORTH:  We'll reserve signature.

20       MR. MORAN:  All right.  Very good.  We'll talk to

21   you in a little bit, Russell.

22       THE WITNESS:  Is it okay for me to leave?  Are we

23   done?

24                   (Discussion off the record.)

Page 324

1          THE VIDEOGRAPHER:  The time is 5:50 p.m.  We are

2     now going off the record.

3                         (Deposition concluded at 5:50 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 325

1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3     ANTHONY JAKES,                )
                                    )
4                   Plaintiff,      )
               v.                   ) No. 19 CV 02204
5                                   )
      KENNETH BOUDREAU, et al.,     )
6                                   )
                                    )
7                   Defendants.     )

8              I, RICHARD A. LEO, Ph.D., J.D., state that I

9     have read the foregoing transcript of the testimony

10    given by me at my videoconference deposition on

11    June 20th, 2022, and that said transcript constitutes a

12    true and correct record of the testimony given by me at

13    said deposition, except as I have so indicated on the

14    errata sheets provided herein.

15

16                         _____

17                         RICHARD A. LEO, Ph.D., J.D.

18    SUBSCRIBED AND SWORN to
      before me this _____ day
19    of _____, 2022.

20

21    _____
              NOTARY PUBLIC

22

23

24

Page 326

```
 1   STATE OF ILLINOIS      )
                            )   SS.
 2   COUNTY OF COOK         )

 3

 4             I, Enza Cosgriff, Certified Shorthand Reporter

 5   and Registered Professional Reporter, do hereby certify

 6   that on June 20th, 2022, the videoconference deposition

 7   of the witness, RICHARD A. LEO, Ph.D., J.D., called by

 8   the Defendants, was taken before me, reported

 9   stenographically, and was thereafter reduced to

10   typewriting under my direction.

11             The said deposition was taken via

12   videoconference, and there were present counsel, all via

13   videoconference, as previously set forth.

14             The said witness, RICHARD A. LEO, Ph.D., J.D.,

15   was first duly sworn to tell the truth, the whole truth,

16   and nothing but the truth, and was then examined upon

17   oral interrogatories.

18             I further certify that the foregoing is a

19   true, accurate, and complete record of the questions

20   asked of and answers made by the said witness,

21   RICHARD A. LEO, Ph.D., J.D., on the date and time

22   hereinabove referred to.

23

24
```

Page 327

1          The signature of the witness, RICHARD A. LEO,

2     Ph.D., J.D., was reserved by agreement of counsel.

3          The undersigned is not interested in the

4     within case, nor of kin or counsel to any of the

5     parties.

6          Witness my official signature as a Certified

7     Shorthand Reporter in the State of Illinois on

8     June 27th, 2022.

9

10

11

12

13     _____
       ENZA COSGRIFF, CSR, RPR
14     161 North Clark Street
       Suite 3050
15     Chicago, Illinois 60601
       Phone: 312.361.8851
16

17     CSR No. 084-004873

18

19

20

21

22

23

24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 328

## A

**A-N-G-E-L-O**
6:12
**a.m** 1:16 4:14
63:2,5 129:2
**Aberdeen** 2:3
**ability** 38:15
127:8,17 147:5
147:19 275:13
289:1
**able** 16:1 27:5
44:6 48:15,18
50:9,13 51:19
63:17 109:22
120:8 193:4
197:2 206:19
207:3 249:16
249:17,21
316:8
**absence** 165:22
169:23 197:8
242:14 275:10
**absent** 146:7
197:12 204:11
**absolute** 27:13
27:16 51:6
**absurd** 238:9
**abuse** 115:7,13
115:15 296:16
296:16,22
297:6 300:2,4
300:10,18
301:16 302:2,4
**abused** 298:16
299:23 301:23
**abusing** 12:11
12:20
**abusive** 189:7
**academic** 7:6
18:20 26:14
80:8,11 82:17
144:20,21
**academics** 224:9
**acc-** 311:20

**accept** 135:1
177:4 195:18
216:12 232:18
265:4
**acceptance**
238:24
**accepted** 105:7
216:9 240:18
**accepting** 280:5
285:8
**access** 8:7 59:13
60:3 125:6
199:20 316:6,8
**accessible**
228:12
**accidental** 232:7
232:16
**accidently**
230:13
**accidents** 239:9
**acco-** 279:24
**account** 52:4,6
112:14,22,22
113:1,18 114:4
114:6 115:24
129:18 181:19
206:20 220:24
232:15,19
270:23,24
280:9 285:8,12
285:13 286:24
287:1,5,20
288:9 296:5
302:3,11,12,13
302:15,21
306:12,14,15
309:18 311:24
312:3,6,15
313:9,10,11
**accountable**
223:4
**accounted**
283:22
**accounts** 19:9
51:23 52:1

114:4
**accuracy** 187:18
289:1
**accurate** 24:9
65:13,14,16
94:17 114:22
135:3 173:10
270:23,24
290:9,12
293:22 296:8
312:15 322:20
326:19
**accurately** 67:1
**accusation**
278:7
**accusations**
69:13 70:11,24
71:15
**accusatory**
110:19 111:3
**accused** 122:5
159:22
**acknowledge**
78:4 98:18
124:22 182:8
214:11 224:3
228:22 297:5
**acknowledged**
217:13 229:21
245:11
**acting** 114:7
**action** 174:6
**actionable**
312:23
**actions** 249:12
**activities** 74:6,7
257:12,13
268:19
**activity** 214:17
**acts** 85:3
**actual** 59:13
135:7 219:18
**adaptive** 264:6,8
264:8
**add** 21:24 59:15

59:19 211:17
288:12
**added** 23:16,21
23:22 41:19
59:22 185:2
**adding** 21:19,20
**addition** 21:5
287:23
**additional** 19:21
20:2 21:19,21
21:22 25:11
63:15 183:13
184:14 185:2,6
186:2 195:1
203:13 263:13
**address** 4:4
78:19 80:4,22
82:2 294:10
306:8
**addressing**
151:6
**adds** 244:12
**adequate** 20:5
22:2,4 322:9
**adequately**
19:16 122:13
157:21 202:5
**adjudicate**
113:4 194:16
301:15
**adjudicated**
169:3
**adjudicates**
172:9
**adjudication**
170:6 172:12
**administer**
263:3
**admissibility**
143:8
**admission** 162:1
311:16
**admitted** 253:17
255:6 286:21
287:14

**adolescence**
54:22 246:10
**adolescent**
248:18
**adolescents**
41:14 56:8
**adopted** 151:12
**adopting** 264:17
**adults** 250:17
**advance** 86:21
**advanced** 222:6
**advantages** 39:1
**adversarial**
176:11,18,20
177:3,12,17
**advisor** 209:11
**advo-** 89:14
**advocacy** 82:20
89:10,11,15,17
**advocated**
109:12 292:9
292:11,14
**advocates**
102:15,19,24
104:22 106:3
108:10 111:21
292:2
**advocating** 82:1
82:18,22 83:16
83:16,18 85:8
85:18 89:7,18
194:5
**affair** 139:13
**affect** 222:19
223:13 246:17
264:20,20
269:13 273:14
**African-Amer...**
40:2
**afternoon** 129:9
129:16
**age** 54:21,22
56:2,2 253:1
254:5 256:6
**agent** 24:11,11

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 329

| | | | | |
|---|---|---|---|---|
| **agents** 24:24 | **agreeing** 258:2 | 174:10,15,20 | 103:21 115:10 | 46:3,4,6,9,18 |
| **aggregate** 39:6 | 261:22 | 174:22 175:1 | 139:1,17,22 | 46:23 47:1,2 |
| 47:2,15 48:1 | **agreement** | 184:17 195:17 | 140:8,12,19 | 53:11 54:21 |
| **aggression** | 51:10,11 74:23 | 201:22 237:12 | 141:19 142:3,9 | 57:20 58:8,10 |
| 58:16 | 177:20 314:18 | 237:16 239:13 | 142:20,22 | 58:11,15,17 |
| **ago** 18:5,6 52:3 | 327:2 | 254:12,14 | 143:5,13 | 59:22 112:2 |
| 52:19 65:23 | **agrees** 266:23 | 257:7 258:5 | 188:10 193:18 | 117:14 119:13 |
| 78:24 79:19,24 | 294:16 | 259:11,13 | **allows** 39:7 | 131:5 137:1 |
| 81:8 172:8 | **aha** 189:9 | 265:15 267:9 | **alongside** | 140:22,23 |
| 208:11 271:17 | **ahead** 5:3,4 13:3 | 268:23 269:3,7 | 220:23 | 141:10,21,23 |
| 321:19 323:11 | 25:22 43:12 | 269:10 270:7 | **Alt** 122:5 208:6 | 146:24 147:22 |
| **agree** 37:13 | 74:22 82:5,13 | 277:6,23 278:4 | 209:1,6 | 148:1 150:15 |
| 41:18 42:4 | 83:4,7 113:13 | 278:8,12,24 | **Alt-key-type** | 150:16 151:14 |
| 49:3,22,23 | 123:6 162:6 | 280:20 281:5 | 124:10 | 152:8 155:10 |
| 50:3 81:24 | 179:15 220:10 | 281:14 296:9 | **alter** 226:5 | 155:12 156:2,7 |
| 89:6,17 90:2 | 237:18 254:13 | 296:12,18 | 245:1 298:4 | 156:10 162:9 |
| 94:12 96:21 | 269:4 281:17 | 299:4,9 304:7 | **altogether** 59:16 | 167:5 170:10 |
| 99:12,13 101:8 | 283:16 286:19 | 305:14 307:21 | **amalgamation** | 172:6 181:15 |
| 103:17,21 | 301:19 304:11 | 308:2,9 310:13 | 105:9 | 181:16 187:8,9 |
| 106:6 108:17 | 307:21 319:23 | 310:23 311:21 | **ambassador** | 188:18,19,23 |
| 115:20 130:7 | 320:5 | 312:1,12 313:6 | 178:20 | 189:2 192:4 |
| 131:16 137:13 | **aim** 93:3 | 313:15 319:19 | **Amendment** | 193:9,22 |
| 174:18 183:11 | **Ainsworth** 2:2 | 319:21 320:2 | 11:22 12:12,21 | 194:13 195:8,9 |
| 183:14 184:11 | 5:2,2,4,8,8 | 320:24 323:19 | 13:16 307:13 | 195:16 196:4 |
| 194:3 209:11 | 12:14,17 13:2 | **al** 1:6 4:11 325:5 | **America** 93:20 | 197:21 199:12 |
| 222:7,13,19 | 13:9 17:15 | **Alaska** 276:20 | 94:7 97:9,20 | 203:15,24 |
| 236:16,19,21 | 18:11 25:19,22 | **alive** 52:4 238:6 | 98:8 99:1 | 205:1 206:24 |
| 237:7 240:6 | 28:5,17 29:5 | 238:11,17 | **American** 24:19 | 207:9,15 209:4 |
| 247:9 249:4 | 34:17 43:11 | 275:18 | 40:4 81:2 | 215:11 217:5 |
| 251:4 255:19 | 50:17 53:9 | **allegation** | 170:15 | 218:19 221:11 |
| 257:5 259:2,3 | 64:16 71:2 | 300:24 | **Americans** | 221:13,18 |
| 259:7 277:18 | 74:15,17,21 | **allegations** | 137:17 | 222:4,10,14 |
| 302:18 303:13 | 82:4,9 83:1,5 | 232:5 296:15 | **amount** 137:7 | 224:4 226:21 |
| 306:15 310:16 | 85:4 87:4 | 296:16,22 | 142:23 277:2 | 226:23 229:18 |
| 320:18 321:5 | 89:20 90:22 | **allege** 16:7 | **Amy** 31:18 | 231:15 234:3 |
| 322:3,6,8 | 94:22 113:10 | **alleged** 15:16 | **analyses** 37:23 | 236:2 242:2 |
| **agreed** 87:17,23 | 113:13,24 | 16:8 87:11 | 48:24 218:10 | 243:9 245:14 |
| 130:22 139:3 | 123:11 135:11 | 230:9 287:18 | 220:23 | 246:7,17,18 |
| 174:20 175:19 | 140:24 143:1 | **allegedly** 11:17 | **analysis** 26:7 | 252:11 257:16 |
| 177:24 182:19 | 143:14 152:3 | **alleges** 10:14 | 33:11 38:17,17 | 257:17 258:24 |
| 188:6 221:12 | 158:20 159:12 | **alleging** 69:22 | 38:21,22,23,24 | 262:21 263:10 |
| 243:11 257:19 | 162:3 163:24 | **allow** 193:9 | 39:7,9,15,16 | 271:6 273:13 |
| 303:22 304:6 | 164:2,9 165:3 | **allowed** 28:8 | 39:19 40:12,22 | 275:8,11 279:7 |
| 308:1 309:19 | 167:13 173:5 | 77:21 83:18,19 | 43:1,2,2 45:12 | 279:12 280:7 |
| 311:17 313:2 | 173:19 174:3 | 84:20 103:18 | 45:16,19,21,22 | 298:7 301:9 |

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 330

319:7,9,10
322:15 323:1,5
**analytical** 45:11
239:11,22
**analyze** 26:19
30:2,11 31:17
47:15 51:3
57:10 222:24
285:11 298:12
**analyzed** 30:19
59:10 64:7,11
**analyzing** 39:12
45:7 47:3 48:9
65:8 146:10
158:16 213:2
218:5,23 219:2
219:13
**and/or** 68:17
70:17 74:8
85:23 92:17
127:12 128:14
**Andrews** 2:8
5:11,11
**anecdotal**
268:16
**annual** 317:16
**annually** 74:12
**anonymously**
45:4
**answer** 9:16
11:8,12,24
14:23 25:22
28:14,18 31:6
33:19 38:16,19
42:9 43:12
47:16,21 50:11
51:7 54:7,10
56:10 80:23
83:12 85:6
90:22 91:1
94:19 107:10
123:23 135:14
139:8 143:2
157:20 158:24
159:5,18

163:24 164:2,5
165:16 167:6
168:16 173:8,8
176:22 177:2
185:11,13,18
195:17,18
197:4 202:5,7
211:7,23
237:18 254:16
261:16 272:1
283:3 291:19
312:4,5 320:2
323:13
**answered** 49:3
94:18 108:7
203:3
**answering** 8:15
48:13 90:19,24
123:21 164:7
183:17 283:12
299:5 300:5,5
**answers** 172:3
182:1 185:14
185:20,21
194:15,18
297:4 326:20
**Anthony** 1:3
4:10 171:2
194:23 282:15
325:3
**anticipate** 16:21
21:18,20
**anticipated** 24:8
24:14 31:22
312:16
**anticipation**
17:1
**anybody** 37:3
43:19 44:19
45:4 52:23
92:16 119:20
132:10 134:4
134:18 212:23
269:23 317:22
320:21

**anymore** 261:5
318:11
**anyway** 166:2
286:17 297:1
**apologies** 86:21
**apologize**
197:16
**appeals** 104:12
104:13
**appear** 7:3 21:4
21:6 41:23
106:20 187:11
295:16,19
**APPEARAN...**
2:1
**appearing** 5:9,9
5:12
**appears** 106:17
107:14 267:5
**apples** 131:18
131:18,18
**apples-to-appl...**
132:1 228:15
**apples-to-ora...**
132:6
**applicable** 4:8
210:7
**application**
144:2,24
148:20 149:15
**applications**
8:21 9:3
**applied** 238:10
**applies** 267:2
**apply** 7:6 149:24
213:18 216:1
231:1
**appreciate**
97:18 196:23
249:18,21
**approach** 27:23
47:3,7 110:22
241:10
**approached**
287:21

**approaches** 48:8
102:10
**appropriate**
28:16 205:6
**approximate**
15:21
**approximately**
13:24 18:15
19:12 29:12
66:14 73:12
**ar-** 44:22
**area** 59:2 137:12
137:21 138:1,1
139:22 143:6
149:3 207:8,17
211:21 245:4
288:4 305:13
**areas** 6:20 7:10
7:12 147:14
149:17,20,23
158:6 211:22
231:7 239:3
305:17
**argue** 90:17
173:24 195:19
**argued** 159:21
322:24
**arguing** 27:21
167:19 173:6
184:18,20
242:12
**argument** 27:16
300:20
**argumentative**
82:10 85:5
114:1 184:18
201:23 296:19
310:14
**arguments**
89:13 268:21
**armed** 228:16
253:12
**Arnold** 154:19
155:1,5,14
156:14 196:8

196:12 272:22
273:2,9
**array** 163:10
**arrest** 15:15,16
60:12 128:20
129:4 306:11
306:23 308:4,9
309:4,17,18,21
312:8
**arrested** 60:16
128:23 129:20
253:9 254:24
255:24 257:12
308:17
**arresting** 307:14
307:24
**arrests** 253:16
257:24 258:12
**arrive** 100:18
110:23 218:10
**arrived** 51:17
172:21 177:16
178:19
**arriving** 20:5
**art-** 23:16
**article** 23:15,17
24:6 26:8
27:10,19 30:20
31:7,21,23
32:21 33:12,12
36:9 39:14
40:10,11,22
41:1,11,11
42:21 43:3,16
43:17 44:5,14
44:19 45:2,8
46:19 48:21
51:13,21 52:23
53:12 54:13
55:21 57:5
58:17 61:6,15
64:9,21 78:1,8
78:15 79:2
81:15,17 82:17
82:18 86:3,8

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 331

86:12,23 87:16
87:22 89:12
90:21 93:24
94:5,21,22
99:5 119:2,5
196:20 204:20
204:22,23,23
210:18,19,20
214:23,23
215:1,2 216:15
217:10 219:15
219:20 223:17
224:22 225:7,8
225:11 226:1
227:4,5,7
228:8 231:10
243:18 314:1
314:24
**articles** 23:19
33:10,13 34:7
40:14 43:10
44:12,12,15
61:1,3,4,7
77:19,20 78:2
78:5 81:10,11
84:1 98:13
100:24 119:3,6
145:17 150:9
151:15 204:19
205:7 218:17
219:11 221:14
225:9 227:4
232:21
**articulate**
248:24
**articulated**
249:9
**articulation**
193:15
**ASA** 184:1
289:17,24
**ascertain** 121:2
**Asian** 40:3
**aside** 44:2 115:7
115:8,18

268:16 313:22
314:3
**asked** 11:15
12:7 13:13
15:14,15 19:23
19:24 25:8
32:11 36:7
49:4 71:9 74:9
79:7,22 81:22
100:21 105:21
131:16 141:9
164:9 185:12
196:5 201:19
202:19 203:2
221:22 256:17
279:4,13
296:24 299:4
326:20
**asking** 15:6,9,20
28:10,23 45:24
54:4 56:10
67:11 68:16
91:20 94:15
108:20 110:16
133:2 142:6
144:11 162:7
163:17 174:15
174:16 175:7
175:10,11,11
176:6 183:10
202:10 203:3
254:3 259:6,8
259:9 261:14
279:14,16
294:2,3 300:6
310:24 312:21
**aspect** 39:23
**aspects** 10:22
182:15 285:19
**aspiration** 93:2
**aspire** 192:12
**assault** 253:11
255:4
**assaulted**
113:19,20

**asserting** 97:11
**assertion** 182:3
**assertions** 11:21
**assess** 171:5
**assessed** 265:11
265:22
**assessing** 145:19
216:17
**assessment**
264:5,8
**assign** 223:1
**assigned** 235:13
235:14
**assignment**
213:5
**assist** 22:6
**assistance** 92:9
92:16
**assistants** 225:1
**associated** 56:7
249:2 261:20
262:11
**assume** 9:17
11:4 32:15
35:16 60:3
79:15 223:9
274:5 292:1,23
293:19 307:18
311:1
**assumed** 252:10
**assumes** 279:1
281:6,15
**assuming** 83:6
277:24
**assumptions**
221:6
**attempt** 34:3
317:8,11
**attempting**
102:24
**attention** 27:18
62:12 132:6
172:10 185:8
264:24 265:7
265:20

**attorney** 71:5
80:19 137:10
193:20 282:23
312:24
**attorneys** 17:4
18:24 19:5,22
70:15 79:14
**attributed** 145:2
148:6
**atypical** 269:17
**audience** 48:16
48:18 49:7,8,9
49:9,10,19
80:8
**Audiovisual**
164:23
**Audy** 301:2,2
**August** 71:23
**aunt** 148:18,18
199:4,4 203:11
254:2
**author** 31:12
79:2,3,24 85:3
87:20 91:10,15
219:19 315:12
**authoritative**
317:22
**authority** 99:9
249:11 260:12
265:12 318:20
318:22
**authors** 31:6,9
31:22 79:20
96:19 97:11
207:3 226:1
**available** 38:11
39:5 43:3,7
51:3 52:8,11
227:8,18,24
228:11 238:19
271:6 272:2
275:19 284:22
301:13 316:7
317:19
**average** 62:1

65:16,17 73:22
88:3 101:12
130:1,4 131:6
**avoid** 27:16
**avoiding** 12:5
**award** 23:20
**aware** 26:12
45:4 119:20
120:5 166:22
220:4 224:13
224:16 240:12
243:13 253:19
258:20 266:10
273:9 280:17

---

**B**

**B** 3:7
**back** 14:17
22:23 43:4
49:5,6 52:24
58:20 63:6
64:4 65:19,20
73:3,14,20
85:24 90:9
94:11 101:14
104:20 108:5
118:21 122:2
123:3,19,23
141:3 143:18
143:19 148:10
148:14,15
150:17 151:15
165:2,18
170:20 179:22
179:24 180:1
188:8 189:17
197:17 198:18
199:9,13,17,18
200:19 203:1,5
203:7,11 204:5
205:11 224:2
225:12 231:23
232:2 235:24
238:23 251:3
255:12 257:4

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 332

270:11,13
274:2 276:24
288:24 300:11
300:16 305:21
309:1 310:21
316:1 322:21
**background**
215:5 256:13
**backwards** 64:5
323:2
**bad** 43:14 50:2
71:9
**ballistics** 136:19
136:22 147:12
158:9,11
**bar** 80:19
**bargains** 60:20
**barging** 256:14
**barred** 138:21
139:5,5 140:14
140:17,22
141:9,14,17,18
141:24
**Barry** 119:17
**based** 7:2 19:21
26:7,8 37:24
40:11 42:18
51:11 62:9
80:5 88:11
98:23 103:11
108:13 109:20
110:5,6,6
111:8 112:21
134:21 187:21
196:3 198:12
199:11 210:14
231:15 241:17
247:11 250:11
250:24 263:21
272:2 280:5
282:4 285:4
286:10 288:6
289:4 292:20
299:21 304:22
305:2 306:5

**baseline** 269:19
**bases** 21:12
193:15
**basic** 39:17
**basically** 111:4
275:22 290:5
305:22 309:10
**basing** 305:10
**basis** 12:24 13:7
13:15 15:15
16:8 28:10,18
143:23 144:4
146:10 160:13
242:1 250:22
258:24 275:17
307:19 310:8
311:18 312:8
312:10 313:3
317:1,24
**Bates** 15:12
**Bates-labeled**
87:2 282:10
**Bay** 59:2
**be-** 98:2
**bear** 38:6 171:3
**bears** 177:7
**beat** 206:18
**bed** 266:16
268:17 269:17
**began** 27:1
**beginning** 82:11
263:17 275:15
**begins** 129:9
285:1
**behalf** 2:6,12
4:21 5:5,9 68:4
69:12,21
**belief** 16:9 97:2
97:14 103:1
108:13
**beliefs** 84:2
214:2
**believe** 10:6
12:24 13:7
18:14 20:4,4

27:15 34:11
35:19 37:3
51:24 62:11
84:3 85:20
90:15 96:1
104:7 107:24
113:6,23
128:16 154:14
160:20 188:10
194:15 198:22
199:8 231:19
243:20 252:3
252:17 260:8
263:8 280:16
286:20 287:6
288:8 304:1
309:20 320:14
323:6
**believed** 134:9
192:20 193:7
195:7,16,24
196:3 200:20
**bell** 78:22
321:18
**bench** 218:3
**beneficial** 103:2
**benefits** 131:14
176:21
**best** 16:3 17:23
38:13,14 39:11
52:13,18 53:22
64:1 68:20
110:15 177:4
192:13,16
202:11 203:6
211:24 230:5
234:1,3 242:18
242:21 271:6
276:10
**better** 38:22,24
55:14 124:9
209:7 243:16
247:24 248:5,5
250:7,12,17
304:1

**beyond** 299:3,6
**bias** 213:12,14
213:20,22,23
213:24 214:8
214:12,15,17
214:18,20
229:18 230:3
**biased** 228:24
229:5,10,11,11
229:13,19,24
**biases** 214:8
**Bible** 108:3
**big** 13:22 170:15
258:13
**binder** 8:7 14:24
15:11
**binders** 8:1,4
**bit** 33:11 46:20
64:6 78:4 79:4
99:5,6 102:17
108:16 151:11
182:5 220:3
243:2 323:21
**blame** 265:4
**blameworthy**
104:16
**blocking** 181:22
**blood** 136:24
158:9,12,22
**blunt** 164:16
**board** 238:10
258:15
**body** 37:15
41:24 42:19
55:21 56:18
57:17 110:6,12
111:10 148:8
169:2 170:14
172:8 239:1
241:22 243:12
**bond** 312:1
**book** 8:3 24:6,7
24:15,17,18,24
25:13 36:9
80:14 81:1,8

84:23 85:8,11
85:15,24 95:5
95:6 99:6
108:3 119:6,17
291:23,24
**book-length**
305:20
**bookcase** 8:7
**bookcases** 8:3,3
**books** 24:12
101:1 144:21
306:1
**borne** 107:17
**bottles** 257:14
258:1 266:19
268:20
**bottom** 137:13
154:5 179:5
261:18
**Boudreau** 1:6
4:11 10:1
14:20 15:4
16:16 182:22
184:2 325:5
**BOUND** 75:1
**box** 185:14
**brain** 56:1,6
250:15
**Brandon** 228:7
**break** 62:13,17
62:19 63:4
123:1,3,8,9,17
130:5 162:13
165:5 166:11
179:13,15,21
181:3 182:4
191:4 270:1,3
270:5,7,10
**breakdown** 40:1
**breaking** 62:15
187:11,16
188:9 192:3,4
210:10
**brief** 235:7
**briefly** 139:9

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 333

143:16
**bring** 29:1 132:5
146:22 256:12
**Brittany** 86:7
**broad** 176:19
209:21 222:21
300:6
**broader** 7:7
37:15 126:22
127:19 146:9
238:14,18
**broadly** 6:17
34:21 186:8
213:17 215:4
222:12 300:5
**broken** 93:5
131:3 159:1
269:16
**brought** 129:10
253:2,20
308:18
**brush** 222:4
**building** 109:2
**bullet** 153:19
154:3,6 167:24
168:20 196:8
198:4 201:11
203:12,14,16
203:17,20,22
203:24
**bunch** 79:20
**bureau** 132:16
317:16
**Burge** 305:4,13
**burglaries** 62:5
133:15
**burglary** 132:1
132:8,14,15,19
132:22 133:8
133:12,21
**business** 4:4

—————————
**C**
—————————
**C** 31:20
**Cali-** 64:23

**California** 4:18
58:23 268:12
**call** 17:17,19
18:10,13 31:4
33:17 41:14
48:7 97:6
104:22 106:3
148:7 150:16
196:15 243:4
271:9 292:10
292:18
**called** 1:10 6:3
26:20 61:5,6
67:2 70:23
71:11,13 81:3
95:16 119:17
122:10 126:24
219:16 241:18
289:12,14,17
301:2 305:20
326:7
**calling** 85:22
185:8 214:1
289:15
**calls** 74:6 89:21
186:12,17
189:10 304:7
312:12 313:6,7
**cancer** 42:14,17
55:16 56:11,15
56:23
**capable** 250:20
**car** 154:10 239:8
**care** 295:22
**career** 64:23
**careful** 262:7
**carefully** 260:19
**carry** 248:13
**carrying** 277:2
277:15
**cars** 257:14
258:1 266:19
268:20
**case** 4:11 6:14
6:20 7:7,10,18

7:21 10:18
12:8 14:13
18:19,24 19:5
19:10 20:12
21:6,16 27:8
27:20 30:14
36:20 40:12
41:3 42:20
44:3 47:1,1,2
51:14 52:2,6
52:21 53:4
59:10,13,23
62:4 63:11
64:17 68:8,24
69:6 73:23
74:2,11,11
80:17,20 102:7
111:16,23
112:5 113:4,17
114:13 115:12
116:8,15 129:8
130:2,3 131:14
132:15 133:23
135:16 137:23
139:2,6,10,12
140:3,6,8,10
140:12 143:21
144:18 147:1
148:12,13
159:8,18 166:6
168:9,14,17
171:9 173:11
175:16 177:9
177:10,16
178:14 191:7
192:11 193:11
193:19 199:12
204:14 212:18
214:4 215:10
216:1,9 218:5
223:22,22,24
226:2 227:7,13
227:14,14
228:8,16,17
229:9 230:6,9

230:16,21
231:14,22
232:6 234:12
235:6 242:16
242:17 245:16
247:12,17,21
248:14 250:24
253:2 254:1
255:2 256:12
258:12 259:20
266:11 268:6
274:1 280:9
281:24 282:1,2
284:15 293:14
299:22 302:20
310:1 315:18
316:9 327:4
**case-by** 160:12
**case-specific**
140:19 284:20
284:23 285:3,4
285:6
**cases** 16:23,23
25:13,16 26:4
26:5,8,9,12,15
26:17,17,18,22
27:2,4,11,15
28:1 29:9,12
30:1,20,20,22
31:1,4 32:4,19
33:5,12 34:22
39:24 40:15,17
40:17,23 41:21
44:22 45:1,1,2
45:3,5,16
48:22,23 51:20
51:22,24 52:9
52:15 53:3,17
53:17 54:9
58:23 59:5,5
60:1,6,6,11,15
60:18,22 61:8
61:9 63:10,13
63:20 64:7,10
64:11,19 65:7

65:11,19,20
66:3,4,6,11,14
66:15,17,23,24
67:7,8,10,11
67:12,14,18,18
67:20 68:15,15
69:4,5,10,15
71:7 73:2,9,10
73:11,14,17
74:2,3,4 80:4
80:13 83:19
84:20 87:11
88:7,17 90:4
92:17 119:1,3
119:11 121:3
125:7,11,13,22
126:6,6,8,9,9
128:5 130:20
130:20 132:8
132:11 133:21
133:22 134:3,7
135:15 138:24
142:8,14 143:5
144:3,22
146:12 147:23
158:11 162:21
163:12 166:9
168:4,14
172:17,18
177:20,22
178:4,13 188:3
190:21 191:3
192:1 193:12
193:13,14
196:19,21
205:20,21,22
206:21 211:19
212:2,10
213:10,15,17
214:3,14,21
216:12,20
217:12 219:2
220:1,19
223:17,20
224:18,22

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 334

225:1,11 226:3
226:7,18
227:18,20,22
227:24 228:2,3
228:4,9 229:8
231:4,7,12
232:20,24
233:19,20
234:4,15
235:13,21
237:20 238:15
238:22 247:5
247:15 248:20
305:8 313:22
314:2,5,10,12
315:16,18,21
316:3,7 318:10
321:22 322:1
cash 272:23
273:10 277:1,2
277:16,21
278:20
catch 123:4
292:6
categories 216:4
217:1,4,6,12
221:22 223:1,3
223:5 235:19
236:3
categorize
231:12
categorized
231:5 233:24
241:19 262:16
categorizing
224:14,17
category 27:18
28:2 30:3 34:2
209:22 218:21
223:2 232:9,13
Caucasian 40:3
cause 7:1,3 55:9
55:11,11 232:7
240:19,21
306:11 309:3

309:18
caused 247:20
257:19 300:17
causes 35:20
121:19
causing 37:11
56:11 244:22
245:18
cell 9:7,8 128:24
certain 36:23
45:16 108:12
111:5 114:10
140:14 147:20
158:15 199:22
206:14 211:5,5
211:10 216:18
221:5 248:6,12
251:10,10,14
251:15 252:7
252:16 271:10
certainly 39:6
47:23 52:15
64:1 89:23
111:14 119:5
161:5 192:12
218:1,4 221:2
227:17,21
231:11 244:5
244:10 248:2,8
248:15 252:20
254:17,19,23
264:23 297:12
certainty 27:14
27:16 206:6
207:6 215:19
238:6
certificate
168:21,22
171:15,17,20
171:24 172:4
173:1 174:5,8
175:5 176:1
177:11 178:8
233:3 315:5
certificates

298:21
Certified 1:14
326:4 327:6
certify 326:5,18
cetera 148:19,19
223:21,21
chain 42:13
challenge 51:15
174:13,18
177:17 178:1,3
225:12
challenged
177:12
challenging
177:18
chance 109:21
204:10 206:6
207:7 246:24
247:1 274:16
change 21:24
82:21 182:9,15
183:12 184:13
185:23 199:14
223:18 243:5
255:24 292:6
293:20 294:14
294:16 295:12
295:23
changed 23:18
102:17 182:6
208:21 209:6
281:3,12
293:22
changes 181:19
182:7,17 184:4
184:10,12
246:6 278:16
298:4
changing 184:15
184:23 185:3
263:20 273:2
chapter 78:23
79:7,8,23,24
80:7,13 81:8
84:23 85:2

94:12 95:5,6
95:22 96:2
99:6
chapters 24:6
25:2 81:12
119:6
characterizati...
174:6 175:13
194:7
characterize
6:17 88:9
89:14,17 98:24
101:4 142:1
160:22 185:3
characterized
100:9
characterizing
106:13 184:24
charge 60:12
104:17
charged 169:4
charges 175:2
187:3 255:4
chase 78:4 91:5
chases 268:20
cheating 122:9
124:9 207:21
209:3,5
check 49:22
227:9
checklist 117:13
chi-square
322:17,19
323:1,12
Chicago 2:4,9
4:5 5:7 160:24
161:11 246:13
263:18 290:21
292:19 298:18
305:1,3,13
306:1,10 309:2
309:22 310:7
327:15
child 180:22
230:13 232:16

232:18
children 56:7
230:13
choice 33:22
chose 14:1
180:18 181:6
chronology
16:10
circadian
267:12
Circuit 140:11
circumsta-
161:24
circumstances
116:24 117:3
158:17 169:5
183:20 307:5
circumstantial
156:22 159:19
160:4,5,11,15
160:16,21,23
161:22,24
162:14 163:9
164:19 165:23
168:11
citation 63:16
143:6,10 188:1
204:18 291:13
291:20
citations 98:14
205:6
cite 84:1 101:16
107:8 140:6
142:20 161:17
228:7 291:7,7
299:2 317:22
321:6
cited 52:23
54:14,17,20
55:4,5 63:10
79:11 98:4
107:15 156:6
161:21 204:19
204:20,21
205:1

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 335

**cites** 63:18
**citing** 290:4
**city** 68:5 161:1
  294:10 305:23
**civil** 1:11 4:7
  16:23 22:12
  66:10,15,17,23
  67:1,4,6,18
  69:14,22 70:19
  74:4 177:22
  193:11 305:7
**claim** 66:18
  166:23 167:1
  189:10
**clarified** 49:18
**clarify** 68:18
  71:8 88:7
  118:8 141:11
  249:7 311:4
**Clark** 327:14
**class** 209:10
**classes** 72:1
  137:8
**classified** 212:18
**classify** 80:5
  112:16 232:1
**clean** 165:18
**clear** 15:19,19
  67:19 69:8
  84:8 115:12
  124:2 150:24
  271:24 301:16
**cleared** 133:16
**clearing** 318:14
**clinical** 136:12
  136:16 263:1
**Clinton** 206:18
**clock** 128:16,18
**close** 61:7 208:9
  215:15 260:22
  276:13,14
**closely** 224:10
**closely-related**
  138:16
**closer** 19:14

  201:16 202:4
  271:16,17
**closest** 207:8
**closing** 8:22
**cluster** 256:1
**co-wrote** 81:8
**coach** 148:5,10
  198:6
**coaching** 284:3
**coauthor** 50:21
  222:5 322:17
**coauthors** 30:17
  34:11 81:11
  225:5 322:23
**cocaine** 306:9
**code** 100:1
**coded** 32:23
  33:1 40:20
**coding** 26:5 27:1
  32:1,1,9 44:16
**coerced** 69:13
  69:23,24 70:1
  70:11,12,24
  71:13,16 109:5
  112:11,13,14
  112:16,20
  113:7,23
  114:18,20,21
  114:21 179:7
  190:24 191:5
  194:21 230:10
  279:19
**coercing** 106:24
**coercion** 6:24
  35:10,11
  113:16 191:18
  191:21
**coercive** 70:17
  88:22 89:2
  109:11 112:23
  122:14 189:7
  191:10,12
  261:24
**coercively** 42:17
**cofounded**

  318:22
**cognitive** 42:3
  55:22 56:4
  138:13,15,16
  138:17,19
  256:8 261:5,21
  262:11 263:1
**cohort** 205:22
**collaborated**
  209:9
**collaborator**
  208:9
**colleagues** 240:2
**collect** 205:21
**collected** 60:22
  318:3
**collecting** 92:10
  209:23 211:11
**collection** 41:21
  45:20 205:19
  205:20 210:23
**collective** 51:2
**college** 122:4
  176:23 207:21
  208:2,21
  241:20
**combination**
  72:10 241:17
**combined** 308:6
**combines**
  130:20
**come** 14:17
  22:23 24:7,8
  24:13,15 28:22
  38:9 48:14
  58:20 64:4
  78:9 79:1 80:1
  101:14 118:21
  128:24 143:18
  143:19 188:8
  202:13 205:11
  212:16 231:8
  276:24 277:16
  282:13 288:17
  298:5 321:23

**comes** 150:8
  292:18
**coming** 272:22
**commencing**
  1:16
**comment** 57:4
**commission**
  278:13
**commissioned**
  79:17
**commit** 230:11
**committed**
  112:3 161:7
  192:9 215:15
  216:19,22
  223:7,11 232:7
**committing**
  159:23
**common** 84:13
  84:16 105:16
  105:20 132:21
  132:24 133:6,8
  133:10,11,13
  151:20 188:2
  216:21,24
  217:2 237:4,6
  240:20 244:2
  256:5 276:17
  276:18,20,21
**commonly**
  105:7
**communicate**
  100:22 103:11
  103:15 137:22
  262:5
**communicated**
  278:9
**community**
  240:11
**compare** 61:23
  127:8,17
  143:20 145:20
  162:10,11
  241:2,5 243:12
  243:17 322:1

**compared** 56:9
  137:15,16
**compares** 120:6
**comparing** 62:1
  62:3 131:17,23
  145:6 147:15
  241:13
**comparising**
  126:22
**comparison**
  56:21 119:21
  131:9 132:1,7
  145:11 228:15
  239:17,19
**compensation**
  67:6
**competent**
  193:20
**competing**
  50:24 51:5
  234:16 301:22
  301:24
**complete** 24:23
  25:3 60:3
  229:2 326:19
**completely**
  135:8 139:6
  173:16 175:15
  313:10
**complex** 16:23
  85:10
**compound**
  50:17 82:10
  173:6
**comprehensive**
  193:17 219:16
**computer** 8:20
  122:6 152:15
  153:2
**con-** 81:5
**conceded** 310:9
**concept** 56:19
  145:9 210:6,13
**concern** 249:9
**conclude** 264:15

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 336

278:22
concluded
199:11 279:24
319:13 324:3
concludes 86:9
conclusion 41:6
41:10,13 60:15
110:23 111:17
144:18 149:1
153:5,12
177:17 178:19
199:15 204:1
217:20 223:10
226:5 229:1
234:14 243:2,6
260:15 261:1,3
262:3,5,14,19
262:22 269:14
269:23 274:10
274:15 275:17
277:19 296:7
298:6,16
299:22 302:9
conclusions 20:6
21:15 37:23
40:24 44:9,18
48:3,17,19
49:22 50:13
51:4,15,17
54:14 61:10,24
64:15 92:12
111:6 217:23
218:10 222:15
222:16 223:14
223:18 227:15
228:19 230:4
232:22 235:23
236:6 238:20
240:3 243:5
245:2 258:14
264:9 273:15
280:2,12 298:3
298:5,14 302:6
condition
229:23

conditioned
285:8
conditions 50:22
conduct 102:1,6
conducted
119:10 122:9
conducting
101:18 226:23
conf- 217:14
confec- 240:15
conferences
26:14
confess 35:9,9
41:24 42:18
confess- 222:16
confessed 52:5
168:15,18
271:2
confessing 103:2
216:23 230:10
237:7 258:13
confession 26:21
27:5,12,17,22
28:2,3 30:9,10
33:17 34:2,8
34:14 35:4
38:1 41:9,15
41:18 42:6
54:23 55:12
66:19 68:6
69:13,23 70:11
71:1,12,15
80:4 88:7 90:4
99:10 103:2,13
103:24 104:6
104:10 106:24
107:4 108:13
109:13,17
112:7,7,11,13
112:19 113:7
113:23 114:18
114:20,22
116:11 117:6
120:22 121:10
121:13 125:7,7

132:14 133:7
133:11 135:8
139:14,22
143:21,22
144:19 145:6
145:19,21
146:4,11,14,19
146:20 147:15
148:6 149:10
149:11 151:4,7
162:20 163:11
166:8 168:4,8
169:14,19,20
171:5 172:18
189:11 190:22
190:24 191:6
191:13 196:13
196:18,21
197:8 204:13
211:19 212:2
212:10 213:9
213:10 215:17
215:19 216:3
216:13 217:21
218:7,21
221:23 222:24
223:12,15
224:17 225:10
228:9 230:24
231:6,16,17,18
231:20 232:2
232:23 233:23
233:24 234:5,7
234:12,13,15
234:19 236:7
236:11,12
237:9,20 238:7
238:12 240:15
242:20 245:18
246:5,24 247:1
247:7 249:19
257:19 258:2
259:19 261:23
272:13 279:8
279:19 280:8

289:21,22
292:15 294:23
295:1,2,19
314:4 315:15
323:5
confessions 6:14
6:21 7:2,3,8
27:4,10 29:9
29:14,22,23
30:2,4,8,21
31:5 33:6,7,9
33:14,15 34:1
34:4,5,6,9,10
34:23 35:6,12
35:20 36:3,3,4
36:12 37:11
51:22 53:13,14
55:7,18 57:10
57:12 61:11,18
61:20,22 72:8
72:16 77:22
78:11,19,21
80:24 81:5
82:3 83:20
84:4,9,17,21
84:24 86:4,6
87:12 88:14,17
88:24 89:3,8
90:14 109:5
117:22 119:8
119:11,15,17
119:18,19,21
119:22,24
120:3,6,7,9,12
120:13,17,17
121:6,20,20,22
124:24 125:3,5
125:9,12 126:3
126:4,4,14,23
127:1,1,10,10
127:12,14,18
127:18,20,23
128:3,5 131:10
132:9,11
133:13 134:1,7

134:9 135:21
144:13 145:14
146:5 149:21
150:3 151:3,21
176:16 196:19
204:21 207:11
211:11 212:16
213:3 216:5,16
217:15 220:16
222:17,18
224:5,14,15
225:8 226:11
231:13 232:10
235:15 236:13
236:15,18,19
237:1 240:4,16
240:19,24
241:5,6,7,12
241:13,14,18
241:19 242:5
243:13,17
244:3,4,15,20
244:21,23
245:12 246:1
246:12,14
247:8 251:4,5
258:18 279:22
290:21 313:22
314:1,10,12,13
315:22 316:13
316:15,17,19
316:21,23
317:9,9,12,24
318:21 321:21
323:9
confessor 32:6
168:5 196:21
215:14 223:7
289:22
confidence
218:23 219:1,4
confidential
50:23 74:18
confidentiality
51:10 314:18

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 337

315:5
**confirm** 63:9
292:2
**conflict** 90:12
91:12,14,23,24
233:22
**confront** 288:11
**confrontational**
260:12 265:12
**confronted**
287:18 288:5
**confuse** 146:19
**conjure** 163:19
**conjures** 46:21
**conjuring** 164:6
**connected**
156:23 158:8
161:23
**connecting**
157:1,14
165:24 166:24
**connection**
159:22 246:19
**connects** 164:20
**Connelly** 2:7
5:12
**connotation**
290:4,11
**conscience**
104:13
**consent** 307:6
**consequence**
239:7 249:12
**consequences**
35:3 99:9
104:16 204:21
249:18
**consequential**
97:7
**conservative**
27:9,14,22
33:21
**consider** 111:15
111:22 181:16
187:22 188:17

188:20,23
192:2,10 198:9
260:24 267:17
283:6 285:15
301:8
**considerations**
51:6
**considered**
13:13 181:15
198:12,14
199:16,18
203:4,7 205:18
230:16,16
231:2 302:23
**considering**
169:6 246:22
**considers**
230:21
**consistency**
145:22 186:19
**consistent** 22:19
128:1 182:17
186:9,23 189:2
200:14,23
202:9 272:5,11
273:17 283:18
284:1,2 298:17
**constellation**
105:1
**constituted**
128:4
**constitutes**
325:11
**constitutional**
116:8 118:11
**constitutionally**
115:21 116:3,5
116:11,12,18
116:20 118:6
118:13,17
288:10,13,14
**constraints**
13:21
**construed** 186:8
**consult** 65:7

68:23 70:23
71:12 221:3,9
261:12 263:5
**consultant**
65:18 68:12,17
69:11 73:1
74:8 85:14,23
92:15,17
**consulted** 68:16
**consulting** 67:12
68:22 69:21
82:8 88:3,4
91:11 92:8,24
190:22
**consume** 28:14
**contact** 97:16
98:2 316:9
**contacted** 26:13
70:14 137:9
**contain** 85:2,16
100:4 146:7
171:8
**contained** 19:18
149:10 273:6
**contains** 21:8,12
85:20,22
**contaminate**
279:8
**contaminated**
279:15
**contamination**
146:7 204:11
279:6
**contem-** 201:15
**contemporane...**
200:8,15 300:1
**contemporane...**
29:20 59:11
**contemporary**
38:5
**contention**
273:8 310:7
**contest** 178:18
**contested**
171:20 173:22

174:2 175:6
**context** 46:15
69:14,15 70:19
70:19 71:11
78:9 94:9,12
103:18 144:9
182:20 185:14
185:16,18,19
187:13 194:12
197:1 229:14
239:23 256:12
284:1
**contexts** 81:6
210:9
**contextual**
188:15
**continue** 166:10
233:4,5 258:7
265:16
**continued**
312:18
**continuously**
275:5
**contract** 24:11
24:13,15 25:3
25:10
**contradict** 185:5
185:23 186:2,4
186:6
**contradicted**
197:19
**contradiction**
154:18 185:7
**contradictions**
12:7 185:8
**contradicts**
185:9 245:2
**contribute**
37:16 116:21
242:1
**contributed**
119:7
**contributes**
211:15
**control** 57:1,5,7

57:12,18,21,22
57:23 58:2
205:13 215:5
220:3,5,7,12
220:14,24
238:1
**controlled**
207:16
**controlling**
220:19
**controls** 214:10
214:19 215:3,6
225:21 230:2
**controversial**
115:9
**convention**
44:13
**conventional**
134:12 236:14
**conventions**
45:11
**conversations**
225:3 276:5
**convicted** 32:7
60:18 126:15
217:16 233:9
**conviction** 7:5
10:2 60:12
66:20 72:14
120:22 135:6
139:17 162:21
163:11 175:1
188:2 212:15
212:19 217:16
240:15 320:11
**convictions**
24:20 72:10
78:12 81:6
85:1 125:14,24
126:1,11,18
178:12,13
240:17,22
241:1,2 242:5
314:11 318:21
318:24 319:14

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 338

319:16 320:13
320:14,22
322:1,3,7,10
323:7
**COOK** 326:2
**cop** 303:1
305:23
**cops** 119:18
304:16,17
305:22
**core** 239:1
250:14
**corner** 157:10
162:16
**corpus** 36:14
**correct** 6:15
7:11 8:9,9
18:12 19:1
21:2,14 23:7
25:12 27:6
29:10 31:10
32:14,18 33:3
41:2 43:24
47:18 50:6
53:5,8 72:21
73:7 81:16
86:8 92:21
102:21,23
107:5 109:10
111:8 115:11
115:17 117:7
118:3 122:11
136:3,18
139:18 140:1
140:13 141:15
148:11,17
155:2,21
169:17 190:19
192:23 193:2
197:10 202:14
202:17,24
203:21 207:23
208:15,17,20
216:11 217:18
221:15 226:19

228:21 230:8
230:12 232:11
241:2 245:13
248:2 249:15
249:20,23
250:4 251:6,9
251:13,18
264:18 265:14
265:24 266:3
267:17 275:14
275:16 276:1
279:21,22
282:24 284:13
285:10,24
287:10 288:8
289:19 291:11
294:22 302:1
309:8,12
311:15 322:1
325:12
**corrected** 156:5
194:20 289:23
290:15 292:17
**correcting** 294:6
295:15
**correction**
292:24 295:18
**corrections**
289:5,7 291:1
**correctly** 32:22
45:9 49:12
52:3 96:7
115:23 260:2
260:21 294:9
294:24 301:12
303:5
**corrects** 295:9
**correlation**
55:20 206:2,3
206:5 207:4,7
**corroborate**
146:20 288:22
289:1
**corroborated**
145:15 146:15

146:19 171:6
**corroborates**
204:9,12
**corroboration**
146:16,17
**corroborative**
179:7 180:11
180:12,15
181:10,10,12
182:2 189:5
192:22 194:12
194:19,21
195:3 196:6
**Cosgriff** 1:14
5:16 326:4
327:13
**couched** 88:13
**counsel** 195:17
326:12 327:2,4
**count** 40:2 129:4
**counted** 210:2
275:2
**counter** 275:3
**counterintuitive**
84:5,13
**countervailing**
301:14
**counting** 313:16
313:17
**country** 127:20
237:5 246:15
305:6 318:10
**COUNTY** 326:2
**couple** 7:15 14:9
18:8 56:9 61:1
63:9 95:21
181:17 220:6
263:13 267:3
272:15 284:7
**course** 15:14
52:22 61:3,18
102:3 111:19
113:3 124:7
190:16 213:16
224:7,11,11

237:5 250:23
258:3,11
280:24 285:2
**courses** 72:3,4,5
72:10,11
**court** 1:1 4:12
5:14,16 117:5
137:19,23
139:3,4,20
169:15 172:8
224:10 289:21
308:21 315:6
325:1
**courts** 1:12
138:21 193:9
193:10
**cover** 75:2 95:10
**coverage** 19:9
**covered** 10:11
**covers** 196:8
**crashes** 237:2
239:9,18
**create** 292:14
307:19
**created** 226:23
241:23 295:15
**creates** 127:12
308:14
**creating** 104:10
312:7
**credibility** 194:5
296:14 297:3
**credible** 171:7
194:9,10
**credit** 112:14,16
112:21 114:4,5
114:10 129:17
201:13 232:14
285:12
**credited** 113:17
285:13
**cri-** 159:2
**crime** 16:10
32:7 51:11
62:9 103:2

104:15 111:24
112:3 114:24
115:4 130:5,10
131:4,7,20
132:18 133:24
133:24 146:14
147:6 157:2,6
157:15,18
158:24 159:23
161:8 165:23
165:24 167:1,8
168:6 169:13
169:19 192:9
200:8,24
201:17 202:5
204:10 215:13
215:15 216:19
216:22 218:12
223:4,7,11
230:10,12
232:6,11,13,15
233:10 236:9
255:7 258:13
273:21 278:13
279:10 283:11
294:8
**crimes** 35:5,6
62:2,7,8,12
125:17 131:11
131:11,22
132:4,4 133:14
133:14 134:10
134:10 135:5
158:15 159:2
253:10,10,11
253:15 298:19
**criminal** 24:19
35:11 61:2
66:1,5 67:2
69:15 70:15,19
72:6,9,12,12
72:13 74:3
90:6 104:18
132:16,18,23
135:23 146:12

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 339

177:21 187:2
191:7 252:24
253:1,6 256:21
257:11 259:17
306:1 307:2
317:17 321:10
322:3
**Criminology**
61:3
**crit-** 230:22
**criteria** 26:20,24
27:9,14 30:13
30:22 32:6
34:13 64:18
128:4 213:16
213:18 214:4,5
214:7,15 215:8
215:9,9,12,24
216:2,8,14,18
218:18 225:4
227:10 229:6
231:16
**critical** 101:20
101:22 103:14
103:16 117:10
122:1,12,20
124:5,13,14,16
124:17 177:3
208:1,6
**criticism** 134:20
**criticisms** 103:5
103:8 108:9
134:15 208:23
208:24 209:3
**criticize** 177:1
**criticized** 117:8
**cross-examined**
15:17
**CSR** 327:13,17
**cues** 110:12
111:6
**Culotta** 264:10
264:14 265:13
**Culotta's** 260:5
260:9,10 262:6

262:21 263:7
**culpability**
255:6
**curious** 16:15
**current** 261:10
**currently** 4:18
71:21 96:14
97:8 98:7
99:19
**curriculum** 61:4
**custodial** 118:15
**custodially**
60:17
**custody** 128:11
128:20
**cut** 78:3 91:4
165:10 299:5
**cuts** 257:1
297:22
**CV** 1:5 4:11
20:11 23:1,3,6
23:23 92:4
205:7 314:8
325:4
**cycle** 269:16
270:2

---

**D**
**D** 3:1 170:21
**data** 30:11 31:18
32:2 37:22,24
38:2,7,9,9,10
38:13,15,18
39:5,12 44:6,7
44:11,14,17,20
44:21 45:7,12
45:19,22 46:18
46:24 47:3,10
47:13,19 48:4
48:9 50:23
51:2 52:24
53:21,22 54:5
59:15 60:22,23
61:8 64:14
92:10 101:5

119:12 126:2
126:10,24
127:8 130:19
132:11,13
134:5,14
209:15,17,17
209:19,23,23
209:24 210:2
210:15,17
211:23 213:11
216:10,12
218:24 219:13
220:15 221:13
222:8,10,14
226:7,17
232:20 234:5
240:3 241:18
244:6 258:14
314:14,14,19
314:20,23
315:3,3,4,19
315:20 318:3
319:10,11,11
322:9,15 323:6
323:7
**database** 26:11
120:14 121:1
126:13,16
211:18 214:7
316:8
**date** 4:13 23:9
246:8 285:5
315:16,23
316:12,22
317:12,13
326:21
**Davis** 95:23 97:7
98:4
**day** 16:21 48:15
129:11 154:19
155:1,5,14
156:14 196:12
235:23 253:20
263:12 272:22
273:9 308:21

325:18
**Day's** 196:8
197:7,13,16,19
273:2
**de-** 262:10
307:14
**dead** 238:16,16
**deal** 170:16
181:24 187:3
187:23
**death** 232:7
**debate** 28:13
**debates** 28:15
**Deborah** 95:23
**decade** 65:22
**decades** 36:14
36:15 169:15
238:24 289:20
290:20
**December**
282:12,15
**deception** 98:1
98:13 100:2,16
102:16 110:12
121:19 313:5
**deceptive** 93:17
93:20,21 94:7
94:11,14 96:15
96:15,23 97:9
97:21,21,21,23
98:8,9,15,17
98:20,24 99:2
99:3,15,15,17
99:19 100:4,10
101:11 109:22
294:1 295:5,10
295:13,14
**decide** 112:8
113:1 187:18
190:17 192:14
192:18 194:2
195:11 198:15
231:5 297:8,9
297:11
**decided** 19:20

167:12
**decides** 28:1
**deciding** 234:15
270:19
**decision** 30:9,22
35:8 37:9
176:3 190:14
225:5,6 250:23
**decisions** 36:22
**declare** 48:17
91:22
**declares** 170:14
**deeper** 37:16
39:9 117:13
**defend** 71:15
178:11
**defendant** 4:21
4:22 90:6
**defendant's**
217:23
**defendants** 1:7
1:10 2:12 5:6
66:2 325:7
326:8
**defender** 301:12
**defenders** 70:15
**defending** 68:6
69:13 70:10,24
**defense** 70:15
230:7 312:23
**defense's** 175:19
**defer** 218:4
261:3
**define** 37:18,19
37:21 159:20
160:8 186:23
202:9 230:24
**defined** 54:6
128:10
**definitely**
316:19
**definition** 160:9
205:5,15 279:5
279:16
**defy** 291:2

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 340

degree 215:18
delete 23:19
delivery 122:18
demanded
253:23
demanding
254:5
demeanor 110:6
111:10
democrat
206:13
demonstrate
55:20 178:23
demonstrating
303:12
denial 99:10
denied 172:17
Denise 200:2,4
denominator
70:14
densely 161:1
department
29:18 58:22
68:5 70:10
304:14 305:4
departments
59:2 71:14
318:9,15
depend 54:2,3
depending 48:4
161:9 236:22
249:3
depends 34:20
36:9 37:17
39:5 53:24
83:3,9 102:5
116:23 121:17
122:19 124:5
126:13 137:18
158:24 159:2
186:23 202:2,8
213:13 220:18
223:16 229:4
239:21 295:6
313:11

depersonalized
314:20
deposed 224:9
deposition 1:9
3:8 4:3,6,9,20
7:14 9:21,23
10:1 11:5,6
12:6 13:21
14:7,19 16:21
18:6,7 19:13
28:15,19,22
29:3 74:18
106:2 137:24
157:23 185:19
187:11 189:20
193:18 200:3
200:10,17
201:9,21
251:24 252:2,4
252:7,13,16
253:17 255:10
255:14 263:7
263:16,18
281:19 282:19
282:20 286:2
324:3 325:10
325:13 326:6
326:11
depositions 1:13
271:16
deprivation
265:21 267:7
267:14 269:21
269:24 270:1,4
deprived 265:22
269:14
depth 45:16
145:16
derivative
204:14
describe 12:3
26:21 39:8
51:12 85:11
89:10 112:17
134:23 150:19

151:23 153:12
154:17 209:2
261:5 304:18
described 7:23
7:24 32:17
40:21 45:15
48:1 51:9
106:7 115:8
117:4,12
141:21 152:6
154:19 177:23
181:18 182:23
184:2,13
209:14 232:6
270:1 285:3
296:22
describes 99:20
113:19 116:1
181:19,22
189:6 301:16
describing
32:12 39:22
40:7 89:9
115:22 150:18
150:21 182:22
233:2 271:21
description
23:18 85:22
112:17,21
155:6,13,14
156:14 157:14
171:11 175:10
189:1 256:14
273:2,2 286:11
296:1
descriptions
52:12 115:19
302:2,3 305:21
descriptive
39:16,19,20,22
40:5 45:20,21
221:15,20
241:7
descriptively
46:24 290:12

design 220:8
designation
95:13
designed 109:17
176:18
desire 36:8
50:10 99:8
destroyed 318:6
detail 97:8
186:10 273:23
273:24 274:3
274:18
detailed 146:19
details 146:14
146:16,20
184:23 274:6
detain 307:5
311:18
detective 10:1
101:24 104:9
107:8,16
111:15 139:13
280:15 281:11
282:22 287:17
287:19 288:5,6
303:2
detectives 111:5
111:22 171:10
184:5 186:16
186:22 271:23
276:2 285:16
286:2,21 287:7
287:14 288:11
289:11,18
290:5 292:3
293:21 300:18
309:23 310:1,9
311:12,17
detectives'
270:24
detention 301:5
312:18
determination
53:13 177:8
194:5 296:15

determinations
51:21 57:11
114:15 180:16
264:1 270:22
297:4 298:11
determine 30:2
30:12 38:17
44:7 47:15
58:4 100:3
115:1,6 117:5
119:22 120:16
127:11,20,23
143:21 145:21
145:23 147:2
163:1 169:20
188:13 215:10
216:9 218:20
231:14 234:22
242:5 258:15
269:20 285:13
299:24 300:3
319:15 320:10
determined
172:14 190:23
199:14 236:3
determines
258:23
determining
90:5 151:3
207:10 233:23
develop 47:21
284:24
developed
248:22
development
56:1,6 248:19
250:15 256:8
developmental
42:2 55:21
device 4:3 292:2
devote 239:7
devoted 217:5
diagnosticity
219:7,12,18,21
219:22

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 341

dictate 222:15
dictated 283:19
difference 176:7
176:8 214:6
279:18 298:1
differences
250:13
different 22:24
32:13 33:2,20
35:17 38:10
43:21 46:22
48:13 62:1,7,8
64:22 73:4
90:20 127:9
131:22 132:3,4
132:4 139:17
150:10 156:15
156:18,18
174:5 183:3
184:7,24 209:4
227:14 230:22
233:14 246:13
247:5 262:15
267:23 271:12
274:21 298:5
313:10
differently 62:9
89:11
difficult 220:18
220:21 319:15
322:6
difficulties
261:5
difficulty 265:6
265:19
dig 14:12,13
205:3
digital 43:5
direct 78:1
107:11 152:9
160:3 163:9
189:11 264:24
272:8
direction 70:9
244:11 271:10

271:19 308:24
326:10
directions
259:22
directly 15:17
61:12 121:14
187:13
dis- 217:22
disabilities
261:11 262:10
262:11 263:1
disability
261:11
disadvantages
39:1
disaggregate
105:5
disagree 38:20
94:10,13 98:1
107:18 194:6
238:13,21
239:2 240:2,9
278:15 320:19
disagreeing
165:11 166:4
disbelieve
194:15
disclaimer 85:3
85:16,22 91:16
disclosed 286:3
disclosing 91:16
287:14
discount 181:17
discounting
200:10,13
discrepancies
270:18
discrim- 204:11
discuss 14:8
35:20 61:15
86:14 87:7
98:13 291:6
302:17
discussed 11:14
34:10 78:18

204:24 207:20
271:15
discusses 80:7
171:15
discussing 55:1
77:21 80:11
84:2 229:18
291:8
discussion 45:21
81:12 86:9
90:16 106:8
111:15 119:7
164:24 170:22
180:23 198:5
252:16 266:21
287:6 291:23
323:24
dismissal 187:2
dismissals
298:20
dismissed 60:19
dismissing
175:2
disposal 270:17
dispositive
215:15,16
dispositively
233:8
disproportion...
36:11 41:22
55:6 223:19
dispute 56:22
240:21 310:6
311:7 312:17
disputed 90:4,4
232:22 233:1
233:11,13,18
233:20,21,23
234:6,8,9,10
234:13 235:7,8
235:9,11 239:2
266:22
disputes 235:16
235:17 268:6
271:5,23

disputing
235:23
dissertation
29:17 59:2,23
209:10
distinction 67:3
68:21 104:2
106:22 138:10
distracted
122:16
District 1:1,1,12
4:12,12 325:1
325:1
distrustful
251:11
divided 20:11
Division 1:2
4:13 325:2
divorce 139:15
DNA 52:9 126:9
126:15 147:11
147:11,12
178:13 217:6
228:1 233:6,7
233:13,14
Doc 82:13
doctor 6:8 7:15
8:13 9:13 20:8
20:21,24 22:23
23:2,6 29:8
62:16 63:8
65:3 67:19
68:18 86:23
87:6 90:7 91:9
92:3 95:8,20
96:16 98:16
99:12 101:14
105:11,22
107:13 123:19
124:2 141:2
152:13,18
162:6 164:16
165:7 174:16
175:4,8 177:10
178:22 180:6

183:10 197:3
233:17 254:16
261:2,2,19
270:3,16
278:19 281:17
282:10 283:4
299:15 301:1
304:11 311:9
312:3 319:23
320:5 323:16
doctoral 29:16
59:2,23
doctrinal 72:11
document 20:13
201:5
documentary
46:3
documented
125:10,13
181:23 182:7
183:4 184:2,6
238:22 320:12
320:13,22
documents
10:17 20:14
26:16,18,19
38:5 40:12,15
189:23 225:2
does- 85:20
doing 30:1 38:6
44:5 45:15
46:19 49:20
50:1 60:19
64:1 79:19
88:12 91:4
106:17 118:24
131:14 165:3
165:16 211:9
211:17 218:9
231:10 235:16
266:24 280:3
289:24 322:15
door 74:13
doorbell 122:17
double-check

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 342

81:10
**downloadable**
95:15 205:8
**downloaded**
96:5,7
**dozens** 44:12,12
238:22
**Dr** 28:9,10
74:15,22 122:9
123:12 260:5
260:10 262:6
262:21 263:7
264:10,14
265:13 301:4
**draw** 11:20,23
61:23 67:3
104:2,5 106:21
111:6 138:18
144:18 146:9
149:1 160:6
227:15 228:18
232:22 238:19
240:3 258:14
**drawing** 64:15
68:21 111:17
146:21 236:4
302:6,9 308:24
**drawn** 48:17
217:20 296:7
299:22
**draws** 145:24
**drew** 41:6,10
44:18 54:14
58:23 61:8,8
260:15
**Drive** 2:8
**driven** 36:2,5,8
36:12
**driver** 123:4
151:18
**Drizin** 30:18
31:13 32:20
39:14 40:10
43:17 45:8
54:13 57:6

58:18 64:9,21
119:2 125:18
125:21 204:22
210:19 214:23
225:9 226:17
**dropped** 166:24
167:12
**drove** 257:15
**drugs** 135:8
307:23 309:14
309:16,24
310:10 311:17
312:1
**DSM** 261:10
**DSM-5** 261:9,12
263:5
**DSM-IV** 261:8
264:2
**due** 207:7
267:15
**Duke** 228:6
**duly** 6:3 326:15
**duplicative**
252:13
**duration** 128:13

———————
**E**
**E** 3:1,7
**E-M-M-E-R-I...**
31:16
**e-mail** 2:5,10
8:24 9:4
**e-mails** 8:22
**earlier** 40:13
47:14 55:17
80:18 118:22
129:11 138:9
185:10 205:12
207:20 211:18
217:13 221:12
224:21 239:22
241:10 284:21
287:20 300:5
317:15
**early** 59:3 64:23

189:17 200:9
208:20 266:16
280:17 281:10
313:20 316:2
316:11 317:13
**earn** 73:23
**earth** 275:23
**easier** 96:10
291:22 293:10
**easily** 228:12
265:3 275:20
**east** 154:8
**Eastern** 1:2 4:13
325:2
**easy** 105:23
**edited** 78:24
81:12
**editing** 25:4,11
**edition** 291:17
**editor** 98:3
**editors** 97:17
**educated** 273:20
274:1 283:11
**education** 144:5
144:7
**Edwin** 151:18
**effect** 55:9,10
85:21 127:13
139:16 177:13
177:14 223:13
247:17 269:21
269:21,22
303:22
**effects** 267:6,7
**efficient** 93:9
**effort** 142:7
193:16 224:19
**eight** 284:12,14
284:18,23
285:5
**eight-hour**
131:23,24
**either** 47:15,20
60:11 66:19
70:15 73:15

91:6 126:5
159:6 184:22
204:9 215:12
222:4 235:12
236:18 264:17
308:8
**elaborates** 99:5
99:6
**election** 206:12
**electronic** 26:10
43:5 316:8
**electronically**
226:24
**element** 55:15
**elements** 104:14
**elicit** 88:24
108:12 109:13
**elicited** 35:4
119:11 120:10
120:12,14
134:2,3
**eliminating**
214:15
**elsewise** 199:14
**emblem** 95:12
**emerge** 61:13
**emerged** 47:11
**Emmerich**
31:15
**empirical** 37:15
37:19,19,21
38:7,8 87:10
88:11 90:1
144:21 166:22
209:15,17,19
210:3 240:9
241:18 313:21
313:24
**empirically**
98:23
**employ** 151:2
214:10
**employed** 58:3
117:4 220:23
**employee** 154:7

**employing**
108:12 109:11
109:16 117:13
**encounters**
254:20
**encyclopedia**
79:8
**encyclopedic**
79:9
**ended** 216:22
258:12
**engaged** 69:11
268:18
**ensure** 22:19
50:13 228:17
230:2 239:19
**enter** 307:3,4,6
308:4,7,16
**entered** 308:13
**entering** 307:14
307:24 308:15
**entertain** 268:3
**entire** 10:8
101:7 194:18
**entirely** 141:14
236:18 304:22
306:6
**environment**
303:11,17
**environments**
208:2
**Enza** 1:14 5:16
270:7 326:4
327:13
**equal** 53:3
**equipped** 78:21
247:24 248:5
250:7,17
**equivalent**
255:3
**era** 305:4,24
**errata** 325:14
**error** 206:15,17
206:20 211:5
224:11 262:13

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 343

289:12,16
291:6,10 292:5
292:10 294:22
295:15
**errors** 34:24
146:7 224:6,8
289:5,18,23
292:17 294:7
**especially**
178:14 224:8
261:23 265:2
290:21 308:18
**essential** 195:1,4
**essentially** 25:6
32:24 80:2
84:18 128:19
194:4 255:6
262:13 296:14
299:18 309:23
310:9 311:17
313:3
**establish** 84:15
214:9 232:12
236:10 243:7,8
258:21
**established**
56:21 186:20
215:17 217:15
245:7
**establishes**
84:15 102:2
258:21
**establishing**
102:11 211:16
214:15 242:9
312:24
**estimate** 17:23
66:5 93:10
100:11 101:2,2
101:7,8 316:14
**estimating**
100:20,20
**estimation**
66:15
**et** 1:6 4:11

148:19,19
223:21,21
325:5
**ethnographic**
305:20
**evaluate** 50:8
51:18 70:16
149:3,22 191:7
192:8 247:14
271:1 285:10
298:2,6,13
316:10
**evaluated** 114:8
247:11,14
270:20
**evaluates**
149:14
**evaluating**
126:3 222:17
246:22 247:13
**evaluation**
52:19
**evaporates**
313:3
**events** 16:10
113:7 183:12
189:1 280:5
285:15 287:9
288:12 296:8
309:7
**eventually** 27:19
67:21
**everybody**
62:23 179:17
**evidence** 27:11
34:11 38:8
83:6 99:11
111:23 114:8,9
128:1 132:14
132:17,22
133:1,7,7,9
134:21 135:6
135:21 138:7
138:10 143:21
143:22 144:8

144:17 145:7
145:14,15,21
146:6,6,11
147:6,6,7,11
147:16,20
151:20 156:22
156:24 157:4
157:13,16
158:5,15,18
159:11,17,19
159:21,23
160:5,5,12,15
160:16,17,21
160:23 161:22
161:24 162:7,8
162:10,11,14
162:19,22,23
163:4,8 164:19
164:19,19
165:23 166:2,5
166:15,22
167:7,17 168:5
168:11,19
169:12,19
171:5,7,8,23
173:2,17,20
174:14,19
175:21 178:4
187:21 189:5
191:5 192:9
198:13,14,17
200:15 201:16
204:9,12,14
215:16 217:7
218:6,13
232:19 233:7
244:10,12,19
246:9,18
266:10 270:20
271:7,13,13,16
271:24 272:3,5
273:7,17,23
278:1,19 279:2
281:6,15
285:11 290:10

297:10,18,19
298:2,4,12,15
298:23 300:2
300:16 301:14
302:7 304:9
306:9 309:1
**evidence-by-e...**
160:13
**evidentiary**
314:22
**exacerbated**
259:4
**exact** 99:22
304:20
**exactly** 100:17
113:15 161:4
227:11 297:17
299:19 311:12
**exam** 80:19
305:17,18
**examination**
1:10 3:4 6:6
**examined** 6:4
15:17 326:16
**example** 32:5
39:24 43:1
56:19 88:19
92:19 103:10
119:1 122:5
146:13,18
148:4 149:5
167:21 210:18
221:21 234:11
242:17 243:24
244:18 246:23
247:23 248:4
249:24 250:10
265:11
**examples** 52:20
99:16 167:22
239:5 241:9
288:8
**exceedingly**
97:7
**exception** 45:3

66:11 177:19
237:1,4 280:3
**exceptions**
307:10
**exchange** 11:19
12:9 103:13
181:24 187:2
321:13
**excluded** 139:1
139:13,19
**exclusively** 52:7
52:14 109:17
216:15
**exculpates**
233:9
**excuse** 72:13
79:18
**exercise** 168:19
**exhibit** 3:8 92:1
92:4,5 95:3
97:6 252:16
265:9 282:16
**exhibits** 252:2,4
252:7,8,13
**exigent** 307:5
**exist** 110:13
229:19 248:12
317:20,20
318:2
**existed** 48:24
273:12 275:22
318:7
**existence** 65:17
231:9
**existing** 54:10
128:2 222:11
242:14 244:14
245:3,8
**exists** 91:12
206:5 245:9,10
246:18 315:4
315:12 318:4
**exoneration**
52:9 126:15
228:1,24 229:2

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 344

230:17,21,23
231:2
exonerations
126:16 212:20
228:3 229:6
233:6,7 298:20
315:20 318:23
319:1,6,12
320:9
expanding
245:4
expect 157:13
162:15,20,23
163:5 164:21
166:2 167:19
193:4 268:19
307:12,16,17
expectation
68:24
expected 157:1
169:13
expecting 166:6
experience
22:16 24:12
144:1,5 147:17
178:10 184:9
249:4 250:12
254:6 256:5,7
256:20 259:16
269:24 291:4
304:1
experiences
249:6 250:6
251:11,15,20
257:11 258:16
268:16
experiment
46:21 48:18
experimental
57:15 121:6
125:8 207:1,13
209:7,20 213:4
219:17 220:8
220:13 242:2
243:20 245:19

experimentalist
57:13 220:7
experimentali...
57:16 207:13
experiments
38:2 46:23
57:23 207:16
241:11
expert 6:13,16
6:19,21 22:13
56:18 64:12,13
65:13,19 66:1
67:21 68:4,8
68:17 69:11,20
71:11 73:2,6
73:18 74:8
78:7,8 81:2,7,9
82:8,16 83:14
84:11 85:3,11
85:17,23 87:7
87:10,17,21
88:3,5,12,16
89:7,19 90:3
91:11 92:8,15
92:18 113:6
114:13 133:2
135:17 136:4,6
136:21,24
137:3,6,10,14
137:16,17,18
137:19,21,24
138:3,5,7,12
138:17 139:17
139:21 143:5,7
143:20 145:20
145:24,24
146:1,9,21
147:9,12 148:2
148:3,24
149:14 151:3
158:8,9,10,14
188:10 190:22
192:11,13,13
192:15 235:9
240:11 260:6

304:12 319:2
expert's 144:4
expertise 6:17
7:5,5,6,6 50:8
138:1,14
143:24 144:2
146:23 147:14
149:21 158:6
191:8 196:4
experts 77:21
78:19 80:23
82:2,18,23
83:18 84:7,10
84:12,19 85:19
86:10 88:6
89:2 90:12,15
90:17 91:18
137:11 142:8
142:15 147:13
147:13 149:3
171:4 240:11
expl- 42:1
explain 45:17
105:15 163:18
195:9 233:15
243:8 271:1
280:7 312:9
explained 211:1
explains 42:1
55:23
explanation
106:16 178:2
188:15 306:17
explicit 302:18
302:19
explicitly 90:17
186:4
exploratory
47:10 49:14
expressed
117:24
extensively 16:5
52:23
extent 151:23
253:5 285:13

extra 196:24
extraordinary
172:19,23
extrapolate
121:5,14,16,18
121:21
extreme 302:22
extremely
174:11 269:17
302:17
eyes 116:14
eyewitness
137:4,6,14
138:3,5 149:24
155:13,16,18

——————
F
——————
fa- 66:19
fact 41:20 42:12
91:10,16 112:7
112:11 113:22
114:8 130:8
139:2 146:15
149:9 156:1
161:6 164:20
165:24 175:6
175:17 176:17
182:5,7 183:13
185:2,6 186:2
186:15 187:1,6
187:12,22
188:4 192:24
196:11 197:12
197:13,18,19
203:13 254:4
255:21,23
256:6 266:23
272:1 273:17
274:15,20
276:24 278:23
279:11,15
281:24 282:1,2
289:4 290:13
295:3 300:17
301:8,24 305:5

factor 36:23
37:10 41:8,15
42:11,15,16
54:15,22,23
55:2 56:14,20
56:23 121:21
127:11,21,21
127:24 128:8
129:15 130:16
207:10,15
211:13 242:2
242:18 244:8
245:14,16,18
246:7,9,10,10
246:17,18,23
246:23 248:9
248:12,13,24
250:22,22
255:17,18,21
256:19,22,24
260:1
factors 35:19,23
35:23 36:6,8
36:20 37:17
53:15 56:4,5,5
57:11 58:5
61:10,22 70:17
118:22,24
119:5,7,8
127:13 131:11
211:10,15,16
213:3 241:17
242:6,10,22
243:7,8,18
247:10,10,16
248:3 249:3
303:21 319:3
facts 12:8 52:21
83:6 113:4
117:14 139:21
171:9 173:11
178:23 190:23
194:2,16
197:11 204:10
216:1 218:6

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 345

234:16 235:8
235:11 247:11
247:20 248:12
250:24 255:16
255:20 268:6
270:19 271:10
273:20 274:1,9
278:1 279:1,23
280:11,11
281:6,15
285:21 286:2
286:20 287:15
287:18 288:11
288:20 291:2
293:15 299:21
301:23 311:2
**factual** 21:12
32:3 114:14
175:10,12
180:15 235:15
235:17 270:22
271:23 275:17
298:10
**factually** 12:1
114:22 135:3
177:24 290:9
306:5
**fail** 34:22
**failure** 152:19
154:15 164:23
186:17
**fair** 8:17 9:5,10
9:18,19 22:13
27:3 36:24
37:11 38:14
53:2 54:15
69:1,19 81:19
98:20,22
101:20 112:6
120:8 140:21
156:2,8,19
158:1 234:23
234:23 240:23
247:2 251:23
264:16 299:7

316:16
**faith** 12:24 13:7
13:15
**fall** 30:3 163:6
217:12 261:6
265:2
**falls** 28:2 223:1
**false** 6:14,21 7:1
7:3,7 26:20
27:5,10,12,13
27:15,17,21,22
28:3 29:9,13
29:22,23 30:3
30:8,9,21 31:5
32:6 33:6,6,8
33:13,15,17
34:2,4,6,8,9,12
34:13,23 35:6
35:12,20 36:3
36:12 37:11
41:8,15,18
42:6 51:21
53:14 54:23
55:7,11,18
57:11 61:11,18
61:20,22 66:19
70:18 72:15
77:22 78:11,19
78:21 80:4,24
81:5 82:3
83:20 84:4,17
84:21,24 86:4
86:6 87:11
88:7,14,24
89:3,8 90:14
103:24 104:6
104:10 107:3
112:7 119:8,21
119:23 120:3,6
120:9,12,18,18
120:22 121:6
121:10,13,19
121:22 124:24
125:3,5,6,9,12
125:12 126:3,4

126:5,14 127:1
127:1,9,18,18
128:3 131:10
151:3,7 162:20
162:24 163:11
166:8 168:4
169:10 172:18
182:19 183:14
189:10 196:18
196:19,20,21
204:21 207:11
211:10,19
212:2,10,16
213:3,9,9
215:17,19
216:3,5,13,16
217:14,15,21
218:7,21
220:16 221:22
222:18 223:12
223:15 224:5
224:14,17
225:8 226:11
228:9 230:23
231:5,12,16,18
231:20 232:2,9
232:23 233:24
234:5,13,15,19
235:14,15
236:6,11,11,19
237:1 238:2,3
238:7 240:3,14
240:16,16,19
240:24,24
241:5,6,11,13
241:19 242:19
244:4,15,19,20
244:23 245:12
245:18,24
246:5,9,12,14
246:24 247:1,6
247:8 249:18
251:5 257:19
258:2,18
259:19 261:22

279:19,21
280:8 290:10
295:23 297:15
307:19 309:4
310:8 312:8
313:2,22 314:1
314:4,10,11,13
315:15 316:12
316:15,20
317:9 318:20
318:21 319:14
319:16 320:12
321:21 323:5,7
323:8
**falsehoods**
237:9
**falsely** 35:9
41:24 42:18
122:4 168:18
271:2
**familiar** 95:11
**familiarized**
144:16
**family** 303:4
**far** 28:9 33:14
111:16 118:4
237:5 245:8
246:8 292:8
307:13
**favor** 185:11
298:15
**favorable**
104:17 237:10
**fear** 296:1,17
**February** 23:9
23:12
**fed** 273:20,24
280:14 281:2
**Federal** 1:11 4:7
22:12
**FedEx** 122:17
123:4
**feed** 164:23
278:22 288:20
**feeding** 279:23

284:3
**feel** 19:16 22:2
143:10 204:4
**feet** 154:11,24
155:1 156:15
**Feld** 119:17
**felon** 187:1,7,23
**felonies** 130:21
**felony** 130:4,6,6
131:2 133:14
134:10
**fewer** 65:20
**field** 29:9,15,18
29:19,22 38:3
50:8 57:16
58:21 59:16
82:19 105:7
113:16 144:1,2
146:22 147:5
219:16 318:20
**fields** 138:16
**Fifth** 11:16,21
12:6,10,12,21
13:16
**fights** 268:21
**figure** 100:19
**figures** 249:11
260:12 265:12
**file** 14:14 28:19
59:14
**files** 59:10 60:3
**fill** 243:2
**final** 24:21 25:7
25:9
**finally** 9:13
**financial** 82:1
82:19,22 85:18
86:1 87:20
88:1,5,12
91:17,23,24
**find** 14:14 25:6
43:7 47:16
57:19 74:1
96:11 152:21
162:15,20,23

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 346

163:5 164:21
166:2 181:9
182:2 187:16
189:5,16
192:22,23
194:11,14
195:5 196:6,7
197:11 211:23
212:1 213:15
213:21 214:3
218:11,12,14
220:19 225:1
231:7 234:14
235:13 244:17
252:8 272:5
273:7 291:15
291:18,18
300:15 308:19
317:8,11
**finder** 113:22
114:8
**finder's** 192:24
**finding** 130:24
169:14,24
177:5 250:14
309:13 310:10
**findings** 27:20
40:23 61:13,15
128:2 225:12
242:15 245:7
260:11
**fine** 7:9 8:18
9:11 62:17,21
62:22 74:20
108:7 179:12
181:4 272:12
277:12
**finely** 194:11
**finer** 136:16
**fingerprint**
137:1
**fingerprints**
147:13 158:10
158:12 163:7
**finish** 26:5 63:17

165:4 197:2
281:7
**fired** 157:12
162:17
**firm** 108:6
292:19
**firmly** 56:21
**first** 6:3 26:16
39:8 46:12
79:3 87:8
95:21 96:12,12
103:9 104:20
125:16 129:5,8
142:12 150:24
154:6 167:24
171:1 182:8
205:17 208:6
209:4,5 214:11
214:23 232:9
234:18 257:2
286:13 315:12
315:23 326:15
**fit** 140:22
141:10,21,21
143:22 144:23
144:24 145:1,4
145:14 146:10
147:15,24
150:8,15,16
151:13 152:7
155:4,10,11,12
156:2,7,10,17
167:4 168:23
168:24 169:18
170:1,6,7,10
170:22,22,24
171:11 172:5
181:15,16
187:8,9,14
188:19,22
194:13 197:21
203:15,24
204:24 216:18
279:12
**fits** 147:20

218:20 222:11
**five** 13:24,24
14:2 19:14,15
62:18,20,21
67:13 69:17
70:7,7 129:3
153:18 154:3
203:14,16,22
203:24
**five-minute**
62:19 123:2
**fix** 68:20
**Floor** 2:3,9
**fluid** 233:8,8
**focus** 27:18
89:12 150:2
181:6 198:20
265:6,20
**focused** 16:6
55:24 56:4
180:16,18
**follow** 45:6
60:14,17
131:20 152:19
154:15 236:1,5
280:12 307:17
**followed** 19:8
45:11
**following**
110:22
**follows** 6:5
171:5 242:8
285:11
**footnote** 25:14
63:11,14
142:11,16
143:12 179:4
180:9 181:19
181:24 183:6,7
183:9 184:1
187:24 192:21
194:4,18
201:12 202:10
202:12 263:11
271:20

**footnotes** 63:18
142:12
**foregoing** 325:9
326:18
**forensic** 138:7
156:21,24
157:4,13 158:5
158:18 159:10
164:19 165:22
168:11 171:6
260:6
**forensics** 138:9
147:10
**Forever** 63:23
**forget** 31:18
**forgive** 203:3
**forgot** 263:17
**form** 12:17 13:2
24:22,23 25:7
25:9,19 34:17
37:3 38:7
43:11,24 45:15
50:17 53:9
64:16 71:2
82:4,9 83:5
85:4 89:20
91:16 100:16
113:24 132:21
135:11 136:5
138:7 140:24
143:1 144:15
152:3 158:20
159:12 162:3
167:13 170:7
171:13 201:22
215:2 254:14
257:7 259:11
263:21 265:15
267:9 269:3,10
277:6,24
278:24 280:20
281:5,14
296:18 304:9,9
305:14 308:3
310:13,23

311:21 319:21
**Formally**
176:13
**formed** 322:5
**former** 31:14
240:10
**forms** 38:10
100:2 103:10
103:13,23
104:5,9
**formulas** 218:16
**formulate** 101:7
**forth** 165:19
322:21 326:13
**forthcoming**
23:15,16,17,19
25:17 26:2
31:12
**found** 79:10,11
114:9 139:3
165:23 169:13
176:9 191:9,12
197:18 198:1
199:2 311:18
**foundation**
34:18 113:10
237:16 239:13
258:6 277:7,23
279:1 304:7,8
312:12
**foundations**
84:11
**four** 23:24 24:4
26:24 30:13
31:22 32:6
70:6 72:4
130:19 152:7
152:10 153:4,7
157:12 170:2
190:4 203:12
215:12 216:4
216:18 217:1,4
221:22 222:1
223:1 235:18
236:3 320:24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 347

**four-page**
291:23
**fourth** 198:4
307:13
**frame** 255:12
**framed** 302:24
**framing** 84:19
**Francisco** 4:18
71:19 72:20
95:14,17
**free** 95:15
129:19 204:4
205:8 310:11
**frequency**
119:23 120:2,9
120:12,13
121:2,4 124:23
125:2,4 134:1
245:12,17,24
**frequent** 134:7
134:10
**frequently**
54:14,18 85:17
134:12 239:4
**Friday** 17:13
18:3
**friendly** 304:2
**friends** 257:14
268:3
**front** 8:10,20
20:9 193:5
198:10,22
199:7,17,19,21
200:18,21
203:5,8,8
298:3,4,12
**frozen** 152:15
**fruit** 132:3
**full** 6:9,10 59:9
96:12 105:24
142:22 269:22
**fully** 37:14
212:21 249:21
**function** 8:21
9:4 112:24

**functional** 255:3
**functioning**
261:21 262:12
264:6,9
**functions** 64:15
**funded** 314:17
**further** 51:3
179:4 326:18
**Fusco** 2:7 5:11
**future** 249:11

──────────
**G**

**gang** 303:3,11
303:24 304:2,3
304:18,23
**gangs** 303:19,20
304:12
**Garcia** 198:5,24
**Garcia's** 148:8
154:10
**Garrett** 228:7
**Gary** 161:15
**gather** 26:18
38:13 40:14,19
47:13 52:13
53:23 62:12
212:9 226:2
**gathered** 64:14
79:20 318:5
**gathering** 37:22
38:7,9 135:21
138:7 144:8
**general** 83:10
88:21 98:18
101:2,2 103:5
110:9 132:5
134:11 140:20
152:22 159:15
167:16 238:24
247:22 249:14
285:1,2 288:19
298:24 322:3
**generality** 83:24
176:23 183:15
234:2

**generalization**
15:22
**generally**
135:19 143:24
240:18
**generate** 74:8
241:11 306:10
309:3
**generic** 114:17
305:11
**getting** 9:5
64:11 87:14
155:20 174:7
203:18 209:7
268:17,20
294:9 307:19
311:8
**girls** 287:22
**give** 15:22 39:9
39:23 51:6
55:18 60:2
66:14 70:23
71:11,12
100:11 101:1
102:24 105:24
119:23 120:3
131:15 142:22
143:13 148:3
152:5 178:14
188:15 201:13
201:20 228:4
243:15 245:15
257:19 266:11
282:8 283:9
313:13
**given** 13:18 15:8
18:23 23:22
67:13 117:6
128:18,18
129:21 139:21
143:12 148:4
157:14 158:5
159:11 162:15
164:21 166:1
181:24 182:12

182:13 249:24
255:18 257:18
269:24 277:17
278:19 290:19
290:22 295:24
296:21 309:23
323:4 325:10
325:12
**gives** 25:3
143:12 147:5
147:19 148:1
266:11 313:1
**giving** 11:9 41:8
164:5 191:2
242:19 249:18
258:18 259:19
267:13 278:21
**glass** 159:1
**go** 5:3,4 8:6 13:3
14:24 25:22
43:12,22 52:24
64:5 66:9,13
66:13 74:22
82:5,13 83:4,7
85:24 88:18
94:11 96:9
100:2 113:13
123:6 129:19
151:15 162:6
166:12 168:18
179:15 184:22
193:19 204:5
205:20 213:15
213:21 214:3
215:24 220:10
225:12,19
227:8 231:7,23
232:2 237:18
245:8 254:13
256:2 265:18
269:4 271:10
271:18 272:10
272:14 281:17
283:16 284:7,9
286:19 293:11

296:4 301:19
302:7 304:3,11
307:14,21
308:21 309:1
309:19 310:11
319:23 320:5
321:2
**goal** 51:19
**God** 308:20
**goes** 20:21 31:21
73:20 108:5
110:16 190:15
193:8 243:9
246:21 248:11
**going** 9:17 14:14
14:22,23,24
20:7,7 21:15
22:22 23:3
26:3 28:12,23
28:24 29:1,2
31:17 37:21
38:2,8 42:5,14
48:16,16 53:15
59:14,15 63:3
65:14,19 73:14
74:13,17 80:3
87:6 92:3,11
93:23 94:24
95:19 96:9
97:6,16 101:13
105:22,23
107:11,13
109:3 113:22
120:1 123:15
124:8 139:8
143:7,9 149:2
149:12 150:17
152:9 160:11
164:6 175:8,16
177:9 179:10
179:20 180:20
189:3 192:16
193:17,20
195:10,19,19
206:12,18,23

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 348

211:9 212:14
215:10,11
216:9 221:10
225:19 228:15
231:5 234:1
235:6 238:13
238:23 239:15
239:15 246:12
252:6 257:20
257:21,23
261:19 264:11
268:1 269:24
270:9 273:10
274:10 278:6
293:20 295:23
296:2 299:6
302:7 305:21
306:20 308:21
312:16 316:1
316:17 321:2
324:2
**good** 9:1,12
12:24 13:7,15
50:2 62:15
177:6 222:8,8
270:5,14
276:14 288:14
288:16 323:20
**Google** 227:19
**gotten** 144:7
224:5 275:24
**govern** 218:15
**government**
120:15 134:5
134:13 314:22
315:6 316:3
318:14
**graduate** 209:9
305:16
**grant** 50:21
314:18 315:7
**greater** 146:23
242:23 243:21
256:8 261:22
**Gross** 318:18

321:8,13 323:6
**Gross's** 320:7
**Grossman** 184:1
289:17,24
293:4
**ground** 7:15
198:6
**group** 36:4 50:7
57:5,7,23 58:2
96:18 97:11
220:5,7,14,24
**groups** 57:2,12
57:18,21,22
205:13 220:3
220:12
**guarantee**
228:20
**guardian** 116:7
148:19 199:5
251:8
**guess** 15:3 58:12
63:21 82:24
87:24 98:6,16
99:24 100:6,8
100:12,21
101:4,5 116:22
122:10 134:20
136:15 137:13
153:1 155:23
157:8,16
172:11 184:1
193:12 202:2
210:8 213:23
228:14 229:4
235:5 241:15
245:19,19
248:17 260:23
268:7 283:17
290:2 291:3
294:3 299:16
305:11 313:9
313:10 322:23
**guessed** 204:10
274:16
**guessing** 99:21

**guide** 80:6,10,15
**guideline** 80:2
**guilt** 90:6 160:2
160:7 217:23
**guilt-presump...**
110:19 111:2
**guilty** 108:13
110:14,18,24
170:19 176:9
233:4,5 255:3
**gun** 135:8
**gunshot** 158:22
**Gus** 11:5 179:6
181:14 187:1
201:12 263:15
271:19 287:20
**guy** 151:17
**guys** 165:3

---

## H

**H** 3:7
**habeas** 66:24
**habit** 266:8
**habits** 266:5,12
266:14 269:20
**half** 17:22 18:17
61:17 179:16
179:18 237:8
**hallmark** 204:8
**halves** 158:7
**hand** 320:6,8
**handbook** 79:11
79:13
**handheld**
275:19,22
**handwritten**
289:7
**hang** 28:5 74:15
156:20 258:5,5
299:4 313:19
**hanging** 165:5
**happen** 178:4
214:16 225:23
244:7 319:14
321:23

**happened** 23:24
121:4,9 138:23
216:23 285:9
290:20 300:4
304:20
**happening**
183:22 214:21
224:20
**happens** 182:14
216:21
**happy** 190:2
272:12,17
**hard** 158:23
159:4 246:19
**harm** 118:1
303:3
**Harris** 140:6,11
142:20 143:13
200:2,4 230:6
232:18 234:11
235:6 271:15
**Harris's** 201:11
231:17 232:15
**Hayward** 59:1,6
59:9 226:8
**head** 120:5
168:13,17
209:22 219:15
**heading** 152:12
**hear** 135:14
254:16 283:1
312:4
**heard** 237:21
256:4 287:23
304:18
**hearing** 10:6
15:8 16:17
73:15 191:9,15
280:18 282:20
**hearings** 189:18
252:22 281:12
**height** 154:19,21
155:6,13
156:18
**held** 104:19

116:19 128:14
129:18 137:24
**help** 31:17 33:2
38:18 48:2
69:8 80:23
83:20,22 84:8
86:10,18 88:14
89:7 99:8
204:3 218:9
221:18 225:1
244:17,21
**helped** 31:14
127:2 227:14
**helpful** 88:23
124:19 191:8,8
191:11,13
197:5 242:13
**helping** 90:13
**helps** 218:15
**hereinabove**
326:22
**high** 93:12
103:24 104:6
122:14 125:8
126:4 127:12
239:7 302:17
**high-end** 302:17
302:18,19,23
303:6
**higher** 104:10
110:10 120:19
247:7 316:20
**highlighted**
153:16
**highlighting**
154:15,18
**highly** 93:14
96:14,15,23
97:20 98:9,24
99:2,14 100:9
101:20 208:1
291:4
**hire** 222:5
**hired** 67:20
68:23 69:6

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 349

85:17 90:13,16
92:8
**hiring** 90:17
**historical** 38:5
305:3
**history** 24:18
187:10,15
188:9 192:3,3
233:10
**hit** 182:10
**hold** 74:14 93:13
93:16,19 94:16
97:2,14 129:1
129:1 135:17
136:4,21,24
137:3,5,19
138:6,12 173:5
173:5,23
299:11 308:2
**holding** 129:6
**holds** 262:14,19
**home** 148:8,15
198:6 199:17
199:19 203:5,7
253:24 301:2,3
307:3,4,5,14
307:15,20,24
308:7,13,15,16
309:15
**homicide** 125:22
131:24 287:23
288:2
**homicides** 62:6
162:21 223:21
**honest** 105:22
**hope** 22:14,14
64:1 125:20
**hoping** 122:18
**hour** 17:22,22
18:17,17 61:17
179:16,18
310:20
**hours** 19:14
91:6 93:4,7,11
116:19 118:5,9

129:3 130:17
130:17,19,23
131:2 287:20
291:1
**house** 148:5,10
148:14,16
198:6,10,18,22
199:7,9,13,21
200:18,19,21
203:5 257:2
301:5 318:14
**human** 214:17
224:11 229:21
229:23
**hundreds** 65:5
100:24 121:3,3
191:1,1 238:22
**hung** 305:22
**hypotheses**
49:16 244:14
**hypothesis** 47:8
47:9,12,16,20
49:13 259:5
**hypothetical**
39:24 91:20
163:4 248:17
279:4,17
293:17,18,20
295:7,18
296:23 311:3
313:7
**hypothetically**
246:4 295:24
296:4

---

**I**

**iceberg** 320:15
**idea** 73:22
145:17 245:17
270:5
**ideal** 50:20
**ideally** 26:18
51:1,2 53:20
**iden-** 118:23
218:9

**identification**
137:4,6,14
138:3,5
**identified** 13:23
25:14 26:17,22
36:16,20 37:6
45:4 59:4
101:15 109:4
109:21 128:4,7
130:16 152:19
164:17 165:22
166:15 215:18
216:5 217:9
228:23 232:9
241:17 259:24
272:18,21
284:18 286:20
289:4 300:11
**identifies** 42:1
**identify** 4:15
26:16 27:5
30:8 33:2,17
34:3 36:6,8,23
37:9 78:21
127:22 128:5
153:5 168:21
170:18 211:10
231:17 244:22
290:15
**identifying** 33:6
37:8 108:10
109:7 118:23
224:22 284:12
**identity** 278:13
**ignores** 134:21
**ignoring** 256:13
**illegal** 135:7
306:21
**Illinois** 1:1 2:4,9
4:5,13 5:10
171:15 276:9
325:1 326:1
327:7,15
**illusion** 306:11
309:3

**illustrate** 40:23
**illustrations**
153:10
**imagine** 80:11
246:4
**immaturity** 56:7
250:16 256:1
**immediate** 7:21
**impact** 38:15
61:6 223:23
224:1 258:16
**imper-** 117:1
**imperfect** 232:3
**impermissible**
116:20 118:2
**implausible**
296:23 304:22
305:2 306:6,16
308:12,16
**implicated**
156:13
**implicates** 155:4
**implications**
99:10 102:4
**implicit** 103:12
**implicitly**
174:13 186:6
**implied** 118:1
262:2
**important** 50:15
124:21 172:2,4
173:24 174:10
174:11 184:12
190:7 197:20
197:22 274:8
**impossibility**
148:10 181:21
199:15 217:2
**impossible**
149:9 161:18
213:2,4,6
215:14 236:9
320:10
**impression**
143:12 210:16

292:15 299:17
**improper** 102:6
311:3 313:6
**improperly**
107:1
**impulsive**
249:12
**impute** 124:16
**in-depth** 33:11
40:22
**inability** 198:5
**inaccuracies**
294:14
**inaccurate**
295:22
**inadequate**
241:1 321:23
**inbox** 8:24
**incentive** 86:2
297:13,16,22
297:22
**incentivized**
188:1,4
**include** 62:6
63:13,19 91:15
142:9 155:8
167:23 168:3
183:12 193:3
196:12 197:24
198:3 214:5
218:21 237:8
291:20,22
292:5 302:8
**included** 26:24
30:14,20
142:20 184:14
210:20 219:3
267:4 274:18
323:8
**includes** 62:5
105:17
**including** 46:23
46:23 47:1
184:23 214:18
225:11 281:18

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 350

294:13
**inclusion** 26:23
30:23 218:6
227:10
**income** 72:18,19
73:5 74:8,10
74:11,12,14
**inconsistencies**
188:17,20
189:4,13,16
190:1 288:6
**inconsistency**
145:22 161:8
161:16,20,22
164:18 189:8
**inconsistent**
128:1 186:21
189:21 196:15
196:17 197:8
197:12,13
201:21 202:3
245:3 283:20
**incorporate**
239:10
**incorporated**
119:12
**incorporating**
195:6,15
**incorrect** 300:19
**increase** 7:4
35:23
**increased** 82:2
82:18 88:6
91:18
**increases** 55:14
125:10
**incriminate**
13:1,8
**independence**
289:2
**independent**
52:18 277:20
**independently**
264:15 273:22
280:23 281:20

288:21 292:24
293:12
**Indiana** 161:15
**indicate** 246:8
**indicated**
325:13
**indicates** 34:12
**indicating**
232:19
**indication**
266:12
**indications**
70:18
**indicator** 163:2
169:2
**indicators**
169:11,11
**indicia** 6:24
146:4 149:6,13
149:18 150:5
152:12,23
153:14 163:2,2
166:8 170:3,5
170:11,21
171:3 183:23
189:9 190:6
193:8 194:14
195:5 196:7,18
196:22 204:8
234:21 298:7
**indictment**
169:4
**individual** 5:6
128:12 259:20
277:2,15
**individuals**
60:16 69:22
**inducement**
302:23
**inducements**
104:12 302:16
302:17,18,19
303:6
**inducing** 109:12
**inescapably**

298:13
**infer** 110:4
159:21 273:22
**inference** 160:1
160:2,3,7
245:23 290:19
**inferences** 11:20
11:23 235:11
308:24
**inferential**
39:21 40:6
**inferentially**
47:1
**inferring** 40:6
**influence** 35:9
36:19 37:7
**influenced**
265:3
**influences**
274:10
**infor-** 19:17
**inform** 36:22
61:9,12 89:2
121:7 127:2
251:15
**informants**
304:18,24
**information** 9:5
19:4,21 20:2
22:1 47:21
53:3,17,18,21
54:9,10 63:15
83:11,12,13
99:24 131:15
148:11,13
153:24 155:9
159:8 184:14
186:16 190:17
196:4,12,24
197:7,8,18,21
201:20 214:1
229:1 232:22
233:1,11,18,21
233:21,23
234:6,8,10

238:19 240:23
242:13 244:16
247:2 253:14
257:5,9,9
265:6,19 267:3
270:17 273:6
273:12 274:14
277:1,5,14,20
277:21 278:9
278:14 280:15
281:2 284:22
285:21 288:21
289:2 312:23
317:18 318:1,4
318:7,11,15
319:16 321:24
322:7
**informed**
263:12 309:24
**informs** 37:9
**inherently** 295:4
**initial** 10:17
184:5
**initialed** 289:6
**initially** 129:20
186:16 200:8
200:23 244:9
281:4 317:14
**initiated** 150:15
291:1 293:16
293:19
**injuries** 300:9
**injury** 300:11,16
300:17 301:8
**innocence** 24:18
52:11,12 90:5
168:21,22
170:15 171:15
171:17,21,24
172:4 173:1
174:5,8 175:5
176:1,9 177:8
177:11 178:5,8
212:19 228:1
233:3 298:21

315:19
**innocent** 52:18
72:15 109:8
110:17 111:1
120:23 169:3
169:16 170:15
170:18 172:9
174:22 177:24
295:18
**inquiry** 51:1
**inserted** 294:23
295:9,11
**insertion** 286:6
286:13 289:3
289:12,15,16
291:6,10
292:10
**inside** 61:5
304:13
**insight** 146:9
243:16
**insightful**
124:19
**insist** 233:4,5
**insofar** 49:23
**instance** 4:21
107:6,11,14
149:5
**instances** 98:19
254:21
**Instanter** 2:13
4:2
**Institute** 50:22
314:17,21
**instruments**
158:24
**intellectual** 56:5
261:10,11,21
262:10,10,12
262:24
**intelligent**
250:19
**intended** 154:9
169:18
**intending** 82:21

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 351

intensive 74:5
intention 87:22
  214:13 229:19
  262:4
intentional
  230:14 232:17
  293:17
intentionally
  278:2,3,6
  289:17 290:6
  294:23 295:9
  295:11
intentions 90:8
inter- 100:1
interact 304:17
  304:23
interactions
  306:3
interest 82:1,19
  82:22 85:18
  87:20 88:1,6
  88:12 90:12
  91:12,14,17,23
  91:24
interested 15:21
  16:4 32:4
  34:21,24,24
  35:2,3,4,13,22
  36:1 60:13,20
  117:21 327:3
interim 23:22
Internet 18:19
interpretation
  110:15 177:23
interpreted
  284:2
interpreting
  283:17
interr- 263:18
interrogate 35:2
  129:1 130:18
interrogated
  42:18 55:18
  60:17 103:1
  116:17 131:12

139:14 255:1
  277:22 298:18
interrogating
  107:1
interrogation
  6:23,24 10:13
  15:14 16:8
  29:21 32:5
  34:8 35:8
  36:18 37:7
  38:1 40:18
  55:3 60:11,14
  60:21 61:5,14
  61:24 64:3
  70:16 72:8,15
  81:1 84:16
  86:6 88:22
  89:3 90:4
  94:14 96:13
  97:8,20,24
  98:14,15,20,24
  99:8,17 102:1
  102:7,12
  103:19 107:3
  107:23 108:1,3
  110:19 111:3
  115:20 118:16
  128:10,15
  129:2,15 130:1
  130:4,15 131:6
  131:7,23,24
  132:2 134:23
  139:22 144:13
  149:21 150:3
  189:7 208:4
  248:6 250:8,9
  256:15 261:24
  271:3 273:18
  274:13,19,23
  275:6,13,21
  276:23 280:2
  286:10 288:19
  297:13,18
interrogations
  29:17,20 35:6

36:11 59:10,12
  60:7 61:17,19
  61:19 62:6
  93:13,16,18,19
  94:6,10 96:22
  98:7,17 99:18
  100:3,8,14,24
  101:12,18
  103:6 122:15
  126:23 128:7
  131:1,3,10,19
  131:22 132:20
  135:20 136:2
  144:9 176:15
  246:5 276:5,8
  276:17 304:15
  316:4,5,6
  317:23
Interrogative
  95:2,22
interrogator
  99:7
interrogatories
  326:17
interrogators
  110:22 276:22
interrupt
  286:18
interrupted
  124:13
interruption
  180:21 315:9
intervals 218:23
  219:1,4
interview 184:6
  209:20 263:2
  276:8
interviewing
  38:4 46:8
  111:17
interviews 40:18
  276:5
introduce 4:24
  5:15
invading 114:13

invalid 188:6
invalidates
  242:14
investigate
  34:22,22
investigated
  60:7 62:2
  156:7
investigation
  72:7 135:20,23
  156:1 157:20
  175:20,21
  177:16 178:7
  179:1 288:7
investigations
  321:24 322:2
investigator
  135:23,24
invoke 250:1
invoked 12:10
invoking 13:16
involuntary
  112:20 116:11
involve 56:6
  74:3 97:24
  100:15 119:16
  132:11 167:4
  196:19 234:6
  234:16
involved 16:9
  27:20 29:17
  33:15 36:11
  38:4 71:7
  114:24 115:4
  126:17,18,19
  157:6 176:15
  220:12 245:22
  314:12
involvement
  111:23 157:12
involving 27:4
  83:20 87:11
  88:17 119:11
  119:22 122:4
  132:9 133:23

178:14 207:21
  248:20 314:4
  315:21
IQ 256:9 259:24
  260:3 261:6
  264:5,23 265:2
  265:3,8
irrelevant 135:9
Islander 40:4
isolate 58:4
isolated 98:19
isolating 241:9
iss- 322:13
issuance 174:4
issue 36:10 41:3
  110:17 151:4
  168:10 174:17
  183:4,7 186:15
  186:24 187:3
  196:11 322:14
issued 231:22
  263:13 311:19
  315:6
issues 16:4
  35:13 158:16
  191:17 192:7
  322:13
item 135:7
IV 263:5

_____
        J
_____
J 2:8
J.D 1:9 3:3 6:2
  325:8,16 326:7
  326:14,21
  327:2
jail 128:24
  139:14
Jakes 1:3 4:10
  10:3,4 15:15
  16:9 114:16,23
  115:8,19 116:6
  116:19 118:2,4
  148:4 155:4
  156:13,23

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 352

157:2,14 159:9
160:17 164:20
165:24 167:11
167:24 168:22
171:2,23
173:17 174:7
174:22 178:8
181:20 187:2
188:21 194:23
196:12 198:9
199:16 200:17
201:2,6 202:16
203:4 242:18
242:19 248:16
251:19 252:24
253:9,17,23
254:3,4,19
255:10 260:7
260:15,24
261:21 264:15
265:11,22
266:18,23
267:4,24
270:18 271:11
271:12 272:18
274:3 277:3,5
277:17,17,19
278:9,21,21,23
280:6,14,17
282:11,15
286:24 287:2
287:18,21
288:1,3,7,11
289:6,19 290:6
290:15 292:5
292:23 297:5
297:12 301:1
303:10,22,24
304:5 306:7,9
308:1 310:6,8
311:8,10 312:9
312:11,16
313:1 325:3
**Jakes's** 19:9
55:1 112:6,7

112:11 113:17
115:24 129:8
155:14 157:9
159:11 162:1
162:15 171:20
175:4 189:1,16
190:9 192:2
194:21 196:7
197:9,14,20
198:5 251:24
252:21 254:20
255:2 259:16
259:24 260:11
264:7,8 266:4
266:12 270:23
272:6 273:3,8
273:16 285:8
287:19 289:6
300:11,16
306:22 311:2
312:8,15
**Jillian** 31:15
**job** 276:14
**jogs** 79:4
**Johnson** 271:20
**Johnson's**
263:16
**journal** 61:2
321:9,16
**journalists** 49:8
**judge** 116:15
139:12 145:23
147:1,1 217:22
258:23 312:10
312:23
**judged** 116:24
**judges** 78:20
106:5 117:13
218:1,5
**judgment** 52:16
52:17 110:21
116:22 172:19
172:23 173:13
226:5 231:13
234:1,3 235:18

236:8 271:9
306:4
**judgments**
147:10 187:21
218:4 234:9
**jump** 95:19
**June** 1:16 4:14
325:11 326:6
327:8
**juries** 78:19,20
80:23 88:14
89:8 90:13
218:5
**juror** 84:2
246:22 247:2
**juror's** 149:8
**jurors** 86:4,5,10
88:21 89:2
**jury** 90:5 112:8
113:1,3,3,15
113:17 114:14
115:1 148:24
148:24 149:2
149:12 163:1
187:19 188:11
193:5,23
194:16 195:11
198:15 199:13
200:13 217:21
250:23 257:22
258:23 285:12
289:21 297:8
298:5 299:24
312:10
**justice** 24:19
35:11 50:22
81:2 104:18
132:17,18
177:21 178:21
256:21 259:17
306:1 314:17
314:22 317:16
317:17
**justify** 306:11
306:23 307:24

308:17 309:3
309:15,17,18
312:8
**juvenile** 41:7,7
42:5 45:3
54:15 55:2,10
55:10 120:6,6
244:2,9,18
248:4,5,19,23
250:5 251:4
255:3,17 256:2
256:19,22,24
256:24 257:1
257:18,24
258:17 259:18
301:4
**juveniles** 41:1
41:21 42:17
55:6,17 56:8
119:12,15,17
119:19,22,23
120:2 223:19
225:13,14
243:21 248:7
248:20,23
249:10,14
250:14,15,18
251:10,14
255:5 256:3,5
258:15,18

---

**K**

**Kassin** 151:17
**keep** 164:13
310:8 313:3
**keeping** 310:11
**Ken** 14:20 15:4
16:16
**Kenneth** 1:6
4:11 325:5
**kernel** 320:18
**key** 122:5 152:7
152:10 207:22
208:6 209:1,6
**kid** 258:12

**kids** 93:8 119:18
181:3
**Kill** 10:2 14:20
14:20 16:16
182:22 280:15
280:18 281:11
282:22 287:17
287:19 288:5,6
303:2
**Kill's** 15:5
**killed** 230:13
238:15
**killing** 52:5
232:16
**kin** 327:4
**kind** 18:20
20:13 43:2,9
49:7 57:7,14
82:17,20 85:16
92:20 109:15
110:20 124:13
134:7 150:8
159:3 164:14
169:5 177:2
179:10 194:19
203:18 207:9
209:19 215:5
217:6 229:17
237:1 243:3
267:2 272:14
284:24 292:5
298:23 314:6
319:2
**kinds** 48:12 78:5
103:15 104:13
219:5 304:4
**Kings** 303:8
**knew** 171:10
273:24 274:3,6
304:1 309:15
**know** 7:14 8:16
11:8 12:16,20
13:11 14:15
15:18,20,22
20:8,12 21:4

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 353

22:9 23:4 28:8
28:9,17,23
29:6 40:5
41:10 42:9,11
42:15 43:14
44:10,11 45:15
45:22,23 48:12
49:18 50:20
51:8 54:17
56:10 57:1
58:11 60:4,10
63:8,9,18 64:8
65:22 67:16
70:1,13 71:4
74:9 77:23
79:10,23 82:10
83:14,15 86:4
86:5,20 87:13
87:13,15,24
90:7 91:6 92:3
93:7,11,11
96:18 99:4
100:12,13
105:3,24
106:19 108:16
110:2 112:1
113:15,18
120:21 121:2,4
121:15,18
123:12 124:23
125:2,4,7,10
125:18 129:20
130:3 132:10
132:21,24
133:4,7 134:1
134:4,5,18
135:5 137:8
139:6 141:2,4
141:7 142:4
145:12,16,17
147:3,10 148:1
149:2,5,7,13
149:20,22
150:14 151:1,8
157:3,9 158:11

158:14,17
159:6,7,9
164:4,5,13
165:12 167:9
167:15 168:13
169:15 170:8
171:19,23
172:2,3,12,14
172:16,24
173:2,11 175:8
175:23 176:3,5
176:16,21
177:9,11,18
178:20,22
183:16,19
184:12,22
189:8,17
193:11,14
196:23 199:16
199:20,22
200:16 201:1
202:18 203:4
204:18 206:18
211:4,17
212:12,24
216:24 221:2
221:21,23
222:1,1 223:10
224:9 225:13
226:12 227:3
227:16 229:5
229:11 230:20
230:24 232:2
234:5 235:6,21
236:9,21 237:8
238:2,3 239:4
239:4 241:24
245:4,15,21
247:2,15
248:18,20
249:5 250:1,10
252:15,19
253:3,5,12,14
253:21 254:1
255:7,13

257:13 261:4
262:2 263:11
263:24 264:7,9
266:4,7,16,24
267:4 268:8,15
269:19 271:4,4
271:5 273:19
274:2,8,17,24
276:3,4,7,15
278:15 279:14
281:13 284:21
287:2 289:13
289:14 290:2
290:10,16
294:5,7 295:17
298:18 299:18
301:2 304:20
306:3 307:1,13
307:16 310:6
310:16 311:7,9
313:17 314:19
315:2 316:3,18
317:4,6,14
318:6,8,17
319:13,22
320:16 321:1
322:2 323:11
knowing 193:17
253:15 318:12
knowledge
44:24 84:13
91:19,23
132:18 144:1,6
146:1,10,22,23
147:16,17,20
147:21 149:8
169:22,23
204:9 212:10
212:11 213:22
239:1 240:5
254:6 288:22
288:23 303:20
304:22 318:1
known 51:14
55:7 211:20

212:3,21 213:9
246:14 277:1
278:20 315:15
316:12,15,20
knows 132:10
279:11 320:1
Kowalski 139:9
139:12,16

— L —

L-E-O 6:12
L-I-U 86:7
lab- 122:1
laboratory 46:7
121:20 122:3,7
122:20 124:7
128:2 209:4
238:23
lack 147:16,21
155:12 156:17
175:13 256:7
267:15 274:12
277:7 279:1
288:22
lacks 105:4,4
277:23 304:7,8
312:12
laid 218:18
language 55:13
86:1 110:6,12
111:10 119:4
145:3 150:8
151:11,12
205:23 206:10
261:10 262:8
262:15
large 221:5
277:2 316:5
largely 36:2
125:14,23
126:5,8,9
larger 320:15
LaSalle 4:4
lasted 18:16
late 267:5,18

268:2,8,9
269:24 310:20
late-night
266:15
Latin 303:8
Laura 78:16
79:3 94:1,6
law 22:10,15
30:19 43:19
44:2 61:2 71:5
71:19 72:9,13
72:20 79:9,21
92:20 95:14,18
102:4,7 115:12
116:9 170:15
204:23,24
228:6 276:6,7
318:23 321:10
lawful 307:2,4
Lawrence
151:17
lawsuit 67:4
lawyer 79:17
80:17
lawyers 49:10
78:20 79:22
80:3,9,12
106:4 305:7
lay 193:21
218:17
layperson 146:1
lead 35:5 42:5
84:17 89:3
110:22 121:22
126:1 146:6
153:21 154:16
171:7 240:16
246:5 322:3
leading 36:11
57:11 61:19
78:11 81:5
84:24 240:24
246:24 247:1,6
leads 120:22
121:12 124:24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 354

125:3,5,8
152:20 204:13
233:9
**leaked** 286:20
**leaking** 285:20
**learn** 51:18
241:6,13 245:5
316:7
**learned** 273:9
273:19 274:20
280:4
**learning** 26:13
**leave** 163:8
166:5,16,23
167:17,20
309:24 311:8
311:11,13
323:22
**leaving** 197:6
278:6,14
**lecture** 176:24
**led** 121:10
125:24 139:16
242:19 243:20
**left** 8:2 64:3
123:20 157:4
158:15,18
159:7,10,18
163:7 168:1,12
168:19,19
211:6 313:15
**legal** 26:11
71:10 84:14
111:20 112:18
172:8,19
176:10,11
318:22
**legally** 104:15
112:20 114:21
116:3 138:24
**length** 32:8
61:13,24 64:3
128:7,10
129:14 130:1,4
130:15 131:6,6

**lenient** 103:12
**Leo** 1:9 3:3,8 4:9
4:17 6:2 28:9
28:10 74:15,22
87:2 98:5
123:12 125:21
325:8,16 326:7
326:14,21
327:1
**lesser** 43:24
215:2
**let's** 9:20 15:2
20:21 58:20
65:11 66:9,13
66:13 78:3
97:5 103:9,9,9
104:20 115:18
121:9 143:18
153:21 162:13
165:4 170:20
182:4,4 186:24
189:12 205:11
222:24 223:9
251:2 257:4
264:14 265:21
270:4 274:2
276:24 282:21
286:12 289:3
292:1 293:19
303:7 306:7
307:18 308:24
313:12
**letter** 322:22
**letters** 321:13
**letting** 164:5
323:16
**level** 83:24
88:21 116:15
130:21 159:3
164:21 166:1
169:22 176:22
183:15 207:5
234:2 247:22
261:21 262:11
**Lexis** 227:19

**liberty** 31:11
**librarians** 95:18
**licensed** 71:5
80:19 136:9,13
**licenses** 136:11
**lies** 97:6
**life** 42:13 56:16
101:7 209:17
241:18 249:4,6
250:5,11
251:11,14,20
254:6 256:7
257:11 258:16
259:16 268:16
**lifestyle** 266:14
269:9,13,13
**light** 21:24
245:2 271:22
291:2 321:23
**lightly** 172:14
172:21 178:14
**likelihood**
110:13 167:15
182:9,12 206:5
242:23 290:22
**limitation** 53:19
53:20,23 142:3
211:21
**limitations** 39:2
54:5 122:20
124:11,12,21
142:2 143:9,9
176:20
**limited** 124:6,15
124:20 131:6
140:2,5 141:24
142:5 230:3
238:19 321:20
321:22
**line** 15:20
137:13 207:17
243:1 282:22
**lines** 74:23,24
272:6,11,14
**link** 162:22

**linking** 167:7
168:5
**links** 95:9 157:5
**liquor** 154:7
203:19
**list** 18:23 20:12
27:1 32:15,16
32:23 36:16,17
100:1 153:3
198:21 215:1
224:22 225:24
227:4,8,13
228:16,17
**listed** 45:2 61:3
98:14 205:7
**Listen** 164:4
**lists** 48:22 320:9
**literature** 41:24
137:7 151:9
178:11 211:15
222:11 305:19
315:18
**litigate** 80:13
**litigated** 80:16
80:20
**litigating** 175:1
**litigation** 79:11
79:13
**litigators** 79:22
**little** 12:1,3
33:11 46:20
64:5 72:24
78:4 79:4
95:12 99:5,6
102:17 108:16
110:10 151:11
151:18 182:5
220:3 222:12
243:2 267:20
272:21 309:13
313:20 319:13
323:21
**Liu** 86:7
**live** 294:10
**lived** 148:14

198:17 199:6,7
199:9,13
200:17 201:2,6
202:16 203:8
203:11
**lives** 137:15
148:18 303:11
**living** 82:8 199:4
**LLC** 2:7
**local** 59:1 116:9
95:20 155:17
155:19
**location** 4:16 5:1
32:5 159:1
**LOEVY** 2:2,2
**logic** 291:2
**logically** 232:14
**long** 16:21 17:21
18:15,23 20:13
62:22 65:17
79:24 116:14
118:13,18
129:23 145:7,9
145:18 151:9
151:10 179:15
265:7 275:10
**long-standing**
292:14,18
**longer** 32:17,23
61:20 62:20
95:1 123:9
226:7 248:10
297:18,19
301:13 310:12
318:8
**look** 8:16,17
17:23 19:3
20:17 32:9
40:1 41:11
44:6 47:15
55:4 61:18
79:4 85:24
94:11 98:16
110:11 128:3

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 355

130:4 141:2
142:7 147:5
151:15 157:16
173:12 185:17
195:12 204:4
212:14 226:10
230:21 231:11
231:23 232:3
242:4 249:11
258:15 261:17
262:21 287:13
289:3 303:7
**looked** 35:18
36:4,17 64:17
64:20 86:12
119:10,11
127:9 133:19
156:9 168:14
217:10 239:19
239:21 264:4
**looking** 15:24
24:5 27:4,7,18
29:12 32:2
34:16 35:22
39:6,12 45:16
46:8 47:10
53:13,14 69:3
86:24 96:2,3
125:14 126:3
126:10,11
131:9 137:10
183:19 214:13
241:9 244:22
268:5 282:14
282:20 286:16
286:22 315:1
**lookout** 157:10
157:12 159:11
162:16 163:8
166:16 167:7
167:20 168:1,8
168:10,12,15
168:18 287:21
**lookouts** 166:5
166:21,23

167:5,6,17
**looks** 6:8 13:23
24:5,7 87:15
95:11 96:4,6
142:15 153:17
153:19 203:13
203:16,19
284:10
**loses** 279:11
288:24
**lost** 310:24
**lot** 11:24 23:24
26:22 30:19
31:14 44:11
48:21 53:7
54:1 74:3,4
80:7 105:19
114:9 117:20
119:1 126:14
132:17 134:21
137:8 138:18
160:23 187:20
211:21 219:17
227:19,20,24
228:8,10,13
231:24 239:7
241:7 245:7
247:7 248:20
252:9 254:10
268:2 272:23
273:10 274:6
275:7,9 277:15
298:17,21
304:14,16,17
305:19 317:17
320:6 322:6
**lots** 42:16,17
97:21 146:7
320:13,13
**loud** 282:5
**love** 91:3
**low** 93:12 256:9
261:6,20
262:11 265:8
**low-base** 239:6

**low-end** 104:12
**lower** 104:16,17
139:4 264:5
265:2
**Lujan** 301:4
**lunch** 179:13
**lung** 42:14,16
55:16 56:15,23
**lying** 110:5
111:8 187:12
297:5

---

## M

**ma-** 73:18
**main** 108:9
134:15 153:4,4
153:4,16
**mainstream**
102:12
**maintain** 97:20
**maintaining**
265:6,20
**majority** 70:2
217:11
**making** 31:4
44:8 53:13
66:18 87:16
88:4 114:14
117:24 167:16
192:19 206:22
209:2 258:1
261:22 294:7
306:4
**man-** 291:12
**mannerisms**
111:6,11
**manual** 101:17
101:21,23
102:2,11,15,19
102:24 103:9
104:23 106:3
106:11 107:8
107:15 108:5
130:18 134:11
134:16 135:2

288:18 289:19
291:7,13
292:12
**manuals** 145:14
145:16 150:12
150:13 290:23
**manuscript**
24:21,24,24
25:2
**margin** 206:15
206:17,20
211:5 262:13
**mark** 20:8 92:3
**marked** 74:18
**match** 146:5
147:7 155:6
169:13,14,18
287:19
**matched** 273:23
**matches** 144:17
**material** 8:8
43:9 44:4
205:4 227:24
**materials** 7:17
7:20,22,24 8:4
8:6 10:24
14:13 18:24
20:4 21:22,22
40:13,19 42:20
46:3 52:8,11
52:13,14 59:24
60:5 92:10
101:6 158:1
179:3 199:12
204:6 226:2,22
227:14,18,20
227:22 228:2,5
228:6,8,10,11
228:12,18
231:14,15
252:9,10,12,13
262:23 263:13
263:19,22
281:22 285:5
292:20,21

298:6 316:9
323:14
**Matt** 2:13 4:2
**matter** 4:10 15:4
96:19 100:12
111:20 129:23
132:5 133:13
141:19 150:19
164:20 166:1
290:13
**matters** 130:8
130:12
**maximization**
102:22 116:13
125:3 247:24
**mean** 12:3 15:2
28:11 35:15
39:18 42:8,14
44:22,22 45:23
48:11,12 49:19
62:10 64:11,13
64:17 67:16
71:10 74:2
78:3,6 81:14
82:11 83:9
86:17 87:24
88:19 93:22
94:16 95:9
100:11 121:11
121:17 122:19
124:5 131:8
133:18 137:18
142:19 144:20
150:16 158:14
158:23 159:6,7
165:8 167:9
174:17 175:18
177:2 182:18
182:21 183:13
195:12,22
202:3 206:8
209:11 213:13
213:19 215:3
224:6,24 229:4
229:13,24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 356

232:14 236:5
236:23 238:5
239:21 242:10
243:5,11
254:24 255:23
256:23 257:9
257:13 262:12
268:7 271:11
271:12,19
282:5 289:12
289:13 294:4
294:18 298:24
301:10 307:8
308:8,23,23
317:4 318:6
319:10
**meaning** 206:7
**meaningful**
214:7 258:16
**means** 11:4 17:7
38:8 121:23
174:13 175:18
180:11 213:15
**meant** 63:8
87:15 106:21
113:15 161:14
260:22 317:1
**media** 19:8
26:11,15 40:17
51:23 52:1,4,6
52:10,14,16,22
279:9
**medical** 171:7
204:12
**medicine** 136:5
136:6
**meet** 17:4 34:13
64:18 216:13
**meeting** 17:7
18:3,4
**meetings** 17:10
**meets** 84:11
214:4 225:3
**members**
304:18,23

**membership**
303:19
**memory** 15:1
16:3 79:4
152:18 190:3
190:11 232:3
**mental** 260:17
260:19,22
261:20 262:9
262:16 264:2
**mentally** 260:16
260:24 262:3
264:15
**mention** 21:23
107:7 187:24
201:10 225:14
263:17
**mentioned**
31:24 32:16
40:13 47:14
80:18 130:17
155:7 167:21
191:21 215:9
226:6 230:19
236:1 241:10
243:4,18
274:23 284:21
317:15
**mentioning**
167:21 302:14
**merely** 7:7
167:16
**merits** 50:2
**message** 137:22
**met** 26:20,24
30:13,22 32:7
216:2 221:7
231:15 235:19
236:4
**meth** 151:2
**method** 45:6,14
45:17 46:14,20
47:3,4 48:6,7
48:10,12 58:14
101:23 102:10

102:14 105:3,9
110:4 134:10
134:23 144:24
289:15 292:19
**methodological**
45:10
**methodologies**
40:9 46:17,23
48:13 58:7
124:11,12
**methodology**
45:14 46:16
51:12,13,17
124:6 134:17
134:20,24
151:2
**methods** 102:14
105:6,10 111:3
177:4 222:13
**Michael** 14:20
15:5 16:16
**Michigan** 139:2
139:3
**Michigan's**
139:20
**midday** 123:10
**middle** 6:11
96:12 123:21
217:6 264:24
**Midwest** 268:9
**millions** 316:17
316:18,23,24
317:5
**Milwaukee**
199:7
**mind** 8:15 45:7
108:20 109:3
110:24 186:17
251:19 312:9
**minimization**
102:19 103:10
103:11,14,15
103:16,17,23
103:23 104:5,9
116:13 121:19

124:24 244:18
246:9 247:24
**minimizations**
104:14
**minimize** 81:4
104:14
**minimizing**
78:11
**minister** 178:21
**Minnesota**
276:20
**minor** 24:1
253:12 294:13
**minority** 138:24
**minute** 115:9
307:18
**minutes** 14:15
61:17 62:18
131:1,1 166:12
313:15 320:24
**Miranda** 61:6
249:24 250:13
253:20 255:22
316:2
**mis-** 154:22
**mischaracteri...**
36:13
**mischaracteri...**
173:19
**misclassificati...**
109:4,7,20
110:16 111:2
**misclassify**
110:17
**misheard** 317:2
**misidentified**
109:16
**misimpression**
84:9
**misleading**
124:14 143:10
143:11,17
185:15
**mismatch**
154:20,22

156:13
**misnomer** 46:20
**misremember...**
172:16
**misrepresenting**
103:7
**misrepresents**
99:7
**missing** 146:6
153:19 171:8
204:13 226:4
278:1
**misspelling**
294:6,10
**misspellings**
293:5
**mistake** 224:12
290:14 295:8
295:10,12
**mistakes** 224:13
224:16,20
225:23
**mitigated** 249:3
249:6 259:4
**modification**
150:2
**modify** 21:24
262:18
**moment** 14:16
25:17 172:7
250:2 274:3
**money** 72:24
74:11 272:23
**month** 18:5,5
**months** 23:24
24:4,13
**monty** 105:24
**morality** 104:13
**Moran** 2:7 3:4
5:3,5,5,13 6:7
28:11 29:4,6,7
31:2,3 43:13
53:10 62:14,16
62:22 63:7
64:19 65:1

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 357

74:20 77:18
82:6,12 86:20
86:22 87:2,5
91:3,8 94:24
95:6,7 122:22
123:1,6,8,13
123:18,22
124:1 135:13
141:1 162:5
164:1,3,11,15
165:4 173:21
173:23 174:9
174:12,17,21
174:24 175:3
179:14,22
180:1,4 181:1
184:20 195:21
254:15 258:9
258:10 259:12
259:14,15
269:1,5,8
270:3,6,11,14
270:15 278:3,5
278:11,15,17
281:7,9,16
296:10,13
299:8,11,13
304:10 307:22
308:6,10
310:15,21
311:4,5,23
312:2 313:13
313:17,18
320:1,3,4
321:2,3 323:15
323:20
**morning** 129:1
129:22 266:2
267:13,23
269:15,18
**mother** 199:6
**motion** 16:17
28:19 29:2
252:21 253:18
280:18

**motions** 189:18
**motivated** 176:4
**motivations**
176:6
**move** 28:21 31:2
211:8 302:16
**moved** 199:7
304:5
**Movement**
24:19
**moves** 226:15
285:1
**moving** 164:13
**multimethod**
241:10
**multiple** 63:19
106:18 196:19
220:24 280:24
**municipality**
67:5 68:6
69:12
**murder** 125:14
126:6,8 130:2
130:3,20,21
131:7,9 154:9
157:5 178:15
194:24 230:14
232:18 238:5,7
238:11 253:24
266:18 276:8
276:17 310:1
**murdered**
277:15

---

**N**

**N** 3:1
**naive** 249:11
250:8 254:10
**name** 4:1,16,17
5:1 6:10,11,12
31:15,18,19
81:14 94:1,22
95:1,3,4
154:11 155:24
156:15,18

219:11 220:2
225:14 290:3
294:9 322:23
**named** 151:18
152:20 154:1
**names** 45:1
**narrow** 54:8
206:14
**national** 50:22
102:3 107:23
107:24 120:14
121:1 126:16
212:19 228:3
229:5 230:20
230:22 314:17
314:21 315:19
318:23 319:12
**Native** 40:4
**naturally** 38:3
**nature** 51:11
57:15 99:10
229:22 304:20
**near** 27:13,16
**nearby** 58:22
**necessarily**
39:12 42:5,13
49:3 53:24
103:8 121:11
127:23 131:8
131:19 166:6
175:16 179:6
180:10,12,17
180:19 181:7,9
182:18,21
194:20 198:19
213:19 228:15
229:24 242:8
250:7 255:23
294:18 299:1
307:17
**necessary** 168:2
168:7 211:14
221:7 294:17
**necessity** 280:9
**need** 8:15 20:1

26:5 62:13,13
63:9 78:18
80:22 83:11,11
83:13 88:13,15
101:14 105:23
113:5 122:22
123:1,9 127:14
147:3 166:11
178:1 181:3
189:24 195:13
206:14 211:5
241:5 269:19
270:7 271:4,4
272:16,16
275:5 284:5
315:2
**needed** 19:21
84:8,10 308:17
**needle** 194:11
**negative** 265:4
290:4,11
**negotiation**
177:20
**neighborhood**
316:12
**Network** 95:17
96:6 205:9
**neuropsychol...**
260:6
**never** 68:8 80:20
137:18 138:4,4
181:23 192:1
216:23 231:19
317:21
**nevertheless**
140:5 243:10
**new** 21:22,24
146:6 171:8
186:10,16
204:13 245:2
253:13 284:22
**newspapers**
181:21
**Nicole** 140:11
230:6 231:17

232:14,18
234:11 235:6
**night** 128:23
129:4 266:8,18
266:20 267:5
267:11,18,19
268:8,9,21
269:18
**nights** 268:3
**nine** 24:12
**Nirider** 78:16
79:3,3 94:1,1,2
94:3,4,6 95:23
**Nirider's** 95:4
**non** 130:6
285:21 305:6
**non-public**
204:10
**non-true** 215:20
**noncoerced**
279:21
**noncontrover...**
106:2
**noncriminal**
305:7
**nondisclosure**
51:10
**nonissue** 302:14
**nonpolice** 305:7
**nonpublic** 171:8
274:15 285:21
286:2,20
287:14
**nonresponsive**
164:12
**noon** 129:11
166:13
**norm** 66:10
130:18,24
236:21
**Normally**
173:24
**north** 2:3 4:4
176:16 327:14
**Northern** 1:1

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 358

4:12 325:1
**Northwestern**
30:18 78:16
**NOTARY**
325:21
**note** 182:5
197:24 260:10
**notes** 226:22
227:1,1
**notice** 1:11
190:6
**nuance** 137:21
146:23,23
**number** 11:15
15:20,21 16:23
32:3 66:13
73:8,9,9,11,13
73:17,20 88:17
99:22 101:11
204:19 221:24
221:24 222:1
246:11,16
305:24 315:15
315:16 316:3,4
316:5,16,19,20
316:23 320:15
**numbered**
284:19
**numbers** 11:9
15:12 23:20
41:22
**numerical** 221:5
**nutshell** 109:15

––––––––––
**O**
––––––––––
**O'Brien** 321:8
322:14
**o'clock** 128:23
179:11 266:19
267:11 268:9
268:11,22
**O-F-S-H-E**
140:1
**Oakland** 29:11
29:18 58:21

59:5,7 226:7
304:14
**object** 12:14
13:2 25:19
34:17 43:11
50:17 53:9
64:16 71:2
82:4,9 83:1,5
85:4 89:20
113:24 140:24
143:1 158:20
159:12,12
162:3,3 167:13
172:15 173:4
173:15 174:4,7
174:12 175:7
175:17 176:3
184:17 201:22
237:16 254:12
254:14 259:11
265:15 267:9
269:10 277:6,7
277:24 278:24
279:1 280:20
281:5,14
286:15 296:9
296:18 304:8
305:14 310:23
311:2,21,21
319:19,21
**objecting**
175:14
**objection** 13:9
113:10,12
135:11 152:3
173:5,6,19
175:11 195:17
237:15 239:13
257:7 258:6
268:23 277:23
279:6 282:5
304:7 308:2,2
310:13 312:12
313:6
**objections**

143:14 281:8
**objective** 192:10
192:12,13,15
192:16,17,17
232:19
**objectively**
235:18 236:9
**observation**
198:23
**observe** 59:11
**observed** 29:20
59:8,9
**observer** 136:2
**observing** 5:12
38:3
**obtain** 26:9
**obtained** 168:22
215:11 275:20
**obvious** 131:12
**obviously** 7:13
8:19 13:18,22
16:20 18:23
31:8 41:3
49:20 60:1
71:18 72:18
73:1 82:7
87:15 102:6
105:1 106:11
113:18 117:24
128:2 142:7
147:1,17
152:13 156:4
158:10 165:21
169:2 173:10
177:15 180:16
187:20 208:7
213:14 216:19
218:1,3 222:15
223:23 227:3
231:22 234:10
238:11 252:9
260:20 271:1
275:8 284:20
292:19 301:15
307:1 316:5

**occasion** 138:23
**occasions** 69:18
**occur** 16:8 39:10
121:6 214:12
215:13 237:20
239:6 301:17
301:18 302:5
302:13 306:5
317:23
**occurred** 10:14
16:7 112:14,17
114:7 146:14
184:3 232:12
232:13,16
253:13 286:11
298:24 299:1
300:3 301:16
302:4,10,21
317:24 318:1
318:12
**occurrence**
216:20
**occurring** 38:3
236:10
**occurs** 41:20
99:13 124:8
233:6 237:14
239:5,6 267:15
**offenses** 169:3
**offer** 140:2
298:3
**offered** 208:23
208:24
**offering** 6:21,22
7:10 112:6,10
112:12,18
140:14,22
284:14,18
**offers** 25:10
87:9,9 88:15
90:1
**office** 5:7 43:6
**officer** 5:6 68:5
69:12 70:10
106:16,23,23

116:7 251:8
296:5 303:2
304:2,3
**officer's** 115:15
**officers** 67:5
70:23 71:14
106:15 145:8
145:10 275:12
275:23 307:12
**officers'** 302:3
**official** 170:14
327:6
**Ofshe** 139:24
145:3 150:9
151:10,22,24
207:24 208:8
208:23 209:8
225:7
**oftentimes**
65:10 117:15
146:8 163:6
178:12 233:11
252:12
**Oh** 59:4 82:4
123:13 135:15
162:13 268:11
282:13 296:12
317:3
**Ohio** 321:9
**okay** 7:9,13,20
8:6,11,19 9:1,7
9:12,20 10:4
10:15,24 13:5
14:10,10 15:2
15:18 17:4,10
18:1,15,18
20:14,15 21:3
21:8,11,18
24:2,5,21
25:13,16 26:3
29:24 30:24
31:8,11,24
32:19,24 33:4
35:15 36:22
39:18 40:24

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 359

42:8 43:9
47:19 48:5
49:2 50:12
54:24 56:13
59:4,13,14
62:20 63:1,8
63:13 64:2
65:6,24 66:7
67:15,24 68:3
68:7,11,18
69:3,7,10,19
70:3,21 71:24
72:17 73:8
74:12,18,21
77:19 78:17
79:12,13,16
80:16,21 83:18
84:7,18 86:23
87:7,19 89:1
89:16 91:14
92:1,5,6,19
94:4 95:8,19
96:1,9,21 97:2
97:4,14 98:4
99:2,14 101:8
101:13 103:17
105:11,13
106:10,14,21
107:6,21
108:19 109:15
109:20 110:1
111:9,12 112:4
112:10,24
114:16 115:12
115:18 116:5
117:8,12,16,24
118:4 122:12
123:4,6,7
124:18 125:20
126:10,20
127:4,17 129:8
129:14 130:11
130:13 131:5
133:5 134:6
135:1,4,22

136:15,19
141:12 142:18
143:18 150:20
152:6 153:10
153:11 154:5,7
154:13,14
155:3,8,16,20
156:16,24
157:19,22
159:19,24
161:16,21
163:13,21,23
164:7 165:1,7
165:13,20
168:20 170:13
171:1,14,19
172:20 173:14
174:21 178:6
178:17 179:4
179:16,19
180:1,10 181:8
181:13 182:4
182:18 183:1
185:2,5 186:11
186:20,24
187:6,15 188:8
189:15 190:21
191:5,6,16,19
192:2,19 194:1
194:3,8 195:6
196:11,15,23
197:11,17
198:4,9,19,20
199:3 200:10
200:16 202:6
203:1,10,22
204:7 206:19
208:21 209:13
210:1 213:8
214:19 215:21
216:4,8,12,17
217:3,19 220:1
223:4 226:14
226:20 227:12
229:15 234:4

235:9,12
236:19 240:23
248:16 249:16
249:21 251:7
251:10,19
252:6,20,24
253:5,17 254:4
257:4 260:15
260:23 261:17
262:20 263:4
263:24 264:13
266:1,4 267:2
273:3,5 275:4
276:2,15
279:23 280:13
281:23 282:8,9
282:14,18
283:6 284:4,7
284:9,17 285:7
285:14,17,24
286:7,12,22
287:2,6,11
288:4,10,16
290:8,13 292:1
292:23 293:1,9
295:11 297:2
298:22 299:16
300:8 303:7,15
306:7,14,15,18
307:1,9 310:3
310:6,18
311:12,16
312:7 313:12
314:6,8 316:11
321:6,11,15,17
321:20 322:11
323:2,4,22
**old** 85:24 268:17
300:17
**older** 56:1 301:8
**once** 18:9 35:3
38:13 182:10
208:18 267:15
309:14
**one-off** 51:9

**one-sided**
173:16 175:15
175:18
**one-size-fits-all**
247:10
**ones** 16:5 26:23
30:21 49:21
50:8 122:4
153:16 208:7
**Oops** 282:13
**open** 8:20,21,22
8:24 51:2
**open-ended**
272:10
**opening** 9:3
**operator** 4:3
**opine** 12:21
13:14 190:2
193:9 196:5
218:2
**opinion** 104:19
112:6,11,12,19
139:19 142:23
148:3,4 155:10
155:11 175:12
177:13,14
185:1 236:17
264:17,20,21
301:7
**opinions** 6:21,22
7:10 14:4
18:19 19:6,17
20:5 21:9,13
21:19,21,24
63:11 70:23
71:12 112:5
114:10 121:7
127:2 138:20
138:24 139:4
140:16,19
142:21 143:13
187:21 193:15
193:16 235:7,9
252:18 272:3
275:9 283:7

**one-sided**
**one-size-fits-all**
284:12,14,17
284:20,23
285:3,6,7
**opportunity**
157:24
**opposed** 33:23
40:5,7 48:9
109:18 130:5
141:24 160:2
214:14 219:20
235:8 236:4
266:15 308:4
**opposing** 233:2
**opposite** 70:9
217:23 234:16
**oral** 326:17
**oranges** 131:18
**order** 8:7 28:20
109:12 160:4
166:16,18
206:14 211:12
218:11 237:9
239:19 269:20
288:22 289:19
295:15 297:14
298:14 305:18
**ordinarily**
188:14
**organization**
120:15
**origin** 274:17
**original** 219:22
228:8
**originate** 277:5
277:19
**other's** 219:21
**outcome** 35:24
60:10 91:17
206:4 211:4
222:19 224:1
237:4
**outcomes** 60:13
265:5
**outside** 19:4
74:6 84:13

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 360

144:8,12 149:8
256:5 267:12
276:19
**overall** 223:13
305:12 316:17
316:19,23
317:12
**overbear** 116:16
116:24 118:14
118:18
**overlap** 36:19
65:10
**overlooking**
212:24 226:4
**oversight** 226:1
**oversimplifica...**
222:12
**oversimplifies**
50:19
**overturned**
217:17
**overview** 284:10
**overwhelmingly**
34:12
**ownership**
218:12

**P**

**p.m** 123:15
165:1 166:13
179:19,24
270:9,12 324:1
324:3
**pace** 164:14
**Pacer** 227:18
**Pacific** 40:4
**packet** 309:13
**page** 3:2,8 11:9
15:20 20:23
23:20 46:13
74:24 75:1
95:10 96:9
97:5 142:16
153:2 154:5
179:5 180:7

261:18,18
265:1 282:21
282:22 284:10
286:22 287:4,9
291:5 303:9
306:8
**pages** 8:1 9:23
21:2 95:21
**paint** 237:9
**pandrews@rf...**
2:11
**paper** 219:17
227:1 321:9
322:14
**papers** 208:18
220:5 291:8
**paradigm** 122:7
122:10 124:9
124:10 207:21
208:6 209:1,3
209:5,6,8
**paradigms**
122:21 241:21
**paragraph** 87:9
88:20 89:6,6
96:13 97:4
99:20 265:1
285:19 287:17
**paragraphs**
284:19
**paraphrasing**
108:16
**parent** 251:8
**part** 10:16,21,22
11:11,11 16:13
29:17,18 37:15
44:7 46:12
47:17 50:15
56:5 65:8 79:8
82:7 84:7
96:18 97:11
99:14 105:21
107:2 108:11
116:23 118:24
119:10 120:4

125:16 138:21
141:17,19,24
152:7 155:23
156:2 168:23
168:24 169:24
170:5,10 183:7
185:18 187:8,9
187:13,13,14
187:24 191:4
199:17 203:19
215:11 219:15
220:8 229:23
273:16 276:22
278:12 304:12
305:18 314:17
322:6
**partially** 236:18
**participants**
4:23
**participated**
135:22
**participation**
136:1 164:22
166:1
**particular** 6:20
35:24 37:9
38:6,11 54:19
57:24 78:2,14
79:5 82:19
85:15 111:16
127:11,21
130:7 144:17
146:24 168:9
177:17 178:23
207:10 211:12
216:1 223:12
242:16 245:16
245:17,22
247:5 248:14
253:2 256:10
257:2 271:19
272:9 278:23
**particularly**
34:7 117:21
162:21 208:5

304:13 305:1
**parties** 327:5
**parts** 10:8,10
11:3,5,7,10
237:5 246:14
263:15 305:6
**pass** 305:18
**passenger**
154:10
**Pat** 5:3,5 28:8
74:19 94:23
163:24 164:2,9
258:6 278:2
299:4
**patient** 164:4
323:16
**PATRICK** 2:7
**pattern** 163:10
166:7 167:1
168:3 178:15
187:10,15
188:3,9 192:3
**patterns** 32:2
33:2,18 34:3
34:15 35:5,15
35:16,18 36:17
38:18 39:7,8
39:10 46:9
47:11,16 48:24
53:15 166:15
168:4 241:9
**pause** 28:6
180:20
**pausing** 113:11
**paying** 172:10
**peaked** 65:22
**peer** 43:20,21,24
44:6,11,14
50:7 215:2
**peer-review**
44:1,7
**peer-reviewed**
43:16 51:13
82:17 87:16
**peers** 49:20

50:14
**people** 38:4
41:16 42:16
46:8 56:1,22
62:20 84:5
104:24 110:4,9
110:11 124:16
131:12 137:15
150:11 159:21
160:23 163:6
170:18 205:23
215:1 217:15
218:9 224:10
227:22 255:12
261:5,11
282:15 316:9
**people's** 163:7
**perceive** 129:19
**perceived** 88:23
303:13
**percent** 23:23
40:2,3,3,4
69:20 70:1
93:2,3,6 94:14
97:23 100:8,15
100:19 109:21
110:9 120:18
120:19 121:9
121:12,23,24
125:22 126:6
131:2 137:17
192:1 196:20
206:6,17 207:5
207:6 221:23
221:24,24
223:20 238:6
246:3,4,5,6,7,7
246:8,16,16,17
246:23 247:1,7
247:8
**percentage** 66:1
66:18 67:7
68:3 69:10
92:22,24 99:18
100:3,8 120:16

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 361

120:17 121:14
121:15,23
132:8,11 152:5
234:4 245:22
246:12
**percentages**
93:5 245:20
**perfect** 53:21
124:15,20
205:10
**perform** 64:14
**performed**
221:13 319:7
**performing**
221:17
**period** 118:5
128:13 129:23
276:4 321:1
**perjured** 139:15
**perjury** 139:16
**permis-** 115:21
**permissible**
59:19 111:14
111:19 116:3,6
116:9,12,18
117:1,2 118:13
288:10,13,15
**permitted**
115:21 118:6
118:17 140:5
140:17 142:2
142:15
**perpetrator**
171:9 215:18
215:20 217:9
223:6,11
233:10 279:10
**person** 17:8 52:5
79:17 89:18
110:14 111:1,7
112:3 120:23
128:19 129:2,5
129:6,7 152:20
154:1 155:4,7
156:13,15

159:22 223:3
233:4,5,9
237:7 238:13
238:15,15
248:9,10
266:15 272:22
273:10 278:13
279:11 320:8
**person's** 249:4
294:9
**personal** 41:15
54:22
**personalities**
250:20
**personality**
248:10 260:11
**personally**
57:20 64:7
89:17
**perspective** 42:3
49:19 115:15
274:9 311:6
**persuasively** 7:3
**pertaining** 1:13
**pertains** 14:4
**petition** 171:20
175:5 177:11
**Ph.D** 1:9 3:3 6:2
325:8,16 326:7
326:14,21
327:2
**phase** 164:12
**PhD** 240:5
305:19
**PhDs** 240:8
**phenomena**
38:4,5,6 84:12
240:6,14
**phenomenon**
237:24 241:8
**Philip** 2:8 5:11
151:17
**phone** 2:4,10 9:8
18:10 327:15
**phones** 9:7

**photographic**
190:3,11
**photos** 301:13
301:13
**phrase** 95:19,20
105:11 106:17
108:24 131:13
180:10 236:2
237:21 260:21
261:4
**phrased** 39:3,11
141:5 239:3
**physical** 35:11
115:7,15,24
118:1 147:6
156:21,24
157:4,13 158:4
159:10 164:18
165:22 168:5
168:11 171:6
181:21 199:15
204:12 217:1
271:13 296:1
300:17 301:16
302:2
**physically**
112:23 113:19
113:20 115:13
155:6 215:14
236:8 261:23
298:16 299:23
301:23
**physiology** 56:1
**picture** 229:3
237:10
**pictures** 286:23
287:2
**piece** 13:22
89:11 160:5
197:20 278:1
**pieces** 161:24
**pierced** 314:23
**pinpoint** 274:13
**pioneered** 151:5
151:8

**pitch** 110:7
**pitched** 159:3
176:22
**place** 152:21
160:18 162:2
182:1 214:20
225:22 230:2
272:9
**placed** 128:19
**places** 14:9
157:9 246:13
**plaintiff** 1:4 2:6
5:9 6:14 66:18
66:22 67:4
282:11 325:4
**plaintiff's** 18:24
19:5,22 113:6
113:7
**plaintiffs** 70:20
260:7
**plane** 237:2
239:9,18
**planet** 275:23
**planted** 306:10
306:23 309:2
**planting** 307:23
**plausible** 178:2
304:19 305:9
317:5
**plea** 60:20
177:21
**plead** 12:6
**pleading** 255:3
**please** 4:15,16
4:24 5:1,14,15
6:9,10 9:2,3,8
9:14 90:22,22
180:2 197:3
249:10 258:7
265:16 310:21
**ploy** 290:10
**ploys** 244:19
**plus** 59:16
**pmoran@rfcl**
2:10

**pockets** 163:7
**poignant** 243:19
**point** 12:1 28:23
46:12 55:5
59:5 62:15
84:7 91:9
98:15,16,22
115:10,20
126:2 136:16
148:24 153:19
154:7,21 161:5
162:9 164:16
165:21 167:17
167:24,24
168:2,6,21
172:5,11
174:11 178:23
180:13 182:6
184:19 189:3
190:1 195:2,4
196:8 197:6
198:4 201:11
203:17,20
208:1 214:9
224:1,3 228:14
234:23,24
242:12 262:13
262:14 264:18
278:18 295:3
296:24 301:19
301:22 302:14
312:7 313:4,9
320:7
**pointed** 55:17
82:21 124:11
148:9 176:8
294:17,20
**points** 55:8
153:8,11,18,19
154:4 203:12
203:14,14,16
203:22,23,24
253:9
**Pol-** 310:7
**police** 5:6 6:23

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 362

6:23 7:8 9:24
14:10,11 29:18
29:21 34:22
35:10 40:16
58:21 59:2
60:1,8 62:10
67:5 68:4,5
69:12 70:9,10
70:23 71:14,14
72:7,15 81:1
84:16 86:5
102:9 105:8,8
106:15,16,22
106:23 108:4
110:17 115:14
116:10 128:24
129:5 132:5
133:16 135:18
135:19,19
144:8,11,12,15
145:5,5,8,10
146:13,18
148:17 150:12
150:13 152:19
154:9,15
155:21 156:9
171:10 176:15
181:23 182:24
199:1 233:3,15
235:22 250:3
251:12,15,17
253:24 254:7
254:18,20,22
255:11,12
256:14 257:3
263:19 271:11
273:1,23 274:1
274:3,17
275:23 276:4
277:16 278:10
278:19,22
279:7,8,14
280:2,4 286:10
288:9,19 293:1
296:4 298:18

303:16,20
304:3,14,23
305:3 306:3,10
307:3,4,12
309:2,6,14,22
310:8 311:1,6
312:11,17,18
318:9,15
**policing** 108:2
305:18,19
**policy** 81:3
82:21 84:19
85:9 90:16
243:9
**polished** 25:2
**political** 176:6
**politically** 176:4
**popped** 96:11
**populated** 161:1
**population**
41:23
**portion** 74:17
**position** 49:21
96:22 100:7
113:22 117:17
117:19 158:3
166:18 167:2
175:20 195:15
201:6 233:16
234:12,19,20
236:24 240:14
250:12 275:12
280:13 285:18
286:14 294:13
295:13 306:22
311:13
**possess** 306:9
**possession** 135:6
135:7
**possession-type**
133:24
**possibilities**
157:18 163:4
163:10,20
**possibility** 98:19

115:3,5 167:10
167:11,16
180:11 182:8
182:11 198:12
198:15 214:12
214:16 224:3
248:16 259:9
259:10 278:8
290:14 297:9
**possible** 13:20
26:17,19,22
38:2 40:15
47:23 52:13
53:21 57:9
59:24 81:6
84:23 100:2
114:16,17
120:11 126:21
127:22 128:6
167:6,21,22
198:2 212:11
214:17 218:1,4
219:23 220:10
220:14 221:2,9
224:7,11,12
225:23 227:17
227:21 230:3
244:5 245:6
248:2,15,22
254:17,23
265:8,10 275:9
291:3 318:7,13
**post** 175:1 228:5
**post-conviction**
15:9 73:16
189:19 193:13
**posted** 96:8
**posts** 228:8
**potential** 35:19
53:20 86:4,5
87:10,18 88:21
89:9 90:2,9,11
91:12 107:3
111:24 143:9
152:20 155:24

156:6 163:2
169:1,11 170:5
259:24 303:19
309:14 312:10
**potentially** 14:8
37:10 41:8
55:11 197:22
217:22 257:6
259:21,21
**pound** 287:24
287:24
**practice** 71:5
80:2,6,10,15
93:1 99:15
107:23 108:1
221:10 276:15
276:18,18
288:14,17
290:23 295:13
298:24
**practiced** 96:14
96:22 97:8
98:7 99:1
**practices** 6:23
**precise** 101:10
121:2,4,22
131:9,15
**precision** 105:4
**predates** 145:5
151:22
**predecessor**
292:12
**predict** 206:12
211:4
**predictions**
206:22
**predictive**
207:10 211:10
**preestablished**
214:4
**preexisting**
214:2,6
**prefer** 28:14
**preference**
33:16,20,22

**preferred** 105:5
**prejudicial**
84:14
**prematurely**
110:23
**premise** 49:4
194:18 259:1
**preparation**
9:21 10:18
11:1 13:18
14:1,21 15:23
17:5 18:7
190:12,13
201:8 252:22
260:13
**prepare** 22:2,4
281:22
**prepared** 13:20
16:22 19:16
21:6 57:4
255:8 260:14
**preparing** 13:19
19:13 22:6
189:22 252:1
281:19
**presence** 169:23
220:24 251:7
312:17
**present** 2:13
48:15 61:11
91:15 103:24
116:7 125:11
127:11 148:2
158:4,5 163:14
197:18,19
220:20 242:17
242:19 250:18
287:22 288:1
294:8 316:2
326:12
**presentation**
173:17 175:15
175:18
**pressing** 207:22
**pressure** 109:11

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 363

pressures
  122:14
presumably
  31:13 42:18
  146:2 149:12
  159:9 160:24
  175:19 247:18
pretext 308:14
  310:11
pretexual
  312:19
pretrial 40:16
  73:15 300:21
pretty 16:11
  37:1 115:12
  170:15 248:21
  283:24 292:21
prevalent 242:6
  244:3,20
prevent 214:20
  224:20
previously
  243:21 326:13
primarily 16:5
  40:11 57:14
  60:8 74:8 80:9
  102:9 150:4
  207:14 209:1
  288:18
primary 40:12
  80:9 142:5
  199:11,11
prime 135:6
principal 288:19
principle 145:4
  149:16,24
printed 8:4,12
prior 15:6 18:2
  18:3,10,10
  29:14 49:24
  71:24 72:3
  137:22 150:11
  151:14,24
  159:15 175:14
  178:7,8 185:5

185:23 186:2,4
  186:6,9,12
  254:20,21
  258:7 278:21
  281:19 283:10
  283:13,18
  285:3 287:19
  322:5
private 120:15
privilege 314:23
probabilistic
  55:15 242:22
  243:6
probability
  55:19 56:20
  126:5 167:11
  243:7,8
probable 35:19
  127:1,18
  167:10 306:11
  309:3,18
probably 7:14
  19:14,14 25:8
  37:18 42:22
  63:23 65:4
  67:13 96:10
  106:1 123:22
  133:8 151:16
  155:22 223:18
  229:9 253:4
  315:17 316:24
probative 161:2
  279:11 288:24
problem 24:20
  37:5 53:15,24
  55:9 68:20
  84:8 85:10
  97:22 107:2
  176:17,20
  179:14 237:22
  238:12,18
problematic
  102:13 185:9
  191:11
problems 109:5

117:20 227:12
  229:17
procedure 1:12
  4:7 22:12 72:7
  72:12,13
  135:18,19
  144:8 307:2
procedures
  251:16
proceeding
  73:16 137:23
  178:7
proceeds 68:24
process 27:1
  32:1,24 35:8
  36:18 37:7,10
  44:1,8 45:7
  50:16 51:1,2
  60:14,21 96:15
  96:16,24 143:4
  212:17 215:7
  218:15 250:7
processing
  265:5,19
product 28:8,10
  189:7 226:21
professional
  1:15 26:15
  60:23 74:6
  92:23 100:11
  326:5
professionals
  146:18
professor 22:10
  22:15 30:18
  31:13 32:20
  39:14 40:10
  43:17 45:8
  54:13 57:6
  58:18 64:9,21
  74:7 119:2
  210:19 228:7
  318:24
professors 26:13
proffered 138:4

programs 8:21
progress 26:3,6
  63:22
project 52:12,12
  54:6 212:19
  228:1 315:19
projects 54:8
prominent
  240:19
promise 116:16
prompted 293:1
pronounce
  192:17
proper 104:22
  107:2
properly 102:1
  106:15,17
properly-trai...
  106:22 107:7
  107:16
property-type
  253:10
proportion
  125:9
proportionately
  88:17
proposal 25:1
  315:8
proposition
  54:19,21 97:12
  98:5,7 107:9
  107:16 156:6
  258:21
pros- 175:18
prosecuted
  133:16
prosecution
  69:18 132:23
  172:15 174:4
  174:20 175:17
  177:24 178:6
  182:3 233:2,15
  300:20
prosecution's
  175:13

prosecutions
  133:8,12
prosecutor
  173:3,15,15
  174:18 175:6
  175:22 176:7
  178:20,24
  184:4 217:21
  271:22 286:6
  312:10,24
prosecutor's
  174:6
prosecutor-ed...
  171:2
prosecutor-wr...
  171:2 295:1
prosecutors
  133:17 146:13
  146:18 175:23
  178:10 218:5
  233:4 235:22
  240:10
protection 84:21
protective 28:20
prove 27:13,15
  244:11
proven 26:20
  27:5 28:3 30:3
  30:8,9,21 31:5
  32:6 33:6,6,8
  33:15,17 34:2
  34:4,6,9,13
  36:3,5 51:21
  53:14 55:7
  119:21 125:12
  126:3,14 127:1
  127:18 128:4
  161:6 216:3,5
  216:13,15
  217:14,14,21
  218:7,20,21
  221:22 223:12
  224:4,14,17
  230:23 231:5
  231:16,18,20

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 364

232:1,9,23
233:24 234:15
235:14 236:6
236:11,11
241:19 314:1
316:20
**provide** 86:10
86:13 99:23
107:7 128:1
140:19 185:14
205:4 288:21
288:23
**provided** 8:4
19:4,22 20:3,3
20:5 21:21
22:1 60:1,2
146:14 184:15
199:12 252:12
252:14 273:22
274:16 276:2,3
298:7 325:14
**provides** 115:19
**province** 114:14
**psychol-** 79:18
**psychological**
6:24 35:10
36:18 37:6
42:2,2 55:22
113:16 319:4
**psychologically**
70:17 112:13
112:23 114:21
191:10,12
261:24
**psychologist**
22:10 79:18
136:7,9,13,17
138:17,18
263:2
**psychologists**
136:10,11,12
**psychology** 6:23
34:7 35:1 79:8
79:21 138:13
138:15,15,17

138:19
**psychosocial**
56:7 250:16
256:1
**public** 70:15
229:7 234:5
301:12 307:7
325:21
**publication**
25:17 26:2
43:23 44:4
63:19 79:14
80:22
**publications**
24:6 26:15
34:10 60:23
64:8,20 72:22
72:24 91:22
95:16 98:6
234:6
**publish** 220:15
**published** 23:17
23:19 28:7
30:17 40:17,21
44:5 58:13
61:2 77:19
81:14 96:6
139:19 166:14
215:1 220:2
224:21 225:24
231:19,21
232:21 315:18
321:13 322:22
**publisher** 25:3
**publishers**
219:12
**publishes** 82:17
**pull** 8:7 22:22
22:24 94:21
95:11 282:9
314:8
**pulling** 8:14
23:2 95:1
**purchased**
275:20

**pure** 100:12
**purportedly**
148:14
**purpose** 90:20
91:10 99:8
297:4
**purposely** 64:13
**purposes** 10:17
27:12 44:14
106:7 128:20
128:22 129:14
129:18 193:10
279:7 280:7
**pursuant** 1:10
1:11 4:6 74:23
**push** 39:10
**put** 20:10,12
23:19 25:7
48:11 116:22
128:23 136:16
178:3 180:19
181:6,9 182:23
183:9 184:23
202:10,11
207:5 225:22
227:3 230:2
232:8 256:21
256:23 264:14
272:14 275:20
284:5 289:18
315:7
**puts** 256:7,8
**putting** 80:10
183:20 193:23
212:1

——————
**Q**
——————
**Q-and-A** 108:11
**qualification**
148:2
**qualifications**
83:17 144:5
**qualified** 42:9
42:10 73:14
137:11 138:2

**qualifier** 82:11
**qualifies** 143:20
**qualitative**
38:21,24 39:2
45:19,22 46:2
46:17 48:1
**quality** 222:13
222:14,14,15
**quantification**
101:10
**quantifies**
100:17
**quantifying**
39:22
**quantitative**
38:21,23 39:2
44:15 45:19
46:2,18,24
48:2 58:15
**Quarter** 287:24
**que-** 129:6 211:6
**Queen** 154:8
**question** 8:15
9:18 11:9,11
12:17 13:2,5
13:13 14:23
15:6 23:3 25:8
25:19 29:14
30:24 32:22
34:17 36:7
37:1,23 39:3
39:11 42:7
43:11,14 45:9
45:24 46:12
47:7,17,22
48:21 49:3,12
49:24 50:1,10
53:9 54:3,11
56:10 64:16
68:9,10,11,16
68:20 69:8
71:2,9 81:22
82:9 83:5,10
83:23 84:19
85:4 89:20

90:19,21,23,24
91:1,2,20
92:14 94:18
98:21 100:6
102:6 105:21
106:6 107:10
108:8 109:2
112:22 113:24
115:23 116:2,6
118:12 120:4
123:21,23
124:3,4 130:11
131:13,16
135:12 139:8
140:24 141:5
143:1,8 148:22
148:23 150:23
150:24 156:3,8
157:9,21 158:8
158:20,23
159:3,13,15,16
159:18 160:14
162:4 163:17
163:24 164:2,7
164:9,11 165:4
165:18 167:13
168:16 175:9
175:12,14
176:19,22
180:2,6 181:2
183:18 184:17
185:12 186:12
186:17 187:20
189:10 191:18
195:6,13,18,23
201:22 202:5,7
202:19,23
203:1,2,3
211:23 219:6
222:21 229:5
233:17 234:2
235:2 237:17
239:24 241:16
246:20 253:24
254:14 256:10

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 365

256:16 258:7,8
259:11,13,14
260:23 261:15
261:16 262:4
262:20 265:15
266:18 267:9
269:7,10 272:9
277:6,10,24
278:16,24
279:4,13,17
280:20 281:5,7
281:14 282:4
282:22 283:2
283:12 286:18
290:3 291:19
293:5,7 296:18
299:5,9,17
300:6 304:9
305:14 308:3,5
309:1 310:14
310:19,24
311:22 312:11
317:1,10
319:21
**questioned**
128:12,14,21
128:22 129:7
224:9 251:7,16
254:21 310:1
**questioning**
28:21 37:10
115:13,14
118:4,8 129:6
129:9,18
167:18 253:2
253:21 282:2
**questions** 9:14
9:16 11:16,18
11:18,24 12:7
14:3 16:22
17:1 28:15,24
32:3 36:10
38:16,19 48:14
54:7 56:10
63:9 79:6

80:23 82:2
105:23 120:1
164:5 172:3
185:13,22
197:1,4 205:12
259:1 323:17
326:19
**quick** 23:1 74:13
92:9 156:11
198:21 313:14
**quite** 101:16
254:9
**quotes** 48:11
**quoting** 93:23

───────────

**R**

**R** 2:7
**R-I-C-H-A-R-D**
6:11
**race** 206:13,23
**racial** 40:1
**Rafael** 154:10
198:5
**ran** 162:16
**random** 120:16
121:1 205:18
211:19 212:2,9
212:17,22
213:2,5,6
**randomly**
206:16 211:20
212:3
**range** 38:2
237:22 238:1,8
238:18 260:17
260:22 261:6
262:9 265:2,9
315:23 317:13
**ranging** 253:10
**rape** 125:14
126:6,9 131:23
233:7
**rapport** 109:2
**rapport-build...**
108:11

**rare** 172:8
193:12,13
216:20 236:20
236:22,22,23
**rarely** 67:17
**rate** 120:21
121:5 239:6
245:17
**ratio** 219:12
**ratios** 219:7,19
219:21,22
**raw** 44:7,11
226:7,17
314:14 315:3
**re-** 72:17 97:19
110:8
**re-review** 16:15
**reach** 21:15
217:22 262:22
274:10
**reached** 21:17
**reaching** 48:2
230:4
**reactions** 35:3
**read** 49:5,6
56:13,16 57:3
65:12 88:20
89:18,18 90:2
100:24 108:20
109:3 111:5
123:22,24
128:17 137:6
156:4,5 171:14
172:23 179:10
180:1,3 252:20
255:14,22
261:19 263:6,9
284:1 285:23
286:1 293:11
293:21 300:15
300:21 305:2
305:19,24
310:21,22
320:6 321:4
325:9

**readily** 38:10
43:7 78:21
**reading** 26:14
89:5,23 144:21
200:1 252:15
266:20 272:24
273:1 293:12
305:13
**reads** 142:21
292:23
**ready** 268:17
**real** 22:24 74:13
92:9 121:11,15
121:24 124:8
125:1,5 126:23
127:10 144:22
156:11 198:21
209:17 213:6
220:21 241:14
241:18 246:1
246:11 290:4
313:14 320:11
**real-world**
125:11,13
209:24 210:2,7
210:15 242:3
245:21
**really** 8:2 27:17
29:15 33:19
56:18 67:1
78:12 83:21
110:2 112:24
113:5 123:11
129:23 134:6
161:2 168:16
180:14 186:14
201:20 203:14
205:21 206:23
207:12 208:3
211:2,6 212:1
219:1 222:18
241:16,16
243:9 255:23
265:18 268:5
271:22 290:14

290:15 295:22
297:24 307:19
312:22 314:11
320:16
**reanalyze** 48:23
**reanalyzed** 45:1
45:5
**rear** 148:5 198:6
**reask** 37:2,4
43:15 165:18
181:2 317:10
**reason** 59:20
96:1,4 105:21
107:18 126:12
142:5 190:19
201:13 257:20
303:23 308:22
312:19
**reasonable**
215:18 236:17
238:13 259:5
269:23 277:18
290:18 296:17
**reasons** 41:16
41:20 112:18
181:17,18
187:20 193:5
195:1 198:16
198:17,21
199:11 205:17
245:6 248:24
**recall** 17:22
60:19 67:9
71:17 81:1
97:18 119:4
153:17 157:7
172:1 190:4
201:3,17 204:2
209:2 219:19
234:18,19
251:21,22
252:5 253:7,15
255:9 262:15
266:13,17
273:11 280:23

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 366

281:20 286:4,9
286:24 289:24
317:22 323:10
323:11
**recalling** 199:10
237:23 271:18
286:8
**receive** 27:19
**receiving** 11:19
12:9
**recite** 15:20
**recognition**
23:20
**recognize** 90:8
90:11 91:11
**recognized**
88:21 137:20
315:6
**recollection**
16:20 17:1
52:15 60:15
80:6,21 96:17
97:10,19
145:13 159:17
172:15 189:24
190:2 197:16
199:18,22,24
200:6,14,22
202:11 203:6
208:5 232:1
264:12 276:11
281:1 283:10
283:20,24
300:19 308:19
308:20 314:9
**recommend**
62:21
**recommended**
290:20,23
**reconstruct**
318:9
**record** 4:1,16,24
6:10 9:3,9 20:9
63:3,6 92:2
114:9 123:14

123:16,19,24
150:24 164:24
165:2 179:20
179:24 180:3
180:23 202:20
202:22 245:23
252:24 253:1,6
257:12 262:24
270:9,13 271:1
271:7 273:21
275:10,13
276:8,21,21,22
282:10 298:12
298:13 310:22
313:13 323:24
324:2 325:12
326:19
**recorded** 4:6,20
273:19 275:6
275:21 276:4
**recorders**
275:19,22
**recording** 4:3
274:12,19
276:16
**recordings** 59:9
**records** 66:22
168:16
**recovered**
156:22 157:1
157:14,17
161:23 162:8,8
162:14
**recreate** 165:15
**recreation** 46:7
**reduced** 326:9
**refer** 104:24
137:11 188:1
206:11
**reference**
291:20
**referenced** 11:4
73:8 108:5
**references** 252:7
**referencing**

180:7
**referred** 58:7
326:22
**referring** 58:2
78:14 86:17
102:5 105:2
106:10,11
110:20 126:13
139:9 140:10
142:11 152:24
153:1 189:14
219:5 239:22
286:17 314:16
**reflect** 208:3
**reflecting**
300:10
**reflects** 145:4
**reform** 81:3
**reforms** 78:10
**refrain** 8:13 9:3
**refresh** 16:20,24
96:17 97:10
159:17 190:2
197:15 199:23
253:16 264:11
314:9
**refreshed** 190:1
**refreshes** 152:18
**refreshing** 97:19
**refused** 11:24
**regard** 183:24
**regarding**
152:20
**regardless** 50:14
73:18 82:20
87:21 89:16
90:7 91:9
128:11 131:20
144:14 238:7
320:21
**Registered** 1:15
326:5
**registries**
228:24 230:19
231:6

**registry** 126:16
212:20 228:3
229:6,7 230:20
230:22 231:1,8
231:12 315:20
318:23 319:12
320:9 322:5
**regression** 58:8
58:10,17
322:15,24
323:5,12
**regularly** 85:3
**regulations**
116:10
**regurgitate**
288:24
**Reid** 101:17,17
101:21,22,23
102:2,9,11,14
102:15,19,24
103:8 104:20
104:22,23,24
105:3,3,6,6,8,9
105:11 106:3,3
106:11,12
107:8,15,24
108:9 109:12
110:4,11 111:4
111:21 130:18
134:11,15
135:1 288:18
289:19 291:7
291:12,13
292:2,9,19,19
292:22
**rejecting** 265:12
**rel-** 257:6
**related** 15:4
22:12 33:5
41:1 77:22
80:23 111:13
132:13 141:20
153:22 154:1
156:1 220:16
254:7 277:21

**relates** 135:20
**relationship**
303:3
**relative** 41:22
**relatively**
221:21
**relatives** 49:9
**relevance** 28:18
255:21
**relevant** 14:6,8
28:12 29:1
38:11 61:21
79:22 112:2
143:6 155:9,11
156:10 158:16
169:5 183:17
187:12,16,22
187:22 188:22
188:24 189:2
190:17,18,19
192:7 193:22
206:23 210:14
219:2 226:2
231:9 252:11
252:17 255:16
256:18 257:5
257:16,17,22
258:22,23
259:17,21,22
263:10 271:18
273:13 303:12
303:18,21
**reliability**
140:23 144:18
145:19 149:4
149:14,18
150:6 151:3,6
151:21 152:12
169:6 170:21
171:4 186:18
189:9 190:6,23
191:18,19,24
193:9,22
194:13,14
195:5 196:7

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 367

204:8 205:1
**reliable** 114:9
117:22 169:21
183:22 191:6
191:14 195:2
208:22 274:11
292:16 295:17
**reliance** 223:12
**relied** 51:20,22
52:1,6,21
127:19 170:7
171:23 173:2
173:12 203:23
220:15 228:18
233:18
**relies** 138:18
**rely** 19:3 25:13
49:24 52:14
57:17 92:15
114:10 131:2
147:13 149:18
172:3 207:14
207:19 208:2
222:5 231:13
232:21 233:19
233:20 280:9
302:12
**relying** 63:10,20
101:5,6 130:19
147:9,11
148:11 181:13
187:7 201:15
203:15 223:14
232:22 261:1
285:14 302:2
302:11 313:11
**remaining**
320:24
**remember** 15:3
15:13 18:8
31:19 49:12
52:7 94:8
107:12 157:18
189:24 200:1
202:24 204:4

225:16 255:5
263:14 266:20
266:21 272:23
273:1 300:13
310:4 322:16
**remembered**
23:18
**remembering**
52:2 219:23
260:2 294:24
301:12 303:5
322:18
**remind** 58:24
**remote** 4:5
167:10
**remotely** 5:10
5:12
**remove** 98:3
108:22,24
115:24
**render** 116:11
188:5
**reorient** 180:5
**rep-** 122:13
**repeat** 13:5
94:19 156:3
172:7 195:13
275:5 299:18
**repeated** 11:21
185:15
**repeatedly** 12:7
12:10
**repeating**
195:20 211:6
**rephrase** 127:15
235:2 299:19
**replace** 98:9
**replaced** 261:9
**replicate** 48:18
49:11 50:9
51:3 122:14
124:8
**replicated** 44:19
50:14 61:14
**replicating**

49:13,16
**report** 7:23,23
8:1,10,14 9:22
10:18 13:19
14:5,7,9,10,11
16:5,22 19:18
20:6,8,11 21:2
21:6,8,23 22:3
22:5,7 25:14
26:7,21 35:21
55:1,5 61:16
63:19 84:1
92:5 101:17
104:3,12
106:12,14,18
106:20 107:6
107:12,18
112:18 130:16
130:24 140:6
140:16 142:9
142:12,16
146:8 147:11
152:7,13,15,22
153:12,18
155:21 166:19
167:3 180:19
181:7,23
189:23 190:12
190:15,18
193:13,14
197:24 198:3
199:1 201:8
203:17 204:4
218:18 231:22
231:24 249:1
249:10 252:1
252:22 255:8
260:5,10,14,21
261:2,18 262:6
262:16,18,22
263:14,20
267:4 272:11
272:18,19
273:1 274:24
275:6,10,15

280:23 281:19
281:22 283:23
284:6,8,9,24
286:16,23
291:5,14,21
293:11 298:11
299:3,6 301:24
303:9 317:16
**reported** 52:22
318:10 326:8
**reporter** 1:15,15
5:14,16 326:4
326:5 327:7
**Reporting** 5:17
**reports** 9:24
22:13,16,19
40:16 60:1,8
182:24 231:24
**represent** 5:1
170:10 240:10
289:20
**representation**
300:2 301:11
**represented**
41:22 55:6
223:19 302:10
**representing**
70:8,22 71:6
71:10 151:19
**republican**
206:13
**request** 29:5
**requested** 20:2
123:24 180:3
310:22
**require** 193:14
193:15 197:1
228:13
**required** 22:20
69:1,2,7 91:15
123:5 145:20
145:24 146:24
148:23 235:15
276:6,7
**requirement**

91:21 307:11
**requirements**
22:11 172:24
**rescheduled**
18:6,7,9
**research** 7:2
18:18,19,20
27:12,23 31:15
33:13,20,21
36:1,2,3,9,14
37:8,14,15,16
37:19,20,21,23
38:11,12,16
40:9 41:12
42:19 46:1,2
47:7,17,21
48:1 50:9 54:3
54:6,8,11
55:22,24 56:17
56:18 57:14,17
57:18 58:1
60:2 65:9 80:8
80:12 88:11
95:17 96:5
98:23,23 102:4
102:13 103:11
110:8,15
112:15 113:16
134:22 136:11
143:24 144:5
146:22 149:3
149:13 150:5
151:19 205:8
207:8,14,17,19
209:14 211:14
211:23 214:22
219:18,21,22
220:1,11,13,15
221:14 222:8
222:20 224:10
224:21,24
225:24 232:21
234:6 240:11
241:23 242:7,9
242:14 243:20

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 368

244:24 245:2,3
250:21 251:2
257:24 258:4
258:11,20
304:13 305:3
305:11,12,12
313:21,24
314:4 319:4,5
319:8,9
**researcher**
31:17 51:14
218:19 225:12
242:11
**researchers**
26:13 30:11,15
35:22 48:23
50:7 51:18
57:16 58:15
171:4 215:4
228:5 240:9,12
244:15 245:1
305:7,22 306:2
**reserve** 21:23
284:22 323:19
**reserved** 327:2
**resident** 307:15
**residue** 158:22
**resist** 247:24
248:5,6
**resisting** 250:21
**resolve** 233:22
235:15 270:17
**resolved** 69:6
177:20 235:17
**resources** 239:8
**respect** 30:7
254:17 261:12
323:5
**responds** 35:12
**response** 87:3
206:1 261:23
321:12
**responsibility**
81:17 193:1
**responsible**

225:5 320:8
**responsive**
81:21 90:23
**rest** 116:1
**restate** 310:19
**restricted**
237:21 238:1,8
**restroom** 62:13
**result** 34:23
249:17 261:20
262:8,9
**resulted** 298:20
**results** 222:7
233:13,15
**retained** 6:13,16
64:12,12 65:12
68:12 69:11,18
69:20 70:20
73:6,18 190:20
191:7 192:8
260:7
**retardation**
260:18,20,22
261:20 262:9
262:17 264:2
**retarded** 260:16
260:24 262:3
264:16
**retired** 208:11
318:23
**retrial** 139:18
139:20
**retrieved** 210:17
**return** 71:23
**reversal** 139:16
**reversals** 125:24
126:18,19
**reversed** 125:15
125:23 126:12
**review** 10:5,17
10:24 11:7
13:17 14:1,11
16:6 19:21
43:19,20,21,24
44:2,6,14

66:22 143:16
156:11 157:24
157:24 168:15
172:13 190:4,9
197:15 198:13
201:3,5,7
202:4,20,21
204:23,24
215:2,7 216:20
219:16 251:24
252:2 260:13
263:21 266:11
271:24 272:2
299:21 303:4
323:3,10
**reviewed** 9:21
9:22,22,24,24
10:10,12,16,21
11:7,10,14
13:19 14:11,18
15:4,7,10 16:7
16:11,19 22:18
22:21 32:20
44:11 61:9
97:8 101:6
119:1 126:24
159:8 168:10
189:23 190:22
196:5 197:17
206:21 217:20
252:9 262:24
263:12,15,16
263:18 280:22
281:18,21
285:5 292:20
301:10
**reviewing** 10:19
15:23 16:12
28:1 64:12
92:10 107:17
116:15 176:15
202:22 228:17
242:17 270:16
292:12 323:13
**Revisited** 61:6

**revolve** 170:7
**reword** 277:10
277:11
**rewrite** 262:18
**rhythm** 267:12
**Richard** 1:9 3:3
4:9,17 6:2
139:24 145:3
150:9 151:10
151:22,24
207:24 208:8
208:23 209:8
225:7 325:8,16
326:7,14,21
327:1
**rid** 97:17 98:10
**ride-alongs**
304:15
**right** 6:8,13 7:23
8:2,8,23 13:23
16:2 19:3,8,12
19:20 20:7,10
20:16,20 21:23
22:6,18,22
23:11 25:5
27:7 28:13
29:6,9,16 30:6
31:9 32:13,17
41:1,4 42:6
43:16,23 47:7
47:8,13,17,22
48:6,20 53:6,7
53:11 54:12,19
55:24 56:3,11
56:21,23 59:6
59:17 62:2
66:15,17 67:23
69:19 70:8,12
71:19,20 72:20
77:22 78:5
80:3 81:18
83:13 84:9,21
86:11,24 88:14
90:18 92:22
94:1,20 95:6

95:15,23 96:16
97:14 98:10
99:4 100:6
101:18 102:16
102:20 103:3,6
104:2 106:12
106:18,24
107:2,4 108:14
108:23 109:5,9
109:13,18,23
110:9 111:7,18
112:4 113:1,2
113:5,8,21
114:19,24
115:3,4,10,16
117:6 118:2,6
118:16,20,24
119:3 121:16
122:6,10 123:3
123:13,19
125:15 126:12
128:8 129:12
131:18 133:19
134:8 135:9
136:14,17
138:11 140:3,9
141:14 142:10
147:10 148:10
148:16 149:11
149:12 152:8
153:20 155:23
157:8 159:11
160:4,19 161:4
161:8,12,14,19
166:10,14
169:12,16,21
170:3,4 171:12
173:4,18
174:14,24
175:7,9 176:9
176:12 177:1,3
178:21 179:7
179:22 180:5
182:10,14,15
184:16 185:3

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 369

186:22 187:4
190:15,18
191:20,21,23
192:21 193:1
194:3 195:1,3
195:8 196:9,13
197:9 198:7
199:2,10
200:17,20,22
201:19,21
202:6,7,16,18
202:21,22
203:19,20
205:3 207:24
208:13,16
209:15,18
210:3,12,24
211:8 212:4
214:15,22
216:6 217:24
219:7 221:17
223:5,6,15
225:16 226:8
226:18,23
227:9 228:19
229:19,20,20
229:22,23
230:4,7 231:3
231:7,11,22
232:10 233:12
237:23 239:10
240:17 241:21
242:16,20,24
244:7,13,23
245:10,12
246:10,13,15
247:4,17,19,21
248:1,7 249:2
249:12,22
250:3,9 251:12
251:17 252:18
254:7,10,22
255:2 257:1
258:9,19 260:1
260:4,7 263:6

264:22,22
266:14 267:15
267:16 270:8
270:11,14
274:8,9,11,12
279:18,20
280:6,15 282:5
282:19 284:22
285:22 287:8
289:8,15 290:2
290:5,17 291:9
291:17 292:1,6
294:2,8,10,15
295:3,5,23
297:7,14,17,20
297:21 299:17
301:4,24
303:10,18,18
306:23 307:6
307:15,18
309:4,7,11,17
310:2,12
311:14,19
312:20 313:19
318:3,5 319:8
319:17 322:19
323:15,18,20
**rights** 11:22
12:12,21 67:4
67:6,18 69:14
69:22 193:12
249:22 250:2
251:16
**ring** 78:22
321:18
**ringing** 122:17
**rise** 116:15
130:21
**risk** 7:4 35:18
35:23,23 36:6
36:8,19,23
37:10,17 41:8
41:15 42:11,15
42:16 53:15
54:15,22,23

55:2,14 56:14
56:20,23 57:11
58:5 61:10,22
70:17 84:21
103:24 104:6
104:10 107:3
118:21,23
119:5,7,8
121:21 125:10
127:11,12,13
127:21,24
128:8 129:15
130:16 131:11
207:10,15
211:10,13,15
211:16 213:3
241:17 242:2,6
242:10,18,22
243:6,8,18,21
244:8 245:13
245:16,18
246:6,9,9,10
246:17,18,22
246:23 247:6,9
247:10,16
248:3,9,12,13
248:24 249:3
250:22,22
255:17,18,21
256:8,19,22,24
258:1 260:1
261:22 319:3
**road** 281:3
**robberies** 62:5
**robbery** 133:24
253:12
**Robinson** 9:23
11:5,14 13:6
13:15 14:2,4,9
179:6 183:24
187:1,6 194:4
194:19,22
201:12 287:20
**Robinson's**
11:21 14:6

181:14 183:21
192:20 193:6
**Rock** 2:7 5:11
**role** 92:15
113:21 114:12
159:11 193:23
301:15
**roles** 178:19
**room** 61:5 250:8
**roughly** 13:24
18:5 66:14
129:10,16
**route** 302:8
**Royal** 5:16
**RPR** 327:13
**rule** 22:11,18,20
22:21 47:20
118:11 187:10
187:15 188:9
192:3,4 193:11
206:5 237:1
**rules** 1:11 4:7,8
7:15 22:12
307:13
**run** 167:12
221:5 227:13
**runs** 157:10,11
**rush** 110:21
**Russ** 5:2
**Russano** 122:9
**Russell** 2:2 5:8
31:2 83:4
86:20 87:2
91:3 174:1
175:8 278:6
319:20 323:21
**russell@loevy...**
2:5

---

**S**

**s** 3:7 151:22
**S-C-H-L-O-S-...**
31:21
**sabbatical** 71:22
71:24

**safeguards**
78:10 84:24
**safety** 307:7
**salary** 74:14
**salient** 10:23
243:19
**Sam** 320:7
**sample** 25:1
120:16 121:1
205:16,18,19
205:21 206:1,9
206:14 210:10
210:20,22
211:1,3,5,12
211:19,20
212:2,3,17,21
213:7,16
**sampled** 206:16
**sampling** 212:22
213:2
**Samuel** 318:18
323:6
**San** 4:18 71:19
72:20 95:14,17
**Sandelin** 2:13
4:2
**sat** 29:19 59:7
**Saul** 151:17
**saved** 43:9
226:24
**saw** 24:8 148:7
200:20 301:1
304:17
**saying** 42:12
46:22 50:6
99:7 107:15
112:21 114:3,7
146:21 155:12
162:24 163:1
165:11 166:4,7
167:6,18
169:10,23,24
182:19 194:9
194:11,14
201:17 206:4

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 370

231:21 234:17
243:6 256:23
259:10 273:24
277:4 280:11
290:5 292:9
296:15 297:13
306:3 318:4
322:8
**says** 94:3 96:13
114:5,6 118:11
130:18 134:11
142:14 148:7
153:7 154:7
162:7,10,11,12
171:1 181:20
209:12,12
270:24 275:13
280:6 287:3,4
293:13,22
295:8 309:1
321:20
**scale** 126:22
127:19
**scanned** 228:2
**scene** 147:6
156:22 157:18
161:23 162:8,9
162:14 165:23
168:12 169:13
169:19 294:8
**scheduling**
18:10
**Schlossberg**
31:18
**scholarly** 240:1
257:23 258:3
258:11,24
**scholarship**
317:22
**school** 30:19
71:19 72:20
95:14 253:12
253:13 267:19
268:2,3 305:16
**science** 38:21

43:20 45:10,18
46:2,4,6,15,22
47:3 49:19
50:7 51:1 58:7
79:21 95:16
96:5 112:15
114:5,6,12
134:22 149:17
149:20,23
205:8,12 209:7
211:22,22
232:12 238:23
239:3 240:12
241:7 245:3,8
270:24 272:4
302:12
**sciences** 37:24
**scientific** 7:2
45:6,13,14,17
45:23 46:14,16
46:17,20 47:4
48:6,7,8,9,12
49:15 110:8,8
110:14 204:11
215:16 217:7
218:13 239:1
**scientifically**
120:11
**scientifically-...**
134:16,19,24
**scientist** 43:22
43:23 50:12
64:14,15 240:5
319:2
**scientists** 44:2
46:1 48:13
151:5,13 230:1
240:8
**scope** 54:6,8
188:13 238:14
**screen** 20:10,16
20:17
**script** 283:19
**scripted** 93:14
96:14,15,23

**scripting** 285:21
286:5,10
295:19
**scroll** 20:20
**scrolling** 95:21
**scrutinize**
224:10
**se** 34:9 116:10
314:2,12
**search** 43:6
96:11 227:23
**searches** 26:11
316:8
**second** 16:13
22:23 44:3
73:3 74:14
90:10 95:1
101:14 104:21
115:18 122:2
141:3 148:8
154:6 156:20
168:20 170:20
173:23 180:21
224:2 235:24
251:3 257:4
274:2 282:8
299:12 313:19
**secondary** 40:12
**Secondly** 205:23
**section** 79:1,5,6
152:23 153:1
170:3,21 204:7
303:5
**sections** 72:6,12
**see** 8:2 9:20 15:2
20:18,22,23
21:5 23:8
47:10 48:23
58:20 86:15,24
94:12 95:8,21
96:11 97:5
143:11,17
152:17 153:22
154:3,4,12,13
158:7 162:20

163:11 166:8
168:4 177:7
178:16 180:6
180:14 186:24
189:20 198:5
204:6,15
205:11 212:16
222:24 231:12
243:17 246:6
246:15 253:23
254:5 272:16
278:16 282:6
282:14,16,21
283:4 286:16
286:17 292:5
294:14 295:12
298:7 313:12
**seeing** 96:17
181:20 246:20
**seek** 98:3 249:10
**seeking** 67:6
178:8
**seen** 146:12
172:17,17
178:3 287:22
290:23 317:21
**sees** 293:5
**select** 213:14
214:21
**selecting** 213:24
213:24 214:8
**selection** 212:10
212:18 213:12
213:14,18,20
213:20,22,23
213:24 214:6,7
214:12,18,20
**selectively** 214:1
**self-defense**
303:1
**semifinal** 24:23
**seminal** 233:8,8
**seminar** 72:7,9
72:14,14
**sense** 12:11,23

13:6 23:14
48:5 61:21
84:14,16 86:13
114:17 121:13
124:14,16
211:2 238:4
248:17 249:5
271:3,22
**sent** 23:8 86:20
95:3,9
**sentence** 32:8
87:8,14 88:10
88:20 94:10
96:13 104:8,17
162:7 167:23
171:1 179:5
262:1,2,22
**sentences** 89:5
**separate** 33:9
75:1 105:19
191:18 195:12
**separated** 20:11
20:13
**September**
161:13 199:21
**series** 33:1 41:16
**serious** 125:17
**Services** 5:17
**session** 108:11
128:15 152:22
**set** 44:2 54:5
107:22,24
115:8,18 126:2
126:10,24
127:8 170:18
216:10,13
218:8 220:19
234:5 240:3
258:14 293:15
314:3,15 323:6
326:13
**sets** 59:15 190:4
213:11 220:15
221:14 232:20
**setting** 115:7

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 371

313:22
settle 67:12
settled 69:6
settlement
    177:22
setup 148:22
seven 91:6
    284:12
Seventh 140:11
severe 62:12
    262:10
severity 62:9
sexual 253:11
    255:4
shape 263:21
sheet 32:10
    44:16
sheets 17:24
    325:14
shelf 14:24
    15:11
shooter 154:10
    154:24 155:5
    155:13,15
shooting 157:11
    158:19 160:18
    162:2
shop 24:24 25:1
    153:24 154:1
    194:23 272:22
shopped 24:10
    24:22 25:7,9
short 63:4
    123:17 179:21
    270:10 310:10
shorten 106:1
shorter 36:17
Shorthand 1:15
    326:4 327:7
shortly 300:2
shots 157:12
    162:16
show 84:4 86:15
    110:8 121:19
    129:5 203:17

215:13 259:8
    267:14 319:23
showed 253:24
showing 52:4
    259:6 289:23
shown 286:23
    287:3,5
shows 102:13
    114:12 238:6
    238:11 272:4
    302:12
shut 74:13
siblings 232:8
sic 49:19 126:22
    141:18 152:12
    170:21 263:16
    271:20
side 177:15
    234:13,17
    235:23 300:24
sides 177:18
    302:8
sight 63:24
sign 122:18
    123:5 314:18
signature 20:23
    323:19 327:1,6
signed 24:14
    265:23
significance
    206:7 207:2,4
    210:14
significant
    10:20 184:3
    186:10 205:16
    205:24 206:8
    210:6,10,20
    211:3,12
    243:19 275:7
    280:14
significantly
    224:1
signs 111:5
similar 34:3
    49:20 53:12

131:7 201:12
    203:3 217:22
    220:19
simple 51:5
    185:24 195:22
    196:1,2 197:1
simplistic
    241:12
simulated 208:2
    209:23
simulation
    124:7
single 247:17
    258:12
sit 15:3 24:2
    59:11 153:15
    157:7,22 179:2
    199:10 202:6
    202:18 203:7
    204:2 219:24
    280:24 281:20
    286:4,9 287:1
    304:15
sitting 110:7
situation 53:16
    53:22 82:16
    84:18 87:19
    217:19 223:11
    234:11 238:10
    256:23 257:2
situations 39:4
    82:1 141:13,16
    141:17 271:8
six 287:20
size 205:16
    206:1,9,14
    211:6,12 221:5
sizes 210:21
    211:1,3
skeptical 84:5
skimmed 263:15
skip 87:6
Skolnick 98:5
sleep 265:21,22
    266:4,12 267:7

267:14,16
269:14,20,21
269:24 270:1,2
    270:4
slightly 64:22
Slobogin 98:6
slower 265:5,18
small 88:16
    138:24
smoke 42:16
smoker 42:13
smokes 55:16
smoking 56:11
    56:11,14,23
Snake 9:23 11:4
    155:9 179:6
    194:19 263:16
    271:20 287:20
Snake,' 154:9
so-called 117:20
social 37:24
    38:20 42:2
    43:20,22,22
    44:2 45:10,18
    46:1,2,4,6,15
    46:16,22 47:2
    48:8 49:15
    50:7 51:1
    55:22 56:5
    58:7 64:14,15
    79:21 95:16
    96:5 110:8
    112:15,15
    114:5,6,11
    134:21 136:10
    138:14,15,18
    149:17,20,23
    151:5,13 205:8
    211:22 240:5,7
    240:12 241:7
    270:23 272:3
    319:1
sociology 305:17
solely 51:23 52:1
solicited 318:14

solution 85:9
solving 133:14
    134:10
somebody 27:20
    42:12 52:17
    90:2 109:16
    110:5,24
    118:12 122:16
    128:23 158:13
    161:2 168:15
    168:17 170:14
    172:9 179:17
    212:12,14
    222:2 250:11
    268:1,8 271:2
    279:9,9 286:15
    307:5
someone's 41:7
    229:2
sooner 63:17
sophisticated
    222:3 250:19
sorry 11:6 12:18
    25:23,23 40:14
    43:18 58:16
    61:16 63:2
    74:16 82:4
    83:4 99:6
    113:9 122:16
    122:21 123:3
    125:19 127:16
    128:5 152:22
    154:13 156:3
    164:7,10,12
    180:21 197:3
    217:14 220:10
    227:7 235:5
    237:15 240:16
    254:13,16
    260:9 272:19
    288:3 296:12
    297:19 306:14
    310:18 315:1
    315:10 317:9
    319:10,20

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 372

sort 78:3 84:20
123:10,20
129:18 133:19
148:3 180:5
183:3 214:13
220:18 262:2
263:11
sought 59:23
60:5
sound 129:12
221:11 282:4
305:6
sounds 16:1
22:10 70:6
126:20 150:16
152:24 175:9
175:20 218:16
233:18 270:5
319:18
source 72:19,22
73:5 101:24
160:10 204:18
205:4 240:19
240:21 277:17
277:20,20
278:20 317:23
321:6
sources 26:10
52:24 63:20
72:18 228:23
231:4
spatter 137:1
158:9,12
speak 43:19
157:23 183:20
209:8
speaking 34:13
34:21 270:4
279:23
special 255:4
specialized
144:6,7
specific 23:3
27:8 58:6
86:18 104:7

105:6 112:1
144:23 153:1
161:3 189:12
190:1 222:22
247:20 253:15
285:2 300:7
specifically 15:7
15:10 18:8
24:3,4 27:3
34:15 57:4
87:8 88:13
133:22 158:13
162:4 166:20
172:1,13
173:12 183:24
271:5 273:3
283:12 286:1
300:10 322:24
speculate
312:21
speculating
133:19 268:4,5
speculation
89:21 268:7
304:8 312:13
312:22 313:7
speculative
100:13 101:9
speed 239:16
spell 6:10 31:19
spelled 31:15
spelling 294:9
spend 137:15
spent 19:13
304:16
SS 326:1
stakes 122:14
stamp 15:12
stand 153:8
170:2 182:10
182:14 262:17
standard 144:24
145:1,4 150:8
standards 102:3
102:12 107:22

107:23 108:1
218:8,14 231:2
264:1
standpoint
319:4
stands 50:2
172:5 196:22
303:23
start 129:6
started 6:9
205:13
starting 129:19
183:18
starts 128:16,19
129:15 287:9
state 6:9,9
108:19 120:9
276:19 321:9
325:8 326:1
327:7
State's 282:23
stated 42:7 94:6
108:18
statement 70:11
71:1,13,16
85:21 87:17
94:9 117:6
129:21 144:19
145:6 147:8
148:5 149:10
151:4 153:6,13
155:5 157:2,9
157:11 161:18
162:15 169:7
169:10,20
171:3 179:6,7
181:14 185:10
186:3,5,7,9,18
186:19 189:6,6
194:21 196:7,9
196:16 197:7,9
197:13,14,16
197:19,20
204:13 240:6
265:23 267:13

272:6,7,10,19
272:20 273:4,8
273:17 274:4
274:11,18
277:4,18
278:21 289:6,7
292:3 295:16
297:19 313:1
322:4
statements
149:4 185:6,23
186:13,21
187:18 190:7
196:17 271:14
289:11
states 1:1,12
4:12 93:14,17
96:23 98:17
99:19 100:9
138:22 276:16
299:10 318:16
325:1
stating 4:16,24
41:13
station 257:3
308:14,15,18
309:14,19
310:8 312:11
312:18,19
statistical 38:17
39:7,8,15,16
39:19 43:1
45:15 46:10
58:14 141:23
206:4,7,22
207:1 210:13
221:6,7,11,13
221:18 222:3,3
322:21
statistically
45:21 133:6
205:15,24
206:8,17 210:6
210:10,20
211:2,11 222:6

statistician
221:3,4,8,10
222:5
statistics 39:17
39:21,21,22
40:5,6,7,8
132:17 221:16
221:20 222:4
317:16
status 41:7 42:4
54:15 55:2
244:1,9 255:17
257:17 258:17
259:18
statute 171:14
171:17 172:24
stay 268:11
staying 266:8
stays 182:16
264:19 267:5
268:8
stenographica...
326:9
step 26:16 242:4
242:9 243:4,9
stepping 113:21
Steve 30:18
225:9
Steven 204:22
stick 273:10
stood 189:21
190:5
stop 28:19 29:2
90:18 96:16
157:24
stops 293:12
store 154:7
203:19
stories 40:17
story 52:17,22
182:5 183:11
274:21 302:8
straight 99:24
118:9

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 373

straightforward
16:11,14 45:20
221:21
straightforwa...
294:1
strat- 100:4
102:12
strategems
97:22 100:5
101:11
strategy 33:21
33:21
street 2:3 4:4
161:10 198:11
198:23 303:3
327:14
street-smart
256:3
stretches 265:7
strictly 34:13
strike 136:19
143:18
striking 122:5
strive 51:16
strong 27:11
110:13
stronger 248:9
250:20
strongly 198:17
structure
131:20
student 208:22
students 31:14
92:20 122:4
207:21 208:2
241:20
studied 100:13
133:21 208:13
studies 29:9,15
30:17 33:4,14
34:1 38:22,23
47:1 49:14,15
49:21 55:7
56:13,16,17
57:1,3 58:21

84:15 110:7
119:9,16 121:6
121:18 122:3
122:13 125:8
127:9 128:2
130:3 144:1,2
147:18,19,23
166:14 167:4
205:19 207:1
207:20 209:7
210:1,3,7,17
211:17 213:4,6
218:9 219:4,5
219:8,10 220:6
231:11 238:23
239:10 240:6
242:2,3 245:20
245:21 246:8
259:6,8 314:4
314:6 315:19
study 29:11,13
29:13,16,18,21
29:21,22,23
33:5,8,23,24
34:5,20 38:1
39:5 41:19
49:11 50:21
57:8,24 59:3
59:17 60:21
61:13,22 62:5
63:17,22 87:9
90:1 100:16
119:14 120:2,5
121:8,14,23
124:9,10
125:21 126:22
128:6 131:10
131:11 146:22
147:5 166:20
178:10 179:3
207:3 208:6
209:4,5 210:14
218:6 220:9
223:22 226:10
226:17 239:8

241:14 242:11
243:3,4 244:11
314:7,7,9,9,11
314:16 315:13
322:9
studying 38:5
39:23 100:22
137:16 239:17
stuff 28:6,7
77:24 184:12
209:9 320:18
sub 153:24
154:1 194:23
272:22
subject 15:4
27:23 38:12
51:9 96:19
100:22 101:1
110:18 137:7,8
137:9,10,19
141:19 176:23
213:12
subjecting 111:1
subjects 10:11
10:13 11:13
15:13,23 38:12
60:2
Submarine
154:8
submit 44:3,13
submitted 44:17
Subpoena 87:3
SUBSCRIBED
325:17
subsequent
187:24 189:19
208:7 281:12
305:24
subsequently
319:1
subset 323:8
substance
306:21,23
substantial
41:12 82:7

137:7 242:9
substantively
264:19
substitute 52:16
substituting
114:13
subtracts
244:12
succinct 171:13
sufficient 54:10
240:3
suggest 104:15
244:8 254:9,20
266:15 267:22
273:16 285:20
304:4
suggested 90:15
198:17 215:16
289:2
Suggestibility
95:2,22
suggesting 47:6
52:17 85:9
90:3,12 181:14
183:16 195:24
196:2,3 201:13
212:7 251:1,2
256:20 258:22
267:8 280:4
288:6
suggestion
192:19
suggestions
103:12
suggests 97:23
178:18 254:19
257:24 267:24
271:24 297:11
suing 67:4
suit 70:20
suitable 239:12
Suite 4:5 327:14
summaries
228:4
summarize

319:5
summarized
219:17
summarizing
219:20
sums 87:14
Sunday 268:21
supply 195:1
support 87:10
90:1 98:6
107:9,15 153:5
153:12 156:5,7
166:18,23
167:1 172:5
214:1,14 273:7
supported 44:9
48:24 110:14
171:6 198:14
270:21
supporting 44:8
54:21 105:24
167:2 190:23
259:1
supports 41:13
88:16 229:1
suppose 215:3
supposed
238:16 292:4,4
suppress 16:17
189:18 252:22
253:18 280:18
suppressed
313:2
suppression
10:6 15:8
191:9,14
Supreme 117:5
139:3,20
sure 6:11 9:8,11
13:6 33:19
46:13 49:5
50:5 62:3
67:19 70:13
77:24 86:19
92:13 102:8

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 374

system 24:19
35:11 104:18
132:18 170:16
176:10,11,17
176:18,20
177:3,19,21
256:21 259:17
306:1 317:17
systemize
151:11
systemizing
152:1

**T**

T 3:7
table 45:2 225:9
275:21
tables 40:21
44:15
tabulate 316:4
tabulated 318:5
tackle 286:13
tactics 108:12
109:16 248:6
250:9 297:6
take 13:12 14:14
24:12 62:16,19
65:11 66:14
80:19 92:8
101:13 113:22
115:23 123:1,2
123:8 142:6
165:5 166:11
179:13,15
181:3 182:4,20
196:11 229:8,9
242:4 261:17
270:3,5 286:12
287:13 303:7
308:7
taken 1:10,13
4:10,21 44:24
67:22 92:24
102:11 117:17
117:19 167:2

117:10 127:3,6
134:22 135:15
144:17 149:23
155:18 156:4
189:13 199:24
203:2 206:7
207:4 216:21
221:11 224:7
225:23 226:3
226:16,20
229:13 235:17
242:8,10,21
249:7 252:5
260:18 277:9
277:10 281:21
294:7 307:8
surfaced 277:3
survey 209:21
surveys 38:6
84:3
survived 226:15
susceptible
41:17
suspect 12:2,4
28:22 99:9
103:1 104:15
108:10,13
109:8 111:16
115:13 116:17
155:24 156:6
157:6,6 192:23
279:9 288:21
290:24 292:16
suspect's 147:16
147:20 169:22
204:9
suspects 110:18
276:8,17
298:18
suspects' 35:2
swear 5:15
switched 194:20
switching 308:5
sworn 5:18 6:4
325:17 326:15

218:12 236:24
238:9 260:5
280:13 282:11
285:18 286:14
288:9 309:10
311:13 326:8
326:11
talk 23:21 103:9
105:6 153:21
189:12 211:2
221:4 250:2
265:21 306:7
323:20
talked 119:6
126:17 145:6
150:11,12,14
201:1 220:3
225:16 271:19
278:9 308:9
talking 28:6,7
34:20 49:13
64:2 65:2
67:20 70:7
85:16 92:14
110:2,3 118:22
122:3,8 130:15
139:7 141:3,4
147:15 149:7
149:19 150:10
152:10 153:3,7
158:12 189:4
191:20 200:3
205:12,13
206:2 210:9
224:23 231:3
234:8 235:10
238:14 245:24
247:4,16
256:11,12,19
262:12 271:5
288:4 299:20
300:9 302:1,4
304:16 308:3
308:10 315:23
320:3 321:21

tall 154:11,24
155:1 156:15
tallied 40:20
tangent 205:14
tape 275:19
tapes 40:18
tasked 90:5
taught 72:9
137:8 250:6
teach 71:23
124:21
teaches 111:4
teaching 71:21
71:23 72:1,2,3
137:21 144:3
307:2
team 214:22
224:21 225:24
235:14
technically 36:5
67:1 232:8
technique 37:9
58:6 101:17
104:20,23
105:1,3,8,12
106:4,12
108:10 121:10
121:12 125:5
245:22 247:6
290:3 292:9,11
292:14,17
293:18,24
294:4,6,22
295:4,6
techniques 7:1
35:1,9 36:10
36:18,19 37:7
37:8 47:24
58:3 86:6
88:22,23 89:3
97:21 102:20
102:22 105:2,6
105:10,19
109:12 116:13
116:14 125:10

131:21 191:10
244:19 248:1
271:3
telephone 17:7
17:17 315:9
tell 9:14,20
11:13 15:12
20:10,20 28:13
28:18 32:1
39:18 68:19
83:22 93:8
94:24 101:3
109:22 131:17
186:15 192:15
195:9 205:15
229:8 244:1
254:5 269:2,6
269:12 280:19
281:11 282:22
282:24 283:2
283:15 286:19
287:13 321:6
326:15
telling 12:5
49:14 80:12
94:16 109:23
110:5 111:7,18
159:16 297:24
Temple 204:24
ten 11:10 19:14
63:23
tend 61:20 62:1
74:9 84:5
125:17
tendency 55:19
tenth 212:15
term 105:2,4,5
105:16 138:8
145:2 160:8
230:24
terms 33:20
65:24 93:4
112:5 159:10
209:6,13
216:17 227:3

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 375

302:6 307:14
312:24 315:7
**test** 48:19 117:3
117:4,8,10,21
141:21 149:18
150:6 167:5
168:23 169:1
169:18 170:1,6
170:7,10,22,23
170:24 171:11
172:5 187:14
191:19 204:24
207:22 260:7
279:12
**tested** 157:5
**testified** 6:4 66:3
66:4 68:8 69:5
73:10,12,15,19
187:1 194:22
199:9 230:6
255:10 257:13
280:17 281:1
281:10 283:21
301:1
**testify** 19:17
28:9 67:17
69:1,7 77:22
83:19,19 84:12
84:20 92:17
138:2 139:1,18
139:23 140:5,9
140:12,18
141:20 142:4,9
142:15,21
143:5 188:11
188:14 191:14
191:15 192:1
193:5,18 281:1
**testifying** 66:1
67:9,21 68:4,7
68:13,17,21
69:21 73:1
82:8 139:6
140:17 141:9
141:14,17,18

297:21
**testimonial**
135:21 138:10
**testimony** 10:1,2
10:3,4,7,23
11:6,14,18,19
12:8,10,24
13:8,17 14:6,7
14:19,20 15:5
15:8,10,13,24
16:6,7,12,15
16:19 67:22
78:7,9 81:3,7,9
84:11 87:11
88:16 90:3
128:18 140:15
140:20,22
142:2,23,23
143:7 149:24
181:20,23
182:1,9,15,16
183:14,21
184:3,9,12,16
185:3 188:2,5
188:5,13,21
189:17,19,20
189:20 190:4
190:10,13
191:2 192:20
193:6 200:1,3
200:7,11,17
201:4,11,14,21
202:4 210:5
252:21 253:19
253:19 271:21
281:3,12,18
282:6,11,20,21
283:6 284:24
285:1,2 300:15
301:11 325:9
325:12
**testing** 49:16
206:4 207:2
239:1
**tests** 208:1,22

220:22 221:6,7
241:20 263:3
**Thank** 4:19
74:21 87:4
152:14 260:4
287:10
**thanks** 181:5
258:9 323:16
323:18
**theft** 130:20
132:8,13,14,19
132:22 133:8
133:12,21
**theft-type**
133:24
**thefts** 133:15
**theoretically**
291:3 318:13
**theory** 128:6
214:14 221:8
233:14
**thing** 8:9 9:7
178:21 185:1
225:13 295:22
**things** 10:20
12:9 13:24,24
32:10 36:23
37:6,8 43:5
54:1 64:18
102:13 110:13
111:13 114:11
116:4,4 124:21
135:4 146:8
152:7,10,17,18
153:4 156:17
163:6 164:6
170:2 172:14
173:4 205:13
216:18 223:16
247:5 249:13
249:17 250:3
253:12 256:4,4
256:13 257:15
267:3 272:11
272:15 280:3

284:7 297:13
304:4 317:17
**think** 5:13 11:6
14:19 17:11
18:5,6,15
19:13 20:21
22:15 23:23
24:2 28:12,24
29:15 31:15,17
31:20 36:13
37:12 39:3
41:6 43:4 49:2
49:6,12,23
50:6,19,19
54:17,20,24
55:4,5,14 56:4
56:22 57:18
58:22 59:5,7
61:1,4,5,12
63:15 64:3,10
64:19 65:4,12
65:14,14,15
66:21 68:12,20
71:9 73:12,13
74:5,9,10
77:20 78:6,6,8
79:2,6,7,19,20
80:6,8,13,14
81:3,8,11 83:9
83:10,10 84:11
85:8,10,22
86:3 87:14
88:3,10 89:5,9
89:14 93:7
94:3 97:15
98:8,12 99:4
99:19 103:7
106:2 108:7,15
110:3,19
114:12 115:9
117:12,19
119:16 123:20
124:4,6,6,9,12
125:21 126:4,6
127:22 128:17

129:9,21
130:11,17
131:15,24
132:6 133:11
133:15 134:18
141:8 142:11
149:2 150:21
150:22 152:7
153:2 155:20
159:2,3 160:11
160:22 165:10
165:11 168:2,7
168:14,17
169:4 170:4
172:18,22
173:10 176:20
178:6 181:11
182:12 184:13
185:15 187:10
187:12,17,19
188:22 192:8
192:14 195:23
196:20 198:13
202:9 203:2
209:21 212:23
216:24 217:1,9
217:11,13,23
219:14,23
220:2,17 221:8
221:12 222:12
224:20 225:3
226:6,9,16
229:7,9,10,21
232:4 237:3
238:12,21
242:13 245:10
247:3,4,15
249:9 253:18
255:20 256:6
259:5,9,20
260:17 261:8,9
261:9 262:14
262:19 265:10
267:20 269:22
269:22 271:3

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 376

272:8,8 273:14
274:22 276:10
276:12,19
277:11 278:2,5
279:13,13
280:4 282:16
284:5 285:19
286:17 287:24
290:18 294:20
296:7 297:10
298:15,17
300:10 301:11
302:23 303:2
303:23 310:19
312:5,21
313:20 314:21
314:21 315:4
316:1,22
317:15,18
320:1,11 321:9
323:15
**thinking** 66:24
104:11 151:20
153:16 162:18
162:19,22
163:3,9,16,18
163:19 193:6
265:5,18 279:5
286:5,9
**thinks** 295:17
**third** 63:16 79:2
79:23 168:20
232:13
**Thomas** 152:20
153:22 154:2,4
154:11 155:7,9
155:24 156:1,9
156:12
**thorough**
175:21 177:15
178:7,24 275:8
**thoroughly**
226:3
**thought** 14:3
15:6,9 22:4

24:8 63:16
106:1 113:11
143:4 152:23
159:15 161:14
168:6 172:18
182:22 183:7
189:8 191:13
198:16 200:18
208:24 210:9
243:22 244:9
245:23 254:2
256:4 260:4
264:3,4 270:21
271:16 296:24
299:11,14
300:6 314:13
317:1 322:17
**thousands** 65:4
100:13,14,23
**threading**
194:10
**threat** 116:16
118:1,1 303:5
303:13,21
304:5,21
**threats** 256:15
302:22 303:7
**three** 20:14
36:14,15 37:6
72:3,5 221:24
287:22 307:3
**three-** 291:23
**threshold** 143:8
**threw** 49:8
**throwing** 256:14
257:14 266:19
268:20
**thrown** 297:14
302:24
**throws** 258:1
**ticket** 309:23
311:9,14,19
313:4
**ticking** 128:16
128:19

**tight** 206:13
**time** 4:14 10:23
13:21 17:24
19:12 22:2,4
50:1 52:11
62:16,17,24
63:2,5 67:13
71:24 74:4,5
79:24 92:23,23
92:24 93:3
106:4 110:10
115:21 116:10
121:9,12 123:8
123:15 128:11
128:13 129:4
129:24 145:18
147:14 151:9
151:10 160:16
160:18,24
162:2 165:1
166:13,13
179:19,23
189:22 190:5
197:2 199:5,8
200:21,23
201:8,16,18
202:4,4 208:11
246:19 247:15
253:4 258:22
265:7,23
267:15 268:14
270:8,12 276:4
277:21 280:22
286:12 288:2
288:18 304:16
305:1 310:10
313:13 317:19
317:20 320:11
324:1 326:21
**times** 7:15 12:2
18:8 56:9
65:13 73:13
101:23 105:5
106:18,19
126:14 191:24

228:7 253:10
274:23 275:3
280:24
**tip** 320:15
**title** 86:24
**today** 11:1 13:18
14:1,21 15:3
15:23 17:5
19:17 21:10,11
23:23 67:22
97:2 106:8
157:7,22 179:2
197:2 202:7,19
203:7 204:2
245:9,10
246:19 255:9
260:13 281:20
286:4 287:1
**today's** 4:13
190:13 316:11
316:22 317:13
**told** 154:9
210:22 272:21
281:13 282:24
283:13 285:15
288:2 311:8,11
**tool** 151:1,5
**tools** 239:11,22
**top** 87:8 88:2
120:5 168:13
168:16 219:14
**topics** 79:21
**total** 64:10
73:17 74:12
315:15
**totality** 116:23
117:3 169:5
183:20 270:20
**towns** 58:22
**track** 132:19
134:13 227:20
228:13
**tracked** 132:12
132:13 317:18
**tracks** 132:17

134:5 317:16
**traditional**
43:20 171:3
**train** 237:2
239:8,18
**trained** 45:18
102:9 106:15
106:17 108:4
145:11,12
215:4 240:7,8
240:12 319:1
**training** 110:11
110:23 136:19
143:24 144:6
144:11,12,14
144:15,20,23
145:16 263:19
292:21
**trains** 110:4
**traits** 249:14
250:17 256:1
265:9
**transcript** 10:8
10:9,10,12
325:9,11
**transcripts**
40:16,16,18
**transparent**
51:14,16
**treat** 62:10
120:1
**treated** 62:8
108:3
**treating** 136:7
**treatment**
103:12 104:17
**trial** 10:1 14:19
14:19 15:5,8
16:15,16,19
40:16 67:18
73:15 88:18
139:1 140:11
142:24 181:20
181:22 183:13
189:19 191:15

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 377

193:18,19
194:21,22
201:2 218:3
252:21 253:19
271:17,21
300:21
**trial's** 182:3
**trick** 286:6,13
289:3,10,13,13
289:16 291:6
291:10 292:10
293:13,16,23
294:1 295:15
**tricked** 290:6
294:19,21
**tried** 40:13 74:1
212:9,12
**tries** 49:10
**trivial** 292:17
294:6,7
**true** 6:21,22 7:3
7:4 32:19
35:12 36:20
39:4 51:15
60:4 62:10
71:1 72:23
88:24 107:8,15
112:10 113:2
114:18,21,22
117:15 119:11
119:15,16,19
119:21 120:6
120:13,17,21
121:5,20 125:7
126:23 127:10
127:22 128:3,5
135:2 136:2
139:2 141:22
157:2 161:17
161:18 166:3
169:10 171:9
197:21 203:15
215:17 217:9
217:14 223:6,6
233:10 236:13

236:15,18
238:2,3 241:6
241:11,14
242:5,5 243:13
243:17 244:3
244:20 245:15
245:18 248:3
265:9 269:21
279:5,10,16
280:6 296:16
297:15 298:1
309:9 325:12
326:19
**truly** 58:5
127:21 238:2,3
244:22 303:12
**Trump** 206:18
**trust** 255:11
**truth** 12:5
109:18,23
110:5 111:7,18
177:5 187:18
326:15,15,16
**truthful** 13:7
127:19 289:11
**truthfully** 294:2
297:21
**truthfulness**
292:3
**truths** 237:8
**try** 40:19 68:19
97:17 128:5
165:15 197:3
216:1 221:10
228:13 229:10
231:14 243:7
252:8
**trying** 25:6 30:8
36:5 54:4,7
55:8 81:21
94:13 100:21
105:13,15
137:22 150:22
151:11 180:13
185:14 188:15

195:9 206:11
211:3 214:9
235:12 239:12
258:21 259:2
270:21 272:1,2
275:8 278:18
295:14 297:3
307:19
**tune** 102:17
**tunnel** 110:21
**turn** 314:19
315:5,10,13
**turned** 248:18
314:20
**turns** 110:24
173:14 277:14
**TV** 268:17
**Tweety** 288:1
**twice** 18:9
**twin** 268:13
**two** 17:11 33:9
56:16 58:22
59:1 61:7 72:6
72:11,11 114:3
120:1 130:17
130:17,23
131:2 156:17
158:7 177:18
186:22 191:17
206:2 214:24
217:6,11,12
247:4 264:5
307:2
**two-fold** 264:4
**two-thirds**
287:16
**two-time** 187:1
187:7,23
**type** 27:8 32:7
43:21,23 46:1
46:3,6,7 53:11
55:9 58:11
85:2 130:5
131:3,7 132:22
133:1,6 158:18

206:24 226:22
244:16 247:10
260:11
**types** 32:10
34:15 38:2
48:2 49:21
62:2 103:16
122:12 130:20
133:9 134:3
158:4,15
168:10 208:1
271:13
**typewriting**
326:10
**typically** 44:3,10
44:13,17 57:22
58:1 61:16
62:1,18 67:12
68:23 70:1,14
70:19 71:6
72:11 74:4
81:13 178:15
205:24 207:5
207:16 213:19
218:2 260:19
319:3
**typo** 288:2
**typographical**
289:5
**typos** 293:6

─────── **U** ───────
**U.S** 96:14
**ultimate** 60:10
60:13 190:14
**ultimately** 54:5
92:11 145:23
225:4
**umbrella** 105:1
**un-** 275:6
**unable** 151:23
**uncommon**
237:24
**unconsciously**
214:13

**unconstitutio...**
115:16
**uncontested**
173:17
**under-** 261:15
307:20
**underline** 10:19
**underlined**
10:21
**underlying** 44:3
44:16 321:24
323:13
**undermine**
149:11 245:13
250:21 255:20
**undermines**
251:1 256:6
**undersigned**
327:3
**understand** 6:19
9:13 32:22
37:14 38:15
45:9 46:11,14
47:5 49:17
50:5,10 51:8
65:2 68:1,19
86:10 88:14
89:8 90:14,20
92:13 93:24
105:20 127:3,7
127:14,16
138:8 141:6,8
147:24 150:13
150:21 160:13
160:14 172:22
182:2 199:6
202:21 219:6
231:3 239:23
241:8 250:12
277:9,13
288:16 293:5
294:12 299:19
306:13 322:9
**understanding**
10:18 22:11,14

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 378

25:10 37:16
39:9 56:24
80:9 115:23
116:2,8 140:4
144:10 145:10
173:3 203:6
261:16 300:1
303:10,16,19
306:19 311:10
315:13
**understands**
255:11
**understood** 9:17
25:5 216:2
255:23
**undoubtedly**
25:4 244:24
**unfreezes** 153:2
**unintentional**
232:17
**unique** 322:12
**United** 1:1,12
4:12 93:14,17
96:23 98:17
99:19 100:9
138:22 276:16
318:16 325:1
**universe** 55:7
69:3 211:20
212:3,21
**university** 30:19
71:19 72:19
74:6 95:13,17
137:20 208:16
228:6
**unpublished**
28:10 40:17
**unre-** 321:21
**unrecorded**
274:23
**unreliability** 7:1
149:4,6,13,15
151:21 152:23
153:14 163:3
166:8 169:2,6

169:11 170:3,5
170:11 183:23
196:18,22
234:21 298:8
**unreliable** 34:23
36:12 69:24
70:18 117:22
146:4,5 153:6
153:13 189:11
**unrepresented**
321:22
**unusual** 267:20
**updated** 23:11
24:3
**updating** 24:1
25:4
**upheld** 139:19
**upload** 95:18
**use** 9:9 20:8
29:16 33:16
35:1,2,10 40:9
49:7 55:13
57:12,21 58:15
58:16,17 82:2
82:18,23 85:18
88:6 89:7,19
91:18 92:11,19
98:13 100:15
102:15,19
104:9 105:11
105:16,20
112:1 116:12
117:13 124:12
150:15 151:5,6
162:11 171:4
176:16 205:23
213:16 218:23
220:4,14
270:19 292:2
**USF** 95:12
**usually** 10:19
24:12 95:10
157:3,5 178:9
205:18 214:22
233:3 244:11

284:24

___

## V

**v** 1:5 325:4
**vague** 11:12
37:1,4,13
83:24 130:12
158:23 308:20
**vagueness** 159:4
183:15
**valid** 48:20
239:20 310:12
**validate** 51:4
**validity** 238:24
**Vallejo** 59:1,6,8
226:8
**valuable** 124:7
124:19 242:7
242:11 243:12
243:14,15
245:5,6
**value** 81:7 87:10
87:17,18 88:16
89:9 90:2,3
279:12 288:24
**values** 50:24
**vandalism-type**
253:11
**vantage** 296:24
**varia-** 247:19
**variable** 32:16
206:3 211:13
220:20
**variables** 32:13
32:16,23 33:2
35:7 40:20
58:4,4 206:2
221:1
**variation** 247:18
248:23
**variations**
247:20
**varies** 74:14
**variety** 26:10
38:9 157:17

**various** 101:15
241:20 253:9
**vast** 70:2
**verdict** 230:7
**verified** 146:17
**verify** 51:4
52:24
**version** 25:2
79:10 113:6
183:12 243:1
280:5 285:15
287:9 288:12
296:8 304:19
305:8 309:7
311:1,2
**versus** 4:10
99:10 130:6,6
167:10 238:2,3
244:20 246:5,6
246:24 282:15
**vet** 226:3
**vicinity** 7:21
160:18,24
161:3,5 162:1
162:4 303:11
**victim** 52:4,5
154:9 194:24
238:5,11
**video** 2:13 4:2,2
4:6,20
**videoconference**
1:14 2:1 4:23
6:4 325:10
326:6,12,13
**VIDEOGRAP...**
4:1,19 5:14
62:24 63:2,5
123:14 165:1
179:19,23
270:8,12 324:1
**view** 7:7 30:12
93:13,16,19
94:15 181:22
289:10,17
**viewed** 11:17

194:24
**village** 68:5 70:9
**villages** 71:15
**violated** 69:23
116:9
**violates** 102:7
**violation** 67:5
315:7
**violence** 115:24
296:1
**virtually** 11:16
60:16 66:3
70:21
**vision** 110:21
**visited** 116:1
**vitae** 61:4
**vocal** 110:7
**vociferously**
178:11
**volume** 78:24
79:9
**volumes** 81:12
**voluntarily**
117:6 289:24
294:16 295:12
308:13,15,16
309:6,19
**voluntariness**
117:21 312:17
**voluntary**
112:19 289:21
292:15 295:16
**voters** 206:16
**vouching** 280:10
**vulnerabilities**
249:2 258:17
259:4
**vulnerable**
41:17 250:9
259:18,19,23
259:23

___

## W

**W-H-O-L-L-Y**
98:12

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 379

**Wacker** 2:8
**wad** 272:23
**wait** 90:24
  150:23 173:23
  309:24
**walked** 257:10
**wall** 256:15
**want** 8:16 13:17
  14:23 16:13,18
  20:20 21:5
  22:24 25:11
  28:13 29:1
  37:13 39:10,24
  44:4,5 46:12
  47:14 49:4
  50:5,12 51:6
  51:13,18 53:20
  58:20 62:16,17
  62:20 64:4
  72:17 78:1
  79:5 83:14,15
  86:15 87:24
  90:7 91:4,5,5,6
  92:13 101:1,3
  107:10 112:20
  115:8 118:21
  123:4 148:1,7
  150:14,16
  151:1 164:8,13
  165:5,8,14,15
  166:11 179:15
  179:17 181:6
  188:8 189:11
  197:2,23
  198:20 204:18
  205:11 212:12
  212:24 222:2
  234:14 235:5
  236:1,4 244:16
  245:4 257:22
  264:24 270:3
  272:13 277:9
  277:11 282:6
  285:14 286:18
  288:20,20

291:14,16,18
291:19 294:5
301:20 302:16
303:4 306:7
310:16 314:8
319:22 321:4
**wanted** 13:20
  15:11 16:15,20
  16:24 48:23
  50:15 52:24
  79:20 283:1
  308:13 315:2
**wants** 51:15
  227:8
**warnings** 250:1
  250:13 253:20
  255:22
**warrant** 253:23
  254:5 307:6,10
**warrants** 254:18
**wasn't** 15:19
  43:20 47:5
  61:21,21 114:7
  161:6,7,17
  162:18,19,22
  162:24 163:3,9
  166:6 189:8
  192:7 207:24
  223:7,15
  230:12 232:6
  241:16 257:12
  268:1 276:6
  297:8 301:4
**watched** 100:23
**watching** 268:17
**way** 12:5 19:20
  21:18 22:9
  32:12 35:17
  37:12 38:14
  39:3,11,12
  42:8 45:23
  56:22 68:11
  69:6 73:4
  80:16 81:21
  88:10 92:1,7

98:21 99:1,20
99:23 102:7
106:7,13
108:15 116:22
133:15 134:6
141:5 142:21
145:18 150:10
151:20 156:23
161:23 162:19
169:5 175:23
177:12 178:9
184:22,22,24
190:21 212:1
228:17,20
235:12 241:8
255:20 257:16
263:6,21
264:14 274:22
277:4 280:1
283:11 287:16
297:24 304:5
308:8 316:1,24
317:7 318:12
318:17 321:22
323:8
**ways** 220:22
  243:14 257:1
  297:23 307:3,4
**we'll** 14:17 20:9
  22:23 143:19
  165:17 179:15
  198:21 229:8
  284:7 286:13
  323:19,20
**we're** 7:13 8:19
  9:2,9,17 20:7
  28:6,7 32:2
  34:21,23,24
  35:2,3,4,13
  46:13 50:1
  62:3 63:3 70:7
  86:24 92:3
  96:2 97:6
  117:21 123:9
  123:11,11,19

130:15 131:9
149:7 164:13
165:2,16
179:10,20,22
179:24 191:19
195:19 206:22
207:4 215:4
226:4 247:4,16
262:12 268:4
270:9,11,13
282:14,20
293:20 313:11
**we've** 28:11
  119:6 186:20
  203:12 224:7
  229:7 238:22
  238:23,24
  239:1
**weak** 160:2
**website** 228:9
**websites** 228:6
**weeding** 117:22
**week** 11:2 93:4
  93:8,11
**weighs** 298:15
**weight** 34:11
  245:15 246:21
  248:12,13
  255:18 256:22
  256:24 257:18
  283:9 297:10
  302:7
**welcome** 245:1
**well-established**
  290:22
**well-known**
  108:6
**well-prepared**
  193:20
**went** 29:19 33:1
  140:11 148:17
  172:12 199:2
  205:14 214:24
  215:2 262:24
  266:16 269:17

275:2 304:14
**weren't** 34:8
  43:5
**West** 2:8 198:11
  198:23
**Westlaw** 227:19
**White** 219:16
**wholly** 93:20,21
  94:7,11 97:9
  97:15,17,22
  98:9,10
**wide** 290:22
**wild** 305:5
**win** 206:12,23
**window** 118:10
  118:12,16
  194:23 302:24
**Wisconsin**
  204:23
**wisdom** 134:12
  236:14
**wit-** 223:2
**witness** 3:2 4:15
  4:17 5:15,18
  6:3 12:15,18
  12:19 13:4,10
  25:20,23 26:1
  34:19 50:18
  62:13,15,18
  63:1 65:19
  69:24 71:3
  74:9,16 78:7,8
  81:2,7,9 83:2,4
  83:8 85:7,12
  85:23 87:11,21
  89:22 90:3
  92:15,18 95:5
  111:17,22
  113:9,11,14
  114:2 115:14
  122:23 123:2,7
  143:3,15 152:4
  154:19 155:7
  156:14 158:21
  159:14 165:9

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 380

167:14 173:7,9
179:13,16
182:10,14
184:9,18,21
194:10,10
202:1 237:13
237:15,19
239:14 254:13
257:8 265:17
267:10 269:11
270:4 271:14
272:1 277:8
279:3 280:21
294:8 296:20
305:5,15
308:11 311:1
312:14 313:8
315:10,11
319:20 323:18
323:22 326:7
326:14,20
327:1,6
**witness's** 183:12
183:14 184:3
**witnessed** 154:8
279:10
**witnesses** 15:16
15:16 87:7,17
89:7,19 182:9
182:14 188:18
270:19
**witnesses'**
182:16
**wonder** 135:5
**wondering**
78:14
**word** 29:15,16
49:7 96:10,11
96:11 97:15,17
97:22 98:2,3
98:10 124:5,13
124:17 154:4
162:4 255:5
275:3 283:19
283:19

**worded** 98:21
260:18
**wording** 37:12
**words** 12:6
70:21 112:1
134:19 145:7
180:17,18
181:6 214:13
218:10 248:11
272:7
**work** 26:3,6,12
28:8,10 29:24
30:1,7,15
31:12 42:24
58:13 63:21
64:22 65:24
68:3 69:20
70:22 71:18
73:5 85:11,23
88:12 91:11
92:7,17,20
93:3,6,7 105:8
118:23,23
144:21 145:5
147:18 150:4
151:22 192:1
206:20 207:13
226:21 227:9
228:13 231:21
243:12 304:23
305:8 322:14
**worked** 16:22
81:10 144:4
220:6
**working** 65:18
92:14,16
213:11 310:1
314:2
**works** 84:16
95:10 101:15
178:9
**workweek** 93:2
**world** 37:22
50:20 108:2
121:11,15,24

124:8 125:1,5
126:23 127:10
144:22 213:6
220:21 241:14
246:1,11
**worldly** 250:19
**worries** 181:2
**worth** 172:9
**wouldn't** 33:22
36:7 43:8 48:7
53:24 55:13
80:5 82:14
88:9 89:10,14
92:19 127:23
129:3,23 146:1
158:14 160:21
160:22 164:21
167:19 168:24
173:24 223:18
227:1 233:13
242:4 243:4
249:4 258:3,11
268:19 273:16
307:16
**wrapped** 233:14
**wrecks** 237:2
239:8,18
**Wrightsman**
151:17
**write** 16:4 79:7
79:21,23
104:11 193:13
204:8 265:1
287:17 295:1
306:8 309:2
**writers** 145:5
306:2
**writes** 319:2,5
**writing** 22:16
46:8,9 80:22
81:2 83:15
87:22 89:10
90:21 96:19
128:18 220:11
252:22 292:4

293:4
**writings** 117:9
117:11 320:7
**written** 26:7
33:9 34:6
41:12 44:12
52:10 56:17
60:9 64:9
77:24 78:5,7,8
78:12,24 79:1
79:24 81:7,13
89:11 98:1
117:17 119:6
119:18 144:3
144:22 145:13
145:17 150:7
231:24 265:23
289:22 314:24
**wrong** 50:6 52:2
67:10,16 110:1
156:4 207:22
222:17 223:9
223:17 224:5
229:8 293:13
**wrongful** 7:4
24:20 66:19
72:9,14 78:11
81:4,5 84:24
120:22 162:21
163:11 178:12
188:2 212:15
212:18 240:21
314:11 318:24
320:11,13,14
320:22 322:7,9
**wrote** 20:6
78:15 80:7
84:22 86:7
96:2 104:7
146:8 150:5,9
201:8 204:20
208:18 261:2
280:23 295:7
303:4 305:22
318:24 321:4,8

322:22

---

**X**

**X** 3:1,7 218:12
218:14

---

**Y**

**Y** 218:13,14
**yeah** 6:16 9:19
11:6 13:14
14:14,22 15:2
17:6 28:11
34:20 43:14
49:6 50:1
51:16 53:23
55:13 58:10,12
58:13 59:1
62:14 64:5
65:21 67:7
71:4,22 72:23
74:20 77:20
78:23 79:12
81:19,19 86:17
87:1,18 88:9
89:24 94:8,20
95:5,6 98:11
105:13,18
112:2 123:2
125:23 127:13
128:22 130:23
133:4 139:24
141:11 152:5
152:11,21
154:13,23
156:12 164:11
165:14 169:22
174:12 179:8
179:23 182:20
182:22 184:5
191:22 194:17
203:18,21
205:6 222:23
224:24 226:24
228:11,14
229:16 231:8

---

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 381

231:23 232:14
232:15 238:5
239:15 241:22
246:2 248:11
248:22 252:19
253:4 256:2,16
259:8 261:8
263:15 268:4
270:12 272:20
276:14 277:13
284:11 285:24
287:4 289:12
303:9 306:12
307:7 312:5,7
313:24 314:3
315:4 316:14
316:14 319:11
322:17
**year** 24:13 32:5
65:13,15 71:22
71:23 72:3,4
88:2 304:16
**yearly** 317:1,23
**years** 52:3,19
63:16,21 77:21
77:24 78:24
79:19 81:8
85:24 86:12
100:23 102:18
146:21 168:23
168:23 176:16
200:7 203:9
208:11 268:17
271:17 321:19
323:11
**yell** 281:8
**yes-and-no**
105:23
**yes-or-no** 124:3
124:4 185:20
185:21 195:22
197:1
**young** 248:19,21
**youth** 41:14
116:6 251:8

255:21

**Z**

**Z** 218:13,14
**zero** 69:14,17
70:7 244:17,21
**Zimbardo**
151:17
**Zoom** 7:13 8:19
8:21 17:7

**0**

**018189** 282:11
**02204** 1:5 4:11
325:4
**084-004873**
327:17

**1**

**1** 3:9 92:5
120:18 246:3,4
246:7,17,23
247:7,8
**1-17** 74:24
**1,500** 206:16
**1:30** 269:15
**1:45** 165:1
**10** 120:19
140:18 221:24
246:6,8 247:1
**10:00** 123:12
266:19 267:11
267:18 268:9
268:11,22
**10:01** 1:16 4:14
**10:45** 123:12
**100** 93:6 94:14
97:23 100:8
238:6
**11** 56:3 140:16
**11-** 62:24
**11:00** 128:23
129:3
**11:19** 63:2
**11:25** 63:5

**110** 314:10,12
**12** 95:22 129:22
321:19 323:11
**12:00** 179:11
**12:30** 129:11,17
**12:43** 123:15
**1208** 161:10
**1212** 198:11,22
**122** 59:7,15
**125** 29:12 30:20
32:19 33:5
39:24 41:21
44:22 45:1,1,5
51:20 53:2
59:5 64:20
223:17,21
226:18
**13** 85:24 96:9
166:12 253:10
257:24 258:12
323:11
**13-year-olds**
268:13,14
**134** 4:4
**14** 323:11
**1400** 4:5
**15** 40:3 56:2
66:14,23
121:23,24
221:23,24
248:18,21
253:1 254:5
268:17 313:15
**15-year-old**
267:19 268:19
290:24
**15-year-olds**
254:10 268:11
**150,000** 88:4
**15th** 199:21
**16** 116:19 118:5
118:9 129:22
291:1
**16-hour** 118:10
118:12,16

**16-year-olds**
248:21
**161** 327:14
**16th** 161:13
**17-year-olds**
248:21
**175,000** 88:4
**18** 41:16 52:3
**18,000** 318:15
**182** 59:16 60:11
60:22 61:8,9
64:21
**19** 1:5 4:11 97:5
325:4
**19-** 200:9 317:13
**1930s** 305:21
**1940s** 108:6
**1967** 292:12
**1970** 316:22
**1970s** 316:11
317:13
**1980s** 298:19
**1983** 67:18
70:20 193:11
**1986** 291:17
292:13
**1989** 320:10
**1990** 151:22
**1990s** 59:3
150:10 200:9
208:20 298:19
**1991** 161:13
189:18 199:21
202:13,16
226:15 255:12
275:18,23
276:16
**1992** 226:15
282:12,15
**1993** 318:10,12
**1996** 61:2 65:19
73:21 209:6
210:19
**1997** 73:14
**1998** 33:8 34:5

204:20 210:19
225:7 231:10
**1999** 86:3
**19th** 2:9

**2**

**2** 3:10 8:1 40:4
92:4
**2,000** 73:20
**2:00** 166:13
**2:02** 179:19
**2:30** 269:15
**2:38** 179:23
**20** 93:2,3 121:9
121:12 208:11
291:5
**20-** 198:10
**200-** 26:7
**2000-** 32:20
**2000s** 208:20
**2001** 33:10
**2003** 276:10
**2004** 30:17
32:20 33:5,12
39:14 40:10
41:19 42:21
43:3,17 44:19
45:8 48:22
51:20 53:12
54:13 57:5
58:17 64:9
119:2,5 196:20
204:22 210:18
214:23 217:10
223:17 225:8
226:17 227:4
231:10 276:12
313:23
**2005** 209:5
**2006** 204:22
**2008** 81:1
291:23
**2009** 86:8
**2010** 219:15
**2012** 231:9

Anthony Jakes v. Kenneth Boudreau; et al.
Deposition of Richard A. Leo, Ph.D. - Taken 6/20/2022

Page 382

322:5
**2013** 204:23
  314:24
**2014** 314:24
**2015** 72:2
**2021** 78:15
  318:13
**2022** 1:16 4:14
  23:9,12 24:11
  325:11,18
  326:6 327:8
**2023** 24:9,16
**20th** 1:16 4:14
  325:11 326:6
**21** 282:22
**22** 306:8
**23-24** 74:23
**24** 40:10
**24-hour** 269:16
  270:2
**25** 246:16
**250** 25:13,16
  26:4,5,8,9,22
  28:1 30:1,7
  31:1 63:10,13
  63:20 313:22
  314:2
**26** 22:11 193:11
**27th** 327:8
**28** 274:23 275:3
**282** 3:13
**2nd** 282:12,15

___

**3**
**3** 3:11 92:1
  206:17
**3,000** 320:9,15
**3:30** 269:15
**30** 59:5,8,8
  100:23 131:1
  176:16 196:20
  200:7 222:1
  271:17
**30,000** 320:16
**300,000** 320:16

**3050** 327:14
**31** 303:9
**311** 2:3
**312.243.5900**
  2:4
**312.361.8851**
  327:15
**312.494.1000**
  2:10
**333** 2:8
**340,000** 88:2
**35** 261:18
**36** 153:2 154:5
  180:7
**385** 66:5
**39** 286:22 287:4
**390** 66:5
**390s** 73:12
**3rd** 2:3

___

**4**
**4** 3:12 97:6
  142:16
**4:28** 270:9
**4:30** 129:10,16
  129:21,21
  266:1 267:12
  267:23 269:15
**4:40** 270:12
**400** 66:4,14 73:2
  73:8,13
**40s** 305:21
**43** 287:9
**45** 61:17 131:1
**460** 314:10
**47** 21:2

___

**5**
**5** 3:13 8:1 40:3
  246:5,7,16
  282:17 284:10
**5-** 73:2
**5:00** 129:22
  269:17
**5:50** 324:1,3

**50** 100:14,18
  109:21
**500** 70:7,13
  315:17 316:12
  316:14
**51** 161:10
**51st** 161:10
  198:11,23
**54** 110:9

___

**6**
**6** 3:4 25:14
  63:11 154:11
  154:24 155:1
  156:15 284:10
  285:19
**6-** 179:4
**6:00** 129:1,2
**60** 59:16 65:13
  65:15 68:15
  93:7,11 225:8
**600** 315:17
**60601** 327:15
**60602** 4:5
**60606** 2:9
**60607** 2:4
**60s** 151:16
**64** 179:4 180:9
  183:7

___

**7**
**7** 142:16
**70** 40:2 260:20
  260:21 261:6
  264:5 265:3
**700** 315:18
  316:15
**70s** 151:16 316:2
**71** 260:3,20
  264:23 265:9
**74** 74:24
**75** 100:15,19
  261:7
**77** 75:1
**799** 87:3

___

**8**
**80** 65:13 68:15
  93:7,11 191:24
  282:22
**81** 125:22 126:6
  223:20,20
**85** 192:1

___

**9**
**92** 3:9,10,11
**94** 227:5
**95** 131:2 206:6
  207:5,6
**97** 3:12
**98** 70:4 227:6,6
  227:7
**99** 69:20 70:1,3
  137:17 206:6
  207:5,6
**99.7** 70:5
**99.9** 23:23