# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| Defendants. | ) | |

---

# EXHIBIT 7

March 31, 2022

Ms. R. Spence
Loevy & Loevy
311 N. Aberdeen St.
Chicago, Il 60607

      Re: ANTHONY JAKES
         (Plaintiff)

      vs.                              Case No. 19 CV 02204

      KENNETH BOUDREAU, ESTATE OF
      MICHAEL KILL, LOUIS CAESAR, THOMAS
      PACK, MICHAEL DELACY, KEN BURKE,
      FRED BONKE, CITY OF CHICAGO, and
      UNKNOWN EMPLOYEES OF THE CITY OF
      CHICAGO
         (Defendants)

**Introduction**

1. I have been retained by the Plaintiff's attorney as an expert witness in the above-referenced civil action. I am therefore submitting the following information and accompanying documents and methodology in support of my opinions. My opinions are to a reasonable degree of professional certainty, based on the evaluation of documents and material provided to me in this case to date, as well as my training, education, experience, and research in the field of law enforcement.

**BACKGROUND AND EXPERIENCE**

2. I retired March 2019 as the chief of police for the Dallas Independent School District Police Department with a workforce of 220 personnel. The department included sworn officers, security officers and police dispatch. At the time of my employment, Dallas ISD was the 14th largest school district in the United States with a student population of 158,000. Additionally, there were 23,000 employees and 230 schools.  I was the Dallas ISD Chief of Police from 2011 to 2019.

3. Prior to my position as the Dallas ISD Police Chief, I was employed by the Dallas Police Department (DPD) and served as the Deputy Chief of the Crimes Against Persons Division (CAPERS).  In this assignment, I supervised 180 personnel with an operating budget of $18.5 million.

I was responsible for all criminal investigations involving murder, robbery, sexual assaults, assaults and the crime scene investigation function for 1.3 million people.

4. Before I was promoted to Deputy Chief, I was the homicide unit commander. I directly oversaw 750 murder investigations, 300 suicides, 75 Officer Involved Shootings (OIS), Death in Custody incidents (DIC) and murder-for-hire investigations. As the homicide unit commander, I also served as head of the Special Investigations Unit for the 9th largest police department in the United States.

5. I came to the Dallas Police Department in February 1982 after graduating from the University of Memphis with a Bachelor of Arts in Criminal Justice. I worked my way through the Dallas Police Department ranks as a patrol officer, patrol sergeant, vice sergeant, patrol watch commander, narcotics unit commander, traffic division commander, bomb squad commander, and ultimately the homicide unit commander. During my first year as a sector sergeant in 1986, nine of the ten officers that I supervised were involved in officer involved shootings in which either a suspect or officer was injured or killed. As a result of the many hours of experience and training I received, I have a very firm understanding of police operations from both the officer's position as well as police management.

6. I am a graduate of the Southwest Legal Foundation Command Management Supervisors Course and the Law Enforcement Management Institute of Texas through Sam Houston State University New Police Chief Course. Additionally, I am a Master Texas Peace Officer with 37 years of experience, a TCOLE State Certified Instructor, and a Certified Analyst through Force Science Institute. I also have been a member of the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF) and the Texas Police Chiefs Association.

7. I have technical, professional, and other specialized knowledge that will assist in understanding the facts and issues of the incident in question. My education and extensive experience provides a deep understanding of how law enforcement officers are trained and operate. This knowledge is the key to reaching a reliable evaluation of a law enforcement officers' conduct. I have conferred with many other law enforcement experts regarding police operations and evaluations thereof. The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in forming opinions or inferences therefrom.

## DOCUMENTS REVIEWED FOR THIS ANALYSIS

8. Plaintiff's attorneys provided me with evidentiary documents for my review in preparation for opining on this case. The attorneys requested that after I reviewed the relevant documents, that I prepare a report documenting and explaining my opinions about the police practices in this case. Those findings and opinions to date are described in this report.

10. As is usually the case in investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process. I may be asked to review these as they may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence that I might subsequently receive.

11. The documents I have reviewed to date are listed below:

1. Complaint for Anthony Jakes (19-cv-02204)
2. Complaint for Arnold Day (19-cv-07286)
3. Chicago PD (CPD) Homicide File
4. Grand Jury Transcripts
5. Trial Transcripts (1993)
6. Crime Scene Photos
7. Arnold Day's Motion to Suppress Transcript
8. Anthony Jakes' Motion to Suppress Transcript
9. Anthony Jakes' Deposition and Exhibits
10. Arnold Day's Deposition
11. Jessie Mae Jones' Deposition and Exhibits
12. Denise Harris Deposition
13. Tyrone Pitts Deposition
14. Claudette Chairse's Deposition
15. Cleotha Chairse's Deposition
16. Kenneth Boudreau's Deposition
17. Ken Burke's Deposition and Exhibits
18. Michael DeLacy's Deposition
19. Officer Duckhorn Deposition and Exhibits
20. Sgt. Bonke's Deposition and Exhibits
21. Louis Caesar's Deposition and Exhibits
22. Youth Officer Patrick Danaher's Deposition
23. Augustus Robinson's Deposition and Exhibits
24. Brian Grossman's Deposition
25. Frank Madea's 2011 Testimony)
26. Marco Garcia's Deposition and Exhibits
27. Eric Winstrom's Deposition and Exhibits
28. Defendants' Interrogatory Responses
29. Anthony Jake's Post Conviction (PC) Testimony
30. Detective Kill's Post Conviction Testimony
31. Post Conviction Testimony for Kenneth Boudreau, Brian Grossman, Kenneth Burke & Louis Caesar
32. Chicago Police Department Policies Regarding

     a.   Admissions, Confessions, and Written Witness Statements
     b.   Interrogations
     c.   Detective Division Standard Operating Procedures – Chapter 18
     d.   Felony Review By Assistant State's Attorney
     e.   Manual of Procedure – Youth Division
     f.   Interviewing Child Victim/Witnesses

33. Kenneth Boudreau, Louis Caesar, Michael Delacy, Ken Burke, and Fred Bonke's Answers and Affirmative Defenses to Plaintiff's Complaint
34. Defendant City of Chicago's Answer, Affirmative Defenses and Jury Demand to Plaintiff's Complaint
35. Brief and Argument for Petitioner-Appellant Anthony Jakes
36. Second Amended Petition for Post Conviction Relief
37. Anthony Jakes' Post Conviction Exhibits
38. Order Granting Certificate of Innocence (Anthony Jakes)

Note: The material reveals that there is conflicting information that was relied upon by Chicago Police investigators. Resolving such conflicts involves assessing witness credibility and assigning weight to the given testimony and is the responsibility of the trier of the fact. Accordingly, the opinions offered in this case related to facts in dispute are based on assumptions that are identified in the basis for my opinion and the totality of my knowledge, training and experience.

**Summary of the Incident**

12. On September 15, 1991, at 11:55 PM, Rafael Garcia was shot and killed just after he left Queen's Submarine restaurant at 1206 West 51st Street in Chicago, IL. Mr. Garcia was in the driver's seat of his vehicle when the shooter shot through the passenger's side window and struck him four times. After being shot, Mr. Garcia stepped out of his vehicle and fell to the ground in front of 1208 West 51st street. Following the shooting, Mr. Garcia was transported to Cook County Hospital where he died as a result of the injuries. Two possible suspects were observed to have fled the scene on foot after the shooting.

13. Detectives from the Chicago Police Department (CPD) Area Three Violent Crime Unit responded and stated the following in supplemental report RD# P 454289:

"R/Ds informed that the victim had been removed by CFD ambulance to the Cook County Hospital and that the victim had apparently been shot while in his auto at this location. R/Ds learned that the victim had exited the Queens Submarine Shop seconds before shots were heard fired from in front of this shop by its operator Gurgid SINGH. R/Ds also learned that the victim had apparently attempted to back his auto from the scene upon being shot and that the 1979 Chevrolet station wagon he was driving lost control and struck a 1983 Plymouth at 1206 W. 51st Street. R/Ds at this time observed that the victims 1979 Chevy station wagon with license plate #RF8509 partially blocking 51st street. And

its passenger side front door window was shattered at 1210 W. 51st St. and learned that the victim had exited his auto after being shot and had fallen on the street at this location where he was removed by the emergency personnel."[1]

14. Also, included in this supplemental report was information learned from the first responding officers:

"bt. 0934, P.O. L. WHITE and R. HARDGROVE, located and related that they had in fact responded to 1102 W. 51st Street regarding information and had spoken with a male Arab owner of the Star Food & Liquors at this location. Bt. related that this individual told them that he heard that this shooting was meant for an individual named 'Snake' who was a passenger in the victim's auto. This male Arab store owner further told them that the shooter was a male black named THOMAS and that the shooter was sent to do this shooting by a dope dealer named 'Troy' who drives a I-ROC and resides in the 5000 block of south Elizabeth…It was further relayed that the shooter was an individual named 'THOMAS' (M/BLK/Skinny/Dark complexion) and that 'THOMAS' had done the shooting for a male black named 'Troy' who drives an I-ROC and resides in the area of 50th & Elizabeth. R/Ds learned that this witness may be the store owners son JAY."[2]

15. On September 15, 1991, before the shooting occurred, Mr. Anthony Jakes (AKA Shawn) had just recently turned 15 years old and had just started his freshman year of high school. At approximately 11:30AM or PM, Mr. Jakes and his cousin Cleotha Chairse (AKA Quarter-Pound) were out on 51st Street only a few houses away from the Queens Submarine Shop.

In Mr. Chairse's Deposition he stated the following regarding what he and Anthony were doing prior to the shootings:

"Q: What do you recall happening the night of September 15, 1991?
A: Well, pertaining—with Shawn getting locked up? We were hanging out – we was on the front of the buildings and it was Mexican parade day. We wasn't sure though. We didn't know. We just figured that they was riding around through making noise and decided to throw bottles at the cars going by and when we threw bottles that the cars going by, the cars stopped and we took off and ran, and maybe 10 minutes after – five to ten minutes after – being in the house, a bottle came through the window – through my apartment window."[3]

16. After Mr. Jakes and his cousin (Quarter-Pound) threw bottles at a car, the car returned and a man from the car threw a bottle through Quarter-Pound's apartment window. After cleaning up the glass with Quarter Pound, Shawn ran from the scene and eventually made his way back to his home where he stayed with his guardian Jessie Mae Jones in a house on the rear lot of 1212 W. 51st Street.

---

[1] CPD Supplement Report RD #454 289. City Jakes 00057
[2] CPD Supplement Report RD #454 289. City Jakes 00057 and 00078
[3] Cleotha Chairse, Deposition, P 12

17. Once Anthony Jakes arrived home he had an argument with his Ms. Jones who slapped in the face and sent him inside.

18. On September 16, 1991, at approximately 12:00 PM, CPD patrol officer Pack received an anonymous call that indicated Anthony Jakes might have information about Garcia's death. At approximately 12:30 PM, Officer Pack and his partner Officer DeLacy arrived at Jake's home and, according to the officers, they requested permission to speak with him. When the officers arrived they spoke with Jessie Mae Jones who informed them that Anthony was upstairs. Upon hearing all of the commotion downstairs, Anthony came down the stairs and met the officers on the stairs. According to Anthony, the officers threw him up against the wall and handcuffed him. As Anthony arrived to the police car, Ms. Jones brought shoes out to the car for him. According to Ms. Jones, while Anthony was inside the police car the officers, without a search warrant, searched through the house looking for a possible murder weapon involved in the Garcia shooting. No weapon was found at Mr. Jakes' home. According to Ms. Jones, at no time did the officers inform her why they were taking Anthony to police headquarters or what if anything he was being charged with. Mr. Jakes was 15 years old when he was taken from his home and transported to the police station by himself.

19. Officers Pack and DeLacy transported (witness) Anthony Jakes to CPD Detectives Headquarters at 39th Street and California Avenue. Once Mr. Jakes arrived, Officer Pack elected to perform a weapons pat down search on Mr. Jakes. During this pat down Officer Pack claimed that when he placed his hand inside Mr. Jakes' front pocket, he discovered a piece of tinfoil wrapped around a powdery substance. At that point, Officers Pack and Delacy elected to charge Mr. Jakes with drug possession and Youth Officer Patrick Danaher processed Mr. Jakes. Officer Danaher knew that Jakes was a juvenile and also knew that he was not accompanied by an adult. In Officer Danaher's deposition he stated the following regarding processing juveniles:

"Q: When you were dealing with a youth who had been arrested, did you ever reach out to that youth's, like parent or guardian?

A: I had to, I had to anytime I had a juvenile in custody, I had to do my level best to get an adult—family member or an adult that was known to the family.

Q: When you say you had to, what made it so that you had to?
A: That's what that was the – what could I say? That was the make-up of the youth division. If we had a juvenile in custody, we had to have an adult companion or relative because the juvenile wasn't we didn't have the – you know, it was just a juvenile and the arresting officer or and or me when we needed someone from the juvenile's family. That's just the way it was.

Q: You mean someone
A: That's just you know whether it was an order or not I don't know. But that's the way it was.

Q: So it sounds like it was the practice of the Chicago Police Department Youth Division to make sure that there was a parent or guardian involved?
A: Exactly"[4]

20. The drug charge that was made against Mr. Jakes was later dismissed when it was discovered that the suspect drugs were not narcotics.

The record reflects conflicting accounts about what happened after Mr. Jakes was processed for allegedly possessing narcotics. According to the officers, after processing, Mr. Jakes was told that he could go home and be interviewed by Violent Crimes detectives later, or remain at the station to be interviewed. The officers indicate that Mr. Jakes agreed to stay to be interviewed. Mr. Jakes, on the other hand, does not testify to ever being given an option to go home but instead being kept in an interview room and was subsequently questioned by detectives.

I did not observe any documentation that Officer Danaher informed Mr. Jakes that he could leave after he was charged, put in a cage, and processed for possessing alleged narcotics.

21. At approximately 4:15 PM (September 16, 1991), CPD Detectives Duckhorn and O'Riley spoke with Mr. Jakes about information that he might have related to the murder investigation. Mr. Jakes informed these detectives that he had no information about the murder involving Mr. Garcia. However, in a desire to be helpful he suggested that three girls from the neighborhood might have information about the murder as he had seen them on the front porch near the time the murder occurred. Mr. Jakes provided these individuals' names to the detectives: Annette Harris, Denise Harris and Nikia Little.

22. After speaking with Detectives Duckhorn and O'Riley, approximately 30 minutes later Mr. Jakes spoke with Detectives Kill and Boudreau. In this conversation Mr. Jakes provided essentially the same information. At this point, according to Mr. Jakes, Detectives Kill and Boudreau locked Mr. Jakes in a room (3rd floor) by himself and went out into the field to interview witnesses. Detectives Kill and Boudreau went back to the crime scene with the intent to interview the witnesses as suggested by Mr. Jakes.

23. Detectives Boudreau and Kill give competing accounts of what happened after their first interview of Mr. Jakes. Boudreau claims that Jakes was asked if he would remain at the police station to assist their investigation if necessary, and Jakes consented to remain. For his part, Kill states that Mr. Jakes agreed to accompany Detectives Kill and Boudreau

---

[4] Youth Officer Patrick Danaher Deposition, P 24-25

when they drove from Area 3 to the crime scene to further their investigation, and that Mr. Jakes remained in the back of their police car until they returned to Area 3.

At the time Detectives Kill and Boudreau left Area 3, they had several leads to follow up on:

> 1. "Arab" store owner (or his son, Jay) told patrol officers that a person named "Snake" was the intended target.

> 2. Detectives were aware of the identify of the Queen Submarine Shop owner Gurgid SINGH who was at the crime scene when Mr. Garcia was murdered and heard the gunshot. Singh might have possible information and could help identify the shooter, might be able to supply a motive, and information about whether the victim had additional possessions with him that were not recovered at the crime scene.

> 3. "Arab" store owner (or his son, Jay) further told patrol officers that the shooter was a male black named THOMAS and that the shooter was sent to do this shooting by a dope dealer named 'Troy' who drives a I-ROC and resides in the 5000 block of south Elizabeth.

> 4. Store owner's son "Jay" might have additional information about the incident.

> 5. Cleotha Chairse (Quarter-Pound) was with Mr. Jakes when they threw the rocks/bottles at the car on 51st and both ran from the scene. Mr. Chairse might have information about the murder and could confirm what Mr. Jakes was doing just before the shooting.

24. Based on the police reports, Detectives Kill and Boudreau tried to find Quarter Pound but the report does not reflect what specific efforts were made to actually identify Quarter Pound. Detectives Kill and Boudreau also reported that they spoke to Denise Harris, Annette Harris, and Nikia Little. Denise Harris, however, states that she never spoke to police. There is no evidence Detective Kill and Boudreau made any attempts to follow up on the leads concerning the Jay, Singh, and the liquor store owner. Detectives Kill and Boudreau instead interviewed five young men from the neighborhood at the police station – Gus Robinson, Ronnie Sloan, Tyrone Pitts, Andre Green, and Michael Sampson. In his deposition, Detective Boudreau testified to knowing Mr. Robinson from having previous dealings with him in the past on other violent crimes in the area. Boudreau also knew that he was known to belong to a gang in the past.

25. Detectives Kill and Boudreau located Gus "Snake" Robinson and spoke with him at the Detectives Headquarters on California, where Mr. Jakes was locked in an interview room (according to Anthony). In this conversation, Mr. Robinson informed the detectives

he had been with his daughter at a park all evening and had received a page that required him to make a phone call.  Mr. Robinson went to the pay phone at Racine and 51st in the parking lot of Oliver's Chicken.   As he approached the phone he was approached by Anthony Jakes who informed him that Little A, Darren and himself were about to rob a Mexican dude who was inside of Queens Sub Shop.  Mr. Jakes asked Mr. Robinson if he wanted to be a with him and assist in the robbery.  Mr. Robinson told him he did not want to be involved and got back into his car and drove from the scene.   A short time later Mr. Robinson heard gun shots at the scene where he had allegedly spoken with Mr. Jakes.

26. After speaking with Mr. Robinson, Detectives Kill and Boudreau focused all of their attention on 15-year-old Anthony Jakes who was now no longer considered a witness, but a suspect in the murder.  Once again all of their attention went to Mr. Jakes and all of the other information supplied by witnesses regarding the target of the murder, alternative suspects, and potential witnesses was cast aside to focus on Anthony Jakes.

As an example of this tunnel vision, the detectives interviewed Denise Harris, who denied having been in front of 1212 W. 51st, contrary to Jakes's information. Boudreau and Kill credited Harris's statement as evidence that Jakes was untruthful. Tyrone Pitts, however, told Boudreau and Kill during the same evening that Harris had told him that she had seen the murder happen right in front of her. Inexplicably, Boudreau and Kill ignored Harris's statement to Mr. Pitts, and never spoke to her again to see if she could identify the perpetrator or describe what occurred during the murder.

Also, Detectives Kill and Boudreau had information that contradicted Mr. Robinson's statement – that the shooter was a man named Thomas and that Mr. Robinson was the target. Nevertheless, Detectives Kill and Boudreau did not contact the Star Food & Liquor owner or the owner's son Jay to investigate this information.

27. At approximately 10:30 PM, (over nine hours after Mr. Jakes arrived at police headquarters) Mr. Jakes was interviewed for the third time of the day.   In Kenneth Boudreau's deposition he stated the following:

Pages 168-169

"Q: Okay. So then, you now want to talk to Jakes since about 10:30, 10:40-45 at night right?
 A: Correct

Q: And so now you want to interrogate Jakes about a murder.  He is 15 years old, and so you can call his aunt to see if she'd come down to the station to be present for the interrogation, right?
A: I don't recall calling his aunt

Q: Right. In fact, you didn't call his aunt, right?

A: No, you know that

Q: All right. And you wouldn't wait 30 seconds for her to come – strike that. You wouldn't wait 30 seconds to call his aunt before questioning a 15-year-old Anthony Jakes, right?
A: Correct

Page 171-172

Q: Okay. So you were asked the following question? This is in the April 2016 testimony at page 87, line 8: You testified that you asked for a youth officer for Anthony Jakes, right?
A: Yes.

Question: Tell the judge at what point in time you asked for a youth officer for Anthony Jakes.
A: After his interview."[5]

28. In the 1987 CPD General Order 87-7 stated the following regarding juvenile interrogations:

"IV. FIELD INTERROGATIONS – AUTHORITY TO STOP A PERSON FOR QUESTIONING

F. In addition to the above warnings, before accepting any warnings, before accepting any admission or statement of a juvenile, the juvenile will be advised that his case might be transferred to a Criminal Court where he will be prosecuted as an adult. An EXPRESS STATEMENT by the juvenile that he UNDERSTANDS THE MEANING of this advice is REQUIRED.

A JUVENILLE SHOULD BE WARNED AND QUESTIONED ONLY IN THE PRESENCE OF AN ADULT (parent, or other relative, friend). IF SUCH AN ADULT CAN BE LOCATED."[6]

29. CPD Detectives Kill and Boudreau knew exactly where Anthony Jakes guardian Jessie Mae Jones lived and how to get in touch with her. They had a GPR on which the only thing written was Jones's name and phone number in large letters. However, after having Mr. Jakes at police HQ for over 9 hours and without a youth officer or Ms. Jones present they elected to read Mr. Jakes his Miranda warning and to start interrogating him as a murder suspect.

30. In the CPD Investigative Manual listed under Exhibit #2, City_Jakes 01252 it states the following:

"INTRODUCTION

---

[5] Kenneth Boudreau Deposition, April 13, 2021
[6] CPD General Order 87-7 (emphasis original)

2. ASSISTANCE WITH DETECTIVE PERSONNEL

A. With the arrest of a juvenile offender who may be charged as a adult, detectives will contact youth officers to be present interrogation. The youth officer will also be present for any and all statements, especially written and court reported statement.

4. AUTOMATIC TRANSFERS

C. There is always some question with regard to the arrest of juveniles and handcuffing. I have spoken with members of the states attorney's office at juvenile court and have read the law regarding the arrest and processing of juveniles. Basically, juveniles CAN be handcuffed when arrested just like any other suspect/offender. However, when they reach the police facility they must be unhandcuffed and placed in a non locked room. As soon as the juvenile is handcuffed in any building that houses a municipal jail, is handcuffed to a stationary object or is LOCKED IN A ROOM. There is a SIX (6) HOUR TIME LIMIT. Also, a log is kept detailing the time spent detaining the juvenile with the charge. A negative report is also made out."[7]

31. Anthony Jakes was at police HQ for 9 hours before the 10:30 PM interrogation by Detectives Kill and Boudreau on September 16, 1991. He was also interrogated for a murder investigation, without a parent/guardian or youth officer present. According to Mr. Jakes, during this interrogation, he was mentally and physically abused by Detectives Kill and Boudreau. At the end of the interrogation, Detectives Kill and Boudreau report that Mr. Jakes gave a statement admitting guilt and involvement in Mr. Garcia's murder.

32. At 3:45 AM (September 17, 1991) Youth Officer Kenneth Burke arrived and spoke for five minutes with Anthony Jakes. In this conversation Officer Burke asked him if he was hungry or thirsty and had he been treated well by the police. At this point, according to Mr. Jakes, he had been by himself, locked in police room for 16 hours and had not eaten or drank anything. According to Mr. Jakes, Mr. Jakes had been mentally and physically abused by Detectives Kill and Boudreau and only wanted to go home and be with his guardian Jessie Mae Jones.

Officer Burke met Anthony Jakes at 3:45 AM on September 17, 1991, and spoke with him for approximately five minutes. During those five minutes, Officer Burke testified that he asked Mr. Jakes if Mr. Jakes wanted his aunt to be present. According to Officer Burke, Mr. Jakes said no, but this conversation purposely was not documented. In his testimony Officer Burke's stated the following regarding documenting the conversation:

---

[7] CPD Investigative Manual, Jakes 01252 & 01253

"Q: So tell the court where you documented that Anthony Jakes was asked by you 'would you like to have your aunt here', and he told you no?
A: I did not document it

Q: You relied on somebody else to document the fact that you asked Anthony Jakes if he – whether he wanted to have a- aunt and he said 'no', right?
A: Well, he told me and I was satisfied with what he told me.

Q: Okay.
A: But, the Chicago Police Department does not require a youth officer in a statement to make any documentation.

Q: You don't make documentation about what you observed, right?
A: Right

Q: It's not required, and your practice was, even it's required, I'm not going to do it?
A: Well, right. I think maybe it should be done. But it's – I was told that were not supposed to do it."[8]

At the time Officer Burke spoke to Mr. Jakes, Officer Burke knew Mr. Jakes was going to be interrogated and/or give a statement. In 1991 it was well documented by police investigators that the longer an interrogation went the more coercive they became. In this case, Mr. Jakes said he had not been fed prior to being offered food at the time of his handwritten statement. In reviewing the detective notes of this case I did not observe any documentation to confirm that Detectives Kill or Boudreau ever inquired with any of the officers about whether Mr. Jakes had in fact eaten or drank anything while in police custody. Further, even with the knowledge that Mr. Jakes was going to give a handwritten statement to the Assistant State's Attorney, neither Officer Burke nor Detective Caesar made any effort to contact Mr. Jakes' guardian.

At 4 AM, Assistant State's Attorney ("ASA") Grossman, Officer Burke and Detective Caesar came into the room with Mr. Jakes. ASA Grossman was introduced to Mr. Jakes by Detective Kill who came in and out of the room as Mr. Jakes spoke with ASA Grossman. ASA Grossman wrote the statement that Anthony ultimately signed.

33. Mr. Jakes' four-page confession is consistent with what Detectives Kill and Boudreau testified Mr. Jakes said during their interrogation. The handwritten statement states the following:

"On September 15, 1991, he was standing just outside Queen's Submarine Shop at 1206 W. 51st Street at about 11:35 PM or 11:40 PM. Anthony stated he was with his friends

---

[8] Officer Burke's June 1, 2016 Hearing Testimony, P 90-91

Little A and Darren. Anthony has known Little A for about a year and one half. Anthony has known Darren for about one year.

Little A came out of the sub shop and said 'The Mexican dude has got a lot of money. We're going to stick him up'. Little then showed Anthony the gun which was sticking out of his waistband. Anthony recognized the gun to be Little A's .380 caliber handgun which Little A usually carries on him at night. Anthony knew that Little A's .380 held between 7 and 8 shells. Anthony knew Little A sometimes kept the clip pf the gun fully loaded with bullets and at other times the gun was half loaded with bullets. Little A told Anthony to get the corner. Anthony understood this to mean he would be the lookout. Anthony's job was to watch for any police that were coming and to let Little A and Darren know that police were coming. After Little A told Anthony to get the corner, Anthony said all right. As Anthony then walked to the corner of 51st and Racine. As Anthony walked toward the corner of 51st and Racine he ran into his friend Snake. In Harold's Chicken (Also known as Oliver's Chicken) parking lot. Anthony went up to Snake and said that he was fittin to rob this man. Anthony asked Snake if he was fittin to help but Snake said 'no'. Snake then drove away from the parking lot.

When Anthony got to the corner of 51st and Racine, Anthony stood there for a little bit and looked both ways. Anthony didn't see any police coming from any direction. Anthony then stood by the newspaper stand which was on the side of Queen's Submarine Shop. Anthony told Little A and Darren it' all right. Anthony meant that he didn't see any police around. Anthony then kept looking both ways.

The Mexican dude then came out of Queen's Submarine Shop Little A went up to the Mexican dude and pointed his .380 caliber gun at the Mexican dude and Little A said, 'This is a stickup'. Darren was standing right next to Little A. The Mexican dude mumbled something that Anthony couldn't hear. The Mexican dude ran to his car parked in front of Queen's Submarine Shop on the street. The Mexican dude started his car and backed up his car. The Mexican dudes car then hit another car.

Little A then went right up to the passenger window of the Mexican dudes car. Little A pointed the gun at the Mexican dude and Little A started shootings at the Mexican dude. Anthony was next to the newspaper stand and was about 10 feet away from Little A. Darren was a couple of feet away from Little A. Anthony did not want to in front of the sub shop because Anthony lived only a few houses away from the sub shop and he didn't want anybody in the sub shop to recognize him. Anthony saw Little A fire four shots at the Mexican dude. Anthony then turned and started to run.

Anthony heard about 3 more shots after he turned and started to run. Anthony ran because he didn't want anybody to see him and he got scared. Anthony came home to 1212 W. 51st Street. Anthony figured that him, Little A and Darren would split the money they were going to take from the Mexican Dude. Anthony didn't want to stick around to get his share because he didn't want anybody to see him and he got scared. After Anthony had been home for a few minutes he looked out onto 51st Street toward the sub shop and saw the Mexican dude moving around on the ground for a minute.

Anthony Jakes states that he has been treated well by the police and the Assistant States Attorney. Anthony has been allowed to use the washroom when he needed to. Anthony states that he is not hungry or thirsty at the present time and told the police that

when was asked if he wanted anything. Anthony states that he was not promised anything in return for his statement nor was he threatened in any way. Anthony is not, nor does appear to be, under the influence of any drugs or alcohol."[9]

34. This statement was signed on each page by Mr. Jakes, Detective Caesar, ASA Grossman and Youth Officer Burke.

35. Mr. Jakes confession includes a detail that is contradicted by the physical evidence: that Mr. Jakes could see the crime scene from the window of his residence. In his handwritten statement, Mr. Jakes stated that:

"After Anthony had been home for a few minutes he looked out onto 51st Street toward the sub shop and saw the Mexican dude moving around on the ground for a minute."[10]

According to Mr. Jakes' arrest report for his narcotics arrest, Mr. Jakes was picked up at 1212 W. 51st Street, rear of the house, where he stated he lived with his Aunt Jessie Mae Jones. In reviewing the photographs and relevant documents, it was not possible for Anthony Jakes to see the "Mexican Dude" in the street moving around from his home in the rear house.

36. An article published by the International Association of Chief of Police (IACP) in conjunction with the Juvenile Justice and delinquency titled "Reducing Risks – An Executive's Guide to Effective Juvenile Interrogation" covers principles that informed generally accepted police practices in 1991. The article includes information about the following:

**Why Does This Issue Matter To Police Chiefs?**

**Wrongful Convictions**: False confessions are a leading cause of wrongful convictions of youth. A youth who falsely confesses may end up in the juvenile justice system or serving time in an adult prison.

**P. 6 The Reality of Juvenile Confessions**

Over the past four years, the United States Supreme Court has stated twice that the pressures of custodial interrogations can cause a 'frighteningly high percentage' of people to falsely confess, while also noting that the risk of false confession is particularly great

---

[9] Anthony Jakes Hand Written Statement.
[10] Anthony Jakes Hand Written Statement

when the person being interrogated is a juvenile. Real-world studies of wrongful convictions support the Supreme Court's conclusions.

- A study of 340 wrongfully convicted people found that 42% of the juveniles studied had falsely confessed, compared with only 13% of adults.
- A study of 125 proven false confessions found that 32% involved individuals under age 18
- The most recent study on juvenile wrongful convictions found that juveniles were almost twice as likely as adults to falsely confess."[11]

37. The IACP article warns to not make promises of leniency and avoid the use of deception during juvenile interrogations. This is a generally accepted police practice that a reasonably trained officer would have been aware of in 1991. The primary reason for this is because a juvenile when offered the option to confess in order to stop the interview can/will tell detectives what they want to hear. According to Mr. Jakes, during his interrogation, Detective Kill told him that if Mr. Jakes confessed to the crime he could go home. If this is true, the risk was that Mr. Jakes would provide a potentially inaccurate statement simply to be able to go home.

38. On February 4, 1992, police arrested Mr. Arnold Day (the "Little A" referenced in Mr. Jakes' handwritten statement) on a warrant for the Garcia murder. According to Mr. Day, while he was interrogated, Detective Foley choked Mr. Day and threatened to throw him out the window. Mr. Day also testified that Detective Boudreau did not do anything to stop Detective Foley's misconduct. At the end of Mr. Day's interrogation, Mr. Day provided a handwritten statement to Assistant State's Attorney Jason Danielian stating that he shot and killed Mr. Garcia. Mr. Day testified in his deposition that this confession was false.

39. Mr. Day and Anthony Jakes went to trial simultaneously, but with separate juries in September 1993. On September 10, 1993, Mr. Day was acquitted by his jury. Mr. Jakes was convicted of felony murder and attempted robbery. He was sentenced to 40 years in prison. Following Mr. Jakes' trial, the *Chicago Tribune* published an article detailing false confessions involving Chicago Police detectives. In this article it detailed allegations of physical abuse and coerced confession in 13 cases involving Detective Kill and 16 cases involving Detective Boudreau. Mr. Jakes was released from prison on June 12, 2012.

**MY OPINIONS & FINDINGS**

40. The principles of law enforcement criminal investigations are thoroughly documented by several different law enforcement organizations. The names of these organizations that I draw my opinions from include the Federal Bureau of Investigation

---

[11] IACP – *Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation*, 2012

(FBI), the International Association of Chiefs of Police, the Texas Police Chiefs Recognition Program, Force Science Research Center and the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA). All of these organizations help to establish guidelines for law enforcement standards and specify how to conduct criminal investigations, lineups, interview witnesses, and prepare arrest affidavits.

41. It is well-settled in the field of policing that the goal of every criminal investigation is to determine the truth. Investigators can never know the truth about what happened during a particular event unless they fully develop the evidence and test all the possible hypotheses against that evidence. Investigators must keep an open mind throughout an investigation and follow the evidence wherever it leads. Well before 1991, investigators were trained to be aware of and to avoid tunnel vision. Investigators are trained to follow the evidence wherever it leads, and to avoid trying to make the evidence fit the police theory of the crime. Investigators are trained that the risk of trying to make the evidence fit the crime is that an innocent suspect might be charged and convicted of a crime.

42. My evaluation of the investigation conducted by investigators Kill, Caesar, Pack, DeLacy, Burke, and Bonke was based on how law enforcement officers are trained prior to 1991. I evaluated how any reasonably-trained police officer could reasonably be expected to respond when faced with the same or similar circumstances involving the arrest of Mr. Jakes in 1991. After evaluating the facts and circumstances of this investigation, I have formed opinions to a reasonable degree of professional certainty. I have concluded that certain aspects in which the investigators conducted their investigation into the Garcia murder investigation violated basic rules of police procedure and was contrary to generally accepted policing practices in effect at the time of the investigation.

**OPINION #1: Mr. Jakes' Seizure and Search were not Reasonable on September 16, 1991**

43. On September 16, 1991, at 12:30 PM Officer Pack received an anonymous tip that 15 year-old Anthony Jakes might have information concerning Mr. Garcia's murder from September 15, 1991. With this information Officer Pack and his partner Officer Delacy along with two other officers went to his residence. At the residence Officer Pack went inside and spoke with Jessie Mae Jones, Mr. Jakes' guardian. Ms. Jones informed Officer Pack that Mr. Jakes was upstairs and according to Ms. Jones the officers immediately went up the stairs. At the same time the officers went upstairs, Mr. Jakes was coming down the stairs. In Mr. Jakes' Motion to Suppress Hearing (MTS) transcript he said Officer Pack and another officer slammed him against the wall and immediately handcuffed him.

44. According to Mr. Jakes, after he was handcuffed he was allowed to put on his pants and he was then escorted to the backseat of a police vehicle. Mr. Jakes said at no point was he provided any information about what was happening or if was being charged with

a crime. Then he was transported to the police station where he was placed in a cage and questioned.

45. It is my opinion that it was not reasonable for Mr. Jakes to be seized at all, let alone be seized in the manner he describes. There was no probable cause justifying a seizure at that time. Additionally, Ms. Jones said that after Mr. Jakes was taken outside to the car, her residence was searched by officers who informed her they were looking for a weapon. Officer Pack received an anonymous tip stating that Mr. Jakes might have information concerning the Garcia murder investigation. The information did not say that Mr. Jakes was believed to have been involved in the murder. The documents I've have reviewed do not include any signed consent to search form that reflect that Ms. Jones gave the officers consent to search her home, nor does Officer Pack's and Officer DeLacy's report reflect any such consent. This search, if it occurred, was also unreasonable because there was no basis to justify searching Mr. Jakes' home without consent. Police officers are trained to not handcuff witnesses without cause, and to not search residences absent consent, probable cause coupled with exigent circumstances, or a warrant.

46. Once Mr. Jakes arrived at the police station he was only considered a possible witness to a crime. However, he was still patted down for weapons by Officer Pack who said he discovered a tin foil wrapper that he believed contained narcotics.
An officer is justified in patting a witness down if the officer has a reasonable suspicion that the suspect or witness poses a threat. If officers had a reasonable suspicion that Mr. Jakes posed a threat, he should have been patted down before ever being placed in their police car. Every police officer is trained not to allow someone into their police car who might be a threat to them.

In addition, when conducting a protective pat down, police officers are trained to pat people down over their clothes (hence the name). Police officers are trained not to go into people's pockets when conducting a protective pat down unless something during the search indicated that the person had a weapon in the pocket. Here, Pack testified that he went into Mr. Jakes' pocket during the protective pat down and found a small foil packet containing suspect narcotics. Officer Pack also testified that at the time he conducted the pat down he did not observe a bulge in Mr. Jakes' pocket. Upon feeling a small foil packet from outside a person's clothing, police officers would not go inside the person's pocket to investigate the packet because it does not appear to be a weapon and it is not readily identifiable as an illegal substance such that there would be probable cause to search further.

Once Mr. Jake's was processed for the drugs he was allegedly advised that he had the option to leave and go home. It was not documented, however, that anyone offered to arrange for transportation to bring Mr. Jakes home or bring Ms. Jones to the station.

In addition, if police officers had received an anonymous tip about Mr. Jakes' knowledge of the murder, I would expect that they would document precise details about that fact.

Anonymous tips can be an important law enforcement tool, but they should be as many details about the call should be memorialized as much as possible. For example, I would expect to see somewhere in the reports an indication about who received the anonymous tip, when the tip was received, how the tip came in (was it over the phone, directed to a particular person, in person, etc.), what the tip said (in this case, did it state where Mr. Jakes could be found? Did the caller refuse to answer additional questions? Did the caller say all they knew was that Jakes knew about the murder? Did the caller reveal the source of knowledge?), and any information about the caller that could be ascertained (such as male or female caller). I see none of this information documented, which is particularly noticeable because Mr. Jakes became the police suspect during his time at the station. Police officers are especially trained to document the circumstances under which a murder suspect first came to the police's attention.

Also, I note that Officers Pack and DeLacey's arrest report states that Mr. Jakes was wanted for questioning by Area 3 Violent Crimes detectives. This is inconsistent with them receiving an anonymous tip that Mr. Jakes had information about the murder. If they had received a tip and that was why they responded to the rear house at 1212 W. 51st Street, training would dictate that they would indicate that in their arrest report (or elsewhere), and they would not document that Jakes was wanted for questioning by Area 3 Violent Crimes detectives.

**OPINION #2: Detectives used procedures that increased risk of unreliable or involuntary confession by a juvenile**

47. It is my opinion that the interrogation of Anthony Jakes at Police Headquarters on the early morning of September 17, 1991, was not conducted consistent with generally accepted police practices. Mr. Jakes was barely 15 years old when he was taken by police from his guardian Jessie Mae Jones's house at 12:30 PM on September 16, 1991. If the officers' accounts are to be credited, when Anthony left his home, he was only advised that he was being brought in for questioning as a witness. As a result of being told this by detectives, his guardian Ms. Jones had no way of knowing that he would be interrogated about a murder.

48. At no point over 16 hours did Mr. Jakes ever speak with Ms. Jones or an attorney even though at 10:30 PM he was considered a suspect in a murder investigation. Ms. Jones was not contacted to alert her that Mr. Jakes was going to be interrogated about a murder.

49. It is my opinion that the interrogation of Mr. Jakes by Detectives Kill and Boudreau without his guardian (Ms. Jones) present or a CPD youth officer present (and without attempting to contact either one, as they testified during the criminal proceedings) departed from generally accepted police practices in 1991.

50. In the aforementioned article from the IACP each of the below-listed practices should have been adhered to by Detectives Boudreau and Kill, particularly after they determined that Mr. Jakes was a suspect in the Garcia homicide, and Youth Officer Burke when he met with Mr. Jakes before Mr. Jakes provided a handwritten confession to the prosecutor:

- Care with Miranda Warnings
- Presence of Friendly Adult
- Child –Sensitive Behavioral Analysis
- Length of Questioning
- Avoid Use of Deception
- Avoid Promises of Leniency and Threats of Harm
- Questioning Style
- Electronic Recordings

**Care with *Miranda* Warnings**

"Even intelligent children and teenagers often do not fully understand their Miranda rights, which can require a 10th grade level of comprehension. This reality has been reflected around the country, as courts have been increasingly willing to throw out a child's confession even after they appear to validly waive their Miranda rights.

When appropriate, law enforcement should also inform young suspects that speaking to police may subject the child to adult criminal consequences. Importantly, police should make sure that the child understands the concept of 'adult criminal consequences' – along with any other concepts that the child may not grasp – before proceeding with questioning."[12]

Further, In Mr. Jakes' handwritten statement from September 17, 1991 written at 4:30 AM at the Area 3 Violent Crimes building he was provided the standard CPD *Miranda* warning that adults were provided:

"I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights. I wish to give a statement."[13]

51. In 1987 the Journal of Criminal Law and Criminology published an article titled, "Miranda in a Juvenile Setting: A Child's Right to Silence." In this article it discussed a

---

[12] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012
[13] Anthony Jakes' Handwritten Statement

juvenile's ability to comprehend and understand their *Miranda* rights and discusses a hypothetical juvenile arrest involving a juvenile known as S.D.

In the article it states the following under I. THE SETTING:

"On appeal, S.D. contends that the confession should have been excluded from his delinquency hearing because he did not understand the *Miranda* warnings. He further asserts that police officers merely read him the warnings from the standardized adult *Miranda* card and made no attempt to explain the warnings in language he could understand.

V. SUMMARY

In light of the foregoing analysis, it is apparent that depending on the specific jurisdiction, appellate resolution of the introductory hypothetical could be decided either way. If the officer advised S.D. of his *Miranda* rights and included an explanation of each in terms the youth could comprehend, the confession would, given the other findings of the juvenile court judge, undoubtedly be admissible in all jurisdictions. Moreover, if the officer had access to, and utilized, a carefully constructed 'Youth Rights Form' which set forth the *Miranda* warnings with accompanying simplified explanations, his testimony naturally would be bolstered by this corroborating piece of documentary evidence. Without such a form, the officer is left with the standard adult *Miranda* exposition and any creativity he can muster at the time if creative at the time he so feels."[14]

52. The U.S. Department of Justice Archives states the following:

"Statements Taken from Juveniles

A juvenile's waiver of Miranda rights will be suspect if given without the advice of a parent or legal guardian…Among the factors which are considered are the juvenile's age, experience, education, background and intelligence, whether he has the capacity to understand the warning given to him, the nature of the Fifth Amendment rights and the consequences of waiving them."[15]

53. In a 1993 textbook titled "Practical Homicide Investigations" written by Vernon J. Geberth it states the following regarding information that CPD detectives would have known at the time of this incident:

That the best practice was for *Miranda* warnings to "be given to the parent (s) as well as the underage suspect. Both the parent (s) and the minor must intelligently waive their rights before an interrogation can proceed."[16]

---

[14] 1987 Journal of Criminal Law and Criminology, "Miranda in a Juvenile Setting: A Child's Right to Silence", Larry Holtz
[15] US Dept. of Justice Archives, Statements Taken from Juveniles
[16] Practical Homicide Investigations, 2nd edition, Vernon Geberth, published 1993, P. 81

54. Anthony Jakes in his trial testimony said that he did not understand his *Miranda* rights and what they actually meant. The record is devoid of evidence demonstrating that the Detectives made any attempt to ensure that Mr. Jakes meaningfully comprehended the *Miranda* warnings. Youth Officer Burke testified in his deposition that other than reading the *Miranda* warnings, he took no steps to ensure that Mr. Jakes understood what each right meant or to determine if Mr. Jakes' educational background hindered his ability to make a knowing and intelligent waiver. By Anthony's own admission he was unaware of the full understanding of his *Miranda* rights and that he could possibly be charged as an adult. Anthony had just turned 15 years old and had just finished his 8th grade when he was arrested. Detectives knew Anthony's age at the time of the interrogation.

55. Any reasonably trained police officer would also know that a juvenile's waiver of *Miranda* rights would be potentially suspect if given without the advice of a parent or legal guardian. Also, generally accepted police practices at the time required that officers take special care when interviewing vulnerable individuals such as juvenile suspects. There was no rush in this case to interrogate Jakes that night where Jakes was already under arrest and was not free to leave.

### Presence of Friendly Adult

"Many states require police to attempt to notify parents before beginning an interrogation. Even states without this requirement still view the absence of a parent negatively."[17] This practice is codified in the Chicago Police Department's policy in 1991.

- There is no documentation that indicates that any detective or youth officer made any attempts to call or notify Mr. Jakes' guardian (Jessie Mae Jones) once Mr. Jakes became a murder suspect, before he was interrogated about his alleged participation in a murder, and before he provided and signed a confession to the prosecutor.

- The record is clear that no legal guardian or relative was present for Mr. Jakes' interrogation. Although Youth Officer Burke was present for Mr. Jakes' questioning by ASA Grossman, Youth Officer Burke admitted that he only attended Mr. Jakes' formal statement because that is what the rules required, but he was not there to act as an advocate for Mr. Jakes (in the way a parent or guardian would). Youth Officer Burke further testified that he never explained his role to Mr. Jakes or attempted to distinguish himself from the other detectives investigating the case. Under those circumstances, the presence of Youth Officer Burke is not the presence of a friendly adult. Any reasonably trained police officer would have known that a juvenile is likely to assume that a youth officer acting as

---

[17] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012

Officer Burke did was the same as any other police officer. Further, Youth Officer Burke and Detective Caesar took no steps to determine whether a guardian had been called for Mr. Jakes or attempt to contact Mr. Jakes' guardian themselves. Under the circumstances, it would be appropriate for Youth Officer Burke and Detective Caesar to attempt to procure Mr. Jakes' guardian for him.

56. Even if the detectives had contacted a youth officer before his interrogation and were told that one was unavailable, as Boudreau testifies in his civil deposition after he was sued, detectives should not have proceeded with Mr. Jakes' interrogation without attempting to contact his guardian. Also, it would be standard practice to document the reason a parent, guardian, or youth officer was not present for the interrogation. If the detectives had attempted to contact a youth officer before the interrogation, they should have documented their attempt to obtain one, as well as the results of their attempt. This is particularly so because the detectives were interrogating a 15-year-old child about a murder without a parent, guardian, or youth officer, and would know that questions would later be raised about the absence of a parent, guardian, or youth officer. In these situations, police officers are trained to document the circumstances that led to the interrogation of a 15-year old child in the absence of a parent, guardian, or youth officer.

**Child –Sensitive Behavioral Analysis**

"Often, interviewers are encouraged to proceed to a full-blown interrogation if behavioral cues indicate that the subject is lying. Children and teens, however, may commonly slouch, avoid eye contact, and exhibit similar behaviors regardless of whether they are telling the truth – particularly in the presence of authority figures. Officers should not interpret these everyday teenage mannerisms as indicators of deception. Rather, officers should decide to interrogate juveniles based on concrete evidence such as witness statements and forensics."[18] This principle would have required Detectives Kill and Boudreau to investigate the leads that had been identified prior to their interrogation of Mr. Jakes, finding independent evidence to corroborate Mr. Robinson's statement before interrogating Mr. Jakes, and making efforts to resolve the discrepancy between Mr. Pitts' and Ms. Harris's statements regarding Ms. Harris's knowledge about the murder.

57. Sensitivity to the suspect's juvenile status is also very important. In his deposition, Boudreau testified that he would have interrogated a juvenile in the same manner as an adult. While he acknowledged that his approach may change slightly based on the child, the record does not reflect that the detectives, including Boudreau, adjusted their interrogation tactics in light of Mr. Jakes' juvenile status. Conducting the interrogations without accommodating Mr. Jakes' juvenile status departed from established police practices which have long established that interrogators are

---

[18] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012

required to take a juvenile's age into account when interrogating them, including when they provide *Miranda* admonishments, as well.

### 58. Length of Questioning

"Juveniles can tolerate only about an hour of questioning before a substantial break should occur. A juvenile interrogation should never last longer than four hours. In fact, if a child or adolescent is questioned for a prolonged period of time, the risk that any statement will be either involuntary or unreliable increases substantially with each passing hour."[19] Generally accepted police practices during this time period recommended that police interrogate suspects for no longer than four hours (except in exceptional circumstances) and that for many cases, a four-hour long interrogation is not necessary.[20]

Mr. Jakes was interrogated for well over four hours by numerous detectives in the 16 hours he was inside Area Three HQ. Any reasonably trained police officer would know that as the length of questioning increases so does the risk of an involuntary or unreliable statement, particularly with a juvenile suspect.

### 59. Avoid Use of Deception

"Currently, the use of deception during an interrogation – such as a false claim that possesses evidence incriminating the suspect – is permissible. However, the changing nature of the legal landscape should make officers think twice before using this technique during juvenile interrogations. The presentation of false evidence may cause a young person to think that the interrogator is so firmly convinced of his guilt that he will never be able to persuade him otherwise. In that event, the young person may think that he has no choice but to confess – whether guilty or innocent – in an effort to cut his losses."[21] According to Detectives Boudreau and Kill, they confronted Mr. Jakes and accused him of lying to them about the murder, and told him that Denise Harris denied his version of events. The detectives knew, however, that Pitts had told them that Harris reported witnessing the murder from exactly where Mr. Jakes said he was. Falsely telling Mr. Jakes that there was no support for his version of events was an improper interrogation technique on a 15-year-old child.

It is my opinion that in 1991 detectives assigned to major crime investigations had the most training and were at the highest level of their profession. Detectives with the experience and training that Kill and Boudreau had would have known that interrogating a juvenile raised additional issues not present when interrogating adults, such as the need for a parent/guardian/youth officer to be present, to ensure that juveniles meaningfully understood *Miranda* warnings, to ensure that juveniles are not lied to or misled for fear

---

[19] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012
[20] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition, P 310.
[21] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012

that they might parrot back a statement the juvenile believes the person in authority wants to hear.

### 60. Avoid Promises of Leniency and Threats of Harm

"Many officers are trained to indirectly suggest during interrogation that the suspect will avoid trouble or get help if he confesses. Even these indirect promises of leniency and threats of harm can be inappropriate when the suspect is a juvenile. They can trigger involuntary or false confessions by presenting the juvenile with an offer he can't refuse. Say what police want to hear or face negative consequences.

In particular, many juvenile false confessors have explained that they confessed under the mistaken belief that they would be able to end the interrogation and immediately go home. To that end, interrogators must take special care to ensure nothing they say could be interpreted as suggesting that the juvenile could go home if he confesses. An innocent youth might jump at the chance and falsely confess out of a desire to return home, believing that his innocence will be straightened out later."[22]

- Any reasonable police officer would know that advising a juvenile that if he confesses, he will be allowed to go home is likely to result in an involuntary or unreliable confession, and according to Mr. Jakes', Detective Kill made such a promise.

- When Mr. Jakes made his confession at 4:30 AM after being at the police station several things had already transpired, according to Mr. Jakes. These included:

  - No Food
  - Nothing to drink
  - Told he was a liar by Detective Kill
  - Slapped in the face by Detective Kill
  - Threatened with a cigarette burn by Detective Kill
  - Had his family threatened by Detective Kill
  - Knocked out of his chair by Detective Kill
  - Stomped on his head and kicked in his body while on the ground by Detective Kill and possibly Detective Boudreau
  - Observed that Detective Boudreau watched as Detective Kill did all of these acts.

The use of these tactics ran afoul of generally accepted police practices in 1991. In fact, a reasonably trained officer would have known that police investigators should use interrogation techniques that are likely to make an innocent person confess. Tactics that

---

[22] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012

involve making promises of leniency, threatening and causing harm falls under that umbrella.[23]

### 61. Time of Questioning

"Officers should be wary of questioning juvenile suspects, especially younger teens and children in the middle of the night. Even a few hours of sleep deprivation, combined with stress of interrogation can increase the risk of false confession. And courts tend to disapprove of the late night interrogations, particularly when children are involved."[24]

Mr. Jakes was questioned throughout the day on September 16, 1991, starting at 4:15 PM. The questioning continued at 10:30 PM when Detectives Kill and Boudreau commenced another interrogation round, and ending finally after 4:30 AM with ASA Grossman's handwritten confession signed by Mr. Jakes. During this time, Mr. Jakes was not provided with any food or drink, nor did he have any contact with a family member.

Generally accepted police practices and training would also alert a reasonable officer to that questioning Mr. Jakes very late at night and into the early morning hours would cause the interrogation to be more stressful and increase the risk of an involuntary or unreliable confession. The same officer would also recognize that this risk would be compounded by Mr. Jakes' youth, and his prolonged stay at the police station and isolation from family members.

### 62. Electronic Recordings

"When an interview or interrogation is electronically recorded from start to finish, police have a complete record that can be used to convict the guilty and ensure that every statement is reliable and voluntary.

Recording is particularly essential when the person being interrogated is a juvenile. The Wisconsin Supreme Court, for instance, has required all juvenile interrogations to be recorded in their entirety, when feasible. Because of the particular vulnerabilities of juveniles during interrogations."[25]

In 1991, many police departments across the United States were audibly recording all interviews involving felony incidents. In this case, Chicago PD did not record the interview of Mr. Jakes, who was a juvenile that they believed was responsible for a murder.

---

[23] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition, P XIV.
[24] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012
[25] IACP – Reducing Risks: An Executives Guide to Effective Juvenile Interview and Interrogation, 2012

63. It is my opinion that there was no need for Mr. Jakes' interrogation to be conducted in the manner it was carried out in this case. There was time to contact Mr. Jakes' legal guardian and have her come to the station. There was also ample opportunity to make sure that Mr. Jakes had an opportunity to have food and drink during his interrogations. The vulnerabilities of juveniles were very well known to law enforcement officers in 1991. The detectives' conduct increased the risk of involuntary or unreliable confession and fell outside of generally accepted police practices in in 1991.

64. The way this investigation and interrogation was conducted was not consistent with the actions that reasonable police detectives would have used in a murder investigation. It was not consistent with generally accepted police practices.

Specifically, although Detectives Kill and Boudreau suggest that Mr. Jakes might have been fed or provided water during his stay at Detective Headquarters on California, the only documentation in the file states that he was offered food and drink but declined it. Knowing that the only documentation indicated that Mr. Jakes declined food and drink, a reasonable police detective would have documented the fact that Mr. Jakes received food and drink earlier in his stay, if that had indeed occurred. This is especially true because of Mr. Jakes' age (15), his long stay at the police station, and the crime with which he was charged (murder), which should have all indicated to the detectives that they would have carefully needed to document the conditions of Mr. Jakes' stay at the police station on September 16, 1991.

Detective Kill testifies that he and Detective Boudreau brought Mr. Jakes with them when they went back to the scene of the crime to investigate. It would be contrary to reasonable police practices and training to bring a 15-year-old witness along with officers investigating a homicide.

**OPINION #3: Detectives failed to conduct a complete and thorough criminal investigation**

**65.** In "Practical Homicide Investigations",, it states the following regarding the duties of the detective or supervisor in a homicide investigation:

"It is extremely important that the detective supervisor and the homicide investigator not permit themselves to fall into a fixed routine. Previous experience is invaluable but can become a hindrance when allowance is not made for new possibilities. Remember, each homicide case is distinct and unique and may require a fresh approach or perspective. Keep an open mind."[26]

66. It is my opinion that the criminal investigation that led to the arrest of Anthony Jakes at Police Headquarters the night of September 16, 1991, was not conducted consistent

---

[26] Practical Homicide Investigations, 2nd edition, Vernon Geberth, published 1993, P. 62

with generally accepted police practices. When Gus Robinson (Snake) was introduced into this investigation, his statements regarding Anthony Jakes' involvement became the focal point of the criminal investigation. Mr. Robinson's story about how Anthony approached him about joining in on the robbery, took center stage for Detectives Kill and Boudreau. Other than Mr. Robinson's statement, there was no physical evidence, photos, videos or other eyewitness account linking Mr. Jakes to this crime.

67. The first responding officers made the following statement in a police supplemental report:

"bt. 0934, P.O. L. WHITE and R. HARDGROVE, located and related that they had in fact responded to 1102 W. 51st Street regarding information and had spoken with a male Arab owner of the Star Food & Liquors at this location. Bt. related that this individual told them that he heard that this shooting was meant for an individual named 'Snake' who was a passenger in the victim's auto. This male Arab store owner further told them that the shooter was a male black named THOMAS and that the shooter was sent to do this shooting by a dope dealer named 'Troy' who drives a I-ROC and resides in the 5000 block of south Elizabeth…It was further relayed that the shooter was an individual named 'THOMAS' (M/BLK/Skinny/Dark complexion) and that 'THOMAS' had done the shooting for a male black named 'Troy' who drives an I-ROC and resides in the area of 50th & Elizabeth. R/Ds learned that this witness may be the store owner's son JAY."[27]

68. Based upon this police report there were several people who were believed to have been involved in the murder and/or have important information relating to the murder:

    1. Snake (the detectives' key witness) was supposed to have been the intended target and was alleged to have been a passenger in the victim's car.

    2. The Arab store owner said the shooter was a man named Thomas. He further referenced that Thomas was sent to do the shooting by Troy who drove an I-Roc and resided in the area.

    3. The store owner's son Jay might have additional information about the shooting.

69. In the initial interview with Mr. Jakes at 4:30 PM on September 16, 1991, Detectives Kill and Boudreau were advised to speak with Denise Harris, Nikia Little, Annette Harris and his cousin Quarter-Pound. Detective Boudreau stated the following in his Deposition:

"Q: All right. And so at the time you took over the investigation, you knew that somebody needed to talk to the Arab store owner, and that you had a person in the area, a 15-year-old kid, who it was said he had information about the murder, but when interviewed, said

---

[27] CPD Supplement Report RD #454 289. City Jakes 00057

he didn't know anything about the murder. He wasn't present at the time when it was committed, right?
A: I also knew we needed to interview Denise Harris, Nikia Little, and Annette Harris.

Page 121

Q: Why did you want to talk to Jakes?
A: To get some additional information about what he told the other detectives, maybe some additional information about Quarter-Pounder. More additional information about, you know, where they may be.

Q: Why did you want information about Quarter-Pounder?
A: Well, because we were on our way out to talk to the girls and then we have these two unknown subjects that may have information about."[28]

70. In Denise Harris' deposition she was asked about being interviewed by the police following the shooting:

P 168
"Q: If the police asked you that night or any other night afterwards he needs to know who shot Mr. Garcia, would you mind tell them who it was?
A: I never talked to the police

P.171

Q: Why do you think- how do you think the police would have known to come knock on your door that night?
A: If they wanted to know what happened, they would have came and knocked door to door and asked questions. Simple as that.
Q: Did you ever talk to the police that night at all?
A: No

71. Mr. Cleotha Chairse (Quarter-Pound) is Anthony Jakes' cousin by marriage. Mr. Chairse is also a fact witness who was with Mr. Jakes the night of the shooting, just before the shooting took place. Mr. Chairse also had an object thrown through the window of his residence that broke the window, just as Mr. Jakes told Detectives Kill and Boudreau. This broken window is visible in the crime scene photograph (CITY_JAKES 507). Mr. Chairse lived at 1212 W. 51st Street in a residence just in front of Mr. Jakes' residence. However, Detectives Kill and Boudreau said they could not find Quarter- Pound and made no effort to investigate the broken window that is depicted in the crime scene photo, which supported the fact that Mr. Chairse had been throwing rocks at cars, just as Mr. Jakes explained to detectives.

---

[28] Det. Boudreau's Deposition. P 120-121

72. In Mr. Chairse's deposition he said just before the shooting he was walking outside on 51st Street near the Queen's Submarine Shop and he was approached by two individuals. In his deposition it stated:

Page 21

"Q: And then after you got home, did you hear anything?
A: Well, before I made it home, I was confronted by two guys that approached me and said they was about to go get this guy when he came out of the store – out of the restaurant because he had a bag full of money. And once – when he stated that to me, I looked at him. It was like, 'Oh okay'. And I took off proceeding and I went – I got to the gangway between 1210 and 1212, and I took off and ran to get back to my apartment. And when I made up the stairs to my apartment, when I made it through the middle of my house I heard the gunshots, and that's when I told sister. I'm like, 'of my god' these guys must have just shot. And I explained to her what had just happened to me – with the two gentlemen that was out front of the restaurant.

Page 26

Q: And what'd you see when you looked out the front?
A: The guy hanging out – hanging out of the station wagon. His body was hanging out of the car and the door closed on him. So he was partially in the car and partially his body was hanging out of the car.

Q: And did you see the shooter or anybody else around the victim?
A: No. No one was there at the time.

Q: All right. Did you see Shawn running westbound or anywhere around?
A: No. Shawn never came back from where he ran the first time."[29]

Page 179-180

Q: Okay. All right. Just a few more topics, or even not topics, questions and then we'll see if we're done. While this – back in 90 – between, you know, I guess 1991 and thereafter, before Mr. Jakes was tried, I guess years later, did you ever hear at the time of the shooting or afterwards, I should say, that the police were looking for you to speak with you about what it is that you might know about the shooting?
A: No

Q: You didn't hear that from anybody?

---

[29] Cleotha Charise's Deposition

A: No

Q: Okay. If you had heard that the police were looking for you would you have spoken with them?
A: Well, sure

Q: Did you talk to the police at anytime that night?
A: No. I don't – no"[30]

73.  Mr. Chairse and Ms. Denise Harris were critical witnesses that could have provided information that was essential to Mr. Jakes.  Mr. Chairse (Quarter-Pound) was never asked about his broken window, or what he and Mr. Jakes were doing before the shooting.  Also, Mr. Chairse was never shown any photos that he could have been used to identify the two people that approached him before the shooting.

74.  In Detective Boudreau's deposition he was asked about key witnesses who could have provided information related to the crime:

Page 237-238

"Q: All right. Was there anything preventing you from, say, going to visit Denise and just asking her if – she witnessed the murder and if she saw Arnold Day commit the murder?
A: No

Q: It would have been a proper investigatory step to go visit Denise Harris, who Tyrone Pitts has said admitted seeing the murder occur, and asking her who she saw commit the murder, right?
A: It could be a good idea. Yeah
Q: It would also have been a good idea to ask the sub operator or owner if he knew who Arnold Day was, and if he didn't, if he could identify Arnold Day from a photo array, right?
A: Could've been. Yeah.

Q: No. Not could have been.  Would that have been a good idea, as an investigative step?
A: It could have been. Yeah.  I mean – I mean, they tried, but it – you know, who knows?

Q: Well, was there any reason not to –
A: I said it would have been a good idea. Yeah.

Q: Is there any reason not to try to go to Gurgid Singh, and ask if he could identify Arnold Day?

---

[30] Denise Harris' Deposition, P. 168 & 171

A: I can't think of one here, but I don't know if that – if that was ever done.  I mean, I was done with the investigation."[31]

75.    It is my opinion that when Detective Boudreau said "I was done with the investigation" after speaking with Snake and Jakes, it was an example of tunnel vision. Tunnel vision was a well-known concern to police investigators. For decades, including prior to 1991, police investigators are routinely trained to be aware of the risk inherent in succumbing to tunnel vision. Police investigators are trained to follow the evidence, rather than making the evidence fit their theory. Investigators are trained that tunnel vision can occur, and if they engage in tunnel vision, innocent people may be charged with serious crimes.  That is exactly what happened here.

After speaking with Gus Robinson (Snake) the detectives were done with the investigation and turned all of their attention to Anthony Jakes.  It was not reasonable for detectives conducting a murder investigation to not:

- Interview Denise Harris (or, according to the officers, Ms. Harris was interviewed and said she did not see the murder. Generally accepted police practices, however, would have dictated that when Mr. Pitts provided information that Ms. Harris had seen the murder, the investigating officer should have re-interviewed her).
- Interview Cleotha Chairse (Quarter-Pound)
- Interview Gurgid Singh
- Process the broken window at Quarter-Pound's apartment
- Realize that Anthony Jakes could not see the location where Mr. Garcia died from his residence based on the information reflected in Officers Delacy's and Pack's report.
- Conduct a photo array with Mr. Singh once Detectives determined Mr. Jakes and Mr. Day were suspects
- Locate and interview store owner's son, Jay
- Try and determine the identity of the second person at the scene (Darren).
- Investigate the tip saying that the shooting was done by an individual named Thomas and it was ordered by a drug dealer named Troy.

If there was some justification for not taking these investigative steps, that justification should have been documented. For example, if Detectives tried to contact Quarter-Pound, they should have documented their specific efforts to find him, the contact information they had for him, and who provided that contact information. This is especially true for a homicide investigation, because detectives know that any subsequent prosecution is going to scrutinize their investigation, and any holes in their investigation (witnesses who were never followed up with, for example) may make their case look sloppy.

---

[31] Det. Boudreau's Deposition, P 237-238

76. In a 1992 textbook titled "Criminal Investigations" 5th Edition, by Charles Swanson it states the following:

Documenting The Interview

In the majority of routine cases involving interviews, handwritten notes made by the investigator during and immediately following the interview generally serve as sufficient documentation. Investigators should not rely on memory for storage of investigative information. The human mind can absorb and recount only a limited amount of information at one time, and most of the information is soon lost if notes are not take."[32]

77. In Mr. Day's handwritten confession he fails two address to critical pieces of the investigation.

A. Darren – Darren is a critical piece of the overall investigation as Snake said that Mr. Day and another individual named Darren were near one another when Mr. Garcia was shot. Mr. Jakes' confession also states that a person named Darren was involved. However, throughout the investigation there is no mention of any efforts to locate Darren or identify who was the person at the car with Mr. Day when he shot Mr. Garcia. Nowhere in Mr. Day's statement does he mention Darren or the second individual who was supposedly with him.

B. Anthony Jakes – At no time in Mr. Day's handwritten confession does he ever mention that Mr. Jakes was present or involved in the shooting. This is critical information as Mr. Day could have confirmed whether Anthony was involved or present as suggested by Mr. Robinson (Snake).

78. In Detective Boudreau's interrogation of Mr. Day, Boudreau reports that he confronted Mr. Day with the statements of Mr. Jakes and Snake. Despite directly telling Mr. Day about Jakes' and Snake's statements, Mr. Day's final confession (as documented in Boudreau's police report as well as in Danielian's handwritten statement) is completely silent about the role played by "Darren" or Mr. Jakes or Snake's role.

Standard police practice at the time would be to question Mr. Day about Mr. Jakes', Darren's, and Snake's role in the murder and document his responses, and where Mr. Day's confession does not include the names of key individuals, generally accepted police practices would have dictated that the investigator documents the explanation for these omissions. Further, reasonable investigators would question Mr. Day to find out why he initially stated that he told Mr. Jakes about the robbery, and that Snake was present for the murder, but then provided a version of events that did not mention Mr. Jakes, Snake, or Frederick Gunn (the man who retrieved a gun for Mr. Day in his first description of the murder), and document Mr. Day's responses.

[32] "Criminal Investigations-5th Edition, Charles Swanson, 1992, P. 148

79. Further, any reasonable police investigator questioning Mr. Day would have questioned him about his story that he traveled over a quarter-mile from the crime scene to get a gun and return to the sub shop to rob the victim. An investigator would want to know how he traveled that distance – did he run? Drive a car? Walk? – as further investigative leads. An investigator would also want to know how long the victim was in the sub shop and whether it was plausible that Mr. Day was able to travel the distance he claimed in order to obtain the gun. An investigator would have suspected that perhaps Mr. Day was potentially covering for another co-offender (possibly Frederick Gunn) who in an earlier statement Mr. Day claimed had provided him with the murder weapon. This would have been a further avenue of investigation. Also a reasonable investigator would have asked Mr. Day about his motive for shooting and killing the victim when the victim did not comply with his demand to give up his possessions.

80. In Detective Boudreau's deposition he stated the following about the tip involving a shooter named Thomas:

Q: Okay. So you brought Troy into the station, is that what you are saying?
A: I don't know if we brought Troy into the station.  I don't think he was brought into the station.  I think the other people were.
Q: Did you make any attempt to find Troy?
A: No. By that time, the investigation turned into another direction.

Q: Did you ever make any effort to find Thomas?
A: No

Q: Did you ever make any effort to speak to the male owner of the liquor store?
A: No"[33]

If Troy had been brought to the station, generally accepted police practices would have required the investigating detectives to document their interview, particularly in light of the information that Troy was the person who arranged and ordered the shooting.

A complete and thorough investigation would involve Detectives Kill and Boudreau making efforts to locate Thomas as there was information that Thomas was the murderer. Investigative steps could have been taken to identify Thomas, obtain his photograph for identification procedures with Jay or the male owner of the liquor store, verify Mr. Robinson's story, and determine Mr. Jakes' (and later Mr. Day's) culpability.
Where there is evidence identifying a perpetrator, generally accepted police practices would direct an investigator to follow up on this lead.

---

[33] Detective Boudreau's Deposition, P. 123

81. Another obvious step that Detectives did not undertake was to contact "Darren." In a homicide investigation, any investigator would have attempted to identify Darren and document the steps taken to do so. Some of the basic investigatory steps to take would have been: to ask Mr. Jakes, Mr. Day, and Snake where Darren lived; where Darren hung out; what Darren looked like; who Darren was known to associate with. The efforts to identify Darren should have been documented so that supervisors, fellow police officers, and the prosecution would know that the police had attempted to identify Darren but had been unable to find him. Any investigator would know that a prosecution of Mr. Day or Mr. Jakes would lead to questions about the police investigation if they failed to document their efforts to identify Darren.

82. Detectives Kill's and Boudreau's 10:30 PM interview (September 16, 1991) of Mr. Jakes is the most critical piece of their investigation. We know with certainty that no youth officer was present as they interviewed Mr. Jakes. We also know that his guardian Ms. Jones was not brought to the police station on behalf of Mr. Jakes. In none of the information I have been supplied have I seen any investigative notes documenting this interrogation.

83. In "Criminal Investigations" it states the following regarding notes:

"Field Notes

From the time of arrival at the scene of an offense, the police officer is constantly engaged in obtaining, assessing, and correlating information. The crime scene is observed, witnesses are interviewed, evidence is collected and other functions are performed. It is impossible- except for those rare individuals blessed with extraordinary memories to remember all of the details necessary to prepare a report immediately following an investigation, let alone months or years later when the case comes to trial. Therefore, a continuous written record must be made as the inquiry progresses, the product of this process is termed field notes."[34]

In addition to the above statement the book references a section titled:

The Importance and Use of Reports

"Among the least popular duties of police officers, reporting is also one of the most important. More than a few excellent investigations have been undone by an officer's failure to document fully in writing the results obtained. By preparing proper reports, investigators also protect themselves from allegations that their investigations were not competent, complete, and professionally correct."[35]

---

[34] "Criminal Investigations-5th Edition, Charles Swanson, 1992, Chapter 6
[35] "Criminal Investigations-5th Edition, Charles Swanson, 1992, P 155

84.  It was important for Detectives Kill and Boudreau to have prepared notes for all of their interactions with Anthony Jakes.  As the textbook reflects, the need for notes was well established by law enforcement in 1991 when Mr. Garcia was shot.  Additionally, these detectives should have written notes for all of their interactions with Gus "Snake" Robinson and Mr. Day.    Mr. Robinson's statements concerning Anthony Jakes involvement in the shooting death of Mr. Garcia were instrumental in labeling him as being involved in the incident.  Mr. Day's confession also was a vital part of the case but there are no notes reflecting what occurred that caused Mr. Day to give the confession Detective Boudreau ultimately accepted as true and was memorialized by the ASA Danielian.

85. Finally, Detectives learned from Snake that he went to Elizabeth Street (one block away) but never followed up on this fact with Tyrone Pitts who stated that he was home on Elizabeth during the night of the shooting to determine if Mr. Pitts could verify Mr. Robinson's whereabouts. There also is no documentation reflecting that Detectives Kill and Boudreau made any effort to visit Mr. Robinson's home to see if there was anyone there who could corroborate Mr. Robinson's statements about returning home around the time of the murder.

86. It is my opinion from having been an experienced police officer, including a homicide commander for the Dallas Police Department, that a complete and thorough criminal investigation was not conducted in the shooting death of Mr. Garcia.  In this case Detectives Kill, Boudreau, and Caesar, and Youth Officer Burke obtained a confession from 15-year-old Anthony Jakes after Mr. Jakes was at the Area Three Police HQ for 16 hours, and isolated from his legal guardian.  Detectives Kill's and Boudreau's reports and notes do not reflect an effort to conduct a thorough and complete investigation, and demonstrate that they decided to rely solely on the information provided by Mr. Robinson to guide their investigation.   In their zeal to close this case and make a quick arrest they overlooked critical evidence that a reasonable detective would have investigated in 1991.

87. The importance of taking notes was well documented as a necessary component of any criminal investigation in 1991.   In the shooting investigation of Mr. Garcia, I did observe that notes were taken of various witnesses by Detectives Kill and Boudreau. However, I did not observe any notes regarding the 10:30 PM interrogation of Mr. Jakes, or the part of Mr. Day's interrogation that led to the statement that was ultimately memorialized by ASA Danielian. Additionally, I did not observe any notes regarding their interview of "Snake".   It is my opinion that as these three interviews were a critical part of this investigations they should have been memorialized through contemporaneous documentation. A police officer knows that a witness or suspect may later change their version of the truth. A critical part of policing is the contemporaneous documentation of a witness' or a suspect's story, so that if the witness or suspect says something different later, there is a record of exactly what was said earlier. The notes can be taken unobtrusively during the questioning, or they can be created immediately upon leaving

the room used for questioning. (Notably, detectives took notes of their earlier interrogation of Mr. Day). It is particularly critical to take contemporaneous notes of crucial witnesses like Snake, as well as of the suspects in a homicide. That way later statements can be compared against earlier statements to look for inconsistencies or facts that might help the investigation. Simply because a confession would be later reduced to writing does not obviate the need for contemporaneous note-taking. Rather, it heightens the need for note-taking, because witnesses and suspects sometimes alter their stories and thus it's necessary to have a contemporaneous records to identify any inconsistencies and potentially confront the suspects and witnesses with them.

**CONCLUSION**

88. On September 16, 1991, 15-year-old Anthony Jakes was brought into Area Three Headquarters by detectives as a witness in the shooting death of Mr. Garcia. If Mr. Jakes' and Ms. Jones' accounts are to be credited, the manner in which Mr. Jakes was removed from his home, searched, and processed violated existing generally accepted police practices. Further, Mr. Jakes' prolonged detention of nearly sixteen hours, during which Mr. Jakes was questioned by multiple detectives about his involvement in the shooting without access to his legal guardian and without food or drink, also was contrary to generally accepted police practices. Moreover, if the fact-finder credits Mr. Jakes' account about Detective Kill's use of threats and physical abuse during his interrogation coupled with Detective Boudreau's failure to stop the misconduct, this behavior would clearly be contrary to generally accepted police practices in 1991.

89. The conduct of Mr. Jakes' interrogations would have been stressful for anyone let alone a 15-year old juvenile. Reasonably trained police officers would have been aware of this at the time.

90. In the end, no physical evidence linked Mr. Jakes to the shooting death of Mr. Garcia. The investigating detectives accepted Mr. Robinson's statement without a critical eye, and in doing so, failed to follow up on leads that any reasonably trained officers would have investigated.  Rather than fully investigating the crime, their conduct indicated that they targeted Anthony and set out to confirm their pre-conceived notions of who was involved in the Garcia murder. The way the investigation was conducted was flawed from the start. It does not appear that this was a criminal investigation designed to learn the truth. The conduct of the investigation was contrary to generally accepted police practices in 1991. It violated basic principles of good police work.

**COMPENSATION**

91. Compensation for my expert witness services is $350 per hour. Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

- **Resume – Attached**. I have no publications in the last ten years.

- **List of cases in which I have testified at trial or deposition in the last four years - Attached**

ATTESTATION

The statements made in this report are true and correct to the best of my

knowledge and I offer these opinions to a reasonable degree of professional certainty. If

asked to testify, I could testify consistently with the opinions offered in this report. This

report is signed under penalty of perjury pursuant to 28 U.S.C. § 1746 on this 31st day of

March 2022.

_____

Submitted by,

Craig R. Miller

# CRAIG R. MILLER

*Available to Travel*

Lt4653@yahoo.com     www.chiefcraigmiller.com

---

**EXPERT WITNESS – CONSULTANT & SUBJECT MATTER EXPERT**

**Career Law Enforcement Officer – Chief of Police**

*Major City – Major Crimes – Use of Force – School District Security*

Accomplished leader who thrives on the energy and excitement of the investigative process balanced by a calming presence that is experienced by staff, superiors, and the public. Focused on getting the job done and accomplishing the objective. Listens, learns, and finds the most capable people available to do the job. Comfortable interacting with people at all levels of an organization as well as respecting the chain of command. Known as a positive person who manages others with respect.

**Officer Involved Shootings & Death in Custody Investigations**

*Deadly /Excessive Force– Police Procedure – Premise Liability – Undercover Police operations – School Safety*

**Organization Leadership – Criminal Investigations**

*High Profile Incidents – Budget & Personnel Management – Emergency Management*

**Decisive – Organized – Calm Under Pressure – Personable – Team Builder – Media Relations**

SUBJECT MATTER EXPERT WITNESS

**EXPERT WITNESS**                                                                                          **2012 – Present**

As a subject matter expert, represents both plaintiffs and defendants in civil and criminal litigation in federal and state courts. Prior to representing a client, reviews facts including videos and reports to determine whether to participate in the case. Reputation for being "extremely professional and prepared".

Areas of expertise include

- Death In Custody Investigations
- Law Enforcement Tactics
- Officer Involved Shootings
- Police Management School Safety
- Police Use of ForceUndercover Operations

POLICE EXPERIENCE

**DALLAS INDEPENDENT SCHOOL DISTRICT, Dallas, TX**                                    **2011 – 2019 (Retired)**
*14th largest US public school system with 160,000 students, 20,000 employees and $1.2 billion operating budget*

**Chief of Police**

Direct the Emergency Management Department and safety plans for the Dallas ISD. Oversee 220 personnel (sworn, non-sworn, dispatch, private security) with 100 vehicles and $13 million budget. Manage contracts for video cameras, coordinate security for buildings and responsible for campus fire and burglar alarm response.

- Created and implemented a program of "hire and train" in which the school district hires individuals and then sends and funds their attendance at the Regional Police Academy (COG) in Arlington, TX, successfully hiring individuals who attended DISD schools and then placing them as police officers in those school where they were instrumental in bridging the culture gap between the students and school safety
- Post Sandy Hook, requested and received funding for $2.1 million for safety enhancements at all 153 elementary schools that previously had not had security such as camera systems, access control, and buzzer intercom at entry points
- Created new standardized "use of force" training for DISD police personnel
- Developed and implemented a new shift structure resulting in more effective utilization of personnel

**DALLAS POLICE DEPARTMENT, Dallas, TX**                                                     **1982 – 2011**
*9th largest police department in the U.S., covering 342 square miles and serving a diverse population of 1.2 million*

**Deputy Chief, Crimes Against Persons** (2010 – 2011)

Responsible for the investigation of all murders, rapes, assaults, and business robberies in the City of Dallas. Also oversaw the Crime Scene Response Unit that is responsible for all physical evidence and DNA collection. Serve as Department Spokesperson to the media for all major violent crimes in the city. Oversaw $3.3 million outsourcing contract with Southwest Institute of Forensic Science. Managed 180 sworn officers and civilian employees and a budget of $18.5 million.

- Instrumental in the implementation of the Sexual Awareness Nurse Examiner (SANE) program, expanding the number of facilities that handled sexual assault victims
- Developed grant application and received state funding for Cold Case DNA for fiscal year 2011-2012
- Foster relationships with the Dallas County District Attorney's Office that leads to arrest and convictions.

**Homicide Unit Commander** (2007 – 2010)

Oversaw 750+ murder investigations and 300+ suicides during CAPERS assignment. Interact daily with the press, including 100's of both print and video media interviews. Physically present at 75 officer-involved shootings (OIS) involving 100+ officers.

- Led the Special Investigations Unit (SIU) that oversees "officer involved" shootings, and death in custody investigations
- Exceeded the national clearance for homicides
- Reduced homicides, the leading indicator of violent crimes, 27% from 200 in 2007 to 148 in 2010
- Created and built the Cold Case Homicide squad (sergeant and 4 officers)

**Tactical Services Commander/Explosive Ordinance Unit** (2004 – 2006)

    Oversaw the mounted patrol, canine squad, and the bomb squad

- Developed grant application resulting in $100,000 state funding for new equipment, including bomb suits

**Narcotics Division Unit Commander** (1997 – 2004)

    Handled day-to-day operations for street level narcotics activity and also oversaw narcotics seizures, asset forfeiture and intelligence operations

- Initiated and spearheaded investigation that led to the resolution of the infamous "fake drug" conspiracy at the Dallas Police Department, resulting in a $10 million settlement to innocent victims, the convictions of multiple police officers, and the resignation of the Chief of Police
- Working with the federal authorities, led the revision of the Standing Operating Procedures of the Narcotics division that dramatically increased controls over narcotics officer operations

**Abatement Unit Commander** (1995 – 1997)

**Legal Services Unit Commander** (1999)

**Traffic Division Unit Commander** (1993 – 1994)

Work directly with the FBI and Secret Service in creating security and transportation plans

**Southwest Patrol Watch Commander** (1992 – 1993), **Commander of Computer Crime Analysis** (1991 – 1992

**Early Career with the Dallas Police Department** (1982 – 1991) Police Officer and Sergeant

**EDUCATION, CERTIFICATIONS & PROFESSIONAL AFFILIATIONS**

**BA, Criminal Justice, Memphis State University**

*Force Science Certification Course (40 hours) – 2015 "Force Science Analysis"*

**Continuing Education**

Graduate of the FEMA Emergency Management Institute

Hazardous Device Supervisors School, Huntsville, AL

Southwest Legal Foundation, University of Texas at Dallas

*Graduate of the Command Management School Supervisor's Course*

Law Enforcement Management Institute of Texas, Sam Houston State University

*New Chief Development Program*

**Professional Affiliations**

International Association of Chiefs of Police (IACP) | Police Executive Research Forum (PERF)

Texas Police Chiefs Association (TPCA) | North Texas Police Chiefs Association (NTPCA)

- Officer Involved Lethal Force Investigations Course – Instructor, 2014 to present

Craig Miller - Case History (Expert Witness)

- **Expert Witness Cases**

Ms. Chris Edwards
Assistant City Attorney
Austin City Attorney
City Hall, 301 W.2nd Street, P.O. Box 1546
Austin, Texas 78767 – 1546
(512)974-2147

*Grady Bolton*
*V*
*City of Austin, Austin Police Sergeants Randy Dear, Manuel Jimenez and Officers*
*Michael Nguyen, Rolando Ramirez,*

| | |
|---|---|
| Result: | Verdict for Defendant (City of Austin) |
| Testified: | Yes (Federal Court – Judge Sparks) |
| Deposition: | No |
| Report: | Yes |
| Defendant: | City of Austin (2018) |

_____

Mr. Howard Schaffner
Hoefeld and Schaffner
30 N LaSalle Street
Chicago, Illinois, 60602
(312) 372-4250

*Nwaeke*
*V*
*City of Chicago*

Circuit Court of Cook County, Illinois

| | |
|---|---|
| Result: | Decision for City of Chicago |
| Testified: | Yes |
| Deposition: | Yes |
| Report: | No |
| Plaintiff: | Prince Nwaeke (2018) |

Mr. Jason Schuette
Assistant City Attorney
City of Dallas
1500 Marilla St.
Dallas, Texas 75201
(214) 670-1333

*Cassandra Luster, et al.,*
*V*
*City of Dallas*

Result:        Verdict for the Defendant City of Dallas
Testified:     No
Deposition:    Yes
Report:        Yes
Defendant:     City of Dallas (2018)

Ms Amy Staples
Loevy & Loevy
18 Village Plaza PMB 181
Shelbyville, Ky. 40065
(312) 243-5900

*Pearlie Sue Gambrel as Administrator for the Estate of Jessie Mills v Knox County*
- Eastern District of Kentucky, Southern Division

Results:       Pending
Testified:     No
Deposition:    Yes
Report:        Yes
Plaintiff:     Jessie Mills (2019)

Ms. Elizabeth Wang
Loevy & Loevy
20160 Broadway
Boulder, Colorado, 80302
(720) 502-2103

*Adam Gray v City of Chicago Police Department*

Result:        Pending
Testified:     No
Deposition:    Yes
Report:        Yes
Plaintiff:     Adam Gray (2020)

Hal Cook
Cook & Cossio
620 w. 3rd Street, Suite 404
Little Rock, Arkansas 72201

*Randy McDaniel v. City of Pine Bluff*

Result:          Pending
Testified:              No
Deposition:   Yes
Report:                 Yes
Plaintiff:              Randy McDaniel (2020)
_____

Ms. R. Spence
Loevy & Loevy
311 N. Aberdeen St.
Chicago, Il 60607
(312) 243-5900

*Norman McIntosh v Chicago PD Officers Bach, Evans & Furgoli*

Result:          Pending
Testified:              No
Deposition:   Yes
Report:                 Yes
Plaintiff:              Norman McIntosh (2021)
_____