# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

ARNOLD DAY,                    )
                               )
        Plaintiff,             )        Case No. 19-cv-7286
                               )
        v.                     )        Hon. Sara L. Ellis
                               )        District Judge
KENNETH BOUDREAU, *et al.*,    )
                               )        Magistrate Judge Jeffrey Cummings
        Defendants.            )

---

# EXHIBIT 8

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117
_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

March 31, 2022

Russell Ainsworth,
Attorney at Law
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

**Re:    Anthony Jakes v. Kenneth Boudreau et al.**
**Case No. 1:19-cv-02204**

Dear Mr. Ainsworth,

This report is per your request in the above-referenced case of *Anthony Jakes v. Kenneth Boudreau, et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For over thirty (30) years, I have conducted and published extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In the last three decades, I have observed, studied and analyzed thousands of interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship

has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions.  To date, I have consulted with criminal and civil attorneys on more than two-thousand and two-hundred (2,200) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and eighty-eight (388) times in state, federal, and military courts in thirty-eight (38) states and the District of Columbia, including thirty-three (33) times in federal and military courts (which includes the 7th circuit).  I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report (Exhibit A).  A list of my court and deposition testimony in the last four years is attached to this report (Exhibit B).   I am being compensated for my time at the rate of $475 per hour.  My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials:

- Complaint

- Order Granting Certificate of Innocence.  June 7, 2019.

- Investigative File.  Bates Stamp: CITY JAKES 23-195

- Anthony Jakes Juvenile File.  Bates Stamp: RFC Jakes 18569-18611

- Scanned Crime Scene Photos.  Bates Stamp: Plaintiff Jakes 8222-8266

- IDOC Subpoena Response 11-20 (Darren Triplett)

- Deposition Transcript of Kenneth Boudreau.  April 13, 2021.

- Deposition Transcript of Ken Burke.  July 8, 2021

- Deposition Transcript of Brian Grossman. September 17, 2021

- Deposition of Transcript of Anthony Jakes.   September 29, 2021.

- Deposition of Transcript of Jessie Mae Jones.  November 12, 2021.

- Deposition Transcript of Louis Caesar.  December 16, 2020.

- Transcript of Motion to Quash Arrest and Suppress Evidence Hearing.  November 18, 1992.  Bates Stamp: Plaintiff Jake s 30457-30480.

- Transcript of Motion to Suppress Statements Hearing. December 2, 1992. Bates Stamp: Plaintiff Jakes 30457-30539

- Transcript of Anthony Jakes Trial Testimony.  September 10, 1993 (Plaintiff Jakes 43205-43267.

- Transcript of Testimony of Kenneth Boudreau at Suppression Hearing.  Bates Stamp: Plaintiff Jakes 42973-42975.

- Transcript of Trial Testimony of Kenneth Boudreau. Bates Stamp: Plaintiff Jakes 31115-31153

- Transcript of Trial Testimony of Kenneth Boudreau.  Bates Stamp: Plaintiff Jakes 42976-81

- Transcript of Testimony of Louis Caesar at Motion to Suppress Hearing.  Bates Stamp: Plaintiff Jakes 30575-30611.

- Transcript of Louis Caesar Trial Testimony.  Bates Stamp: Plaintiff Jakes 30869-30980

- Transcript of Testimony of Brian Grossman at Motion to Suppress Hearing. Bates Stamp: Plaintiff Jakes 30457-30522)

- Transcript of Trial Testimony of Brian Grossman.  Bates Stamp: Plaintiff Jakes 31205-31241

- Transcript of Testimony of Michael Kill at Motion to Suppress Hearing.  Bates Stamp: (Plaintiff Jakes 43532-43559)

- Transcript of Trial Testimony of Michael Kill.  Bates Stamp: Plaintiff Jakes 43560-43608.

- Transcript of Testimony of Arnold Day.  Bates Stamp: DAY 039710-43826.

- Transcript of Testimony of Arnold Day.  Bates Stamp: DAY 42505-42519

- Transcript of Testimony of Arnold Day.  Bates Stamp: RFC_Jakes 007116-RFC_Jakes 007197

- Transcript of Trial Testimony of Ken Burke.  Bates Stamp: Plaintiff Jakes 31205

- Transcript of Anthony Jakes Post-Conviction Testimony.  August 4, 2015.  Bates Stamp: Plaintiff Jakes 42010-42102

- Transcript of Anthony Jakes Post-conviction Testimony Part 2.  August 18, 2015. Bates Stamp: Plaintiff Jakes 43609-43738

- Transcript of Post-Conviction testimony of Michael Kill.  November 3, 2015. Bates Stamp: Plaintiff Jakes 42261-42418.

- Transcript of testimony of Kenneth Boudreau.  February 18, 2016.  Bates Stamp: Plaintiff Jakes 42614-42713

- Transcript of Anderson Jakes Testimony.  April 29, 2016. Bates Stamp: Plaintiff Jakes 42714-42819.

- Transcript of Testimony of Brian Grossman Testimony at PCP Hearing. June 1, 2016.

- Testimony of Testimony of Louis Caesar.  June 1, 2016.  Bates stamp: Plaintiff Jakes 95186-95338.

- Transcript of Testimony of Jessie May Jones.  Bates Stamp: Plaintiff Jakes 335-353

- Testimony of Jessie May Jones in Motion to Suppress. Bates Stamp: Plaintiff Jakes 30457-39572

- Transcript of Testimony of Michael Kill. August 2, 2011.

- Post-Conviction Hearing Exhibits P100-P151.  Bates Stamp: Plaintiff Jakes 5078-5496

- Deposition Transcript of Michael Kill. August 21, 2008.

- Testimony of Dr. Enrixuer Lujan.  Bates Stamp: Plaintiff Jakes 031305-031320

- Deposition Transcript of Denise Harris.  September 23, 2021.

- Deposition Transcript of Annette Harris. October 4, 2021.

- Deposition Transcript of Annette Harris. December 16, 2021.

- Neuropsychological Report of Dr. Vincent Culotta.

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability.  I will then discuss these issues as they relate to the investigation, interrogation, and prosecutor-written confession statement of Anthony Jakes.[1]

1) Anthony Jakes' description of what occurred during his lengthy unrecorded interrogation on September 16-17, 1991 that led to his prosecutor-written statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

2) Anthony Jakes' description of his lengthy, unrecorded interrogation on September 16-17, 1991 contains numerous examples of extremely physically coercive interrogation techniques, methods and strategies that have been demonstrated to cause false, unreliable and involuntary confessions.  These interrogation techniques, methods and strategies cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

3) Anthony Jakes' description of his lengthy, unrecorded in-custody interrogation on September 16-17, 1991 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause false, unreliable and involuntary confessions.  These interrogation techniques, methods and strategies cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

---

[1]  Because the Chicago police investigators failed to electronically record any of Anthony Jakes' interrogation on September 16-17, 1991 – despite having the capacity to do so – we are forever deprived of an objective record of what occurred during the interrogation.

4) Anthony Jakes' account of what occurred during his lengthy unrecorded interrogation on September 16-17, 1991 contains a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. These include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, minimization, threats, promises, physical abuse and psychological coercion.

5) Anthony Jakes was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on September 16-17, 1991 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his youth and associated psychosocial immaturity at the time, his sleep deprivation, and his intellectual and cognitive disabilities.

6) The lengthy and unrecorded interrogation on September 16, 1991 described both by Anthony Jakes as well as by the police investigators involved multiple documented instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Jakes' prosecutor-written confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

7) Anthony Jakes' interrogation-induced confession statement on September 17, 1991 bears the hallmarks, characteristics and indicia of a false and unreliable confession. If false, Mr. Jakes' confession statements are properly classified as *coerced-compliant* false confessions.

8) The lengthy unrecorded interrogation on September 16-17, 1991 described by Anthony violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1991.

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, these principles, methods, and findings are generally

accepted in the social science community,[2] beyond common knowledge,[3] and therefore numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation.[4]

      This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[5] The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities. Social scientists have documented hundreds of false confessions in America since the early 1970s,[6] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty. As a result, Richard Ofshe and I coined the term "*proven* false confession"

---

[2]   *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[3]   See Fabiana Alcest, Timothy Luke, Allison Redlich, Johanna Hellgren, Aria Amrom, and Saul Kassin (2020). "The Psychology of Confessions: A Comparison of Expert and Lay opinions." *Applied Cognitive Psychology*, 25, 39-51.

[4]   *See Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession); *Kluppelberg v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) , *aff'd*, 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[5]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[6]   The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). Since 2004, Steve Drizin, Gillian Emmerich, Amy Shlosberg and I have collected an additional two-hundred and fifty false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

in 1998,[7] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;

2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

3) When the true perpetrator is identified and his guilt is objectively established; and/or

4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[8] If this estimate is accurate, American police elicit tens, if not hundreds, of thousands of false confessions every year.

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[9] Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques

---

[7]    Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

[8]    Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

[9]    *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008). "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011). "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010). "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies*, 7, 231-247.

are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

## V. The Social Psychology of Police Interrogation[10]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[11] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[12] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them

---

[10] *See* Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[11] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[12] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATON AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

only on suspects believed to be guilty.[13]  When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices.  The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation.  The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless.  If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself.  To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent.  Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished.  The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion.  By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

---

[13]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, *see* Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [14] Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities.

---

[14] See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[15] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because

---

[15] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive.  Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance.  *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not.  Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals.  The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep.  The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[16]  These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

**VII. The Three Sequential Police Errors
That Can Lead to False (But Sometimes Detailed) Confessions**

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements.  The first decision point is the police decision to classify someone as a suspect.  This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true.  This is called *the misclassification error*.  It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[17]

---

[16]   *See* Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[17]   *See* Fred Inbau, John Reid and Joseph Buckley (1991).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-12 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case….  All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence.").  *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects. This is called *the coercion error*. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[18]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit. Although the "Reid" Manual[19] did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, of promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[20] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently.

---

[18] Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[19] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[20] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[21]

## VIII. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession. This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive or intellectual functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. This is especially true of individuals with intellectual disability who test in the very low borderline range of mental retardation (an IQ of around 70 or lower). Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations. Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.[22]

Juveniles are especially vulnerable to the pressures of psychological interrogation and increased risk of making or agreeing to a false confession because of their psychosocial immaturity, which affects their perceptions, reasoning processes, judgements and decision-making. Substantial empirical research shows that juveniles are more impulsive, more averse to stress, more conflict-avoidant, more impulsive and have fewer psychological resources with which to withstand pressure from authority figures. As a result, juveniles are more naïve, more easily led and manipulated, and more suggestible and compliant. For all of these reasons, juveniles are disproportionately represented in the known universe of documented false

---

[21]    Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[22]    *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

confessions.  The younger the juvenile, the greater the risk that they will make or agree to a false confession in response to police interrogation pressure.

## IX. Evaluating the Reliability of Incriminating
## Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases.  To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[23]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime.  If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.  If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence.  Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement.  Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of

---

[23]  *See* Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

innocence.[24]  For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[25]  Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge.  Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime.  In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[26]  This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth.  If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence.  Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative.  While it is not possible to verify every post-

---

[24]  Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[25]  Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[26]  Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit.  The more verifiable information elicited from a suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence.  Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot.  The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime.  His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence.  Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance.  Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess.  The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large.  If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details.  If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt.  This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

## X. The Problem of Police Interrogation Contamination and Scripting

Police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading a suspect to parrot back a police-driven narrative of how and why the crime occurred) increase the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating.

The confession-taking process is about more than merely eliciting information from the suspect.  Investigators in practice have been observed to shape the suspect's narrative to make

the confession as persuasive as possible and to enhance the chances of conviction.[27]  In this way, confessions are scripted or constructed by interrogators.  A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime.  It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime.  Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary.  Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect.  Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know. One interrogation scripting technique that stands out is known as "The Error Insertion Trick," in which the interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors. The purpose of "The Error Insertion Trick" is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[28]

The problem of contamination and scripting in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[29] Because they are trained to presume the guilt of those whom they interrogate, police assume that they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.

---

[27]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[28]  See Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).  Pp. 175-177.  There is evidence that prosecutors, like police, are also trained to use the Error Insertion Trick.  See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[29]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Instead, the innocent suspect is often pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration. After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[30] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[31] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[32]

## XI. The Lengthy Interrogation and Prosecutor-Written
## Statement of Anthony Jakes on September 16-17, 1991

### A) Introduction

Because the Chicago police detectives failed to electronically record any of their interrogation of Anthony Jakes on September 16-17, 1991 – despite having the ability to do so (with hand-held tape recorders available at the time) -- there is no objective record of the lengthy interrogation that resulted in Mr. Jakes' prosecution-written statement. As a result, the only (highly imperfect) record that exists of Mr. Jakes' interrogation on September 16-17, 1991 are the recollections of the various participants (as captured in their testimony and reports): Anthony

---

[30] Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[31] Brandon Garrett (2011). CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press).

[32] Brandon Garrett (2015). "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

Jakes and Detective Michael Kill (now deceased), Detective Kenneth Boudreau, Detective Louis Caesar, Youth Officer Ken Burke and former assistant state's attorney Brian Grossman, all of whom testified about their recollections, or absence of recollections, of what occurred during Anthony Jakes' interrogation on September 16-17, 1991 in pre-trial hearings, at trial, in post-conviction proceedings and/or in depositions. Not surprisingly, this case therefore presents a classic swearing contest: the accounts of what occurred during this lengthy unrecorded interrogation by Anthony Jakes, on the one hand, and detectives Kill, Boudreau, and Caesar, Youth Officer Buke, and former ASA Grossman, on the other hand, are dramatically different. They cannot be reconciled.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. I therefore cannot opine about whose account of what occurred during Anthony Jakes' lengthy unrecorded interrogation on September 16-17, 1991 is more factually accurate. I can only evaluate the accounts provided by the various participants of the unrecorded interrogation of Anthony Jakes in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to both sets of accounts of Anthony Jakes' interrogation on September 16-17, 1991, discuss the implications and concerns that they raise for each set of accounts and offer my professional expert opinions.

### B) Anthony Jakes' Description of His Interrogation and Prosecutor-Written Confession Statement on September 16, 1991

According to Anthony Jakes, at approximately 12:30 p.m. on September 16-17, 1991, 4-5 plainclothes Chicago police officers forced their way into Mr. Jakes' home without a warrant. Due to the police break-in, Mr. Jakes' aunt, who was his primary caretaker, began yelling. When Mr. Jakes came down the stairs, the plainclothes Chicago police officers slammed him against the wall, and handcuffed his hands behind his back. Mr. Jakes' aunt asked the plainclothes officers whether they had a warrant, why they were handcuffing Mr. Jakes and where they were taking him. Mr. Jakes also asked the officers what was going on, but they did not answer. The plainclothes officers walked Mr. Jakes, who was handcuffed, to a police car and took him to the Area 3 headquarters of the Chicago Police Department at 39th and California, where he was placed in the bullpen. According to Mr. Jakes, at the police station, a Chicago police officer reached into his pocket and claimed that they found a foil packet of cocaine, and Mr. Jakes was then arrested for the drug charge, after which he was placed in a locked interrogation room. Mr. Jakes indicated he did not possess cocaine, but that the evidence was planted on him by Chicago Police to generate the illusion of probable cause to justify his false arrest. Subsequently, the substance that police alleged to find on him was determined not to be an illegal substance.

Nevertheless, Mr. Jakes was held in custody at the Area 3 police station for approximately 16 hours after his initial contact with police at his home. During this time, Mr.

Jakes was first questioned about the murder of Rafael Garcia by Chicago Police Detectives Duckhorn and O'Riley at approximately 4:15 p.m. Detectives Duckhorn and O'Riley asked Mr. Jakes basic questions about who he was with and where he was at the night before the murder. Mr. Jakes denied directly knowing anything about the murder, he told the detectives that Annette Harris, Denise Harris and Nikita Little could have information about the murder of Mr. Garcia because they were near the shooting at the time it occurred.

Shortly after this session with Detectives Duckhorn and O'Riley, at approximately 4:45 p.m., Mr. Jakes was interrogated by Detectives Kill and Boudreau. Mr. Jakes repeated his denials and account to Detectives Kill and Boudreau, who left Mr. Jakes inside the locked interrogation room for the next 6 hours.

When Detectives Kill and Boudreau returned to the interrogation room at approximately 10:45 p.m., Detective Kill aggressively accused Mr. Jakes of participating in the murder of Rafael Garcia. According to Mr. Jakes, when Detectives Kill and Boudreau walked in, Detective Kill slammed the door, and Detective Kill seemed agitated and upset, scaring Mr. Jakes. Mr. Jakes continued to deny the accusations and assert his innocence. Detective Kill told Mr. Jakes that he had a picture of the person who had committed the crime and then showed Mr. Jakes a picture of himself. Mr. Jakes continued to deny participating in, witnessing or knowing anything about the crime.

At some point during this interrogation, Detective Kill became even more agitated, and slapped Mr. Jakes hard across the face with an open hand. Detective Kill also punched Mr. Jakes in the ribs, causing Mr. Jakes to fall down in pain and ball up into the fetal position. Detective Kill kicked and stomped on Mr. Jakes, causing Mr. Jakes to cut his back on a locker in the interrogation room. My Jakes was terrified. In addition to the physical abuse, Detective Kill threatened to throw Mr. Jakes out the window if he did not confess, and told Mr. Jakes that he (Detective Kill) would say it was in self-defense and that Mr. Jakes was trying to reach for Detective Kill's gun. In addition, Detective Kill threatened to have Mr. Jakes' family killed by the Latin Kings street gang – with whom Detective Kill represented he had a close relationship -- if Mr. Jakes did not confess. Detective Kill also threatened to burn Mr. Jakes with a cigarette if he did not confess. Mr. Jakes feared for his life. At the same time, according to Mr. Jakes, Detective Kill suggested that Mr. Jakes' role in the murder of Rafael Garcia was only as a lookout while Arnold Day shot Mr. Garcia, and that Mr. Jakes would be able to leave the police station and go home if he confessed to the scenario (Arnold Day as the killer, Mr. Jakes as the lookout) that Detective Kill was suggesting.

According to Mr. Jakes, Detectives Kill and Boudreau educated him about the crime details and facts of the of murder of Rafael Garcia, none of which Mr. Jakes previously knew. Detectives Kill and Boudreau also educated Mr. Jakes about their theory of the murder of Rafael Garcia, that Mr. Jakes allegedly asked Gus "Snake" Robinson if he could be a lookout while Arnold Day robbed and shot Rafael Garcia as he was leaving a Subway shop. Mr. Jakes reports

that after educating him about the facts and police theory of the crime, Detective Kill told him that someone would be seeing him to discuss Mr. Jakes' statement and that he needed to repeat the same story Detectives Kill and Boudreau had told him or else he would receive more physical abuse and punishment as he just had. Detective Kill glared at Mr. Jakes, scaring him even more. This interrogation session ended around midnight.

Assistant State's Attorney Brian Grossman subsequently entered the interrogation room and wrote out a statement from Mr. Jakes. During this time, Detective Kill kept coming in and out of the room, intimidating Mr. Jakes further. Mr. Jakes reports that he had seen Detective Kill and ASA Grossman shake hands and greet each other as friends, so he did not tell ASA Grossman about Detective Kill's physical abuse, threats and promises that caused Mr. Jakes to agree to a false confession to being a lookout in the murder of Rafael Garcia. ASA Grossman wrote out Mr. Jakes' confession statement, intentionally inserted trivial errors into the statement, corrected the errors by scratch out, and then directed Mr. Jakes to initial the errors in the statement that ASA Grossman had both inserted and then corrected. Mr. Jakes signed the confession statement after 5 a.m. on September 17, 1991. At that point, he had been in custody at the Area 3 police station for over 16 hours. According to Mr. Jakes, during the more than 16 hours of captivity, he had not been offered anything to eat, anything to drink or the opportunity to call his legal guardian, his aunt Jessie Mae Jones. The confession statement documents that Ms. Jones was not present for his confession. The confession also states that Mr. Jakes was not provided any food or drink because he declined offers to provide them to him. Mr. Jakes had glanced at but did not read the confession statement before signing it.

### C) Risk Factors for False Confession in Anthony Jakes' Account

Anthony Jakes provides a robust account of what he recalls occurring during his lengthy, unrecorded interrogation by Detectives Kill, Boudreau, and Caesar, Officer Burke, ASA Brian Grossman on September 16-17, 1991. Mr. Jakes describes how and why these interrogators moved him from adamant denial to signing a prosecutor-written statement to participating in the murder of Rafael Garcia as a lookout that he has always maintained he is factually false and for which the State of Illinois has declared him factually innocent. In his account of the lengthy, unrecorded interrogation by Detectives Kill, Boudreau and Caesar, Officer Burke and ASA Grossman, Anthony Jakes describes numerous interrogation techniques, methods and strategies, as well as other factors, that decades of empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include:

1) *Physical Abuse and Coercion*. Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[33] The

---

[33] See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists –dispute it, and it has been prohibited by federal constitutional law that has applied to the States for more than eighty (80) years. Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is universally recognized as apt to make an innocent person falsely confess. All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely unlawful.

As discussed above, according to Anthony Jakes, Detective Kill (and possibly Detective Boudreau) violently physically assaulted Mr. Jakes during the interrogation. Detective Kill slapped Mr. Jakes across the face, punched Mr. Jakes repeatedly in the ribs (causing Mr. Jakes to fall down), tried to burn Mr. Jakes with a cigarette, and kicked and stomped on Mr. Jakes when he was on the ground. While being kicked and stomped by Detective Kill, Mr. Jakes cut his back on the edge of a locker in the interrogation room. At his trial, Mr. Jakes counsel presented photographs taken during Mr. Jakes initial court appearance that according to the record showed fresh bruises on his body.

There is no dispute that the physical coercion that Mr. Jakes describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature, and that this kind of physical coercion would have significantly increased the risk of eliciting false compliance and a false confession from Mr. Jakes.

2) *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue*. Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[34] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The amount of time that Mr. Jakes was at the station, and interrogated, on September 16-17, 1991 was extraordinarily lengthy per traditional police standards existing both then and now.[35]

---

[34] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[35] According to Mr. Jakes and Detective Boudreau, Mr. Jakes spent the entirety of the time at Area 3 detective headquarters. According to Detective Kill, Mr. Jakes accompanied the police on their investigation for several hours, remaining in the police car the whole time. Regardless of whether Mr. Jakes remained at the police

Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[36] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[37] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[38] Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure. The 1986 Reid and Associates police interrogation training manual (which was the current version in 1991) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[39] Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[40] especially where interrogators use psychologically aggressive, manipulative and/or coercive methods.[41] The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission. Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne

station the entire time or spent some of the time confined in a police car, this does not alter my analysis regarding the effect of the length of time that Mr. Jakes was away from his home prior to his confession. Likewise, the detectives contend that Mr. Jakes was free to leave while he was at the police station until approximately 10:45 p.m., while Mr. Jakes claims he was locked inside a room during that time, over 3 miles from his house, with no way of leaving the station without police assistance. I need not resolve this factual dispute; whether 15 year-old Anthony spent 16 hours in custody or if he was at the station voluntarily for some portion of that time, while being questioned intermittently, the effect is the substantially the same for purposes of my analysis.

[36] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[37] Richard A. Leo (1996). "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303. *See also* Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[38] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[39] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[40] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[41] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

and that an innocent suspect will make or agree to a false statement, admission and/or confession.

As noted above, a 16-hour period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation. In addition, Mr. Jakes also reports that he was not offered any food to eat or liquid to drink by his various interrogators, and that he was in a heightened state of stress and fear after Detective Kill violently hit him in the face, repeatedly punched him in the ribs, and kicked and stomped Mr. Jakes while he was on the ground, all of which would have added to his fatigue and exhaustion during the lengthy interrogation. As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, substantially increased the likelihood that Mr. Jakes would falsely comply and falsely confess on September 16-17, 1991.

3) *Sleep Deprivation*. Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[42] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[43] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[44] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession. Mr. Jakes' reported deprivation of food and drink would likely have compounded the weakening effects of his sleep deprivation.[45]

As noted above, a more than 4 hour period of overnight detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing

---

[42]  Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[43]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[44]  Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

[45]  If, as the detectives assert, Mr. Jakes was offered food and drink during his 4-5 a m. interrogation by ASA Grossman, but declined, this may be evidence of, and have reflected, a heightened state of stress brought on the by cumulative circumstances of the more than 16 hour period of detention, formal custody and interrogation.

and psychologically weakening, thereby increasing the risk of impairing, a suspect's ability to freely choose to continue participating in the interrogation. As substantial research supports, sleep deprivation and lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources they contribute to and produce, substantially increased the likelihood that Anthony Jakes would make or agree to false and unreliable statements, admissions and/or confessions on September 16-17, 1991. The detectives' lengthy interrogation of Anthony Jakes on September 16-17, 1991 substantially increased the risk of eliciting a false confession from him.

       4) *False and Exaggerated Evidence Ploys*. Police interrogators routinely tell criminal suspects that the evidence establishes their guilt: If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of eliciting, false statements, admissions, and/or confessions. False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[46] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.

       As mentioned above, during his interrogation, Mr. Jakes repeatedly denied directly knowing anything about the murder. But he told the detectives that Denise Harris, Annette Harris, and Nikita Little could have information about the murder of Mr. Garcia because they were near the shooting at the time it occurred. Denise Harris denied being present, but witness Tyrone Pitts reported to police that Denise Harris told him that she witnessed the murder right in front of her, but she was never interviewed by the police about her statement to Mr. Pitts. Even though Detectives Kill and Boudreau knew that Mr. Pitts had told police that Denise Harris told him she witnessed the murder of Rafael Garcia, they chose to tell Mr. Jakes only that Denise Harris denied being present. In other words, they lied to Mr. Jakes by omission, implying that he was lying when he said that Denise Harris could have information about the murder of Mr. Garcia because they were near the shooting at the time it occurred. In their depositions years later, both Denise Harris and Annette Harris testified that they were present and heard shots fired, corroborating Mr. Jakes' account.

       Detective Kill's and Detective Boudreau's lying by omission is not just an implicit false evidence ploy, but is also suggestive of their investigative bias and tunnel vision. According to

---

[46]    Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Mr. Jakes' account of what occurred during the lengthy unrecorded interrogation, the detectives had their mind made up that he knew about and had participated in the murder of Rafael Garcia. According to Mr. Jakes' account of the lengthy unrecorded interrogation, Detectives Kill and Boudreau's investigative approach in this case was not to treat Mr. Jakes' possible guilt as a hypothesis to be investigated and independently corroborated or falsified depending on where the evidence took them. Rather, the detectives, according to Mr. Jakes' description, conducted the lengthy unrecorded interrogation as if there were already substantial evidence of Mr. Jakes' guilt. Yet they failed to conduct any follow up investigation to test or attempt to corroborate the accuracy of their theory about Mr. Jakes' alleged involvement. For example, Detectives Kill and Boudreau told Mr. Jakes they did know who Quarter Pound or Tweety were, implying that he was lying, but there is no indication that they asked anyone about Quarter Pound or Tweety. Nor, as mentioned above, did they interview Denise Harris about Tyrone Pitts' statement that she told him that she witnessed the murder right in front of her. Nor did they investigate or question "Darren" about his or Mr. Jakes' alleged involvement in the murder. And nor did they investigate the lead that someone named "Thomas" committed the murder at "Troy's" direction.

As a century of basic psychological research on misinformation effects has shown[47] (as well as decades of applied psychological research on police lying to suspects during interrogation)[48] false evidence ploys are effective at eliciting compliance,[49] confusing some suspects into believing that they have been framed or that such evidence really does exist,[50] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[51] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[52] Based on well-established basic and applied social scientific research going back decades, the detectives' false evidence ploy of telling Mr. Jakes that Denise Harris was not where he claimed increased the risk of eliciting a false and unreliable confession from him.

---

[47]  Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

[48]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[49]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[50]  Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[51]  Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[52]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014). "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 1-11 (published online January 14, 2015); and Julia Shaw (2016). THE MEMORY ILLUSION (Random House).

5) *Minimization*. A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious. Interrogation techniques and strategies that implicitly or explicitly minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting involuntary and/or unreliable statements, admissions and/or confessions. Such *minimization* techniques and strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[53] Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – *i.e.*, suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement – are also associated with and known to increase the risk of eliciting involuntary and/or unreliable confessions. Such *maximization* strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess. *Minimization* and *maximization* interrogation strategies are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession).

In their interrogation of Anthony Jakes, as recounted by Mr. Jakes, Detective Kill and Detective Boudreau used minimization interrogation techniques and strategies to downplay or minimize Mr. Jakes' alleged blameworthiness or culpability, as well as the potential consequences he would face, if he stopped denying and started making or agreeing to an incriminating statement or confession during the lengthy interrogation. Detectives Kill and Boudreau minimized Mr. Jakes' culpability, and, by implication, the consequences he would face if made an incriminating statement, by downplaying his alleged role in the murder of Rafael Garcia by suggesting he was a mere "lookout" to the murder of Rafael Garcia rather than a direct participant. The clear implication is that if Mr. Jakes would admit to being the lookout he would be less responsible for the alleged crime, he would be less blameworthy or legally culpable, and thus face less severe, and more lenient treatment, than the alleged co-perpetrator, Arnold Day, whom detectives Kill and Boudreau told Mr. Day had killed Rafael Garcia.

Social science research has repeatedly demonstrated that m*inimization* techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom and/or a different benefit in exchange for compliance and confession, and, conversely, *maximization* techniques sometimes also imply harsher treatment of punishment in the absence of compliance and confession. Detective Kill and Boudreau's use of *minimization* techniques by suggesting that

[53] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Mr. Jakes was a mere lookout to the homicide rather than the instigator (which reduces culpability by seeming redefining the elements of the alleged crime downward and thus conveying mitigated punishment in exchange for compliance and confession) -- increased the risk that Mr. Jakes' would be overborne and that he would make or agree to false and/or unreliable incriminating statements, admissions and/or confessions.

6) *Threats and Promises*. As discussed earlier in this report, the use of implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession and implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) in exchange for compliance and confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm and promises of leniency, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. As noted above, Mr. Jakes describes being slammed up against a wall at his house while he was being arrested as part of the Chicago Police detectives' warrantless entry into his aunt's house, and subsequently slapped, hit, punched, kicked and stomped by Detective Kill are the Area 3 police headquarters. Detective Kill explicitly and repeatedly threatened Mr. Jakes: Detective Kill threatened that he would continue to physically assault and coerce Mr. Jakes if Mr. Jakes did not comply with his demands to confess to Detective Kill's theory of the Rafael Garcia murder and eventually sign the prosecutor-written statement eventually placed before him; Detective Kill threatened to throw Mr. Jakes out the window and falsely claim it was in self-defense; and Detective Kill threatened to have the Latin Kings gang, with which Detective Kill represented himself to have a close relationship, kill Mr. Jakes' family. Detective Kill's multiple threats of physical harm and abuse to Mr. Jakes and his family were also implicit promises of leniency (i.e., an implied promise to terminate physical abuse, not throw Mr. Jakes out the window and claim it was self-defense, not have the Latin Kings gang harm Mr. Jakes' family, and not burn Mr. Jakes with a cigarette) in exchange for a confession, since Detective Kill's statements led Mr. Jakes to believe that signing the confession was the only way for him to avoid the possibility of further physical abuse by Detective Kill. In addition, Detective Kill explicitly promised Mr. Jakes that he could go home if he agreed to Detective Kill's version of the murder of Rafael Garcia and subsequently signed the prosecutor-written confession statement. According to Mr. Jakes, he understood Detective Kill's explicit promise to be allowed to go home if he parroted back the police and prosecutor version of the Rafael Garcia as signaling that Mr. Jakes would also not be charged with a crime.

The use of explicit and implicit threats of harm (in the absence of compliance and confession) as well as explicit and implicit promises of leniency, immunity and/or a tangible benefit (in exchange for compliance and confession) significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm or harsher punishment and promises of leniency and

immunity are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes.  There may be no psychological interrogation technique more potent than the use of threats and promises.  Threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests.  Like other *high-end* inducements, threats and promises contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation.   The extreme threats and promises, that Mr. Jakes describes Detective Kill using in his lengthy unrecorded interrogation on September 16, 1991 terrorized Mr. Jakes, and significantly increased the likelihood of eliciting false compliance and a false confession from him.

7) *Psychological Coercion*.  As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[54] In my professional opinion, the lengthy interrogation described by Anthony Jakes was psychologically coercive for at least three reasons.

First, as just discussed and illustrated, the lengthy interrogation described by Anthony Jakes on September 16-17, 1991 contained substantial threats of harm (i.e., ongoing physical assault, being thrown out a window, having the Latin Kings gang kill his family) if Mr. Jakes did not comply with Detective Kill's demand that he repeat his confession to ASA Grossman and sign the prosecutor-written statement.  And the lengthy interrogation described  by Anthony Jakes contained explicit and implicit promises of leniency and freedom, as well as escape from more abusive interrogation by Detective Kill, in exchange for repeating his confession to ASA Grossman and signing the prosecutor-written statement.  These extreme techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements.  Avoiding the use of threats of harm—especially extreme ones such as being physically assaulted for failing to comply and confess and threatened with being thrown out a window and having one's family killed by a violent gang as Mr. Jakes describes here— in the absence of compliance/confession and  making promises of leniency and freedom in exchange for compliance and confession is among the most fundamental prohibitions in American police interrogations,[55] second only to the prohibition against using physical violence on suspects to elicit confessions,[56] which Mr. Jakes had also described and which, of course,

---

[54]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[55]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[56]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

made Detective Kill's threat of additional physical violence seem all the more real and certain if Mr. Jakes, who had only recently turned 15 years old, did not comply and confess to avoid it. Threats and promises – especially the one Mr. Jakes describes Detective Kill using in this case -- are psychologically coercive and thus taint the rest of an interrogation.[57]

Second, the detectives' interrogation methods, according to Mr. Jakes, caused him to perceive that his situation was hopeless and that there was no way out of the interrogation room other than to sign the prosecutor-written statement -- in other words, Detective Kill's and Detective Boudreau's interrogation techniques cumulatively caused Mr. Jakes to perceive that he had no meaningful choice but to comply with, and to submit to, their demands to sign the prosecutor-written confession statement if he wished to put an end to abusive, lengthy, frightening, and overwhelming interrogation. As Mr. Jakes has repeatedly described in his testimony, he felt scared, intimidated and trapped during the lengthy period of custody and interrogation, and ultimately he felt forced to sign a prosecutor-written statement out of fear, exhaustion and a sense of hopelessness. Mr. Jakes describes a highly psychologically coercive interrogation that would have taken away his free will and in which he was made to comply involuntarily with the investigators' demands. As Mr. Jakes described in court testimony, he believed that the interrogation was so cumulatively psychologically coercive that he would only be able to escape it by agreeing with Detective Kill's theory of the crime that he was the lookout in Mr. Garcia's murder, filling in the e crime details that Detectives Kill and Boudreau educated him about, and signing the prosecutor-written statement without complaint, including initialing the scratch outs that ASA Grossman directed Mr. Jakes to sign after ASA intentionally inserted trivial errors into the confession statement he wrote out.

Third, Mr. Jakes describes numerous deprivations that in my professional opinion would have been psychologically coercive, especially for a 15 year old child. Mr. Jakes reports that the detectives did not provide food or anything to drink during his 16 hours of custodial detention at the Area 3 headquarters of the Chicago police department (he had not eaten or drank anything since having lunch on September 16 before being taken to the police station).[58] Nor did he have any way of contacting his Aunt, who was his guardian. According to Mr. Jakes, he was locked for many hours in the interrogation room and thus had no way of getting out. Significantly, Chicago police department regulations at the time required a parent, guardian, or youth officer to be present if detectives interrogated a 15 year old child outside the presence of the child's parent

---

[57] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[58] The police suggest that Mr. Jakes may have been fed or provided drink during his stay at the police station, but there is no documentation to support that contention. In addition, the only documentation on the subject states that Mr. Jakes was offered but not provided food or drink.

or guardian. Yet the detectives did not have a youth officer present during Mr. Jakes' interrogation by the detectives. Indeed, by their own account, the detectives did not attempt to procure a parent, guardian, or youth officer to be present for Mr. Jakes' interrogation.[59]

Mr. Jakes describes here classic psychological coercion by the detectives leading to involuntary compliance. Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be forced to make or agree to false and unreliable statements, admissions and/or confessions. The psychologically (in addition to the physically) coercive interrogation pressures that Mr. Jakes describes being subject to during his lengthy interrogation on September 16-17, 1991 substantially increased his risk of falsely complying and falsely confessing.

8) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*. In addition to the *situational* risk factors present here—physical abuse, investigative bias born of tunnel vision, lengthy interrogation, minimization, threats, promises and psychological coercion—Mr. Jakes, who was 15 years old at the time of his interrogation by Detectives Kill and Boudreau, was at a heightened risk of making and/or agreeing to a false and/or unreliable confession statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his relative youth.

Youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. Juveniles are disproportionately represented in the reported false confession cases, as has been well-documented by scholars[60] and in the National Registry of Exonerations.[61] They are particularly vulnerable to the pressures of psychological interrogation. Adolescence is associated not only with psychological traits such as greater psychosocial immaturity and impulsiveness, but also higher suggestibility and emotional arousability, poor decision-making, higher trust of authority figures, increased gullibility and a tendency to focus on the present rather than the future. As a result, juveniles tend to be more easily led and manipulated than adults; more naïve, gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more likely to engage in risky behaviors; less capable of considering long term consequences. These psychological tendencies of youth significantly increase the risk of false confessions. The risks are compounded by the

---

[59] Detectives Boudreau and Kill testified during the criminal proceedings that they did not attempt to get a youth officer until after Mr. Jakes' confession. During his deposition in the civil case, Boudreau testified that he tried to get a youth officer before interrogating Mr. Jakes. Detective Boudreau's more recent assertion in his deposition is not documented anywhere in the record. Regardless, it is undisputed that Boudreau did not delay the interrogation to allow a youth officer to be available, or to even attempt to have a parent or guardian available for the interrogation.

[60] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007.

[61] *See National Registry of Exonerations*, http://www.law.umich.edu/special/exoneration/Pages/about.aspx (last accessed August 18, 2019).

fact that although police officers may realize that juvenile suspects are easily influenced, interrogators often apply the same interrogations tactics on juveniles that they use on adults, as occurred in the interrogation of Anthony Jakes. All other things being equal, the empirical research would predict that it would take far less time for police interrogators to break an innocent juvenile suspect and move him from denial to admission than an adult. Because of his relative youth, Mr. Jakes was at an increased risk of making or agreeing to false statements, admissions and/or confessions in response to police interrogation pressures, especially in response to lengthy and highly coercive interrogations like the one he endured here from Detectives Kill and Boudreau on September 16-17, 1991.

In addition to the increased risk for making and/or agreeing to a false confession due to his youth, Anthony Jakes was obviously extremely tired and exhausted at the time of his interrogation and prosecutor written confession statement, having spent more than 16 hours of custodial detention and interrogation at the Area 3 headquarters when he signed his prosecutor-written and edited confession statement after 4:30 a.m. on September 17, 1991. As discussed earlier in this report, longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources and energy necessary to resist the pressures and stresses of accusatory interrogation,[62] especially when investigators use psychologically manipulative, deceptive and/or coercive methods as Mr. Jakes describes occurring during his more than 16 hour period of custody and interrogation on September 16-17, 1991.[63]

In addition to his youth and sleep deprivation, Mr. Jakes' ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ █

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

---

[62]   Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.

[63]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

███████████████████████████████████

███████████████████████████████████

### D) Indicia of Unreliability

Anthony Jakes' prosecutor-written and prosecutor-edited statement does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence: it is not supported or corroborated by any physical, forensic, medical or other credible independent evidence; it did not lead to new or missing evidence; it did not contain any non-public case facts that only the true perpetrator, but not the police detectives, knew; and it is inconsistent with and contradicted by numerous other case facts, logic and evidence.  There is no reliable evidence linking Mr. Jakes to the murder of Rafael Garcia other than the prosecutor-written and prosecutor-edited statement that Mr. Jakes signed after a lengthy interrogation that he describes as extremely physically and psychologically coercive.[64]

Four points stand out here:

- None of the physical, forensic or circumstantial evidence recovered at scene was connected in any way to Mr. Jakes;

  The liquor store employee just east of Queen Submarine who had witnessed the murder told police that the intended victim was "Snake", a passenger in Rafael Garcia's car, and that the shooter was 6 feet tall and had the last name of Thomas. The person implicated as the shooter by Mr. Jakes, Arnold Day, was only 5'8 at the time;

- After reviewing the facts of Mr. Jakes' case and conviction, the Cook County Circuit Court issued a Certificate of Innocence, which stated that: "The Defendant /Petitioner is innocent of the offenses charged in the indictment" and that "The Defendant/Petitioner did not by his/her own conduct voluntarily cause or being about his/her conviction.";

---

[64]  In my professional opinion, the unrecorded, police-induced statement of Gus "Snake" Robinson is not necessarily corroborative of Mr. Jakes' coerced statement because  at trial, Gus "Snake" Robinson testified that he and Anthony Jakes went to the window of the sub shop and actually viewed the victim before the murder. This fact is missing from both Mr. Robinson's and Mr. Jakes' contemporaneous statements, and according to ASA Grossman and Detective Boudreau, is something that would certainly have been documented if it had indeed occurred.  In addition, - Gus "Snake" Robinson, a two time felon, testified against Mr. Jakes in exchange for dismissal of criminal charges against him. Substantial empirical research indicates incentivized testimony, such as that obtained from Mr. Robinson, carries a heightened risk of being unreliable and is a risk factor associated with many wrongful convictions.  See Brandon Garrett (2011). CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press).

- The statement of Mr. Jakes' and the statement of Arnold Day, who was acquitted at his trial, are inconsistent with one another, and Mr. Day's statement does not say anything about Mr. Jakes acting as a look out or playing any role in the murder of Rafael Garcia, or of "Darren", a man who supposedly committed the crime alongside Mr. Day; and, most importantly:

- Mr. Jakes' statement that he saw the murder victim Rafael Garcia on the ground from his home is factually impossible, and thus false, because Mr. Jakes lived in the rear house at 1212 W. 51st Street, and it was not possible from his house to see the front of 1208 W. 51st Street or 1210 W. 51st Street because of the two buildings in front of 1212 W. 51st Street blocking that view.[65]

In short, Anthony Jakes' prosecutor-written and prosecutor-edited statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. A hallmark or indicia of reliability is evidence that corroborates either a suspect's knowledge of non-public crime facts not likely guessed by chance (absent contamination) or scientific, medical or physical evidence that corroborates the confession statement or leads to new, missing or derivative case evidence. As documented above, the State's evidence corroborating the statement that Mr. Jakes signed and initialed, but did not write, is suspect, and the evidence contradicting it is substantial. In addition, Mr. Jakes did not supply non-public facts that only the true perpetrator (and not the police investigators) would know nor did his prosecutor-written and police-edited statement lead to any new, missing or derivative case evidence that would have corroborated it. These features indicate that Mr. Jakes' statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt.

### E) Police Interrogation Contamination and Scripting: Fabricating Anthony Jakes' Confession Statement

As mentioned earlier, police interrogators are trained to refrain from contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. In his deposition, Detective Boudreau agreed that he had been trained to not reveal non-public crime scene facts. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions

---

[65]     The police claim that Mr. Jakes may have been somewhere other than his home when he viewed Mr. Garcia's body in the street. The signed statement, however, states that Mr. Jakes was in his home when he viewed Mr. Garcia's body, and police documented that Mr. Jakes was picked up from his home at 1212 W. 51st rear house when he was brought to the station at approximately 12:30 p.m. on September 16, 1991.

that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the claim is made that they were volunteered by the suspect). Though police interrogation contamination is believed to often be inadvertent rather than intentional, it can make otherwise completely false confessions appear not only to be true but persuasively so.[66]

Related to contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[67] Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing expectations about how and why the suspect must have committed the crime, interrogators continue to interrogate the suspect and pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[68] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against someone whose guilt they assume). Instead or pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. Just as police interrogation contamination can make otherwise completely false confessions appear not only to be true but persuasively so,[69] the same is true of police interrogation scripting.[70]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's confession statement originated with the suspect or originated with police interrogators who already knew those facts and suggested them

---

[66] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[67] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[68] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE. *Justice* (Harvard University Press).

[69] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[70] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

to the suspect, who then parroted them back in a statement. According to Mr. Jakes, the police detectives educated him about the Rafael Garcia homicide (Mr. Jakes did not know anything about the crime at the time of his interrogation), repeatedly suggested detailed crime scene facts to him that he did not know, repeatedly tried to put words in his mouth, and repeatedly and coercively pressured and persuaded him to agree with their description of theory of the facts of the murder of Rafael Garcia. According to Mr. Jakes, for example, Detectives Kill and Boudreau: Showed Mr. Jakes a picture of Gus "Snake" Robinson; told Mr. Jakes that he walked up to Gus "Snake" Robinson and asked Mr. Robinson if he wanted to be a lookout also; showed Mr. Jakes a picture of Arnold Day; suggested that Mr. Jakes was the lookout while Arnold Day and Darren attempted to rob Rafael Garcia; told Mr. Jakes that Arnold Day shot Mr. Garcia; told Mr. Jakes that Arnold Day used a .380 caliber gun after saying "this is a stick-up." As Mr. Jakes described in his testimony during the second day of the post-conviction hearing when asked whether the words contained within his statement were words that he said: "They would be words that I said, with detail that [Detective Kill] gave me." (P. 72)

Eventually, after many hours of physically and psychologically coercive guilt-presumptive accusatory interrogation according to Mr. Jakes, he signed a prosecutor-written and prosecutor-edited statement that had literally been scripted by Detectives Kill and Boudreau and ASA Grossman. Anthony Jakes did not write a single word of his confession, he asserts he only glanced at a small portion of it, and he signed and initialed it where directed. In addition, ASA Grossman used the "Error Insertion Trick," a police interrogation scripting technique discussed above in which the interrogator (here ASA Grossman) initially inserts trivial errors into the statement, scratches out or corrects them, and then directs the suspect to initial each correction, as if the suspect had directed the corrections and edited them rather than the police interrogator (or here the prosecutor). According to Anthony Jakes, he did not even fully read the statement and signed it and initialed where told do so at the direction of ASA Grossman and in the shadow of Detective Kill's coercive multiple threats to physically abuse him and harm his family if he did not. By contrast, as if following standard American police interrogation training, ASA Grossman, who was in effect acting outside his role as prosecutor and continuing the interrogations of Detectives Kill and Boudreau, insisted that Anthony Jakes, not ASA Grossman, first spotted the trivial errors in his prosecutor-written statement and then Anthony Jakes directed ASA Grossman to correct the trivial errors, after which Anthony Jakes voluntarily initialed the error corrections. As mentioned earlier, police interrogators use "The Error Insertion Trick" technique to (1) create the impression of validating a confession's voluntariness and accuracy and (2) "confirm" the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts.[71]

Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false confession statement appear to be true.

---

[71] *See* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 175-177.

As mentioned above, police interrogation contamination is often believed to be inadvertent, not deliberate.  Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[72]  Police interrogation contamination and scripting therefore increase the risk that once a suspect has falsely complied or falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession statement is self-corroborating and therefore true and accurate.  The detectives and ASA Grossman's contamination and scripting in this case (if it occurred) did not increase the risk that Mr. Jakes would make or sign a false confession as much as it increased the risk that his false statement, once signed, would cause third parties to erroneously believe that in contained indicia of reliability, and thus that it was corroborated, and erroneously convict him. As described earlier, confession evidence, even when false, is extremely persuasive to third parties such as juries,[73] and in this case it appears that the jury convicted Mr. Jakes based solely on their perception of his (contaminated and scripted) confession statement to participating as a lookout in the robbery/murder of Rafael Garcia, despite substantial indicia of its unreliability.

### F) Violation of National Police Interrogation Training Standards, Protocols and Best Practices

In Anthony Jakes' account of the 16 hours of custodial interrogation, the Chicago police investigators *repeatedly* violated numerous national police interrogation standards, protocols and best practices in general as they existed in 1991.

First, police investigators illegally entered Mr. Jakes' residence without probable cause or a search warrant (or an exception to the warrant requirement of the 4th Amendment), and illegally arrested Mr. Jakes (without an arrest warrant).  According to Mr. Jakes, Chicago police investigators subsequently planted alleged drug evidence on him to justify their illegal arrest of him, only to have the evidence determined not to be illegal drugs. Chicago police investigators nevertheless continued to unlawfully detain Mr. Jakes in custody for 16 hours prior to his prosecutor-written and edited confession statement.  American police investigators are trained to comply with the requirements of the 4th Amendment, but the Chicago police investigators egregiously and knowingly violated the 4th Amendment requirements for the search, seizure, arrest and prolonged custody of Mr. Jakes.

---

[72]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[73]   See William Douglas Woody and Krista D. Forrest (2020). UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York University Press).

Second, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, Anthony Jakes describes the use of a sustained violent physical assault by Detective Kill in which he slapped, punched, kicked and stomped Mr. Jakes. Physically coercive interrogation not only been a violation of universal American police interrogation standards since 1936, but is also illegal as all police detectives knew in 1991 and know today.

Third, American police investigators are trained generally to avoid the use of threats of harm (implicit or explicit) and promises of leniency (implicit or explicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As discussed above, Mr. Jakes describes an interrogation in which the Detective Kill threatened the possibility of additional physical assault if Mr. Jakes continued to deny the detectives' accusations and did not sign the prosecutor-written statement that memorialized the detectives' theory of how and why Rafael Garcia was murdered. Detective Kill's threat of physical harm in the absence of compliance also implied a promise of freedom from additional physical harm in exchange for compliance, both of which were unlawful and violated universal American police interrogation standards as they existed in 1991.

Fourth, relatedly, American police are trained never to deprive a suspect of essential necessities such as food, drink, sleep or rest during interrogation because that is also unconstitutional and is recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Mr. Jakes describes not having been provided with any food or anything to drink during his lengthy custody and interrogation, which lasted from the middle of the day on September 16, 1991 to the early morning hours of September 17, 1991. Locked in an interrogation room for hours on end, Mr. Jakes also describes being extremely tired by the end of the lengthy interrogation. The sleep and food deprivation that Mr. Jakes describes violated American police interrogation standards and best practices as they existed in 1991.

Fifth, and related, the detectives violated commonly accepted standards with respect to the length of Mr. Jakes' police interrogation. As discussed earlier, the 1986 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[74] The sixteen-hour custodial interrogation that the detectives subjected Mr. Jakes to on September 16-17, 1991 violated American police interrogation standards and best practices as they existed in 1991.

---

[74]    Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

Sixth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. Yet the detectives leaked numerous non-public crime details, as well as their theory of how and why the homicide occurred and the double murder was committed, to Mr. Jakes, fully educating him about a crime that he knew nothing about prior to the interrogation, as previously discussed and illustrated. The investigators' contamination of Anthony Jakes during the lengthy interrogation on September 16-17, 1991 violated American police interrogation standards and best practices as they existed in 1991.

Seventh, Detectives Kill and Boudreau failed to call a parent, guardian or youth officer prior to their custodial interrogation of Anthony Jakes at 10:45 p.m. on September 16, 1991 despite being required to do so by Chicago police department regulations at the time. Detectives Kill and Boudreau knowingly failed to contact either the fact that police regulations required that a parent, guardian or youth officer be present when Chicago police interrogated a fifteen year old child without a parent or guardian[75]

Eighth, and finally, the Reid and Associates training manuals and programs have always repeatedly implored police investigators not to use any interrogation technique that is "apt to make an innocent person confess."[76] Yet, according to Anthony Jakes' description of what occurred during the unrecorded interrogation, the detectives used at least four techniques that the Reid Manual specifically teaches investigators not to use because they are apt to cause a false confession: physical coercion, threats, promises, and deprivation of essential necessities.

In short, according to Mr. Jakes' account, the Chicago police detectives who detained, searched, held Mr. Jakes in custody, and coercively interrogated him *repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 1991. In my professional opinion, on Mr. Jakes' account, these

---

[75] Detective Kill testified consistently that he and Detective Boudreau did not contact a parent, guardian or youth officer prior Anthony Jakes' custodial interrogation at Area 3 Headquarters at 10:45 p.m. on September 16, 1991, despite being required to do so according to Chicago police department regulations. Prior to his deposition in April, 2021, Detective Boudreau had, like Boudreau, testified on multiple occasions that he and Detective Kill had failed to contact a parent, guardian or youth officer prior to their custodial interrogation of Anthony Jakes at 10:45 p.m. on September 16, 1991, despite being required to do so by Chicago police department regulations. Detective Boudreau offered no explanation in his April 13, 2021 deposition for his recent change in testimony. As with Detective Kill, Detective Boudreau testified that they requested a youth officer at 1:30 a.m. on September 17, 1991, after their final custodial interrogation session with Anthony Jakes and prior to ASA Grossman's custodial interrogation of Anthony Jakes that began at approximately 4 a.m. on September 17, 1991.

[76] *See* Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition at xiv (Williams & Wilkins).

violations individually and cumulatively would have contributed to Mr. Jakes' perception that
his situation was hopeless, that the detectives would not have honored a right to silence even if
he had asserted one, and that he had no other option but to sign the prosecutor-written confession
statement to put an end to the physically and psychologically coercive interrogation that he
describes as causing him to make an involuntary false confession.[77]

### G) Detective Kill's, Detective Boudreau's, Detective Caesar's, Officer Burke's and Assistant State Attorney Brian Grossman's Account of the Lengthy Unrecorded Custodial Interrogation of Anthony Jakes on September 16, 1991

Compared to Mr. Jakes' description of what occurred during his 16 hours of custody and
interrogation on September 16, 1991, Detective Kill's, Detective Boudreau's, Detective
Caesar's, Officer Burke's and ASA Grossman's descriptions of what occurred are relatively
sparse. According to the law enforcement account, on September 16, 1991, Officer Thomas
Pack received a phone call indicating that Anthony Jakes may have information related to the
homicide of Rafael Garcia that occurred in close proximity to where Mr. Jakes lived on West 51st
Street.[78] Officer Pack and his partner Officer Michael DeLacy went to Mr. Jakes residence at
1212 W. 51st Street, rear house, and knocked on the door. It was answered by Jessie Mae Jones,
Mr. Jakes' aunt. According to Officers Pack and DeLacy, Ms. Jones gave Mr. Jakes permission
to accompany the officers to the Area 3 Violent Crimes Unit, which Mr. Jakes agreed to do
voluntarily. They arrived at the police headquarters at approximately 12:30 p.m. At Area 3, and
Mr. Jakes was placed in an interview room. The officers conducted an unrelated pat down
search of Mr. Jakes, which in their account led them to find a tin foil packet containing narcotics
in Mr. Jakes' right hand pocket (it was later determined not to be narcotics). The officers then
arrested Mr. Jakes and took him to the Area 3 Youth section. After being processed for the
arrest, Mr. Jakes was told, according to the law enforcement account, that he could either go
home or be interviewed by the Violent Crimes detectives later about the Rafael Garcia murder,
and, according to the law enforcement account, Mr. Jakes said he wished to be interviewed
before going home. A youth officer summoned Detectives Duckhorn and O'Riley from the
Violent Crimes Office, who subsequently questioned Mr. Jakes, who described his activities on
the evening of September 15, 1991 but asserted he did not know anything about the murder of
Rafael Garcia.

Detective Duckhorn and O'Riley relayed this information to Area 3 Homicide Detectives
Michael Kill and Kenneth Boudreau, who subsequently interviewed Mr. Jakes at approximately
4:15. Mr. Jakes again described his activities on the evening of September 15, 1991 and again

---

[77] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and
Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A.
Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[78] Officer Pack's arrest report for Mr. Jakes states that he went to Mr. Jakes' home at 1212 W. 51st Street, rear
house, at the direction of detectives from the Area 3 Violent Crimes Unit. This appears to contradict Officer
Pack's testimony, but I draw no conclusion about which version of facts is correct.

denied knowing anything about the murder.  According to Detectives Kill and Boudreau, this interview lasted only 15-30 minutes or so, after which they left Mr. Jakes at the police station in an open room and went on to interview other individuals who might have information about the crime. Detectives Kill and Boudreau returned to Area 3 at approximately 9:30 p.m., and proceeded to interview Mr. Jakes again at approximately 10:30 or 10:40 p.m..  According to Detectives Kill and Boudreau, in the time they had left Mr. Jakes at the police station (since approximately 4:45 p.m.), Gus "Snake" Robinson had told them that Mr. Jakes tried to solicit Mr. Robinson to be a lookout in the robbery of Rafael Garcia, and the three girls who Mr. Jakes had said might know something about the homicide – Denise Harris, Annette Harris and Nikita Little – claimed not to be present during or have seen the homicide.   When Detectives Kill and Boudreau returned at 9:30 to interview Mr. Jakes, they considered him to be under arrest, though they did not explicitly tell him that he was under arrest.  According to Detectives Kill and Boudreau, when they interviewed Mr. Jakes at 10:30-10:40 p.m., they did not request a youth officer, but only did so after this interrogation.[79]  At the beginning of this interrogation at 10:30-10:40 pm, Detective Kill read Mr. Jakes his Miranda rights and elicited a Miranda waiver. Detective Kill  then confronted Mr. Jakes with the alleged facts that Detective Kill said did not match Mr. Jakes' prior account 6 hours earlier (i.e., that Gus "Snake" Robinson said Mr. Jakes approached him to be the lookout, that the three girls had not seen or been present for the homicide, and, in addition, that nobody had heard of Quarter Pounder or Tweety, whom Mr. Jakes had said he was present with around the time of the homicide), and then told Mr. Jakes that he was under arrest.  After this brief exchange, according to the law enforcement account, Mr. Jakes admitted his role in the Rafael Garcia homicide and then provided details about how it happened.  According to Detectives Kill and Boudreau, they asked Mr. Jakes if he wanted to eat and he said he was not hungry.  Detectives Kill and Boudreau deny hitting, kicking or physically assaulting Mr. Jakes, they deny threatening him or his family, and they deny promising him that he could go home if confessed or signed a confession statement.

Following the alleged confession statement of Anthony Jakes, Detectives Kill and Boudreau requested a youth officer to come to the station as well as an Assistant's State Attorney to question Mr. Jakes and memorialize his confession statement.  ASA Brian Grossman arrived at the police station at 2 a.m. according to the law enforcement account, and he – with Youth Officer Ken Burke and Detective Louis Caesar present – began questioning Anthony Jakes at 4:00 a.m. on September 17, 1991 and at 4:30 a.m. wrote out a statement that Mr. Jakes read, signed and corrected.  According to ASA Grossman, he first introduced himself as the state's attorney, said he worked with the police and that he was not Mr. Jakes' attorney.  ASA Grossman then read Mr. Jakes his Miranda rights, elicited a Miranda waiver and obtained Mr. Jakes' consent to speak to him.  ASA Grossman reports that he asked Mr. Jakes if he had been provided food or drink, and Mr. Jakes said that he was not hungry or thirsty (ASA Grossman says he had offered Mr. Jakes a can of soda pop). ASA Grossman testified that he did not inform

---

[79]    In his civil deposition, Detective Boudreau testified that, contrary to his earlier testimony, he believes he attempted to contact a youth officer. Again, I draw no conclusions one way or the other about which version of Detective Boudreau's facts is correct.

Mr. Jakes that he could be charged as an adult.  According to ASA Grossman, Mr. Jakes then confessed to being the lookout in the robbery of Rafael Garcia with Arnold Day, who, according to ASA Grossman, Mr. Jakes said shot Mr. Garcia.  ASA Grossman summarized what Mr. Jakes told him, and again read Mr. Jakes the Miranda warnings and again made sure Mr. Jakes understood them.

ASA Grossman then asked Mr. Jakes if he would like to have his confession statement stenographically transcribed by a court reporter or if Mr. Jakes would like to have Mr. Grossman write it out.  According to ASA Grossman, Mr. Jakes said he preferred that ASA Grossman write out the statement. ASA Grossman proceeded to write out a summary what Mr. Jakes told him. ASA Grossman again read Mr. Jakes his Miranda warnings and elicited a waiver, had Mr. Jakes read the Miranda warnings out loud, and even had Mr. Jakes read a few lines out loud from the confession statement.  ASA Grossman then went through the confession statement with Mr. Jakes word by word and line by line and read it out loud to make sure that Mr. Jakes understood it.  ASA Grossman then asked Mr. Jakes if he wanted to make any changes or corrections, and d Mr. Jakes said he did.  Both ASA Grossman and Mr. Jakes pointed out minor errors in the statement, and, according to ASA Grossman, Mr. Jakes made corrections to the statements and then signed his initials to the scratched out corrections.  Mr. Jakes then signed the confession statement that had been written by ASA Grossman.

### H) Comparing Anthony Jakes' and the Law Enforcement Accounts of the Unrecorded Interrogation of Anthony Jakes on September 16-17, 1991

The accounts (by Anthony Jakes on the one hand, and Detectives Kill, Boudreau and Caesar, Youth Offer Burke and ASA Grossman on the other) of what occurred during Mr. Jakes lengthy unrecorded custody and interrogation on September 16-17, 1991 are dramatically different and diverge on virtually every key factual detail.  In Mr. Jakes' telling, there were numerous interrogation techniques (*e.g.*, accusations, attacks on denials, minimization, escalation of pressure, threats, promises, physical violence) as well as interrogation contamination and scripting.  These interrogation techniques were physically and psychologically coercive and involved several known risk factors for eliciting false confessions according to decades of empirical scientific research on the psychology of police interrogations and suspect confessions. The interrogation methods, strategies and techniques that Mr. Jakes describes fit with the empirical research on the kinds of interrogation techniques, methods, practices and effects that lead to false compliance and false confession.

In the law enforcement telling, the entirely unrecorded questioning of Anthony Jakes -- despite the length of custody and detention – was brief, mostly conversational and essentially consisted of only a few brief interviews (first by Detectives Duckhorn and O'Riley, then twice by Detectives Kill and Boudreau, and finally by ASA Grossman).  These brief questioning sessions were more interview (*i.e.*, mostly question and answer) than interrogation, and very briefly involved only an accusation of not telling the truth before Mr. Jakes -- who was always

alert and wide awake, never tired, hungry, frightened, in pain or discomfort, or desirous of a parent or guardian -- voluntarily and near spontaneously confessed to participating as a lookout to the robbery that allegedly led Arnold Day shoot and kill Rafael Garcia. Nevertheless, even in the law enforcement account of what occurred during Mr. Jakes' unrecorded custody and interrogation that led to his prosecutor-written confession statement, there were still several factors present that, based on well-established social science research, would have increased his risk of making and/or agreeing to a false confession: the length of his custody/interrogation, Mr. Jakes' age and associated psychosocial immaturity, and Mr. Jakes' inevitable sleep deprivation by and into the early morning of September 17, 1991.

## XII. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) Anthony Jakes' description of what occurred during his lengthy unrecorded interrogation on September 16-17, 1991 that led to his prosecutor-written statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

2) Anthony Jakes' description of his lengthy, unrecorded interrogation on September 16-17, 1991 contains numerous examples of extremely physically coercive interrogation techniques, methods and strategies that have been demonstrated to cause false, unreliable and involuntary confessions. These interrogation techniques, methods and strategies cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

3) Anthony Jakes' description of his lengthy, unrecorded in-custody interrogation on September 16-17, 1991 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause false, unreliable and involuntary confessions. These interrogation techniques, methods and strategies cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

4) Anthony Jakes' account of what occurred during his lengthy unrecorded interrogation on September 16-17, 1991 contains a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. These include: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, minimization, threats, promises, physical abuse and psychological coercion.

5) Anthony Jakes was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on September 16-17, 1991 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his youth and associated psychosocial immaturity at the time, his sleep deprivation, and his intellectual and cognitive disabilities.

6) The lengthy and unrecorded interrogation on September 16, 1991 described both by Anthony Jakes as well as by the police investigators involved multiple documented instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Jakes' prosecutor-written confession statement would, misleadingly, appear to be detailed, accurate and self-corroborating.

7) Anthony Jakes' interrogation-induced confession statement on September 17, 1991 bears the hallmarks, characteristics and indicia of a false and unreliable confession. If false, Mr. Jakes' confession statements are properly classified as *coerced-compliant* false confessions.

8) The lengthy unrecorded interrogation on September 16-17, 1991 described by Anthony violated numerous universally accepted police investigative and interrogation national training standards, police protocols and best practices that existed in 1991.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco

February, 2022

**DR. RICHARD A. LEO, PH.D, J.D.**

## CURRICULUM VITAE

### ADDRESSES

**Professional Office (Mailing Address)**          **University Office**
15 Ashbury Terrace                                University of San Francisco
San Francisco, CA 94117                           School of Law
                                                  San Francisco, CA 94117


Phone:      (415) 661-0162                         415-422-6513
FAX:        (415) 422-6433                         (415) 422-6433
Email:      rleo@usfca.edu                         rleo@usfca.edu

Webpage:    http://www.usfca.edu/law/faculty/fulltime/leor.html
SSRN:       http://ssrn.com/author=1020356
BePress:    http://works.bepress.com/richardleo/

### POSITIONS HELD

| | |
|---|---|
| 7/06-Present | Hamill Family Professor of Law and Psychology<br>University of San Francisco |
| 8/05-3/20 | Fellow, Institute for Legal Research<br>Criminal Justice Studies Program<br>University of California, Berkeley School of Law |
| 9/14-6/15 | Fellow, Center for the Advanced Study in the Behavioral Sciences<br>Stanford University |
| 7/13-6/14 | Visiting Professor of Law and<br>Co-Director, Program on Understanding Law, Science and Evidence<br>University of California, Los Angeles |
| 7/97 – 6/06 | Associate Professor of Criminology, Law and Society and<br>Psychology and Social Behavior<br>University of California, Irvine |
| 8/94 - 5/97 | Assistant Professor of Sociology and Adjunct Professor of Law<br>University of Colorado, Boulder |

## EDUCATION

8/90 - 8/94        Ph.D. in Jurisprudence and Social Policy
                               **Specialization: Criminology and Social Psychology**
                               University of California, Berkeley

8/92 - 5/94        J.D., Boalt Hall School of Law
                               University of California, Berkeley

9/87 - 6/89        M.A. in Sociology
                               University of Chicago

9/81 - 5/85        A.B. in Sociology, with Honors
                               University of California, Berkeley

## ACADEMIC SPECIALIZATION

| | | |
|---|---|---|
| Criminology/Criminal Justice | Psychology and Law | Social Psychology |
| Criminal Law/Criminal Procedure | Law and Social Science | Police Organization/Behavior |

## RESEARCH SPECIALIZATION

| | | |
|---|---|---|
| Police Interrogation | Wrongful Convictions | Coercive Persuasion |
| False Confessions | Miscarriages of Justice | Influence and Decision-Making |

## AWARDS

Distinguished Scholar Award (2017). American Society of Criminology, Division of Policing (For outstanding contributions to the field of policing).

Academic Excellence Award (2017). International Investigative Interviewing Research Group (In recognition of outstanding achievements to ethical investigative interviewing).

Lifetime Achievement Award (2014). Society for the Study of Social Problems, Crime and Juvenile Delinquency Division. (For distinguished scholarship in the fields of crime and delinquency).

Paul Tappan Lifetime Achievement Award (2014). Western Society of Criminology. (For outstanding contributions to the field of criminology).

The President's Award (2014). Western Society of Criminology. (For contributions to the field of criminology and positive influence on the current Western Society of Criminology President's career).

Fellowship, Center for the Advanced Study in the Behavioral Sciences (2014-2015). Stanford University.

William J. Chambliss Lifetime Achievement Award (2013). Society for the Study of Social Problems, Law and Society Division. (For career-spanning excellence and achievement in the area of law and society).

Guggenheim Fellowship (2011). John Simon Guggenheim Memorial Foundation. (For men and women who have already demonstrated exceptional capacity for productive scholarship or exceptional creative ability in the arts). New York, N.Y.

Edwin H. Sutherland Outstanding Scholarship Award from the Society for the Study of Social Problems, Law and Society Division (2010) for *Police Interrogation and American Justice* (Harvard University Press, 2008). Inaugural award.

Outstanding Book Award (2010) from the Academy of Criminal Justice Sciences for *Police Interrogation and American Justice* (Harvard University Press, 2008).

Herbert Jacob Book Prize (2009) from the Law and Society Association for *Police Interrogation and American Justice* (Harvard University Press, 2008)

Distinguished Scholarship Award (2009) from the Pacific Sociological Association for *Police Interrogation and American Justice* (Harvard University Press, 2008). Honorable Mention.

Soros Senior Justice Fellowship (2004). Open Society Institute. Soros Foundation. New York, N.Y.

The Saleem Shah Career Achievement Award (2000). Given by The American Psychology-Law Society (Division 41 of the American Psychological Association) and the American Academy of Forensic Psychology for early career excellence and contributions to psychology, law and public policy.

The Ruth Shonle Cavan Young Scholar Award (1999). Given by The American Society of Criminology to recognize outstanding scholarly contributions to the discipline of criminology.

Distinguished Assistant Professor Award for Research (2000-2001). University of California, Irvine. Conferred by the Academic Senate of the University of California, Irvine for distinguished research.

Faculty Career Development Award (1998-1999). University of California, Irvine.

Graduate Student Paper Award, Honorable Mention (1994) from the American Sociological Association, Crime, Law, and Deviance Section.

Outstanding Graduate Student Instructor Award (1993). University of California, Berkeley. Department of Legal Studies.

Prosser Prize (1992), "Guggenheim Crime Policy Seminar." University of California, Berkeley, Boalt Hall Law School.

## ADDITIONAL HONORS AND DISTINCTIONS (SELECTIVE)

50 Most Downloaded U.S. Law Professors in 2021 (#38). See
https://taxprof.typepad.com/taxprof_blog/2022/01/the-50-most-downloaded-us-law-professors-of-2021.html#more

Most impactful and widely cited scholars of all time according to HeinOnline. (#84 as of July 23, 2020). See https://home.heinonline.org/top_authors/

Publications have been downloaded more than 50,000 times on the Social Science Research Network (Top 10% of all authors). See http://www.usfca.edu/law/faculty/fulltime/leor.html

Member (Elected), American Law Institute (October, 2011-Present).

Listed in 2016 by the *Wall Street Journal* as one of 25 U.S. Law Professors whose research and publications have been cited most often by courts. See Nick Farris, Valerie Aggerbeck, Megan McNevin, & Greg Sisk, *Judicial Impact of Law School Faculties*,
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2826048

The subject of a full-length feature article by Mark Leviton (July, 2017). "The Whole Truth: Richard A. Leo on Why Innocent People Confess to Crimes." *The Sun Magazine*, Pp. 6-15. See
http://thesunmagazine.org/issues/499/the-whole-truth

The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009). See:
http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

Listed in Brian Leiter, *Most Cited Law Professors by Specialty, 2000-2007*, Criminal Law and Procedure, (http://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml)

*Member*, Scientific Advisory Board. National Center for Reason and Justice (3/02-Present).

*Board member*, Forensic Social Sciences Association (2/14-Present).

*Affiliate*, Center on Police Practices and Community (COPPAC). University of California, Santa Barbara Institute of Social, Behavioral & Economic Research (7/01-Present).

Fellow, Earl Warren Legal Institute Criminal Justice Program, University of California, Berkeley School of Law (10/98-8/05)

*Visiting Scholar*, Boalt Hall School of Law, University of California, Berkeley (8/03-8/05).

*Visiting Professor* of Sociology, Nankai University, Tianjin, China (10/96).

## PUBLICATIONS

### BOOKS

2023   Richard A. Leo and Tom Wells. THE INNOCENCE REVOLUTION: THE AMERICAN MOVEMENT AGAINST WRONGFUL CONVICTIONS (Under Submission; Expected Publication Date: 2023).

- Received Guggenheim Fellowship Award to write this book

2012   CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (with George C. Thomas III).  New York: Oxford University Press.  ISBN #: 978-0-19-533893-5. Available at: http://www.oup.com/us/catalog/general/subject/Sociology/CriminalJustice/?view=usa&ci=978 0195338935

- Translated into Chinese by SHANGHAI JIAOTONG UNIVERSITY PRESS of Shanghai (2014)

2008   POLICE INTERROGATION AND AMERICAN JUSTICE (2008).  Cambridge: Harvard University Press.  ISBN #: 0-674-02648-9.  Available at: http://www.hup.harvard.edu/catalog/LEOPOL.html  or  http://www.amazon.com/Police-Interrogation-American-Justice-Richard/dp/0674026489

- Edwin H. Sutherland Outstanding Scholarship Award. The Society for the Study of Social Problems (2010).  Inaugural award.

- Outstanding Book Award (2010).  Academy of Criminal Justice Sciences.

- Herbert Jacob Book Prize (2009).  Law and Society Association.

- Distinguished Scholarship Award (2009).  Pacific Sociological Association.  Honorable Mention.

- Excerpts reprinted in Yale Kamisar Et. Al, Eds. (2008).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 540, 624, 719-720

- Paperback version published in August, 2009

- Translated into Chinese by China University of Political Science and Law Press (2012)

- Translated into Korean by Humanitas Press (2014)

2008   THE WRONG GUYS: MURDER, FALSE CONFESSIONS AND THE NORFOLK FOUR

(2008) (with Tom Wells). New York: The New Press. ISBN #: 978-1-59558-401-4. Available at: http://amazon.com or http://thenewpress.com. See also: http://www.wrongguys.com.

- Nominated for a National Book Award and a Pulitzer Prize

- The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009). See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

- Received Soros Senior Justice Fellowship (2004) to write this book

2008    THE PROBLEM OF FALSE CONFESSIONS IN THE POST-DNA WORLD (2008) (with Steven Drizin). Published as a book in Japan by Nippon Hyoronsha Co., LTD. ISBN #: 978-4-535-51664-9.

1998    THE MIRANDA DEBATE: LAW, JUSTICE AND POLICING (1998) (with George C. Thomas III, Eds). Boston: Northeastern University Press. ISBN #: 1-55553-338-8.

1998    THE AMERICAN CRIMINAL JUSTICE SYSTEM (1998), (Ed). (Simon & Schuster). ISBN #: 0-536-00826-4.

## ARTICLES, BOOK CHAPTERS AND OTHER PUBLICATIONS

2022    "Interrogation and the Infanticide Suspect: Mechanisms of Vulnerability to False Confession." Forthcoming in Keith Findley, Cyrille Rossant, Kana Sasakura, Leila Schneps, Waney Squier, and Knut Wester Eds. (2022). *Shaken Certainties* (Cambridge University Press)

2022    "Theorizing Failed Prosecutions" (with Jon B. Gould Victoria M. Smiegocki). Forthcoming in the *Journal of Criminal Law and Criminology*. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2022    "A History of Interrogation and Interrogative Suggestibility," (with Laura Nirider and Deborah Davis). Forthcoming in Demos Lorandos, Ed. *The Litigator's Handbook on Forensic Medicine, Psychiatry and Psychology* (West Thomson Reuters). Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2021    "On the Synergy Between Pretext Caller and Police Interrogator" (with Deborah Davis, Tyler Livingston and Peter Rerick) in Nadine Deslauriers-Varin and Craig Bennell, Eds. (2021).

*Criminal Investigation of Sexual Offenses* (Springer).  Pp. 115-130.  Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773751

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 14, No. 1 (2021)

2020   "Science Lag and Knowledge Cumulation: Urgent Issues and Prospects in Reforming Interrogation Practices in the USA and Canada" (with Brent Snook et al.).  Forthcoming in *Legal and Criminological Psychology*.  Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3669413

- Reprinted in Alice Kaswan, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020   "Structural Police Deception in American Police Interrogation: A Closer Look at Minimization and Maximization." in Lutz Eidam, Michael Lindemann, and Andreas Ransiek, Eds, (2020*). Interrogation Confession and Truth: Comparative Studies in Criminal Procedure.*  (Baden-Baden, Germany: Nomos Press).  Pp. 183-207.   Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3584817

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 13, No. 1 (2020)

2020   "The Analysis of Nonverbal Communication: The Dangers of Pseudoscience in Security and Justice Contexts" (with Vincent Denault et al.).  *Annual Review of Legal Psychology*, 30, 1-12.  Also simultaneously published in French (*Revue internationale de criminologie et de police technique et scientifique*) and in Spanish (*Anuario de Psicología Jurídica*).

2019   "Police Interrogation and Suspect Confessions," in Eric Miller and Tamara Lave, Eds. (2019), *The Cambridge Handbook on Policing in the United States* (Boston, MA: Cambridge University Press).  Pp. 178-199.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 11, No. 2 (2018)

2018   "Mental Health and False Confessions" (With William Follette and Deborah Davis).  In Elizabeth Kelley, Ed (2018).  *Representing People with Mental Disabilities: A Criminal Defense Lawyer's Best Practices Manual* (Chicago: American Bar Association).  Pp. 95-124.  Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies

Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 3 (2017)

2018    "Interrogation and Confessions: Social Science, Law and Public Policy." Pp. 233-259. In Erik Luna, Ed. (2018), *Academy for Justice: Reforming Criminal Justice, Vol. 2: Policing*. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2018    "Police Interrogation and Coercion in Domestic American History: Lessons for the War on Terror" (with Alexa Koenig), in Scott Anderson and Martha Nussbaum, Eds., (2018) *Confronting Torture: Essays on the Ethics, Legality, History, and Psychology of Torture Today*. Pp. 146-174. (Chicago: University of Chicago Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 1 (2010).

2017    "What Innocence Means Today and Why It Matters," 68 *Florida Law Review*, 1569-1596 as a larger essay entitled, "Voices on Innocence" (with Lucian Dervan, Meghan Ryan, Valena Beety, Gregory Gilchrist and William Berry). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2017    "The *Miranda* App: Metaphor and Machine (with Andrew Guthrie Ferguson). *Boston University Law Review*, Vol. 97. Pp. 935-992. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2017    "The Criminology of Wrongful Conviction: A Decade Later." *Journal of Contemporary Criminal Justice*. Vol. 33. Pp. 82-106. Available at: http://ssrn.com/author=1020356

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 5 (2016)

2017    "Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence," in Daniel Medwed, Ed. (2017), *Wrongful Convictions and the DNA Revolution: Twenty-Five Years of Freeing the Innocent* (Boston, MA: Cambridge University Press). Pp. 57-83. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 3 (2016)

2017  "Police Interrogation, False Confessions and Alleged Child Abuse Cases." *The Michigan Journal of Law Reform*, Vol. 50. Pp. 693-721. Available at: http://ssrn.com/author=1020356

- Reprinted in Brian Gallini, Ed. (Forthcoming). *Investigative Criminal Procedure: Inside This Century7's Most (In) Famous Cases* (West Publishing).

- Reprinted in Tristin Green, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 10, No. 1 (2017)

2017  "A Damning Cascade of Investigative Errors: Flaws in Homicide Investigation in the U.S.A." (with Deborah Davis) in Fiona Bookman, Ed. (2017). *Handbook on Homicide* (Wiley-Blackwell). Pp. 578-598. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2017  "Police Interrogation and False Confessions in Rape Cases" in Roy Hazelwood and Ann Burgess, Eds (2017). *Practical Aspects of Rape Investigation: A Multidisciplinary Approach*. 5th Edition. (Boca Raton, Florida: CRC Press). Pp. 177-186. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 2 (2016)

2016  "The Path to Exoneration" (with Jon Gould). *Albany Law Review*. Vol. 79, Pp. 325-372. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016  "When Exoneration Seems Hopeless: The Special Vulnerability of Sexual Abuse Suspects to False Confession" (with Deborah Davis) in Ros Burnett, Ed. (2016). *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press). Pp. 175-190. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 5 (2014)

2016  "Analyzing Videotaped Interrogations and Confessions." *The Champion*. Vol. XL, No. 12 (December, 2016). Pp. 40-47. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016   "Her Story, His Story: Sexual Miscommunication, Motivated Remembering, and Intoxication as Pathways to Honest False Testimony Regarding Sexual Consent." (With Guillermo Villalobos and Deborah Davis) in Ros Burnett, Ed. (2016). *Wrongful Allegations of Sexual and Child Abuse* (New York: Oxford University Press). Pp. 129-142. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 6 (2014)

2016   "False Confessions in the 21st Century" (with Brian Cutler). *The Champion*. Pp. 46-55. Vol. XL, No. 4 (May, 2016). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2015   "The Sound of Silence: *Miranda* Waivers, Selective Literalism and Social Context" in Lawrence Solan, Janet Ainsworth and Roger Shuy, Eds. (2015). *Speaking of Language and Law* (New York: Oxford University Press). Pp. 255-259. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 4 (2014)

2014   "The Justice Gap and the Promise of Criminological Research." *Criminology, Criminal Justice, Law & Society*, Vol. 15, No. 3. Pp. 1-37. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 8, No. 1 (2015)

2014   "Predicting Erroneous Convictions" (with Jon Gould, Julia Carrano and Katie Hail-Jares). *Iowa Law Review*, Vol. 99, Pp. 471-522. Available at: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 358-359; 595-600.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 6, No. 3 (2013)

2014   "Disputed Interrogation Techniques in America: True and False Confessions and the Estimation and Valuation of Type I and II Errors" (with Deborah Davis) in Sarah Cooper, Ed. (2014). *Controversies in Innocence Cases in America* (Surrey, England: Ashgate Publishing

10

Ltd).  Pp.  57-72. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014    "Innocent Defendants: Divergent Case Outcomes and What They Teach Us" (with Jon Gould, Julia Carrano, and Katie Hail-Jares) in Marvin Zalman and Julia Carrano, Eds. (2014), *Wrongful Conviction and Criminal Justice Reform: Making Justice* (London: Routledge).  Pp. 73-92. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014    "Interrogation and Confessions" (with Deborah Davis) in Jay Albanese, Ed. (2014).  *The Encyclopedia of Criminology and Criminal Justice*, Vol. III (New York: John Wiley & Sons). Pp. 1199-1206.   Available at: http://ssrn.com/author=1020356

2013    "Why Interrogation Contamination Occurs," The *Ohio State Journal of Criminal Law*, Vol. 11. Pp. 193-215.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2013    "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" (with Peter Neufeld, Steven Drizin, and Andrew Taslitz).  *Temple Law Review*, Vol. 85, Pp. 759-838. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 2 (2013)

2013    "False Confessions and the Constitution: Problems, Possibilities and Solutions."  John T. Parry and L. Song Richardson, Eds. (2013).  *The Constitution and the Future of Criminal Law in America* (New York: Cambridge University Press).  Pp. 169-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 1 (2013).

2013    "The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection" (with Deborah Davis) in Stephen Morewitz and Mark Goldstein, Eds. (2013). *Handbook of Forensic Sociology and Psychology* (New York: Springer).   Pp. 47-75. Available at: http://ssrn.com/author=1020356

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018).  *Questioning Police*

*Interrogation Methods: A Comparative Study* (China: Law Press).

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 5 (2012).

2013   "Acute Suggestibility in Police Interrogation:  Self-Regulation Failure as a Primary Mechanism of Vulnerability" in Anne Ridley, Ed. (2013). *Suggestibility in Legal Contexts: Psychological Research and Forensic Applications*.  (Chicester: John Wiley & Sons, Ltd.).  Pp. 171-195.  Available at: http://ssrn.com/author=1020356

2013   "The Law of Interrogation" (with George C. Thomas III).  G.J.N. Bruinsma and D.L. Weisburd, Ed. (2013).  *Encyclopedia of Criminology & Criminal Justice* (New York: Springer).  Pp. 2835-2840.  Available at: http://ssrn.com/author=1020356

2012   "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" (with Deborah Davis).  *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 4 (2011).

2012   "To Walk in Their Shoes: The Problem of Missing, Misrepresented, and Misunderstood Context in Judging Criminal Confessions" (with Deborah Davis).  *New England Law Review*.  Vol. 46, No. 4.  Pp. 737-767.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 4 (2012).

2012   "Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent" (with Deborah Davis) in Lawrence Solan and Peter Tiersma, Eds. (2012).  *Oxford Handbook on Language and the Law* (Oxford University Press).  Pp. 354-366.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 2 (2011).

2011   "Three Prongs of the Confession Problem: Issues and Proposed Solutions" (with Deborah Davis).  In Carol Henderson and Jules Epstein, Eds. (2011).  *The Future of Evidence: How Science and Technology Will Change The Practice of Law* (Chicago: American Bar Association Books).  Pp. 233-264.  Available at: http://ssrn.com/author=1020356

2011   "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" (With Iris Blandon-Gitlin and Kathryn Sperry).  *Psychology, Crime and Law*.  Vol. 17, 239-260. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 4, No. 1 (2011).

2010 "One-Hundred Years Later: Wrongful Convictions after a Century of Research" (with Jon Gould). *Journal of Criminal Law and Criminology*. Vol. 100, 825-868. Available at: http://ssrn.com/author=1020356

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 69-71.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010 "The Gatehouse and Mansions: Fifty Years Later" (with Alexa Koenig). T*he Annual Review of Law and Social Science*, Vol. 6, 323-339. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 3 (2010).

2010 "From False Confession to Wrongful Conviction: Seven Psychological Processes" (with Deborah Davis). *The Journal of Psychiatry and the Law*, Vol. 38, 9-56. Available at: http://ssrn.com/author=1020356

- Excerpted in Open Access Journal of Forensic Psychology (2009), Vol. 1. Available at: http://www.forensicpsychologyunbound.ws/

- Reprinted in Asifa Begum, Ed. (2009). *Law and Justice – Psychology Role Play* (Amicus Books: The Icfai University Press) and in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 5 (2009)

2010 "White Paper Commentaries: Looking Ahead" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*. Vol. 34, Pp. 49-52. Available at: http://ssrn.com/author=1020356

2010 "Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*.Vol. 34, Pp. 3-38. Available at: http://ssrn.com/author=1020356

- Designated a "White Paper" of the American-Psychology Law Society, Division 41 of the American Psychological Association.

- Reprinted in Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 140-

150.

- Reprinted in Ira Belkin, Chao Liu, and Amy Gao (2018). *Questioning Police Interrogation Methods: A Comparative Study* (China: Law Press).

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2010 "Selling Confession: Setting the Stage with the Sympathetic Detective with a Time-Limited Offer (with Deborah Davis and William Follette). *Journal of Contemporary Criminal Justice*, Vol. 26, Pp. 441-457. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010 "Overcoming Judicial Preferences for Person versus Situation-Based Analyses of Interrogation Induced Confessions" (with Deborah Davis). *The Journal of the American Academy of Psychiatry and the Law*, Vol. 38. Pp. 187-194. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 3 (2012).

2010 "Reply to Samuel R. Gross and Barbara O'Brien" (with Jon Gould). *The Ohio State Journal of Criminal Law*, Vol. 8, Pp. 277-279. Available at: http://ssrn.com/author=1020356

2010 "Moving Targets: Placing the Good Faith Doctrine in the Context of Fragmented Policing" (with Hadar Aviram and Jeremy Seymour). *The Fordham Urban Law Journal*. Vol. 37, Pp. 709-742. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 2 (2012).

2010 "The Three Errors: Pathways to False Confession and Wrongful Conviction" (with Steve Drizin) in Daniel Lassiter and Christian Meissner, Eds. (2010). *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations*. (Washington, D.C.: American Psychological Association). Pp. 9-30. Available at: http://ssrn.com/author=1020356

- *Police Interrogation and False Confessions* selected as recipient of the 2011 American Psychology-Law Society's Outstanding Book Award and the 2010 Publishers Award for Professional and Scholarly Excellence in the field of psychology

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 1 (February 29, 2012).

2009    "Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould). *The Ohio State Journal of Criminal Law,* Vol. 7, Pp. 7-30.    Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2009    "False Confessions: Causes, Consequences and Implications."   *The Journal of the American Academy of Psychiatry and the Law*, Vol. 37, Pp. 332-343. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 2. (March 13, 2009).

2009    "What Do Potential Jurors Know About Police Interrogation and False Confessions?" (With Brittany Liu). *Behavioral Sciences and the Law*, Vol. 27, Pp. 381-399.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 3. (May 29, 2009).

2009    "Psychological and Cultural Aspects of Interrogations and False Confessions: Using Research to Inform Legal Decision-making" (with Mark Costanzo and Netta Shaked) in Daniel A. Krauss and Joel D. Lieberman, Eds (2009).  *Psychological Expertise in Court: Psychology in the Courtroom*.  Volume II.  (Burlington, VT: Ashgate Publishing Co).  Pp. 25-56.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 1 (2011).

2009    "Interrogation" (with Mark Costanzo) in Allan Jamieson and Andre Moenssens (Eds). The Wiley Encyclopedia of Forensic Science (London: John Wiley & Sons).  Volume 3.  Pp. 1586-1590.  Available at: http://ssrn.com/author=1020356

2008    "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds. *Practical Rape Investigation: A Multidisciplinary Approach*.  4th Edition.  (Boca Raton, Florida: CRC Press).  Pp. 211-217.

2007    "The Problem of False Confession in America."  *The Champion*.  Vol. 41, No. 10. Pp. 30-35.

2007    "Mandate the Electronic Recording of Police Interrogations" (with Kimberly D. Richman).  *Crime and Public Policy*, Vol. 6, Pp. 791-798.  Available at: http://ssrn.com/author=1020356

2007    "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs"
(with Saul M. Kassin, Christian A. Meissner, Kimberly D. Richman, Lori H. Colwell, Amy
Leach, and Dana LaFon). *Law and Human Behavior*. Vol. 31, Pp. 381-400. *Available at*:
http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research
  Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2007    "Mental Health Status and Vulnerability to Police Interrogation Tactics" (with William Follette
and Deborah Davis). *Criminal Justice* (A publication of the American Bar Association), Vol.
22, Pp. 42-49.

2007    "Research and Expert Testimony on Interrogation and Confessions" (with Mark Costanzo). In
Mark Costanzo, Dan Krauss and Kathy Pezdek, Eds. (2007). *Expert Psychological Testimony
for the Courts*. (New Jersey: Erlbaum). Pp. 69-98. *Available at*:
http://ssrn.com/author=1020356

2006    "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First
Century" (with Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner). *Wisconsin Law
Review*. Vol. 2006, Pp. 479-539. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Russell Covey and Valena Beety, Eds. (2018). *Reading Innocence: A
  Wrongful Convictions Reader*. (Durham: Carolina Academic Press). Pp. 135-139.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research
  Paper Series. University of San Francisco School of Law. Volume 2, No. 1. (January 15,
  2009).

2006    "Strategies for Preventing False Confessions and Their Consequences" (with Deborah Davis).
In Mark Kebbell and Graham Davies, Eds. (2006). *Practical Psychology for Forensic
Investigations and Prosecutions*. (New York: John Wiley & Sons). Pp. 121-149. Available
at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research
  Paper Series. University of San Francisco School of Law. Volume 4, No. 3. (July 21,
  2010).

2006    "Psychological Weapons of Influence: Applications in the Interrogation Room" (with Deborah
Davis). *Nevada Lawyer*. Pp. 14-19.

2005    "Re-Thinking the Study of Miscarriages of Justice: Developing a Criminology of Wrongful
Conviction." *Journal of Contemporary Criminal Justice*. Vol. 21, Pp. 201-223. *Available at*:
http://ssrn.com/author=1020356

2005    "Interrogating Guilty Suspects: Why Sipowicz Never Has to Admit He is Wrong" (with George

C. Thomas III).  In Glenn Yeffeth, Eds (2005).  *What Would Sipowicz Do? Race, Rights and Redemption* (Dallas: BenBella Books).  Pp. 35-46.

2005    "Interrogation and Confessions," in J. Miller Mitchell & Richard A. Wright, Eds.  *The Encyclopedia of Criminology* (New York: Routledge). Vol. 2, Pp. 819-825.

2004    "The Problem of False Confessions in the Post-DNA World" (with Steve Drizin).  *North Carolina Law Review*.  Vol. 82.  Pp. 891-1007.  *Available at*: http://ssrn.com/author=1020356

- Cited by United States Supreme Court in *J.D.B. v. North Carolina*, 2011 WL 2369509.

- Cited by United States Supreme Court in *Corley v. United States*, 129 S. Ct. 1558 (2009).

- Published as a book in Japan in 2008 by Nippon Yoronsha Co., Ltd

- Reprinted in Yale Kamisar et al. (2008).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 652 and 718.  Reprinted in Andrew E. Taslitz and Margaret Paris (2007).  *Constitutional Criminal Procedure*, 3rd Edition (Foundation Press).

2004    "The Third Degree and the Origins of Psychological Interrogation in America."  In Daniel Lassiter, Ed. (2004).  *Interrogations, Confessions and Entrapment.*  Perspectives in Law and Psychology Series, Vol. 20 (New York: Kluwer Academic/Plenum Publishers).  Pp. 37-84.  *Available at*: http://ssrn.com/author=1020356

2004    "Beating a Bum Rap."  *Contexts*.  Vol. 3, Pp. 68-69.

2002    "The Effects of *Miranda v. Arizona*: Embedded in Our National Culture?" (With George C. Thomas III).  In Michael Tonry, Ed.  *Crime and Justice – A Review of Research, Crime and Justice*.  Vol. 29, Pp. 203-271.  *Available at*: http://ssrn.com/author=1020356

2002    "*Miranda*, Confessions and Justice: Lessons for Japan?" In Malcolm Feeley and Setsuo Miyazawa, Eds. (2002). *The Japanese Adversary System in Context: Controversies and Comparisons* (London: Palgrave). Pp. 200-219. *Available at*: http://ssrn.com/author=1020356

2002    "Interrogation." In David Levinson, Ed. *The Encyclopedia of Crime & Punishment* (Great Barrington, MA: Berkshire Reference Works).  Pp. 927-931.

2001    "Questioning the Relevance of *Miranda* in the Twenty-First Century." *The Michigan Law Review*.  Vol. 99. Pp. 1000-1029.  *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

- Reprinted in Yale Kamisar, Wayne LaFave, and Jerold Israel (2002).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Ninth Edition.  (St. Paul, MN: West Publishing).

2001 "The Truth about False Confessions and Advocacy Scholarship" (with Richard Ofshe). *The Criminal Law Bulletin*. Vol. 37, Pp. 293-370. *Available at*: http://ssrn.com/author=1020356

2001 "False Confessions: Causes, Consequences, and Solutions." In Saundra D. Westervelt and John A. Humphrey, Eds. (2001). *Wrongly Convicted: Perspectives on Failed Justice* (Newark: Rutgers University Press). Pp. 36-54.

2001 "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds. *Practical Rape Investigation: A Multidisciplinary Approach*. 3rd Edition. (Boca Raton, Florida: CRC Press). Pp. 233-241.

2001 "Confessions" in Gillian Lindsey and Jonathan Michie, Eds. *Reader's Guide to the Social Sciences*. Vol. 1. (London: Fitzroy Dearborn Publishers). Pp. 266-267.

2000 "Autism, Rape and Arson" (with Ann Burgess, David Elkovitch, Jay Jackman). *Sexual Assault Report*. Vol. 4, Number 2. November/December. Pp. 17, 28-30.

1999 "Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*" (with Welsh S. White). *Minnesota Law Review*. Volume. 84. Pp. 397-472. *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)

1998 "Using the Innocent to Scapegoat *Miranda*: Another Reply to Paul Cassell" (with Richard Ofshe). *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 557-577. *Available at*: http://ssrn.com/author=1020356

1998 "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe). *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 429-496. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Alisa Smith (2004). *Law, Social Science, and the Criminal Courts* (Durham: Carolina Academic Press). Pp. 286-295.

1998 "*Miranda* and the Problem of False Confessions." In Richard A. Leo and George C. Thomas, III. Eds. *The Miranda Debate: Law, Justice and Policing* (Boston: Northeastern University Press). Pp. 271-282.

1998 "Civil Rights and Civil Liberties: Videotaping the Police." *Criminal Justice Ethics*. Vol. 17, No. 1. Winter/Spring. Pp. 44-45.

1998 "Witness for False Confession No Expert." *The Forensic Echo: The Monthly Newsmagazine of Psychiatry, Law & Public Policy*. Vol II., No. 3 (February). Pp. 14-15.

1998    "False Confessions and Miscarriages of Justice." *The Defender* (January). Pp. 3-6.

1997    "The Social and Legal Construction of Repressed Memory." *Law & Social Inquiry*, Vol. 22, Pp. 653-693. *Available at*: http://ssrn.com/author=1020356

1997    "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem" (with Richard Ofshe). *Denver University Law Review*. Vol. 74, Pp. 1135-1144. *Available at*: http://ssrn.com/author=1020356

1997    "The Decision to Confess Falsely: Rational Choice and Irrational Action" (with Richard Ofshe). *Denver University Law Review*. Vol. 74, Pp. 979-1122. *Available at*: http://ssrn.com/author=1020356

   • Reprinted in Myron Moskovitz (2010). *Cases and Problems in Criminal Procedure: The Police*. 5th Edition.

1997    "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" (with Richard Ofshe). *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251. Available at: http://ssrn.com/author=1020356

1997    "Some Thoughts about Police and Crime." In Lawrence Friedman and George Fisher, Eds. (1997). *The Crime Conundrum: Essays on Criminal Justice* (Boulder: Westview Press). Pp. 121-125.

1997    "False Confessions and Miscarriages of Justice Today." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 169-206.

1997    "A Historical Overview of Confession Law." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 151-160.

1997    "The Criminal Justice System: An Overview." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 1-20.

1996    "Police Scholarship for the Future: Resisting the Pull of the Policy Audience." *Law & Society Review*, Vol. 30, Pp. 865-879. *Available at*: http://ssrn.com/author=1020356

1996    "The Impact of *Miranda* Revisited." *The Journal of Criminal Law and Criminology*. Volume 86, Pp. 621-692. *Available at*: http://ssrn.com/author=1020356

   • Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998). *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press). Pp. 208-221.

1996    "*Miranda*'s Revenge: Police Interrogation as a Confidence Game." *Law & Society Review*, Vol. 30, Pp. 259-288. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Ronald Allen et al. (2005). Comprehensive Criminal Procedure (New York: Aspen Publishers). 2nd Ed. Pp. 888-889.

1996   "Inside the Interrogation Room." *The Journal of Criminal Law and Criminology*. Vol. 86, Pp. 266-303. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Adam M. Gershowitz (2013). *The Wire: Crime, Law and Policy* (Durham, NC: Carolina Academic Press). Pp. 147-161.

- Reprinted in Jeannine Bell, Ed. (2006), *Police and Policing Law*. Ashgate Publishing, Ltd. Pp. 99-136. Also reprinted in Joshua Dressler and George C. Thomas III (1999), *Cases and Materials on Criminal Procedure* (West Publishing). Pp. 566-568, 598, 673-676.

1996   "The Ethics of Deceptive Research Roles Reconsidered: A Reply to Kai Erikson." *The American Sociologist*. Vol. 27, Pp. 122-128.

1995   "Trial and Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." *The American Sociologist*. Vol. 26, Pp. 113-134.

- Reprinted in Robert Emerson (2001), *Contemporary Field Research: Perspectives and Formulations* (Prospect Heights: Waveland Press). 2nd Edition. Pp. 260-279.

1994   "Police Interrogation and Social Control." *Social and Legal Studies*: *An International Journal*, Vol. 3, and Pp. 93-120. *Available at*: http://ssrn.com/author=1020356

1994   "Police Interrogation in America: A Study of Violence, Civility and Social Change" (Ph.D. dissertation, University of California at Berkeley). *Available at* http://0-proquest.umi.com.ignacio.usfca.edu/pqdweb?did=742035331&sid=1&Fmt=2&clientId=16131&RQT=309&VName=PQD.

1993   "The Yale White-Collar Crime Project: A Review and Critique" (with David T. Johnson). *Law And Social Inquiry*, Vol. 18, Pp. 63-99. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael Levi, Ed (1998). *Fraud: Organizational, Motivation, and Control*, Volume II (England: Ashgate Publishing Ltd). Pp. 51-88.

1992   "From Coercion to Deception: The Changing Nature of Police Interrogation in America." *Crime, Law, and Social Change: An International Journal*. Vol. 18, Pp. 35-59. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998). *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press). Pp. 65-74.

1992   "The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick). *Criminal Justice Ethics*. Vol. 11, No. 1. Winter/Spring. Pp. 3-12. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael C. Braswell, Belinda R. McCarthy and Bernard J. McCarthy (2005) *Justice, Crime and Ethics*. Fifth Edition. Pp. 69-84. Reprinted in Jeffrey Reiman (2000), *Criminal Justice Ethics* (New York: Prentice-Hall). Reprinted in *The Leadership Journal* (January-March, 1993). Pp. 23-27; (Cincinnati: Anderson Publishing Co). Reprinted in *The Boalt Hall Transcript*, spring, 1993. Pp. 21-23; Revised and expanded as a chapter in John Bizzack (Ed), *Issues in Policing: New Perspectives*. (Lexington: Autumn House Publishing). Pp. 75-95.

## OTHER WRITINGS

"Predicting Erroneous Convictions: A Social Science Approach to Miscarriages of Justice" (with Jon Gould, Julia Carrano and Joseph Young). Report to the National Institute of Justice. (December, 2012).

Amicus Curiae Brief, United States Supreme Court. *State of Florida v. Kevin DeWayne Powell* (October 30, 2009) (No. 08-1175). Sole author.

## CITATION BY APPELLATE COURTS

### United States Supreme Court

*J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011)
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)
*Corley v. United States*, 129 S. Ct. 1558 (2009)
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004)

### Canadian Supreme Court

*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).

### All Appellate Courts

2021   *Miller v. Montgomery Cty.*, 2021 U.S. Dist. LEXIS 213914.
*People v. James*, 70 Cal.App.5th, 262 A.3d 44 (2021)
*State v. Griffin*, 339 Conn. 631 (2021)
*Jimenez v. Madden*, 2021 U.S. Dist. LEXIS 195694
*People v. Kowalski*, 2021 Mich. App. LEXIS 5683
*Tarlton for McCollum v. Sealey*, 2021 WL 1845171 (E.D.N.C. May 7, 2021).
*Estate of Alley v. State*, 2021 WL 1828501 (Tenn. Crim. App. May 7, 2021).
*United States v. Knights*, 989 F.3d 1281 (11th Cir. 2021).
*Lucio v. Lumpkin*, 987 F.3d 451 (5th Cir. 2021).
*Montoya v. City & Cty. of Denver*, 2021 WL 1244264 (D. Colo. Mar.   4, 2021).

2020   *State v. Baker*, 465 P.3d 860 (Haw. 2020)

*Bush v. Dunn*, No. 2:12-CV-345-RAH, 2020 WL 4514585 (M.D. Ala. Aug. 5, 2020).

*Rafay v. Obenland*, No. C16-1215-RAJ-MAT, 2020 WL 5984210 (W.D. Wash. Jan. 28, 2020)

*State v. Gore*, No. W201901320CCAR3CD, 2020 WL 6793393 (Tenn. Crim. App. Nov. 18, 2020).

*People v. Xiong*, 54 Cal. App. 5th 1046 (2020). Decision date = Sept 22, 2020

*United States v. Begay*, No. CR 14-0747 JB, 2020 WL 2514661 (D.N.M. May 15, 2020).

*People v. Mays*, No. E070904, 2020 WL 1983878 (Cal. Ct. App. Apr. 27, 2020).

*Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081 (N.D. Ill. Apr. 13, 2020).

2019    *United States v. Booker*, No. 3:18-CR-02611-GPC, 2019 WL 2717275 (S.D. Cal. June 28, 2019).

*United States v. Jumper*, 1:19 CR 5, 2019 U.S. Dist. LEXIS 195243 (W.D.N.C. Sept. 30, 2019).

*Nieves Martinez v. United States*, No. CV1300955TUCCKJLAB, 2019 WL 4785519 (D. Ariz. Sept. 30, 2019).

*State v. Matsumoto*, 145 Haw. 313, 452 P.3d 310 (2019). Opinion date = Oct. 29, 2019.

*Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (2019). Opinion date = Aug. 21, 2019.

*People v. Lucero*, No. F072676, 2019 WL 337820 (Cal. Ct. App. Jan. 28, 2019).

*People v. Jimenez*, No. 2D CRIM. B271066, 2019 WL 1592812 (Cal. Ct. App. Apr. 15, 2019),

*People v. Chow*, No. H045576, 2019 WL 2710211 (Cal. Ct. App. June 28, 2019).

*People v. Whitley*, No. H043651, 2019 WL 6242496 (Cal. Ct. App. Nov. 22, 2019).

*People v. Scarber*, No. F068908, 2019 WL 5958004 (Cal. Ct. App. Nov. 13, 2019).

*State v. Schaetzle*, No. A-17-1050, 2019 WL 446632 (Neb. Ct. App. Feb. 5, 2019).

*State v. Young*, 9 Wash. App. 2d 1091 (2019)

*United States v. Hayat*, No. 2:05-CR-0240 GEB DB, 2019 WL 176342 (E.D. Cal. Jan. 11, 2019).

2018    *State v. Turner*, --So. 3d.--, No. 2016-KA-1841 (La. Dec. 5, 2018).

*Sanders v. Frauenheim*, No. 17-05008, 2018 WL 3777571 (N.D. Cal. Aug. 8, 2018).

*People v. Santana*, No. 2D CRIM. B261900, 2018 WL 4959443 (Cal. Ct. App. Oct. 15, 2018).

*People v. Martinez*, No. H042235, 2018 WL 3640560 (Cal. Ct. App. Aug. 1, 2018).

*People v. Torres*, 25 Cal. App. 5th 162, 235 Cal. Rptr. 3d 478 (Ct. App. 2018)

*Martinez v. United States*, No. CV1300955TUCCKJLAB, 2018 WL 3359562 (D. Ariz. July 10, 2018).

*People v. Hernandez*, No. A144628, 2018 WL 3359628 (Cal. Ct. App. July 10, 2018).

*People v. Aguilar*, No. B267955, 2018 WL 3121533 (Cal. Ct. App. June 26, 2018).

*Parmer v. Premo*, No. 6:16-CV-1090-SB, 2018 WL 3094879 (D. Or. June 20, 2018).

*People v. Tiger*, 32 N.Y.3d 91, 110 N.E.3d 509 (2018).

*Dean v. Searcey*, 893 F.3d 504 (8th Cir. 2018).

*People v. Saldana*, No. D071432, 2018 WL 387799 (Cal. Ct. App. Jan. 12, 2018).

*Harris v. City of Chicago*, No. 14 C 4391, 2018 WL 2183992 (N.D. Ill. May 11, 2018).

*United States v. Begay*, No. CR 14-074 JB, 2018 WL 1069147 (D. N.M. Feb. 23, 2018).

*Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 468286 (N.D. Okla. Jan. 18, 2018).

2017    *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3193585 (N.D. Ill. Jul. 27, 2017).
*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).
*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11, 2017).
*Dassey v. Dittmann*, 860 F.3d 933 (7th Cir.) (Opinion date = June 22, 2017), *vacated en banc, Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) (en banc Opinion date = Dec. 8, 2017).
*Martinez v. United States*, No. CV 13-955 TUC CKJ, 2017 WL 4536177 (D. Az. Oct. 11, 2017).
*United States v. Monroe*, 264 F. Supp. 3d 376 (D. RI 2017). Opinion Date = Sept. 11, 2017
*Vega v. Montgomery*, No. 16-cv-05145-YGR, 2017 WL 4808606 (N.D. Cal. Oct. 24, 2017).
*People v. Cardman*, No. 14CA0202, 2017 WL 2806266 (Colo. App. June 29, 2017).
*People v. Wright*, No. B269217, 2017 WL 4230430 (Cal. Ct. App. Sept. 25, 2017).
*Foree v. Commonwealth*, No. 2016–CA–000599–MR, 2017 WL 3129213, (Ky. Ct. App. Jul. 21, 2017).
*People v. Cruz*, No. B276536, 2017 WL 2459874 (Cal. Ct. App. June 7, 2017).
*State v. Cardenas-Flores*, 189 Wash. 2d 243 (2017). Opinion date = Aug. 17, 2017
*People v. Davis*, No. E065184, 2017 WL 4675078 (Cal. Ct. App. Oct, 18, 2017).
*People v. Collins*, No. H042491, 2017 WL 3575190, (Cal. Ct. App. Aug. 18, 2017).
*R. v. Ururyar*, [2017] O.J. No. 3824. Ontario Superior Court of Justice
*Gupta v. State*, 156 A.3d 785 (Md. Ct. App. 2017).
*R. v. Pike*, 2017 NLTD(G) 41.
*United States v. Hayat*, No. 2:05-cr-0240 GEB DB, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017).
*United States v. Rodriguez-Soriano*, No. 1:17-cr-197, 2017 WL 6375970 (E.D. Va. Dec. 11, 2017).
*United States v. Phillipos*, 849 F.3d 464 (1st Cir. 2017).

2016    *Dassey v. Dittmann*, 201 F. Supp. 3d 963 (E.D. Wis. 2016).
*State v. Richardson*, 210 So. 3d 340 (La. Ct. App. 2016).
*Barbee v. Davis*, No. 15-70022, 2016 WL 6902479 (5th Cir. Nov. 23, 2016).
*Floyd v. Cain*, No. 11-2819, 2016 WL 6216141 (E.D. La. Sept. 14, 2016).
*United States v. Whittle*, No. 3:13-CV-00170-JHM, 2016 WL 4433685 (W.D. Ky. Aug. 18, 2016).
*State v. Rivera*, 169 Conn. App. 343 (2016).
*Jimerson v. State*, 56 N.E.3d 117 (Ind. Ct. App. 2016)
*People v. Santana*, No. B261900, 2016 WL 5845750 (Cal. Ct. App. Oct. 6, 2016).
*People v. Cavazos*, No. F069276, 2016 WL 5404083 (Cal. Ct. App. Sept. 28, 2016).
*People v. Cardman*, No. 14CA0202, 2016 WL 5219964 (Colo. App. Sept. 22, 2016).
*State v. Jackson*, 882 N.W.2d 422 (Wis. 2016).
*United States v. Thomas*, No. 13-CR-01874, 2016 U.S. Dist. LEXIS 103533 (D.N.M. Aug. 5, 2016).
*R v. Howe*, 2016 NSSC 151.
*R v. Martin*, 2016 BCPC 337.
*R v. Isaacs*, 2016 ONSC 5272.

*State v. Leniart*, 140 A.3d 1026 (Conn. App. Ct. 2016).

*People v. Cruz*, No. HO42221, 2016 Cal. App. Unpub. LEXIS 4167 (Cal. Ct. App. June 7, 2016).

*Rhoades v. State*, 880 N.W.2d 431 (Iowa 2016).

*People v. Peoples*, 62 Cal. 4th 718 (2016).

*R. v. R. (M.)*, [2015] O.J. No. 3885 (Can. Ont. Ct. J.).

*People v. Cortez*, No. H041081, 2016 WL 6962539 (Cal. Ct. App. Nov. 29, 2016).

*Campos v. Stone*, 201 F. Supp. 3d 1083 (N.D. Cal. 2016).

*Campos v. Stone*, 199 F. Supp. 3d 1237 (N.D. Cal. 2016).

2015    *People v. Days*, 131 A.D.3d 972 (N.Y. App. Div. 2015).

*In re Elias V.,* 237 Cal. App. 4th 568 (2015).

*People v. Angol*, No. B259874, 2015 WL 7568947 (Cal. Ct. App. Nov. 24, 2015).

*People v. Delossantos*, No. HO40746, 2015 WL 6865701 (Cal. Ct. App. Nov. 9, 2015).

*Alcox v. Beard*, No. CV-08-1587-JVS, 2015 WL 10083966 (C.D. Cal. Nov. 3, 2015).

*People v. Wyngarden*, No. 321736, 2015 WL 4746277 (Mich. Ct. App. Aug. 11, 2015).

*In re Manuel R.*, No. GO49389, 2015 WL 4640284 (Cal. Ct. App. Aug. 5, 2015).

*Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015).

*Turner v. United States*, 116 A.3d 894 (D.C. 2015).

*Commonwealth v. Bland*, 115 A.3d 854 (Pa. 2015).

*Walker v. State*, No. CR-11-0241, 2015 WL 505356 (Ala. Ct. Crim. App. Feb. 6, 2015).

*Lapointe v. Comm'r Correction*, 316 Conn. 225 (2015).

*Mullen v. Barnes*, No. 2:13-cv-0165-MCE-EFBP, 2015 WL 2000764 (E.D. Cal. Apr. 30, 2015).

*Williams v. Schmidt*, No. 3:10-cv-0025 TMB, 2015 WL 1396800 (D. Alaska March 25, 2015).

*Spence v. Beard*, No. 14-cv-1624 BAS (KSC), 2015 WL 1956436 (S.D. Cal. Apr. 29, 2015).

*People v. Vega*, 236 Cal. App. 4th 484 (2015).

*Commonwealth v.  Bland*, No. 33 EAP 2013, 2015 WL 3370266 (Pa. May 26, 2015).

*Barros v. State*, No. PM/11-5771, 2015 R.I. Super. LEXIS 66 (R.I. Super. Ct. May 18, 2015).

*Sessoms v. Grounds*, 776 F.3d 615 (9th Cir. 2015).

2014    *Gumm v. Mitchell*, No. 11-3363, 2014 WL 7247393 (6th Cir. Dec 22, 2014)

*Soffar v. Stephens*, No. H-12-3783, 2014 U.S. Dist. LEXIS 175331 (S.D. Tex. Dec. 18, 2014).

*Teleguz v. Davis*, No. 7:10CV00254, 2014 WL 3548982 (W.D. Va. July 17, 2014).

*Commonwealth v. Alicia*, 92 A.3d 753 (Penn. 2014).

*People v. Yi*, No. B251560, 2014 WL 5409066 (Cal. Ct. App. Oct. 24, 2014).

*People v. Boyce*, 59 Cal. 4th 672 (2014)

*State v. Fernandez-Torres*, 337 P.3d 691 (Kan. Ct. App. 2014)

*Commonwealth v. Scuderi*, No. CP-51-CR-1010101-1994, 2014 Phila. Ct. Com. Pl. LEXIS 140 (Phila. Ct. Com.  Pl. May 16, 2014)

*Bies v. Sheldon*, Nos. 12-3431 & 12-3457, 2014 WL 7247396 (6th Cir. Dec. 22, 2014)

*Sessoms v. Grounds*, 768 F.3d 882 (9th Cir. 2014).

*Dean v. State*, 288 Neb. 530 (2014)

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)

*People v. Carino*, No. B244423, 2014 WL 1256072 (Cal. Ct. App. March 27, 2014).

*People v. Mays*, No. E055989, 2014 Cal. App. Unpub. LEXIS 405 (Cal. Ct. App. Jan. 21, 2014).

*People v. Whatley*, No. G049642, 2014 WL 1499553 (Cal. Ct. App. Apr. 17, 2014).

*Woodall v. State*, 754 S.E.2d 335 (Ga. 2014).

*Commonwealth v. Hoose*, 5 N.E.3d 843 (Mass. 2014).

*State v. Juranek*, 844 N.W.2d 791 (Neb.2014).

*State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014).

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014).

*R.v. Reid*, 2014 CarswellNfld 59 (Can. Nfld.) (WL).

2013   *Livers v. Schenck*, No. 8:08CV107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013).

*Steele v. Harrington*, No. LA CV 10-04872-VBF-E, 2013 WL 5441750 (C.D. Cal. Sept. 25, 2013).

*Dean v. County of Gage*, No. 4:09CV3144, 2013 U.S. Dist. LEXIS 182187 (D. Neb. Dec. 31, 2013).

*Wright v. Comm'r of Corr.*, 143 Conn. App. 274 (2013).

*People v. Sanford*, No. 291293, 2013 WL 5379673 (Mich. Ct. App. Sept. 26, 2013).

*People v. Linton*, 56 Cal. 4th 1146 (2013)

*Irwin v. Commonwealth*, 465 Mass. 834 (2013)

*Coleman v. State*, No. 14-12-00553-CR, 2013 WL 5758084 (Tx. Ct. App. Oct. 24, 2013)

*People v. Sanders*, No. A134386, 2013 WL 4470551 (Cal. Ct. App. Aug. 19, 2013).

*Shelby v. State*, 986 N.E. 2d 345 (Ind. Ct. App. 2013).

*Commonwealth v. Harrell*, 65 A.3d 420 (Pa. Super. Ct. 2013).

*U.S. v. Preston*, 706 F.3d 1106 (9th Cir. 2013).

*Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013).

*People v. Carrera*, No. E053997, 2013 WL 1883289 (Cal. Ct. App. May 7, 2013).

*People v. Ortega*, No. B235552, 2013 WL 1635909 (Cal. Ct. App. Apr. 17, 2013).

*In re Tyler S.*, No. 4-11-0540, 2013 WL 1552421, (Ill. Ct. App. Apr. 12, 2013).

*State v. Dassey*, 827 N.W.2d 928 (Wis. Ct. App. 2013).

*Dorsey v. United States*, 60 A.3d 1171 (D.C. 2013)

*State v. Perea*, 322 P.3d 624 (Utah 2013).

*State v. Lemoine*, 827 N.W.2d 589 (Wis. 2013).

*United States v. Rodriguez*, No. 12-CR-45S, 2013 WL 6057862 (W.D. NY Nov. 13, 2013).

2012   *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012).

*U.S. v. Fugate*, No. 11-3694, 2012 WL 3893114 (6th Cir. Sept. 7, 2012).

*U.S. v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012).

*People v. Spence*, 212 Cal. App. 4th 478 (2012)

*Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012).

*Simmons v. State*, 105 So. 2d 475 (Fla. 2012).

*Ex parte Soffar*, Nos. WR-29980-03, WR-29980-04, 2012 WL 4713562 (Tex. Crim. App. Oct. 3, 2012).

*State ex rel. A.W.*, 51 A.3d 793 (N.J. 2012).

*People v. Kowalski*, 821 N.W.2d 14 (Mich. 2012).

*State v. Stevens*, 822 N.W.2d 79 (Wis. 2012).

*United States v. Ford*, 683 F.3d 761 (7th Cir. 2012).
*State v. Rafay*, 285 P.3d 83 (Wash. Ct. App. 2012).
*People v. Perez*, 946 N.Y.S.2d 835 (N.Y. Sup. Ct. 2012).
*State v. Abdulle*, 275 P.3d 1113 (Wash. 2012).
*People v. Kinstley*, No. A130102, 2012 WL 831535 (Cal. Ct. App. Mar. 12, 2012).
*People v. Mullen*, No. C062851, 2012 WL 758145 (Cal. Ct. App. Mar. 8, 2012).
*Miner v. Neotti*, No. CV 10-07419 ODW (SS), 2012 WL 1116078 (C.D. Cal. Feb. 16, 2012).

2011   *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011).
*Bell v Ercole*, No. 05 CV 4532(ERK), 2011 WL 5040436 (E.D.N.Y. Oct. 21, 2011)
*White v. Smith*, 808 F. Supp. 2d 1174 (D. Neb. 2011).
*Dean v. Smith*, 805 F. Supp. 2d 750 (D. Neb. 2011).
*Brown v. Blumenfeld*, 930 N.Y.S. 2d 610 (N.Y. App. Div. 2011). Decided Oct. 4, 2011.
*People v. Gaono*, No. D055290, 2011 WL 4500857 (Cal. Ct. App. Sept. 29, 2011)
*Commonwealth v. Rios*, No. 2007-1051, 2011 WL 4089553 (Mass. Super. Ct. Sept. 7, 2011)
*United States v. Michael Jacques* 784 F. Supp.2d 59 (D.Mass. 2011)
*People v. Hernandez*, No. B215707, 2011 Cal. App. Unpub. LEXIS 3039 (Apr. 25, 2011).
*People v. Dimas*, No. B223795, 2011 Cal. App. Unpub. LEXIS 2464 (Apr. 11, 2011).
*United States v. Ross*, No. CR S-99-0043 WBS EFB, 2011 WL 1253870 (E.D. Cal. Mar. 30, 2011).
*Commonwealth v. Wright*, 14 A. 3d 798 (Pa. 2011).
*People v. Sanchez*, No. 2-08-1243, 2011 Ill. App. Unpub. LEXIS 872 (Ill. App. Ct. 2/4/2011).

2010   *People v. Polk*, 942 N.E. 2d 44 (Ill. App. Ct. 2010).
*People v. Garcia*, No. B216793, 2010 WL 4868186 (Cal. Ct. App. Nov. 30, 2010).
*State v. Lockhart*, 4 A. 3d 1176 (Conn. 2010).
*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010).
*United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010).
*People v. Kowalski*, No. 294054, 2010 WL 3389741 (Mich. Ct. App. Aug. 26, 2010).
*Dorsey v. United States*, 2 A.3d 222 (D.C. 2010).
*Crowe v. County of San Diego*, 593 F.3d 841 (9th Cir. 2010).
*Milke v. Ryan*, No. CV 98-60-PHX-RCB, 2010 WL 383412 (D. Ariz. Jan. 29, 2010).
*Kaguyutan v. Rozum*, No. 2:08-1022, 2010 WL 483791 (W.D. Pa. Feb. 5, 2010).
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010).
*Rathbun v. Scribner*, No. CV 08-3339-AG, 2010 WL 1266666 (C.D. Cal. Feb. 10, 2010).
*State v. A.N.J.*, 225 P.3d 956 (Wash. 2010).
*Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010).
*People v. Vargas*, No. G041999, 2010 WL 2525582 (Cal. Ct. App. 4th June 23, 2010).
*United States v. Brown*, 617 F.3d 857 (9th Cir. 2010).

2009   *Cason v. Hedgpeth*, No. CV 08-4576-JVS (RNB), 2009 WL 1096209 (C.D. Cal. 4/22/2009).
*Corley v. U.S.*, 129 S. Ct. 1558 (2009).
*R. v. Cech*, [2009] Q.C.C.S. 1041 (Can.).
*R. v. Edwards* [2009] CarswellOnt 6324 (Can.).
*R. v. Merceus*, [2009] Q.C.C.S. 3205 (Can.).

*R. v. T.E.*, [2009] ON.C. LEXIS 4222 (Can.).

*People v. Leon*, No. G037950, 2009 WL 249362 (Cal. Ct. App. Feb. 3, 2009).

*People v. Olague*, No. C053372, 2009 WL 924503 (Cal. Ct. App. April 7, 2009).

*State v. Fairconatue*, 773 N.W.2d 226 (Wash. Ct. App. 2009).

*State v. Riofta*, 209 P.3d 467 (Wash. 2009).

*Wade v. Brady*, 612 F. Supp. 2d 90 (D. Mass. April 30, 2009).

*People v. Robles*, No. G038739, 2009 WL 1364364 (Cal. Ct. App. May 15, 2009).

*Bush v. State*, No. CR-03-1902, 2009 WL 1496826 (Ala. Crim. App. May 29, 2009).

*People v. Lucas*, No. C057593, 2009 WL 2049984 (Cal. Ct. App. Aug. 4, 2009).

*Wroten v. Felker*, No. CV 08-04352-AG, 2009 WL 3171705 (C.D. Cal. Sept. 30, 2009).

*In re D.K.*, No. 289371, 2009 WL 3401152 (Mich. Ct. App. Oct. 22, 2009).

*People v. Singletary*, No. B211849, 2009 WL 3931360 (Cal. Ct. of App. Nov. 20, 2009).

2008   *People v. Madrigal*, No. F051127, 2008 WL 192310 (Cal. Ct. App. Jan. 24, 2008).

*U.S. v. Chancellor*, No. 07-20578-CR, 2008 WL 622937 (S.D. Fla. Feb. 8, 2008).

*Anthony v. State*, 980 So. 2d 610 (Fla. Dist. Ct. App. 2008).

*In re Taylor*, 144 Wash. App. 1038 (2008).

*People v. Cerda*, No. E041249, 2008 WL 2123855 (Cal. Ct. App. May 21, 2008).

*In re Detention of Law*, 144 Wash. App. 1047 (June 2, 2008).

*People v. Rosario*, 862 N.Y.S.2d 719 (2008).

*People v. Steele*, No. B193519, 2008 WL 2410394 (Cal. Ct. App. June 16, 2008).

*R. v. Choy*, [2008] 456 A.R. 177 (Can.).

*R. v. Fabas*, [2008] B.C.S.C. 677 (Can.).

*R. v. Leslie*, [2008] O.N.C.J. 666 (Can.).

*R. v. Modjani*, [2008] 458 A.R. 96 (Can.).

*Bell v. Ercole*, No. 05 CV 4532(ERK), 2008 WL 2484585 (E.D.N.Y. June 20, 2008).

*State v. Montejo*, 974 So.2d 1238 (La. 2008).

*State v. Turner*, 187 P.3d 835 (Wash. Ct. App. 2008).

*State v. Unga*, 196 P.3d 645 (Wash. 2008).

*State v. Wooden*, No. 23992, 2008 WL 2814346 (Ohio Ct. App. July 23, 2008).

2007   *People v. Cason*, No. B187189, 2007 WL 891292 (Cal. Ct. App. March 26, 2007).

*In re Bradford*, 165 P.3d 31 (Wash. Ct. App. 2007).

*In re Genaro R.*, No. A112572, 2007 WL 934886 (Cal. Ct. App. March 29, 2007).

*People v. Bean*, 847 N.Y.S.2d 903 (2007).

*People v. Villarreal*, No. H029622, 2007 WL 1556645 (Cal. Ct. App. May 30, 2007).

*People v. Rathbun*, No. B178509, 2007 WL 2391258 (Cal. Ct. App. Aug. 23, 2007).

*Doughtie v. Scribner*, No. CIV S-06-1695-FCD-CMK-P, 2007 WL 2669922 (E.D. Cal. 9/7/07)

*People v. Muratalla*, No. B192446, 2007 WL 4376374 (Cal. Ct. App. Dec. 17, 2007).

*People v. Wroten*, No. B188462, 2007 WL 4501776 (Cal. Ct. App. Dec. 26, 2007).

*R. v. Osmar*, [2007] 84 O.R.3d 321 (Can.).

*R. v. Osmar*, [2007] ONCA 50 (Can.).

*State v. Bannister*, 734 N.W.2d 892 (Wis. 2007).

*State v. Lawrence*, 920 A.2d 236 (2007).

2006    *Edmonds v. State*, 955 So. 2d 864 (Miss. Ct. App. 2006).
        *People v. Doughtie*, No. C049197, 2006 WL 137426 (Cal. Ct. App. Jan. 18, 2006).
        *People v. Smann*, No. D045166, 2006 WL 1075228 (Cal. Ct. App. April 25, 2006).
        *R. v. Hammerstrom*, [2006] B.C.S.C. 1700 (Can.).
        *R. v. Wilson*, [2006] 213 O.A.C. 207 (Can.).
        *Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820 (Tenn. Crim. App. 6/ 22/06)
        *People v. Fuentes*, No. B184728, 2006 WL 2102898 (Cal. Ct. App. July 31, 2006).
        *Washington v. Wilmore*, No. Civ.A. 3:02CV00106, 2006 WL 2471511 (W.D. Va.8/23/2006).
        *Reyes v. Duncan*, No. C 05-04078 SI, 2006 WL 2529106 (N.D. Cal. Aug. 31, 2006).
        *Milke v. Schriro*, No. CV-98-0060-PHX-RCB, 2006 WL 3421318 (D. Ariz. Nov. 27, 2006).

2005    *In re Jerrell C.J.*, 699 N.W.2d 110 (Wis. 2005).
        *Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005).
        *People v. Ford*, No. A100574, 2005 WL 236593 (Cal. Ct. App. Jan. 31, 2005).
        *People v. Mora*, No. B167805, 2005 WL 1140646 (Cal. Ct. App. May 16, 2005).
        *Scott v. State*, 165 S.W.3d 27 (Tex. App. 2005).
        *Singletary v. Fischer*, 365 F. Supp. 2d 328 (E.D.N.Y. 2005).
        *U.S. v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005).
        *In re Owens*, No. D045194, 2005 WL 2160209 (Cal. Ct. App. Oct. 7, 2005).

2004    *Commonwealth v. Cornelius*, 856 A.2d 62 (Pa. Super. Ct. 2004).
        *Commonwealth v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004).
        *Kerkowich v. Wwanesa Mutual Ins. Co*., [2004] M.B.Q.B. 110 (Can.).
        *Medley v. Commonwealth*, 602 S.E.2d 411 (Va. Ct. App. 2004).
        *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).
        *People v. Ramos*, 121 Cal. App. 4th 1194 (2004).
        *People v. Reyes*, No. A097648, 2004 WL 831245 (Cal. Ct. App. April 19, 2004).
        *People v. Sowl*, No. A098094, 2004 WL 1080171 (Cal. Ct. App. May 14, 2004).
        *People v. Ford*, No. A100574, 2004 WL 1776598 (Cal. Ct. App. Aug. 10, 2004).
        *State v. Cook*, 847 A.2d 530 (N.J. 2004).
        *Thorson v. State*, 895 So.2d 85 (Miss. 2005).
        *Weeks v. State*, 140 S.W.3d 39 (Mo. 2004).
        *West v. State*, 876 So.2d 614 (Fla. Dist. Ct. App. 2004).
        *Cobb v. Bruce*, No. CIV.A. 03-3400-KHV, 2004 WL 3019345 (D. Kan. Dec. 29, 2004).
        *Kerkowich v. Wawanesa Mutual Insurance Co*., 2004 M.B.C. LEXIS 188 (Can. Man.) (Lexis).

2003    *Brown v. Crosby*, 249 F. Supp. 2d 1285 (2003).
        *In re C.J.*, 674 N.W.2d 607 (Wis. Ct. App. 2003).
        *People v. Martinez*, No. B157095, 2003 WL 1438802 (Cal. Ct. App. March 21, 2003).
        *People v. Gonzalez*, No. B154557, 2003 WL 22977531 (Cal. Ct. App. Dec. 19, 2003).
        *R v. Chalmers*, [2003] CarswellOnt 4704 (Can.).
        *R. v. Watts*, [2003] B.C.S.C. 1403 (Can.).
        *R. v. Wiegand*, [2003] 335 A.R. 157 (Can.).
        *State v. Mauchley*, 67 P.3d 477 (Utah 2003).
        *State v. Patton*, 826 A.2d 783 (N.J. Super. Ct. App. Div. 2003).

*U.S. v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003).
*Green v. City of Wenatchee*, 2003 WL 26089744 (E.D. Wash. Mar. 14, 2003)
*Vent v. State*, 67 P.3d 661 (Alaska Ct. App. 2003).

2002    *Franks v. State*, 90 S.W.3d 771 (Tex. Ct. App. 2002).
*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. Feb. 27, 2002).
*Monroe v. Angelone*, No. 3:98CV254, 2002 U.S. Dist. LEXIS 26310 (E.D. Va. 3/28/2002).
*In re Jorge R.*, No. G028977, 2002 WL 31121106 (Cal. Ct. App. 2002).
*People v. Escobedo*, No. B150558, 2002 WL 31160879 (Cal. Ct. App. Sept. 30, 2002).
*People v. Smann*, No. D038219, 2002 WL 31608283 (Cal. Ct. App. Nov. 21, 2002).
*People v. Hernandez*, No. E030489, 2002 WL 31781129 (Cal. Ct. App. Dec. 13, 2002).
*R. v. MacKay*, [2002] 222 Sask. R. 259 (Can.).
*State v. Cobb*, 43 P.3d 855 (Kan. Ct. App. 2002).
*State v. Conger*, 652 N.W.2d 704 (Minn. 2002).
*U.S. v. Cantres*, No. 00 C 3555, 2002 WL 276132 (N.D. Ill. Feb. 27, 2002).
*U.S. v. Faulkingham*, 295 F.3d 85 (1st Cir. 2002).
*U.S. v. Rodgers*, 186 F. Supp. 2d 971 (E.D. Wis. 2002).

2001    *Cherrix v. Braxton*, 131 F. Supp. 2d 756 (E.D. Va. 2001).
*Monroe v. Angelone*, No. 3:98CV254, 2001 U.S. Dist. LEXIS 25216 (E.D. Va. 2001 4/18/01).
*People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. 2001).
*R. v. Tessier*, [2001] 245 N.B.R.2d 1 (Can.).
*U.S. v. Astello*, 241 F.3d 965 (8th Cir. 2001).

2000    *Hearndon v. Graham*, 767 So.2d 1179 (Fla. 2000).
*Lapointe v. Warden*, No. CV 970571161, 2000 WL 1409721 (Conn. Super. Ct. Sept. 6, 2000).
*R. v. Leahey*, [2000] 278 A.R. 201 (Can.).
*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).
*State v. Davis*, 32 S.W.3d 603 (Mo. Ct. App. 2000).

1999    *Moriarty v. Garden Sanctuary Church of God*, 511 S.E.2d 699 (S.C. Ct. App. 1999).
*People v. Philips*, 692 N.Y.S.2d 915 (1999).
*State v. Rettenberger*, 984 P.2d 1009 (Utah 1999).
*State v. Schofield*, 97 Wash. App. 1085 (1999).

1998    *State v. Meade*, 963 P.2d 656 (Or. 1998).

## <u>MEDIA COVERAGE, APPEARANCES, AND CITATION OF RESEARCH</u>

2022    *The Marshall Project*

2021    NBC *Discovery+* 1                *Murder on Ice* (Podcast)
       *Los Angeles Times* (Podcast)        *My Favorite Murder* (Podcast)
       *Masslive.com*

| 2020 | *The San Francisco Chronicle* | *Tennessee Commercial Appeal* |
|---|---|---|
| | *The Intercept* | *Undisclosed* (Podcast) |
| | *Double Talk* ([https://loeschtwins.com/](https://loeschtwins.com/)) | *Sixth Hour* (Podcast) |
| | *University of Chicago Law Review Podcast* | *The Salem News* |
| | *Wrongful Convictions: False Confessions* (Podcast) | |

| 2019 | *Washington Post* | *The Guardian* |
|---|---|---|
| | *Science Magazine* | *Injustice Watch* |
| | *The Flathead Beacon* | *The Focus* |
| | *Medium.com* | |

| 2018 | *Sacramento Bee* | *San Francisco Chronicle* |
|---|---|---|
| | *NBC 9 News Denver* | *PBS* |
| | *The Alton Telegraph* | *The Indiana Lawyer* |
| | *East Bay Times* | *The ABA Journal* |
| | *Netflix, The Innocent Man* | *Mic* |
| | *Injustice Watch* | *Capital News Service* |
| | *Refinery29.com* | *9 News (Jefferson County, CO)* |

| 2017 | *San Francisco Chronicle* | *The Canadian Press* |
|---|---|---|
| | *The Sun Magazine* | *Benchmark Television (Australia)* |
| | *Al Jazeera* | *Westchester County Journal News* |
| | *North Shore News* | *La Tercera (Chile)* |
| | *Richmond Times-Dispatch* | *El Mercurio Legal (Chile)* |
| | *Lohud.com* | |

| 2016 | *Good Morning America* | *Wall Street Journal* |
|---|---|---|
| | *The New Yorker* | *Chicago Sun Times* |
| | *ABA Journal* | *New Orleans Advocate* |
| | *New Orleans Advocate* | *Charlotte Observer* |
| | *Radio New Zealand News* | *Benchmark Television (Australia)* |
| | *The Clarion-Ledger* | *Kokomo Tribune* |
| | *Vice.com* | *San Luis Obispo News* |
| | *Criminal Injustice Podcast* | *CT News Junkie* |
| | *Santa Barbara Independent* | *Takepart* |
| | *Santa Maria Times* | |
| | *The Marshall Project* | |

| 2015 | *New York Times* | *Life of the Law* (Podcast) |
|---|---|---|
| | *Los Angeles Times* | *Slate* |
| | *AP Online* | *Virginia Pilot* |
| | *The Marshall Project* | *New York Law Journal* |
| | *The Guardian* | *Peru Tribune* |
| | *Criminal Law Reporter* | |

| | |
|---|---|
| 2014 | *Philadelphia Inquirer* |
| | *Beatrice Daily Sun* |
| | *The Daily Times* |
| | *The Buffalo News* |

2014  *Philadelphia Inquirer*      *Pittsburgh Post-Gazette*
      *Beatrice Daily Sun*          *San Quentin Times*
      *The Daily Times*             *Modesto Bee*
      *The Buffalo News*            *Omaha World-Herald*

2013  *The New York Times*         *The Atlantic*
      *The New Yorker*             *The Nation*
      *The Philadelphia Inquirer*  *The San Diego Union-Tribune*
      *KPIX TV* (Channel 5, San Francisco)  *KPBS Radio* (San Diego)
      *Christian Science Monitor Weekly*    *The Buffalo News*
      *Evansville Courier-Press*   *Connecticut Law Tribune*
      *The Philadelphia Daily News*  *CBS News*

2012  *USA Today*                  *New York Times*
      *Chicago Tribune*            *Philadelphia Inquirer*
      *Pacific Standard Magazine*  *Oregon Register-Guard*
      *San Francisco Chronicle*    *San Francisco Business Times*
      *Crestline Courier- News*    *Fairbanks Daily News-Miner*
      *Ground Report*              *Evansville Courier Press*
      *Owensboro Messenger-Inquirer*  *Inland Valley Daily Bulletin*

2011  *San Francisco Chronicle*    *Detroit Free Press*
      *Chicago Tribune*            *Philadelphia Inquirer*
      *New York Times*             *Los Angeles Times*
      *The Lawton Constitution*    *Memphis Commercial Appeal*
      *Vancouver Sun*              *Chicago Sun-Times*
      *Brooksville, FLA Hernando Today*  *Great Falls Tribune*
      *Tampa Tribune*              *Chicago Daily Herald*

2010  *Chicago Tribune*            *KTVU News Channel 2* (San Francisco)
      *The New York Times*         *Appleton Post-Crescent*
      *Columbia Missourian*        *Yakima-Herald*
      *Houston Chronicle*          *Grand Rapids Press*
      *Seattle Times*              *Manitowoc Herald Times Reporter*
      *Oshkosh Northwestern*       *Wausau Daily Herald*
      *Sheboygan Press*            *Chambersburg Public Opinion*
      *Aolnews.com*                *Green Bay Press Gazette*
      *Joplin Globe*               *KY3 News* (Missouri)
      *Voice of America*           *San Francisco Examiner*
      *New York Magazine*          *PBS Frontline*
      *Mississippi Clarion-Ledger*  *KUCI FM* (Orange County, CA)
      *Kansas City Star*

2009  *The New Yorker*             *The Atlantic*
      *San Francisco Chronicle*    *St. Petersburg Times*

*Miami Herald*  
*Livingston Daily News*  
*Columbia Missourian*  
KAOS Radio (Evergreen, WA)  
*Transitions,* Syndicated NPR  
*Siskiyou Daily News*  
*The Ft. Collins Coloradoan*  

*The Detroit News*  
*American Lawyer*  
*California Lawyer*  
*Boulder Daily Camera*  
*The Texas Observer*  
*The Virginia Pilot*  

2008  *Columbia Missourian*  
KQED Radio, San Francisco, CA  
*Orlando Sentinel*  
WUIS Radio, Springfield, Illinois  
KPIX, Channel 5 Bay Area  
*Springfield State Journal-Register*  
KKSU Perspectives, Syndicated NPR  
*Legal Intelligencer*  
*Columbia Daily Tribune*  
*Albuquerque Journal*  
*Seattle Weekly*  
*Broward Daily Business Review*  
*Omaha World Herald*  
*Style Weekly*  
*Contra Costa Times*  
*Illinois Times*  
*Washington Examiner*  

*Washington Post*  
*The Virginia Pilot*  
*San Jose Mercury News*  
*Oakland Tribune*  
*Fairbanks News-Miner*  
KGO Radio  
*Baltimore Examiner*  
*KPCC Radio* Los Angeles  
*Riverside Press-Enterprise*  
*Justice Denied Magazine*  
*Palm Beach Daily Business Review*  
*Miami Daily Business Review*  
*NBC Dateline*  
*National Law Journal*  
*Arkansas Democrat-Gazette*  
*Fault Lines*  

2007  *San Francisco Chronicle*  
*Arkansas Democrat-Gazette*  
*New York Times*  
*Akron Beacon Journal*  
*Bakersfield Californian*  
*Missoula Independent*  
*Mr. Big* (Documentary)  

KQED Radio, San Francisco, CA  
*The Westchester Guardian*  
*Chicago Tribune*  
*Wisconsin Lawyer*  
*National Public Radio*  
*Evansville Courier & Press*  

2006  *San Jose Mercury News*  
*Contra Costa Times*  
*Oprah Magazine*  
*Atlanta Journal-Constitution*  
*Wisconsin State Journal*  
*Richmond-Times Dispatch*  
*Missoula Independent*  
*Cox News Service*  
*Business Wire*  
*San Mateo County Times*  
*Virginian-Pilot*  

*National Law Journal*  
*Los Angeles Times*  
*Oklahoma City Journal Record*  
*New York Law Journal*  
*Connecticut Law Tribune*  
*Pittsburgh Post-Gazette*  
*Palm Beach Post*  
*ABC News*  
*Fulton County Daily Report*  
*Tennessean*  
*Salon.Com*

| 2005 | *California Lawyer* | *Wisconsin State Journal* |
| | *Vermont Brattleboro Reformer* | *Louisville Courier-Journal* |
| | *Arizona Republic* | *Chronicle of Higher Education* |
| | *Chicago Reader* | *Newsday* |
| | *New York Law Journal* | *Court TV* |

| 2004 | *San Diego Union-Tribune* | *New York Times* |
| | *Los Angeles Times* | *Pittsburgh Post-Gazette* |
| | *Legal Times* | *San Francisco Recorder* |
| | *Court TV* | *Village Voice* |
| | *Orange County Register* | *Fort Lauderdale Sun-Sentinel* |
| | *Winston Salem Journal* | *Hayward Daily Review* |
| | *Rochester Democrat and Chronicle* | |

| 2003 | *Miami Herald* | *San Diego Union-Tribune* |
| | *New York Times* | *Chicago Tribune* |
| | *Los Angeles Times* | *CBS News* |
| | *Law and Order* | *Copley News Service* |
| | *Seattle Times* | *CNN* |
| | *Modesto Bee* | *Amnesty International Magazine* |
| | *USA Today* | *Arts & Entertainment Channel* |
| | *San Antonio News-Express* | *Toronto Star* |
| | *Birmingham Post-Herald* | *Orange County Register* |

| 2002 | *Miami Herald* | *San Jose Mercury News* |
| | *New York Times* | *National Public Radio* |
| | *Oprah Magazine* | *Wisconsin State Journal* |
| | *Pittsburgh Post-Gazette* | *Virginian-Pilot* |
| | *Deseret Morning News* | *Fort Lauderdale Sun-Sentinel* |
| | *National Public Radio, This American Life* | *Forensic Files* |
| | *Milwaukee Journal Sentinel* | *Harpers Magazine* |
| | *Austin American-Statesman* | *San Mateo County Times* |
| | *FBI Law Enforcement Bulletin* | *Capital Times* |

| 2001 | *New York Times* | *Pittsburgh Post-Gazette* |
| | *Orange County Register* | *St. Louis Post-Dispatch* |
| | *Forensic Files* | *Minnesota Star Tribune* |
| | *Detroit Free Press* | *Boston Globe* |
| | *Charleston Post and Courier* | *Port Huron Times Herald* |
| | *Grand Rapids Press* | |

| 2000 | *San Jose Mercury News* | *New York Times* |
| | *Chicago Tribune* | *Los Angeles Times* |
| | *Modesto Bee* | *Boston Globe* |

*Ascribe Newswire*          *Dallas Morning News*
*University Wire*           *Chicago Daily Law Bulletin*
*San Francisco Examiner*    *Syracuse Post-Standard*
*Washington Times*          *Fort-Worth Star Telegram*
*American Prospect*         *Reason*

1999  *San Francisco Chronicle*                *Washington Post*
      *National Public Radio*                  *Los Angeles Times*
      *Newsday*                                *Milwaukee Journal Sentinel*
      *Rochester Democrat and Chronicle*       *Daily Press.Com*
      *New York Law Journal*                   *Nation*
      *American Bar Association Journal*       *Chicago Magazine*
      *Seattle Post-Intelligencer*             *Playboy Magazine*
      *Federal News Service*                   *Baltimore Sun*

1998  *Washington Post*                        *Riverside Press-Enterprise*
      *San Diego Union-Tribune*                *New York Times*
      *Chicago Tribune*                        *Los Angeles Times*
      *Seattle Times*                          *St. Louis Post-Dispatch*
      *Dallas Morning News*                    *U.S. News & World Report*
      *Hartford Courant*                       *Chicago Sun-Times*
      *Baltimore Sun*                          *New Orleans Times-Picayune*
      *Raleigh News & Observer*

1997  *Boulder Daily Camera*                   *Orlando Sentinel*
      *Riverside Press-Enterprise*             *San Diego Union-Tribune*
      *Newsday*                                *Detroit Free Press*
      *Boston Globe*                           *Charleston Post and Courier*
      *Dallas Morning News*                    *Hartford Courant*
      *Denver Post*                            *Maury Povich Show*
      *New York Post*                          *Geraldo Rivera Live*
      *New York Daily News*                    *Newark Star-Ledger*
      *Memphis Commercial Appeal*              *Memphis Commercial Appeal*
      *Vancouver Columbian*                    *Indianapolis News*
      *Philadelphia Inquirer*                  *Gary Post-Tribune*
      *Morristown Daily Record*                *Wilmington News Journal*
      *Belleville News-Democrat*               *Mobile Register*
      *Greenville News*                        *Charleston Gazette-Mail*
      *Cleveland Plain Dealer*                 *Wheeling Sunday News-Register*
      *Everett Herald*                         *Augusta Chronicle*
      *Columbus Dispatch*                      *Columbus Leger-Enquirer*
      *Worchester Telegram*                    *Macon Telegraph*
      *Scranton Times*                         *Contra Costa Times*
      *Dayton Daily News*                      *Canton Repository*
      *Eugene Register-Guard*                  *Tacoma News Tribune*

*Salem Statesman Journal*  *Trenton Times*
*Bridgewater Courier-News*  *Hackensack Record*
*Shreveport Times*  *Orange County Network*

1996  *Los Angeles Times*  *Louisville Courier-Journal*
*Legal Times*  *Shreveport Times*
*New Jersey Law Journal*

1995  *Boulder Daily Camera*

## PRESENTATIONS

2022  "Police Interrogation, False Confessions and Wrongful Convictions." Notre Dame Law School. *Notre Dame Journal of Legislation* Symposium.  April, 2022.

"Interrogation By Proxy."  American-Psychology Law Society.  Denver, CO.  March, 2022.

"Police Interrogation, Psychological Coercion, and Suspect Confessions: Science and Litigation. Metropolitan Public Defenders Office.  Portland, Oregon.  February, 2022

2021  "The Conflation Error: The False Equation of Factual Innocence with Legally Defined Exonerations."  American Society of Criminology.  Chicago, IL.  November, 2021.

"The Enduring Problem of Deception in American Police Interrogation."  The Deception Research Society.  London, England.  October, 2021

"Does the Scholarly Arc of Wrongful Conviction Scholarship Bend Toward Justice?"  Loyola University Chicago School of Law.  Conference: Criminal Justice System in Review: Accountability, Reform and Policy.  Chicago, IL.  April, 2021.

2020  Analyzing and Litigating Wrongful Conviction Cases Involving Coercive Interrogations and False Confessions."  Exoneration Justice Project.  Notre Dame Law School.  Notre Dame, Indiana.  November, 2020.

"Coerced and False Confessions: Psychological Science and Implications for Practice."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  San Diego, CA.  February, 2020.

"Police Interrogation and Suspect Interrogations."  Association of American Law Schools. Washington, D.C.  January, 2020.

2019  "Analyzing Involuntary and Unreliable Confessions: Science and Practice."  Illinois Association of Criminal Defense Lawyers.  St.  Charles, IL.  December, 2019.

"Double Wrongful Convictions and Second Chance Near Misses: What Does Data from the

National Registry of Exonerations Teach Us?" (with Amy Shlosberg).  American Society of Criminology.  San Francisco, CA.  November, 2019

"Interrogation, Coercion and Confessions."  California Public Defenders Association.  24th Annual Felony Defense Practice Seminar.  Yosemite, CA.  November, 2019.

"Understanding and Litigating Interrogation-Induced Statements: Psychological Science and Practice." King County Department of Public Defense.  Seattle, WA.  October, 2019.

"Interrogation, Coercion, and Unreliable Testimonial Evidence."  Federal Criminal Defense Practice Seminar for the Eastern District of North Carolina. Beaufort, NC.  October, 2019.

"Coerced and False Confessions."  Stanislaus County Public Defenders' Office.  Modesto, CA.  August, 2019.

"Interrogation, Confession and Truth." University of Bielefeld, School of Law.  Bielefeld, Germany.  May, 2019.

"From Policing to Exonerations: Understanding Practices, Changing Policies, and Pursuing Social Justice."  University of California, Irvine.  Department of Criminology, Law and Society.  May, 2019.

"The Signal in the Noise: A Tribute to Sam Gross."  The National Innocence Network Conference. Atlanta, GA.  April, 2019.

"Police Interrogation, Psychological Coercion and False Confessions."  Annual Kansas Federal Criminal Defense Seminar.  Lawrence, Kansas.  April, 2019.

"Analyzing 250 New Proven False Confessions: Causes, Consequences, Solutions." Northwestern University School of Law.  Chicago, Illinois. March, 2019.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2019.

2018  "Analyzing Proven False Confessions in the Age of Innocence."  American Society of Criminology. Atlanta, Georgia.  November, 2018.

"Police Interrogation and False Confessions." Renmin University.  Beijing, China. May, 2018

"Police Interrogation, False Confessions and Miscarriages of Justice in the United States." People's Public Security University of China, Muxidi Campus.

"Questioning Police Interrogation Methods: A Comparative Study." Beijing Normal University.  Beijing, China.  May, 2018.

"Police Interrogation, False Confessions and Miscarriages of Justice." China University of Political Science and Law, Jimenqiao Campus.  Beijing, China.  May, 2018.

"Police Interrogation Methods and False Statements in China, the United States and the United Kingdom."  East China University of Political Science and Law.  May, 2018.  Shanghai, China.

"Police Interrogation, Psychological Coercion and False Confessions." People's Public Security University of China, Tuanhe Campus.  Beijing, China.  May, 2018

"False Confessions: The Psychological Science."  Illinois Public Defender Association. Springfield, IL.  May, 2018.

"Understanding and Litigating False Confessions."  San Francisco Public Defender's Office. San Francisco, CA.  April, 2018.

"Interrogating Suspects with Intellectual Disabilities."  Habeas Corpus Resource Center.  San Francisco, CA.  April, 2018.

"Suspect Confessions: Why Innocent Suspects Confess."  Annual Hamill Family Endowed Chair Lecture.  University of San Francisco Law School.  San Francisco, CA.  April, 2018.

"Litigating the Confession Suppression Motion."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2018.

"False Confessions."  Federal Public Defender, Northern District of California.  San Francisco, CA.  February, 2018.

"Litigating Police Interrogation and False Confessions."  Alabama Criminal Defense Lawyers Association.  Annual Capital Casework Seminar.  Birmingham, AL.  January, 2018.

2017   "Theorizing Failed Prosecutions" (with Jon Gould).  Law and Society Association of Australia and New Zealand.  Dunedin, New Zealand.  December, 2017.

"The Problem of Wrongful Conviction."  The University of Diego Portales, School of Law. Santiago, Chile.  November, 2017.

"Conviction Integrity Units."  National Public Prosecutor's Office."  Santiago, Chile. November, 2017.

"Police Interrogation, Psychological Coercion and False Confessions."  The National Public Defender Office.  Santiago, Chile.  November, 2017.

"Wrongful Convictions: A Comparative Perspective."  U.S.-Asia Law Institute.  New York University, School of Law. New York, New York.  October, 2017.

"Police Interrogation, False Confessions and Wrongful Convictions." International Society for the Reform of Criminal Law. San Francisco, CA. July, 2017

"Litigating False Confessions." National Innocence Network Conference. San Diego, CA. March, 2017.

"Lies, More Lies and the Reid Method: Coercion, Contamination, and Cover-Up in the Interrogation of Brendan Dassey." American Psychology-Law Society. Seattle, WA. March, 2017.

"How Interrogation Techniques and Suspect Vulnerabilities Interact to Produce False Confessions." Habeas Assistance and Training Counsel Project National Seminar on Forensic Evidence and Criminal Law. Seattle, WA. March, 2017.

"Interrogation and Confessions." Criminal Justice Reform Conference. Arizona State University Law School. Phoenix, AZ. February, 2017.

"False Confessions: The Psychological Science." United States Marine Core Defense Service Organization Worldwide Training Conference. San Diego, CA. February, 2017.

"Police Interrogation and Coerced/False Confessions." Reno Public Defender's Office. Reno, Nevada. February, 2017.

"How to Avoid/Void Wrongful Convictions: False Confessions." University of San Diego School of Law and Community Defenders, Inc. San Diego, CA. January, 2017.

"Analyzing Proven False Confessions." Association of American Law Schools. San Francisco, CA. January, 2017.

2016    "The Path to Exoneration" (with Jon Gould and Eric Martin). American Society of Criminology. New Orleans, LA. November, 2016.

"The *Miranda* App" (with Andrew Ferguson). Boston University Law School. Boston, MA. September, 2016. Also presented at the Annual Meeting of the American Bar Association, Criminal Justice Section. Washington, D.C. November, 2016.

"The Serial Case – Social Media, and the Trial of Adnan Syed." Bar Association of San Francisco. San Francisco, CA. November, 2016.

"False Confessions and Wrongful Convictions." Harvard Law School. American Constitution Society. Cambridge, MA. November, 2016.

"When Prosecutions Go Wrong – Convicting the Innocent." Nebraska Criminal Defense Attorneys Association. Omaha, NE. October, 2016.

"Writing (Academic and Popular) Books."  University of San Francisco School of Law, Faculty Colloquium.   September, 2016.

"The Problem of Wrongful Conviction in America." Keynote Address. University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016

"Police Interrogation, Psychological Coercion and False Confessions."  University of Auckland, Criminal Bar Association of New Zealand.  Auckland, New Zealand.  August, 2016.

"What Can Be Done About Wrongful Convictions?"  Institute of Criminology, University of Sydney Law School.   Sydney, Australia.  April, 2016.

"The Problem of Confessions."  Simon Fraser University, School of Criminology. Vancouver, Canada.  April, 2016

"*Miranda*: 50 Years Later." University of San Diego School of Law.  San Diego, CA.  April, 2016.

"The Use of Social Framework Evidence on False Confessions in Criminal Cases." American Psychology-Law Society.  Atlanta, GA.  March, 2016.

"Does *Miranda* Protect the Innocent?"  Northern Kentucky University School of Law. Highland Heights, Kentucky.  February, 2016.

"Police Interrogation and False Confessions."  The Center for American and International Law. Plano, Texas.  February, 2016.

"The Reid Method, Police Interrogation and Confessions."  California Attorneys for Criminal Justice/California Public Defenders   Association Capital Case Defense Seminar.  San Diego, CA.  February, 2016.

"False Confessions, Convicting the Innocent and the Troubling Case of Joseph Giarratano, Jr." Washington and Lee School of Law. Lexington, VA.  February, 2016.

2015    "Successes and Failures of the Innocence Revolution."  Duke University Law School. Durham, North Carolina.  November, 2015.

"Reflections on a Classic Ten Years Later: Richard Leo's "Rethinking the Study of Miscarriages of Justice."  American Society of Criminology.  Washington, DC.  November, 2015.

"Wrongful Convictions and the Death Penalty."  University of San Francisco School of Law. Criminal Law Society.  November, 2015.

"Police Interrogation, False Confessions, and Alleged Child Abuse Cases." University of Michigan, School of Law. Conference on Child Abuse Evidence: Perspectives from Law, Medicine, Psychology and Statistics. Ann Arbor, MI. November, 2015

"The Path to Exoneration (with Jon Gould). National Science Foundation and National Institute of Justice Conference. "Elephants in the Courtroom: Examining Overlooked Issues in Wrongful Convictions." Arlington, Virginia. October, 2015.

"Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence "Wrongful Convictions and the DNA Revolution: 25 Years of Freeing The Innocent" Conference." Northeastern University School of Law. September, 2015.

"A Damning Cascade of Investigative Errors." Southeastern Association of Law Schools. Boca Raton, FLA. August, 2015.

"The Problem of Wrongful Conviction." Center for the Advanced Study in the Behavioral Sciences. Stanford University. Palo Alto, CA. May, 2015.

"False Confessions: The Psychological Science." American Psychology-Law Society. San Diego, CA. March, 2015.

"The Social Psychology of Police Interrogation, False Confessions and Wrongful Conviction." Department of Psychology, Social Psychology Program. Stanford University. Palo Alto, CA. March, 2015.

2014    "Litigating False Confession Cases" and "Presenting Expert Testimony." National Forensic College. Cardozo Law School. New York, New York. June, 2014.

"False Confessions, Erroneous Convictions and Safeguarding the Innocent." The Rand Corporation. Santa Monica, CA. May, 2014

"The Problem of Wrongful Conviction." University of California, Irvine. The Newkirk Center for Science and Society, The Center for Law, Society and Culture, and the Center for Psychology and Law. Irvine, CA. April, 2014.

"Police Interrogation and Coerced and False Confessions." Los Angeles Public Defender's Office. Van Nuys and Downtown Offices. Los Angeles, CA. April, 2014.

"False Confession and Wrongful Conviction: Causes, Consequences, and Solutions." Susquehanna University. Arlin M. Adams Center for Law and Society Distinguished Lecture. Selinsgrove, PA. April, 2014.

"Legal Scholarship Employing Theory: A Critique." Northwestern University School of Law. Boston, MA. March, 2014.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2014.

"The Justice Gap and the Promise of Criminological Research."  Western Society of Criminology.  Honolulu, HI.  February, 2014.

2013   "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  UCLA School of Law.  Los Angeles, CA.  August, 2013.

"Why Interrogation Contamination Occurs."  Association of American Law Schools.  Mid-year Criminal Justice Conference.  San Diego, CA.  June, 2013.

"Social Psychological Testimony Regarding Interrogations and Confessions."  American-Psychology Law Society.  Portland, OR.  March, 2013.

"To Walk in Their Shoes: The Problem of Recognizing False Confessions" (with Deborah Davis).  American-Psychology Law Society.  Portland, OR.  March, 2013.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2013.

2012   "Contaminated Confessions: Accuracy and Error in Decision-Making in the Criminal Justice Process."  Duke University School of Law.  Durham, North Carolina.  December, 2012.

"Innocent Differences? An Empirical Study of Wrongful Convictions vs. "Near Misses" (with Jon Gould and Julia Carrano).  American Society of Criminology. Chicago, IL.  November, 2012.

"False Confessions: Causes, Consequences, Solutions."  Roosevelt University, Department of Psychology. Wrongful Convictions Distinguished Speakers Series.  Chicago, IL.  November, 2012.

"Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  American University School of Law.  Washington, D.C.  September, 2012.  U.C. Davis School of Law.  Davis, CA.  October, 2012.  Temple University School of Law.  Philadelphia, PA.  November, 2012.

"An Early Peek at the Results: An Empirical Study of Wrongful Convictions versus "Near Misses" (with Jon Gould and Julia Carrano).  Law and Society Association.  Honolulu, HI.  June, 2012.

"The Science of False Confessions."  Washington State Courts Continuing Judicial Education Conference.  Cle Elum, Washington.  April, 2012.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection". Western Psychological Association. San Francisco, CA. April, 2012.

"Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent." Loyola University Law School. Los Angeles, CA. April, 2012.

"Two Real-Life Studies, a Meta-Analysis, and the Effects of Unanticipated Questions." American Psychology-Law Society. San Juan, Puerto Rico. March, 2012.

"False Confessions: Understanding and Litigating the Issues." New Mexico Criminal Defense Lawyers Association. Albuquerque, NM. March, 2012.

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2012.

2011    "The Dynamics of False Confessions." The Texas Bar, Continuing Legal Education. Dallas, Texas. December, 2011.

"Studying Wrongful Convictions: Learning from Social Science" (with Jon Gould). American Society of Criminology. Washington, D.C. November, 2011.

"False Confessions: Why Innocent People Confess." Northern California Innocence Project. Santa Clara University School of Law. Santa Clara, CA. October, 2011.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection." Federal Public Defender, Capital Habeas Unit. Los Angeles, CA. August, 2011.

"The Science of False Confessions." Texas Criminal Defense Lawyers Association. Austin, TX. August, 2011.

"Police Interrogation Methods and False Confessions." New York State Justice Task Force on Wrongful Convictions. New York, NY. June, 2011.

"Police Interrogation: Tactics, Responses and Outcomes." University of Minnesota School of Law. Conference on Barry Feld's book, *Police Interrogation of Juveniles: Practice and Policy*. May, 2011.

"The Truth About False Confessions: Interrogation-Related Regulatory Decline: Ego-depletion, Failures of Self-Regulation and the Decision to Confess." Western Psychological Association Conference. Los Angeles, CA. April, 2011.

"False Confessions: Causes, Consequences, Solutions." National Innocence Network Conference. University of Cincinnati School of Law. April, 2011.

"Police Interrogation in the Shadow of Trial." New York University School of Law. Hoffinger

Criminal Justice Colloquium.    March, 2011.

"Confessions of the Innocent: Causes, Consequences and Solutions."  Forensic Mental Health Association of California Annual Conference.  Keynote Address.  Seaside, CA.  March, 2011.

"Three Prongs of the Confession Problem: Issues and Proposed Solutions." University of Washington School of Law.  Faculty Colloquium. Seattle, WA. January, 2011.

2010    "Purpose-Driven Scholarship, Justice Work, and the Problem of Wrongful Conviction." University of San Francisco School of Law. Justice Forum. November, 2010.

"Innocent: Recent Advances in Uncovering Wrongful Convictions." Stanford University School of Law. Shaking the Foundations Conference. October, 2010.

"*Miranda* at 50: What Have We Learned?"  Seattle University School of Law.  Faculty Colloquium.  September, 2010.

"The Gatehouses and the Mansions: 50 Years Later."  University of San Francisco School of Law.  Faculty Brown Bag Series.  July, 2010.

"A Doctrinal Analysis of *Miranda v. Arizona* and its Progeny: Why the Conventional Explanation is Wrong and What's Really Going On."  University of San Francisco School of Law.  Faculty Colloquium. April, 2010.

"Police Interrogation, Psychological Coercion and False Confessions: Understanding and Litigating the Issues." Los Angeles County Bar Association.  April, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions."  University of California, Berkeley School of Law.  Center for the Study of Law and Society Faculty Colloquium. March, 2010.

"The Psychology of Coerced and False Confessions" and "Litigating Coerced and False Confession Cases." Department of the Army, U.S. Trial Defense Service Conference. Ft. Lewis, WA.  March, 2010.

"Stage Setting in Police Interrogation: Interactive Effects of a Pretext for Interrogation and Minimization" (with Osvaldo Hernandez, Deborah Davis, Crissa Draper and William Follette). American Psychology-Law Society Conference.  Vancouver, Canada.  March, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions."  Emory University School of Law Faculty Colloquium.  February, 2010.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2010.

"Interrogation Through Pragmatic Implication: Communicating Beneficence and Promises of Leniency" (with Deborah Davis and William Follette). Society for Personality and Social Psychology Conference. Las Vegas, NV. January, 2010.

"One Hundred Years of Getting It Wrong? Wrongful Convictions after a Century of Research" (with Jon Gould). Northwestern University School of Law. Conference on a Century of Criminal Law and Criminology. Chicago, IL. January, 2010

"Police Interrogation and False Confessions: A Review of the Research." Association of American Law Schools Annual Conference. New Orleans, LA. January, 2010.

2009 "The Wrong Guys: Author Meets Critics." American Society of Criminology Conference. Philadelphia, PA. November, 2009.

"False Confessions: Science and Research" Office of the State Appellate Defender and Illinois Institute for Continuing Legal Education Conference. Keynote Address. Springfield, IL. October, 2009.

"Police-Induced Confessions: Risk Factors and Recommendations." UC Hastings School of Law. Faculty Colloquium. San Francisco, CA. September, 2009.

"The Psychology of Forced Confessions" and "Litigating False Confession Cases." Indiana Public Defender Council Conference. Indianapolis, IN. August, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." National Association of Criminal Defense Attorneys Conference. Santa Fe, NM. April, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence." Illinois Institute for Continuing Legal Education Death Penalty Conference. Keynote Address. Chicago, IL. March, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." Contra Costa County Public Defender's Office. Martinez, CA. March, 2009.

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence." San Francisco Public Defender's Office. February, 2009

"False Confessions: Causes, Consequences and Reforms." Texas Court of Criminal Appeals. Criminal Justice Integrity Unit. Austin, TX. January, 2009.

2008 "The Wrong Guys: Murder, False Confessions and the Norfolk 4." Northwestern University

School of Law.  Chicago, IL.  November, 2008.

"Police Interrogation and American Justice: Author Meets Critics" and "When Lightning Strikes Twice: Studying Double Wrongful Convictions."  American Society of Criminology Conference.  St. Louis, Missouri.  November, 2008.

"The Psychology of False Confessions: Causes, Consequences and Reforms."  University of Illinois, Springfield.  Institute for Legal and Policy Studies and Downstate Illinois Innocence Project.  November, 2008.

"The Wrong Guys: Murder, False Confession and the Norfolk 4."  University of San Francisco, School of Law.   November, 2008.

"Police Interrogation, Psychological Coercion, and False Confessions."  California Defense Investigators Association Conference.  San Jose, CA.  November, 2008.

"False Confessions: Causes, Consequences, and Implications."  American Academy of Psychiatry and Law Conference.  Keynote address.  Seattle, WA.  October, 2008.

"Police Interrogation and American Justice."  New York University School of Law.  Hoffinger Criminal Justice Colloquium.    September, 2008.

"False Confessions and Wrongful Convictions."  Innocence Project.  New York, NY.  September, 2008.

"Police Interrogation and False Confessions."  Alaska Investigators Association and Alaska Innocence Project Conference.  Anchorage, AL.  September, 2008.

 "False Confessions, Wrongful Convictions and Legal Reform."  Association of American Law Schools.  Mid-year Meeting, Evidence Section.  Cleveland, Ohio.  June, 2008.

"False Confessions" and "Police Interrogation, False Statements and Confessions".  Habeas Corpus Resource Center Conference.  San Francisco, CA.  June, 2008

"False Confessions."  National Association of Criminal Defense Attorneys Conference.  Las Vegas, NV.  April, 2008.

"Litigating False Confession Cases." National Innocence Network Conference. University of Santa Clara School of Law.  March, 2008.

 "Recommending False Confession for the Innocent" (with Deborah Davis and William Follette).  American Psychology Law Society Conference.  Ft. Lauderdale, FL.  March, 2008.

"Police Interrogation and Coercion in Domestic American History."  University of Chicago School of Law.  Conference on Torture, Law and War.  March, 2008

"Persuaded False Confessions." University of Chicago School of Law. Criminal Law Faculty Colloquia. February, 2008.

"Understanding False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2008.

2007    "Understanding False Confessions." California Public Defenders' Association Conference. Yosemite, CA. November, 2007.

"Persuaded False Confessions" and "Effects of Interrogation Tactics on Recommendation of False Confessions for the Innocent" (with Deborah Davis and William Follette). University of Texas, El Paso. "Interrogation and Confessions: A Conference Exploring Current Research, Practice and Policy." September, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Florida Public Defender Association Conference. Orlando, FlA. September, 2007.

"Effects of Failed Polygraph Results on Perceived Wisdom of True and False Confessions" (with Deborah Davis). American Psychological Association Conference. San Francisco, CA. August, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." District of Columbia Public Defender Service. Washington, DC. June 2007.

"Understanding the Reid Method and How It Coerces Confessions." Habeas Corpus Resource Center Conference. San Francisco, CA. June, 2007.

Wrongful Convictions and False Confessions. Tel Aviv University, School of Law. Conference on New Directions in Courtroom Research. Tel Aviv, Israel. May, 2007.

"False Confessions: Causes, Consequences, Solutions." Ohio Innocence Project. University of Cincinnati School of Law. Cincinnati, OH. March, 2007.

"Wrongful Conviction: Legal and Judicial Perspectives." Academy of Criminal Justice Sciences Conference. Seattle, WA. March, 2007.

"False Confessions and the Wrongful Conviction of the Innocent." National Innocence Network Conference. Harvard University Law School. March, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." National Legal Aid and Defender Association. Annual Conference on Indigent Defense. Dallas, TX. March, 2007.

"Understanding the Reid Method and How It Coerces Confessions." California Attorneys for

Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA.  February, 2007.

"The Social Psychology and Consequences of Police-Induced False Confessions."  Northern California Innocence Project.  Santa Clara, CA.   February, 2007.

"Police Interrogation, Psychological Coercion, False Confessions."  Santa Clara County Public Defender's Office.  San Jose, CA.  February, 2007.

 "Why Do Suspects Falsely Confess?" Administrative Offices of the United States Courts. Conference on Forensic Evidence and the Criminal Law. New Orleans, LA.  January, 2007.

2006    "Police Interrogation, False Confession and American Justice."  University of Oklahoma, Department of Psychology.  Faculty Colloquium.  Norman, OK.  December, 2006.

"Police interrogation, Psychological Coercion, False Confessions."  Missouri State Public Defender System Conference.  St. Louis, MO.  December, 2006.

 "Police Interrogation and American Justice." University of San Francisco School of Law. Faculty Colloquium.  November, 2006.

 "The Limits of *Miranda*."  University of Colorado School of Law.  Conference on the 40th Anniversary of *Miranda v. Arizona*.  Boulder, CO.  October, 2006.

"Interrogating Guantanamo Detainees."  University of San Francisco School of Law.  October, 2006.

"Coerced and False Confessions."  National Child Abuse Defense & Resource Center Conference.  September, 2006.  Las Vegas, NV.

"False Confessions: Causes, Consequences and Solutions." California Commission on the Fair Administration of Justice.  Los Angeles, CA.  June, 2006.

"Sympathetic Detectives with Time Limited Offers: Effects on Perceived Consequences of Confession" (with Deborah Davis, Deborah Knaack and David Bailey).  Association for Psychological Science Conference. New York, NY.  May, 2006.

"Police Interrogation and Confessions."  San Mateo Private Defender Program.  Burlingame, CA.  May, 2006.

"*Miranda*'s Past, Present and Future."   Harvard University School of Law.  Conference on Criminal Procedure Stories.  Cambridge, MA.  April, 2006.

"Incriminating Ourselves?"  U.C.L.A. School of Law.  Conference on the Faces of Wrongful Conviction:  Examining California Justice Gone Wrong.  April, 2006.

"Police Interviewing and Interrogation: Toward A National Self-Report Survey of Police Practices and Beliefs" (with Saul Kassin, Kimberly Richman, L.H., Colwell, Amy Leach, Dana La Fon, & Christian Meissner) and "Evaluating Law Enforcement Evidence Ploys when Confessions are False: Mock Juror Perceptions of Deception and Coercion" (with Jennifer A. Bienhoff, Krista D. Forrest & Brad J. Stastny) and "Evaluating Evidence Ploys: The Role of Ploy Type in Perceptions of Deception and Coercion" (with Brad Stastny, Krista Forrest & Jennifer Bienhoff). American Psychology-Law Society Conference. St. Petersburgh, FL. March, 2006.

"Police Interrogation and False Confessions: Best Practice Guidelines." Wisconsin Criminal Justice Study Commission. Milwaukee, Wisconsin. February, 2006.

"Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century." University of San Francisco School of Law. Faculty Colloquium. January, 2006.

2005    "Preventing Wrongful Convictions: Re-Examining Fundamental Principles of Criminal Law to Protect the Innocent" (with Steve Drizin). University of Wisconsin Law School. Conference on Wrongful Convictions. November, 2005.

"Reforming Criminal Interrogation: Legal Solutions." University of Chicago Law School. November, 2005.

"Bringing Reliability Back In: False Confessions and Legal Safeguards." Seattle University Law School. Faculty Colloquium. November, 2005.

"Police Interrogation and the American Adversary System." Washington University School of Law. Faculty Colloquium. St. Louis, Missouri. October, 2005.

"Police Interrogation and the American Process of Justice." Loyola University School of Law. Faculty Colloquium. Los Angeles, CA. September, 2005.

"The Social Psychology and Consequences of Police-Induced False Confessions." Northern California Innocence Project. Santa Clara, CA. July, 2005.

"Re-Thinking the Study of Wrongful Conviction." Law and Society Association Conference. Las Vegas, NV. June, 2005

"Beyond CSI: Psychology, Crime and Justice." University of California, Irvine. The UCI Think Forum Series. May, 2005.

"True, False, and Suspicious Confessions: Research and Testimony on Interrogations and Confessions (with Mark Costanzo). Symposium on Applied Social Psychology. Claremont McKenna College. Claremont, CA. April, 2005.

"Proven False Confessions: What They Tell Us About Police Interrogations." American Psychology Law Society Conference. San Diego, CA. March, 2005.

"Teaching Law and Society in Undergraduate Programs." West Coast Law and Society Retreat. University of California, Berkeley. March, 2005.

"The Psychology of Police Interrogation and False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2005.

"The Evidentiary Aspects of Wrongful Convictions." The Association of American Law Schools Annual Conference. San Francisco, CA. January, 2005.

2004    "Police Interrogation and False Confessions." Northern California Innocence Project. University of Santa Clara. Santa Clara, CA. November, 2004.

"Police Interrogation, Psychological Coercion and False Confessions." Distinguished Faculty Scholar Lecture. University of Pittsburgh, School of Law. November, 2004

"Psychological Coercion and Unreliable Confessions" (with Richard Ofshe). American Society of Criminology Conference. Nashville, TN. November, 2004.

"The Psychology of Police Interrogation and False Confessions: What You Need to Know." Solano County Bar Association. Fairfield, CA. November, 2004.

"Police Interrogation and False Confessions." Los Angeles County Bar Association. Los Angeles, CA. November, 2004.

"Police Interrogation and Unreliable Statements: Thinking about the James Tucker Case." Northern California Innocence Project. Golden Gate University School of Law. San Francisco, CA. September, 2004.

"Police Interrogation, Psychological Coercion and False Confessions." National Defender Investigation Association Western Regional Conference. Redondo Beach, CA. September, 2004.

"The Search for Truth." 2004 Northern District of California Judicial Conference, Ninth Circuit. Santa Cruz, CA. May, 2004.

"Interrogation, Confession and Innocence." Innocence Project, Benjamin N. Cardozo Law School. New York, N.Y. May, 2004.

"Protecting Human Subjects vs. Preserving Social Research." University of California, Berkeley, School of Law. Berkeley, CA. April, 2004.

"Police Interrogation and Confessions." Santa Clara County Public Defender's Office. San Jose, CA. March, 2004.

"Police Interrogation: A Study in Deception." San Mateo County Private Defenders Program. Burlingame, CA. January, 2004.

2003   "Confessions, Admission, and False Statements." California Attorneys for Criminal Justice Conference. San Francisco, CA. December, 2003.

"Procedures for Interrogation and Confession." The University of California, Irvine. Conference on Science and the Law of Evidence. November, 2003.

"Confessions and Coercion." Habeas Corpus Resource Center Conference. San Francisco, CA. November, 2003.

"Understanding Police Interrogation, Coercion and Confessions." San Francisco Public Defenders' Office. San Francisco, CA. October, 2003.

"Videotaping Interrogations: Does it Enhance the Jury's Ability to Distinguish True and False Confessions?" (with Saul Kassin, C. Crocker and Lindsay Holland). Psychology & Law International Interdisciplinary Conference. Edinburgh, Scotland. July, 2003.

"Exploding the Myths of False Confession: Lessons from the Central Park Jogger Case" (with Steve Drizin). The Law and Society Association Conference. Pittsburgh, PA. June, 2003.

"Analyzing Confessions and Their Consequences." The Advanced Judicial Academy for Illinois Judges." University of Illinois. Champaign, Illinois. June, 2003

"The Social Psychology of Police Interrogation and False Confession." San Diego Psychology-Law Society. San Diego, CA. May, 2003.

"The Psychology of Police Interrogation and False Confession." The National Judicial Institute. Victoria, British Columbia. May, 2003.

"The Psychology of Police Interrogation, Coercion and False Confession." Full day training course." Miami Beach Police Department. Miami Beach, FLA. February, 2003

"False Statements." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2003.

2002   "The Psychology of Police Interrogation and False Confession." National Judicial Institute. Judicial Safeguards for the Prevention of Wrongful Convictions Seminar. Ottawa, Ontario. Canada. December, 2002.

"The Consequences of False Confessions Revisited in the DNA Age" (with Steve Drizin). The

American Society of Criminology Conference.  Chicago, IL.  November, 2002.

"Influence, Persuasion and Compliance: The Psychology of Police Interrogation and Confession Evidence."  University of California, San Diego. Department of Psychology. Faculty Colloquium.  November, 2002.

"Studying Police Interrogation and Confessions."  Long Beach Police Department.  Long Beach, CA.  November, 2002.

"The Psychology of Interrogation, Coercion and Police-Induced False Confession."  California Public Defenders Association Conference.  Rohnert Park, CA.  August, 2002

"The Psychology of Police Interrogation and False Confession." Three-day training course for investigators at the Broward County Sheriff's Office.  Ft. Lauderdale, Florida.  July, 2002.

"False Confessions."  Spokane Criminal Defense Attorneys.  Spokane, WA.  June, 2002.

"Thinking About Miscarriages of Justice." The Law and Society Association Conference. Vancouver, Canada.  May, 2002.

"Police Interrogation, False Confessions and Miscarriages of Justice."  California State University, Northridge.  Department of Sociology.  Faculty Colloquium.  May, 2002.

"Public Perceptions of Interrogation Tactics in Criminal Setting" (with Jodi Quas and Brianne Beck).  The Western Psychological Association Conference.  Irvine, CA.  April, 2002.

The Psychology of Police Interrogation and False Confessions."  Invited Lecture to Military Prosecutors as part of the "Prosecuting Complex Litigation" Course Seminar.  Naval Justice School.  San Diego, CA.  April, 2002.

"Video-taping, Police-Induced False Confessions and Interrogation Reform: Defining the Problems, Finding the Solutions." National Innocence Network Conference, California Western School of Law. San Diego, CA.  January, 2002.

2001    "Police Interrogation and False Confessions." Annual Trial Defense Service Conference. United States Army.  Las Vegas, Nevada.  November, 2001.

"Analyzing False Confession Cases: How to Know Them When You See Them; What to Do When You Get Them." The Federal Defenders Program and the Illinois Association of Criminal Defense Lawyers Conference.  Chicago, IL.  October, 2001.

"How Police Induce False Confessions."  Wisconsin Public Defender Conference.  Milwaukee, WI.  October, 2001.

"Influence, Coercion and Confession: Connecting Scholarly Research and Courtroom

Testimony." The American Psychological Association Conference. San Francisco, CA. August, 2001.

"Investigating and Correcting Official Misconduct: Preliminary Lessons from the Rampart Scandal" (with Bill Thompson and Paul Kaplan). The Society for the Study of Social Problems Conference. Anaheim, CA. August, 2001.

"Police Interrogation, Coercion and False Confessions: Exposing Police Misconduct Inside the Interrogation Room and Exonerating the Innocent." The National Association of Criminal Defense Attorneys Conference. Minneapolis, MN. August, 2001.

"Police Interrogation Techniques and False Confessions." New Mexico Criminal Defense Lawyers Association Seminar. Albuquerque, NM. July, 2001.

"Police Interrogation, Coercion and False Confessions." Los Angeles Public Defender's Office. Los Angeles, CA. June, 2001.

"Thinking Critically About False Memories, False Confessions and False Accusations: Past, Present and Future." University of California, Irvine. Students for Science and Skepticism. May, 2001.

"Police Interrogation, Coercive Influence Techniques, and False Confessions." Western Circuit Workshop, United States Air Force. Travis Air Force Base. Sacramento, CA. March, 2001.

"Proving Your Client's Confession is False or Coerced." Capital Case Defense Seminar. California Attorneys for Criminal Justice and the California Public Defenders Association. Monterey, California. February, 2001.

"False Confessions." Benjamin N. Cardozo School of Law, Innocence Project Lecture Series. New York City, N.Y. January, 2001.

2000    "Questioning the Relevance of *Miranda* in the Twenty-First Century." University of Michigan, School of Law. Conference on *Miranda* After *Dickerson*: The Future of Confession Law. Ann Arbor, MI. November, 2000.

"Studying Miscarriages of Justice in the Age of DNA, Video Technology and Death Row Exonerations: Understanding and Solving the Problem." Distinguished Faculty Lecture. University of California, Irvine. November, 2000.

"Police Misconduct Inside the Interrogation Room" and "Police-Induced False Confessions, Wrongful Deprivations of Liberty, and Miscarriages of Justice. The American Society of Criminology Conference. San Francisco, CA. November, 2000.

"Confessions: Creating New Approaches to Excluding False, Coerced and Unlawfully Obtained Statements." San Diego County Public Defenders' Office.   November, 2000.

"The False Confession."  Orange County Public Defender's Training Seminar.  Santa Ana, California.  November, 2000.

"Miscarriages of Justice in the 21st Century: Coercion, False Confessions and the Wrongful Conviction of the Innocent." Marian Miner Cook Athenaeum Distinguished Lecture. Claremont McKenna College. Claremont, CA.  September, 2000.

"Interviewing/Interrogation."  Full day Training Session.  Cyprus Police Training Program.  Ministry of Justice and Public Order of the Republic of Cyprus. Nicosia, Cyprus.  September, 2000.

"Psychological Research and Wrongful Convictions: Influence, Suggestion and Coercion."  The American Psychological Association Conference.  Washington, D.C.  August, 2000.

"Obtaining Truthful Confessions, Avoiding Coerced and/or False Confessions." Training Seminar.  Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX.  July, 2000.

"Going to a Different Ivory Tower."  Association of American Law Schools Mid-Year Conference on Criminal Justice.  Washington, D.C.  June, 2000.

"Police Interrogation Methods, Coercion, and False Confessions."  West Virginia Public Defender Conference.  Davis, West Virginia.  June, 2000

"Police-Induced False Confessions."  The Mississippi Judicial College, University of Mississippi.  Tunica, Mississippi.  May, 2000.

"Coercive Interrogation and False Confessions: Reflections on the Wenatchee Cases."  The University of Washington, Washington Law School Foundation. Seattle, WA. April, 2000.

"The Legal Consequences of False Confessions."  The American Psychology-Law Society Conference.  New Orleans, LA.  March, 2000.

"Suggestive Interrogation and False Confessions."  University of California, Irvine.  Miscarriages of Justice Conference.  School of Social Ecology.  March, 2000.

"Interrogations and Confessions: Implications for Attorneys and Psychologists." Half-day course for prosecutors, defense attorneys and psychologists. Sponsored by Goebel & Vigen: Clinical, Forensic & Organizational Psychology.  Shreveport, Louisiana.  March, 2000.

"False Confession Theory and Application."  Central Circuit Defense Team Conference, United States Air Force.  Randolph Air Force Base.  San Antonio, Texas.  January, 2000.

"Police Interrogation, Coercive Influence Techniques, and False Confessions."  Federal

Defenders of San Diego Conference.  San Diego, CA.  January, 2000.

1999    "Coerced and False Confessions."  Indiana Public Defender Council Conference.  Indianapolis, Indiana.  December, 1999.

"False Confessions: Causes, Consequences, and Solutions."  The American Society of Criminology Conference.  Toronto, Canada.  November, 1999.

"Coerced Confessions."  The Colorado State Public Defenders' Association Conference.  Crested Butte, CO.  October, 1999.

"Video-taping Interrogations and Confessions."  Testimony before the Illinois House of Representatives. Task Force on Videotaping Interrogation and Confessions.  Chicago, IL.  September, 1999.

"Litigating a False Confession Case."  National Seminar on Mental Illness and the Criminal Law.  The Federal Defender Training Group.  Washington, D.C.  June, 1999.

"Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*."  University of Southern California School of Law.   Faculty Colloquium. March, 1999.

"Analyzing Coerced and/or False Confessions."  National Association of Criminal Defense Attorneys Conference.  St. Louis, Missouri. March, 1999.

"False Confessions: Inside the Interrogation Room from Coercion to Deception."   Criminal Defense Attorneys of Michigan Conference.  Detroit, Michigan.  March, 1999.

"The Social Psychology of Police Interrogation and False Confession."  University of California, Santa Barbara. Department of Psychology.  Social Psychology Symposium.  January, 1999.

"The Social Psychology of Police Interrogation and False Confession." University of California, Irvine.  Department of Psychology and Social Behavior.  Faculty Colloquium.  January, 1999.

1998    "The Regulation and Memorialization of Confessions."  Northwestern University School of Law.  Conference on Wrongful Convictions and the Death Penalty.    November, 1998.

"Science in the Courtroom."  The American Society of Criminology Conference.  Washington, D.C.  November, 1998.

"Analyzing Coerced Confession Cases."  Arizona Attorneys for Criminal Justice Conference.  Tucson, AZ.  September, 1998.

"The Social Psychology of False Confessions."  American Sociological Association Conference.  San Francisco, CA.  August, 1998.

"The Psychology of Confession Evidence: From the Ivory Tower to the Realities of Practice."  The Law and Society Association Conference.  Aspen, CO.  June, 1998.

"*Miranda* and the Adversary System: Lessons for Japan."  University of California, Berkeley School of Law.  Center for the Study of Law and Society.  Conference on Japanese Criminal Justice.  April, 1998.

"The Truth about False Confessions: Understanding Their Causes and Consequences."  Wayne State University. Center for Legal Studies.  Faculty Colloquium.  Detroit, MI.  April, 1998.

"The Truth About False Confessions: What Criminologists Should Know."  The Academy of Criminal Justice Sciences Conference.  Albuquerque, NM.  March, 1998.

"Coerced Statements, False Confessions and Creating Memory, Parts I and II." The Federal Judicial Center Conference.  San Diego, CA and Atlanta, GA. March, 1998.

"The Causes and Consequences of False Confessions."  University of Washington, Seattle.  Department of Sociology.  Faculty Colloquium.  January, 1998.

1997    "Police Interrogation, False Confessions and Miscarriages of Justice."  The University of California, Irvine School of Social Ecology. Newport Beach, CA.  November, 1997.

"Police Interrogation, False Confessions and Expert Witnesses."  American Society of Criminology Conference.  San Diego, CA.  November, 1997.

"The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe).  Law and Society Association Conference.  St. Louis, Missouri.  May, 1997.

"The Decision to Confess."  The University of Denver College of Law. Symposium on Coercion, Exploitation and the Law.  Denver, CO. March, 1997.

"Police Interrogation, False Confessions, and Expert Witnessing."  University of Colorado, Boulder.  Department of Sociology, Graduate Student Forum.  March, 1997.

"Explaining False Confessions."  The University of Colorado, Boulder School of Law.  Faculty Colloquium.  Boulder, CO. February, 1997.

"False Confessions and Miscarriages of Justice *Today*."  Conference sponsored by The Justice Committee.  Salem, MA.  January, 1997.

1996    "Coerced False Confessions."  American Society of Criminology Conference.  Chicago,

Illinois. November, 1996.

"False Confessions: Documenting, Explaining and Preventing Miscarriages of Justice." University of California, Irvine. Department of Criminology, Law and Society. Faculty Colloquium. November, 1996.

"Is *Miranda* Enough or Should We Video-tape All Confessions?" Seton Hall University Law School. Newark, NJ. October, 1996.

"The Principles and Practices of Criminal Law in the United States." Tsingua University School of Law. Bejing, China. October, 1996.

"Police Interrogation in America." Chinese People's Public Security University. Department of Criminology. Bejing, China. October, 1996.

"Police Interrogation and False Confessions in America." Supreme People's Procuratorate of the People's Republic of China." Bejing, China. October, 1996

"Deception by Sociologists." American Sociological Association Conference. New York, NY. August, 1996.

"Secrecy and the Interrogation of Suspects." University of Colorado, Boulder. Conference on George Simmel's Actual and Potential Impact on Contemporary Society. April, 1996.

"Between Reality and Metaphor: A Friendly Critique of *The Myth of Repressed Memory*." Pacific Sociological Association Conference. Seattle, WA. March, 1996.

1995    "The Context and Outcome of Police Interrogation: A Quantitative Analysis." American Society of Criminology Conference. Boston, MA. November, 1995.

"The Social and Legal Construction of Recovered Memories." University of Delaware at Newark, Department of Legal Studies. November, 1995.

"False Confessions and Miscarriages of Justice: A Preliminary Study" and "The Mythology and Sociology of Recovered Memories." Northern Arizona University, Departments of Sociology and Criminal Justice. Flagstaff, AZ. October, 1995.

"The Social Meaning of the O.J. Simpson Case." University of Colorado, Boulder. Department of Sociology, Diversity Forum. October, 1995.

"Interrogation and Surveillance: Changing Trends in Police Detection and Social Control." American Sociological Association Conference. Washington, D.C. August, 1995.

"False Memory, False Confession: When Police Interrogations Go Wrong." Law & Society Association Conference. Toronto, Canada. June, 1995.

"Trial *and* Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." The Pacific Sociological Association Conference. San Francisco, CA. April, 1995.

"Police Interrogation: Empirical Observations, Legal Questions, Ethical Dilemmas." University of Colorado, Boulder School of Law. Faculty Colloquium. February, 1995.

"Violence, Civility and Social Change: The Case of American Police Interrogation in the Twentieth Century." University of Minnesota, Minneapolis. Department of Sociology. Faculty Colloquium. January, 1995.

1994    "Westville Revisited: A Contemporary Analysis of Order, Legality, and Crime Detection." American Society of Criminology Conference. Miami, FLA, November, 1994.

"The Sociologist as Detective: Reflections on the Methodology and Ethics of Fieldwork Inside the Police Interrogation Room." University of California, Los Angeles. Department of Sociology. October, 1994.

"The Historical Sociology of the Third Degree in America: Analyzing the Rise and Fall of a Violent Social Practice." American Sociological Association Conference. Los Angeles, CA. August, 1994.

"The Impact of *Miranda* Revisited: Analyzing an Old Question with New Data." Law & Society Association Conference. Phoenix, AZ, June, 1994.

"Police Interrogation as a Confidence Game." Western Society of Criminology Conference. Berkeley, CA, February, 1994.

1993    "Inside the Interrogation Room: A Participant Observation Study of Custodial Police Questioning." American Society of Criminology Conference. Phoenix, AZ, October, 1993.

"How to More Effectively Elicit Confessions." Presentation to the Hayward Police, CA Department, Criminal Investigation Division. August, 1993.

"Violence, Civility and Institutional Change: The Case of American Police Interrogation." University of Colorado, Boulder. Department of Sociology. Faculty Colloquium. January, 1993.

1992    "Criminal Interrogation and Confessions Revisited: An Analysis and Critique of Inbau and Reid's Police Training Manuals and Courses." American Society of Criminology Conference. New Orleans, LA, November, 1992.

"Police Interrogation and Social Control." Law and Society Association Conference. Philadelphia, PA, May, 1992.

1991   "From Coercion to Deception: An Empirical Analysis of the Changing Nature of Police Interrogation in America."  American Society of Criminology Conference.  San Francisco, CA. November, 1991.

"The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  University of California, Berkeley, School of Law.  Faculty Colloquium. September, 1991.

"The Social Psychology of Coerced-Internalized False Confessions" (with Richard J. Ofshe). American Sociological Association Conference. Cincinnati, OH, August, 1991.

"Research on Police Interrogation: Some Thoughts and Questions About the Permissible Limits of Deception."  University of California, Berkeley.  Jurisprudence and Social Policy Program, Friday Forum.  May, 1991.

## LEGISLATIVE, JUDICIAL AND EXECUTIVE TESTIMONY

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Court of Criminal Appeals. Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
The Illinois House of Representatives (1999)

## GRANTS AND FELLOWSHIPS

Stanford University, Center for the Advanced Study in the Behavioral Sciences (2014-2015)
Guggenheim Foundation (2011-2012)      Open Society Institute (2004-2005, 2008)
National Science Foundation (2005-2006)   Univ. of California, Irvine (1998-2002)
MacArthur Foundation (1992-1993)       Univ. of Colorado, Boulder (1994-1996)

## COURSES TAUGHT

| LAW | UNDERGRADUATE |
|---|---|
| Criminal Procedure | Introduction to Criminology, Law and Society |
| Criminal Law | Interrogation, Confession and the Law |
| Wrongful Convictions | Miscarriages of Justice |
| White Collar Crime | Influence, Memory and the Law |
| | Topics in Criminology |
| | Criminal Justice in the United States: An Introduction |
| **GRADUATE** | American Criminal Justice System: Advanced Overview |
| | Critical Thinking |
| Miscarriages of Justice | Sociology of Law |
| Police Organization and Behavior | Police, Law and Society |
| Police Scandal and Misconduct | Police Interrogation and False Confessions |

Topics in Criminology                Sociology of White-Collar Crime

## POLICE INTERROGATION TRAINING (GIVEN)

2/03    Taught 8-hour training course on interrogation methods, psychological coercion and false confessions for felony investigators in the Miami Beach Police Department.  Miami Beach, FL.

7/02    Taught three 8-hour training courses on interrogation methods, psychological coercion and false confessions for felony investigators in the Broward County Sheriff's Office.  Ft. Lauderdale, FL.

9/00    Taught a full-day training session on interview and interrogation to the Cyprus Police as part of their training program in the Ministry of Justice and Public Order.  Republic of Cyprus. Nicosia, Cyprus.

7/00    Taught training seminar on obtaining truthful confessions and avoiding coerced and/or false confessions to the Law Enforcement Coordinating Committee for the Fifth Circuit.  San Antonio, TX.

## POLICE INTERROGATION TRAINING (RECEIVED)

3/93    Attended and participated in one-week advanced interrogation training course taught by the Federal Law Enforcement Training Center (FLETC).  Glynco, Georgia. Received certificate.

1/92    Attended and participated in one-week interrogation training course taught by the San Mateo Community College, Administration of Criminal Justice Department.  San Mateo, California.  Received certificate.

11/91   Attended and participated in two-day advanced interrogation training course taught by Reid &Associates.  San Francisco, California.  Received certificate.

3/91    Attended and participated in three-day introductory interrogation training course taught by Reid & Associates.  Los Angeles, California.  Received certificate.

12/90   Attended one-day in-house interrogation training course for Sergeants.  Criminal Investigation Division, Oakland Police Department.  Alameda, California.

## OTHER LAW ENFORCEMENT RELATED SERVICE WORK

10/01-6/03    Member, Academic Education and Action Research Advisory Committee to the Chief of Police, Long Beach Police Department.  Long Beach, CA.

5/84-8/84    Voluntary Internship.  San Francisco District Attorney's Office, Consumer Fraud Division.  San Francisco, CA.

**PROFESSIONAL ACTIVITIES (SELECTIVE)**

Editorial Board, *Wrongful Conviction Law Review* (2019-Present)
Editorial Board, *Journal of the Forensic Social Sciences* (2019-Present)
Editorial Board, *Behavioral Sciences and the Law* (2017-Present)
Editorial Board, *Law and Society Review* (1998-2002)

<u>Peer Reviewer, Journals</u>:

*Frontiers in Psychology* (2021)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2021)
*Psychology, Public Policy and Law* (2013-2014, 2019-2021)
*Behavioral Sciences & the Law* (2014, 2017-2020)
*Criminology and Public Policy* (2007, 2018-2019)
*Crime, Media and Culture* (2019)
*New Criminal Law Review* (2018)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013; 2017-2018; 2020)
*Law & Society Review* (1996-2000; 2002-2003; 2012; 2014; 2016; 2018)
*Journal of Quantitative Criminology* (2017)
*Law & Social Inquiry* (1997-1998; 2001; 2005; 2013; 2017)
*The Journal of Applied Research in Memory and Cognition* (2017)
*New Criminal Law Review* (2017)
*The American Psychologist* (2016)
*Stanford Law Review* (2015)
*Philosophy, Science and Law* (2014)
*Journal of the American Academy of Psychiatry and the Law* (2014)
*Current Directions in Psychological Science* (2014)
*Justice Quarterly* (1998, 2000, 2005, 2009, 2013)
*Sociological Quarterly* (1998, 2013)
*American Journal of Criminal Justice* (2013)
*Journal of Law and Courts* (2012)
*British Journal of Sociology* (2012)
*Basic and Applied Social Psychology* (2011)
*Psychology, Crime and Law* (2009)
*Regulation and Governance* (2009)
*Journal of Criminal Justice* (2000, 2006, 2008)
*Legal and Criminological Psychology* (2006)
*Journal of Law, Economics & Organization* (2005)
*Psychological Science* (2004)
*Psychological Science in the Public Interest* (2004)
*Law, Culture and the Humanities* (2004)
*Queen's Law Journal* (2004)
*Criminal Justice Ethics* (2003)
*Criminology* (2001-2002)

*Research in Crime & Delinquency* (1995, 1999)
*Sociological Forum* (1998-1999)
*Journal of Criminal Law and Criminology* (1996)
*Studies in Law, Politics and Society* (1996)
*Social Problems* (1996)
*American Journal of Sociology* (1995)

Peer Reviewer, Book Manuscripts:

*University of California Press* (2014, 2017, 2021)
*Oxford University Press* (2013-2014; 2020)  *Routledge, Taylor & Francis* (2020)
*New York University Press* (2006-2007, 2011-2012, 2015, 2017, 2019)
*Rowman and Littlefield Publishers* (2018)  *Hope and Life Press Books* (2017)
*Sunbury Press* (2017)                         *Ankerwycke Books* (2016)
*Lexington Books* (2011)                       *Princeton University Press* (2008)
*University of Arizona Press* (2008)           *Cornell University Press* (2006)
*University of Michigan Press* (2005)          *AltaMira Press* (2004)
*University of Chicago Press* (2004)           *Academic Press* (2003)
*Aspen Publishers, Inc.* (2000)                *Northeastern University Press* (1999)

Tenure and Promotion Reviews:

Virginia Commonwealth University, Department of Criminal Justice (2018)
St. Joseph's University, Department of Sociology and Criminal Justice (2018)
University of Ottawa, Faculty of Social Sciences (2017)
University of California, Riverside, Department of Psychology (2016)
University of Pittsburgh, School of Law (2015)
University of North Carolina, Greensboro, Department of Sociology (2015)
Roger Williams University, Department of Psychology (2015)
Emory University, Department of Psychology (2014)
Arizona State University, School of Criminology and Criminal Justice (2014)
University of Washington, School of Law (2013)
John Jay College of Criminal Justice (New York), Department of Psychology (2010)
UC Hastings College of Law, San Francisco, CA (2010)
University of Nevada, Reno, Department of Psychology (2004)
University of California, Berkeley, School of Law (2004)
Lafayette College (Pennsylvania), Department of Sociology (2003)
Northwestern University School of Law (2002)
Franklin and Marshall College (Pennsylvania), Department of Sociology (2001)

## **PROFESSIONAL MEMBERSHIPS**

American Law Institute                  American Society of Criminology
American Psychological Association      American Psychology-Law Society
Association for Psychological Science   Law and Society Association

Academy of Criminal Justice Sciences          Association of American Law Schools
Society for the Study of Social Problems      The American Sociological Association
Pacific Sociological Association              Western Psychological Association
Western Society of Criminology               International Investigative Interviewing Research Group

## <u>CONSULTATIONS (SELECTIVE)</u>

<u>Law Enforcement</u>

Pima County District Attorney's Office, Conviction and Sentence Integrity Unit (2021-Present)
San Francisco District Attorney's Office, Innocence Commission (2021-Present)
U.S. Department of Justice, Criminal Section, Civil Rights Division (2020-2021)
Lawrence County Prosecutor's Office, Ironton, Ohio (2020)
Seattle Community Police Commission, Seattle, WA (2018)
Tempe Police Department, Tempe, AZ (2018)
State of California, Department of Justice, San Diego, CA (2002-2004; 2013)
Maricopa County Sheriff's Office, Phoenix, AZ (2011)
Riverside County Sheriff's Association, Riverside, CA (2006)
Solicitor's Office, State of South Carolina, Seventh Judicial Circuit (2005)
Wyoming Association of Correctional Employees (2005)
Miami Beach Police Department, Miami Beach, FLA (2003)
Broward County Sheriff's Office, Ft. Lauderdale, FLA (2002)

<u>Legislative, Judicial and Executive Organizations</u>

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
Illinois State Legislature, Task Force on Recording of Interrogations (1999-2000)

<u>Innocence Projects and Universities (Selective)</u>

MacArthur Justice Center, Northwestern University Law School. Chicago, IL (2009-2011; 2013; 2015-Present)
Northern California Innocence Project, Santa Clara University Law School (2004-2005; 2014-Present)
The Exoneration Justice Clinic, Notre Dame School of Law. South Bend, IN (2019-Present)
The Exoneration Project, University of Chicago School of Law (2018-2020)
Innocence Project, Cardozo Law School. New York, NY (1999-2000, 2009; 2012; 2017, 2019)
Northeastern University Law School Innocence Project. Boston, MA (2018)
The Exoneration Initiative.  New York, NY (2015-2017)
Minnesota Innocence Project.  Minneapolis, MN (2011-2016)
University of Oklahoma Innocence Project (2012-2015)
Midwest Innocence Project, Kansas City, Missouri (2014)
Pennsylvania Innocence Project, Philadelphia, PA (2014)

University of Wisconsin Innocence Project (2006; 2011-2014)
PACE University Law School Post-Conviction Criminal Defense Clinic. White Plains, NY (2010-2013)
University of California Davis School of Law, Immigration Clinic (2011-2012)
American University, Preventing Wrongful Convictions Project, Washington D.C. (2011-2013)
Centurion Ministries, Princeton, NJ (1998-2011)
Center for Wrongful Conviction, Northwestern University School of Law.  Chicago, IL (2011)
George Washington University, Preventing Wrongful Convictions Project. Washington, DC (2010-2011)
Mid-Atlantic Innocence Project, George Washington University School of Law, Washington, D.C. (2008-2010)
Downstate Illinois Innocence Project, University of Illinois (2008-2010)
Ohio Innocence Project, University of Cincinnati Law School (2007-2010)
Bluhm Legal Clinic, Northwestern University School of Law.  Chicago, IL (2008-2010)
Innocence Project Northwest, University of Washington Law School.  Seattle, WA (1998-1999; 2005-2006; 2008-2010)
MacArthur Justice Center, University of Chicago Law School (1999; 2005-2006)
Innocence Project, Osgoode Hall Law School, York University.  Toronto, Ontario (2000)

Law Firms (Selective)

Cheshire Parker Schneider, PLLC, Raleigh, NC (2021)
Brown, Goldstein & Levy, Baltimore, MD (2021)
Morrison & Foerster LLP, San Francisco, CA (2020-Present)
Debevoise & Plimpton, LLP, New York, NY (2020-Present)
Riley, Safer, Holmes & Cancila LLP, Chicago, IL (2020-Present)
Meyer, Shaffer & Stephans, PLLP. Missoula, MT (2016-Present)
Loevy & Loevy, LLP, Chicago, IL (2012-2013; 2015-Present)
Drinker, Biddle & Reath LLP, Princeton, NJ (2011-Present)
Squire, Patton and Boggs LLP, New York, NY (2009-Present)
Hogan Lovells LLP, Washington D.C. (2019-2021)
Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. (2014-2021)
Sidley Austin LLP, Chicago, IL (2009-2014; 2020-2021)
Morgan, Lewis and Bockius LLP, Chicago, IL (2012-2013; 2019-2020)
Innocence Legal Team, Walnut Creek, CA (2011-2012; 2015-2017; 2018-2019)
Tyson and Mendes LLP, San Diego, CA (2018-2019)
Neufeld, Scheck and Brustin, LLP, New York, NY (2013-2014; 2016-2019)
Riordan & Horgan, San Francisco, CA (2014-2018)
Cuomo, LLC, New York, New York (2016-2018)
The Valorem Group, Chicago, IL (2015-2017)
Arnold & Porter Kaye Scholer LLP, New York, New York (2017)
Sideman Bancroft LLP, San Francisco (2015-2016)
Venable LLP, Washington D.C. (2007-2016)
Carpenter, Lipps & Leland LLP, Columbus, OH (2016)
Arent Fox, LLP, Los Angeles, CA (2015-2016)

Rudolf, Widenhouse and Fialko, Charlotte, NC (2015)
Kirkland & Ellis, LLP, Washington, DC (2013-2014)
Bingham McCutchen LLP, Boston, MA (2005-2014)
Beldock, Levine & Hoffman, LLP, New York, NY (2004-2014)
Goodwin Procter LLP, Boston, MA (2012-2013)
Williams & Connolly LLP, Washington, D.C. (2011-2012)
Reed Smith, New York, NY (2011-2012)
Fredrikson & Byron, P.A., Minneapolis, MN (2009-2012)
McGwire Woods LLP, Richmond, VA (2011)
Lane Powell, Seattle, WA (2008-2010)
Paul, Weiss, Rifkind, Wharton & Garrison LLP (2009-2010)
Sidley & Austin LLP, San Francisco, CA (2009)
Weil, Gotshal & Manges LLP, New York, N.Y. (2009)
Kirkland & Ellis LLP, New York, N.Y. (2008-2009)
Cochran, Neufeld, and Scheck LLP, New York, N.Y. (2003-2009)
Holland & Knight LLP, New York, NY (2004-2005, 2007-2009)
Goodwin Procter LLP, New York, N.Y. (2008-2009)
Covington & Burling LLP, Washington, D.C. (2006)
O'Melveny & Myers LLP Los Angeles, CA (2003, 2005-2006)
Kelley, Drye & Warren LLP, New York (2006)
Joseph, Greenwald & Laake, PA, Greenbelt, Maryland (2005-2006)
Tamburello & Hanlon, San Francisco, CA (2005)
Hallinan, Wine & Sabelli, San Francisco, CA (2003)
Jenner & Block, Chicago, IL (2000-2001)
Jackson Walker LLP, Houston, TX (2000)
Day, Berry and Howard LLP, Hartford, CT (1999-2000)

Other (Selective)

The Anthony Graves Foundation, Houston, Texas (2021)
Norwegian Centre for Human Rights, University of Oslo (2019-Present)
Center for Human Rights and Humanitarian Law, American University (2019-Present)
Association for Prevention of Torture (2019)
Original Productions, LLC (2016, 2018)
Bay Area Book Festival (2016)
Government of Mexico (2014)
NAACP Legal Defense Fund (2007-2009)
*Good Morning America.* ABC, New York, New York (2009)
Equal Justice Institute, Montgomery, ALA (2001-2004)
Beverly Monroe Coalition for Justice, Richmond, VA (1997-2003)
*Sixty Minutes*, CBS, New York, NY (2003)

## **EXPERT WITNESS TESTIMONY (SELECTED CASES)**

*United States v. Gregg Bigda.* Springfield, MA (2021)

*Henry Lee McCollum et al v. Robeson County et al.* Raleigh, NC (2021)
*State of California v. Daljit Atwal et al*. Modesto, CA. (2019)
*United States v. Hayad Hamat.* Sacramento, CA. (2018)
*State of California v. Gina Bailey*. Fairfield, CA. (2017)
*State of New York v. Selwyn Days.* White Plains, NY. (2017)
*James Dean et al v. Richard Smith et al*. Lincoln, Nebraska. (2016)
*Danial Williams et al. v. State of Virginia.* Richmond, Virginia. (2015)
*State of Tennessee v. Jimmy Rauhuff.* Maryville, TN. (2014)
*State of Wyoming v. John Balczewski.* Cheyenne, Wyoming. (2012)
*State of Oregon v. Angelica Swartout.* Eugene, Oregon. (2012)
*United States vs. Clifton Yarborough*. Washington, D.C. (2012)
*State of Washington v. Ted Bradford*. Yakima, WA. (2010)
*State of Wisconsin v. Brendan Dassey*. Manotowec, Wisconsin. (2010)
*United States vs. Debra Milke*. Phoenix, AZ. (2010)
*State of Arizona v. Daphne Henry.* Flagstaff, AZ. (2009)
*State of Missouri v. Ryan Ferguson.* (2008)
*State of Alaska v. Eugene Vent.* Anchorage, Alaska. (2008)
*State of Arkansas v. Kenneth Osborn.* Hamburg, Arkansas. (2008)
*State of California v. James Dees.* Los Angeles, CA. (2007)
*State of Montana v. Barry Beach.* Deer Lodge, Montana. (2007)
*United States v. Matthew Joyce.* San Diego, CA. (2006)
*State of Wisconsin v. Beth LaBatte.* Appleton, WI. (2006)
*Earl Washington v. Kenneth Buraker et al.* Charlottesville, VA. (2006)
*State of Iowa v. Juan Macias.* Sioux City, Iowa. (2005)
*State of California v. Richard Tuite.* San Diego, CA. (2004, 2013)
*State of Alabama v. Medell Banks*. Butler, Alabama. (2003)
*State of California v. Robert Lee Salazar.* Pomona, CA. (2002)
*Beverly Monroe v. State of Virginia*. Richmond, Virginia. (2000)
*State of Connecticut v. Richard Lapointe.* Hartford, CT. (2000)
*State of California v. Kenneth Cowling.* Alameda County Superior Court. (2000)
*State of Washington v. Doris Green*. Wenatchee, Washington. (1999)
*State of Connecticut vs. David Saraceno*. Middletown, Connecticut. (1998)

**References Available on Request**

**CASES IN WHICH DR. RICHARD LEO HAS BEEN QUALIFIED AND TESTIFIED**
**(April 1, 2018-March 31, 2022)**

<u>**EXPERT WTINESS TESTIMONY – Pre-Trial Hearings, Trials and Post-Conviction Hearings**</u>

*United States v. Bahtiyor Jumaev*.  Trial. Federal Court. United States District Court. Denver, Colorado.  April, 2018.

*State of Arizona v. Adrian Ponce*.  Suppression Hearing.  Maricopa County Superior Court. Phoenix, AZ.  April, 2018.

*State of Ohio v. Aaron Robertson*.  Suppression Hearing.  Cuyahoga County Court of Common Pleas.  Cleveland, Ohio.  May, 2018.

*State of Illinois v. Michael Burgund*.  Trial.  Madison County Circuit Court.  Edwardsville, Illinois.  May, 2018.

*State of California v. Timothy Mays*.  Suppression Hearing.  Riverside County Superior Court. I Indio, CA.  May, 2018.

 *State of California v. Timothy Mays*.  Trial.  Riverside County Superior Court. Indio, CA. June, 2018.

*State of California v. Michael O'Donnell*.  Trial. San Diego County Superior Court. El Cajon, CA.  August, 2018.

*State of California v. Manuel Dominguez*.  Suppression Hearing.  Kern County Superior Court. Bakersfield, CA.  October, 2018.

*State of California v. Christian Burton*.  Trial. Alameda County Superior Court.  Oakland, CA. October, 2018.

*State of Montana v. Ryan Lamb*.  Suppression Hearing.  Flathead County District Court. Kalispell, Montana.  December, 2018.

*State of California v. Chloe James*.  Trial.  Solano County Superior Court.  Fairfield, CA. December, 2018

*State of California v. Manuel Dominguez*.  Suppression Hearing (Re-Trial).  Kern County Superior Court.  Bakersfield, CA.  January, 2019

*State of California v. James Rickleffs*.  Suppression Hearing.  San Francisco County Superior Court.  San Francisco, CA.  January, 2019

*Armando Nieves v. United States*.  Trial (Civil).  Federal Court. United States District Court, District of Arizona.  Tucson, Arizona.  January, 2019

*State of California v. Benito Regalado*.  Suppression Hearing. Monterey County Superior Court. Salinas, CA.  March, 2019.

*State of California v. Amarjit Singh*.  Suppression Hearing.  Solano County Superior Court. Fairfield, CA.  April, 2019.

*State of California v. Daljit Atwal et al*.  Trial.  Stanislaus County Superior Court.  Modesto, CA.  May, 2019.

*State of California v. Curtis Leonard*.  Suppression Hearing.  Tuolumne County Superior Court.  Sonora, CA.  May, 2019.

*In the Matter of Michael Wright*.  Administrative trial.  Division of Occupational Licensing, Department of Commerce, State of Utah.  Salt Lake City, Utah. May, 2019.

*State of Montana v. Ryan Lamb*.  Trial.  Flathead County District Court.  Kalispell, Montana. June, 2019.

*State of Arizona v. Gary Worrell*.  Trial.  Yavapai County Superior Court.  Prescott, AZ.  July, 2019.

*United States v. Joseph Jumper*.  Pre-trial Suppression Hearing. Federal Court.  United States District Court. Western District of North Carolina. 4th Circuit. Asheville, North Carolina. August, 2019.

*State of California v. Gerardo Cerna*.  Suppression Hearing.  Monterey County Superior Court. Salinas, CA.  August, 2019.

*State of California v. Alejandro Benitez*.  Suppression Hearing.  Santa Clara County Superior Court.  San Jose, CA.  August, 2019.

*United States v. M.M.J.  Suppression Hearing*.  United States District Court for the Eastern District of North Carolina.  Raleigh, NC.  September, 2019.

*State of Ohio v. Michael Ferricci*.  Trial.  Cuyahoga County Court of Common Pleas. Cleveland, OH.  March, 2020.

*State of California v. Nicholas James*.  Suppression Hearing. Yuba County Superior Court. Marysville, CA.  March, 2020

*State of California v. Anthony Garcia*. Suppression Hearing. Orange County Superior Court.

Santa Ana, CA. July, 2020.

*United States v. K.I.W. Suppression Hearing*. United States District Court for the Eastern District of North Carolina. Raleigh, NC. July, 2020. (Video Link).

*State of California v. Anthony Garcia*. Trial. Orange County Superior Court. Santa Ana, CA. July, 2020.

*State of California v. Herbert Mendez*. Suppression Hearing. Orange County Superior Court. Indio, Ca. November, 2020.

*Lavelle Jones v. City of Albany et al.* and *Carl Dukes v. City of Albany et al.* Trial. New York State Court of Claims. Civil. Albany, NY. March, 2021.

*State of California v. Anthony Garcia*. Trial. Orange County Superior Court. Santa Ana, CA. March, 2021.

*Henry Lee McCollum et al v. Robeson County et al.* (Civil). Trial United States District Court. Eastern District of North Carolina. Federal Court. Raleigh, North Carolina. May, 2021

*State of California v. Jeffrey Eastman*. Trial. Stanislaus County Superior Court. Modesto, CA. May, 2021.

*State of Nevada v. Anita Rohr*. Suppression Hearing. Washoe County Superior Court. Reno, Nevada. August, 2021

*State of Nevada v. Anita Rohr*. Trial. Washoe County Superior Court. Reno, Nevada. September, 2021

*State of Missouri v. Jeremy Simmons*. Trial. Jackson County Superior Court. Independence, Missouri. September, 2021

*State of California v. Josiah Ramey*. Trial. Riverside County Superior Court. Riverside, CA. November, 2021.

*United States v. Gregg Bigda*. Trial. United States Federal District Court for the District of Massachusetts. 1st Circuit. Springfield, MA. December, 2021. (Prosecution).

*United States v. Kathleen Richard*. Suppression Hearing. Military Court, United States Coast Guard. Norfolk, VA. December, 2021.

*United States v. Kathleen Richard*. Trial. Military Court, United States Coast Guard. Norfolk, VA. January, 2022.

*State of California v. Aziel Gonzales*. Trial. Orange County Superior Court. Santa Ana, CA.

February, 2022.

*State of California v. Roberto Kourchenko*.  Trial.  Los Angeles County Superior Court. Pomona, CA.  March, 2022.

## **DEPOSITIONS**

*Daniel Taylor v. City of Chicago et al.*  (Civil). February 9, 2018

*Art Tobias v. City of Los Angeles et al*. (Civil).  July 10, 2018.

*Jane JBR Doe v. Neighborhood House Association*. (Civil). May 6, 2019.

*Jesus Flores v. City of Bakersfield* (Civil).  July 29, 2019

*Joel Alcox v. City of Lompoc et al*. (Civil).  December 9, 2019.

*Henry Lee McCollum et al v. Robeson County et al.* (Civil). June 5, 2020.

*William Amor v. Naperville Police Officer Michael Cross et al* (Civil). April 12, 2021.

*Nickie Miller v. Montgomery County et. al* (Civil)*.* May 20, 2021.

*Arthur Brown v. City of Chicago et al.* (Civil).  August 17, 2021.

*Jesus Sanchez v. The Village of Wheeling, et al.* (Civil). January 26, 2022.

*Lamarr Monson v. Joan Gougoian, et al.*  (Civil).  March 20, 2022