# Exhibit 41

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
CASE NO. 19-CV-02204
HON. MANISH S. SHAH
HON. BETH W. JANTZ

ANTHONY JAKES,

Plaintiff

V.

KENNETH BOUDREAU, ET AL.,

Defendants.

DEPONENT: KENNETH BOUDREAU
DATE:     APRIL 13, 2021
REPORTER: MAGGIE PATTERSON

## Page 2

1       APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
4       Russell Ainsworth
5       Renee Spence
6       Loevy & Loevy
7       311 North Aberdeen Street
8       Third Floor
9       Chicago, Illinois 60607
10      Telephone No.: (312) 243-5900
11      E-mail: russell@loevy.com
12           spence@loevy.com
13      (Appeared via videoconference)
14
15    ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, LOUIS
16    CAESAR, MICHAEL DELACY, KEN BURKE, FRED BONKE:
17      Andrew Grill
18      Rock Fusco & Connelly, LLC
19      312 North Clark Street
20      Suite 2200
21      Chicago, Illinois 60654
22      Telephone No.: (312) 494-1000
23      E-mail: agrill@rfclaw.com
24      (Appeared via videoconference)
25

## Page 3

1       APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:
4       George Yamin
5       The Sotos Law Firm, P.C.
6       141 West Jackson Boulevard
7       Number 1240a
8       Chicago, Illinois 60604
9       Telephone No.: (630) 735-3300
10      E-mail: gyamin@jsotoslaw.com
11      (Appeared via videoconference)
12
13    Also Present: Anthony Jakes, plaintiff
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                INDEX
2                         Page
3    PROCEEDINGS                    7
4    DIRECT EXAMINATION BY MR. AINSWORTH      9
5    CROSS EXAMINATION BY MR. GRILL        305
6
7
8                EXHIBITS
9    Exhibit              Page
10   1 - Supplementary Report -
11       Plaintiff Jakes 005319 - 005322    110
12   2 - Supplementary Report -
13       Plaintiff Jakes 005312 - 005317    115
14   3 - Detective Kills Trial Testimony -
15       Plaintiff Jakes 043567       127
16   4 - Interview with Denise Harris      130
17   5 - Supplementary Report       132
18   6 - General Progress Report of Tyrone Pitts -
19       Plaintiff Jakes 005309       147
20   7 - Boudreau's Motion to Suppress Testimony -
21       Plaintiff Jakes 030575 - 030591    176
22   8 - Plaintiff Jakes 005305        178
23   9 - Photo - Plaintiff Jakes 005079    198
24   10 - Photo - Plaintiff Jakes 004583   199
25

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 5

EXHIBITS (CONTINUED)

Exhibit                                        Page
11 - Investigative File - City Jakes 23 -
     City Jakes 195                            240
12 - Supplementary Report - City Jakes 00001 -
     City Jakes 00022                          250
13 - Sex Assault Arrest Form -
     CCSAO  6669 - 6672                        283
14 - Gus Robinson Trial Testimony -
     Plaintiff Jakes 31047                     293

(Will forward all exhibits upon receipt.)

---

Page 6

STIPULATION

The VIDEO deposition of KENNETH BOUDREAU was taken at
KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET,
LOUISVILLE, KENTUCKY 40202, via videoconference in which
all participants attended remotely, on TUESDAY the 13th
day of APRIL, 2021 at approximately 11:08 a.m.; said
VIDEO deposition was taken pursuant to the FEDERAL Rules
of Civil Procedure. The oath in this matter was sworn
remotely pursuant to FRCP 30.

It is agreed that MAGGIE PATTERSON, being a Notary
Public and Court Reporter may swear the witness.

---

Page 7

PROCEEDINGS

COURT REPORTER: We are now on the record. My
name is Maggie Patterson. I'm the video technician
and court reporter. Today is the 13th day of April
2021. The time is 10:08 a.m. We're convened by
videoconference to take the deposition of Kenneth
Boudreau, in the case of Anthony Jakes versus
Kenneth Boudreau et. al., pending in the United
States District Court for the Northern District of
Illinois, Eastern Division, case number
19-CV-02204. Counsel, please state your
appearance, how you're attending and the location
you're attending from starting with plaintiff's
counsel.

MR. AINSWORTH: This is Russell Ainsworth
appearing on behalf of Mr. Jakes. I'm appearing in
Illinois. And please let the record also reflect
that Mr. Anthony Jakes is also present for the
deposition.

MS. SPENCE: This is also -- this is Renee
Spence. I am appearing on behalf of Mr. Anthony
Jakes, and I am also appearing from DC --
Washington, DC.

MR. GRILL: This is Andrew Grill, G-R-I-L-L,
on behalf of the deponent, Kenneth Boudreau, and

---

Page 8

the individual police officers. And we are in
Chicago, Illinois.

MR. YAMIN: And my name is George Yamin,
Y-A-M-I-N, on behalf of Defendant City of Chicago.
I'm attending from Chicago.

MR. AINSWORTH: I forgot to ask, counsel.
Would all -- would Counsel just agree both that
Mr. Boudreau is who he says he is, but also that
you don't object to him being sworn in remotely.
And on behalf of Plaintiff, we stipulate that
Mr. Boudreau is who he says he is, and we have no
objection to him being sworn in remotely.

MR. GRILL: Andrew Grill here. No objection.
And we so stipulate.

MR. YAMIN: Same with the City of Chicago.

COURT REPORTER: Thank you. Mr. Boudreau,
will you state your full name for the record,
please?

THE WITNESS: Kenneth J. Boudreau,
B-O-U-D-R-E-A-U.

COURT REPORTER: Thank you. And will you
please raise your right hand? Do you solemnly
swear or affirm the testimony you're about to give
is the truth, the whole truth, and nothing but the
truth?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

## Page 9

1    THE WITNESS: I do.
2    COURT REPORTER: Thank you. You may proceed.
3    DIRECT EXAMINATION
4    BY MR. AINSWORTH:
5    Q  Sir, could you please state and spell your
6    name for the record?
7    A  Kenneth J. Boudreau, B-O-U-D-R-E-A-U.
8    Q  Mr. Boudreau, I know you've been deposed on
9    several occasions, but I just want to go over the ground
10   rules so we're on the same page; is that okay?
11   A  Sure.
12   Q  First thing I ask you to do is to, like you do
13   in other depositions and in court, to answer the
14   questions out loud with a "yes" or "no" if the question
15   calls for it, okay?
16   A  Yes.
17   Q  Next thing I ask you to do is to wait until
18   I'm done with my question before you begin your answer
19   so that we're not speaking at the same time, okay?
20   A  Yes.
21   Q  And I'll try and do the same to you and that
22   is wait until you're done with your question before
23   -- done with your answer before I begin my next
24   question, all right?
25   A  Thank you.

## Page 10

1    Q  If you don't understand any of my questions,
2    please ask me to rephrase the question, re-ask the
3    question, or in some way indicate to me that you do not
4    understand my question, okay?
5    A  Okay.
6    Q  The flip side of that is that if you answer my
7    question, I'll assume that you've understood my question
8    as I posed it, fair?
9    A  Fair.
10   Q  If you need a break any time, please do just
11   let us know. All we ask is that you answer any question
12   that's pending before we break, okay?
13   A  Okay.
14   Q  Do you have any medical condition, or are you
15   on any medication that would affect your ability to
16   testify truthfully and accurately here today?
17   A  No. I'm on high blood pressure medicine, but
18   no.
19   Q  All right. Does that high blood pressure
20   medication affect your fatigue?
21   A  No.
22   Q  Or your alertness, I should say?
23   A  No.
24   Q  Does your high blood pressure condition affect
25   your memory, to your knowledge?

## Page 11

1    A  Not to my knowledge, no.
2    Q  Have you ever been told by a doctor that
3    there's something abnormal about your memory?
4    A  No.
5    Q  Have family members or other -- or close
6    friends commented to you that you have a problem with
7    your memory?
8    A  No.
9    Q  Do you feel that you have a problem for your
10   memory apart from, you know, the natural aging process
11   that occurs in all humans?
12   A  No.
13   Q  What did you do to prepare for this
14   deposition?
15   A  I reviewed my reports and previous testimony.
16   Q  When you say your reports, what reports did
17   you review?
18   A  Well, I meant the reports that are in the
19   investigative file of the Chicago Police Department
20   concerning the homicide of Rafael Garcia.
21   Q  Okay. Did you review all of the documents
22   contained in that investigative file or just a subset of
23   those documents?
24   MR. GRILL: Objection to form. Foundation.
25   A  I think I looked at all of them.

## Page 12

1    Q  Okay. And did that include supplementing
2    police reports that you authored, or you and your
3    partner authored, I should say?
4    MR. GRILL: Objection to form. Foundation.
5    A  Yes.
6    Q  Do they include supplementary police reports
7    authored by other police detectives?
8    A  Yes.
9    Q  Do they include GPRs?
10   A  Yes.
11   Q  Do they include handwritten statements?
12   A  I didn't read the handwritten statements I
13   wasn't a part of.
14   Q  All right. So which handwritten statements
15   did you read?
16   A  I didn't read any of the handwritten
17   statements in this matter.
18   Q  Okay. Did you review the evidence processing
19   reports?
20   A  I glanced at them, yes.
21   Q  How long ago did you review the investigative
22   file for the Rafael Garcia murder?
23   A  Last night.
24   Q  And when was the -- when did you review those
25   reports previous to last night?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 13

1  A   Probably three, four years ago when I
2  testified in a post-conviction hearing, or when you
3  previously deposed me on this matter.
4  Q   Did you review any photographs?
5  A   No.
6  Q   Did you review GPRs that were authored by
7  people other than yourself?
8  A   Yes.
9  Q   Why didn't you review the handwritten
10  statements?
11      MR. GRILL:  Objection.  Form.  Foundation.  To
12      the extent that it calls for any attorney-client
13      communications.  Go ahead otherwise and answer.
14      A   Yeah.  Because I wasn't a participant in the
15  taking of those handwritten statements.
16  BY MR. AINSWORTH:
17  Q   Why did you --
18  A   That I can remember.
19  Q   -- review the GPRs that -- I'm sorry, continue
20  with your answer.
21  A   That I can remember.
22  Q   Why did you review the GPRs that were authored
23  by people other than yourself about interviews or events
24  that occurred when you weren't present?
25      MR. GRILL:  Hang on -- hang on -- hang on.

---

Page 14

1  Objection.  To the extent that that crosses over
2  into any conversations you or I have had.  You can
3  answer it otherwise.  Go ahead.
4  A   Yeah.  You misstate my testimony.  I didn't
5  say I didn't review GPRs.  You asked me about
6  handwritten statements.  I said I reviewed GPRs.
7  BY MR. AINSWORTH:
8  Q   Right, sir.  I understand that.  And I'm
9  asking you, why did you review the GPRs that were
10  authored by people other than yourself about events that
11  you were not a party to?
12      MR. GRILL:  Objection.  Same objection on
13      privileged grounds.  Go ahead and you can answer
14      otherwise.
15      MR. YAMIN:  Objection as to form as well, and
16      foundation.
17      A   Because they were generated prior to my
18  speaking with Jakes.
19  BY MR. AINSWORTH:
20  Q   Did you review the GPRs regarding events that
21  occurred in February of 1992?
22  A   I -- I don't understand the question.  Which
23  GPRs?
24  Q   GPRs that were --
25      MR. YAMIN:  Objection to form.

---

Page 15

1  Q   GPRs that were generated in 1990, in February
2  of 1992.  Did you review those GPRs, sir?
3      MR. GRILL:  Objection to form.  Go ahead and
4      answer if you understand.
5      A   I -- I still don't understand the question.
6  Are you referring to a specific GPR, or what GPRs you're
7  referred to?  Is this case or another case?
8  Q   Well, all the GPRs contained in the
9  investigative file that were created in February of
10  1992.  Did you review -- well, let me ask you this.  Did
11  you review any GPRs that were created in February 1992?
12      MR. GRILL:  Objection to form.  Foundation.
13      A   No.  I only reviewed the GPRs pertaining to
14  Jakes as that's what this deposition was about.
15  Q   Okay.  You stated you reviewed your prior
16  testimony.  What prior testimony did you review?
17  A   I believe it was a motion to suppress hearing,
18  a trial transcript, and then the post-conviction
19  transcript with Anthony Jakes.
20  Q   Was there one post-conviction transcript, or
21  was there more than one?
22  A   I believe there were two.
23  Q   Did you review any other testimony in
24  preparation for today's deposition?
25  A   No.

---

Page 16

1  Q   Did you review any testimony by your former
2  partner, Detective Kill?
3  A   No.
4  Q   Did you review any testimony by Assistant
5  State's Attorney Brian Grossman?
6  A   No.
7  Q   Did you review any testimony by former Youth
8  Officer Ken Burke?
9  A   No.
10  Q   Did you review any testimony by Detective
11  Louis Caesar?
12  A   No.
13  Q   Did you have the opportunity to meet with your
14  counsel in advance to this deposition?
15  A   Yes.
16  Q   How many times did you meet with your lawyer
17  in preparation for this deposition?
18  A   Twice.
19  Q   When did you meet with your lawyer?
20  A   Yesterday, and then a week prior via Zoom.
21  Q   When you say a week prior, when a week prior?
22  A   A week prior.  Last week.
23  Q   So do you mean a week ago, Monday?
24  A   I don't remember the day it was.
25  Q   You were supposed to be deposed last Tuesday,

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 17

1  correct?
2      A   Correct.
3      Q   Why did you need to delay your deposition?
4          MR. YAMIN:  Objection to form.
5      A   Because a close pers -- personal friend of
6  mine, and also a member of my executive team of my
7  company, passed away and I was helping the family plan
8  the wake and the funeral.
9      Q   And when did your friend die?
10         MR. GRILL:  Objection.  Form.
11     A   I don't remember the exact date.  I can look
12 up his obituary on my phone and give you the exact date
13 if you want.
14     Q   Sure.
15     A   The obituary is not giving me the date of
16 death.  It's just giving me the funeral information,
17 which was -- April 8 was visitation and the funeral was
18 April 9.
19     Q   When you met with your lawyer yesterday, who
20 was present?
21     A   My lawyer.
22     Q   Which lawyer?
23     A   Mr. Miguel [sic].  Mr. Gill.
24         MR. GRILL:  Grill.
25     A   Grill.

Page 18

1      Q   And how long did you meet with Mr. Grill
2  yesterday?
3      A   About five hours.
4      Q   And last -- and was that in person?
5      A   Yes.
6      Q   And last week, when -- how long was that
7  meeting that you had with Mr. Grill over Zoom?
8      A   Probably about the same.
9      Q   About five hours?
10     A   Yeah.
11     Q   Did you have enough time to consult with your
12 lawyer in preparation for this deposition?
13         MR. YAMIN:  Objection to form.
14     A   Yes.
15     Q   Is there anything that you wanted to do to
16 prepare yourself for this deposition that you didn't
17 have an opportunity to do?
18     A   No.
19     Q   Were there any documents that you wanted to
20 review, but didn't have the opportunity to review in
21 preparation for this deposition?
22         MR. YAMIN:  Form.  Objection.
23     A   No.  Unless we're going to start talking about
24 all the cases, I only prepared for Jakes.
25     Q   So you prepared to talk about Mr. Jakes and

Page 19

1  the Rafael Garcia murder investigation; is that right?
2      A   Yes, sir.
3      Q   When you gave that testimony at the
4  evidentiary hearing back in 2016, you had a lawyer
5  present with you, your own personal lawyer at -- when
6  you testified; is that right?
7      A   Yes.  I had a lawyer that represented the
8  city, I believe.  Not that represented me at that
9  hearing.
10     Q   Was it your understanding that the lawyer who
11 was present was representing you or was representing the
12 city?
13     A   She was there as an observer.  She wasn't
14 representing me in front of Judge Hooks, she was there
15 as an observer because of other pending litigation which
16 you're aware of.
17     Q   What pending litigation?
18     A   I don't know.  You and I have had pending
19 litigation for what, the last seven years.  I don't know
20 which specific case but --
21     Q   Did you have the opportunity to meet with that
22 lawyer before, well, -- strike that.  Who was that
23 lawyer who came to the hearing representing the city?
24     A   I don't remember.
25     Q   Did you have an opportunity to meet with that

Page 20

1  lawyer before the evidentiary hearing?
2      A   No.
3      Q   Have you ever spoken with that lawyer?
4      A   I may have.
5      Q   What did you speak to that lawyer about?
6      A   I -- I don't recall.
7      Q   As I recall, there's actually two different
8  lawyers at the two different -- at the hearing in
9  February of 2016 and the hearing in April of 2016.  One
10 was Stacy Benjamin, and one was Eileen Rosen, do those
11 names ring a bell?
12     A   Eileen Rosen does.
13     Q   All right.  Did -- she attended the April 2016
14 hearing.  Did you speak with Eileen Rosen on or about
15 the date of your testimony in April of 2016?
16         MR. GRILL:  Hang on.  I'm going to object.
17 Attorney-client privilege.  Do not disclose -- if
18 you talked to her, I don't know -- do not disclose
19 any conversations that you had with her, you can
20 answer yes or no if you talked to her and that's
21 it.
22     A   Okay.  I may have.  I don't -- I don't recall
23 if I did or if I didn't, I could have.
24 BY MR. AINSWORTH:
25     Q   Well, did Eileen Rosen represent you at the

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 21

1  time that you -- in April 2016?
2      A   Nobody represented me at the hearing in front
3  of Judge Hooks. It's my understanding that they were
4  attorneys that were appointed by the city, they'd have
5  others that were there as observers to watch this
6  testimony as it may have impacted other litigation.
7      Q   And so they were not -- you keep saying in
8  front of Judge Hooks, what about outside of Judge Hooks?
9  Were they your lawyers?
10         MR. YAMIN: Objection. Form.
11         MR. GRILL: Yeah. I'm going to -- I'm also
12     going to object on foundation.
13     A   Well, they represented me in other matters.
14 And we know that this is an ongoing proceeding that'll
15 never end, so I -- I'm not sure how to answer your
16 question.
17 BY MR. AINSWORTH:
18     Q   Did you meet with the special prosecutors in
19 advance to your testimony at the evidentiary hearing in
20 February and April of 2016?
21     A   I recall going down to see his special
22 prosecutors one time at their office. I don't remember
23 what case it was.
24     Q   Can you tell us if it was for the Jakes case
25 or some other case?

Page 22

1      A   I just said I don't recall what case it was.
2      Q   And who did you meet with when you met with
3  the special prosecutors?
4      A   I -- you know, I don't remember his name. It
5  was an Irish name.
6      Q   Was it Myles O'Rourke?
7      A   Yes. That's it.
8      Q   Or Mike O'Rourke.
9      A   I think it was O'Rourke.
10     Q   Was there anybody with O'Rourke when you met
11 with him?
12     A   I don't remember.
13     Q   How long was that meeting?
14     A   I don't remember.
15     Q   Do you recall when that meeting was?
16     A   No.
17     Q   Did you talk on the phone with the special
18 prosecutors?
19     A   I may have. I don't recall if I did or if I
20 didn't.
21     Q   Did you prepare for testimony by phone with
22 the special prosecutors?
23     A   Again, I may have. I -- I don't recall if I
24 did or if I didn't.
25     Q   When you testified at the evidentiary hearing

Page 23

1  for Mr. Jakes in February and April of 2016, did you
2  feel prepared to answer questions?
3         MR. YAMIN: Objection. Form.
4      A   Concerning the Rafael Garcia homicide, yes.
5      Q   In your review of the prior testimony that you
6  gave, did you observe any errors in your testimony?
7         MR. GRILL: Objection. Form. Foundation.
8         MR. YAMIN: Same.
9      A   There were a bunch of typos and words that
10 were -- that weren't said, but that are in the
11 transcripts, but yes, I did see some mistakes.
12     Q   Apart from typos, did you observe any
13 misstatements that were attributed to you in the
14 transcripts that you reviewed of your testimony?
15     A   No. Not that I can recall. Other than words
16 that were typed in the transcript that weren't my words
17 but --
18     Q   What do you mean the words that were typed in
19 the transcript that weren't your words?
20     A   If you give me a moment, I could review the
21 transcript and point them out to you.
22     Q   Sure.
23     A   Does that mean I can look at the transcript?
24     Q   Which transcript are you referring to?
25     A   Those dates that you just told me about the

Page 24

1  post-conviction hearing.
2      Q   All right. So it was in the evidentiary
3  hearing?
4      A   Yes.
5         MR. AINSWORTH: Sure. If you have it, Andy,
6     you know, take a look at that testimony, and let us
7     know.
8         MR. GRILL: I don't have any exhibits here
9     Russell, I don't -- did you send any over?
10        MR. AINSWORTH: I haven't, I was just -- I
11    -- he asked if he could look at them. So do you
12    have a copy of that transcript, sir?
13     A   No.
14 BY MR. AINSWORTH:
15     Q   I should've asked you at the beginning, who's
16 in the -- who's in the room with you?
17     A   My attorney. Nobody else.
18     Q   All right. So Mr. Grill's present and nobody
19 else?
20     A   Yes, sir.
21     Q   Okay. And if you do look at any documents,
22 please just let me know or wait for me to direct you to,
23 okay?
24     A   Okay.
25     Q   In your review of the investigative file, did

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 25

1  you observe any errors in the investigative file?
2      MR. YAMIN: Objection. Form. Foundation.
3      A  I'm not sure, I understand your question.
4  Errors in the investigative file.
5      Q  Did you observe -- go ahead --
6      A  I didn't see anything -- I didn't see anything
7  that was a misstatement if that's what you're asking.
8      Q  All right. So you didn't observe any
9  misstatements in the investigative file is that correct?
10     MR. YAMIN: Objection. Asked and answered.
11     MR. GRILL: Objection also. Form and
12  foundation.
13 BY MR. AINSWORTH:
14     Q  And you didn't observe anything in the
15 investigative file that indicated to you that there is a
16 mistake had been made or something had been written down
17 wrong; is that right?
18     MR. YAMIN: Objection. Foundation. Form.
19     Calls for speculation.
20     A  No. I did not see -- I did not see anything
21 like that that.
22     Q  In your review of the investigative file, did
23 you observe any investigative leads that you felt
24 should've been followed up on but weren't?
25     A  No.

---

Page 26

1      Q  In your review of the investigative file, did
2  you observe anything that was documented that seemed
3  wrong to you in that, you know, it was contrary to how
4  you would conduct a police -- a homicide investigation?
5      MR. YAMIN: Objection. Form.
6      MR. GRILL: Yeah. Foundation. Form. Calls
7  for speculation, go ahead.
8      A  There's -- there was a lot of question, if you
9  can break that up a little bit.
10 BY MR. AINSWORTH:
11     Q  Sure. When you were reviewing the
12 investigative file, did you observe anything that seemed
13 to you a police officer had acted inappropriately?
14     MR. GRILL: Objection. Form. Foundation.
15     A  No.
16     MR. YAMIN: Same.
17     Q  And did you observe anything documented in the
18 investigative file that indicated to you, you know, that
19 police officer should not have done what he or she said
20 she did?
21     MR. GRILL: Objection. Form. Foundation.
22     MR. YAMIN: And asked and answered.
23     A  No.
24     Q  Did you attend Detective Kill's funeral?
25     A  No.

---

Page 27

1      Q  Why not?
2      A  I don't recall if I was out of town or not.
3      Q  If you were in town, would you expect that you
4  would have attended his funeral?
5      MR. YAMIN: Objection to form.
6      A  I would have liked to, yes.
7      Q  You were a detective with Detective Kill back
8  at Old Area 3, right?
9      A  Yes.
10     Q  Did you stay in contact with him after Old
11 Area 3 closed in '92?
12     A  Yes.
13     Q  How did you stay in contact with Detective
14 Kill after Old Area 3 closed in 1992?
15     A  We did security together.
16     Q  Okay. And where did you do security together?
17     A  Lettuce Entertain You restaurants.
18     Q  And was he the one who told you about that
19 side job and, kind of, helped you get in?
20     A  He wasn't the one that told me about it. I
21 didn't know him when I started that side job, it was
22 other officers.
23     Q  And for how long did you and Detective Kill do
24 security together?
25     A  Up until his death.

---

Page 28

1      Q  Back in the early '90s, so let's say the time
2  frame of '91, '92, '93, what was your impression of
3  Detective Kill's abilities as a police detective?
4      MR. YAMIN: Objection. Form.
5      A  I would characterize him as a good detective.
6      Q  Was he honest?
7      A  Yes.
8      Q  And was he diligent?
9      A  Yes.
10     Q  Was he sharp?
11     MR. GRILL: Objection.
12     MR. YAMIN: Objection. Form.
13     MR. GRILL: Real quick, Russell. Just, can,
14 you know, one objection applies to also me and
15 Mr. Yamin don't have to be making the same
16 objection. Is that all right?
17     MR. AINSWORTH: I agree.
18     MR. GRILL: Okay.
19     A  As far as he -- are you talking about, like,
20 his IQ or his educational background?
21 BY MR. AINSWORTH:
22     Q  I don't mean his education. Like, I just mean
23 -- what I mean by sharp is that he understood what was
24 going on and had a handle on investigations that were
25 going on.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 29

1    MR. YAMIN: Objection. Form.
2    A    Yes. He -- he was actually a member of MENSA.
3  He had a very high IQ, and he had an extremely good
4  grasp of what was going on.
5    Q    And that was true in the time period of '91 to
6  '93, he had -- Kill had a very good grasp of what was
7  going on; is that correct?
8    A    I believe so. Yes.
9    Q    And you knew that from working with him as a
10  detective and working with security with him?
11    A    I knew that mostly from working security with
12  him. And the times that we did work together, that
13  would be my opinion of him on this case, I can't speak
14  for all cases, but my involvement with him, yes.
15    Q    What about in 2015, was Detective Kill still
16  sharp?
17    MR. YAMIN: Objection. Form. Foundation.
18    A    No.
19    Q    All right. When did you notice that Detective
20  Kill's mental ability deteriorated in some way?
21    A    Somewhere around 2014 and '15. It was my
22  understanding that he had blockage in his carotid
23  arteries.
24    Q    And how did you learn that?
25    A    He told me.

Page 30

1    Q    And what did you observe about Detective
2  Kill's mental ability back in 2014 and 2015?
3    A    Sometimes he would confuse things.
4    Q    In that time period of 2014 to 2015, did you
5  employ Mr. Kill?
6    A    Did I what?
7    Q    Did you employ Mr. Kill?
8    A    No. We were business partners.
9    Q    Okay. Did you take any steps to prevent him
10  from working on security matters that you were involved
11  in?
12    A    We didn't really have any accounts back then,
13  but I would say that I stepped into that role where I
14  would take care of the accounts.
15    Q    What was Detective Kill doing for your
16  partnership in that time?
17    A    Like I said, we didn't have many accounts back
18  then, we lost our biggest client.
19    Q    Who was your biggest client?
20    A    It was -- at that time was National City Bank,
21  it was brought. It was taken over by another bank and
22  they eliminated our protection.
23    Q    Okay. So when did you and Detective Kill
24  become partners?
25    A    1995.

Page 31

1    Q    And what kind of things did you observe
2  Detective Kill confusing in the 2014 to 2015 time
3  period?
4    MR. GRILL: Objection. Foundation. Form. Go
5  ahead.
6    A    He would mix up, you know, he'd tell me a
7  story about something in the past, and I'd look at him
8  and say, "Mike, I wasn't even there for that." You
9  know, it was a security event, or -- I don't remember
10  specifically, but I think it could have even been a
11  murder that he'd talk about. And then I had to prove
12  him, and say, "Mike, I wasn't there. I was in Iraq."
13    Q    But he thought you were there. Is that what
14  you're saying?
15    A    No. I didn't say I thought I was there. He
16  thought I was there. I was telling him.
17    Q    That's what I'm saying. Kill thought you were
18  there.
19    A    Yes.
20    Q    Did you talk with Detective Kill about this
21  case, the Garcia murder investigation in the 20 -- you
22  know, 2013 onward time period?
23    A    I may have, but I -- I don't recall any
24  specific conversations with him.
25    Q    But you were both being -- you knew that he

Page 32

1  was being asked to testify at an evidentiary hearing,
2  right?
3    A    Correct.
4    Q    Did you tell anyone, "Gee, I, you know, I've
5  got a concern because Mike Kill's memory," or, "Mike
6  Kill's mental state isn't what it once was?"
7    MR. GRILL: Objection. To the extent that
8  touches on any attorney-client communications
9  otherwise, go ahead.
10    A    No. I told Mike.
11    Q    What did you tell Mike?
12    A    I told Mike that, you know, "Make sure you're
13  remembering things correctly because you're messing
14  things up." Not particularly for this case but in -- in
15  previous conversations about other things.
16    Q    So when did you have this conversation with
17  Mike Kill when you told him to remember things
18  correctly?
19    A    I don't -- I don't recall that. It was
20  during a conversation when he was talking about his
21  medical condition and a blockage in his neck. As a
22  matter of fact, he told me at one time that his -- his
23  body rerouted the blood supply to his brain to another
24  vein which I -- I didn't know about but that's what he
25  told me.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 33

1   Q   And so why did you tell Mike Kill in that
2   conversation about his medical condition to remember
3   things correctly?
4   A   What -- what I was saying, remember things
5   correctly, it's -- it's not as devious to make sure he
6   remembers things that are truthful and not make things
7   up if he's not sure of it.
8   Q   Why did you tell him to remember things that
9   are truthful and not make things up if he's unsure about
10  them?
11  A   Because I told you when I talked to him he was
12  confusing things specifically when I was away in Desert
13  Storm.  He'd say, well, you remember that?  I said no
14  Mike, I wasn't here for that.  So that -- that's what
15  I'm referring to.
16  Q   Okay.  Apart from stories about where Mike
17  Kill thought you were present for something when you
18  were actually mean, were there any other things that
19  Mike Kill confused in speaking to him?
20  A   There may have been.  I -- I just don't recall
21  them right now.
22  Q   All right.  And so as you sit here today, the
23  only thing that you can recall Mike Kill confusing was
24  when he would tell stories, and think you were present,
25  but actually you were overseas at that time.  Is that

Page 34

1   fair to say?
2   A   Yeah.  He was losing his memory, and -- and it
3   was not truthful what he was remembering, not only that
4   but the other things.
5   Q   Well, and that's what I'm trying to find out.
6   Were there any other things, other than him thinking
7   that you were present for something that happened in,
8   you know, approximately 1990, 1991 but actually you were
9   overseas?
10  MR. GRILL:  Objection.  Asked and answered.
11  A   I'm not going to leave it to just 1990 to
12  1991.  Prior to him having that medical condition, he
13  would confuse things that happened three months earlier.
14  So if the -- there's a lot of different -- do I recall
15  those items specifically that he would confuse?  No, I
16  don't.  But if -- if it's to me, I -- I'd recognize it
17  right away because I had a lot of time spent with him.
18  Q   Did you tell the special prosecutor that you
19  thought that Mike Kill was confusing things and not in
20  his right mental state?
21  A   No.
22  Q   Did you tell the special prosecutor anything
23  about Mike Kill's mental abilities?
24  A   No.
25  Q   Let's talk about your knowledge of the area of

Page 35

1   51st and Racine.  How did you first become acquainted
2   with that area?
3   A   When I was a patrolman with the 9th District
4   in 1986.
5   Q   All right.  Were you patrolling, I'm sorry, in
6   1980 what?
7   A   1986.
8   Q   At that time where you patrolling in a large
9   squad car in uniform?
10  A   Yes, sir.
11  Q   And you did that for four years; is that
12  right?
13  A   Two years, and then two years as a tactile
14  officer in the 9th District.
15  Q   All right.  But both your time in patrol and
16  on TAC was in the 9th District, correct?
17  A   Correct.
18  Q   What was the beat they used to work
19  predominantly when you were in patrol?
20  A   Ultimately, I was assigned to Beat 933, which,
21  I think, ran from 47th to 55th in Racine to Paulina.
22  Q   All right.  So Racine West to Paulina, and
23  then 47th to Garfield?
24  A   Yes.
25  Q   Did you become acquainted and -- strike that.

Page 36

1   When you were on Beat 933, that's while you were a
2   patrol officer, correct?
3   A   Correct.
4   Q   How long did you patrol that Beat 933?
5   A   Approximately two years.
6   Q   And was that from about 1986 to 1988, in that
7   time frame?
8   A   Approximately, yes.
9   Q   All right.  And did you become acquainted with
10  the gangs in that beat when you were patrolling it?
11  A   Yes.
12  Q   What gangs were operating in that area at the
13  time that you were patrolling it.
14  A   We had the Blackstone P Stone -- the Black P.
15  Stone street gang, which was actually west and east of
16  the park, however, was supervised by different
17  individuals.  On the west side -- on the west side of
18  the park that was really controlled by Watkeeta Fort,
19  Prince Kida, David Lucas, (Inaudible) who was a general,
20  Charles Barron, who was also known as Baldy.  On the
21  west side of the -- on the east side of the park, that
22  was under the territory of Bernard Gales who was known
23  as G-Rock and Papa Burnam, who was -- to my
24  understanding was his enforcer.  And then to the north,
25  51st Street around 49th Street, you had a Hispanic gang

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 37

1  called the La Rassas. And then you had a pocket of
2  Latin Kings that were on 51st Street. I want to say
3  either Ada or Elizabeth. They just had one block where
4  they would be able to stand out there. One of their
5  leaders lived in the Quarter. And then, further north
6  and east was the Saints street gang that ran from pretty
7  much 43rd to 47th from Ashlynn to Wood. And then we had
8  some Two Six that run a block of 54th and Winchester,
9  then we had some GDs that were on the blocks between
10  51st and 55th, just east of -- west of Paulina. We had
11  one block of Vice Lords on the 54 -- 5400 block of
12  Winchester. And I could go on for the rest of the
13  district, but that's the immediate area.
14     Q  Okay. When you became a tactical officer in
15  the 9th District, that was from about '88 until you made
16  detective in '90; is that right?
17     A  Correct.
18     Q  And where were you assigned when you were a
19  TAC officer?
20     A  The 9th District.
21     Q  Where within the 9th District were you
22  assigned?
23     A  Well, we were TAC officers for the entire
24  district.
25     Q  Did you gain additional familiarity with the

Page 38

1  street gangs in the district as a TAC officer?
2     A  Yes.
3     Q  All right. Did you gain any additional
4  familiarity with the Black Stones, apart from what
5  you've already told us about your context within the
6  gang?
7     A  Yeah. I gained additional knowledge, every
8  day you gain knowledge.
9     Q  How would you gain knowledge about the Black
10  P. Stones?
11     A  Talking to citizens. They tell you what's
12  going on. Arresting people that were purchasing drugs,
13  they tell you where the dope spots were, talking to the
14  gang members out there, and just by observing.
15     Q  Would gang members speak to you?
16     A  Yes.
17     Q  How often would you talk to members of the
18  Black P. Stones?
19     A  Probably every day I was out there.
20     Q  And what kind of things would you talk to
21  Black P. Stone gang members about?
22     A  You know, sometimes we'd joke with each other.
23  "It's my job to lock you up." But, you know, I would
24  talk to some of the older guys about making a lot of
25  money, just make sure nobody dies. We'd talk about the

Page 39

1  opposing street gang, the Gangster Disciples that they
2  were on the war path, "Be careful," stuff like that.
3     Q  What do you mean you talked to some of the
4  older street gang members about making lots of money,
5  just make sure nobody dies?
6     A  Well, we knew, like, Watkeeta Fort, there was
7  dope spots all over the district. Some of them were
8  24-hour dope spots where they sold drugs. As much as we
9  tried, we'd try and catch them. Sometimes we did.
10  Sometimes we didn't. And that we knew that they were
11  making a lot of money. And the thing is, is that, you
12  know, as a policeman on a beat where you got prolific
13  narcotic sales, there's no way we were going to stop it,
14  I just didn't want anybody dying over it.
15     Q  And why didn't you think you could stop the
16  narcotic sales?
17     A  Because I'm a realist. We haven't stopped
18  them to this day.
19     Q  Did you attempt to stop them?
20     A  We'd make arrests when we could. But if it's
21  a 24-hour dope spot the gang leaders aren't that bad at
22  getting people to fill in and go out and sell. I mean,
23  sometimes that was their only way to make money.
24     Q  And well, if it's a 24-hour dope spot, that
25  means they're selling dope all the time, right?

Page 40

1     A  Correct.
2     Q  So anytime you wanted, you could go over there
3  and arrest somebody for buying dope, right?
4     MR. GRILL:  Objection. Mischaracterizes his
5  testimony and argumentative.
6     A  The answer for that is an absolute no.
7     Q  Why not?
8     A  Well, two things. They had a rather elaborate
9  lookout section. So if I pulled up, they knew who we
10  were. We weren't strangers. We were in marked squad
11  cars, they'd yell, "five-o." They would hide the drugs
12  either in the gang ways, or in a potato chip bag, or in
13  a car's tire. And you had to get close enough to see
14  where they were hiding the drugs. Or sometimes they
15  would run, sometimes they'd swallow them. So you
16  couldn't arrest them all the time.
17     Q  So were you trying --
18     A  It was very organized that the next -- they
19  brought -- if I arrested a kid on the spot they'd be
20  serving, the next kid would step up and be selling drugs
21  next.
22     Q  So did you try and gain a rapport with some of
23  the gang members?
24     A  I had a rapport with a lot of them.
25     Q  Okay. And what time frame you talking about

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 41

1    here?  Is that from '86 to '92, did you have a rapport
2    with members of the Black P. Stone gang members?
3        A    And after.
4        Q    Could you go to them to find out who was at
5    war with whom?
6        A    They would -- they would tell me who they're
7    at war with.  Yes.
8        Q    Could you talk to -- if you're looking for
9    someone, could you talk to members of the Black P. Stone
10   gang, and, you know, try, and find out where somebody
11   was?
12       A    Sometimes.
13       Q    All right.  Were there people within the gang
14   who were cooperative and would provide you information
15   about criminal activity?
16       A    Sometimes.
17       Q    Who was within the Black P. Stone gang in that
18   time frame of '86 to '92, who was cooperative with you
19   and would tell you about criminal activity?
20       A    You know what, I -- I'm not going to answer
21   that, because you're asking me to disclose informants.
22   And I -- I'm not going to get them killed on the street,
23   even this many years later.  I mean, we could talk about
24   this later, but I'm not going to talk about who -- who
25   my police informants were.

Page 42

1        Q    Well, were these people who were -- ha -- were
2    they official informants with the Chicago Police
3    Department, with a file documenting their history of
4    reliability.  Or are you talking about people who just
5    gave you information on the street?
6        A    People that gave me information on the street.
7        Q    So none of the people that you were talking
8    about wanting to protect, were official informants with
9    the Chicago Police Department.  Is that correct, to your
10   knowledge?
11       A    We did not register informants as TAC
12   officers.  We had sources of information and people that
13   would tell us.  It could be interchangeable, but I
14   consider them -- them sources of information and stuff
15   like that, and -- and -- I -- I can't get them hurt.
16       Q    And in the time frame, including when you were
17   a detective from '90 -- from '86 to '92, you didn't
18   register any of your Black P. Stone gang members as
19   registered informants, with the Chicago Police
20   Department; is that correct?
21           MR. GRILL:  Objection.  Form.  Foundation.
22   Assumes facts not in evidence and mischaracterizes
23   his testimony.  Go ahead.
24       A    Yeah.  I may have.  I may have turned them
25   over to the Bureau of Organized Crime for narcotics, but

Page 43

1    I didn't register any personally, no.
2    BY MR. AINSWORTH:
3        Q    You would speak to Dexter Bell on a daily
4    basis; is that right?
5        A    I would speak to, probably, depending on what
6    time frame, Bernard Gales, on a -- daily basis, Nikia
7    occasionally, Sammy Knox, Dave Lucas, Charles Barron, a
8    -- a number of people.  It all depends on the day.
9        Q    And you would maintain regular contact with
10   those high-ranking members of the Black P. Stone gang,
11   correct?
12       A    Along with the low-ranking members too, yeah.
13       Q    All right.  So those guys you mentioned were,
14   like, of the general level; is that correct?
15       A    Correct.
16       Q    And you would also maintain contact with
17   low-ranking members; is that right?
18       A    I'd see them on the street, yes.
19       Q    How would that help you in your police duties,
20   to maintain contact with both the generals and the
21   lower-ranking members of the Black P. Stone gang?
22       A    Because, you know, when you talk about those
23   narcotics spots, you know, it's the same people out
24   there every day.  And if something happens on that
25   block, you have an idea of where to go talk to -- or who

Page 44

1    to go talk to.  You know, if you're serving drugs every
2    day at 51st and Elizabeth, and I see you out there every
3    day, whether or not I could catch you or not, and I know
4    that he's a lookout, he's a lookout, and he's a lookout,
5    and then I have a shooting on that block, I'm going to
6    go out and talk to those people, and that -- that's how
7    it would help.
8        Q    So who would you want to talk to about a
9    shooting that occurred at 51st & Racine, in 1991?
10       A    Who would I want to go talk to what that time,
11   if I had time?
12           MR. GRILL:  Objection.  A little late.  Form
13   objection.  Go ahead.
14       A    And you are asking me to speculate because we
15   knew who we wanted to talk to after that, but for 51st
16   and Racine, generally, I would probably -- at one point
17   in time, there was a pool hall located across the street
18   from where this occurred, which was the Motown hang out.
19   I would go speak to people that were on that block of
20   51st Street because that was a hangout.  I would go over
21   to 53rd and Laflin because that's a hangout.  I'd go to
22   50th and May.  That's a hangout.  So I'd -- I'd go to
23   different, various places depending on what it was.  And
24   we wouldn't just going to one area, we would expand.
25   Everybody in the neighborhood knows what's happened, so

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 45

1  --
2      Q   And so who would be the point of contact that
3  you want to talk to about something that happened, you
4  know, around 51st & Racine?
5      A   Dependent on what --
6      Q   In the time frame of '91?
7      A   I'd probably go talk to Watkeeta, but he
8  wouldn't tell me anything. I'd probably go talk to the
9  other generals, so they probably wouldn't tell me
10  anything. And then I talked to the people on the
11  street, or even sometimes prostitutes.
12      Q   All right. So you would have daily
13  conversations with these generals. Would they ever give
14  you information?
15      A   Sometimes.
16      Q   What kind of information would the generals
17  give you?
18      A   Just, sort of, general gang warfare, like when
19  we had a governor or a GD shot at 55th and Damen, and
20  the GDs retaliated that weekend by shooting like 19 or
21  20 Black P. Stones between 51st and 55th. So I would go
22  to talk to them and try and figure out, you know, we got
23  to figure out a way to stop this. I got 20 people shot
24  in a weekend. So we go talk to them about it. And
25  sometimes they would say, I mean, they wouldn't usually

Page 46

1  give me the names of the people that did the shooting.
2  But if it was a renegade member of the street gang, they
3  would -- look, they were businessmen. They would tell
4  me, "It's bad for business. This guy is running around
5  doing a bunch of stuff."
6      Q   Would the generals help you find particular
7  people that you were looking for? Like if you're
8  looking for someone, could you ask them, "Hey, I'm
9  looking for G-Nate," or somebody like that?
10      A   G-Nate, Nathaniel Anderson, who was murdered?
11      Q   Yeah.
12      A   Sometimes, they would. G-Nate -- and when I
13  talked about renegade gang members, G-Nate was one of
14  those individuals, as was Arnold Day. They may not know
15  where they were, but they were considered renegades in
16  the -- in the street gang.
17      Q   And so is that the kind of information that
18  the gang members would help you out by providing, the
19  -- where renegade street gang members were?
20      A   Yeah. When they're robbing their own dope
21  spots, yes.
22      Q   Back in 1991, if you had a nickname for
23  somebody, what resources did you have available to you
24  to try and find out who that person was?
25      A   Well, we had the gang crime unit, Gang Crime

Page 47

1  South, where there was gang specialists assigned to each
2  street gang. They worked at Organized Crime division
3  and had extensive knowledge of members of the street
4  gangs and their nicknames. We also had the gang books
5  inside the districts. Some districts maintained gang
6  books of who's who, and where they're at, with their
7  nicknames.
8      Q   Do you have a nickname file? You know, of
9  index cards with nicknames on it?
10      A   I did not, no.
11      MR. GRILL: Sorry, Russell, there's a beeping
12  that I'm get -- is that just something going
13  outside? I just wanted to make sure it wasn't
14  something technical that we could stop.
15      MR. AINSWORTH: Not on my end.
16      MR. GRILL: Okay. All right. It's gone now.
17  Sorry to interrupt. Go ahead.
18  BY MR. AINSWORTH:
19      Q   I heard it too. I'm sorry. I didn't hear
20  your answer to my question about whether you had
21  nickname files, like index cards with nicknames on it.
22      A   I did not.
23      Q   Do you know if anybody at Area 3 did?
24      A   If they did I didn't know about it.
25      Q   Did you hear about that in -- within Area

Page 48

1  -- within the Chicago Police Department nickname files?
2      A   Well, I know there's nickname files. I don't
3  know how they maintain them, as I just testified. The
4  gang specialists who were assigned to a street gang,
5  would have their nicknames, and how they maintain them,
6  I don't know. And even the district TAC teams would
7  sometimes have gang books of who they gang -- the gang
8  members are, with their nicknames.
9      Q   Was there a district located at Area 3 -- old
10  Area 3 at 39th and California?
11      A   No.
12      Q   Do you have gang books at old Area 3 at 39th
13  and California?
14      A   I did not see any, no.
15      Q   If you wanted to look at gang books when you
16  were working at area -- old Area 3, where would you go?
17      A   I don't recall ever wanting to see a gang
18  book. If I had a question about a street gang, I'd
19  reach out to Gang Crimes and told them, "Hey, this is
20  what we're trying to figure out." I mean, it's their
21  job.
22      Q   Where was Gang Crime -- I'm sorry. Let me
23  -- didn't mean to cut you off, sir?
24      A   Hopefully, they had the answer for that or
25  they would go off and try and find the answer.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 49

1    Q   Were you -- and when you were reaching out to
2    Gang Crimes, was that Gang Crime self that you would
3    talk to?
4    A   Yes.
5    Q   Were they located at Area 2?
6    A   I think they were located at 51st and
7    Longhorse.
8    Q   Okay.  And could you go to the 9th District
9    TAC office if you wanted to look at gang books in 1991?
10   A   Yes.
11   Q   And could you go to the TAC officers in the
12   9th District if you wanted to know information about
13   gang members operating at 51th and Racine -- 51st &
14   Racine or in that area?
15   A   I could, yes.
16   Q   And did you do that?  Talk to TAC officers to
17   try and find information out about gang members, when
18   you were detective?
19   A   Probably throughout time, yes.
20   Q   Including in 1991?
21   A   Yes.
22       THE WITNESS:  Could I run to the bathroom real
23   quick?
24       MR. AINSWORTH:  Sure.  Let's go off the
25   record.

Page 50

1        THE WITNESS:  All right.
2        COURT REPORTER:  The time is 11:07.  We are
3    off the record.
4        (OFF THE RECORD)
5        COURT REPORTER:  The time is 11:14, and we are
6    back on the record.
7    BY MR. AINSWORTH:
8    Q   In 1991, did you still know several of the TAC
9    officers at -- in the 9th District?
10   A   Yes.
11   Q   How did you meet Mike Kill?
12   A   I met him outside the Police Department
13   working security for Lettuce Entertain You.
14   Q   And when was that?
15   A   Probably '87, '88.
16   Q   Did you socialize with Mike Kill when you were
17   a member the Chicago Police Department?
18   A   I -- I'd have to say in a strict definition,
19   probably yes.
20   Q   Okay.  What do you mean by that?
21   A   Well, we worked together.  We'd go to social
22   functions.  I'd see him at social functions.  I don't
23   recall ever having him over at my house for dinner, or
24   me over at his house for dinner.  But yes, I would
25   socialize with him.

Page 51

1    Q   Did he attend any of your weddings?
2    A   I'd have to look at the pictures.
3    Q   Did he ever -- did you ever attend any of his
4    weddings?
5    A   No.  He's been married to Marge forever.
6    Q   Did you attend any of his kids' weddings?
7    A   I don't know if they're married or not, but
8    the answer to that's, no.
9    Q   How did you meet Louis Caesar?
10   A   When I was promoted to detective in Area 3.
11   Q   Did you ever work the same watch as detective
12   Caesar?
13   A   I may have.  I -- I don't recall if I did or I
14   didn't.
15   Q   When you were made detective at Area 3, what
16   watch were you assigned to?
17   A   Then, I don't remember.  Because back then you
18   would go through rotation with different detectives.  It
19   may have been afternoons like, you know, I -- I just
20   don't remember, but I wasn't there that long, I left.
21   Q   What watch was Louis Caesar assigned to when
22   you were at Area 3?
23   A   I don't know.
24   Q   Did you know Ken Burke?
25   A   No.

Page 52

1    Q   Apart from this case, have you ever met Ken
2    Burke?
3    A   I think so.  Yes.
4    Q   On what other occasions did you meet Ken
5    Burke?
6    A   Trying to think.  He may have worked for us at
7    one time.  But I don't recall meeting him.  I could have
8    but I -- I -- I don't know.
9    Q   Do you recall meeting Ken Burke on any other
10   occasion other than when he came to be a youth officer
11   and sitting on Anthony Jakes' statement with the
12   Assistant State Attorney?
13   A   I don't recall him before that, no.
14   Q   How about after that?  Did you interact with
15   Ken Burke after that?
16   A   No.  Not really.  You know, as I just told
17   you.  He may have worked for us at one time in 2018 or
18   '19, but I don't remember meeting him.
19   Q   What makes you think he may have worked for
20   you in 2018 or 2019?
21   A   Because I remember the name, Ken Burke.
22   Q   Why did he stop working for you?
23   A   I don't know.
24   Q   Did you have any direct supervision over Ken
25   Burke?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 53

1    A   No.  I mean, I was the owner of the company
2  but did I ever -- was I ever at the same spot with him?
3  No.
4    Q   Did you interact with Ken Burke?
5    A   Say that.
6    Q   Excuse me?
7    A   I could have been.  But I -- I don't recall.
8    Q   After Mike Kill passed away, did you have
9  another business partner?
10   A   No.
11   Q   All right.  Did you interact with Ken Burke at
12 the trial for Anthony Jakes?
13   A   Not that I could remember.
14   Q   How do you know ASA Grossman?
15   A   I only know him, that he was a prosecutor for
16 the Cook County State's Attorney's office.
17   Q   How many times did you meet him?
18   A   I -- I don't know that.
19   Q   Was it more than once?
20   A   I -- I don't know.  I'm sure it was.
21   Q   How many times did you meet him in the context
22 of him being a Felony Review Assistant State's attorney?
23   A   That, I don't remember.
24   Q   Did you ever -- were you ever called as a
25 witness by ASA Grossman in a case he was prosecuting?

Page 54

1    A   I could have been.
2    Q   Do you recall interacting with ASA Grossman in
3  any case other than the Rafael Garcia homicide?
4    A   I could have.  I don't remember right now.
5    Q   Have you ever socialized with ASA Grossman?
6    A   Not that I can recall of.
7    Q   Do you know anyone who knows ASA Grossman?
8    A   I'm assuming the State's Attorneys know him.
9    Q   Not that you assume, but is there anybody who
10 you know is a friend of or knows ASA Grossman?
11   A   No.  Not in my circle.  No.
12   Q   What about ASA Dillon.  How do you know him?
13   A   I know him through the prosecutor's office.
14   Q   Were there cases in which you were called as a
15 witness, where he was a prosecutor?
16   A   I believe so.  Yes.
17   Q   Cases other than Jakes' case?
18   A   I believe so.  Yes.  I can't name them but,
19 yes.
20   Q   Do you know anyone who knows ASA Dillon?
21   A   Not in my personal circle, no.
22   Q   What is a clear's -- clear closed report?
23   A   Clear closed means that the -- the case has
24 been cleared and so they know who did it and closed
25 means that the -- it's really not being investigated

Page 55

1  anymore.  And then there's rules for that.  It could be
2  clear closed by arrest and prosecution.  It could be
3  clear closed prior to prosecution.  It'd be clear closed
4  exceptionally closed.
5    Q   Were there any other reasons for something
6  being clear closed other than prior to prosecution,
7  clear closed by arrest and prosecution or exceptionally
8  cleared?
9    A   There might be.  I'd have to look at -- it's --
10 -- it's under a face and -- and detective supp report.
11   Q   Okay.  And what is a cleared open report?
12   A   It means there's a -- all the offenders are
13 not in custody.
14   Q   But they're identified?
15   A   Sometimes they are --
16   Q   Or some of them are?
17   A   -- sometimes they're not.
18   Q   If you have multiple offenders.  Can you clear
19 case closed without apprehending all of the offenders?
20   A   But I wouldn't.  I'd leave it open.
21   Q   Were you provided training with how to conduct
22 interrogations?
23   A   Yes.
24   Q   And were you provided training on how to
25 conduct interviews?

Page 56

1    A   The words are synonymous.  When we received
2  their training, interviews and interrogations are
3  synonymous.
4    Q   Can you tell us how were you trained to
5  conduct or, well -- strike that.  What training did you
6  have in interrogations and interviews as of September of
7  1991?
8    A   My first bit of training was when I was a
9  police cadet in Bayless Hills, going to seminars.  One
10 of them, I think, was put on by the John Marshall Law
11 School, auto theft and juvenile offenders.  We went
12 through a couple of other seminars.  And after that, I
13 went to the United States Military Police Academy at
14 Fort McClellan, Alabama for four months.  They had some
15 training on that.  And when I came back from that
16 military training, I went to the Cook County Sheriff's
17 Police Academy.  We had some training and interviews
18 there.  And then when I left the Bayless Hills Police
19 Department and came to the Chicago Police Department.  I
20 had training in the Chicago Police Academy and then
21 later on -- then I was in the detective's academy.  There
22 may be some seminars intermingled among those.
23   Q   And so how were you trained to conduct
24 interviews and interrogations as of September of 1991?
25   A   Well, that's a broad question.  Well, I could

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

| Page 57 | Page 58 |
|---|---|

Page 57

1  go on for about three days on this.  I mean, I'm trying
2  to keep this short.  I mean, it's to establish a rapport
3  with the individual.  Look for -- talking to them, look
4  for items of deception, to the projection, deflection,
5  look at body language, or ask some questions you already
6  know the answers to.  Sometimes use open-ended
7  questions, sometimes use close ended questions.  So it
8  all depends.
9      Q   When you're interviewing somebody, are you
10  trained to establish the reliability, the information
11  they're providing to you?
12     A   Yes.
13     Q   And there could be different reasons for why
14  information is un -- made a mistake, or forgot
15  something? or it could mean that somebody is
16  intentionally trying to mislead you as a police officer;
17  is that fair to say?
18         MR. YAMIN:  Objection to the form. Foundation.
19     A   Along with the fact that I know that many
20  times two -- people will try and mitigate their
21  involvement in something.  So that it might be entirely
22  -- you know, a lot of it is true, but they may certainly
23  leave it out what they did because, you know, that they
24  want to mitigate what they did or so.  Yeah, all those
25  reasons.

Page 58

1      Q   Okay.  So that's yet another reason why some
2  information might not be reliability because somebody is
3  trying to minimize their own culpability, right?
4      A   Correct.
5      Q   And it's part of your job to both assess the
6  reliability and find out why somebody might be
7  unreliable, correct?
8      A   If I can.
9      Q   Yeah.  If you think that you've received
10  unreliable information, do you indicate your doubts
11  about the reliability, the information in your police
12  report?
13     A   No.  No.
14     Q   And the police reports that you create are
15  relied on by prosecutors, correct?
16     A   Yeah.
17         MR. YAMIN:  Objection to form foundation.
18     Q   And they're relied upon by your fellow police
19  officers, correct?
20     A   Yes.
21     Q   And they're relied upon by you as an aid to
22  your memory, correct?
23     A   Yes.
24     Q   And they're relied upon by criminal defense
25  attorneys who are, you know, charged with defending

| Page 59 | Page 60 |
|---|---|

Page 59

1  their clients against criminal charges, correct?
2      A   I wouldn't say that.  I don't think they rely
3  on anything, but not in my experience.
4      Q   Were you were aware that your police reports
5  are provided to criminal defendants, and their attorneys
6  in their quest to defend themselves against the charges,
7  correct?
8      A   Correct.
9      Q   Why don't you include your doubts about
10  reliability of information that's provided to you in
11  your police reports?
12     A   It's because my job is to go out and interview
13  people.  That -- that's what they say.  That's what they
14  say.  My police reports are tendered as evidence in
15  criminal trials, so there's always a person that come in
16  and that's the system.  If a -- person tells me that,
17  I can't say, "I think he's a lia."  I don't have any
18  proof.  I think he may be mitigating this thing, but I
19  wasn't there, so I don't know.  Sometimes it's just a
20  common sense theory, you know, is what -- that don't
21  make any sense.  But you write it down, and -- and
22  that's for the court, the defense attorney, and the
23  prosecutor, is to figure out.
24     Q   Jakes gave you a few different statements
25  about his involvement in the Garcia murder, right?

Page 60

1      A   Yes.
2      Q   His final version of events, did you believe
3  that to be a truthful version?
4      A   I'd have to say, yes.  Except now when we go
5  through all of this, there was one part that I think he
6  lied about.
7      Q   All right.  What do you think he lied about,
8  now?
9      A   Well, I think he lied about being in the rear
10  coach house when he said he watched the guy on the
11  sidewalk.  He was inside the -- I believe he was inside
12  the front house, where he was previous, so just cleaning
13  up broken glass at the front of the coach house when he
14  said he looked and saw the man on the street.
15     Q   Okay.  So you think he said he was in the rear
16  coach house, but he was actually in the front house; is
17  that right?
18     A   That's right.  I think, yes.
19     Q   Why do you think he lied about that fact?
20     A   I don't know.
21     Q   Well, I mean, you know, you've testified in
22  three occasions to the post-conviction testimony, you
23  testified as suppression hearing in that trial, and
24  you're testifying in a deposition, and you've been sued,
25  do you have any thoughts at all about why Anthony Jakes

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 61

1  would lie about being in the rear coach house when he
2  saw the victim in the street rather than the front
3  house?
4      MR. YAMIN: Objection. Asked and answered.
5      Calls for speculation.
6      A  Well, our -- our basis is upon my experience,
7  all right? I know from standing over the scenes of
8  shooting victims all throughout that neighborhood,
9  especially younger -- younger members. If there --
10  there's a crime scene in front of the house, you-all
11  come out, and they can look at it. I -- I don't know if
12  anybody who says that, "I heard shots, and then the
13  police were there," that they're going to stay in their
14  house, behind their house, when all his friends are
15  standing up front. So to me, it's just -- it's -- it's
16  implausible that he'd do that.
17      Q  It's implausible that he would stay inside his
18  house, in the rear house after being ordered to be there
19  by his aunt. Is that what you're saying?
20      MR. GRILL: Objection.
21      MR. YAMIN: Objection.
22      MR. GRILL: Yes. Mischaracterized.
23      MR. YAMIN: Sorry, Andrew.
24      MR. GRILL: That's okay. Go ahead.
25      MR. YAMIN: What was your objection?

Page 62

1      A  He was ordered to be there by his parents? Is
2  that your question to me?
3      MR. YAMIN: Excuse me again. What was your
4  -- what was Andrew's objection? I didn't catch it.
5      MR. GRILL: It's mischaracterizes his
6  testimony, is my objection.
7      MR. YAMIN: Okay.
8  BY MR. AINSWORTH:
9      Q  I'll restate the question, sir.
10      A  Can you restate the question please?
11      Q  Do you think it was implausible that
12  Mr. Jakes would stay inside his home, in the rear house
13  when ordered to by his aunt?
14      MR. YAMIN: The objection mischaracterizes the
15  record.
16      A  Well, that -- that's something that I've never
17  been made aware of or previously disclosed to me, that
18  his aunt ordered him to stay inside the house.
19      Q  Okay.
20      A  I don't -- I don't recall reading it anywhere.
21      Q  But to you it's implausible that Mr. Jakes
22  would stay inside the rear house when somebody had been
23  shot out front, correct?
24      A  Yeah. I -- I -- I feel that and based upon
25  earlier 14 previous arrests, obviously he didn't listen

Page 63

1  to his aunt before. I don't -- I don't think he'll
2  listen to his aunt then. Based upon my knowledge of
3  that block and the house where this occurred and the
4  subway shop and the chicken place, it was right where
5  routine gang hung out. I mean, that's my belief.
6      Q  All right. When you established rapport with
7  -- do you try and do that with witnesses or some other
8  suspects?
9      A  Both.
10      Q  Do you lie to suspects?
11      MR. YAMIN: Objection to form.
12      MR. GILL: Form.
13      A  Well, sometimes.
14      Q  What kind of things do you lie about to
15  suspects?
16      A  So we were trained that there -- there are
17  some things that you could do. You could lie to them
18  about connecting them to a crime. You can't lie to them
19  about committing a crime. You can't lie to them about
20  falsified evidence against them. So those types of
21  things. But I mean, if you want to talk I say, well, I
22  talked to, you know, all your gang members, you know, or
23  I'd say, I talked to the leader of the street gang or
24  somebody, you know, when or maybe necessarily I haven't.
25  So that -- that would be a lie. But that said, but we

Page 64

1  were trained to always ask ourselves this empirical
2  question. When you were engaged and that is to, what am
3  I about to do or say -- the empirical or what am I about
4  to do or say will enforce me into and they confess. So
5  we're very careful with that.
6      Q  Okay. Did you lie to Anthony Jakes during his
7  -- any of his interviews or interrogations?
8      MR. GRILL: Objection. Form.
9      A  No.
10      Q  But you wanted to build a rapport with him; is
11  that right?
12      A  Pardon?
13      Q  You wanted to build a rapport with Mr. Jakes;
14  is that right?
15      A  Yeah. I -- I mean, it -- it wasn't really
16  adversarial when we talked to him. He was there as a
17  witness. He was, you know, as far as we know,
18  cooperating, and it wasn't until later on that we
19  learned that he was lying.
20      Q  And in any of your interactions with
21  Mr. Jakes, did you mislead him in any way?
22      A  No.
23      MR. GRILL: Objection to form.
24      Q  What's the difference between connecting
25  someone to a crime and lying to them about committing a

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 65

1  crime?
2      A   An example of that was, "Hey, you were on the
3  block when the shooting occurred," rather than, "you
4  pulled the trigger."
5      Q   All right. So you wouldn't say to somebody,
6  "I know you did it." You -- but you might say, "people
7  are saying you were in the area," or something like
8  that; is that correct?
9          COURT REPORTER: They just -- their phone just
10  hung up.
11         MR. AINSWORTH: Guys, we can't hear you so you
12  got to reconnect your phone.
13         COURT REPORTER: Going to go off the record.
14         MR. AINSWORTH: Lets go off the record.
15         COURT REPORTER: Yeah. The time is 11:36, and
16  we are off the record.
17             (OFF THE RECORD)
18         COURT REPORTER: The time is 11:37, and we are
19  back on the record.
20  BY MR. AINSWORTH:
21      Q   What are items of deception?
22      A   What are you -- are you meaning when I look at
23  somebody, and, like, deflection and, you know, body
24  language, or are you looking about items of -- I'm not
25  -- I'm not sure what you mean, from what -- which

Page 66

1  standpoint.
2      Q   I just wrote it down based on what you said to
3  us earlier. And you said you looked for items of
4  deception as part of your training. And I was asking
5  you, what do you mean by that?
6      A   Well, as I said, it's part of our training. If
7  I'm speaking to you, and, you know, an example of you
8  start deflecting. I mean, I'm asking you a question,
9  and you're not answering the question. And -- and --
10  but we don't answer compound questions, or we try not to
11  answer compound questions. And then -- or you could
12  project it, you know, projection where you're projecting
13  onto a third person or speaking in third person. There's
14  not one thing, even in body language, there's not one
15  gesture that indicates that anybody is telling the
16  truth. It's a whole series of training. You got to
17  take the course. So tho -- those are the types of
18  things. And -- and none of them are absolute.
19      Q   Are you aware of any empirical studies based
20  on the ability to detect truth or deception via body
21  language?
22      A   Well, I -- I mean over the years, I read a
23  number of books about body language. So, you know, I
24  -- I think it's -- I think it's an aid to investigation.
25  It's not an end-all-be-all that could help you,

Page 67

1  sometimes it won't help.
2      Q   I'm just asking, sir if you're aware of any
3  empirical studies about the efficacy of being able to
4  determine truth or lies based on somebody's body
5  language?
6      A   I -- I don't know if any academic studies
7  right now, no.
8      Q   How about non-academic imperial -- empirical
9  studies conducted to determine the efficacy of the
10  ability to tell truth from lies based on body language,
11  that you are aware of?
12      A   No. And -- and -- and -- and I -- I think the
13  disconnect here is I'm a graduate student. So it'd have
14  to be an academic study for me to be empirical. So --
15  at least in my view. It had to follow some standard
16  approach.
17      Q   All right. And so you mention one attribute
18  of deflection is not answering the question. What are
19  other attributes of deflection? I should say examples
20  of deflection.
21      A   Well, "What did you do next?" " Well, Billy
22  did this." That's -- and he's trying to deflect as to
23  what you -- not what Billy did. That would be a
24  deflected question.
25      Q   So not answering the question. Is there any

Page 68

1  other form of deflection that you're aware of other than
2  not answering the question?
3      A   Yeah. There -- there's a whole -- whole bunch
4  of different things, but that -- that's basically the
5  meat and potatoes of it.
6      Q   What, other than not answering the question,
7  is an example of deflection?
8      A   Well, again, deflecting away from the
9  question.
10      Q   Okay. So --
11      A   You might be careful how you -- how you do
12  that. Because there could be a series of questions
13  that's being asked and answered, and asked and answered,
14  like we do here. Where the same question is answered,
15  and is asked, and answered, and then you try and say,
16  okay, listen, then it's misstated to you. It's not
17  -- it's not like a deposition. I'll never use it -- not
18  like a deposition. It's not set up to try and trick
19  somebody or to confuse them or stuff like that.
20      Q   Yeah. I'm just trying to find out, sir, if
21  you're aware of any examples or types of deflection
22  apart from not answering the question?
23      A   There's -- there's more but I -- I don't have
24  them in front of me right now and I can't remember them.
25      Q   Okay. And then you mentioned projection, and

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 69

1  that's projecting onto a third person. I take that to
2  mean if somebody talks about a third person when they're
3  asked about themselves, is that what you mean or -- can
4  you explain that for us, please.
5      A    Projecting -- projecting their actions onto
6  somebody else.
7      Q    And so what's an example of that?
8      A    It's a part of mitigation. You know, it's
9  -- it could be a rape case. Say, where one person hold
10 her down and he says, "Well, I held her down, but I
11 didn't rape her." He's projecting what he actually did
12 onto the other person because he's trying to minimize or
13 mitigate what his guilt is. Or, "I threw the rock
14 through the window, and then he shot," or, you know,
15 stuff -- stuff like that. That -- that's what I'm
16 talking about, projection. It's projecting what they
17 did onto somebody else to mitigate their responsibility.
18     Q    When somebody is projecting, there's no way
19 for you to tell whether they're projecting or whether
20 they're just giving an accurate account of the incident.
21 Is that fair to say?
22     A    Well, it depends. It depends if there was a
23 series of conversations. If he went from this to that
24 to this, then he's projecting. If that's his statement
25 all along, you hope it's the truth, you write it down,

Page 70

1  and you let the the courts figure it out.
2      Q    Arnold Day also gave a number of statements
3  about the Garcia homicide to you; is that correct?
4      A    I -- I didn't review his statements, so I
5  can't answer that. I'd have to review all his reports.
6      Q    Okay. Fair. And so how does body language
7  assist you in determining whether in interviewing or
8  interrogating a suspect?
9      A    Well, as -- as I stated earlier, his body
10 language is not the absolute. You'll look for themes
11 that run through the interview. It may be an hour. You
12 look at gestures promoted. You look at self-grooming
13 gestures. You look at truncated body emblems. You look
14 at a lot of different things. I -- I can't say you did
15 one thing and now you are a liar, or you're lying about
16 something. You got to look at the context of the
17 interview. And then you fade in and out of asking
18 questions you already know the answer to and see how
19 they respond. It's sort of like a -- a test subject. So
20 you got to have a test matters -- a test answer so you
21 know, so you could see how they're responding. For some
22 people may just be very nervous, and they can be
23 exhibiting all the signs of being deceptive, but they're
24 not. So that's why you have to talk to them.
25     Q    What are self-grooming gestures?

Page 71

1      A    I -- I'll do one for you. So it's this, you
2  know, I'm fixing my, you know, I'm doing this or girl
3  twirling on her hair. Or rubbing her hand through --
4  through her hair.
5      Q    What's that indicative of?
6      A    It's indicative that I'm really not listening
7  to you. I'm more -- I'm more in tune to myself. I'm
8  not really paying attention. You know, if you ever went
9  to a bar, and asked a girl out, and she starts twirling
10 her hair, I'd say move down the bar.
11     Q    And what do you mean by gestures per minute?
12     A    So people when they sit, then you got to watch
13 them. So as I'm sitting here, and I start doing this.
14 I'm doing this. I'm doing this, and then you start
15 seeing an increase over time of gestures and you've got
16 to look at the whole body. That's -- that -- that could
17 be indicative that they're talking about something, or
18 they're uncomfortable, or they're being deceptive.
19     Q    Okay. And what are truncated body emblems?
20     A    Truncated body emblems are -- the easiest way
21 to explain is you see somebody that's bouncing their
22 feet, that could be indicative that they really don't
23 want to talk to you, that they want to run away from the
24 conversation.
25     Q    Are there other kind of body -- truncated body

Page 72

1  emblems, other than bouncing their feet?
2      A    There could be.
3      Q    Well, I'm asking you sir, are there?
4      A    Yeah. There are. I mean, you can thrust your
5  fist at somebody if you extend it, truncate your body
6  out of movement. So if I start doing this, you know, or
7  moving my hands up towards you, it -- it could be that -
8  - it may be I want to hurt you. I mean, you're also
9  trained for that on the street that when people start
10 bringing her hands up, you need to take a step back. So
11 clenching their fist repeatedly is a truncated body
12 emblem. I mean, they're sort of telegraphing what they
13 want to do. So there -- there's a lot of different ones
14 out there.
15     Q    And so do truncated body emblems mean that
16 somebody's deceptive or does it mean something else?
17     A    As I said before, you can't -- you can't look
18 at one gesture or one part. It's a series of
19 observations over a period of time. So in and of itself
20 it means nothing.
21     Q    I'm not suggesting that it's determinative. I
22 just mean, there is a indicative of deception. Are
23 truncated body emblems indicative of in -- of deception?
24     A    No. It -- it could -- to me it means that
25 they -- they want to avoid their question. So there

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 73

1    -- there's something that's going on. Why -- why do
2    they want to run away from this question? It could be
3    that they have to tell on a loved one or a friend. I
4    -- it could -- it could mean a number of things. You
5    -- you just have to dive into it a little bit.
6        Q   And so why do you pay attention to truncated
7    body emblems?
8        A   Well, it's to see if -- if the guy is
9    receptive to being interviewed. I mean, you -- you have
10   -- you have open and closed body motives too.
11       Q   What are opening and closing --
12       A   If I hung back like this, that means I really
13   don't want to hear what the hell you're saying. If I'm
14   like this (indicating), it's an open -- it's -- it's
15   open to conversation. So there -- there's all sorts of
16   different things, like I said. And you -- you need to
17   go to a class and -- and not an hour, or some an hour,
18   but you need to go through a class and practice it to be
19   any good at it.
20       Q   And how do you know if you're good at it?
21       A   I -- I think you develop it over time whether
22   or not, you know, as you talk to him, yeah, he did do
23   that. So he just, you know, I know what's going on.
24       Q   Have you seen studies showing that police
25   officers are no better than lay people at determining

Page 74

1    truth tellers from liars?
2        A   I've never seen a study like that, no.
3        Q   Okay. In 1991, when you interrogated
4    juveniles, you would -- well -- strike that. In 1991
5    when you would interview juvenile suspects, you would
6    interview them the same way you would interview adults;
7    is that correct?
8        MR. GRILL: Objection. Form.
9        A   It is -- it's sort of -- sort of framing it
10   that way. But the answer would be yes, but there are
11   nuances that are different.
12       Q   Right. So generally speaking, you would
13   interrogate juveniles the same way that you interrogate
14   adults, correct?
15       MR. GRILL: Objection. Asked and answered.
16   Form.
17       A   Yes.
18       Q   And what are the -- what are the nuances that
19   you referred to that would be different for
20   interrogating a juvenile versus a suspect -- or versus
21   an adult?
22       A   It -- it would be the same thing, you -- you
23   try and assess whether or not, in the introductory
24   phase, are they lucid or response to your questions, do
25   they understand? You try and determine does this person

Page 75

1    have a -- either a learning disability or comprehension.
2    So you would talk about different things ahead of time
3    to try and gauge that. Whether or not you are an adult
4    or a juvenile, you try to understand, does this guy
5    understand what's happening?
6        Q   So you try and gauge intellect and
7    understanding regardless who you're speaking to; is that
8    right?
9        A   Correct.
10       Q   And so are there any nuances that are
11   different for juveniles that you would do for juveniles
12   but you wouldn't do for adults as of 1991?
13       A   As far as speaking to them, I may dumb down my
14   language a little bit if I'm talking to somebody else,
15   but not really.
16       Q   And you would dumb down the language in the
17   same way you might do for an adult who presents with a
18   lower educational level; is that right?
19       A   If I could determine that, yeah. It's hard to
20   determine, but yes. I got to sneeze, one minute. Okay.
21   Go ahead.
22       Q   Later in your career, did you interrogate
23   juveniles different from adults after 1991?
24       MR. YAMIN: I'm just going to have a
25   continuing objection, foundation objection to the

Page 76

1    term "juvenile." Otherwise, go ahead.
2        MR. GRILL: I object to the -- or different or
3    differently form.
4        A   Well, I -- I would say I interviewed them the
5    same.
6    BY MR. AINSWORTH:
7        Q   Throughout your career, correct?
8        COURT REPORTER: It just hang up again.
9        MR. AINSWORTH: As your phone is up, let's go
10   off the record.
11       COURT REPORTER: Okay.. The time is 1:52 a.m.
12   We are off the record.
13       (OFF THE RECORD)
14       COURT REPORTER: The time is 11:54 a.m. We are
15   back on the record.
16   BY MR. AINSWORTH:
17       Q   In 1991, before you interrogated a 15-year-old
18   about a homicide, you were supposed to have either a
19   parent or a guardian or a youth officer present; is that
20   right?
21       MR. GRILL: Objection. Form. Foundation.
22       A   If one is available, yes.
23       Q   All right. And so you were supposed to make
24   some effort to try and find either a parent, a guardian,
25   or a youth officer, before interrogating a 15-year-old

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 77

1  about a homicide, correct?
2       MR. GRILL: Objection. Form. Foundation.
3       A   If one is available, yes.
4       Q   I'm asking you about your effort. You were
5  supposed to make some effort in 1991 to obtain either a
6  parent, a guardian, or a youth officer before
7  interrogating a 15-year-old about a homicide, correct?
8       MR. GRILL: Same objection.
9       A   Yeah. You'd make an attempt, yes.
10      Q   All right. And so what was your understanding
11  back in 1991 about the attempt that you're supposed to
12  make to get either a parent, a guardian, or youth
13  officer to be present for an interrogation of a
14  15-year-old about homicide?
15      A   You try to notify the parent, if you're
16  successful. If not, then you would notify the youth
17  division. Hope that one was available.
18      Q   All right. So first you would try and notify
19  the parent or guardian before contacting the youth
20  division; is that right?
21      A   Normally, yes.
22      Q   And then if you were unsuccessful in notifying
23  the -- or getting a hold of parent or guardian, then you
24  would contact the youth division, correct?
25      A   Correct.

Page 78

1       Q   And you'd give them a reasonable opportunity
2  to be present before conducting your interrogation of a
3  15-year-old about a homicide back in 1991, correct?
4       MR. YAMIN: Objection to form.
5       A   Right. You're referring to both the parent
6  and the youth officer?
7       Q   Either one. Yeah.
8       A   Yeah, I have -- I'm not sure what you mean,
9  reasonable, I'm sure it's been subject to debate, but
10  yes.
11      Q   Well, in your mind back in 1991, how long
12  would you wait for a parent or a youth officer to arrive
13  before conducting an interrogation of a 15-year-old
14  about a homicide?
15      MR. YAMIN: Objection. Form. Incomplete
16  hypothetical.
17      A   Yeah. It's -- it's -- there's not an
18  absolutely answer for that. It's all based on
19  individual scenarios.
20      Q   Okay. Well, understanding that, would you
21  wait half an hour for a youth officer to arrive?
22      A   As I just said before --
23      MR. GRILL: Objection. Same objections.
24  Excuse me.
25      A   You're making a hypothetical question. It'd

Page 79

1  be all different for scenarios. I need more information
2  to make the answer to that question.
3       Q   Okay. So sometimes you might wait half an
4  hour, and sometimes you might not wait half an hour for
5  a youth officer to arrive. Is that fair to say before
6  interrogating a 15-year-old about a homicide?
7       MR. GRILL: Objection. Incomplete
8  hypothetical form.
9       A   Yeah. It's -- it's hypothetical. I -- I --
10  I can't answer it. What if there's no juvenile officer
11  available? I'm not going to wait 30 minutes. Knowing
12  that ahead of time --
13      Q   All right. That's fair. If the parent,
14  guardian, or youth officer told you they'd be there, you
15  know, in half an hour, would you wait half an hour
16  before interrogating about -- a 15 year-old about a
17  homicide?
18      MR. YAMIN: Objection. Incomplete,
19  hypothetical. Form.
20      MR. GRILL: Thank you -- thank you, judge.
21  Beat me to the punch.
22      A   Yes.
23  BY MR. AINSWORTH:
24      Q   Were there any -- were there any Mickey Cobras
25  in the area of 51st and Racine?

Page 80

1       MR. YAMIN: Objection. Foundation.
2       Q   Back in 1991, fair. Back in 1991.
3       A   Yes.
4       Q   Where were the Mickey Cobras?
5       A   At 50th and May.
6       Q   What was the relationship between the Black
7  Stones and the Mickey Cobras?
8       MR. GRILL: Objection to form.
9       A   They were allies.
10      Q   They were allies?
11      A   Yep.
12      Q   What gang was Snake a member of?
13      MR. GRILL: Objection. Foundation.
14      A   You know, I -- I don't remember exactly right
15  now. He was either a Mickey Cobra or a Black Stone. I
16  don't remember.
17      Q   Was he a gang member?
18      A   Yes.
19      Q   And when I say Snake, you know I'm referring
20  to Gus Robinson, right?
21      A   Correct.
22      Q   All right. So you -- when you were trained to
23  conduct interrogations, you were trained to establish
24  rapport and look for indices that might indicate
25  deception. Is that fair to say?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 81

1    MR. GRILL: Objection. Asked and answered.
2    A    Yeah. If -- if there was deception, sometimes
3    there was no deception.
4    Q    And then how else were you trained to conduct
5    interrogations back in -- as of 1991, September of 1991?
6    MR. YAMIN: Objection. It's asked and
7    answered. Not just a single question, but in a
8    line of inquiry.
9    A    To sit down and talk to somebody. I mean, I
10   don't understand what you're -- the -- the question. Sit
11   down, we talked to them what they voluntarily volunteer,
12   or if it's -- we have -- if we believed it's suspect,
13   then we will confront them with what we believe is a
14   lie. And that's -- and that's what we would do.
15   BY MR. AINSWORTH:
16   Q    Were you trained to confront suspects with
17   inculpatory evidence?
18   A    So I think you're talking about confront them
19   with other statements.
20   Q    Sure.
21   A    Yes. So you would -- as a barometer, you
22   would confront them with a portion of that statement.
23   You wouldn't give them all the facts of what occurred.
24   You know.
25   Q    As part of your, you know, analysis of

Page 82

1    reliability that you were conducting, would you want to
2    ensure that you didn't tell the suspect any non-public
3    crime scene facts before the suspect told you those
4    facts?
5    MR. GRILL: Objection. Form. Incomplete
6    hypothetical.
7    A    Yeah. I don't -- what you mean non-public
8    facts. No. When -- when I was saying that we would in
9    -- in that circumstance, yeah. But most of the time
10   people don't know what the -- what the facts are in a
11   case. They know somebody got shot on the street. You
12   know, we may know where he was shot, how he was left if
13   -- if the person was involved with the body. But, you
14   know, when you're shooting at somebody from across the
15   street, there's -- there's the public facts are what
16   they are. But we wouldn't give them all of those facts.
17   When I say confront them with a portion of a statement,
18   that would be, as in this case, you asked somebody to be
19   a lookout. You know, I still don't know, you know.
20   Q    And that's what I'm trying to get at. Just
21   that you wouldn't tell a suspect, for example, the
22   caliber of the gun that was used, or information that
23   might be known only to somebody who was either present
24   for the murder, or spoke to somebody who was present for
25   the murder, correct?

Page 83

1    MR. GRILL: Objection. Form. Foundation.
2    Incomplete hypothetical. Calls for speculation.
3    Go ahead.
4    A    Again, normally, no.
5    Q    And part of that reason is because your -- you
6    want to test the reliability of the information that
7    you're being provided. And so if the witness starts
8    giving you information that matches your file, your
9    police file, then you know that the information they
10   have is more likely to be reliable. Is that fair to
11   say?
12   A    Sometimes, yes.
13   Q    Was it ever not true? I mean, you're always
14   trying to assess the reliability, correct?
15   A    To -- to the best of our ability, yeah.
16   Q    And part of that reliability assessment is to
17   always make sure that you don't, you know, give
18   information to the suspect before the suspect volunteers
19   that information to avoid the situation where the
20   suspect is just parroting information back to you,
21   correct?
22   MR. YAMIN: Objection, form.
23   A    Yeah. Exactly. I mean, you didn't give them
24   all the information, and you were on guard to make sure
25   he didn't get, you know, I know what you're driving at.

Page 84

1    But no, That's not my policy.
2    Q    Okay. Were you trained to give suspects hope
3    when you were conducting Interrogations of them?
4    MR. YAMIN: What was the word? I didn't catch
5    the word, Russell.
6    MR. AINSWORTH: Hope.
7    MR. GRILL: Objection. Form.
8    A    I don't think we're trained to give them hope.
9    But I can tell you the way I approached it is that, you
10   know, even back then, these kids thought this -- the
11   gang life was a video game where they shoot at each
12   other every day. And then one day, the lord said that
13   someone's got to die, and then let them know there's
14   -- there's life after this. And so that's the type of
15   hope that I would refer to.
16   BY MR. AINSWORTH:
17   Q    Well, is that what you were trained to do,
18   sir?
19   A    I think -- I mean, we were trained to
20   establish the difference between hope and leniency.
21   THE WITNESS: Can I go pee again?
22   MR. AINSWORTH: Certainly, sir. Anytime.
23   THE WITNESS: Thank you.
24   COURT REPORTER: The time is 12:05. we are off
25   the record.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 85

1      (OFF THE RECORD)
2          COURT REPORTER: The time is 12:13, and we are
3      back on the record.
4          MR. GRILL: Hey Russell, we'll -- keep going,
5      you know, but we'll just FYI, we'll want a break
6      for lunch at some point. We'll deal with it down
7      the road.
8          MR. AINSWORTH: Whenever you want.
9          MR. GRILL: Yeah. Okay. Keep going. Yep.
10     BY MR. AINSWORTH:
11         Q   Okay. So sir, it would be improper to tell a
12     witness in a homicide that if they admit to
13     participation in the homicide, they could go home in
14     order to obtain their statement; is that correct?
15         A   Yeah. Absolutely.
16         Q   And it would be improper to feed a witness
17     information about a crime in order to assist them in
18     fabricating a statement, correct?
19         A   Correct.
20         Q   Were you trained to create an environment for
21     suspects in which they would want to come clean and tell
22     the truth?
23         A   I don't understand the term, "create an
24     environment."
25         Q   Well, was that your ultimate goal, to get a

Page 86

1      witness to -- or a suspect to tell the truth?
2          A   As best we could, yes. Sometimes --
3          Q   And so how is -- all right. And so one way
4      you would accomplish that is by establishing a rapport,
5      correct?
6          A   Correct.
7          Q   How else would you get witnesses to tell
8      -- or suspects to tell the truth?
9          A   How would I?
10         Q   Yeah.
11         A   Well, I'd hope to do it through establishing a
12     rapport with them, talking to them about, you know, even
13     their childhood or gang members, or if it's a gang case
14     talking to them about their -- when they -- were came
15     into the gang, and talking about other gang members to
16     show that I have a basis of knowledge about the street
17     gang. That, you know, you're not going to be able to
18     give me any bullshit about your street gang. Talk to
19     them about that and talk to him about where did he see,
20     you know, what did they see their future. (phone rings)
21     I'm sorry. This is on silent. Why did -- there you go.
22     Okay. Sorry about that.
23         Q   That's okay.
24         A   So that we establish a rapport with them. It's
25     -- it's not -- to me, it wasn't adversarial. I mean,

Page 87

1      I'm not going to get him to talk to me unless I'm, sort
2      of, somewhat their ally in terms so to speak.
3          Q   Are you allowed as a police officer to assist
4      witnesses in homicide cases by giving them money or
5      giving them assistance in some way?
6          MR. GRILL: Objection to form. Foundation.
7          A   I guess, the overarching umbrella to that
8      question would be yes. You know, giving them personal
9      money? No. I mean, if -- if they were hungry and you
10     wanted to feed them afterwards, yeah. Giving them food,
11     arranging for witness protection. There's all sorts of
12     different things that we tried. I mean, we're not just
13     going to kick them back out on the street.
14         Q   Like helping a witness move is something that
15     you might do?
16         A   Yes.
17         Q   If you provide a witness with assistance,
18     should you document that fact?
19         A   Sometimes.
20         Q   All right. What's the line for you in terms
21     of when you should document that fact and when you
22     should not document that you're providing assistance to
23     a witness?
24         MR. GRILL: Objection. Form. Incomplete
25     hypothetical.

Page 88

1          A   Well, I'm not going to put in a report or GPR
2      a subject moved to the address saying I -- I moved them
3      to this address. It'd be defeating the purpose because
4      it would be centered in discovery. So no.
5          Q   Well, I mean, just the fact that you moved
6      somebody, you might -- you -- you would document that
7      fact or -- or -- strike that. You wouldn't try and hide
8      the fact that you were assisting a witness, would you?
9          MR. YAMIN: Objection.
10         MR. GRILL: Objection. Foundation.
11         A   No. But you're saying I moved them but if
12     they moved and called me, it'd be different. So if I
13     move them, it would probably be through the Cook County
14     State's Attorney's victim witness unit. So I mean, I
15     don't -- I didn't move people.
16         Q   What if you helped them move, you know, packed
17     up their stuff and drove it over to a new place?
18         MR. YAMIN: Same objections.
19         Q   You didn't do that?
20         A   I don't remember doing that. I could have
21     done that for somebody, but I also don't remember doing
22     it.
23         Q   But if you did do that, that's the kind of
24     thing that you should document in a police report,
25     right?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

| Page 89 | Page 90 |

**Page 89**

1    MR. YAMIN: Objection. Form. Foundation.
2    Incomplete hypothetical.
3    A   To me, the answer would be no. It has nothing
4    to do with the case. You know, if it's no evidentiary
5    value. I mean, later on in trial, yes. But not to be
6    documented with the murder case, no.
7    Q   Would you not document if you gave a witness
8    money?
9    MR. GRILL: Objection. Form. Incomplete
10   hypothetical.
11   A   Sometimes. If -- if you're referring to when
12   I give money for their testimony, the answer to that is
13   no. We don't buy testimony. If somebody is hungry, I
14   give them money to eat, yeah. Just like when you're in
15   office, we don't have a restaurant that comes
16   around. We take out of our own pocket, and run to
17   McDonald's, or a pizza place, and we buy pizza for the
18   witnesses to eat.
19   Q   Is it okay to question a witness more than
20   once in a homicide investigation?
21   MR. YAMIN: Objection to form. Foundation and
22   incomplete hypothetical.
23   A   Yes.
24   Q   There's nothing that prevents you from
25   questioning a witness a second time, correct?

**Page 90**

1    A   No.
2    Q   You might want to see if a witness' story
3    changes, right?
4    A   Yes.
5    Q   You might want to ask them about new stuff
6    you've learned in the investigation since the first time
7    you talked to them, right?
8    A   Yes.
9    Q   And you might want to -- and -- right? When
10   you fill out a supplemental police report, and you have
11   an arrestee, you have to document information about the
12   arrestee in that supplemental police report, correct?
13   MR. GRILL: Objection to form.
14   A   I -- I think it's a vague question, but the
15   answer is yes. I'm -- I'm not sure what --
16   Q   We --
17   A   We must have the reports for that information,
18   yes.
19   Q   And you have to include information about
20   their address, phone number, height, weight, correct?
21   A   I don't know what --
22   MR. GRILL: Objection of form.
23   A   On an arrest report, yes. Not so much in a
24   case report. But if you can, do it.
25   Q   All right. Where do you get the information

| Page 91 | Page 92 |

**Page 91**

1    to include on the SUP report about an arrestee's, you
2    know, identifiers, their height, weight, address, phone
3    number, that kind of stuff?
4    MR. GRILL: Objection. Incomplete
5    hypothetical.
6    MR. YAMIN: And form.
7    A   Most of the time you ask them.
8    Q   Any reason why you wouldn't ask them for that
9    information?
10   A   Unless I already knew where he lived and knew
11   his phone number.
12   Q   Did you know Anthony Jakes before September
13   16, 1991?
14   A   I don't recall knowing him, but reviewing my
15   records, I now know that I arrested him for an
16   aggravated criminal sexual assault or criminal sexual
17   abuse.
18   Q   And when did you arrest him for that?
19   A   I think it was a year prior.
20   Q   And where did you arrest him?
21   A   I -- I don't -- I don't know. I just
22   -- looking at the records, it showed that there was an
23   arrest with my name on it.
24   Q   Do you have any recollection of that arrest?
25   A   No, sir.

**Page 92**

1    Q   Do you know any of the facts of that arrest?
2    A   I just know that -- that a female -- I knew
3    there were multiple defendants from looking at the
4    report, but other than that, no.
5    Q   And do you know that it was you who arrested
6    Jakes as opposed to somebody -- another person in your
7    team?
8    A   I don't have any independent recollection, but
9    looking at the paperwork, it appears that I arrested
10   him.
11   Q   All right. What about the paperwork makes you
12   believe that you were the one who arrested him?
13   A   It has my name on the rap sheet.
14   Q   Any other reason?
15   A   No. Other than that.
16   Q   And so what about the fact that your name is
17   on the rap sheet indicates to you that you were present
18   for the arrest?
19   A   Well, that's where they get the information
20   from your -- the are -- the arrest report.
21   Q   All right. So did you know Arnold Day before
22   September 16, 1991?
23   A   I believe I did.
24   Q   How do you know him?
25   A   I knew him from my traveling around the

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 93

```
 1   neighborhood.  I also knew at that time, I was contacted
 2   by a Black P. Stone general, Bernard Gales, known as
 3   G-Rock from the penitentiary, telling me that Arnold Day
 4   and G-Nate are going around robbing Black P. Stone drug
 5   spots, and that they were trying to kill his brother,
 6   Michael.
 7      Q   Trying to kill Bernard's brother, Michael?
 8      A   Yes.  To take over his operation.
 9      Q   Okay.  And so Bernard Gales contacted you from
10   prison; is that right?
11      A   Correct.
12      Q   How did he contact you?  Was it by letter or
13   by phone call?
14      A   You know, I don't recall.
15      Q   Well, what did Bernard Gales say to you?
16      A   He told me -- he asked for help that Little A
17   and G-Nate -- and G-Nate was subsequently killed, but
18   that they were trying to kill his brother, Michael, if I
19   could stop it.
20      Q   Okay.  And what did you -- and when was this?
21      A   It was prior to Arnold being arrested, so I
22   -- I don't -- I don't know exactly when.
23      Q   Was it after the Garcia murder, or was it
24   after the Irving murder, or -- do you know when in time
25   it was?
```

Page 94

```
 1      A   Well, I -- I believe it was before the Garcia
 2   murder.
 3      Q   All right.  And so what did you do with that
 4   information?
 5      A   I remember going over and talking to Michael,
 6   his brother to determine whether or not that was true or
 7   not, and -- and then the whole neighborhood knew what
 8   was going on, so -- and -- but Michael never got killed.
 9   So --
10      Q   Well, what did you do with this information
11   apart from going to Michael, and talking to him about
12   it?
13      A   Just drove around and kept it.  There was
14   -- there was no crime committed, it was rumor, an
15   innuendo, and I just maintained it.
16      Q   Did you tell anyone within the Chicago Police
17   Department?
18      A   I don't know.  I may have.  I don't -- I don't
19   know if I did or not.
20      Q   Can you tell us what your belief is as to why
21   G-Rock reached out to you as opposed to another member
22   of the Chicago Police Department with this information?
23          MR. YAMIN:  Objection.  Calls for speculation.
24      A   You know, as I -- as I told you earlier that I
25   would drive -- would drive around every day and talk to
```

Page 95

```
 1   these gang members.  Actually -- I actually even
 2   arrested Bernard Gales.  He broke my finger one time
 3   during an arrest.  But like I said, nothing's personal
 4   out there.  It's, you know, it's his job to get away, it
 5   was my job to lock him up.  And I would say, I -- I
 6   would call us friends, we just had that, you know, I had
 7   a mutual respect for him.  And that's why he reached
 8   out, because he knew that I --
 9          MR. AINSWORTH:  We've lost the audio again.
10          COURT REPORTER:  Yeah.
11          MR. AINSWORTH:  Guys, can we use a different
12   phone?  Because the Zoom seems to be working fine.
13   I think it's the phone.
14          COURT REPORTER:  Maybe, try one of -- maybe
15   try to unmute Mr. Boudreau's computer and use the
16   volume on there.  You want to go off the record?
17   You want to go off the record?
18          MR. AINSWORTH:  Yes, please.  Thank you.
19          COURT REPORTER:  Right.  Okay.  Time is 12:28,
20   and we're off the record.
21          (OFF THE RECORD)
22          COURT REPORTER:  Time is 12:28, and we're back
23   on the record.
24   BY MR. AINSWORTH:
25      Q   What's Michael's last name?
```

Page 96

```
 1      A   Gales.
 2      Q   G-A-L-E-S?
 3      A   I forgot how to spell it, but I think it was.
 4      Q   And where did Gales live -- Michael Gales
 5   live?
 6      A   I would normally see him on the block of 52nd
 7   and May Street.
 8      Q   And what did Michael Gales say when you spoke
 9   to him about the information that his brother provided?
10      A   It was more of a warning, and to be careful.
11      Q   What do you mean it was more -- you told him
12   to be careful --
13      A   Yeah.
14      Q   -- right?  Did you ask him if he'd talked to
15   his brother?
16      A   No.
17      Q   All right.  Well, did you ask him if he'd
18   heard anything about somebody trying to kill him?
19      A   Just told him to be careful, and I hear that
20   Little A is gunning after him.  I don't remember
21   anything else after that.
22      Q   Well, did you ask him if he knew about Little
23   A trying to gun for him?
24      A   I may have.  I just don't remember it.
25      Q   Did you talk to Little A about it?
```

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 97

1    A  No.
2    Q  Why not?
3    A  Because I -- I -- I'm not sure of the time
4  frame on it.  I may have tried to find him, but I
5  couldn't and then, you know, he was on the run for a
6  while, from the time of the murder 'til February.
7    Q  Are there any documents that you're aware of
8  that would allow us to tell when you had that
9  conversation with Bernard Gales or Michael Gales?
10   A  Not -- not that I'm aware of.
11   Q  And your phone cut out earlier, so I just want
12 to ask you a question.  Do you have a -- what's your
13 belief as to why, well, no.  You answered that.  Sorry.
14 Why did you respect G-Rock?
15   A  Well, you know, when I say respect to you, you
16 might find it hard to believe coming from a policeman
17 but, you know, he -- he was a general on a street gang.
18 He ran a successful narcotics operation.  There is
19 nothing personal out there.  And he did some stupid
20 things, but, you know, as a human being that I talked to
21 where every day, you know, he -- he -- even though he
22 did what he did, he wasn't to -- to me a bad individual.
23 He just was trying to feed his family.  As a matter of
24 fact, when he was released from the penitentiary for
25 -- out of compassionate release, I went to his house to

Page 98

1  see him before he passed away.
2    Q  So you respected a general in the Black Stone
3  -- Black P. Stone running a drug spot to get money to
4  feed his family, is that what you're saying?
5    A  Yeah.  The antiniment would be -- mean I
6  disrespected him, and I don't think that would be too
7  healthy or promising, so yeah.  You respected them when
8  they were out there, you didn't disrespect them.
9    Q  But you had respect for him, you know, you
10 weren't just pretending.  You felt respect for him,
11 right?
12   A  Yeah.  I did.
13   Q  And did you have prior interactions with
14 Bernard where he said he respected you?
15   A  Yeah.  I may have.  I know when he broke my
16 finger when he was a little nervous about that, but we
17 got beyond that.
18   Q  What I'm trying to get is, any other basis for
19 believing why Bernard would reach out to you in
20 particular as opposed to any other Chicago police
21 officer?
22   A  I guess, he trusted me.
23   Q  Had he provided you with information before?
24   A  Not really.  I mean, I remember talking to him
25 about -- there was a girl that got shot, she was holding

Page 99

1  her baby, took a bullet to the side of the head and
2  handed her baby to another woman in his area, and we
3  were hoping that he would tell us who it was.  It was
4  probably cele -- celebratory gunfire, and it just
5  happened to kill the woman, but he would never really
6  give me much.  Neither would tell.
7    Q  All right.  So the only information that he
8  gave you about a crime was saying that Little A was
9  trying to kill his brother, right?
10   A  And there was no crime yet.
11   Q  Okay.  So the only information he gave you
12 about somebody who might commit a crime, was telling you
13 that Little A was trying to kill his brother, right?
14   A  Yeah.  Right.  That's when we had that
15 internal conflict with the Stones.
16   Q  All right.  At Area 3 you had access to a
17 polaroid camera, correct?
18   A  Yes.
19   Q  You can take photographs of suspects or
20 witnesses at the area, right?
21   A  Sometimes.
22   Q  At Area 3, the old Area 3, how would you
23 protect witness' need for anonymity when they were at
24 the area?
25   MR. GRILL:  Objection.  Form.

Page 100

1    A  I'm not sure if they -- they keep from
2  anonymous while they're there.
3    Q  Yes.  Like to, you know, a witness might not
4  really want other people to know that there at the
5  police station cooperating with the police
6  investigation, right?
7    A  Yes.
8    Q  And so how would you protect them from being
9  seen by other potential suspects in the same case, you
10 know, when you're bringing suspects to the area?
11   A  Well, this was in a public police station, so
12 we had control.  Sometimes if we had to, we'd -- we'd
13 put them in a -- a room downstairs.  We'd put them in a
14 room upstairs.  I know, you know, people all assigned
15 property crimes.  We may put them into a -- an office or
16 slash interview room, and shut the door there, and then
17 just make sure I tell them don't open the door.
18   Q  Okay.  And the interview rooms that you had at
19 Area 3, you described them as being eight by five.  Is
20 that about an approximate size of the rooms?
21   A  I spent a lot of time -- yeah.  I mean, some
22 may have lockers in it, some of them had a bench in it,
23 some had tables, one was a little bit bigger than the
24 other, had a typewriter right up where we would type so
25 --

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 101

1      Q    Let me read this testimony to you from your
2  trial testimony on September 9, 1993 in this case.  This
3  is page 272 of the transcript.
4           MR. GRILL:  Are you marking this as an
5      exhibit?
6           MR. AINSWORTH:  No.  Why?
7           MR. GRILL:  Okay.  I just -- it hasn't been
8      -- no exhibits have been provided to us so --
9           MR. AINSWORTH:  Right.
10          MR. GRILL:  Can't tell if -- I'm assuming
11     you're going to read it accurately, but obviously
12     can't follow along.  Go ahead.
13  BY MR. AINSWORTH:
14     Q    Line 7 through 13, question, "The interview
15  room that he was taken to, would you describe it for us,
16  please?"  Answer, "An interview room is located on the
17  third floor, be -- facing the north side beyond the
18  north side of the building.  I would guess the
19  dimensions would be maybe eight feet by five feet, in
20  which there was a chair, a table there with four
21  chairs."  Question, "I'm sorry, eight feet by five feet?
22  I would guess, sir.  Approximately?  Yes, sir.  And
23  there is a window in the room?  Yes, sir.  There's also
24  a ring attached to one of the walls; is that correct?"
25  Answer, "Yes, sir.  There's a ring attached to a wall."

Page 102

1  And that's it says on ending at line 22.  Does hearing
2  that testimony refresh your recollection about the
3  dimensions of the interview rooms at the Area 3.
4           MR. GRILL:  I'm going to object.  It's
5      improper how if you've attempted to refresh his
6      recollection, and to the -- and since I can't
7      verify it, I'm going to have a standing objection
8      to how you're characterizing the testimony because
9      we can't verify it at this point.  But otherwise,
10     go ahead and answer the question.
11     A    Yeah.  Your -- your -- your question to me was
12  about interview room so I -- I took that collectively.
13  But when you refer to my testimony, you're referring to
14  one interview room, and I don't remember that interview
15  room.  It sounds about right.  But I'd stand by my
16  testimony back then.  Did he hear me?
17  BY MR. AINSWORTH:
18     Q    I can hear you.
19     A    Right.  Okay.
20     Q    All right.  And so witnesses who were at Area
21  3, couldn't just wander about the place because you had
22  secure police stuff going on inside Area 3, right?
23     A    Most of the time, yes.
24     Q    And so you wouldn't want witnesses just
25  wandering into rooms or looking at paperwork concerning

Page 103

1  homicides or things of that nature, right?
2     A    No.
3     Q    And so you would make sure that witnesses were
4  escorted when they're moving about Area 3, violent
5  crimes, correct?
6     A    Sometimes.
7     Q    Were there instances where you would just let
8  witnesses roam free within Area 3, violent crimes?
9     A    It -- it depends if there was a, you know, all
10  the reports that you just mentioned are locked up in the
11  sergeant's office or in there.  I mean, it was a
12  separate door to get into.  But we had a big open bay
13  and if somebody was sitting at a table and needed to use
14  the bathroom, you know, they'd walk over and use the
15  bathroom, they weren't escorted.  So it depends,
16  sometimes they were, sometimes they weren't.
17     Q    Okay.  In homicide investigations, one of the
18  basics of a homicide investigation is that you want to
19  identify the witnesses to a homicide, right?
20     A    Yes.
21     Q    And if possible you want to see if they can
22  identify your suspect as being the perpetrator, right?
23     A    If there an eyewitness, yes.  They could be
24  circumstantial, but yes.
25     Q    And you can see if they can identify your

Page 104

1  suspect in a lineup, right?
2     A    If they can, yes.
3     Q    And you can also see if they could identify
4  your suspect in a photo array, correct?
5     A    Correct.
6     Q    And this was all true back in 1991, right?
7     A    Correct.
8     Q    And so if you have a person who witnessed a
9  murder, you'd want to talk to them to see if they could
10  identify your suspect, right?
11     A    Yes.
12     Q    Was there -- and Snake talked to you while you
13  were at Area 3 on September 16, 1991, correct?
14     A    Correct.
15     Q    Was Snake cooperative?
16     A    Yes.
17     Q    Was he forthcoming?
18     A    Yes.
19     Q    Was there any information that he provided you
20  that you thought he was either lying about or shielding
21  the truth?
22     A    No.
23     Q    There were youth officers at Area 3, correct?
24     Q    I'm sorry, say that again?
25     Q    There was -- there were youth officers at old

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 105

1  Area 3, correct?
2      A   There was an office for youth officers, yes.
3      Q   And it was staffed in the first and second
4  -- or in the second and third watches, correct?
5      A   Yes.
6      Q   And they ended at midnight, right?
7          MR. AINSWORTH:  We lost you again.
8          COURT REPORTER:  Yep.
9          MR. AINSWORTH:  Guys can we use -- let's go
10 off the record.
11         COURT REPORTER:  The time is 12:43, and we are
12 off the record.
13             (OFF THE RECORD)
14         COURT REPORTER:  The time is 1:36, and we are
15 back on the record.
16 BY MR. AINSWORTH:
17     Q   All right.  Sir, did you get a chance to eat?
18     A   I didn't eat.  I'm on a diet, so I'm trying to
19 hold off.
20     Q   Did you -- if you feel fatigued at any point
21 in this deposition, I'm going to ask you to tell me.
22 This is not supposed to be a stamina test and, you know,
23 if you need a break any time, let us know, okay?
24     A   Okay.  Thank you.
25     Q   Would you like to proceeded at this time?

Page 106

1      A   Yes, sir.
2      Q   And you're not going to tell us later that you
3  said something that wasn't true because you were hungry
4  or because you're distracted by that; is that correct?
5          MR. GRILL:  Well, I mean, he might get hungry
6  later, you know, who knows.
7      A   I'm not a criminal or defendant, no.  I won't
8  come up with those excuses.
9      Q   Okay.  And so if you do get hungry later, you
10 will tell us if it's going to impact your ability to
11 give testimony here today, right?
12     A   Yes, sir.
13     Q   Okay.  So at Area 3, the youth officers were
14 staffed during the second and third watches, correct?
15     A   That's my understanding, yes.
16     Q   And they went home around midnight; is that
17 right?
18     A   That's my understanding, yes.
19     Q   Okay.  So then before you interrogate
20 somebody, you were trained to thoroughly investigate the
21 case, correct?
22         MR. GRILL:  Objection to form.
23     A   Yes.
24     Q   You want to reserve interrogations for
25 somebody who you have a belief that they committed the

Page 107

1  crime, correct?
2      A   Interviews, yes.  Yeah.
3      Q   Well, when you are talking to a suspect, do
4  you want to make -- and they're your suspect, you want
5  to -- well, strike that.  Interrogations are supposed to
6  be used for people who you believe are guilty, correct?
7          MR. GRILL:  Objection.  Form -- yeah.  Form.
8  Yeah.
9      A   And as I testified many times, interviews, and
10 interrogations, they are the same.  They're one and the
11 same so yes.  As far as your question goes, but --
12     Q   Right.  You will -- and so in order to come to
13 a belief that a person is guilty, you want to do a
14 thorough investigation first, right?
15     A   Come to a belief that a person's guilty, you
16 know, I'm not sure how to answer that.  The guilt or
17 innocence is determined in court.  So if -- if -- if I
18 believe someone's told me the truth, and they confessed
19 or it's an inculpatory statement, I may have some of it,
20 but not -- not all of it or I may have all of it.  It
21 -- it all depends.
22     Q   I'm just saying I thought that you agreed with
23 me that you only interrogate people who you believe are
24 guilty, right?
25         MR. GRILL:  Objection.  Form.  Foundation.

Page 108

1      A   The answer is no.  You interview everybody.
2      Q   Okay.  All right.  Do you lie to witnesses?
3      A   No.
4          MR. YAMIN:  Objection.  Asked and answered.
5          MR. AINSWORTH:  Has not, George.
6      Q   Do you mislead witnesses as opposed to
7  suspects?
8          MR. GRILL:  Objection.  Form.
9      A   No.
10     Q   All right.  But you would do those tactics or
11 employ some of those tactics with the suspect, correct?
12     A   Sometimes.
13     Q   All right.  And you would only use tactics
14 such as lying to a suspect or misleading a suspect if
15 you believed that the suspect is guilty, right?
16     A   No.  Not just guilty, but if he's protecting
17 somebody or he's withholding information.
18     Q   Okay.  So if you have a belief that the person
19 is not being truthful with you, then you would employ
20 those tactics, right?
21     A   Maybe.  Maybe not.
22     Q   And only with a suspect, right?
23     A   Yes.
24     Q   All right.  And so before you come to a belief
25 the suspect is, you know, withholding information or not

27 (Pages 105 to 108)

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 109

1  being entirely truthful, you want to do a thorough
2  investigation, correct?
3      A  Best we can, yes.
4      Q  All right.  And so when you started the Garcia
5  homicide investigation or your part in it, you wanted to
6  know what had happened in the investigation leading up
7  to your involvement, correct?
8      A  Correct.
9      Q  And so you spoke to detectives Duckhorn and
10 O'Riley right?
11     A  Yes.
12     Q  And you reviewed the available reports, right?
13     A  Correct.
14     Q  And you would have wanted to review the scene
15 supp, right?
16     A  If it was available, yes.
17     Q  And that scene supp was typed by detectives
18 McCann, Caesar, and Brankin by September 16 at noon.  Do
19 you recall that?
20     A  I don't recall it, but if you got the report
21 in front of you, I will agree with you.
22     Q  And if you'd liked it to check if you have the
23 investigative file in front of you, you can look at page
24 Bates numbered Jake -- City Jake's 55.
25     MR. GRILL:  I have different -- the ones I

Page 110

1  have are different Bates stamps.  This has been
2  produced in a couple of different spots in the
3  production.  Maybe just screen share it and we'll
4  do it that way, and then I can just match up the
5  actual page here with the set up that --
6      MR. AINSWORTH:  Sure.  Well, then let me show
7  you this version.
8  BY MR. AINSWORTH:
9      Q  All right.  Taking a look at what we'll mark
10 as Plaintiff's Exhibit 1, this is a supp report, Bates
11 numbered Plaintiff Jakes 5319 through 5322, and this is
12 -- do you recognize this to be the report authored by
13 Detectives McCann, Caesar, and Brankin, and submitted on
14 September 16th at noon?
15     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
16     A  That's what it says.
17     Q  All right.  So you would have had access to
18 this report when you started your investigation
19 somewhere between -- somewhere around 4:00 on the 16th,
20 correct?
21     MR. GRILL:  Form.
22     A  I probably did.  The sergeant didn't approve
23 it 'til September 17, but I'd probably be familiar with
24 what it's in it.
25     MR. GRILL:  Can you see --

Page 111

1      MR. AINSWORTH:  And you also --
2      THE WITNESS:  Yeah.
3      MR. GRILL:  Sorry.  I just want to make sure
4  he can see okay.
5      THE WITNESS:  It's perfect.
6  BY MR. AINSWORTH:
7      Q  And you also sat down and talked to Duckhorn
8  and O'Riley, right?
9      A  Correct.
10     Q  And they were two detectives -- were they on a
11 different watch from you?
12     A  I believe they were.
13     Q  All right.  And so they were coming off second
14 watch, and you were coming on third wash and -- watch,
15 and taking over the Garcia homicide investigation,
16 right?
17     A  I believe so, yes.
18     Q  Okay.  And from the scene supp, you knew, I
19 mean, some basic information about the murder that
20 looking at the -- the top page of the second page of
21 Exhibit 1 -- or the top paragraph of the second par --
22 second page of Exhibit 1.  It says, "The reporting
23 detectives were informed that the victim had been
24 removed by CFD ambulance to the Cook County Hospital,
25 and that he had apparently been shot while in his auto

Page 112

1  at this location.  Detectives learned that the victim
2  had exited the Queen's Submarine Shop seconds before
3  shots were heard from in front of this shop by its
4  operator, Gurgid Singh.  Detectives also learned that
5  the victim had apparently attempted to back his auto
6  from the scene upon being shot, and that the 1979
7  Chevrolet station wagon he had been driving had lost
8  control and struck a 1983 Clements at 1206 West 51st
9  street."  And then at the end of that paragraph, it
10 says, "And learned that the victim had exited his auto
11 after being shot and had fallen on the street at this
12 location where he was removed by the emergency medical
13 personnel."  Do you see that, sir?
14     A  No.
15     Q  Sorry.  The last part I was reading was from
16 here.
17     A  Okay.  Yes.  I do.
18     Q  Okay.  And so you knew that there had been a
19 shooting in front of the Queen's Submarine Shop, right?
20     A  Yes.
21     Q  The owner/operator had heard the shots being
22 fired shortly after a customer had left his shop, right?
23     A  The owner/operator of the vehicle, you mean
24 the victim?
25     Q  No.  I mean the operator of the submarine

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

| Page 113 |
| --- |

```
 1    shop, Gurgid Singh?
 2        A   Yes.
 3        Q   Okay.  And that the victim had gotten into his
 4    car, and then after he was shot, he then backed his auto
 5    into another car and then left the car and fell into the
 6    street, right?
 7        A   Yes.
 8        Q   All right.  And you also knew from the supp
 9    report that the victim had, "Jewelry on him that
10    included four yellow metal neck chains, two metal rings,
11    a ring with two stones, a watch and a medallion," and
12    that he also had $89.24 when he was -- on his person
13    when he was brought to the hospital, right?
14        A   Okay.  Yep.
15        Q   And you were aware of that information when
16    you were conducting your investigation to the Garcia
17    homicide, right?
18        A   I believe I was.
19        Q   All right.  And then the bottom of -- sorry, I
20    called this the second page, but it's apparently the
21    third page of Exhibit 1.  It states that detectives also
22    learned some information from officers White and
23    Hargrove, who had spoken with the male Arab owner of the
24    Star Food and Liquors, and that, "That individual told
25    them that he had heard that the shooting was meant for
```

| Page 114 |
| --- |

```
 1    an individual named Snake, who was a passenger in the
 2    victim's auto, and this male Arab store owner further
 3    told them that the shooter was a male black named
 4    Thomas, and that the shooter was sent to do the shooting
 5    by a dope dealer named Troy, who drives an I-ROC, and
 6    resides in the 5000 block of south Elizabeth."  Do you
 7    see that, sir?
 8        A   I do.
 9        Q   And you're aware of that information on
10    September 16, 1991, when you were investigating the
11    Garcia murder, correct?
12        A   Yes.
13        Q   And then you see on the next page, page 4 of
14    Exhibit 1 says, "Efforts to locate and interview this
15    male Arab store owner remained and detectives learned
16    that the individual to be interviewed may be the owner's
17    son, Jay.  Detectives were unable to locate this
18    individual or to personally interview him regarding this
19    information and where he had obtained it from.  Efforts
20    to locate the operator of the Queen's Submarine Shop
21    also negative as he had closed the shop prior to
22    detectives arrival on the scene, and no home phone or
23    address was available.  Additional efforts will be made
24    to locate and personally interview these individuals."
25    Do you see that, sir?
```

| Page 115 |
| --- |

```
 1        A   I do.
 2        Q   All right.  Would you agree that it would be
 3    your responsibility as the detective following up on
 4    this investigation to question the sub shop owner and
 5    follow up on the lead about the Arab store owner who had
 6    information about Thomas and Troy with the I-ROC being
 7    involved in the murder?
 8        MR. YAMIN:  Object to the form.
 9        MR. GRILL:  Yeah.  Objection.
10        A   I would say absent any other information I
11    would, but that wasn't the case here.
12        Q   All right.  So then you spoke to Duckhorn and
13    O'Riley, and they provided you with some information
14    about the murder, correct?
15        A   Correct.
16        Q   All right.  So let's show you what we'll mark
17    as Exhibit number 2.  All right.  This is a supp report
18    created by yourself and your partner, correct?
19        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
20        A   Correct.
21        Q   And this is a document Bates numbered
22    Plaintiff Jakes 005312 through 5317.  All right.  Let's
23    go down to the third page of this document.  It says,
24    "On September 16th at 4:30 hours, the reporting
25    detectives were assigned to a follow-up investigation
```

| Page 116 |
| --- |

```
 1    under this RD number.  And the reporting detectives had
 2    a conversation with police officer Pack of the night
 3    district technical team and the following information
 4    was learned from this officer."  Do you see that, sir?
 5        A   I do.
 6        Q   And did you and Detective Kill have a
 7    conversation with Thomas Pack about what he knew?
 8        A   I don't know if I did or the other detectives
 9    that we were taken over from did.
10        Q   In any event, the information that Pack had
11    was conveyed to you and your partner Detective Kill,
12    correct?
13        A   Correct.
14        Q   Did you work with Pack in the night district?
15        A   I did.
16        Q   All right.  And how long had you worked with
17    Pack?
18        A   I don't know.  I switched TAC teams. So, you
19    know, I'm not sure but we did work the same TAC team for
20    a while.
21        Q   Did you respect him?
22        A   Yes.
23        Q   Let me go back.  All right.  So then Thomas
24    Pack related that, "On September 16th at apar --
25    approximately 12:30 in the afternoon, he received a
```

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 117

1    telephone call from a subject to indicate that Jakes
2    Anthony S of 1212 West 51st Street, may have information
3    for Area 3 violent crimes regarding the homicide murder
4    recorded under this RD number. Pack and his partner,
5    Mike DeLacy, went to 1212 West 51st Street and knocked
6    on the door of the rear house. The door was answered by
7    Jenny Mae Jones, 42 year-old woman. She related that it
8    was her apartment, and that she was the aunt of Jakes,
9    Anthony S, and that he lived with her." Do you see
10   that, sir?
11       A   I do.
12       Q   So when you started this investigation, you
13   were aware that Jakes lived in the rear house at 1212
14   West 51st Street with his aunt Jenny or Jessie Mae
15   Jones, right?
16       A   Correct.
17       Q   And the tactical officers, and then the report
18   continues on saying, "The tactical officers spoke with
19   both Jakes and Jones. Jakes agreed to come to Area 3
20   with the officers, and Jones gave her permission for the
21   subject, Jakes, to accompany the officers to Area 3
22   Violent Crimes. And upon arrival at the Area, the
23   subject was placed in an interview room." Do you see
24   that, sir?
25       A   Yeah. I -- I'm sorry, you skipped over the

Page 118

1    part about the of the protective pat down and the drugs.
2        Q   Well, I haven't gotten to that part yet --
3        A   Okay.
4        Q   -- to be fair.
5        A   Okay.
6        Q   And then you learned that there -- the
7    officers conducted a protective pat down and found drugs
8    and then processed Mr. Jakes, right?
9        A   Correct.
10       Q   And then moving down the third page of Exhibit
11   number 2, there is a summary of the interview with
12   Mr. Jakes. And he said that at the -- you know, about
13   the time of the murder or a little before the time of
14   the murder, 11:30 the night before, he was in front of
15   his home including Denise Harris, Nikia Little, and
16   Annette Harris, a cousin named "Quarter-Pounder," and
17   another cousin named "Tweety," and about 11:30 a vehicle
18   were
19   -- had people who were waving a Mexican flag, and that
20   one of the occupants threw a bottle from the vehicle,
21   which broke according to this, the second floor front
22   window at 1212 West 51st Street. And Jakes said that he
23   and the people he is with cleaned up the broken glass,
24   and as they're putting the gr -- glass in the garbage in
25   the alley, they ran into three teenagers who they were

Page 119

1    fighting with earlier. These three young men chased
2    Jakes and his cousins who were with him to Throop
3    Street. "Jakes and his cousins outran their assailants
4    and returned home. When they arrived in front of 1212
5    51st Street, the Chicago fire ambulance was already
6    there. Jakes went up on the front porch of 1212 51st
7    Street and began an argument with another boy. His aunt
8    slapped him across the face for causing trouble sent him
9    into the house." Do you see that?
10       A   I do.
11       Q   Okay. And all that information was conveyed
12   to you by detectives Duckhorn and O'Riley before you
13   talked to Jakes on September 16, right?
14           MR. GRILL: Objection. To the extent it
15   mischaracterizes his testimony. Go ahead.
16       A   I believe most of it, yes.
17       Q   Is there any portion of that that I was just,
18   you know, showing you and reading to you that you recall
19   you did not receive?
20       A   I have no recollection of this at all. I'm
21   just saying -- doing the best I can here. I'm sure I
22   would've got some of it. I don't know if I can say I
23   got all of it. I just don't remember.
24       Q   All right. You would want -- you would have
25   wanted to reprise yourself of the important

Page 120

1    investigation to date, correct?
2        A   Yeah.
3        Q   All right. And so at the time that you took
4    over the investigation, you knew that somebody needed to
5    talk to the Arab store owner, someone needed to talk to
6    the sub shop owner, and that you had a person in the
7    area, a 15-year-old kid, who it was said he had
8    information about the murder, but when interviewed, said
9    he didn't know anything about the murder. He wasn't
10   present at the time that it committed, right?
11       A   I also knew we needed to interview Denise
12   Harris, Nikia Little, and Annette Harris.
13       Q   Okay. So you now had more witnesses to track
14   down?
15       A   Correct.
16       Q   Did you use his cases a training exercise at
17   all being a new detective?
18           MR. GRILL: Objection. Form.
19       A   No.
20       Q   Okay. So you were a fully-fledged detective
21   and you're hitting the ground running, right?
22           MR. GRILL: Objection. Objection form.
23   Argumentative. Go ahead.
24       A   Yeah. According to the Chicago Police
25   Department, I was a fully-fledged detective.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 121

1    Q   Okay.  And then at the bottom of page 3, it
2  says -- of Exhibit 2, "At this time, the undersigned
3  reporting detectives reported for duty.  The reporting
4  detectives took over the investigation.  The reporting
5  detectives were advised of the facts and progress of the
6  investigation."  And then it says that you talked to
7  Jakes; is that right?
8    A   Correct.  Correct.
9    Q   Why did you want to talk to Jakes?
10   A   To get some additional information about what
11 he told the other detectives, maybe some additional
12 information about Quarter-Pounder.  More additional
13 information about, you know, where they may be.
14   Q   Why did you want information about
15 Quarter-Pound?
16   A   Well, because we were on our way out to go
17 talk to the girls and then we have these two unknown
18 subjects that may have information about it.
19   Q   According to Jakes, Quarter-Pound was with him
20 away from the scene of the crime at the time the crime
21 happened, right?
22   A   But he also said he knew who they were in a
23 fight with.
24   Q   Okay.  Why did you want to know who they were
25 in a fight with?

Page 122

1    A   Because at that time, we didn't know who shot
2  them yet.  Could have been the -- could have been the
3  three people he had a fight with, it could have been the
4  Mexicans that he mentioned, nobody knew what happened.
5  So we tried to figure it out.
6    Q   It could also be Thomas who was sent by Troy,
7  right?
8        MR. GRILL:  Objection to form.
9    A   It -- it could be, but when we got hold of
10 Snake, we learned who -- we knew that they were drinking
11 with Troy.  So that sort of went out the window.
12   Q   Okay.  You knew who was drinking with Troy?
13   A   It's in my GPR as, I think, Ronnie Sloan.  When
14 we came upon Gus Robinson mentioned the name Troy.
15   Q   Right?  And Troy didn't commit the murder,
16 right?  He ordered the murder, right?
17   A   Right.  According to the --
18   Q   So you were given information about Troy.  And
19 you thought that because Troy was drinking with Mr., I
20 think, it was Sampson, you then -- it went out the
21 window that he could have been involved in the murder.
22 Is that what you're saying?
23   A   We already had -- we did bring Troy in.  And
24 then when we got to the area, we learned from Gus
25 Robinson what occurred.  And there was no Troy, there

Page 123

1  was no else there only Troy.  Gus wasn't the target as
2  these anonymous people wanted to say.  So we -- we took
3  Gus' statement and what the others individuals told us
4  so we proceeded that way.
5    Q   Okay.  So you brought Troy into the station,
6  is that what you're saying?
7    A   I don't know if we brought Troy into the
8  station.  I don't think he was brought into the station.
9  I think the other people were.
10   Q   Did you make any attempt to find Troy?
11   A   No.  By that time, the investigation turned
12 into another direction.
13   Q   I'm not asking about that time.  At any point,
14 did you ever make any effort to find Troy?
15   A   No.
16   Q   Did you ever make any effort to find Thomas?
17   A   No.
18   Q   Did you ever make any effort to speak to the
19 male owner of the liquor store?
20   A   No.
21   Q   Okay.  And is it fair to say that you then
22 spoke to Jakes, and he told you, basically, the same
23 information that he'd provided before?
24   A   At what point?
25   Q   Sorry.  When you spoke to Jakes -- well, let's

Page 124

1  go back for a second.  After you spoke to Duckhorn and
2  O'Riley, you wanted to speak to Jakes, right?
3    A   And I just said we did, yes.
4    Q   What information were you hoping to find out?
5    A   As I just previously stated we're trying to
6  get some additional information about the girls where
7  they may be, whatever.  I mean, I -- I don't remember
8  that, but I'm telling you that's what I would've done.  I
9  had no addresses for them.  So I'd go out and try and
10 find them, to talk to them.  They may have information
11 concerning the murder, or they may not.
12   Q   And I mean he told you they were at 1212 West
13 51st Street or that you told Duckhorn and O'Riley
14 they're at 1212 West 54th Street, 51st Street right?
15   A   Right.
16   Q   Okay.  So then you spoke to Mr. Jakes and he
17 told you this around 4:45 on the afternoon of September
18 16, right?
19   A   Correct.  Very briefly, yes.
20   Q   Did you take his photograph at that time?
21   A   I don't recall doing that, no.
22   Q   All right.  There'd be nothing that would
23 prevent you from doing that, correct?
24   A   No.
25   Q   And -- all right.  So and it might have been

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 125

1  helpful to have a photograph of him, if you're talking
2  to Denise Harris and Nikia Little and Annette Harris to
3  confirm that those were the people that he was talking
4  about, right?  That they knew each other?
5       A  No.  I would've -- they were neighbors, so I
6  would have -- it would have been helpful for me, but
7  --
8       Q  Okay.  Did you know any of those three girls
9  before you talked to them on September 16?
10      A  I may have -- I may -- I may have had some
11  interaction with them, but I don't remember.
12      Q  Okay.  And Jakes told you that his cousin
13  Quarter-Pound lived next door to him, right?
14      A  Correct.
15      Q  All right.  So where did you go to look for
16  well, strike that -- after you talked to 15-year-old
17  Anthony Jakes, and you knew he was 15 years old, right?
18      A  Correct.
19      Q  After you talked to 15-year-old Jakes, did you
20  offer to give him a ride home?
21      A  No.
22      Q  Did you offer to let him make a telephone call
23  and tell his aunt where he was?
24      A  No.  His aunt knew where he was.
25      Q  Did you offer to allow him to get a ride home

Page 126

1  from somebody else?
2       A  No.
3       Q  Did you tell him he was free to leave?
4       A  Never came up, no.
5       Q  You wanted to keep Anthony Jakes at Area 3,
6  right?
7       A  He was cooperating in an investigation.  Be
8  helpful, yes.
9       Q  And when you left Anthony Jakes, you left him
10  in an interview room, correct?
11      A  I don't know if we left him in an interview
12  room or on the bench.  He was sitting, it could have
13  been the sergeant's office.  I don't recall where he
14  was.
15      Q  Well, let me read you a portion of, you know,
16  I'll show it to you so there's no ambiguity.  This is
17  Kill's trial testimony page 191.  Line 13, it says,
18  "What did you and Detective Boudreau do at that time?"
19  Answer, "At that time, Detective Boudreau left him in
20  the area, in the interview room.  He was seated in the
21  interview room and we went out in the police car.  We
22  went to the vicinity of 51st and Racine, which is 1200
23  West 51st Street."  Do you see that, sir?
24      A  I do.
25      Q  All right.  Do you agree with Detective Kill's

Page 127

1  testimony that you left Jakes in the interview room when
2  you went out to the scene to investigate?
3       A  Yeah.  I -- I don't remember that, but I have
4  no reason to doubt Detective Kill's testimony.  That's
5  what he testified to.
6          MR. YAMIN:  Russell, could you just read the
7       Bates stamp of that page in the record?
8          MR. AINSWORTH:  It's Plaintiff Jakes 043567.
9          MR. YAMIN:  Thanks.
10         MR. AINSWORTH:  Let me just make sure I have
11      the right version.  Yeah.
12         COURT REPORTER:  I just want to --
13         MR. AINSWORTH:  Sure we can mark this as
14      Exhibit 3.
15         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
16         COURT REPORTER:  Okay.
17  BY MR. AINSWORTH:
18      Q  Okay.  So and that would have given Jakes some
19  privacy.  If people came to the area, you know, and they
20  wouldn't necessarily see him sitting out in the open
21  area with him in an interview room, right?
22      A  Yes.
23      Q  Okay.  So then you go to the scene and you
24  talked to the owner of the sub store, correct?
25      A  No.

Page 128

1       Q  All right.  Let me show you what we'll mark
2  -- what we've already marked as Exhibit 3, which is
3  Kill's testimony.
4       A  I stand corrected.  I was just glancing, well,
5  I remember reading a report that we did talk to somebody
6  or whatever.
7       Q  Why is it not showing up.  Okay.  So on the
8  next page, page 191 -- no 192, line 7, it says,
9  Detective Kill asked, "Did you have a conversation with
10  anyone at the sandwich shop?"  Answer, "Right.  We
11  talked to the proprietor of the sandwich shop."  Answer.
12  "How long did you talk to the proprietor for?"  Answer,
13  "That was probably 15 to 20 minutes, but we talked to
14  him, but he gave us no information."  Do you see that
15  testimony, sir?
16      A  I do.
17      Q  Do you have any reason to doubt Detective
18  Kill's testimony back in 1993 that you and he went to
19  the scene and talked to the sub store owner?
20      A  Again, I don't remember that, but I stand by
21  his testimony.
22      Q  Seems like a pretty, you know, basic
23  investigatory thing to go and talk to the sub store
24  owner when no other detective had talked to him yet.  The
25  person who reported the shooting.

32 (Pages 125 to 128)

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 129

1    A   Generalization, yes.
2    Q   You would agree that's a good thing to do,
3  right?
4    A   Yes.
5    Q   He might have seen who the victim was with,
6  right?
7    A   Yes.
8    Q   Okay.  All right.  So then while you were at
9  the scene around 1206 West 51st Street, you talked to
10  -- you found and talked to the three girls, Denise
11  Harris, Nikia Little, and Annette Harris, right?
12   A   Yes.
13   Q   Did you speak to them together or separately?
14   A   I don't recall.
15   Q   All right.  So Denise Harris told you that she
16  wasn't home at the time of the shooting, right?
17   A   I'd have to refer to my GPRs.
18   Q   Well --
19   A   If that's what she said.  I don't remember
20  what she said.
21   Q   All right.  So let's take a look back at
22  Exhibit number 2, page 4 of Exhibit number 2.  All
23  right.  We've got Denise Harris.  Basically, she says,
24  "I wasn't home when the murder happened.  I walked away
25  over to May Street, and when I came back, the shooting

Page 130

1  had already been -- had already happened," right?
2    A   Uh-huh.  Can I see my GPR around that
3  interview?
4    Q   You can.  Sure.
5        MR. AINSWORTH:  Mark this as Exhibit 4.  All
6  right.
7    Q   Here's your interview with Denise Harris.
8  Don't think it's going to help you, but you tell me.
9        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
10   A   That's specifically what she said.  I just
11  didn't know if there's more on there or not.
12   Q   All right.  So I'm going to direct you back to
13  Exhibit number 2.  So Nikia Little says she was at home
14  when the murder happened.  And then Annette Harris said
15  that she was gone somewhere the night, and she found out
16  about the incident the following day.  Do you know where
17  Annette Harris went?
18   A   No.
19   Q   Did you ask her?
20   A   We may have.
21   Q   Did she refuse to tell you?
22   A   I don't recall.
23   Q   Would you have documented that if you had
24  -- if she had?
25       MR. GRILL:  Objection.  Form.

Page 131

1    A   Oh, probably.
2    Q   Kind of thing that would -- you know, if
3  you're investigating a homicide, you'd want to write
4  down if somebody is refusing to tell you where they were
5  at the time of the crime, right?
6    A   Yeah.  Yeah.  Maybe, but, well, you know --
7  when we went to go talk to him, they're, sort of, like
8  alibi witnesses for Jakes, so whatever they said, they
9  weren't with him.  So --
10   Q   What do you mean alibi witnesses for Jakes?
11   A   Well, then Jakes say he was with them they
12  were at the front porch.
13   Q   You had no suggestion -- no one had suggested
14  that Jakes had anything to do with the murder, right?
15   A   No.  I was talking about where he was.  He
16  said he was with them and that they may know who did it.
17  So obviously, that was a lie.
18   Q   So Jakes lied, was your conclusion?
19   A   Well, I mean, there's something going on.  He
20  mentioned three girls, we went to talk to them, and they
21  don't know anything he's talking about.
22   Q   Okay.  So in your police mind, you determined
23  that there's something -- something going on here,
24  right?
25       MR. GRILL:  Objection.  Form.

Page 132

1    Q   You want to investigate further?
2        MR. GRILL:  Objection.  Form.
3    A   What's a police mind?
4    Q   Well, I thought you were looking at this as a
5  police officer, right?
6    A   Looking at it from a common-sense standpoint
7  of the human being, yes.
8    Q   Okay.
9    A   Anybody would ask that same question too not
10  just a police officer.
11   Q   Okay.  You knew that liquor store, where the
12  person had made -- had claimed that he knew that Thomas
13  and Troy had something to do with the murder, right?
14   A   Yes.
15   Q   All right.  And just for those of us playing
16  along at home, let's mark this as Exhibit 5.  All right.
17  So -- all right.  The address given was 1102 West 51st
18  Street, right?
19       (EXHIBIT 5 MARKED FOR IDENTIFICATION)
20   A   Correct.
21   Q   And that sound about right for where the
22  liquor store was?
23   A   Close.  Yeah.
24   Q   All right.  And so did you want to go to 1102
25  West 51st Street to talk to the employee who said that

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 133

1    the shooting was meant for Snake. And that a guy with
2    the last name of Thomas did the shooting with the
3    description of a six-foot-tall, skinny, dark complexion.
4    And that Thomas was sent by a man named Troy, who was
5    5'7", 190 pounds, who drives an I-ROC, and resides on
6    the 50th block of Elizabeth?
7        A    Oh, yeah. But we found Snake instead.
8        Q    Okay. So you wanted to talk to the employee
9    at the liquor store, right?
10       A    I wanted to talk to the employee at the liquor
11   store and also Snake.
12       Q    Okay. And then showing you -- turning back to
13   Exhibit number 2. He then went to 1100 West 51st
14   Street, right?
15       A    Correct.
16       Q    So you're like, at the liquor store --
17       A    Correct.
18       Q    -- when he had this conversation, right?
19       A    Correct.
20       Q    So while you're at the liquor store, you
21   talked to somebody who refused to provide their name,
22   right?
23       A    A female, yes.
24       Q    Right. Who was the woman who refused to
25   provide her name?

Page 134

1        A    I don't know she refused to provide her name.
2        Q    I see. You'd never seen her before; is that
3    right?
4        A    I don't recall ever seeing her before. I mean
5    she wanted anonymity and we gave it to her. She lives
6    in the middle of a -- a -- a gang area.
7        Q    Okay. Right. And so you referred to this
8    person with the male gender you say, "he related" --
9    that "he and some friends." Why did you write "he"?
10       A    I didn't write this report Detective Kill did
11   but he identifies her as a female black about 18 to 20
12   years of age in the report.
13       Q    Right. And -- but I'm trying to find out why
14   your report identifies the pers -- or assigns a male
15   gender to the person?
16       MR. GRILL: Objection. Mischaracterizes his
17   testimony.
18       A    Yeah. As I said before, Mike Kill typed this
19   report you're going to have to ask him why he put the
20   word in, he.
21       Q    Okay. And before this report was submitted,
22   you checked it for accuracy, correct?
23       MR. GRILL: Objection. Form.
24       A    I might have -- I may have. I -- I don't know
25   if I would've caught that.

Page 135

1        Q    Well, I'm not suggesting that you would have
2    caught, you know, as any typo within the document. I'm
3    just saying that before it was submitted, you would have
4    -- reviewed the report to ensure that it was accurate,
5    right?
6        MR. GRILL: Objection. Form.
7        A    As usual, yes.
8        Q    Before your signature or before either your
9    signature is affixed to the report or before you give
10   your permission for your partner to put your signature
11   on it, you review the report to make sure that it's
12   accurate, correct?
13       A    Sometimes.
14       Q    Right. Do you sometimes sign your name to
15   reports without checking to ensure that they're
16   accurate?
17       A    I didn't sign my name to this report.
18       Q    All right. Do you give your partner
19   permission to sign your name to this report -- to
20   reports without ensuring that the report is accurate?
21       A    Sometimes.
22       Q    Do you know one way or the other if you
23   reviewed this report before it became final?
24       A    I have no recollection. I may have I may not
25   have, I don't know.

Page 136

1        Q    I'll come back to that. All right. So it
2    says that -- you say that you heard two to three
3    gunshots from the west. And 1100 West -- or 1102 West
4    51st Street is east of this Queen's Submarine Shop,
5    right?
6        A    Uh-huh.
7        Q    And so the shots would have come from the
8    west?
9        A    According to this, yes.
10       Q    Well, according to the --
11       A    And that's where the Submarine Shop was yes.
12       Q    Yeah. Okay. All right. It says, "He then
13   went to the scene of the incident and heard a subject
14   asking if Snake was all right," right?
15       A    Yep.
16       Q    And then it refers to the subject was an
17   unknown female black about 18 to 20 years of age. Do
18   you see that?
19       A    Yep.
20       Q    And that's referring to the subject who is on
21   the street asking if Snake was all right, correct?
22       A    I -- I -- I can't tell from reading it. I
23   think it's both.
24       Q    It says, "The subject citizen then returned to
25   1100 West 51st Street. He could add nothing further

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 137

1 regarding the incident." Correct?
2      A   Correct.
3      Q   All right.  You don't have any memory of
4  speaking to this individual on the street, correct?
5      A   No, sir.
6      Q   All right.  And so -- but you do agree that at
7  this point you now have two different people providing
8  information about Snake being involved in this homicide
9  in some respect, right?
10     A   Of being the target, yes.
11     Q   Okay.  So then because you're at the liquor
12 store, you walk into the liquor store to talk to the
13 employee to find out information about Thomas being the
14 perpetrator of a hit ordered by Troy, correct?
15     A   I -- I don't ever recall anything in my report
16 or previous testimony that I walked into a liquor store.
17 I don't know where you're getting that.
18     Q   Why wouldn't you, if you're at the liquor
19 store, then walk inside the liquor store to find out
20 information about the Thomas who committed the murder at
21 the direction of Troy?
22         MR. GRILL:  Objection.  Argumentative.
23     A   I -- I mean -- I don't even know if the liquor
24 store was open.  So I -- I -- I can't answer that right
25 now.

---

Page 138

1      Q   So you were out there between the hours of
2  5:00 and 9:00 p.m., correct?
3      A   Correct.
4      Q   All right.  And so you're saying the liquor
5  store might have been closed between the hours of 5:00
6  and 9:00 p.m. at the corner of was Aberdeen and 51st
7  Street?
8          MR. GRILL:  Objection.  Form.  Mischaracterizes
9  his testimony.
10     A   I -- I -- I'm not saying that, I -- I'm saying
11 that we were looking for Snake as well.  And he's down
12 the block from the liquor store.
13     Q   And when you were at the liquor store, why
14 didn't you talk to the employee at the liquor store who
15 might have known who the actual perpetrator was, not the
16 victim?
17         MR. GRILL:  Objection.  Form.
18     A   I -- I -- he may have -- maybe that person
19 wasn't there.  I -- I don't know but we looked for
20 Snake.
21     Q   Well, I'm giving you an opportunity, sir, do
22 you have any explanation for why when you were at the
23 liquor store, you did not go inside the liquor store to
24 ask the employee if you knew anything about the Thomas
25 who allegedly committed the murder or the Troy who

---

Page 139

1  allegedly ordered the murder?
2          MR. GRILL:  Objection.  Mischaracterizes his
3  testimony.  Form.
4      A   And you're -- you're question my mental
5  gyration.  So I wanted to talk to first.  I just told
6  you I looked for Snake.  So I don't have an explanation
7  why I wouldn't in there.  I knew who Snake was and
8  that's where I went to talk to him instead of some
9  anonymous person.  They heard this, so --
10     Q   Anonymous person named Jay, right?
11     A   Yeah.
12     Q   Who was an employee of the liquor store,
13 correct?
14     A   He's still anonymous at that time.
15     Q   All right.  And did you do anything to make
16 him less anonymous?
17         MR. GRILL:  Objection.  Form.
18     A   No.
19     Q   All right.  So then you left the liquor store.
20 Do you remember what you did next?
21     A   I think we went around the corner and found
22 Snake.
23     Q   All right.  Do you remember you doing that or
24 you're relying on the report to tell you that?
25     A   Relied on the reports.

---

Page 140

1      Q   Okay.  You don't really know what you did
2  next, but the next thing is report in your -- in Kill's
3  report -- on your report is that there's a meeting with
4  Snake at 1531 South Elizabeth, right?
5      A   Along with others.
6      Q   Okay.  And so tell us what happened when you
7  encounter Snake on the street?
8      A   I -- I mean -- I don't recall.  I'd have to
9  stand by what's in my reports or any previous testimony.
10     Q   Well, did you interview them?
11     A   I'll say it again.  I don't remember.  I'd
12 have to stand by my reports from my previous testimony.
13     Q   Okay.  Can you tell us why you brought Snake
14 into the station?
15         MR. GRILL:  Objection.  Form.
16     A   I -- I don't recall why we wanted to figure
17 out why people thought he was a target of a shooting,
18 and that he may have been with the victim.
19     Q   Okay.  And had you -- how do you know Snake?
20     A   He was from the neighborhood.  I think I
21 previously arrested him.
22     Q   All right.
23     A   And the reason why I know him he had a -- he
24 had a skin disease or a pigment deficiency in his skin
25 which -- that's why everybody called him Snake.  It was

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

| Page 141 | Page 142 |
|---|---|

**Page 141**

1  easily recognizable.
2     Q   Did you have a relationship with him?
3     A   Not that I can recall.  No.
4     Q   Have he ever provide you information about
5  another case before?
6     A   Not that I can remember.  No.
7     Q   Had he provided you information about gang
8  members or gang activities in the area?
9     A   Not that I can remember.  No.
10     Q   All right.  Since then did he provide you with
11  information about gang members?
12     A   After this murder?
13     Q   Yeah.
14     A   No.
15     Q   Did he provide -- did he ever provide you with
16  information on any other case apart from the Garcia
17  murder?
18     A   No.  Not that I can recall.  No.
19     Q   Okay.  So you brought in Snake because he's
20  alleged to be the victim, you talked to him on the
21  street, right?
22     A   Yes.
23     Q   And he told you that Jakes was involved in
24  this murder, right?
25     A   I don't know if he told me that on the street

**Page 142**

1  but he subsequently told us that.
2     Q   Take a look at your second -- your testimony
3  at the evidentiary hearing in April, page 43 of that
4  transcript.
5     MR. GRILL:  The Bates stamp, just in case?
6     MR. AINSWORTH:  4275 -- Plaintiff 42756.
7     MR. GRILL:  Got it.
8  BY MR. AINSWORTH:
9     Q   Are you there, sir?
10     A   I'm here.  I've read it.
11     Q   All right.  So this is testimony, you know, on
12  being questioned by the Special Prosecutor, not being
13  tricked by Russell Ainsworth, or something like that.
14  And so at page 43, line 16, it says -- well, line 8.
15  "Question.  What did Gus Robinson tell you?"  Answer,
16  "He basically gave me a statement."  There's an
17  objection to the foundation.  At which time we're
18  talking about.  And then at line 16, you asked the
19  Question.  "When you were out in the street, what did Gus
20  Robinson tell you and Detective Kill?"  Answer, "That
21  Anthony Jakes was involved in this."  Question, "After
22  Gus Robinson told you that, what did you do?"  Answer,
23  "Brought him, Andre Green, Michael Sampson, and Tyrone
24  Pitts, and Ronnie Sloan to the office."  Do you see
25  that, sir?

| Page 143 | Page 144 |
|---|---|

**Page 143**

1     A   Yeah.
2     MR. GRILL:  Object.  It's not a memory.
3     Q   Does that refresh -- does that refresh your
4  recollection that Gus Robinson told you on the street
5  that Jakes was involved in the murder?
6     A   Doesn't refresh my recollection, but that's
7  what I testified to.
8     Q   Do you have any reason to dispute your test
9  -- to doubt your testimony that that is indeed what
10  happened?
11     A   No.
12     MR. GRILL:  Objection.  Form.
13     Q   All right.  So you then -- you have four other
14  individuals with Snake.  Why did you bring them to the
15  station?
16     A   Just hold a minute.
17     Q   What are you looking at, sir?
18     MR. GRILL:  I was just handing him --
19     A   Just handing him back his documents.  Because
20  they were with Gus, and the fact that they were drinking
21  with a -- somebody named Troy, I believe.  And I -- I'm
22  guessing right now, but they all came in.  And I don't
23  recall the specific reasons why, but I know we wanted to
24  interview them.
25     Q   So did you question them on the street about a

**Page 144**

1  murder?
2     A   We may have asked him about it.
3     Q   Well, did -- do you know one way or the other
4  if you did?
5     A   I -- I don't.  I know what's in the police
6  report and that's the sum and substance of what they
7  told us.
8     Q   All right.  So can you explain, for instance,
9  why you asked Ronnie Sloan to come to the station?
10     A   28 years later, I can't.  I think -- I -- I
11  don't know the answer to that.
12     Q   And did you handcuff any of them?
13     A   I don't recall doing that, no.
14     Q   All four of them come to the station
15  voluntarily?
16     A   Yeah.
17     Q   Did you give him a protective pat-down before
18  bringing them to the station?
19     A   Probably.  I don't remember.
20     Q   When you do a -- when you do a protective
21  pat-down, that's just to check for weapons, right?
22     A   Yeah.  Just for a weaponry.
23     Q   You don't go into people's pockets, right?
24     A   No.
25     Q   Unless you feel something that might be a

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 145

1  weapon, correct?
2      A   Correct.
3      Q   Okay.
4          MR. YAMIN:  You -- Russell, excuse me a
5  second.  Let me interrupt your flow.  I need a
6  five- minute break for biological reasons.
7          MR. AINSWORTH:  That's fine, George.  And
8  we're at a point where we're going to switch to the
9  interviews of the station, so let's break now.  Off
10 the record.
11         MR. YAMIN:  Okay.  I appreciate that, thanks.
12         COURT REPORTER:  The time is 2:37.  We're off
13 the record.
14         (OFF THE RECORD)
15         COURT REPORTER:  The time is 2:49, and we are
16 back on the record.
17 BY MR. AINSWORTH:
18     Q   All right.  So sir, when you spoke to Denise
19 Richard out in the street, she didn't run away, right?
20     A   Denise?  No.
21     Q   Yeah.  She answered your questions, correct?
22     A   Yes.
23     Q   Okay.  And so do you put all five guys in the
24 back seat of your car?
25     A   I don't recall if I did, or if I didn't.

---

Page 146

1      Q   How else would you get them to the station?
2      A   I could have put two in our car and called for
3  another car, I just don't remember.
4      Q   All right.  Do you have any concern about the
5  fact that Anthony Jakes was sitting at the station all
6  this time that you were out in the street talking to
7  people?
8      A   No.
9      Q   You got back to the station about 9:30 at
10 night; is that right?
11     A   Correct.
12     Q   Why weren't you concerned about 15-year-old
13 Anthony Jakes still being in the station at 9:30 at
14 night?
15     A   It wasn't my mind at -- at extensive time.  And
16 he was safe.
17     Q   Okay.
18     A   And he was cooperating.
19     Q   How was he cooperating?
20     A   Well, when we left him, he was -- told us
21 about what he -- well, what he knew about the murder.
22 Albeit lying to us, but he was cooperating, trying to
23 give information as to who may know about it.
24     Q   Why do you think he was lying?  What makes you
25 say that?

---

Page 147

1      A   I can sit there is retrospect now because
2  after we talked to the girls, we knew that that wasn't
3  true.  And then after we talked to Jakes, we knew what
4  he told us before wasn't true.
5      Q   Okay.  So after you talked to the girls, I
6  mean, you talked to Tyrone Pitts, right?
7      A   Yes.  That's what I --
8      Q   What did Tyrone Pitts tell you?
9      A   I'd have to see my GPR and a police report.
10     Q   All right.  Do you have any recollection of
11 your conversation with Mr. Pitts?
12     A   No.
13     Q   All right.  What do you want to see, your GPR
14 or your police report?
15     A   Both.
16     Q   Okay.  Well, let's mark this as Exhibit number
17 6.  It's GPR.  This is your handwriting?
18         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
19     A   Yes, sir.
20     Q   All right.  So you had information about
21 Pitts' information.  And then at the bottom here, can
22 you tell us what this last paragraph says?  Can you read
23 that to us?
24     A   Today I was walking to the submarine place
25 around 11:00 p.m. I was in the submarine place.  It

---

Page 148

1  looks like Denise sitting on the porch where Denise
2  lives.  One of them's telling him that they saw a man
3  get shot and he died right in front of her -- or them.
4      Q   So he's telling you that Denise, who told you
5  she wasn't there, was actually right in front of the sub
6  shop and watched the person get shot and die in front of
7  her, right?
8      A   That's what he said.
9      Q   So when did you -- when did you talk to
10 Mr. Pitts?
11     A   It was after we located him on the street.
12     Q   All right.  And that was sometime before 9:30
13 p.m. on September 16?
14     A   Correct.
15     Q   And the murder happened the night before, like
16 at 11:55 p.m.?
17     A   Correct.
18     Q   So when did Pitts say he was walking to the
19 submarine place?
20     A   You mean, when did he tell me?
21     Q   When did he say he was walking to the
22 submarine place?
23         THE WITNESS: (Phone rings) I'm sorry.  I got
24 to take this call.  Could you give me a minute?
25         MR. AINSWORTH:  Yeah.  Off the record.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 149

1    COURT REPORTER: The time is 2:54 and we are
2    off the record.
3        (OFF THE RECORD)
4    COURT REPORTER: The time is 2:55 and we are
5    back on the record.
6  BY MR. AINSWORTH:
7    Q  Okay. I want to show you Exhibit number 2
8  again. This is your supp report. For Tyrone Pitts, you
9  say, in summary, but not verbatim, he relayed that he
10 was at school until 9:30 on September 15. He went home.
11 And then it says, he related to that at about 11h00 on
12 September 16. He was walking to Queens Submarine when
13 Harris, Denise said she was on the porch when the
14 shooting happened, and the man died in front of her. She
15 said the guys that did it were Blackstones, but she
16 wouldn't say who they were. He could add nothing
17 further to the investigation. Do you see that, sir?
18    A  I do.
19    Q  All right. So -- and Pitts was telling you
20 that the morning after the shooting, Denise Harris told
21 him that she witnessed the murder. She saw who did it,
22 and she saw the man die in front of her, right?
23    A  Correct.
24    Q  And Jakes had told you that at the time of the
25 murder, Pitts -- or Denise Harris was in -- on the porch

---

Page 150

1  at 1212 W 51st Street and she might have seen what
2  happened, right?
3    A  Correct.
4    Q  And so did this make you think that Jakes was
5  lying?
6    MR. GRILL: Objection, form.
7    A  That? No. I knew she was lying. And what I
8  testified earlier, I said we've talked to Gus, and now
9  when we -- and we also knew that Jakes was lying about
10 that.
11    Q  Okay. So what else was Jakes lying about?
12    MR. GRILL: Objection. Mischaracterizes his
13 testimony. Form.
14    A  His involvement. He -- he -- we learned from
15 Gus Robinson that he was -- that he asked to be a
16 lookout.
17    Q  All right. So you believed that Jakes --
18    A  And he left that out.
19    Q  Okay. So you believed that Jakes was telling
20 the truth about Denise and Anette and Nikia being out
21 front at the time of the murder. But that he was not
22 being truthful about, you know, meaning the part where
23 he was the lookout for the murder; is that fair to say?
24    A  No. I mean, he wasn't being forthcoming. I
25 don't -- I wasn't going to pick sentences apart, which

---

Page 151

1  is a truth and not the truth. He was leaving
2  information out about this homicide. So he -- he was
3  being untruthful.
4    Q  Okay. So you talked to Michael Sampson as
5  well, do you recall that conversation at all?
6    A  I do not.
7    Q  Michael Sampson told you that, "he and his
8  friends, Green, Andre, and Walker, Troy, were standing
9  at about 5030 S Throop from about 23h00 to 1:30 in the
10 morning, the night before. At about midnight they heard
11 two to three shots. He went to the telephone and called
12 his girlfriend, Tanya. When he returned to the group, a
13 man named Jimmy came by and said someone had been shot
14 by the Queens submarine shop." Do you see that?
15    A  I do.
16    Q  So you now have information that there's a
17 Troy Walker who is hanging out on the 5000 block of S
18 Throop, right?
19    A  Correct.
20    Q  And the Troy that you're looking for, or the
21 Troy that the scene supp people were looking for,
22 resides in the 5000 block of S Elizabeth, right?
23    A  Yes.
24    Q  Did you do anything to try and find out, to
25 talk to Troy Walker. Now you have a last name for him?

---

Page 152

1    A  No. We were talking to Gus Robinson, and he
2  told us what happened. We had to -- the logical thing
3  would be go back and talk to Jakes to clear it up.
4  Everything else about Troy was anonymous.
5    Q  Well, now you got a name for Troy. Did you
6  find -- did you ask Michael Sampson if Troy drove an
7  IROC?
8    MR. GRILL: Objection. Form. Foundation.
9    A  I -- I don't know. We may have. We may not
10 have. I -- I don't -- I don't remember.
11    Q  As a good detective, that would have been a
12 good thing to do in this instance, if you got Sampson at
13 the area cooperating with you to find out if the Troy
14 that he knows drives an I-ROC, right?
15    MR. YAMIN: Objection to form.
16    MR. GRILL: Objection. Yes. Join.
17    A  Well, let me -- no, I am a good detective. All
18 right. And there's only so much I could do. I had four
19 people I had to bring to the area. I had a juvenile
20 that was at the area. Those things would have been
21 other things so that -- to characterize that I was a bad
22 detective is the wrong thing, especially for someone who
23 has never been a detective.
24    Q  Well, tell me, sir, if you're training
25 somebody, would you -- and you have information that a

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 153

1  Troy ordered this hit, and you're talking to somebody
2  who is with a Troy Walker at the time of the murder, and
3  was with Troy Walker when somebody came up to him and
4  told him that somebody had been shot at the Queen's
5  Submarine Shop right after the murder. Do you think it
6  would be a good idea to ask that person where Troy lives
7  and does he drive an IROC?
8      MR. GRILL: Objection.
9      MR. YAMIN: Objection to form.
10     A  I would suppose at that point in time right
11  there, no. We had to address what was being presented
12  to us then. If we would've went back, I mean, you want
13  to speak in innuendos, if we would have went back and
14  Anthony Jakes told us. I did ask Gus Robinson to be a
15  lookout, but I left, then -- then -- then we'd start
16  going in other directions. But that didn't happen.
17     Q  Okay. So if you -- just, you know, one
18  opportunity arose and for all, do you have any reason not
19  to ask Sampson questions about Troy and where he lives
20  and what kind of car he drives?
21     MR. GRILL: Objection. Asked and answered,
22  form.
23     A  No.
24     Q  All right. So then, do you recall speaking to
25  either Andre Irene, or -- Greene, or Ronnie Sloan?

Page 154

1      A  I don't recall speaking to them, no.
2      Q  Do you recall who any of those four people
3  were, like, dealing with them on other cases or in any
4  other instance?
5      A  No. As I sit here today, 28 years later, no.
6      Q  All right. So now, you talked to Gus at the
7  area, what did Gus tell you?
8      A  I'd have to see my report in -- what's in our
9  police report.
10     Q  Do you have any recollection of what Gus told
11  you apart from looking at your report?
12     A  No.
13     Q  Why did you take GPRs in -- or notes on a GPR
14  when you were talking to the four guys, Sloan, Pitts,
15  you know, Green, and Sampson?
16     A  It's a way to memorialize what they said.
17     Q  Okay. And it was the way you
18  contemporaneously memorialized it?
19     A  Well, that's a way, yes.
20     Q  The people you were speaking to didn't have
21  any problem with you taking notes, right?
22     A  No. I don't know if I took them
23  contemporaneously or I walked out of the room and wrote
24  them down. I know, sometimes where you take notes in
25  front of people, they get nervous and clam up, so that -

Page 155

1  - that could have been the case there. I don't -- I'm
2  not sure.
3      Q  And there's nothing that prevents you from
4  taking notes right after you leave an interview with the
5  witness, right?
6      A  No.
7      Q  That's correct?
8      A  Correct.
9      Q  Okay. Did you take notes of your interview
10  with Snake?
11     A  I don't recall seeing any.
12     Q  Well, my question is, did you take any?
13     A  I -- I don't know. I don't recall seeing any,
14  so I can't answer that. I don't remember.
15     Q  Did you take any notes after -- on a GPR of
16  your conversation with Snake right after you talked to
17  him?
18     A  I just said I -- I don't remember, and I don't
19  recall seeing any in the file, so I --
20     Q  Did you --
21     A  -- don't know the answer to that.
22     Q  -- withhold your notes of the conversation
23  with Snake?
24     MR. GRILL: Objection. Form.
25     A  No. I don't recall much.

Page 156

1      Q  Where are your notes or -- strike that. Why
2  didn't you -- why don't you have any notes of your
3  conversation with Snake?
4      MR. GRILL: Form and foundation.
5      A  Maybe, I didn't realize -- maybe, I didn't
6  feel I needed notes at that time.
7      Q  Why didn't you feel you needed notes of Snake,
8  but you needed -- you felt you needed notes of Sampson,
9  Pitts, Green, and -- the other guy -- and Sloan?
10     A  I -- I don't know. I can't remember that.
11     Q  All right. Where did you write down Gus
12  Robinson's, you know, personal information, like his
13  address and phone number and things like that?
14     A  If I did write it down, it'd be on a GPR.
15     Q  All right. And so if you didn't have a GPR,
16  how would you remember his address, and his phone
17  number, and things like that to put it in the report?
18     A  Probably get it off of an arrest report or
19  something like that. Rap sheet. I -- I don't know.
20     Q  How would you know if that address was
21  current?
22     MR. GRILL: Objection.
23     A  I wouldn't know if it was current and if you
24  asked him either. So we don't know.
25     Q  Well, if you ask him at least, you know, this

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 157

1  is what he was saying was current, right?
2        MR. GRILL:  Objection to --
3     A  I don't know.
4        MR. GRILL:  -- foundation.
5     A  I don't know.  He was going to be interviewed
6  by the state's attorney, and they would certainly ask.
7     Q  Okay.  Do you think it's a good idea to take
8  notes of your conversations with witnesses?
9     A  Sometimes.
10    Q  Was it ever a bad idea to take notes of your
11 conversation with witnesses?
12    A  Depends on what they're saying.
13    Q  All right.  What about somebody like Snake who
14 tells you about a murder, and his near-involvement in
15 it, and implicates people in the murder.  Do you think
16 it's a good idea to take notes of that conversation?
17    A  It might be if his -- if his story was pretty
18 straightforward and standard, and he was going to repeat
19 it to a State's attorney or the State's attorney was
20 going to further investigate it, there's no reason to
21 take a statement.  I mean, we could remember a short
22 statement.
23    Q  All right.  Well, let's take a look.  So when
24 you talked to Snake, you wanted to know what happened,
25 correct?

Page 158

1     A  Yes.  What his knowledge was, yes.
2     Q  And you want to know who was involved, right?
3     A  Yes.
4     Q  That was important to you, correct?  You
5  wanted to know who was involved, right?
6     A  Yes.
7     Q  All right.  And Jakes was cooperative when you
8  spoke to him, right?
9     A  Correct.
10    Q  All right.  Let me show you Exhibit number 2
11 again.  This is page 5.  And before I go any further, I
12 want to just read into the record Exhibit number 6.  The
13 GPR of Mr. Pitts is Bates numbered, 5 -- Plaintiff Jakes
14 5309.  All right.  Okay.  So we're looking at Exhibit
15 number 2 again, page 5 near the bottom.  And it says for
16 Gus Robinson, "In summary, but not verbatim, he related
17 the following information.  He was in front of
18 approximately 1102 West 51st Street at about 23:50 hours
19 on September 15, 1991.  He had just parked his car when
20 he was approached by Jakes Anthony S.  He said he was
21 known -- he has known Jakes for about four months.  Jakes
22 told Robinson that there was a white dude in the Queens
23 Submarine Shop, and that Little A and his friend were
24 checking on how much money he had because they were
25 going to rob him.  Jakes asked Robinson to act as the

Page 159

1  lookout while they, Jakes, Little A, and his friend,
2  robbed the man when he came out of the store.  Robinson
3  said he wouldn't do it, and he left the parking lot.
4  Robinson drove around the block to Elizabeth and heard
5  approximately three gunshots from the vicinity of the
6  Submarine Shop.  Robinson then went home."  Do you see
7  that, sir?
8     A  I do.
9     Q  Okay.  Do you -- did Robinson tell you
10 anything other than what's listed in the report?
11    A  I -- you know, I don't know.  I don't
12 remember.
13    Q  Does this paragraph accurately summarize the
14 information that Gus -- that Snake provided?
15    A  Yes.
16    Q  All right.  So Jakes referred to the guy -- to
17 Snake as the white dude, right?
18    A  That's what he said.
19    Q  Okay.  And Jake said that Little A and his
20 friend were checking on how much money he had, do you
21 -- is that right?
22    A  I see that.
23    Q  Not that they'd seen his money, but that they
24 were checking on how much money he had because they were
25 planning to rob him, right?

Page 160

1     A  Yes.
2     Q  And Snake called them Little A, right?
3     A  That's what he related to -- yeah.  That's
4  what Jakes told him, Little A.
5     Q  And did Jake -- did Gus or Snake tell you that
6  he saw Little A at the scene?
7     A  From reading this, no.
8     Q  So according to this, you're saying that as
9  far as you knew, little A did not witness -- sorry.
10 Snake did not witness Little A at the scene, right?
11       MR. GRILL:  Hang on.  Objection to form to the
12       extent that you're characterizing this as his
13       report, so forming a question, as the author of it.
14       Go ahead.
15    A  Okay.  So I mean, it's what it says right
16 there.  I don't recall, but that's -- that's what he
17 said to us.
18 BY MR. AINSWORTH:
19    Q  You're one of the reporting detectives on this
20 report, right?
21    A  Yes.  But I didn't write the report.
22    Q  I didn't say you authored, but you're -- this
23 is a report of what you observed, right?
24       MR. GRILL:  Objection.  Foundation.
25    A  It's a summary of what a lot of detectives

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 161

1  did.
2     Q   Okay.  Did -- and Snake didn't tell you that
3  he walked over to the window to look inside the sub shop
4  and see the victim, right?
5       MR. GRILL:  Objection to form.
6     A   No.  It doesn't appear in this interview
7  though.
8     Q   Well, it didn't -- it doesn't appear in any
9  interview, right?
10       MR. GRILL:  Objection to form.
11     A   I know there was a handwritten statement
12  conducted that I wasn't a part of.  I don't know if it
13  says it in there, so I -- I don't know the answer to
14  that.
15     Q   Right.  If Snake had told you that he'd
16  actually seen the victim, and that Jakes had pointed out
17  the victim to him, you would have documented that fact,
18  right?
19     A   I think so.  Yeah.
20     Q   Well, tell us why you would have documented
21  the fact that, if Snake had told you that he'd seen the
22  victim and Jakes had shown him who the victim was, that
23  you would have documented that fact?
24     A   Well, you're -- you're speaking hypothetical
25  again.  I -- I don't -- I said I probably would.  And I

Page 162

1  don't know if it's in a subsequent interview.
2     Q   Okay.  And you would want to know that fact
3  because it would allow you to corroborate Snake's story.
4  If he was able to identify, for example, a photograph of
5  the victim that would determine that, you know, the
6  corroboration for his story that Jakes was there, and he
7  saw the victim, right?
8     A   Possibly.
9     Q   And if he said he saw the victim, you could
10  have asked him to describe the victim.  So that he
11  could, you know, also corroborate his story by, you
12  know, identifying, you know, generally speaking, the
13  physical description of the victim, right?
14     A   Possibly, yes.
15     Q   When you say possibly, as a -- as a good
16  detective, that's what you would have done, right?
17     A   You're speaking on hypothetical situations
18  with pieces of information.  I don't know what I
19  would've done.  I would have to look at the whole thing.
20  It all -- if I would have done this, if I would have
21  done that, it's all hypothetical.
22     Q   Well, I'm not -- I'm talking about in this
23  instance, as a experienced police detective, if you're
24  training another detective about how to do the job.  If
25  you have a guy like Snake say, I saw the victim, you

Page 163

1  would then ask Snake to describe the victim, so you
2  could ensure that what he's saying is truthful, and he's
3  not just trying to snow you like Denise Harris was,
4  right?
5       MR. GRILL:  Objection.  Objection to form.
6     Q   You can answer.
7     A   As I said, probably.
8     Q   Is there any reason why you wouldn't ask Snake
9  to either describe the victim or identify a photograph
10  of the victim in order to corroborate that he truly did
11  -- was there and did see the victim?
12     A   I don't know where he was standing.  If he was
13  a half a block away, he may not be able to describe.  If
14  was up in his face, he'd be able to describe him.  But I
15  -- I don't know.
16     Q   Well, if he told you that he walked up to the
17  window of the sub shop, and looked in and saw the victim
18  inside --
19     A   Yeah.
20     Q   -- you would have asked him to describe the
21  victim, or in some way show -- you know, see if he could
22  identify a photo of the victim in order to corroborate
23  his statement, right?
24       MR. GRILL:  Objection.  Calls for speculation.
25     A   It depends on -- I -- I'll speculate.  If the

Page 164

1  guy walked outside and got shot, he's dead on the
2  street, no.  Well, what's the point?  And we know its
3  the victim.  If the guy left the sub shop and got robbed
4  three blocks away, maybe, to make sure it's the same
5  victim.
6     Q   Well, the idea is not so much to identify the
7  victim as the victim, but to identify Gus' story as
8  being legit.  Because this was a way that he could, you
9  know, provide identifying information about the victim
10  rather than just, you know, tell a story like Denise
11  Harris did.
12       MR. GRILL:  Objection to form.
13     A   No.  I didn't -- I didn't get that sense from
14  Gus Robinson.  He told us that he was asked to
15  participate in an armed robbery.  He's being sort of
16  truthful.
17     Q   Did you know who Little A was when Snake said
18  Little A?
19     A   I'm sure of it.
20     Q   Yeah.  Because you were already on the lookout
21  for him, right?
22     A   Then?  No.  I don't think so.
23     Q   All right.  You weren't on the lookout for
24  Little A at the time of this murder, correct?
25     A   I -- I don't recall if I was or if he was

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 165

1  wanted for something else. So I don't know when the
2  Gerard Irving murder was. It was before this or after
3  that.
4       Q   Okay. Did you want Little A for anything
5  other than the Irving murder or the Garcia murder at the
6  time that you talked to Snake?
7           MR. GRILL: Objection. Mischaracterizes his
8  testimony. Foundation.
9       A   Not that I can recall.
10      Q   Okay. And you weren't interested in him for
11 any other reason, correct?
12          MR. GRILL: Same objections.
13      A   Not that I can recall.
14      Q   If you didn't know who Little A was, would you
15 have asked Snake, "Snake, do you know Little A's real
16 name or where I can find him?"
17      A   Probably.
18      Q   He was a cooperative guy. He knew the
19 neighborhood, right?
20      A   Yeah. But I knew who he was, so I didn't have
21 to ask him that.
22      Q   Got it. Okay. So then it says that Robinson
23 then drove around the block to Elizabeth and heard three
24 gunshots and then went home. Did you ask Snake why he
25 went to Elizabeth?

---

Page 166

1       A   I don't know why. I know I -- I can assume he
2  didn't want to be a part of this robbery.
3       Q   Elizabeth is, you know, around the block to
4  Elizabeth is where the Troy with the I-ROC lives right?
5  On the 5000 block of Elizabeth.
6           MR. GRILL: Objection. Foundation.
7           THE WITNESS: I -- I believe that was in the
8  report, yes.
9  BY MR. AINSWORTH:
10      Q   Did you ask Snake why he went to Elizabeth?
11      A   No.
12      Q   Why not?
13      A   I don't know why. I -- I can't tell you why.
14 I don't remember.
15      Q   Well, did you want to know who Snake was with
16 on Elizabeth so you could corroborate his story? You
17 know, somebody who could say, yes, at the time of the
18 shooting, Snake was with us. He wasn't the target. And,
19 you know, the story he's telling you matches up. He
20 arrived right before the shots were fired and then the
21 shots were fired.
22      A   You know, I -- that wasn't the information
23 that was being presented to us at the time. I had no
24 reason to doubt Gus Robinson's story to us.
25      Q   Okay. All right. So now you have information

---

Page 167

1  from Snake that Jakes is implicated in a murder, right?
2       A   Well, we know that he was asked to be a
3  lookout. Whether or not Jakes remained, I don't know
4  yet.
5       Q   And Jakes -- according to Snake, Jakes told
6  you that he -- Jakes was aware of a plan between him,
7  Little A, and a third person to rob the victim of the
8  Garcia murder, right?
9       A   Well, I think they said "they," I don't know
10 if he was included in that. I wasn't making that
11 assumption.
12      Q   Okay. Well, let's just take a look at your
13 report and see if that doesn't clarify it where, "Jakes
14 told Robinson that there is a white dude in the Queens
15 submarine shop, and that Little A and his friend were
16 checking out how much money he had because they were
17 going to rob him. Jakes asked Robinson to act as a
18 lookout while they: Jakes, Little A, and his friend,
19 robbed the man when he came out of the store." Do you
20 see that, sir?
21      A   I do.
22      Q   Okay. So according to Snake, it's Jakes,
23 Little A, and his friend, all three of them are going to
24 rob the man when he comes out of the submarine store,
25 who then ends up dead after being shot in cold blood,

---

Page 168

1  right?
2       A   Correct.
3       Q   And so you now want to question Jakes about
4  the murder, right?
5       A   I do.
6       Q   And at this point, Jakes is under arrest,
7  right?
8       A   In my mind, yes.
9       Q   And if he tried to leave, you wouldn't let him
10 leave, correct?
11      A   Correct.
12      Q   And so when you brought Snake back to the
13 area, Jakes wasn't -- you didn't want Jakes to see Snake
14 coming into the area, right?
15      A   I believe so. Yes.
16      Q   And so Jakes was still in the interview room
17 where you had left him when you came up into the area. And
18 so you didn't have to deal with Snake -- or with Jakes
19 seeing Snake, right?
20      A   You know, I can't remember, but that wouldn't
21 be improbable.
22      Q   Okay. So then, you now want to talk to Jakes
23 since about 10:30, 10:40 -- 10:45 at night, right?
24      A   Correct.
25      Q   And so now you want to interrogate Jakes about

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 169

1  a murder. He's 15 years old, and so you call his aunt
2  to see if she'd come down to the station to be present
3  for the interrogation, right?
4      MR. GRILL: Objection. Form.
5      A  I don't recall calling his aunt.
6      Q  Right. In fact, you didn't call his aunt,
7  right?
8      A  No. You know that.
9      Q  All right. And you wouldn't wait 30 seconds
10  for her to come or -- strike that. You wouldn't wait 30
11  seconds to call his aunt before questioning 15-year-old
12  Anthony Jakes, right?
13      MR. GRILL: Objection. Argumentative.
14      Q  Correct?
15      MR. GRILL: Incomplete hypothetical.
16      A  I'm not going to answer your question,
17  Mr. Ainsworth. It's -- it's argumentative. You're
18  being a little -- you're trying to belittle me, and
19  you're mischaracterizing everything that's going on.
20      Q  All right, sir. At that hearing on February
21  18, 2016, page 81, Bates number Plaintiff Jakes, 42694.
22  You were asked the following question.
23      MR. GRILL: Hang on. Page 81.
24      MR. AINSWORTH: Yes, sir.
25      MR. GRILL: And what's the Bates again?

---

Page 170

1      MR. AINSWORTH: 42694.
2      MR. GRILL: Yeah.
3      MR. AINSWORTH: There's only one pagination.
4      MR. GRILL: You're on a different day. I got
5  it, February 1.
6      MR. AINSWORTH: Yes. I am.
7      MR. GRILL: That makes a difference.
8      MR. AINSWORTH: It's just page 81. There's no
9  different pagination.
10      MR. GRILL: Yeah. No. There is two different
11  -- sets of dates and testimony. The last one you
12  were asking was out of the April 1 and this one is
13  --
14      MR. AINSWORTH: I'm aware of that.
15      MR. GRILL: Yeah. Which is why I was
16  confused.
17  BY MR. AINSWORTH:
18      Q  All right. Page 81, line 4. You were asked
19  the question: "You wouldn't wait 30 seconds to try and
20  find out if Ms. Jones would come to the station and be
21  with her nephew while you questioned him," right?
22      MR. GRILL: Objection.
23      MR. AINSWORTH: Answer, "Again, no."
24      MR. GRILL: Objection. Form
25  BY MR. AINSWORTH:

---

Page 171

1      Q  Did you get asked that question, and did he
2  give that answer, sir?
3      A  I --
4      MR. GRILL: Objection to form. It's not
5  impeaching.
6      A  I did.
7      MR. GRILL: Foundation -- hang on, Ken -- and
8  it's argumentative.
9      MR. AINSWORTH: Okay. I think we'll --
10      A  I did do that at the post-conviction hearing,
11  but I also know when you're asking me if I had
12  questioned him that during the motion to suppress
13  hearing, that you know that we requested a youth officer
14  to come to the station.
15  BY MR. AINSWORTH:
16      Q  After Jakes confessed, you asked for a youth
17  officer?
18      A  That's misstating the testimony from the
19  record.
20      Q  Okay. So were you asked the following
21  question? This is in the April 2016 testimony at page
22  87, line 8: "You testified that you asked for a youth
23  officer for Anthony Jakes, right?" Answer, "Yes."
24      Question: "Tell the judge at what point in
25  time you asked for a youth officer for Anthony Jakes."

---

Page 172

1  Answer, "After his interview." Were you asked that
2  question -- those questions? Did you give those
3  answers, sir?
4      MR. GRILL: Objection. Mischaracterizes his
5  testimony in this deposition.
6      A  Yeah. And again, sir, I mean, I say that's
7  what it says. I don't know which interview you're
8  talking about at that time, but you go back to the trial
9  testimony, which was a couple of years after this
10  incident, which clearly reflected that there was a youth
11  officer requested before he gave his inculpatory
12  statement. We were told that there were none, and we
13  marched on with the interview.
14      Q  You didn't question Jakes after. You're
15  confused about which point you -- we're talking about
16  here? Which interview it was, is that what you're
17  saying?
18      MR. YAMIN: Objection. Mischaracterizes --
19      MR. GRILL: Objection. Mischaracterizes his
20  testimony.
21      MR. AINSWORTH: I really --
22      MR. YAMIN: Join.
23      MR. AINSWORTH: Well, let me read you, sir,
24  your testimony from that same hearing on page 50.
25  All right. Question. Line 7.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 173

1     MR. GRILL: Hang on. We're in April?
2     MR. AINSWORTH: Yes.
3     MR. GRILL: Page 50. Okay.
4  BY MR. AINSWORTH:
5     Q  All right. This is questioning from the
6  special prosecutor, sir. Question, "What did you do
7  after Anthony made that statement?" And just to
8  clarify, the statement that is referenced as you see
9  earlier on that page is the -- statement. This is the
10 confession. And the question in line 7, "What did you
11 do after Anthony made that statement?" Answer, "At that
12 time, we notified the Cook County State's attorney
13 following review. And then we requested the youth
14 officer to come to the scene because we now transitioned
15 from a witness to a defendant." Do you see that, sir?
16    A  I do.
17    Q  All right. From that -- and -- were you asked
18 that question, or did you give that answer?
19    A  I did.
20    Q  And that same --
21    MR. GRILL: I'm going to object. It is not
22 impeaching. Go ahead.
23    Q  And that same testimony on page 91, were you
24 asked -- let's start actually on page 90, line 23.
25    MR. GRILL: In the April testimony, okay.

Page 174

1     Q  Question, "Despite the fact that you believed
2  Anthony Jakes to be under arrest at 10:40 p.m. you did
3  not contact a youth officer prior to speaking to him,
4  right?" Answer, "No." And then skipping down to page -
5  - to line 16 on page 91. "Did you contact a youth
6  officer before you spoke to Anthony Jakes?" Answer,
7  "No." Were you asked those questions, and did you give
8  those answers?
9     A  I did.
10    Q  All right, sir, I now want to show you Exhibit
11 1 again. This is Kill's trial testimony. Page 206,
12 line 12. "Approximately what time was it that this
13 conversation with the defendant concluded?" Answer,
14 "About 11:45 p.m." Question, "Now, did you and Detective
15 Boudreau then leave the interview room where the
16 defendant was at?" Answer, "Yes." Question, "Did you
17 make any notifications at some point in time after you
18 left the interview room?" Answer, "Yes. I went right
19 down the hall to the Area 3 youth office, which is in
20 the rear of the 3rd floor at 3900 South California, to
21 get a youth officer from the 3rd watch. And Detective
22 Boudreau went to the telephone to notify the office of
23 the State's Attorney Felony Review Unit." Question,
24 "Now, when you say the 3rd watch, what time is the 3rd
25 watch?" Answer, "In the Youth Division, it ends at

Page 175

1  midnight. It runs from 8 hours from 4:00 p.m. -- well,
2  actually 3:30 p.m. when they have roll call, until
3  midnight." "What was the reason that you were going to
4  the youth -- going to the youth officer?" Answer, "To
5  get a youth officer so that when the youth officer and
6  the State's attorney, and either myself or Detective
7  Boudreau talked to them, that the youth officer would be
8  present." Do you see those questions and do you see
9  those answers?
10    A  I do.
11    Q  All right. And let me pull your -- and you're
12 saying that, in your suppression hearing testimony, that
13 you said that you called for a youth officer before the
14 interrogation took place? Is that what you're saying?
15    A  You -- you know, I may be mistaken. That this
16 -- this happened 28 years ago and the testimony you're
17 referring to, that was more closer to the incident,
18 which would be the motion to suppress in a trial
19 testimony is probably more accurate. I may be confusing
20 this after 28 years.
21    Q  So you agree that you did not call for a youth
22 officer until after Jakes confessed, correct?
23    MR. GRILL: Objection. Form.
24    A  I'd have to review all the testimony. I don't
25 know if it came back up on rebuttal or not. But, maybe,

Page 176

1  we didn't.
2     Q  You've reviewed the testimony in preparation
3  for this deposition, right?
4     MR. GRILL: Objection. Argumentative.
5     A  I reviewed my testimony, as I told you.
6     Q  Okay. I mean, take -- let's take a look.
7  Like, the only reference to a youth officer in your
8  motion to suppress testimony is at page B18. I'll show
9  it to you if you'd like to see it.
10    A  I -- I would.
11    MR. AINSWORTH: All right. Let's mark this as
12 Exhibit number 7.
13    (EXHIBIT 7 MARKED FOR IDENTIFICATION)
14    COURT REPORTER: Yes. Seven.
15 BY MR. AINSWORTH:
16    Q  This is Boudreau's motion to suppress
17 testimony. And it starts at page Bates numbered
18 Plaintiff Jakes 30575 and at page 30591. All right. So
19 line 13. Question, "At the conclusion of the reading of
20 those warnings, did he agree to speak with you?" Answer,
21 "Yes, sir. He did." Question, "Did he provide a
22 statement at that time?" Answer, "Yes, sir. He did."
23 Question, "At the conclusion of that statement, was he
24 considered under arrest?" Answer, "Yes, he was."
25 Question, "Subsequent to that statement being provided,

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 177

1  what did you and your partner do?" All right. So after
2  the statement, "After we talked to him, we talked to
3  other witnesses, and we also attempted to locate a
4  co-defendant, which Mr. Jakes provided us with."
5  Question, "At some point in time, was Central Youth
6  called as well?" Answer, "Yes." Question, "Central
7  Youth, where are they located?" Answer, "They're
8  located downtown." Question, "Did you indicate that
9  what -- they would send out a youth officer as soon as
10 one was available?" Answer," Yes." Question, "Did you
11 wait for that youth officer into the early morning of
12 September 17, 1991?" Answer, "Yes, sir." Question, "Was
13 Felony Review of the State's Attorney's office also
14 contacted?" Question [sic], "Yes, they were." "Do you
15 recall what time an assistant State's Attorney come in -
16 - assistant came out in the early morning hours of
17 September 17?" Answer, "Approximately 2:00 a.m." Were
18 you asked those questions, and did you give those
19 answers in December of 1992, sir?
20      A  Yes.
21      Q  All right, sir. So nowhere do you say that
22 you called for a youth officer before Jakes'
23 interrogation, correct?
24      A  No. No. I stand corrected. Thank you.
25      Q  All right. So then to just circle back, you

Page 178

1  wouldn't even wait 30 seconds to call Jessie Mae Jones,
2  right?
3          MR. GRILL: Objection. Asked and answered.
4      A  I testified no before. Yes.
5      Q  And let me show you what we'll mark as Exhibit
6  8. This is page Bates numbered Plaintiff Jakes 5305.
7  You had Jakes' aunt's phone number, right?
8          (EXHIBIT 8 MARKED FOR IDENTIFICATION)
9      A  Sure, we did.
10     Q  Why didn't you simply pick up the phone and
11 call her to find out if she wanted to come?
12         MR. GRILL: Objection. Form. Foundation.
13     A  I don't know if she knew where he was.
14     Q  Well, you would agree with me, sir, that
15 nobody had, had contact with Ms. Jones since 1:05 p.m.,
16 right? Do you know?
17     A  I was not on duty. No.
18     Q  That's correct?
19     A  As far as I know, yes.
20     Q  And as far as you knew, nobody had told her
21 that her son was -- or her nephew was now wanted for
22 murder, right?
23     A  Well, she knew where he was, and then he was
24 placed under arrest, and she didn't bother to come to
25 the station, so I -- I don't know what she knew or

Page 179

1  didn't know.
2      Q  Okay. So at that hearing on February 18,
3  2016, at page 77, you were asked the following question
4  and -- or the following questions, and you gave the
5  following answers. Page 77, line 14, Question, "Your
6  and -- understanding was that nobody had told Ms. Jones
7  that Mr. Jakes, or a 15- year-old Anthony Jakes, was now
8  being wanted for murder, right?" Answer, "No."
9  Question, "That's correct?" Answer, "I didn't say that
10 to her, no." Question, "Your understanding was that
11 nobody told her that?" Answer, "I agree." Were you
12 asked those questions, and did you give those answers,
13 sir?
14     A  Yes. I did.
15     Q  So to your knowledge, nobody knew -- sorry --
16 strike that. To your knowledge, Jessie Mae Jones had no
17 knowledge that her son -- her nephew was now being
18 wanted for murder, right?
19     A  Wanted for murder? He wasn't wanted. He was
20 in the station cooperating with an investigation that
21 she said he could go to.
22     Q  Yeah. So look -- you -- thank you for
23 pointing that out. When you went to interrogate
24 Mr. Jakes about a homicide, to your knowledge, his
25 guardian, his aunt, Jessie Mae Jones, had no idea that

Page 180

1  you were going to be interrogating him about a murder,
2  right?
3          MR. GRILL: Objection. Form. Foundation.
4      A  No. No. She -- as far as I know, no.
5      Q  And you did nothing to apprise her of the fact
6  that her 15-year-old nephew was now going to be
7  interrogated about a murder, including being read his
8  Miranda rights and being told that he could be charged
9  as an adult for the murder, right?
10     A  Correct. But we didn't know what Anthony
11 Jakes was going to say. I mean, we confronted him with
12 portions of -- well, let me put this in context. We
13 could put it in -- in context with what Jakes told us,
14 that he was going to be a lookout. He could've easily
15 said he walked away from it, but we know that we had
16 previous inconsistent statements. So I didn't know what
17 he was going to say. I didn't know who was lying that
18 night. Because Robinson could've been lying, Jakes
19 could've been lying. Who knows? So that's what we did.
20     Q  Why did he tell Jakes that he could be charged
21 as an adult for murder?
22         MR. GRILL: Objection. Foundation.
23     A  Because those are part of the juvenile
24 warnings.
25     Q  Okay. So you knew that what he was being

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 181

1  accused of was something that could land him in prison
2  for life, right?
3      A   Unless he told us that.  Yeah.  He did ask
4  from there, and he walked away, and then provided who
5  did the murder.  He would've been a witness, still.
6      Q   Okay.  Do you think it would've been a good
7  idea to have either his aunt or his -- or a youth
8  officer present for his questioning that could cause him
9  to be imprisoned for his life?
10     A   It was a brief interview.  We didn't know what
11 he was going to say.  In retrospect, I guess, you could
12 say yes.
13     Q   I'm not saying anything.  I'm asking you, sir,
14 do you think that you should've had Mr. Jakes' --
15 15- year-old Jakes' aunt or youth officer present for
16 that interrogation, that could subject to him being
17 in prison for life?
18     A   I mean, at the time, that's not what I thought
19 of.
20     Q   All right.  I'm -- I mean, you're telling us
21 that's not what you thought of, but I'm just saying
22 looking back now, do you think that his aunt or youth
23 officer should've been present for that interrogation?
24     A   Well, we tried to get a youth officer.  There
25 wasn't any available.  So that's out the court -- that's

Page 182

1  out the door.  His aunt already knew where he was, and
2  she didn't bother to come down.  So, you know, it's
3  would've, could've, you know, what if this, what if
4  that, it's -- it's all hypothetical.  So I -- I don't
5  know.
6      Q   You didn't try to get a youth officer until
7  after the interrogation, sir?
8      A   I didn't know what he was going to say.
9      Q   Right.  So my question is --
10     A   He might say something and implicate himself.
11 himself.
12     Q   You were -- you thought that Snake was telling
13 the truth, right?
14         MR. GRILL:  Objection.  Mischaracterizes his
15 testimony.
16     A   I thought he was at the time, but I don't
17 know.  I could've slipped -- flipped on a minute
18 depending on what Jakes told me.
19     Q   And so you thought that Snake was telling you
20 the truth.  And you didn't even walk down the hall to
21 get a youth officer from Area 3, right?
22         MR. GRILL:  Objection.  Form.  Foundation.
23 Argumentative, and mischaracterizes his testimony.
24     A   Yeah.  I don't know if I did, or somebody else
25 did.  I -- I'd -- I don't recall.

Page 183

1      Q   No.  We've already established, sir, that you
2  didn't contact a youth officer.  Neither yourself, nor
3  Detective Kill contacted a youth officer until after
4  Jakes' interrogation.  And so --
5      A   That wasn't your question.  You asked me if
6  anybody walked down the hallway to get a youth officer.
7  I don't know.  Maybe one of the other detectives did.
8      Q   All right.
9      A   I don't know.
10     Q   Well, let me -- all right.  Neither yourself,
11 nor Detective Kill, nor anyone else that you're aware of
12 walked down to Area 3 Youth to grab a youth officer to
13 be present for the interrogation, right?
14     A   Right now, no.  I don't -- I don't know the
15 answer to that, but I didn't.
16     Q   And you're not aware of anyone else who did,
17 right?
18     A   Not as I sit here today, no.
19     Q   And your prior testimony is nobody ever
20 contacted -- you and your partner's testimony is that
21 neither of you contact your youth officer until after
22 the interrogation, right?
23     A   It's what the testimony states, yes.
24     Q   And you got no reason to dispute that
25 testimony, right?

Page 184

1      A   Not right now, no.
2      Q   Okay.  All right.  So you then -- what is your
3  -- what's your purpose for talking to Jakes when you
4  -- after you've talked to Snake?
5      A   I'm trying to figure out what his involvement
6  is.
7      Q   All right.  15-year --
8      A   He could've told us that -- he could have told
9  us that Snake is full of crap, or he could have told us,
10 yeah, I was asked to be lookout and somebody else did
11 it, but I left.  I -- just trying to clarify what --
12 what he knows.
13     Q   Do you have any recollection of that
14 conversation with Jakes?
15     A   Other than what's recorded in the police
16 reports, no.
17     Q   All right.  Jakes never told you he got into
18 any fistfight with anybody that day, right?  Or blows
19 were actually struck on him?
20     A   I'd have to look at the police report.  I -- I
21 don't recall what he told us at that time.
22     Q   Do what?
23     A   I'd have to look at the -- the police report.
24     Q   Let's show you -- we've marked as Exhibit 2.
25 And I'm referring to the previous conversation.  Just

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 185

1  says, "They ran into three male black teenagers who they
2  were fighting with earlier. These three young men
3  chased Jakes to Throops [sic], and they out-ran their
4  assailants and returned home." Do you see that?
5      A  I do.
6      Q  And then I'll also show you your motion to
7  suppress testimony. All right. This is page -- the
8  motion to suppress testimony, which is Exhibit 7, page
9  30660. You're asked this question, "Detective Boudreau,
10  Detective Duckhorn, and O'Reilly did not indicate the
11  amount of blows, or if any blows were in fact struck
12  between Mr. Jakes and the three black males who came
13  back; is that correct?" Answer, "That's correct." Were
14  you asked that question? Did you give that answer back
15  in December of 1992?
16      A  Yes, sir.
17      Q  All right. So -- and as you sit here today,
18  you don't have any recollection of Jakes ever telling
19  you that he was actually struck by any of the people
20  that he had a fight with, right?
21      A  I don't have any recollection, only what's
22  been previously testified to and what's in police
23  reports.
24      Q  Okay. So what did you -- what approach did
25  you take with Mr. Jakes when you spoke to him at about

Page 186

1  10:45 at night?
2      A  So I don't recall any of this, so I -- I don't
3  know what approach I took.
4      Q  Did you provide him with any food during the
5  entire time that he was in custody?
6      A  I think, review on the report said he was
7  offered food, but he said he wasn't hungry.
8      Q  All right. Did that concern you that a
9  15-year-old boy had been at the station since noon? It
10  was 10:45 at night, and he hadn't eaten.
11      A  No. Not if he was offered food.
12      Q  Okay. Do you think that meant he was under a
13  lot of stress if he hadn't eaten since noon, and it was
14  10:45 at night?
15      MR. YAMIN: Objection. Form. Calls for
16  speculation.
17      A  I guess, according to his statement, he said
18  he wasn't hungry, so that's what it means.
19      Q  Well, did you have any concern for his
20  welfare, sir, that Jakes was at the station, and he
21  wasn't eating?
22      A  No.
23      MR. YAMIN: Objection -- oh, excuse me.
24  Objection.
25      THE WITNESS: I'm sorry.

Page 187

1      MR. YAMIN: Form of the question -- that's
2  okay. Form of the question and calls for
3  speculation. That's okay, Mr. Boudreau.
4  BY MR. AINSWORTH:
5      Q  Okay. And Jakes, as of 4:00 in the morning,
6  hadn't eaten anything, either. Did that concern you?
7      A  I don't know if he did or if he didn't.
8      MR. YAMIN: Same objections.
9      Q  Well, you didn't get him any food, right?
10      A  No.
11      Q  Okay. Did you confront Mr. Jakes with Denise
12  Harris' statement that, you know, she said that -- he
13  had said that she and the other two girls were out in
14  front of the house. But when you talked to them, they
15  said they weren't there.
16      A  I don't know if we did or not.
17      Q  In light of Mr. Pitts' statement that Denise
18  admitted to him that she really was in front of the
19  house, that, kind of, would've been poor play to accuse
20  Mr. Jakes about lying about those three girls, when in
21  fact, there's evidence that they really were exactly
22  where he said?
23      MR. GRILL: Objection.
24      MR. YAMIN: Objection.
25      MR. GRILL: Form.

Page 188

1      MR. YAMIN: Form of the question.
2  Argumentative.
3      A  You asked me to speculate. I don't know if
4  it'd be poor play or not.
5  BY MR. AINSWORTH:
6      Q  All right. Well, that's fair, I guess. But
7  as an experienced detective, do you think that would be
8  a proper question to put to Mr. Jakes or a proper, you
9  know, fact to put to Mr. Jakes to tell him, you told us
10  that the three girls were out front, we talked to them,
11  and they said that they weren't there. In light of the
12  fact that Pitts had said that Denise admitted him that
13  she really was there?
14      A  I -- I don't think it was -- I don't think it
15  got that far. I think he was told that Gus Robinson
16  implicated him, asking him to be a lookout. It never
17  even got to that.
18      Q  Well, I'm not asking you whether it happened
19  or not at this point. I'm saying, would it be proper to
20  do that, in your mind, to confront Jakes with the
21  statement that the three girls had made about not being
22  there when you knew from Pitts that Denise had admitted
23  she really was there just as he said?
24      A  It could've been proper. It could've been
25  proper.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 189

1    Q   Okay.  What if you were teaching a homicide
2  investigation class?  Would it -- in this situation,
3  would you think it was okay to tell 15-year-old Jakes
4  that the three girls that he said were out in front of
5  his house, when you questioned him -- them, they said
6  they weren't there, despite the fact that Pitts had said
7  that one of them had admitted that she really was there?
8    A   But I already know that --
9        MR. YAMIN:  Objection.  Form of the question.
10  Form of the question.  Objection.
11    A   But I already know that there's a person
12  inside the office, implicate him, and requested him to
13  be a participant in an armed robbery?  No.  I -- I -- I
14  -- I'd probably go with that first.
15    Q   Okay.  Let me show you what we've marked as
16  Exhibit number 3, Kill's trial testimony.  Previously in
17  this deposition, I misreferred to it as Exhibit 1.  It's
18  actually Exhibit 3.  So just to clarify that.
19    A   Okay.
20    Q   This is page 200.  I'll share it with you so
21  you can read along at home.  All right.  This is Kill's
22  testimony, page 200, line 20.  "At that point in the
23  conversation, did you advise the defendant, Anthony
24  Jakes, of anything regarding the investigation?" Answer,
25  "Yes, I did." Question, "What did you tell the

Page 190

1  defendant, Anthony Jakes?" "Well, I told him we went
2  over to 1212 West 51st Street.  I told him we talked to
3  Annette Harris, and Denise Harris, and Nikia Little.
4        They said" -- and then, question, "What did
5  the defendant -- did you tell the defendant what these
6  women said?" Answer: "I told him that we talked to the
7  three women, and that the three of them said they were
8  not with him when he said they were with him at the time
9  of the shooting and immediately prior to that." Do you
10  see those questions and answers, sir?
11    A   I do.
12    Q   Do you think that was a proper investigatory
13  tactic to use in 15-year-old Jakes' interrogation?
14        MR. YAMIN:  Objection to form.
15        MR. GRILL:  Form.
16    A   That -- yeah.  I -- I -- you're asking me to
17  recall almost 30 years later what occurred in an
18  interview room, and you're referring to testimony that
19  was given within a couple of years.  So as I stated
20  before, you're -- you're asking me hypothetical
21  questions.  Would it be proper?  Would it not be proper?
22  I guess, the answer is it was proper because he was
23  asked that, according to the testimony of Mike Kill.
24    Q   Okay.  So because it was done, that means it
25  was proper?  Is that what you're saying?

Page 191

1        MR. GRILL:  Objection.  Mischaracterizes his
2  testimony.
3    A   Well, why wouldn't we?
4    Q   I'm asking you, sir.  So you --
5    A   Well, I -- you're ask -- you're -- you're
6  asking what is proper and what is not proper.  It's
7  certainly not improper.
8    Q   Okay.  So I was just wondering what your take
9  on it was.  And you didn't see any problem with omitting
10  the fact that Pitts' said that Denise admitted that she
11  really was there, from Mr. Jakes, right?
12        MR. GRILL:  Objection.  Mischaracterizes his
13  testimony.
14    A   When -- when did I omit that fact?  It's
15  written down in -- in my GPRs.  When did I omit that
16  fact?
17    Q   I mean, in talking to Mr. Jakes.  That's what
18  I mean.
19        MR. GRILL:  Objection.  Mischaracterizes his
20  testimony.  Form.
21    A   What I said is I don't remember doing that,
22  but Mike Kill certainly did.  And he testified to that
23  that it was.  So I didn't omit nothing.
24    Q   I'm saying that when Mr. Kill told Jakes about
25  the three girls saying that they weren't out in front.

Page 192

1  Mr. Kill omitted the fact that Pitts had told you that
2  Denise Harris actually admitted to him that she really
3  was out in front.  And so that's what I'm asking.
4  Whether that omission during Mr. Jakes' interrogation
5  was proper?
6        MR. GRILL:  Objection to form.
7    A   No.  I -- I don't -- I -- I won't say -- it's
8  up to Mr. Kill to determine how much he wants to give
9  Jakes.  I mean, does it matter at this point what --
10  what's happening?  He said he was with three people.
11  He's not.
12    Q   Why'd you say he's not with three people?
13    A   Well, the -- the -- the girl said he wasn't.
14  But -- so that -- that's one person that -- that says
15  that.  I mean, it -- it -- you -- you want to put this
16  in -- in a can of what's proper or not proper, or -- it
17  was -- it was a line of questioning that went -- went
18  -- that went through.  And it's either -- it's --
19  nothing about this was improper.
20    Q   Okay.  So Denise might lie about whether she's
21  there or not because she don't want to tell the police
22  that she's a witness to a murder, right?  Why would
23  --
24    A   And also -- also a fact that I think she's
25  living in the house that's owned by the Jakes family.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 193

1    She probably doesn't want to get killed.
2        Q.  Okay.  Why would Pitts make up a story about
3    Denise telling him that she witnessed the murder without
4    you suggesting to him that, you know, what Denise had
5    said or anything about Denise?  But just spontaneously
6    tells you that Denise Harris, a person you fortuitously
7    had spoken to just a few hours earlier, told him that
8    she was in front on the porch at 1212 West 51st Street
9    and witnessed the murder?  Why would you ascribe any
10   motive for Pitts lying about that fact?
11           MR. GRILL:  Objection.  Form.
12           MR. YAMIN:  What is -- yeah, form.
13           MR. GRILL:  Foundation.  Calls for
14   speculation.  Incomplete hypothetical.  It's
15   ridiculous question.  If you understand --
16           MR. YAMIN:  And I think there were --
17           MR. GRILL:  -- go ahead, and --
18           THE WITNESS:  I do.  But I -- I don't --
19           MR. YAMIN:  I'm sorry, Andrew.  I think there
20   was a couple of questions built into that one.
21   Maybe, you could try that again, Russell?
22           MR. GRILL:  Yeah.  Hang on.  Let's --
23   BY MR. AINSWORTH:
24       Q.  You can answer it, sir.
25       A.  When did I ascribe that Tyrone Pitts was

Page 194

1    lying?  When did I say that?
2        Q.  Well, sir, I'm asking you --
3        A.  That's -- that was the last part of your
4    question when I subscribed that Tyrone Pitts was lying.
5    Well, I've never testified to that.
6        Q.  I'm wondering if you have any explanation for
7    a motive for Mr. Pitts to lie about Denise Harris
8    telling him that she witnessed the murder?
9            MR. GRILL:  Calls for speculation.  Incomplete
10   hypothetical.  Form.
11       A.  I don't -- I don't know.  I don't know why
12   -- was he lying, or was he not lying.
13       Q.  What makes you -- well, name the members of
14   the Jakes family that you know.
15           MR. GRILL:  Objection.  Foundation.
16       A.  I don't know.  I know his family had -- I know
17   his family owned both buildings.
18       Q.  Okay.
19       A.  I believe.
20       Q.  Tell us the names of any of the members of
21   Jakes' family?
22       A.  I don't know any of them.
23       Q.  Okay.  Can you describe them?
24       A.  No.
25       Q.  Can you describe whether they're men or women

Page 195

1    or who they are?
2        A.  No.  I just answered no that I don't.  I can't
3    describe any of them.  Certainly, can't describe men or
4    women, and I can't describe any of them.
5        Q.  Okay.  Do you know if they're involved in the
6    narcotics trade?
7        A.  I don't know.
8        Q.  What makes you believe that the Jakes family
9    owns both buildings on the lot at 1212 West 51st Street,
10   or did own it back in 1991?
11       A.  I think we had learned that throughout this
12   investigation after all of this came forth.
13       Q.  So after September 16, 1991, you learned that
14   Jakes' family owned both the front and the rear
15   buildings at 1212 West 51st Street; is that right?
16       A.  I believe so, yes.
17       Q.  Okay.  Who told you that?
18       A.  I don't recall.
19       Q.  Did you document that fact anywhere?
20       A.  No.
21       Q.  Is today the first time that you've ever said
22   that after September 16, 1991, you learned that Jakes'
23   family owned the front and the rear buildings at fifth -
24   - 1212 West 51st Street?
25       A.  I don't think I learned that until after the -

Page 196

1    - around the time of the post-conviction hearings 25
2    years later.
3        Q.  How did you learn that around the time of the
4    post-conviction hearings 25 years later?
5        A.  I don't remember.
6        Q.  Well, did you learn it from yourself?
7            MR. GRILL:  Objection.  Foundation.
8        A.  What -- could you explain to me what does that
9    mean, "Did you learn it from yourself?"
10       Q.  Well, you testified at the post-conviction
11   hearing about you learned it from me.  And so I was
12   trying -- and "me" referring to yourself, not referring
13   to Mr. Ainsworth.  And so I'm trying to, you know, like
14   what leads you in any way to believe that the Jakes
15   family owns the property at the front and back of 1212
16   West 51st Street?
17           MR. GRILL:  Objection.  It's been asked and
18   answered a couple of times now.
19       A.  You just stated I testified in the
20   post-conviction hearing that I had learned it from me.
21   That's what I testified to?  I testified to that?
22   Because those were your exact words to me.
23       Q.  Well, not about learning that the building --
24   here, I'll pull it for you, sir.  It was a --
25       A.  Yeah.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 197

1    Q   -- it was rather odd exchange. All right.
2  This is from the February 18, 2016 testimony, page 87,
3  lines 3 through 7. Question --
4       MR. GRILL: Yeah. What page again, Russell?
5       MR. AINSWORTH: 87. Lines 3 through 7.
6    Q   Question, "Could you please specifically tell
7  us the identity of the person who told you that Anthony
8  Jakes had access to the front house at 1212 West 51st
9  Street?" Answer, "Me." Were you asked that question?
10  Did you give that answer, sir?
11    A   Yes.
12    Q   All right, sir. So you told yourself that
13  Jakes -- did you tell yourself that Jakes' family owned
14  the front and rear properties at 1212 West 51st Street?
15       MR. GRILL: Objection. Form. Foundation.
16  Argumentative. Asked and answered.
17  Mischaracterizes --
18    A   That's not what I --
19       MR. GRILL: -- his testimony.
20    A   Yeah. It's -- it's not what I said before. I
21  said that I knew that Jakes had access to that because
22  when I said "me", it was my observation when I was a
23  technical officer. All of those years that they sold
24  drugs off the front porch. And I think Jakes even said
25  that he was cleaning up broken glass in the front of a

Page 198

1  house. Not the back of the house, in front of the
2  house.
3  BY MR. AINSWORTH:
4    Q   And let's take a look at that --
5       THE WITNESS: While you're doing it before a
6  question is proposed, can I use the bathroom,
7  please?
8       MR. AINSWORTH: Of course.
9       THE WITNESS: Thank you.
10       MR. AINSWORTH: Off the record, please.
11       COURT REPORTER: The time is 4:06. We're off
12  the record.
13       (OFF THE RECORD)
14       COURT REPORTER: The time is 4:15, and we are
15  back on the record.
16  BY MR. AINSWORTH:
17    Q   Okay. I want to show you what we'll mark as
18  Exhibit number 9. All right, sir. Do you recognize
19  this photo, which we've marked as Exhibit 9, and its
20  Bates number, Plaintiff Jakes 5079?
21       (EXHIBIT 9 MARKED FOR IDENTIFICATION)
22    A   Look, it's a photograph, I -- yeah. I don't
23  remember it, but I'm looking at the photograph.
24    Q   Okay. And do you see that's the submarine
25  shop on the right-hand side of the crime photo? And

Page 199

1  then you've got the victim's station wagon prominently
2  in the middle of the photo and the sub shop, the address
3  is 1206 West 51st Street, right?
4    A   Okay.
5    Q   Then you got 1208 next to it, 1210, and then
6  1212?
7    A   Correct.
8    Q   Okay. And so do you recall that the window
9  that was busted out was in 1210 West 51st Street,
10  Quarter-Pound's home?
11       MR. GRILL: Objection. Foundation. Go ahead.
12    A   You know, I did -- I didn't know that was
13  Quarter-Pound's home. But that's the broken window. I
14  -- I wasn't there that night, but I'll go ahead and say
15  --
16       MR. AINSWORTH: Let me mark as Exhibit 10 this
17  photo, which is Plaintiff Jakes 005483.
18       (EXHIBIT 10 MARKED FOR IDENTIFICATION)
19    A   Okay.
20  BY MR. AINSWORTH:
21    Q   This is a -- you see you still have the sub
22  shop on the right-hand side of the photo, of the
23  victim's car there. But now we have a little better
24  shot of the busted window on the second floor of the
25  building at 1210 West 51st Street. Do you see that,

Page 200

1  sir?
2    A   Is this -- is this the -- what -- just so I
3  can understand. Is this the window that Jakes was
4  inside cleaning up?
5    Q   Yes, sir.
6    A   Okay.
7    Q   All right, sir. So -- and you knew that, as
8  you testified earlier today, that Quarter-Pound lived
9  next door to Jakes, right?
10    A   No. I never testified to that. As a matter
11  of fact, I don't know who Quarter-Pound is.
12    Q   All right. Well, within today's testimony
13  -- so I can't read that part to you because we don't
14  have that transcript yet. But if I can direct you to the
15  February transcript from February 2016, page 43. Sorry,
16  45. Let me know when you're ready.
17    A   Okay.
18    Q   All right. Line 4 through line 11. Question,
19  "So did you go to Quarter-Pounder's home and -- to talk
20  to him?" Answer, "I couldn't identify who he was."
21  Question, "Did you have an address for him?" Answer,
22  "He supposedly lived in an area right next door and
23  actually said it was his cousin, but he didn't know his
24  cousin's name that lived next door. When you say next
25  door, what address?" Answer, "Either to the north or

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 201

1  south.  I would have to look at the report.  I know it
2  was next door, I believe.  East or west."  I'm sorry.
3  When you were asked those questions, did you give those
4  answers in February of 2016?
5      A   Yes.
6      Q   All right, sir.  So do you dispute that Jakes
7  told you that Quarter-Pound lived next door to him?
8      A   No.
9      Q   Okay.  And Jakes told you that it was in
10 Quarter-Pounds' home that the glass was broken?
11     A   I don't see that.  If you could point that out
12 to me, but I don't see that.
13     Q   All right.  Well, as you sit here, you don't
14 recall, right?
15     A   I don't recall.
16     Q   Fine.  All right.  And you have no source for
17 us for this -- your belief that Jakes owned -- the Jakes
18 family owned the front and back buildings at 1212 West
19 51st Street, right?
20     A   No.
21     Q   That's correct?
22     A   That's correct.
23     Q   Had you ever arrested a member of the Jakes
24 family before?
25     A   I may have.

Page 202

1      Q   Okay.  You didn't remember what Jakes looked
2  like as of September 16, 1991, right?  He wasn't --
3      A   No.
4      Q   -- somebody who'd stick out to you?
5      A   No, sir.
6      Q   So there's no reason for you to be paying
7  attention to whether he was going into the front
8  building at 1212 West 50 -- West 51st Street, or the
9  rear -- building, right?
10     A   How would I know what building he was going
11 into?  I don't -- I don't recall.  I didn't say I saw
12 him going to the -- a building.
13     Q   All right.  I think we're on the same page,
14 sir.  And -- or I meant to -- you would agree with me,
15 showing you Exhibit 10 again, that if you're in the rear
16 building at 1212 West 51st Street, there's no way you
17 can see what's going on in the street in front of 1208
18 West 51st Street, right?
19     A   I would agree.
20     Q   All right.  And you never saw anybody going in
21 and out of the rear building at 1212 West 51st Street,
22 correct?  You can't even see back there.
23     A   No.
24     Q   That's correct, you never saw anyone going in
25 and out of that building, right?

Page 203

1      A   Not that I recall the initial investigation,
2  no.
3      Q   Or any investigation, you never saw people
4  coming in or out of the 12 -- the rear building at 1212
5  West 51st Street, right?
6      A   Not that I can recall, no.
7      Q   All right.  So you have no basis to believe
8  that Jakes had access to the front building at 1212 West
9  51st Street?  Is that --
10         MR. GRILL:  Objection.  Foundation.  Calls for
11 speculation.  Form.
12     A   I know that he was in the front of the
13 building cleaning up glass and -- and a cousin that he
14 didn't know his name.  I know from my observations as a
15 tactical officer that there was a gang hangout, both
16 porches, for the street gang.  So I -- I can't say if he
17 had access or not access.
18     Q   Jakes never told you he -- Mr. Jakes never
19 told you he had access, right --
20     A   No.
21     Q   -- to the front building.  That's correct?
22     A   No.
23     Q   That's --
24     A   I didn't ask him.
25     Q   -- correct?  And what's your basis for

Page 204

1  believing that Jakes told you he was cleaning up glass
2  at 1212 West 51st Street?
3      A   He told us.  He told us he was cleaning up a
4  broken window in the front of the building.
5      Q   Are you sure he didn't tell you that it was at
6  Quarter-Pound's building, and you can see the broken
7  window in the crime scene photo?
8      A   I'm not sure what building it is.  I know that
9  he had access to the front of one of those buildings.
10     Q   All right.  Of one of those buildings.  Either
11 1210 or 1212, right?
12     A   Correct.
13     Q   Okay.  All right.  Let's -- then you had a
14 -- can you describe the room in which Jakes was in for
15 that interrogation?
16     A   No.  Unless it's in my previous testimony, but
17 I don't remember --
18     Q   One second, hang on.  We got to mute.  One
19 second.  Okay.  All right.  Do you know if it was in the
20 sergeant's office or some other place within Area 3?
21         MR. AINSWORTH:  Sorry, we mute -- you're
22 muted, or you're -- we got no audio.
23         MR. GRILL:  I think they muted everybody.
24         MR. AINSWORTH:  Okay.  There you go.  There
25 you go.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 205

1    MR. GRILL: Yeah.
2  BY MR. AINSWORTH:
3    Q  All right. Okay. Can I -- let me ask that
4  question. Do you know if Jakes was in the sergeant's
5  office?
6    A  I -- I don't have any recollection where he
7  was. I'd have to stand by what previous testimony that
8  was given in this, if that was even name.
9    Q  All right. Can you describe the sergeant's
10  office if you're using it for an interrogation back in
11  1993 -- 1991?
12    A  It was a large office where the Sergeant and a
13  Lieutenant sat. And then just outside that office, it
14  was part of one big office with a divider. It's where
15  the unit secretary would sit. I think there was a
16  refrigerator in there, but -- that -- that's it, that's
17  the office.
18    Q  So how many chairs were in there?
19    A  I don't know. Seven, eight maybe. I mean, I
20  know there was at least four desks.
21    Q  Do you know where Jakes was sitting?
22    A  I don't recall.
23    Q  Do you know where you were sitting for the
24  interrogation?
25    A  I don't recall at all.

Page 206

1    Q  Who led the interrogation?
2    A  I -- I don't recall.
3    Q  Did both you and Detective Kill question
4  Jakes?
5    A  I don't recall. We may have.
6    Q  Did you reference your gang knowledge when
7  speaking to Jakes to put him at ease that, you know, you
8  knew what you're talking about like you described
9  earlier?
10    A  I may have.
11    Q  Okay. And we can agree it will be totally
12  improper to threaten Mr. Jakes during that
13  interrogation, right?
14    A  We can agree to that, yes.
15    Q  If anybody mentioned Mr. Jakes out a
16  window, that would've violated his constitutional
17  rights, correct?
18    A  Correct.
19    Q  And same with threatening to have him beaten
20  up by gang members, that would have violated his
21  constitutional rights, right?
22    A  Yeah. I mean, that seems sort of silly to me,
23  but I didn't know we had that power over street gangs.
24  But yeah, it would be against his constitutional rights.
25    Q  And it would be totally improper to threaten

Page 207

1  to burn Jakes with a cigarette, right?
2    A  Correct. It's the first time hearing of that.
3  Yes.
4    Q  You didn't observe any injuries to Mr. Jakes,
5  right?
6    A  Not that I can recall, no.
7    Q  If you observed injuries to Mr. Jakes, then
8  you would have documented how those injuries were, so
9  there would be no suggestion that he'd obtained those
10  injuries while he was in your care or custody, right?
11    A  Put so yes.
12    Q  Do you have any explanation for how Jakes came
13  to have injuries that were photographed at his bond
14  hearing?
15    A  I'm -- I'm not aware of that. So I -- I don't
16  know what you're speaking of.
17    Q  It would be totally improper for you and
18  Detective Kill to kick Mr. Jakes out of his chair and
19  onto the floor during his interrogation, right?
20    A  Yeah. Yes.
21    Q  If he was kicked or struck during his
22  interrogation, that would have violated his
23  constitutional rights, right?
24    A  Yes.
25    Q  All right. Can you tell us how you got

Page 208

1  Mr. Jakes to open up and tell you the truth during that
2  interrogation with Mr. Jakes?
3    A  We just confronted him with Jake with the Gus
4  Robinson statement, that he was lying.
5    Q  All right. And do you recall what 15-year-old
6  Anthony Jakes told you?
7    A  It's memorialized in the police report.
8    Q  How long did it take to get Mr. Jakes to
9  confess? Like once you started the interrogation?
10    A  I don't recall. It wasn't lengthy.
11    Q  Well, what's not lengthy?
12    A  Well, I think it's in the report that -- I
13  think -- I don't know. I'm trying to remember 28 years
14  later that was rather quick that he gave that statement,
15  because we're calling for a state's attorney.
16    Q  After his interrogation, right?
17    A  After his one interview, yes.
18    Q  Well, not after his first interview.
19    A  No. His first interview where he was a
20  witness.
21    Q  Okay. All right. Let's take a look at
22  -- back at Exhibit number 2. Your clear open supp
23  report says at the bottom, page 5, "At this time, the
24  reporting detectives evaluated what had been learned
25  during the investigation. The subject Jakes was

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 209

1  re-interviewed by the reporting detectives. At this
2  time, the subject was advised of his rights from the
3  1991 FOP handbook, page number 79. He was also advised
4  that if charged, he would be charged as an adult. And
5  if prosecuted, he would be prosecuted and receive the
6  sentence as an adult. The subject, Jakes, stated that
7  he understood each of his rights, and what the reporting
8  detectives had said to him. He agreed to speak with the
9  reporting detectives about the incident. The reporting
10 detectives then informed him of their conversation with
11 Robinson. The reporting detectives further related that
12 they would like to know the truth about what had
13 occurred." And then Mr. Jakes says, or attributed to
14 him, it says, "In summary, but not verbatim." And let
15 me just pause there. Did -- is that what it took to get
16 Mr. Jakes to fess up. You told him about, Mr. -- you
17 know, Snake's statement and then told him you wanted the
18 truth from him, and then he just told you the truth?
19    A   I -- I don't see anywhere in that report that
20 indicates anything other than that, no.
21    Q   Well, I understand there's no -- I'm trying to
22 find out from you. From your read of the report that
23 you and Detective Kill authored, what -- whether there's
24 anything in here that indicates it took anything more
25 than that.

Page 210

1    A   No. There's nothing that indicates more than
2  that.
3    Q   Okay. And so your understanding is you simply
4  told him about Snake's statement, and then asked him to
5  tell the truth, and he told the truth, right?
6    A   It's what he said.
7    Q   All right. And according to Jakes, he said
8  that, "At about 11:45 p.m. on September 15, 1991, he was
9  standing on the sidewalk in the immediate vicinity of
10 the Queen's Submarine Shop at 1206, West 51st Street. He
11 was with his friend, Little A, and Darren. He stated he
12 did not know Darren's last name or address. He's known
13 both of them for about a year. Little A went into the
14 submarine shop and told them that there was a Mexican in
15 the restaurant who had a lot of money, and they're going
16 to stick him up. Little A then showed Jakes the handgun
17 that he had. He showed him the gun in the front
18 waistband of his pants. When Jakes saw the gun, he
19 realized that it was the 380 automatic that Little A
20 usually carried with -- carries with him at night.
21 Little A always carried the weapon loaded. After seeing
22 the weapon, Little A told Jakes to go to the corner of
23 51st and Racine to look and see if any police were
24 around. Jakes went to the corner and looked up and down
25 Racine. Jakes started to go to the corner and met a

Page 211

1  friend of his that he knows as Snake. Jakes asked Snake
2  to be the lookout, but he refused, and Snake drove away.
3  Jakes then went to the corner of 51st and Racine and
4  looked for the police. Satisfied that there were no
5  police in the area, Jakes returned to the east side of
6  the submarine shop and told Little A, "all right." As
7  he said this, the victim came out of the shop. Little A
8  walked up to the victim and announced, "This is a
9  stick-up." Darren was right next to Little
10   A.   The victim said something and ran to his car.
11 The victim got into his car and started it. The victim
12 backed up. And as he did, Little A come up to the car
13 and opened fire. Jakes saw Little A fire four shots at
14 the victim who is seated in his car and then Jakes
15 turned to run from the scene. He heard about three
16 shots as he ran away. Jakes related that he stood away
17 from the window of the submarine shop and ran because he
18 lived a few doors away and didn't want to be identified.
19 Jakes ran back to his house and looked out of the window
20 and saw the victim moving around on the ground for a
21 while. The victim stopped moving and then the ambulance
22 came for him." All right. Did I read that correctly,
23 sir?
24    A   Yes.
25    Q   And that's a summary of what Jakes told you?

Page 212

1    A   That's what memorialized, yes.
2    Q   All right. And Jakes -- in your same report,
3  you document that Jakes lives in the rear house at 1212
4  West 51st Street, right?
5    A   Correct.
6    Q   In that statement Jakes never says -- Jakes
7  never says that he show -- he walks Snake to the window
8  and he and Snake looked through the window to see the
9  victim, right?
10   A   He doesn't say that this interview, no.
11   Q   Jakes doesn't refer to the victim as the white
12 dude, right?
13   A   Not in this interview, no.
14   Q   Well, in none of the interviews with you does
15 he refer -- did Jakes refer to the victim as the white
16 dude, right?
17   A   No. I'd have to look. I don't believe so.
18 Somebody referred to him as a white dude.
19   Q   Yeah. That was Snake, right?
20   A   I don't believe --
21   Q   And Snake's -- yeah, we just read that Snake
22 said that Jakes -- here, I'll show you. On the previous
23 page of Exhibit 2. There is a white dude.
24    A   Okay.
25    Q   That's Snake saying that Jakes called him a

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 213

1    white dude.  But here Jakes called him the Mexican guy,
2    right?
3         A    Correct.
4         Q    And here Jakes said that when Little A came
5    out of the restaurant, he showed Jakes the handgun that
6    he had, right?
7         A    Correct.
8         Q    And that was in the front waistband of his
9    pants, right?
10        A    Uh-huh.
11        Q    So Jakes is armed when he comes out of the
12   restaurant with the plan to rob the -- the victim,
13   right?
14        A    Jakes is armed, or Little A is armed?
15        Q    Little A is armed.
16        A    Little A is armed, correct.
17        Q    And then Jakes doesn't say that Snake was on
18   the phone when he talked to him, right?
19        A    No.
20        Q    And Jakes says that the victim got into his
21   car and started it and as he backed up, he was -- then
22   Little A came up to the car and opened fire, right?
23        A    It's what he says.
24        Q    Jakes doesn't say that the victim got in
25   through the passenger side, right?

Page 214

1         A    Not in this interview, no.
2         Q    Well, and not in any of the interviews with
3    you, right?
4         A    No.  This is the last interview I had with him
5    so --
6         Q    All right.  Jakes told you that he ran to the
7    backyard of 1212 West 51st Street and went up to the
8    second floor, right?
9         A    Well, he says he ran back to his house. Didn't
10   say anything about a rear yard.
11        Q    The only reason that Jakes would have to go in
12   the rear yard after the shooting is to go to the rear
13   house at 1212 West 51st Street, right?
14             MR. GRILL:  Objection.  Calls for speculation
15        to the form.
16        A    I don't know.
17        Q    All right.  Well, let's take a look at -- and
18   -- and so if Jakes told you that he went to the backyard
19   of 1212, and went up to the second floor, you would take
20   that to mean he was going to the rear house, right?
21             MR. GRILL:  Objection.  Form.  Foundation.
22        A    You said, if he told me he went to the rear
23   house, and if he told me he went to the second floor,
24   yes.
25        Q    Well, if he told you he went to the backyard,

Page 215

1    and then up to the second floor, right?
2             MR. GRILL:  Objection.  Form.  Foundation.
3         Calls for speculation.
4         A    That doesn't mean he'd be going to the rear
5    house, he'd go through the backdoor of the front house.
6    So I -- and I don't know.  I don't know what you're
7    trying to get at here.
8         Q    Well, let's take a look at Kill's testimony at
9    page 205 from the trial.  This is Exhibit 3, again, line
10   15 through 24.  Question, "What did he say happened
11   next?"  Answer, "He said the man got into his car, and
12   start to backup as Mr. Garcia -- well, the victim start
13   to backup Arnold Day opened fire."  He said, "he
14   believed four -- he fired four shots and as he was
15   finishing firing the last of those four shots,
16   Mr. Jakes ran northbound through the Oliver's chicken
17   lot to the alley, then westbound the alley, and into the
18   backyard at 1212, where he went up to his -- up to the
19   apartment on the second floor."  Do you see that, sir?
20        A    I do.
21        Q    All right.  Where did you -- where in the
22   first -- in the front house, did you believe Jakes to
23   reside?
24             MR. GRILL:  Objection.  Foundation.
25        A    I didn't -- I didn't say I believe he resided.

Page 216

1    I believe he had the access to the houses, both of them.
2         Q    Okay.  So -- but Jakes told you that he went
3    up to the apartment on the second floor in the backyard
4    at 1212, right?
5         A    That's --
6             MR. GRILL:  Objection to the extent.  It
7         mischaracterizes this attend that transcript
8         --
9         A    You know, I -- I testified I don't remember
10   him telling me you read me what detective Kill's
11   testimony is, I -- I don't remember that.
12        Q    All right.  So this is Kills' testimony from
13   September of 1993.  You don't have any reason to doubt
14   detective Kill's testimony, right?
15        A    No.  No, sir.
16        Q    All right.  And Kill states that Jakes said he
17   went westbound the alley, then westbound the alley at 1212
18   where he went up to his -- up to the apartment on the
19   second floor, do you see it, sir?
20        A    I see it.
21        Q    And so that's what Jakes is saying according
22   to detective Kill, right?
23        A    Correct.
24        Q    And you have no reason to doubt Kill's
25   testimony here on this point, right?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 217

1    MR. GRILL: Objection. Foundation and form.
2    A   I don't have any reason to doubt that's what
3    Jakes told detective Kill.
4    Q   Okay. I didn't mean to do that. All right.
5        MR. GRILL: Actually Russell, -- I -- this
6    -- sorry to interrupt you. This just donned on me.
7    The -- it -- I presume all that racket that we
8    heard about ten minutes ago was individuals with
9    Mr. Jakes. So I would like you -- to us to take a
10   break and make sure that there's no one else
11   listening to this proceeding other than your client
12   because they would not -- there's been no agreement
13   that anybody else could be here, so could you
14   please do that?
15       MR. AINSWORTH: Sure. One second.
16       MR. GRILL: And then we can put on record that
17   everybody is cleared out, and, maybe, he could turn
18   his camera on and confirm that for us.
19       THE WITNESS: Better not be a room full of
20   gang members.
21       MR. AINSWORTH: Yeah. All right. Mr. Jakes
22   is going to show his face so you guys can see that
23   there's nobody else with him.
24       MR. GRILL: Okay. And the other thing I'd ask
25   on the record here is if he could identify and give

Page 218

1    us the names of the people that we did -- that were
2    there?
3        MR. AINSWORTH: No. There wasn't anyone
4    there. And no one is not going to be too.
5        MR. GRILL: Yeah. Everybody here heard the
6    same thing. There was a lot --
7        MR. AINSWORTH: No.
8        MR. GRILL: -- of people. So who is there?
9    Are you telling me that you're not going to -- that
10   --
11       MR. JAKES: Hello.
12       MR. GRILL: Hang on -- hang on. So I'm asking
13   for you to identify, and you can talk to Mr. Jakes
14   about this, off to the side. You don't have to do
15   it here, but --
16       MR. AINSWORTH: Uh-huh.
17       MR. GRILL: -- I want to know what the names
18   are, of the people that Mr. Jakes was greeting and
19   talking to, and apparently celebrating with. And
20   everybody here on this deposition heard them. So
21   I'd like to know who they were. And, you know, I
22   think that's absolutely appropriate because we all
23   know what the rules are with these depositions. If
24   other people were going to be listening. And his
25   camera has been blacked out this entire time, other

Page 219

1    than at the very beginning of this deposition when
2    we began, I have no way of telling if people have
3    been listening in to this deposition, that no one
4    agreed to or that shouldn't have been, so --
5        MR. AINSWORTH: All right. Mr. Jakes is
6    alone, as you can see from his cameras. He's in
7    his car. He's got nobody there with him.
8        MR. GRILL: Yeah -- yeah. Five-and-half-hours
9    into the deposition.
10       MR. AINSWORTH: We know that.
11       THE WITNESS: It's just everybody from the
12   house.
13       MR. GRILL: So just -- I would have ask that
14   you talk to him. We can go off the record for a
15   minute, But I'd ask for the names of the people
16   that he was speaking with and that's it. I don't
17   think it's -- that's a controversial request.
18       MR. AINSWORTH: No. Okay. Let's continue.
19       MR. GRILL: Well, hang on. Are you refusing
20   to do that?
21       MR. AINSWORTH: Yes.
22       MR. GRILL: Okay. We're going to go off the
23   record for a minute. I'll be back, okay?
24       COURT REPORTER: Are we -- do parties agree
25   we're off the record, Mr. Ainsworth?

Page 220

1        MR. AINSWORTH: Yeah. Sure.
2        COURT REPORTER: Okay. Time is 4:47. We're
3    off record.
4        (OFF THE RECORD)
5        COURT REPORTER: The time is 4:56. We're back
6    on record.
7        MR. GRILL: All right. So picking up where we
8    left off, Russell, I would like to know, just to be
9    perfectly clear here, what -- who the people were
10   that we all heard with Mr. Jakes, how long those
11   people were listening to this deposition. And I
12   think that's totally reasonable information to
13   know. So what say ye about that?
14       MR. YAMIN: The city joins in that request.
15       MR. AINSWORTH: What I can tell you is that
16   Mr. Jakes was driving in his car, as you saw, and
17   so ten minutes ago, he was driving past a friend
18   who's birthday it was, and he stopped to say hi.
19   He did not get out of the car. What you has heard
20   was the greeting between them, and I think his
21   phone got bumped when they were greeting. He has
22   not been around anyone else. That was a -- he said
23   he'd -- they didn't get in the car, he didn't get
24   out of the car. And that's -- that is what
25   happened.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 221

1    MR. YAMIN: Is this deposition, video
2  recorded?
3    MR. AINSWORTH: Yes.
4    MR. GRILL: That's right.
5    THE WITNESS: Yeah.
6    MR. YAMIN: Okay.
7    MR. GRILL: The deposition, when we began this
8  deposition, Mr. Jakes was in his -- well, I presume
9  -- I don't know if it's his home, but he was in,
10  what looked to be a bedroom, so I'm assuming that
11  was his house or where he's living. So -- and then
12  the next -- well, it looks like he's maybe back
13  here. The next time we heard anything from him was
14  just, you know, ten or so minutes ago with that
15  commotion. And now he's in a car, and I understand
16  now he is in his car, but I don't know what's been
17  going on this whole time. And because of that, it
18  caused me some -- to question like, what's going
19  on?
20    MR. YAMIN: Yeah.
21    MR. GRILL: So have you confirmed with him
22  that -- or would, you know, if you haven't, would
23  you confirm with him, you know, that -- what it is
24  that you're telling me, I mean, is that the case?
25    MR. AINSWORTH: Yes. That's coming from him.

---

Page 222

1  Yeah. I talked to him.
2    MR. GRILL: Okay.
3    MR. AINSWORTH: Yes.
4    MR. GRILL: Okay -- okay.
5    MR. AINSWORTH: And he's on the phone, and so
6  -- Mr. Jakes, what I told them was that you were
7  driving in your car about ten minutes ago, when you
8  heard the noise, and you had stopped because a
9  friend who you'd seen in the neighborhood was
10  celebrating his birthday. You stopped to greet that
11  person. But you never exited your car, and they
12  never entered your -- all right. So
13  --
14    MR. GRILL: What was this -- can you give us
15  the name of the person that he was greeting? Is it
16  -- well, the person for me, it sounded like it was
17  more than one person.
18    MR. AINSWORTH: Yeah. I'll have to think
19  about that.
20    MR. GRILL: I -- well, I don't know what is
21  there to think about. It's to the -- to me, it's a
22  yes or no. And if it's a no, I would like to know
23  what your basis is stand for.
24    MR. AINSWORTH: Because it's not relevant to
25  any fact or issue, you know. In the case --

---

Page 223

1    MR. GRILL: That's not for you to determine at
2  this point. So are you telling me that you're not
3  going to give me a basis other than that --
4    MR. AINSWORTH: I told --
5    MR. GRILL: -- in your opinion, it's not
6  relevant that Mr. Jakes --
7    MR. AINSWORTH: It's not relevant.
8    MR. GRILL: -- was talking -- that Mr. Jakes
9  is talking to a person or other persons during a
10  deposition in his lawsuit while it's going on and
11  it's being broadcast on his phone. Like, do I got
12  it right?
13    MR. AINSWORTH: Yeah. I'm saying no. It was
14  not broadcast to anyone else. So no. If somebody
15  else was listening.
16    MR. GRILL: No. That's totally not true.
17    MR. AINSWORTH: No one's observing --
18    MR. GRILL: That's totally not -- I mean, we
19  all heard it, Russell. I mean --
20    MR. AINSWORTH: No. And just because you're
21  stating it, doesn't make it true and --
22    MR. GRILL: I don't have to stating it --
23    MR. AINSWORTH: I'm telling you --
24    MR. GRILL: -- the video go speak for itself.
25    And --

---

Page 224

1    MR. AINSWORTH: Okay.
2    MR. GRILL: -- I don't think I misrepresenting
3  anything here. So, okay. So you're saying no, and
4  -- you're saying no. You won't give us the name of
5  the person or persons that we heard. We all heard
6  on his microphone when it got tripped.
7    MR. YAMIN: And I will also ask that --
8  Russell, that to be confirmed that there was no one
9  else present throughout the duration of the
10  deposition.
11    MR. AINSWORTH: And I said that.
12    MR. YAMIN: Now with Mr. Jakes.
13    MR. AINSWORTH: Yes.
14    MR. YAMIN: And there was -- I don't think
15  that was addressed in what -- in your response to
16  Andrew?
17    MR. AINSWORTH: Yeah. There was nobody else
18  with Mr. Jakes.
19    MR. GRILL: Okay. Let's move on for now. And
20  actually, if we've got to address it later, we
21  will.
22    MR. AINSWORTH: Okay. Where the heck were
23  we?
24  BY MR. AINSWORTH:
25    Q  Okay. So after Jakes gives his statement to

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 225

1  you, you want to know where Little A is right?
2  Mr. Boudreau?
3      A  Yeah.  Yeah.  I mean, we were going -- we went
4  out looking for Little A.
5      Q  Okay.  And you want to know -- because you
6  wanted to question him about the murder, right?
7      A  Yes.
8      Q  You also wanted to know where Darren was,
9  right?
10     A  We didn't know who Darren was, but yeah.  I'd
11  like to know who Darren was, eventually.
12     Q  Well, you wanted to know who Darren was, okay,
13  right?
14     A  Right.
15     Q  All right.  So you asked Mr. Jakes where
16  Darren hung out, right?
17     A  I don't know if we did specifically ask that.
18  We may have.
19     Q  Okay.  That would be a pretty logical question
20  if you're trying to find Darren, to ask Jakes where he
21  hangs out, right?
22     A  Yeah.  But he didn't know anybody's last
23  names, not even his cousin next door, so, I mean -- I
24  --
25     Q  Not talking about last names, I'm just saying

Page 226

1  where he had seen him, where Darren was known to hang
2  out, right?
3      A  We may have.  I mean, I think we were looking
4  for Little A at the time.  He was the shooter.  He was
5  armed.
6      Q  Yeah.  I'm not actually asking what you did in
7  this line of questioning.  I'm just asking what you
8  wanted to know.  As an experienced, you know, as a
9  detective, a sharp guy, you want to know from Jakes how
10  you can find Darren, right?
11     A  May have, yeah.  You know --
12     Q  Well, no, not may have.
13     A  -- I don't know.  We may have.
14     Q  I'm not asking what you did.  I'm just
15  saying:  You, as a sharp guy, would have wanted to know
16  how to find Darren when you're with Mr. Jakes on
17  September 16, 1991, right?
18     A  Might have.
19     Q  Any reason why you wouldn't want to know how
20  to find Darren?
21     A  I think at that time we were looking for
22  Little A.  We knew who he was.  We knew he was armed.  He
23  was a trigger man.
24     Q  And so does that mean that you didn't want to
25  know where Darren was?

Page 227

1      A  No.  I'm just saying that we went out looking
2  for Little A first.
3      Q  Okay.
4      A  I don't think we ever determined who Darren
5  was.
6      Q  All right.  Well, did you want -- I mean, I
7  -- you know, I got to ask, like, what did you do to find
8  Darren?
9      A  I don't -- I don't remember what we did to
10  find Darren.
11         MR. AINSWORTH:  I'm going to suggest
12     something.  All right.  Mr. Jakes, you got to mute.
13     There we go.  Okay.  Thank you.
14  BY MR. AINSWORTH:
15     Q  Did you ask Snake where you could find Darren?
16     A  We may have.  We may not have.  But we were
17  --
18     Q  Right.
19     A  -- looking for Little A, so I don't know.
20     Q  All right.  If you wanted to -- if you wanted
21  to find Darren, that would be a good idea to ask Little
22  A where Darren is -- or to ask Snake where Darren is,
23  right?
24     A  If he knew, yeah.
25     Q  Because Darren could lead you to Little A,

Page 228

1  right?
2      A  I think, I'd rather go look for the person I
3  know his full identity, instead of driving around,
4  asking people, do you know who Darren is.
5      Q  Not driving around I mean, Snake is in the
6  station.  He's down the hall.  Just walk over to him and
7  say, "Hey, Snake, you were really helpful to us on this
8  investigation.  Could you tell us who Darren is?  Do you
9  know a Darren in the neighborhood?"
10     A  We -- we may have asked that question, and
11  we'd went to go look for Little A, Arnold Day.
12     Q  I'm not asking what you did.  I'm just asking,
13  that's something you could have done, right?
14     A  Yeah.  Hypothetical.  Yeah.  I guess, you
15  -- you could have, but I'm not saying we didn't, so but
16  I -- I don't know.
17     Q  Okay.  You could have asked the cadre of gang
18  members that you spoke with on a daily basis, who Darren
19  was, right?
20     A  Could have.
21     Q  You could have talked to the night district
22  tactical teams about a Darren who lived in the area of
23  51st and Racine, right?
24     A  Could have.
25     Q  Could have talked to gang crime south to, you

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 229

1  know, ask about a Blackstone named Darren who hung out
2  with Little A, right?
3      A   Could have.
4      Q   Tell us the entirety of what you did to
5  identify Darren, this person who's implicated in the
6  murder?
7          MR. GRILL: Objection. Foundation.
8      A   I don't recall what we did.
9      Q   And did you do anything to determine who
10 Darren was?
11         MR. GRILL: Objection. Foundation.
12     A   We may have. I don't remember 28 years later.
13     Q   Did you know a Darren Triplet (phonetic)?
14     A   I know the name.
15     Q   How do you know the name?
16     A   Because it came up before that we thought that
17 might be the Darren, I think.
18     Q   When did you think that --
19     A   Or it came up in other investigations.
20     Q   Okay. Did you ever talk to Darren Triplet to
21 find out if he was the Darren in this case?
22     A   I don't know.
23     Q   Did you ever show Darren Triplet's photo to
24 Snake and ask him if he was somebody he recognized from
25 the neighborhood?

Page 230

1      A   No. Not that I can recall. No.
2      Q   How much time did you spend trying to find
3  Little A?
4      A   I know we went out that evening, and then I
5  was looking for him for a long time.
6      Q   How much time did you --
7      A   There was a stop order in effect for -- is
8  -- Darren -- for Little A.
9      Q   Would you agree with me that you went out
10 looking for Little A two to three -- or three to four
11 times a week?
12     A   Probably when I was driving around the
13 neighborhood. If I was working on that case and other
14 cases, I'd say I'd look for him, yeah.
15     Q   Three to four times a week, right?
16     A   I was in that neighborhood all the time. So I
17 -- I would say if I was off three to four times a week
18 doing that investigation or another investigation with
19 the Black P. Stones, I'd look for him.
20     Q   And to look for him you went to 50th and
21 Elizabeth, and 50th and Troop, 54th and May, and 51st
22 and Racine, right?
23     A   Correct. Among other places -- we looked
24 all over the place for him.
25     Q   Well, those are the places from your trial

Page 231

1  testimony that you looked, right?
2      A   Yep.
3      Q   And so while you were looking at all those
4  places three to four times a week between September 16
5  and February -- September 16, 1991 and February of 1992,
6  what did you do to find Darren?
7      A   I don't know. I didn't know who Darren was so
8  I could have run around the street asking for people. I
9  -- I don't recall.
10     Q   All right. So now you have Jakes implicating
11 Arnold Day as the trigger man in a murder and Jakes have
12 put him -- has put Little A inside the sub shop with the
13 victim. So as an experienced homicide detective, who do
14 you think you might go to to see if you can corroborate
15 and get an eyewitness to identify Arnold Day as the
16 perpetrator of the murder?
17         MR. GRILL: Objection to the form. Compound
18 question.
19     A   I don't know if Arnold Day went into the -- I
20 don't remember a statement, but we were -- I was looking
21 for Arnold Day to cooperate with Jason. I don't know,
22 maybe -- maybe Arnold Day was the lookout and Jakes was
23 the shooter. Maybe he was just putting it on Day. I --
24 I don't know.
25     Q   Okay. But according to Jakes's statement, Day

Page 232

1  was -- that we just read, Day was inside the sub shop
2  with the victim, and saw him pay for the food, and saw
3  that he had a lot of money on him, right?
4      A   That what his statement says, yes.
5      Q   Okay. So if you've got Arnold Day and the
6  victim in the sub shop together, as -- as an experienced
7  homicide detective, who do you think you might turn to
8  to try and identify Arnold Day as being with the victim
9  right before the murder takes place?
10     A   Well, eventually, that would probably be a
11 post-arrest situation, and -- maybe anybody who was
12 there, and maybe any guy in the sub shot. I don't -- I
13 don't know if other detectives did that.
14     Q   Okay. So you --
15     A   My involvement with this case ended after my
16 first interview with Anthony Jakes, until Arnold Day was
17 subsequently arrested.
18     Q   I thought you spent -- you went looking for
19 Arnold Day three to four times a week, every week from
20 September of --
21     A   I did say that.
22     Q   -- until February.
23     A   I did. I was looking for a wanted offender. I
24 -- but I didn't say I was doing any furthermore
25 investigation.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 233

1    Q   Were you prohibited from doing investigation
2  on this case?
3        MR. GRILL: Objection. Argumentative. Form.
4    A   No.
5    Q   All right. And as you told us before, one
6  thing that you can do as a homicide detective is look
7  for a witness to see if they can identify a suspect,
8  right?
9    A   Yes.
10   Q   All right. And so there's nothing stopping
11 you on September 17, 1991, from going to the sub shop
12 and talking to the sub operator, or the, you know, owner
13 of that shop, who talked to you for 15 to 20 minutes on
14 the 16th, and see if he could pick out Arnold Day as
15 being with the victim on the day of the shooting, right?
16   A   Are you talking about midnight? I guess, if
17 it was open, we could have done that, but I don't know
18 if -- we were out looking for Arnold Day in the middle
19 of the night. I don't know if the sub shop was open.
20   Q   No, sir. I mean on -- during the evening
21 hours on the 17th, or the 18th, or any time that week.
22   A   No. I think we got Arnold Day's name around
23 10:00 p.m. I think according to what you told me
24 earlier.
25   Q   Right. So I mean, the next day, sir, or the

Page 234

1  day after that. You could have gone --
2    A   Could've.
3    Q   -- to find them -- let me just ask you the
4  question. So on the 17th or the 18th of September, you
5  could have gone to Gurgid Singh and asked him to view a
6  photo array including Arnold Day, and see if he could
7  identify your suspect as being with the victim right
8  before he was killed, right?
9    A   Could've.
10   Q   And for -- and, you know, Arnold Day lived in
11 the neighborhood, right?
12   A   He lived on Damon.
13   Q   About a mile away?
14   A   I think it was 1220 under there. Yeah, about
15 eight blocks.
16   Q   We had -- you know, let's -- let me see if I
17 can grab his rap sheet for us real quick. Because he
18 had listed his as addresses as 5125 South Paulina,
19 right? 5200 South May -- 5200 South May is just a block
20 away from 51st and Racine, right?
21       MR. GRILL: Russ, can you just tell us what
22 you're reading from? None of us have that in front
23 of us.
24       MR. AINSWORTH: Right?
25       MR. GRILL: Can you tell us where you're

Page 235

1  reading from?
2        MR. AINSWORTH: No. My notes.
3        MR. GRILL: Why? Are you just making these
4  addresses up then? I mean, how do we know?
5        MR. AINSWORTH: Well --
6        MR. GRILL: Now, you just tell us -- just --
7  if you're reading it off of something -- if it's
8  something in discovery, and you're reading it to
9  this witness, just tell us with the Bates stamp
10 number so we have a record. That's all.
11       MR. AINSWORTH: It just said it's my notes,
12 Andrew.
13       MR. GRILL: I didn't hear it. I -- my
14 apologies. I didn't hear you say that.
15       MR. AINSWORTH: It's okay.
16   A   Well, I -- I don't know what he lived at those
17 addresses. You're just -- you're throwing out addresses
18 to me. I don't know the time frame of them. I don't
19 know if he was arrested there. But If I remember
20 correctly, he lived at 50th and Damon.
21 BY MR. AINSWORTH:
22   Q   I'm just saying that you -- did you do
23 anything to see if the owner or operator of the sub
24 place could identify Arnold Day as the perpetrator?
25   A   Oh. I've already answered that question. No.

Page 236

1    Q   Okay. Did you have any other witnesses that
2  you could talk to to see, you know, who may have
3  witnessed the murder, to see if they could identify
4  Arnold Day?
5    A   I didn't go out and talk to any other
6  witnesses. No.
7    Q   Well, did you already have any witnesses in
8  mind who you thought may have witnessed the murder to
9  talk to them to see if they could identify Arnold Day as
10 the shooter?
11   A   No. Because this is -- besides me going out
12 and looking for Arnold Day, my involvement with that
13 investigation was over with. It went back to the scene
14 detectives.
15   Q   It went back to the scene detectives who were
16 working midnights? To follow up on investigations? Is
17 that what you're saying how it works, sir?
18   A   It was -- it was their scene -- it was their
19 scene, it went back to them.
20   Q   All right. So you're saying that in the
21 Chicago Police Department in 1991, when the midnight
22 crew did the scene on a murder, all follow-up for that
23 murder would revert back to them when your shift was
24 done. Is that what you're telling us, sir?
25       MR. GRILL: Objection. Mischaracterizes his

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 237

1    testimony.
2        A   I'm not saying that. What I'm saying is that
3    after I talked to Jakes and he was implicated, my
4    involvement with this investigation was over, other than
5    looking for a wanted offender, like we looked for all
6    wanted offenders.
7        Q   Okay. Did anyone tell you not to do any more
8    investigation on this case?
9        A   No.
10       Q   All right. Was there anything preventing you
11   from, say, going to visit Denise and just asking her if
12   it -- if she had witnessed the murder and if she saw
13   Arnold Day commit the murder?
14       A   No.
15       Q   It would have been a proper investigatory step
16   to go visit Denise Harris, who Tyrone Pitts has said
17   admitted seeing the murder occur, and asking her who she
18   saw commit the murder, right?
19       A   It could be a good idea. Yeah.
20       Q   It would also have been a good idea to ask the
21   sub operator or owner if he knew who Arnold Day was, and
22   if he didn't, if he could identify Arnold Day from a
23   photo array, right?
24       A   Could've been. Yeah. Would that have
25       A   No. Not could have been. Would that have

---

Page 238

1    been a good idea, as an investigative step?
2        MR. GRILL: Objection to form.
3        A   It could have been. Yeah. I mean it -- I
4    mean, they tried, but it -- you know, who knows?
5        Q   Well, was there any reason not to --
6        A   I said it would have been a good idea. Yeah.
7        Q   Is there any reason not to try to go to Gurgid
8    Singh, and ask if he could identify Arnold Day?
9        A   I can't think of one here, but I don't know if
10   that -- if that was ever done. I mean, I was done with
11   the investigation.
12       Q   And so Arnold --
13       A   You're asking me to speculate -- you're asking
14   me to speculate on an investigation. I don't know,
15   maybe the defense attorneys want an interview. I -- I
16   don't know. Who knows? I -- I -- I did not go out and
17   do it, and I can't tell you what anybody else did.
18       Q   Right. I'm just asking now, you know, with
19   your 30-plus years of law enforcement experience, do you
20   think it'd be a good idea to see Gurgid Singh in the
21   week after the murder and see if he can identify Arnold
22   Day as the -- as the guy with the victim, right before
23   the shooting?
24       MR. GRILL: Objection. Asked and answered.
25       A   But I -- I've answered it. The answer is yes.

---

Page 239

1        Q   Okay. And now -- you then -- so then Snake
2    gives a statement, right? And Detective Kill witnesses
3    that statement. Did I get that right?
4        A   Which statement are you referring to?
5        Q   The handwritten.
6        A   I'd have to look at the handwritten, but I
7    believe you're correct.
8        Q   All right. I'm going to -- sir, that rap
9    sheet that you saw your name on it with -- for Jakes,
10   that you had arrested him before, was that part of the
11   investigative file?
12       MR. GRILL: Objection. Foundation.
13       A   It would be something that we would get in the
14   course of this investigation, yes.
15       Q   Did you review it in the course of preparing
16   for this deposition?
17       A   I did not.
18       Q   When did you see that document?
19       A   I don't recall. I may have saw it the other
20   day but -- but -- but I mean, I can't remember, but I'm
21   sure I had knowledge of that document then when he was
22   in custody.
23       Q   Can you describe the document at all? Because
24   I don't know that I've seen that document. I don't know
25   if it's been produced in discovery.

---

Page 240

1        MR. GRILL: What document are you talking
2    about?
3        MR. AINSWORTH: The rap sheet for Mr. Jakes
4    that lists Boudreau as an arresting officer on an
5    aggravated criminal sexual assault.
6        MR. GRILL: I don't know. I would have to --
7    I have a lot of documents in this case. I can't
8    --
9        MR. AINSWORTH: Fair.
10       MR. GRILL: I can't do it right now.
11       MR. AINSWORTH: Yeah. It was a surprise to
12   me. I'll follow up with you afterwards. It's
13   okay. I thought I was just dumb, but then I looked
14   again, and I don't see it.
15   BY MR. AINSWORTH:
16       Q   And you're sure it was an aggravated criminal
17   sexual assault?
18       A   It was a -- a sex case. I'm not sure exactly
19   what it was. I actually read the report.
20       Q   Okay. In any event, sorry for the
21   distraction.
22       A   I'm just seeing. Think we got lost. Might be
23   a youth -- juvenile molester.
24       Q   All right. Let me show you what we'll mark as
25   Exhibit 11. This is just going to be the whole

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 241

1    investigative file, and it's Bates numbered -- City
2    Jakes 23 through City Jakes -- I think it's 91/95. But
3    I'll direct your attention to just City Jakes 95, which
4    is the statement of Gus Robinson. You see that Michael
5    Kill witnessed that statement?
6            (EXHIBIT 11 MARKED FOR IDENTIFICATION)
7        A  Are you showing that to me now on the screen?
8    I -- I -- I'm not looking at it.
9        Q  Shoot. I'm not. You're right. I finally
10   screwed it up. Okay. Now you see it?
11       A  I do.
12       Q  Okay. And then, see on the second page, page
13   City Jakes 19 -- City Jakes 96 says, "Gus drove around
14   the block on Elizabeth and went up to Troop. Gus was
15   telling his homies that he was fitting to go home. Gus
16   then heard about three gunshots from the area near the
17   sub shop. Gus then drove directly home." Do you see
18   that?
19       A  I do.
20       Q  Would you want to know who Snake was with? Who
21   his homies were? So that you could verify that he
22   really was where he said he was in the statement, and
23   far from the scene of the crime?
24       A  Maybe.
25       Q  Any reason you wouldn't want to know who they

Page 242

1    were?
2        A  I mean, who -- I mean, who cares who's three
3    blocks away or two blocks away?
4        Q  Well, they were with Snake at the time of the
5    murder. And so they could corroborate that he had just
6    arrived. Meaning he came from the sub shop or someone
7    else, and then arrived there shortly before the gunshots
8    were -- went off and then he left?
9        A  Could have. I mean --
10       Q  You said --
11       A  -- I wasn't there when this was said. So I
12   don't know.
13       Q  All right. Would that have been a good idea
14   to find out from Snake where his -- who his homies were
15   that he was with that night?
16       A  It could be. I -- I'd have to talk to the
17   detectives that heard that statement to see -- you know,
18   in retrospect, it might have been a good idea, might not
19   have been. I -- I don't know.
20       Q  Any reason why you wouldn't want to know who -
21   - the names of those people were?
22       A  There'd be 100 reasons why. Could be 100
23   reasons why it'd be a good idea. I don't know.
24       Q  Well, can you give us one reason?
25       A  At what point? I mean, do we just always go

Page 243

1    around and corroborate witnesses what -- what they did
2    after they left the crime scene?
3        Q  Yeah.
4        A  I don't know. Maybe now, but back then? No.
5    I don't I -- I don't -- I don't think so. Not all the
6    time. There's nothing hard and fast.
7        Q  All right. Sir, this is Exhibit 2 again. This
8    is your supp report. Why did you put three offenders in
9    this box for a number of offenders?
10       A  I didn't type this report, but I'm assuming
11   it's because Darren is involved.
12       Q  Because there's three offenders told to you?
13       A  No. We knew Jakes that -- we knew Jakes was
14   involved. He was the lookout. We knew Arnold Day from
15   Jakes, that he was the trigger man, and then we also
16   learned that Darren was a part of this, as well.
17       Q  What was Darren's description?
18       A  I don't recall.
19       Q  Well, did you get a description from Jakes
20   about what Darren looked like?
21       A  I -- I don't recall if we did or if we didn't.
22       Q  What's homicide 101 when you were trying to
23   get a -- you know, an identification of an unknown
24   person? You ask for the name. What else do you ask
25   for?

Page 244

1        MR. GRILL: Objection. Form.
2        Q  You ask for a description, if you can -- if
3    they know it. That's if you believe it. I -- I mean,
4    there's lots of things. I mean --
5        Q  Did you not believe Jakes when he said that
6    --
7        A  No. I didn't say that. But you're -- you're
8    asking all these generic questions about homicide 101,
9    and there's only so much time you could do when you got
10   people in custody. There's probably a lot of things you
11   could do. Especially 28 years later when you're an
12   attorney, trying to get millions of dollars. I'm sure
13   you can nitpick this whole investigation.
14       Q  And so my question to you, sir, is when you're
15   trying to identify a suspect in a homicide, do you ask
16   witnesses to describe the suspect, right?
17       A  Yes.
18       Q  You ask for gender, height, weight, build,
19   hairstyle, hair length, complexion, distinguishing
20   marks, eye color, hair color, all those things, right?
21       A  Correct.
22       Q  And this is somebody that Jakes said he'd
23   known for a while, right?
24       A  Correct.
25       Q  All right. Jakes had a phone --

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 245

1    MR. GRILL: Russell?
2    MR. AINSWORTH: Yeah?
3    MR. GRILL: Sorry. I thought you were --
4    thought I was slipping in there between questions.
5    I've got the Bates range for those rep -- those
6    records regarding a criminal sexual assault. They
7    were disclosing. I can give them to you if you
8    want.
9    MR. AINSWORTH: Thank you. Is it Plaintiff's
10   Bates?
11   MR. GRILL: Nope. At least the ones that I'm
12   looking at. The first one is CITY JAKES 815, which
13   is a juvenile information summary that identifies
14   the criminal's sexual assault, and it looks like
15   the RD number. And then in the State's attorney's
16   production, you're looking at documents -- they're
17   Bates stamped CCSAO subpoena exhibit, starts at
18   numbers -- it starts at 6669, and it runs through,
19   looks like, 6672.
20   MR. AINSWORTH: Thank you.
21   MR. GRILL: Yup.
22   BY MR. AINSWORTH:
23   Q    Okay. Mr. Jakes had a phone, right?
24   A    I -- I -- don't know if he did or if he
25   didn't.

Page 246

1    Q    Well, showing you Exhibit number 8 again,
2    that's Jessie Mae Jones' phone number, Jakes lives with
3    Jessie Mae Jones. He's 15 years old. That's his phone
4    number, right?
5    MR. GRILL: Objection. Foundation. Calls for
6    speculation.
7    A    I -- I don't know. It could have been the
8    downstairs neighbor's phone. I don't know if that's
9    Jakes' number for sure. I know that Jessie Mae Jones
10   could be reached at that number.
11   Q    Okay. Are you saying that Jakes said he
12   didn't have a phone?
13   MR. GRILL: Objection. Mischaracterizes his
14   testimony.
15   A    I didn't say that. I don't know if he had a
16   phone or not, is what I testified to.
17   Q    All right. Where did you get the information
18   in this -- on Exhibit 2, page 1, next to "In custody,"
19   where it says 5'9, 135 pounds?
20   A    That could have came from him or when they
21   were typing up to the arrest report asking him for his
22   own little boxes are on an arrest report. They could've
23   asked him then.
24   Q    Okay. What about up here? Where did you get
25   this information for Jakes, in the offender name or

Page 247

1    -- you know, or description, where it says 5'8, 155
2    pounds?
3    A    I don't know.
4    Q    Okay. And then, why didn't you include Darren
5    as somebody who is wanted?
6    A    You have to ask Detective Gill who typed up
7    this report.
8    Q    Do you agree with me that Darren should've
9    been listed as somebody wanted in this report?
10   A    Yeah. Wanted for questioning. Yes.
11   Q    Okay. And so you weren't present when Day was
12   arrested, right?
13   A    No. I was not.
14   Q    All right. I'm not going to ask you about
15   your interrogation of Arnold Day, but I just want to
16   know about statements they made about the Garcia murder.
17   And so what did Arnold Day tell you about the Garcia
18   murder?
19   A    I'd have to review the reports and handwritten
20   statements. I don't have any recollection of that. I'd
21   have to stand by what was previously tendered or
22   testified to.
23   Q    Okay. So when you're talking to Arnold Day,
24   you want to know about Darren, right?
25   A    Again, that may be in there, or maybe we did

Page 248

1    ask him who that was, maybe he refused. I -- I don't
2    know.
3    Q    I'm just trying to --
4    A    I'd have to review the reports and see what's
5    in the statements. But I don't recall if I did. It's
6    28 years ago. I don't recall what I asked back then.
7    Q    Sure. It's been a long time. What I'm trying
8    to get at is, like, a thought experiment. You as an
9    experienced detective, bringing your knowledge to bear
10   on this issue. You're now finally, five months after
11   the murder, have a chance to talk to Arnold Day. And
12   one of the things you want to ask Arnold Day about is,
13   who is Darren, right?
14   A    I would think so, but I didn't know we were in
15   a thought experience. I thought we were talking about
16   facts.
17   Q    Well, it -- it's a fact --
18   A    Is this deposition a thought experience? I
19   mean, should I characterize this whole thing as a
20   thought experience?
21   Q    You can do however you please, sir. What I'm
22   --
23   A    Okay. Thank you.
24   Q    -- what I'm asking you is, is it a fact that
25   you would want to know from Arnold Day who Darren was?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 249

1    A   Maybe.
2    Q   All right.  Is there any reason why you
3  wouldn't want to know from Arnold Day who Darren is?
4    A   Maybe.
5    Q   Can you think of a reason?
6    A   Not off the top of my head.
7    Q   All right.  We'll give it a minute.  Why don't
8  you take as much time as you need to think about it?
9    A   Or maybe Darren's dead.  I -- I don't know.
10  Well, you know --
11   Q   All right.
12   A   -- maybe he's in custody, so --
13   Q   That would be a -- that would be --
14   A   Maybe Little A didn't want to rat out his
15  fellow gang members like Jakes did.  I -- I don't know
16  why.
17   Q   Sure.  But you'd want to ask Darren -- or
18  you'd want to ask Little A about Darren, right?
19   A   As I said before, that may have happened, it
20  may not have happened.  I don't know.  It's a thought
21  experiment.
22   Q   No.  Well, now I'm not asking you what
23  happened or didn't happen.  I'm asking you what you
24  wanted to know.  You wanted to know about Darren, right?
25   A   I don't recall what I wanted to know back

Page 250

1  then.
2    Q   Well, how about now, looking at these facts?
3  You know, any reason why you wouldn't want to know about
4  Darren?
5    A   Nope.
6    Q   Okay.  And you would also want to know from
7  Little A about Jakes's involvement, right?
8    A   I think that was part of his statement.
9    Q   Yeah.  You want to get corroboration from
10  Arnold Day that, you know, about Jakes's involvement or
11  find out if Jake -- if Arnold Day is saying no, Jakes,
12  you know, wasn't involved, for some reason.
13   A   Or maybe Arnold Day is going to say that Jakes
14  pulled the trigger.  I -- I don't know.
15   Q   He could say anything, right?
16   A   Right.
17   Q   But you got to -- you want to ask him, fair?
18   A   Correct.
19   Q   Okay.  Here, I've got mismatched Bates
20  numbers.  Okay.  Let me direct your attention to Exhibit
21  11, and -- oh, shoot.  Actually, I'll just use the one
22  that I know, and I'll mark it as Exhibit 12.
23       (EXHIBIT 12 MARKED FOR IDENTIFICATION)
24       MR. GRILL:  Can we get a little input on how
25  much time we've got left?

Page 251

1        MR. YAMIN:  10:26.
2        MR. AINSWORTH:  We can do that at the break.
3  Can we do that at the break?
4        MR. GRILL:  Yeah.  Unless the court reporter
5  knows off-hand right now.  I don't know if they're
6  keeping a running time.  I've got a tally, but they
7  have the official one.
8        MR. AINSWORTH:  Well, I know.  Let's do it at
9  a break, man.
10  BY MR. AINSWORTH:
11   Q   So we are now at -- this is Exhibit 12.  This
12  is Bates number CJakes 1-22.  I'm going to direct you to
13  page 17 of this rep -- exhibit.  This is a supp report,
14  and this time you signed it, right?
15   A   I -- can you put it up on the screen?
16   Q   Son-of-a-gun.  That's two -- twice I've done
17  that.  Okay.  All right.  That's your name in the first
18  box in the bottom left-hand corner?
19   A   Yeah, but --
20   Q   Page 17 of Exhibit 12?  That's your signature?
21   A   No.
22   Q   That's not your signature.  Is that Foley
23  signing for you?
24   A   I think so.
25   Q   All right.  Did you type this report?

Page 252

1    A   Can you go down a little bit?
2    Q   Sure.  Can you tell if you typed it?
3    A   No.  I can't, but maybe portions of it.
4    Q   Okay.  You would have reviewed this report
5  before it was submitted, right?
6    A   I would believe so -- yes.
7    Q   That was your standard practice, to review
8  reports before they're submitted, right?
9    A   Correct.
10   Q   If your name is listed as one of the two
11  reporting officers, correct?
12   A   I would try to.  Yes.
13   Q   All right.  You weren't present for Day's
14  arrest, right?
15   A   No.
16   Q   Okay.  Do you know why it says your -- you
17  arrested him?
18   A   It's because if -- if you look at this -- this
19  arrest report and other things, it -- I developed
20  information that led to his arrest, namely Jakes's
21  statement.
22   Q   I see.  So they're giving you credit for this
23  arrest even though you weren't present?
24   A   Correct.  It's on the arrest report --
25   Q   Was there a quota -- all right.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 253

1  A  -- and when you look at the report--
2  Q  Was there a quota --
3  A  Let me finish, please.
4  Q  Sure.
5  A  If you look at an arrest report, it says who
6  are the arresting officers, and it's anybody who has
7  information or proper information to support the
8  probable cause for the arrest.
9  Q  Was there a quota system where you had to get
10  so many arrests, and, you know -- and so this -- you
11  wanted credit for this arrest?
12  A  No.
13  Q  Would it increase your performance reviews if
14  you put your name on more arrests even if you weren't
15  present for the arrest?
16  A  I -- I have no idea.  I never looked at what a
17  performance rule entail -- a performance review
18  entailed.
19  Q  Up here, you listed for the Garcia murder
20  there were three offenders, right?
21  A  Correct.
22  Q  Because we got Darren, right?
23  A  Correct.
24  Q  Okay.  Do you want to know what Little A had
25  to say about the murder?

Page 254

1  A  Not if you're going to ask me.
2  Q  All right.  Well, let's take a look at the
3  bottom of page -- City Jakes 18.  It says -- I'll make
4  it a little bit bigger.  "Day related that on the day of
5  this murder, he was working the 6:00 to midnight shift
6  selling drugs on the street at 53rd and Aberdeen.  Day
7  left work early and went to get something to eat at the
8  submarine shop located at 51st and Racine.  Day related
9  that he ordered some food and then left and had no
10  knowledge of this incident, but heard about it the
11  following day from fellow gang members."  All right.  Do
12  you see that, sir?
13  A  I do.
14  Q  Do you remember that conversation with
15  Mr. Day?
16  A  No.
17  Q  Do you remember any of this -- any
18  conversation with Mr. Day about the Garcia murder?
19  A  No, sir.
20  Q  Okay.  Then says, "Detectives then confronted
21  Day with portions of witness and co-offender statements.
22  Day then offered this version of the events surrounding
23  this murder.  Day related that while at the Submarine
24  Shop, he observed the Mexican guy pull up in front
25  driving a station wagon.  The victim entered the

Page 255

1  submarine store and ordered his food.  Day related that
2  he watched the victim to have some jewelry on, and when
3  the victim paid for his food, he had a nut-roll.  Day
4  res -- explained that nut-roll means a lot of money.  Day
5  went on to say that he decided that the victim would be
6  easy to rob, and he then went outside the sub shop, and
7  told Shawn (phonetic) Jakes that they were going to rob
8  the dude in the store, and that he had a lot of money.
9  Day then told another gang member, Fred Gunn, to go and
10  get the gun that was hidden at 53rd and Aberdeen Street
11  where they sold their dope.  Day then told Gunn to bring
12  the gun to him so that he and Snake could rob the
13  victim.  He then went on to say that Gunn then left and
14  got the gun, and that Gunn gave him, Day, the gun.  Day
15  then stated that he gave the gun to Snake, Gus Robinson.
16  Day then related that the victim walked out of the sub
17  shop, and that Snake and he walked up to the victim and
18  accosted him, stating, 'This is a stick-up.'  Day went on
19  to say that the victim ignored them and continued to
20  walk to his car.  He then added that the victim was
21  entering his car when Snake ran up to the victim and
22  shot the victim several times with the gun that Day had
23  given to Snake.  Day then added that he then ran from
24  the scene back to 53rd and Aberdeen Street."  Do you see
25  that, sir?

Page 256

1  A  I do.
2  Q  So now Day is saying that Snake is the trigger
3  man and using the gun, and that Day was involved in the
4  -- in the robbery, and that he told Jakes about the
5  robbery, but didn't specifically mention Jakes being a
6  lookout, right?
7  A  Not in that interview if that's not what's
8  written.  No.
9  Q  And nothing about Darren in that interview,
10  right?
11  A  No.
12  Q  Okay.  So then it states, "The reporting
13  detectives then had occasion to relate to Day the status
14  of the investigation, and in particular -- the
15  discrepancies between his account of this incident and
16  the other accounts given by the co-offender and the
17  witness.  At that time, Day stated that he had not been
18  entirely truthful with the reporting detectives, and
19  that he now wanted to tell the reporting detectives the
20  truth.  Day then went on to say that he was in the sub
21  shop, and that while he was waiting for his order, he
22  saw the Mexican guy -- victim enter the shop.  He then
23  stated that he observed that the victim had a lot of
24  money on him.  He said that he saw the money when the
25  victim paid for his food.  He then stated that the

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 257

1  victim not only had a lot of money, but that he was also
2  was wearing a lot of expensive jewelry. Day then stated
3  that he decided that he was going to rob the victim. Day
4  stated that he went -- he then went and got the gun that
5  was used for the protection of the dope business at 53rd
6  and Aberdeen. He then returned to the sub shop armed
7  with a 30 caliber -- returned to the sub shop armed with
8  a 380 caliber automatic pistol. Day then stated that
9  the victim was then exiting the sub shop, and at that
10  time, he, Day, stopped the victim and announced the
11  robbery, stating, this is a stick-up. Day then went on
12  to say that the victim ignored him and continued to walk
13  to his car. Day then went on to say that he followed
14  -- he then followed the victim to his car, where he shot
15  the victim two or three times as the victim sat in his
16  own car. Day then went on to say that at no time did he
17  see the victim armed with any kind of weapon. Day went
18  -- then went on to say that he then fled from the scene
19  and returned to the dope business at 53 and Aberdeen
20  Street. He then went on to say that he had heard later
21  on the street that he'd killed the victim." Do you see
22  that, sir?
23        A  I do.
24        Q  Okay. So in the final iteration of Day's
25  statement, he essentially, says it was all his idea, and

Page 258

1  he carried it out acting alone, right?
2        A  Correct.
3        Q  Except we just infer that. We don't actually
4  see what is going on. Well -- strike that. What did
5  Day say about Jakes's role in the murder in this final
6  iteration?
7        A  I'd have to look at the handwritten statement.
8  I don't know if he said something different to the
9  state's attorney, but right here he says nothing about
10  it.
11        Q  Okay. Let's take a look back at Exhibit 11,
12  the investigative report. I'm going to turn you to page
13  70 of that document. All right. Here's Arnold Day's
14  statement, and I'll read it to you starting on the
15  second page, down here where it starts referencing the
16  day of the murder. "Arnold Day states that on 15
17  September 1991, he was selling drugs on Aberdeen Street
18  from 6:00 p.m. to 11:00 a.m. but he decided to leave
19  early to get something to eat. At around 11:30 p.m. he
20  went into the Queen's Submarine shop at 1206 West 51st
21  Street. Before he had a chance to order, he saw the
22  Mexican guy, who he now knows as Rafael Garcia, pull up
23  in a station wagon and come into the sub shop, ordered
24  his food -- and ordered his food. Arnold states that
25  the Mexican guy was flashy, which means -- which Arnold

Page 259

1  has explained means he had on a lot of jewelry and had a
2  nut roll, which Arnold explains means he had a lot of
3  money. Arnold states that he decided to rob the Mexican
4  guy of the money and jewelry. Arnold states that he
5  went outside the sub shop and got the nation gun. Arnold
6  has explained that the nation gun is a gun which belongs
7  to the gang and is used for gang activity. Arnold
8  further explain that the gun was a 380 caliber. Arnold
9  states that when this -- the Mexican guy exited the sub
10  shop, he pulled out his 380 caliber and told the Mexican
11  guy, 'Stick-up.' The Mexican guy walked back to his
12  station wagon and got in on the passenger side. Arnold
13  states that when the Mexican guy got into the car,
14  Arnold shot him two or three times and fled." Do you
15  see that, sir?
16        A  I do.
17        Q  Okay. So let me just ask you a few questions
18  about this. What did Jake -- what did Day say about
19  Jakes' role in the murder in this final iteration?
20        A  In this interview, nothing.
21        Q  Well, what did Day say about Jakes'
22  involvement when you asked him about Jake's involvement?
23        A  This is what he said.
24        Q  Well, did he say --
25        A  He did not say anything about Jakes.

Page 260

1        Q  Did you -- well, how did he respond when you
2  asked him what was Jakes' role?
3        A  I don't recall what -- what he said or even if
4  that was addressed. He asked us to -- we asked him to
5  give a statement, and this is what he said.
6        Q  But you had wanted to know what he said about
7  Jakes, right?
8        MR. GRILL: Objection. Calls for speculation.
9        A  You know, this is his statement. We write
10  down what he says, even though it sometimes it don't
11  make sense, we write down what they say. Maybe he's --
12        Q  Sure.
13        A  -- protecting Jakes. I don't -- I don't know.
14        Q  Okay. Did he refuse to answer questions about
15  Jakes?
16        A  No.
17        Q  All right. Did he say that Jakes had nothing
18  to do with the murder?
19        A  I -- well, according to this, yes.
20        Q  Where did he say that?
21        A  Well, he doesn't mention him.
22        Q  Okay.
23        A  He doesn't -- he doesn't say -- he's telling
24  us what happened. He's not talking about anybody else
25  except him.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 261

1    Q   Who -- what does Day say about Darren's
2    involvement?
3    A   He doesn't say anything about Darren.  Not
4    from the report I'm reading.
5    Q   Okay.  Do you want -- did you want to ask him
6    about Darren?
7    A   I don't know if I did or if I didn't, but this
8    was his statement.
9    Q   No.  I understand you can't remember what you
10   asked him.  I'm just saying as we established before,
11   you would want to know from Day what he had to say about
12   Darren, right?
13   A   Yeah.  I believe so, yeah.  I mean, why
14   wouldn't I?  But if he didn't --
15   Q   Right.
16   A   -- say it, I can't force him to say it.  If I
17   was forcing him to say something, I'd probably say that
18   Jakes was involved, but we didn't.  This was his
19   statement.  He didn't come up with anything else.  We
20   know the differences between the statement.
21   Q   Was Day --
22   A   Maybe, he didn't want rat out -- maybe he
23   didn't want -- he said he wanted to be a general.  Maybe
24   he didn't rat -- want to rat out his fellow gang
25   members.  I don't know.  You have to ask Arnold Day

Page 262

1    those questions.  I can't answer those.
2    Q   Okay.  Was Arnold Day forthcoming when he gave
3    this final statement?
4    A   As forthcoming as he was going to be, I guess.
5    He's admitted to shooting a murderer -- shooting a gun
6    in a murder.  To me that's forthcoming.
7    Q   All right.  Let me switch back to Exhibit 11,
8    and direct your attention to document one -- or page
9    number City Jakes 131.  Right.  This is a report
10   authored by you and your partner, Bill Foley, right?
11   A   Uh-huh.
12   Q   Is that a yes?
13   A   Yes.
14   Q   Okay.  So we've got -- this isn't the Irving
15   murder and I'm not going to ask you about the Irving
16   murder apart from this one aspect of it, which is that,
17   he had offender number 2 as G-Nate --
18   A   Correct.
19   Q   -- right?  Then offender number 3 is a
20   nickname, Tennille?
21   A   Uh-huh.
22   Q   And then offender number 4, is somebody named
23   Darren?
24   A   Correct.
25   Q   All right.  Do you know who Tennille is?

Page 263

1    A   No.
2    Q   Now, you've got a guy named -- another guy
3    named Darren involved in a murder with Arnold Day.  Did
4    that make you, you know, want to find Darren, and talk
5    to him?
6    A   Probably.  Could you -- could I look at this
7    report a little bit more?
8    Q   Sure.  What aspect of this report would you
9    like to see?
10   A   Might as well back up and see all the people
11   assigned to it.
12   Q   So we got two detectives, Foley, and Boudreau.
13   A   Yeah.
14   Q   Were you hoping there would be a lot of
15   detectives there who, you know, so it could be somebody
16   else's job?
17   A   No.
18       MR. GRILL:  Oh, wait a minute.
19       MR. YAMIN:  Objection.
20       MR. GRILL:  Russell, totally unnecessary.  So
21   knock it off.  Objection.  Argumentative.  If --
22       MR. AINSWORTH:  I will withdraw the question.
23       MR. GRILL:  -- we're at the end.  If you do it
24   again, I'll just end the dep, okay?  So don't do
25   that.

Page 264

1        MR. AINSWORTH:  Andrew, it's -- no need to get
2    theatrical.
3        MR. GRILL:  Don't -- you're the one that
4    messed up, Russell.
5        MR. AINSWORTH:  I didn't mess up.  It's a fair
6    question.
7        MR. GRILL:  Russell.  Oh, really?  Okay.
8        MR. AINSWORTH:  Yes.
9        MR. GRILL:  That's rich.  We're done.
10       MR. AINSWORTH:  Mr. --
11       MR. GRILL:  On to the next question, please.
12   BY MR. AINSWORTH:
13   Q   Mr. Boudreau, why did you want to see the
14   listed detectives who are assigned?
15   A   Because you're asking me about something that
16   occurred 28 years earlier.  I'm trying to jog my memory.
17   Q   And how would the detectives --
18   A   That's why.
19   Q   How would the detectives assigned jog your
20   memory, sir?
21   A   Who knows what jogs memories.  I'm trying to
22   look at the report.  Give me the time to read this
23   report.  It may jog my memory.  I don't know.  But
24   you're not being fair.  You're asking me about something
25   28 years ago, and you expect me to regurgitate.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 265

1    Q   Oh, I'm not. I'm just asking you, sir.
2    A   No. You're not being fair. You're right.
3  That's the only truthful thing you said today, so thank
4  you.
5    Q   You're welcome. So when I'm just asking you,
6  did you want to ask Arnold Day about where you could
7  find Darren?
8    A   I may have 28 years ago. I don't know. Maybe
9  we did, and, maybe, he didn't tell us.
10   Q   All right. So just showing you, this is page
11  Bates number CJX134 --
12   A   Aren't we in another murder?
13   Q   We are.
14   A   This is another homicide.
15   Q   That's correct, sir.
16      MR. GRILL: If we're in Irving, then no. We -
17  - and in fact, I think Russell, you already covered
18  this, said you didn't intend to -- you're sticking
19  to Jakes, so let's do that.
20      MR. AINSWORTH: I am. The only thing I wanted
21  to show him was the reference to Darren, you know,
22  there's a reference to Darren in the Irving murder.
23  And so did you try and find --
24      MR. GRILL: Okay. And --
25      MR. AINSWORTH: -- try and find Darren?

Page 266

1      MR. GRILL: Hang on. We've done that. You've
2  asked the question, so we have a whole other case
3  where you can ask those questions. So I'm going to
4  direct him not to answer any questions about this
5  because this is about the Gerard Irving murder,
6  which is a different case that is open, and that he
7  still going to be deposed in. And so we'll deal
8  with it then.
9      MR. AINSWORTH: No. But I can't because for
10  Jakes we need to know, like, this witness now is
11  being told about Darren in yet another murder, and
12  as far as I can tell, and correct me if I'm wrong,
13  there's no effort to identify Darren or to question
14  Darren. But I don't know. So ...
15  BY MR. AINSWORTH:
16   Q   Oh all I'm asking, sir, is did you ever make
17  any effort to find Darren?
18   A   Wait. Are you -- are you suggesting to me
19  that these two Darrens are the same, and they're not
20  different people? I -- I don't -- do you have knowledge
21  that they're the same people? So I don't know. I mean,
22  to tie back to the Garcia homicide -- I'm just trying to
23  answer your question.
24   Q   Sure.
25   A   Are you asking me what -- what's going on

Page 267

1  another homicide with another person named Darren
2  because lord knows there's only one Darren in the whole
3  world.
4    Q   Well, it's a Darren who's picked up with
5  Little A in two different murders, right?
6    A   He was picked up?
7    Q   Or not -- but implicated in two different
8  murders with Little A, and that's why I'm -- I'm just
9  wondering, did you ever try and find Darren?
10      MR. GRILL: I just object to the form of the
11  question.
12   A   You know, I didn't prepare for this thing. I
13  don't know what's in this investigative file. Maybe,
14  -- maybe, we did. But if you want to give me the entire
15  investigative file on Gerard Irving, and all testimony
16  that I had, I would gladly answer the questions.
17      MR. GRILL: So Russell, I just wanted to make
18  sure that, so the record's clear here, consistent
19  with what we're all agreeing to and understand.
20  Your question, I presume is, did you try to find
21  Darren in the context of the Garcia homicide?
22  That's what we're talking about, right?
23      MR. AINSWORTH: In the context -- well, if he
24  ever tried to find Darren.
25      MR. GRILL: Well, if you're going -- if it's

Page 268

1  going into the Day case, I'm going to direct him
2  not to answer for the reasons I've already stated.
3  If you want to rephrase that question to -- and
4  confine it to the context of the Garcia homicide
5  investigation, I'll let him answer the question.
6  Beyond that, I'm going to direct him not to answer
7  it. So it's up to you how you want to -- how you
8  want to phrase the question.
9  BY MR. AINSWORTH:
10   Q   Well, in regard to the Garcia homicide, did
11  you ever -- after speaking to Day on February 4, 1992,
12  did you ever speak -- did you ever try and find Darren?
13      MR. GRILL: In the -- in the Garcia homicide
14  investigations?
15      MR. AINSWORTH: I already said that.
16      MR. GRILL: Okay. Just want to be clear.
17      THE WITNESS: I may have. I may not have. I
18  don't know.
19  BY MR. AINSWORTH:
20   Q   Once you got a confession from Arnold Day, why
21  did you clear close the Garcia homicide?
22   A   You're assuming a fact that I didn't testify
23  to. Who said I clear closed anything?
24   Q   All right. So let's take a look at -- we're
25  looking back at Exhibit 12. This is page -- you know,

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

|  |  |
|---|---|
| Page 269 | Page 270 |

Page 269

1 the sub-report that starts at page City Jakes 17, where
2 you and Foley are the authors of the report.
3     A   It also says -- it says two indications.
4 There's an X on cleared open. Can you see that? There's
5 a handwritten X, and there's a plain X, cleared open.
6     Q   So what does that mean when it's cleared
7 closed and cleared open?
8     A   I don't know. It's a typo. I don't know why
9 it's that way. But you can't have either -- it has to
10 be either/or.
11     Q   Well, let's take a look at how you
12 characterized it in your report. "The reporting
13 detectives request that this case be cleared by arrest
14 and closed." Why did you, as one of the reporting
15 detectives, request that this case be cleared by arrest
16 and closed?
17     A   Like I said, Detective Foley typed this arrest
18 -- this case report. I don't know why he put that in
19 there.
20     Q   You didn't say that. Are you now saying that
21 this is Foley's typed report?
22         MR. GRILL: Objection. Mischaracterizes his
23 testimony.
24     A   I told you earlier that Foley signed my name
25 to that report. He's listed as number one on the back

Page 270

1 page, which I didn't see before, and usually, it's the
2 person that prepares the report that is listed first.
3     Q   So you're saying that when Foley went to type
4 up this report, he got to the boxes in the bottom
5 left-hand corner of the first page, and he wrote your
6 name in first as the reporting officer, and then his
7 name second, even though he was typing this report;
8 that's what you're saying happened?
9     A   Oh, he signed the report.
10     Q   Oh, but I'm just trying to be clear.
11     A   Yeah. But I mean, why -- if I typed my name
12 first and I typed it up, I'd sign it, and I'd sign his
13 name. So I'm saying right now, I don't have any
14 recollection. But what we would do is whoever typed the
15 report, would sign the other person's name, why he
16 decided to put my name first, I don't know.
17     Q   All right. So --
18     A   But his name's first on the back page. So 28
19 years later, I don't know.
20     Q   But we can agree, sir, that in any event, it
21 was wrong to clear these cases closed, cleared by
22 arrest, and closed when there are three offenders and
23 only two in custody, right?
24         MR. GRILL: Objection. Form. Foundation.
25     A   I wouldn't have typed that. I wouldn't

|  |  |
|---|---|
| Page 271 | Page 272 |

Page 271

1 characterize this as closed. It was open.
2     Q   Why?
3     A   She had a -- you had a possible third offender
4 there. But it depends according to Day, he took the
5 third offender out. He made it sound like he was the
6 only person. He didn't identify anybody else.
7     Q   Is there a reason why you wouldn't ask Arnold
8 Day when you have him in custody and he's confessing to
9 committing a murder, "Who is Darren?"
10     A   We went through this. I may have, I may not
11 have. I -- I don't know what -- I don't remember 28
12 years what we asked him. Maybe, he -- he in this
13 interview said -- and that's probably why Foley knew it
14 -- said that he was the only offender in this. He takes
15 Jake out of the picture. He takes -- everybody wants to
16 put it out as Snake, which was common knowledge at that
17 time that Snake implicated Jakes. And this was the
18 first story that came out. And then we had to relocate
19 -- I mean, Snake had to move because of this murder.
20     Q   All right. So did you notice any
21 discrepancies between Jakes' confession and Day's
22 confession, apart from Jakes and Darren are in one, and
23 in Day's confession, it's only him?
24     A   You just said it. That's a big difference.
25     Q   That's one. Okay. Do you notice any other

Page 272

1 discrepancies?
2     A   I haven't gone through them line by line. But
3 as again, I will say these discrepancies between
4 defendants who say what they say, I write down what they
5 say.
6     Q   Right. But then your job is --
7     A   You know, if all of them had the exact same
8 statement, then I think you'd probably have a good
9 reason to question there, but if they have different
10 statements, I would suggest to you that those are those
11 words, they're not mine.
12     Q   Okay. So but one -- part of your job is to
13 assess the reliability of the information you're
14 getting, right?
15     A   Yes. And sometimes when you're dealing with
16 defendants, all you can do is write down what they say.
17 I mean, that's what they said. I -- I can't change it.
18 I may push them a little bit more, but I'm not going to
19 say it. A lot of them mitigate what they do. Some of
20 them don't want to implicate other people for various
21 reasons. What -- what I'm supposed to do?
22     Q   What do you mean push them a little more?
23     A   It's their -- those are -- those -- those are
24 their -- those -- that is their words, not only to me,
25 but to the Cook County State's attorney.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 273

1    Q   What do you mean push them a little more?
2    A   Well, just like you say in an interview, well,
3  what about this?  Why didn't you ask him this?  Why
4  don't you ask them that?  Maybe I did.  Maybe they --
5    Q   Okay.
6    A   -- didn't want to do it.  Maybe they didn't
7  want to say anything else.
8    Q   So you can follow up with the suspects to find
9  out why their story is, you know, contrary --
10  contradicts somebody else's story, right?  Because there
11  might be an explanation for it, right?
12    A   Sometimes you can, yeah.  I mean, I couldn't
13  go back and ask Jakes.  He was represented by an
14  attorney.  I don't think his attorney would talk to me.
15    Q   No.
16    A   They got charged.  I -- I you know, what am I
17  going to do?
18    Q   But when you have Day in the station, he's
19  telling you about the murder and he -- you know,
20  remember, Jakes told you that when Day came out of the
21  Sub Shop, he was armed with the 380 in his waistband,
22  right?
23    A   Correct.
24    Q   And when Day is telling you this story, he
25  comes out of the Sub Shop, and he doesn't have a gun,

Page 274

1  right?
2    A   I think his statement was that he ran three,
3  four blocks to get it and then came back before this guy
4  left with his food.  Is that his statement?
5    Q   Yeah.  I wanted to ask you about that.  Did
6  -- was there anything --
7    A   Yeah.
8    Q   Kind of odd, right?
9    A   I think you need to ask Arnold Day that.
10    Q   Well, I'm just saying, did that, like, set off
11  any, you know, buzzers in your own head that, jeez, you
12  got a guy at a Sub Shop who's ordering chicken wings.
13  It's not going to take that long to get them done.  And
14  this guy, Arnold Day, is saying that he's running from
15  54st and Racine, to 53rd and Aberdeen, to go get a gun,
16  and then running back and, you know, expecting the guy
17  to still be there waiting for him to rob him.
18    MR. GRILL:  Object to the form.
19    Q   Does that seem little odd to you?
20    MR. GRILL:  Object to form of the question.
21  Calls for speculation.  That's it.
22    A   All I could tell you is what Arnold Day told
23  me.  You know, the fact that somebody shoots somebody
24  over a lot of money is odd to me.  So I -- I'm not
25  trying to understand everything.  I'm writing down

Page 275

1  exactly what they say.  There's nothing else I could do
2  except talk to people, write down what they say, and it
3  is what it is.
4    Q   Right.  But did you then follow up with Arnold
5  Day and say, "You know, what made you think the victim
6  was still going to be there when you got back with a
7  gun?"
8    MR. GRILL:  Object.  Form.
9    THE WITNESS:  What would be the point?
10    Q   Well, he maybe -- he was --
11    A   He's admitting to shoot a man and robbing him.
12  What would be the point to -- why would you think that?
13  Am I to understand why a man is going to do certain
14  things when he's committing an armed robbery and
15  shooting people.  Does that got to make sense?  Is
16  anything he's going to tell me make sense?  No.  The
17  entire act itself didn't make sense.
18    Q   Okay.  Yeah.  Because he, you know -- also I'm
19  sure as an experienced detective, you noticed that
20  Arnold Day was doing this as a stick up to try and get
21  money, but then doesn't rob the victim, right?
22    MR. GRILL:  Objection.  Mischaracterizes the
23  evidence.  Assumes facts not in evidence.
24  Foundation.  Go ahead.
25    A   There were -- there is nothing that I've seen

Page 276

1  that suggested that he didn't.  I mean, I did review the
2  reports before I came here.  He did have some jewelry.
3  He did have $89.  I wouldn't characterize that a nut --
4  as a nut roll in a neighborhood, not $89.  I don't know.
5  Maybe he got spooked, maybe the guy did something and he
6  shot him, but that's what he said.
7    Q   But Day doesn't tell you that he robbed the
8  victim, right?
9    A   His -- his statement is what his statement is.
10    Q   Well, that's what I'm trying to find out, sir,
11  because Day tells you that he doesn't rob the victim,
12  even though the whole point of confronting him is to rob
13  him for money, right?
14    A   Yeah.
15    Q   So why did you ask Day why he didn't follow
16  through with the burglar -- with the robbery?
17    MR. GRILL:  Objection.  Mischaracterizes the
18  evidence.  Assumes facts not in evidence.  Form.
19  Foundation.
20    THE WITNESS:  No, I didn't ask him.  Who knows
21  why he didn't rob him.  Maybe after he shot him he
22  wanted to get out of there and flee.  I don't know.
23  Ask Arnold Day those questions.
24  BY MR. AINSWORTH:
25    Q   Okay.  When Arnold Day told you that Snake was

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 277

1  the shooter, you didn't just write that down and then
2  call felony review and have them come out and record his
3  statement, right?
4      A   No.
5      Q   No.  It didn't make sense to you.  You want
6  answers about why he was saying that Snake was the
7  shooter when Jakes was saying Day was the shooter, and
8  Snake was saying that, you know, he was asked to be a
9  lookout and left, right?
10     A   Correct.
11     Q   So you didn't just write down whatever Day was
12 telling you and then leave it at that, right?
13     A   No.  I did.  I wrote down that he said -- I
14 wrote down that he said Snake was the shooter.  It's in
15 the report, isn't it?
16     Q   You sure did.  But then, you didn't leave it
17 there.  You then went back and interviewed him again to
18 find out more information, right?
19     A   I -- I don't know if that was the second
20 interview or was one continuous interview.  But the fact
21 was remained that he was confronted with portions of
22 Jakes' statement, which probably he didn't know that
23 Jakes ratted him out.
24         MR. GRILL:  All right.  We're going to take a
25 couple minute break.  I need a break.  So let's go

Page 278

1  out for a couple minutes.  And since we're on a
2  break, Ms. Court Reporter, how much time do we got?
3         COURT REPORTER:  The time is 6:13.  We are off
4  the record.
5             (OFF THE RECORD)
6         COURT REPORTER:  Time is 6:27.  We are back on
7  the record.
8  BY MR. AINSWORTH:
9      Q   Okay.  Sir, I just want to direct your
10 attention back to Exhibit number 12.  And so after Day
11 gave his story about Snake being the shooter, it says,
12 The detective -- "reporting detectives then had occasion
13 to relate to Day the status of the investigation, and in
14 particular, the discrepancies between his account of
15 this incident and other accounts given by the co-
16 offender and the witness."  Do you see that, sir?
17     A   I do.
18     Q   So you certainly confronted Day about
19 discrepancies between his account and his co-offender's
20 account, right?
21     A   Correct.
22     Q   And that was a -- that was a good
23 investigatory tactic to take, right?
24     A   I'd say so, yes.
25     Q   And so you would have also wanted to get

Page 279

1  answers to other discrepancies between Jakes' and Day's
2  stories.  Like why Jakes said Day already had a gun, and
3  Day was saying he didn't have a gun, right?
4      A   You know, I don't remember that, but I don't
5  know if that would be that important.  He had the gun
6  when he shot and killed someone.
7      Q   So to you --
8      A   You know, if he had it ten minutes before or
9  15 minutes before, he had it on him.  To me, it's not
10 that important.  And again, I want to reiterate that
11 this is Day's statement.  This is what he's saying.  And
12 all I can do is memorialize what he says.
13     Q   Well, no.  According to your report, you
14 didn't just memorialize because you confronted him with
15 the discrepancies, right?
16     A   I did.
17     Q   Okay.  And so when you talked to Day, you
18 wanted -- well, strike that.  Are you saying that as a
19 guy with over 30 years in law enforcement, it doesn't
20 matter whether Day had a gun when he was exiting the Sub
21 Shop as Jakes testified to or Jakes stated?  Or if Day
22 didn't have a gun and had to run over a half mile away -
23 - sorry -- over a quarter mile away to get a gun and
24 then over a quarter mile back to bring the gun to the
25 scene of the crime?  You're saying that doesn't matter

Page 280

1  to you?
2         MR. GRILL:  Objection.  Mischaracterizes his
3  testimony.  It's argumentative.
4      A   And -- and again, I didn't have 30 years on
5  when this happened.  So I know you keep saying 30 years.
6  I'm just going to go back to what I said that, you know,
7  there's some things that you can confront people on, but
8  to me where -- you know, it's enough he said he had the
9  gun when he shot and killed the guy.  To me, it's not
10 -- it's not important to where he went and got it
11 because I got it out of the gateway.  It's -- it's not
12 important to me.
13 BY MR. AINSWORTH:
14     Q   Doesn't it raise questions in your mind as to
15 why Day is, you know, about the whole plan?  That
16 somebody at a Sub Shop is still going to be there to be
17 robbed after Day has to run over a quarter mile to get a
18 gun and then over a quarter mile back?
19     A   There's -- there's a lot of different
20 questions about that but is that -- is that the truth?
21 Did he just say that?  I mean -- I mean, Jakes said he
22 had the gun on him when he came out of the store.  And
23 now he's saying that Gus Robinson was the offender while
24 everybody else in this investigation said that Gus was
25 the initial target, and then he was asked to be a

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 281

1  lookout. So you're going to have to ask Arnold Day
2  these questions. I -- I -- I can't answer them.
3      Q   Well, did you ask Arnold Day the questions?
4  That's what I'm trying to gather.
5      A   I don't know if we asked him about it or not.
6      Q   It something -- it's something you would want
7  to know though, right? You would want to know about why
8  Day is saying that he had to run over a quarter mile to
9  get a gun when Jakes is saying he already had a gun on
10 him, right?
11     A   Maybe. You know, I don't recall how this
12 flowed or what happened. I could tell you what's
13 written down 28 years later. That's what he said.
14     Q   Did you ask Day if he walked, ran, got a ride,
15 how he came to get the gun from 53rd and Aberdeen?
16     A   No. I knew from Jakes that he always carried
17 the gun. That's what Jakes said.
18     Q   Okay.
19     A   So I -- I don't know. I -- I can't answer
20 that.
21     Q   Why would Day admit to shooting and killing
22 Rafael Garcia, but not admit that he was armed with the
23 gun and had to go and get the gun in order to shoot the
24 victim in cold blood?
25     MR. GRILL: Objection. Calls for speculation.

Page 282

1      A   I don't know --
2      MR. GRILL: Foundation.
3      A   I'm sorry. I don't know that answer. Ask
4  Arnold Day.
5      Q   Okay. Well, you were the detective who was in
6  an interrogation with Arnold Day, right?
7      A   Yes.
8      Q   It's a truth-seeking process, right?
9      A   To the best of your ability, I told you
10 earlier that people mitigate and give half-truths all
11 time. You write down what they say and that's what it
12 is.
13     Q   And so you wanted to know what his -- what the
14 truth was when you were talking to Day, right?
15     A   Well, what he's willing to reveal. Whether or
16 not I got the entire truth is one thing.
17     Q   What do you think Day was lying about?
18     A   Which -- which interview?
19     Q   In his last interview.
20     A   I think he was -- well, I mean, he lied about
21 Snake. But I think he was lying about the gun. I mean,
22 that came from Jakes. That didn't have any bearing on
23 what was going on. There was a topic at Jakes review.
24 Was it germane to the case, or whether or not he ran to
25 get a gun or not get a gun. He said he had it on him.

Page 283

1      Q   And as you sit here today, would you want to
2  know if -- why they didn't rob the victim?
3      A   As I said before, I don't know if he did or
4  did not rob him. We know he had some stuff item but we
5  don't know what he had on him. Maybe -- maybe they did
6  take something from him, or, maybe, he panicked and
7  fled. I don't know.
8      Q   Let me ask you or let me show you what we'll
9  mark as Exhibit number 13. This is the four-page
10 document, Bates number CCSAO subpoena exhibit 6669 --
11 6669 through 6672. and you see here, sir, where you're
12 listed as an arresting officer on page 6671.
13     (EXHIBIT 13 MARKED FOR IDENTIFICATION)
14     A   Yeah. We've talked about this before. Is
15 that the criminal sexual abuse or assault?
16     Q   Yeah. But you see how Jakes is listed as the
17 number 9 offender?
18     A   Correct.
19     Q   And Jake -- offenders 6 through 9 are charged
20 with disorderly?
21     A   Uh-huh.
22     Q   So he was never charged with a sex crime in
23 this case, right?
24     A   It doesn't look like it, no.
25     Q   All right. Did Snake ever tell you that he

Page 284

1  was afraid for his safety?
2      A   He did.
3      Q   When did that happen?
4      A   I do -- I don't recall when it was after this,
5  but I remember going to meet him at -- at a residence
6  that he was hiding from because the street gang wanted
7  to kill him, or at least that's what his belief was.
8      Q   Okay. And did he call you in particular, or
9  did he call Detective Kill, or how did you get the call?
10     A   I think he called me. I -- I don't remember,
11 but I was the one that went to his house.
12     Q   Do you know why he called you?
13     A   I'm assuming he trusted me.
14     Q   Did you ever handcuff Snake? I'm sorry, what
15 was that?
16     A   That he trusted me. That's what I'm saying.
17     Q   On September 16, 1991, did you ever handcuff
18 Snake?
19     A   I don't remember if I did or if I didn't.
20     Q   Did you have any reason to handcuff Snake?
21     A   As I sit back here and look over the case, not
22 really. No.
23     Q   Did you handcuff any of the four individuals
24 who were with him that night?
25     A   I don't know. We may have, we may not have. I

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 285

1   don't -- I don't know.
2       Q   So you may have handcuffed all five of them,
3   right?
4       A   Maybe. I -- I just don't remember.
5       Q   Did you keep Snake overnight, the night of
6   February -- September 16 through the morning of
7   September 17?
8       A   I don't know. I -- I went home at some point
9   in time. I wasn't present for Jakes' statement, and I
10  don't think I was there in the morning, or I might have
11  been. I just don't remember.
12      Q   Well, did you take Jakes -- did you take Snake
13  to the grand jury the next morning?
14      A   I don't recall if I did or if I didn't. I may
15  have. I don't know.
16      Q   Is that something you would do, keep a witness
17  at the police station all night so you could take him to
18  the grand jury the next morning?
19      A   Sometimes we did, and sometimes we didn't.
20  Sometimes I go pick them up their houses and bring them.
21      Q   So that was an option. You could bring a
22  witness home, and then just go get them the next morning
23  after they've had chance to rest at home, right?
24      A   Sometimes, yeah.
25      Q   How would you determine whether you would

Page 286

1   bring a witness to the -- bring them home before taking
2   them to the grand jury or keep them at this -- at the
3   area?
4       A   I mean, there's a number of factors. Sometimes
5   they'd want to stay, or sometimes it'd be 5:30 or 6:00
6   in the morning, they want to go home and we were leaving
7   in, like, an hour or two. So it depends, there's no
8   fast and hard rule.
9       Q   When Snake told you that he was afraid, did he
10  ask for anything?
11      A   Not -- not that I can remember. I just don't
12  remember going to his house, and he moved out of the
13  neighborhood.
14      Q   And did you help him move?
15      A   No.
16      Q   Why was he calling you?
17      A   Because, I just told you, I think he trusted
18  me.
19      Q   What did he say to you? What did you say to
20  him?
21      A   He was nervous about being targeted. He moved
22  to an opposing gang faction's territory.
23      Q   He was nervous about the opposing gang or his
24  own gang?
25      A   No. He was nervous about the Black P. Stone

Page 287

1   gang. And he moved into an opposing gang's territory
2   that -- that didn't know him.
3       Q   Which gang?
4       A   Gangster Disciples.
5       Q   Where did he move?
6       A   I just remember it was south of 55th Street.
7       Q   And why did you go see him?
8       A   Because he was afraid. He asked for help.
9       Q   So he did ask for something?
10      A   Well, he was calling to tell me what -- that
11  he was afraid, and the gangs were targeting him. So
12  yeah, that's -- that's -- that's the reason that's all.
13      Q   And so he was asking you --
14      A   He didn't ask for anything that I could
15  physically give him. He just wanted people to know.
16      Q   So he asked for your help, right?
17      A   Yeah. He wanted me to know what was going on.
18      Q   And so how did he ask you to help him?
19      A   He called me and told me that the gang was
20  trying to kill him from -- from the best of my
21  recollection.
22      Q   All right. Was this before or after Arnold
23  Day was arrested?
24      A   I don't recall exactly. I think it was after
25  Jakes was arrested prior to Arnold Day being arrested.

Page 288

1       Q   Gus Robinson didn't implicate Arnold Day,
2   right?
3       A   No. He didn't.
4       Q   He only implicated 15-year-old Anthony Jakes,
5   right?
6       A   Correct.
7       Q   And -- all right. Did you think that Arnold -
8   - that 15-year-old Anthony Jakes had any sway with the
9   gang?
10      A   I don't know what sway he had with the gang. I
11  mean, they were part of a street gang. They had rules
12  that they followed, they listened to people.
13      Q   Well, it was your job to know who the
14  hierarchy of the gang was, right?
15      A   And I testified that who that was. Yes.
16      Q   And did -- so did you have any knowledge that
17  Anthony Janks -- Jakes had any rank in the gang at 15
18  years old?
19      A   No.
20      Q   Did you ever investigate to pull, like, city
21  records or tax records or property titles to find out
22  who owned the front building at 1212 West 51st Street?
23      A   No.
24      Q   So you just said that the Jakes family owned
25  it without investigating?

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 289

1    A   No. I told you I had learned that. And this
2  is exactly what I said, I learned that sometime during
3  the post-conviction hearing, and I don't remember who
4  that the family owned both places.
5       Q   So, could it have been from Mike Kill, when he
6  was having his, you know, his poor health. Maybe, he
7  told you that?
8       A   I didn't have a chance to talk to Mike Kill
9  about his testimony. We were -- we were separated.
10      Q   What do you mean you were separated?
11      A   A motion -- there was a motion to exclude.
12      Q   Well, your testimony came --
13      A   I don't recall, but I don't believe it was
14 from Mike Kill.
15      Q   And so somebody said that they owned both
16 buildings, and you just took that at face value without
17 investigating?
18      A   So you're suggesting to me that I could
19 re-investigate this murder, and go out there, and do
20 that retired. So I mean, would that be proper? When
21 I'm a party to a case? If it is, let me know, and I
22 will start re-investigating this the best I can.
23      Q   So you're saying that, but for the fact that
24 you retired, you would have investigated to find out
25 where Anthony Jakes or who owned the building at 1212

Page 290

1  West 51st Street, right?
2       MR. GRILL: Objection. Mischaracterizes his
3  testimony.
4       A   I -- I didn't say I investigated it, I said I
5  was told.
6       Q   Well, when Jakes was -- had his conviction
7  overturned, and he was seeking a COI, you moved in court
8  to overturn that or to oppose that COI right?
9       A   Not with Jakes, with Day.
10      MR. GRILL: And that's as far as we're going
11 with that line of questioning then?
12      Q   No. It was with Jakes. So you didn't oppose
13 Jakes' certificate of innocence, right?
14      A   I don't recall what the attorneys filed.
15      Q   Well, did you want to oppose Jakes'
16 certificate of innocence?
17      A   If I had my choice, yes. Or what choice do I
18 have?
19      Q   Why did you want to oppose Jakes' certificate
20 of innocence?
21      A   Because this is a sham.
22      Q   Okay. Can you elaborate what is a sham?
23      A   This is a sham. This is a sham. This is all
24 about money. This has nothing to do with the truth. And
25 -- and that's why you're here. This is about money. You

Page 291

1  weren't in a criminal court in the beginning. I've
2  never known you to be a public defender. You show up
3  afterwards, and then you throw doubt and misstate facts
4  to earn money. So that -- that's why I'm saying it's a
5  sham.
6       Q   Okay. Do you bristle at being questioned
7  about, you know, investigated choices you made along the
8  way in this case?
9       MR. GRILL: Objection. You know what, I would
10 even reckon not even bothering to answering that,
11 at this point. It's argumentative and it's
12 improper.
13 BY MR. AINSWORTH:
14      Q   You can answer the question, sir.
15      A   My attorney says not to.
16      MR. AINSWORTH: Are you going take your
17 attorneys -- you can't tell him not to answer a
18 question. You can move for a protective order.
19      MR. GRILL: He doesn't have -- he doesn't have
20 to take my advice. I'm not telling -- I'm not
21 telling him what way to do -- which way to go with
22 it, Russell. I just think that the question itself
23 is improper and it's intended only to argue with
24 this witness. So I really don't know --
25      MR. AINSWORTH: Let me ask this question.

Page 292

1       MR. GRILL: -- what evidentiary value that
2  question has to anything that is --
3       MR. AINSWORTH: Andrew, done. Done with the
4  speaking objections.
5       MR. GRILL: Okay. Well, then ask a better
6  question then, Russell.
7       MR. AINSWORTH: Well, stop with these speaking
8  objections. I'm -- I've had it all day. I mean,
9  all freaking day. You've just been like --
10      MR. GRILL: You think I've been doing speaking
11 objections all day?
12      MR. AINSWORTH: Yes.
13      MR. GRILL: That's rich -- that's rich. Okay.
14 Clarice, why don't you print this transcript out
15 when we're done and send me the portions out
16 where I've been doing that, other than just this
17 minute right now. Okay. I look forward to getting
18 that e-mail from you, Russell.
19 BY MR. AINSWORTH:
20      Q   Okay. Mr. Boudreau, and only Mr. Boudreau. Do
21 you have a problem with people critiquing your
22 performance as an investigator in this case?
23      MR. YAMIN: Objection. Form.
24      A   No.
25      Q   Is there anything -- is there anything that,

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

|  | Page 293 |
| --- | --- |

1    you know, looking back on it, having had the chance to
2    review the Garcia homicide investigative file, that you
3    would have done differently?
4    A   As I sit here today, no.
5    Q   Do you recall Snake refusing to show up for
6    trial?
7    A   I don't recall that.
8    Q   Do you recall there being a warrant issued for
9    his arrest, for failing to appear at trial?
10    A   I don't recall that.
11    Q   Do you recall having to -- well, let me show
12    you what we'll mark as Exhibit 13.
13    COURT REPORTER: 14.
14    MR. AINSWORTH: 14. Thank you, Maggie.
15    Q   This is the -- Gus Robinson's trial testimony
16    and it's page 181. The Bates number is Plaintiff Jakes
17    31047. Questioned, "All right. How did you know" --
18    line 1, sorry. Question, "All right. How did you know
19    there is a warrant?" Answer, "I didn't until the police
20    came to my new address." Question, "That would be
21    Detective Kill?" Answer, "Boudreau." Okay. So does
22    reviewing that testimony refresh your recollection that
23    you came to Snake's house to bring him to court?
24    (EXHIBIT 14 MARKED FOR IDENTIFICATION)
25    A   No.

|  | Page 294 |
| --- | --- |

1    Q   All right. And then showing you on that same
2    page, lines 13 through 22, it says, question, "And did
3    you get to go home after you gave that statement?"
4    Answer, "No. I went to the grand jury the next day."
5    Question, "So you spent the night in the police
6    station?" Answer, "Yes." "And did they -- were you
7    handcuffed at all, or anything like that?" Answer,
8    "Yes." Question, "Yes?" Answer, "Yes." Does reviewing
9    that testimony refresh your recollection that --
10    A   So I -- I'm trying to understand --
11    Q   Let me ask the end of the question. Does
12    reviewing that testimony refresh your recollection that
13    Gus Robinson spent the night at the police station, went
14    to the grand jury the next morning, or that he was
15    handcuffed while he was at the police station?
16    MR. GRILL: Please don't yell at the witness.
17    Go ahead and answer.
18    A   Well, if -- if -- if I could just may -- you
19    asked me for trial, that he didn't show up for trial
20    when there's a warrant issued for his arrest for trial.
21    This is not trial. He's already a witness. He would
22    have been brought to the grand jury, he'd be brought to
23    the judge. So I'm -- I'm just confused by your -- your
24    question.
25    Q   This is just so we're all clear about what

|  | Page 295 |
| --- | --- |

1    this is, this is Gus Robinson's trial testimony, and he
2    testified at trial that he was -- that a warrant was
3    issued for failure to appear as a witness at trial. Does
4    that refresh your memory, about that instance, at all?
5    A   No. So we -- we took him to the grand jury
6    instead of the trial court? Is that what you're --
7    Q   First -- two different instances. First, he
8    went to the grand jury the following morning.
9    Separately, he had a warrant was issued for his arrest
10    for failure to appear at the trial, itself.
11    A   Can -- can you go up. I'm just trying to
12    follow your questioning --
13    Q   Yes.
14    A   -- because I think it talks about a warrant.
15    Q   So the top one is: There is a warrant for his
16    failure to appear to trial -- at trial.
17    A   And you're saying I went to his house and
18    arrested him, that's what he's saying.
19    Q   That's what he's saying.
20    A   And then you took him to the grand jury?
21    Q   No. Then you took him to trial. Grand jury
22    was a separate incident that happened --
23    A   Okay.
24    Q   Yeah. So he's saying that you brought him to
25    trial so he could testify that day. And in the midst of

|  | Page 296 |
| --- | --- |

1    his testimony, he also talked about going to the grand
2    jury, the morning after his statement.
3    MR. GRILL: Okay. I'm just going to object to
4    the extent mischaracterizes that transcript. Go
5    ahead.
6    Q   Well, the question for you, Mr. Boudreau, is:
7    Do you recall any of -- do you recall based -- after
8    having a chance to review this testimony, does it
9    refresh your recollection that Gus Robinson was
10    handcuffed while he was at the police station?
11    MR. GRILL: Objection to foundation.
12    A   No. It doesn't refresh my recollection.
13    Q   Does it refresh your recollection about Snake
14    spending the night at the police station?
15    A   It does not reflect my recollection.
16    Q   Does it refresh your recollection about taking
17    Snake to the grand jury the following day?
18    A   It does not refresh my recollection.
19    MR. GRILL: It's 12 minutes left FYI.
20    Q   Did you have any doubt in your mind about --
21    strike that. Was there any ambiguity in your mind about
22    where Jakes lived when you were questioning him the
23    night of September 16, 1991?
24    A   No.
25    Q   Okay. You knew he lived in the rear house,

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 297

1  right?
2      A   I don't know if I knew.  I know you say he
3  lived in the rear house, but it doesn't mean he didn't
4  have access to the front and rear houses, and that his
5  family had.  So where he spent the night.  I don't know.
6  I mean --
7      Q   As we talked several hours ago, you said that
8  -- in your report about Jakes, you documented that his
9  aunt said he lived in the rear house, when the police
10 came to the rear house to get him, and that he lived
11 there with her, right?
12     A   That's correct.  Yes.
13     Q   And when Jakes told you that he ran home, and
14 looked out the window, and saw the victim in the street,
15 there is no discrepancy in your mind about where Jakes
16 was at that time, right?
17     A   No.  That's not true.
18     Q   So you did have some doubts about where Jakes
19 was, when he ran home, correct?
20     A   I think, I testified: I don't believe he was
21 in the rear house when he looked out the window, if --
22 if that was true, even.
23     Q   But you never clarified with -- you never
24 clarified with Jakes, where he was at the time that the
25 victim was laying in the street, and he was supposedly

Page 298

1  able to see it from his window, right?
2      MR. GRILL:  Objection.  Mischaracterizes the
3  testimony.
4      A   No.  I didn't -- I didn't clarify it with him.
5      Q   And if it was unclear to you that you would
6  have -- if it was unclear about where Jakes was saying
7  he was, you would have clarified it with him, right?
8      A   Yeah.  But as -- as I sit here today, I don't
9  believe he was in the rear house.  I don't -- I don't
10 know of any 15-year-old person that's going to have
11 windows broken out, hear gunshots, and then run and hide
12 in a rear house, unless he's involved.  He would have
13 --
14     Q   What do you --
15     A   -- been out there with everybody else, looking
16 at the body in the police response.  So that's -- that's
17 what I'm thinking.  I think it's implausible.  I mean,
18 that's based on my experience.
19     Q   Okay.  So you think it's an abnormal response
20 to gunshots to stay in the house?
21     A   I think it's a self-serving statement by
22 Mr. Jakes, that he wanted to run into the house, or he
23 was confused, or maybe, he said he ran into the house,
24 and that's part of his house back there.  I mean, you
25 gave me five or six address -- addresses for Arnold Day.

Page 299

1  I'd have to look at Jakes' arrest report to see how many
2  addresses he gave.
3      Q   Okay.  And so are you discounting Mike Kill's
4  testimony at trial that Jakes told him he ran into the
5  backyard of 1212 West 51st Street and ran to the second
6  floor?
7      MR. GRILL:  Objection.  It mischaracterizes
8      the testimony and the evidence.  Form.  Go ahead.
9      A   I didn't -- I didn't say that that's what Jake
10 said to Mike Kill.  There was a discrepancy.  That's
11 what he said.  You are asking me if I believed it, but
12 the answer is no.
13     MR. AINSWORTH:  Do we have an agreement on
14     punitives?  I can't remember if --
15     MR. GRILL:  Yeah.  We're not touching it right
16     now.  I don't remember if there's an agreement, but
17     he's not answering questions about his net worth or
18     finances at this point.
19 BY MR. AINSWORTH:
20     Q   Are you going to take your attorney's advice
21 and not answer questions about your net worth and
22 finances, sir?
23     A   I am not going to talk to about that.  It's
24 way premature.
25     Q   How did you feel -- did you -- were you ever

Page 300

1  interviewed by the special prosecutor?  Did you ever
2  talk to Bob Milan?
3      A   Yes.
4      Q   Did you talk to him about this case?
5      A   I don't know if I talked to him about this
6  case or other cases.
7      Q   How did it come up that you had a conversation
8  with Bob Milan?
9      MR. GRILL:  Form.
10     A   I think I'm going to have to stay away with
11 that because my attorneys were present.  I don't know if
12 I could answer that without revealing attorney-client
13 privilege.
14     Q   It is not attorney-client privilege if Bob
15 Milan was present because he's not your attorney.
16     A   No.  I understand that, but how I got to talk
17 to him was what you asked.
18     Q   Well, what -- what did he say to you and what
19 did you say to him?
20     A   I don't recall what we discussed.  I mean, it
21 was about cases.
22     Q   All right.  Were these cases that Bob Milan
23 was prosecuting?
24     A   I believe so, yes.  I'm assuming it's why he
25 asked.

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

---

Page 301

1    Q   What did you -- what did you say to Bob Milan?
2    A   I -- I don't recall that conversation.  I
3  couldn't even tell you which case it was.  I remember
4  talking to him, but that's it.
5    Q   Did you take any steps to try and convince Bob
6  Milan not to let Anthony Jakes out of prison, or not to
7  overturn Anthony Jakes' conviction?
8    A   Not that -- not that I'm aware of, no.  Maybe
9  you told me I filed a -- an objection to a certificate
10 of innocence, which I remember one of Day.  I don't
11 remember one of Jakes, but if you're telling me that.
12   Q   How did you feel when you learned that Jakes'
13 conviction had been overturned?
14   A   Well, it's -- it's my understanding that this
15 conviction was overturned because the state backed out
16 of it, and they gave Judge Hooks time to rule on it,
17 that they withdrew their objection, correct?
18   Q   Well, how do you feel about the fact that
19 Jakes' conviction was overturned?
20   A   It's frustrating.
21   Q   Why is it frustrating?
22   A   Because the -- the reason for it was
23 overturned -- nobody has any problem for a defendant
24 getting a new trial, or maybe, even being released from
25 prison because evidence changes, but what I -- what I

---

Page 302

1  get aggravated about was -- is that the lies behind it.
2  You know, I understand witnesses flip, and the state's
3  attorney has an ethical obligation, that they can only
4  retry a case if there -- if it's favorable -- if they're
5  likely to hurt -- to get an eviction, or all the
6  witnesses are dead, and then these are in -- especially
7  in gang cases, when everybody's flipping, they are not
8  going to be able to do that.  So yeah, but what -- what
9  -- what I take very -- you -- you -- you're always, and
10 I've seen this in a lot of your cases, Russell, that
11 what somebody says, how there were reviewed, after
12 talking to you, it's embellished.  It's all sorts of
13 stuff that goes on, and -- and that -- that's what
14 aggravates me because I think you subord perjury.
15   Q   And so you think that I'm responsible for
16 people making allegations against you?
17   A   No.  I think -- I think that after they speak
18 to you, their allegations get branded --
19   Q   I see.
20   A   And I think -- and that's done by design on
21 your part because you're in it for the money, that's
22 what you're here for.
23   Q   Okay.  And so what are the lies that you were
24 referring to in regard to Jakes' conviction being
25 overturned?

---

Page 303

1    A   I think that this whole -- this whole tale of
2  abuse.
3    Q   Do you ever do anything -- did you ever do
4  anything to try and over -- to try and contact Thomas,
5  the shooter, or the alleged shooter.  I asked you about
6  Troy.  So I want to make sure I ask you about Thomas,
7  too.
8    A   Thomas wasn't the shooter.  We learned early
9  out on the investigation, due to findings that Thomas
10 had nothing to do with it.  Jakes himself said Arnold
11 Day was the shooter.  So why I'm going to go to talk to
12 him, looking for mythical shooters.
13   Q   All right.  And Jakes' statement was uncoerced
14 by you or anyone else; is that right?
15   A   It was not coerced.  No.
16   Q   Did you review Jakes' statement after it was
17 provided?  The handwritten one.
18   A   Maybe, when I came back to work, I could've.
19 Maybe, I looked at it during trial.  I don't -- I don't
20 recall.
21   Q   How many times did you go to Day's house to
22 find him, in regard to the Garcia murder?
23   A   I don't know how many times I went to the
24 house, but every time we were in that neighborhood --
25 we had lots of murders, we were always driving through

---

Page 304

1  -- I'd look for him on the street because I knew him,
2  and I know that he had an active stop order, which means
3  if any other policeman stopped him, they would have
4  taken them into custody because he'd show up as wanted
5  in the system.
6          MR. AINSWORTH:  All right, sir.  I don't have
7  any further questions for you.
8          MR. GRILL:  Russell, I've just got, I think
9  literally two follow-ups.  Could you -- I think
10 it's Exhibit 2, that's the --
11         MR. AINSWORTH:  Yeah.  His sup.
12         MR. GRILL:  Yeah -- yeah.
13         MR. AINSWORTH:  Sure.  I'll pull it up.
14         MR. GRILL:  If you could just go to page 5.
15 It's the one that has like Ronnie Sloan, and Tyrone
16 Pitts, and everybody listed on it?
17         MR. AINSWORTH:  Yes.
18         MR. GRILL:  Thanks.  All the way.  Go down to
19 Gus Robinson's --
20         MR. AINSWORTH:  Sure.
21         MR. GRILL:  -- part at the bottom.  Yeah.
22 Okay.  Right there.  Can you see that?  Can you see
23 that?  You got this on your screen?
24         THE WITNESS:  Yes.
25         CROSS EXAMINATION

---

The Deposition of KENNETH BOUDREAU, taken on April 13, 2021

Page 305

1    BY MR. GRILL:
2        Q   Okay.  So I don't know, a little bit ago,
3    Mr. Ainsworth asked you if Gus Robinson had mentioned
4    the name Arnold Day to you, and your answer was, "No,"
5    and I want to draw your attention to this report, kind
6    of, in the middle, and I'm just going to read it for
7    you.  It says, "Jakes asked Robinson to act as a lookout
8    while they, Jakes, Little A, and his friend robbed them
9    -- robbed the man when he came out of the store.  " Do
10   you see that?  Russell just highlighted it.
11       A   I do.
12       Q   Okay.  And so Little A is Arnold Day, right?
13       A   Correct.  I knew his name.  I don't think
14   Russell knew his name.
15       Q   So it'd be more accurate to say that Gus
16   Robinson did mention Little A which is Arnold Day to
17   you?
18       A   Yes.
19       Q   Okay.  That's seven hours.  Sorry about that.
20           All right.  The only question I have just to
21   be clear: At any point during your investigation, did
22   you ever interview a person named Troy?
23       A   No.
24       Q   And you never had a person named Troy down at
25   the area, interviewing him?

Page 306

1        A   No.
2        Q   You never found a person named Troy?
3        A   No.
4        MR. GRILL:  All right.  I've got nothing else.
5        MR. YAMIN:  No questions from the city.
6        MR. GRILL:  Okay.
7        MR. AINSWORTH:  Signature and we are done.
8        THE WITNESS:  Right, thank you.
9        MR. AINSWORTH:  All right.
10       COURT REPORTER:  We close the deposition.  The
11   time is 8:06.  We are -- or 7:06, and we are off
12   the record.
13           (DEPOSITION CONCLUDED AT 7:06 P.M.)

Page 307

1            CERTIFICATE OF REPORTER
2            COMMONWEALTH OF KENTUCKY AT LARGE
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded stenographically and mechanically by
10   me and then reduced to typewritten form under my
11   direction, and constitutes a true record of the
12   transcript as taken, all to the best of my skill and
13   ability.  I certify that I am not a relative or employee
14   of either counsel, and that I am in no way interested
15   financially, directly or indirectly, in this action.
16
17
18
19
20
21
22   MAGGIE PATTERSON,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES: 06/04/2022
25   SUBMITTED ON: 05/11/2021