# Exhibit 47

3

INDEX

DATE: 9-10-93
PAGES: 1-83
CHARGE: MURDER
HON: THOMAS P. DURKIN

CCSAO Subpoena Exhibit 005906

3

(Jury was present.)

1      THE COURT: Mr. Katz, call your witness.

2      MR KATZ: At this time, I call Arnold Day.

3           (Witness was sworn.)

4           MR. ARNOLD DAY,

5      called as a witness on his own behalf, was first duly

6      sworn, examined and testified as follows:

7      THE COURT: State your name?

8      MR. DAY: Arnold Day.

9      THE COURT: You may proceed.

10           DIRECT EXAMINATION

11               BY

12     MR. KATZ:

13          Q   Mr. Day, how old are you?

14          A   Twenty years old.

15          Q   Mr. Day, I would like to direct your

16     attention to February 4th, 1992, the day you were

17     arrested on this case. Do you recall that day?

18          A   Yes, sir.

19          Q   You recall that address where you were

20     arrested?

21          A   Yes, sir.

22          Q   Where was that?

23          A   5234 South Sangamon.

CCSAO Subpoena Exhibit 005907

4

1       Q   Who lives there?

2       A   Quami.

3       Q   Is that a friend of yours?

4       A   Yes, sir.

5       Q   Do you remember what time the police arrived

6 at your house that day?

7       A   They arrived early in the morning, around

8 the hours of 9:30, something like that.

9       Q   What happened when the police came in?

10       A   I was already in the basement when they came

11 in so I wasn't at the door when Quami answered the

12 door.

13       Q   Could you hear them come in?

14       A   No.

15       Q   What was the first indication you had that

16 the police were there?

17       A   The first indication I had, I heard a lot of

18 rumbling upstairs.

19       Q   What did you do?

20       A   I got up to see what was going on cause I

21 thought them was some friends of ours comin over and

22 they be playing a lot, so I got up to go see who it

23 was.

24       Q   What did you see or hear?

CCSAO Subpoena Exhibit 005908

```
1           A     I didn't see nobody cause I didn't make it

2    upstairs.

3           Q     What happened?

4           A     And then, the police, they was in the house

5    with their guns out.

6           Q     Could you see the police with their guns?

7           A     After they came downstairs in the basement.

8           Q     And what did you do when you saw the police

9    with their guns?

10          A     I went back into the room where I was

11   arrested at that night because I spent the night over

12   Quami's house.

13          Q     What did you do in the room?

14          A     When the police came down there?

15          Q     Yes.

16          A     I hid under the bed when they came down

17   there.

18          Q     Why would you hide under the bed?

19          A     Because I was scared.

20          Q     Did the police enter the basement room?

21          A     Yes, sir.

22          Q     And then what happened?

23          A     He entered the room, and then, he flipped

24   the bed over.
```

CCSAO Subpoena Exhibit 005909

1      Q      When you saw, "he," do you know who that

2      was?

3      A      Yes, sir.

4      Q      Who was that?

5      A      Detective Evans.

6      Q      Was that the detective that testified

7      yesterday?

8      A      Yes, sir, it was.

9      Q      What happened after he flipped the bed over?

10     A      He flipped the bed over and then he kicked

11     me in the head with his shoes on.

12     Q      What did he do next?

13     A      He handcuffed me.

14     Q      Any other police officers in the room at

15     that time?

16     A      No, there wasn't. They was coming down

17     there.

18     Q      What happened after Officer Evans handcuffed

19     you?

20     A      He took me out into a large area of the

21     basement. He took me out of the room to a larger part

22     of the basement. By that time, the other officers

23     were down there. They was already down there, but

24     that's where they took me too.

CCSAO Subpoena Exhibit 005910

1       Q   Were you subsequently transported to the

2  police headquarters?

3       A   Could you make that a little clearer to me.

4       Q   Were you driven to the police headquarters?

5       A   Yes.

6       Q   Do you remember what time you arrived at the

7  police headquarters?

8       A   I arrived like about half an hour, 20, 25

9  minute, half an hour after.

10      Q   After you got arrested?

11      A   Yes, sir.

12      Q   Where did they first take you when you

13  arrived at the police station?

14      A   They took me upstairs to a holding cell.

15  It's like a fence build in on the third floor at 39th

16  and California.

17      Q   How long did you remain in that holding

18  cell?

19      A   No more than about 5 minutes.

20      Q   And then where did they take you?

21      A   Into another room, another part of the

22  police station.

23      Q   Was that an interview room?

24      A   Yes, sir.

CCSAO Subpoena Exhibit 005911

8

1   Q Were you handcuffed at that time?

2   A When I -- when they took me into the room,

3 they handcuffed me to the wall.

4   Q How did they do that?

5   A They just took me over to the wall, and it's

6 a ring that comes out of the wall, and they put the

7 handcuffs on the ring and the other one was on my

8 wrist.

9   Q Do you remember what detective or officer

10 took you into that room?

11   A I can't recall. I'm not gonna say no name

12 because I can't remember, but I know they took me up

13 in that room.

14   Q And were you left in that room alone or did

15 somebody go with you?

16   A A detective came in there with me.

17   Q Which detective?

18   A It was Evans at the time, I believe.

19   Q Okay. And did he stay in the room with you

20 or did they leave you alone?

21   A He didn't stay too long, and then he came in

22 there threatening me.

23   Q I'm sorry. Did somebody come into the room

24 after that? Did Detective Evans leave or did somebody

CCSAO Subpoena Exhibit 005912

1        else come in?

2        A   Detective Evans was still there.

3        Q   And then, did somebody subsequently enter

4        the room?

5        A   What do you mean by that?

6        Q   Did somebody else come in the room?

7        A   Yes.

8        Q   Who?

9        A   Detective Foley.

10       Q   Detective Foley hasn't testified here as of

11      this point, is that correct?

12       A   That's correct.

13       Q   All right.  Did Detective Foley come in by

14      himself?

15       A   Yes, he did.  He came by himself.

16       Q   Did he say anything to you when he came into

17      the room?

18       A   He told me he was talkin about what had

19      happened, what they arrested me for, threatening me.

20       Q   What did he tell you they arrested you for?

21       A   Murder.

22       Q   And did they tell you who's murder it was?

23       A   Naw, they didn't say his name. They just

24      said where it happened. They didn't say names, they

CCSAO Subpoena Exhibit 005913

1      didn't say names.

2           Q    And where did he say it happened at?

3           A    On 51st and Racine.

4           Q    Okay.  What else did Officer Foley say to

5      you at that time?

6           A    He was telling me "you know you did it.  You

7      can tell us.  You did it.  We got people pointing you

8      out saying you did it."

9           Q    And was he alone or was he the only

10     detective saying this?

11          A    No.

12          Q    Who else was in there?

13          A    Detective Evans.

14          Q    Detective Evans was in there at this point?

15          A    Yes.

16          Q    Detective Evans would come back into the

17     room?

18          A    No, he was still in the room.

19          Q    He would come back in the room.  How did you

20     respond to Detective Foley?

21          A    I told Detective Foley --

22          MR. GOODFRIEND:  Objection, hearsay.

23          THE COURT:  Overruled.

24          THE WITNESS:  I told Detective Foley that I

CCSAO Subpoena Exhibit 005914

11

1      didn't know what he was talkin about.

2          Q   What happened after you told him that?

3          A   He kept threatening me.

4          Q   How did he keep threatening you?

5          A   Telling me the same things over and over

6      again.  "We know you did it.  You can tell us.  You

7      did do it. We got people saying you did it," and so

8      forth and on and on.

9          Q   How long were you in that interview room

10     with Detective Foley and Evans?

11         A   For approximately 20 to 25 minutes,

12     something like that.

13         Q   What happened after that 20 or 25 minutes?

14         A   The same process over and over again.

15         Q   Okay.  You said you were in there with them

16     for 20 or 25 minutes. What happened then?

17         A   After that?

18         Q   After you were in there for 20 or 25

19     minutes, what happened next?

20         A   I believe Detective Boudreau arrived up

21     there it the room where I was at.

22         Q   Now, when Detective Boudreau came in, were

23     Detectives Foley and Evans still in the room?

24         A   Yes, sir.

CCSAO Subpoena Exhibit 005915

1        Q   All 3"

2        A   Yes.

3        Q   What happened after Detective Boudreau came

4   into the room?

5        A   He just came in the -- Detective Boudreau

6   came in the room.  He didn't really say -- he didn't

7   really say nothing to me.

8        Q   All right.  Did they continue to talk to

9   you, any of the detectives?

10       A   Yeah, they continued to talk to me, yes.

11       Q   And who was it that continued to talk to

12   you?

13       A   Evans and Foley.

14       Q   And what were they saying once Detective

15   Boudreau came in? What were they saying?

16       A   Practically the same thing they were saying

17   before they came in there, but Foley was doing most of

18   the talking.

19       Q   And specifically, what was he saying to you?

20       A   "We know you did it," the same thing that I

21   just stated to the jury.

22       Q   Did they talk to you only about this murder?

23       A   Only about the murder.

24       Q   Did they talk about other situations?

CCSAO Subpoena Exhibit 005916

13

1      A    Yes, sir.

2      Q    How long did you remain in there with

3  Detective Boudreau, Detective Foley and Evans?

4      A    For -- I really -- I can't remember.

5      Q    At anytime, while you were talking to them,

6  did you acknowledge that you participated in the

7  shooting or attempted armed robbery of Rafael Garcia?

8      A    No, sir.

9      Q    At some point, did they leave the room?

10     A    Yes, sir.

11     Q    What happened? Do you remember how long you

12  had been in there with them before they left? Do you

13  remember approximately what time it was when they

14  left?

15     A    No.  It wasn't a clock in the room on the

16  wall or nothin.

17     Q    When they left, were you in the room alone

18  for a while?

19     A    Yes, I was.

20     Q    Do you remember how long you were alone?

21     A    I was alone for -- I can't remember.  I was

22  alone in the room for a nice little amount of time

23  though.

24     Q    Okay.  And then, did somebody come back into

14

1      the room?

2           A   Yes, sir.

3           Q   And who came into the room?

4           A   Detective Boudreau came back in.

5           Q   He come by himself?

6           A   Yes.

7           Q   What did he say to you at that time?

8           A   He was trying to get me to confess to the

9      murder.

10          Q   And did you?

11          A   I told them -- okay, this is what happened,

12      Ladies and Gentlemen.  After they intimidated me so

13      much, I was scared for my life.  I had never been in

14      no type of questioning like that.  After they was

15      threatening me so much and then -- no I did not

16      confess to him about it.

17          Q   You did not confess to the shooting at that

18      time, is that right?

19          A   That's right.

20          Q   And Detective Boudreau then left the room?

21          A   Naw, he stayed in there for a little while

22      still trying to get me to confess.

23          Q   And did you?

24          A   No, sir.

CCSAO Subpoena Exhibit 005918

1        Q   At some point, did Detective Boudreau leave?

2        A   Yeah.

3        Q   And were you again alone in the room for a

4   while?

5        A   This time Detective Foley came back.

6        Q   Okay.  Now, at some point, an Assistant

7   State's Attorney came, is that correct?

8        A   That's correct.

9        Q   Did Detective Foley come back in before this

10   or after the Assistant State's Attorney?

11        A   After the Assistant State's Attorney.

12        Q   So, the next person who came into the

13   interview room was that the Assistant State's

14   Attorney?

15   MR. DILLON: Objection, leading.

16   THE COURT: Sustained. Let the witness testify.

17   MR. KATZ:

18        Q   Who was the next person that came into

19   the interview room?

20        A   You mean when Assistant State's Attorney

21   came in?

22        Q   After Detective Boudreau left, who was the

23   next person come into the room?

24        A   I can't recall. I know I was in there for

1    a minute, though.

2          Q   Later on, who came into the interview room?

3          A   I believe the State's Attorney had arrived

4    at the police station.

5          Q   And was that Assistant State's Attorney

6    Jason Daniellan?

7          A   Yes, that was the one that testified

8    yesterday.

9          Q   Did anybody come in with him?

10         A   He came --

11        MR. DILLON:  Objection, leading.

12        THE COURT:  Overruled.  He may answer.

13        THE WITNESS:  Did anybody come with him?

14        MR KATZ:

15          Q   Right.

16         A   Excuse me.  Yes, somebody did come in the

17    room with him.

18         Q   Who came?

19         A   Detective Foley came in the room with him.

20         Q   What did the Assistant State's Attorney tell

21    you when he first came in the room?

22         A   He told me who he was.

23          Q   And what exactly did he say to you?

24         A   He told me he was the Assistant State's

1       Attorney.

2               Q    And did you understand what that meant?

3               A    Yes, I did understand what that meant.

4               Q    What if anything did he say or what if

5       anything did you say at that point?

6               A    I didn't say nothing.

7               Q    Did he say anything to you?

8               A    Naw, he just --

9               Q    Did he tell you why he was there?

10              MR DILLON:  Objection, leading.

11              THE COURT:  Overruled.

12              THE WITNESS:  Yes, he told me why he was there.

13              MR. KATZ:

14                   Q    And why did he say he was there?

15              A    To question me about a murder case.

16              Q    What did you tell him about the murder case?

17              A    I told him I didn't know what he was talkin

18      about.

19              Q    What happened after you told him that?

20              A    He kept questioning me and questioning me,

21      and then he got -- I assume that he got mad and --

22              MR. DILLON:  Objection.

23              THE COURT: Sustained.

24              MR. KATZ:

CCSAO Subpoena Exhibit 005921

18

1     Q    Just tell us what he did.

2     A    He came in the room and he questioned me and

3     I wouldn't talk to him, and then, he left the room.

4     Q    When he left the room, is there anybody in

5     the room with you or did anybody enter the room at

6     that point?

7     A    Somebody entered the room at that point.

8     Q    And who entered the room?

9     A    That was Detective Foley.

10    Q    Detective Foley came down there?

11    A    Yes, sir.

12    Q    What did Detective Foley say or do at that

13    time?

14    A    Detective Foley came in the room and he

15    grabbed me in my collar and he pushed me up against

16    the wall and he was threatening me.  He even stated

17    that he would throw me out of the window and wouldn't

18    nobody tell: who was going to tell on him.

19    Q    Anybody else in the room at that point

20    except you and Detective Foley?

21    A    I believe, yes, it was.

22    Q    Who else was in the room at that point?

23    A    Detective Boudreau.

24    Q    What happened after Detective Foley did this

CCSAO Subpoena Exhibit 005922

19

1      to you?

2              A    He left back out.

3              Q    And did anybody else -- what happened next?

4              A    And then Assistant State's Attorney came

5      back in.

6              Q    What happened when the Assistant State's

7      Attorney came back in?

8              A    He was asking me was I ready to cooperate

9      with them at that time.

10             Q    And what did you say then?

11             A    I told the Assistant State's Attorney that

12     I was.

13             Q    And at that time, did the Assistant State's

14     Attorney write out a handwritten statement?

15             A    Yes.

16             Q    And did you sign that handwritten statement?

17             A    Yes, I did.

18             Q    All right.  I would like to direct your

19     attention back to September 15th of '91, at around

20     10:00, 10:30, in the evening on September 15, 1991, do

21     you remember where you were?

22             A    Yes, I do.

23             Q    Where were you?

24             A    I was standing on the block -- the 1500

CCSAO Subpoena Exhibit 005923

20

1    block of Aberdeen.

2        Q    And who lives there?

3        A    I was at the address of 5147 South Aberdeen

4    at Eleanor Robinson's house.

5        Q    What is your relationship to Eleanor

6    Robinson?

7        A    No relationship. We're just close friends.

8        Q    Who else resides there with her?

9        A    Her -- her husband, her kids, her mother and

10   a couple of her nieces and nephews.

11       Q    Okay. Do you remember what time you got to

12   that address?

13       A    Naw, I don't remember what time I had got

14   there, but I know I was there.

15       Q    When you were there around that time in the

16   evening, who were you with?

17       A    I was sittin on the porch.

18       Q    By yourself or anybody else?

19       A    No. I was sittin on the porch with a couple

20   of her nieces and nephews.

21       Q    And specifically, who was out there?

22       A    Dorthea Robinson.

23       Q    What is Dorthea's relationship to Eleanor?

24       A    Daughter.

CCSAO Subpoena Exhibit 005924

21

1        Q    How old is Dorthea?

2        A    Now?

3        Q    Then?

4        A    I believe she was 9 years old then.

5        Q    And were the 2 of you alone or other people?

6        A    There were other people.

7        Q    What were you and Dorthea doing out there?

8        A    Just sittin on the porch.

9        Q    How long did you and Dorthea talk on the

10 porch?

11        A    We was out there for quite a while, just

12 talkin for about 45 minutes.

13        Q    What happened after you had been talking for

14 a while?

15        A    After we was talkin for a while, she wanted

16 to go to the store.

17        Q    So, what did she do?

18        A    She went in the house and asked her mother

19 could I take her to the store.

20        Q    And did she come back out of the house?

21        A    Yes, she did.

22        Q    What did you do next?

23        A    I took her to the store.

24        Q    Which store did you go to?

CCSAO Subpoena Exhibit 005925

22

1        A   I went to -- I was supposed to took her to

2    Fine Fair, which is located on 51st and May, but Fine

3    Fair was closed, so I took her to Saymost Liquors on

4    51st and Racine.

5        Q   Did she purchase anything?

6        A   Yes.

7        Q   What did she buy?

8        A   She bought some potato chips.

9        Q   And after she bought the chips, what did the

10    2 of you do?

11        A   We went back to her house at 5147 South

12    Aberdeen.

13        Q   When you got back to the house, anybody out

14    front?

15        A   Yes, next door neighbors. It was quite a

16    few people out front.

17        Q   And did anything unusual happen while you

18    were out front?

19        A   After we sat out there, after we sat for a

20    while, somebody -- we heard some gunshots. We was

21    sittin on the porch for a while. We heard some shots.

22        Q   And what else happened?

23        A   And then somebody road up on the bike. I

24    can't recall who it was, and just told us to call

CCSAO Subpoena Exhibit 005926

23

1    Murray, that's Eleanor Robinson's nephew, that

2    somebody just got shot.

3        Q    And do you remember approximately what time

4    this was?

5        A    It was after 11:00. I know it was after

6    11:00.

7        Q    Arnold, at anytime that evening, did you

8    have a gun with you?

9        A    No, sir.

10       Q    At anytime that evening, did you attempt to

11   rob Rafael Garcia?

12       A    No, sir.

13       Q    At anytime that evening, did you shoot

14   Rafael Garcia or any other person?

15       A    No, sir.

16       MR KATZ: Nothing further.

17                    CROSS EXAMINATION

18                         BY

19   MR. DILLON:

20       Q    Mr Day, you indicated back on February

21   4, of '92, you had spent the night at 5234 South

22   Sangamon, is that correct?

23       A    Yes, sir.

24       Q    Now, back on that date, February the 4th of

CCSAO Subpoena Exhibit 005927

24

1    '92, you weren't living at 5058 South Damen, is that

2    correct?

3       A    Yes, sir.

4       Q    You were living there with your grandmother,

5    is that right?

6       A    Yes, sir.

7       Q    And your grandmother's name is Mitty Gibson,

8    is that correct?

9       A    Correct.

10      Q    You were living with your uncle, is that

11   correct?

12      A    Correct.

13      Q    Now, you had been living at 5038 South

14   Gibson for quite some time?

15      MR. KATZ:  Objection.

16      THE COURT:  I think you misstated the address.

17      MR. DILLON:  I'm sorry.

18      MR. KATZ:  This is beyond the scope

19      MR. DILLON:

20         Q    5038 South Damen, for some period of

21   time?

22      THE COURT:  Overruled.

23      THE WITNESS: Right, off and on.

24      MR. DILLON:

CCSAO Subpoena Exhibit 005928

25

1        Q   Well, specifically, you were, in

2   September, living there?

3        A   Right.

4        Q   Now, in September of '91, you were aware

5   that members of the Chicago Police Department were

6   looking for you, weren't you?

7        A   Yes, I was.

8        Q   Now, in September of '91, did you ever

9   contact members of the Chicago Police Department to

10  speak with them?

11       A   No, I did not.

12       Q   Did you ever go down to the police station

13  to speak with the police in September of '91?

14     MR. KATZ:  I object. This is beyond the scope.

15     THE COURT:  Overruled.

16     THE WITNESS:  Nope.

17     MR. DILLON:

18       Q   In October of '91, did you contact the

19  police in October of '91 after you became aware that

20  they wanted to speak to you?

21       A   No.

22       Q   Did you go down to the police station in

23  October of '91 to speak with the police because they

24  wanted to speak to you?

CCSAO Subpoena Exhibit 005929

26

1        A   No, I did not.

2        Q   How about November of '91. Did you contact

3  the police then?

4        A   No, I did not.

5        Q   Did you go down to the police station then?

6        A   No.

7        Q   How about December of '91, did you contact

8  the police then?

9        A   No, I didn't.

10       Q   Did you go down to the police station then?

11       A   No, I did not.

12       Q   How about January of '92?

13       A   No, I didn't.

14       Q   You never went down to the police station?

15       A   Nope.

16       Q   Never contacted the police?

17       A   Nope.

18       Q   But you knew the police wanted to speak with

19  you?

20       A   Correct.

21       Q   In February of '92, up to February of 4th,

22  you never went to the police station?

23       A   Correct

24       Q   And you never contacted the police, correct?

CCSAO Subpoena Exhibit 005930

27

1      A    Correct.

2      Q    Event though you were aware that as of

3  September 17th of '91 they wanted to speak with you,

4  is that correct?

5      A    That's right.

6      Q    Now, you indicated that back in September of

7  '91, specifically September 17th, you were living at

8  5038 South Damen, correct?

9      A    Correct.

10     Q    You weren't there on September the 17th of

11 '91 though at approximately 5:00 o'clock in the

12 morning, were you?

13     A    No, I was not.

14     Q    Can you tell the Ladies and Gentlemen where

15 you were?

16     A    I don't know where I was at that day.

17     Q    You don't remember where you were?

18     A    Not that night at 5:00 o'clock in the

19 morning.  I only -- I didn't stay there everyday.

20 Ladies and Gentlemen, I stayed there from time to tome

21 with my grandmother.

22     Q    Well, who else did you stay with from time

23 to time?

24     A    Quami Tate.

CCSAO Subpoena Exhibit 005931

28

1       Q   He's a friend of yours, correct?

2       A   Correct.

3       Q   And your testimony is you did not live with

4 your grandmother, is that right?

5       A   No, it is not.  I did live with my

6 grandmother. I spent the night with her every single

7 night.

8       Q   How often would you spend the night with

9 your grandmother?

10      A   Like 5 days out of the week.

11      Q   So, during those 5 days out of the week that

12 you stayed there, you were fully aware the police

13 wanted to question you, correct?

14      A   Correct.

15      Q   Now, on February the 4th of '92, your

16 testimony is that you stayed at Quami's house, right?

17      A   Yes.

18      Q   On that day, you stated you were in the

19 basement and you were sleep when you heard a commotion

20 downstairs, correct?

21      A   Yes.

22      Q   And you say they had their guns out?

23      A   Correct.

24      Q   And you went and you hid under your bedroom

29

1    correct?

2        A    Yes.

3        Q    You didn't put your hand up and say I

4    surrender?

5        A    Yes.

6        Q    You thought the police were going to shoot

7    you?

8        MR. KATZ:  Objection.

9        THE WITNESS:  No.

10       MR. DILLON:

11           Q    My question is, did you think the

12   police were going to shoot you?

13       A    I don't know what my thoughts were at that

14   time, but I was scared of the police.

15       THE COURT:  Overruled.

16       MR. DILLON:

17           Q    You told us what your thoughts were

18   that you were scared, correct?

19       A    Yes.

20       Q    You hid under the bed?

21       A    Yes.

22       Q    When you hid under the bed, when the police

23   brought you out from under that bed, there was a

24   bullet underneath you, correct?

CCSAO Subpoena Exhibit 005933

30

1      A    Yes.

2      Q    That was a .9 millimeter bullet, correct?

3      A    Yes.

4      Q    Now, you said that when Officer Evans or

5  Detective Evans pulled you out from under that bed,

6  you said he kicked you in the head, is that correct?

7      A    Yes.

8      Q    What kind of shoes was he wearing?

9      A    I don't know what kind of shoes he had on

10  but he kicked me, though.

11      Q    Where did he kick you on your head? Can you

12  point?

13      A    Back here in the back of my head.

14      MR. DILLON:  He's pointing to the back of his

15  head.

16          Q    Did he kick you hard?

17      A    It was like a stomp.

18      Q    He stomped you?

19      A    Yes.

20      Q    Did he cut your head?

21      A    No.

22      Q    Did you get a bruise on your head, a bump?

23      A    Not that I remember.

24      Q    Well, it hurt a lot, didn't it?

CCSAO Subpoena Exhibit 005934

31

1      A    Yes, it did hurt a lot.

2      Q    After Officer Evans stomped you on the head,

3  you said you were handcuffed and taken to the police

4  station at 39th and California, correct?

5      A    Correct.

6      Q    And when you got to 39th and California, you

7  were put in an interview room?

8      A    In a holding cage.

9      Q    That's the cage that's up on the 3rd floor

10  of Area 3 Violent Crimes, correct?

11      A    Correct.

12      Q    And once you were placed i that cage, your

13  testimony is a short time later, you were placed in an

14  interview room?

15      A    Correct.

16      Q    And who was it that placed you in an

17  interview room?

18      A    Who placed me in the interview room?

19      Q    Yes.

20      A    I cannot recall. I know they placed me in

21  there, though.

22      Q    You say that Detective Evans drove you from

23  Quami's house to the police station?

24      A    Yes.

32

1        Q   Did Officer Evans abuse you in anyway on

2  your way to the police station?

3        A   No.

4        Q   Anyone else abuse you on the way to the

5  police station?

6        A   No.

7        Q   So, you were kicked just once in the back of

8  the head, is that right?

9        A   Yes.

10        Q   Then, you got to Area 3 Violent Crimes and

11  you were put in the interview room?

12        A   Yes.

13        Q   You don't recall who put you in there?

14  THE COURT: Asked and answered. Move on, Counsel.

15  MR. DILLON:

16        Q   How long were you in the interview room

17  before anyone came in?

18        A   I wasn't in there too long. As a matter of

19  fact, they came in there with me and handcuffed me to

20  the wall.

21        Q   And you say that while you were handcuffed

22  to the wall, that's when Officer Evans came in,

23  correct?

24        A   Correct.

CCSAO Subpoena Exhibit 005936

33

1        Q    And Officer Evans started to tell you that

2    you had knowledge about a murder, correct?

3        A    Officer Evans started threatening me about

4    a murder.

5        Q    What did he say to you?

6        A    He was telling me that he know I did this

7    murder.

8        Q    Was that the exact words he used?

9        A    He know I did the murder, yes, sir.

10       Q    What did he say to you?

11       A    He was saying a lot of things.  I can't

12    reflect back.  I'm not going to go back and say what

13    he said cause I don't remember because it happened so

14    long ago.

15       Q    But you remember that part?

16       A    Yes.

17       Q    Now, after he told you that you did this

18    murder, you said at that point, Detective Foley came

19    in, correct?

20       A    Yes.

21       Q    And Detective Foley he threatened you?

22       A    All day, all the while I was up there.

23       Q    How did he threaten you?

24       A    He was threatening me about the murder.

CCSAO Subpoena Exhibit 005937

34

1    telling me that he know I did this murder; that they

2    got people to point me out, saying I committed this

3    murder.

4        Q   And did he tell you the names of the people

5    that would point you out?

6        A   No.

7        Q   He just said that you did this murder and

8    people pointed you out?

9        A   Yes.

10       Q   Now, your testimony is that some point later

11    in time, an Assistant State's Attorney came up,

12    correct?

13       A   Yes.

14       Q   And when the Assistant State's Attorney came

15    out, your testimony is that when he first tried to

16    question you about the murder, you had nothing to say

17    to him, is that right?

18       A   That's right.

19       Q   And you say that after that, the State's

20    Attorney left the room and then Detective Foley came

21    in, correct?

22       A   Yes.

23       Q   And Detective Foley grabbed you by the

24    collar and threw you up against the wall, correct?

CCSAO Subpoena Exhibit 005938

35

1        A   Yes.

2        Q   Did you ever file any formal complaints

3   about Officer Evans having kicked you in the head?

4        A   No, sir, I did not.

5        Q   Did you ever contact the Officer of the

6   Professional Standards of the police department to

7   tell them about how Officer Evans kicked you in the

8   head?

9        A   No, but I told my attorney about it.

10        Q   My question is, did you ever tell anyone

11   from the Officer of Professional Standards?

12        A   I don't know what that office is.

13        Q   Did you ever file a lawsuit against Officer

14   Evans for the way he treated you back on that date?

15        A   No.

16        Q   Did you ever make any complaints with the

17   police department about the way Detective Foley

18   treated you back on February 4th of '92?

19        A   No.

20        Q   Did you file a lawsuit against him?

21        A   No.

22        Q   Now, you indicated that after the State's

23   Attorney had left and Detective Foley did this to you,

24   the State's Attorney came in and said that you were

CCSAO Subpoena Exhibit 005939

36

1     ready -- are you read to make a statement to them,

2     correct?

3         A   Yes.

4         Q   And you said at that time, the State's

5     Attorney wrote up the statement, correct?

6         A   Correct.

7         Q   So, what you're saying is that the State's

8     Attorney is the one that wrote up what your statement

9     was, correct?

10        A   Correct.

11        Q   Those words didn't come from your mouth,

12     correct?

13        A   Say that again.

14        Q   Those words that are in that statement

15     didn't come from you, is that correct?

16        A   Naw.

17        Q   So, nothing -- everything that's in that

18     statement is based on what the State's Attorney told

19     you, correct?

20        A   It's based on what I told them, what I

21     thought that they wanted to hear.

22        Q   So, you told the State's Attorney what it is

23     you believed they wanted to hear, correct?

24        A   Correct.

CCSAO Subpoena Exhibit 005940

37

1          Q   When you told the State's Attorney what it

2     is that you believed they wanted to hear, the State's

3     Attorney wrote that down, correct?

4          A   Yes.

5          Q   Now, after you told the State's Attorney

6     what you thought he wanted to hear and he written that

7     whole thing up, he went over the statement with you,

8     didn't he?

9          A   Yes.

10         Q   He had you read a portion of it out loud, is

11    that correct?

12         A   Yes.

13         Q   After reading that first portion of the

14    statement out loud, he then read the rest of it while

15    you read along with him, correct?

16         A   Yes.

17         Q   In that statement, you went through the

18    entire statement that way, correct?

19         A   Yes.

20         Q   After you went through the statement -- by

21    the way you made some corrections during that

22    statement, correct?

23         A   No, he made some corrections.

24         Q   Did you make corrections?

CCSAO Subpoena Exhibit 005941

38

1          A    No.

2          Q    Did you point out any corrections in the

3    statement?

4          A    No.

5          Q    The State's Attorney made the corrections,

6    correct?

7          A    That's right.

8          Q    You put your initials next to those

9    corrections, correct?

10         A    Yes.

11         Q    Did the State's Attorney make you put those

12   initials next to the corrections?

13         A    Fear made me put my initials next to it.

14         Q    Who made you?

15         A    Fear.  I was scared.

16         Q    You were scared. Was Detective Foley in the

17   room when the statement was taken?

18         A    No.

19         Q    Was Detective Evans in the room when you

20   made the statement?

21         A    No.

22         Q    So, people that had threatened you, weren't

23   even in the room when you gave the statement, were

24   they?

CCSAO Subpoena Exhibit 005942

39

1       A    No, Boudreau was in the room.

2       Q    Now, after you made these corrections, you

3    proceeded to sign the statement, correct?

4       A    That's right.

5       Q    This is based on what you thought the

6    State's Attorney wanted to hear, correct?

7       A    Correct.

8       Q    Now, I'm going to give you a copy, not a

9    copy, the original statement that you made. I ask you

10   to take a look at that People's Exhibit Number 33. Is

11   that the statement that you made?

12      A    Yes, it is.

13      Q    And that has your signature on it, correct?

14      A    Yes.

15      Q    Now, the first portion of your statement is

16   "after being introduced to the State's Attorney,

17   Daniellan, and being told Assistant State's Attorney

18   Daniellan, an attorney working with the police and not

19   his personal attorney, Arnold Day was advised of his

20   constitutional rights per miranda the State's Attorney

21   did advise you of your rights, didn't he?

22      A    After he got -- after I made this statement

23   and after he read it to me, that's when he said the

24   miranda rights.

CCSAO Subpoena Exhibit 005943

40

1     Q   So, your statement is that the State's

2   Attorney never gave you miranda warnings until after

3   the statement was all done?

4     A   After it was all done.

5     Q   So, that portion of the statement isn't

6   true?

7     A   Which part?

8     Q   That "after being introduced to the State's

9   Attorney, he gave you miranda warnings?"  That's not

10   true?

11     Q   That's not true.

12     Q   That's a lie?

13     A   That's a lie.

14     Q   Now, you also put in your statement that

15   after hearing and acknowledging those rights, you

16   agreed to give a statement of your knowledge and

17   involvement in the shooting death of Rafael Garcia,

18   that's not true?

19     A   Could you read that again so I can read

20   along with you?

21     Q   Sure.  You also put in your statement that

22   after hearing and acknowledging those rights, you

23   agreed to give a statement of your knowledge and

24   involvement in the shooting death of Rafael Garcia,

CCSAO Subpoena Exhibit 005944

41

1    that's not true?

2        A   Yeah, that's true.

3        Q   So, you agreed to give the State's Attorney

4    your knowledge of the involvement -- of your

5    involvement in the shooting of Rafael Garcia?

6        A   Excuse me. It was not my knowledge. I just

7    agreed to cooperate with him and tell him what I

8    thought he wanted to hear.

9        Q   Well, that's based on your knowledge,

10    correct. You told the State's Attorney what you

11    thought he wanted to hear, correct?

12        A   Correct.

13        Q   You also put in your statement that the

14    State's Attorney explained to you the difference

15    between a court reported and handwritten statement.

16    Did the State's Attorney explain the difference of

17    those statements to you?

18        A   No, he did not.

19        Q   He never said those things to you?

20        A   No.

21        Q   He put that in your statement and that's a

22    lie?

23        A   Yes.

24        Q   Did you sign that statement as being true,

CCSAO Subpoena Exhibit 005945

42

1   and correct?

2         A    Right.

3         Q    Now, you put in the statement that you were

4   20 years old, it was scratched out and 18 was put in,

5   was that the truth?

6         A    No.

7         Q    You weren't 18 years old then?

8         A    I was 18 at the time.

9         Q    Well, that was the truth, then?

10        A    Yes.

11        Q    So, that portion of the statement is right?

12        A    He wrote down 20.  I didn't tell him I was

13   20 years old.

14        Q    That portion of the statement, which says

15   you're 18 years old is based on what you told the

16   State's Attorney?

17        A    Right.  I was 18 at the time.

18        Q    So that portion of the statement that says

19   you're 18 years old is true?

20        A    Correct.

21        Q    Now, you also indicated in that statement

22   that  you had completed the 10th year of school at

23   Tilden High School, is that true?

24        A    Yes.

CCSAO Subpoena Exhibit 005946

43

1        Q    That's what you told the State's Attorney,

2 correct?

3        A    Yes.

4        Q    And the State's Attorney put that in your

5 statement?

6        A    Yes, he did.

7        Q    Now, you also indicated that you were a

8 member of the Black Disciples Gang and have been for

9 3 years. Was that true?

10        A    Yes, that was true.

11        Q    You a member the Black Stones, correct?

12        A    Not anymore.

13        Q    You were a member of the Black Stones in

14 '91?

15        A    No, before then.

16        Q    Well, you have tattoos on your body that

17 show that you're a member of the Black Stones?

18        A    No gang related tattoos saying I'm a part of

19 the Black Stones organization.

20        Q    Black Stones are affiliated with the People?

21 Explain to me what that means?

22        MR. KATZ: Objection, asked and answered.

23        MR. DILLON:

24        Q    Why don't you explain to me what the

44

1    People are since you're a member of the Black Stone

2    organization?

3         A    Explain to you what the People are?

4         Q    Yeah.

5         A    It's okay. I'm not going to say it's a gang

6    because if I said it's a gang, I might as well say the

7    Klu Klux Klan is a gang and it was another

8    organization. It's for those of you jury members who

9    live in Chicago I know ya'll seen it in the news about

10   --

11        THE COURT: Sustained. Answer the question, Sir.

12        MR. DILLON:

13            Q    Tell us what the People are?

14        A    The People --

15        Q    People.

16        A    It's a representative of a certain

17   organization.

18        Q    The People are made up of all of various

19   streets gang in the City of Chicago Cook County?

20        A    Yes.

21        Q    Among them the Black Stone?

22        A    Correct.

23        Q    And you also have another tattoo on you're

24   body, APS, correct?

CCSAO Subpoena Exhibit 005948

45

1          A     Correct.

2          Q     And that stands for the fact of the Black

3     Stones that you were affiliated which is the Apache

4     Stones, correct?

5          A     Correct.

6          Q     But your testimony is back in September of

7     '91, you weren't affiliated with the Black Stones?

8     That your testimony?

9          A     That's my testimony.

10         Q     So, that portion of your statement saying

11    that you were a Black Stone and have been for 3 years

12    that wasn't true?

13         A     No, that wasn't.

14         Q     But, you thought --

15         THE COURT:  Ladies and Gentlemen, I want to give

16    you an instruction concerning this.  The reason I'm

17    allowing this testimony is to test the defendant's

18    statement concerning the statement; however, the fact

19    that he may or may not be a member of a gang, is not

20    evidence for purposes of determining whether or not

21    the State has proven this case beyond a reasonable a

22    doubt.  It's being allowed for you to hear it solely

23    for the purpose of determining the voracity of the

24    statement concerning the prior statement.

CCSAO Subpoena Exhibit 005949

46

1        MR. DILLON:

2        Q   You also indicated that you were an

3  officer in the Black Stones, correct?

4        A   Yes.

5        Q   Which is second highest rang, correct?

6        A   Correct.

7        Q   Officers are the second highest rang in the

8  Black Stones?

9        THE COURT:  He asked and answered that.

10       MR. DILLON:  I'm asking if --

11       THE COURT:  I'm sorry.

12       MR. DILLON:

13       Q   Officers are the second highest rank in

14  the Black Stones, aren't they?

15       A   Yes.

16       Q   The only people above them are the generals,

17  correct?

18       A   Correct.

19       Q   And you were an officer of the Black Stone

20  Street Gang, weren't you?

21       A   Yes.

22       Q   You were an officer in September of '91?

23       A   No.

24       Q   You put that in the statement because you

CCSAO Subpoena Exhibit 005950

47

1     thought that's what the State's Attorney wanted to

2     hear, correct?

3         A   The State's Attorney -- yes, yes, I did.

4         Q   Now, you also indicated that back on

5     September 15th, you had been selling drugs on Aberdeen

6     Street, is that true?

7         A   No, that's not true.

8         Q   You thought that's what the State's Attorney

9     wanted to hear?

10        A   Whatever I told him, if -- whatever I told

11    him I was doing that day to result to the shooting

12    death of the man that's deceased, he would have wrote

13    it down.

14       Q   What I'm asking you is back on September the

15    15th, you put in your statement you were selling drugs

16    on Aberdeen, is that true or not?

17       A   That's not true.

18       Q   That's another lie you put in your

19    statement?

20       A   Yes.

21       Q   Have you ever sold drugs before?

22       A   Yes, I sold drugs before.

23       Q   You indicated in your statement that about

24    11:30, you left to get something at the Submarine

CCSAO Subpoena Exhibit 005951

48

1        Shop, is that true or a lie?

2        A   Lie.

3        Q   You decided to make that up?

4        A   Yes.

5        Q   You thought that's what the State's Attorney

6        wanted to hear?

7        A   Because I was scared.

8        Q   Just so I'm clear, the detective didn't tell

9        you to say that?

10        A   The detective told me about what they

11        thought what had happened during the process of the

12        crime; that they was lookin for me.

13        Q   Did detectives tell you what to say?

14        A   No, they was puttin words in my mouth, so --

15        Q   The detectives was putting words in your

16        mouth?

17        A   Yes.

18        Q   Did you previously testify on January 29th

19        of '93 in regards to this matter?

20        A   Yes.

21        Q   Specifically, Page 3 you were asked a

22        question, "the police didn't tell you what to say,

23        did they?" Your answer was, "no," isn't that correct?

24        A   That's correct.

CCSAO Subpoena Exhibit 005952

49

1        Q   And you were under oath at that time,

2  correct?

3        A   Yes.

4        Q   So, now, you're telling us the police did

5  tell you what to say?

6        A   They had been saying it all the time.

7  During the month of January, you did not say what you

8  just said then.

9        Q   My question to you isn't that what yo just

10  said?

11        A   Yes, that's what I just said.

12        Q   So, which one is it?  Did the police tell

13  you to say it or didn't they?

14        A   They threatened me to say it.

15        Q   They threatened you to say it.

16        A   Yeah, they told me --

17        Q   So, what you testified to back on January

18  29, under oath, was a lie, correct?

19        THE COURT:  Sustained.  The jury will make that

20  determination, not the witness.

21        MR. DILLON:

22        Q   You indicated that you saw a Mexican

23  guy pull up in a station wagon and come into the

24  submarine station?

CCSAO Subpoena Exhibit 005953

50

1      A    Yes, that was a lie.

2      Q    Did the detectives tell you to say that?

3      A    Yes.

4      Q    When?

5      A    They was saying it all the while I was

6   there.

7      Q    Which detectives were telling you to say

8   this/

9      A    It was Evans saying it, Foley saying it.

10     Q    You think?

11     A    I know.

12     Q    Evans and Foley told you to say this?  How

13  long did they spend telling you to get down the story?

14     A    I don't know how long they was in there

15  telling me this altogether, but, I know they was

16  saying it a lot back and forth.

17     Q    So, it was for a long period of time.

18  correct?

19     A    Correct.

20     Q    Now, you also put in your statement that

21  when you went into the submarine shop. you saw a

22  Mexican guy saying he was flashing, which means that

23  he had a lot of jewelry.  Did the police tell you to

24  say flash?

CCSAO Subpoena Exhibit 005954

51

1   A No.

2   Q Who's words were those?

3   A Police words. Police words were not flashy,

4 but they told me that it was a Mexican guy in there

5 and that I wanted to go and rob him.

6   Q So, you came up with the words flashy?

7   A Yes.

8   Q And those are your words?

9   A Yes.

10   Q You put in your statement also that he had

11 a nut-roll. Did the police tell you to use the word

12 nut-roll in the statement?

13   A No.

14   Q Who's words were those?

15   A Mine.

16   Q And what is a nut-roll?

17   A A nut-roll -- a nut-roll could be anything.

18 It could be some sweet sugar candy, but in that

19 matter, it means money.

20   Q But, is that what a nut-roll means?

21   A If that's that way you would like to take

22 it, yeah.

23   Q When you gave your statement to the State's

24 Attorney, is that what you wanted the State's Attorney

52

1          to believe a nut-roll was?

2              A    Yeah.

3              Q    You also indicated in your statement that

4          after you observed the Mexican guy who was flashing

5          and a nut-roll on him, you said you decided to rob

6          this guy, correct?

7              A    That's what the -- during the process of

8          this statement, I feared for my life, Mr. State's

9          Attorney.

10             Q    Well, Mr. Day, you told me that the

11         Detective Evans and Detective Foley told you to say

12         this, correct?

13             A    Correct.

14             Q    But, Detective Evans or Foley wasn't in the

15         room with you when you gave the statement, correct?

16             A    Correct.

17             Q    So, your testimony is you signed a written

18         statement admitting to trying to rob somebody at gun

19         point and killing them when the detectives who

20         threatened you weren't even in the room with you?

21             MR. KATZ: Objection, argumentative.

22             THE COURT: Sustained.

23             MR. DILLON;

24             Q    You indicated that after you decided to

CCSAO Subpoena Exhibit 005956

53

1       rob him, you went outside and got a nation gun. Who's

2       words were nation gun?

3           A    Those are my words.

4           Q    And a nation gun is a gun you use for gang

5       activity, correct?

6           A    Yes.

7           Q    That's what you put in your statement,

8       correct?

9           A    Correct.

10          Q    That's the truth, right?

11          A    That's the truth, but what was said in this

12      statement is not the truth. See you trying to get

13      around to make me look like I'm a liar.

14          Q    You were in the Black Stones and you know

15      what that means, correct?

16          A    Correct, but I was not a Black Stone back in

17      September of '91.

18          Q    By the way, you have a 5 point star on your

19      chest and your shoulder too, correct?

20          A    Correct.

21          Q    And a 5 point star shows you're affiliated

22      with the People, correct?

23          A    Correct, but you don't --

24          Q    And you wear it on the left side of your

CCSAO Subpoena Exhibit 005957

54

1    body. Affiliated People wear their clothing and their

2    tattoos on their left side of the body to show their

3    affiliated with the other gangs and the People nation,

4    correct?

5        A   Correct.

6        Q   But you're not in a gang?

7        THE COURT:  Asked and answered. Sustained.

8        MR. DILLON:

9        Q   Now, you indicated that once you got

10    this nation gun that you use for gang activity, you

11    said that it was a 380, correct?

12        A   Correct.

13        Q   And that's what the police officers told you

14    to say, correct?

15        A   Correct.

16        Q   And that would be Detective Foley and

17    Detective Evans again that told you to say that?

18        A   Yes.

19        Q   Now, after you got this 380 and the Mexican

20    guy exited the submarine shop, you said, "stick up."

21    Is that truth or a lie?

22        A   That's a lie.

23        Q   You put that in the statement because

24    Detective Foley and Detective Evans told you to say

55

1      that?

2          A    Because I was afraid.

3          Q    And they weren't in the room with you when

4      you said that?

5          MR. KATZ:  Objection.

6          THE COURT: Grounds.

7          MR. KATZ:  Asked and answered.

8          THE COURT: Sustained.

9          MR. DILLON:

10         Q    Now, you also indicated in your

11     statement that you had been treated well by the

12     detectives, correct?

13         A    I did not put that in the statement.

14         Q    My question to you is, did you tell the

15     State's Attorney that you had been treated well by the

16     detectives?

17         A    He didn't ask me.

18         Q    Well, it was put in your statement that you

19     were treated well by the detectives, correct?

20         A    Yes.

21         Q    And you signed that statement as being the

22     truth, correct?

23         A    Correct.

24         Q    You also put in your statement you were

CCSAO Subpoena Exhibit 005959

56

1         given pop, oranges and oreo cookies, is that the

2         truth?

3             A   Yes, that's the truth.

4             Q   The police did give you food?

5             A   Yeah, after the statement was signed.

6             Q   It wasn't until after that you got the food?

7             A   Yeah, and I don't even eat oreo cookies

8         because they have animal shortening in it.

9             Q   Were you allowed to use the bathroom?

10            A   Yes.

11            Q   How long did you have to wait?

12            A   Until a certain officer came.

13            Q   How long was it before you waited?

14            A   No longer than 5 or 7 minutes.

15            Q   You also put in the statement that you were

16         treated well by the State's Attorney Daniellan. Was

17         that the truth?

18            A   No, that was the truth because he wrote the

19         statement down, but when he first came in there and I

20         didn't want to cooperate with him, it seems to me as

21         if he got mad and left and that's when Foley came back

22         in and threatened me some more when he came back.

23            Q   My question is, did Assistant State's

24         Attorney Daniellan treat you well?

CCSAO Subpoena Exhibit 005960

57

1     A   He didn't treat me bad or anything.

2     Q   So, that portion of the statement is true?

3     A   Yes.

4     Q   You also indicated that no promises or deals

5   were made to you in exchange for the statement. Is

6   that the truth?

7     A   That's a lie.

8     Q   You also indicated in your statement that

9   you were allowed to make changes that you wanted or

10  additions?

11    A   That's what was put in the statement.

12    Q   That's the truth?

13    A   No, that's not the truth.

14    Q   You also indicated that the statement was a

15  true and accurate summary of what you told the State's

16  Attorney and that you had given the statement freely

17  and voluntarily?

18    A   Can you repeat that again?

19    Q   You also indicated that the statement was a

20  true and accurate summary of what you told the State's

21  Attorney and that you had given the statement freely

22  and voluntarily?

23    A   No, that's not the truth.

24    Q   That's a lie?

CCSAO Subpoena Exhibit 005961

58

1          A    Yes.

2          Q    Now, you indicated that you were being

3     questioned about other cases as well, correct?

4          A    Yes.

5          Q    What cases were you being questioned about?

6          MR. KATZ:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:  About some cases that my friend,

9     Nate Anderson, who is deceased now, some cases he had

10    done a while back.

11         MR. DILLON:

12         Q    That's General Nate, right?

13         A    Yes.

14         Q    And specifically what were they talking to

15    you about?  What kind of cases?

16         A    Attempt murders, armed robberies.

17         Q    Murder?

18         A    Yeah.  Attempt murder, not murder.

19         Q    Police didn't talk to you about another

20    murder?

21         A    Yeah, they talked to me about another

22    murder.

23         Q    Now, after you signed this statement, you

24    were taken ultimately to Cook County Jail, correct?

59

1      A    I was taken, yeah.

2      Q    And you were seen by a doctor when you got

3   there, correct?

4      A    Yes.

5      Q    Did you complain about the treatment you had

6   received at the hands of the police to the doctor who

7   examined you?

8      A    No.

9      Q    Did you complain to anybody about the

10  mistreatment that you got while you were at Cook

11  County Jail to any jail personnel?

12     A    Yes, I did.

13     Q    What jail personnel did you complain?

14     A    No, I didn't complain to a jail personnel,

15  but I talked to somebody abut it and that person is at

16  court right now today.

17     MR. KATZ:  Objection.

18     THE COURT: Sustained.

19     MR. DILLON:

20     Q    Mr. Day, on February 4, '92, you had

21  spoken with the police on a number of prior occasions?

22     A    Correct.

23     Q    Probably excess of 20 times, correct?

24     MR. KATZ:  Objection.

60

1          THE COURT: Sustained.

2          MR. DILLON:

3              Q    You knew what your miranda warnings

4      were, didn't you?

5          MR. KATZ: Objection.

6          THE WITNESS: Not at that time.

7          MR. KATZ: Objection.

8          THE COURT: Overruled.

9          MR. DILLON

10             Q    Well, you had been advised of your

11     miranda warnings by police officers before February

12     4th of '92, correct?

13             A    Correct, but I didn't know that that meant

14     miranda warnings.

15             Q    You knew that you had a right to remain

16     silent, didn't you?

17             A    Yes.

18             Q    You had a right to have an attorney present,

19     didn't you?

20             A    Yes.

21             Q    Did you ask for an attorney?

22             A    No, sir.

23             Q    You also knew that if you couldn't afford an

24     attorney, the Court would appoint one for you,

CCSAO Subpoena Exhibit 005964

61

1      correct?

2         A   Yes.

3         Q   You never asked for an attorney?

4         THE COURT:  Asked and answered.

5         MR. DILLON:

6           Q   You knew anything you said could be

7      used against you in a court of law?

8         A   Correct.

9         Q   Now, you knew Anthony Jackson back on

10     September of '91, correct?

11        A   I knew him.

12        Q   Yes.

13        A   Yes.

14        Q   How long have you known Anthony Jackson?

15        MR. KATZ:  Objection, beyond the scope.

16        THE COURT:  Overruled.

17        THE WITNESS:  I ain't been knowing him that long.

18    I just used to se him from time to tome.  I never had

19    no conversations with him.

20        MR. DILLON:

21          Q   Anthony Jackson is a Black Stone too,

22    right?

23        A   I don't know.

24        MR. KATZ:  Objection.

CCSAO Subpoena Exhibit 005965

62

1      THE COURT:  Answer may stand.

2      MR. DILLON:  Nothing further.

3      THE COURT:  Redirect?

4                 REDIRECT EXAMINATION

5                        BY

6   MR. KATZ:

7      Q    Mr. Day, the police officers Evans and

8   Foley tell you when the Assistant State's Attorney

9   came in, you had to give him a specific statement?

10     A    No, they did not.

11     Q    Did they tell you exactly what words to

12  relate to the State's Attorney?

13     A    They didn't really tell me what words to

14  relate.

15     Q    How did you know what to tell the State's

16  Attorney?

17     MR. DILLON:  Objection, asked and answered.

18     THE COURT:  Overruled.

19     THE WITNESS:  Because they had been talking to me

20  all since I had been there.

21     MR. KATZ:

22     Q    When the State's Attorney came in, he

23  asked you when he was writing down the statement, he

24  was asking you questions, isn't that right?

63

1     A    That's right.

2     Q    And as you gave him the answers, he wrote

3  them down, is that right?

4     A    Correct.

5     Q    You didn't volunteer the fact that you were

6  in the -- you had completed the 10th grade at Tilden

7  High School, correct?

8     A    No.

9     Q    You didn't volunteer the fact that you had

10  been a member of the Black Stone Gang, is that

11  correct?

12    A    That's correct.

13    Q    You didn't at the end, say State's Attorney

14  Daniellan, you treated me well, write this down, did

15  you?

16    A    No.

17    Q    He put that in the statement, is that

18  correct?

19    A    That's correct.

20    Q    And the words down here are his words, not

21  yours, is that right?

22    A    That's right.

23    Q    Mr. Day, you signed this statement, is that

24  right?

CCSAO Subpoena Exhibit 005967

64

1       A    That's right.

2       Q    Is the story contained in this statement

3   true and accurate?

4       MR. DILLON: Objection, asked and answered.

5       THE COURT: It's also up to the jury to make that

6   determination. Sustained.

7       MR. KATZ:

8       Q    When you signed the statement, did you

9   believe the story that was contained in here to be

10  true?

11      MR. DILLON: Objection, relevance.

12      THE COURT: Sustained. Same basis.

13      MR. KATZ: Nothing further.

14      THE COURT: Any recross?

15      MR. DILLON: No, Judge.

16      THE COURT: All right.

17              (Witness was excused.)

18      THE COURT: The record should reflect the jury in

19  the case of Anthony Jakes is present and the jury for

20  Mr. Arnold Day is not present. Mr. Jakes is present

21  with counsel.

22              (Witness was sworn.)

CCSAO Subpoena Exhibit 005968

65

1              MR. ARNOLD DAY,

2    called as a witness on behalf of the Defense, was

3    first duly sworn, examined and testified as follows:

4              DIRECT EXAMINATION

5                    BY

6    MS. BORMANN:

7         Q    Mr. Day, on February the 4th, of 1992,

8    at 4:30 in the afternoon, you were at Area 3 Violent

9    Crimes?

10        A    Yes.

11        THE COURT:  Keep your voice up.

12        THE WITNESS:  Yes.

13        MS. BORMANN:

14        Q    You were being questioned by an State's

15   Attorney by the name of Daniellan?

16        A    Yes.

17        Q    And Detective Boudreau, correct?

18        A    Correct.

19        Q    You gave an interview at that time, correct?

20        A    Yes.

21        Q    And the State's Attorney Daniellan wrote the

22   notes from that interview down, correct?

23        A    Yes.

24        Q    I'm going to show you what I have already,

66

1       marked as Defendant's Exhibit Number 4 for

2       identification. May I approach?

3                THE COURT: You may.

4                MS. BORMANN:

5                Q    Can you tell us what that is, please?

6                A    It's a handwritten statement.

7                Q    Is that your handwritten statement from

8       February 4th of '92

9                A    Yes, Ma'am.

10               Q    And did you sign that statement?

11               A    Yes, Ma'am.

12               MS. BORMANN: Your Honor, at this time, I would

13      like to publish this statement to the jury.

14               THE COURT: You may do so.

15               MS. BORMANN: Thank you. Ladies and Gentlemen,

16      statement of Arnold Day taken 4, February 1992 at 1030

17      hours, 3900 South California, Area 3. Present,

18      State's Attorney Daniellan, Detective Boudreau. This

19      statement taken regarding the shooting death of Rafael

20      Garcia, which occurred on 15th of September, 1991 at

21      1208 West 51st Street at about 11:30 p.m. I

22      understand that I have a right to remain silent and

23      that anything I say can be used against me in a court

24      of law. I understand that I have the right to talk to

1      a lawyer and have him with me during questioning, and

2      if I cannot afford to hire a lawyer, one will be

3      appointed to represent me before any questioning.

4           Understanding these rights, I wish to give

5      a statement. That's signed, Arnold Day, after being

6      introduced to the State's Attorney Daniellan, and

7      being told that State's Attorney Daniellan is an

8      attorney working with the police and not his personal

9      attorney, Arnold Day was known his rights and after

10     hearing those rights and understanding those rights,

11     thereafter, Arnold Day agreed to give a statement of

12     his knowledge of an involvement in the shooting death

13     of Rafael Garcia.

14          State's Attorney Daniellan explained to

15     Arnold Day the definition of and difference between a

16     court reported statement and a handwritten statement.

17     Arnold Day wishes to give a handwritten and not court

18     reported statement which is a summary and not word for

19     word.

20          Arnold Day states that he is 18 years old;

21     that he completed the 10th year of high school at

22     Tilden High School.

23          Arnold Day states that he could speak and

24     read and write English

CCSAO Subpoena Exhibit 005971

1      Arnold Day states that he's a member of the

2   Black Stone Gang and has been for 3 years.  He holds

3   the rank of officer, which he explains is the second

4   highest rank.

5      Arnold Day states that on 15th of September

6   1991, he was selling drugs on Aberdeen Street from

7   6:00 p.m. to 12:00 a.m., but he decided to leave early

8   to get something to eat.  At around 11:30 p.m., he

9   went into the Queen Submarine shop at 1208 West 51st

10  Street.  Before he had a chance to order, he saw quote

11  a Mexican guy unquote, who he now knows as Rafael

12  Garcia pull up in a station wagon and come into the

13  submarine shop and order his food.

14      Arnold states that the quote Mexican guy was

15  flashy unquote, which Arnold has explained means  he

16  had on a lot of jewelry and a quote, nut-roll unquote,

17  which Arnold Day explained means a lot of money.

18      Arnold states that he decided to rob the

19  Mexican guy of his money and jewelry.

20      Arnold states that he went out of the

21  submarine shop and got the quote nation gun, unquote.

22  Arnold has explained that the nation gun is a gun

23  which belongs to the gang and is used for gang

24  activity. Arnold further explained that the gun was a

CCSAO Subpoena Exhibit 005972

1      380 caliber.

2         Arnold states that when the quote Mexican

3 guy unquote exited the submarine shop, he pulled out

4 his 380 caliber and told the quote Mexican guy unquote

5 stick up. The Mexican guy walked back to his station

6 wagon and got in on the passenger side.

7         Arnold states when the Mexican guy got into

8 the car, Arnold shot him 2 or 3 times and fled.

9         Arnold states that he has been treated well

10 by the detectives and was given oranges and oreo

11 cookies. He was given cigarettes to smoke and was

12 allowed to use the bathroom when he needed to. He was

13 treated well by the State's Attorney Daniellan.

14         Arnold states he has not been threatened or

15 abused in any way, by the detective or State's

16 Attorney Daniellan.

17         Arnold states that no promises or deals had

18 been made in exchange for this statement.

19         Arnold has read this statement and made any

20 corrections or additions that he wishes.

21         Arnold states that this is a true and

22 accurate summary of what he has told the State's

23 Attorney, and that he has given the statement freely

24 and voluntarily.

CCSAO Subpoena Exhibit 005973

1           Nothing further.

2              CROSS EXAMINATION

3                    BY

4    MR. GOODFRIEND:

5        Q   Mr. Day, I'm going to direct your

6    attention to September 25th of 1990, you were found

7    guilty on that date of the offense of robbery?

8        A   Yes, I was.

9        Q   What kind of sentence did you get for your

10   offense of robbery?

11       A   Four years.

12       Q   Four years where?

13       A   In I.D.O.C.

14       Q   On September 8th of this year, were you

15   convicted of another offense in this courtroom and

16   sentenced?

17       A   Yes, I was.

18       Q   What offense were you convicted for before

19   Judge Durkin on September 8, and sentenced for?

20       A   A drug case.

21       Q   What was the charge?

22       A   Delivery, I believe.

23       Q   Delivery of a controlled substance?

24       A   Right.

1          Q      And what sentence did Judge Durkin give you

2      several days ago?

3          A      Seven years.

4          Q      Seven years where?

5          A      I.O.D.C.

6          Q      Sir, are you still a member of the Black

7      Stones Street Gang?

8          A      No, I am not.

9          Q      Well, when did you resign from that gang?

10         A      Before I got out of the penitentiary in '91.

11         Q      You have any tattoos on your body?

12         A      Yes.

13         Q      What kind of tattoos do you have on your

14     body?

15         A      I have a 5 point star, my mother's name.

16         Q      How many 5 point stars do you have?

17         A      Two.

18         Q      What side of your body are they on?

19         A      The left side of my body.

20         Q      Now, there is 2 facts common of street gangs

21     in the City, People and Folks, correct?

22         A      Yes.

23         Q      Black Stone --

CCSAO Subpoena Exhibit 005975

1     MR. KATZ: Objection.

2     THE COURT: Overruled.

3     MR. GOODFRIEND:

4      Q Black Stones have People, correct?

5     A Yes.

6     Q The area of 51st and Racine, that's a Black

7 Stone gang territory, correct?

8     MS. BORMANN: Objection.

9     THE COURT: Overruled.

10    THE WITNESS: Correct.

11    MR. GOODFRIEND:

12     Q Does a gang have certain rules?

13    A Like what?

14    Q What's a violation?

15    A Violation can mean anything.

16    Q To rat on a fellow gang member, is that a

17 violation?

18    A Is that a violation?

19    Q Yes.

20    A I don't know.

21    Q You in the gang for 3 years and you don't

22 know whether it's a violation to rat o a fellow gang

23 member?

24    MR. KATZ: Objection, argumentative.

CCSAO Subpoena Exhibit 005976

1           THE COURT:  Aksed and answered.  Sustain.

2           MR. GOODFRIEND:

3               Q    You went to the police station and were

4      in the police station on February 4th, 1992?

5               A    Yes.

6               Q    You had known the individual Anthony Jakes

7      for some time, is that correct?

8               A    I didn't know him personally as far as

9      having conversations with him.  When we were on the

10     streets, I have seen him from time to time.

11              Q    Did you know whether he belonged to the

12     Black Stones Street Gang?

13              MR. KATZ:  Objection.

14              THE COURT:  Overruled.  If he knows he may

15     answer.   MR GOODFRIEND:

16              Q    Now, this offense that you were

17     arrested for, occurred on the evening of September the

18     15th 1991, is that correct?

19              A    Yes.

20              Q    You learned the next day that the police

21     were looking for you in regards to the shooting,

22     didn't you?

23              A    Yes.

24              Q    Who told you that the police were looking

1          for you?

2                  A    My grandmother.

3                  Q    Did you go to the police station after your

4          grandmother told you?

5                  A    No, I did not.

6                  Q    How many times did your grandmother tell you

7          that the police were looking for you?

8                  A    She told me she -- it doesn't matter how

9          many times she told me though.

10                 Q    How many times did your grandmother tell you

11         that the police were looking for you in regards to the

12         shooting?

13                 A    I don't know.

14                 Q    Would it be more than 5?

15                 A    Yes.

16                 Q    Would it be more than 10?

17                 A    I don't know.

18                 Q    In the month of September, did you go to the

19         police station in regards to their wanting to question

20         you?

21                 A    On what date?

22                 Q    In the month of September of '91, did you go

23         to the police station?

24                 A    No, I didn't.

CCSAO Subpoena Exhibit 005978

1         Q   In the month of October, of '91, did you go

2        to the police station to tell them what you knew?

3         A   No, I didn't.

4         Q   Anytime in 1991, did you go to the police

5        station?

6         A   No, I didn't.

7         Q   Anytime in '92, did you go to the police

8        station?

9         A   Yeah, February.

10        Q   You didn't go voluntarily, did you?

11        A   No.

12        Q   They took you there?

13        A   Right.

14        Q   Now, you said in direct testimony that when

15        the police came to the house on February the 4th,

16        1991, you were scared, is that correct?

17        A   Yes, I was.

18        Q   Well, that wasn't the first time that you

19        had contact with the police, was it?

20        A   No.

21        Q   How many times in your life, had you had

22        contact with the police?

23        A   Quite a few.

24        Q   How many times is quite a few?

CCSAO Subpoena Exhibit 005979

1          A   I can't count.

2          Q   More than 10?

3          A   Yes, but less than 20.

4          Q   When the handwritten statement was taken, it

5  was taken by State's Attorney Daniellan?

6          A   Correct.

7          Q   And Detective Boudreau was there?

8          A   Correct.

9          Q   Now, at no time while they took the

10  statement was the Detective Evans there, was he?

11         A   He was there at the station. He wasn't in

12  the room when the statement was taken.

13         Q   He wasn't in the room when the State's

14  Attorney talked to you, was he?

15         A   He came in back and forth.

16         Q   When the handwritten statement was taken,

17  the Detective Evans wasn't present, was he?

18         A   Nope.

19         Q   Do you remember having a conversation with

20  State's Attorney Jason Daniellan and no other officers

21  being present?

22         A   Yes, I did.

23         Q   And State's Attorney Daniellan asked you at

24  that time, how you were treated by the police, is that

1     correct?

2          A     Well, you know --

3          Q     Sir, did the State's Attorney Daniellan ask

4     you how you were treated by the police?

5          A     No, he didn't.

6          Q     You don't remember telling him that the

7     police had treated you fine?

8          A     No. I did not, that's something he wrote

9     hisself.

10         Q     You knew you could make changes on that

11    statement, didn't you?

12         A     So they say.

13         Q     Well, you made some change, didn't you?

14         A     About my age.

15         Q     Did you ask him to change that part of the

16    statement where you say you had been treated find by

17    the police?

18         A     No, I did not.

19         MR. GOODFRIEND:  Nothing further.

20         MS. BORMANN:  No questions.

21         THE COURT:  You may step down.

22              (The witness was excused.)

23              (Witness was sworn.)

1                      DETECTIVE WILLIAM FOLEY,

2        called as a witness on behalf

3        Illinois, as a Rebuttal witnes

4        examined and testified as follow.

5                  DIRECT EXAMINATION

6                      BY

7        MR. DILLON:

8            Q   State your name for the record?

9            A   William Foley, F-o-l-e-y, star number 20450.

10       currently assigned to Area 1 Violent Crimes.

11          Q   How long have you been a Chicago Police

12       officer?

13          A   Twenty-three years.

14          Q   How long have you been a detective?

15          A   Sixteen years.

16          Q   Detective, I would like to direct your

17       attention back to the date of February the 4th of '92,

18       where you were you assigned on that particular day,

19       Detective?

20          A   Area 3 Violent Crimes, which was located at

21       3900 South California.

22          Q   Detective, I would like to direct your

23       attention to approximately 11:00 o'clock on the

24       morning of February 4th '92, did you have an occasion

CCSAO Subpoena Exhibit 005982

1      to have any conversation with a person by the name of

2      Arnold Day?

3          A    I did.

4          Q    Do you see that person here in court today?

5          A    Yes. This gentleman in the tie, dark tie,

6      white shirt.

7          THE COURT:  Has your client been identified?

8          MR. KATZ:  Yes, your Honor.

9          MR. DILLON:

10         Q    At the time you had your conversation

11     with Mr. Day, was anyone with you?

12         A    My partner for the case, Detective Boudreau.

13         Q    At the time you had a conversation with the

14     defendant, Arnold Day, did you ever grab him by the

15     collar and push him up against the wall?

16         A    No, sir.

17         Q    Did any police officer in your presence ever

18     abuse Arnold Day in any way shape or form?

19         A    No, sir.

20         Q    Now, during your conversations with the

21     defendant, Arnold Day, did he ever mention to you that

22     on September 15 of '91, he was with a person by the

23     name of Dorthea Robinson on a porch on Aberdeen

24     Street?

CCSAO Subpoena Exhibit 005983

1          A    No, sir.

2          Q    Did he mention he was with a person by the

3    name of Carl Murray on Aberdeen Street on September 14

4    of '91?

5          A    No.

6          Q    Did he ever mention whether or not he was

7    ever with a person by the name of Eleanor Robinson on

8    a porch on the evening hours of September 15 of '91 on

9    Aberdeen Street?

10         A    No.

11        MR. DILLON:  Nothing further.

12        THE COURT: Cross.

13               CROSS EXAMINATION

14                    BY

15    MR. KATZ:

16          Q    Detective Foley, you have been working

17    on the investigation of the shooting of Rafael Garcia

18    --

19         A    The only day I was assigned wa this day in

20    particular.

21         Q    When  you went and talked to Mr. Day, you

22    went to talk to him about that case, is that correct?

23         A    I don't specifically remember which case

24    Detective Boudreau was talking to him about because

CCSAO Subpoena Exhibit 005984

1      Detective Boudreau was doing most of the questioning.

2           Q   You did go in to participate in the

3      questioning?

4           A   Yes.

5           Q   In fact, you went in there first at 11:00

6      a.m., correct?

7           A   Yes.

8           Q   You were in and out of the room during the

9      course of the day?

10          A   I believe I left several times.  I'm not

11     certain of that fact.

12          Q   And when was the last time during the day

13     you saw him? Do you remember how late it was?

14          A   Approximately 1:45, 1:30, through that area.

15          Q   You saw him a number of times, roughly 3 or

16     4 hours, is that correct?

17          A   Three hours, yes.

18          MR. KATZ:  Nothing further.

19          THE COURT: Redirect.

20                    REDIRECT EXAMINATION

21                         BY

22     MR. DILLON:

23          Q   Did you ever tell the defendant what to

24     say when the State's Attorney --

CCSAO Subpoena Exhibit 005985

82

1      MR. KATZ: Objection, beyond the scope.

2      THE COURT: Overruled.

3      THE WITNESS: Absolutely not.

4      MR. DILLON:

5          Q   Were you present at anytime when

6      Arnold Day gave a handwritten statement?

7      MR. KATZ: Objection, beyond the scope.

8      THE COURT: Sustained.

9      MR. DILLON: Nothing further.

10     THE COURT: Recross.

11     MR. KATZ: No.

12     THE COURT: You may step down.

13              (Witness was excused.)

14     (Which were part of the proceedings had that day.)

15          *        *        *        *

2

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS,

I, JAMIE MITCHELL, an Official Court
Reporter, for the Circuit Court of Cook County, Cook
Judicial Circuit of Illinois, do hereby certify that
I reported in shorthand the proceedings had on the
hearing of the above-entitled cause; that I thereafter
caused the foregoing to be transcribed into
typewriting, which I hereby certify to be a true and
accurate transcript of the proceedings had before the
HONORABLE THOMAS P. DURKIN, Judge of said court.

JAMIE MITCHELL, CSR
Official Court Reporter
Circuit Court of Cook County
# 084-003450

Dated this 13th day
of October A.D. 1993.

CCSAO Subpoena Exhibit 005987