# Exhibit 86

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

**1**

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

HON. SARA L. ELLIS

MAGISTRATE JUDGE JEFFREY CUMMINGS

CASE NO. 19-CV-7286

ARNOLD DAY,

Plaintiff

V.

KENNETH BOUDREAU, ET AL.,

Defendants

DEPONENT: KENNETH BOUDREAU
DATE:      DECEMBER 1, 2022
REPORTER: SYDNEY LITTLE

**2**

1   APPEARANCES

2

3   ON BEHALF OF THE PLAINTIFF, ARNOLD DAY:

4   Heather Lewis Donnell, Esquire

5   Renee Spence, Esquire

6   Gayle Horn, Esquire

7   Loevy & Loevy

8   311 North Aberdeen Street

9   Third Floor

10  Chicago, Illinois 60607

11  Telephone No.: (312) 243-5900

12  E-mail: heather@loevy.com

13      spence@loevy.com

14      gayle@loevy.com

15  (Appeared via videoconference)

16

17  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

18  George Yamin, Esquire

19  The Sotos Law Firm, P.C.

20  141 West Jackson Boulevard

21  Suite 1240A

22  Chicago, Illinois 60604

23  Telephone No.: (630) 735-3300

24  E-mail: gyamin@jsotoslaw.com

25  (Appeared via videoconference)

**3**

1   APPEARANCES (CONTINUED)

2

3   ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, WILLIAM

4   FOLEY, JUDE EVANS, MICHAEL KILL, DAN MCWEENY, JAMES

5   BRENNAN, ANTHONY WATSON, MARTY RADTKE:

6   Andrew Grill, Esquire

7   Rock Fusco & Connelly, LLC

8   321 North Clark Street

9   Chicago, Illinois 60654

10  Telephone No.: (312) 494-1000

11  E-mail: agrill@rfclaw.com

12  (Appeared via videoconference)

13

14  Also Present: Sheila Jones, Videographer

15

**4**

1   INDEX

2       Page

3   PROCEEDINGS          8

4   DIRECT EXAMINATION BY MS. DONNELL      10

5   CROSS EXAMINATION BY MR. GRILL      286

6   REDIRECT EXAMINATION BY MS. DONNELL      289

7

8   EXHIBITS

9       Page

10  1 - Deposition Transcript of Kenneth

11      Boudreau in Anthony Jakes V. Kenneth

12      Boudreau, et al. Case      97

13  2 - Criminal Trial Testimony Transcript of

14      Kenneth Boudreau June 21, 1994 -

15      DAY 029522-029761      109

16  3 - Criminal History Report of Ralph Watson

17      - CITY_DAY 00199-00205      114

18  4 - Arrest Information of Ralph Watson

19      CITY_DAY 00087      114

20  5 - Statement of Ralph Watson

21      January 20, 1992 - CITY_DAY 00080-00083  115

22  6 - Area File of the Gerrod Erving Homicide

23      - CITY_DAY 00049-00158      147

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

5

1                EXHIBITS (CONTINUED)
2
3        7 - Permanent Retention File of the
4            Gerrod Erving Homicide -
5            CITY_DAY 00001-00047            149
6        8 - Supplemental Report February 18, 1992
7            - CITY_DAY 00056-00060           153
8        9 - Letters from Ralph Watson - CCSAO
9            Day v. Boudreau et al., 19C7286
10           000407-19C7286 000416            176
11       10 - Statement of Ralph Watson
12            December 15, 1992 - CCSAO
13            Day v. Boudreau et al., 19C7286
14            000405-000406                   189
15       11 - Handwritten Note - CCSAO
16            Day v. Boudreau et al., 19C7286 000717  198
17       12 - Crime Laboratory Report August 8, 1991
18            - CITY_DAY 00046                210
19       13 - Firearms Receipt and Worksheet - CCSAO
20            Day v. Boudreau et al., 19C7286 000984  217
21       14 - Supplementary Report July 4, 1991 -
22            CCSAO Day v. Boudreau et al., 19C7286
23            001007-001014                   225
24
25

---

6

1                EXHIBITS (CONTINUED)
2
3        15 - Statement of Arnold Day of Gerrod
4             Erving Homicide February 4, 1991 -
5             CITY_DAY 00076-00083            245
6        16 - Statement of Arnold Day of Rafael
7             Garcia Homicide February 4, 1991 -
8             CITY_JAKES 00781-00784          247
9        17 - General Progress Report
10            February 17, 1992 - CITY_JAKES
11            00074-00075                     265
12       18 - Arrest Report of Arnold Day
13            February 5, 1992 - CITY_DAY 00084  267
14
15
16
17
18
19
20
21
22
23
24
25

---

7

STIPULATION

1
2
3    The VIDEO deposition of KENNETH BOUDREAU was taken at
4    LOEVY & LOEVY, 311 NORTH ABERDEEN STREET, 3RD FLOOR,
5    CHICAGO, ILLINOIS 60607, via videoconference in which
6    all participants attended remotely, on THURSDAY the 1ST
7    day of DECEMBER 2022 at 10:10 a.m. (CT); said VIDEO
8    deposition was taken pursuant to the FEDERAL Rules of
9    Civil Procedure. The oath in this matter was sworn
10   remotely pursuant to FRCP 30.
11
12   It is agreed that SYDNEY LITTLE, being a Notary Public
13   and Court Reporter for the State of ILLINOIS, may swear
14   the witness and that the reading and signing of the
15   completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25

---

8

PROCEEDINGS

1
2
3        VIDEOGRAPHER: Okay. We are now on the record.
4    My name is Sheila Jones. I'm the videographer today
5    and Sydney Little is our court reporter.
6    Today is the 1st day of December 2022 and the time
7    is 10:11 a.m. Central Time. We are at the offices
8    of Loevy and Loevy 311 North Aberdeen Street,
9    Chicago, Illinois, to take the deposition of Kenneth
10   Boudreau in the matter of Arnold Day v. Kenneth
11   Boudreau, et al. Pending in the United States
12   District Court for the Northern District of Illinois
13   Eastern Division. Case number 19- CV-7286. Will
14   the Counsel please identify themselves for the
15   record, starting with Plaintiff's counsel?
16       MS. DONNELL: Good morning. Heather Lewis
17   Donnell on behalf of the Plaintiff, Arnold Day, and
18   my colleagues over the course of the day, Renee
19   Spence and Gayle Horne may also appear via video,
20   but they'll just be listening in.
21       MR. GRILL: Andrew Grill on behalf of the
22   individual officer Defendants. Is Mr. Day going to
23   log on? I'm asking because I don't have the Zoom up
24   on my --
25       MS. DONNELL: I don't think so --

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

9

1    MR. GRILL: Okay.
2    MS. DONNELL: I think he's working today.
3    MR. GRILL: Yeah, if he does just let me.
4    MS. DONNELL: Well, I'll note.
5    MR. GRILL: Okay, thanks.
6    MS. DONNELL: Or you can if you notice it.
7    MR. GRILL: Yeah.
8    MR. YAMIN: And George Yamin on behalf of
9    Defendant, City of Chicago.
10   VIDEOGRAPHER: Perfect. Mr. Boudreau,
11   would you please raise your right hand for our
12   court reporter?
13   THE WITNESS: Sure.
14   COURT REPORTER: Do you solemnly swear or
15   affirm that the testimony you're about to give will
16   be the truth, the whole truth, and nothing but the
17   truth?
18   THE WITNESS: I do.
19   COURT REPORTER: Thank you. Counsel,
20   you may begin.
21   MS. DONNELL: Sure. And before you get
22   started, I don't know if noted the time that
23   I started but at 10:11.
24   VIDEOGRAPHER: Okay.
25   MR. GRILL: Yep.

10

1            DIRECT EXAMINATION
2    BY MS. DONNELL:
3    Q   Good morning, Mr. Boudreau, how are you doing?
4    A   Good morning.
5    Q   My name's Heather Lewis Donnell, I represent
6    Arnold Day in this matter, and I think I mentioned
7    before that I met you during the Hood -- Tyrone Hood
8    Case a number of years ago.
9    A   Okay.
10   Q   So I know you've been deposed a number of
11   times. Will you just let me know if you don't
12   understand one of my questions. It's bound to happen
13   over the course of the day. So just let know, and I'll
14   rephrase my question if you don't understand it, okay?
15   A   Okay.
16   Q   Also, we ARE going to go all day so we'll take
17   breaks, so just let me know when you need a break.
18   I'm happy to accommodate a break for bathroom or lunch
19   or whatever you want. Just answer the question that's
20   pending before we take a break; sound good?
21   A   Okay.
22   Q   And are you on any medications that you've
23   been told by a doctor would impact your memory in any
24   way?
25   A   No.

11

1    Q   Okay. What documents did you review for your
2    deposition today?
3    A   I reviewed some trial transcripts from the
4    original trial of Arnold Day. Some police reports.
5    Some arrest reports. That's pretty much it.
6    Q   I want to go through in just a little more
7    detail. For the trial transcripts, you're referring to
8    the trial transcripts of the criminal prosecution of
9    Arnold Day in the Gerrod Erving homicide?
10   A   Well, I think it was, yeah.
11   Q   Okay. Did you review your testimony in
12   Mr. Day's criminal trial?
13   A   I did.
14   Q   Did you review anybody else's testimony other
15   than your testimony in Mr. Day's criminal trial for the
16   Erving homicide?
17   A   I think there's testimony in that trial
18   transcript from Detective Foley, some rebuttal testimony
19   by Detective Evans, some crime lab testimony by Pat
20   Moran, relative to Gerrod Erving, a life and death
21   witness, and Arnold Day's testimony as well.
22   Q   Okay. So to be clear, you read the whole
23   trial transcript; is that right?
24   A   Briefly, yes.
25   Q   Okay. And when did you read the criminal

12

1    trial transcript?
2    A   Last night.
3    Q   Had you read at any time in the recent past
4    before last night?
5    A   No.
6    Q   Did you read any of your testimony in the
7    pretrial motions hearings, like the motion to suppress?
8    A   I don't think I had those -- that testimony.
9    Q   Okay.
10   A   I mean the allegations were re-litigated in
11   the trial, so --
12   Q   You also mentioned that you reviewed some
13   police reports before your deposition today?
14   A   Yes.
15   Q   What police reports did you review?
16   A   The Gerrod Erving homicide file.
17   Q   Okay. Anything else?
18   A   Uh-uh.
19   Q   Is that a no?
20   A   Yes, no.
21   Q   Sorry. You have to give verbal answers.
22   A   Okay.
23   Q   Okay. And arrest reports. What arrest
24   reports did you review?
25   A   Arnold Day's.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

**13**

1  Q  Anybody else's?
2  A  Ralph Watson and Larry Lewis.
3  Q  Larry Lewis?
4  A  Uh-huh.
5  Q  Is that a yes?
6  A  Yes.
7  Q  Okay. Yes, sir, I'll just remind you, you
8  have to give verbal answers, "yes" "no". So the court
9  reporter can take them now. Okay. What arrest reports
10  for Arnold Day did you review?
11  A  For the arrest of the murder of Gerrod Erving.
12  Q  Any other arrest reports for Mr. Day?
13  A  No -- no -- no, there was no other reports in
14  the file. I know it came up during trial that he had I
15  think 15 or 17 previous arrests, but those reports
16  weren't in there.
17  Q  Okay. And you said you reviewed arrest
18  reports of Mr. Ralph Watson to prepare for today,
19  correct?
20  A  Yes.
21  Q  What arrest reports did you review for
22  Mr. Watson?
23  A  One where he was charged with multiple counts
24  of armed robbery.
25  Q  All right. And then you said you reviewed

---

**14**

1  arrest reports for an individual by the name of Larry
2  Lewis?
3  A  Yes.
4  Q  And what arrest reports did you review for
5  Mr. Lewis?
6
7  A  Multiple counts of armed robbery.
8  Q  Any other arrest reports?
9  A  Uh-uh. No. Sorry.
10  Q  No problem. It's easy to do. So I want to go
11  back and ask you about testimony. Did you review any of
12  your deposition testimony in any other cases where
13  you're a defendant?
14  A  You guys deposed me nine times on the same
15  subject over and over again. I didn't review them, no.
16  Q  Okay. And did you review any of your
17  testimony you've given in post-conviction hearings to
18  prepare for today?
19  A  No.
20  Q  Anything else you reviewed to prepare for your
21  deposition today?
22  A  No.
23  Q  Other than meetings with your attorneys,
24  did you -- let's strike that. Other than communications
25  with your attorneys, have you talked to anybody else

---

**15**

1  about your deposition today in this matter?
2  A  Other than the fact that I'm going to do a
3  deposition.
4  Q  Okay. Who did you inform that going to do a
5  deposition?
6  A  My wife, my family, Detective Halloran.
7  Q  Anyone else?
8  A  No, not that I can think of.
9  Q  Okay. Well I should have said this earlier,
10  but I think you know this. If something over the course
11  of this deposition, your memory is refreshed and you
12  wanted to amend or correct your testimony, just let me
13  know, okay?
14  A  Yeah. And I usually that's better for me
15  after I review it in writing.
16  Q  Understood. Okay. So other than speaking to
17  your attorneys, you let your wife, your family, and
18  Detective Halloran know that you're going to be deposed
19  today; is that it?
20  A  And my coworkers.
21  Q  Who -- your coworkers in your security firm?
22  A  Yes.
23  Q  Okay. And what's the name of your security
24  firm?
25  A  The Embassy Security Group.

---

**16**

1  Q  And are you the sole owner of that now?
2  A  Yes.
3  Q  Okay. How many employees do you have at the
4  Embassy Security Group?
5  A  Approximately 191.
6  Q  191, you said?
7  A  Uh-huh. Part-time.
8  Q  Is that a yes?
9  A  Part-time, yes.
10  Q  Are all of them part-time?
11  A  Yes.
12  Q  I'm just going to stop for one minute.
13  A  That's me.
14  Q  Okay. Do you need to take that?
15  A  No.
16  Q  Okay. Are they independent contractors or
17  employees?
18  A  Employees. Everybody's a W-2.
19  Q  Everyone's a W-2?
20  A  Yeah, they're mostly part-time. I have a few
21  full-time employees.
22  Q  And your Embassy Security Group provides
23  security for businesses and venues in the city of
24  Chicago?
25  A  Yes. Including at one time your boss,

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

17

```
1   Mr. Loevy.
2       Q   I'm aware of that, yeah.
3       A   Okay.
4       Q   Thank you for telling me.  Do you -- let's
5   see.  What is -- well, I don't know that -- is it an S
6   Corp or what's the corporate structure?
7       A   It's a C corporation.
8       Q   Okay.  What was the gross revenue last year
9   for Embassy Security Group?
10          MR. GRILL:  We are going to hold off on his
11  financial stuff until the end.
12          MS. DONNELL:  Until what end?
13          MR. GRILL:  Well we don't know what position
14  we're taking with punitive so -- this to me sounds
15  like it goes to it, so I'll tell him not to answer
16  it at this point.
17          MS. DONNELL:  Okay.  Well --
18          MR. GRILL:  Because I can't imagine that
19  financial position have anything to do about any
20  potential issue in this case other than his ability
21  to pay.
22          MS. DONNELL:  I will agree to reserve questions
23  on punitive damages related to discovery.  So long
24  as you know you're willing to bring Mr. Boudreau
25  back to be deposed on that matter.
```

18

```
1           MR. GRILL:  We'll see if it's necessary.  I'm
2   not going to agree to that right now.  I'm going to
3   tell him to not answer those questions and then
4   depending on how that gets resolved, that may be the
5   case.  And I get it.  But in this deposition --
6           MS. DONNELL:  Let's just move on for now.
7           MR. GRILL:  Yeah.
8   BY MS. DONNELL:
9       Q   Okay.  So you're going to take your Counsel's
10  advice and not answer those questions at this moment?
11      A   Yes.
12      Q   Okay.  Does Detective Halloran work with
13  Embassy Security Group?
14      A   No.
15      Q   Did Detective Foley?
16      A   No.  Detective Foley's been dead for many
17  years.  No, he never --
18      Q   But he never worked there.
19      A   No.
20      Q   And Detective Kill who did prior to his
21  passing, correct?
22      A   He stopped working about a year prior to his
23  passing.
24      Q   Okay.  Your conversation with Detective
25  Halloran, what did you and Detective Halloran discuss
```

19

```
1   about your deposition today?
2       A   We didn't discuss any testimony.  I just told
3   him that that was going down there for a deposition on
4   Arnold Day.
5       Q   And what did he say when you told him that you
6   were going to be deposed on the Arnold Day case today?
7       A   He said, "Good luck."
8       Q   Anything else?
9       A   Nope.
10      Q   Did you and Detective Halloran discuss any of
11  his involvement with respect to Arnold Day?
12      A   No.  Because I don't think he had any
13  involvement with Arnold Day.
14      Q   Did you and Detective Halloran have any
15  discussions about his interaction with Ralph Watson?
16      A   No.
17      Q   Have you and Detective Halloran ever had
18  conversations about Ralph Watson?
19      A   No.  Our conversations are pretty much
20  centered around your law firm.
21      Q   Okay.  Maybe I'll put that to the side, we'll
22  come back to that perhaps later today.
23      A   Okay.
24      Q   Did you and Detective Halloran have any
25  discussions about the Gerrod Erving homicide?
```

20

```
1       A   About what?
2       Q   The Gerrod Erving homicide?
3       A   No.
4       Q   Okay.
5       A   It was a short conversation yesterday.
6       Q   How frequently are you and Detective Halloran
7   in conversation -- in communication?
8       A   Well, once every couple of months.
9       Q   Do you still see him in person from time to
10  time?
11      A   I don't think -- I have not seen him, it's got
12  to be at least over six, seven months.
13      Q   Okay.  And you and John Halloran were partners
14  when you were both homicide detectives of the Chicago
15  Police Department, correct?
16      A   Yes.
17      Q   And you started out as partners together at
18  Area 3?
19      A   Yes.
20      Q   And then you left and you were deployed,
21  I think to Iraq; is that right?
22      A   Correct.
23      Q   And that was in the 1990?
24      A   1990, yes.
25      Q   Okay.  But you and John Halloran had been
```

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

21

1  partners prior to that time?
2      A  No.
3      Q  At Area 3.  Okay.  You became partners of him
4  when you return?
5      A  No.  I -- I became a detective in July of 1990
6  and I got activated right around September of 1990.
7      Q  And then you returned in May of '91?
8      A  May of '91.  Or June.
9      Q  I'm sorry, what's that?
10     A  May or June.
11     Q  May or June.  And then it was after that when
12 you returned that you went back to Area 3, correct?
13     A  Correct.
14     Q  And then that's when you and John Halloran
15 became partners?
16     A  Not immediately.  I sort of got thrown back
17 into the rotation because I was really only a detective
18 a month when I left.  So I had to go through the
19 training and I rotated with different detectives.
20     Q  When did you and John Halloran become
21 partners?
22     A  I -- you know -- I don't know the time frame.
23 I'm trying to figure that out today.  I remember our
24 first murder that we worked together.
25     Q  What was your first murder you worked

22

1  together?
2      A  It was the Fox homicide.
3      Q  The Fox?
4      A  Yeah, that's -- was the name.
5      Q  And that was an Area 3, correct?
6      A  Yes.
7      Q  Okay.  Is it fair to say by January '92 you
8  and John Halloran are partners?
9      A  I believe so, yes.
10     Q  Okay.  And then you both were transferred over
11 to Area 1 homicide when Area 3 closed?
12     A  Correct.
13     Q  And that was in the fall of '92?
14     A  October 15.
15     Q  Yeah.  Okay.  And then you stayed at Area 1
16 for a number of years, right?
17     A  Correct.
18     Q  When did you leave at Area 1?
19     A  Pardon?
20     Q  When did you leave your assignment as a
21 homicide detective at Area 1?
22     A  Around -- I switched to days and I had a new
23 partner then.
24     Q  Who was your new partner when you switched to
25 days?

23

1      A  Svilar, Lieutenant Svilar, or Commander
2  Svilar, then.
3      Q  Okay.  And that was still at Area 1?
4      A  Yes.
5      Q  Do you remember the approximate year that you
6  switched to days at Area 1?
7      A  I want to say about '97, '98.
8      Q  Okay.  How long did you remain on days at Area
9  1?
10     A  Shortly after that we had a -- a murder that
11 occurred in the south side of Chicago.  The victims were
12 Gil Navaris and Raul Cortado that I started working on.
13 And -- and that investigation based upon where it took
14 us, I ended up being detail to a US Department of
15 Justice Task Force in Merrillville, Indiana
16 investigating policemen who committed homicides.
17 And I stayed there for about two years till the
18 culmination of that investigation.  We arrested a police
19 officer named Erving for committing a double homicide in
20 Chicago and trafficking cocaine along with multiple
21 other defendants.
22     Q  And what was the name of that officer?
23     A  Pardon?
24     Q  The Irvin, you said, what was the name of the
25 officer?

24

1      A  Officer Irvin.
2      Q  I-R-V-I-N.
3      A  It's either E-R-V-I-N or --
4      Q  And what was Officer Irvin's first name,
5  if you recall?
6      A  I don't remember.
7      Q  Okay.  And that was a two year detail, right?
8      A  Approximately, yeah.
9      Q  Okay.  And then when you came back?
10     A  I came back, I then went to the cold case
11 homicide unit.
12     Q  And was John Halloran with you at the cold
13 case homicide unit?
14     A  No.
15     Q  No.  Okay.  And how long were you at cold
16 case?
17     A  For about six, seven months.
18     Q  And where did you go?
19     A  At that time, I was asked to go back to the US
20 Department of Justice work on a violent crime task force
21 for DEA in the Chicago Field Division.
22     Q  And how long were you there?
23     A  Approximately, three.  Three years, maybe.
24 Three, four.
25     Q  Okay.  And then where'd you go next?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

25

1   A   Then in April 1, 2004 I was promoted to
2   sergeant.
3   Q   And you went to patrol?
4   A   I went to patrol in 9th District, I had
5   midnights.
6   Q   That's -- okay.  And how long were you the
7   sergeant in the 9th District on midnights?
8   A   Less than a year.
9   Q   And then where were you next?
10  A   I was then assigned to back to the Bureau of
11  Organized Crime, the criminal enterprise section.
12  Q   How long were you there?
13  A   Approximately three years.
14  Q   Okay.  And where are you next?
15  A   At that time, I was a commanding officer of
16  that unit.  Supervised the -- the FBI task force on
17  gangs underneath me to DEA, hide a task forces, the
18  asset forfeiture unit, the trap team, the hotel motel
19  unit.  When I say, "supervise them," I didn't have
20  operational control over them, I just was sort of like
21  their administrator.
22  Q   Okay.
23  A   Because we had policemen assigned to those
24  units.  From there I became the group supervisor for the
25  federal money laundering team, which is a multi-agency

26

1   team here in Chicago.
2   Q   How long were the group supervisor for the
3   money laundering team, the multi-agency unit?
4   A   Maybe about a year.
5   Q   Okay.  And then where were you next?
6   A   I went back to the patrol for the 8th
7   District.
8   Q   And were you -- what was your rank then?
9   A   Sergeant.
10  Q   Sergeant.  Okay.  How long were you a sergeant
11  in patrol?
12  A   I was only there for about six months.
13  Q   Okay.
14  A   Then I was asked to come back and be the
15  commanding officer of operations and administration for
16  the gang investigation unit.
17  Q   And where was the -- is that at a Home and
18  Square or where?
19  A   Yes.
20  Q   Okay.  How long -- when were you in Home and
21  Square for the gang investigation unit?
22  A   Well the first -- the first criminal
23  enterprise unit was in Home and Square as well so --
24  Q   I see.  Okay.
25  A   Probably I stayed at Home and Square, but I

27

1   left that unit.
2   Q   And what unit did you go to?
3   A   Superintendent Weis asked at that time,
4   Commander Schmitz -- you know Schmitz -- and me to form
5   the gang enforcement division.
6   Q   That was a new unit?
7   A   It was.
8   Q   Under Weis?
9   A   Well Weis was a superintendent --
10  Q   Yeah.
11  A   --it was going to be within the Bureau of
12  Organized Crime under Commander Schmitz, which was going
13  to be 480 man unit.
14  Q   Did it not get to -- you say "it was going to
15  be"; What happened?
16  A   I -- it -- it -- we got it off the ground and
17  running, but I don't think we had all 480 people.
18  Q   Okay.  And what was the purpose of that
19  particular new unit that Superintendent Weis had formed
20  -- the gang enforcement unit?
21  A   It was a short term investigation gang unit.
22  Q   Was it citywide?
23  A   Yes.
24  Q   Okay.
25  A   In five offices.

28

1   Q   Okay.  Was there a different tactical approach
2   that Superintendent Weis was going to take with that
3   gang enforcement unit?
4       MR. GRILL:  Object to form.
5   A   Yeah.  I -- I don't know if you and I would
6   have the same definition of tactical, so I don't know
7   how to answer that.
8   Q   Well, it was a new unit.  So I was wondering
9   what was the purpose of the new unit as opposed to the
10  other --
11  A   It was to combat the effects of gang violence
12  from their poly criminal drug distribution, acts of
13  violence, recruiting, controlling other gang members by
14  use -- use of force or threats of force.
15  Q   Was there -- I'm sorry, I didn't mean to
16  interrupt you.
17  A   And -- and then what it also did, it was to
18  monitor the shootings.  We sort of had a saying that we
19  can't prevent the first shooting, but maybe we could
20  prevent the second one.  And then what we would do is
21  try and determine which gangs are fighting each other,
22  where the retaliation is going to come, and then put
23  gang officers in that neighborhood to try and prevent
24  violence.
25  Q   Was this the unit that was meeting with gang

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

29

1  members and gang leader during his administration and
2  trying to, you know, broker amnesties or trying to -- I
3  thought there were some meetings back in this time with
4  various gangs?
5      MR. GRILL: Hang on. Form, objection. Go
6  ahead.
7      A   Yeah, I -- I don't know about broker and
8  amnesty, I'm not sure what that means. Did we meet with
9  gang leaders and gang members, yes, of course we did.
10     Q   Was there a particular area of the city that
11 this was focusing on, the gang enforcement area?
12 The west side or the south side or was it?
13     A   It was entire citywide.
14     Q   Entire city.
15     A   We had five offices each commanded by a
16 lieutenant. One for every area.
17     Q   And what was the time -- the date range for
18 the -- this when you were assigned to the gang -- the
19 commanding officer of the gang enforcement unit with
20 also I think Officer Schmitz.
21     A   Somewhere around 2009 to 2011.
22     Q   Okay.
23     A   Maybe right around there.
24     Q   And you were the commanding officer,
25 is that right?

---

30

1      A   No, but just of administration and operations.
2      Q   Okay.
3      A   There were five offices that were out in the
4  field and those each were headed by a lieutenant.
5      Q   Okay. And they reported to you?
6      A   They reported to Commander Schmitz.
7      Q   Schmitz. Okay. And after that assignment in
8  2011?
9      A   At that time I was asked to put together a
10 gang intervention program. The idea was put forth by
11 Chuck Wexler, who's the executive director at the Police
12 Executive Research Foundation. Superintendent Weis, Ron
13 Huberman, the CEO of Chicago Public Schools, and
14 presiding Judge of Cook County, Ryan Evans.
15     Q   Okay. How long did you do the gang
16 intervention program?
17     A   Until I retired in 2014.
18     Q   And what was your date of retirement?
19     A   July 18th, I think.
20     Q   Okay. And since your retirement -- well even
21 before you retired, you had started Embassy Security,
22 correct?
23     A   Correct.
24     Q   Okay. And since your retirement then you've
25 been working full time with your company?

---

31

1      A   Yes.
2      Q   Okay. As a -- a police officer and a
3  detective, you were trained in report writing, correct?
4      A   Correct.
5      Q   Okay. And so you were trained that you were
6  supposed to include all the pertinent information that
7  you obtained in an investigation in your reports, right?
8      A   Summary of the investigation, correct.
9      Q   The who -- the who, what, why, when, how that
10 you cover in your investigation?
11     A   Correct.
12     Q   And that's because your reports are going to
13 be used in the criminal --
14     VIDEOGRAPHER: I've lost the witness.
15     COURT REPORTER: Heather, can you hear us?
16     VIDEOGRAPHER: Okay, I'm going to try to send a
17 message.
18     COURT REPORTER: Okay.
19     (OFF THE RECORD)
20     VIDEOGRAPHER: Okay. We're back on the record
21 for the deposition of Kenneth Boudreau. My name is
22 Sheila Jones. Today's date is December 1, 2022.
23 And the time is 11:43 a.m.
24     MS. DONNELL: Actually it's 10:43 here.
25     VIDEOGRAPHER: I apologize. 10:43 a.m. Central

---

32

1  time.
2  BY MS. DONNELL:
3      Q   Okay. I'll just put on the record that before
4  we took a break at some point prior to taking the break,
5  Mister -- the witness's computer turned off and we lost
6  the audio and the video for a second. For that portion
7  of the, we'll just have to refer to the written
8  transcript, but I think we can proceed. Okay. Were you
9  trained as a police officer with respect to your
10 obligations under Brady v. Maryland?
11     A   About turning over everything?
12     Q   Yes.
13     A   Yes.
14     Q   And what were you trained in regard to turning
15 over everything?
16     A   Everything that we generated was to be placed
17 in a permanent retention file.
18     Q   And when you're saying everything you
19 generated, do you mean any handwritten notes you took on
20 the case?
21     A   Any handwritten notes, whether or not they're
22 on a general progress report, a blank piece of paper, a
23 napkin on whatever it may be, any police reports.
24     Q   And just -- just so you know, just make sure I
25 get my whole question out. I know you know where I'm

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

33

1  going often, so just make sure I get my whole question
2  out before you answer. But basically, so the record's
3  clear, you were trained that in the work of as a police
4  officer, you had to turn over all of the investigatory
5  materials you obtained, whether it was a handwritten
6  note, on a GPR, on a piece of paper, or napkin is
7  supposed to go into the investigatory file.
8      A  Yes.
9      Q  Okay. And you were trained that, that was
10 important because it might have exculpatory information
11 for the individual who was charged in a criminal
12 offense?
13         MR. GRILL: Objection. Form, foundation.
14     A  It may have exculpatory and inculpatory
15 information.
16     Q  Okay. Were you trained that you had to turn
17 over leads on alternative suspects that didn't turn out
18 to be the individual charged?
19         MR. GRILL: Objection. Form.
20     A  I -- I don't understand that question.
21     Q  Well, if you were investigating a suspect that
22 didn't ultimately get charged with a criminal offense,
23 did you have to turn over all the information you'd
24 gathered about that alternative suspect?
25         MR. GRILL: Objection. Form.

---

34

1      A  So I -- I guess just so I'm understanding it.
2  So if we had a suspect and we documented that he was a
3  suspect and he didn't get charged, like there could be a
4  number of reasons why he didn't get charged and that's
5  the state's attorney's purview. But if there was
6  another offender, then we would pursue that
7  investigation as well.
8      Q  And would all of that information get put in
9  the investigatory file?
10        MR. GRILL: Objection. Form, foundation.
11     A  It should be, yes.
12     Q  Were there ever times where you'd be
13 investigating a lead, and it didn't pan out so you
14 didn't turn over that -- you didn't put that information
15 in the file?
16        MR. GRILL: Objection. Form.
17     A  No.
18     Q  Okay. So even if you were running down a lead
19 of a potential suspect and it led to a dead end, or
20 there was an alibi, or turned out that person couldn't
21 have committed the crime, if you took steps talking to
22 witnesses or talking to the individual, would all of
23 that information be documented and put in file?
24        MR. GRILL: Form.
25     A  Yes.

---

35

1      Q  Okay. And why was that? Why were you trained
2  to do that?
3      A  Well we were trained to write a summary of our
4  investigation and wherever that investigation took us,
5  that's where it took us.
6      Q  Back in this time frame, the early '90s, so
7  you know, May -- early '90s, '91, '92. At that time,
8  did you carry around a notebook with you to take notes
9  when you were out in the field?
10     A  We carried a blue clipboard with GPRs in it.
11     Q  And were you issued the blue clipboard by the
12 Chicago Police Department?
13     A  I believe we were, yes.
14     Q  And didn't you had GPRs, was it like a pad of
15 pre-printed GPRs?
16     A  Yes. Like a legal pad you could, like that,
17 we could rip them off.
18     Q  Right. And were they the pad with the
19 adhesion at the top or on the side, your GPR pads?
20     A  The ones I recall seeing had some adhesive at
21 the top.
22     Q  Okay. So you'd be like a legal pad, it'd be
23 like a pad of GPS you'd put on your CPD blue issued blue
24 clipboard, and that's what you'd have on the field when
25 you were talking to individuals?

---

36

1      A  Yes.
2      Q  And then once you got back to the area, what
3  would you do with your GPRs that you'd written out in
4  the field?
5      A  They'd be given to the sergeant where he would
6  sign and approve them, and then they would be placed in
7  department retention pile.
8      Q  Okay. Did you ever -- during this time period
9  again, the early '90s, take notes out in the field on
10 like the steno pad or just a legal pad or any other
11 thing that wasn't a GPR -- pre-printed GPR pad on your
12 blue clipboard?
13        MR. GRILL: Foundation.
14     A  Yeah, I'm sure I have. I'm sure I used plain
15 paper.
16     Q  Okay. And then what would you do when you
17 took notes on plain paper, legal pads, or other pieces
18 of the paper?
19     A  We would write at the top of it what the
20 offense classification, put the RD number on it, and
21 sign it on the back, and then the sergeant would also
22 review that and sign that as well.
23     Q  Okay. So I think your testimony is,
24 basically, even if you took your notes on a something
25 other than the official GPR pad, you would treat it like

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

37

1  it was a GPR and date it with the RD number and submit
2  it to the sergeant to get into the file?
3      A   That was my testimony, yes.
4      Q   Okay.  When you were conducting an
5  interrogation of an individual back at the area, did you
6  also take notes in your interrogations?
7          MR. GRILL:  Foundation.
8      A   Sometimes you would take them to
9  contemporaneously, sometimes you wouldn't.
10     Q   Was there a particular practice you had with
11 regard to when you would take notes during an
12 interrogation and when you wouldn't take notes during an
13 interrogation?
14         MR. GRILL:  Foundation and form.
15     A   My practice was that I normally didn't start
16 off taking notes because it usually makes people a
17 little nervous.  And -- and just started off the
18 developing rapport with them.
19     Q   Okay.  If you were conducting an interrogation
20 with John Halloran and did you and John -- would you
21 both take notes or would one of you take notes while the
22 other one didn't take notes?  Like it was an
23 interrogation the two of you were conducting together?
24         MR. GRILL:  Form, foundation.
25     A   Sometimes we may both take notes.  I don't

---

38

1  recall that, but either be one or the other.  If we were
2  taking notes contemporaneously or we would go back out
3  and sit outside, write a down what was said.
4      Q   Back when you became a detective, when you
5  were at Area 3 before your deployment, do you remember
6  learning about running files?
7          MR. GRILL:  Object to form.
8      A   Yeah.  You -- you call it a running for follow
9  to the future.  Attorneys have a lot of different names
10 for it.  They call a street file, running file, but yes.
11 And what that is was when we would turn it over to the
12 sergeant, he would make copies of it, and put it in a
13 file so the detectives coming on shift and see what's
14 going on with that case.  And -- and then it would be
15 passed among each other, so you wouldn't have -- so the
16 integrity of the permanent street file would remain.
17     Q   Okay.  And so I think I understand this from
18 the last time I talked to you is that, back at that
19 time, the running file was essentially a retractable
20 expandable file like I have here, right?
21     A   Pretty much.
22     Q   Something like an accordion file?
23     A   Yep.
24     Q   And the accordion file would have like the RD
25 number and anything else on the outside?

---

39

1      A   Maybe the victim's name.
2      Q   The victim's name.  And then this would be --
3  at Area 3 it was called a running file and in it would
4  have the sup reports and the GPRs as the investigation
5  was proceeding?
6      A   Copies.
7      Q   Sorry.  Thank you.  You said copies of those
8  and that was so that when other detectives would come on
9  shift and they got assigned to follow up on that
10 investigation, they could look at the running file and
11 see what had already been done.
12     A   Yes.
13     Q   And it was a way when you got on, for example,
14 when you got on an investigation and you were assigned
15 to talk to someone, let's say somebody had come in for
16 an interrogation and you were -- hadn't done any work on
17 that case, you could look at the running file and get up
18 to speed on what had happened in the case that - - in
19 the investigation that far?
20     A   Yes.
21     Q   Okay.  And I think you said when you would
22 turn in a GPR, a copy would be made and put in the
23 running file?
24         MR. GRILL:  Objection to form, go ahead.
25     A   I said it would be given to the sergeant and I

---

40

1  don't know if he'd make a copy or he had somebody make a
2  copy of it, but I guess it would be.
3      Q   How about the -- is the same tree for
4  supplementary reports, like once you turned the
5  supplementary report into your sergeant for approval,
6  was it your understanding that a copy of the
7  supplementary report would get put in the running file
8  as well?
9          MR. GRILL:  Objection to form and foundation.
10     A   Yes.  It was an open case and was still being
11 investigated.  If there was no open case then -- then
12 there would be no file for it.
13     Q   Sure.  And we're talk -- let's talk about open
14 cases, so cases that are being investigated.
15     A   Okay.
16     Q   So in those cases, what other documents other
17 than GPRs -- is everything okay?
18         MR. GRILL:  Yeah, the power thing was flashing.
19 I wanted to make sure that it's not --
20         COURT REPORTER:  It's fine, now.
21         MR. GRILL:  That's all.
22         MS. DONNELL:  Okay.  Just let me -- you know
23 what --
24         MR. GRILL:  She says it's fine.  I'm going to
25 say that's okay.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

41

1      MS. DONNELL: Okay. Let me -- let's see if I
2    didn't totally lose my train --
3      MR. GRILL: I didn't mean to throw you off.
4    BY MS. DONNELL:
5      Q   No, no it's okay. It's okay. It's been a
6    long week so. Okay. So I think -- oh I know what I was
7    asking you. I was asking you about supplementary
8    reports. Your understanding was you would turn in your
9    supplementary report to the sergeant for approval,
10   right?
11     A   Correct.
12     Q   And then based on your experience as a
13   homicide detective, it's your experience that a copy of
14   the supplementary report would also get put into the
15   running file?
16     MR. GRILL: Form, foundation. Go ahead.
17     A   Well, if needed, yes.
18     Q   Okay. If it's an open investigation, open
19   homicide?
20     A   If there's other stuff to go in, yes.
21     Q   Okay. What do you mean if there's other stuff
22   to go in?
23     A   Well some cases go cold, so the running files
24   don't exist, and -- and you know forever.
25     Q   Sure. Do you have an understanding back when

---

42

1    you were at Area 3, what would have you to the running
2    file on a homicide that went cold?
3      MR. GRILL: Objection. Foundation.
4      A   No. It'd be up to the sergeant, I guess.
5      Q   So and when you were at Area 3, did the
6    running files get stored in the sergeant's office?
7      A   Yes.
8      Q   And so if you were a detective assigned to
9    work on an open and active homicide, you could go into
10   the sergeant's office and get the running file?
11     A   Usually he'd hand it to you and say this is
12   what you're working.
13     Q   Okay. So if you were given an assignment by
14   the sergeant, he might hand over the running file and
15   say, here I need you to go do this on this
16   investigation.
17     A   Correct.
18     Q   Okay. And then when you would -- you could
19   take the running file out in the field if you're out
20   looking for a witness or a suspect; is that right?
21     A   Correct.
22     Q   And then you -- when you got back from that
23   shift and you were done with your assignment, you would
24   give it back to the sergeant to put back in the office?
25     A   Correct.

---

43

1      Q   Okay. And in Area 3 in the sergeant's office,
2    where were the running files kept?
3      A   In the sergeant's office.
4      Q   I'm sorry. I want to be a little more
5    specific. Where within the sergeant's office were the
6    running files kept?
7      A   On top of the filing cabinet.
8      Q   Were they also in the filing cabinet?
9      A   No.
10     Q   Do you know what was in the filing cabinet?
11     A   No, I don't -- I -- I don't remember. I know
12   there's numerous filing cabinets that had the permanent
13   retention files in them, that was done by the case
14   management. And then you had the summary case files. I
15   mean every police report generated in that area at that
16   time for three police districts, a copy of it was sent
17   to the area. Because we also investigated simple
18   batteries and robberies and stuff like that.
19     Q   And so those reports are also being kept in
20   the sergeant's office?
21     A   Yes.
22     Q   Okay. And those were --
23     A   Well, I don't remember if they were all in the
24   sergeant's office. I think they were in case
25   management.

---

44

1      Q   Okay. You said that the -- I don't know if I
2    heard you correctly, so please correct me if I heard you
3    wrong. Was it your understanding the permanent
4    retention files were also being kept in the sergeant's
5    office at that time in your area?
6      A   No. I think I just stated that they were kept
7    in the case management office.
8      Q   Okay, got it. So as far as you remember back
9    in Area 3 homicide, the running files were kept on top
10   of the filing cabinets in the sergeant's office?
11     A   Yes and sometimes inside or whatever. But it
12   would be in there.
13     Q   Okay. And I don't know if I asked you this,
14   but there wasn't some sort of a formal check in checkout
15   log, if you took a running file. If the sergeant handed
16   it to -- to you to do an assignment, you took it out
17   into the field. There wasn't sort of, you had to log
18   that in any way, correct?
19     A   No. It was -- it was copies of reports.
20   If you took the permanent retention file and you had to
21   log.
22     Q   I see. And were -- were there times when
23   you'd go get the permanent retention file?
24     A   The state's attorney requested it.
25     Q   Okay. And what would you do to get the

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

45

1  permanent retention file? What you'd have to do to get
2  that?
3      A   Go talk to the sergeant, permission to take
4  it, sign it out, then bring it back.
5      Q   Okay.
6      A   It was like a library card in the file with
7  your name on it saying that you have it.
8      Q   How about the inventory for homicide
9  investigations? Did you have any responsibility
10 documenting what went on the inventory sheet?
11     A   In the front of the file?
12     Q   Yes.
13     A   No, that was case management.
14     Q   Okay. And were there ever inventories kept in
15 the running file?
16     A   No, not that I've seen. There could -- they
17 could have been but I don't recall.
18     Q   In terms of the kinds of items that were in
19 the running file back in Area 3, we talked about GPRs
20 and we talked about sup reports. Would there ever be
21 like the medical examiner's report?
22     A   No. Because those normally came way later.
23     Q   How about photographs? Would there ever be
24 Polaroids in there if there were people you were looking
25 for?

---

46

1      A   There -- there might be. Or IR photos you'd
2  have to go down and get them and then put them in a
3  file.
4      Q   Okay. So you could go get the IR photos for
5  someone you were interested in, in the case, and they
6  would make you in the running file?
7      A   Correct.
8      Q   Okay. How about like if you pulled arrest
9  histories of individuals you were investigating, would
10 that kind of arrest reports or criminal history
11 documents be put in the running file?
12     A   They might be.
13     Q   What about evidentiary reports? Do the --
14 those go in the running file? Like crime lab -- like
15 crime laboratory reports? The copies of the crime lab
16 reports go in the running file from time to time?
17     A   Sometimes, sometimes not. Because those are
18 mailed to the office through the police mail and
19 depending on who got it, did they put it right in a
20 permanent retention file and inventory it, or did they
21 make a copy and put it in the file.
22     Q   Meaning the running file?
23     A   The running file, yeah.
24     Q   So I guess is it -- I'm just trying to
25 understand. Is it your testimony that when the crime

---

47

1  lab produced reports for particular RD number and they
2  came back to the area, they would get put in the
3  permanent retention file for that homicide file;
4  Is that right?
5      A   Correct.
6      Q   And then they may or may not have -- those
7  crime laboratory reports to may or may not get into the
8  running file?
9      A   Correct.
10     Q   Okay. I'm pretty sure I already asked you
11 this so I'm so sorry, I apologize. But do you have any
12 personal knowledge of what would happen to the running
13 file once an investigation had been completed, meaning
14 it was somebody had been charged and it was moving on to
15 the next stage?
16     A   No.
17     Q   Okay. If there was a lineup conducted in the
18 context of a homicide investigation, would the line
19 report make it into the running file -- a copy of the
20 lineup report make into the running file?
21     A   Well, possibly yes.
22     Q   How about if you took an individual for a
23 polygraph examination and the -- there was a polygraph
24 examination conducted in the context of a homicide
25 investigation, and you received back the results of the

---

48

1  polygraph examination? What would happen in that
2  instance? Where would those reports go?
3      A   Again, those would -- the typed ones would be
4  sent to the office and should have been placed in
5  the permanent retention file.
6      Q   Would those -- copies of those -- the -- the
7  typed up polygraph examiner report, like that final
8  report, that one sheet, would those sometimes make it
9  into the running file too?
10     A   I'm sure they did.
11     Q   Okay. Thank you. Okay, so back in the same
12 time period, the early 1990s when you were at Area 3,
13 how would you -- would -- how were you assigned to a
14 homicide investigation, did the sergeant assign you to
15 work on it?
16     A   Yes.
17     Q   Okay. And in terms of when there was an
18 initial homicide -- and there was going to be someone
19 assigned to be the scene detective, did the sergeant
20 determine who would be assigned to the scene?
21     A   Yes.
22     Q   Okay. And if you -- if your sergeant assigned
23 you to be the one to go out to process the scene of a
24 homicide, did that become sort of your case?
25         MR. GRILL: Objection. Form.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

49

1    A    That's not my understanding.  The case
2    belonged to the Chicago Police Department.  There's no
3    lead detectives or primary detectives on any case.
4    Anybody could come in and work a case.
5         Q    Okay.
6         A    If the sergeant assigns them.
7         Q    Okay, fair enough.  So if you're assigned as
8    the scene detective, that doesn't necessarily mean
9    you're going to be the one that is going to be
10   responsible for it.  You-all at the area were
11   responsible for all the homicides, and the sergeant
12   would assign you to either be at the scene or do follow
13   up or whatever it was needed.
14        MR. GRILL: Form.
15        A    Well he would assign you to the scene and if
16   you're on the scene, and as you're conducting your scene
17   investigation and interviewing witnesses, and it leads
18   to a suspect, then you would pursue that suspect.  Yes.
19        Q    Okay.  When you were assigned by your sergeant
20   to conduct follow up investigation on a work -- on
21   a -- on a homicide, when you were not the scene
22   detective, what was your practice in terms of becoming
23   knowledgeable about the homicide and the investigation?
24        MR. GRILL:  Objection.  Form.
25        A    We review the running file if it, if there is

50

1    one or if it's an old case then some information came
2    in, we'd go review the retention file.
3         Q    So if you -- again, for a case where you
4    weren't the scene detective and if your sergeant said,
5    hey, I need you to do this follow up investigation work,
6    go find this witness, so find the suspect, or go run
7    down this lead.  It was your practice to familiarize
8    yourself with the homicide and the investigation by
9    looking at the running file or perhaps the permanent
10   retention file;  is that what you said?
11        MR. GRILL:  Form and foundation.
12        Mischaracterizes his testimony.  Go ahead.
13        A    I guess, but there'd also be times where you'd
14   be conducting an unrelated investigation, and you'd get
15   some information about a murder.  Then, you'd have to go
16   get the file to see if he's telling you the truth.
17        Q    Understood.  Okay.  Is it -- as a homicide
18   detective, -- when you were doing follow up
19   investigation, did you -- was it your practice, though,
20   to familiarize yourself with the nature of the homicide
21   you're investigating?  In other words, like who the
22   victim was, what was the date of the murder, the cause
23   of death, that kind of information before you would
24   conduct a follow-up investigation?
25        A    Yeah.

51

1         Q    And why was that important to you to have some
2    of that basic information about what had happened in
3    terms of the crime before you did any further
4    investigation?
5         A    So when you're out there interviewing people,
6    you have an idea if they're telling you the truth.
7         Q    That way if there was sort of physical
8    evidence that had been collected, let's say like you
9    knew that this was a homicide that was caused by gun
10   versus stabbing.  Somebody's telling you, yeah, I
11   stabbed the person, you know, the person was shot, you
12   know, this person obviously isn't telling you the truth
13   about what happened?
14        A    Correct.
15        Q    Okay.  And the same is true, if somebody tells
16   you something that -- that they had a particular type of
17   weapon, and they used it, and that matches with the gun
18   or the bullets that were used for that murder, then that
19   might be corroborating evidence that this suspect has
20   information about this murder?
21        A    Could be.
22        Q    Okay.  Back in this time frame, you know, the
23   early '90s, is it fair to say that was a time in which
24   the homicide rate was quite high in the city of Chicago,
25   vis-a-vis other years?

52

1         A    In the 1990s?
2         Q    Yeah.  Early 1990s.
3         A    Yes, there was -- it was very high.  Yeah.
4    Shootings and murders every day.
5         Q    Yeah.  And in fact, it was at a rate -- I
6    don't think we ever got back to a rate similar to that
7    until in very recent times, I think; Is that right?
8         A    Correct.
9         Q    But fair to say, it was a fairly,
10   the time -- that time in the city, it was experiencing
11   very high homicide rate?
12        A    Yeah, I think over 900, yes.
13        Q    Yeah, it was -- yes, I think it was.  It was
14   over 900.  And so as a homicide detective at that point
15   and where you were assigned in the city, it was a busy
16   area?
17        A    Yes.
18        Q    Do you know in like 1990, 1991, how many
19   homicides you were working on in any given month, do you
20   know what kind of?
21        A    I would say every day you came into work you
22   may be working on one or four.
23        Q    Yeah.
24        A    And at that time we had a huge problem with
25   gang violence, and that would erupt into multiple

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

53

1  shootings. So you may told, okay, the Black Stone shot
2  a GD and now we've got 17 Black Stone's shot go out and
3  try to find some information.
4      Q   And the Area 3 that you were assigned to at
5  that time, what were the -- were there -- well can you
6  identify the primary gang -- gangs that were -- were in
7  that area of the city at that time?
8      A   Well, Area 3 encompassed three police
9  districts at that time, the 7th, 8th, and the 9th.
10  If you'd start with the -- I'll start with the 9th
11  District.
12      Q   And I'm sorry you -- I don't think I said
13  this earlier, but sorry to interrupt you. But you had
14  been assigned to the gang unit in the 9th District
15  prior to --
16      A   No, I was not.
17      Q   You're not?
18      A   A tactical unit officer.
19      Q   I'm sorry. Tactical, but that was out of the
20  9th.
21      A   Yes.
22      Q   Okay.
23      I was a patrolman there as well.
24      Q   Okay. Sorry. So the 9th you were quite
25  familiar with when prior to becoming a detective from

54

1  being in a tactical unit and also on patrol?
2      A   Yes.
3      Q   Okay, so go ahead.
4      A   And then you got to be quite familiar with the
5  gangs that bordered your district, like the borderline
6  between the 7th and the 9th District was McGuffey
7  Boulevard.
8      Q   So let's start with that. I had -- I'm sorry
9  I interrupted you, but -- about your history. But back
10  when you were Area 3, you were describing for me the
11  gangs that were primarily operating in the geographic
12  region and you were going to do it by district,
13  by police district. I think starting with the 9th.
14      A   I do. Okay.
15      Q   Yeah.
16      A   So I'll start with the 9th Districts.
17      Q   Okay.
18      A   The area along like 40th and Princeton,
19  43rd and Princeton in that area was Mickey Cobras.
20  Area around 31st and Hollister was Saint Disciples.
21  Area 33rd and Morgan was Latin Kings. When you moved
22  south to 43rd Street from 43rd and 42nd, Ashland to
23  Damen, you had the Latin Saints. From 47th to
24  approximately 49th west of -- east of Ashland, you had
25  the La Raza. You had a small pocket of Latin Kings on

55

1  50th Street. And then from there you had some Mickey
2  Cobras at the west end -- of east end of the district
3  around 54th and Princeton. And as you went east or
4  west, you started to get into the Black Stone street
5  gang territory. And at that time, the street gang, the
6  Black Stone Street gang was divided into a couple of
7  factions. There were some Jet Black Stones over there.
8  And then you had Motown, which at that time was led by
9  Jeff Fort's (phonetic) son Watkeeta (Inaudible) Fort on
10  the west side of the park. East side of the park, that
11  was controlled by Bernard Gales, who was known as G
12  Rock. Around 50th and Loomis, that was controlled by a
13  general over there. The (Inaudible) by G Vooge was
14  Dexter Bell.
15      Q   I'm sorry. G Rude?
16      A   G Vooge.
17      Q   G Vooge. And that was Dexter Bell?
18      A   Yep.
19      Q   Okay.
20      A   And then when you got over by 52nd and
21  Marshfield, there was another faction of Stones that was
22  controlled by Baldy who was -- whose real name was
23  Charles Barron. And then over around -- around 54th
24  Street and Marshfield, there was a guy named Fat Fred. I
25  don't remember his name -- real name. As you continued

56

1  west around 54th and Winchester, you had some more
2  Gangster Disciplines. More Vice Lords around 51st and
3  Winchester, you had some Gangster Disciples. And then
4  as you proceeded to go west into the district, you'd run
5  into some spots of Latin Kings and Saint Disciples. And
6  then if you went over to 7th District on 55th Street,
7  that was primarily all gangs of Disciple, except for the
8  Ebony Vice Lords, which is around 57th and Moine, if I
9  remember correctly. And then as you got east in the
10  district, Inglewood you had the Black Disciple street
11  gang.
12      Q   Okay, thank you.
13      A   And then the 8th District, we have much
14  violence in the 8th District, so we had a gang presence
15  there but not a lot violence.
16      Q   That good.
17      A   That's about as much as my brain has right
18  now.
19      Q   That's nice. That's good. Okay. Back when
20  you were assigned as a homicide detective to Area 3, did
21  you keep any sort of gang files?
22      A   No.
23      Q   Okay. Did you have access to like the 9th
24  District gang units files that they had on the gangs if
25  you needed the information?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

57

1    A   Some districts would maintain a gang book,
2  put photographs of people of known street gangs.  And
3  then we had mugshot files in the office when we would
4  bring a victim in to look at mugshots.  If you're a
5  robbery victim, we'd ask you to come and sit down and
6  look at books and books of mugshots, see if you can
7  identify anybody.  But no -- we didn't, I didn't have
8  any personal gang maps or gang stuff like that.
9       We other units in the police department that was their
10  job to --
11    Q   That was the gang -- yeah, I've heard somebody
12  from the gang units that they had gang synopsis that
13  they would write up that would, you know, on gang
14  activity in a particular area or particular month.
15  But did you have access to those kinds of reports?
16    A   If I asked for it, I would probably get it,
17  yes.
18    Q   Okay.  And did you work closely, let's say
19  with the 9th District's gang unit?
20    A   We worked very closely with the districts,
21  especially if we had information about a shooting and we
22  looking at who's, you know, who's Jo Jo.  We'd call them
23  up and ask them.
24    Q   Yeah.  I was going to say, did they keep
25  things like nickname files, like a card -- a -- a file

---

58

1  of nicknames to track what person had what street name?
2    A   I don't know if they did, but maybe they did.
3    Q   But for your purposes you could call up one of
4  the gang officers in like the 9th District or the 7th
5  District and say, "Hey, who goes by the name of Jo Jo,"
6  or, "Who goes by the street name," of whatever?
7    A   Yeah, if we didn't know, because we weren't
8  familiar with it.
9    Q   Okay.
10       MR. GRILL:  Heather, can we take a one minute
11  break.
12       MS. DONNELL:  Yes, totally.  Let's go off the
13  record.  Actually let's take a ten --
14       THE WITNESS:  Can we make it a ten minute
15  break?  I could pee and have a cigarette?
16       MS. DONNELL:  Yes, of course.
17       THE WITNESS:  Thank you.
18       VIDEOGRAPHER:  Okay.  Going off the record.
19  11:15 a.m.
20       (OFF THE RECORD)
21       VIDEOGRAPHER:  We're back on the record for the
22  of Kenneth Boudreau.  My name is Sheila Jones.
23  Today's date is December 1, 2022 and the current
24  time is 11:30 a.m.
25  BY MS. DONNELL:

---

59

1    Q   Okay.  Yeah.  So I think where we left off,
2  you were talking about you identifying some of the gangs
3  that worked in the -- that were present in the early
4  '90s in the areas that you worked in, in Area 3, right?
5    A   Correct.
6    Q   Okay.  And at that time, based on your
7  testimony and other cases I viewed, you -- you had
8  relationship with various gang leaders of some of those
9  gangs that you would talk to in the course of your
10  investigations, right?
11    A   Yes.
12    Q   Okay.  Were there particular gangs that you
13  just identified that you had better relationships with
14  than others or had you developed relationships with all
15  of those gangs to assist in your investigations?
16    A   No, I probably had a better relationship with
17  the gangs in the 9th District.  In particular, the Black
18  P Stones street gang.
19    Q   Okay.
20    A   And Mickey Cobra's over there because as I
21  testified earlier, I was also patrolling there.
22  So I'd drive around the streets, I'd see them every day.
23  And when I was a tach officer, the same thing.
24    Q   Okay.  And how about just the regular Black
25  Stones as opposed to the Black P Stones, you said you

---

60

1  had maybe a closer connection with various leaders in
2  the Black P Stones?
3       MR. GRILL:  Hang on.  Form, foundation.
4    A   No, I -- I won't say closer relationship.
5  If -- if there was violence starting to kick off, I mean
6  we'd go to the leader like Watkeeta and say, hey, knock
7  it off, you know.
8    Q   But Watkeeta was someone who you had frequent
9  or relatively frequent communications with.  Is that
10  right?
11       MR. GRILL:  Foundation, form.
12    A   If -- if I was out on the street, and I
13  stopped, and I saw him, I talked to him.
14    Q   Okay.  Was Watkeeta the one that you had an
15  arrest with at one time that he broke his finger?  Was
16  that Watkeeta?
17    A   No, Bernard Gales --
18    Q   That was Bernard Gales.  Okay.  Bernard Gales
19  was another individual that you would have
20  communications with from time to time?
21    A   Yes.
22    Q   Okay.
23    A   Among others, I mean.
24    Q   Yeah.
25    A   That's -- yeah.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

61

1    Q   And if you were investigating a homicide that
2  you believed had -- was gang related, would you reach
3  out to various leaders of those gangs or rival gangs to
4  try and investigate who might have done it?
5    A   I'd reach out to their leaders. But they were
6  never forthcoming. They weren't going to turn in your
7  own people. They -- they may -- we just told them, "You
8  got to stop the shooting or your build operations are
9  all going to get shut down."
10   Q   Yeah. So you would talk to them in terms of
11 like their business interests being implicated by the
12 violence and if they wanted to continue the -- the
13 narcotics operation, the --
14   A   I don't why -- I didn't give permission to
15 continue to their narcotics operation. I told them that
16 if the violence doesn't stop, the city's going to
17 respond. It's not going to be me. Because I don't
18 enforce narcotics as a detective. That they'd probably
19 better off to stop. I mean -- I mean I even went to
20 Watkeeta on other things that were -- a number of gang
21 members, and asked them about what happened, and it
22 wasn't a gang murder. It was a young woman standing on
23 her porch during the Bulls riots, Rosalyn Slaughter and
24 was holding her baby and takes a bullet right to the
25 head and hands her baby to her friend and drops dead.

62

1  And there was -- tried to tell them that that's wrong.
2  You know, this isn't the gang on gang where you shoot
3  each other all the time, shoot at each other all the
4  time. It's a big game to you guys. This is something
5  else.
6    Q   So how about -- I'm going to bring you to the
7  time frame of when you got back from your deployment,
8  which I think you said was either May or June 1991, that
9  time frame.
10   A   Correct.
11   Q   And you went back to Area 3, and I think you
12 testified earlier today that you went back on rotation
13 sort of getting re-familiarized because you'd only been
14 a detective in homicide for about a month prior to
15 deployment. Did I get that right?
16   A   Yeah, approximately. Yeah. Because when --
17 when I got back and -- and prior to me going, we had a
18 thing called active duty for special work. So they put
19 me on orders for four or five days and then I'd be off,
20 and then I'd come back to work for a few days, and they
21 may put me back on orders again, because we had all our
22 equipment being shipped back from the Persian Gulf and
23 somebody's got to be there to inspect it, catalog it,
24 and put it back to where it's supposed to be.
25   Q   Got it. But sort of -- so just putting, I'm

63

1  orienting you to the time of May, June 1991 when you got
2  back. Since you were gone for some period of time, it's
3  probably fair to say you didn't have a familiarity of
4  what was going on in terms of like gang rivalry or gang
5  issues in the city. Because you've been gone for
6  several months overseas, right?
7    A   Yeah, but unfortunately our gangs here are
8  generational. And the same gangs that existed 25 years
9  ago and the same conflicts and just the same.
10   Q   So when you got back from your deployment,
11 and you went back to Area 3. Do you have a memory of at
12 that time, were there any particular, I don't know what
13 the term is best to use wars, feuds, beefs between
14 particular gangs in the area, in the Area 3, anything
15 specific?
16   A   Yeah. No, the La Rama were at more with the
17 Saints. The GDs were at were with the Black P Stones.
18 Every once in a while the Vice Lords would bump up and
19 because they're a small portion. And back then it
20 would, violence would usually erupt over narcotic sales.
21   Q   And when you're saying these factions,
22 the La Rama versus the Saints or the GDs versus the
23 Black P Stones, those you're saying were sort of the
24 generational conflicts that sort of were ongoing,
25 nothing that sort of persisted over time -- nothing

64

1  specific as to May or June 1991?
2    A   No, they -- they -- they persisted before I
3  got there in 1986 as a patrolman and they persist --
4  they persisted the same.
5    Q   Okay. So other than the sort of --
6    A   There was a difference, though. I mean
7  traditionally we had, depending on what number you want
8  to count, 52 or 68 traditional street gangs that had a
9  very limited, very structured organization. And now
10 today I think there are over 3,000 different gang
11 factions in the city.
12   Q   And is that, because at some time, I think in
13 the late or mid to late '90s, several of the high
14 ranking leaders in the GDs and other street gangs got
15 imprisoned for a long time. And so it sort of diffused
16 and decentralized. Is that your understanding?
17   A   No, to me it wasn't immediate, was it's --
18 it's more or less this generation, they don't want to
19 listen to anybody. I had a conversation with some gang
20 leaders and they told me that these kids don't want to
21 listen to anybody, they don't listen to their parents,
22 they don't listen to us. So they're all about money.
23 That's why you have black on black violence.
24   Q   So it's just decentralized and diffuse.
25 Also, technology has changed with cell phones and all

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

65

1 sorts of other things.
2  A Social media is a big problem.
3  Q Yeah. So okay, let's get back to the
4 May 1991.
5  A Okay.
6  Q Okay. So during that time frame there wasn't
7 anything -- when you got back from your deployment, you
8 went back to Area 3, there wasn't any specific war or
9 feud that you recall other than the big general one that
10 had been persisting ever since you were in patrol; is
11 that fair?
12  A Yeah, it was ongoing. Yeah. That's --
13  Q Okay. So I want to talk now about -- well, my
14 client Arnold Day. Do you know Arnold Day?
15  A Uh-huh.
16  Q Is that a yes?
17  A Yes.
18  Q Okay. And so when do you first recall coming
19 to meet or learn or know about Arnold Day?
20  A You know, I -- I -- I can't remember when I
21 first ran into Arnold Day. I don't even know if any
22 those 15 or 17 juvenile arrests had, if I was a
23 participant in any of those arrests. I just knew who he
24 was as a member of the gang, along with a number of
25 other ones like Little Gang Sammy Knox, the Twins Favlon

---

66

1 and Faylon Witherspoon, Oath the Eagle. I mean, you
2 just knew who these guys were because they -- you know,
3 the citizens that lived -- they're, to me, they were
4 sort of held hostage in their neighborhood. Lot of good
5 people in the neighborhood 1 percent of the -- the gang
6 members terrorized everybody. So you got the idea of
7 who they were and at that time they liked to congregate
8 on street corners and then we would pull up and tell
9 them go stand in front of your own house. So that's how
10 I got to know Arnold Day, and I got to know him a little
11 bit better later on.
12  Q Okay. But so, and I -- again, just to the
13 best of your recollection, do you remember when you
14 first came to know Arnold Day, were you a patrol
15 officer?
16  A I could have been. I just -- I just, I can't
17 remember right now. I mean, if I looked at all his
18 paperwork, I'd probably give you more of a definitive
19 answer. We'll see if I'm on any of his 15 or 17
20 juvenile arrests, or the eight adult arrests, I -- I'm
21 not sure.
22  Q Okay. So let's do this before, or, you know,
23 just as you -- the best of your recollection, when you
24 first came to know Arnold Day, do you recall how old he
25 was? He was a teenager?

---

67

1  A Most of them were young teenagers, yes.
2  Q Do you think you knew him or first came to
3 know him, like approximately how -- what age do you
4 recall him being, if you remember?
5  A I -- I -- I don't remember. I don't want to
6 misspeak.
7  Q And do you have a memory of speaking to him
8 sometime out on the street sometime before you know,
9 your deployment in 1990?
10  A I don't have any specific memory of it.
11 I mean, I reviewed his testimony. He said he to me and
12 he talked to me before, but I -- I don't have any
13 recollection.
14  Q And I know you re-read your testimony, so in
15 your testimony you said you knew who he was prior to,
16 you know, the Erving and Garcia homicide, right?
17  A Yeah.
18  Q And, but I guess what I'm trying to ask you
19 now is if you have any specific memories of interactions
20 with Mr. Day prior to your interaction with him in the
21 Erving and Garcia homicide?
22  A No.
23  Q You just know that you knew who he was?
24  A Correct.
25  Q And were there certain geographic areas that

---

68

1 you associated seeing him in?
2  A 53rd and Aberdeen.
3  Q Anywhere else?
4  A Well, 51st and Racine. 1215 West 51st Street
5 was a gang hangout. There was a pool wall across the
6 street.
7  Q I'm sorry, what was the address you said?
8  A 1215 West 51st Street.
9  Q Okay. And that was a home that was considered
10 a gang hangout?
11  A A lot of gang members would hang in front of
12 it. There was also a -- right. It's right like to the
13 Garcia homicide.
14  Q And there was also the pool hall?
15  A And there's a pool hall across the street.
16  Q Okay. And then anywhere else? And what about
17 53rd and Aberdeen, what was there?
18  A That was actually where Bernard Gales lived
19 and I knew that area well and the gang members knew that
20 because that's where I grew up. I grew up at 5240 South
21 Main Street.
22  Q So you had lived at that area as a child?
23  A Uh-huh.
24  Q Is that a yes?
25  A Yes.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

69

1    Q   So you knew the area well.  Where -- where did
2   you go to high school?
3    A   Back when I was -- I went to Stag High School
4   at Palos Hills.
5    Q   Oh you did, okay.
6    A   But back then I was going to St. Basil, which
7   was at 55th and Wood and then Sherman School, which is
8   at 52nd and Morgan.
9    Q   Okay.  And then you moved out to Palos Hills?
10    A   Uh-huh.
11    Q   Yes?
12    A   Yes.  I moved to 63rd and Lockwood.
13    Q   Got it.  Okay.  So Bernard Gale's home was at
14   53rd and Aberdeen.
15    A   That was, yeah, his home spot.
16    Q   Okay.  And then 51st and Racine was 1215 West
17   51st was the sort of a hangout and that's where Garcia
18   homicide occurred near and then there was also a pool
19   hall there.  Anywhere else that you associate with
20   seeing Arnold Day?
21    A   No, I mean he could have been anywhere in that
22   area.  It's a Black Stone area.
23    Q   Okay.
24    A   And -- and when I say I don't have independent
25   memory of him being at 53rd and Aberdeen, I just know

70

1   those would be the areas that even when I went looking
2   for him, that's where you would normally find other gang
3   members.
4    Q   So it's fair to say -- I think what you're
5   saying is there were certain areas that you associated
6   with the Black P Stones, but you don't have a specific
7   recollection of ever seeing Arnold Day in any of those
8   particular locations?
9    A   No.
10    Q   Is that right?
11    A   Yeah, no, I don't have any specific
12   recollection.
13    Q   Okay.  There's testimony in your deposition in
14   the Jakes case that Russell took about you having a
15   conversation with Bernard Gales about Arnold Day.
16   Do you remember that testimony?
17    A   I do.
18    Q   Okay.  When did that conversation with
19   Mr. Gales occur, to the best of your recollection?
20    A   I -- I don't know.  I was trying to figure
21   that out last night.  Bernard was actually locked up
22   inside the penitentiary.
23    Q   So when you had this conversation, he was
24   actually in prison?
25    A   Yes.

71

1    Q   At IDOC?
2    Q   At IDOC and I ridded him out.
3    Q   You ridded him out?
4    A   I did.
5    Q   Why did you rid Bernard Gales out?
6    A   Because he contacted me and said that there
7   was an internal gang warrant that may kick off within
8   the Black Stone Street gang.  It was primarily being
9   driven by G-Nate or Nathaniel Anderson.
10    Q   I'm so sorry.  Keep going.
11    A   Yeah.
12    Q   Okay.  So had Gale's had made contact with you
13   from inside IDOC to let you know about this internal
14   gang war going on that was going to kick off within the
15   Black P Stones related to G-Nate, is that right?
16    A   Yes.
17    Q   And then oh, sorry.  Before you go on.
18    A   I want to finish.
19    Q   Sure, you can finish.  Go ahead.
20    A   And that, he was in fear for his family's life
21   since he was a general and he was locked up.
22    Q   And he was specifically in fear for his
23   brother Michael Gales or --
24    A   I don't know which -- which family -- I can't
25   recall which family member.

72

1    Q   Okay.  But just stepping back and you
2   can -- I'm going to let you finish your answer if
3   there's more to say.  But what I wanted to ask is:
4   How did Bernard Gales get in touch with you from inside
5   IDOC?
6    A   I -- you know, I don't remember exactly.
7   He could have called the office.  I mean they do have
8   phone privileges.  He could have.
9    Q   But were you on -- was the Area 3 on his call
10   list?  Like could you receive calls from --
11    A   I --
12    Q   Just one second.  Did you receive calls from
13   Bernard Gales from IDOC directly to Area 3?
14    A   I don't know.  I -- I can't remember how he
15   reached out to me.  I just know it culminated with him
16   being ridded out of the penitentiary.
17    Q   Okay.  But I guess what I -- do you have any
18   memory of ever speaking to Bernard Gales on the phone
19   when he was in custody in IDOC?
20    A   No.
21    Q   You just know that you learned of this somehow
22   and then you ridded him back to the county?
23    A   Right.
24    Q   Okay.  And then did you speak to him at the
25   county jail?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

73

1    A   I picked him up at the county jail, and I
2  brought him to 39th and California, and I spoke to him
3  there.
4    Q   And in terms of timing, was this before your
5  deployment?
6    A   It -- no, I -- it's only the -- no, because I
7  made Detective July 14, 1990. I came out of the academy
8  in August 14, 1990. That September -- not even a month
9  later I was gone, so this was after I came back.
10   Q   Okay. So sometime after May or June 1991?
11   A   Uh-huh.
12   Q   Yes?
13   A   Yes.
14   Q   I'm so sorry I have to keep --
15   A   No, it's okay.
16   Q   No problem. Okay, so you -- and then tell me
17  about the conversation. So you brought him over to Area
18  3 and was -- was it a conversation you had with John
19  Halloran or anybody else present other than you and
20  Bernard Gales?
21   A   I -- I don't recall. I don't -- I don't
22  remember.
23   Q   All right. What do you remember of the
24  conversation you had with Bernard Gales?
25   A   Just that he was telling me about G-Nate,

74

1  Nathaniel Anderson and Arnold Day were brought in Round
2  Robin dope dealers. And then I was fearful at that time
3  that Bernard was probably going to have them shot and
4  killed him. And lo and behold, Nathaniel Anderson was
5  shot and killed, I think it was determined suicide, but.
6    Q   When you had this conversation with Bernard
7  Gales, did he -- he was telling you that there was going
8  to be a potential war or a feud that was going to -- an
9  internal gang war that was going to happen because
10  according to your testimony, according to Mr. Gales,
11  G-Nate and Arnold Day were robbing dope dealers?
12   A   Uh-huh.
13   Q   Is that a yes?
14   A   Dope spots, yes.
15   Q   And was there anybody else mentioned or just
16  these two?
17   A   I only recall those two.
18   Q   Okay. And -- and had -- did Bernard Gales
19  identify for you who was being robbed? Like was it
20  his -- your understanding that the gang was being
21  robbed?
22       MR. GRILL: Objection. Form.
23   Q   Who was being robbed?
24   A   No, he did identify anybody specifically just
25  said that they were robbing dope spots.

75

1    Q   But why was that going to result in an
2  internal gang war, to your understanding? What did
3  Mr. Gales say?
4    A   Well, you're asking me why I understood that,
5  what that meant to me. Well I knew back then at the
6  time, most of our violence was driven over narcotic
7  sales. And if you go rob a dope spot, there's probably
8  going to be retaliation. It -- it -- to someone because
9  it's their money or their work. And that's what we were
10  trying to prevent violence from erupting.
11   Q   Okay. What did you do -- well first of all,
12  did you document this conversation with Mr. Gales?
13   A   No.
14   Q   You never wrote up a report?
15   A   Nope.
16   Q   Why not?
17   A   I considered him at that time giving me
18  information, an informant that wouldn't go on a police
19  report.
20   Q   Why wouldn't it go on a police report if
21  you're considering him an informant?
22   A   Because the only reports I had to was a
23  supplemental report, which I'd have to put an RD number
24  on it and obtain an RD number on it. There could have
25  been an information report generated and I may have done

76

1  that. And that doesn't have any RD number on it. Just
2  information that would be shared, among everybody,
3  understand.
4    Q   When you're saying an information report,
5  you have to define -- help me understand what that
6  means. What's an information number?
7    A   Just an information report.
8    Q   Like a to-from memo?
9    A   No.
10   Q   Okay.
11   A   It was actually a form.
12   Q   It was a form?
13   A   Yep.
14   Q   It was an official form that was just called
15  an information report?
16   A   Right.
17   Q   And if you talked to somebody and they were
18  giving you information like a confidential informant but
19  didn't go to any particular RD number, you could fill
20  out an information report?
21   A   Yeah. But a lot of the stuff that -- we
22  received a lot of information on the street, we just
23  sort of kept in your head.
24   Q   Okay.
25   A   What was going on in the neighborhood, some of

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

**77**

1 it wasn't actionable. You couldn't go out and arrest
2 anybody based upon what you knew. You were just trying
3 to understand relationships and, you know, who's
4 adversarial to each other, and who's running this dope
5 spot, who's running that dope spot.
6    Q   What did you do with the information that
7 Bernard Gales gave you on that day that you ridded him
8 out and talked to him at Area 3 about this potential
9 internal war for the Black P Stones starting related to
10 G-Nate and Arnold Day, robbing dope spots. What did you
11 do to follow up on that information, if anything?
12    A   I -- I don't recall specifically what I did.
13 I -- I can't even guess what I did. I'm sure I did
14 something, but right now, I just don't know what it is.
15    Q   Okay. Did you tell any other detectives that
16 you worked with who were also concerned about violence
17 in this area that there was this possibility of an
18 internal violence erupting because of this?
19    A   I'm sure I did. I just don't remember who
20 that is.
21    Q   Okay. But you're sure you did because that
22 would've been important information you'd want to share
23 in the area because you thought there'd be potential
24 violence?
25    A   Yeah, I might even shared it with the 9th

---

**78**

1 District, yes.
2    Q   Okay. And I guess, why would you not have
3 wanted to document in a written report? Because say for
4 example, a week later, a month later, there's a, you
5 know, a string of homicides that are connected to this
6 internal, you know, feud. Wouldn't you have wanted to
7 document that conversation with Bernard Gales?
8    A   It depends if it was relevant to that homicide
9 -- what there would be a -- there would be a police
10 report number. I'd probably type up a report. If it's
11 specific to that homicide. This wasn't specific to
12 anything. It was just talk on the street. I don't even
13 know if Bernard knew specifically who was getting
14 robbed, it was just what was going on.
15    Q   Did you ask Bernard how he had gotten that
16 information? Because obviously, you know he was an IDOC
17 so he didn't observe any of this or see any of this.
18 Did you ask Bernard how he had gotten this information
19 so he could follow up with those individuals?
20    A   No, I didn't.
21    Q   Why not?
22    A   He was a general in the Black Stones.
23 I'm sure he, you know, just like your client Arnold Day,
24 I think back then he was the institutional coordinator
25 for the penitentiary, which means he was in charge of

---

**79**

1 the Black Stone street gang while in the penitentiary,
2 just like your client was.
3    Q   I'm so sorry. You're saying -- just so I'm
4 getting your testimony. But you're saying your
5 understanding at that time was Bernard Gales was in
6 charge of the Black P Stones inside the penitentiary.
7 Is that right?
8    A   Where -- where his facility.
9    Q   Where his facility. Wherever -- do you know
10 where he was at, at that time?
11    A   No.
12    Q   Was it Stateville?
13    A   I don't remember.
14    Q   Okay. But I think your testimony is that my
15 client was also in that role. Is that what your
16 testimony is?
17    A   Up until his release, yes.
18    Q   Okay. How do you - what are you basing that
19 testimony on?
20    A   Just some information that I received.
21    Q   From who?
22    A   You know, I cannot remember who exactly told
23 me that. I think it was Mark Delia. He's passed away
24 now.
25    Q   When did Mark Delia -- did he have a street

---

**80**

1 name, Mark Delia? Was he a general too?
2    A   No he was a chief of investigations and
3 intelligence for Illinois Department of Corrections, but
4 he's deceased now.
5    Q   Okay. Mark Delia, he --
6    A   Yeah.
7    Q   -- was chief of investigations inside of IDOC,
8 correct?
9    A   Chief of investigations and intelligence for
10 all of IDOC.
11    Q   Okay. Sorry, let's go off the record.
12 I think we just lost --
13        (OFF THE RECORD)
14        VIDEOGRAPHER: Okay. We are back on the record
15 for the deposition of Kenneth Boudreau. My name is
16 Sheila Jones. Today's date is December 1, 2022.
17 The current time is 12:52 p.m. You may continue.
18 BY MS. DONNELL:
19    Q   Okay. Before we took a lunch break, we were
20 talking about information that you had received from
21 Mark --
22    A   Delia.
23    Q   Please spell that? Mark Delia?
24    A   D-E-L-I-A.
25    A   D-E-L-I-A.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

81

1    A   Yeah.

2    Q   Regarding Mr. Day.

3    A   Correct.

4    Q   And I believe you were testifying that

5 Mr. Delia, who was the head of intelligence over IDOC,

6 had indicated to you that Mr. Day was in a leadership

7 position within his facility at IDOC.

8    A   For the , right.

9    Q   For the Black Stones, okay.  When did you get

10 that information from Mr. Delia?

11    A   I don't know, a few years ago.

12    Q   Meaning recent past?

13    A   Pardon?

14    Q   Meaning in the very recent past?

15    A   Yes, yeah.  Mark died last year.

16    Q   Okay.

17    A   And retired, I think, six months or eight

18 months before that.

19    Q   And was this an in-person conversation or a --

20    A   Yes, we worked together.

21    Q   He -- does he work for you?

22    A   He did.

23    Q   I see.  So when he was working for -- in IDOC,

24 he was part-time working for you for Embassy Security?

25    A   Yes.

---

82

1    Q   Okay.  And so how did this conversation come

2 about, this in-person conversation come about with

3 Mr. Delia about Arnold Day?

4    A   I'm sure I brought it up to him.

5    Q   And so you asked him, does he have any

6 intelligence on Arnold Day?

7    A   No, I asked him when I learned that Arnold Day

8 filed a court complaint.  But then it was denied by the

9 TIRC Commission and then miraculously reopened.  I told

10 him at that time that I felt that the street gang

11 members were conspiring amongst each other, just like

12 they did on the street, and they're very sophisticated

13 and that they were organizing themselves to get

14 themselves out of jail.

15    Q   Did you think they were organizing against you

16 or organizing to get themselves out of jail, or both?

17    A   Both.

18    Q   Okay.  What did you think gang members were

19 doing to organize themselves against you?

20    A   Well, if I was one of the detectives on the

21 case, and then I'd file the TIRC allegations, that their

22 TIRC allegations were different and embellished more

23 than what they testified at trial, and sometimes they

24 never even made an allegation at trial.  And I all of a

25 sudden, all these allegations are -- are coming to

---

83

1 light.  And I told them that there's -- they were

2 probably sharing affidavits and -- and stuff because

3 they knew that the TIRC Commission was a way to get a

4 new hearing.  Might be called up sometimes (Inaudible).

5    Q   Okay.  And so you reached out to Mark who was

6 your employee to say, "Hey, can you find out some -- or

7 do you have access to information about Arnold Day and

8 other individuals who had filed TIRC petitions?"

9    A   Well, I just told him what I thought Arnold

10 Day was doing and he told me that he was the

11 institutional coordinator.

12    Q   Okay.  So -- but I guess, why would you

13 decide to talk to Mark about it?  Because at the end of

14 the -- did you think he could get you information?

15    A   No, because Mark wouldn't have given me

16 information out of IDOC.  But he -- he did tell me that,

17 but I told him that you guys need to monitor this

18 because it's somebody suborning perjury and obstructing

19 justice.

20    Q   What did you specifically tell Mark to do to

21 monitor the situation?

22    A   I didn't tell him to do anything.  I just told

23 him, this -- these were my thoughts.  And he was the

24 chief, I wasn't going to tell him to do anything.

25    Q   But you -- sounds like you told -- you

---

84

1 remember conveying to Mark that he should monitor the

2 situation?

3    A   Yeah, yeah.

4    Q   And what did you think he should monitor?

5 Did you tell -- I'm sorry.  What did you tell Mark to

6 monitor?

7    A   I didn't -- I -- I said I think he should

8 monitor the activity of the street gangs when it comes

9 to this.

10    Q   Did you tell him that -- how the street gangs

11 would be communicating, like to monitor their main?

12    A   I didn't know how they were communicating.

13 I -- that's what he would have to figure out.

14    Q   Okay.  And --

15    A   And I'm aware of some of my training and

16 experience how street gangs communicate in the

17 penitentiary by the use of kites, which is messages that

18 they pass among each other, or they use intermediaries,

19 they use mail drops.  They use -- they use three-way

20 phone calls.

21    Q   Okay.  Anything else?

22    A   No, there's probably more, but --

23    Q   Was that -- oh, I'm so sorry to interrupt you,

24 was that information that Mark provided to you or that's

25 just a version you know from based on your work as a

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

85

1  police officer?
2         MR. GRILL: Objection to form.
3         Q  I'm sorry, when you were testifying that they
4  use kites, they use mail drops, they use intermediaries,
5  they use three-way calls, were you saying you knew
6  that's how gangs communicated with each other inside the
7  penitentiary, information you had gathered as a police
8  officer or is that information that Mark conveyed to
9  you?  And I'm sorry, I just didn't hear one way or the
10 other.
11        MR. GRILL: Form.
12        A  It was probably a combination of both.
13 I mean, there were indictments in federal courts of
14 members running your gangs while in prison, and -- and
15 still pulling the strings.  And -- and we thought that,
16 that they still had control on the outside, that they
17 were still involved in intimidating witnesses and making
18 sure their families -- just like the mafia -- making
19 sure that the families were baking -- being taken care
20 of with drug proceeds and stuff like that.  So --
21        Q  And I guess you'd have some of that
22 information based on your own relationship, say, with
23 somebody like Bernard Gales who had information on the
24 outside who was reaching out to you to say, "Hey, there
25 might be this internal gang war, I want you to, you

86

1  know, make -- I'm worried about my family," so you had
2  direct information based on your work as a detective
3  that people still had information, leaders in the gangs
4  had information once they were locked up?
5         MR. GRILL: Objection to form.
6         MS. DONNELL:  That was a very convoluted
7  question.  Let me shorten it, thank you, Andrew.
8         MR. GRILL:  You're welcome.
9  BY MS. DONNELL:
10        Q  Basically, I'm saying you had some of
11 this -- you're testifying that some of this information
12 about how street gangs communicated with one another
13 once some of their members were incarcerated was based
14 on information you had obtained in your role as a police
15 officer and some of it was information that Mark had
16 conveyed to you; is that fair?
17        A  No, what I said is I learned -- I learned how
18 they communicated through a combination of police work
19 and some training.  What I told you about Mark, I told
20 what I thought was happening and asked him to monitor.
21        Q  Okay.  Did Mark ever tell you in that
22 conversation or any other conversation how he thought
23 gang members communicated with one another?
24        A  No.
25        Q  Okay.  And this conversation you had with

87

1  Mark, did you have more than one conversation with him
2  about Arnold Day or just one?
3         A  I saw Mark pretty much every day, you know.
4  I -- I don't -- I wouldn't have talked to him every day
5  about Arnold Day.  I mean, I'd tease him, one of his
6  parolees made the news and, you know, did something
7  wrong.  And I said, "Well, that was another brilliant
8  move."  And then we would trade barbs back and forth.
9         Q  But just focusing in on your conversations
10 with Mark Delia about Arnold Day, did you have more than
11 one conversation with him about Arnold Day?
12        A  I may have.  I -- I could have, I mean --
13        Q  You don't recall?
14        A  I don't recall.
15        Q  But --
16        A  But he was with them for a very long time,
17 even when I was a policeman, and I don't remember when
18 Arnold Day filed his TIRC complaint.  So I'd probably
19 started talking about Arnold Day back then.
20        Q  When you're saying you talked to Mark about
21 Arnold Day, you're saying back when Arnold filed his
22 TIRC petition?
23        A  That'd probably be when it started.
24        Q  Okay.  And you don't remember talking to Mark
25 -- well, when did Mark and you start working together?

88

1  When do he come work with you?
2         MR. GRILL: Objection to form.
3         A  I don't recall.  He worked for IDOC, I worked
4  for the police department, we did some joint operations
5  together back then.  And then he used to be in charge of
6  security at the United Center, and then I brought him in
7  and he was my president of the company in an unpaid
8  stance until we could hopefully make money someday.  You
9  know, and he'd come in maybe once or twice every two
10 weeks.
11        Q  Okay.  Did you ever communicate with
12 Mark's -- I mean, Mark's, whoever replaced Mark when
13 he -- as head of intelligence at IDOC?  Did you have any
14 communications with that individual?
15        A  No, and I know who replaced him because he's
16 actually my neighbor.
17        Q  Oh, who's that?
18        A  His name was Jackson, he's a retired FBI
19 agent.  But we never talked.  I don't think he --
20 he -- he knew that I knew Mark, but we never talked
21 about anything going on at IDOC.
22        Q  And the replacement, Mark's replacement,
23 Jackson, who's your neighbor, is that his first name or
24 last name?
25        A  I don't know his -- Jackson's his last name I

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

89

1    think.
2        Q    Okay.  You don't know his first name?
3        A    No.
4        Q    But he replaced -- your understanding is
5    Mr. Jackson, who was a former FBI agent who also is your
6    neighbor --
7        A    He left the FBI to take that position.
8        Q    The head of intelligence at IDOC?
9        A    Yes.  And then --
10       Q    When Mark left?
11       A    And then he left, and then Jackson left, too.
12   So I don't know who's in charge now.
13       Q    Did you have any communications with Jackson
14   about information he had when he was the head of
15   intelligence at IDOC about Arnold Day?
16       A    No, I just -- I just said that, I never talked
17   to him about --
18       Q    Okay.
19       A    -- anything.  I don't even know if he -- he
20   knew that I knew Mark, and that was probably it.
21       Q    Okay.  And how about the person who replaced
22   Jackson, do you know who that is?
23       A    I don't know who that is.
24       Q    And when Mark left IDOC, did he come full time
25   to Embassy Security?

---

90

1        A    No, he was always part time.  He was one or
2    two days, you know, like every few weeks.
3        Q    Okay.  Okay, so back to the particular
4    conversation that you do recall having with Mark
5    sometime after Arnold Day filed his TIRC petition, where
6    Mark, you let Mark know that you were concerned that
7    gang members were, I forget the word you used,
8    but --
9        A    Conspiring.
10       Q    Conspiring, okay.  You word is that they were
11   conspiring to, I think, overturn the convictions, is
12   that right?
13       A    Yes.
14       Q    And that that also was, they were conspiring
15   against you and other detectives who had criminally --
16   been involved in the criminal investigations?
17       A    Yes.  It was a -- it was a -- way to get out
18   of jail --
19       Q    Okay.  And you thought one of the ways that
20   they were doing that was to communicate about
21   affidavits, to put into their TIRC petition, is that
22   what you testified to?
23       A    I -- no, I think what it was is when, even
24   what you guys do, you guys assume that it's factual
25   because five people said this happened even though their

---

91

1    stories change five different times, and that's the way
2    that TIRC bases their decisions, at least from me -- me
3    reading the reports.  And so why not?  If I'm a
4    convicted gang member and I'm sitting jail, why wouldn't
5    I say, oh yeah, by the way, he did that to me too, and
6    maybe I can get a new hearing, and then maybe I could
7    get Loevy & Loevy to get me $2, $3 million.
8        Q    Okay.
9        A    So why -- why not?
10       Q    And I think, I get the sense that, and I know
11   from your talking to the media, that I think you think
12   this is sort of like a innocence industry or something.
13       A    It's a what?
14       Q    Well, innocence industry, or something
15   manufactured to get people -- well, let's strike that.
16   Let me just strike that --
17       A    Yeah, I don't --
18       Q    Let's -- okay.  So let's --
19            MR. GRILL:  Just ask him -- you can just ask
20       him in a different way.
21       Q    I'll ask a different way.  So let's, and in
22   fact we'll just go to that later.  So -- but back to
23   this conversation we had of Mark, he gave you -- he told
24   you that Arnold Day was, I think you used the word
25   institutional coordinator?

---

92

1        A    Yes.
2        Q    Okay.  And where did Mark say that Arnold Day
3    was the institutional coordinator for the Black Stones?
4            MR. GRILL:  Form.
5        A    I -- I didn't ask him what -- I happened to
6    know that Arnold Day was in penitentiary.  There's
7    multiple occasions, I didn't ask him which institution.
8        Q    Did he give you any other information, Mark,
9    did he give you any other information in this
10   conversation other than to say he -- he believed Arnold
11   Day was an institutional coordinator for the facility he
12   was at?
13       A    No, that's about it.
14       Q    Did Mark ever give you any written reports?
15       A    No.
16       Q    Okay.  Did Mark ever convey to you anything he
17   was doing to monitor Arnold Day?
18       A    No.
19       Q    Back when you were a homicide detective in
20   Area 3, did you have information of who was considered
21   the, you know, institutional coordinator of certain
22   gangs in IDOC?
23       A    I may have back then, but I don't -- I don't
24   recall specifically.
25       Q    Okay.  Did you know what that term meant when

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

93

1   Mark said Arnold Day was the institutional coordinator?
2       A   Yes.
3       Q   And how did you know what that term meant?
4       A   Because of my training and experience.
5       Q   Okay.  And what was your understanding of what
6   that meant when Mark said Arnold Day is the
7   institutional coordinator?
8       A   As I said earlier, he's the leader of the
9   street gang inside the penitentiary.
10      Q   And what does that mean to you?  I mean, what
11  does that mean if you're the leader of a street gang
12  inside the penitentiary?
13      A   The same way you're the leader of a street
14  gang on a street, you're in charge.
15      Q   Did you ever know Arnold Day to have a
16  leadership title within a street gang?
17      A   Yes.  As a matter of fact, in his criminal
18  trial, he testified extensively that he was an officer,
19  that there was three ranks within the street gang, he
20  told me that in his statement and he also testified to
21  that report in court, that he was an officer in
22  that -- that he held the position of officer in the
23  street gang.
24      Q   But did he ever, to your knowledge, have the
25  title of a general?

94

1       A   Not -- not that I'm aware of.  He mostly got
2   promoted when he was in the penitentiary.
3       Q   But you never knew Arnold Day to have G slash
4   something out on the street, correct?
5       A   No, I only know was Little A.
6       Q   Okay.  And your understanding of the gang back
7   then is officers were below generals, correct?
8       A   Right below a general.
9       Q   And above the general is the prince?
10      A   Yes.
11      Q   Okay.
12      A   There's no full princes, though.
13      Q   Well, but you never knew Arnold Day to have
14  the title of a prince, did you?
15      A   No.
16      Q   Okay.  So okay.  When I'd the first time you
17  remember looking for Arnold Day, in connection with the
18  Erving or Garcia homicide?  Well, let me ask it a
19  different way.  When's the first time you remember
20  looking for Arnold Day in connection with the Erving
21  homicide?
22      A   With the Erving homicide?
23      Q   Correct.
24      A   I'd be shortly after I talked to Ralph Watson.
25      Q   Okay.  So is it your testimony that you did

95

1   not make any efforts to find Arnold Day in connection
2   with the Erving homicide prior to your conversation with
3   Ralph Watson?
4       MR. GRILL:  Objection to form.  Mischaracterizes
5   his testimony.
6       A   Yeah.  I mean, Arnold Day wasn't a suspect
7   on the Erving homicide until Ralph Watson confession
8   so --
9       Q   But you were looking for Arnold Day in
10  connection with the Garcia homicide?
11      A   We were --
12      MR. GRILL:  Hang on.  Foundation.
13      Q   Well, you read your testimony, you know you
14  were -- you've testified that you were looking for
15  Arnold Day --
16      A   Yes, yeah.
17      Q   -- as of September 17, 1991.
18      MR. GRILL:  Thank you.
19      Q   Correct?
20      A   Yes.
21      Q   Okay.  And so I just want to be clear, because
22  I don't think it was clear in your prior testimony, were
23  you -- but I think you've just clarified, you weren't
24  looking for Arnold Day with respect to the Erving
25  homicide until Ralph Watson talked to you?

96

1       MR. GRILL:  Form.
2       A   Correct.
3       Q   Okay.  Were you -- you know this conversation
4   you testified earlier before the lunch break of -- that
5   you had with Bernard Gales, remember that conversation
6   you told me about?
7       A   Yeah.
8       Q   When you had that conversation with Bernard
9   Gales, were you already looking for Arnold Day in
10  connection with the Garcia homicide?
11      A   I -- I may have gone out to look for him.
12  I -- I just don't know.
13      Q   I was trying to see if that helped you place
14  when that conversation was with Bernard Gales.  So if it
15  was before or after the Garcia homicide, are you able to
16  say one or the other?
17      A   Oh, it was -- you know, I -- I can't remember
18  sitting here.  I'm sure there's something that would be
19  able to determine what date that was.
20      Q   Yeah, what do you think that would be?  Because
21  it doesn't seem -- I have not seen a report about it,
22  and I know you testified to it.  But is there any way
23  we'd be able to find out when you had that conversation
24  with Bernard Gales?  I guess I writted him --
25      MR. GRILL:  Object.  Form, form.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

97

1    Q   You writted Bernard Gales --
2    A   Yes, so there should be some record of it.
3    Q   Okay.  I think I did when I asked you, I don't
4  know if you remember, but did you get calls from
5  individuals within IDOC at Area 3?
6        MR. GRILL:  Form.
7    A   No, I just had -- yeah, I -- I testified
8  earlier, I -- I don't know if I did or if I didn't.
9  I -- I can't recall a specific time that I did,
10 but I -- I can't say it did or it didn't happen.
11   Q   Did you ever have calls of people who were
12 inside IDOC on a three-way call where someone within
13 IDOC called a family member or friend and then they
14 would patch you in?  Did that ever happen?
15       MR. GRILL:  Form.  Foundation.
16   A   It's been 30 years.
17   Q   And back in '91, did you have cellphones then
18 or Nextels, or what did you have in '91?
19   A   No, pay phones.
20   Q   You didn't have -- the department didn't issue
21 cellphones or car phones or anything like that?
22   A   No, no.  We had pagers.
23   Q   Just pagers, okay.  All right.  Okay.  I think
24 we'll mark this as Exhibit 1, and I'm going to see if
25 this refreshes your recollection.

---

98

1        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2        MR. GRILL:  What is this?
3    Q   It's his deposition in the Jakes testimony --
4  or Jakes case.  I'm sorry.  Okay.  I'm going to see if
5  this refreshes your recollection.  First lets mark this
6  as Exhibit 1.  And I'm going to go to page 93.  She's
7  going to mark this --
8    A   Yeah, I'm -- sure.
9    Q   I took this off so you can flip, so --
10       MR. GRILL:  It refreshes, what's it refreshing
11 about what?
12   Q   Oh, okay.  So earlier, I asked you if Bernard
13 Gales had told you whether he was concerned about his
14 brother Michael Gales being killed, and I think you said
15 you didn't remember.  So I'm going to ask you to
16 look -- turn to page 93 and review your testimony.
17 I guess you could start on page 92, starting at 92-21,
18 and then reading through 93-11.
19       MR. GRILL:  I don't think this impeaches
20 him or --
21       MS. DONNELL:  I said this refreshes
22 recollection, not impeaching him.
23       MR. GRILL:  I don't -- I'm not sure that this
24 applies in light of the questions and the answer
25 here but --

---

99

1  BY MS. DONNELL:
2    Q   Well, you can read all the way through 19.
3  So thank you.  Let's see if reading, starting at 92-21
4  through 93-19 refreshes your recollection around
5  your -- about your conversation with Bernard Gales,
6  okay?
7        MR. GRILL:  And this is about whether
8  Bernard --
9        MS. DONNELL:  What Bernard Gales told him --
10       MR. GRILL:  -- called him at Area 3?
11       MS. DONNELL:  No, that's not what it's about.  I
12 said it -- whether he -- what he relate -- I'll just
13 ask my question.  Thanks.
14       MR. GRILL:  Yeah, let's do that.  Yeah.
15       MS. DONNELL:  I already did, so you --
16       MR. GRILL:  But ask the question again because
17 I'm confused now what the question is.  You want --
18       MS. DONNELL:  I asked if it refreshes the
19 recollection about what his conversation was with
20 Bernard Gales.
21       MR. GRILL:  The substance?
22 BY MS. DONNELL:
23   Q   I'm going to just ask -- can you read
24 the -- the testimony and let me know when you're ready?
25   A   Yeah.

---

100

1    Q   Okay.  Does that refresh recollection, having
2  read that testimony, does it refresh your recollection
3  about your conversation with Bernard Gales?
4    A   No.
5    Q   It does not?
6    A   No.
7    Q   Okay.  So do you see where it says that -- at
8  93, the question was, "Trying to kill Bernard Gales,
9  Michael?"  Eight, answer, "Yes, to take over his
10 operation."  Do you see that testimony?
11   A   I do.
12   Q   Okay.  Does that refresh your recollection in
13 any way that Bernard Gales was telling you that he was
14 concerned about his brother Michael Gales being --
15   A   It doesn't refresh my memory, but I'll stand
16 by what I testified there.
17   Q   Okay.  Did you ever go try and talk to Michael
18 Gales?
19   A   No.
20   Q   Okay.  Now maybe you want to put this back
21 together.
22   A   All right.
23   Q   So it's your testimony that after you had this
24 conversation with Bernard Gales where he was concerned
25 about his brother Michael Gales being murdered, that you

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

101

1  didn't make any efforts to go talk to Michael Gales?
2       MR. GRILL: Objection. Form. Mischaracterizes
3  his testimony. Foundation.
4       A  No, I didn't -- I didn't go talk to him.
5       Q  Okay. Why not?
6       MR. GRILL: Objection. Foundation.
7       A  I guess because it was his brother giving the
8  information, I'm sure he told his own brother. There
9  was no reason for me to do that.
10      Q  Okay. Let's go back to when you were -- you
11 started to look for Arnold Day after you were assigned
12 to the Garcia homicide, right?
13      MR. GRILL: Mischaracterizes testimony.
14      Q  Well, you took a statement from Gus Robertson,
15 Snake, in the Garcia homicide, right?
16      A  Right.
17      Q  And then you took a statement from Anthony
18 Jakes or Shaun Jakes in the Garcia homicide, right?
19      A  Correct.
20      Q  And after that, you started looking for Arnold
21 Day?
22      A  I didn't review that file. I don't know what
23 order it occurred, but -- but I did speak to Jakes and I
24 did speak to Gus Robertson, yes.
25      Q  And you did review your testimony that you

---

102

1  started looking for Arnold Day in September -- around
2  September 17, 1991?
3       A  Yes, I -- I -- well, I -- this, I do, I
4  remember going to his grandmother's house --
5       Q  Okay.
6       A  -- I remember from the trial it was 50th and
7  Damen.
8       Q  So you went to -- at 5038 South Damen to talk
9  to his grandma?
10      A  If that's the address, correct.
11      Q  Okay. And what did -- did you know Arnold
12 Day's grandma prior to the time you went to talk to him?
13      A  I don't believe so.
14      Q  Okay. I'm going to go back to this. I'm
15 going to read along with me, we're going to go to page
16 94. Starting at Line 3.
17      MR. GRILL: At 94, you said?
18      MS. DONNELL: Uh-huh.
19      MR. GRILL: Is there a question pending?
20 BY MS. DONNELL:
21      Q  Well, I'm going to read it. So do you
22 remember giving this -- I'll wait till you get the
23 number.
24      A  93?
25      Q  94, Line 3.

---

103

1       A  94.
2       Q  Okay. In your deposition in Mr. Jakes case,
3  well you can read this and see if it refreshes your
4  recollection. Can you read 94, Line 3 to 9?
5       MR. GRILL: What are we refreshing it for?
6       MS. DONNELL: If he went to talk to Michael
7  Gales.
8       MR. GRILL: Got it. Okay.
9       A  Okay.
10 BY MS. DONNELL:
11      Q  Does that refresh your recollection that you
12 did, in fact, go talk to Michael Gales after you had
13 your conversation with Bernard Gales?
14      A  Yeah, as I said, I don't remember doing it,
15 but I -- I'll stand by what's on here.
16      Q  But back in April 2021, you testified that you
17 did follow up on that information and go talk to Michael
18 Gales?
19      A  I did.
20      Q  Okay. And now, do you remember that Bernard
21 Gales also had asked you to help him out with respect to
22 Little A and G-Nate, and them trying to kill his
23 brother, Michael, do you remember that?
24      A  I remember, yeah, he -- he was worried that
25 his family was going to get killed. Yes.

---

104

1       Q  But he testified back in the Jakes case that,
2  "What did Bernard Gales say to you?" And answer,
3  "He told me he asked for help that Little A and G-Nate,
4  and G-Nate was subsequently killed but that they were
5  trying to kill his brother Michael, if I could stop him."
6  You see your testimony?
7       A  Yeah, that's what I testified earlier.
8  He was looking for help to keep his family from
9  getting --
10      Q  Okay. And then it's your testimony earlier
11 today that you didn't take any steps, but now you've
12 reviewed your transcript, you did in fact talk to
13 Michael Gales, right?
14      A  I -- I have an --
15      MR. GRILL: Objection, mischaracterizes
16 testimony. Go ahead.
17      A  I'm not -- I was saying that I didn't know,
18 it's been so many years. I -- I don't know. I mean,
19 I'll stand by what's in this deposition, and I'll stand
20 by my previous testimony in court.
21      Q  Okay. As you sit here today, do you remember
22 taking any other steps to follow up on what Mr. -- your
23 conversation with Bernard Gales, other than going to
24 talk to Michael Gales?
25      A  I don't have any independent recollection in

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

105

1  this at all except what I could read.
2      Q  Okay.  All right.  So you talked to Arnold's
3  grandmother.  I think I asked you, did you know Arnold's
4  grandmother prior to this conversation with her, when
5  you were looking for Arnold Day after the Garcia
6  homicide?
7      A  And I said I don't know.
8      Q  You don't know.  Okay.  And then I think you
9  remember testifying that, or reviewing your testimony,
10  that you were looking for Arnold Day over the next
11  couple months, right?
12      A  Yeah, here and there.  Yeah.
13      Q  Okay.  Well -- and you never found him, right?
14      A  No.  But that wasn't my sole -- that wasn't
15  anything I was doing.
16      Q  I'm sorry, go ahead.
17      A  If I was in the area, I -- I'd look for him.
18  If -- if not, but because I believed there was a -- a
19  stop order out on him, that everybody knew he was wanted
20  by the police department when he was running.
21      Q  Were there any other stop orders out?
22  Was that for the Garcia homicide?
23      A  Yes.
24      Q  Were there any other stop orders out for
25  anybody else, other than Arnold Day for the Garcia

106

1  homicide, that you're aware of?
2      A  I don't know, no.  I'd have to review the file
3  and see about that.
4      Q  Did you put out the stop order for Arnold Day
5  and the Garcia homicide?
6      A  I -- I don't know.
7      Q  Okay.  And were you also, in this time frame,
8  September 1991, October 1991, were you also looking for
9  -- to try and figure out who Darren was with respect to
10  the Garcia homicide?
11      A  Yeah, I'm sure, yeah.  I mean, everybody knew
12  we were looking for somebody named Darren.
13      Q  Okay.
14      A  As I sit here today, I think it's Darren
15  Triplett, but I can remember the name of what he told me
16  then.
17      Q  Well, why, as you sit here today, do you not
18  think it was Darren Triplett that you were looking for?
19      A  Pardon?
20      Q  Why, as you sit here today, you believe you
21  were looking for Darren -- well, what did you -- do you
22  think you were -- it was Darren Triplett?
23      A  Yes.
24      Q  Why, as you sit here today, do you believe
25  that was Darren Triplett that --

107

1      A  Because Darren was a member of Black Stones
2  street gang.  He was the only Darren I knew over there.
3      Q  Did you know who Darren Triplett was back in
4  May of 1991, bridge -- September 1991?
5      A  I don't know.  I don't know if I did or if I
6  didn't.
7      Q  Okay.  Did you know Denardo Triplett back in
8  September 1991?
9      A  I -- I may have.  I -- it's just not ringing a
10  bell.
11      Q  Did you know a gentleman by the name of
12  G-Nardi back in 1991?
13      A  G-Nardi?
14      Q  Yes.
15      A  That nickname's not ringing a bell with me at
16  this time.
17      MR. GRILL:  I just want to lay down that, and
18  the same agreement applied to Plaintiff's
19  deposition, that we need to do our best here to keep
20  the examination germane to the Erving homicide
21  investigation.
22      MS. DONNELL:  Yeah, I am.
23      MR. GRILL:  So okay.
24      MS. DONNELL:  Yeah.
25      MR. GRILL:  Well, then that, for example, some

108

1  of these questions are specific to his investigation
2  regarding the Garcia homicide, and I get how that
3  relates to some degree, but the last question, for
4  example, was specific to Darren in relation to the
5  Garcia homicide, so -- and that -- it's fine that
6  you asked the question, I just want to point it out.
7      MS. DONNELL:  Okay.
8      MR. GRILL:  Just try to keep it focused on
9  everything I just said.
10      MS. DONNELL:  I -- I'm -- I think we're going
11  to -- think we'll be okay.
12      MR. GRILL:  Yeah.
13      MS. DONNELL:  You can let me know if you think
14  it goes too far.
15      MR. GRILL:  Yeah, sure.  Yeah.
16  BY MS. DONNELL:
17      Q  That's fine.  Okay.  I believe you reviewed
18  your trial transcript in preparation for today, so I'll
19  just ask you if you remember reviewing in your trial
20  transcript of Mr. Day's criminal trial that you
21  testified that you'd seen Arnold Day routinely between
22  1987 and 1990.  Do you remember reviewing that
23  testimony?
24      MS. DONNELL:  They went off the record.  We're
25  going to go off the record.  I think we -- or did we

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

109

1    go off the record?
2        COURT REPORTER: We're fine. Ms. -- Ms. Horn
3    just joined us.
4        MS. DONNELL: Oh, got you. Okay. Sorry.
5    BY MS. DONNELL:
6        Q    All right. Okay. So you remember giving that
7    testimony that in -- in the -- in your criminal trial
8    testimony or would you like to see it to refresh your
9    recollection?
10       A    No, I'd like to see it.
11       Q    Sure. Okay, we'll mark this as Exhibit 2.
12           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
13       MR. GRILL: This is the what?
14       MS. DONNELL: His criminal trial testimony in
15    the -- what page are we on?
16       MR. GRILL: Mr. Boudreau's?
17       MS. DONNELL: Yes.
18       MR. GRILL: Okay. Not sure if it was the
19    Plaintiff's or something else --
20       MS. DONNELL: No, sorry I just need to make
21    sure --
22       MR. GRILL: This one's mine or is it for him?
23       MS. DONNELL: That's for him. She's got to
24    copy. I need copies of this.
25    BY MS. DONNELL:

110

1        Q    Okay. Mr. Boudreau, I've marked as Exhibit 2
2    to your deposition your criminal trial testimony in
3    Mr. Day's criminal trial. This is from the 29th. Let's
4    see, do I have that right? The 21st of 1984. Is that
5    what you have in front of you? I have a lot of
6    transcripts, so.
7        MR. GRILL: June 21st.
8        Q    June 21, 1984?
9        A    Yes.
10       Q    Okay. And I think it's Bates stamped, but I
11    have the cover page 29522 and then it picks up in 523
12    and then it -- it picks up with your testimony at
13    Day 29 -- 29714 consecutive to 29761.
14       A    Okay.
15       Q    So I just asked you if you remembered saying
16    that you testified that you routinely saw Arnold Day
17    between 1987 and 1999 -- 1990, and you said no. If you
18    turn to Page D -- it'll say D212 at the bottom of the
19    transcript page, Lines 7 through 13. If you want to
20    review that testimony then see if that refreshes your
21    recollection as to your testimony.
22    So the question -- did you get there?
23       A    Uh-huh. Yes, ma'am. On this page?
24       Q    Yep. And I think earlier -- I'll just
25    represent to you, earlier, you testified that you hadn't

111

1    seen Mr. Day while you were being deployed, because
2    obviously you were overseas --
3        A    Uh-huh.
4        Q    -- you weren't on the streets, so that -- you
5    hadn't seen him for a number of -- maybe a year and a
6    half prior to May 1991. And then you're asked this
7    question, "What period of time before May 17 of 1991,
8    how long prior had it been since you had seen Mr. Day at
9    any of those locations?" And then you answered,
10    "I would say I routinely saw him there between 1987 and
11    1990, when I was assigned as a tactical officer assigned
12    to the 9th District." Do you see that?
13       A    I do.
14       Q    Okay. Does that refresh your recollection,
15    then, that back at the time of his criminal trial and
16    back on June 21, 1994, you had testified that you were
17    routinely seeing Mr. Day at certain locations when you
18    were in the 9th District and then as a tactical officer?
19       MR. GRILL: Well, seeing --
20       A    I remember -- well, that's what I testified
21    to. I -- I don't -- I don't think that answer's clear.
22    I don't know if I'd seen him there constantly between
23    1987 and 1990, and it's a three-year period. But I did
24    see him at times. I don't know if that time period is
25    absolutely correct.

112

1        Q    Okay.
2        A    Okay. I just -- I don't remember.
3        Q    And does that refresh your recollection of any
4    specific instances you saw Mr. --
5        A    No.
6        Q    -- day when he was a young teenager?
7        A    I don't recall any specific incidents.
8        Q    Okay. So you were out there, looking -- you
9    talked about -- you went to Arnold Day's grandmother's
10    house, you didn't find him there. And then you were
11    looking for him as you were going about your other
12    business over the course of those fall months. Is that
13    right?
14       A    What was the date of the -- that I talked to
15    Gus Robinson?
16       Q    So the murder -- the Garcia homicide was
17    September 15, 1991.
18       A    Okay.
19       Q    And that -- you were on the next day,
20    September 16, 1991.
21       A    Is that when I talked to Gus Robinson?
22       Q    Correct.
23       A    All right, so it would be shortly after that.
24       Q    You went to his grandma -- Day's
25    grandmother --

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

113

1   A   I went to his grandmother's house.
2   Q   Okay.  And then you were looking for him four
3   to five times a week.
4   A   Whenever I would drive through the
5   neighborhood, if I saw him, yeah.
6   Q   Okay.  Do you remember testifying back at his
7   criminal trial that you were looking for Arnold Day four
8   to five times a week during that time period?
9       MR. GRILL: Objection.  Form.
10  A   I -- that's what I testified to, that's what
11  I testified to.  I -- I know that whenever I was in an
12  area, we were looking for a lot of people on Pectin
13  Road, not just Arnold Day.
14  Q   Okay.  Did you ever ask any of your contacts
15  in the Black P Stones where Arnold Day was during this
16  time period?
17  A   I may have and I may not have.  Like I said,
18  they weren't very forthcoming with information to me.
19  It was more letting them know, stop the violence.
20  Q   Okay.  I want to shift gears and talk to you
21  about your conversation with Ralph Watson, okay?
22  A   Okay.
23  Q   So did you know Ralph Watson from your work in
24  the 9th District?
25  A   I -- I don't have any independent recollection

---

114

1   if I did or if I didn't.
2   Q   When you writted Ralph Watson to talk to him,
3   that was January 20, 1992, is that right?
4   A   No, I talked to him before that when he was
5   arrested with Larry Lewis, committing multiple armed
6   robberies, fleeing, dropping a car at 1250 West 51st
7   Street.  Then they were arrested by TAC officers.
8   I think I spoke to Ralph Watson on those days.
9   Q   Is that back in November 1991?
10  A   That's when those -- that's when he was
11  arrested, yes.
12  Q   Okay.  So back in November 1991, you had
13  spoken to Ralph in the context of those armed
14  robbery -- the arrest?
15  A   If I could see his handwritten statement and
16  his arrest report, I'd be able to answer these for sure.
17  Am I done with these for a second here?
18  Q   Yeah, you can -- sure.  Okay, let's do that.
19  Let's mark this as Exhibit 3, I'll just mark a couple of
20  things, so just a second.  Cool.  Exhibit 4.
21      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22      MR. GRILL:  This is 3?
23  Q   This will be five.  All right.  So I stop some
24  things.  Got it.  Turn to that.  So Detective Boudreau,
25  I-- okay, so for Exhibit 3 is City_Day 1099 consecutive

---

115

1   through 205?
2       MR. GRILL:  199.
3   Q   I'm sorry, 199.  Thank you.  199 through 205.
4   It's the criminal history report for Ralph Watson.
5   George, Exhibit 4 is City_Day 87, and Exhibit 5 is
6   City_Day 80 is Ralph Watson's Statement 80-83.  Okay.
7   If you turn to the back part of Exhibit 3, there's an
8   arrest report from -- back from November 20, 1991 for
9   Ralph Watson for series of armed robberies.  Is this the
10  arrest report you're referring to, or you're referring
11  to a different one that has Larry Lewis also on it?
12      (EXHIBIT 4 MARKED FOR IDENTIFICATION)
13      (EXHIBIT 5 MARKED FOR IDENTIFICATION)
14  A   Referring to what, you said?
15  Q   Was the arrest report?
16  A   Or your -- I was referring to another one.
17  Q   Yeah.  Were you referring to this arrest
18  report?
19  A   Oh yes.
20  Q   Okay.  This is the one you're referring to,
21  right?
22  A   Uh-huh.
23  Q   Okay.  So does that -- so this arrest was on
24  November 29, 1991, right?
25  A   Right.

---

116

1   Q   And it was around this date that you spoke to
2   Ralph Watson in -- in the connection with these armed
3   robbery arrests, right?
4   A   Yes.
5   Q   Okay.  And at that time, back in November of
6   1991, did Arnold Day come up at all in your
7   conversations with Ralph Watson?
8   A   No, I was focused on these multiple armed
9   robberies.
10  Q   Okay.
11  A   And he gave a statement that day too, but I
12  don't see that yet.
13  Q   The statement he gave.  Okay.  And that
14  statement didn't relate at all to the Gerrod Erving
15  homicide, correct?
16  A   No, we were focused on the five or six on
17  average.
18  Q   Okay.  And then you -- you also spoke to Ralph
19  Watson again on January 20, 1992.  That's the day he
20  gave you the statement, in the Gerrod Erving homicide.
21  A   Correct.
22  Q   Exhibit 5.  Did you speak to Mr. Watson on
23  other occasions between November 29, 1991 and January
24  20, 1992?
25  A   I -- I don't know.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

117

1    Q   Okay.  And then here we have the arrest
2  information in Exhibit 4.  Do you see that, Exhibit 4?
3    A   Yes.
4    Q   Yes.  And it has you and your partner John
5  Halloran as the arresting officer along with Ball and
6  Anderson?
7    A   Yes.
8    Q   Okay.  And these were on charges for
9  aggravated battery with a firearm, right?
10   A   Yes.  The -- the first arrest car is
11 pertaining to the arrest by the night district officers.
12 The second arrest is pertaining to an armed robbery
13 victim, Robert Cho, who was also shot at -- is a
14 continuing part of the investigation from the earlier
15 incidents on January 20.
16   Q   So the first one -- I'm sorry.  So there's two
17 arrest reports.  There's two arrests listed here, the
18 November 29, 1991 at the top.  That's the 9th District
19 tactical one, right?
20   A   Yep.
21   Q   And then the second one is the one that you
22 ended up with charging on January 20, 1982.
23   A   With the additional armed robbery.
24   Q   With the additional armed robbery.  Right.
25 Okay.  So tell me about why did you write Ralph Watson

---

118

1  to Area 3 on January 20, 19, 1991?  What was your
2  original purpose for that writ?
3    A   I -- I don't recall.  If I had all the reports
4  on all five of these armed robberies, it may have been
5  part of a continuing investigation to do a physical
6  lineup.  It appears from here and I -- I don't know that
7  Robert Cho was shot, so he wouldn't be available on his
8  original day of the arrest.  Maybe he came in later on.
9  I'd have to see the police reports, though.  I -- I can't
10 tell.
11   Q   Okay.  And I don't know if you recall, I can
12 otherwise can get their reports, but you also had Edward
13 Robinson there at the Area 3 on that January 20, 1992 as
14 well in context with armed robbery investigations.
15   A   I don't recall Edward Robinson being involved
16 in this investigation at all.  Ralph Watson in his armed
17 robbery statements identified Anderson and then Edward
18 Sanders, but no Edward Robinson.  So I -- as I said here
19 today, I don't know who Edward Robinson is related to
20 these armed robberies.
21   Q   Okay.  So do you have an independent
22 recollection of talking to Ralph Watson on January 20,
23 1991?  Or is your memory totally dependent on what's
24 written in the statement and in the police report?
25   A   Yes.  I apologize, but my memory is dependent

---

119

1  on the end, what's written in these statements.
2  And I don't have any independent recollection of
3  anything.
4    Q   Let me ask you this.  Did -- how did the
5  Erving homicide come up first, did you bring it up to
6  Ralph Watson?
7    A   I -- I don't know.
8    Q   It's fair to say you originally writted him to
9  talk to him about these armed robbery investigations,
10 right?  Is that right?
11   A   Correct.
12   Q   Okay.  And prior to January 20, 1991, had you
13 done any work on the Gerrod Erving homicide
14 investigation?
15   A   I don't think I'd done any work on it.
16   Q   Did you know about it just because it was out
17 of Area 3 and it was one of the homicides that had
18 happened in the area right when you got back from your
19 deployment?
20   A   I -- I may have.  Yeah.  I -- I don't recall
21 working at it.  I know I didn't work the scene.
22   Q   Do you remember having any conversations with
23 Dan McWeeny about the Gerrod Erving homicide, he had
24 worked the scene?
25   A   No.

---

120

1    Q   Okay.  When's the first time you
2  remember -- well, let me ask you this.  Did you ever
3  review the Gerrod Erving running file?
4    A   I -- prior to talking to Ralph Watson?
5    Q   First of all, I'm just asking you at any point
6  in time, did you?
7    A   Oh, I -- I may have.  I don't remember.
8    Q   How about prior to talking to Ralph Watson?
9    A   I mean, I -- I may have, I -- I just don't
10 know.
11   Q   The running file would've been available to
12 you at Area 3, though, correct?  I mean, it was an Area
13 3 homicide.
14   A   Yeah.  I don't -- there may have been a civil
15 running file there from May 10 months later, right?
16 Is it May to February?  I -- I don't know if there was
17 or not.
18   Q   Okay.  You had -- do you know why you were
19 involved in investigating all these armed robberies at
20 this time?  The Watson armed robberies from November
21 29th.  Do you remember how you got that assignment?
22   A   Yeah, I was assigned to the district, made the
23 arrest.  They called our office, and they had offender
24 for multiple armed robberies.  And our sergeant assigned
25 us 3 stop.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

121

1    Q   Did your sergeant also assign you to the
2  follow-up on January 20, 1992 or was that just a
3  follow-up you were doing on your own report with
4  Halloran?
5    A   That might have been a follow-up on our own
6  accord, or a request from the state's attorney.
7  Or Mr. Cho wasn't available for lineups, or was it
8  available interview by the state's attorney, but -- and
9  we know we followed up on an update, the state's
10  attorney's office responded, and there would've been
11  additional charge.
12    Q   Did you tell Ralph Watson that he could get
13  leniency or -- if he cooperated with you on homicide
14  investigations on January 20, 1992?
15    A   No, I've never told anybody that they'd get
16  leniency. That's improper. So the answer to that is a
17  flat-out not.
18    Q   And you're saying that because you would
19  never -- I think you're saying you would never make a
20  promise of leniency on a criminal case to get
21  cooperation in one of your investigations?
22    A   No.
23    Q   And that's improper because it's a -- why?
24    A   It's -- it's a -- first off, it's illegal.
25  Because you can't do that. The Supreme Court had at

122

1  that time, a rule that you could offer hope but not
2  leniency. And we were trained in that. So you were do
3  that. Secondly, as I testified earlier about my
4  relationships with all these gang leaders, I had that
5  relationship because I didn't lie to gang members.
6  They trusted me to -- to a point. And that's why we
7  don't do that. Because if I start lying to the entire
8  street gang, my credibility with them is nothing.
9  And you needed that on the street.
10    Q   So what was the -- what could you do in terms
11  of, like, what your practice was? You're testifying you
12  couldn't give them a promise of leniency, but you could
13  give them a hope. What would -- what were you able to
14  say or what did you say?
15    A   I would tell them that I would come to court
16  and tell the judge that he cooperated with me. If they
17  had any remorse, maybe I'd tell the judge that they had
18  remorse. But you know, we know now that there's
19  not a defense attorney in the world that's going to
20  call -- call me to a criminal trial and say my defendant
21  cooperated and showed remorse. And so that -- that
22  never happened. And the other thing that I would tell
23  him, used to preach this to young street gang members
24  all the time that, "You know, guys, you -- you get shot
25  at every day. You shoot at somebody every day, and it's

123

1  like a game until one day the Lord says someone's going
2  to die." And -- and basically that's what it is. You're
3  a young kid, and there's life after this. You know,
4  especially if they're 18, 19 years old, this ain't the
5  end of the world. And that's the way I would talk to
6  these gang members.
7    Q   Would you ever tell someone that they could go
8  home if they cooperated with you?
9    A   No, it's going back to what I just said,
10  that -- that then my reputation on the street would be
11  that I'm a liar. And --
12    Q   Did you ever -- well, I guess then the
13  converse is, did you ever make threats that if someone
14  didn't cooperate with you and provide information, did
15  you ever make threats?
16    A   Make threats? Like what? I don't understand.
17    Q   Like threats that they'd be charged with a
18  crime they wouldn't cooperate with you. Threats that
19  you would add additional criminal charges to them they
20  didn't cooperate with you?
21    A   I mean, no, I -- I didn't do that.
22    Q   Did you ever make any verbal physical threats?
23    A   No.
24    Q   Did you ever use any physical force?
25    A   Nope.

124

1    Q   Did you ever witness any of your
2  colleague -- your fellow detectives use physical force
3  with a suspect you were interrogating?
4    A   During the -- no.
5    Q   That never happened?
6    A   Nope.
7    Q   Okay. Did you -- or well, did you threaten
8  Edward -- I'm sorry, Ralph Watson that if he didn't
9  cooperate with you, he would get charged with additional
10  armed robberies on January 20, 1992?
11    A   No, he was charged with four previous armed
12  robberies. He was charged with an armed robbery that
13  day.
14    Q   Did you have a stack of additional armed
15  robberies that you were going to charge him with that
16  were unsolved, if he didn't cooperate with you in the
17  Erving homicide investigation? Did you hear Detective
18  Halloran make any threats to Ralph Watson when you were
19  in the room with him at Area 3?
20    A   No. Ralph Watson was cooperating 100 percent.
21  Talking about himself, talking about other gang members.
22  There'd be no reason to threaten him. So why would we
23  want to lose that cooperation?
24    Q   Wait, how is it that Ralph Watson -- how is it
25  that the Gerrod Erving homicide came up on January 20,

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

125

1    1992?  How did it even come up?
2    A   I -- I don't recall.  I mean, I -- I could sit
3  here and speculate on a number of scenarios that may
4  have happened, but I -- I don't recall specifically how
5  it did come up.
6    Q   Is it fair to say that you brought it up?
7    A   Specifically to Erving homicide or specific to
8  any homicides?
9    Q   Well, did you bring up to Ralph Watson,
10  "Hey, can you give me any information on any homicides
11  in the area that you have information about?"
12    A   That's one of the scenarios I was talking
13  about.  Maybe I did do that or maybe he volunteered it.
14    Q   Because as a -- I mean, as a homicide -- as an
15  experienced homicide detective working in an area that
16  had a lot of unsolved homicides in the early 1990s, when
17  you had somebody who was cooperating with you, like
18  Mr. Watson, that's one of the scenarios that you or
19  Halloran would present to him.  "Hey, can you give us
20  any help giving us information on one of these unsolved
21  homicides?"  That is a scenario that could happen,
22  right?
23    A   You got to break that question up.  There's a
24  lot of --
25    Q   Sure.  Sorry.  It's fair -- well, one of the

126

1  things you would do as a homicide detective is if you
2  had a cooperating witness, you might ask them, "Do you
3  have any information from me on any unsolved homicides
4  that have gone on in the area?"  Right.
5    A   Yep.
6    Q   And that's something you would -- did as a
7  homicide detective because you're trying to solve all of
8  these unsolved homicides that were outstanding, right?
9    A   Yes.
10    Q   And if you could close a case and make an
11  arrest, that would be good.
12    A   Well, that was our job.
13    Q   And so it would be probably fair to say that
14  if you had a cooperating witness like Ralph Watson you
15  might have information that you or your partner, John
16  Halloran, would've brought up to him, "Hey, can you help
17  us out on any of these homicides we've got?"
18    A   That's a possibility, yes.
19    Q   Okay.  And you don't have a specific
20  recollection that that's what happened here, but that's
21  certainly a very reasonable possibility.
22    A   Yes.
23    Q   Okay.  It's more reasonable that that's what
24  happened than Ralph Watson just said, "Hey, I've got
25  some information on some homicide for you."

127

1    A   No, I reject your assertion it's more
2  reasonable.  It happened both ways, so I can't agree
3  with that.
4    Q   Okay.  So sometimes you had somebody who would
5  just volunteer -- who was being investigated for an
6  armed robbery who just started volunteering information
7  about homicide unprovoked?
8    A   Yeah, we -- we've had some people, you know,
9  you can't -- people are all different.  People speak to
10  us for different motivations and for different reasons.
11    Q   Okay.  Did you have any information prior to
12  January 20, 1991 that would give you any indication that
13  Ralph Watson had any information about the Gerrod Erving
14  homicide?
15    A   No, not until Ralph Watson told us.
16    Q   Okay.  How were you able to get people to
17  cooperate with you if you were just giving them the hope
18  of possible leniency?  What incentive did savvy street
19  gang members have to cooperate with you if that's all
20  you could give them?
21    A   It's -- it's not as simple as an incentive.
22  As I testified before, I testified previously in
23  criminal court, as I do develop a rapport with these
24  individuals.  Many times with gang leaders, you have to
25  separate their personality when they say that, you know.

128

1  I don't know if you have children, when they're
2  children, they have one personality when they're with
3  their friends, they have another personality when
4  they're at church, they have another personality when
5  they're at school.  And these young gang members,
6  when they're out on the street, they're exhibiting the
7  personality of their street gang.  And then you try to
8  get them away from that.  So you'll talk about their
9  family.  You'll talk about, "Okay, well -- well, let me
10  tell you, Jean Nate loves you, right?  Bernard loves
11  you, right?  They take you to the doctor, they make sure
12  you got school clothes."  "No, no."  "Your mother loves
13  you, right?"  "Yeah."  "So did your mother teach you to
14  cheat, steal and shoot people?  Oh no.  Let me guess it
15  was your first grade teacher that told you to do that.
16  No, let me guess.  It was the preacher at Sunday church
17  that taught you to do that."  So what you had to do was
18  try to get them back out of that personality, so they
19  could see and know that there's life outside of street
20  gang.  And the way to do that was, the old adage the
21  truth will set you free.  You know, and I always used to
22  tell them this as well, that, you know, remember when
23  you were a little kid and you broke something in the
24  house and your mother came home and asked you about it,
25  and you lied to her.  And you got spanked then.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

129

1  And it's probably worse spanking than you got than if
2  you would've just told her the truth and said,
3  "Mom, I'm sorry." So that -- that's what we need to
4  think about here. You have life after this. This isn't
5  the under the world for you. So that's how I would
6  get -- I would talk to them as human beings with
7  a -- with a problem. You know, not one of these people
8  that I've ever dealt with, you know, they weren't born
9  stone cold killers. You know, they're -- they're a
10  product of their environment. Half of them didn't know
11  what they're doing. They're being manipulated by the
12  older street gang members. So that's how I would get
13  them to talk to me. And that -- and that same avenue,
14  that is the same avenue that we use in developing the
15  gang intervention program that I talked to you about
16  earlier, that was studied by the University of Chicago
17  and said it should be a model program. It was the same
18  thing.
19  Q  Yeah. Let's get back to Mr. Watson, okay?
20  A  Okay.
21  Q  Okay. So you can't tell me exactly what
22  happened in the context of that conversation in January
23  20, 1992 when you had Ralph Watson in the interrogation
24  room with your partner Halloran, how the Gerrod Erving
25  murder came. Do you need to take that?

---

130

1  A  No, I'm -- I'm sorry. No, it's okay.
2  No, I wish I could. I -- I -- I just don't recall.
3  It's been 30 years.
4  Q  And we agree that one scenario is that you or
5  Halloran suggested to Mr. Watson, does he have any
6  information to help you out on some of those unsolved
7  homicides that were outstanding, right?
8  A  Yeah. In so many words. Yeah. Do you know
9  anything about any unsolved homicides in the
10  neighborhood?
11  Q  Oh, if Mr. -- you know, at this point Ralph
12  had already been charged with a number of armed
13  robberies, right?
14  A  Correct.
15  Q  And he was being brought in for some lineups
16  that day?
17  A  I think one the way we --
18  Q  Yeah.
19  A  -- the report reads.
20  Q  And why was he being -- why were you
21  interrogating after the lineup? Like, why was he up
22  there at Area 3? Why were you interrogating him in the
23  first place?
24  A  Interrogating him?
25  Q  Or interviewing Ralph Watson? Why were -- why

---

131

1  were you -- after the line-up, why were you also talking
2  to him? What was the purpose of that? I mean, he'd
3  already been charged.
4  A  Well, he had another charge coming, so it was
5  a new crime.
6  Q  Is there any, like, notes or anything you
7  would've taken that could help us know how the Gerrod
8  Erving homicide came up that day? Have you seen any
9  notes you took?
10  A  No. If you could produce the investigative
11  files for the five or six armed robberies, there might
12  be something in there.
13  Q  But did you see anything in your preparation?
14  A  No, I don't have those files, either. I don't
15  see them.
16  Q  Do you agree with me that it's a little odd
17  that -- well, maybe it's not, but would you agree that
18  it's a little strange that you're talking to Ralph
19  Watson, investigating these armed robberies, and
20  suddenly you're getting a statement in a murder that you
21  had not previously done work on? That a little odd?
22  MR. GRILL: Object to form, argumentative.
23  A  Yeah, I don't -- I don't agree with your --
24  that it's odd. No, it's not.
25  Q  If -- once the Gerrod Erving homicide came up

---

132

1  on January 20, 1992 --
2  A  Uh-huh.
3  Q  -- would you, as an experienced homicide
4  detective, take a -- a break and look at the file to
5  apprise yourself about what this homicide was? You
6  know, cause of death, what happened, where it was?
7  MR. GRILL: Objection. Form.
8  A  Yeah, maybe. I -- I don't know. And you keep
9  saying an experienced homicide detective. In '92, I was
10  a detective for less than a year, so let's -- so
11  I don't -- I -- I don't know. I may have. I may not
12  have. I just don't know.
13  Q  Okay. All right. Let's go through
14  Mr. Watson's statement. You have that in front of you
15  as Exhibit 5?
16  A  I do.
17  Q  Okay. So this statement is dated January 20,
18  1992 at 23:30, at, like, 11:30, right?
19  A  Yes.
20  Q  And it was at Area 3, Violent Crimes?
21  A  Yes.
22  Q  And the felony review attorney was Attorney
23  Noonan?
24  A  Yes.
25  Q  I think it's John Noonan. And you were there

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

133

1  to witness it, and that's your signature down at the
2  bottom on each of the pages, right?
3      A  Yes.
4      Q  Okay.  And again, you don't remember this, is
5  that right?
6      A  I do not.
7      Q  Okay.  And -- but we'll skip the first part,
8  but it says -- let's see.  Down on the second page, when
9  it starts talking about the statements -- let's see,
10  about quarter -- maybe a quarter of the way down, you
11  read with me, it says, "Ralph states that a couple of
12  days prior to May 17, 1991, G-Nate robbed a dope house
13  located at 927 West 54th Street, which was run by the
14  Jet Black Stones Nation, which is a different gang from
15  the Black Stones."  Do you see that?
16      A  Yes.
17      Q  Okay.  Let me ask you this, did you know the
18  location 927 West 54th Street in your work as a tactical
19  officer, or a patrol officer, or at Area 3?
20      A  That specific address?
21      Q  Yes.
22      A  No.
23      Q  Okay.  So that specific address doesn't --
24  didn't mean anything to you at the time?
25      A  No.

---

134

1      Q  Okay.  And then it goes on to say, "Ralph
2  states G-Nate took a 12 gauge shotgun, a 0.3 caliber
3  that shoots a .357 rounds, and some cocaine from the Jet
4  Black Stones.  Ralph states that after G-Nate did this,
5  the Jet Black Stones declared war against the Black
6  Stones."  Do you see that?
7      A  Uh-huh.
8      Q  Yes?
9      A  Yes.
10      Q  Is it accurate to say that prior to January
11  20, 1992, you'd already had your conversation with
12  Bernard Gales about a possible internal war related to
13  G-Nate robbing dope houses?  You had that conversation
14  prior to this conversation with --
15      A  I --
16      Q  -- Ralph Watson, right?
17      A  -- I -- I said I don't know, but we'd have to
18  see what they -- it was rid out.
19      Q  Okay.
20      A  I -- I'm not sure.
21      Q  Okay.  I guess -- but if you did rid out
22  Mr. Gales prior to this time in January 20, 1982, that
23  would've been information you got from Mr. Gales, right?
24      A  What's in the statement?
25      Q  Well, about there being -- about G-Nate

---

135

1  robbing dope houses.  That was the information you got
2  from Mr. Gales, right?  Whenever you got it?
3      A  Yeah.
4      Q  Okay.  The statement goes on to say that,
5  "Ralph states that on May 16, 1991, just before
6  midnight, he was standing on the corner of 52nd and
7  Aberdeen with about eight other Black Stones.
8  Ralph states G-Nate came over and pointed to Little Ray,
9  who is Arnold Day, Darren, and Tenelle, and to him, and
10  told them to follow him."  Do you see that?
11      A  Yep.
12      Q  "Ralph state Little A is an enforcer, Darren
13  is a soldier like him, and Tenelle is a lookout for the
14  Black Stone and holds guns for them."  Do you see that?
15      A  Yes.
16      Q  Did you know back on January 20, 1991 who
17  Darren was?
18      A  No.
19      Q  Okay.  Did you ask Ralph Watson to -- tell
20  you who Darren was?
21      A  I -- I believe we all did.  Well, he knew it
22  was Darren.  I don't know if he knew his last name.
23      Q  Did you ask him to describe the physical
24  description of Darren?
25      A  I think he did, and I think that's in your

---

136

1  report.
2      Q  Okay.  Did you ask him who Tenelle was?
3      A  I'm sure we did.
4      Q  Did you ask him to describe Tenelle?
5      A  I believe that description is in the police
6  report, too.
7      Q  Okay.  But did you, back in -- on this date,
8  you didn't the Darren that he was referring to, correct?
9      A  Not as it pertains to the statement.  I said
10  earlier that I knew a Darren, whether or not it's the
11  same Darren, I don't know.
12      Q  And how about Tenelle, did you know a Tenelle
13  back in January 20, 1982?
14      A  No.  Was Tenelle a boy or girl?
15      Q  Well, did you know the Tenelle that Ralph was
16  telling you about?  Did you ask him to describe Tenelle?
17      A  No, I -- that's why I'm asking.  You asked me
18  if I know a Tenelle.  I just -- is Tenelle a boy or a
19  girl?
20      Q  Did you ask Mr. Watson if Tenelle was a boy or
21  a girl?
22      A  I believe we may have, yeah.  If it's in the
23  description of the report.
24      Q  Okay.  Okay, let's go on.  It says -- then the
25  statement goes on to say, "Ralph states he has known all

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

137

1      of them for five years."  Do you see that?
2          A  Uh-huh.
3          Q  Is that a yes?
4          A  Yes.
5          Q  Okay.  "Ralph states that they all follow
6      G-Nate through the alley to 927 West 54th Street.
7      Ralph states, he knows this is a Jet Black Stone
8      territory.  Ralph states that they all go into the
9      gangway across the street from 927 West 54th Street."
10     Do you see that?
11         A  Yes.
12         Q  You reading along?  Okay.  "Once in the alley,
13     Ralph states that G-Nate pulls out an automatic handgun,
14     and gives it to Little A."  You see that?
15         A  Yes.
16         Q  "Then Ralph states, G-Nate pulls out a second
17     gun, a revolver, which Ralph states he has seen many
18     times before because it belongs to the gang."
19     Do you see that?
20         A  Yes.
21         Q  Okay.  "Ralph states that Tenelle gets out of
22     the gangway first to act as a lookout.  Ralph states
23     that G-Nate and Little A go out of the gangway next,
24     right?"
25         A  Yes.

---

138

1          Q  And then "Ralph states that he goes about two
2      feet out of the gangway, and looks around for Jets, so
3      he does not get shot.  Ralph states that Darren is next
4      to him.  Ralph states a Jet named Gerrod, who he knows
5      across the street from -- is across the street, I'm
6      sorry, on the porch of 927 West 54 Street."  Do you see
7      that?
8          A  I do.
9          Q  Did you know Gerrod Erving?
10         A  Nope.
11         Q  And do you remember -- oh, sorry.  Okay, so
12     Ralph -- the statement goes on to say, "Ralph states
13     G-Nate walks across the street with the gun, points at
14     Gerrod, and Little A walks on over, too, with his gun
15     out.  G-Nate says to Gerrod, 'Look like you own it.
16     Look like you owe it?'"
17         A  Blow it like you owe it.
18         Q  Look like --
19         A  Blow it.
20         Q  Oh, blow it like you owe it?  Thank you.
21         A  Yeah, that's a street term around here.
22         Q  What does that mean, blow it like you owe it?"
23     In your -- what was your understanding of what that
24     phrase means?
25         A  Give it up.

---

139

1          Q  Give it up?  Okay.
2          A  Yeah.
3          Q  And then Little A says to Gerrod, "All as
4      well.  What's up with Mo?  What's up, Mo?"  Right?
5          A  "All is well," is a gang greeting, and "What's
6      up, Mo," is another gang greeting.
7          Q  Okay.  "Then Ralph states, 'What's up, Mo?"
8      Is a greeting between Black Stone gang members, right?
9          A  Uh-huh.
10         Q  Is that what's in the statement?
11         A  Yes.
12         Q  "And G-Nate said to Gerrod, 'Give me the
13     drugs,' and Gerrod said, 'I don't have it.
14     Little,'" -- can you -- what does that say?
15         A  It's hard to read.  Little Wee has it?
16         Q  Little Wee we has it.  Do you know who Little
17     Wee is or who that refers to?
18         A  I don't know.
19         Q  Then, "Ralph states he -- that he then was
20     looking around in a different direction, and he heard
21     three gunshots."  Do you see that?
22         A  I do.
23         Q  And then, "Ralph states, he saw Gerrod fall
24     back into the hallway of the porch.  Ralph states he and
25     Darren ran through the gangway to 53rd and Aberdeen,"

---

140

1      right?
2          A  Yes.
3          Q  And then, "Ralph states Tenelle ran toward
4      Halstead.  Little A and G-Nate ran toward 53rd and May,"
5      right?
6          A  Yes.
7          Q  Okay.  So you don't remember Ralph giving this
8      statement to you and the felony review attorney Noonan,
9      right?
10         A  No.
11         Q  But you know that you were present for this,
12     and this is what was documented by the felony review
13     attorney?
14         A  Yes.
15         Q  Okay.  Now, after this statement, you
16     continued to look for Arnold Day.  Is that right?
17     I'm sorry, what are you reading?
18         A  I -- yeah, I'm -- I'm just -- I don't know if
19     after that statement, if I could pinpoint where people
20     were looking for Arnold Day.  I don't -- I don't recall
21     if I went out looking for him or not.
22         Q  What actions did you take after you got this
23     statement to corroborate the information that Mr. Watson
24     had provided to you, if any?
25         MR. GRILL:  Form.  Form.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

141

1    A   I -- I don't know.  Sitting there 30 years
2 later, I don't know what I did.
3    Q   Is it -- well, generally, was it your
4 practice, once you got a statement from somebody in a
5 homicide case, to try and corroborate the information
6 that the individual had provided to you --
7    A   If you could.
8    Q   -- to see if it matched the physical evidence
9 in the case?
10   A   If you could, yes.
11   Q   Okay.  So here, did you take any steps to
12 corroborate the information that Ralph Watson had
13 provided to you about the weapons that were used in this
14 homicide?
15   A   I'm sure we did.  I just -- I -- I don't
16 remember.  I mean, if he was giving us a statement, and
17 the weapons were incorrect, it -- he probably would've
18 been questioned about it that you're lying or you don't
19 know.
20   Q   And that was just what I was going to get to.
21 One of the important things about when you get a
22 statement is you, as a homicide detective, want to
23 corroborate, is that information accurate?  Is it
24 truthful, right?
25   A   To -- to the best of your ability that you can

142

1 determine, yes.
2    Q   Because sometimes people might be lying to
3 you, right?
4    A   Yes.  Yeah, we've had our case.  We -- we have
5 had.
6    Q   Or sometimes they may just not know and may
7 not remember, right?
8    A   Yeah, no, we've had this street gang do that.
9    Q   Lie to you?
10   A   Pardon?
11   Q   You've had this street gang, the Black
12 Keystones?
13   A   Yeah.
14   Q   You had them provide false information on a
15 homicide?
16   A   Yeah, they were -- they were paid to identify
17 a Gangster Disciple as a member of a homicide.
18 We found out about it after he was charged, and he was
19 subsequently released.
20   Q   Okay.  So that's one of those reasons,
21 especially, you want to make sure that the information
22 you're getting matches up with something that you can
23 corroborate, say like the physical evidence that you
24 have?
25   A   If you can.

143

1    Q   Yeah.  You can't always, but if you can --
2    A   Yeah.
3    Q   -- you want to, right?
4    A   Yes.
5    Q   Because that's an important step to find out
6 is this a reliable statement or not, right?
7    A   Yeah, among other things.  Uh-huh.
8    Q   Well, certainly in that case you just gave me
9 as an example, you were given false information, an
10 individual got charged, and it turned out they had
11 nothing to do with that homicide.  Somebody was
12 manufacturing or making up facts against them or
13 statements against them.
14   A   Yeah.  The gang was -- they wanted to get rid
15 of them.
16   Q   They wanted to get rid of this Gangster
17 Disciple?
18   A   Yes, all about money.
19   Q   Okay.  So here, some of the information that
20 just on the face of the statement you had to go off was,
21 there were apparently other individuals involved in
22 this, a Darren, right?
23   A   Uh-huh.
24   Q   Is that right?
25   A   Yes.

144

1    Q   And a Tenelle, right?
2    A   Yes.  We talked about that, yes.
3    Q   And then Little A's mentioned, right?
4    A   Little Wee, yes.
5    Q   Little Wee, also Little A.
6    A   Little A.
7    Q   And -- okay -- oh, and G-Nate.  I'm sorry,
8 G-Nate.
9    A   Uh-huh.
10   Q   Right?
11   A   Yes.
12   Q   Did you already know at this time that
13 G-Nate had -- was deceased?
14   A   Yes.
15   Q   So by the time you were talking to Ralph
16 Watson, you already knew Nathaniel Anderson had been
17 killed in a homicide?
18   A   Yes.  I think it was officially ruled a
19 suicide, but I forget what actually happened.
20   Q   And he -- that was back in October, right?
21   A   I believe it's in my report.  Yeah, I think
22 October of '91.
23   Q   How did you know -- how did you find out that
24 G-Nate had been -- had died?
25   A   I don't recall.  Would've been somewhere in

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

145

1   our office on the homicide board.
2       Q   Oh, tell me about the homicide board.
3   What was the homicide --
4       A   It was just a --
5       Q   can you describe the homicide board?
6       A   It was just a piece of paper that listed
7   chronologically from the first of the year, the victim's
8   name, address, where it occurred.  I think gang
9   affiliation.  I haven't see one in a long time.  Whether
10  or not the case is open or cleared, or who's wanted.
11      Q   So there would've been one of those for 1991,
12  and the Gerrod Erving homicide would have been on it?
13      A   It'd be on a clipboard with two holes up here.
14  That's all.
15      Q   And it was hanging in the Area 3 --
16      A   Sergeant's office.
17      Q   -- okay.  So in the sergeant's office -- what
18  did you guys call it?
19      A   Sergeant's office?
20      Q   I'm sorry, what did you call the clipboard
21  that had the list of homicides?
22      A   Oh, I called it a homicide board.  I don't
23  know what other people called it.
24      Q   But it was just -- would it just contain the
25  homicides that were part of Area 3's jurisdiction?

146

1       A   Yes.
2       Q   Okay.  And then it would indicate the name of
3   the victim, the location, if there was any individuals
4   wanted -- I'm sorry, have the name of the victim, the
5   date of the homicide, the location of the homicide, if
6   anybody was wanted, and if it was cleared, closed --
7       A   If somebody was in custody, cleared-closed or
8   cleared-open.
9       Q   Okay.  And just for the record, cleared-close
10  is when the homicide's been cleared, and all the arrests
11  have been made, right?
12      A   Yes.
13      Q   And cleared-open is where there's been some
14  arrests made, and there might be some outstanding
15  assailants that have not yet been arrested?
16      A   Right, and there's exceptionally cleared-
17  closed and exceptionally cleared-open.
18      Q   And what does exceptionally cleared-closed
19  mean?
20      A   Exceptionally cleared-closed is where the
21  police have done their investigation.  We've identified
22  who did the murder, but there's a bar to prosecution.
23  Either the offender's dead, or the witnesses all died,
24  and there's nowhere else to go.  So -- and then
25  say -- there's exceptionally cleared-open, you know, one

147

1   of them is dead, or there's a bar to prosecution, and
2   the other people are -- we don't know who they are.
3   They're still open.
4       Q   Okay.  And would the RD number also be on that
5   list?
6       A   Yes.
7       Q   Okay.
8       A   And there would be a number, too.
9       Q   What do you mean a number?
10      A   Can I see that?  You see that 9163?
11      Q   Yes, and I'm going to just --
12      A   Yes.
13      Q   -- well we can write --
14      A   So that -- that would be the number on the
15  board.  9163.
16      Q   Okay.
17      A   So that's the 63rd murder for 1991.
18      Q   So I guess I'll just flip that up.  So I'm
19  holding up, this is a color copy of the investigative
20  file.  It's Day -- City_Day 49 through 156, or -- I'm
21  sorry, not 156, 158.
22      MS. DONNELL:  And we're going to make
23  this -- we can make this -- which are we on?
24  Exhibit 6?
25      (EXHIBIT 6 MARKED FOR IDENTIFICATION)

148

1       COURT REPORTER:  Yes.
2       THE WITNESS:  Can we -- would this be a good
3   time to take a break so I can go to the bathroom?
4       MS. DONNELL:  It's a perfect time for me, too.
5       THE WITNESS:  Okay, perfect.
6       MS. DONNELL:  So when we come back, we'll do
7   this.  So we'll go off the record, but just take
8   five minutes?
9       THE WITNESS:  Yeah, thank you.
10      VIDEOGRAPHER:  2:15, going off the record.
11      (OFF THE RECORD)
12      VIDEOGRAPHER:  We're back on the record for the
13  deposition of Kenneth Boudreau.  My name is Sheila
14  Jones.  Today's date is December 1, 2022, and the
15  current time is 2:25 p.m.
16      MS. DONNELL:  Okay.  I'm so sorry.  Can you
17  read back the last -- oh, I think I know where we're
18  at.
19      THE WITNESS:  Believe we were going to talk
20  about that homicide board.
21  BY MS. DONNELL:
22      Q   No, yes.  I'm sorry, and I did -- we made it
23  as Exhibit 6, so here we go.  Here's a -- this is a
24  black and white copy, but I think what you were telling
25  me when you got up -- and this -- I'll just put my color

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

149

1  copy up for the record, but you were saying that on the
2  front page of Exhibit 6, there's a 91-63, and that would
3  be for the year of 91.  The Gerrod Erving murder was the
4  63rd murder.
5      A.  Yes.
6      Q.  Is that out of Area 3?
7      A.  That's just Area 3.
8      Q.  That's just Area 3?
9      A.  Right.
10     Q.  Okay.  And then this is a -- you can look at
11  mine if you want to see, but the -- okay, I have the
12  color copy, but this folder here, this would be -- this
13  was the file that had the -- the victim's name,
14  the location, and the -- the date that it occurred,
15  right?
16     A.  Yes.
17     Q.  Okay.  And do you see the front page of -- did
18  you -- is any of this your writing on the front page of
19  Exhibit 6?
20     A.  No, this is the permanent retention file,
21  where all the reports go in.  It's got two hole
22  clipboards.
23     Q.  Yeah.  But isn't I represent to -- let's
24  make this Exhibit 7 -- since we're at 7.
25          (EXHIBIT 7 MARKED FOR IDENTIFICATION)

150

1      A.  That'd be --
2      Q.  So what -- do you recognize Exhibit 6?
3  You were saying you recognize that as the permanent
4  retention file?
5      A.  That -- that's what I call it.  There may be
6  another file that the police department keeps, but this
7  is what I recommend.  This --
8      Q.  That's --
9      A.  -- this is the one that's maintained in the
10  area.
11     Q.  Okay.  Tell me how you know this is the
12  Exhibit 6 is the copy that's maintained in the area?
13     A.  I've seen these a million times.
14     Q.  Okay.  And what is it about the appearance of
15  Exhibit 6 that makes you think this was your area file?
16  You can flip through it, too, if you want to.
17         MR. GRILL:  Form.
18     A.  I -- I recognize the folder.
19     Q.  You recognize the folder?  Okay.  And -- and
20  when you're saying area file, are you saying -- is that
21  the same thing as a running file?
22     A.  No.
23     Q.  Different?
24     A.  Yes.
25     Q.  What's an area file?

151

1      A.  This is where -- when we turn all the GPSs and
2  reports in, it gets placed in here, or if a crime lab
3  report comes in later on, it gets placed in here.
4      Q.  Okay.  But isn't that what you were saying was
5  the running plan, or no?
6      A.  No.
7      Q.  Okay.  What was the -- what was the running
8  file?  How did that look different?
9      A.  The running file was something that the
10  detectives would be able to refer to without taking this
11  out of the office.
12     Q.  I see.  So the file exhibit that you're
13  holding up as Exhibit 6, that's the file that stayed in
14  the office that if the state's attorneys want, you have
15  to check out and fill out like a library card?
16     A.  Yes.
17     Q.  But you're saying the running file was sort
18  of -- it was kept in an accordion shaped file?
19     A.  Yep.  We would have copies of maybe not all of
20  the stuff in it, but at least some of it.
21     Q.  Okay.  And that was a separate file that was
22  also kept at the area?  That was called the running
23  file.  That's the one you could take out on the street?
24         MR. GRILL:  Objection.  Foundation.
25     A.  It's more of a working file, whether you call

152

1  it a working fall or not.  It's a working file.
2      Q.  Okay.  But whatever you called it --
3      A.  That's what I would refer --
4      Q.  -- yeah, whatever you called it -- it had
5  different names, but whatever you called it, a working
6  file, that was the file that when the sergeant was
7  giving you an assignment on a homicide, he would hand
8  you that file.  And you would look through and see GPRs
9  and sub reports, get up to speed --
10     A.  Uh-huh.
11     Q.  -- and then go do the next step in the
12  investigation?
13     A.  Yes.
14         MR. GRILL:  Objection.  Foundation.
15     Q.  And that file looked different to you than
16  what I've given you as Exhibit 6?
17     A.  It could be.
18     Q.  The working file would be different?
19     A.  It could be different, yeah.
20     Q.  But that's when we talked about earlier today,
21  that gets kept up on the sergeant's desk for any open
22  homicides?
23     A.  Correct.
24     Q.  I'm sorry, in the sergeant's office, on top of
25  the file cabinet?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

153

1    A  Or in the filing cabinet.
2    Q  Or in the filing cabinet.  Right.  Okay.
3  On the face of Exhibit 6, there's, "In Custody: Arnold
4  Day," right?
5    A  Yes.
6    Q  And then a CV number, right?
7    A  Yes.
8    Q  And then down below it says -- I think it
9  says, "wanted," right?
10    A  Yes.
11    Q  And it says Number 3 is "M/B/16-20/Tenelle"?
12    A  Uh-huh.
13    Q  Right?
14    A  American male, Black, 16 to 20, Tenelle.
15    Q  And then Number 4 is male, Black --
16    A  16 to 18, Darren.
17    Q  -- and then Number 2 is Nathaniel Anderson,
18  killed in homicide on October 10, 1991, and then there's
19  a number.
20    A  Yes.
21    Q  But none of that's your writing, right?
22    A  No.
23    Q  Okay.  I'm going to make this Exhibit 8.
24  You can hold onto that.
25        (EXHIBIT 8 MARKED FOR IDENTIFICATION)

---

154

1    A  Okay.
2    Q  -- because we're going to back to that.
3  Just maybe set that -- so it's going to be Exhibit 8.
4  George, Exhibit 8's going to be the May -- the
5  supplementary report, so I marked as Exhibit 8, the
6  supplementary report produced in the cases City_Day 56,
7  and it should be just through 59.  I don't know if I
8  have an accidental page in some of these, and it's the
9  supplementary report that's dated February 18, 1992.
10        MR. YAMIN:  Okay.  Thank you, Heather.
11        MS. DONNELL:  I'm sorry, George.  I'm sorry,
12    what did you say?  Okay.
13        MR. YAMIN:  Yes, thank you.  That's all.
14        MS. DONNELL:  Thanks, George.
15  BY MS. DONNELL:
16    Q  Sorry.  Okay, so you have Exhibit 8 in front
17  of you, Detective Boudreau?
18    A  I do.
19    Q  Okay.  And you recognize Exhibit 8 as a
20  supplementary report pertaining to the Gerrod Erving
21  homicide?
22    A  One of them, yes.
23    Q  Okay.  And this is the one that you and your
24  partner, William Foley, or the partner that you had on
25  February 4, 1982, memorializes some of your

---

155

1  investigative work, right?
2    A  Yeah.  Detective Foley prepared this report.
3    Q  And you know that because he's the one in the
4  first box that says Reporting Officer?
5    A  Yeah, he signed my name.
6    Q  Okay.  And then you're listed in Box 94 as the
7  second officer, right?
8    A  Right.
9    Q  And then Sergeant Bonnke signed off on this
10  report?
11    A  Yes.
12    Q  And he was one of the homicide sergeants for
13  Area 3 during this time period, right?
14    A  Yes.
15    Q  Okay.  And he was your sergeant for your
16  shift, is that right?
17    A  It might have been one or two sergeants.
18    Q  Sergeant Bonnke, and who was your other
19  sergeant at that time?
20    A  Back then?  I don't know.  Sergeant -- we had
21  Sergeant Palmer, and we had Sergeant Corless in the
22  office, and Sergeant Crump.
23    Q  Is that everybody?
24    A  That's all I remember.  That -- no, right
25  here.  So no.  We had Sergeant Bonnke, Sergeant Ridges,

---

156

1  Sergeant Day, Sandra Day, and Sergeant Fitzgerald, and
2  then there was a couple more, I just can't remember
3  them.
4    Q  Okay.  And so I think you testified that
5  Sergeant Foley would've -- I'm sorry.  Sorry, Detective
6  Foley filled out this supplementary report, but it was
7  memorializing the work that you and Foley did together,
8  correct?
9    A  Right.  Yes.
10    Q  Would you have reviewed this before it was
11  submitted to Sergeant Bonnke?
12    A  I believe I would have, yeah.
13    Q  Was that your practice back in the day that if
14  you worked with somebody, one of your partners, either
15  Halloran, or Foley, or Keller, whoever it was, that if
16  they prepared the sub report, that you would review it
17  before it was submitted?
18    A  I -- I would say most of the time,
19  but I mean -- but if I was going on vacation, and this
20  would've been done a week later, I probably wouldn't see
21  it until it was already submitted, but --
22    Q  I was going to ask about that.  So this report
23  is dated February 18, 1992, right?
24    A  Correct.
25    Q  And -- but it is memorializing the work you

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

157

1   did on January 20, 1992 talking to Ralph Watson,
2   correct?
3       A   Yep, and the arrest of February 4.
4       Q   And the arrest of February 4, right?
5       A   Correct.
6       Q   Do you have any explanation as you sit here
7   today, why this report wasn't submitted until February
8   18, 1992?
9       A   It was submitted when he -- Mr. Davis was
10  placed under arrest, 4 days after the arrest, I mean.
11  There are no --
12      Q   Well --
13      A   -- about --
14      Q   -- I'll tell you that Mr. Day was arrested on
15  February 4, 1992.
16      A   4th, yeah.  Submitted two weeks later.
17      Q   Okay.  Was that -- I mean -- well, I guess
18  I'm saying do you have any explanation for why there
19  wasn't a supp report submitted after you spoke to Ralph
20  Watson on January 20, 1992?
21      A   No.  I -- I don't know.
22      Q   And was that day that you talked to Ralph
23  Watson, that was just you and John Halloran, right?
24  It wasn't Detective Foley, right.
25      A   You have the statement?

158

1       Q   Yeah.  You want to look back at the statement?
2       A   And we have all the armed robbery reports?
3       Q   Not at the -- I have the originals.
4       A   I -- I -- in order to answer, I'm going to
5   need the armed robbery reports, investigative files, not
6   only when this statement was taken, and if there was a
7   lineup conducted on that day.
8       Q   Okay, but you'll agree with me that the
9   information and the statement you got from Ralph Watson
10  is memorialized in this supplementary report that wasn't
11  submitted until February 18th, correct?  So if you look
12  on page 3 and page 4 of this supplementary report, is
13  where it's -- memorializes the information you got from
14  Ralph Watson, right?
15      A   I -- yes, but like I said, I -- I'd have to
16  see the armed robbery reports.  It may mention that he
17  gave a statement on this murder as a -- as a related RD
18  number, so I -- I don't know if this is the only place
19  this appears.  I could be.
20      Q   I see what you're saying, but with respect to
21  this RD number for the Erving homicide, this is the
22  supplementary report documenting for this RD number?
23      A   I'm confused.  You mean the Watson statement?
24      Q   Yes.
25      A   Or it could be documented in this armed

159

1   robbery file, too.  I don't know.
2       Q   I think what you're saying is it's possible
3   that the information that he gave with respect -- well,
4   Watson gave with respect to the Gerrod Erving homicide
5   would be memorialized in your supp report in an armed
6   robbery investigation?
7       A   That was mentioned.  Maybe not memorialized,
8   just that a statement was taken.
9       Q   But you would agree with me -- you haven't
10  seen any -- you haven't seen any supp report you
11  prepared on your conversation with Ralph Watson on
12  January 20, 1982, other than this one?
13      A   I have not.
14      Q   Okay.
15          MR. GRILL:  This one being -- just for the
16  record.
17          MS. DONNELL:  Exhibit 8.
18          MR. GRILL:  Thanks.
19  BY MS. DONNELL:
20      Q   Got it.  All right.  Okay.  Remember how
21  earlier I was asking you about if you asked Ralph Watson
22  who Darren was, right?  Remember that?
23      A   Yes.
24      Q   And you said -- oh, I think you described it
25  in your supp report.  Do you remember that?

160

1       A   Yes.
2       Q   Do you see anywhere in your supp report where
3   you indicate that you asked Mr. Watson to describe who
4   Darren was, and that you put that in your report, or
5   Foley put it in this report?
6           MR. GRILL:  Fully or Foley?
7       A   So I mean it's -- it's documented, the
8   description of Tenelle and Darren, and the only other
9   person talked to that mentioned them was Ralph Watson,
10  so I'm going to assume that came from Ralph Watson.
11      Q   Okay.  And what are the descriptions you're
12  referring to?
13      A   Under Wanted, under -- offender number 3:
14          male, Black, 16 to 25, 5'6", 140 pounds,
15  black hair, brown eyes, medium complected, frequents
16  area 53rd and
17          Aberdeen Street, no further information.
18  Nickname: Tenelle.
19      Q   Okay.
20      A   And Offender 4: male, Black, 16 to 18,
21  possibly named Darren, 5'5", 160, black hair, brown
22  eyes, medium complected, frequents the area of 53rd and
23  Aberdeen.
24      Q   Okay.  And you're saying you think
25  that -- you're testifying that information came from

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

161

1   Ralph Watson, or you're just speculating, and you don't
2   know where it came from?
3       A   There's only two people interviewed in this
4   report. One's Ralph Watson. One's Arnold Day. Arnold
5   Day does not mention Darren or Tenelle, so that's where
6   it came from.
7       Q   Okay. And then -- okay, it could have come
8   from the description of the offenders that the
9   eyewitness had given, correct?
10          MR. GRILL: Objection. Form.
11          MS. DONNELL: So if you look on -- I think you
12  have Exhibit 7 in front of you. Is that seven?
13          COURT REPORTER: Yes.
14  BY MS. DONNELL:
15      Q   Do you have Exhibit 7, sir? Exhibit 7.
16  And if you turn to Exhibit 7 on maybe the fourth page,
17  it has a Bates stamp City_Day 5. Oh, I think you went
18  too far. City_Day 5.
19      A   I can't see the Bates stamp.
20      Q   That's okay.
21          MR. GRILL: The next page.
22      Q   The next page. Do you see this page where the
23  offenders are described?
24      A   Yeah. The defenders are described on this
25  page, too.

162

1       Q   Okay. And what are the descriptions of the
2   offenders there?
3           MR. GRILL: On which page?
4       Q   I'm on City_Day 5. I don't know what you're
5   on -- is he on -- either one, you can be on, you can be
6   on City_Day 4 --
7       A   It says, "Male, black, 16 to 20, 5'3" to 5'6",
8   weight," no weight mentioned, "medium, dark complexion,"
9   and no name mentioned.
10          MR. GRILL: And that's on City_Day 4.
11      Q   You're on City_Day 4, sir? Yes.
12      A   Yeah.
13      Q   Okay. And then the second offender is listed
14  as?
15      A   Same. "Male, black, 16 to 20. 5'3" to 5'6".
16  Medium." No name, no weight, "Dark complexion," as
17  well.
18      Q   Okay. As you sit here today, you don't know
19  where the information in the sup report about the wanted
20  individuals came from? They came from the initial
21  incident reports or if it came from Ralph Watson,
22  correct?
23          MR. GRILL: Objection. That's not what he
24  steps back to. Mischaracterized.
25      A   No, what I'm -- what I'm saying is the

163

1   description inside the report prepared Detective Foley
2   is much more detailed, has a first name and it has a
3   weight. So is -- again, I'm going to say that this
4   information came from Ralph Watson.
5       Q   Okay. But on the part of the sup report where
6   the information is memorialized, that came from Ralph
7   Watson, in that part of the sup report, is there any
8   description of the Tenelle given in the part under,
9   starting on page 3 where it says Ralph Watson, is there
10  any physical description of Tenelle in that section of
11  report on page 3 or page 4?
12          MR. GRILL: Objection.
13      A   I don't -- I don't see it in the narrative.
14      Q   And the same is true for Darren, right?
15      A   Yeah, I -- I don't see any physical
16  descriptions in the narrative for anybody.
17      Q   Okay. Remember how in Ralph's statement he
18  said that he'd known Darren and Tenelle for five years?
19      A   Yes.
20      Q   Is there any reason you can think of that you
21  wouldn't have asked Darren to identify, I mean, asked
22  Ralph Watson to identify Darren for you so that you
23  could go find him?
24          MR. GRILL: Objection. Form, foundation.
25  Mischaracterizes the testimony.

164

1       Q   Well, any reason you can think of that you
2   wouldn't have asked Ralph Watson to identify Darren by
3   his last name?
4           MR. GRILL: Mischaracterizes the evidence,
5   form, argumentative.
6       A   Okay. Answer?
7           MR. GRILL: Yeah.
8       Q   Yeah.
9       A   Yeah. So in Ralph Watson's previous
10  statements, when he identified offenders like Edward
11  Anderson and Edward Sanders, like he provided the last
12  name, I -- I'm assuming right here that he didn't know
13  their last name. He couldn't identify him any further
14  than what he just did.
15      Q   So you're assuming you asked him to identify
16  Darren and that he just couldn't, and that's why you
17  didn't write it down?
18      A   I -- I -- I'm saying is if he had more
19  information to provide on their identities, it would be
20  documented.
21      Q   And that's because -- I'm sorry.
22      A   And it's not. And I can't -- it's hard to
23  identify somebody by their first name.
24      Q   And -- but you're saying -- I think what
25  you're saying is you would've wanted to know what

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

165

1    Darren's last name is or what Darren's street name is so
2    you could go find him, right?
3         A   If he knew it, yeah.  It would be documented.
4    Just like in his previous statement to me, Edward
5    And -- Ralph Watson did identify people and he did
6    identify them by their first and last name because he
7    knew it. This one, I'm guessing he didn't.
8         Q   And you're saying you are -- I'm saying you
9    are saying -- testifying that you would've asked Ralph
10   Watson to give you that information, right?  That's a
11   normal follow up.  Like if he said Darren was present
12   for the murder of Gerrod Erving, you would want to go
13   find Darren and arrest him, right?
14        MR. GRILL:  Objection.  Form.  Argumentative.
15        A   Yes.  And I -- I testified that's what he
16   provided with us and there was no other further way to
17   identify him at that time.
18        Q   Okay.  And the same is true with Tenelle.
19   You would've asked Ralph Watson to give you-all the
20   information he could possibly give you about Tenelle,
21   so you could go find Tenelle?
22        MR. GRILL:  Objection.  Form.
23        A   That's my guess right now, yeah, because based
24   upon my previous experience with Ralph Watson, if he had
25   the last names he provided him.  He didn't have them

166

1    this time.
2         Q   Okay.  And we don't have a GPR from you or
3    other notes from you on your conversation with Ralph
4    Watson on January 20, 1992, correct?
5         A   I don't know if you do or not.  I -- I --
6         Q   You haven't seen it?
7         A   I haven't seen it.  I don't know if it's in
8    one of those other armed robbery files, either it was
9    connected, got filed, or, I don't know.
10        Q   Do you remember taking notes during that
11   conversation with Ralph Watson?
12        A   Not 30 years later, no.
13        Q   Okay.  And there's no -- I haven't seen any
14   record of evidence that Detective Foley was on shift
15   with you, on duty with you on January 20, 1992. Assuming
16   that's the case, that Foley wasn't with you, you
17   would've provided him the information about Ralph
18   Watson, correct?
19        A   Well --
20        MR. GRILL:  Form.  All wrong with that
21   question.
22        A   Yeah.  I'm not saying I informed Detective
23   Foley about anything.  I mean, it was common knowledge.
24   The statement was taken on the 12th -- the supervisors
25   would've known about it, people would've been known

167

1    about it.  To me, it's clear that the gang specialists
2    knew about it because they -- according to the reports,
3    they met Detective Foley at 51st and National and they
4    go to a house.  So maybe they -- they already knew about
5    it and tried to find them, so.
6         Q   Okay.  You can put that down.
7         A   I just want to make sure that there's no GPR.
8         Q   So you're looking through Exhibit --
9         A   I want to see if there's any GPRs, yeah.
10        Q   Okay.
11        Q   Okay.
12        Q   You didn't find any, right?
13        A   Not in this one, no.
14        Q   Okay.  I think -- can I have -- let's keep
15   this together.
16        A   I mean, there's a forward arrow GPR in it.
17   Is that part of this?
18        Q   It's going to be, but it's not -- it's --
19   okay.  What I have in front of you is Exhibit 6, is one
20   of the Erving homicide files, and Exhibit 7 is the other
21   Erving homicide file, both of which were produced by the
22   city in this case, okay?  That's what you have -
23        -
24        A   Aren't they the same?
25        Q   Nope.  They'd be different, but --

168

1         A   Okay.
2         Q   Okay.  But you can have them there.
3         A   Okay.
4         Q   I think you already answered this, but you
5    don't have any memory of taking any steps to go find the
6    Darren that Ralph Watson implicated in his statement
7    after he gave you that statement, as you sit here today,
8    correct?
9         A   No, I don't.  And if -- if we only had a first
10   name of Darren, I -- I wouldn't know I -- besides
11   driving up 53rd, I never even asked him for somebody
12   named Darren.  No, I -- I don't recall if I did or if I
13   didn't.
14        Q   Okay.  And the -- you certainly haven't seen
15   any reports, GPR supplementary reports documenting any
16   investigatory steps you took to go find Darren, correct?
17        A   Not me or other detectives.  I mean, I know
18   what I did in this case, but there's a number of
19   detectives assigned to this, yes.
20        Q   But in your review of the file, the Erving
21   homicide file, you haven't seen anything indicating any
22   follow up that you or the other detectives did to locate
23   Darren?
24        A   No.
25        Q   Okay.  And when you wrote, or when -- in the

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

169

1  supplementary report in Exhibit 8, that report indicates
2  it's cleared open, correct?  Meaning there's the arrest
3  of Arnold Day, but it's open as to the --
4     A  Report that the -- detective Foley prepared?
5     Q  Correct?
6     A  Yes.  Those are open.
7     Q  Okay.  Now, and the same is true for Tenelle?
8  You don't see anything in the file documenting any
9  investigatory steps you took to go find or identify the
10  Tenelle that Ralph Watson implicated in his statement on
11  January 20, 1992, correct?
12    A  No.
13    Q  And you can't think of anything that you did
14  that isn't documented in a report to go find out who
15  this Tenelle was, correct?
16    A  No.
17    Q  Okay.
18    A  Not that I can see.
19    Q  Now, back at this time, you had -- obviously
20  you had connections in the gang that you could have gone
21  and made inquiry to try figure out who this Darren
22  was, right?
23       MR. GRILL:  Objection.  Form.
24    A  Could have, yeah.
25    Q  And, same is true for Tenelle, you could have

170

1  gone and found out -- try and find out who's this
2  Tenelle, too, right?
3     A  I could have, and I may have.  I don't know.
4  I just --
5     Q  And also that's true for the gang unit.
6  You could have called the gang unit over at the Ninth
7  District to see, do they know somebody by the name of
8  Darren that hangs around with Jeanie, right?
9     A  They -- this information may have been shared
10  with them.  I -- I don't know.
11    Q  Would there be any reports documenting if
12  you'd gone -- if you had made that effort to call up the
13  gang unit over at Area 9 to try and find out who Darren
14  or Tenelle was that hangs around with G-Nate at this
15  time?
16    A  No.
17    Q  Could you have asked Bernard Gales who Darren
18  was, who hangs around with G-Nate?
19    A  As I told you before, they weren't very
20  forthcoming about their own street gang.
21    Q  Well at this time Bernard Gales was already
22  trying to get your help to protect his family, because
23  he was worried about what G-Nate was doing.
24    A  That -- that's correct.  But he wasn't going
25  to tell on his own street, he'd tell me about street

171

1  gang to save his family.  But he wouldn't tell me.
2  I talked to him millions of times.  He would never
3  identify -- told you the story about the young lady
4  where the baby, as tragic as that was, not -- none of
5  them would talk.  One of them fired bullet, was probably
6  celebratory, but none of them would tell us who did
7  that.
8     Q  Understood, in that scenario.  But in this
9  scenario, Bernard Gales was already trying to solicit
10 your help to protect his family.  There was already
11 going to be, you know, potentially an internal gang war.
12 Why wouldn't you have gone to Bernard Gales to say,
13 "Hey, I'm looking for this Tenelle or Darren who hangs
14 around with G-Nate and is robbing dope houses?
15       MR. GRILL:  Objection foundation.
16    Q  Is there any reason why you wouldn't have
17 tried that?
18    A  I may have --
19       MR. GRILL:  Objection.  Form.
20    A  I will submit this to you, though.  Me trying
21 to help somebody isn't conditional.  Me trying to save
22 somebody's life is a conditional on whether or not
23 you're going to provide me with name of somebody.
24 I'm going to help you either way.
25    Q  Oh sure.  I was just saying for you -- for

172

1  your purposes of trying to solve this homicide and you
2  know that there's -- you have a statement from Mr.
3  Watson that's implicating, you know, three individuals
4  including himself.  My question was just why you
5  wouldn't've made efforts to find out and identify at
6  least those two other individuals.
7     A  There's probably 40 individuals to try and
8  identify with that street gang that did shootings.
9  I -- as I've told you before, Bernard Gales wasn't
10 formally identified --
11    Q  Okay.
12    A  He needed, you know, he just didn't want his
13 family killed.
14    Q  Did you make any efforts to -- well let me ask
15 you, did you any -- any conversations with the felony
16 review attorney Noonan on January 20, 1992, about
17 seeking charges for Ralph Watson for his participation
18 in the Erving homicide?
19       MR. GRILL:  Objection.  Foundation.
20    Q  After he gave the statement?
21    A  I -- it may have came up, it may not have,
22 but that -- that's under the purview of the state's
23 attorney and whether to charge or not charge.
24    Q  Do you have any information as to why -- or
25 Ralph Watson wasn't listed as a -- one of the possible

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

173

1  assailants on the Erving homicide?
2      A   I -- I look at his statement.  It's -- it's
3  sort of explanatory.  He went with them, doesn't -- it's
4  not clear that he's a lookout.  He didn't have a gun on
5  him.  Tenelle went to be a lookout.  So that -- I guess
6  that's a state -- question for the state's attorney's
7  office, why he wasn't listed.
8      Q   So is it your testimony after you got this
9  statement from Ralph Watson on January 20, 1992, you
10  didn't call felony review in an effort to pursue charges
11  on Ralph Watson?
12      A   They were already there.  They were there and
13  talking to Ralph Watson.  They heard his story.  There's
14  no reason for me to call him back.
15      Q   I'm sorry.  They were -- but you called them
16  to come take the statement, right?
17      A   And -- and the -- do the approval on the fifth
18  charge, which ASA never did.
19      Q   I see.  So he was already there to approve the
20  fifth charge on the aggravated robbery?
21      A   Some, yeah.  It's one state's attorney, some
22  state's attorney, as I have the arrest report.
23      Q   But I guess your question, do you know for
24  sure you never pursued seeking charges against Ralph
25  Watson for the Gerrod Erving homicide, because you

174

1  viewed a statement as exculpatory of himself.
2      A   I -- I, we may have discussed --
3          MR. GRILL:  Hang on -- form.
4      A   We may have discussed it.  I -- I -- I don't
5  know.  I'm just telling you that when I read this today,
6  I -- I could see it.  It's -- it's a toss-up either way.
7      Q   Okay, but you're not saying you -- you
8  remember what you're feeling was back in January 20,
9  1992, if it was just a toss-up either way back then, or
10  you think you would've had the same belief back then
11  about Mr. Watson's involvement in the Erving homicide?
12      A   Yeah, I -- I mean, I don't know what my
13  feelings were back then, but you know, if he's -- if
14  it's fringe line, whether or not he's accountable or
15  not, I mean, I do know the state has an obligation to
16  only bring charges that they ethically believe they can
17  win.  And whatever the mental gyrations of were of
18  state's attorney or farther review at that time, I -- I
19  don't know.  I mean, I'm not a lawyer so I don't know
20  what happened.
21      Q   Okay.  We're going to move on to -- well,
22  actually, let's stick with Mr. Watson for a little bit.
23  So do you remember -- well did you have contact with
24  Mr. Watson after the January 20, 1992 statement?  Do you
25  remember having communications with Mr. Watson with

175

1  regard to his statement he gave in the Erving homicide?
2      A   Oh, he wrote me a series of letters.
3      Q   Okay.  Did he send them directly to you?
4      A   Yes.
5      Q   Okay.  So you remember getting those letters?
6      A   Or he sent them to state's -- I don't remember
7  why, but I remember seeing them.
8      Q   Well, you remember seeing them back in 1992?
9      A   Somewhere around there, yes.
10      Q   And did you meet with him when he got ridded
11  to Cook County sometime after that?  Do you remember
12  meeting with him ever again?  Ralph Watson.  Did you
13  ever meet with him?
14      A   On the 20th?  I don't -- I don't remember ever
15  meeting him again.  I didn't --
16      Q   I mean, never meeting him after January 20,
17  1992.
18      A   No, I don't remember.
19      Q   Okay, but you remember -- did you review the
20  letters before your deposition today?
21      A   No, I did not.
22      Q   Okay.  But you remember Ralph Watson trying to
23  send you some letters?
24      A   Yes.
25      Q   Okay.  What do you remember about the letters?

176

1      A   He was looking for help with his armed
2  robberies.
3      Q   Okay.  Anything else?
4      A   No.
5      Q   Can't find them.  Lost them --
6      A   And I -- my guess at -- at that time and he
7  kept thinking that he's not in a good place.
8      Q   What do you mean by that?
9      A   Well he identified an officer of his street
10  gang and now they're both locked up in the same jail
11  together and now he's labeled as a -- a fink.  He's got
12  to do something.
13      Q   Did Ralph Watson ever tell you that?
14      A   No, that's my -- as I said, I believe that
15  that's my thought.
16      Q   Okay.  I think we're on Exhibit 9, is that
17  right?
18          COURT REPORTER:  Yes.
19          MS. DONNELL:  Okay.
20          MR. GRILL:  Nine?
21          COURT REPORTER:  Yep.
22          MS. DONNELL:  I'm giving you what I marked as
23  Exhibit 9, which has the Bates stamp -- George, is
24  the Bates stamp O'Connor Exhibit 3 and it's Cook
25  County State's Attorney Day v.  Boudreau 407

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

177

1    through, I think, 414 or 416.  I'm sorry.
2         (EXHIBIT 9 MARKED FOR IDENTIFICATION)
3    BY MS. DONNELL:
4         Q    And you can look through these if you didn't
5    get a chance to review these.
6         A    Okay.
7         Q    Did you read all of them or just that first?
8         A    Just that first one.
9         Q    Okay.
10        A    There's a lot here so.
11        Q    Yep, that's fine.  We can start with the first
12   one.  Okay.  Do you remember receiving -- so we're
13   looking at the letter that's on Bates stamp 408 and 409,
14   right?
15        A    Yes.
16        Q    And it starts, "Dear Ken, by the time you
17   receive this letter, I hope it finds you in the best of
18   health."
19        A    Yes.
20        Q    Okay.  And then he relays to you that,
21   "Ken, I went to court on 2-14-92 and they told me that I
22   have three indictment instead of two.  And the only case
23   I can see is where you told me if I could help you clear
24   up that murder that it could help me."  Do you see that?
25        A    Uh-huh.

---

178

1         Q    Yes?
2         A    Yes.
3         Q    Okay.  Did you tell Ralph Watson that he could
4    help you on a murder, that you could help him?
5         A    No, I told him that I would convey, as I told
6    you earlier, that he cooperated in other investigations.
7         Q    And then he goes on to say, "I pray that I
8    don't have no murder case, because I didn't have nothing
9    to do with it.  You told me to sign and it could help
10   me.  So I took you at your word."  Do you see that?
11        A    Yeah.  He was worried about just the same way
12   that you were asking me about line of questions about is
13   he accountable.
14        Q    Is he going to get charged?
15        A    Is he going to get charged.
16        Q    Did you make -- tell Ralph that if he provided
17   the statement to you that implicated G-Nate and Arnold
18   Day, that he wouldn't have to worry about being charged
19   in the Erving homicide, because he was just going to be
20   someone who witnessed it.  He wasn't saying he did with
21   a lookout or he was a shooter?
22        A    No, because the state's attorney was there
23   when he gave that statement.  If he was going to get
24   charged, he would've got charged then.
25        Q    Well he would've given you that statement

---

179

1    before the state's attorney arrived or the substance of
2    the statement before the state's attorney arrived,
3    right?
4         A    And he gave it to the state's attorney that
5    day.  So if he would've -- if he was going to be
6    charged, he would've been charged that day.
7         Q    I know.  And so I'm saying it's -- did you
8    indicate to Ralph that he didn't have to worry about
9    getting charged in that Erving Murder?
10        A    No.  I never told him that.
11        Q    You never told.  Okay.  And he's asking you to
12   come visit him, right?
13        A    He's also asking me did his information help
14   me, because I don't know if he learned that Arnold Day
15   got locked up, but if any of that got out, he's going to
16   be killed.
17        Q    Where is that?  Where do you see that?  Where's
18   that In this letter?
19        A    It's pretty bad.  "I heard about Mr. Day
20   getting caught.  Did any of my information help in any
21   way?"
22        Q    I'm sorry, what page are you on?
23        A    I'm right here.
24        Q    Okay, you're on a different letter.
25   I'm sorry.  Can we go back to the first letter?

---

180

1         A    Yeah.
2         Q    Okay.  Sorry.  I just want to make sure we're
3    on the same --
4         MR. GRILL:  Okay.  Well you did ask him where
5    it was.
6         MS. DONNELL:  I did.  And I thought he just
7    read -- he -- I thought he just read the first
8    letter.  So maybe we're just reading different
9    letters, so I just want to make sure
10   we're --
11   so --
12        MR. GRILL:  Right, but  he can still answer the
13   question.
14        MS. DONNELL:  Sure.  He can answer the
15   question.  But we were, I was talking about the
16   first letter --
17        MR. GRILL:  So let him answer the question.  So
18   which -- the question was -- you want to have it
19   read back?
20        MS. DONNELL:  Well, let's just be clear,
21   because I thought we were on the same two pages and
22   he said he'd only read one letter.  So I'm just
23   making sure we're on the same letter.
24   BY MS. DONNELL:
25        Q    So why don't you tell me what you're

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

181

1  looking at and what I'm looking at, because I don't
2  want to --
3      A   He actually -- he makes that statement in both
4  letters.
5      Q   Well, okay.
6      A   I heard about Mr. Day --
7      MS. DONNELL: Let's stop for a second, just
8  stop for a second, because I want to make sure we're
9  on -- Andrew, it's totally fair that we're on the
10  same page and that we're talking about the same
11  document.
12      MR. GRILL: Right. And he's trying to tell you
13  that.
14      MS. DONNELL: Understood.
15      MR. GRILL: He's trying to tell you where in
16  the letter --
17      MS. DONNELL: But we were --
18      THE WITNESS: -- is the language that --
19      MS. DONNELL: Andrew, I appreciate that
20  you're -- you don't even have to do this. I said,
21  are we on page 408 and 409? He said, "Yes." And
22  we're clearly on different pages, so let's just get
23  on the same pages.
24  BY MS. DONNELL:
25      Q   So Mr. Boudreau, what pages have you read and

182

1  are you prepared to talk about?
2      A   Well, I'm trying to figure out, I guess,
3  but --
4      Q   Do you want to read all of them?
5      A   One letter here, 213. I said I have another
6  one here, 214 and then I have another one, 214. So are
7  these all the same?
8      MR. GRILL: I would just --
9      Q   So let's just start with the -- let's just
10  start with the first page, okay? So let's just be
11  together.
12      A   Okay.
13      Q   We're going to get through them all.
14  I'm not -- and you can testify -- okay. So let's -- so
15  the first page, I have a letter that says, "Dear Ken,
16  by --
17      A   Yes.
18      Q   -- the time you receive this letter." Okay.
19  And it's got Bates 408 at the bottom and 409. Do you
20  see that?
21      A   I do.
22      Q   Okay, so just for this one, that's where I was
23  at first, okay?
24      A   Okay.
25      Q   And then I was going to -- did you get a

183

1  cha -- let me just get you a chance to read these two
2  pages. Why don't you do that first, okay?
3      A   Okay.
4      Q   Okay. So we already talked about the first
5  part of this letter, right?
6      A   Yes.
7      Q   Okay. And then and the end of this letter,
8  it says, "Richard told me he's going to help me in any
9  way he could." Do you see that?
10      A   Yes.
11      Q   Do you know who he's referring to?
12      A   I think it's his attorney. I think it's the
13  public defender.
14      Q   Okay. I want you to skip to the fact that
15  there's a note that says Rich Dowling 5656 and there's a
16  number, then it says Mass Transit Unit. This is on page
17  414.
18      A   Okay. Where did that come from?
19      Q   I don't know, I'm asking you, do you know who
20  that is? Rich Dowling? Who is that?
21      A   He was one of the original arresting officers
22  on his original arrest.
23      Q   Okay.
24      A   But why that's part of that letter, I don't
25  know.

184

1      Q   Is that the Richard he's referring to?
2  Is Richard Dowling involved in the original arrest back
3  in November 29, 1991?
4      MR. GRILL: Hold on. Form. Calls for
5  speculation and foundation.
6      A   I have no idea why that Richard's on there.
7      Q   Okay.
8      A   I don't know who wrote that.
9      Q   Okay.
10      A   It doesn't -- is it his writing?
11      Q   No, it's in -- I don't -- it's in the state's
12  attorney's file. So I'm just saying, if you -- let me
13  ask you this, did you ever talk to Ralph Watson in the
14  presence of Richard Dowling?
15      A   Unless it was during his original arrest in
16  November.
17      Q   That's what I'm saying. Back in November,
18  did you talk -- did you and Officer Dowling talk to
19  Ralph Watson together back in November in 1991?
20      A   I don't know if we did or not.
21      Q   You don't remember?
22      A   No.
23      Q   Okay, let's turn to the next letter. So I'm
24  now on page 410 and 411.
25      A   Okay.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

185

1    Q.  Okay.
2    A.  Next -- next letter?  Okay.
3    Q.  Okay, so this is the letter that -- this
4    starts out the same way.  And it says, "Ken, I went to
5    court on 2-13-92 and they told me I had three
6    indictments instead of two.  And I know I got two
7    additional charges on me, but I don't know where the
8    other indictment came from.  The only thing I could
9    think about is where you told me to help you clear that
10   murder and it would help me out.  Ken, I did everything
11   to help myself and it and you.  I even signed the paper
12   that I had nothing to do with."  Do you see that?
13   A.  Yes.
14   Q.  Okay.  So do you remember getting this letter
15   from Ralph Watson?
16   A.  I remember seeing this letter.  I -- I don't
17   remember if it came directly to me or if it was the
18   state's attorney or I got it and gave it to the state's
19   attorney.
20   Q.  But you remember getting the letter back in
21   1992?
22   A.  I remember seeing these letters, yes.
23   Q.  Okay.  But I'm saying you remember seeing
24   these back at the time of the Erving homicide
25   investigation, like back around, you know, February,

186

1    1992?
2    A.  I don't know when I saw them, but it could be
3    possible I saw them around this time.
4    Q.  And here is where it says, "I heard about
5    Mr. Day getting caught, did any of my information help
6    in any way?"
7    A.  Yes.
8    Q.  You see that?  Okay.
9    A.  Yeah.  He says that in the first letter, too.
10   Q.  And then it says -- this letter goes on to
11   say, let's see, "I also heard about Mr. Jesse, Jo Jo."
12   Do you see that?
13   MR. GRILL:  Is that Tojo or Jo Jo?  I don't
14   know.
15   Q.  Do you know who that is?
16   A.  I don't know who that is right now.
17   Q.  Do you know somebody who went by the name of
18   Jo Jo on the street back in 1991?
19   A.  Not off the top of my head, no.
20   Q.  Okay.
21   A.  And are you saying he's worried about getting
22   killed?
23   Q.  Okay.
24   A.  "If anybody sees any of those papers -- "
25   Q.  This says, "Richard told me he would do what

187

1    he can to help me and to get less time."  Do you see
2    that?
3    A.  Yeah.  I -- I -- I -- I -- I think -- I think
4    he's referring was -- I'm guessing, I don't know,
5    but I think he's referring to his public defender.
6    Q.  Okay.
7    A.  I mean, it's -- it was -- it was nice to
8    receive a letter like this.
9    Q.  Why was it nice to receive a letter?
10   A.  Just read his last paragraph.  "Kenneth, thank
11   you for allowing me to see what I am missing in the
12   world, and who loves me, and how to get through life."
13   It's the same -- it's the same way I told you I talked
14   to people.
15   Q.  This is sort of reinforcing for you about how
16   you said you talked to people?
17   A.  And the rapport I had with him, yes.
18   Q.  Okay.  And here Mr. Watson is telling you that
19   essentially he trusted you and went ahead and gave you
20   information on a murder that he said he had nothing to
21   do with, right?
22   A.  He's not -- see that's -- he's -- I -- I think
23   he's worried about getting charged with that murder.  And
24   when he says he had nothing to do with it, it doesn't
25   mean he wasn't there.  It means he didn't have a gun.

188

1    He didn't shoot anybody.  He was their look out.
2    Q.  Okay.
3    A.  I mean, the state's attorney had this letter.
4    If you -- if you think that that's what they're doing,
5    then maybe they would've charged him with murder.
6    Q.  Okay, did you ever recall learning that
7    Mr. Watson recanted his statement back in 1992 or 1993?
8    A.  He recanted his statement?
9    Q.  Yes.
10   A.  No, we anticipated he would.
11   Q.  Why did you anticipate he would?
12   A.  Because he identified an officer in a street
13   gang and that's death.  And the street gang was going to
14   threaten him, just like he indicates in these letters,
15   that if it gets out he's dead.  So his only choice is to
16   recant.
17   Q.  Well, by the time these letters came around,
18   you already had a statement from Arnold Day, right?
19   A.  I did, yeah.
20   Q.  Yeah.
21   A.  It don't matter, though.  I told on you,
22   I snitched on you, you're going to get a violation,
23   may even be death.  He's even articulating that, that
24   he's worried about.  He's worried about seeing his
25   family again.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

189

1    Q   Did you --
2    A   So of course he's going to recant. We see it
3  all the time in gang cases, where they recant.
4    Q   Okay, did you have any conversations about
5  Mr. Watson with -- I'm sorry, strike that. Did you have
6  any communications in any form with Mr. Watson after you
7  received these letters?
8    A   I don't know. I just, I can't remember.
9  I'm sorry.
10       MS. DONNELL: Okay, I think we're on Exhibit
11       10. George, Exhibit 10 is the Cook County State's
12       Attorney Day vs. Boudreau 405.
13       (EXHIBIT 10 MARKED FOR IDENTIFICATION)
14       MR. YAMIN: Okay, thank you.
15  BY MS. DONNELL:
16   Q   Mr. Boudreau, have you seen this exhibit
17  before? And if not, I'll let you review it and then
18  I'll ask you some questions about it, okay? Have you
19  seen this before?
20   A   No, who took this?
21   Q   Okay. You want to read it and then
22  we can -- I can talk to you about it?
23   A   Yeah, I'm just wondering who authored this
24  before I read it.
25   Q   This is Mr. Katz, Stuart Katz, the public

190

1  defender for this part of this, okay?
2    A   Oh, assistant investigator? Yes.
3    Q   So you can review it.
4    A   Okay.
5    Q   See Mr. Katz's signature?
6    A   So this is a defense recantation of the
7  witness.
8    Q   Have you seen this before?
9    A   No.
10   Q   Okay, so why don't you read it, and then I'll
11  ask you some questions.
12   A   Okay.
13       MR. YAMIN: Sorry, did you represent this
14       letter as one particular year?
15       MS. DONNELL: Oh, I said '92, '93. It's dated
16       both, so there's both. We can say each signature,
17       who has what date.
18       MR. GRILL: Yeah, you could -- yeah.
19       MS. DONNELL: It just --
20       MR. GRILL: I mean, the --
21       MS. DONNELL: I didn't date it.
22       MR. GRILL: Yeah, the exhibit speaks for
23       itself.
24       MS. DONNELL: Yeah.
25       MR. GRILL: I just was more concerned about the

191

1  dates. Got it, thank you.
2        MS. DONNELL: I said both.
3        THE WITNESS: Okay.
4  BY MS. DONNELL:
5    Q   Okay?
6    A   Uh-huh.
7    Q   Okay, so let's walk through this.
8    A   Yes.
9    Q   Okay, so in this statement -- in this -- so in
10  this statement of Ralph Watson, it says that -- that you
11  were -- that he was arrested on November 27, 1991, for
12  an armed robbery and when he was in the Cook County Jail
13  in January of '92, he was brought over to the area -- or
14  brought to the police station by Detective Boudreau,
15  right?
16   A   Yes.
17   Q   And then he says after the lineup, Detective
18  Boudreau said I was being charged with five more armed
19  robberies and two more attempt murders. Do you see
20  that?
21   A   I do.
22   Q   Did you tell Mr. Watson he was going to be
23  charged with two attempt murders?
24   A   No.
25   Q   So you deny that happening?

192

1    A   Yes.
2    Q   Okay. And then it says Detective Boudreau
3  asked us if I knew anything about several different
4  murders in my neighborhood, right?
5    A   Yes, I see that.
6    Q   And that's something you said you possibly
7  could have said, you just don't recall one way or the
8  other, right?
9    A   Right.
10   Q   Okay, so you're not saying that's not true?
11   A   Right.
12   Q   Okay. And then I said no when he asked about
13  the Gerrod Erving murder. Do you see that?
14   A   I do.
15   Q   Did you ask mister -- does this refresh your
16  recollection that you asked Ralph Watson direction about
17  the Gerrod Erving murder?
18   A   No, this doesn't. I mean, this is a -- this
19  is a document presented -- prepared by his defense
20  attorney through his investigator.
21   Q   Okay.
22   A   That flies in the face of the context of the
23  two previous letters that he sent me by himself.
24   Q   Okay. "Then Detective Boudreau brought in a
25  stack of unsolved armed robberies and he said I could be

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

193

1 charged with all of them and I'd never see the streets
2 again." Do you see that?
3    A  I do.
4    Q  Do you -- did that happen?
5    A  No.
6    Q  Okay, you think that's made up?
7    A  I do.
8    Q  Okay.  "And if I didn't want to be charged
9 with all of those other cases, which I did not commit,
10 I would have to agree to say that Arnold Day shot Gerrod
11 Erving."  Do you see that?
12    A  I see it.
13    Q  Do you -- did you do that?  Did you tell
14 Mr. Watson that he would have to say that Arnold Day
15 shot Gerrod Erving?
16    A  No, absolutely not.
17    Q  Okay.  "Detective Boudreau told me what I was
18 supposed to say, and to write it, and he gave me all the
19 details, including who was there, what kind of gun was
20 used, and where it took place."  Do you see that?
21    A  I do.
22    Q  Okay, did you give Ralph Watson the
23 information about the Gerrod Erving murder on January
24 20, 1992?
25    A  No.

194

1    Q  You deny that happening?
2    A  Yes.
3    Q  And that's because you wouldn't feed a witness
4 or a suspect stats about a homicide, right?
5    A  Maybe portions of it, but not all of it.
6    Q  What do you mean?  You would give them some
7 portions of the information about a homicide?
8    A  I might give them some information.  You know,
9 there's three people there, if you were one of them, or
10 something like that, see if one's telling the truth,
11 but I'm not just fishing.
12    Q  I see, so you might give some information that
13 you know about a homicide in order to have not leverage,
14 but to let the individual know you actually know what
15 was going on, so they can't lie to you?
16    A  Yeah.
17    Q  Would you give them non-public information,
18 like you know where the victim was found or something
19 unique about the crime scene?
20    A  No, where the victim's found is public
21 information.  It's out there in the middle of the
22 street.  No, I would probably give non-public
23 information, something that we would need that person to
24 tell us so we know he's telling the truth.
25    Q  Would you ever give the suspect that you know

195

1 what kind of weapon was used or what caliber bullets
2 were used?
3    A  No.
4    Q  Why not?
5    A  Why not?
6    Q  Yeah.
7    A  Well, that's a little bit like you said
8 before.  We like to corroborate several elements.
9 It's one of the things that we do.
10    Q  It's also true that you don't want to
11 contaminate information, like if you provide information
12 that's only known to the investigating officers then you
13 have no way to corroborate whether the individual
14 actually had that information independent of the police,
15 right?
16    A  Yeah.  Sometimes you can't corroborate
17 anything.
18    Q  But you would agree with me that you think
19 it's improper for a detective in the context of an
20 interrogation to give the individual you're
21 interrogating non-public information about the murder,
22 right?
23    A  Generally, yeah.  I would agree with you.
24    Q  All right, so let's go on.  Let's see.  How
25 about this?  Did you -- you know, it says Detective

196

1 Boudreau gave me two scraps of paper to write down
2 everything he said.  He then got some food, two hot
3 dogs, some donuts, and a coffee, and I agreed to do what
4 he -- he want to avoid being charged with that stack of
5 armed robbery.
6    A  I do.
7    Q  Did you give Ralph Watson some scraps of paper
8 with the information he was supposed to say about the
9 Gerrod Erving homicide?
10    A  Nope.
11    Q  Okay, so you deny that happening?
12    A  I -- this will be the first time in my entire
13 career somebody ever said that, so yeah.  No, I deny it.
14    Q  Okay.  And then after I ate he called the
15 state's attorneys and it took about an hour for the
16 state's attorney to arrive.  Do you know whether that's
17 true or not?
18    A  Yep.
19    Q  You do?
20    A  Pardon?
21    Q  Is that true?
22    A  No.  I don't -- I don't know how long it took
23 them to arrive.
24    Q  Okay.  And when he arrived, I told the state's
25 attorney my name.  The state's attorney took the two

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

197

1  scrap pieces of paper I had and wrote out the story I
2  supposed to give. Do you see that?
3      A  I do.
4      Q  Did that happen?
5      A  No.
6      Q  So you deny that --
7      A  The state's attorney took two pieces of paper.
8      Q  Okay. And then he went over the written
9  statement with me and showed me where to sign it,
10  and I signed it as directed, right?
11      A  I believe the statement was taken
12  contemporaneously, but yeah. He showed me where to sign
13  it, he would have done that.
14      Q  And then Mr. Watson says, "I never told the
15  state's attorney that Detective Boudreau had threatened
16  me with the other robberies to make me sign the
17  statement." Right? That part happened, right?
18  That never happened? That's true?
19      A  That never happened, and, you know, and the
20  proof of that is, if you look at his two previous
21  letters, these ain't letters written by somebody who was
22  threatened. But, I mean, this -- you got to -- I'm
23  looking at this and I understand that you got to go over
24  this, but this was written by defense to get their
25  client off. And this is a young man who is sitting in

198

1  the penitentiary, worried about getting killed because
2  he was -- he identified a gang leader and he actually,
3  at the end of the statement, he's trying to apologize to
4  him. He's trying to save his life, so I don't give much
5  credence to what's on this piece of paper.
6      Q  Okay, fair enough.
7      MS. DONNELL: Are we at 11?
8      COURT REPORTER: Yes.
9      MS. DONNELL: Okay, George, Exhibit 11 is Cook
10  County State's Attorney Day v. Boudreau 717.
11      (EXHIBIT 11 MARKED FOR IDENTIFICATION)
12      MR. YAMIN: Okay, thank you.
13  BY MS. DONNELL:
14      Q  Okay, I'm going to ask you some questions
15  about Exhibit 11, but before I do, when you're saying
16  Mr. Watson gave you statements about a gang leader,
17  you're referring to G-Nate or Arnold Day, or both?
18      A  Sorry, what?
19      Q  You're saying that Ralph Watson was concerned
20  because he'd given information about a leader in the
21  gang, right?
22      A  Yeah.
23      Q  Are you referring to G-Nate?
24      A  Both.
25      Q  Both, and Arnold Day. Okay.

199

1      A  Arnold testified at his trial he was an
2  officer in the gang, so they're both in it.
3      Q  So you're referring to both of them.
4  Okay, but at the time --
5      A  But G-Nate's dead, so I don't think he's
6  worried about G-Nate killing him.
7      Q  Okay. So this is a piece of paper from the
8  Cook County State's Attorney's file. Do you recognize
9  this handwriting at all?
10      A  No.
11      Q  Okay. And here is it said there's a
12  statement, "Can't throw it out statement, new defendant
13  to see him, just three were present, four cases armed
14  robbery, is the first part of the note." Do you see
15  that?
16      A  Can't throw it out, the statement. I see it.
17      Q  Okay. And it says "Writ Watson in for 2-21
18  or 2-22. Boudreau has case up on writ for 2-23, 2-24,
19  but Boudreau has cases up." Do you see that?
20      A  I do.
21      Q  Does that refresh your recollection? Did you
22  ever -- about whether or not you met with Ralph Watson
23  at some point when he was writted for court?
24      A  No. I mean, this is a state's attorney's
25  handwriting. Maybe they might have been rendered in on

200

1  those two days. I have a case upon a write for 2-23,
2  2-24, but I don't know. You're going to have to find
3  out the state's attorney who wrote this.
4      Q  Yeah.
5      A  It's not making any sense to me.
6      Q  Not making sense to you and it doesn't refresh
7  your recollection whether you ever met Watson over at
8  court on a day you had cases up?
9      A  I'm sorry, say it again?
10      Q  I'm saying it doesn't refresh your
11  recollection in any way whether you met with Watson
12  about his -- after his recant sometime when -- at court,
13  correct?
14      A  No, and if -- and if a witness recanted with a
15  defense attorney, I wouldn't go. That's something for
16  the state now to deal with. I wouldn't go reenter the
17  room again.
18      Q  Okay.
19      A  I've never done that.
20      Q  You never did that? Okay, I need to take just
21  a short break, so I apologize.
22      A  Okay, good.
23      MS. DONNELL: I'll just take -- let's go off
24  the record.
25      VIDEOGRAPHER: Okay, going off the record.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

201

1   3:27 p.m.
2       (OFF THE RECORD)
3       VIDEOGRAPHER: Okay, we're back on the record
4   for the deposition of Kenneth Boudreau. My name is
5   Sheila Jones. Today's date is December 1, 2022, and
6   the time is 3:45.
7   BY MS. DONNELL:
8       Q   Okay. I'm going to switch gears a little bit.
9   So --
10      A   Who's Renee Spence?
11      Q   She's one of the attorneys on our --
12      A   Okay, all right.
13      Q   Yeah. She's been here occasionally off
14  and on --
15      A   Yeah, I see her hopping off and on.
16      Q   She's my colleague. Okay, so the Gerrod
17  Erving was obviously a shooting death, right?
18      A   Yes.
19      Q   Okay. And I'm going to just -- I'm going to
20  have you look at -- this was Exhibit 6, the
21  investigative file. If you turn to -- I don't know if
22  you remember the evidence that was obtained from the
23  crime scene, but just to refresh your recollection you
24  can turn to City_Day 63. This is Exhibit 6.
25      A   Oh it's a two-sided thing?

---

202

1       Q   Oh, yeah, did two sided, sorry.
2       A   And then some of them were upside down.
3   You see?
4       Q   So if you go to City_Day 63 -- if you start at
5   62, it's the major crime progress report is where I'm
6   going. Do you have Exhibit 6 in front of you?
7       A   Yeah, it's this one
8       Q   Do you have 6 in front of you?
9       A   Yeah, this is the one I got.
10      Q   Oh, okay, yeah.
11      MR. GRILL: Yeah, okay.
12      Q   Okay, got it. Sorry, it looks like 7, too.
13  This one, it's about maybe ten pages in from the
14  beginning. I'm referring to Dan McWeeny had the major
15  crime progress report, the scene report. That's what
16  I'm referring you to, okay? Are you with me on page
17  City_Day 63? Do you see that the weapon was a nine
18  millimeter handgun, automatic, not recovered. And then
19  if you look down, evidence recovered, nine millimeter
20  bullet, two nine millimeter cartridge casings, pictures
21  of the scene and the victim, blood standards all were
22  processed by the crime lab. Do you see that?
23      A   Yes.
24      Q   Okay. All right, so I think earlier you
25  testified that obviously that kind of evidence, physical

---

203

1   evidence, obtained at a murder scene is the kind of
2   evidence that you would use as a homicide detective to
3   solve the crime, right? If possible.
4       A   If possible, yeah.
5       Q   It's information you could use to corroborate
6   statements gave by witnesses or suspects, right?
7       A   Sometimes, yeah.
8       Q   And sometimes you could use that -- that
9   evidence to also match up to a murder weapon, possibly,
10  if the ballistics analysis can do that?
11      A   Yeah. I mean, there's limitations on that.
12      Q   Okay, what kind of limitations are you
13  referring to?
14      A   The limitations are -- are this. We knew that
15  the street gangs, if they use the handgun in a shooting
16  or a murder, it would usually make its way over to an
17  opposing street gang at a couple different ways. One,
18  have a hype go over there and sell it, because they
19  didn't want to get caught with a dirty gun.
20      Q   When you're saying a hype, you're saying a
21  drug addict or --
22      A   A drug addict.
23      Q   Okay, so they could -- so you're saying if a
24  gun got used in a homicide --
25      A   By a street gang. If it's a nation gun.

---

204

1   A nation gun is a -- it's the gun belongs to the street
2   gang.
3       Q   Okay.
4       A   And I think in this case we had testimony from
5   people that there was a national gun stolen at 53rd and
6   Aberdeen, I believe, where Mr. Day admitted he sold
7   drugs in his testimony. And if that gun became dirty or
8   was used in -- in a homicide, the gang would try -- they
9   wouldn't want to keep it, because they watch TV, too,
10  and ballistics, and it'd sometimes make its way over to,
11  you know, into another gang territory, be traded for
12  narcotics or actually sold on the street. We've had
13  cases where one gun was used in five, six different
14  shootings all over the city and none of them were
15  connected, except by the gun. So you got to be very
16  careful with that.
17      Q   Well, wouldn't the gangs be sort of savvy to
18  that? Like, why would they buy another gang's gun if it
19  was a dirty gun? Do you have information as to --
20      A   Well, it's not --
21      MR. YAMIN: Hold on.
22      MS. DONNELL: He can answer that.
23      MR. YAMIN: I can give an objection first,
24  because of how that question is formed and the
25  foundation for it. Go ahead, if you can try to

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

205

1    answer that.
2        THE WITNESS: I -- I don't know if I can answer
3    that. I just know they couldn't go up to a store
4    and buy a gun, and guns were -- as I said, that's my
5    experience.
6    BY MS. DONNELL:
7        Q    Can I ask you this? Oh, go ahead.
8        A    Yeah.
9        Q    Well, my question is, you know how you just
10   testified that you had to be careful about the
11   ballistics evidence or guns being recovered because of
12   this practice, you're saying, of guns that were
13   considered dirty once they were used in a homicide
14   being, if it was a nation gun they'd get rid of it, or a
15   gang gun they'd get rid of it, right?
16       A    Yeah.
17       Q    How did you get that information?
18       A    We -- we learned that on the street from
19   people. I mean, I even had a case where I had an
20   informant going around buying guys' guns, so.
21       Q    What do you mean going around buying those
22   guns? Buying nation guns or dirty guns?
23       A    He was buying dirty guns for us, yeah.
24       Q    And then you --
25       A    The street gang would tell us, "I got to get

---

206

1    rid of this gun. It was used in a shooting," and we
2    bought it.
3        Q    And you bought it to get off the street or you
4    bought it to do the ballistics?
5        A    We bought it to further the investigation in
6    that case, but if I caught -- if you had a gun and it
7    was used in a shooting eight months ago, it doesn't mean
8    you did the shooting.
9        Q    Understood, but --
10       A    That's what I'm saying.
11       Q    That's what you're saying. So you're saying
12   it was -- it was evidence that you'd have to take and
13   find out was there other corroborating evidence?
14       A    Yes, and sometimes when that would happen, the
15   information like that would be sent over to ATF or the
16   CAGE unit and they would do a -- they would try to
17   figure out where that gun came from.
18       Q    But it's also -- is it also fair to say that
19   it's not that you would totally disregard that evidence
20   if you got ballistic evidence linking a gun to a murder.
21   It's not like you'd be like, "Oh, that means nothing to
22   me because it probably was sold to somebody else once it
23   was used in the murder."
24       MR. YAMIN: Well, form, foundation, calls for
25   speculation. Go ahead.

---

207

1        A    That's a very -- no, would I ignore it?
2    No, I wouldn't.
3        Q    Okay.
4        A    Would I be aware of it? Probably is there
5    stuff that we could do with it? Maybe.
6        Q    Depends on the case.
7        A    It probably depends on the case.
8        Q    Sure, it depends on the case. I guess what
9    I'm saying is if you have -- if you had evidence linking
10   a gun to a homicide, it's certainly information you
11   wouldn't ignore. It's information you'd see, can I do
12   something with this, right?
13       MR. GRILL: Objection. Form, foundation, calls
14   for speculation. Go ahead.
15       Q    You can answer.
16       A    Yeah, and it depends on what point in the
17   investigation when --
18       Q    Sure.
19       MR. GRILL: Let me -- hang on. You done with
20   your answer?
21       A    Yeah, but in this case right here, at this
22   time and this date when you're talking about this, I was
23   focused on Ralph Watson and an eyewitness testimony.
24   There's other detectives assigned to this case
25   and -- that may look that later, but my entire focus on

---

208

1    that day was Mr. Ralph Watson, state's attorney, not
2    only on this murder, but we had an armed robbery going,
3    we have other witnesses that are coming in from the
4    armed robbery, I believe. Mr. Choke. So that was my
5    focus on this.
6        Q    Understood, and I'm just going to ask you some
7    general questions first, though, okay?
8        A    Okay.
9        Q    So -- but -- just generally speaking, as a
10   homicide detective, when you have a shooting homicide
11   and there were bullets or casings recovered, that was
12   the kind of information that was collected, sent to the
13   crime lab so analysis could be done, because it may
14   prove through evidence to solve the crime?
15       A    It could.
16       Q    It could, and it would certainly be your
17   expectation that the crime lab -- well, it's true that
18   the crime lab would send their reports back to the area
19   and it would go into the homicide file, right?
20       MR. YAMIN: Objection. Foundation. Go ahead.
21       A    Yeah, I would hope so.
22       Q    Yeah, and when that information came back, you
23   would expect the sergeant, if there was information to
24   follow up on, say follow up on this and he'd give it to
25   someone, the detectives, to follow up on, right?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

209

1    MR. YAMIN: Objection. Foundation,
2    speculation.
3    A    You'd have to ask the sergeants how they
4    handled that.
5    Q    Well, you -- is it true that from time to time
6    you were assigned to follow up on evidence that came
7    back from the crime lab that might link to a possible
8    suspect?
9    MR. YAMIN: Incomplete hypothetical point.
10    A    I -- I don't recall any time just sitting
11    here. It may have, but I don't recall any time.
12    Q    Well --
13    A    It'd probably go back to the same detectives,
14    to the detectives that were on the crime scene report
15    that -- that were there when the crime lab recovered the
16    bullets. That's who the report would be made out to.
17    Q    So you're saying if the linked crime lab -- if
18    there was evidence collected at the crime scene, like
19    ballistic evidence, that typically those reports would
20    go back to the scene detective? So in this case,
21    McWeeny?
22    MR. YAMIN: Objection, mischaracterizes his
23    testimony.
24    Q    I'm sorry, I thought that's what he just said.
25    If I mischaracterized it, you can correct me.

210

1    A    Most of the time. If I could show you a crime
2    scene processing report, you'll see the detective's name
3    that requested the crime lab.
4    Q    Okay.
5    A    And that's who the report would probably go
6    to.
7    MS. DONNELL: Okay, let's make this Exhibit 12.
8    Okay, this is Exhibit 12. George, Exhibit 12 is
9    City_Day 46.
10    (EXHIBIT 12 MARKED FOR IDENTIFICATION)
11    MR. YAMIN: Thank you.
12    BY MS. DONNELL:
13    Q    Sir, I'm showing you what I've just designated
14    as Exhibit 12 to your deposition. It has a Bates stamp
15    City_Day 46. This is a Crime Laboratory Report dated
16    August 8, 1991, okay? And have you seen this report
17    before?
18    A    I may have.
19    Q    Okay, let me know when you've had a chance to
20    review it.
21    A    Yeah, I know this report was discussed at the
22    trail of Arnold Day, but -- so go ahead.
23    Q    Okay, so this is a classification and an
24    evaluation relative to the Erving homicide, the RD
25    number for the Erving homicide, correct?

211

1    A    Correct.
2    Q    Okay. And it indicates that -- that on July
3    3, 1991, firearm F1-1745 was received at the crime
4    laboratory from unit 632 and it has an inventory number
5    for an RD number, right?
6    A    Yes.
7    Q    Okay. And then it says this weapon is a nine
8    millimeter caliber S&W model 439 automatic, auto pistol
9    with serial number O-B-L-I-T.
10    A    It's obliterated. The gang -- somebody
11    removed the serial numbers.
12    Q    I see, obliterated, okay. Then the
13    weapon -- thank you -- that same weapon was examined and
14    test fired and, in the opinion of the reporting firearms
15    examiner, some or all of the evidence submitted
16    was fired in this -- from this weapon identified as
17    F1-1745, right?
18    A    Yes.
19    Q    Okay, so in this case for the Erving homicide,
20    the crime laboratory was able to match up a gun with the
21    bullets fired, according to their opinion, that were
22    found at the Erving homicide, right?
23    MR. GRILL: It slightly mischaracterizes the
24    exhibit, but --
25    A    It's not bullets that were matched.

212

1    It appears to be the shell casing.
2    Q    I'm sorry, the shell casing. Thank you for
3    that correction, both of you. Thanks. Okay, but you'd
4    agree basically the casings collected from the Erving
5    homicide were matched with a particular firearm that had
6    been recovered?
7    A    Yes, that's what the report says.
8    Q    Okay. And that was part of the Erving
9    homicide investigation?
10    A    Correct.
11    Q    And that was known as of August 1991?
12    MR. GRILL: Objection, form.
13    MS. DONNELL: Well, the report's dated
14    August 1991.
15    MR. GRILL: Well, it's still form an
16    objection --
17    MS. DONNELL: That's fine.
18    MR. GRILL: Go ahead.
19    Q    You can --
20    MR. GRILL: And foundation. So that'd be both,
21    actually.
22    MS. DONNELL: Okay, you can just --
23    MR. GRILL: Just form and foundation.
24    MS. DONNELL: Thank you.
25    MR. GRILL: You're welcome.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

213

```
1    BY MS. DONNELL:
2        Q   Do you want to -- I mean, you want to find it
3    in the investigative file?  So you can look at City_Day
4    46.  I gave it to you separately, but --
5        A   No --
6        Q   -- if you want to look at it --
7        A   I'm trying to answer your question that it was
8    known as of August 8th.  It was known at a crime lab.
9    I want to see what -- when did it make it into this
10   file?
11       Q   And you're looking at the inventory on Exhibit
12   6 --
13       A   The inventory.
14       Q   -- to try and find it?  And that's the crime
15   lab reports were documents on inventory, right?
16       A   So I'm just trying to figure out and
17   not -- I'm not seeing it listed on this inventory for
18   this file.  I mean, the date of the report is
19   May -- august 8th.  There's a crime lab report dated
20   May 21, '91, but I don't see this in here.  It could be,
21   but I'm not seeing it on inventory.
22       Q   So that's a good question.  So but -- so would
23   you have expected, if it was in the -- that file to be
24   on the inventory, right?  And you don't see it on the
25   inventory, right?
```

214

```
1        A   Unless this is a misprint.
2        Q   What do you mean?
3        A   Well, we had -- whatever item 12 is.  Crime
4    lab report, let me see if it's the same one.  Court
5    reporter.  And then there's also the crime lab report on
6    the back of this, but that's from the crime lab.
7        Q   I'm sorry, I don't know what you're referring
8    to.  If you're referring to the back --
9        A   That little thing right there, that's a
10   firearms evidence report.  That's telling you the class
11   characteristics.
12       Q   Okay.  And so you're referring to -- I'll just
13   make sure the record's clear, that on City_Day 50, which
14   is --
15       A   Yeah, there's one there, too.
16       A   There's a crime report that says weapon
17   characteristics, describing the weapon characteristics
18   for the crime?
19       A   Right.
20       Q   Okay.  And you're saying that's another crime
21   lab report?
22       A   That would come from the -- that would come
23   from the crime lab.
24       Q   Okay, thank you.
25       A   Is -- they're identifying the characteristics.
```

215

```
1        Q   Thank you.  I just want to make sure you keep
2    that together.
3        A   Yeah, I am.
4        Q   So -- so I'm going to -- I think you're trying
5    to find it in that file in front you and in front
6    of -- in Exhibit 6 --
7        A   Yeah, because I don't see it in this file.
8    I see this one.
9        Q   Yep.
10       MR. GRILL:  What's -- identify this one.
11       THE WITNESS:  Oh, I'm sorry.
12       MS. DONNELL:  He -- sorry -- he's saying he
13   sees the crime lab report that has Bates stamp --
14       THE WITNESS:  Oh, City_Day 0127.
15   BY MS. DONNELL:
16       Q   And that's the May report?
17       A   That's the May report that's listed on
18   inventory.
19       Q   And the inventory, right.  Oh, and just
20   generally speaking, for the inventory all the documents
21   that go in that file were supposed to be in the
22   inventory, all the GPRs, right?
23       A   If received there.  If I'm not mistaken,
24   there's two sets of files.  One that downtown keeps and
25   one that the office keeps.
```

216

```
1        Q   Okay.  And did they have different sets of
2    information in them?
3        A   No.
4        Q   Okay, so I'll have you look at City_Day -- I'm
5    sorry, I'll have you look at Exhibit 7.
6        A   Okay.
7        Q   But keep that one together so -- I know,
8    you've got a lot of paper in front of you.
9        A   Okay.
10       Q   There's a clip over there for you, so we're
11   going to get that --
12       A   That's right here.
13       Q   Okay, here is Exhibit 7, which was produced by
14   the city in this case, and if you go to City_Day 46 --
15       MR. GRILL:  Wait a minute.
16       Q   -- I think you'll find the same report.
17       A   Okay.
18       Q   So towards the back, at the very end of this
19   file.
20       A   Okay.
21       Q   You're going to see the May and then the
22   August crime lab reports.
23       A   Okay, I see it.
24       Q   Okay.  And also if you look on page City_Day
25   23, you'll also see a copy of the same August report.
```

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

217

1     A   On City_Day 23?  In this one?
2     Q   Yeah.
3     A   Are these both here?
4     Q   One more.
5     A   Oh, it's in here twice.
6     Q   Do you see that?
7     A   Yes.
8     Q   Okay, so -- okay.  And then let's see, are we
9   on Exhibit 13?  I've got one more for you.  So you agree
10  with me it's at least in one of the files --
11        (EXHIBIT 13 MARKED FOR IDENTIFICATION)
12    A   Yes.
13    Q   Okay.  And it's there at least two times?
14    A   Uh-huh.
15    Q   In that file.  Okay.  I'm handing you -- did I
16  hand you Exhibit 13?  George, Exhibit 13 is Cook County
17  State's Attorney Day v.  Boudreau 984.  Okay.  Have you
18  ever -- what I'm heading you is a firearms receipt and
19  worksheet.  Do you see this?  Do you recognize this kind
20  of document from the crime lab?
21    A   I do.
22    Q   Okay.  And here there's some analysis being
23  done.  This is for a case named by Thomas Antonio,
24  right?
25    A   Case name Antonio Thomas.  Correct.

218

1     Q   Okay.  And there's a firearm number.
2   That's the same firearm, the F1-1745 that matches up
3   with the gun that you just reviewed in Exhibit 12,
4   right?  You see up at the top, it says Firearm Number?
5     A   Yes.
6     Q   Okay.  And then there's the property inventory
7   number, and that matches up with the report where you're
8   looking at, at Exhibit 12.  You can have them side by
9   side if you want to.
10    A   You're talking about which number matches up?
11    Q   Do you see that the firearm F1-1745 --
12    A   Yeah.  That matches up.
13    Q   -- matches up?
14    A   Right.
15    Q   Okay.  Right.  And then I think the property
16  inventory number, 885027, is also looking to say
17  that this is the same property that was inventoried.
18  I'm just saying for like the chain of custody.  Do you
19  see the property inventory number under the first
20  paragraph here?
21    A   I do see it there.
22    Q   Okay.  And do you see up at the top it says
23  Property Inventory Number?  Those match up?
24    A   Yes.
25    Q   Okay, great.  So -- and here it says down at

219

1   the bottom that the weapon, I think, received and test
2   fired on 8 August '91, tests compared with casings
3   91-976 for RD number 223384.  That's our RD number,
4   right?
5     A   Yes.
6     Q   For the Gerrod Erving.  And it says,
7   "A positive ID on the discharged --"
8     A   Cartridge cases.
9     Q   -- thank you.  "And inconclusive with evidence
10  bullet."  Do you see that?
11    A   With the bullet.  Yes.
12    Q   Okay.  And this gun was obtained from Antonio
13  Thomas, right, based on this report?
14    A   First name, Antonio Thomas.  Yes.
15    Q   Okay.  Did you know Antonio Thomas?
16    A   Nope.  I don't believe so.  But it ain't
17  ringing a bell.
18    Q   And would you at least agree with me that on
19  the face of this, as a detective, if you have a gun that
20  was obtained matching up with casings from a murder,
21  it's an -- at least an investigatory lead that should be
22  looked into?
23        MR. GRILL:  Form.  Calls for speculation.
24    A   I would, and I'm -- I'm guessing Detective
25  Griffin was following up on it, because this is the one

220

1   who requested the analysis.
2     Q   Okay.  Did you have any conversations with
3   Detective Griffin about the -- this -- and --
4   well -- it's fair to say you never questioned
5   Antonio -- Antonio Thomas, right?  Thomas -- Antonio
6   Thomas.  Sorry.  Antonio Thomas -- about the Erving
7   homicide, right?
8     A   No.  It's not in these reports, so the
9   answer -- I have to say no.
10    Q   Okay.  And you didn't see anything in the
11  investigatory file that anybody followed up on this
12  investigatory lead?  You didn't see any of those
13  reports, did you review, in your review of the file?
14    A   Not in Erving homicide.  I -- the only thing
15  that I see someone doing a follow-up is Detective
16  Griffin, but it's still sitting under a different RD
17  number.  So I guess the answer would be -- lie with
18  Detective Griffin and what follow-up was done when he
19  talked to Antonio Thomas.
20    Q   But the -- the report that -- that matched up
21  the gun, that was in the Erving homicide, under the
22  Erving ID number, right?
23    A   Yeah, but Detective Griffin is the one that
24  submitted the firearm evidence.  He's the one that
25  requested the comparison.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

221

1    Q   Right.  But the -- but the report made its way
2  back to the Erving homicide file because it was matching
3  up with evidence that was obtained from the Erving
4  homicide, from the victim, the casing --
5    A   Yeah.  And I'm guessing it made it back into
6  this file, too.
7    Q   Okay, great.  But I guess I'm focused now on
8  any follow-up that was done with respect to a gun being
9  matched to casings in the Erving homicide.  You didn't
10  see anything in the review of the Erving homicide to
11  suggest there was any follow-up done on -- for the
12  Erving homicide, did you?
13    MR. GRILL:  Objection.
14    A   It's a long question.  Yeah.
15    Q   Sorry.  I'll do it -- I can rephrase.
16    MR. GRILL:  Hang on -- my objection.  Form.
17    MS. DONNELL:  I can rephrase it.  That's fine.
18    MR. GRILL:  Okay.
19    THE WITNESS:  Okay.  As I testified --
20    MS. DONNELL:  I asked --
21    MR. GRILL:  Let her ask --
22    THE WITNESS:  Okay.
23    MR. GRILL:  Let her ask a question.
24  BY MS. DONNELL:
25    Q   Sorry, I'll just trying to get through, so

222

1  that's fine.  I'll just try and make a clearer question.
2  So Mr. Boudreau, you didn't see anything in your review
3  of the Erving homicide file that memorializes any
4  follow-up done on the ballistic information connecting
5  the gun F1-1745 to the casings found at the Gerrod
6  Erving homicide, correct?
7    MR. GRILL:  Objection.  Foundation.
8    A   I -- I don't see anything in the file that
9  shows that.  I know that Detective Griffin's following
10  up.  So yeah, but to answer your question, I -- I don't
11  see anything in the files.
12    Q   Okay.  And it's certainly -- this is
13  certainly -- you'd at least agree with me that this is
14  the kind of information that a homicide detective would
15  want to follow up on, if you get a match with casings,
16  with the actual gun, to see if that has anything to do
17  with this -- that -- that's -- the person who's found in
18  possession of the gun has anything to do with the case?
19  Maybe yes, maybe no, but at least you want to follow up
20  on the lead, right?
21    A   Yeah.  In this case, the homicide detective is
22  following up on it.  Detective Griffin's a homicide
23  detective, so somebody's following up.
24    Q   Okay.  And if Detective Griffin followed up on
25  it with respect to the Erving homicide, you would expect

223

1  to see a GPR, a sub report about any conversations he
2  had with Antonio Thomas about the Erving homicide,
3  correct?
4    MR. GRILL:  Calls for speculation.  Form.
5    Foundation.
6    A   I don't know.  I mean, Antonio Thomas may have
7  been represented by an attorney.  Detective Griffin
8  said, "Hey, I want to talk to Antonio Thomas."  He said,
9  "Go screw yourself."  Who knows?
10    Q   Well, that would be documented in the file,
11  right?  Because --
12    A   Maybe not.
13    Q   Maybe not?
14    A   Maybe not.
15    Q   So if -- if Detective Griffin went to talk out
16  to Antonio Thomas, because he was trying to say maybe
17  this guy had something to do with the murder of
18  Gerrod Erving, and he goes and talks to him, and
19  Gerrod Erving -- I mean, and Antonio Thomas says,
20  "I refuse to talk to you," you're saying Detective
21  Griffin wouldn't put that in the --
22    A   I don't --
23    Q   -- the homicide --
24    MR. GRILL:  Whoa, whoa, whoa.  Wait.  Hang on.
25    Speculation.  Incomplete hypothetical.  It's

224

1  argumentative.  Form.
2    A   I -- I can't -- I can't speak to what other
3  detectives do.  I mean, I -- I -- I know you want an
4  answer to the question.  I would ask Detective
5  I -- I don't have the answer to that.  He's the one
6  following up on it, and -- and I don't want to speculate
7  on what other detectives do or don't do.
8  BY MS. DONNELL:
9    Q   Okay, that's fine.  Let me ask you a different
10  question.
11    A   Okay.
12    Q   If there's information from the crime lab that
13  links a gun to a murder, a particular gun to a murder,
14  you would agree with me that that is the kind of lead,
15  investigatory lead that you want to follow up on?
16    MR. GRILL:  That's been asked and answered.
17    THE WITNESS:  I --
18    MR. GRILL:  This is the fourth time now.
19    A   I've answered it yes previously,
20  and I said -- and in this instance, Detective Griffin is
21  following up on it.  So the answer to that's yes.
22  Nobody did not follow up on it.  Detective Griffin did.
23  The document's in front of us.
24  BY MS. DONNELL:
25    Q   And does that suggest to you that Detective

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

225

1  Griffin went out and talked to Antonio Thomas about
2  whether he had any knowledge or participation in the
3  Erving homicide?
4      A  No.  It suggests to me that Detective Griffin
5  made the request for these comparisons.
6      Q  And then the comparisons came back with the
7  information that it matched to the Erving homicide,
8  right?  And I think what I'm saying is you're saying
9  Detective Griffin followed up on the information, but
10 there's nothing in Exhibit 13 that says Detective
11 Griffin went out and talked to Antonio Thomas to see if
12 he had knowledge or participation in the Erving
13 homicide, is there?
14     MR. GRILL:  Form.  Form.  Go ahead.
15     A  And I already -- you answered me that -- you
16 asked that to me before, too.  I said there's nothing in
17 the file that shows that Detective Griffin did anything
18 with this.
19     Q  Okay.  And I just want to -- let's make this
20 Exhibit 14.
21     MR. GRILL:  Thank you.
22     Q  Okay.  George Exhibit 14 is Cook County
23 State's Attorney Day v. Boudreau 1007 consecutive
24 through 1014.  This is a supplementary -- supplementary
25 report dated June 13th.  I'm sorry, not dated -- July 4,

226

1  1991.  And it indicates that in custody is Antonio
2  Thomas, a black male age 18.  And if you look on page 3
3  with me on the supplementary report, it indicates that
4  what was inventoried was a Smith and Wesson nine
5  millimeter semiautomatic pistol, okay?
6      (EXHIBIT 14 MARKED FOR IDENTIFICATION)
7      A  Yes.
8      Q  Okay.  And just to date that, the arrest of
9  Antonio Thomas was made, you know, July 4, 1991 for an -
10 - for a -- for a crime that had occurred June 13, 1991,
11 right?
12     A  Okay.
13     Q  Okay.  And that would've been less than a
14 month after the Erving homicide, right?
15     A  Approximately, yes.
16     Q  So the fact that the gun was used -- well,
17 I'll strike that.  Do you know Andre Thomas?
18     A  Andre Thomas?
19     MR. GRILL:  Foundation.
20     MS. DONNELL:  I'm just asking if he knew him.
21     MR. GRILL:  When?
22     MS. DONNELL:  Back in 1991.
23     THE WITNESS:  Is this the Andre Thomas that's
24 in this report that --
25 BY MS. DONNELL:

227

1      Q  Yeah.  I think I asked you if you knew Antonio
2  Thomas, and now I'm -- Andre Thomas.
3      A  Well, there's an Antonio and an Andre.
4      Q  Correct.  I'm asking if you knew either one.
5      A  I don't know if I had any contact with either
6  one of them before, but their names ain't ringing a
7  bell.  No.
8      Q  Okay.  I think I'm done with that right now.
9      A  Okay.
10     Q  Yes, maybe not totally.  Did you -- is this
11 information that you would've had back when you picked
12 up the file, after you talked to Rock Watson in January
13 20, 1992?  You would've had access to the crime
14 laboratory reports that were in the file, right?
15     A  Yes, but as I said before, this was the file
16 in the area.  It doesn't show that it was in there,
17 but I -- I may have had access to it.  But again, it
18 wasn't -- I wasn't assigned to follow up on the firearm
19 evidence.  My focus was on Ralph Watson and eyewitness,
20 not only to a murderer, but also running a lineup and
21 stuff like that.  So I -- I can't answer -- I could tell
22 you that the firearm evidence was followed up on by
23 Detective Griffin, not me.  So I don't know what the
24 result of that was.
25     Q  Well, Detective Griffin was submitting the

228

1  firearm evidence in the context of his investigation
2  for a different crime, the one that you have with
3  Exhibit --
4      A  Yes, and it's -- he submitted the evidence.
5  He'd be the one to get the report as well, because they
6  would -- he requested the examination.  They would send
7  him the report.
8      Q  Well, the report --
9      A  So I -- I don't know what happened with that.
10     Q  Understood.
11     A  I can't answer that.
12     Q  You agree with me, though, the report made it
13 not only into -- well, sorry.  The report on the gun
14 being matched with the casings in Erving's homicide made
15 it back to the Erving file, because it has the
16 Erving ID number on it, correct?
17     A  Yes, but you showed me two different files.
18 One has and one doesn't.
19     Q  Okay.
20     A  So I don't know.  Yes, it would have made it
21 to one of the files, but --
22     Q  Well, is it possible that that information
23 never made it to the area file?  I mean, is it
24 possible -- like, if it's not in the Exhibit 6, which is
25 the area file, is it possible that the crime lab report

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

229

1    just never made it to that file?
2        MR. GRILL: Form
3        A   I -- I don't know. I can't answer that.
4    I'd be speculating. Right. I -- I do know that during
5    the trial, this very issue came up with Arnold Day about
6    this firearm evidence.
7        Q   And about a potential alternative suspect?
8        A   Yeah. Yeah. As I said before, it's --
9    it's -- it's not -- it's not uncommon for street gangs
10   to alternate guns around the city.
11       MR. GRILL: So a little late to the punch, but
12       object the form of your question.
13       MS. DONNELL: Well --
14       MR. GRILL: Foundation. Obviously I'm not
15       going to tell him not to answer that.
16   BY MS. DONNELL:
17       Q   Thanks. Okay. But at least with respect to
18   this particular evidence in the Erving -- well, it's
19   already been asked and answered. But basically, there's
20   nothing in the file that you see following up on this
21   information in the context of the Erving homicide file?
22   In the Erving homicide investigation? I'm sorry,
23   correct?
24       MR. GRILL: Form. Which file --
25       Q   I'm sorry. There's nothing in either Exhibit

230

1    6 or Exhibit 7 that indicates that there was any
2    follow-up investigation done on the ballistic
3    information matching a particular gun to the casing
4    found at the Erving homicide that you've seen, correct?
5        A   That's not true.
6        MR. GRILL: Hold on. Form. Yeah.
7        A   There -- there is evidence of follow-up, and
8    it's Detective Griffin's request for comparison.
9    So there was some follow-up being done.
10       Q   This worksheet that I gave you is in
11   the -- it's in the Cook states attorney file.
12   Do you see this worksheet? Oh, sorry. Exhibit --
13   it's -- sorry - thank you.
14       A   Is that Exhibit 13?
15       Q   I think it's Exhibit 13. Thank you, sir.
16   Exhibit 13.
17       A   Yeah.
18       Q   Exhibit 13 is under a different RD number,
19   right?
20       A   Right.
21       Q   And it goes with the report I gave you,
22   Exhibit 14, right?
23       A   Yep.
24       Q   Okay --
25       A   So it came from the state's attorney's file.

231

1        Q   Okay. But I'm saying -- let me just ask, you
2    don't see a supplementary report of any detective going
3    out to talk to Antonio Thomas about the Erving homicide
4    in the Erving homicide file, correct?
5        A   No. I testified to that before, too. I said
6    no.
7        Q   You don't see that? Yes.
8        A   I didn't see that.
9        Q   And what you're saying is follow-up is you're
10   referring to the receipt that Detective Griffin put in
11   for how -- for evaluation of the evidence he had
12   collected in his arrest of Antonio Thomas, right?
13       A   Correct.
14       Q   And that evidence was submitted, I guess, on
15   July 2, 1991, right?
16       A   It -- yeah, received at the crime lab July 2.
17       Q   Okay. And then you don't have any -- in front
18   of you right now, you don't have any follow-up that
19   Detective Griffin did after July 2, 1991, right?
20       A   Nope.
21       Q   Okay. And then the report that links up the
22   gun that Detective Griffin submitted to the Erving
23   casings, the casings collected in the Erving homicide,
24   that's dated August 8, 1991, right?
25       A   Yes.

232

1        Q   And you don't have any -- you haven't seen
2    any reports after August 8, 1991 memorializing any
3    follow-up that was done on this report, Exhibit 12?
4        A   No, not in the Erving homicide. No.
5        Q   Okay. Thank you. All right, let's move on.
6    And I think -- I'm so sorry, I have to circle back to
7    this. I think when I asked you if somebody talked
8    to Antonio Thomas about the gun that he was found in
9    possession with matching up to the Erving homicide, you
10   would expect to see that in a GPR or a sub-report in the
11   Erving homicide investigation, correct?
12       MR. GRILL: Form. Asked and answered.
13       A   Yeah.
14       Q   I mean --
15       A   Yeah, if there was information obtained.
16       Q   But I think you said if Detective Griffin went
17   out and talked to Antonio Thomas and he said, "I don't
18   want to talk to you," then maybe it just wouldn't have
19   been written down anywhere? I think that's what you
20   said earlier, but maybe I got it wrong.
21       A   It may have. I mean, I -- I -- I don't know.
22   I -- I -- I wasn't there. I can't -- I'm not going to
23   speculate on what or who -- when they went to interview
24   Antonio Thomas. I know there's a follow-up on a
25   firearm. Where that is, I don't know.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

233

1     Q   Well, when you're saying you know there's a
2  follow-up on the firearm, you're just saying -- you're
3  speculating that somebody followed up on it?
4     A   No.
5     Q   You're referring to the submission to get the
6  analysis?
7     A   Detective Griffin requested that this -- that
8  this evidence be analyzed.  This isn't just the crime
9  lab doing -- "Oh, let's shoot and see what we can
10  match."  It has to be done by a request by a detective,
11  so --
12     Q   I'm -- and I'm referring to follow-up after
13  that.  So I'm saying after they did their analysis, you
14  don't have any information --
15     A   I --
16     Q   -- or evidence that there was any follow up
17  after August 8, 1991, correct?
18     A   No, I don't.
19     Q   Okay.
20     A   All I know is that -- Detective Griffin was
21  following up on him.
22     Q   Thank you.  But -- okay.  I think we -- when
23  you're saying Detective Griffin was following up on him,
24  you're referring to him submitting evidence to be
25  analyzed back in July 1991?  That's what you're

234

1  referring to when you say follow-up, right?
2     A   Yeah.  He's requesting that there be --
3     Q   Okay.
4     A   -- laboratory --
5     Q   And when I'm saying follow-up, I'm saying no
6  follow-up after August 8, 1991, referring to after it
7  gets matched to the Erving homicide.
8     A   I -- I don't know that.
9     Q   Okay.
10     A   I didn't -- who is now on the phone listening?
11  Who is (133) 757-4270?
12        MS. DONNELL:  Let's see.  Mr. Day, is that you?
13        MS. SPENCE:  Heather, did you ask if -- about
14  me?
15        MS. DONNELL:  Oh, yeah.  Who's -- I don't -- is
16  that you, Spence?
17        MS. SPENCE:  Yes.  I got kicked off on the
18  video, so I called in.
19        MS. DONNELL:  Oh, okay.  Got it.  It's Spence.
20        THE WITNESS:  Who is it?
21        MS. DONNELL:  It's Spence.
22        MR. GRILL:  Spence, the other -- one of the
23  other ones.
24        MS. DONNELL:  It's one of the other attorneys.
25  Thanks, Spence.

235

1        THE WITNESS:  Oh, okay.  Thanks.
2  BY MS. DONNELL:
3     Q   Bye.  Okay.  I want to -- just before we move
4  on, I wanted to ask you a question.  There's been
5  testimony in the -- or there's evidence in the record
6  that Ralph Watson met with District -- Assistant
7  District Attorney O'Connor, Buzz Simmons, or Simons, and
8  Ed Doyle back in August 12, 1992.  Does that refresh
9  your recollection of whether you were present for that
10  meeting or not?
11     A   No.  Should I be present at that meeting?
12     Q   I'm just asking if -- there's testimony that
13  you were present in that meeting, but --
14     A   There was testimony that I was --
15     Q   Yeah, but I don't -- I'm just saying, do you
16  know whether you were or not?  Do you remember?
17        MR. GRILL:  Form.
18     A   I don't recall ever being -- Buzz Simmons --
19  is Henry Simmons a judge?
20     Q   Yeah.
21     A   So I -- I'm meeting with a judge and two
22  states' attorneys?
23     Q   Well, he wasn't a judge at the time.
24  I don't think.
25     A   Okay.

236

1        MS. DONNELL:  Yeah.  Okay.  Okay, we can move
2  on.  So we never got your coffee.
3        THE WITNESS:  Treated like a junkyard dog
4  again.  Can I go to the bathroom too --
5        MS. DONNELL:  Yeah, let's a take a break.
6        THE WITNESS:  Okay.
7        MS. DONNELL:  We can go off the record.
8        VIDEOGRAPHER:  Okay.  Going off the record.
9  Time, 4:27 p.m.
10        (OFF THE RECORD)
11        VIDEOGRAPHER:  We're back on the record for the
12  deposition of Kenneth Boudreau.  My name is Sheila
13  Jones.  Today is December 1, 2022, and the time is
14  4:39 p.m.
15  BY MS. DONNELL:
16     Q   Okay.  Right.  I want to shift gears to
17  February 4, 1992, the day that you talked to Arnold Day,
18  okay?
19     A   Yes.
20     Q   First of all, before we get into it, do you
21  have any actual memory of what happened on that day, or
22  is your memory really -- is your memory limited to your
23  testimony and your report?
24     A   I -- I -- I just have to stand by my testimony
25  and what's in the reports.  I don't have any independent

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

237

1   recollection.
2       Q   Okay, fair enough.  And you have your
3   supplementary report in your criminal trial testimony,
4   so if we need to refer to it, you can, okay?  I mean,
5   I'm going to ask you questions you may know, but I'm
6   just saying if you need to refer to it because you don't
7   have an actual memory, then just let me know and I'll
8   make sure you have it, okay?
9       A   I -- I don't have any testimony here.
10      Q   It was probably Exhibit 1.  No, Exhibit 2 --
11  nope, that's the deposition of Anthony Jakes-- there you
12  go.
13      A   Okay.
14      Q   Okay.  So first of all, February 4, 1992, you
15  were at -- still at Area 3, right?
16      A   Yes.
17      Q   And that day you were partnered with Detective
18  Foley?
19      A   I -- I believe so.
20      Q   And you were not part of the actual arrest of
21  Mr. Day; is that true?
22      A   No.
23      Q   Okay.  You were still at the area, and they
24  brought Mr. Day over to -- back to Area three, right?
25      A   Yes.

238

1       Q   Okay.  Did you -- had you learned that they
2   had located him and you knew they were going out
3   the -- foley and the -- the gang unit was going out to
4   arrest him?
5       A   I -- I don't know.
6       Q   Okay.  You don't recall, right?
7       A   I -- I don't recall.  I mean, I looked at my
8   testimony.  I testified that I saw him come in with him
9   or saw him --
10      Q   Right.  I guess I was trying to ask you if you
11  knew -- and maybe you don't know, which is fine -- if
12  you recall whether you knew that he had been located and
13  they were going out to the location at Kwame Tate's to
14  make the arrest, or if you first became aware of that
15  when he was brought back to the area, or if you know one
16  way or the other.
17      A   No, I mean, as I sit here today, I mean,
18  if I knew, I probably would've went with if -- if I
19  wasn't doing anything then.
20      Q   I see.
21      A   Yeah.
22      Q   But based on your report, you know that --
23  that you came to find out that he was at the area
24  when --
25      A   Yes.

239

1       Q   -- when John Day was at the area?
2       A   Yes.
3       Q   Okay.  So how about the arresting officers,
4   gang specialists Bloore, Schaffer, Evans?  Did you know
5   who those folks were?
6       A   Yes.
7       Q   Okay.  And you had worked with them back
8   at -- when you were in the tactical unit, some of them?
9       A   No, I -- I started working with them when they
10  became detective.
11      Q   I see.  But you had worked with them on other
12  cases before February 4th --
13      A   Yes.
14      Q   -- 1992?  Got it.
15      A   Yeah, they were the gang experts.
16      Q   And so when you had gang-related crimes or
17  homicides, you would work with them in terms of
18  your -- if you could get information from them?
19      A   Yes.
20      Q   Okay.  So when Arnold Day was brought to the
21  area, he went into one of the interrogation rooms, and
22  you and Detective Foley went into talk to him, right?
23          MR. GRILL:  Objection form.
24      A   Yeah.  I'm -- I'm going to rely on my
25  testimony and Mr. Day's testimony that -- when he said

240

1   he arrived, he went into a holding pen, and then he was
2   moved to an interview room.  And I think my testimony is
3   that when I interviewed him, he was already in the
4   interview room.
5       Q   Right.  So you don't -- there's no testimony
6   or anything indicating you talked to him when he was in
7   the holding pen?
8       A   No.
9       Q   Okay.  And then when you went into the
10  interview room, you know, I believe that there's
11  testimony that you started talking to him first about
12  the Erving homicide, then the Garcia homicide, right?
13      A   I'd have to stand on what's inside my
14  testimony.
15          MR. GRILL:  Form.
16      Q   Okay.  So -- so as you sit here today, you
17  don't have a memory which homicide you talked to Mr. Day
18  about first, right?  You just are going to stand by your
19  prior testimony?
20      A   Yeah.  As I just said, I don't have a memory
21  of any of it.
22      Q   Of any of it.  Got it.
23      A   Just stand by my testimony.
24      Q   Okay.  So we're going to focus on your
25  conversation with respect to the Erving homicide with

241

1  Mr. Day, okay?
2      A   Okay.
3      Q   Okay.  So when you talked to -- when you and
4  Detective Foley were asking Mr. Day about the Erving
5  homicide, he initially denied any involvement, correct?
6          MR. GRILL:  Foundation.
7      Q   Do you remember that, reviewing that in your
8  criminal trial testimony?  If not, I can refer you.
9      A   Could you --
10     Q   Sure --
11     A   -- point to that testimony?
12     Q   Sure.  Go to page 181 of your testimony in
13 Exhibit 2.  Okay.  And it says you were asked a
14 question.
15     A   I have to advise him of his rights.
16     Q   Okay.  It says, "Can you please -- " Question,
17 "can you please tell me what you said to the Defendant
18 and what he said to you?"  Starting at line 13 on page
19 181.  Answer, "I asked him if he had any knowledge
20 concerning the murder of Gerrod Erving, which happened
21 at 729 West 54th Street, at which time Defendant told me
22 he did not have any knowledge of that and that he was
23 nowhere in the area at that time," right?
24     A   Yes.
25     Q   So when you first talked to Mr. Day about the

242

1  Erving homicide, he told you he didn't have any
2  knowledge about that, correct?
3      A   Correct.
4      Q   And he told you that he also was not in the
5  area at that time, right?
6      A   Correct.
7      Q   And then the next thing that you did was to
8  show him Ralph Watson's statement, right?
9      A   Correct.
10     Q   Okay.  And then your testimony was that after
11 you showed him Ralph Watson's statement, did you have
12 another conversation with the defendant?  Yes, you did.
13 And then you asked him, "Can you explain this?"  And he
14 related to you that he wasn't truthful to you, and he
15 offered where he was at that date and time.  That's what
16 you testified to back in his criminal trial, right?
17     A   Yes.
18     Q   Okay.  And so is that how it went down?  You
19 just showed Mr. Day Ralph Watson's statement, and then
20 he gave you a statement?
21         MR. GRILL:  Objection.  Form.
22     A   That's what I testified to.  In reviewing
23 Mr. Day's testimony too, he testified to the very same
24 thing.  He states, "I didn't read it to him.  I didn't
25 let him read it.  I showed it to him."  So yes.

243

1      Q   Okay.  Now, Mr. Day also testified that
2  Detective Foley was being -- was physically abusive
3  during that interrogation too, correct?
4      A   He did.
5      Q   And he testified that Officer -- that
6  Detective Foley threatened to throw him out the window,
7  right?
8      A   Correct.
9      Q   And that Officer -- detective Foley attempted
10 to choke him, right?
11     A   I think he already -- also testified that
12 Detective Evans did the same thing, testified that Evans
13 and Foley were interviewing him before we did.
14     Q   And that Detective -- he also -- right.
15 And then he testified that Foley attempted to choke him,
16 right?  Do you remember reviewing that testimony?
17     A   I'll adopt the premise of your question is
18 yes.  I mean you read it I didn't specifically say I
19 agree with you.
20     Q   And that Detective Foley pinned him at one
21 point against the wall or the -- had pushed him against
22 the wall, right?
23     A   Yeah.  If that's in his testimony, yes.
24     Q   Did you observe Detective Foley make a threat
25 to Mr. Day that he would throw him out the window?

244

1      A   No.
2      Q   And did you observe Detective Foley use any
3  physical force with Mr. Day?
4      A   No.
5      Q   So you deny that Foley struck Mr. Day?
6      A   Yes.  In Day's testimony, he doesn't say I was
7  present when that happened.
8      Q   So there's a portion of time when Detective
9  Foley was alone with Mr. Day, right?
10     A   According to -- I -- I -- I don't believe he
11 was, but I don't -- I don't know.  I mean, we got Day's
12 testimony, and I know what I do.
13     Q   Well, was there a time when you -- I'd
14 like -- actually, I'm going to have to find it, but you
15 testified that you had stepped out and there's a portion
16 of time where Foley was alone with Day, as well.  Do you
17 remember that testimony?
18     A   Say that again.
19     Q   I'm going to have to find it for you.  I'll
20 come back to that.
21     A   Okay.
22     Q   But is it true that sometimes you would
23 interview someone alone and Halloran would step out, and
24 sometimes you'd be alone with a suspect and vice versa;
25 right?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

245

1    A   Not -- not for long.  I mean but --
2    Q   Not for long, but sometimes that would happen;
3    right?
4        MR. GRILL:  Foundation and form.  Go ahead.
5    A   Yeah.  If we were talking to somebody and I
6    had to go to the bathroom, I'd go to the bathroom.
7    Or as you know, I smoked then, I'd run out and have a
8    cigarette.
9    Q   Okay.  But it's your testimony -- well, I'll
10   just ask you.  In your presence, did Detective Foley
11   ever physically strike or hit Mr. Day?
12   A   No.
13   Q   And in your presence, did Detective Foley ever
14   threaten Mr. Day to throw him out the window?
15   A   No.
16   Q   Okay.  Do you have a recollection -- well, let
17   me strike -- okay, after you -- so, let's go through --
18   I'm going to get Mr. Day's statement.  Let's go through
19   Mr. Day's statement.
20   A   His testimony or his statement?
21   Q   I'm going to go through the statement.
22   A   Okay.
23   Q   But actually -- yeah, let's go through the
24   statement.  It's page 15.  Okay, George, I'm marking
25   Mr. Day's statement as Exhibit 15, and it's got

246

1    City_Day -- oh, sorry.  I'm so sorry.
2        (EXHIBIT 15 MARKED FOR IDENTIFICATION)
3    A   Thanks.
4    Q   Okay, so Exhibit 15 is City_Day 76 consecutive
5    through 83, and it's Mr. Day's statement on February 4,
6    1992.  Okay, we'll go through this.  Okay, so -- so you
7    talked to Mr. Day about both the Erving and the Garcia
8    homicide and then you called the felony review attorney
9    to come down and take statements on both cases, right?
10   A   I believe so, yes.
11   Q   Okay.  And my understanding based on the
12   testimony that's in this case is that you interrogated
13   Mr. Day about the Erving homicide, then about the Garcia
14   homicide, then the felony review attorney came or was
15   called.  Is that your recollection?
16   A   I -- I don't remember that.
17   Q   Not recollection, but that's --
18   A   If -- if it's in my testimony, that's what
19   happened.
20   Q   And then it's also been testified to that once
21   the felony -- Danielian came, that the Garcia
22   handwritten statement was taken first, then the Erving
23   statement.  Do you remember that?
24       MR. GRILL:  Form.
25   A   I -- I don't remember which one was taken

247

1    first.  It -- it - all statements 00
2    Q   They do, but they're dated and timed at the
3    same time.
4    A   Pardon?
5    Q   They have the same date and time.
6    A   Both at 4:30, of Garcia and Erving?
7    Q   I can get it for you later.  I have it --
8    Yeah, we can make this Exhibit 16.  George, Exhibit 16
9    is the Garcia statement, which is City Jake 781
10   consecutive through 784.  I'm handing you, which I've
11   designated as Exhibit 16, which is Arnold Day's
12   statement on February 4, 1992, that's also dated 4:30.
13       (EXHIBIT 16 MARKED FOR IDENTIFICATION)
14   A   Okay.
15   Q   Okay.
16       MR. GRILL:  How is it --
17       MS. DONNELL:  We were talking about the --
18       MR. GRILL:  These are the same --
19       MS. DONNELL:  No, they're not.
20       MR. GRILL:  Oh, I'm sorry.  Got it.
21       MS. DONNELL:  Okay.
22       THE WITNESS:  Okay.
23       MS. DONNELL:  You with me?  We got it?  Okay.
24       MR. GRILL:  Yeah, I see it.  Sorry --
25   BY MS. DONNELL:

248

1    Q   No problem.  Okay, but let's go back to
2    Exhibit 15 now, okay?
3    A   Okay.
4    Q   Okay.  Okay, so had you -- had you worked with
5    Assistant State's Attorney Danielian before this date of
6    February 4, 1992; do you recall?
7    A   I may have.
8    Q   Okay.  And you see your signature on Exhibit
9    15?  It's a little bit cut off on the copy I have, but
10   you see you're --
11   A   Yeah.
12   Q   -- listed of being present for the statement?
13   A   Yeah, (Inaudible).
14   Q   Okay.  All right, so let's walk through this
15   statement.  So the first part says that after being
16   introduced to ASA Danielian and after being told that
17   ASA Danielian's an attorney working for the police and
18   not his personal attorney, Arnold Day was advised of his
19   Constitutional rights; right?
20   A   That's what it says.
21   Q   All right, I'm going to skip forward to page
22   2 of the statement where it says, "Arnold states that on
23   17-May-91, he and Nate Anderson, a fellow Black Stone,
24   decided to rob some JBs."  Do you see that part?  It's
25   sort of the bottom half.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

249

1   A   I do.
2   Q   And it says, "Arnold Day has explained that
3   JB stands for Jet Black Stones, a rival gang of the
4   Black Stones." Do you see that?
5   A   I do.
6   Q   Okay. It further states that, "He and Nate
7   wanted to rob the JBs in retaliation of some robberies
8   of Black Stone street drug dealers, which was done by
9   JBs." Do you see that?
10  A   Yes.
11  Q   Okay. And then it goes on to state that,
12  "Arnold states that he had a TEC-9, .9 millimeter.
13  Arnold states that he went to the building at 927 West
14  51st Street, known to him as a JB house, at about
15  midnight," right?
16  A   Yes.
17  Q   Arnold states that when he walked up to the
18  front door, he heard shots from the outside, right?
19  A   Yep.
20  Q   Arnold states that he heard the shots. He saw
21  a male black come down the stairs from the second floor
22  to where he was standing. Arnold states that he fired
23  the TEC-9 three or four times, right?
24  A   Yep.
25  Q   Hitting the black male known to him as Gerrod

250

1   Erving, right?
2   A   Uh-huh.
3   Q   Yes?
4   A   Yes.
5   Q   And then after he shot the male black,
6   Arnold -- I can't -- went away from the -- Arnold states
7   that the male black did not say anything to him or have
8   anything in his hands when he walked down the stairs,
9   right?
10  A   Yes.
11  Q   Okay. And so this was the information that
12  Arnold Day provided to you on February 4, 1994, right?
13  A   To the State's Attorney.
14  Q   Oh --
15  A   The State's Attorney is who documents
16  everything, yes.
17  Q   But he had provided a statement to you prior
18  to you calling Felony Review, right?
19  A   Yes.
20  Q   Okay. Now, you may be -- this statement
21  doesn't include the same information that Mr. Watson
22  provided to you, right?
23  A   No.
24  Q   It doesn't mention Tenelle?
25  A   Nope.

251

1   Q   It doesn't mention Darren?
2   A   Nope.
3   Q   Doesn't mention Ralph Watson?
4   A   Nope.
5   Q   Doesn't mention any other weapons?
6   A   Nope.
7   Q   Doesn't mention any other conversation that
8   Mr. Watson included in his statement?
9   A   No.
10  Q   Between Gerrod Erving and (Inaudible).
11  A   No.
12  Q   Okay. Why not?
13  A   Well, that's pretty common. I don't know.
14  You'd have to ask Arnold Day. It was an
15  off -- off-service street gang. Maybe he wasn't going
16  to rat out his other friends like Ralph did.
17  I -- I don't know. I can't explain that. Maybe he
18  thought he was being the hero and taking this all on
19  himself. I -- I don't know.
20  Q   Did you ask him about Darren when you were
21  interrogating him, and Darren's involvement?
22  A   I didn't -- I don't know if I did or I didn't.
23  I'm sure I did.
24  Q   Did you ask him who Darren was?
25  A   I -- I don't know if we did or we didn't.

252

1   Q   How about Tenelle?
2   A   I don't know if we did or if we didn't.
3   Q   Okay. Do you recall there being a time after
4   ASA Danielian arrived, where he left to get some papers
5   and left Arnold Day alone with Detective Foley and then
6   came back? Do you remember reading that testimony?
7   A   I don't -- in my testimony? Or in whose
8   testimony?
9   Q   It may have been in Danielian's testimony.
10  A   I -- I didn't see his testimony. I don't --
11  Q   Okay. I'm going to have you look back at your
12  supplementary report. Okay, it's Exhibit 8. It's your
13  supplementary report, the February 8 one. Do you have
14  it there?
15  A   Got it.
16  Q   Okay.
17  A   I think.
18  Q   Okay, if you turn with me to the Page -- I
19  think it starts on page 4. Okay, so starting on page 4,
20  it says -- well, I'm sorry, let's start on Page -- the
21  bottom of Page -- okay, I'm ready. Let's see, hold on
22  let me see. I just need to --
23  A   Okay.
24  Q   Okay, I think I'm going to start back on -- I
25  think I forgot to ask you about this earlier, so can you

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

253

1  turn with me to page 2?  It has City_Day 57 at the
2  bottom.  It's page 2 of the Supp Report.
3      A   Okay.
4      Q   So it says, "In continuation of this
5  investigation, RDs have developed information about the
6  in-custody subject who's wanted in connection with
7  another murder, recorded under RD 454289.  Further, the
8  RDs had interviewed above in-custody subject Day as the
9  offender of this homicide," meaning the Erving homicide.
10     A   Uh-huh.
11     Q   And then it says, "Additionally, the RDs
12  developed information that Day was hiding out in the
13  basement of the building located at 5234 South
14  Sangamon."  Do you see that?
15     A   I do.
16     Q   Do you remember how you got that information?
17     A   I -- I didn't receive that information,
18  as -- as I testified and I think everybody testified to,
19  was that there was Foley and the gang specialist there
20  who got --
21     Q   Right.
22     A   -- who got the information.
23     Q   Okay.  But you don't remember getting that
24  information --
25     A   No, as I said earlier, no, I didn't receive

254

1  it.
2      Q   Okay.  I -- I think you testified earlier that
3  if you had known that information, you probably would
4  have gone too, because you were looking for him.
5      A   Yes.
6      Q   Okay.  All right, so then it says,
7  "Subsequently, it was learned by RDs that Offender 2 in
8  this case, Nathaniel Anderson, AKA G-Nate, had been
9  killed in another homicide, which occurred 10 October
10  '91.  Do you see that?
11     A   I do.
12     Q   Do you see where it says subsequently?  Do you
13  think that means you didn't learn that G-Nate had been
14  killed until sometime after you talked to Mr. Day on
15  February 4, 1992?
16     A   I --
17         MR. GRILL:  Objection.  Calls for speculation.
18     A   You're going to have to ask Detective Foley.
19  I mean, he typed this report.  I don't know if that was
20  his perspective.
21     Q   Because I think I thought you already knew
22  that.
23     A   But we -- we knew -- I mean, I -- I know that
24  I -- we knew that G-Nate died right around the time he
25  got shot.

255

1      Q   Okay.  That's what I was going to ask you,
2  because I think I thought you knew that much earlier,
3  before you talked to Ralph Watson.
4      A   We did.
5      Q   Okay.
6      A   Right.
7      Q   Got it.  Then, I think you earlier had said
8  you thought it was ruled a suicide, not a homicide.
9      A   I -- I -- I don't know.  I remember hearing
10  about it.  I mean, my thoughts were that he was
11  executed, because he was robbing the dope spots.  That
12  was my feeling on it, and I'm not sure if it was ruled a
13  suicide or not.  I didn't investigate it.
14     Q   Okay.  But I will just tell you there was
15  an -- an RD on it and somebody was arrested on it as a
16  homicide.
17     A   Oh, there was?
18     Q   Yeah.
19     A   Oh, okay.
20     Q   Okay, so --
21     A   I'm just curious, can I get a copy of that
22  afterwards?
23     Q   I'm sure Andrew can get it for you.
24         MR. GRILL:  A copy of what?
25         MS. DONNELL:  Nate --

256

1         THE WITNESS:  Nathaniel Anderson and the person
2  who got arrested.
3         MS. DONNELL:  Okay, so --
4         MR. GRILL:  Yeah, let's just move on.
5  BY MS. DONNELL:
6      Q   I can get it for you, if you want.  All right,
7  so okay -- so, okay, so anyway, now I want to go back to
8  page 4.
9      A   Okay.
10     Q   And it says the in-custody subject Day was
11  interviewed regarding this matter and an unrelated
12  homicide, the Garcia homicide; right?
13     A   Yes.
14     Q   Okay.  Before these interviews conclude -- the
15  interviews, which were conducted in the Offices of Area
16  3 Violent Crimes, Day was informed of his rights.  Okay,
17  it says, "Day stated he had no knowledge regarding this
18  investigation, as he was nowhere in the area of this
19  incident."  Right?
20     A   Where?
21     Q   Right after the line that says, "Day, Arnold,
22  AKA Little."  It says, "Day stated that he had no
23  knowledge regarding this investigation, as he was
24  nowhere in the area of this incident."  Do you see that?
25     A   Is it -- oh, that's Watson's statement.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

257

1 I'm sorry, I'm on the wrong page.
2 Q No problem. I'm on page 4.
3 A Yes, I do see that.
4 Q Okay. And then it says, "Day was informed of
5 the status of this investigation, and at that time, Day
6 related that he was in fact in the area of this
7 incident. And he went on to say that he's an officer in
8 the Black Stone Nation street gang," right?
9 A Yes.
10 Q Here you didn't include that you showed him
11 Watson's statement before he started to talk, right?
12 A No, it says he -- he was shown the progress of
13 the investigation. That means the progress of the
14 investigation, so --
15 Q Okay, that's what you were referring to, or
16 what the report --
17 A What Foley's referring to.
18 Q Okay. And then it says, "He went on to say
19 that on the night of this incident, he was in the area
20 of 52nd to 53rd in Aberdeen, selling dope," right?
21 That's what's documented in the Supp Report?
22 A Yes.
23 Q And then the Supp Report goes on to say,
24 "He went on to say that he was then approached by his
25 General in the gang, G-Nate, and that G-Nate was his

258

1 boss in the hierarchy of the Black Stone gang." Do you
2 see that?
3 A Yes.
4 Q That part's not in this statement, though.
5 It's just in your Supp Report, right?
6 A Well, I'm -- I'm checking the characterization
7 of your Supp Report.
8 Q Okay. In the Supplementary -- in the
9 Supplementary Report documenting what you and Detective
10 Foley did on February 4, 1992, there's a question that
11 says, about G-Nate being his boss in the hierarchy of
12 the Black Stone gang. That isn't included in Exhibit
13 15, his handwritten statement, right?
14 A No, he didn't -- he didn't include a lot of
15 stuff within the State's Attorney's statement. He
16 didn't include G-Nate. I mean, they're different. Like
17 I said, this was ASA Danielian's interview. This was
18 our interview, and they -- there's changes.
19 Q Well, G-Nate is included, right?
20 A Yes.
21 Q In his handwritten statement and in your supp
22 report, right?
23 A No, he didn't include him.
24 Q He didn't? Okay. So then -- okay. And then
25 he went on to say that G-Nate's real name -- oh, sorry,

259

1 you said that, and then you have the homicide -- the
2 homicide case numbers here, right? And then it says,
3 "Day went on to say that when approached by G-Nate,
4 G-Nate told Day that they were going to rob a dope house
5 that belonged to a rival gang, the Jet Black Stones, and
6 that the dope house was at 54th -- at 54th Street,"
7 right?
8 A Yes.
9 Q Then Day went on to say that this robbery is
10 in retaliation for the Jet Black Stones robbing several
11 dope dealers, right? Belonging to the Black Stone
12 Nation street gang, which he and G-Nate were affiliated
13 with, right?
14 A Yes.
15 Q Day went on to say that he was given a TEC-9
16 machine pistole by G-Nate and that Nate was armed with
17 a .38 caliber revolver. Do you see that?
18 A I do.
19 Q Now, that was information that was in Watson's
20 statement, right?
21 A It could be. I don't recall if it was or not.
22 Q You can look back at it, if you want.
23 A No, I don't -- I don't -- I believe you.
24 Q Okay.
25 A I'm sure it is.

260

1 Q Day then stated that there were several other
2 Black Stone Nation members around the corner and that
3 they included but were not limited to G-Nate, himself,
4 Darren, and Tenelle. Do you see that?
5 A Yes.
6 Q And that was also the information that Ralph
7 Watson had given you in his statement, right?
8 A Yeah, but Day eliminates Watson.
9 Q I'm sorry. Just to be clear, Ralph Watson's
10 statement included that G-Nate, Arnold Day, Darren, and
11 Tenelle were all involved in this, right?
12 A Yes.
13 Q But, and you have Mister -- and according to
14 the Supplementary Report, Mr. Day apparently told you
15 that G-Nate, Darren, and Tenelle were involved in this
16 homicide, right?
17 A And himself. He left -- as I said, he left
18 out Ralph.
19 Q Ralph Watson. Did you ask him about Ralph
20 Watson?
21 A I don't know.
22 Q Well, you showed him that Ralph Watson made a
23 statement against him, right?
24 A Yes.
25 Q Okay. So you're saying you don't ask him if

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

261

1    Ralph Watson had anything to do with it?
2        A    I'm not saying I didn't ask him that.
3    I'm saying that I don't know.
4        Q    But you at least agree with me the fact that
5    G-Nate and Darren and Tenelle are mentioned in what
6    Mr. Day apparently told you and Detective Foley before
7    ASA Danielian showed up is not in the handwritten
8    statement that he -- that Danielian wrote up?
9        MR. GRILL:  Objection to form.
10       Q    Right?
11       A    Yeah, that's correct.  I -- I pointed that out
12   earlier.
13       Q    Okay.
14       A    It's a lot of differences.
15       Q    Okay.  And then according to a statement
16   written up in the Supplementary Report, Mr. Day had
17   G-Nate and Mr. Day being involved in the homicide, but
18   that was not included in the handwritten statement,
19   right?
20       A    Yeah -- yeah -- yeah, I mean, we've gone over
21   that.  Yes.
22       Q    And then according to the statement -- or
23   according to the Supplementary Report, the day after the
24   murder, apparently G-Nate went -- was standing with a
25   large group of Black Stone Nation gang members.  And at

262

1    that time, G-Nate told Day that the shooting -- the
2    victim in the dope house was the best way to take care
3    of business and control the Jets, right?
4        A    Yes.
5        Q    Okay.  And that's information about the
6    conversation after -- after was not something that was
7    in Mr. Day's statement, right?
8        A    It was in Mr. Day's oral statement.  He didn't
9    include it to the prosecutor, no.
10       Q    But that information about that conversation
11   after the homicide, that was in Mr. Watson's statement.
12   Do you remember that?
13       A    I don't know if it was or not.
14       Q    Okay.  Now, before ASA Danielian met with
15   Mr. Day on February 4, 1992, you met with Danielian to
16   tell him about the investigation, right?
17       A    Yes, we would have -- we probably would have
18   had the previous handwritten statements and the
19   following review file of the previous statement of
20   Watson, and we would have given him what we had then.
21       Q    And you testified in the criminal trial that
22   you gave him all the reports you had and made those
23   available to him.  Do you remember that?
24       A    I don't -- yes, if that was my testimony, yes.
25       Q    Okay.  Well, if you want to look at it, it's

263

1    page 185, if you want to take a --
2        A    Pardon?
3        Q    You can look at it.  It's page 185 of your
4    testimony --
5        A    No, no, I mean, I -- I -- I'm going to trust
6    you.  I don't think you're going to misrepresent my
7    testimony.
8        Q    Okay.  But that was also your practice; right?
9    When you called Felony Review over, you would give them
10   everything you had that was relevant --
11       A    Yes.
12       Q    -- before talking to somebody?  Before they
13   talked to somebody, right?
14       A    Right.
15       Q    Okay.  And in a situation like this, where
16   you've gotten information from a suspect, Mr. Day, that
17   then isn't included when the ASA's talking to them in
18   their statement, what typically happens?  Do you ask
19   questions like, "Why isn't G-Nate -- "
20       A    Well, I mean, you have to remember, it's their
21   statement.  We can't change what he wants to tell the
22   State's Attorney.  If that's what he told us and that's
23   what he told the State's Attorney, that's the way it is.
24   I -- I know for people that don't work with street
25   gangs, that you may find this uncommon, but it's very

264

1    common.
2        Q    Meaning that you get some information in your
3    interrogation that doesn't come out in the handwritten
4    statement?
5        A    Yeah, because I mean, if we were, as some of
6    your partners characterized me to the media, I guess I
7    do a poor job, because I guess if we were doing what you
8    say we were doing, all these statements would be
9    identical and you wouldn't be able to say nothing about
10   it.  So that's what -- so, that's -- it is what it is.
11       Q    Okay.  Do you -- I didn't -- in your
12   conversation with Mr. Day on the Erving homicide,
13   I didn't see any GPRs in the file or handwritten notes
14   in the file.  Did you?
15       A    I don't know if I took GPRs or not.  It's
16   troubling to me that I don't see any GPRs in there.
17       Q    Yeah.
18       A    Whether or not they got lost or whether or not
19   Foley typed this report up from memory and this
20   statement, and maybe contacted them following review to
21   see what else in their notes, I don't know.
22       Q    Because it -- would it -- I mean, is it
23   surprising to you that there's no GPR for you for the
24   Ralph Watson interview and none for the Day interview?
25       A    No, it seems that the -- in -- in a lot of our

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

265

1    cases, by the time these things get to your office,
2    they're -- stuff seems to be missing.
3        Q    Okay.
4        A    So --
5        Q    I guess I'm saying, like, do you think that
6    based on your practice, you would expect to have seen a
7    GPR from you, from one of those statements by the time
8    it gets --
9        A    If you needed it. I mean, not -- you didn't
10   do GPRs every time, but if -- if I -- if I talked to you
11   for ten minutes and you told me something and -- and I
12   typed it up, I -- I don't know if Detective Foley back
13   then used (Inaudible), typed it up on a disc, and saved
14   it for later. I don't -- I don't know.
15       Q    Okay. I'm going to make this Exhibit 17.
16   George, Exhibit 17 is City_Jakes 74, and I'm -
17           (EXHIBIT 17 MARKED FOR IDENTIFICATION)
18       MR. YAMIN: Thank you.
19       Q    Okay. And it's a GPR. Mr. Boudreau, I'm
20   handing you what I just marked as Exhibit 17, your
21   deposition. And this is your GPR --
22       A    I thought you just told me there were no GPRs.
23       Q    Well -- okay, well, the point is, this is the
24   GPR that has to do with the Garcia homicide.
25       A    Okay.

266

1        Q    But I'm saying -- that's what I was going to
2    ask you about, because I have a GPR in the -- from you,
3    from your interrogation, I think, or your involvement in
4    the -- I'm sorry, I'm getting convoluted. I'm showing
5    you now Exhibit 17, because I want to show you your GPR
6    and it has to do with your conversation with Arnold Day,
7    I think, and the Garcia homicide. And I'm just
8    wondering why there isn't one for the Erving homicide.
9        A    I -- I can't answer there.
10       Q    Because this would suggest to me that you were
11   taking notes on GPRs that day regarding the information
12   that you were getting in your interrogation.
13       A    Yes.
14       Q    And that -- that's why I'm wondering, like,
15   shouldn't there be one for the information you got in
16   your interrogation of Arnold Day during the Erving
17   homicide?
18       MR. GRILL: Objection. Form, asked and
19   answered, Foundation.
20       A    Yeah, I would -- I would think so --
21       Q    Okay. And you didn't -- after you got the
22   statement from Arnold Day -- well, strike that, let me
23   ask you this. When you got the statement from Ralph
24   Watson back on January 20, 1992, why didn't you seek an
25   arrest warrant for Arnold Day at that time?

267

1        MR. GRILL: Objection. Foundation.
2        A    For the Erving homicide?
3        Q    Yes.
4        A    I believe there was a stop order already out.
5        Q    Okay. And so with the -- because the stop
6    order was out on the Garcia homicide, right?
7        A    Yeah.
8        Q    So you didn't -- you thought that was
9    sufficient? You didn't need to do -- you didn't have to
10   get an arrest warrant?
11       A    No, we -- we didn't get arrest warrants.
12       Q    Okay.
13       MR. GRILL: And are we on page 19?
14       MS. DONNELL: 18.
15       MR. GRILL: 18.
16   BY MS. DONNELL:
17       Q    Okay. I'm showing you now the arrest report
18   for Arnold Day, and this is his arrest report for both
19   the Erving and the Garcia homicide, right?
20           (EXHIBIT 18 MARKED FOR IDENTIFICATION)
21       A    Is there another one? Is this -- I --
22   I -- this isn't the original. I don't know if this is a
23   draft. There's no CB number on it.
24       Q    Well, this is City Day - Are you saying there
25   should be a different one? I don't know if it's the

268

1    copy that we got, or -- you're saying there should be a
2    different one?
3        A    Well, usually I'm able to see -- there's no
4    approval of charges listed on this, so it's incomplete.
5        Q    So you think this is --
6        A    It doesn't have a lockup keeper on it.
7        Q    You think this is just a draft?
8        A    I don't know who signed this. It's -- I don't
9    know if -- like I said, I don't know if this is
10   something the gang specialists started to type up,
11   because they got two other names in the arrest reports.
12   I don't know whose signatures those are. I mean,
13   it's -- there's no date and time of charges, who
14   approved the charges.
15       Q    Okay, maybe I need to get you a different
16   copy.
17       A    There's no -- yeah -- no booking officer or CB
18   number listed.
19       Q    So you think this is just a draft?
20       A    I -- I don't know. I don't know if -- I know
21   that normally when we go to Court, the CB number's on
22   there. You get a front and back and the booking
23   officer's name is on it.
24       Q    Okay. Actually, do you want to look at -- I
25   forget the number. I think it's 6. It's your area file

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

269

1  that -- you were finding the area file.
2      A   Got it.
3      Q   And can you turn to page 88, City_Day 88?
4      A   How would I -- should I search?
5      Q   No, so it's City_Day 88.  Do you have
6  City -- I think -- you're not on the right page.  It's a
7  handwritten note.
8      A   87 -- this?
9      Q   Yeah.  Do you see that?  It says -- this is
10  the 10-October-91, the G-Nate homicide.
11     A   Okay.
12     Q   And do you recognize this handwriting?
13     A   No.
14     Q   It's not yours?
15     A   Uh-huh.
16     Q   Is that a no?
17     A   No.
18     Q   Okay.  Okay, I'm also going to have you
19  now -- one second.  Okay, can I have you turn to page
20  132, it's a GPR?
21     A   Okay.
22     Q   Okay, here there's a Green, an Edward Green
23  that was told to from 909 West 54th Street.  Did you
24  know Edward Green back in May of 1991 or January 1992?
25     A   No, this isn't my GPR report.

270

1      Q   No, I know it's not your GPR, I didn't mean to
2  represent that it was.
3      A   What is this from?  The scene?
4      Q   This is -- yes, from the scene investigation.
5      A   From the scene detectives?
6      Q   Uh-huh.
7      A   No, I -- I don't recall knowing Mr. Green.
8      Q   Okay, how about Corona Taylor?  She was one of
9  the individuals who lived at 927 West 54th Street, where
10  this murder happened, who was an eyewitness?  Did you
11  ever have any interactions with Corona Taylor?
12     A   No.
13     Q   Okay.  And she spoke to -- if you look at the
14  next GPR, on page 133, she spoke to Detective McWeeny,
15  and got a description of the assailants?  Do you see
16  that?
17     A   Yes.
18     Q   Okay, did you ever make any efforts to go talk
19  to Corona Taylor once you talked to Arnold Day or Ralph
20  Watson?
21     A   I -- I don't know if we did.  I'm sure we
22  would have tried to.
23     Q   You think you would have tried to?
24     A   Yeah.
25     Q   Would you have tried to do a lineup?

271

1      A   The State's Attorney would have wanted us -- I
2  think the State's Attorney probably would have wanted to
3  talk to all the witnesses, if they were available.
4      Q   Okay.  And that's -- and -- and certainly if
5  she was an eyewitness, she would have been someone who
6  could have -- you could have done a lineup for, to see
7  if she could identify Mr. Day, or Mr. -- Nathaniel
8  Anderson, right?
9      A   Yeah, how -- yeah, if -- if she wanted to come
10  forward, and -- but if she's a young female, she may not
11  wanted to -- she's -- she's living right in the middle
12  of a gangland, and now she's going to have to identify
13  gang members, and she may not want -- she may have
14  avoided us back then.
15     Q   But if you went out and talked to someone, and
16  they said they didn't want to cooperate, that was
17  something you would put down in a supplemental report?
18  Like if you --
19          MR. GRILL:  I'm going to object to form and
20     foundation of these questions.  Go ahead.
21     A   Sometimes.
22     Q   Do you recall doing that in the Garcia
23  homicide, when you went out and talked to a woman in the
24  area of the scene, who didn't want to cooperate with
25  you, and didn't want to identify herself.  You put that

272

1  in your supp report?
2      A   Which people?  Yeah, I don't know --
3          MR. GRILL:  Are we talking Garcia?
4          MS. DONNELL:  Garcia.
5          THE WITNESS:  You're talking about Garcia?
6          MR. GRILL:  Why are we talking about Garcia?
7  BY MS. DONNELL:
8      Q   Because I was saying sometimes you did do
9  that, when you went to talk to someone who didn't want
10  to talk, right?  You would say -- you would put that in
11  the supp report, right?
12     A   Well, I said sometimes.
13     Q   Because I'm saying -- okay, well I know we're
14  just like -- I was asking you if you ever went out to
15  talk to Corona Taylor, all right?  I think you were
16  saying, "I think we would have.  The State's Attorney
17  would have wanted us to, because she was an eyewitness."
18  And I was saying if you did that, then you would have
19  put that in a GPR or a supp report indicating that you
20  had went out to try and talk to the eyewitness, and she
21  did not want to talk, right?
22          MR. GRILL:  Hang on, form of the question,
23     foundation.  Go ahead, Ken.
24     A   And -- and I'm not saying I did.  I'm saying
25  that we, meaning the police department, could --

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

273

1  certainly could have sent over detectives. I don't
2  know.
3      Q   Okay. I'm going to have you look at City_Day
4  110. It's a GPR, it's not your GPR. It's Dan
5  McWeeny's, but I want you to look at it. In Exhibit 6.
6      A   Okay.
7      Q   And I don't know if you've had a chance to
8  review this in your preparation for today, but why don't
9  you look that over, and then I'm going to ask you
10  questions about it, okay?
11     A   Okay.
12     Q   Okay, so here's, "Spook, a very dark male,
13  Black, 16 to 20 years old, 5'7" to 5'8", sells drugs at
14  55th and 57th, between Peoria and Sangamon," right?
15     A   Uh-huh.
16     Q   Yes?
17     A   That's what it says.
18     Q   "He used to stay at 5705 South Peoria," and
19  then I think it says pants something, and that Maureen?
20  Do you know who Spook is, or who went by the street name
21  of Spook back in May of 1991?
22     A   Nope.
23     Q   And that says, "Mark, Black male, 16 to 20
24  years old, 5'7", 5'8"." I -- I don't know if that -- I
25  can't read that, "Both medium build and --

274

1      A   "Dark complected."
2      Q   Okay, "Gerrod's spot," do you know -- this
3  says, "Gerrod's spot is at garage at 52nd and 53rd and
4  Peoria. Spook and Mark is at 55th and 57th, Peoria and
5  Sangamon," right?
6      A   Yup.
7      Q   Then it says, "Gerrod is a Black Stone.
8  Gerrod's spot," and something, "Big money house." Can
9  you read that?
10     A   I don't know what it -- that's big -- I don't
11  know what -- "Gerrod's spot, and -- " I don't know
12  who's -- the word there, money? It says money, "big
13  money house."
14     Q   Okay. And it says, "Spook and Mark are
15  Disciples," meaning Danger Disciples, right?
16     A   Yup.
17     Q   "Spook was wearing a Bulls jacket," right?
18     A   Yeah.
19     Q   "And Gerrod shook Mark's hand," right?
20     A   Got it.
21     Q   Then it says, "Cousin Nicolo may -- Nicola may
22  know the offenders."
23     A   Uh-huh.
24     Q   Is that right?
25     A   Yup.

275

1      Q   And then it says, "60th and Halstead," and
2  that something Maureen. Then, "Jo Jo shot JB Posse two
3  times last month." Do you see that?
4      A   I do.
5      Q   Do you know what that means?
6         MR. GRILL: Objection, calls for speculation.
7  Foundation.
8      Q   Do you have any idea what that means?
9      A   Well, it says JB, Jeff Black Stone Posse above
10  it.
11     Q   Okay.
12     A   So Jo Jo shot, and it says with an arrow Jeff
13  Black Stone Posse, two times last month. I don't know
14  what Jeff Black Stone Posse is.
15     Q   Okay. And then it says, "Ronnie sells at 927
16  54th Street."
17     A   It does.
18     Q   Down below. Did you do any investigation with
19  respect to a Spook or a Mark and their possible
20  involvement in the Gerrod Erving homicide?
21     A   No, I did -- I did not, and I don't know what
22  the context of this is with Detective McWeeny.
23     Q   Okay.
24     A   I don't know if this is something he'd just
25  go, "Who was he having problems with?" And this is what

276

1  they came up with, or -- or what's the basis for this
2  information. Like I said, I mean I had Ralph Watson,
3  and I was focused on what he said, and I mean we had
4  Arnold Day's. But I -- this information was given to
5  me. I mean I'm involved in this almost 10 months later.
6  So I guess the question would be to ask these detectives
7  if they did any follow-up. Because I didn't work on
8  that murder until I got this job in January 1992, so
9  what happened between May of '91 and January of '92,
10  I don't know.
11     Q   Okay. I'm going to have you again look at
12  this Exhibit 6, but I might have you look at my copy,
13  because it might be easier to see.
14     A   Okay.
15     Q   I'm going to ask you some questions about
16  what's in it, towards the back. You'll see at the back,
17  starting at City_Day 142, there is a copy of an
18  envelope, and it says, Personnel Division? And then
19  behind it, there's a copy of the backside of this manila
20  folder that says, Erving. And then in there there's a
21  bunch of mugshots, okay?
22     A   Okay.
23     Q   But if it's easier to see on my copy, I'll let
24  you look at -- I'll trade you, if you want.
25     A   Okay.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

---

277

1    Q   Do you want to look at these copies?
2    A   No, I'm not going to be able to remember these
3    people, I already know, but --
4    Q   Okay, well, so -- but is this something that,
5    you know, if people were pulled as possible suspects,
6    they'd get -- that might be information -- I'm sorry.
7    I'm so sorry, I'm getting tired.  If there were
8    individuals that were suspects in a possible homicide
9    investigation and somebody pulled mugshots from the
10   Identity Bureau, Personal Identification Bureau, that's
11   the kind of stuff that would get put in a -- in a
12   homicide file, an investigative file, right?
13   A   It might.
14   Q   And so --
15   A   And it doesn't have to be limited to suspects,
16   it could be fillers for a photo lineup.
17   Q   Okay, so it could be suspects, it could be
18   fillers?
19   A   Yeah, it could be the co-defendants, so in
20   that --
21   Q   Okay.  I'm going to walk you through some of
22   these, to see if any of these names -- if you know any
23   of these people.
24   A   Okay.
25   Q   Did you pull photographs for the Erving

---

278

1    homicide?
2    A   No.
3    Q   This was not you?
4    A   No.
5    Q   Okay.  Do you remember seeing these
6    photographs when you got the file?
7    A   Not as I sit here, no.
8    Q   Okay.  And do you know who Marcus Chapman is?
9    A   It's not ringing a bell.
10   Q   Colvin Mitchell?
11   A   Nope.
12   Q   Calvin Mitchell.  Terry Philpot?
13   A   Nope.
14   Q   Theodore Robinson?
15   A   Nope.
16   Q   Okay, I'm going to shift gears again.  I'm
17   going to come back to some of this, but I want to shift
18   gears for a minute, and talk to you about the media, and
19   your interaction with the media, because recently there
20   was an article in the Cook County Reporter.  Do you
21   remember that article?
22   A   Yes.
23   Q   Okay.  And do you remember your interview for
24   that article?
25   A   Yes.

---

279

1    Q   Okay.  And did you reach out to Whitaker
2    Kennedy?
3    A   No, he reached out to me.
4        MR. GRILL: Kennedy is before.
5    Q   Kennedy Whitaker?  No?
6    A   No, he called me.
7    Q   He called you.  Do you know him?
8    A   No.
9    Q   Why did he reach out to you?
10       MR. GRILL: Objection.  Foundation.
11   Q   Or why did he say he was reaching out to you?
12   A   That he's -- he's read the stories.  He's a
13   reporter.
14   Q   Did he tell you what kind of story he was
15   writing?
16   A   He told me he was writing a story about
17   the -- the lawsuits, and I told him my thoughts on it,
18   and he wrote that article.
19   Q   Did he audio record you?
20   A   Did he what?
21   Q   Did he -- was he recording you, to your
22   knowledge?
23   A   I have no idea, it was on the phone.
24   Q   It was on the phone, okay.  And did you talk
25   to him on one occasion, or more than one occasion?

---

280

1    A   Once.
2    Q   And then you had an e-mail where you sent him
3    Judge Hook's opinion?
4    A   Yes.
5    Q   Okay.  Did you have any other e-mail
6    communication with him?
7    A   I -- I can look again.  I -- I don't think I
8    did, but --
9    Q   Okay.  How about by text?  Did you guys text?
10   A   No.
11   Q   And did you see that as an opportunity to give
12   your version of what you think is happening, to clear
13   your name of these -- the conspiracy that individuals
14   have against you?
15   A   I took it as an opportunity to share the
16   truth.
17   Q   Okay.  Maybe I just asked you this.  You
18   didn't make any efforts to do a lineup with the
19   eyewitness, Corona Taylor, right?
20   A   I -- as I said before, I -- I don't know if
21   they couldn't find her that night.
22   Q   No, I'm sorry, for you.
23   A   I'm -- I'm -- no, I -- I -- I did not.
24   Q   And the same was true with Edward Green, you
25   didn't try and do a lineup for him, right?

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

281

1    A  For who?
2    Q  Edward -- Edward Green, the other person who
3  they talked -- I showed you the GPR from the scene.
4    A  No.
5    Q  Okay.  Why didn't you do a lineup?
6      MR. GRILL:  Objection.
7    Q  To have the eyewitness identify Mr. Day?
8    A  I -- like I said before, I don't know if
9  they -- if the other detectives were assigned to go out
10  to try to find the witnesses.  I don't know if it was
11  part of a continuing thing to run the lineups later, and
12  bring Day back in for a lineup, or that nobody wanted to
13  cooperate.  I -- I don't know.  I could tell you I -- I
14  was focused on Arnold Day's arrest and the statement.
15  I mean, you know, I'm not the sole person responsible
16  for this entire investigation.
17    Q  Did you know -- I'm going to ask you some
18  individuals, okay?  Back in 1991, did you know somebody
19  who went by the name of G-Johnny, a general named
20  G-Johnny?
21    A  Is he paralyzed?  Did he get shot in the back
22  at Great American, and sold drugs in his wheelchair at
23  54th and Winchester?
24    Q  He might have been.  I don't know.
25    A  If that's G-Johnny, I -- I -- but I don't

282

1  remember a G-Johnny, not in my time.
2    Q  Okay.  How about Ron Brown or G Ron?  Did you
3  know Ron Brown or G Ron?  Back in this time period?
4    A  Not on the top of my head, no.
5    Q  John Burnham?  Did you know John Burnham?
6    A  Popoff (phonetic), yes.  I know him very well.
7    Q  Did you speak with him regularly before he got
8  incarcerated?  Was he one of your --
9    A  No, he wasn't -- he wasn't the friendly type.
10    Q  He wasn't the friendly type?
11    A  He was the enforcer for Ramon Gallos
12  (phonetic).
13    Q  So you would talk to Gallos, but not Burnham?
14    A  Yeah.
15    Q  Okay.  I think I already asked you about
16  Spook, you didn't know who that was?
17    A  No.
18    Q  And were you less familiar with the Gangster
19  Disciples; is that fair?
20    A  That would be fair, yeah.
21    Q  Okay, so if Spook was a --
22    A  I mean then, yeah.
23    Q  Then.
24    A  Yes.
25    Q  I'm saying then, at that time you were

283

1  less -- you were more familiar with --
2    A  Yes.
3    Q  Okay.  I think earlier you testified that it's
4  now your belief that the Darren in the statement that
5  Ralph gave to you referred to Darren Triplett, right
6    A  That's right.
7    Q  And can you tell me what your reason for that
8  belief is?
9    A  I think it came up in other documents that I
10  was reviewing, either in this case or other cases,
11  and the fact that Arnold Day is friends with him on
12  Facebook.
13    Q  Anything else?
14    A  Nope.  I mean just I'm guessing, that's what I
15  think.
16    Q  Okay.  Well, maybe I forgot to ask you this.
17  When you arrested -- when Arnold Day, you said
18  called -- strike that.  When you sought for there to be
19  charges accrued for the Erving homicide on Arnold Day,
20  what was the actual basis for the probable cause at that
21  time, on February 4, 1992?
22    A  The probable cause for the charge, or probable
23  cause for the arrest?
24    Q  Probable cause for the -- well, he was -- he
25  was arrested whenever he came in, right?  On the --

284

1    A  Right.  I think he also had warrants out for
2  him too.  I saw that somewhere.
3    Q  So probable cause for the charges on the
4  Erving homicide, not for the arrest, which I think had
5  to do with the Garcia stop order, right?
6    A  Well, the -- the charges were based upon,
7  I believe Ralph Watson's statement, and Day's only
8  statement.
9    Q  Anything else?
10    A  I mean I guess you'd have to ask the State's
11  Attorney what he thought was the probable cause on that.
12    Q  But for you, for purposes of a homicide
13  arrest, it was Ralph Watson's statement and Day's
14  statement, correct?
15    A  Yeah, I mean those are the inculpatory things.
16  I mean we didn't always agree with the State's attorney.
17  Sometimes they wouldn't charge, and we'd argue with
18  them, and they won.
19    Q  But it's fair to say at that point, on
20  February 4, 1992, you didn't have any physical evidence
21  linking -- linking Mr. Day to the crime, correct?
22      MR. GRILL:  Form.
23    A  Other than his signature on the statement,
24  I mean that's physical, but --
25    Q  Okay.  Also, I don't know if I -- I asked you

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

285

1    this earlier, so just to follow-up, and I can show it to
2    you if you need to, but do you recall when you read your
3    criminal trial testimony, that you were asked about your
4    conversation with Watson, and you testified that you had
5    gotten the statement from Watson before you talked to
6    Mr. Day?  Do you remember that in your criminal trial
7    testimony?
8        A   Yeah, I believe we got the -- the statement,
9    it's actually dated January 20.
10       Q   But you remember you testified as to Watson's
11   statement in Mr. Day's -- testified as to the existence
12   of getting a statement from Mr. Watson, not the
13   substance of the statement, at Mr. Day's criminal trial?
14   Do you remember that testimony?
15       A   Yeah, they did -- I couldn't testify,
16   I believe you guys use the legal term, I could talk
17   about it as tracing the investigation, but I wasn't
18   allowed to reveal the substance of Mr. Watson's
19   statement for the motion in limine.
20       Q   But the State's Attorney asked you questions,
21   in -- in the course of your investigation, how was
22   it -- of course, you talked to Mr. Watson, got a
23   statement, then you talked to Mr. Day, right?
24       A   Yeah, it's called tracing the investigation,
25   yes.

286

1        Q   Okay.  I need to take just a short break.
2    We're almost done, okay?
3        A   Yeah.  I can go to the bathroom in another
4    quick second, right?
5        Q   Sure.
6        VIDEOGRAPHER:  5:43, we're going off the
7    record.
8        (OFF THE RECORD)
9        VIDEOGRAPHER:  We're back on the record for the
10   deposition of Kenneth Boudreau.  My name is Sheila
11   Jones.  Today's date is December 1, 2020, and the
12   time is 5:54 p.m.
13       MS. DONNELL:  Mr. Boudreau, I actually don't
14   have any further questions for you, so --
15       THE WITNESS:  You're done?  You're done?
16       MS. DONNELL:  Yeah, I just said we had to go on
17   the record.
18       MR. GRILL:  I have like four questions.
19       MS. DONNELL:  Well, now I might have to,
20   so now --
21       MR. GRILL:  I don't think so.
22       MS. DONNELL:  I might, Andrew.  You usually
23   make me ask more questions.
24       CROSS EXAMINATION
25   BY MR. GRILL:

287

1        Q   Okay, real quick, did you have a partner named
2    Richard in 1991 or 1992?
3        A   No.
4        Q   Have you ever been partnered with anybody
5    named Richard?
6        A   No.
7        Q   In your career?
8        A   No.
9        Q   Okay.  Did you -- this is Exhibit, I guess
10   it's 6?  Yeah, so Exhibit 6 is the Investigative File,
11   right?  I think the area file, I think that somehow
12   Ms. Donnell is looking into it, but in any event,
13   did you -- do you have any recollection about whether
14   you reviewed this file before, or any of the police
15   reports in it before you interviewed Ralph Watson on
16   January 20, 1992?
17       MS. DONNELL:  Objection.  Form and foundation.
18   You can answer.
19       A   I -- I don't know if I did.
20       Q   Okay.  Exhibits 12 and 13, so I know this
21   is -- 12 was the Summary Findings of the Firearms
22   Evidence, and 13 was the Firearms Receipt and Worksheet,
23   that was CCSAO 94, and that one's City_Day 46?
24       A   Yes.
25       Q   Do you have any recollection of reviewing

288

1    either of those documents before you interviewed Ralph
2    Watson on January 20, 1992?
3        A   No.
4        Q   Okay.  My last question.  Let's see, there you
5    go.  There it is.  This is Exhibit 8, which is the Supp
6    Report that Detective Foley drafted.  Your signature's
7    on that at the bottom?
8        A   No, that's not my signature.  Detective Foley
9    signed my name.
10       Q   Okay.  And would it have been -- do you have
11   any recollection of having reviewed that supplemental
12   report before you -- before it was submitted?
13       A   I -- I don't have any recollection, as I sit
14   here.
15       Q   Was it your practice to have Foley sign your
16   name to supp reports back at this time period?
17       A   It was -- yeah, but it was not Foley, but
18   whoever prepared the report would usually sign both
19   partners or both people's signatures to it.
20       Q   Was it your practice, when you think back to
21   that time period, if a non-detective was going to sign
22   your name to a report, for you to review the typewritten
23   supplemental report before it was submitted?
24       MS. DONNELL:  Objection.  Form, and foundation,
25   and incomplete hypothetical, but you can answer.

The Deposition of KENNETH BOUDREAU, taken on December 01, 2022

289

1      A   Sometimes.  It depends, if you're there when
2  he's preparing it, then you might read it.  You might
3  read a draft, or you might find it in your mailbox for
4  when you come back to work, if you don't work together.
5  I mean if we -- or you went on vacation and you're gone
6  for a month, so they're going to sign it.
7          MR. GRILL:  Okay, all right.  That's all I've
8      got.  Do you have anything else?
9          REDIRECT EXAMINATION
10  BY MS. DONNELL:
11      Q   Just about, if -- if there's information in
12  the supplemental report in Exhibit 8, that Detective
13  Foley had no participation in, for example, talking to
14  Ralph Watson, then he would have gotten that information
15  from you, right?
16          MR. GRILL:  Objection to form.
17      A   Yes, and the handwritten statement, and the
18  handwritten statement was provided to him, so he was in
19  the office.
20          MS. DONNELL:  That's all.
21          MR. GRILL:  Okay.
22          MS. DONNELL:  Do you want to reserve signature?
23          MR. GRILL:  Yeah, we'll reserve.
24          MS. DONNELL:  Okay.
25          COURT REPORTER:  Okay.  And Heather, how would

290

1  you like your copy?
2          MS. DONNELL:  I'm just going to get regular,
3      delivery E-Tran.
4          COURT REPORTER:  E-Tran, and do you want to
5      have the video?
6          MS. DONNELL:  No, I don't need it.
7          COURT REPORTER:  Okay.  And Andrew, how would
8      you like your copy?
9          MR. GRILL:  Just an E-Tran.
10          COURT REPORTER:  And would you like a copy of
11      the video?
12          MR. GRILL:  No, not yet.
13          COURT REPORTER:  Okay.  And I think George has
14      left, but I'm going to guess that he got --
15          MS. DONNELL:  He does --
16          THE WITNESS:  I apologize, but I --
17          COURT REPORTER:  All right, you can take us off
18      the record.
19          VIDEOGRAPHER:  I'm going off the record.  The
20      time is 5:58.
21          (DEPOSITION CONCLUDED AT 5:58 P.M. (CT))
22
23
24
25

291

1              CERTIFICATE OF REPORTER
2              STATE OF ILLINOIS
3
4      I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me digitally and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skills and ability.  I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  SYDNEY LITTLE,
23  COURT REPORTER/NOTARY
24  COMMISSION EXPIRES ON: 03/18/2026
25  SUBMITTED ON: 12/13/2022