Exhibit 163

Cassandra Taylor, 2/23/2023

1

                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

ARNOLD DAY,                    )
                               )
              Plaintiff,       )
                               )
         vs.                   )    No. 19 CV 7286
                               )
KENNETH BOUDREAU, et al.,      )
                               )
              Defendants.      )


         The deposition of CASSANDRA TAYLOR, taken

pursuant to the Federal Rules of Civil Procedure,

before Donna M. Urlaub, Certified Shorthand

Reporter No. 084-000993, via Zoom, on Thursday,

February 23, 2023, commencing at 10:00 a.m.,

pursuant to notice.


         APPEARANCES:

             LOEVY & LOEVY, by
             MS. HEATHER LEWIS DONNELL
              (311 North Aberdeen Street, Third Floor
               Chicago, Illinois  60607
               312.243.5900
               heather@loevy.com)

             GREENBERG TRIAL LAWYERS, by
             MR. STEVEN A. GREENBERG
              (53 West Jackson Boulevard, Suite 1260
               Chicago, Illinois  60604
               312.879.9500
               steve@greenbergcd.com)
                 appeared on behalf of the plaintiff;

Cassandra Taylor, 2/23/2023

## 2

APPEARANCES: (Cont'd)
ROCK FUSCO & CONNELLY, LLC, by
MR. ANDREW J. GRILL
MS. LAUREN FERRISE
(333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000
agrill@rfclaw.com)
appeared on behalf of the individual
defendant officers;
THE SOTOS LAW FIRM, PC, by
MR. MAURICE C. HUNT
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
mhunt@jsotoslaw.com)
appeared on behalf of the defendant
City of Chicago.

* * * * *

I N D E X

Witness:                              Page

CASSANDRA TAYLOR

Examination by:

Mr. Grill.................   3

E X H I B I T S

(None marked.)

- - -

## 3

1  (Witness sworn.)
2  CASSANDRA TAYLOR
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5  EXAMINATION
6  BY MR. GRILL:
7  Q.  All right.  Ms. Taylor, my name's
8  Andrew Grill.  I'm one of the attorneys that
9  represent the police officers and detectives and
10  whatnot that Mr. Day is suing.
11  And as you heard before we got on
12  the record, one of my colleagues, Lauren Ferrise,
13  is on with us as well.
14  So -- and it's my understanding
15  that Ms. Donnell is representing you today; is that
16  right?
17  MS. DONNELL:  Yes, I'm representing the
18  witness today.
19  BY MR. GRILL:
20  Q.  You can hear me?
21  A.  Yes, sir, I can.  I'm sorry, I thought
22  you said Donna.
23  Q.  Donnell.  Yeah, no worries.  Okay.
24  So if at any point today you can't

## 4

1  hear me or something I'm asking you is confusing or
2  it's not clear to you, just please feel free to
3  speak up and let me know that you can't hear me or
4  you don't understand what it is that I'm asking you
5  so we can, you know, make sure you can hear me and
6  are getting the question that you understand.  Okay?
7  A.  Understood.
8  Q.  All right.  Have you ever given a
9  deposition before in your life?
10  A.  Yes, sir.
11  Q.  Okay.  When was the last time that you
12  gave a deposition?
13  A.  I can't remember the year.
14  Q.  Within the last ten years?
15  A.  Yes.
16  Q.  What kind of case was it that you were
17  a deponent in?
18  A.  It was a lawsuit against the company.
19  Q.  All right.  A company that you worked
20  for?
21  A.  Yes, sir.
22  Q.  Was it like an employment case or
23  something?
24  A.  Yes, sir.  It was a -- yeah, it was

## 5

1  like a company lawsuit, yes, sir.
2  Q.  Were you a plaintiff in that case?
3  A.  Yes, sir.
4  Q.  Were you the only plaintiff?
5  A.  No, sir.
6  Q.  And who was the -- what was the name of
7  the employer that you were suing?
8  A.  Strike that.  I wasn't suing anyone.
9  They were suing the company.
10  Q.  Okay.  What was the name of the company
11  that was being sued?
12  A.  United Auto Credit.
13  Q.  Okay.  How long did you work for United
14  Auto Credit?
15  A.  Eight years.
16  Q.  Starting when until when?
17  A.  September of 2012, and I left the
18  company in September 2021.
19  Q.  Where do you work now?
20  A.  Santander.
21  Q.  Can you say that again?  I didn't hear
22  you.
23  A.  Santander.
24  Q.  Can you spell that?

Cassandra Taylor, 2/23/2023

6

1    A.    S as in Sam, A as in alpha, N as in
2    Nancy, T as in tango, A as in alpha, N as in Nancy,
3    D as in delta, E as in echo, R as in Romeo.
4    Q.    What does that company do?
5    A.    It's an auto finance company.
6    Q.    And that's where you work now?
7    A.    Yes, sir.
8    Q.    What do you do for them?
9    A.    I'm a senior rep.
10   Q.    What does that mean?
11   A.    That means I provide modifications for
12   people that's having a hardship.
13   Q.    Modifications to their loans?
14   A.    Yes, sir.
15   Q.    And what did you do for United Auto
16   Credit when you worked for them between September
17   of '12 and September of '21?
18   A.    Started off as a front-end
19   representative, where I taken and made outbound
20   calls due to people that was past due on their
21   loans.
22        From there, I moved to a team lead.
23   As a team lead, I had about twelve employees that
24   was under me.

7

1        Then I moved to the modification
2    department, where I was doing the same thing that
3    I'm doing at Santander.
4    Q.    How long did you do the loan
5    modification at United Auto Credit?
6    A.    Two years.
7    Q.    So the last two years that you were
8    there, you were doing the loan modifications?
9    A.    Yes, sir.
10   Q.    And part of your job at United Auto
11   Credit gave you access to skip traces, the ability
12   to locate people as to, like, where they lived,
13   contact info, et cetera, right?
14        MS. DONNELL:  Objection; form.  But you can
15   answer, Ms. Taylor.
16        THE WITNESS:  Yes, sir, it did.  A part of my
17   duties did provide that service.  Not all of the
18   time that I was with United Auto Credit did that,
19   provide that service.
20   BY MR. GRILL:
21   Q.    During what years from September of '12
22   to September of '21, when you worked at United Auto
23   Credit, did you have the ability or access to skip
24   traces?

8

1    A.    Starting in 2018.
2    Q.    And was there a particular job title or
3    position that you had beginning in 2018 that gave
4    you that capability to run skip traces?
5    A.    Yes, sir.
6    Q.    What was that job?
7    A.    Recovery.
8    Q.    And you had access to or the ability to
9    run skip traces from 2018 until September of '21,
10   when you left?
11   A.    Yes, sir.
12   Q.    And why did you stop working at United
13   Auto Credit in September of '21?
14   A.    Because I had maxed out on being able
15   to move forward within the company.  There was no
16   other departments I can go to.
17   Q.    Okay.  It wasn't connected to the
18   lawsuit or anything like that?
19   A.    No, sir.
20   Q.    And did you take off any time between
21   leaving United Auto Credit and starting at
22   Santander?
23   A.    No, I didn't.
24   Q.    When you began having the capability in

9

1    2018 to run skip traces, did United Auto Credit
2    place any limitations on you when it came to --
3    when it was permitted for you to run a skip trace
4    on an individual in order to find contact
5    information or an address or something like that?
6        MS. DONNELL:  Objection; form.  But you may
7    answer, Ms. Taylor.
8        THE WITNESS:  I had no limitations.
9    BY MR. GRILL:
10   Q.    Did you have to sign any type of
11   authorization or any paperwork in order to provide
12   you with the authority or ability to run skip
13   traces beginning in 2018 at United Auto Credit?
14   A.    No.
15   Q.    Was there any special license or
16   license of any sort that you needed to have while
17   working at United Auto Credit in order to run skip
18   traces beginning in 2018?
19   A.    No.
20   Q.    Were you trained or did you receive any
21   training at United Auto Credit as it pertains to
22   running skip traces while you were employed there?
23   A.    Yes.
24   Q.    What kind of training did you receive?

Cassandra Taylor, 2/23/2023

10

1    A.   The training just provided us with
2  showing us how to search for parties that we were
3  in search of.
4    Q.   And parties that you were in search
5  of would typically be people that maybe were
6  defaulting or deficient on their loan payments;
7  would that be fair?
8    A.   Correct.
9    Q.   What other types of circumstances would
10 exist that would cause you to run a skip trace on
11 someone that worked for United Auto -- when you
12 were working for United Auto Credit?
13   MS. DONNELL:  Objection; form to the extent
14 it calls for speculation.
15       But you can answer if you can,
16 Ms. Taylor.
17   THE WITNESS:  Please repeat the question.
18 BY MR. GRILL:
19   Q.   Pardon me?
20   A.   Please repeat the question.
21   Q.   Sure.  Other than running a skip trace
22 in order to find a person that was deficient on
23 their loan payments, what were some of the other
24 circumstances that would cause you to run a skip

11

1  trace on someone while, you know, you were employed
2  at United Auto Credit?
3    MS. DONNELL:  Objection; form.  But you can
4  answer.
5    THE WITNESS:  There was no other circumstances.
6  BY MR. GRILL:
7    Q.   Okay.  So the only time, typically,
8  that you would be running a skip trace while you
9  were employed at United Auto Credit was in order to
10 find someone that was behind on their loan payments
11 to United Auto Credit; is that right?
12   A.   Correct.
13   Q.   Where would you typically be able to --
14 well, strike that.
15       Were you able to run skip traces --
16 let me strike that again.  I'll start the question
17 over.
18       Were you able to run skip traces --
19 or did you have to use a particular computer at --
20 or some type of technology at United Auto Credit in
21 order to run a skip trace?
22   MS. DONNELL:  Objection; form.  But you can
23 answer.
24   THE WITNESS: Can you please be clear on your

12

1  question?
2  BY MR. GRILL:
3    Q.   Yeah.  Could you run -- did you have --
4  was there, like, a particular computer that you had
5  to use at United Auto Credit to run a skip trace?
6    A.   I used my own desktop to run skip trace.
7    Q.   You were on desktop at United Auto
8  Credit?
9    A.   Yes, sir.
10   Q.   What about a personal computer at home,
11 could you do it from there too?
12   A.   No need.
13   Q.   Why not?
14   A.   Because I didn't use my personal
15 computer for anything that was accessible to the
16 company due to the privacy of other customers.  So
17 I didn't have any data for other customers on my
18 personal computer.
19   Q.   Okay.  So you would only run skip
20 traces at work using a United Auto Credit computer
21 in order to protect the private personal
22 information of the people who you were running skip
23 traces on; is that right?
24   A.   That would be correct.

13

1    Q.   And why did you receive training from
2  United Auto Credit that trained you in a way
3  that -- trained you to -- that trained you in a way
4  that this was the method that -- let me strike that
5  question over.  Bad question.  It's early in the
6  morning.
7        The training that you received from
8  United Auto Credit on how to run skip traces, did
9  they train you that this was the way to protect the
10 private personal information of the people that you
11 were running skip traces on?
12   MS. DONNELL:  Objection; form.  But you can
13 answer.
14   THE WITNESS:  Again, they gave us training on
15 how to use the programs that we had been provided.
16 BY MR. GRILL:
17   Q.   Okay.  Were you given any training on
18 how to protect the personal private information of
19 the people who you were running skip traces on?
20   MS. DONNELL:  Objection; asked and answered.
21 You can answer again.
22   THE WITNESS:  Your question is not clear to
23 me.
24

Cassandra Taylor, 2/23/2023

14

BY MR. GRILL:
2  Q.  Okay.  So the training that you
3  received from United Auto Credit on how to run skip
4  traces, did that training include any training on
5  how to protect the personal private information of
6  the people on which you were running skip traces?
7     MS. DONNELL:  Objection; asked and answered.
8  But you can answer again.
9     THE WITNESS:  The only protection that we
10  were trained on is not leaving the person's account
11  visible on the screen if you are not at your desk
12  at that time.
13  BY MR. GRILL:
14  Q.  Okay.  Were you aware of any rules that
15  United Auto Credit had in place between 2018 and
16  2021 that governed who you were permitted to run
17  skip traces on?
18  A.  Yes.
19  Q.  And what did those rules, to the best
20  of your recollection, say were the limits on who
21  you could run skip traces on?
22  A.  The limits were you weren't to run a
23  skip trace on a customer's family member if they
24  wasn't a part of the account or the party that we

15

1  were in search of.
2  Q.  Did you have any understanding as to
3  why those limits were in place at United Auto Credit
4  between 2018 and 2021?
5     MS. DONNELL:  Objection; form, foundation.
6  I'm sorry, you can answer.
7     THE WITNESS:  Yes.
8  BY MR. GRILL:
9  Q.  What was your understanding?
10  A.  Understanding that I got from it was
11  to not use the program to search for a customer's
12  family member or a person that wasn't a part of the
13  loan.
14  Q.  Okay.  Right.  So my question, though,
15  is as to if you had an understanding at all as to
16  why United Auto Credit had those limitations in
17  place.
18     MS. DONNELL:  Objection to the extent it
19  calls for speculation.  But you can answer, if you
20  can.
21     THE WITNESS:  Yes.
22  BY MR. GRILL:
23  Q.  What was your understanding as to why
24  those limits were in place?

16

1  A.  Because they weren't our customer.
2  Q.  Okay.  You assisted Mr. Day in locating
3  Krona Taylor; correct?
4  A.  Correct.
5  Q.  And you did that by running a skip
6  trace in order to find out where she lived and how
7  to get in contact with her; correct?
8  A.  Correct.
9  Q.  And you did that at some point between
10  September of -- or between 2018 and 2021 while you
11  were at United Auto Credit, right?
12  A.  I'm not sure when it taken place.
13  Q.  All right.  Did you run that skip trace
14  on Ms. Krona Taylor while you were employed at
15  United Auto Credit?
16  A.  Yes.
17  Q.  And did you use the United Auto Credit
18  computer, your desktop at work, for example, in
19  order to run that skip trace?
20  A.  Yes.
21  Q.  And Ms. Krona Taylor did not have a
22  loan of any sort with United Auto Credit or that
23  United Auto Credit was servicing at the time you
24  ran that skip trace; correct?

17

1  A.  Correct.
2  Q.  And so when you ran Krona Taylor's skip
3  trace for Mr. Day, you were running it on a person
4  that -- well, let me rephrase that.  Rephrase the
5  question.
6     So when you ran the skip trace on
7  Krona Taylor, that would not have been in
8  compliance with the limitations in skip traces that
9  you just described; correct?
10     MS. DONNELL:  Objection; form.  But you can
11  answer.
12     THE WITNESS:  Correct.
13  BY MR. GRILL:
14  Q.  Correct, that was your answer?
15     MS. DONNELL:  She said correct.
16     MR. GRILL:  I didn't hear it, I'm sorry.
17  BY MR. GRILL:
18  Q.  Okay.  And if you -- did your company
19  find out, if you know, that you had ran -- had run
20  a skip trace for -- on Krona Taylor when you were
21  employed there?
22     MS. DONNELL:  Objection; form.  But you can
23  answer.
24     THE WITNESS:  They get a daily report.

Cassandra Taylor, 2/23/2023

18

```
 1   BY MR. GRILL:
 2       Q.   I'm sorry, it was muffled.  Can you
 3   just say your answer again?
 4       A.   They get a daily report.
 5       Q.   Okay.  Do you know, did you suffer any
 6   consequences at work or repercussions of any sort
 7   for running a skip trace on somebody that did not
 8   have a loan that was being serviced by United Auto
 9   Credit?
10       A.   No.
11       Q.   All right.  Was it your expectation
12   that you would -- or that you could, I should say,
13   suffer some type of employment consequence for
14   running a skip trace on a person in a way that fell
15   beyond what the limitations were on running skip
16   traces that you described?
17       MS. DONNELL:  Objection; form, foundation,
18   calls for speculation.
19           You can answer, if you can.
20       THE WITNESS:  No.
21   BY MR. GRILL:
22       Q.   Did you take any steps to protect Krona
23   Taylor's personal identifying information that you
24   found as a result of running that skip trace on her?
```

19

```
 1       A.   Yes.
 2       Q.   What steps did you take?
 3       A.   By not leaving the personal information
 4   on my computer and walking away from the computer.
 5       Q.   Did you print out that information that
 6   you found?
 7       A.   Yes.
 8       Q.   And what did you do with the printout?
 9       A.   I provided the information to Mr. Day.
10       Q.   How did you provide it to him?
11       A.   Over the phone.
12       Q.   Okay.  Was that a phone call that you
13   made from work to Mr. Day?
14       A.   Please repeat the question.
15       Q.   When you called Mr. Day and provided
16   him with this information, were you calling him
17   from your work?  From your office?
18       MS. DONNELL:  Objection; foundation.
19           You can answer, Ms. Taylor.
20       THE WITNESS:  There was no way for me to call
21   Mr. Day; he was incarcerated.
22   BY MR. GRILL:
23       Q.   Well, you talked to Mr. Day often on
24   the phone while he was incarcerated; correct?
```

20

```
 1       A.   Yes.
 2       Q.   So on any of those occasions, was it
 3   the circumstance where you were calling him in
 4   prison, or was it always that he was calling you?
 5       A.   Again, there was no way for me to call
 6   Mr. Day in incarceration.
 7       Q.   So he had to call you.
 8       A.   Yes.
 9       Q.   Okay.  So did he call -- when you
10   provided this information to him in the skip trace
11   over the phone, did he call you at work or did he
12   call you when you were at some other place, if you
13   remember?
14       A.   It was home.  We never received -- I
15   never received calls from him during work hours.
16       Q.   Okay.  And did you provide -- other
17   than to Mr. Day, did you provide, yourself, did you
18   provide the information regarding Ms. Taylor from
19   the skip trace to anybody else?
20       A.   No.
21       Q.   Did you run skip traces on anybody else
22   that you can think of other than Ms. Taylor for
23   Mr. Day?
24       A.   No.
```

21

```
 1       Q.   How did you know to run a skip trace on
 2   Krona Taylor?
 3       MS. DONNELL:  Objection; form, foundation.
 4   But you can answer.
 5       THE WITNESS:  Mr. Day's attorney,
 6   Mr. Greenberg, had informed me that they had been
 7   in search of her, and he had an address, and my
 8   skip trace purposes was to verify the address that
 9   he had was correct.
10   BY MR. GRILL:
11       Q.   How did Mr. Greenberg communicate that
12   to you?
13       A.   Over the phone.
14       Q.   But you had Mr. Greenberg's phone number?
15       A.   I did.
16       Q.   And why not call Mr. Greenberg and
17   provide Krona Taylor's information to him, as
18   opposed to relaying it to Mr. Day in that phone
19   call where he called you at home and you relayed
20   the information?
21       A.   Mr. Greenberg had the information on
22   Krona already.
23       Q.   Right.  But he had asked you to verify,
24   by running a skip trace, whether it was correct,
```

Cassandra Taylor, 2/23/2023

22

1   right?
2       A.   He didn't ask me to run it.  I did it
3   on my own.
4       Q.   Okay.  So I thought a moment ago that
5   Mr. Greenberg asked you to help him verify
6   Ms. Taylor's address.  Is that not correct?
7       A.   That's very incorrect.  Mr. Greenberg
8   provided me with Krona's address.  He stated that
9   they had been in search of her, and I take it upon
10  myself to make sure that was the correct address.
11  I never stated Mr. Greenberg asked me that.
12      Q.   Do you have any understanding as to
13  why -- from any source, as to why Mr. Greenberg was
14  telling you that he had this address for Krona
15  Taylor but was trying to verify it and having
16  trouble find her?
17      MS. DONNELL:  Objection; form, foundation,
18  calls -- but you can answer, if you can.
19      THE WITNESS:  Mr. Greenberg's communication
20  with Arnold was through me.  Arnold provided
21  Mr. Greenberg authorization to speak with me.
22  BY MR. GRILL:
23      Q.   Okay.  But my question is a little bit
24  more specific.  Do you know why it was that

23

1   Mr. Greenberg was relaying this information
2   regarding his efforts to locate Krona Taylor to you?
3       MS. DONNELL:  Objection; form, foundation,
4   calls for speculation.
5           Ms. Taylor, you can answer, if you
6   can.
7       THE WITNESS:  Repeat your question, please,
8   Mr. Grill.
9   BY MR. GRILL:
10      Q.   Do you have any understanding as to why
11  Mr. Greenberg was relaying to you anything about
12  his difficulties and efforts when it came to
13  finding Krona Taylor?
14      MS. DONNELL:  Same objections.
15          You can answer, if you can.
16      THE WITNESS:  Yes.  Because the investigators
17  had went by her home several times to reach her,
18  and he was uncertain if that was the correct address.
19  BY MR. GRILL:
20      Q.   Did you know if Mr. Greenberg knew that
21  you had access to a system that would allow you to
22  run skip traces on people?
23      MS. DONNELL:  Objection; form -- I'm sorry,
24  Ms. Taylor, hold on a second.  Objection; foundation,

24

1   calls for speculation.
2           You can answer.
3       THE WITNESS:  No, he didn't.
4   BY MR. GRILL:
5       Q.   Okay.  So then let's go back to my
6   question then.
7           Do you have any understanding as to
8   why Mr. Greenberg was telling you anything about
9   his efforts or difficulties in finding Krona Taylor?
10      MS. DONNELL:  Objection; asked and answered,
11  form, and foundation.
12          You can answer again, Ms. Taylor.
13      THE WITNESS:  To relay the information to
14  Arnold.
15  BY MR. GRILL:
16      Q.   Okay.  So it's your understanding that
17  he was telling you about his difficulties in
18  finding Krona Taylor so you could then get that
19  information or pass that on to Arnold; is that
20  right?
21      A.   Correct.
22      Q.   And once Mr. Greenberg relayed that
23  information to you, you took it upon yourself to
24  run a skip trace on Krona Taylor; is that right?

25

1       A.   Correct.
2       Q.   And before you ran that skip trace,
3   Mr. Greenberg had given you the address that he had
4   for Krona Taylor?
5       A.   I'm not certain.
6       Q.   Okay.  Did he give you any other -- any
7   information about Krona Taylor other than her name
8   before you ran that skip trace?
9       A.   Only her name.
10      Q.   So what type of information would you
11  need in order to run a skip trace?
12      A.   All I would need is her name.
13      Q.   How would you know -- well, how many
14  Krona Taylors came up when you ran her name through
15  the system that you had at your job?
16      A.   One.
17      Q.   In the whole country?  Well, let me ask
18  you -- let me walk that question back.
19          When you run a skip trace, do you
20  have an understanding as to, like, how wide of a
21  net that system searches?  Is it nationwide, for
22  example?
23      A.   It searches for the state that you put
24  in there.

Cassandra Taylor, 2/23/2023

26

1    Q.    Okay.  And what state did you put in
2  for Krona Taylor?
3    A.    Illinois.
4    Q.    And how -- and how did you know that --
5  well, when did you -- let me ask it this way:  Did
6  Mr. Greenberg tell you that he had an address for
7  Krona Taylor when you talked to him?
8    MS. DONNELL:  I'm sorry, I just missed that
9  question.  Could you repeat it?
10  BY MR. GRILL:
11    Q.    Yeah.  Did Mr. Greenberg tell you,
12  before you ran the skip trace on Krona Taylor, that
13  he did indeed have an address for her?
14    MS. DONNELL:  Objection.  I think this has
15  been asked and answered.  But you can answer again.
16    THE WITNESS:  He provided me with a name.
17  BY MR. GRILL:
18    Q.    Right, I know, but did he at least tell
19  you that -- regardless of whether he actually gave
20  you the address, did he tell you that he had one
21  for her?
22    MR. GRILL:  Objection; asked and answered.
23  But you can answer again.
24    THE WITNESS:  I don't recall.

27

1  BY MR. GRILL:
2    Q.    When is it that you first came to
3  find out that Mr. Greenberg had an address for
4  Ms. Taylor where it was that you ran the skip trace
5  on her?
6    MS. DONNELL:  Objection; form, foundation,
7  vague.  But you can answer, if you can.
8    THE WITNESS:  I don't recall.
9  BY MR. GRILL:
10    Q.    Did Mr. Greenberg tell you anything
11  about his efforts up and to the point that he spoke
12  to you when it came to finding Krona Taylor?
13    A.    The only information he provided was
14  the investigators went over there twice and got no
15  answer.
16    Q.    Okay.  And did he ask you at all in any
17  way to assist him or to assist Arnold in finding
18  Krona Taylor?
19    MS. DONNELL:  Objection; asked and answered.
20  But you can answer again.
21    THE WITNESS:  No.
22  BY MR. GRILL:
23    Q.    At the time Mr. Greenberg relayed this
24  information to you to pass on to Arnold Day, did

28

1  you have any understanding as to who Krona Taylor
2  is?
3    A.    No --
4    MS. DONNELL:  Give me -- I'm sorry.  Go
5  ahead.  Thanks.
6  BY MR. GRILL:
7    Q.    Did you have any understanding at that
8  time as to why Mr. Greenberg was looking for
9  Ms. Taylor?
10    A.    Yes.
11    Q.    And what was your understanding as to
12  why Mr. Greenberg was looking for Ms. Taylor?
13    A.    She was the witness on the case.
14    Q.    I'm sorry, you said that she was a
15  witness on the case?
16    A.    She was the witness on Mr. Day's case.
17    Q.    And where did you learn that from?  How
18  did you learn that?
19    A.    Mr. Greenberg.
20    Q.    When did Mr. Greenberg tell you that?
21    A.    I'm sorry, I don't remember the date.
22    Q.    All right.  Before Mr. Greenberg told
23  you about Krona Taylor being a witness on the case,
24  had you ever heard her name before then?

29

1    A.    Yes.
2    Q.    When -- and what did you hear about her
3  before then?
4    A.    Reading over Arnold's police reports,
5  I've seen the name.
6    Q.    And when did you first see Arnold's
7  police reports?
8    A.    I'm sorry, I can't remember.
9    Q.    All right.  Well, was it at some point
10  while Arnold Day was in prison for this murder?
11    A.    Yes.
12    Q.    And who gave you the police reports
13  from Arnold Day's case?
14    A.    He mailed a lot of his information home.
15    Q.    Arnold mailed a lot of his information
16  home; is that what you mean?
17    A.    Correct.
18    Q.    And he mailed it to you personally, or
19  did he send it to somebody else and then you got it
20  from that person?
21    A.    He mailed all his paperwork to me.
22    Q.    At which -- where did -- where were you
23  living at when you were receiving these documents
24  from him?

Cassandra Taylor, 2/23/2023

---

30

1    A.   Physical address, I don't recall, but
2  it was in Texas.
3    Q.   Okay.  And that's where you're at now,
4  in Texas, right?
5    A.   Correct.
6    Q.   And where are you right now on this
7  Zoom deposition?
8    A.   In my home in Texas.
9    Q.   Do you have any documents or anything
10 in front of you right now?
11   A.   No.
12   Q.   Did anybody send you anything to review
13 in order to prepare for your deposition today?
14   A.   No.
15   Q.   Did you speak with Ms. Donnell to
16 prepare for your deposition today?
17   A.   Yes.
18   Q.   How many times did you speak with her
19 to prepare for today's deposition?
20   A.   I don't want to insinuate, but I
21 believe it was once.
22   Q.   Did you speak with her on the phone?
23   A.   Yes.
24   Q.   And was there anybody else on that call

---

31

1  other than Ms. Donnell when you spoke with her?
2    A.   No.
3    Q.   How long did you speak with Ms. Donnell
4  for on that call?
5    A.   45 minutes to maybe an hour.
6    Q.   Is it possible that Mr. Day was sending
7  you materials, such as police reports like you just
8  described, as far back as 2015, 2014?
9    A.   Repeat the question?
10   Q.   Is it possible that Mr. Day was sending
11 you materials to review, like the police reports
12 that you just described, as far back as 2015 or
13 2014?
14   MS. DONNELL:  Objection to the extent it
15 calls for speculation.  But you can answer, if you
16 know.
17   THE WITNESS:  I don't recall.
18 BY MR. GRILL:
19   Q.   Did Mr. Day ever tell you why he was
20 sending you things like the police reports from the
21 homicide investigation that resulted in him going
22 to prison?
23   A.   It wasn't just police reports that he
24 was sending.  He had to clear out because he had

---

32

1  been incarcerated so long, so they had him to send
2  some of his mail out or get rid of it.  So he sent
3  mail to the house that he no longer needed.
4    Q.   Okay.  Other than police reports, what
5  else did he send you?
6    A.   Maybe letters that he had, some pictures.
7    Q.   What else?
8    A.   That was it.  Books.  I'm sorry, books.
9    Q.   Did any of these letters talk about his
10 case, criminal investigation, for example, or the
11 criminal trial that --
12   MS. DONNELL:  Object -- sorry.
13   MR. GRILL:  -- culminated in him being
14 sentenced to prison?
15   MS. DONNELL:  Objection; form.  Sorry, I
16 thought you were done, Andrew.  Objection;
17 foundation.
18        You can answer, if you can.
19   THE WITNESS:  Possibility.  I didn't look
20 through it all.
21 BY MR. GRILL:
22   Q.   Okay.  When you say -- why do you think
23 it's a possibility that he sent you letters that
24 summarized his case?

---

33

1    MS. DONNELL:  Objection; misstates the
2  witness' testimony, form, and --
3    MR. GRILL:  Actually, I didn't ask that.  Let
4  me re- -- strike -- I'll withdraw the question.
5  BY MR. GRILL:
6    Q.   Some of those letters that he sent you
7  summarized blow by blow his case, right?
8    MS. DONNELL:  Objection.  Misstates the
9  witness' testimony, form, foundation --
10   MR. GRILL:  I'm not characterizing her
11 testimony; I'm asking a direct question.
12 BY MR. GRILL:
13   Q.   Some of those letters that he sent you
14 were ones that he wrote to you that summarized his
15 case blow by blow; correct?
16   A.   No --
17   MS. DONNELL:  Objection; form.  Objection --
18 hold on one second, Ms. Taylor.  Objection; form,
19 and argumentative, and asked and answered.
20        You can answer, Ms. Taylor.
21   THE WITNESS:  No.
22 BY MR. GRILL:
23   Q.   Do you remember talking to him on --
24 let me ask you this:  Did Ms. -- I'll put it this

---

Cassandra Taylor, 2/23/2023

---

34

1 way. I'm going to represent to you that as part of
2 the discovery that was done, which is like a fancy
3 name for the investigation that Ms. Donnell's law
4 firm has done in this case and that my law firm and
5 Mr. Hunt's law firm have done in this case, some of
6 that investigation included the discovery of over a
7 thousand recorded phone calls between you and
8 Mr. Day roughly between the time period of 2015
9 and, I think, 2018, 2019; okay? And so some of
10 the questions that I'm going to be asking you here
11 today are going to be based on things that were
12 recorded as being said between you and Mr. Day.
13         So with that as an introduction,
14 this question is based on some of those calls;
15 okay?
16         So do you have a recollection of
17 speaking to Mr. Day, while he was in prison, on
18 the phone, where he told you about a package of
19 information that he was sending you so you could
20 read through it and know everything about the case,
21 the criminal investigation, that resulted in him
22 going to prison? Do you remember having a
23 conversation like that with Mr. Day?
24         MS. DONNELL: First of all, objection; form

---

35

1 and -- but -- and I also would say, Andrew, if
2 you -- obviously, there's over a thousand phone
3 calls, so if you're referring to a specific phone
4 call, I would ask that you play it for the witness
5 because there is no way in the world for this
6 witness to remember things said over that time
7 period. So I'm not sure if that's where you're
8 headed, but I will just say right now, I'm going to
9 object.
10         If you have a transcript of a call
11 and you're asking her questions about that, that's
12 going to be -- I'm going to object to it as
13 improper. You're going to have to play the
14 recording that your defendants subpoenaed.
15         So I'm not sure if that's where this
16 is headed, but I'm just going to put that out there
17 because obviously that discovery is voluminous that
18 the defendants sought and received. So I have no
19 problem if you're going to do that, but I'm going
20 to ask that you play those calls for her then.
21         MR. GRILL: Well, I don't know really what
22 your objection is there.
23         MS. DONNELL: My objection is --
24         MR. GRILL: Stop, please. It's my turn to

---

36

1 talk. My turn.
2         MR. DONNELL: No, no, I'm just going to get
3 real clear. It's like as if you had a document
4 that you were reading from, like a police report,
5 and I would do the same thing --
6         MR. GRILL: Stop, stop, stop, stop. We're
7 going to put the witness off to the side, if you
8 want to have this out with me. Right now, you're
9 just coaching her and telling her how to answer
10 these questions.
11         MS. DONNELL: We can take a break and let the
12 witness go. I just -- that's where we're at. Why
13 don't you ask your question again --
14         MR. GRILL: Stop --
15         MS. DONNELL: It seemed like you were quoting
16 verbatim a transcript of a call. I thought that's
17 where you were going, and I'm just putting that
18 objection out there. Why don't you ask your
19 question again.
20         MR. GRILL: Yeah, I'm going to ask my
21 question, and I'm going to do my deposition the way
22 I want to do it, and if you haven't listened to the
23 calls yourself, that's on you. Okay?
24         MS. DONNELL: No, no, no, stop doing --

---

37

1         MR. GRILL: Stop, stop, stop.
2         MS. DONNELL: Let's do this --
3         MR. GRILL: We're going to take a break, and
4 I'm going to come back and ask this question again,
5 and I'm not going to let you dictate how I take a
6 deposition. See you in a few minutes. Good-bye.
7         MS. DONNELL: It's so unfair to Donna. Don't
8 do this, Andrew.
9         Ms. Taylor, I apologize. We'll take
10 a short break. We'll come back -- he's already
11 left. Let's come back in five minutes, and we will
12 start again. So you can just mute yourself and
13 mute your video.
14         (Recess taken.)
15 BY MR. GRILL:
16   Q.   Cassandra, did you get any messages or
17 phone calls from Ms. Donnell during our break?
18   A.   No.
19   Q.   Okay. Did you ever -- in any of these
20 documents, in addition to letters or police
21 reports, did Mr. Day ever send you a copy of the
22 confession that he gave, that the police at least
23 say that he gave, as it pertains to the murder of
24 Jerrod Irving?

---

Cassandra Taylor, 2/23/2023

38

1    A.   I don't recall.
2    Q.   Have you ever seen a copy of the
3  confession that Mr. Day gave as it pertains to the
4  Jerrod Irving homicide?
5    MS. DONNELL:  Objection; form.  But you can
6  answer, if you can.
7    THE WITNESS:  No, sir.
8  BY MR. GRILL:
9    Q.   Never seen it to this day?
10   A.   No, sir.
11   Q.   Do you have -- are you aware that the
12  police say that Mr. Day confessed to having killed
13  Jerrod Irving?  Do you understand that?
14   A.   Yes.
15   Q.   And what is -- where did you get that
16  understanding from, if you can remember?
17   A.   From Mr. Day.
18   Q.   Do you remember when Mr. Day told you
19  that there was a confession that the police had
20  regarding -- from him regarding the murder of
21  Jerrod Irving?
22   MS. DONNELL:  Objection; form.  But you can
23  answer.
24   THE WITNESS:  No, sir.

39

1  BY MR. GRILL:
2    Q.   All right.  So did you ever -- did
3  Mr. Day ever send you, if you can remember,
4  materials for you to review so you could ask him
5  questions so he could get practice answering
6  questions that people might ask him about his case?
7    MS. DONNELL:  I'm just going to object to the
8  foundation.  And I'm going to -- and please let me
9  just say my objection peacefully so we don't scare
10  any dogs, and then you can respond; I'll let you
11  respond.
12       So I'm going to object to the extent
13  that if counsel is reading from a transcript of
14  phone calls or -- that hasn't been produced -- or
15  is referring to a specific phone call that they
16  give the witness -- first of all, there's no
17  foundation for that -- but they give the witness an
18  opportunity to hear what they're asking about, just
19  like I would do with a document if you were reading
20  from a document.
21       So I guess my objections are
22  twofold.  One, if you have a transcript of calls
23  that hasn't been produced, I'd ask you to produce
24  it right away.  Two, if you're going to be asking

40

1  about specific phone calls, that you give the
2  witness the opportunity to know that, and then you
3  play them for the witness and then ask those
4  questions.
5    MR. GRILL:  Well, I don't know what that
6  objection has anything to do with the question I
7  asked, which is, does she remember if she ever was
8  sent materials from Mr. Day to review so she could
9  help him practice answering questions that people
10  might ask him about his case.
11  BY MR. GRILL:
12   Q.   Do you have any memory like that?
13   MS. DONNELL:  Objection; form and foundation.
14  And to the extent that counsel is referring to a
15  particular call and is reviewing that without
16  giving the witness the opportunity to know that,
17  then I'm objecting to it as an improper question.
18   MR. GRILL:  I don't know how that's improper.
19  I don't even really know what your objection is
20  based on or what rule it might fall under.
21       But be that as it may, your
22  objection is noted.  My question still stands.
23  BY MR. GRILL:
24   Q.   Do you have any recollection of

41

1  anything -- Arnold Day asking you to do anything
2  like that ever?
3    MS. DONNELL:  Same objections.
4        You can answer, Ms. Taylor, if you
5  can.
6    THE WITNESS:  No, sir.
7  BY MR. GRILL:
8    Q.   Do you think it's possible something
9  like that happened?
10   MS. DONNELL:  Objection; calls for
11  speculation, lack of foundation, and form.
12  BY MR. GRILL:
13   Q.   You can answer yes or no, if you want.
14   MS. DONNELL:  You can answer if you can,
15  Ms. Taylor.  Same objections.
16   THE WITNESS:  Repeat your question, please.
17  BY MR. GRILL:
18   Q.   It's possible that anything like that
19  happened, that "anything" being Mr. Day sent you
20  materials about his case for you to review so you
21  could ask questions to him about that -- those
22  materials to help him prepare and practice
23  answering those questions that people might ask him
24  about his case.

Cassandra Taylor, 2/23/2023

---

42

1    MS. DONNELL:  Objection; form, foundation.
2  If you are -- improper refresh your recollection,
3  if that's what you're doing, and calls for
4  speculation and incomplete hypothetical.
5          Ms. Taylor, you can answer the
6  question if you can.
7    THE WITNESS:  Anything's possible.  I can't
8  honestly answer that question.
9  BY MR. GRILL:
10   Q.   Did Mr. Day ever send you any
11  correspondence that he wrote, for example, like in
12  a letter, for example, where he laid out blow by
13  blow what occurred in his investigation -- in the
14  investigation, excuse me, regarding the Jerrod
15  Irving homicide?
16   MS. DONNELL:  Objection; asked and answered.
17        I am going to object again to the
18  extent that I think counsel is referring to a
19  specific document or call and is not showing it to
20  the witness as improper, and if we need to, you
21  know, get -- if we need to provide you authority or
22  talk to you about that, we can, but I don't know
23  because you won't say what you're doing or not
24  doing.  And form and foundation.

---

43

1    MR. GRILL:  So the proper objection there,
2  Heather, is form or foundation.  If this keeps up,
3  we'll just bring the witness back for a second
4  deposition because of the amount of time that
5  you're wasting.
6    MS. DONNELL:  No, we definitely won't, but we
7  can call Judge Magistrate Cummings and deal with it
8  today.  No, we won't.  We can just get it --
9    MR. GRILL:  I'm not asking you to agree.  I'm
10  telling you that's what will happen.  So let the
11  witness answer my question.
12   MS. DONNELL:  Ask your questions, Andrew.  Go
13  ahead.  Keep going.
14  BY MR. GRILL:
15   Q.   Do you have any recollection, ma'am, of
16  being sent correspondence from Mr. Day wherein he
17  laid out blow by blow what occurred, for example,
18  in the criminal investigation regarding the Jerrod
19  Irving homicide?
20   MS. DONNELL:  Objection; asked and answered.
21  This is the last time she's going to answer it.
22  This is the fourth time you've asked her the same
23  question.
24        Ms. Taylor, you can answer it one

---

44

1  more time --
2    MR. GRILL:  You keep interrupting her and not
3  letting her answer the question.
4          So, ma'am, please answer my question.
5    MS. DONNELL:  Same objection.
6    THE WITNESS:  I don't recall.
7  BY MR. GRILL:
8    Q.   Okay.  Do you have any correspondence
9  from Mr. Day that you have not given to Ms. Donnell
10  yet that she produced -- you know, to be produced
11  to us?
12   A.   As far as what?
13   Q.   Anything that you got from Mr. Day.
14  Is there any correspondence that you have from
15  Mr. Day that you have not given over to his
16  attorneys?
17   A.   Everything that I had in my presence
18  was provided to her.  Every letter that was written
19  that was kept was provided to the attorneys.
20   Q.   Did Mr. Day ever tell you that he
21  wanted you to review materials related to the
22  criminal investigation into the Jerrod Irving
23  homicide so that you can talk about his case as
24  well as he can?

---

45

1    MS. DONNELL:  Objection --
2  BY MR. GRILL:
3    Q.   Did he ever tell you anything like
4  that?
5    MS. DONNELL:  Objection; form and foundation.
6  And I'm going to reiterate my same objection to the
7  extent that counsel is reading from a transcript, a
8  document, a letter, or transcript of calls, and not
9  identifying it, and I'll object to the foundation.
10   MR. GRILL:  None of those things --
11   MS. DONNELL:  Answer if you can --
12   MR. GRILL:  I'll make it clear.  I don't have
13  a transcript, Heather.
14   MS. DONNELL:  That's okay.  Ask it -- I'm
15  sorry --
16   MR. GRILL:  I don't have a transcript,
17  Heather.  I've just spent some time listening to
18  the phone calls, okay?
19   MS. DONNELL:  You can play the phone calls.
20        [Simultaneous crosstalk.]
21        Ms. Taylor, will you listen to his
22  question, and then I'm going to take a short break.
23  BY MR. GRILL:
24   Q.   Go ahead, Ms. Taylor.

---

Cassandra Taylor, 2/23/2023

46

1    A.   Okay.  Repeat your question, please.
2    MR. GRILL:  Let's have it read back, please.
3         (Question read as follows:
4         Did Mr. Day ever tell you
          that he wanted you to review
5         materials related to the
          criminal investigation into
6         the Jerrod Irving homicide so
          that you can talk about his
7         case as well as he can?  Did
          he ever tell you anything
8         like that?"
9    MS. DONNELL:  Objection.  Same objections.
10        You can answer, Ms. Taylor, if you
11   can.
12   THE WITNESS:  I don't recall.
13   MS. DONNELL:  Okay.  Let's take -- I need a
14   quick break.  I'm going to take a ten-minute break,
15   and we can come back.  Let's come back at, like,
16   11:15.
17   MR. GRILL:  Sure.  See you then.
18        (Recess taken.)
19   MR. GRILL:  Back on the record.
20        What was my last question and what
21   was the witness' answer?  If you could just read it
22   back.
23
24

47

1         (Record read as follows:
2         "Did Mr. Day ever tell you
          that he wanted you to review
3         materials related to the
          criminal investigation into
4         the Jerrod Irving homicide so
          that you can talk about his
5         case as well as he can?  Did
          he ever tell you anything
6         like that?
          A.  I don't recall."
7    BY MR. GRILL:
8    Q.   Okay.  So as far as Mr. Day's
9    confession is concerned, do you have any
10   understanding as to how his confession was
11   documented?
12   MS. DONNELL:  Objection; form, vague.  You
13   can answer, if you can.
14   BY MR. GRILL:
15   Q.   Can you hear me, ma'am?
16   A.   I can hear you, but I'm trying to get
17   an understanding of your question.
18   Q.   Well, if you need me to ask it again,
19   just ask me, I'll reask it.
20   A.   Please repeat.
21   Q.   Sure.  So you understand that Mr. Day
22   confessed because he told you that, right?
23   MS. DONNELL:  Objection; form.  You can
24

48

1    answer.
2    THE WITNESS:  Correct.
3    BY MR. GRILL:
4    Q.   Okay.  And do you have any
5    understanding as to how the police or the state's
6    attorney's office, or anybody, for that matter,
7    documented his confession?
8    MS. DONNELL:  Objection; foundation, calls
9    for speculation.
10        You can answer, if you can.
11   THE WITNESS:  No.
12   BY MR. GRILL:
13   Q.   Do you know if it was, like, written
14   out on a piece of paper?
15   A.   No.
16   Q.   Do you know if it was typed out by a
17   court reporter?
18   A.   No.
19   Q.   Do you know if it was recorded by,
20   like, audiotape or videotapes?
21   A.   No.
22   Q.   All right.  Since finding out from
23   Mr. Day that he confessed, did you ever have a
24   conversation with Mr. Day about the substance of

49

1    his confession?  Like the actual things that police
2    say he said.
3    MS. DONNELL:  Objection; form.
4    THE WITNESS:  Answer?
5    MS. DONNELL:  Yes, you can answer.  Thank you.
6    THE WITNESS:  What I rekindled was the abuse
7    that he suffered is what caused the confession.
8    BY MR. GRILL:
9    Q.   Right.  My question is different,
10   though.  I'm asking, did Mr. Day ever tell you what
11   it was that he said to the police as a result of
12   that abuse?  About the murder of Jerrod Irving.
13   A.   I don't recall.
14   Q.   Do you recall ever asking him anything
15   like, Arnold, what did you say to the police in
16   your confession?
17   MS. DONNELL:  Objection; form, foundation.
18   BY MR. GRILL:
19   Q.   Did you ever ask him, in all these
20   years that you've been talking to him, anything
21   like that?
22   MS. DONNELL:  Same objections.
23        You can answer.
24   THE WITNESS:  No, sir.

Cassandra Taylor, 2/23/2023

50

BY MR. GRILL:
2    Q.   Is there any reason that you can think
3  of as to why you never asked Arnold what it was
4  that he said to the police when he confessed to
5  killing Jerrod Irving?
6    MS. DONNELL:  Objection; form, foundation,
7  calls for speculation.
8        You can answer, if you can.
9  BY MR. GRILL:
10   Q.   I'm not asking you to speculate.  I
11  want you to think for yourself in your brain.
12   A.   Well, you say what --
13   Q.   What --
14   MS. DONNELL:  And argumentative.
15   MR. GRILL:  What the reasons you --
16   THE WITNESS:  Well, you stated why he killed
17  Jerrod Irving.  So he didn't kill Jerrod Irving, so
18  can you rephrase your question?
19  BY MR. GRILL:
20   Q.   Yes.  My question is, is can you think
21  of any reason, for yourself, that you never -- that
22  caused you to never ask Arnold Day anything about
23  what it was that he said to the police when he
24  confessed to killing Jerrod Irving?

51

1    MS. DONNELL:  Objection; form and foundation.
2  And I think you already asked and she answered.
3  But you can answer again, Ms. Taylor.
4    THE WITNESS:  As to why he ... no, I don't
5  rec- -- I don't recall.
6  BY MR. GRILL:
7    Q.   Did you have any -- do you recall
8  having any interest or wanting to know what it was
9  that he said to the police when he confessed to
10  killing Jerrod Irving?
11   MS. DONNELL:  Objection; form.
12        You can answer, if you can.
13   THE WITNESS:  I had no interest in it because
14  I am aware of how Chicago police officers operate.
15  BY MR. GRILL:
16   Q.   Now -- and is that information based on
17  personal experience about how the Chicago police
18  officers operate?
19   A.   Yes.
20   Q.   All right.  And what experience did you
21  have --
22   A.   Experience --
23   Q.   -- about that?
24   A.   Experience to the point where

52

1  detectives on the West Side of Chicago would
2  threaten to place drugs on people.  I've had that
3  to be with family members as well, as well as
4  myself.
5    Q.   Have you ever had drugs planted on you
6  by the police?
7    A.   No.
8    Q.   Have you ever had the police accuse you
9  personally of committing a crime that you didn't
10  commit?
11   A.   Yes.
12   Q.   Okay.  And these were Chicago police
13  officers?
14   A.   Yes.
15   Q.   What crime did they accuse you of
16  committing that you did not commit?
17   A.   A retail theft.
18   Q.   And when did that happen?
19   A.   In 1990.
20   Q.   1990?
21   A.   Yes.
22   Q.   Do you remember who -- and were you
23  arrested for that retail theft?
24   A.   Yes.

53

1    Q.   And were you with anybody when you were
2  arrested?
3    A.   Yes.
4    Q.   And did you -- what happened to the
5  charge?  Did it get dropped?  Did you plead guilty?
6  Were you found guilty?  Were you acquitted?
7    A.   No, I wasn't acquitted.  It -- I think
8  I confessed to it.
9    Q.   And why did you confess to it if you
10  did not commit that retail theft?
11   A.   Ignorance of the law.
12   Q.   And what were -- did you have a lawyer?
13   A.   No.
14   Q.   And did you -- where did you confess?
15  Who did you confess to?  Let me put it that way.
16   A.   The public defender.
17   Q.   You confessed to the public defender?
18   A.   Yes.
19   Q.   What is your understanding as to what
20  a -- who a public defender is?
21   MS. DONNELL:  I'm just going to enter --
22  Ms. Taylor, you don't have to convey your
23  communications with your attorney.  Those are your
24  attorney/client communications.  So I'm not sure,

Cassandra Taylor, 2/23/2023

54

1   based on the questions, what was happening.  It
2   sounds like you didn't have a lawyer.  A public
3   defender is actually a lawyer.  So I think --
4           MR. GRILL:  Stop, stop, stop.  I'm asking --
5   that goes right to the question that I just asked
6   her.
7           What is your understanding --
8           MS. DONNELL:  Yes --
9           MR. GRILL:  Stop.  I'm not asking for
10  communications right now at all.
11          MS. DONNELL:  Except you did give them --
12          MR. GRILL:  Please stop, please stop, please
13  stop.
14          MS. DONNELL:  But it's the --
15              [Simultaneous crosstalk.]
16          MS. DONNELL:  I'm sorry, Andrew --
17          MR. GRILL:  Ms. Taylor, what's your
18  understanding --
19          MS. DONNELL:  Don't talk over me.  Stop it.
20  You don't do this every single time.
21          MR. GRILL:  Give this witness an instruction
22  that goes right to my question.
23          Ma'am, please tell me, what is your
24  understanding of who a public defender is?  That's

55

1   all I want to know.
2           MS. DONNELL:  Andrew -- Ms. Taylor, you'll
3   have to pause a minute.
4           Ms. Taylor, you have an attorney/
5   client privilege with your attorneys.  The public
6   defender is an attorney.  And so you do not
7   disclose your communications to see Mr. Grill with
8   your attorney, who a public defender is an
9   attorney.
10          And, Andrew, I think you know very
11  well that if the witness has a privilege, you are
12  not to invade that, and if she is confused about
13  the law --
14          MR. GRILL:  Wait.
15          MS. DONNELL:  And the fact that you're
16  talking over me when I'm instructing her about her
17  privilege is so improper and so unprofessional --
18          MR. GRILL:  Listen to my question.  Listen to
19  my question.  If I had asked for communications,
20  fine.  You're interrupting.  That doesn't have
21  anything to do with the question I asked, so please
22  stop.  Please.
23          MS. DONNELL:  Andrew, the same goes to you.
24  Please.  It's unfortunate that all these people

56

1   have to listen to this.  I am trying to stay calm.
2           Ms. Taylor, you can answer
3   Mr. Grill's question, but please follow my
4   instructions with respect to your communications
5   with attorneys in your criminal cases, including
6   public defenders.
7   BY MR. GRILL:
8       Q.  Ma'am, what's your understanding of who
9   a public defender is?
10      A.  I'd rather not answer.
11      Q.  You have to.
12          MS. DONNELL:  Ms. Taylor, do you -- you can
13  answer Mr. Grill's question if you have an
14  understanding of who a public defender is.
15          THE WITNESS:  My understanding of someone
16  that represents you when you can't afford an
17  attorney.
18  BY MR. GRILL:
19      Q.  Okay.  So you confessed -- so you
20  confessed to an attorney that the court appointed
21  to represent you in the retail theft; is that
22  correct?
23          MS. DONNELL:  I object to the question
24  now because -- I'm going to object to the question

57

1   now because Ms. Taylor answered the question
2   without understanding the privilege.  So we're
3   going to assert the privilege now on behalf of the
4   witness, and you are now expressly asking for
5   communications.  So there was a -- because she
6   didn't understand, there was a disclosure.  We can
7   claw that back.
8           But, Ms. Taylor, I'm going to
9   instruct you not to answer this question, and
10  Mr. Grill can move on.
11          MR. GRILL:  It is her privilege, and I don't
12  think -- to waive -- and I don't think what you're
13  doing is at all proper here, Heather.
14          MS. DONNELL:  Andrew, we can take up her
15  privilege with the court, but you can ask the next
16  question.
17          MR. GRILL:  Sure.  You can file a protective
18  order at the proper time, if you want, okay?
19          MS. DONNELL:  I'm going to instruct her not
20  to answer those questions.  Will you ask your next
21  question, please.
22  BY MR. GRILL:
23      Q.  Ma'am, did you plead guilty, then, to
24  the retail theft?

Cassandra Taylor, 2/23/2023

---

58

1     A.   You state I can answer the question?
2     MS. DONNELL:  If you pleaded guilty in a
3  court of law.  He's asking if you made a guilty
4  plea in a court of law.
5     THE WITNESS:  Yes.
6  BY MR. GRILL:
7     Q.   Okay.  What were you ignorant about
8  that caused you to confess or plead guilty to the
9  retail theft that you claimed you didn't commit?
10    A.   My constitutional rights and the
11 attorney telling me --
12    MS. DONNELL:  I'm so sorry.  I was muted.  I
13 don't know why.  I think it was -- Ms. Taylor, the
14 way the question is currently asked, I'm going to
15 instruct you not to answer.
16          Mr. Grill, if you wanted to rephrase
17 the question, you can ask it again.  But I'm going
18 to instruct her not to answer the one you just
19 asked because it is, I think, based on the
20 testimony, asking for a privileged communication.
21 But I'm sure you can rephrase it to get a
22 different -- to get her to be able to answer it.
23    MR. GRILL:  No, I'm not going to rephrase it.
24 Can you read -- reask the -- can you restate my

---

59

1  question, Ms. Court Reporter.
2          (Record read as follows:
3          "What were you ignorant about
4           that caused you to confess or
5           plead guilty to the retail
6           theft that you claimed you
7           didn't commit?
8           "A. My constitutional rights
9           and the attorney telling
10          me --"
8     MS. DONNELL:  I'm so sorry, I was muted.  I
9  was objecting.  I was just saying that I was
10 intending to object -- well, my computer -- I hit
11 the keyboard, and it was muted.  The video will
12 show, but I was visibly objecting, Andrew.  So I
13 apologize that she was answering.  I'm going to
14 instruct Ms. Taylor not to answer that question the
15 way it was currently asked.
16          You can rephrase it, Andrew.
17    MR. GRILL:  My question patently doesn't call
18 for attorney/client communication, so it stands.
19          So can you answer my question, ma'am?
20    MS. DONNELL:  I'm going to instruct the
21 witness not to answer.  Ms. Taylor, you're
22 instructed not to answer the question.
23 BY MR. GRILL:
24    Q.   Are you going to take that advice,

---

60

1  Ms. Taylor?
2     A.   Yes.
3     Q.   All right.  So tell me in your own
4  words -- and I don't want you to talk about
5  anything your public defender may have told you --
6  but what were you -- so putting those conversations
7  aside, what were you ignorant about regarding your
8  constitutional rights that caused you to plead
9  guilty to a retail theft that you say you didn't
10 commit?
11    MS. DONNELL:  And, again, Ms. Taylor, just to
12 be clear, he is not asking for your communications
13 with your attorney, which was a public defender at
14 that time.  So if you can answer it without
15 divulging those communications, you can answer.
16    THE WITNESS:  The fear of going to jail.
17 BY MR. GRILL:
18    Q.   Okay.  And did you sign a confession,
19 like a written confession?  Or did you -- when you
20 confessed to this crime.
21    MS. DONNELL:  Again I'm going to object
22 because, based on her testimony, I think you're
23 expressly asking for her communication with a
24 public defender based on her prior testimony.  So

---

61

1  I'm going to instruct the witness not to answer.
2          If you want to ask about a plea or
3  something like that, I'm sure you could get what
4  you -- that's what you're intending.  But based on
5  her testimony, I'm going to instruct her not to
6  answer the way you've currently asked the question.
7     MR. GRILL:  I can't wait to do a second day
8  of this deposition.
9  BY MR. GRILL:
10    Q.   Okay.  So, ma'am, again, don't tell me
11 about anything you talked with your public defender
12 about.  Did you sign a confession of any sort to
13 this retail theft?
14    A.   No.
15    Q.   Okay.  Did you confess to the police
16 when they arrested you for the retail theft?
17    A.   No.
18    Q.   Now, were you arrested with anybody
19 else for this retail theft?
20    MS. DONNELL:  Objection, asked and --
21    MR. GRILL:  And did any --
22    COURT REPORTER:  Wait.  Was there an answer?
23 The talking over is problematic for the record.
24 I'm just warning you.

---

Cassandra Taylor, 2/23/2023

---

62

1      I did not understand or hear the
2  answer.
3          (Record read as follows:
4          "Now, were you arrested
           with anybody else for this
5          retail theft?"
6      MS. DONNELL: Objection; asked and answered.
7      Now you can answer, Ms. Taylor.
8      THE WITNESS: Yes.
9  BY MR. GRILL:
10     Q.   How many people were you arrested with?
11     A.   One.
12     Q.   Is that -- and what was the name of
13  that person, if you remember?
14     A.   Carolyn Wynn.
15     Q.   Can you spell that?
16     A.   C-a-r-o-l-y-n W-y-n-n.
17     Q.   And did Carolyn steal anything, to your
18  knowledge?
19     A.   Not to my knowledge.
20     Q.   What were you accused of stealing?
21     A.   Now, I would have to kind of get in
22  depth with that because that's not a yes or no
23  answer.
24     Q.   Well, was it merchandise?

---

63

1      A.   Merchandise.
2      Q.   At what store?
3      A.   I don't recall.
4      Q.   And do you remember what the value was
5  of the item or items that you were accused of
6  stealing?
7      A.   No.
8      Q.   Were you charged with a felony?
9      A.   No.
10     Q.   So this was a misdemeanor retail theft?
11     A.   Yes.
12     Q.   And, if you can, briefly summarize for
13  the record what it was that you were accused of
14  stealing.
15     A.   Again, I have to kind of like get into
16  details because it wasn't even originally me. It's
17  that I walked -- it was her and her children, and
18  when I walked out and asked what was going on and
19  they asked if I was with them, I stated yes. So
20  they took us all down to the room and talked to us.
21  So since it was her and her children, it was two
22  adults, they arrested us both of us.
23     Q.   "Her and her children" meaning Carolyn
24  Wynn and Carolyn Wynn's children?

---

64

1      A.   Correct.
2      Q.   That's who you're referring to? Got
3  it. Okay.
4          So did you ever learn about what it
5  was that you were accused or being a participant in
6  stealing? Like, what the items were?
7      A.   Clothing.
8      Q.   Clothing. Okay.
9          Do you know if Carolyn pled guilty?
10     A.   Yes.
11     Q.   And had you ever been arrested before,
12  charged with any crime, before this incident in
13  1990?
14     A.   No.
15     Q.   So it's fair to say that you basically
16  had no criminal record at this point; is that fair?
17     A.   Correct.
18     Q.   And don't tell me anything that your
19  public defender may have told you, but do you have
20  any understanding from any other source as to why
21  you might be facing jail time for this?
22     A.   No.
23     Q.   Is that something that you believed on
24  your own, personal belief, that you'd go to jail if

---

65

1  you didn't plead guilty?
2      A.   Yes.
3      COURT REPORTER: Heather, there's a problem
4  with your sound. Just on that objection. So could
5  you repeat it, please?
6      MS. DONNELL: Again I was reminding the
7  witness that he's not asking for any attorney/
8  client communications.
9          Can you hear me okay now, Donna?
10     COURT REPORTER: Yes.
11     MS. DONNELL: Okay. Thank you.
12  BY MR. GRILL:
13     Q.   Who arrested you? Was it like a person
14  from the store that stopped you and Carolyn Wynn
15  and that person then called the police, or were
16  there police there that grabbed you and accused you
17  right on the spot of stealing something?
18     A.   Associates from the store.
19     Q.   And so why is it that you believe,
20  since people that worked at the store were accusing
21  you and Carolyn of stealing merchandise, that the
22  police then are the ones that falsely accused you
23  of a crime that you didn't commit?
24     A.   Guilty by association.

---

Cassandra Taylor, 2/23/2023

---

66

1    Q.   Right, but how is that the police's
2  fault?  That's what I'm asking.  Why is it the
3  police that are the ones that falsely accused you
4  when it was store employees that -- ones that
5  actually accused you and Carolyn of stealing?
6    MS. DONNELL:  Objection to the form,
7  foundation.
8        You can answer, if you can.
9    THE WITNESS:  Again, guilty by association.
10 That was stated from the police.
11 BY MR. GRILL:
12   Q.   Right.  But you agree that the police
13 aren't the ones that accused you of stealing
14 anything, it was the store employees; correct?
15   MS. DONNELL:  Objection; misstates the
16 witness' prior testimony.
17 BY MR. GRILL:
18   Q.   Right?
19   MS. DONNELL:  Same objection.
20        You can answer, Ms. Taylor.
21   THE WITNESS:  Again, when sharing the story
22 with the police, they stated that it was guilty by
23 association.
24

---

67

1  BY MR. GRILL:
2    Q.   Okay.  Did Arnold Day in any of your
3  conversations with him while he was in prison ever
4  tell you what the police did to him in order to get
5  him to confess to killing Jerrod Irving?
6    A.   Yes.
7    Q.   What do you remember him telling you
8  about that?
9    A.   That they were choking him out and
10 threatened to throw him out the window.
11   Q.   Anything else?
12   A.   Not that I can remember.
13   Q.   Okay.  Did he tell you how long they
14 choked him for?
15   A.   No.
16   Q.   Did he tell you how many times they
17 choked him?
18   A.   No.
19   Q.   Did he tell you who choked him?
20   A.   I'm sure he did, but I can't remember.
21   Q.   Did he tell you if he was choked by
22 more than one detective or police officer?
23   A.   I don't recall.
24   Q.   Did he tell you who threatened to throw

---

68

1  him out the window?
2    A.   I'm sure, but I don't recall who.
3    Q.   Did he tell you anything about how the
4  room -- or where he was in the police station when
5  he was choked or threatened?
6    A.   No, sir.
7    Q.   Did he tell you anything about whether
8  there indeed was a window in the room that he could
9  be thrown out of?
10   MS. DONNELL:  Objection; form.
11        You can answer, if you know.
12   THE WITNESS:  I don't recall.
13 BY MR. GRILL:
14   Q.   Do you know if Arnold Day had ever
15 been arrested before for anything before this
16 interrogation by the police where this alleged
17 abuse happened?
18   A.   Yes.
19   Q.   And what do you know about that?
20   MS. DONNELL:  Objection; form.
21   THE WITNESS:  Prior to the arrest, which is
22 what I thought this case was about, was a previous
23 case that he was incarcerated for.
24

---

69

1  BY MR. GRILL:
2    Q.   What kind of case was that, do you know?
3    A.   A murder.
4    Q.   So you believe that Arnold Day was
5  incarcerated for another murder on a totally
6  different -- at a totally different time?
7    MS. DONNELL:  Objection; form.  I think it
8  misstates the witness' testimony.
9        But you can answer, Ms. Taylor.
10   MR. GRILL:  I'll actually rephrase it.
11 BY MR. GRILL:
12   Q.   When do you -- what is your understanding
13 as to when Arnold Day was incarcerated for this
14 other murder?
15   A.   In '91.
16   Q.   Do you know if Arnold Day had ever been
17 arrested for any other crimes other than that other
18 murder?
19   A.   Not to my knowledge.
20   Q.   Did you know Arnold Day in 1991?
21   A.   Yes.
22   Q.   And do you remember what year it was
23 that you first met Arnold Day?
24   A.   '91.

---

Cassandra Taylor, 2/23/2023

70

1  Q.  Tell me how you met Arnold Day.
2  A.  At Cook County Jail.
3  Q.  And what were you doing at Cook County
4  Jail?
5  A.  Taking my cousin to visit someone.
6  Q.  Who were you there to visit?
7  MS. DONNELL:  Objection to the extent it
8  misstates her testimony.
9  BY MR. GRILL:
10  Q.  I thought you said you were taking --
11  you were with your cousin -- taking your cousin to
12  visit somebody at Cook County Jail.  Did I not hear
13  that right?
14  A.  Yes.
15  Q.  Okay.  So who were you and your cousin
16  visiting at Cook County Jail when you met Arnold
17  Day?
18  A.  His name was Calvin.  I don't know the
19  last name.
20  Q.  Do you have a nickname?
21  A.  No.
22  Q.  And were you there to visit Calvin, or
23  were you just accompanying your cousin?
24  A.  Accompanying my cousin.

71

1  Q.  What's your cousin's name that you were
2  there with?
3  A.  Did you ask a question?
4  Q.  What was your cousin's name that you
5  were there with?
6  A.  Terry Bell.
7  Q.  Can you spell that, please.
8  A.  T-e-r-r-y B-e-l-l.
9  Q.  Terry Bell.  Got it.
10      So tell me how you met Arnold Day
11  when you were there.
12  A.  Mr. Day was on a visit, and I was
13  standing up against the wall during the visit with
14  my cousin and her friend, and the person that he
15  was on the visit with asked me to come to the
16  window, that Arnold wanted to speak to me.
17  Q.  Okay.  And did you go and speak with
18  him?
19  A.  Yes.
20  Q.  And what did Arnold say to you?
21  A.  He asked me if he knew me.
22  Q.  He asked you if you knew him?
23  A.  Yes.
24  Q.  Did you?

72

1  A.  No.
2  Q.  So this was your first time ever
3  meeting Arnold Day in your life; is that right?
4  A.  Yes.
5  Q.  Did he tell you whether he knew you?
6  A.  He stated I looked familiar.
7  Q.  Did he tell you why you looked familiar
8  to him?
9  A.  No.
10  Q.  Did he tell you why he was in jail?
11  A.  No.
12  Q.  Did you find out during this visit why
13  Arnold Day was in jail?
14  A.  No.
15  Q.  Did he tell you if he had a nickname or
16  anything like that?
17  A.  Not at that time.
18  Q.  Eventually you learned that he had a
19  nickname?
20  A.  Yes.
21  Q.  When did you learn that?
22  A.  Over conversations after the visit.
23  Q.  Okay.  And who told you what his
24  nickname was?

73

1  A.  He did.
2  Q.  When was this conversation wherein
3  Arnold Day told you what his nickname was?
4  MS. DONNELL:  Objection; foundation and form.
5  But you can answer, if you know.
6  THE WITNESS:  Sometime in '91.
7  BY MR. GRILL:
8  Q.  So after this meeting with Arnold Day
9  in the jail, when was the next time you talked to
10  him?
11  A.  Maybe a couple weeks later.
12  Q.  Was that in person or over the phone?
13  A.  Over the phone.
14  Q.  And did he call you on this occasion?
15  A.  Yes.
16  Q.  And do you know how he got your phone
17  number or a phone number to call you on?
18  A.  I provided it on the visit.
19  Q.  Did you do that, or did he ask for your
20  number when you met him that first time at Cook
21  County Jail?
22  MS. DONNELL:  Objection; form.  But you can
23  answer.
24  THE WITNESS:  He asked.

Cassandra Taylor, 2/23/2023

---

74

```
 1   BY MR. GRILL:
 2       Q.   And how long do you think you talked to
 3   him this first time you met him at Cook County Jail
 4   when you gave him your phone number?
 5       MS. DONNELL:  Objection; calls for
 6   speculation.
 7            You can answer, if you remember.
 8       THE WITNESS:  Fifteen minutes.
 9   BY MR. GRILL:
10       Q.   Do you remember what you talked about?
11       A.   No.
12       Q.   Do you recall learning during this
13   initial 15-minute conversation with Arnold Day at
14   Cook County Jail whether you and he had anybody in
15   common that you each knew?
16       A.   No.
17       Q.   Did any of your friends that you
18   were -- your cousin or anybody that you were with
19   at the Cook County Jail know who Arnold Day was?
20       A.   No.
21       Q.   After meeting Arnold Day, did you ask
22   around in your neighborhood or anybody that you
23   knew whether they knew who Arnold Day was?
24       A.   No.
```

---

75

```
 1       Q.   And after meeting him this first time
 2   but before your next call -- your next conversation
 3   with Arnold on the phone when he called you the
 4   first time, in that time period did you learn
 5   why -- you know, from any source why Arnold Day was
 6   in jail at that time?
 7       A.   I believe so.
 8       Q.   What did you learn?
 9       A.   Someone stated that they seen an
10   article in the newspaper.
11       Q.   All right.  And who was this someone?
12       A.   Carolyn Wynn.
13       Q.   The same girl that you got caught
14   with -- or was arrested for shoplifting?
15       A.   Yes.
16       Q.   All right.  And what did Carolyn tell
17   you about Arnold Day that she learned in the
18   newspaper?
19       A.   That he had been arrested for a murder.
20       Q.   For one murder?
21       A.   Yes.
22       Q.   Not two murders?
23       A.   No.
24       Q.   Do you remember the name of the victim
```

---

76

```
 1   that Arnold Day had been arrested for and accused
 2   of killing?
 3       MS. DONNELL:  Objection; form.
 4            Are you referring to this time
 5   period with Carolyn Wynn, or what are you referring
 6   to?
 7       MR. GRILL:  She only knows about one murder.
 8   BY MR. GRILL:
 9       Q.   So the one murder that Carolyn told you
10   about, do you remember who the victims -- who the
11   victim was, the name of the victim?
12       A.   No.
13       Q.   Does the name Jerrod Irving ring a bell?
14       A.   No.
15       Q.   Rafael Garcia, does that name ring a
16   bell?
17       A.   Yes.
18       Q.   Why does that name ring a bell?
19       A.   When you mentioned the name, then it
20   rekindled who it was.
21       Q.   So that's the name of the victim that
22   you understood Mr. Day at that time had been
23   accused of killing; is that correct?
24       A.   Yes.
```

---

77

```
 1       Q.   Did you ever come to find out that
 2   Mr. Day was accused of killing another person named
 3   Jerrod Irving?
 4       A.   No.
 5       Q.   To this day, have you ever found out
 6   that Mr. Day was also accused of killing a person
 7   named Jerrod Irving?
 8       A.   Yes.
 9       Q.   When did you find that out?  The first
10   time.
11       A.   I believe when he was released from
12   Danville.
13       Q.   What year, if you can recall, was that?
14       A.   I can't recall the year.
15       Q.   This was when he was released from
16   prison?
17       A.   Yes.
18       Q.   So just so I'm clear, is it your
19   testimony today that you did not know that Arnold
20   Day had been accused of killing a person named
21   Jerrod Irving until he was released from prison,
22   Danville prison?  Is that correct?
23       A.   I'm sorry, I misunderstood your
24   question.
```

---

Cassandra Taylor, 2/23/2023

---

78

1    Can you please repeat that question?
2    I'm sorry.
3    Q.   When did you first find out that Jerrod
4    Irving was also accused of having killed a person
5    named Jerrod Irving in addition to Rafael Garcia?
6        MS. DONNELL:  I'm going to object to the
7    form because you -- I think you -- you said Jerrod
8    Irving twice, so I think you meant to say when did
9    you find out that Arnold Day was first accused.  So
10   you might want to just state that question again.
11       MR. GRILL:  So I'll restate it.  Thanks.
12   BY MR. GRILL:
13   Q.   So when did you first find out that
14   Arnold Day was accused of killing Jerrod Irving in
15   addition to Rafael Garcia?
16   A.   I don't recall the year.
17   Q.   Was it during the time period that
18   Arnold Day was at Cook County Jail?
19   A.   No.
20   Q.   Why do you say no?
21   A.   The reason why I'd say no is because I
22   don't remember a Jerrod Irving's name coming up,
23   only the Rafael guy.
24   Q.   And how many times do you think you

---

79

1    spoke with Arnold Day while he was at Cook County
2    Jail?
3        MS. DONNELL:  Object to the extent it calls
4    for speculation.
5            But if you know, you can answer.
6        THE WITNESS:  I don't know.  I'm sure daily.
7    BY MR. GRILL:
8    Q.   So you were -- he was calling you on a
9    daily basis while he was at Cook County Jail; is
10   that what you're saying?
11   A.   Yes.
12   Q.   And how long do you think that went on
13   for?
14   A.   Until after the case with the Rafael
15   guy.
16   Q.   So after the trial for the Rafael
17   Garcia homicide?
18   A.   Yes.
19   Q.   Did you go attend any of the trial to
20   see it?
21   A.   From whom?  Rafael Garcia?
22   Q.   Sure.
23   A.   Yes.
24   Q.   How much of it did you watch?

---

80

1    A.   I attended right until the end.
2    Q.   Do you remember if he was being tried
3    for any other crimes at that time?
4    A.   That's when I found out.
5    Q.   Found out what?
6    A.   That there was another case pending.
7    Q.   So Arnold Day had never mentioned to
8    you anything about the other murder that was
9    pending against him during all these conversations
10   that you had on a daily basis with him while he was
11   in Cook County Jail; is that correct?
12       MS. DONNELL:  Objection to the form.
13           You can answer, if you remember.
14       THE WITNESS:  I don't remember.
15   BY MR. GRILL:
16   Q.   Did -- let's talk about the Rafael
17   Garcia homicide.  Did Arnold Day ever tell you
18   anything about how it was that he came to be
19   arrested for that homicide?
20   A.   He only stated that he didn't even know
21   how his name came up in that case.
22   Q.   He told you that he didn't know how his
23   name came up in that case?
24   A.   Yes.

---

81

1    Q.   Do you remember him saying anything
2    else to you about how it was that he believed he
3    got charged with killing Rafael Garcia?
4        MS. DONNELL:  Objection to the form of the
5    question.  But you can answer, if you can.
6        THE WITNESS:  That the guy that involved him
7    in the case was a guy that he knew of but never
8    hung around.
9    BY MR. GRILL:
10   Q.   Do you remember that guy's name?
11   A.   No.
12   Q.   All right.  Did Arnold Day ever tell
13   you where he was when Rafael Garcia was killed?
14   A.   I believe so, but I don't remember.
15   Q.   What about when you found out about the
16   Jerrod Irving -- that he had been accused of
17   killing a guy named Jerrod Irving, did you ever ask
18   him why he had not told you about it before, I
19   guess, the criminal trial?
20       MS. DONNELL:  Objection; argumentative, and
21   objection to the extent it misstates her prior
22   testimony.
23           But you can answer, if you can.
24       THE WITNESS:  I assumed that it was all the

---

Cassandra Taylor, 2/23/2023

82

1  same case.
2  BY MR. GRILL:
3      Q.   Like that he had killed two people at
4  the same time, not on separate dates; is that what
5  you mean?
6      A.   Just, in my mind, I just felt like it
7  was all the same case.  I didn't separate them.  I
8  didn't involve the two, like, to connect all in one
9  day.  I just knew that it was a murder involved,
10  and when I was going back and forth to court, I
11  assumed that it was the same case.
12      Q.   Did Arnold Day help -- ask you at all
13  to help him defend himself in any way for those
14  murders that he was facing when he was at Cook
15  County Jail?
16      A.   Please ask the question again.
17      Q.   Did Arnold Day ask you to help him in
18  any way defend himself when he was at Cook County
19  Jail awaiting trial for those two murders?
20      A.   No, sir.
21      Q.   Did you believe at that time that
22  Arnold Day was responsible for either the Garcia
23  murder, for example?
24      A.   No, sir.

83

1      Q.   Why did you believe that he was
2  innocent?
3      A.   Just from whom I assumed he was, and
4  the passion of the individual, Arnold Day.  I
5  didn't believe it.
6      Q.   Who did you assume that he was at that
7  time?
8      MS. DONNELL:  Objection; form.  Objection;
9  form.  But you can answer.
10      THE WITNESS:  The same person that I assumed
11  him to be today, a very loving, caring, and
12  passionate person.
13  BY MR. GRILL:
14      Q.   And what was that assumption that you
15  had about Arnold Day at the time you were speaking
16  with him on a daily basis when he was in Cook
17  County Jail, what was that assumption for you based
18  on?
19      A.   A scared young man that had been
20  trapped in some things that he had nothing to do
21  with.
22      Q.   Okay.  And so why did you believe that
23  he was trapped or had nothing to do with these
24  murders?

84

1      MS. DONNELL:  Objection.  I think it's been
2  asked and answered.
3      But you can answer again, Ms. Taylor.
4      THE WITNESS:  Just from who the person
5  Mr. Day is.
6  BY MR. GRILL:
7      Q.   And what type of person is that?
8      A.   Caring, loving and giving, passionate.
9      Q.   And this was an assumption that you are
10  arriving at based on your interactions with him
11  while he was at Cook County Jail awaiting trial; is
12  that right?
13      A.   Yes.
14      Q.   Okay.  Was that assumption based on
15  anything else other than your interactions with him?
16      A.   No.
17      Q.   Did you ever learn anything about
18  whether -- what Arnold Day's life was like on a
19  day-to-day basis before his arrest for these
20  murders?
21      MS. DONNELL:  Objection; form.  But you can
22  answer, if you can.
23      THE WITNESS:  No.
24

85

1  BY MR. GRILL:
2      Q.   Do you know if he, Arnold Day, ever
3  went to school before he was arrested for these
4  murders?
5      A.   Yes.
6      Q.   Where did he go to school?
7      A.   I can't recall the name.
8      Q.   Is that something he told you?
9      A.   Yes.
10      Q.   Did he ever tell you whether he had a
11  job before he was arrested?
12      A.   No.
13      Q.   Did he ever tell you whether he was a
14  member of a street gang of any sort prior to his
15  arrest?
16      A.   No.
17      Q.   Did he ever tell you whether he
18  remained a member of any street gang or was a
19  member of any street gang while he was in jail at
20  Cook County Jail?
21      A.   No.
22      Q.   Did he ever tell you that he was a
23  member of a street gang while he was in prison?
24      A.   No.

Cassandra Taylor, 2/23/2023

---

86

1    Q.   Did he ever tell you that he joined a
2 street gang at any point in his life?
3    A.   Are you asking now, or in the past did
4 he tell?
5    Q.   In the past, prior to his release from
6 prison.
7    A.   No.
8    Q.   Have you ever come to learn that Arnold
9 Day was a member of the Black Stones, in particular
10 the Apache Stones?
11    A.   The Black Stones.
12    Q.   You did learn that?
13    A.   Yes.
14    Q.   When did you learn that?
15    A.   I don't recall exactly when it was that
16 I learned it.
17    Q.   Who did you learn it from?
18    A.   Mr. Day.
19    Q.   And what did Mr. Day tell you about his
20 membership in the Black Stones?
21    A.   I don't exactly recall what he told me,
22 but he did tell me he was involved in the gang.
23    Q.   Did he tell you when he was involved in
24 the gang?

---

87

1    A.   No.
2    Q.   Did he tell you how long he was in
3 the -- a member of the gang?
4    A.   No.
5    Q.   Did he tell you anything about the rank
6 or position within the gang that he held at any
7 point?
8    A.   No.
9    Q.   Did he ever tell you whether his
10 responsibilities as a member of the Black Stones
11 were while he was a member of the gang?
12    A.   No, sir.
13    Q.   Did he ever tell you that he was a,
14 back in 1991, at the time he was arrested -- excuse
15 me -- in 1992, at the time he was arrested for
16 these homicides, he was an officer in the Black
17 Stones?
18    A.   No.
19    Q.   Have you ever known that? Has he ever
20 told you that ever, to this day?
21    A.   Has he told me himself?
22    Q.   Yes.
23    A.   I'm sorry, I'm sure -- I'm not sure how
24 to answer that question.

---

88

1         With questioning him, he told me.
2    Q.   What did he tell you?
3    A.   I questioned, with hearing
4 conversations that he was having about his
5 deposition, and that made me question him about
6 what is the gang and all of this that he was
7 involved in at that time.
8    Q.   About his deposition in this case?
9    A.   Yes.
10    Q.   Did you read his transcript or
11 something; is that what you're saying?
12    A.   No.
13    Q.   Okay. How did you find out what it was
14 that he said at his deposition in this case?
15    MS. DONNELL:  Objection. I think you're
16 misstating the witness' testimony, and -- yeah.
17         You can answer the question.
18         But I need a quick break. Maybe we
19 could just -- could you answer this question, and
20 we could take a break?
21    MR. GRILL:  Yeah. We'll get an answer to
22 this question, and then we can -- I've got to go to
23 the bathroom anyway too.
24         Can you answer this question, ma'am?

---

89

1    THE WITNESS:  I think with him being
2 questioned from his attorneys.
3 BY MR. GRILL:
4    Q.   Were you present when he was questioned
5 by his attorney to prepare him for his deposition?
6    MS. DONNELL:  You can answer this question,
7 and then we need to take a break. So go ahead.
8    THE WITNESS:  Ask the question again. I'm
9 sorry.
10 BY MR. GRILL:
11    Q.   Were you present when his attorney
12 questioned him to prepare him for his deposition in
13 this case?
14    A.   No.
15    Q.   Did Mr. Day tell you what he talked
16 about with his lawyer in order to prepare him for
17 his deposition?
18    A.   Not into details.
19    MS. DONNELL:  Okay --
20    MR. GRILL:  Hang on. I'm going to finish
21 this line of questioning. Hang on, hang on, hang
22 on, hang on.
23 BY MR. GRILL:
24    Q.   Did Mr. Day tell you, although not in

---

Cassandra Taylor, 2/23/2023

90

```
 1   detail, the types of -- let me just ask you this
 2   question:  What did Mr. Day tell you about
 3   questions or things his lawyers told him in order
 4   to prepare him for his deposition?
 5        MS. DONNELL:  Objection to the extent it
 6   misstates her testimony.
 7             And I've been -- I really do need to
 8   take a break, but I don't know how long that answer
 9   is going to be.  So, Ms. Taylor, can you answer the
10   question, and then can we please take a break,
11   Andrew, and then we can come back -- you can come
12   back right to where you are.
13        MR. GRILL:  I'm realizing now you've probably
14   got something with your kids.
15        THE WITNESS:  The answer to my question is
16   him stating that they were asking him about some
17   old gangbanging things from his past.
18        MR. GRILL:  Okay.
19        MS. DONNELL:  I don't mind if you come right
20   back here.  I just need five minutes.
21        MR. GRILL:  Take a couple minutes.  Five
22   minutes.
23             (Recess taken.)
24        MS. DONNELL:  Are you back on the record?
```

91

```
 1        MR. GRILL:  Are we back on the record?  I
 2   assume we were.
 3        MS. DONNELL:  I'm just trying to keep track
 4   of time, that's why.
 5   BY MR. GRILL:
 6        Q.   Ms. Taylor, did you get something to
 7   eat over lunch?
 8        A.   No, sir.
 9        Q.   Are you -- do you have enough energy to
10   keep going?
11        A.   Absolutely.
12        Q.   Okay, good.  Did you talk to Ms. Donnell
13   over the break at all?
14        A.   No, sir.
15        Q.   All right.  So I want to circle back to
16   what we were talking about right before we took a
17   break, and that was what Mr. Day told you about his
18   conversations with his lawyers about preparing for
19   his dep.  You said one of the things that he
20   mentioned was his old gang things from his past
21   coming up.
22             What else, if anything, did he tell
23   you he discussed with his lawyers?
24        A.   That was it.  He discussed no more
```

92

```
 1   about it.  Other than that.
 2        Q.   Are you done with your answer?
 3        A.   Yes, sir.
 4        Q.   What types of old gang things did he
 5   tell you were coming up from his past in his, you
 6   know, deposition preparations?
 7        MS. DONNELL:  Objection; foundation.
 8             You can answer.
 9        THE WITNESS:  Things that they were trying to
10   involve him as far as things -- him being -- I
11   don't know the exact words, and I don't want to
12   just, you know, put things in his mouth, but it was
13   to the extent that he was supposed to have been in
14   a gang while he was in jail, and he was kind of
15   like talking really about the color of red.
16   That's, like, one of his favorite colors.  That has
17   nothing to do with the gang relations, just due to
18   the complexion of Mr. Day, and that's one of the
19   colors that brings out his complexion more.  So
20   that was pretty much all.  He didn't get into any
21   further details about that.
22   BY MR. GRILL:
23        Q.   Well, did he explain to you, like, why
24   the color red was being discussed in the context of
```

93

```
 1   his old gang things from the past?
 2        A.   Yeah.  That was due to -- that was the
 3   color of the gang that he was supposed to have been
 4   in.
 5        Q.   Okay.  So is -- did you ask Mr. Day if
 6   he was indeed a member of a gang at some point in
 7   the past?
 8        A.   Yes.
 9        MS. DONNELL:  Objection.  It's been asked and
10   answered.
11             But you can answer again.
12        THE WITNESS:  Yes.
13   BY MR. GRILL:
14        Q.   And what did -- did you ask him that
15   question in this conversation you're recounting
16   right now?
17        A.   Yes.
18        Q.   Had you ever asked him that question
19   before?
20        A.   No.
21        Q.   So what did Mr. Day tell you about
22   whether he was in a gang in the past?
23        A.   He stated that he was in a gang in the
24   past, but it wasn't the type of gang where they
```

Cassandra Taylor, 2/23/2023

94

1  hurt people, it was more like a family thing.  You
2  know, with him being the only child, his uncles
3  were much older, more disciplined, so those were
4  the guys that he hung around.
5      Q.   What uncles?
6      A.   His uncles.
7      Q.   Were they, like, older members in the
8  gang, those uncles?
9      A.   No.  Just with him not having any
10 siblings, he only had older uncles, so he just hung
11 out with those guys.
12     Q.   So he described the gang that he was in
13 as more like a family thing and a group of people
14 that didn't hurt people, that's how he described it
15 to you?
16     A.   Yes.
17     Q.   Did he tell you anything about when it
18 was or how old he was when he joined the gang?
19     A.   No.
20     Q.   Did he tell you anything about when he
21 left the gang?
22     A.   He told me in '98.
23     Q.   He told you that he left the gang in
24 1998?

95

1      A.   Yeah.
2      Q.   Did he ever tell you how it was that he
3  came to leave the gang?
4      A.   He just said that he no longer wanted
5  to have any involvement with them.
6      Q.   All right.  And did he tell you
7  specifically which gang he was a member of?
8      MS. DONNELL:  I'm so sorry.  Something is
9  crinkling up near a microphone and making --
10     MR. GRILL:  Sorry.
11     MS. DONNELL:  It's really loud.
12     MR. GRILL:  Yeah, it's okay.  No, I appreciate
13 it.
14 BY MR. GRILL:
15     Q.   Did he tell you how it was that he left
16 the gang?
17     A.   No, not that I can recall.
18     Q.   And did he tell you anything about what
19 his responsibilities were while he was in the gang?
20     MS. DONNELL:  Objection; asked and answered.
21 You can answer again.
22     THE WITNESS:  No, sir.
23 BY MR. GRILL:
24     Q.   Did he tell you anything about what the

96

1  rules of the gang were that he was a member of?
2      A.   No, sir.
3      Q.   Did Mr. Day and you ever talk about
4  what he was like before he was arrested, like what
5  his childhood was like or his life was like before
6  he was arrested for these murders?
7      MS. DONNELL:  Objection; form, and objection
8  to the extent it was asked and answered.  But you
9  can answer.
10     THE WITNESS:  Yes, I've questioned it.
11 BY MR. GRILL:
12     Q.   And it would be fair to say that
13 anything that you know about Mr. Day, what he was
14 like as a person before he was arrested -- I should
15 say before the day that you met him in Cook County
16 Jail -- would be based on things that mostly he
17 told you; correct?
18     MS. DONNELL:  Objection; foundation.  But you
19 can answer.
20     THE WITNESS:  Mr. Grill, I'm sorry, can you
21 repeat that?
22 BY MR. GRILL:
23     Q.   Anything that -- my question is that it
24 would be true to say that anything that you know

97

1  about how -- about Mr. Day's life before you met
2  him in Cook County Jail would be based on things
3  mostly that he told you, right?  About himself.
4  Right?
5      A.   Correct.
6      Q.   All right.  Now, did Mr. Day and you
7  ever talk about what type of kid he was?
8      A.   Yeah.
9      Q.   In other words, did he -- let me
10 rephrase that.
11          Did he ever tell you, like, what
12 type of kid he thought he was growing up before he
13 got arrested for these murders?
14     A.   Yes.
15     Q.   What kind of kid did he tell you he was?
16     A.   He was a pretty decent kid.  A smart
17 kid.  And I can tell that.  He was the only child.
18 And was raised by his mom, and then he went to stay
19 with his grandmother.
20     Q.   Okay.  So he described himself as a
21 decent kid to you, that's what he told you,
22 generally, about the type of person he was before
23 his arrest?
24     A.   Yes, a normal kid.

Cassandra Taylor, 2/23/2023

98

1    Q.   And did he ever tell you whether he had
2  been arrested for anything else other than these
3  two murders?
4    MS. DONNELL:  Objection; I think that's been
5  asked and answered.  But you can answer it again,
6  Ms. Taylor.
7    MR. GRILL:  It was asked, but her answer was
8  about the murder -- the other murder, so I want to
9  know if there's anything else, any other arrests
10  that he mentioned to you outside of those arrests
11  that occurred before you saw him at Cook County
12  Jail.
13    MS. DONNELL:  Objection; asked and answered.
14  But you can answer again.
15    THE WITNESS:  Under -- only his juvenile
16  arrests.
17  BY MR. GRILL:
18    Q.   Okay.  What do you know about those?
19    A.   Just him being a normal kid, fighting.
20    Q.   Did Mr. Day ever talk to you about, you
21  know, anything about whether he thought prison was
22  a good thing or a bad thing for him?
23    MS. DONNELL:  Objection; form.
24       You can answer.

99

1    THE WITNESS:  Can you repeat so I can get an
2  understanding?
3  BY MR. GRILL:
4    Q.   In any of your conversations that you
5  had with Mr. Day while he was in prison serving
6  time for these -- for this murder for killing
7  Jerrod Irving, did he ever express to you anything
8  about what he -- whether he thought having gone to
9  prison was a good thing for him to have happened to
10  him, or a bad thing that had happened to him?
11    MS. DONNELL:  Sorry.  Objection; foundation.
12       You can answer, if you can.
13    THE WITNESS:  It's a bad thing.
14  BY MR. GRILL:
15    Q.   What did -- why did he tell you that it
16  was a bad thing?
17    A.   He just says it's no place for nobody,
18  especially for a person that's innocent.
19    Q.   Did he ever tell you that he thought
20  prison saved his life for any reason?
21    MS. DONNELL:  Hold on one second, Ms. Taylor.
22       I'm going to object, and I'm going
23  to reiterate my same objection before.  To the
24  extent counsel is referring in their questioning to

100

1  a specific call, then I am going to object to the
2  extent that the witness -- as you know, there's
3  about a thousand calls for hours, and I think it's
4  improper and unreasonable to be asking the witness
5  about specific calls without giving them the
6  opportunity to hear that.  I'm going to maintain
7  that objection; I think it's improper form and
8  foundation.
9       Ms. Taylor, you can answer the
10  question, if you can.
11    MR. GRILL:  So I think that we've been down
12  this road.  I think the only way to interpret, for
13  anyone, including the court, to interpret your
14  absolutely baseless objection that doesn't exist
15  within any federal rule or court decision, is
16  intended only to suggest to this witness how to
17  answer particular questions.  So if it keeps up, I
18  think that the best thing for us to do is to stop
19  the deposition and go before the court on a motion
20  so you can be told by the judge that what you're
21  doing is actually improper.
22    MS. DONNELL:  So, Andrew, I actually agree.
23  I think -- I mean, we're going to disagree about
24  who's right here.  I actually think I'm in the

101

1  right, but I'm happy for the court to tell me I'm
2  wrong and tell you that you're right.
3       I do think that it's improper form
4  and foundation when you have -- and you know we
5  have objected to defendants getting these
6  voluminous records and call records.  It's totally
7  unreasonable for a witness to be prepared on a
8  thousand calls -- plus calls.  And so I -- I
9  know -- you and I both know what you're doing, and
10  I'm saying that I think you should be giving the
11  witness an opportunity.
12       But it's fine, if -- I just make
13  form and foundation objections.  I think those are
14  my legal objections.  I'll continue to do that,
15  just so you know, and if we need to tee it up for
16  the court, then we can do that.
17       So right now, I didn't instruct her
18  not to answer.  I said form, foundation.
19       Ms. Taylor, you can answer the
20  question, if you can.
21    MR. GRILL:  All right.  So if you will stick
22  to the objections, form and foundation, going
23  forward, we shouldn't have a problem.  But you
24  are -- your objections include much, much more than

Cassandra Taylor, 2/23/2023

102

1  that, okay?  And I'll give you the opportunity
2  right now, and we don't need to have her -- the
3  witness wait for this -- to point out any decision
4  or federal rule that obligates me to prepare your
5  witness for this deposition or to play -- if I'm
6  not trying to impeach her -- play any recording of
7  anything that my question may be based on.
8          So can you direct me to any of that,
9  Heather?  Because I don't know, I've never seen
10  that anywhere.
11      MS. DONNELL:  Sure.  So we had it come up in
12  a case with our -- with Corp. Counsel before where
13  they were doing the same thing with a document --
14  granted, a police report -- and they -- it's, I
15  think, Kaufman versus City of Chicago.  And they
16  called Judge Shadur, and Judge Shadur was like, you
17  have to show them the GPR.  You can't keep doing
18  this, you can't keep asking questions that
19  everybody knows, and counsel knows, comes from a
20  document, and doing this to the witness.
21          So I have had this come up, and in
22  that case -- I mean, you know, it's not a case law,
23  but it was happening in the deposition, and it went
24  in the direction where the city corp. counsel had

103

1  to show the GPR, couldn't keep questioning off the
2  document.
3          So in my experience, it has come up
4  before, and in that context, I'm happy to send you
5  a transcript, if you want to read it.  And I think
6  this is analogous, but with a phone call.  So
7  that's where it's coming from.
8      MR. GRILL:  Hm.  Something tells me you're
9  mischaracterizing or taking significant liberties
10  with whatever was discussed there.  But how about
11  this:  Why don't you keep your objections to form,
12  foundation, and then you have your record, and if
13  this becomes an issue down the road, you will have
14  made your record, instead of telling this witness
15  the long-form speaking objection, all the reasons
16  why you think it's wrong, which to me just is
17  broadcasting a potential way to this witness that
18  she should answer these questions.
19          So if we can agree on you keeping
20  your objections limited to what they are supposed
21  to be, form, foundation, and just those words, I
22  don't think we're going to have a problem going
23  forward.
24      MS. DONNELL:  Well, maybe you could --

104

1      THE WITNESS:  Answer --
2      MS. DONNELL:  Well, I'm not quite done.  And
3  if you want to dismiss the witness, we can, and you
4  and I can talk about this on the record but not in
5  front of the witness.  I'm not trying to instruct
6  her.
7          Just so you know, I'm not sure
8  that's going to work because to the extent that I
9  think you are taking verbatim quotes or you're
10  paraphrasing quotes of, you know, one of the
11  thousands of calls and improperly questioning the
12  witness, then I'm not going to just -- I might just
13  stop the deposition.  Maybe we can call Judge
14  Cummings, because Judge Ellis isn't there, and we
15  can tee the issue up.  Because for me, the issue is
16  that you know there's voluminous calls, and this is
17  not a memory test for this witness, and so what I
18  think you're doing is improper.
19      MR. GRILL:  Have you listened to the calls,
20  Heather?
21      MS. DONNELL:  Andrew, I don't have --
22      MR. GRILL:  Did you hear them?
23      MS. DONNELL:  I have listened to calls, yes.
24  I have not listened to every single call, but I

105

1  have.  And our office -- we have work product.  We
2  have done our due diligence.
3          I don't like that implication at
4  all.  Have you listened to the calls?  Do you have
5  a transcript and, as a point of discovery, given
6  your transcript or had it produced?  We can get
7  into that debate.  But I don't think it's fair to
8  the witness.
9          I'm just saying, with the witness
10  here, I don't think that kind of questioning is
11  fair.  And if we want to call Judge Cummings, maybe
12  we should do that and resolve it right now, and,
13  you know, get it resolved.  Because I don't -- I
14  think you and I have, you know, different positions
15  on what's happening, and that's fine.  So --
16      MR. GRILL:  I've already told you I don't
17  have a transcript.  And, to your question, I have
18  listened to every call, okay?  And I know who's in
19  the calls, but I'm not at all convinced that you
20  do, which to me would be a reason why you're doing
21  what you're doing.
22      MS. DONNELL:  That's not the issue, Andrew.
23  That is not the issue.  We have done our due
24  diligence, and I've listened to calls.  I'm not

Cassandra Taylor, 2/23/2023

---

106

1  representing to you that I have listened to every
2  minute of every call. Maybe you have. Good for
3  you. Maybe that's why it's been postponed for so
4  long. So --
5      MR. GRILL: Clearly, clearly your -- what's
6  implicit in your position is that you don't know
7  what it is that my question is based on --
8      MS. DONNELL: That's not true. No, that's
9  not true --
10     MR. GRILL: -- which tells me that you
11  haven't listened to the call.
12     MS. DONNELL: That's not true, Andrew. I
13  don't have to disclose my work product to you.
14  What I'm saying to you is --
15     MR. GRILL: Try.
16     MS. DONNELL: -- I think what you're doing is
17  improper -- let's try. You can go ahead. I'm
18  suggesting we call Judge Cummings right now and
19  just resolve it because I think it's a pretty quick
20  question, it's a really easy question: Do you --
21  are you allowed to be questioning -- for me the
22  question is, can you question this witness about
23  specific calls without laying the form and
24  foundation and without letting her listen to it,

---

107

1  and to just ask your questions on -- based on your
2  translation or, you know, transcription of what you
3  think the call says. That's what I think is
4  improper.
5      So maybe we could just tee that up
6  for Judge Cummings and just get a resolution and go
7  forward, and he'll either say, you're doing it
8  proper, Ms. Donnell, you're wrong, or he'll say,
9  Mr. Grill, play the call.
10     MR. GRILL: Let's be a little more clear
11  about what the real issue is. And that is that I'm
12  asking this witness questions about calls that she
13  made that she was recorded on conversations with
14  your client, okay? So whether she remembers it or
15  not --
16     MS. DONNELL: Okay. You just ask her if she
17  remembers certain calls over a three-year period,
18  over a thousand calls, and you just want to know,
19  do you remember this call or not, and that's all
20  it's going to be, I'll just make form and
21  foundation, if that's all you're going to do.
22     MR. GRILL: That would be the proper thing to
23  do. As opposed to what you've been doing. But
24  let's move on, and let's go.

---

108

1      MS. DONNELL: Maybe it will work if you just
2  want to say do you remember -- okay, go ahead.
3      MR. GRILL: Maybe you can just make a proper
4  objection. That would be the appropriate thing.
5      MS. DONNELL: I think I already have.
6      MR. GRILL: It would be. I'm very right on
7  that. But let's move forward. Okay?
8      So, Ms. Court Reporter, with all
9  that -- I hope you got it all -- can you read back
10  my last question that kicked off this rather long
11  side show of nonsense.
12     MS. DONNELL: I'm going to refrain from
13  commenting, Andrew, but please note that I don't
14  agree with your --
15     MR. GRILL: I'm commenting. I'm commenting.
16     MS. DONNELL: Don't interrupt me. I let you
17  do what you needed to do, Andrew. Please don't
18  interrupt me. It's really getting tiresome.
19     MR. GRILL: Last question, please, when you
20  get a chance.
21          (Record read as follows:
22           "Did he ever tell you that
23           he thought prison saved his
23           life for any reason?"
24     MR. GRILL: That's my question.

---

109

1      MS. DONNELL: Object to form and foundation.
2  BY MR. GRILL:
3      Q.  Go ahead, ma'am. You can answer my
4  question.
5      A.  Did he think that ... I'm not certain.
6      Q.  Did Mr. Day ever tell you that he
7  thought God was protecting him by putting him in
8  prison? Do you remember him saying anything like
9  that to you?
10     MS. DONNELL: Objection; form and foundation.
11  And the same objection I had before about improper
12  questioning.
13     THE WITNESS: Should I answer?
14     MS. DONNELL: Yes, ma'am. I'm sorry.
15     THE WITNESS: I'm not certain if he stated
16  it. I can recall telling him that over the years.
17  BY MR. GRILL:
18     Q.  That you told him that you thought God
19  was protecting him by putting him in jail?
20     A.  Yes.
21     Q.  Why did you tell him that?
22     A.  Because of everything that's going on,
23  and for him to be incarcerated for something that
24  he didn't do, I just think that that's a part of

---

Cassandra Taylor, 2/23/2023

---

110

1 saving him.
2 Q. So what was everything that was going
3 on that putting him in prison for a crime that he
4 didn't commit allegedly was protecting him from?
5 A. The killings, things of that nature, is
6 what I was speaking on.
7 Q. Okay. Killings where?
8 A. Everywhere.
9 Q. It -- just everywhere in the world; is
10 that what you mean?
11 A. Everywhere in the world.
12 Q. So you thought it was better -- that
13 God was -- I shouldn't say better. That God was
14 protecting Arnold Day by putting him in -- by him
15 going to prison for a crime that he allegedly
16 didn't commit because that would protect him from
17 killings that were happening in the world; is that
18 right?
19 A. And mainly from where he's from, the
20 South Side.
21 Q. Okay. So what do you know about the
22 South Side yourself that Arnold Day going to prison
23 for a crime he allegedly didn't commit was
24 protecting him from?

---

111

1 A. Just seeing things on the news, legal
2 help firm, all the murders, carjacking, things of
3 that nature. And just more of a comforting thing
4 for Mr. Day.
5 Q. I'm sorry, what was the last part of
6 your answer?
7 A. And more of a comforting thing for
8 Mr. Day.
9 Q. What do you mean by that?
10 A. By just telling him to hold on, you
11 know, if he didn't do it, he will be released, and
12 just comforting him through the matter.
13 Q. Did Mr. Day ever express to you that he
14 thought that he was in prison, although unjustly,
15 but it was maybe because of something else he did
16 on another occasion?
17 MS. DONNELL: Objection; form and foundation,
18 calls for speculation.
19 THE WITNESS: Not in that nature, but I do
20 recall him stating that he's never done anything
21 that bad to get that type of time in prison.
22 BY MR. GRILL:
23 Q. Did Mr. Day ever talk to you about --
24 well, let me rephrase that question.

---

112

1 What neighborhood did you grow up in
2 back in 1991, the time the homicides happened?
3 MS. DONNELL: Objection; form.
4 You can answer.
5 THE WITNESS: What neighborhood did I grow up
6 in?
7 BY MR. GRILL:
8 Q. Yeah. Where were you growing up in?
9 A. Northwest Side.
10 Q. Can you give me some streets?
11 A. North Avenue and Cicero.
12 Q. Did you ever hang out in -- well,
13 strike that question.
14 Did you come to learn where it was
15 that Arnold Day lived in 1991?
16 A. I've heard of the area.
17 Q. What area is that?
18 A. I think it's 55th and Morgan, if I'm
19 not mistaken.
20 Q. So how far apart do you think you and
21 Arnold roughly lived from each other back in 1991?
22 A. Oh, Lord. Too far.
23 Q. Did you ever hang out in the
24 neighborhood that Arnold Day lived in in 1991, that

---

113

1 time?
2 A. No.
3 Q. Did you have any friends in that area?
4 A. No.
5 Q. Did you ever come to know a person by
6 the name of Nathaniel Anderson? Does that name
7 ring a bell?
8 A. No.
9 Q. Do you know any of Arnold Day's friends
10 with the name of Nate? Did you ever hear that name?
11 A. I've heard of the name.
12 MS. DONNELL: Objection; form.
13 BY MR. GRILL:
14 Q. How have you heard of the name Nate?
15 A. If I'm not mistaken, I believe Nate was
16 one of his friends that he grew up with, and --
17 yeah, that was one of his friends. I can't
18 rekindle on what's the relationship with the two,
19 but I've heard Nate's name before, but I don't know
20 him personally.
21 Q. Okay. Do you know if Nate's still
22 alive?
23 A. No, I don't.
24 Q. Did Arnold ever tell you whether he

---

Cassandra Taylor, 2/23/2023

---

114

1  died or not?
2      A.   No.
3      Q.   What type of friend -- or how did
4  Mr. Day -- strike the question.
5           How do you know that Nate was a
6  friend of Mr. Day?
7      A.   I think they grew up in the same
8  neighborhood.
9      Q.   Do you know what Nate's nickname was?
10     A.   No.
11     Q.   Did Mr. Day ever, in any of your
12 conversations that you had with him, ever express
13 to you any theories or beliefs that he had about
14 who might have killed Jerrod Irving?
15     A.   No.
16     Q.   How about who he thought might have
17 killed Rafael Garcia?
18     A.   No.
19     Q.   Did Arnold Day ever express to you that
20 he suspected that it was Nate who committed the
21 murder of Jerrod Irving?
22     MS. DONNELL:  Objection; form and foundation.
23     THE WITNESS:  I'm uncertain about that.
24

---

115

1  BY MR. GRILL:
2      Q.   What do you mean that you're uncertain?
3  Can you -- is it something you don't remember or --
4      A.   I don't remember.
5      Q.   Do you have any belief based on any --
6  from anybody, except I guess Ms. Donnell, who's
7  your lawyer, who might have killed Jerrod Irving?
8      A.   No, sir.
9      Q.   How about Rafael Garcia, got any
10 idea -- you hear any rumors, theories from anybody
11 about who might be responsible for that murder?
12     A.   No, sir.
13     Q.   Did you know who Jerrod Irving was --
14     A.   No, sir.
15     Q.   -- in 1991 to '92?
16     A.   No, sir.  It's an age gap in us, so I
17 don't know any of those guys.
18     Q.   Okay.  Did you know Krona Taylor back
19 in 1991?
20     A.   No, sir.
21     Q.   Do you know -- do you know who Ralph
22 Watson is?
23     A.   No, I don't know Ralph Watson
24 personally.

---

116

1      Q.   His nickname is Boogie.  Maybe -- do
2  you know anybody with that nickname, or went by
3  that nickname?
4      A.   No, sir.
5      Q.   Did Arnold Day ever mention the name
6  Ralph Watson or Boogie to you?
7      A.   I believe I heard Boogie before.
8      Q.   From Arnold?
9      A.   Not personally talking to me in content.
10     Q.   Well, who did you hear the name Boogie
11 from?
12     A.   Just Arnold speaking the name.  And I
13 don't recall how or when.
14     Q.   Do you know -- do you remember what it
15 was that Arnold was saying about Boogie to you?
16     MS. DONNELL:  Objection; foundation.
17     THE WITNESS:  I believe he was just having a
18 conversation stating that if -- if I'm not
19 mistaken, if Boogie wouldn't have lied on him,
20 he wouldn't have been incarcerated.
21 BY MR. GRILL:
22     Q.   When did Arnold tell you this?
23     A.   I don't know when.
24     Q.   Was this during one of your

---

117

1  conversations on the phone with Arnold when he was
2  in prison?
3      A.   Can't recall.
4      Q.   You think this is something that Arnold
5  told you for the first time after he was out of
6  prison?
7      MS. DONNELL:  Objection; foundation.
8      THE WITNESS:  I can't recall, Mr. Grill.
9  BY MR. GRILL:
10     Q.   Do you remember anything else Arnold
11 Day ever telling you about Boogie?
12     A.   No, sir, I can't.
13     Q.   All right.  Do you have any
14 understanding of what it was that Boogie lied about
15 that had he not done that, Arnold wouldn't have
16 gone to jail?
17     MS. DONNELL:  Objection; foundation.
18     THE WITNESS:  The only thing that I'm aware
19 of is he was supposed to have been the one that
20 signed a confession and involved Arnold Day.
21 BY MR. GRILL:
22     Q.   Okay.  And how do you know that?
23     A.   From Arnold Day.
24     Q.   Did Arnold ever tell you anything about

---

Cassandra Taylor, 2/23/2023

---

118

1  what it was that was in Boogie's confession that he
2  signed?
3      A.   No.
4      Q.   Did Arnold tell you anything about how
5  it was that Boogie came to confess in a way that
6  implicated Arnold Day in a crime?
7      MS. DONNELL:  Objection; foundation.
8      THE WITNESS:  No.  Only that he knew of
9  Boogie, but Boogie was younger than him, if I'm not
10  mistaken, and he never hung around him, so he don't
11  know why he would mention his name.
12  BY MR. GRILL:
13      Q.   All right.  Did Arnold Day ever tell
14  you whether he knew or had any belief as to why
15  Boogie said something to the police that implicated
16  Arnold in a crime?
17      MS. DONNELL:  Objection; asked and answered.
18  Foundation.
19      THE WITNESS:  Answer?
20      MS. DONNELL:  You can answer, yes, thank you.
21      THE WITNESS:  He feels as though the police
22  had already implicated him in the matter and
23  harassed Boogie to indicate Arnold was the person
24  that did it.

---

119

1  BY MR. GRILL:
2      Q.   What do you mean that the police had
3  already implicated Arnold in the matter?  Can you
4  explain what you mean by that?
5      A.   The police is the ones that had Boogie
6  to confess that it was Arnold that did the murder.
7      Q.   Okay.  Is this something Arnold told
8  you?
9      A.   Yes.
10      Q.   Did Arnold ever tell you how he came to
11  know or believe that?
12      A.   No.
13      Q.   Did Arnold ever tell you whether he
14  talked to Boogie?
15      A.   No.
16      Q.   Do you know if Arnold's in contact with
17  Boogie today?
18      A.   No.
19      Q.   Do you know when the last time it was
20  that Arnold talked to Boogie?
21      MS. DONNELL:  Objection; foundation.
22      THE WITNESS:  No, I don't know.
23  BY MR. GRILL:
24      Q.   Do you know if Arnold's in contact with

---

120

1  Boogie today?  Or can contact him?
2      A.   Not from my understanding.
3      Q.   Did you ever talk to Arnold since his
4  release from prison about Boogie?
5      A.   Other than I don't like him, and I
6  don't know him.
7      Q.   Why don't you like him?
8      A.   For someone to give misinformation of
9  the sorts and take someone's freedom away, I think
10  that was very unruly.
11      Q.   Well, do you believe -- what's your
12  understanding -- or do you have any understanding
13  as to why Boogie told the police whatever it was
14  that he told them that implicated Arnold?
15      MS. DONNELL:  I think it's an asked and
16  answered, foundation, calls for speculation.
17          You can answer, if you can,
18  Ms. Taylor.
19      THE WITNESS:  All I can give you is a
20  personal reason.
21  BY MR. GRILL:
22      Q.   What's your personal reason?
23      A.   The same thing as it was with Arnold,
24  the harassment and torture from the police.

---

121

1      Q.   So why does that cause you to not like
2  Boogie?
3      A.   Because he did something to someone
4  that I care about.
5      Q.   Right.  But you're telling me that the
6  police are the ones that made him say those things,
7  right, about Arnold?
8      A.   Yes.
9      Q.   So why does that make you not like
10  Boogie?
11      A.   I don't like the police or Boogie.
12      Q.   Right.  So why does the fact that the
13  police made, according to you, Boogie say something
14  about Arnold that implicated him in a crime make
15  you not like Boogie?
16      A.   Because I don't.
17      Q.   Any other reason?
18      A.   No.
19      Q.   Do you agree or -- am I right, though,
20  that it's your belief that whatever Boogie told the
21  police, the police made Boogie say, right?
22      A.   Yes.
23      Q.   When was the first time -- strike that.
24          Have you ever met Boogie?

Cassandra Taylor, 2/23/2023

122

1    A.   No.
2    Q.   And although you don't like Boogie, do
3  you know what Arnold's opinion today is about
4  Boogie?  Like, if he likes him, for example.
5       MS. DONNELL:  Object to form.
6       THE WITNESS:  He likes everybody.
7       MR. GRILL:  Go ahead.
8       MS. DONNELL:  I'm sorry, did you ask another
9  question, Andrew?  I couldn't hear it.
10      MR. GRILL:  No.  I was just waiting for an
11 answer to the question.  I didn't hear that she
12 answered it.
13      MS. DONNELL:  I think she answered it, but I
14 was objecting at the same time.
15           I think you answered it.
16 BY MR. GRILL:
17   Q.   What was your answer?
18   A.   Arnold is just somebody that likes
19 everybody regardless.
20   Q.   Has Arnold ever expressed to you that
21 he, since he's been out of prison, for example,
22 that he does not like Boogie?
23   A.   No.
24   Q.   Did he ever express to you that he

123

1  likes Boogie?
2    A.   Neither way.
3    Q.   Has Arnold ever told you that he's
4  spoken or contacted Boogie in any way since Arnold
5  got out of prison?
6    A.   I don't recall him telling me that.
7    Q.   While Arnold was in prison, did you and
8  he ever -- did you and Arnold ever discuss anything
9  about whether Boogie had information that might be
10 able to -- that Arnold might be able to use to help
11 him get his conviction reversed?
12   A.   I don't recall.
13   Q.   Did you have any understanding from any
14 source while Arnold was in prison that Boogie had
15 information that Arnold might be able to use to
16 help him get his conviction reversed?
17   A.   Not that I recall.
18   Q.   All right.  Do you have any
19 understanding from any source that -- as to what
20 information, if any, Krona Taylor might have that
21 Arnold could use to help him get his conviction
22 reversed?
23   A.   Can you rephrase it, please?
24   Q.   Yes.  So this is all about, you know,

124

1  in the time period when you're talking to Arnold on
2  the phone, and he's in prison.  Do you have any
3  understanding during that time period about what
4  type of information, if any, Krona Taylor had that
5  Arnold might be able to use to help him get himself
6  out of jail?
7       MS. DONNELL:  Objection; form.  But you can
8  answer, if you can.
9       THE WITNESS:  Yes.  That she was a witness to
10 it.  She was there when it transpired.
11 BY MR. GRILL:
12   Q.   Okay.  And what information did Arnold
13 tell you that Krona had that he believes would help
14 him get his conviction reversed?
15      MS. DONNELL:  Objection; foundation.
16           You can answer, if you can.
17      THE WITNESS:  That she was a witness to the
18 murder.  She was standing outside at the time that
19 it occurred, and -- or strike -- not that she was
20 standing outside.  Her and the guy had been out
21 there talking, the deceased, and she seen some guys
22 walking down the street, so she stepped into the
23 hallway, and she seen the guys.  That she knew they
24 weren't even the height or anything of Arnold Day,

125

1  so she knew it wasn't Arnold.
2  BY MR. GRILL:
3    Q.   Did Arnold tell you that he believed
4  that Krona Taylor actually saw these people?  Other
5  than, like, height, did he tell you anything else
6  about what he believed Krona saw about these people?
7       MS. DONNELL:  Objection; form.
8           You can answer, if you can.
9       THE WITNESS:  He believed that she had more
10 information.
11 BY MR. GRILL:
12   Q.   Did he ever tell you what that more
13 information might be --
14   A.   No.
15   Q.   -- that she had?
16   A.   No.
17   Q.   Did you ever learn from any source
18 today, up to today, about what that other
19 information might be or is?
20   A.   Not that I can recall.
21   Q.   Did you have any understanding -- and,
22 again, this is during the time period when Arnold's
23 in prison, you guys are talking on the phone --
24 during that time period, did you have any

Cassandra Taylor, 2/23/2023

126

1  understanding as to whether Boogie was also a
2  possible eyewitness to this homicide?
3     MS. DONNELL:  You can answer, if you can.
4     THE WITNESS:  From my understanding, Boogie
5  was a kid, so, no, not that he had anything to do
6  with anything.
7  BY MR. GRILL:
8     Q.  Right.  So my question is, is did you
9  have any understanding as to whether Boogie was
10 thought to be an eyewitness as well?
11    MS. DONNELL:  Objection; asked and answered.
12       You can answer again.
13    THE WITNESS:  No.
14 BY MR. GRILL:
15    Q.  Do you know if -- do you know a person
16 by the name of Ed or Edward Robinson?  Does that
17 name ring a bell?
18    A.  No.  Is there a nickname?
19    Q.  Circle?
20    A.  Oh, yes.  Yes, I know him.
21    Q.  How do you know him?
22    A.  From talking to him on the phone.
23    Q.  When have you talked to him on the
24 phone?

127

1     A.  Oh, maybe a year ago.
2     Q.  Is that the first time you'd ever
3  spoken to him?
4     A.  No.  I've spoken to him before when he
5  was incarcerated.
6     Q.  And how was it, when he was incar --
7  well, what year, if you can recall, was it that you
8  first started speaking to Ed Robinson while he was
9  incarcerated?
10    A.  I can't recall the year.
11    Q.  How -- can you tell me why it was that
12 you were speaking to Ed Robinson while he was in
13 jail?
14    A.  Just the introduction.
15    Q.  Who introduced you to him?
16    A.  Arnold.
17    Q.  And do you know why it was that Arnold
18 had introduced you to Ed Robinson?
19    A.  Because it's his friend.
20    Q.  His friend from prison?
21    A.  No.
22    Q.  How do you know that Ed Robinson and
23 Arnold Day were friends?
24    A.  Because Arnold told me.

128

1     Q.  They were cellmates, right, at one
2  point?
3     MS. DONNELL:  Objection; form, foundation.
4     THE WITNESS:  I'm not certain about that.
5  BY MR. GRILL:
6     Q.  Was it your understanding, at the time
7  Arnold made this introduction, Ed Robinson to you,
8  that they were in the same prison?
9     A.  I thought Ed was in a different prison.
10    Q.  Tell me how this introduction went.
11 Were you, like, talking on the phone with Arnold
12 and then he, like, handed it off to Ed for you to
13 talk to him, or was it something different than
14 that?
15    A.  It was something different than that.
16 Arnold wasn't in prison when I spoke to Ed.
17    Q.  Okay.  So tell me how it was then that
18 it went down when you were first introduced to Ed.
19    MS. DONNELL:  Objection; form.
20       You can answer.
21    THE WITNESS:  We were riding, and Ed called
22 Arnold, and they were talking, and he asked
23 Arnold -- well, Arnold told him he was in the car
24 with me, and he just said, let me speak to her.

129

1  BY MR. GRILL:
2     Q.  Do you remember what it was that you
3  and Ed spoke about when Arnold handed the phone off
4  to you in the car?
5     A.  Nothing other than Ed just stating that
6  I had a good guy.  Also, I think Ed was asking me
7  did I have any friends.  And that was basically it.
8     Q.  Did you ever ask Arnold or did he ever
9  tell you how it is that he came to know or be
10 friends with Ed Robinson?
11    MS. DONNELL:  Objection; form.  But you can
12 answer.
13    THE WITNESS:  I don't recall.
14 BY MR. GRILL:
15    Q.  Did Arnold tell you when it was that he
16 and Ed Robinson became friends?
17    MS. DONNELL:  Objection; asked and answered.
18 But you can answer.
19    THE WITNESS:  I don't recall.
20 BY MR. GRILL:
21    Q.  Do you know how long Arnold has known
22 Ed Robinson?
23    A.  I think from his teenage years, if I'm
24 not mistaken.

Cassandra Taylor, 2/23/2023

---

130

1    Q.    Okay.  And that's something you believe
2    Arnold told you?
3        A.    I'm not certain.
4        Q.    Has Arnold shown you at any point any
5    transcripts of any witnesses' testimony in this
6    case?
7        A.    Not personally.
8        Q.    Have you reviewed any transcripts or
9    seen any transcripts from anybody who's testified
10   in this case?
11       A.    No, sir.
12       Q.    Have you seen any documents related to
13   this case at all?
14       A.    Some documents he sent home I glanced
15   at them, but it's just so many pages that I just
16   didn't have the time to go through those pages.
17       Q.    Did Arnold tell you anything else about
18   what he understood Krona saw as far as the people
19   who he believed killed Jerrod other than their
20   height?
21       A.    I don't recall if he did or didn't.  I
22   just remember the name Krona coming up.
23       Q.    You don't remember if he told you
24   anything else about what he believed Krona saw

---

131

1    about these people other than how tall they were;
2    fair?
3        A.    I don't recall him giving me --
4        MS. DONNELL: I'm sorry.  Just objection to
5    the extent it misstates prior testimony.  But you
6    can answer, Ms. Taylor.
7        THE WITNESS:  I don't recall any details that
8    he may or may not have provided.
9    BY MR. GRILL:
10       Q.    Are there any other things that Arnold
11   told you that he believed Ms. Taylor, Krona Taylor
12   knew about or saw about these people that they've
13   killed Jerrod Irving and he believed excluded him
14   as a person involved in this killing other than
15   their height?
16       MS. DONNELL: Objection; form.
17       THE WITNESS:  I don't recall if he did or
18   didn't.
19   BY MR. GRILL:
20       Q.    Is that something you think you'd
21   remember, if he told you something else along the
22   lines of, hey, Krona I saw this about these people,
23   and that means it couldn't have been me?
24       MS. DONNELL: Objection; form, and calls for

---

132

1    speculation.
2        THE WITNESS:  You said that would be
3    something I would remember?
4    BY MR. GRILL:
5        Q.    Yeah, is that something that you think
6    you'd remember if he told you that?
7        MS. DONNELL:  Objection; form and foundation.
8    Calls for speculation.
9        THE WITNESS:  No, sir, not necessarily.
10   BY MR. GRILL:
11       Q.    Okay.  Did you ever -- well, do you
12   have a personal belief of your own as to whether
13   Arnold is guilty or innocent of killing Jerrod
14   Irving?
15       A.    Yes, I do.
16       Q.    And what is that?
17       A.    I don't believe Arnold Day committed
18   the crime.
19       Q.    And can you please tell us why you
20   believe that?
21       A.    I believe it because I know Arnold.
22   Again, I can't express enough the passion and the
23   love this man has for everybody.  Arnold did not do
24   that.  I mean, if I had to put my life on the line

---

133

1    and someone can show me where I'm wrong, I would
2    stand and put my life on the line that he did not
3    do this crime.
4        Q.    So that personal belief that you have
5    about Arnold is based, it sounds like, on your
6    personal interactions with Arnold; is that fair?
7        A.    Personal interactions with Arnold and
8    the interactions Arnold have with everybody that
9    comes around him.
10       Q.    Have you ever seen any evidence of any
11   sort, other than, you know, what Arnold's told you
12   or your interactions with him, have you ever seen
13   any evidence that proves to you that Arnold was not
14   involved in this homicide?
15       MS. DONNELL: Objection; form.  But you can
16   answer.
17       THE WITNESS:  No, sir.
18   BY MR. GRILL:
19       Q.    So bottom line, your belief in his
20   innocence is based entirely on what Arnold's told
21   you about what happened to him and your own
22   personal interactions with him over the years; is
23   that correct?
24       A.    And just seeing the interaction that

---

Cassandra Taylor, 2/23/2023

134

1    Arnold has with others, not just me personally.
2       Q.   So a while back, we were talking about
3    how you know or are aware that Arnold confessed,
4    at least according to the police and the state's
5    attorney, to killing Jerrod Irving, right?  You're
6    aware of that; correct?
7       A.   I'm aware of what?
8       Q.   That Arnold confessed, according to the
9    police and the state's attorney, to having killed
10   Jerrod Irving.  You're aware of that, right?
11      A.   Yes.
12      Q.   Okay.  And, remind me, I believe you
13   said before that you've never seen a copy of the
14   actual physical written-out confession, right?
15      A.   Correct.
16      Q.   All right.  Have you ever talked with
17   Arnold about how it was that he knew what to say
18   when he confessed?
19      MS. DONNELL:  Objection; form and foundation.
20   You can answer if you can, Ms. Taylor.
21      THE WITNESS:  Did I ever talk to whom and --
22   who did you say?  Did I talk to Ms. Arnold?
23   BY MS. GRILL:
24      Q.   Yeah, did you ever have a conversation

135

1    at any point in the past with Arnold wherein he
2    explained to you how it was that he knew what to
3    say when he confessed to killing Jerrod Irving?
4       MS. DONNELL:  Objection; form and foundation.
5      THE WITNESS:  If I'm not mistaken, I believe
6    that it was already written out.
7    BY MR. GRILL:
8       Q.   Okay.  So it's your understanding that
9    Arnold was presented with a confession that
10   somebody else wrote out for him?
11      A.   Is that a question?
12      Q.   Yes.
13      A.   Yes.
14      Q.   Yes, is that your understanding?
15      A.   Yes.
16      Q.   Is it your understanding at all that
17   Arnold -- let me ask it this -- strike -- I'll
18   strike that question over.
19      Do you believe that Arnold said any
20   of the things that are -- that he confessed to
21   himself?
22      MS. DONNELL:  Objection; form and foundation,
23   calls for speculation.
24      You can answer, Ms. Taylor, if

136

1    you're able to.  I mean, she doesn't -- I guess --
2      THE WITNESS:  Okay.  So repeat that question,
3    please?
4    BY MR. GRILL:
5       Q.   Do you have any understanding as to
6    whether Arnold said any of the things that he
7    confessed to were things that he actually said to
8    the police, that he spoke words to the police that
9    were then memorialized in a written confession?
10      MS. DONNELL:  Objection; foundation, calls
11   for speculation.
12      You can answer the question if
13   you're able to, Ms. Taylor.
14      THE WITNESS:  I don't recall.
15    BY MR. GRILL:
16      Q.   What do you recall Arnold telling you
17   about this confession that was written out for him?
18   On how that happened.
19      A.   I'm uncertain. I don't recall.
20      Q.   Do you have any recollection of any
21   conversation with Arnold wherein he told you
22   anything about where the information that appears
23   in this written confession came from?
24      MS. DONNELL:  Objection; asked and answered

137

1    and form and foundation.
2      But you can answer if you can,
3    Ms. Taylor.
4      THE WITNESS:  I don't recall.
5    BY MR. GRILL:
6       Q.   Were you curious at all to find out
7    from Mr. Day where the information that appears in
8    his confession came from?
9      A.   No, sir.  It -- no, I wasn't curious at
10   all.
11      Q.   Did Arnold tell you who wrote the
12   confession out?
13      A.   I don't recall.
14      Q.   Did Arnold tell you whether he signed
15   the confession?
16      A.   Yes, he did.
17      Q.   And what did he tell you about that?
18      A.   I don't think he directly told me
19   anything.  I asked him why would he sign it if he
20   didn't do it.
21      Q.   What did he tell you in response to
22   that question?
23      A.   I don't understand the abuse that he
24   was going through, and anyone would have signed if

Cassandra Taylor, 2/23/2023

138

1    they went through that abuse.
2        Q.   Did he ever tell you that he was -- had
3    to repeat any story of any sort to the police or to
4    the state's attorney as part of his confession?
5        MS. DONNELL:  Objection; form, foundation.
6        THE WITNESS:  I don't recall.
7    BY MR. GRILL:
8        Q.   When you think back to the trial, the
9    criminal trial that you attended, Arnold Day's
10   trial, criminal trial, do you remember how you felt
11   when you realized that Arnold was accused of
12   killing two people, and not one?
13       A.   I'm still a little bit confused.
14   Again, I thought, in my mind, that all of that was
15   the same case.
16       Q.   But it was at the trial where you
17   realized that it was not the same case, right?
18       A.   And still at that time, I didn't
19   understand that it still were two different cases.
20   I just know he was acquitted on one, so I thought
21   these were all cases combined together.
22       Q.   Okay.  Where did you go to high school?
23       A.   Prosser.
24       Q.   Prosser?

139

1        A.   Yes.
2        Q.   What's the highest level of education
3    that you've obtained to date?
4        A.   Some college.
5        Q.   Some college?
6        A.   Yes.
7        Q.   What college did you go to?
8        A.   Sawyer's Business College.
9        Q.   Where is that at?
10       A.   It was in Oak Park.
11       Q.   How far did you get?
12       A.   I did the first semester.
13       Q.   And then started working?
14       A.   No.  I was a mom at 16.
15       Q.   So you had to stop going in order to
16   take care of your child, is that --
17       A.   Yes.
18       Q.   Have you ever gone back to finish your
19   degree?
20       A.   No, sir.
21       Q.   So after the -- Arnold Day's criminal
22   trial concluded, did you continue speaking with
23   Arnold Day on the phone like, you know, you were
24   before, while he was in Cook County Jail?  Did it

140

1    continue after that?
2        A.   Can you be clearer?  Are you speaking
3    of when he went to prison, or while he was still in
4    Cook County?
5        Q.   Pretty much once he went to prison, did
6    you continue speaking with him?
7        A.   No, sir.
8        Q.   Did you -- did the -- did you stop
9    speaking with him pretty much as soon as he went to
10   prison; is that when it ended?
11       A.   No.  I think he was still in the County.
12       Q.   And was there any reason that you can
13   think of that you stopped communicating with Arnold
14   at that time?
15       A.   When I met Arnold, I was pregnant.  I
16   was eight months' pregnant when I met Arnold.  I
17   had delivered my baby; I then moved forward with my
18   life; I got married.  After getting married, I
19   moved down here to Texas with my family.
20       Q.   And what year was it, if you can
21   recall, that you started talking with Arnold again?
22       A.   I'm not certain, but I kind of want to
23   say maybe 2016, 2015 or '16.
24       Q.   Do you know -- can you tell me how it

141

1    was that you and Arnold reconnected?
2        A.   He asked his godsister Areanda if she
3    had spoken with me, and she stated that she talks
4    with me periodically.  And he asked her if she can
5    call me.  And she called me from her son's phone,
6    and I told her to give him my number.
7        Q.   Is that Modee?
8        A.   Yes.
9        Q.   M-o-d-i, right?
10       A.   I think it's M-o-d-e-e.
11       Q.   So Modee re- -- you know, facilitated
12   you and Arnold reconnecting?
13       A.   I guess in a sense, yes.
14       Q.   Maybe I missed this from the answer you
15   gave a minute ago, but did you say that Arnold
16   asked to speak with you?  Asked Modee to connect
17   you two?
18       A.   He asked Modee had she been -- had she
19   spoken with me, and she say periodically.
20       Q.   Did you ever ask Arnold why it was that
21   he wanted to reconnect with you?
22       A.   He would often still write me letters.
23   But, again, I had moved forward and gotten married,
24   and my husband started to intercept the letters.

Cassandra Taylor, 2/23/2023

142

1  So when he wasn't getting me any return letters
2  back, he just stopped writing. But he would always
3  send my kids birthday cards, and he would send them
4  to Modee --
5      Q.   Arnold would?
6      A.   Yes, Arnold. And will send them to
7  Modee for Modee to send them to me.
8      Q.   Did you give your kids those cards?
9      A.   Yes.
10     Q.   And did you tell your -- what did you
11 tell your kids about who Arnold was?
12     A.   They knew who he was from when I first
13 met him.
14     Q.   There's a person named Devo that you
15 and Arnold talk about often in these calls. Who is
16 Devo?
17     A.   Devo is a childhood friend.
18     Q.   How do you spell his name?
19     A.   D-e-v-o.
20     Q.   Okay. Is that a nickname, Devo?
21     A.   Yes.
22     Q.   Do you know his real name?
23     A.   I do, but I think it's Shunta.
24     Q.   "Chonta"? "Shoonta"?

143

1      A.   I believe so.
2      Q.   His last name Rhodes?
3      A.   I don't know Devo's last name.
4      Q.   Okay. And when you say a childhood
5  friend, a childhood friend of who?
6      A.   Of Arnold's.
7      Q.   Was he a friend of yours also in
8  childhood?
9      A.   No.
10     Q.   When did you first meet Devo?
11     A.   Before Arnold got out of prison, I
12 would contact Devo all the time. Very smart guy.
13 So I will contact him because I was just trying to
14 find ways to get Arnold out. Looking to go into my
15 401K, but was also trying to find out is there a
16 bond? Could there be a bond? To get Arnold out.
17     Q.   And so did Arnold put you in contact
18 with Devo?
19     A.   Did he put me in contact with Devo.
20 I'm not certain. It could have been -- he spoke of
21 Devo, but I don't know if a connection came with
22 Modee? I'm not certain. I'm not certain.
23     Q.   Did Arnold tell you that -- anything
24 along the lines that he believed Devo could help

144

1  you with your efforts to get Arnold out of jail?
2      A.   Oh, no.
3      Q.   Was Devo involved in any effort, to
4  your knowledge, at all when it came to helping
5  Arnold get out of jail?
6      A.   No, he wasn't.
7      Q.   There's another person named Myann. Do
8  you know who that is?
9      A.   Myann?
10     Q.   Yeah.
11     A.   That's Modee's sister.
12     Q.   Okay. And is that M-y-a-n?
13     A.   M-y-a-n-n.
14     Q.   Myann involved in -- was Myann involved
15 in any of the efforts to help Arnold get out of
16 jail?
17     A.   No.
18     Q.   Do you know a person named Lincoln
19 Morris?
20     A.   No, I don't know Lincoln Morris.
21     Q.   How about a Riley Jackson?
22     A.   I don't know Riley Jackson.
23     Q.   Dee Dee, do you know who that is?
24     A.   Who?

145

1      MS. DONNELL: What did you say?
2  BY MR. GRILL:
3      Q.   Dee Dee, D-e-e D-e-e.
4      A.   That's Modee and Myann's sister.
5      Q.   And what's her real name?
6      A.   Hm. I can't recall.
7      Q.   Is that Dorethea?
8      A.   Dorethea, yes, sir.
9      Q.   Dorethea Robinson, right?
10     A.   Yes, sir.
11     Q.   And Dorethea is Myann and Modee's
12 sister also?
13     A.   Yes, sir.
14     Q.   Okay. And when you say sister, these
15 are actual blood siblings.
16     A.   Yes, sir.
17     Q.   Not people that are just referring to
18 each other as sisters, right?
19     A.   Right.
20     Q.   Do you know Arnold's friend Kwame Tate?
21     A.   I've heard of the name.
22     Q.   How have you -- what have you heard, or
23 how have you heard of the name?
24     A.   And I think I've gotten him mixed up

Cassandra Taylor, 2/23/2023

146

1  with Nathaniel that you asked me about.
2     Q.   Mixed up with who?
3     A.   Nathaniel.  You asked me about
4  Nathaniel, and I was thinking of Kwame.
5     Q.   Got it.  Okay.
6         So Kwame -- so is it fair to say you
7  don't know who Nathaniel is at all, then?
8     A.   No, sir, I don't know Nathaniel.
9     Q.   Do you know somebody by the nickname
10 G-Nate?
11    A.   No, sir.
12    Q.   Arnold never mentioned somebody with
13 that nickname?
14    A.   No, sir.
15    Q.   So Kwame, you think that this is --
16 this is the person you were thinking of when you
17 were talking about a friend of Arnold's from back
18 in the day?
19    A.   Yes, sir.
20    Q.   Do you know or did Arnold ever tell you
21 anything about the circumstances of his actual
22 arrest for these homicides?
23    A.   That he was at Kwame's home.
24    Q.   Did Arnold ever tell you why he was at

147

1  Kwame's home?
2     A.   He had been staying with Kwame, and I
3  think the mom, Kwame mom taken a liking to Arnold.
4     Q.   Okay.  Did Arnold ever tell you any
5  other reasons why he was at Kwame's house when the
6  police came and arrested him there?
7     A.   No, sir.
8     Q.   Did Arnold ever tell you whether he was
9  hiding from the police in Kwame's basement?
10    A.   Yes, sir.
11    Q.   Okay.  So he did tell you --
12    A.   Yes.
13    Q.   -- why he was at Kwame's house.
14         Okay.  So what did Arnold tell
15 you --
16    MS. DONNELL:  Objection; form.  But you can
17 answer the question that was just asked.
18 BY MR. GRILL:
19    Q.   So what did Arnold tell you about why
20 it was that he was hiding from the police in
21 Kwame's basement?
22    A.   So it sounds as though you asking me
23 two different questions and connecting them
24 together.

148

1     Q.   Okay.  So the question that I'm trying
2  to ask you is this:  What did Arnold tell you about
3  why it was that he felt he needed to be hiding from
4  the police in Kwame's basement?
5     MS. DONNELL:  Objection; form, foundation.
6  I'm sorry, Ms. Taylor, just one second.  Objection;
7  form and foundation.
8         You can answer if you can.
9     THE WITNESS:  Fear.
10 BY MR. GRILL:
11    Q.   Fear of what?
12    A.   The police.
13    Q.   Did Arnold tell you what the police
14 were looking for him for?  Like what kind of crime
15 or why they were looking for him at all?
16    MS. DONNELL:  Objection; form.
17    THE WITNESS:  He stated that they was looking
18 for him for a murder.
19 BY MR. GRILL:
20    Q.   Did he tell you which murder?
21    A.   No.
22    Q.   Okay.  Did he tell you how long he had
23 been hiding out in Kwame's basement for?
24    A.   No.

149

1     MS. DONNELL:  Objection; form and foundation.
2  BY MR. GRILL:
3     Q.   Did he tell you how it was that he
4  found out that the police were looking for him for
5  a murder?
6     A.   I believe word on the street.
7     Q.   What does that mean?
8     A.   People was telling him that they had
9  been looking for him.
10    Q.   But the word on the street was not
11 specific enough, at least to your knowledge, as to
12 which murder they were looking for him for, right?
13    A.   Right.  Never inquired.
14    Q.   And did Arnold tell you anything about
15 what happened when the police found him at Kwame's
16 house?
17    A.   Not that I can recall.
18    Q.   Did Arnold tell you where exactly he
19 was in Kwame's house when the police found him?
20    A.   In the basement.
21    Q.   Did he tell you where he was in the
22 basement?
23    A.   No.
24    Q.   Tell you what -- anything about what --

Cassandra Taylor, 2/23/2023

---

150

1  how the police treated him when they found him?
2      A.    I believe they kind of hemmed him up in
3  the basement, and he said he had his boxers on;
4  that's all I could recall.
5      Q.    Do you ever communicate in the last,
6  let's say two years, with Kwame Tate?
7      A.    Never communicated with Kwame Tate.
8  Just heard the name.
9      Q.    Never in your life?
10     A.    Never in my life.
11     Q.    Do you know where he lives?
12     A.    No, I don't.
13     Q.    Do you know if Arnold communicates with
14  Kwame Tate?
15     A.    No, sir.
16     Q.    And do you know where Arnold's living
17  now?
18     A.    Where Arnold's living?
19     Q.    Yes. Now.
20     A.    5617 Creekhollow Drive.
21     Q.    With you; correct?
22     A.    Correct.
23     Q.    Anybody else live with you and Arnold
24  in Texas?

---

151

1      A.    Not in our home.
2      Q.    Do you know, does the name Tennelle
3  Jones ring a bell to you?
4      A.    I've heard of Tennelle.
5      Q.    What have you heard about Tennelle?
6      A.    That she's a girl and they think she's
7  a boy.
8      Q.    All right. Who says that?
9      A.    That's what Arnold says.
10     Q.    Okay. So do you understand what he
11  means by that?
12     A.    I take it as she's gay.
13     Q.    And have you ever met Tennelle?
14     A.    No.
15     Q.    Do you know how long Arnold has known
16  Tennelle for?
17         MS. DONNELL: Objection; foundation.
18         THE WITNESS: He states that they all hung
19  out together. I don't know how long.
20  BY MR. GRILL:
21     Q.    Hung out together would have to be at
22  some time before he was incarcerated for these
23  murders, right?
24     A.    Yes.

---

152

1      Q.    Do you know a person or does the name
2  Gus Robinson mean anything to you?
3      A.    No, sir.
4      Q.    Or a person with the nickname of Snake?
5  Arnold ever mention somebody like that to you?
6      A.    No, sir.
7      Q.    Okay. Do you know the names of any of
8  the detectives that investigated Arnold for either
9  of these homicides?
10     A.    Boudreau.
11     Q.    Anybody else?
12     A.    Forney.
13     Q.    Who?
14     A.    I think his name is Forney. I'm not
15  certain.
16     Q.    Foley maybe?
17     A.    Who?
18     Q.    Foley maybe? Is that --
19     A.    Foley, yes.
20     Q.    Any other names?
21     A.    No, sir.
22     Q.    What do you remember Arnold telling you
23  about Boudreau?
24     A.    Boudreau was one of the detective that

---

153

1  was in the room when all of this transpired.
2      Q.    What transpired?
3      A.    When they assaulted him.
4      Q.    Who assaulted -- who did Arnold tell
5  you assaulted him?
6      A.    Forley, Forney, or whatever the
7  detective is.
8      Q.    Foley?
9      A.    Yes.
10     Q.    And did Arnold tell you that any other
11  detectives assaulted him other than Foley?
12     A.    I'm not certain if he told me about
13  Boudreau.
14     Q.    Did Arnold Day tell you whether he knew
15  any of these detectives that investigated him for
16  any other reason outside of his arrest for these
17  homicides?
18     A.    No, sir.
19     Q.    There's a -- do you know a person or a
20  friend of Arnold's, by any chance, named Darren?
21  Does that ring a bell?
22     A.    I believe I heard Darren's name.
23     Q.    Do you know what Darren's last name is?
24     A.    No. I think he maybe be in a hospice

---

Cassandra Taylor, 2/23/2023

154

1    facility or something.
2        Q.   Do you know how Arnold knows Darren?
3        A.   No, sir.
4        Q.   Do you know if Darren is a witness in
5    any way to any of the homicides that he was accused
6    of committing in 1991?
7        MS. DONNELL:  Objection; foundation.  But you
8    can answer if you know.
9        THE WITNESS:  I don't know.  I just thought --
10   I was always -- maybe had a disability or something.
11   BY MR. GRILL:
12       Q.   Has Arnold ever tell you whether
13   Darren, putting his disability aside, might have
14   any information of any sort that could be useful to
15   this lawsuit or was useful in any way to his
16   efforts to get out of jail?
17       A.   Never heard anything about Darren's
18   name being mentioned in the case.
19       MS. DONNELL:  Andrew, at a good stopping
20   point, could we take just a short break?
21       MR. GRILL:  Sure.  How long do you need?
22       MS. DONNELL:  I just need to check on my kid
23   for like five minutes.
24       MR. GRILL:  See you in -- just come back at

155

1    10 after 2:00.
2        MS. DONNELL:  That's fine.
3              (Recess taken.)
4    BY MR. GRILL:
5        Q.   Did Arnold ever tell you anything about
6    whether he was able to review or did review the
7    confession that somebody wrote out for him that he
8    signed before he signed it?
9        MS. DONNELL:  Objection; form, foundation.
10   But you can answer if you can.
11       THE WITNESS:  I don't recall.
12   BY MR. GRILL:
13       Q.   Did Arnold ever tell you whether he
14   understood that he was signing a confession to a
15   murder?
16       MS. DONNELL:  I'm sorry, I missed that
17   question too.
18   BY MR. GRILL:
19       Q.   Did Arnold ever tell you that he
20   understood that he was signing his name to a
21   confession to a murder?
22       A.   Yes.
23       Q.   What did he tell you about that?
24       A.   I don't quite recall what he told me

156

1    about that.
2        Q.   Do you know or did he ever -- do you
3    know that he signed a -- signed a confession to two
4    murders, one of which he was ultimately acquitted
5    of, but that there were two murders that the police
6    interrogated him about, that there were confessions
7    signed by Arnold to both murders.  Do you
8    understand that?
9        A.   No --
10       MS. DONNELL:  Objection; form --
11       THE WITNESS:  Sorry.
12       MS. DONNELL:  Objection; form and foundation.
13   You can answer.
14       THE WITNESS:  No, I don't recall it being two
15   murders.  Only one.
16   BY MR. GRILL:
17       Q.   Okay.  But, in any event, it's your
18   understanding that he signed a confession to
19   murder, and when he signed it, he knew that it was
20   a confession to a murder.  That's fair, right?
21       A.   Yes.
22       Q.   Did Arnold ever tell you whether he had
23   asked to speak with a lawyer when he was being
24   questioned by the police?

157

1        A.   I don't recall him telling me that.
2        Q.   Did you ever ask him if he asked to
3    speak with a lawyer?
4        A.   No, I didn't.
5        Q.   Did you ever talk to Arnold about what
6    it was or what he thinks about the quality of
7    representation he got from his criminal defense
8    attorney up to and through the time of his criminal
9    trials?
10       MS. DONNELL:  Objection; form and foundation.
11   As I'm going to just reiterate my objection before
12   to the extent you might be referring to a specific
13   call without referring it to the witness.
14            But go ahead, you can answer if you
15   can, Ms. Taylor.
16       THE WITNESS:  Okay.  Can you repeat so I can
17   make sure I have an understanding of what the
18   question is?
19   BY MR. GRILL:
20       Q.   Did you ever talk -- do you have any
21   recollection or did you ever talk to Arnold, you
22   know, wherein he explained to you what he thought
23   about the quality of representation he got in his
24   criminal case from his lawyer?

Cassandra Taylor, 2/23/2023

158

1     MS. DONNELL:  Form and foundation.
2     THE WITNESS:  Yes.
3  BY MR. GRILL:
4     Q.  What do you remember Arnold telling you
5  about what he thought about how good his attorney
6  was?
7     A.  He wasn't a good one.
8     Q.  Do you remember what Arnold told you
9  about why he thought his attorney was not a good
10 attorney?
11    A.  Because he came right in and said that
12 the judge is not going to give you the death
13 penalty, but it's a possibility you can get life.
14    Q.  Anything else?
15    A.  That's all I can recall.
16    Q.  Did Arnold ever tell you whether he
17 thought his attorney spoke to all the witnesses?
18    A.  He didn't speak to any witnesses.
19    Q.  How do you know that?
20    A.  Because Arnold stated that he didn't
21 speak to any witnesses, he didn't do anything as
22 far as investigation on the murder.
23    Q.  Did Arnold express to you anything
24 about what he believed these witnesses might have

159

1  been able to say or tell his attorney that could
2  have changed, you know, his fate in the murder
3  trial?
4     MS. DONNELL:  Objection; form and foundation.
5  You can answer if you can.
6     THE WITNESS:  Not that I can recall.
7  BY MR. GRILL:
8     Q.  Do you have any understanding today as
9  to why it was important for his criminal defense
10 attorney to have spoken to these witnesses then?
11    A.  Yes.
12    Q.  All right.  What's your understanding?
13    A.  That they could have got the correct
14 person.
15    Q.  How would these witnesses have been
16 able to point the police or anybody at who or whom
17 the correct person or people would have been?
18    A.  Because the witness was the one that
19 seen the person that did the crime.
20    Q.  And which witness is that?
21    A.  Krona Taylor.
22    Q.  Do you know if Krona Taylor testified
23 at Arnold Day's criminal trial?
24    A.  I didn't see her.  Not that I know of.

160

1     Q.  Do you have any understanding from any
2  source whatsoever as to why she may not have
3  testified there?
4     A.  Yes, I do.
5     Q.  And what is that understanding?
6     A.  That when the trial began -- started,
7  they gave her the wrong date to attend the trial.
8     Q.  And this is something Arnold told you?
9     A.  Arnold and Krona.
10    Q.  Okay.  And when you say "they gave her
11 the wrong date," who's the "they" you're referring
12 to?
13    A.  Whomever sends out the court dates.
14    Q.  Do you know if Arnold's attorney sent
15 out the court date?
16    MS. DONNELL:  Objection --
17    THE WITNESS:  No.
18    MS. DONNELL:  -- form and foundation.  You
19 can answer if you can.
20    THE WITNESS:  I don't know.
21 BY MR. GRILL:
22    Q.  I think you said this already.  You
23 didn't know Krona Taylor back in 1991 or '92, right?
24    MS. DONNELL:  Objection; asked and answered.

161

1  You can answer again.
2     THE WITNESS:  No, sir.
3  BY MR. GRILL:
4     Q.  There's another person that you and
5  Arnold Day talk about, and I understand it as EB.
6  Is that right?  Is that a person you know, EB, the
7  letter E, the letter B?
8     A.  Yes.
9     Q.  Who is EB?
10    A.  "EB."
11    Q.  "EB"?
12    A.  Yes.
13    Q.  And I'm talking about E as in Edward,
14 B as in boy.  Am I getting that right?
15    A.  Yes.
16    Q.  Do you know EB's real name?
17    A.  Shantanique.
18    Q.  Can you spell that, please?
19    A.  S-h-a-n-t-a-n-i-q-u-e.
20    Q.  And is EB one of Arnold's friends, to
21 your knowledge?
22    A.  That's my daughter.
23    Q.  That's your daughter.  Okay.  Got it.
24 That I could not figure out.

Cassandra Taylor, 2/23/2023

162

1          How old is your daughter, EB?
2      A.   36.
3      Q.   Do you know a detective named Michael
4  Kill, for any reason?  Do you know who that is?
5      A.   No, sir.
6      Q.   Do you know a detective named John or
7  Jack Halloran?  Does that name ring a bell to you?
8      A.   No, sir.
9      Q.   Do you know what a state's attorney or
10 an assistant state's attorney is?  Do you have an
11 understanding of what type of attorney that is?
12     A.   A state's attorney?
13     Q.   Yeah.  Do you know what that is?
14     A.   Someone that represents the state.
15     Q.   Right.  In, like, a criminal
16 prosecution, right?
17     A.   Yes.
18     Q.   So did Arnold Day ever tell you
19 anything about his interactions with the state's
20 attorney at the police station when he was there
21 and had been questioned about the Irving and Garcia
22 homicides?
23     A.   No.  I just recall Boudreau and Foley.
24     Q.   When Arnold was hiding in Kwame's

163

1  basement and running from the cops -- or hiding
2  from the cops because, as you said, he was in fear
3  for his life, did you ever ask him, like, why it
4  was that he was in fear for his life?
5      MS. DONNELL:  Objection; form and foundation.
6  You can answer if you can.
7      THE WITNESS:  No, sir, I didn't.
8  BY MR. GRILL:
9      Q.   Did you have any theory of your own as
10 to why he was so afraid for his life that he needed
11 to hide in Kwame's basement from the police?
12     MS. DONNELL:  Objection; form and foundation,
13 and to the extent you're misstating her testimony.
14 But you can answer, Ms. Taylor.
15     THE WITNESS:  Again, just my personal
16 opinion, I can understand detectives back then were
17 dirty.
18 BY MR. GRILL:
19     Q.   Did Arnold Day ever tell you anything
20 about any prior interactions he ever had with the
21 police that might cause him to be in fear of his
22 life from the police once he found out they were
23 looking for him for a murder?
24     A.   I can briefly recall him stating

164

1  something, but I can't recall what he actually
2  stated that had him feeling that way.
3      Q.   Did he ever tell you that the police
4  had, like, beaten him up or done something to him
5  in the past?
6      A.   I can't recall.
7      Q.   Did he ever tell you that the police
8  had tried to frame him for a crime he didn't commit
9  on some other occasion in the past before these
10 arrests?
11     A.   Not that I can recall.
12     Q.   Do you know if Arnold Day knew either
13 of the victims of the murders that he was arrested
14 for in February of 1992?
15     A.   He didn't know Garcia, but he did -- he
16 had heard of the other guy.
17     Q.   How do you know that?
18     A.   Because he told me.
19     Q.   And the other guy is Jerrod Irving,
20 right?
21     A.   Yes, sir.
22     Q.   Did Arnold tell you how it was that he
23 had heard of Jerrod Irving?
24     A.   He said he was a younger guy from the

165

1  neighborhood that didn't cause any harm toward
2  anybody; it would be no reason for anyone to kill
3  him.
4      Q.   Did Arnold tell you anything about
5  whether Jerrod was in a gang?
6      A.   I can't honestly say he told me that.
7  I don't -- I'm not sure he told me that.
8      Q.   Do you think somebody else may have
9  told you that?
10     A.   Well, nobody else that I really
11 communicate that could have told me that, but my
12 mind could just be telling me that he was a younger
13 guy that was involved in a gang back then.
14     Q.   Did Arnold tell you anything about what
15 he understood Jerrod was doing at the time he was
16 killed?
17     MS. DONNELL:  Objection; form and foundation,
18 calls for speculation.
19     THE WITNESS:  He only states that they said
20 it was a robbery.
21 BY MR. GRILL:
22     Q.   What type of robbery?
23     A.   I don't know.  I only know one way of a
24 robbery; to just be robbed for something.

Cassandra Taylor, 2/23/2023

166

1    Q.   Okay.  Well, did he say that they
2  were -- what they were trying to rob Jerrod --
3  these people were trying to rob Jerrod of?
4        MS. DONNELL:  Objection; form and foundation.
5        THE WITNESS:  No, sir.
6  BY MR. GRILL:
7    Q.   Did Arnold tell you anything about
8  whether he knew Jerrod Irving for any other reason?
9    A.   No, sir.  He knew his brother.
10    Q.   Did Arnold ever tell you whether he had
11  been arrested with Jerrod Irving in the past?
12    A.   No, he never told me that.
13    Q.   Did Arnold tell you -- you know,
14  obviously you've told me today that Arnold told you
15  that the police choked him, or Foley choked him and
16  threatened to throw him out the window.
17        Did Arnold ever tell you how long it
18  was that he was questioned by the police about
19  these murders?
20        MS. DONNELL:  Objection; form.
21        THE WITNESS:  He did, and I can't recall how
22  long he stated it was that he was questioned with
23  no food and water.
24

167

1  BY MR. GRILL:
2    Q.   Did he tell you whether he was
3  handcuffed or not when he was being questioned by
4  the police?
5    A.   I'm not certain if he told me that, if
6  he was handcuffed or not.
7    Q.   All right.  Just give me a second here.
8  Move past a couple things here to speed this up.
9        Did Arnold ever tell you whether he
10  was interviewed at all or questioned by a state's
11  attorney while he was at the police station?
12    A.   I can't recall him telling me anything
13  about the state's attorney.
14    Q.   Did he tell you whether he complained
15  to anybody, while he was at the police station or
16  thereafter, other than his lawyer, to anybody else
17  about the abuse that he says he suffered at the
18  hands of the police at the police station?
19    A.   I'm uncertain.  I don't want to give
20  the wrong answer.  I can't recall that.
21    Q.   And do you know where or who Arnold was
22  living with at the time he was arrested for these
23  murders?
24        MS. DONNELL:  Objection; asked and answered.

168

1  But you can answer again.
2        THE WITNESS:  The guy whose house he was
3  arrested at.
4  BY MR. GRILL:
5    Q.   Kwame Tate?
6    A.   Yes.
7    Q.   All right.  Do you know if Arnold was
8  living with anybody else at that time -- or did he
9  ever tell you, I should say, whether he was living
10  with anybody else around the time of his arrests
11  when he was hiding from the police?
12        MS. DONNELL:  Objection; form, foundation.
13        THE WITNESS:  His grandmother.
14  BY MR. GRILL:
15    Q.   Do you remember her name?
16    A.   No, sir.
17    Q.   Did Arnold Day ever tell you whether he
18  made a phone call to any family member, or friend,
19  even, after his arrests for these murders -- after,
20  actually, he was charged with these murders -- to
21  tell them what had happened to him at the police
22  station that caused him to falsely confess to these
23  homicides?
24        MS. DONNELL:  Objection; form.  You can

169

1  answer if you know.
2        THE WITNESS:  I don't -- no, he never told me
3  anything about that.
4  BY MR. GRILL:
5    Q.   Did you ever ask him anything like,
6  Arnold, did you call your grandmother or Kwame
7  Tate's mom or Kwame Tate to tell them, hey, I just
8  was threatened and beat up by the police and forced
9  to sign a confession to a murder that I didn't
10  commit?  Did you ever ask him if he made a call
11  like that to anybody?
12        MS. DONNELL:  Objection; form, foundation.
13  You can answer.
14        THE WITNESS:  No, sir.  I don't have familiar
15  with police officers like that to even think to ask
16  questions like that.  I didn't do it for myself, so
17  I know I definitely didn't do it for him, to ask
18  him those questions.
19  BY MR. GRILL:
20    Q.   Well, I mean, try to put yourself in
21  Arnold's shoes.  If that had happened to you, don't
22  you think it would be common sense to tell somebody
23  that -- you know, a family member or friend about
24  what happened to you?  I mean, wouldn't you do that

Cassandra Taylor, 2/23/2023

170

1 that?
2     MS. DONNELL: Objection; argumentative and
3 asked and answered. And you can answer again,
4 Ms. Taylor.
5     THE WITNESS: If I wasn't knowledgeable
6 enough to not agree to a crime that I didn't do,
7 no, sir, I wouldn't think to ask him those
8 questions.
9 BY MR. GRILL:
10     Q.   Right. I guess really what my question
11 was -- it's a little different. And it's, do you
12 agree that it's common sense to call somebody, a
13 family member that you can trust, and tell them
14 what had happened to you? In this case, the police
15 threatened and physically abused Arnold Day, forced
16 him to falsely confess to a murder that he didn't
17 commit. Do you believe that it would be common
18 sense to let somebody know in the family about that?
19     MS. DONNELL: Objection. It's been asked and
20 answered two times now. So argumentative.
21         And, Ms. Taylor, I'll let you answer
22 it one more time, and then hopefully we can move on.
23     THE WITNESS: Everyone's common sense is not
24 the same.

171

1 BY MR. GRILL:
2     Q.   Do you believe Arnold was an
3 intelligent guy back when you were talking with him
4 at -- when he was at Cook County Jail? Was that
5 your impression of him?
6     A.   Yes, sir.
7     Q.   You saw you said earlier that the
8 police -- excuse me. You said earlier that you
9 watched the, basically the entire criminal trial
10 that the state presented against Arnold Day that
11 culminated in him going to prison, right?
12     MS. DONNELL: Objection. I think that
13 misstates her prior testimony. But you can answer,
14 Ms. Taylor.
15     THE WITNESS: Not the case that he was
16 incarcerated on. It was the Garcia's case.
17 BY MR. GRILL:
18     Q.   Okay. You did not watch the trial that
19 resulted in him going to prison; is that what
20 you're saying?
21     A.   Yes, sir.
22     Q.   So was there any reason why you did not
23 watch the other trial? The one that he went to
24 jail on.

172

1     A.   Because I was under the impression that
2 it was the same trial.
3     Q.   Got it. Okay. So you didn't know
4 about the other trial; is that right?
5     A.   Correct.
6     Q.   Okay. Now, in the Garcia trial, do you
7 remember thinking that the police were lying about
8 anything that they were saying on the stand?
9     A.   Honestly, I don't even recall the
10 police being on the stand.
11     Q.   Did Arnold ever tell you, in any of
12 your conversations with him, whether when he was at
13 Cook County Jail or when he was in prison, that he
14 believed that the police had withheld any type of
15 evidence that he could have used to prove he was
16 innocent during his criminal trial?
17     A.   Yes, sir.
18     Q.   What did Arnold tell you as far as what
19 it was that he believed had been withheld?
20     A.   There was some documentations that was
21 omitted out of the transcript.
22     Q.   Out of the -- what transcript?
23     A.   For the case that he was fighting.
24     Q.   Okay. Do you have any understanding

173

1 as to what information was in the -- in this
2 documentation that was withheld according to Arnold?
3     A.   No, sir.
4     Q.   Did you -- have you ever gained an
5 understanding to date as to what that evidence
6 might be that Arnold claims was withheld?
7     A.   No, sir.
8     Q.   Did you ever ask Arnold anything along
9 the lines of, what is the evidence, Arnold, that
10 you believe the police withheld from you that could
11 prove you are innocent?
12     A.   He -- he told me what was omitted out
13 of the transcripts. I never just hold -- held on
14 to it to even understood -- to understand it. I
15 think I was kind of at the point where I was just
16 wishing this will all go away. Even today, I wish
17 this would just go away. So I -- I never
18 questioned anything.
19         Once he got out, when he was in
20 there, I didn't do a whole lot of questioning on
21 what, where, why. I was just under the impression
22 that this was an innocent guy that has been
23 incarcerated for something that he had nothing to
24 do with.

Cassandra Taylor, 2/23/2023

174

1    Q.   Okay.  So I want you to just think
2  about, like, the -- the point in time, you know, I
3  guess in, like, 2015-ish, you start communicating
4  with Arnold on the phone again while he's in
5  prison, up to the point that you get in touch with
6  him -- or actually, no, up until today.
7        But during that time period, did
8  Arnold ever explain to you what the evidence was
9  that he believed was withheld from him?
10   MS. DONNELL:  Objection.  That was asked and
11 answered.  But you can answer again.
12   THE WITNESS:  Yeah, he explained, but I -- I
13 would listen, but I wasn't hearing.  Whatever it
14 was, I didn't know that was important to hold onto.
15 BY MR. GRILL:
16   Q.   Well, didn't -- if you believed he was
17 innocent and was wrongfully incarcerated, were you
18 interested in understanding how it was that this
19 evidence would show that Arnold was innocent?
20   A.   I was --
21   MS. DONNELL:  Hold on one second.  Objection;
22 argumentative.
23       You can answer.
24   THE WITNESS:  I was more interested in

175

1  finding the witness.  Whatever was in the
2  transcript was a lie, as well as everything else
3  that has transpired, so my most important interest
4  was to find Krona, and that's what I done.
5  BY MR. GRILL:
6    Q.   What was in the transcript about Krona
7  that was a lie, to your understanding?
8    MS. DONNELL:  Objection to the extent you're
9  misstating her testimony.
10       You can answer if you can.
11   THE WITNESS:  I don't know about anything
12 been in the transcript about Krona that was a lie.
13 I'm just stating what the police done and what
14 caused him to be incarcerated.
15 BY MR. GRILL:
16   Q.   Was it your -- well, did you believe
17 that Krona had said something that caused Arnold
18 Day to be incarcerated?
19   A.   She didn't get the opportunity to say
20 anything.  That's what caused Arnold to be
21 incarcerated.
22   Q.   So what was it that you were trying to
23 correct with Krona Taylor?
24   MS. DONNELL:  Objection; form and foundation.

176

1  You can answer if you can.
2    THE WITNESS:  I wasn't trying to correct
3  anything.  I was just trying to bring the truth to
4  the light, and the truth to the light was Krona.
5  BY MR. GRILL:
6    Q.   Okay.  Because Krona would be able to
7  say what?
8    MS. DONNELL:  Objection; form and foundation.
9  But you can answer.
10   THE WITNESS:  She was the witness to the
11 situation.
12 BY MR. GRILL:
13   Q.   Right.  So what would Krona -- what was
14 your understanding about what Krona could say that
15 would prove Arnold was innocent?
16   A.   What she seen.  And it wasn't Arnold.
17   Q.   Well, you've told me that what she saw,
18 to your understanding, was two people, and how tall
19 she estimated they were.  So is there anything else
20 other than that that you believe Krona could have
21 testified to that would show Arnold was innocent?
22   MS. DONNELL:  Objection; misstates her prior
23 testimony.  But you can answer.
24   THE WITNESS:  I'm not certain of if Krona

177

1  knew the name of the person.  I do know that Krona
2  knew the identity of the person and the description
3  of the person, and the description that Krona had
4  about the individual that committed the crime was
5  not the description of Arnold Day.
6  BY MR. GRILL:
7    Q.   So it was your understanding that Krona
8  Taylor knew the identity of one or both of the
9  people that she saw approaching Jerrod Irving.
10   A.   She knew the description, and they
11 stated that it was two guys, and they named
12 Tennelle as one of the guys and gave Tennelle a
13 different name, which Tennelle was already
14 incarcerated, and Tennelle is not a male; Tennelle
15 is a female.
16   Q.   And how do you know all of that?
17   A.   How do I know all of what?
18   Q.   What you just said.
19   A.   I know that from what was told to me by
20 Arnold Day.
21   Q.   And when did Arnold Day tell you all of
22 that?
23   A.   I don't have the year, date, or time.
24   Q.   Was it while he was in prison and you

Cassandra Taylor, 2/23/2023

---

178

1  were having these conversations between 2015 and
2  2018?
3      A.    Some part of it was in prison, some
4  part of it would have been when he was out of
5  prison.
6      Q.    Give me one second.
7            Where is Arnold working now?  Does
8  he have a job?
9      A.    Yes.
10     Q.    Where is it?
11     A.    It's in Mansfield, Texas.
12     Q.    What is it?  What is he doing?
13     A.    He works for -- it's -- they do
14  different things.  Welding.  It's a welding
15  company.
16     Q.    And how often -- what's his -- does he
17  work 40 hours a week?  Is this like a full-time job
18  or --
19     A.    Yes, he works 40 hours a week.
20     Q.    How long has he had this job for?
21     A.    He's been working here for over three
22  months now.
23     Q.    Was he working anywhere before that?
24     A.    Yes.

---

179

1      Q.    Where was he working, if you know?
2      A.    Goodwill.
3      Q.    How long was he there for?
4      A.    Over a year.
5      Q.    How about before then?
6      A.    Goodwill was the first job he landed
7  here in Texas.
8      Q.    When did he move in with you, roughly?
9      A.    In March of -- the year he got out, but
10  it was the month of March.  I believe March of
11  2018, March 1st.
12     Q.    How is Arnold getting along socially in
13  Texas?  Is he making friends, for example?
14     A.    Only people that he works with.
15     Q.    Do they ever come over to the house to
16  hang out?
17     A.    No, sir.
18     Q.    Does he ever go out with any work
19  people?
20     A.    No, sir.
21     Q.    Do you know why that's the case?
22     A.    I think he's just a little timid and
23  he -- anything that he does, he does with either me
24  or my children.

---

180

1      Q.    Do you and Arnold go out together on
2  any regular basis?
3      A.    Periodically.  Not too often.
4      Q.    Okay.  What does Arnold like to do,
5  from your point of view, to relax, outside of work?
6      A.    He likes to read.  He likes to watch
7  CNN.  And that's pretty much it.
8      Q.    How is he with your kids?
9      A.    Great.
10     Q.    Can you describe what makes him so
11  great with your kids?
12     A.    Arnold had a relationship with my
13  children when he was in the County Jail.  I am a
14  mom of four, a grandmother of two.  Arnold is just
15  the perfect person.  My kids defend him at all
16  times.  They think I'm a little rough with him.  I
17  don't think so.  But, you know, they always side
18  with him.  My mom as well.
19           Uncles, cousins, they all really
20  like Arnold.
21     Q.    Okay.  Do you think Arnold had any
22  trouble finding a job once he got down in Texas?
23     A.    No.  I wouldn't allow him to have a
24  problem with it.

---

181

1      Q.    Okay.  Do you think he likes going to
2  work and having a job and doing those things?
3      A.    Absolutely.
4      Q.    So do you have any understanding from
5  any of the calls that you had with Arnold while he
6  was in prison, in IDOC, whether he was helping his
7  attorneys that represent him now in any other
8  lawsuits that they were representing other people
9  in?
10     MS. DONNELL:  Objection; form and foundation,
11  calls for speculation.
12           You can answer if you can.
13     THE WITNESS:  I have no knowledge of it.
14  BY MR. GRILL:
15     Q.    You don't remember Arnold telling you
16  anything like that in any of these calls, where he
17  was helping any of his lawyers in lawsuits on
18  behalf of other people that they were representing?
19     MS. DONNELL:  Objection; form and foundation.
20  And to the extent you are referring to a specific
21  call but not letting the witness hear it, then I
22  will reiterate that same objection earlier on the
23  record.
24

---

Cassandra Taylor, 2/23/2023

182

1  BY MR. GRILL:
2      Q.  Go ahead.  You need to take a break,
3  ma'am?
4      A.  Me?
5      Q.  Yeah.  Are you all right to continue?
6      A.  Oh, yeah, absolutely.
7      Q.  So do you have any recollection of
8  Arnold telling you that he was helping his lawyers
9  win lawsuits that they were bringing on behalf of
10  other people that were in maybe a similar situation
11  as his?
12      MS. DONNELL:  Form and foundation.
13          You can answer if you can.  It's
14  been asked and answered.
15      THE WITNESS:  I don't have a recollection of
16  it at this time.
17      MR. GRILL:  Just give me a couple minutes.
18  I think I might be close to done.  Just give me a
19  couple minutes.  Let's come back in like five
20  minutes.
21      MS. DONNELL:  Sure.
22          (Recess taken.)
23      MR. GRILL:  I'm done.  So I don't know if
24  Maurice or Heather have any questions for you, but

183

1  I do appreciate your time today.  And thank you so
2  much.  Okay?
3      MR. HUNT:  I do not have any questions for
4  you.  Thank you.
5      MS. DONNELL:  Ms. Taylor, we are going to
6  reserve signature, which means you'll get an
7  opportunity to review the transcript.  So if it's
8  ordered, Donna, you can send it to me, and then
9  I'll facilitate it.
10      COURT REPORTER:  Heather, if it's ordered,
11  and you don't order a copy, then I guess I'll
12  provide a read-only.
13      MS. DONNELL:  That's fine.
14      MR. GRILL:  I'm going to -- I need a copy or
15  we'll order it, whatever we've got to do.
16      MR. HUNT:  I will take a copy as well.
17      COURT REPORTER:  Heather?
18      MS. DONNELL:  I don't need it, but you can
19  send me a read-only and we'll review it.
20          (The proceedings adjourned
21          at 2:59 p.m.)
22
23
24

184

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  ARNOLD DAY,            )
                          )
4      Plaintiff,  )
                          )
5      vs.        )  No. 19 CV 7286
                          )
6  KENNETH BOUDREAU, et al.,  )
                          )
7      Defendants.  )
8
9      This is to certify that I have read my
10  deposition taken on Thursday, February 23, 2023,
11  in the foregoing cause and that the foregoing
12  transcript accurately states the questions asked
13  and the answers given by me, with the changes or
14  corrections, if any, made on the Errata Sheet
15  attached hereto.
16
17      _____
           CASSANDRA TAYLOR
18
   No errata sheets submitted (Please initial)
19  Number of errata sheets submitted_____pages
20
   Subscribed and sworn to
21  before me this_____day
   of_____2023.
22
23      _____
        Notary Public
24

185

1      REPORTER'S CERTIFICATE
2      I, Donna M. Urlaub, do hereby certify that
   CASSANDRA TAYLOR was duly sworn by me to testify
3  the whole truth, that the foregoing deposition was
   recorded stenographically by me and was reduced to
4  computerized transcript under my direction, and
   that said deposition constitutes a true record of
5  the testimony given by said witness.
6      I further certify that the reading and
   signing of the deposition was not waived, and the
7  deposition was submitted to Heather Lewis Donnell,
   plaintiff's counsel, in read-only pdf format, for
8  review and signature.  Pursuant to Rule 30(e) of
   the Federal Rules of Civil Procedure, if deponent
9  does not appear or read and sign the deposition
   within 30 days, the deposition may be used as fully
10  as though signed, and this certificate will then
   evidence such failure to appear as the reason for
11  signature not being obtained.
12      I further certify that I am not a relative
   or employee or attorney or counsel of any of the
13  parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
14  indirectly in this action.
15      IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
16  Illinois, this 13th day of March 2023.
17
18
19      Illinois CSR No. 084-000993
20
21
22
23
24

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586