# Exhibit 15




```
1        IN THE UNITED STATES DISTRICT COURT FOR THE
2                NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION
4                   HON. SARA L. ELLIS
5                      DISTRICT JUDGE
6         MAGISTRATE JUDGE JEFFREY CUMMINGS
7                   CASE NO. 19-CV-7286
8
9
10
11                        ARNOLD DAY,
12                         Plaintiff
13
14                            V.
15                  KENNETH BOUDREAU, ET AL.,
16                         Defendants
17
18
19
20
21
22
23   DEPONENT:   DEFENDANT MARTIN RADTKE
24   DATE:       MARCH 28, 2022
25   REPORTER:   TAYLOR VENEMAN
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---




```
1                        APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ARNOLD DAY:
4    Heather Donnell, Esquire
5    Loevy & Loevy
6    311 North Aberdeen Street
7    Third Floor
8    Chicago, Illinois 60607
9    Telephone No.: (312) 243-5900
10   E-mail: heather@loevy.com
11   (Appeared via Videoconference)
12
13   AND
14
15   Steven Greenberg, Esquire
16   Greenberg Trial Lawyers
17   53 West Jackson Boulevard
18   Suite 1260
19   Chicago, Illinois 60604
20   Telephone No.: (312) 879-9500
21   E-mail: steve@greenbergcd.com
22   (Appeared via Videoconference)
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---



```
1                 APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, MARTIN RADTKE; INDIVIDUAL
4    POLICE OFFICER DEFENDANTS:
5    Andrew Grill, Esquire
6    Rock, Fusco & Connelly LLC
7    321 North Clark Street
8    Suite 2200
9    Chicago, Illinois 60654
10   Telephone No.: (312) 494-1000
11   E-mail: agrill@rfclaw.com
12   (Appeared via Videoconference)
13
14   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
15   George Yamin, Esquire
16   Sotos Law Firm
17   141 West Jackson Boulevard
18   Suite 1240A
19   Chicago, Illinois 60604
20   Telephone No.: (630) 735-3300
21   E-mail: gyamin@jsotoslaw.com
22   (Appeared via Videoconference)
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1                          INDEX
2                                                    Page
3    PROCEEDINGS                                       6
4    DIRECT EXAMINATION BY MS. DONNELL                 7
5    CROSS EXAMINATION BY MR. GRILL                   145
6    REDIRECT EXAMINATION BY MS. DONNELL              150
7
8                         EXHIBITS
9                                                    Page
10   1 - Case Report CITY DAY 66-67                   103
11   2 - Color Copy of Case Report CITY DAY 5-6       106
12   3 - Supplementary Report CITY DAY 62-65          125
13   4 - CITY DAY 1371-1391 (MARKED IN
14       CONFIDENTIAL PORTION)
15
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1              STIPULATION
2
3   The VIDEO deposition of DEFENDANT RADTKE was taken at
4   KENTUCKIANA COURT REPORTERS, LLC, 730 WEST MAIN STREET,
5   SUITE 101, LOUISVILLE, KENTUCKY 40202, via
6   videoconference in which all participants attended
7   remotely, on MONDAY the 28th day of MARCH, 2022 at 11:12
8   a.m. (ET); said deposition was taken pursuant to the
9   FEDERAL Rules of Civil Procedure.  THE OATH IN THIS
10  MATTER WAS SWORN REMOTELY PURSUANT TO FRCP 30.
11
12  It is agreed that TAYLOR VENEMAN, being a Notary Public
13  and Court Reporter may swear the witness and that the
14  reading and signing of the completed transcript by the
15  witness is not waived.
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1              PROCEEDINGS
2
3       COURT REPORTER:  We are on record.  My name is
4   Taylor Veneman.  I'm the online video technician and
5   court reporter today representing Kentuckiana Court
6   Reporters located at 730 West Main Street, Suite
7   101, Louisville, Kentucky 40202.  Today's the 28th
8   day of March, 2022.  The time is 11:12 a.m. Eastern
9   Standard.  We are convened by videoconference to take
10  the deposition of Defendant Radtke in the matter of
11  Arnold Day versus Kenneth Boudreau, et al., pending
12  in United States District Court for the Northern
13  District of Illinois.  Case number 19-CV-7286.  Will
14  everyone but the witness please state your
15  appearance, how you're attending, and the location
16  you're attending from starting with Plaintiff's
17  counsel?
18      MS. DONNELL:  Sure.  Heather Lewis Donnell.
19  I represent the plaintiff in this action.  And I am
20  here at Loevy and Loevy, which is at 311 North
21  Aberdeen in Chicago, Illinois with Mr. Grill and the
22  witness.
23      MR. GRILL:  Andrew Grill for the individual
24  police officer defendants, and I'm also representing
25  the deponent, Marty Radtke.  And we are here with
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1   Ms. Donnell at the Law Offices of Loevy and Loevy.
2   Go ahead, George.
3       MR. YAMIN:  And George Yamin.  I represent the
4   Defendant City of Chicago.  I'm appearing remotely
5   in Chicago.
6       COURT REPORTER:  Thank you.  Mr. Radtke, please
7   state your full name for the record and then hold
8   your ID up to the camera?
9       MS. DONNELL:  Oh, we'll stipulate that he is
10  the person that he is.
11      COURT REPORTER:  Okay.  Well, that works.
12  All right.  Thank you, sir.  All right.
13  And Mr. Radtke, will you please raise your right
14  hand?  Do you solemnly swear or affirm the testimony
15  you're about to give will be the truth, the whole
16  truth, and nothing but the truth?
17      THE WITNESS:  Yes, I do.
18      COURT REPORTER:  Thank you.  Counsel, you may
19  begin.
20           DIRECT EXAMINATION
21  BY MS. DONNELL:
22      Q   Good morning.
23      A   One thing I'll just caution you.  I have a
24  problem with the hearing.  I got -- just put in my
25  hearing aids, so I might have to ask you to repeat
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1   something over because I couldn't quite hear.  They're
2   good, but I'm having problems with accents, so --
3       Q   Okay.
4       A   Just that I might have to ask you
5   exceptionally more times to repeat something because
6   I'm having difficulty.
7       Q   Sounds good.  Can you please state and spell
8   your name for the record.
9       A   It's Officer Radtke, R-A-D-T-K-E.
10      Q   And what's your first name, sir?
11      A   Martin, M-A-R-T-I-N.
12      Q   Okay.  And you just informed me that you have
13  your hearing aids in and so you might need to ask me to
14  repeat my questions; is that right?
15      A   Correct.
16      Q   How are you hearing me right now?
17      A   Very good.
18      Q   Okay.  Just let me know if you don't hear my
19  question.
20      A   Just a little slow, but not necessarily loud.
21      Q   Understood.  It's easier if I go slower?
22      A   Well, not too slow.  What is the problem that
23  the loss of my hearing is that it's basically like the
24  female voice because it's a higher pitch and that's at
25  the point of where I'm losing the hearing.  I can hear
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
10

1 men's voices fine, but right now it's women's voices

2 that I have difficulty hearing because it's too much of

3 a higher pitch to my reception.

4 Q   Understood.  Okay.  I'll do my best and

5 then --

6 A   Thank you.

7 Q   -- if you don't hear me or if you need me to

8 repeat, I'm happy to do that, okay?

9 A   Thank you.

10 Q   Okay.  And also, we talked briefly before we

11 went on the record, but if at any point you would like a

12 break, not a problem, I'm happy to accommodate it. Just

13 answer the question that's pending, and then I can

14 accommodate a break whenever you'd like.  Does that

15 sound fair?

16 A   Thank you.

17 Q   Okay.  And have you been deposed before,

18 Mr. Radtke?

19 A   Been what?

20 Q   Have you had a deposition before?

21 A   Oh, yes.

22 Q   Okay.  When's the last time you were deposed?

23 A   I've been retired for ten years, so it's got

24 to be a couple of decades ago.  I -- I can't recall

25 exactly when.

---

1 Q   Okay.  The last time you were deposed, were

2 you a named defendant in an action?

3 A   Yes.

4 Q   Okay.  How often have you -- how many times

5 have you been named as a defendant in a lawsuit related

6 to your work as a police officer with the Chicago Police

7 Department?

8 A   What comes to mind is three.

9 Q   Okay.

10 A   It could be more, but three.

11 Q   Can you please describe for me the three cases

12 that you do recall being named as a defendant?

13 A   One was a -- a squad car accident.

14 Q   And in the squad car accident, did the squad

15 car hit a civilian car?

16 A   Yes.

17 Q   Okay.  And then there was a lawsuit related to

18 that car accident?

19 A   Yes, ma'am.

20 Q   Was anybody injured in the car accident?

21 A   The driver of the other car claimed that he

22 was injured.

23 Q   Do you recall being deposed in that action?

24 A   I --

25 Q   Did you recall having to sit for a deposition



---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
11

1 like you are today?

2 A   Yes.  Yes.

3 Q   Okay.  Do you remember the outcome of that

4 lawsuit?

5 A   I -- I believe the settlement was that he got

6 money for the car that was totaled, but the jury refused

7 to give him any money due to his claims of not being

8 able to find work and seek work because the jury didn't

9 believe that he was honest enough.  He wasn't working

10 before the accident, and he was trying to claim that

11 because of the accident he couldn't find any work.

12 So there was a partial reward to the -- the driver of

13 the other car.

14 Q   And it sounds like that case actually went to

15 a jury trial?

16 A   It did.

17 Q   Was that in state court or federal court if

18 you recall?

19 A   State.

20 Q   And did you testify in the trial as well?

21 A   No, I gave a deposition.

22 Q   But you didn't have to call -- you never had

23 to testify at the jury trial?

24 A   No.

25 Q   Were you the driver of the vehicle?  The squad

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
12

1 car?

2 A   The squad car, yes, ma'am.

3 Q   And just to be clear, you didn't have to

4 testify at the trial?

5 A   No, I gave a deposition.

6 Q   Okay.

7 A   Just like now.

8 Q   Do you remember the year or approximately --

9 A   No, ma'am.

10 Q   Okay.  Oh, I didn't tell you this, but even if

11 you know where I'm going, for the court reporter, it's

12 best if you just wait until I finished my entire

13 question before you answer.  That way the court reporter

14 doesn't have to -- we don't talk over one another.

15 And I'll do my best not to interrupt you in your answer.

16 Even if you know where I'm headed, okay?

17 A   Yes, ma'am.

18 Q   Sounds good.  Okay.  Other than the squad car

19 accident, what's the other two -- one of the other two

20 occasions you recall being deposed in a lawsuit in which

21 you were a defendant?

22 A   I was assigned -- it was an accident with a

23 drunken driver.  We located the -- the driver, and my

24 partner and I tried to place him under arrest.  It was

25 in February with snow on the ground.  He began



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

13

1 struggling with us. We're slipping and sliding and
2 falling. His claim was that, the way the Corporation
3 Counsel explained it, there was a -- a boiler maker
4 claim that we severely beat him about the top of the
5 head, the back of the head, the ears, the eyes, the
6 nose, the mouth, the jaw bone, the neck. And he
7 completely went down a list of parts of the body that
8 he was -- that he got completely bruised.
9     Q   And you sat for a deposition in that case?
10    A   Yes, ma'am.
11    Q   And was that in state or federal court if you
12 recall?
13    A   I don't believe it went that far.
14    Q   Oh, but it was filed -- there was a complaint
15 filed before you gave a deposition?
16    A   I --
17    Q   What do you recall about the case?
18    A   I remember making a deposition at the
19 Corporation Counsel on Salle Street.
20    Q   Okay. And do you remember anything else about
21 the case, how it was -- do you remember how the case was
22 resolved?
23    A   The Corporation Counsel mentioned to me that
24 this is a nuisance case. That they're going to offer
25 him a settlement fee. He didn't say any figures. That's

14

1 what he said he was going to do and just to get rid of
2 it. That it's a nuisance case.
3     Q   Do you remember the year or approximate year
4 for that case?
5     A   No, ma'am.
6     Q   Okay. Do you remember the name of the
7 individual?
8     A   No, ma'am.
9     Q   Do you remember your partner that you were
10 with that night?
11    A   What?
12    Q   Do you remember your partner you were assigned
13 with that night?
14    A   No.
15    Q   Okay. How about the third case that you
16 remember giving us a deposition in?
17    A   I'm having a hard time drawing that up right
18 now. Right this -- I'm having a hard time recalling,
19 but I do remember there three times.
20    Q   Okay.
21    A   At least.
22    Q   I'm going to shift gears and ask you another
23 area of questions, but if over the course of your
24 deposition your memory is refreshed and you would like
25 to supplement your answer, because sometimes memory

15

1 works that way, you might be reminded of what that case
2 was, you can just let me know.
3     A   Thank you.
4     Q   All right. I'm going to move on now and talk
5 about your history with the Chicago Police Department,
6 okay? You became a sworn officer July 18, 1977; is that
7 right?
8     A   Yes, ma'am.
9     Q   And prior to becoming a Chicago police officer
10 with the Chicago Police Department, you had worked with
11 another agency in Minnesota; is that right?
12    A   No.
13    Q   You worked with them after you became an
14 officer?
15    A   I was a Chicago officer with a leave of
16 absence, and I went to Minnesota as a police officer.
17    Q   Okay. And so I -- maybe I misunderstood. You
18 weren't initially with that department before you became
19 a Chicago police officer, you just took a leave to go
20 there?
21    A   I took a leave from Chicago.
22    Q   I see. Okay. So when you became a sworn
23 police officer in July, 1977 with the Chicago Police
24 Department, was that the first law enforcement agency
25 you had been employed with?

16

1     A   Yes, ma'am.
2     Q   And did you serve in the military prior to
3 becoming a Chicago police officer?
4     A   No, ma'am.
5     Q   Okay. Did you ever have any military service?
6     A   No, ma'am.
7     Q   Okay. How old were you when you became a
8 sworn police officer?
9     A   I believe I was 28.
10    Q   Okay.
11    A   It was -- my birthday was after my starting
12 date.
13    Q   Your birthday's in November?
14    A   October.
15    Q   October. Okay. And you served with the
16 Chicago Police Department until November 16, 2020;
17 is that correct?
18    A   Not continually. There was the break in
19 between.
20    Q   Yes. Sorry. With that clarification, you
21 retired from the Chicago Police Department in November
22 of 2020; is that right?
23    A   Yes, ma'am.
24    Q   Okay. And other than the one year you took a
25 leave of absence to go spend a year in Two Harbors,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Minnesota with their police department, did you have any
2  other leave of absences?
3      A    No, ma'am.
4      Q    And your leave of absences to Two Harbors,
5  Minnesota, was that to be -- why did you do that?
6      A    When did I do that?
7      Q    Or why did you do that?
8      A    I was thinking that I would like to work in a
9  smaller town.
10     Q    You wanted to try a smaller police department?
11     A    Yes, ma'am.
12     Q    Ad your family had connections with Two
13 Harbors, Minnesota?
14     A    No, ma'am.
15     Q    You just selected that area?
16     A    Yes, ma'am.
17     Q    Was there a reason you selected Two Harbors,
18 Minnesota?
19     A    Pardon?
20     Q    Was there a reason you selected that area in
21 Minnesota?
22     A    They were in in need of hiring.
23     Q    Why did you decide to come back to Chicago
24 Police Department?
25     A    At the time that I went to Minnesota, there



1  was a problem with financial with all the little towns.
2  The State of Minnesota was giving money to each of the
3  little towns and every month they would receive an
4  allotment.  Right in the time that I was there, the
5  state said we can't continue to give you any more money.
6  They were cutting off those funds to the little towns.
7  So while I was there, the chief of police informed me
8  that I was going to have to be fired because they were
9  not going to be able to afford to keep me any longer.
10 So it came down to being the last hire, first fired.
11 And they were going to drop a person from every one of
12 the little town departments, fire, water department,
13 city office, and a few other agencies.  They were all
14 going to have to drop one employee.  Chief met me and
15 said that it would be a good idea to contact Chicago and
16 get back to it.
17     Q    How long did you end up serving as a police
18 officer in Two Harbors?
19     A    Not for very long because they weren't going
20 to be able to afford to pay my salary.  So it was
21 approximately three, four months, that's all.
22 As I mentioned, while I was there, that's when the state
23 held back the money, the funds.
24     Q    Got it.  And the request -- as I understand
25 it, you put in the request to take the leave to



1  Superintendent Brezezk in October, 1981; is that right?
2      A    I can't recall who was the superintendent
3  then.
4      Q    Okay.  But you remember that you left in 1981;
5  is that right?
6      A    I believe I returned in '81.
7      Q    Well, you were only there for like four months
8  though, right?
9      A    Pardon?
10     Q    Were you only there for a couple months?
11     A    Yes, ma'am.
12     Q    And you came back in October 1981?
13     A    No, I officially started in October,
14 and I ended in the end of, approximately the end of
15 January.
16     Q    So your leave was effective October 1981?
17     A    Yes, ma'am.
18     Q    And then you came back in January '82?
19     A    Yes, ma'am.
20     Q    Okay.  And when you -- okay.  How about from
21 1977 until you left for Two Harbors in 1981, where were
22 your assignments?
23     A    I was just a -- a patrol officer.
24     Q    So after you completed your field training,
25 where were you assigned as a patrol officer?

1      A    Yes, ma'am.  I had approximately three years
2  on the job with Chicago.
3      Q    And what districts were you assigned to?
4      A    The 9th District.
5      Q    Okay.  And were you regular patrol for that
6  whole time?
7      A    Yes, ma'am.
8      Q    Okay.  When you retired, were you still a
9  patrol officer?
10     A    Retired from Chicago in --
11     Q    In 2020?
12     A    -- '19 -- I mean, 2010.  Yes.
13     Q    Oh, sorry.  2010.  You retired in 2010.
14     A    I retired from Chicago.
15     Q    I misspoke earlier.  You retired in 2010,
16 correct?
17     A    Yes, ma'am.
18     Q    Okay.  I'm sorry, I misspoke earlier and said
19 2020.
20     A    November -- November of 2010.
21     Q    Yes, I'm sorry.  We can correct the record.
22 I misspoke earlier and said 2020 I think twice.
23 But you retired in November of 2010, correct?
24     A    Yes, ma'am.
25     Q    Okay.  Have you had any -- oh, and just to be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    clear, when you retired in November 2010, that was at

2    the rank of patrol officer, correct?

3        A    Yes, ma'am.

4        Q    Okay.  Did you ever take any tests for

5    promotions to sergeant?  Did you ever take the

6    sergeant's test?

7        A    No, ma'am.

8        Q    And did you ever try to become a detective?

9        A    No, ma'am.

10       Q    Is there any reason why you never sought those

11   promotions?

12       A    I'm a bad test taker.

13       Q    So you never even tried to take the test?

14       A    No.

15       Q    Okay.  When you were reinstated in January of

16   1982 --

17            MR. GRILL:  Objection to the foundation, but go

18       ahead.

19       Q    Well, when you came back to the Chicago Police

20   Department, where were you assigned?

21       A    I was assigned to the 6th District.

22       Q    And was that as a patrol officer?

23       A    Yes, ma'am.

24       Q    Okay.  In July of 1982, do you recall being

25   appointed as a patrol specialist?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1        A    Yes, ma'am.

2        Q    And what was a patrol specialist in July 1982?

3    What was it -- your role?

4        A    It was a -- what they call it now is an FTO

5    field training officer.  Patrol specialist was that I

6    was to work with the new recruits coming fresh out of

7    the academy.  It was the same job, just a different

8    title.

9        Q    Got it.  And you had that job on and off

10   throughout your career?

11       A    Yes, ma'am.

12       Q    Okay.  Was it usually your decision whether to

13   be the field training officer or not the field training

14   officer?  You'd put in -- you'd elect to be whether you

15   wanted to be a field training officer?

16       A    Yes, ma'am.

17       Q    Okay.  And what caused you to change, like to

18   decide not to be a patrol specialist?

19            MR. GRILL:  Object to form.

20       A    When I was not allowed to carry the -- the

21   FTO statue going, it was into the gang crimes unit where

22   I was transferring to.

23       Q    I see.

24       A    There was no need for an FTO there.  They were

25   all seasoned officers.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1        Q    Okay.  When did you become part of the gang

2    crime unit?

3        A    I don't remember exactly, but it was during

4    the summer of '83.

5        Q    And that -- that was with the 9th District?

6        A    No, I was leaving the 6th District

7    transferring into Gang Crime South.

8        Q    Gang Crime South.  Okay.  And can -- and that

9    was in 1983?

10       A    Yes, ma'am.

11       Q    How long did you serve with Gang Crime South?

12       A    Approximately two years.

13       Q    Until 1985?

14       A    Yes, ma'am.

15       Q    And then where did you go?

16       A    Pardon?

17       Q    Where was your next assignment?

18       A    I transferred from the Gang Crimes to the 9th

19   District.

20       Q    In what position?

21       A    As an FTO again.

22       Q    How long did you serve as an FTO at the 9th

23   District?

24       A    All the way through until I transferred to the

25   4th District.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1        Q    And when did you transfer to the 4th District?

2        A    I'm trying to recall right now.  I can't

3    remember.

4        Q    Was it June of 1996 you went from the 9th

5    District --

6        A    '96 would be, yes.

7        Q    Okay.

8        A    Spring or summer of '96.

9        Q    Okay.  And at that time when you went to the

10   4th District, you were no longer a police specialist,

11   correct?

12       A    No, I had to relinquish that making a -- the

13   lateral transfer.

14       Q    So you were a lateral transfer as a patrol

15   officer from the 9th District to the 4th District?

16       A    Correct.

17       Q    Okay.  And that was in the June of 1996?

18       A    I'm not sure of a month, but it was '96.

19       Q    And then is it accurate to say that in 1991

20   you were an a field training officer assigned to the

21   9th District?

22       A    Of the year of '91?

23       Q    Yes.  The year of '91.

24       A    Yes, it was.  Yes.

25       Q    Yep.  Okay.  I want to go back to your Gang

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**25**



```
 1   Crime South assignment.  What was the territorial
 2   boundaries for the Gang Crime South when you were
 3   assigned there between roughly 1983 and 1985?
 4      A    There were three areas, Gangs North, Gangs
 5   South, and Gangs West.  And we basically patrolled
 6   the -- the districts in the center part of the city, and
 7   down to the southern border of the border.
 8      Q    So you went from The Loop south?
 9      A    We would -- for the most Carmak, I
10   would -- believe was the north boundary and then we
11   went down to the southern border of the city.
12      Q    And how far west did she go?
13      A    Not very far.  I believe it was somewhere like
14   around Ashland, because then Gangs West would pick up
15   that territory.
16      Q    Okay.  Did you ever serve in Gang Crimes North
17   or West, or just South?
18      A    Just the south.
19      Q    Okay.  Did Gang Crime South encompass the 9th
20   District?
21      A    Yes, ma'am.
22      Q    Why did you -- oh, let me ask you this.
23   Did you request to transfer from Gang Crimes South to
24   the 9th District in 1985?
25      A    Yes, ma'am, I requested.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

**26**



```
 1      Q    Why did you request to leave Gang Crime South
 2   for the 9th District?
 3      A    The police department was revamping their
 4   recruit training program.  They were going to designate,
 5   I believe it was going to be, six districts where
 6   they're going to have the FTOs and the recruits working
 7   in.  There were not going to be in every district.  There
 8   were designated districts and the 9th District was one
 9   of those districts where they were going to send
10   recruits and they needed FTOs.
11      Q    Were you asked?
12      A    No, I wanted to become an FTO again.
13      Q    Why did you want to become an FTO again?
14      A    I'd liked being an FTO.
15      Q    Okay.  Why'd you like it?  Okay.  Got it.
16   All right.  You can continue.  An attorney for
17   Mr. Day --
18           MR. GRILL:  Do you want to -- do you want to
19      repeat, so I know --
20           MS. DONNELL:  Yes, I'll repeat the question.
21           MR. GRILL:  Maybe just put it on the record.
22           MS. DONNELL:  Oh, yeah.  I'll put it on the
23      record that attorney Steve Greenberg joined the
24      deposition.  I'm sorry, I forgot the question now.
25      Taylor, could you read back the question?  I'm
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

**27**

```
 1   sorry, I forgot it.
 2           MR. GREENBERG:  Sorry, Heather.
 3           MS. DONNELL:  No problem.
 4           COURT REPORTER:  Give me one second.  Let me
 5      pull it up.  Oh, yeah.  Hold on.  Okay.
 6           (REPORTER PLAYS BACK REQUESTED QUESTION)
 7           COURT REPORTER:  Oh, sorry.  That was the one
 8      before that where you asked -- okay.  Right here.
 9   BY MS. DONNELL:
10      Q    Oh, now I think I remember.  Mr. Radtke --
11      A    Officer Radtke.
12      Q    Officer -- all right.  Officer Radtke, that's
13   fine.  Officer Radtke, why did you want to become a
14   field training officer and leave Gang Crime South in
15   1985?
16      A    I enjoyed being an FCO.  I liked working with
17   the brand-new recruits, getting them acclimated to the
18   streets.  I didn't care for working with some of the
19   officers there in a district -- any district at all.  And
20   I thought if I'm going to have to be a partner, I would
21   like to work with somebody who's brand-new.  I'll be
22   able to train them well, train them the way I was close
23   to by the general orders, and I can count on them not
24   getting -- picking up bad habits from some of the other
25   officers.  Basically, I'd be able to mold a recruit to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

**28**

```
 1   my own learnings and teachings.  I wouldn't be able to
 2   see any bad habits developing in them.  So it was my
 3   safety, and I'm -- along the way, I'm trying to teach
 4   somebody to become a good officer themselves.  I had
 5   aspirations of being a teacher and I felt that this was
 6   way of continuing my -- my teaching.  And a squad car
 7   was a one classroom, and the teacher-student ratio was
 8   one-on-one.  I enjoyed teaching.  At one time it was my
 9   aspiration to be a teacher, so this is why I saw the
10   opportunity to go back to teaching.  But it would be a
11   different form of teaching.  That's why I became an FTO
12   again.
13      Q    Okay.  And was there -- it sounds like there
14   were -- well, strike that.  Were there observations you
15   made of your fellow officers in the Gang Crime South
16   that you didn't want to be around anymore?
17   Is that -- it sounded like you wanted to be around young
18   recruits so you could mold and shape them to your
19   liking because you were seeing bad habits or things you
20   didn't like in the officers you were with, and I was
21   wondering was that specific to Gang Crime South?
22      A    No.  No, ma'am.
23           MR. GRILL:  Objection to the form of the
24      question.  Go ahead, Marty.
25      Q    Go ahead.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

1    MR. GRILL:  Well, I guess he's already answered
2    it, but give it a second time.
3    Q    Well, you mentioned bad habits and wanting to
4    be with young recruits that you could mold and shape
5    into your form of how you thought an officer should be,
6    right?
7    A    Correct.
8    Q    So what were some of the bad habits of the
9    other officers that you didn't like to be around?
10   A    Quite frankly, I got bored in the gangs units.
11   What I did yesterday, I'm going to do today, I'm going
12   to do tomorrow unless something really erupted in the
13   city.  I got tired of the boredom.  I go for meals,
14   dinners, and you're there for over an hour.  We were on
15   radio call all through the day, but we would sit there
16   for hours, and I don't like sitting there that long.
17   When I was in the gangs unit, I started putting on
18   weight.  I was up to 205.  I don't like feeling that
19   heavy and uncomfortable.  I liked working in a beat car
20   back in a district.  I was active and I started losing
21   weight.  And I felt good, and I felt proud about working
22   with recruits again.
23   Q    Where was the Gang Crime South stationed out
24   of when you were there in '83?
25   A    51st and Wentworth.  They had the 2nd -- no,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1    they were behind the desk of the 2nd District.
2    That was basically where the quarters.
3    Q    And Area 1 was above you?  Area 1 -- detective
4    area was part of that?
5    A    You know, when you say Area 1, that used to be
6    at 39th and California.  I can't recall if they made the
7    move then, because I think the detectives are there now.
8    Q    Were they there starting in '93, do you
9    remember?
10   A    I -- but to me, area -- area 2, detective
11   division, was at 39th and California at one time.
12   I think they moved it then, but I -- I don't know when.
13   Q    Okay.  How long did you serve as a field
14   training officer at the 9th District?
15   A    Until I left -- transferred to the 4th
16   District.
17   Q    Oh, sorry.  In 1996.  I'm sorry.  How long were
18   you at the 4th District?
19   A    At the 9th District?
20   Q    Yep.
21   A    What comes to mind is 12 years.
22   Q    And then did you transfer to the 18th?
23   A    Yes, ma'am.
24   Q    And did you retire from the 18th?
25   A    Yes, I did.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1    Q    Okay.  How long were you at the 18th before
2    you retired?
3    A    Pardon?
4    Q    How long were you at the 18th District before
5    you retired?
6    A    I think approximately two and a half years.
7    Q    And did you serve as a field training officer
8    at the 4th District?
9    A    Yes.  Once again I picked up the -- the rank
10   of FTO.
11   Q    Were you a field training officer for those
12   12 years?
13   A    Yes, ma'am.
14   Q    Okay.  How about when you went to the 18th
15   District?  Were you a patrol or --
16   A    No.  Occasionally they knew that I was a
17   former FTO, they would put an inexperienced officer to
18   work with me for a day or two or a week.
19   Q    Okay.  And was your star number -- well,
20   what was your star number?
21   A    11157.
22   Q    And that was for your entire career, correct?
23   A    Yes, ma'am.
24   Q    Okay.  Do you recall the gangs that you
25   investigated or -- well, strike that.  When you were a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1    gangs crime specialist with Gang Crime South, did you
2    conduct investigations of specific gangs?
3    A    For your information, because you understand
4    there were two groupings in the Gang South.  One was
5    gang specialists, the other was gang enforcement.  The
6    gang specialist did the work exactly like a detective.
7    The gang enforcement, if they had an emergency or
8    something was happening in a city where they needed
9    officers quickly, a fast response, we were assigned to
10   go to the District of Emergency.  That's why we were
11   always on radio status and was on that.  But when we
12   didn't have special assignments or units, we would do
13   regular patrol.  Again, it was like being a patrol
14   officer and they gave us specific areas to -- to patrol.
15   Q    But when -- what side were you on?  You were
16   the gang specialist or the gang enforcement?
17   A    No, ma'am, I was -- I was a gang enforcement.
18   When the gang specialist would have a warrant, they
19   needed uniform officers, they drew on us as uniform
20   officers to go and assist them.
21   Q    I see.  So you -- those two years you served
22   in Gang Crime South, you were still uniformed?
23   A    Yes, ma'am.
24   Q    I see.  And so you assisted the gang crime
25   specialists in executing search warrants that they had?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
33

1   A    Occasionally.
2   Q    And then you would be called out to be a rapid
3   response to a particular district that needed support?
4   A    Yes, ma'am.
5   Q    And then you would also work patrol in the
6   uniform if you were given an assignment?
7   A    Routine to patrol of a hot area, yes, ma'am.
8   Q    Okay.  And did you have a regular partner that
9   you worked with as a gang enforcement officer in Gang
10  Crime South?
11  A    Yes, ma'am.
12  Q    Who was that?
13  A    It was Louis Gaal, G-A-A-L.
14  Q    G-A-A-L?
15  A    Yes, ma'am.  Double A.
16  Q    Got it.  Okay.  Was there a particular
17  district or area within the district that you and
18  Officer Gaal were regularly assigned to patrol?
19  A    They would -- I was part of a team.  Depending
20  on what some of the assignments were, the team would go
21  from the -- generally from the 2nd District or go to the
22  7th District and just patrol the area.  I can't remember
23  if there was other -- other -- there -- there were a few
24  other teams, but we would be basically -- there was
25  nothing hot happening in the city, we'd go to the Deuce



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
34

1   or we'd go to Englewood primarily.
2   Q    What was the first neighborhood you said?
3   A    Pardon?
4   Q    What was the first area you said?
5   A    The 2nd District.
6   Q    Oh, you go to the Deuce?  You said -- you mean
7   the 2nd District or Englewood?
8   A    Correct.
9   Q    Okay.  Got it.
10  A    I called it Deuce, the 2nd District.
11  Q    Thank you.  I just didn't hear what you said.
12  A    Old habit came back there.
13  Q    That's fine.  I just didn't -- I wanted to
14  make sure I heard you correct.  Okay.  Great.  And in
15  that time frame, roughly 1983 to 1985, what gangs were -
16  - well, let me ask you this.  Did you know what gangs
17  were present in the city that you were in patrolling in
18  Gangs Crime South between 1983 and 1985?
19      MR. GRILL:  Objection to the form.  Go ahead.
20  A    I was trying to educate myself who was around
21  what areas.  I found it a little bit difficult to keep
22  track of it.  I -- I didn't have a real good knowledge
23  of where the areas were, even though we did patrol the
24  South end of the 9th District from time, it used to be
25  at the south end of 9, going into the north end of 7.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
35

1   But I -- I tried to -- tried to stay abreast of some of
2   the things that were going on, but I couldn't say that
3   I was that knowledgeable.
4   Q    As you sit here today, do you remember any of
5   the gangs that were prevalent in the Gang Crime South
6   area when you were there between '83 and '85?
7       MR. GRILL:  Asked and answered.
8   Q    You can answer.
9   A    I wasn't getting familiar with the 7th
10  District gangs, but on the north end, from my previous
11  experience of being in 9, there was the -- the
12  Blackstone Rangers, and then there was a little
13  subsection of them called the Mickey Cobras.
14  Q    Back in 1983 and 1985, did you have any
15  knowledge of who the leader of -- or leaders of the
16  Blackstone Rangers were?
17      MR. GRILL:  Objection.  Foundation.
18  A    I as, again, I said, I wasn't getting that
19  knowledgeable.  I wasn't being in depth knowledgeable
20  about it.  Partly it's because I was not getting any
21  specialist.  They were the ones that go through and
22  canvas and find out who the leaders are, who the
23  generals are, who the foot soldiers are, and -- and it
24  didn't quite filter all the way down to me.  When I
25  would learn something that would -- it would be -- I'd

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
36

1   have to put it on the side because something else was
2   popping up.  We would get an assignment to go somewhere
3   else in another part of the town.  I wasn't getting that
4   familiar with it as it came along.
5   Q    Is it accurate to say that you really didn't
6   have knowledge a --
7   A    A real solid good working knowledge, I got to
8   say no, just vaguely.
9   Q    Okay.
10  A    I knew that some of the neighborhoods that
11  were -- they were mean, they were vicious, and I tried
12  to go through them and learn some of these things with
13  a -- where they were pitching dope, I tried to find out
14  a few of those places and all that, but I wasn't --
15  again, that -- that -- that's -- that was something that
16  I wasn't really interested in doing.  That's why it was
17  one of the reasons that I decided to leave.
18  Q    Okay.  And again, just a reminder, I know
19  sometimes you know exactly where I'm going with my
20  question, but like, make sure I get my whole question
21  out before you answer.  So just to make the record
22  clear, is it accurate to say that when you were assigned
23  to Gang Crime South that you didn't have a very detailed
24  understanding of the gangs at that time; is that right?
25  A    I had some knowledge, but it wasn't a -- a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  really good working knowledge.

2     Q    And you weren't one of the gang crime

3  specialists that was assigned where it was your job to

4  investigate and understand the gangs, right?

5        MR. GRILL:  Objection.  Asked and answered.

6     A    Correct.  The specialist would conduct

7  investigations of certain crimes that happened, and we

8  were just like a fill in, an extra unit, to help assist

9  them whenever they called for help in through the City.

10    Q    Okay.  When you were in the -- went to the

11 9th District, you were a field training officer; is that

12 right?

13    A    Once I left the gangs unit, I was reinstated

14 as an FTO in the 9th District.

15    Q    Okay.  And I'm going to focus now on that 1991

16 time period, okay?

17    A    All right.

18    Q    In 1991, when you were working as a field

19 training officer in the 9th District, what shift were

20 you working?

21    A    I recently got married and in order to have

22 some stability in the family, I requested to work a

23 straight third watch.

24    Q    What was the hours of the third watch back in

25 1991?



1     A    It would be either a 3:00 start or a 4:00

2  start, but it would be evenings.

3     Q    Okay.  Do you remember how long you were

4  assigned to work a straight third watch with the 9th

5  District?  What years?

6     A    Pretty much the -- the remainder of the

7  career.  They started up a program, I forgot -- one of

8  the superintendents wanted to have something, or one of

9  the deputies, somebody came up with the idea of having

10 a -- another third watch, I should say a -- not a third

11 watch, but having a third starting period with cars that

12 were available to cover the -- the early cars and the

13 late cars going in after tour of their duty, there would

14 be stripped so many cars in there.  So we would -- he

15 came up with the idea is to have a group of officers

16 start at 6:00 to cover that overlap.  So they created

17 that 6:00 car.  So we started at 1800 and went to 0230

18 in the morning.  And that I -- I stayed on until the

19 remainder of my time at the 9th District.

20    Q    Is that the shift you were working in 1991?

21    A    Yes, ma'am.

22    Q    Okay.  So you would start at 1800 and go until

23 2:30 in the morning?

24    A    Yes, ma'am.

25    Q    Did you have a particular -- in 1991, do you



1  remember having a particular beat you were

2  assigned -- regularly assigned?

3     A    No, whatever was available, sometimes I would

4  get bounced up to an earlier start because of the lack

5  of manpower.  There was nothing set in stone.  It was

6  basically shifting manpower when needed.

7     Q    How about areas within the 9th District?

8  Would you work the whole district, or would you have a

9  particular area that you were regularly assigned?

10       MR. GRILL:  Objection.  Form.  Go ahead.

11    A    I would basically work the -- the south --

12 southeast side of the district.

13    Q    And what was the southeast side of the

14 district back in the early 90s?

15    A    It would start from like 39th Street over to

16 Damen and it goes south, Damen all the way to Garfield.

17 Garfield over to Dan Ryan and Dan Ryan back up to

18 39th Street way.

19    Q    Did you have any knowledge -- well,

20 in that -- in the year, in 1991, in the 9th District,

21 did you have knowledge of any -- if there was any gang

22 activity in that southeast side of the 9th District?

23    A    I was very much aware of it, yes.

24    Q    Okay.  Did you have any knowledge of what

25 gangs or gang were operating in that area?

1     A    Pretty much it was the Mickey Cobra.

2     Q    And back in 1990, 1991, did you have knowledge

3  of the -- any of the leaders or officers of the Mickey

4  Cobras?

5     A    Not really.  Not really, that --

6     Q    Were you -- strike that.  As a patrol officer

7  in 1990 -- I'm sorry, strike that.  As a field training

8  officer in 1990, did you -- and 1991, did you respond to

9  radio dispatch calls?  Is that primarily how you got the

10 assignments?

11    A    Oh, yes, ma'am.

12    Q    Okay.  So you and your trainee would ride

13 around in the squad car and respond to dispatch?

14    A    Well, as part -- yes, ma'am.

15    Q    Okay.  But -- strike that.  Did you have any

16 regular partners or did you -- other than your field

17 training officers?

18       MR. GRILL:  Objection.  Form.

19    A    Yeah, thank you.  That's a fair objection.

20 Let me restate that.  Back in 1991, did you have any

21 regular partners or were you always with a cadet

22 or a --

23    A    No regular partners unless I had the recruit

24 and at that time, the training program required a

25 recruit to have an FTO or be with an FTO for three

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Panel 1 (page 41)**

```
 1   months.  That didn't always hold true either.  FTOs got
 2   sick, they went on vacation, so their recruit would
 3   bounce, so either with an available FTO or they would
 4   sign the poor kid to whoever was else available.
 5        Q    Okay.  I'm going to switch gears.  Would you
 6   like to take a short break before we switch gears?
 7        A    That'd be fine.
 8             MS. DONNELL:  Okay.  We're going to go off the
 9   record.
10             COURT REPORTER:  Okay.  We're going off the
11   record at 11:56 p.m. Eastern Standard.
12             (OFF THE RECORD.)
13             COURT REPORTER:  We are back on the record for
14   the deposition of Martin Radtke, conducted by
15   videoconference.  My name is Taylor Veneman.  Today
16   is March 28, 2022.  The time is 12:05 Eastern
17   Standard Time.  Ms. Donnell, you're good to go.
18   BY MS. DONNELL:
19        Q    Thank you.  Okay.  Officer Radtke, how many
20   homicide scenes did you respond to as a patrol officer
21   when you were in the 9th District, other than this one
22   in -- on May 17, 1991?
23        A    It'd be difficult to say.  I'm not going to
24   say there -- there were hundreds and all that.  I -- I
25   really can't say, but I'll tell you this though, when I
```



**Panel 2 (page 42)**

```
 1   was still a rookie, I made my very first homicide
 2   arrest.  I was chasing the guy down the gangway, and he
 3   still had the gun and I was able to apprehend him before
 4   he got out of that backyard.  And we were -- I searched
 5   him up to the front where my partner was, and my partner
 6   was first then just getting out of the squad roll.  I
 7   remember a lot of those things because that was my
 8   first, remember it like it was last month.  Some things
 9   you just remember everything.  And usually as a rookie,
10   the first of everything you remember really good.  But a
11   couple of things I remember is that the partner was
12   first starting to get out of the cab of the truck and
13   I'm walking the prisoner back already.
14        Q    Okay.  And that time -- was that when you were
15   a probationary officer?
16        A    Yes, ma'am.  But I -- I was, as I mentioned
17   before, the recruits would be ideally with a FTO for
18   three months and then after that the recruit would still
19   have recruit status, but they would be able to work with
20   other different officers, and that's where I was at that
21   point.  I maybe had like about ten months on the job,
22   though.
23        Q    So that particular homicide arrest is
24   memorable to you because it was one of your first --
25        A    Yes --
```



**Panel 3 (page 43)**

```
 1        Q    But -- let me ask a question.  So yeah -- so
 2   then my prior question was, and maybe that -- you can't
 3   answer it, but are you able to tell me how many homicide
 4   scenes you were called to?
 5        A    It -- it'd be hard to estimate that.  It'd be
 6   hard to estimate it because I also, for the sake of the
 7   learning opportunity for the recruits, if somebody else
 8   had a call, especially a homicide, aggravated battery, I
 9   would make -- and if I was available, I'd make an effort
10   to get over there, so the recruit would get the
11   experience the exposure to what's going on, see what's
12   going on.  Secondly, I just enjoyed helping the other
13   officers, so I'd go over there and assist them, and it
14   gave the opportunity to the recruit to see what's going
15   on, how it's going on.  So if you say I've got a number,
16   if I had, I -- I -- I don't know because I also went as
17   an assist unit for training experiences for the
18   recruits.  So there were -- there were -- I -- when
19   available I -- and I tried to get over to it, so I don't
20   know what the number is, but there have been several.
21   The first day I went into the 4th District, I handled a
22   homicide first day, made the arrest.  I helped -- I
23   had to help out the sergeant, turn out that she was just
24   newly promoted and didn't knew -- know what her sergeant
25   duties were.  I had to help her what she had to do.  I'm
```

**Panel 4 (page 44)**

```
 1   not a know-it-all, but she had to ask me a few times
 2   what to do, how to do it, what am I doing, what's going
 3   on.
 4        Q    Let me ask you this:  if you were the first
 5   officer to respond to a homicide, what were your roles
 6   and responsibilities as the patrol officer who is first
 7   on scene?
 8        A    To see if it was -- see if I wasn't too late
 9   to try and get some medical help for the -- for the
10   victim.  Next, try and make an opportunity to see what's
11   the possibility of apprehending the offender.  If not,
12   then try and get a good description of the offender and
13   then find out what was going on, what happened, what led
14   up to the shooting.
15        Q    The steps you've just described, are those the
16   steps you trained your field training recruits to
17   conduct?
18        A    That's what I passed along to them when I was
19   trained in the academy.  Those would be the priority
20   orders.
21        Q    Okay.  Oh.  So what you just described for me
22   that you first see if you can give medical help to the
23   victim, then you --
24        A    If needed be, if needed.
25        Q    If needed.  Then second was find -- see if
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

**Page 45**



```
1    there's an opportunity to apprehend the offender, if not
2    attempt to get a good description of the offender or
3    offenders and then try and ascertain what led up to the
4    shooting or stabbing or homicide.  Are those steps that
5    you -- the steps you testified to ones that you were
6    trained on at the academy?
7        A    Pretty much so, yes.
8        Q    Okay.  And remind me, how long was the academy
9    when you attended back in '77?
10       A    That is a little tricky.  There was a basic
11   time of actual classroom learning in the academy.  And
12   when I went through in '77, they had a -- a -- a -- an
13   approach to it.  They -- what they called it two weeks
14   out, two weeks in.  So I would do the classroom academic
15   work, then for two weeks I'd be out in a district
16   working with an FTO or so, whatever was came that way,
17   and then the next two weeks I'd be back into the
18   academy.  And I think that went on for approximately,
19   I'd say two -- I forgot how many weeks what it was, but
20   it was called two weeks out, two weeks in, the rotation
21   of like that --
22       Q    Right --
23       A    So I forgot -- I forgot how much I had to go.
24   And so when you say how much I was out, I was also in.
25       Q    Thank you for clarifying because I think that
```

**Page 46**



```
1    after you were there, they changed the academy to be all
2    instruction and then go out on --
3        A    Yes, fortunately for the recruits, I'm aware
4    of that because once the recruits finished their
5    academic, then they put them out in the street for an
6    FTO period.
7        Q    Okay.  But while you were there, it was the
8    two weeks on, two weeks out?
9        A    Two weeks out.  Yes.
10       Q    Do you remember how long duration the entire a
11   part of the academy was where you were going that
12   two-week rotation?
13       A    At that time, the program ran for an entire
14   year.
15       Q    Okay.  Thank you.  Would you go back to the
16   same field training officer each of those two weeks back
17   or did they rotate you?
18       A    You might -- you might even get assigned to a
19   different district.
20       Q    I see, okay.  And let me ask you this, did you
21   get trained -- do you remember who trained you on these
22   priorities of responding to a crime scene when you were
23   at the academy?
24       A    Well, to start with it would've been
25   the -- the instructor at the academy.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

---

**Page 47**

```
1        Q    Do you remember who that was?
2        A    No, I -- there were different teachers.
3    They had different abilities that they would talk about,
4    how to write reports --
5        Q    Do you remember -- oh yes.  Let me ask you
6    about that.  Did you get trained on how to write reports
7    at the academy?
8        A    Pardon?
9        Q    Did you get trained on how to write reports at
10   the academy?
11       A    Yes.  There -- there were various things they
12   did of the report writing and with the general
13   offense --
14            MS. DONNELL:  I'm going to pause you just for a
15   second.  His video went out.
16            MR. GRILL:  Oh, it's -- he's got 10 percent,
17   it just -- he's going -- he's going to run out of
18   batteries.  It's off again now.
19            MS. DONNELL:  Okay.  We're just going to pause
20   for a record.
21            COURT REPORTER:  Do you want to go off record?
22            MR. GRILL:  Yeah, right?
23            MS. DONNELL:  Sure.
24            MR. GRILL:  Yeah.
25            COURT REPORTER:  Okay.  Off record, 12:13.
```

**Page 48**

```
1            (OFF THE RECORD)
2            COURT REPORTER:  Okay.  We are back on record
3    for the deposition of Martin Radtke being conducted
4    by videoconference.  My name is Taylor Venezian.
5    Today is March 28, 2022.  Time is 12:14 p.m. Eastern
6    Standard.
7            MS. DONNELL:  Taylor, can you read back the
8    last question so that -- because we had to interrupt
9    the witness to get his screen back on.
10           COURT REPORTER:  Yes, ma'am.  Oh, sorry.
11           (REPORTER PLAYS BACK REQUESTED QUESTION)
12   BY MS. DONNELL:
13       Q    I think that was the question.
14       A    Yes.
15       Q    I can -- it was quite hard for you to hear.
16   I asked you do you recall being trained on how to write
17   reports at the police academy?
18       A    I had the fortune of -- of having the sergeant
19   that created the general offense case report.  He, along
20   with the FBI, created a report that all the different
21   departments could report several crimes on one report.
22   He was one of the instructors that I had.  So I felt
23   myself fortunate in getting it straight from the horse's
24   mouth.
25       Q    Do you remember his name?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

**49**

1    A    Sergeant Lau.

2    Q    Sergeant Lau.  Okay.  What was Sergeant Lau's

3  first name if you recall?

4    A    No.

5    Q    And how did you recall Sergeant Lau training

6  you on how to fill out the case report?

7    A    Repeat?

8    Q    Do you recall Sergeant Lau's training on how

9  to fill out a case report?

10    A    He was a pretty stern teacher and he wanted us

11  walking out of his classroom knowing how to at least

12  competently do the new report.

13    Q    I'm sorry, do you mind just angling it a

14  little bit better for you?  There you go.  That's easy.

15  There you go.  Okay.  How did you get --

16    A    I'm also trying to lean --

17    Q    Hear, sure.

18    A    -- on to hear what you're saying.

19    Q    How were you trained to -- what -- sorry. What

20  information were you trained to include in your reports

21  by Sergeant Lau?

22    A    What he was trying to do is to get us

23  introduced to how to fill out a case report because it

24  was -- we were among the first group of officers to come

25  through the academy to be filling out this brand-new



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**50**

1  reports format.  Prior to that, there was a one case

2  report for every individual case.  This is called a

3  general offense, was that it incorporates a lot of

4  different crimes at a time.  And he was trying to get a

5  point across how this new form would work.  It had a lot

6  to do with the FBI statistics taking, so he wanted to

7  get this across to us because we were going to be

8  somewhat of a spearhead to try and get information

9  collected uniformly.  So he was emphasizing a lot of

10  things because these were individual new boxes that a

11  lot of the instructors didn't know about.  He wanted

12  stress it with us so that we do a good report and that

13  the program goes through.

14    Q    And what information were you supposed to

15  include?

16    A    It depends on what case report where

17  were -- he was teaching or what area of he was talking

18  about.

19    Q    Were you trained that you were supposed to

20  include all the pertinent information that you -- about

21  the crime?

22    MR. GRILL:  Objection, form.

23    A    It would be the kind of crime there, but it

24  was the individual filling in the boxes.  It was kind of

25  new approach, how the boxes would be filled with what



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**51**

1  particular information that was to go in there. The

2  writing of the narrative was like a several -- several

3  classes on writing narratives.

4    Q    What were you supposed to include in the

5  narrative, if you recall?

6    A    Summary of the facts.  Summaries

7    Q    Were you supposed to include the who, why,

8  what, where --

9    A    Those were the ones, yes.  Who, what, where,

10  when, why, how, and how much.  Those were -- that was

11  the one of the things that I remember him writing on the

12  board and he mentioned it to us for a -- for the

13  narrative portion, you fill these five -- or no, I think

14  there were seven.  You fill those seven answers, you're

15  going to have a good report.

16    Q    Okay.  And

17    A    I remember that.  That was one of the things

18  I kept, and I tried to pass along to the recruits about

19  writing reports.  Those seven -- seven questions.

20    Q    Who, what, why, when, where, how, and how

21  much --

22    A    You have the answers to each one of those

23  regardless of how long or how short your report is,

24  you'll have a good report.

25    Q    Okay.  Okay.  So -- and that was so you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**52**

1  supposed to fill out in the narrative section all the

2  important information about the who, what, why, when,

3  where, how, and how much?

4    A    Should incorporate that, should have.

5    Q    Okay.  And so any of the information that was

6  relevant to an investigation was supposed to be included

7  in your report?

8    MR. GRILL:  Objection.  Form.  And asked and

9    answered.

10    Q    You can answer.

11    MR. GRILL:  Yeah.

12    A    All right.

13    MR. GRILL:  Real quick, this will make it

14    easier.  Answer the question unless I tell you not

15    to. So I'll object from time to time, but you still

16    got to answer the question unless I tell you

17    otherwise.

18    THE WITNESS:  Okay.

19    MR. GRILL:  Yes.

20    A    It was a summary of the facts, it wasn't a

21  detailed report because that was to be filled out by the

22  detectives.  They got longer case reports, they got

23  questionnaires, they answers, they -- they have to

24  answer to get the answers to.  We were just the primary

25  and it was get the summary of the facts, the highlights



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of what occurred.
2  BY MS. DONNELL:
3      Q    Okay.  But any of the highlights that you
4  received about what occurred, you would include in your
5  report so that that would be documented for the
6  detectives to follow-up on, right?
7          MR. GRILL:  Objection form.  Go ahead.
8      A    It would depend on what it is.  What did
9  the --
10     Q    Well, you wouldn't leave out anything that you
11 thought was important?
12     A    I try not to.
13         MR. GRILL:  Hang on.
14         MS. DONNELL:  Okay.
15         MR. GRILL:  Objection.  Form.
16 BY MS. DONNELL:
17     Q    And you wanted to be as thorough as you could
18 be, right?
19         MR. GRILL:  Objection.  Form, asked and
20 answered.
21     Q    Wasn't answered, but you can answer.
22         MR. GRILL:  He said it's a summary of the
23 facts, so that is asked and answered there.
24     Q    Okay.  You can answer, sir.
25     A    Repeat the question.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

1      Q    You wanted to be as thorough as you could in
2  preparing your reports, correct?
3          MR. GRILL:  Same objection.
4      Q    You can answer.
5      A    I -- I --
6          MR. GRILL:  If you understand the question --
7      A    Yes --
8          MR. GRILL:  -- go ahead and answer it.
9      A    I -- I try to be.
10     Q    Okay.  Back in 1991, when you were in patrol,
11 were your reports all handwritten or did you do any
12 typewritten reports back then?
13     A    Detectives write type -- would type, staff
14 teams would type.  Some of the officers that had typing
15 skills would type, essentially it was handwritten.
16     Q    Okay.  But for you in 1991, your reports were
17 all handwritten; is that right?
18         MR. GRILL:  Objection.  Form.
19     A    I couldn't type, I didn't know how to type.
20     Q    Okay.  So it's accurate to say your reports
21 were handwritten, right?
22     A    Yes.
23     Q    Okay.  Officer Radtke, I'm going to ask you
24 some questions now about your preparation for your
25 deposition today.  I'm not asking you about your



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

1  conversations with Mr. Grill.  Do you understand that?
2      A    I think so.
3      Q    Okay.  Did you meet with Mr. Grill to prepare
4  for your deposition today?
5      A    Yes, I did.
6      Q    Okay.  And did you look at any documents or
7  reports to prepare for your deposition today?
8      A    Yes, I did.  That's what I was --
9      Q    Can you please identify for me the documents
10 that you looked at to prepare for your deposition today?
11     A    Repeat?
12     Q    Thank you.  What documents did you look at to
13 prepare for today?
14     A    Oh, the case -- general offense case report
15 that was filled out that night and I believe some of the
16 detectives' reports that they wrote out for when they
17 wrote -- came to the scene.
18     Q    Anything else?
19     A    It was looking over the deposition of the
20 recruit, Watson.
21     Q    Okay.
22     A    I looked at some of the photos that were there
23 that were included.
24     Q    Anything else?
25     A    That was enough.  That was enough material.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

1  I might have glanced at some of the others, gone through
2  it kind of quickly, but it didn't seem like -- that was
3  enough for me to try and digest.  Basically, trying to
4  recall.
5      Q    Before you looked at the general offense
6  report, the detective supplementary reports in the
7  deposition of Officer Watson, and the photographs of the
8  scene, before you looked at any of those documents, did
9  you remember responding to this homicide scene on
10 May 17, 1991?
11         MR. GRILL:  Objection.  Form.
12     A    Oh yes.  Oh yes.  Yes, I do.
13     Q    So even before you looked at any documents to
14 prepare, you had an independent memory?
15     A    There were some memory itself.  What stood out
16 in my mind at the time was that this was the recruit's
17 very first homicide.  And --
18     Q    And when you're saying recruit, you're saying
19 Officer Watson?
20     A    Yes, ma'am.
21     Q    Okay.
22     A    And I remember him, we were talking and
23 discussing because we were -- we started at 6:00
24 together.  I was trying to get a feel for how much he
25 knew.  What experiences did he have?  Did he handle a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS



1  few particular crimes?  One of them was he had not
2  handled a homicide.  And what I remember is that this
3  was his first -- first homicide and I remember taking
4  him over there and that I wanted to give him this
5  opportunity because part of that whole thing was
6  out -- was man shot and no offender on the scene.  What
7  I was thinking was that this is going to be a straight
8  paper job, that there wouldn't be this complicated if
9  there was a -- an offender arrested.  I thought the
10  recruit would be competent and capable of handling that.
11  If not, I was going to help him get through it.  So my
12  focus was him first time handling this.
13     Q    And let -- just to be clear, before you looked
14  at anything to prepare, you had an actual memory of the
15  radio call and this specific experience with the
16  recruit, Watson --
17     A    No, just the -- just the experience -- giving
18  the -- the recruit the experience.
19     Q    Okay.
20     A    Because he -- he bounced around.  He didn't
21  have a lot of officers that would want to help work with
22  him and get him the -- the training and the exposure
23  that he needed.
24     Q    Why is that?
25     A    His two FTOs, one got sick, there was another

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



1  FTO that was continually getting hurt and the kid
2  bounced.  So I was the first one.  Now he was off of his
3  period of being with FTOs.  He was in that say like
4  final three months.  They -- the station put his with me
5  because they knew he needed some extra help.  He wasn't
6  getting it.
7     Q    How long had he been assigned to you before
8  May 17, 1991?
9     A    It's the only -- one day.
10     Q    The only day you worked with him?
11     A    Only day I ever worked with him.
12     Q    Okay.  Okay.  And do you have a memory of the
13  radio call that you -- the dispatch call?
14        MR. GRILL:  Objection.  Form.  And it's
15  argumentative.
16     A    I -- I remembered going out as, "Man shot.
17  Offenders are no longer on the scene."
18     Q    Do you recall where you were when you received
19  the dispatch
20     A    No, no, I can't -- I can't tell where we
21  were -- I can't recall what we were doing.
22     Q    Do you recall --
23        COURT REPORTER: And I'm sorry.  Officer
24  Radtke, if you could just let Ms. Donnell finish her
25  question before you -- it's just easier on me so I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  get each one of you talking separately.
2  BY MS. DONNELL:
3     Q    She's saying if you could do your best to wait
4  until I've completed my entire question before you start
5  your answer.
6     A    Oh.
7     Q    It's getting hard for the court reporter
8  because you're talking before my questions --
9     A    I thought I was waiting long enough.
10     Q    No problem.
11     A    All right.  I'm sorry.
12     Q    No problem.  It may be because it's also, you
13  know, there's a computer and she's virtual, so we just
14  need to pause a little longer.  Okay.  Do you remember
15  anything else that you and Officer Watson did?  Any
16  calls you responded to during your shift on May 17,
17  1991, before this dispatch?
18        MR. GRILL:  Objection.  Form.
19     A    I can't recall what else we were doing.
20  What we do, try to be active.  I try and get the
21  recruits the opportunity to write tickets, to assist.
22  That if they don't get a call to go assist the officers,
23  that's one way of learning what to do.  I like to be
24  active.
25     Q    My question is though, do you recall any of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



1  the things that you did to train Officer Watson before
2  you received the dispatch to respond to 927 West 54th
3  Street?
4     A    No --
5        MR. GRILL:  Objection.  Form.  Go ahead.
6     A    No, I can't.  Other than I wasn't busy.
7  What we did, I don't recall.
8     Q    Okay.
9     A    I remember what that third deposition was.
10     Q    Sure.  You can supplement your testimony.
11     A    You want to do it now or in a break?
12     Q    Sure, you can do it now.  Nope, go ahead.
13     A    It was being sued, myself and several Cook
14  County sheriffs.  I arrested a guy for putting his
15  girlfriend's baby into the freezer portion of a
16  refrigerator.  The baby was small, was crying
17  constantly, and it irritated him so bad that he thought
18  it'd be a way of muffling the baby's crying, so he puts
19  her into the compartment with the ice cubes.  She was
20  there approximately half hour, 45 minutes.  He left and
21  the -- the mother of the baby heard muffled cries and
22  she followed the cries, the moaning and that, into the
23  refrigerator and opened up the top door, and there was
24  her baby laying on top of the ice cube trays.  The guy
25  took off, wasn't on the scene.  We canvased the area,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    went around, she offered some information that he likes
 2    to hang out in a particular tavern on Western Avenue.  I
 3    went there, he wasn't there.  I asked the bartender some
 4    information about if they know who the guy is, and that
 5    if he comes in, if the bartender would be so kind as to
 6    call us.  And that was all we could do at the time.
 7    Later on in the night, there was about an hour later, a
 8    call went out, information for the -- for the police.
 9    It turned out to be the bartender was calling us, that
10    the offender came into the bar and was drinking at the
11    far end of the bar, that's where we found the offender.
12    We explained to him why we're taking him into custody,
13    and we put the cuffs on him.  There was no resistance,
14    we put him in a car, processed him, and he goes to jail.
15    While he's in jail, he claims that he was beaten up by
16    several, I think he said 14, unknown Cook County
17    sheriffs, and his allegation against me was that I was
18    the one that called over to the county sheriff to
19    orchestrate this guy getting beat up.  And I don't know
20    what happened after that, but the allegation was that I
21    would call over to county jail and have the guards beat
22    him up.
23         Q    And you were deposed in that action?
24         A    Pardon?
25         Q    You had a deposition in that case?
```



```
 1         A    That's the third one.
 2              MS. DONNELL:  Okay.  Hold on, Andrew, can you
 3    move that so --
 4         A    What am I -- what am I doing?
 5              MR. GRILL:  You want it there?
 6              MS. DONNELL:  Thank you.  Yeah, that's perfect.
 7              MR. GRILL:  Okay.
 8    BY MS. DONNELL:
 9         Q    Yep, perfect.  Okay.  Thank you for
10    supplementing your testimony.  I want to go back to the
11    night of May 17, 1991 when you responded to the dispatch
12    radio call at 927 West 54th Street, okay?
13         A    Yes, ma'am.
14         Q    All right.  And you were in the squad car with
15    Officer Watson, your field training recruit or --
16         A    Let's call this a recruit because that --
17         Q    That's fair.
18         A    -- was what it was, that's where he was stuck
19    in limbo.
20         Q    Do you have an actual memory of a --
21    responding to the scene?
22         A    Some.
23         Q    Okay.
24         A    Some.
25         Q    Do you have an actual memory of speaking to
```



```
 1    any witnesses on the scene?  And I'm just asking if you
 2    have a memory of it, an actual memory of it.
 3         A    What my intent was, to take Officer Watson do
 4    the interview.  He would take down the information and
 5    he would collect that information, I wanted him to get
 6    the experience of doing that, of conducting an
 7    investigation.  I was there with him, I listened to what
 8    the witnesses said, I was making sure that he was
 9    collecting the information, but I essentially wanted to
10    have him learn to do the writing, the note-taking, and
11    the -- conducting the interviews.
12         Q    Okay.  Understood.  Do you remember those
13    interviews with any of the witnesses on the scene?
14    Do you have an actual memory of that, as you sit here
15    today, sir?
16         A    There -- there's things about that, that I do
17    and that I don't.  I wanted the recruit to do the most
18    of the talking, but I'm there with my ear standing next
19    to him, having my ear open and listening to what he's
20    got to say, so at a later time we can compare what
21    he was getting, what he was writing down, and what
22    his -- information he was collecting.
23         Q    I under -- I -- so, I understand your
24    intention and what your goal was.  I just want to get an
25    answer to my question, was, as you sit here today, do
```

```
 1    you have an actual memory of any of the interviews you
 2    and Officer Watson conducted on May 17, 1991?
 3         A    I -- I can't recall.  I -- I -- I -- just how
 4    much.
 5         Q    Did you take notes that evening?
 6         A    No, I really didn't because I wanted the
 7    recruit --
 8         Q    Did --
 9         A    I wanted the recruit --
10         Q    Sorry.
11         A    -- to be the one to do that.
12         Q    Did you observe Officer --
13              MR. GRILL:  Hang on, hang on, were you done?  I
14    thought he was still going.  Sir, were you finished?
15              THE WITNESS:  Yes.
16              MR. GRILL:  Okay.
17    BY MS. DONNELL:
18         Q    Did you observe Officer Watson taking notes?
19         A    Yes, because I wanted to take notes.  That was
20    the purpose of going over, it was a training exercise, I
21    believe it or not, under those sad, sad conditions, this
22    was a training exercise for him.
23         Q    What was Officer Watson taking notes on, if
24    you recall?
25         A    I -- I forgot the order, but the -- he talked
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
65

```
 1   to a -- a -- a female witness that came out and took
 2   down what she had to say.  There were some comments that
 3   she just blurted out and he put quotes in it, and then
 4   she was also the one that provided us with a -- a
 5   description of the two offenders.  And then later, just
 6   a short while later, there was a -- a male subject that
 7   came out and we talked to him, and the recruit was the
 8   one taking the notes down.  Was there anything else,
 9   ma'am?
10        Q    My question was, what was Officer Watson
11   taking notes on?
12        MR. GRILL:  Asked and answered.
13        Q    You can answer again.  I don't think you
14   answered what he was writing on.
15        A    Well, as -- as I said, he was the one that was
16   describing the offenders, gave us a --
17        Q    I'm just going to pause because I'm not sure
18   you've heard my question.
19        MR. GRILL:  He's answering it.
20        Q    So I said, "What" -- okay.
21        MR. GRILL:  Are you withdrawing the question?
22        MS. DONNELL:  No, I'm going to re-ask it.
23        MR. GRILL:  Okay.
24   BY MS. DONNELL:
25        Q    Was -- did Officer Watson take notes on a pad
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
66

```
 1   of paper, on a notebook, on a report?  What was he
 2   taking the notes --
 3        MR. GRILL:  That's a totally different
 4     question.
 5        A    Oh, you're talking writing utensils.
 6        MR. GRILL:  Hang on, hang on.  That's a totally
 7     different question.  Go ahead and answer it, but I
 8     just want to point out --
 9        MS. DONNELL:  Go ahead.
10        MR. GRILL:  -- he was answering your last
11     question.
12        MS. DONNELL:  Understood.
13        A    Oh, I didn't understand it.  I understand now.
14   He had a little pocket notebook that we carried.
15   BY MS. DONNELL:
16        Q    Was it some -- a notebook that the department
17   issued to officers?
18        A    No.  No, it's something that we go and
19   purchase ourselves.
20        Q    Is it a spiral notebook?
21        A    A little small note -- spiral, yes.
22        Q    So did you observe Officer Watson taking notes
23   on a spiral pocket notebook while he was talking to
24   witnesses out at the scene at 927 West 54th Street?
25        A    Yes, I did.
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
67

```
 1        Q    Okay.  But did you take any notes in your
 2   pocket notebook?
 3        A    I don't recall if I did or not.  Essentially,
 4   I -- I -- probably not.  I want the recruit to learn to
 5   do this.
 6        Q    Do you have an actual memory, or are you just
 7   guessing?
 8        MR. GRILL:  Objection, argumentative, and it's
 9     asked and answered.
10        Q    You can answer.
11        MR. GRILL:  You can answer it again, Marty, if
12     you answer a second time.
13        A    I might have taken some notes down, like who
14   was responding to the scene, like with the -- with the
15   detectives and all that.  I was trying to get it, but I
16   wanted the recruit to do that.  My notes, I would take
17   to make sure he was getting the information down.
18        Q    Okay.  I -- do you have an actual memory of
19   taking notes or are you just guessing?
20        A    I -- I don't recall 100 percent taking notes,
21   but I -- I felt that I might have taken it to back it up
22   because things were starting to get warmed up now with
23   people responding and -- and that, I wasn't sure how
24   much the recruit was getting at the time there.  So I
25   was with him, but I noticed the detectives coming up on
```

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
68

```
 1   the scene, the ambulance was coming up, and I waited
 2   with the recruit and then I steered him -- when he
 3   finished talking to one, I steered him over to get the
 4   names quickly of the two detectives.
 5        Q    And what were the names of the two detectives?
 6        A    I don't remember, I wasn't there.  It was
 7   an -- unusual name, McWeeny, I believe now, after
 8   looking at the notes, there was a McWeeny and I forgot
 9   who the partner was.
10        Q    Do you know Dan McWeeny?
11        A    Pardon?
12        Q    Do you know Dan McWeeny?  Back -- maybe I'll
13   rephrase that, so sorry.  Back in May 1991, did you know
14   who Dan Mc -- Detective Dan McWeeny was?
15        A    I may have seen him around coming through the
16   district or going to the area detectives, but I -- I
17   cannot put a face to the name.
18        Q    How about Detective James Brennan, did you
19   know Detective James Brennan --
20        A    Same --
21        Q    -- back in May 1991?
22        A    Again, the same.  I -- I remember faces more
23   so than I do names.  I can't say.  I might've seen him
24   around, seen him in the station when I'm passing through
25   and he was there, or something else, but I -- I can't
```

**Page 69**

1    say that I really could put a face to the name.

2    Q   When you and Officer Watson arrived at the

3    scene at 927 West 54th Street, were you the first

4    officers on the scene?

5    A   Yes, ma'am.

6    Q   Do you recall how long after you arrived at

7    the scene, that Detective McWeeny and Detective Brennan

8    arrived?

9    A   It struck me as not too very long.

10   Q   What does that mean?  Minutes?

11   A   They -- they -- quarter of an hour or

12   something like that.  It was relatively quick.

13   Q   How long after you arrived on the scene --

14   well, when you and Officer Watson arrived on the scene,

15   did you have to call for the ambulance?

16   A   No, I didn't call.  The problem was that -- it

17   was communications -- it didn't have access to a

18   telephone, so I have to use my radio to call the 9th

19   District to put the request through to get sent out an

20   ambulance, to get the detectives over, and if they could

21   get a -- a crime scene unit over to process for

22   evidence.  I --

23   Q   Did you have a handheld radio?

24   MR. GRILL:  Hang on, hang on, hang on, hang on,

25   hang on.



---

**Page 70**

1    MS. DONNELL:  I'm sorry, I thought he was done.

2    MR. GRILL:  I -- yeah, I wasn't sure, it

3    sounded like you weren't -- were you finished with

4    your answer?

5    THE WITNESS:  I -- I think I was, it's partly

6    to take a breath.

7    MR. GRILL:  Okay.

8    THE WITNESS:  I'm leaning in.  I'm trying --

9    trying to take a breath.

10   BY MS. DONNELL:

11   Q   Officer Radtke, did you have to call on the

12   radio, was that a handheld radio or was your radio in

13   your car?

14   A   No, we have body radios.

15   Q   You had body radios in '91?  Okay.  And so is

16   it your testimony that you called on your radio, your

17   handheld radio, back to the 9th District to dispatch the

18   ambulance, the detectives, and the crime scene

19   personnel?

20   A   Yes, I was asking the desk crew to do that

21   because I had no access to a phone.  There were pay

22   phones at the corner of 54th and -- actually, it was at

23   55th and Peoria, but I was not going to go and leave the

24   recruit there by himself.

25   Q   Did the recruit --



---

1    A   So --

2    Q   Oh, sorry, go ahead.

3    A   So I thought the safest way, and have done

4    that from time to time, officers who didn't have access

5    to a phone, they called through the radio to the

6    either the dispatcher or to the desk.

7    Q   Why did you make the -- well, first of all,

8    do you recall whether Officer Watson had a handheld

9    radio on his person?

10   A   Yes.

11   Q   And why didn't you have the recruit, Officer

12   Watson, do that part of the call?

13   A   Just --

14   Q   I'm sorry, do that part of the job?

15   A   I wanted to do it because I wanted to make

16   sure the information got through accurately.

17   Q   And what information did you want to make sure

18   got through accurately?

19   A   That I needed the detectives there, I wanted

20   an ambulance, and I wanted to get some -- the ET out

21   there or mobile crime lab.  I wanted to get that moving

22   because, partly, it'll take a while for them to arrive.

23   Q   Who will it take long to arrive?

24   A   Those responding units.

25   Q   All three of those?

---

1    A   Yes.

2    Q   Do you know how long it took an ambulance to

3    arrive on scene?

4    A   I can't -- I can't remember that.  They did

5    arrive after the detectives.

6    Q   When you first arrived on scene, were there

7    any other people out on the street?

8    A   That I don't recall.  Don't recall if there

9    were or not.

10   Q   Did people come out onto the street after you

11   arrived?

12   MR. GRILL:  Objection.  Form.

13   A   I don't recall that, no.

14   Q   Did you go inside any -- 920 -- did you go

15   inside the -- any of the apartments at 927 West 54th

16   Street that night?

17   A   No.  No.

18   Q   You stayed out on the street?

19   A   Pardon?

20   Q   You stayed out on the street?

21   A   Had to.

22   Q   Why did you have to?

23   A   The body was blocking the entrance to the

24   house.

25   Q   Okay.  But you never made any attempt to go up

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   a back entrance to talk to people?
 2       A    No.
 3       Q    Okay.  You said you and Officer Watson spoke
 4   to a female and a male, right?
 5       A    Correct.
 6       Q    Did you only speak to two witnesses?
 7       A    That's all we talked to.
 8       Q    Did you -- do you recall speaking to Detective
 9   McWeeny and Detective Brennan on the scene when they
10   arrived?
11       A    Oh, yes.  Yes.
12       Q    Do you recall your conversation with them?
13       A    I just gave them a general rundown of what we
14   had, what my recruit was writing down.  In exchange,
15   I was getting his name and his star number, and his
16   partner's name and star number, their unit.
17   And I also want the recruit to do that, but I wanted to
18   make sure it was done correctly.
19       Q    So who spoke --
20       A    I got the right name and that, but I had the
21   recruit actually ask him himself.  I wanted to get him,
22   but I wanted to make sure I had the right information
23   from the get-go.
24       Q    You mean you wanted to make sure you had the
25   right detectives' names and star numbers?
```



```
 1       A    Yes.
 2       Q    Okay.  But you said you did recall speaking to
 3   Detective McWeeny and Brennan when they appeared on
 4   scene?
 5       A    Yes.
 6       Q    Okay.  Tell me what you told them.
 7       A    Pardon?
 8       Q    What did you tell them?
 9       A    When they arrived, apparently the first words
10   out of their mouth was, "What you got, kid?"  And I gave
11   them a rundown, that we have the body laying in the
12   doorway, and some of the other bits of information that
13   we gathered.
14       Q    What were the other bits of information that
15   you had gathered?
16       A    Pardon?
17       Q    What was that information that you had
18   gathered at that point?
19       A    We didn't know who the victim was at that
20   time.  We got information, what happened, from the
21   woman, and I was letting the detective know that the
22   recruit was in the process of talking to her right then.
23       Q    So let me just stop you there.  When you --
24   when the detectives arrived on the scene, Officer Watson
25   was talking to a female person out on the street, and
```



```
 1   you approached Detective McWeeny and Detective Brennan
 2   and told them what you had?
 3            MR. GRILL:  Hang on.  Objection,
 4   mischaracterizes his testimony.  Go ahead.
 5       Q    You can answer.
 6       A    Well, when the detectives arrived, I didn't
 7   walk away and leave the recruit by himself.  I was still
 8   with them.  Alls I did is I turned as the detectives
 9   approached, that's the way I remember doing that.
10       Q    What were you and Officer Watson doing when
11   Detective McWeeny and Brennan arrived on the scene?  I'm
12   sorry, I'll repeat.  What were you -- well, let me
13   strike that.  Let's go back.  What's the first thing
14   that you and Officer Watson did when you arrived on the
15   scene?
16            MR. GRILL:  Asked and answered.
17       Q    You can answer.
18            MR. GRILL:  Marty, answer it again.
19       A    Yeah.  Well, we went to check to see the body,
20   see if it was actually alive because supposedly it
21   was a -- gun shot, so we wanted to see if he was still
22   alive.  And just like I explained in the academy,
23   if he -- if he -- see what you could do to give medical
24   care to the victim if they're still alive, find out if
25   there was any witnesses, try and see if there's a
```

```
 1   possibility of -- of apprehending the offender.
 2       Q    Okay.  And when you arrived on scene at 927
 3   West 54th Street, the first thing you did was approach
 4   the victim, right?
 5       A    Yes.
 6       Q    Okay.  And you -- did you both walk up to the
 7   victim, you and the recruit?
 8            MR. GRILL:  Your phone's ringing.
 9            THE WITNESS:  I -- I'm sorry.  I --
10            MR. GRILL:  That's okay.
11            THE WITNESS:  I got a new cell phone and I
12   don't know how to kill it.  I thought I --
13            MS. DONNELL:  No problem.
14            THE WITNESS:  I turned it off.
15            MS. DONNELL:  That's not a problem.  Do you
16   want to check it?
17            THE WITNESS:  He's going to kill the button
18   now.  No.
19            MS. DONNELL:  Okay.
20            THE WITNESS:  More than likely it's some
21   call -- bogus call, I apologize.  I --
22            MS. DONNELL:  Don't worry about it.
23            THE WITNESS:  I -- I thought I killed it, but
24   I'm new to this technology stuff.
25            MS. DONNELL:  Yeah, no worries.  We can deal
```



```
1    with it.
2        A    I'm glad I left the department when I did.
3    This -- all this computer stuff will drive me up the
4    wall.  Now, I don't even know how to turn my phone off.
5    That's how advanced I am.  Yes, ma'am?
6    BY MS. DONNELL:
7        Q    Officer Radtke, when you and Officer Watson
8    approached the victim, did you both approach the victim,
9    or did you go first?  Who went first?
10       A    No, we both approached.
11       Q    Okay.
12       A    He got out of the passenger side of the squad
13   car, I got out of the driver's side, and we both
14   cautiously walked up to it.
15       Q    Do you remember where you parked your squad
16   car?
17       A    It -- it -- it's -- part of our training and
18   part of my experience is, don't pull up right in front
19   of, always pull up a little bit behind.  And most times
20   it between two buildings so people don't know where
21   you're going, what you got.  Another thing is, if
22   there's somebody hiding and that might pop out, you
23   don't want to expose yourself that much to it, you want
24   to give yourself a little edge so you don't pull up
25   right in front of an address.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    So do you remember where you parked that night
2    on 927 --
3        A    Yes, I would've parked approximately --
4    approximately, somewhere a little further to the east of
5    the house itself, maybe between the -- the two -- the
6    boundary line between the adjoining property.  You don't
7    know what you're going to find when you get them up into
8    those corners and all that.  You don't want to pull up
9    right in front of the house because that's how you can
10   get a bad surprise.  I wanted to get out of the car, get
11   a chance to walk up and survey the entry -- the building
12   itself to see if there's anybody moving around and what
13   was going on.  I don't like to approach it.
14       Q    Did you see anybody else on the street when
15   you pulled up and parked your squad at 927 West 54th
16   Street?
17       A    I -- I don't remember.  I don't remember
18   seeing anybody.  I -- I don't -- I don't think there
19   was, I don't think -- not right at that time.  It was a
20   little after midnight.  A little after midnight.  I
21   don't recall anybody being out on the street.  I think
22   that -- we did talk to the -- Ms. Taylor because she
23   came out, I think she might have come around the side or
24   something at a house, but I forgot where she was.  I
25   can't recall where she was at.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    But when you first arrived, there was nobody
2    out front by the victim?
3             MR. GRILL:  Objection.  Form, foundation,
4        mischaracterizes his testimony.
5        Q    Well, I'll ask again.  Was there anybody with
6    the victim when you approached the victim?
7        A    No.  No.  There was nobody.
8        Q    Okay.
9        A    I -- I -- I've got to pretty much say, that
10   there was nobody around.
11       Q    Okay.  How did you assess whether the victim,
12   Mr. Irving -- well, did you assess whether Mr. Irving
13   was alive or dead at the time that you arrived?
14       A    Well, we looked at his wounds and the amount
15   of blood, there -- there -- there was a good possibility
16   he expired.
17       Q    Did you check for a pulse, or Office Watson?
18       A    No.  No, no, no.  There was too far in and there
19   was no movement.  No.  And that was part of not
20   contaminating the crime scene.
21       Q    So you never touched the victim?
22       A    No.
23       Q    Okay.  And what did you do after -- so you
24   just -- you never walked inside the building either, you
25   just stood out on the sidewalk and saw the victim and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    assessed --
2        A    That was the crime scene.
3        Q    Okay.  Did you -- what did you do next?
4        A    After doing what?
5        Q    After you assessed the crime scene and that
6    the victim -- and you assessed not to provide any
7    medical attention at that time, what did you do next?
8             MR. GRILL:  Objection.  Form.  Go ahead.
9        A    I surmised that we're going to need an
10   ambulance to come out to make a rough -- to take over
11   and -- and make sure that there was no pulse, to confirm
12   that.  So I was thinking that first, that "We're going
13   to need to get an ambulance out here."  I think
14   that -- that's what came to mind first, "We got to get
15   an ambulance here," either they got to help him or
16   they're going to make a pronouncement for him, but he'd
17   look like he -- he was not have any life signs at all.
18   And then I started looking around through the --
19   basically, I would've been just -- told to have
20   training, just looking around over my shoulder up and
21   down the street and see if anybody is still lingering
22   there.  And there was nobody.  Then Ms. Taylor came out,
23   and I cannot recall where she came out of.
24       Q    So your testimony is that Ms. Taylor
25   approached you and Officer Watson?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

81

```
1       A    I'm going to say yes.  She approached us
2   because I can't recall where she was.
3       Q    Okay.  Tell me everything you recall about
4   your interaction with Ms. Taylor.  First of all, where
5   was it?  Where were you?
6       A    Pardon?
7       Q    Where did you speak with Ms. Taylor?
8       A    I didn't do much speaking with her; I left the
9   recruit do the interview --
10      Q    And where did Officer Watson speak --
11      A    -- and I --
12          MR. GRILL:  Hold on, hold on, hang on, hang on.
13      Q    Where did Officer Watson speak with her?
14          MR. GRILL:  Wait, wait, wait.  Wait a minute,
15      wait a minute.  He was answering your question and
16      you started talking over him, Heather, so go ahead
17      and finish your answer, please.
18      A    My purpose of training was to have Officer
19   Watson interview her, but I was -- I wanted to listen,
20   how he was handling it.  If he was asking her the right
21   questions -- the correct ones, the pertinent questions.
22   I wanted to listen to his conversation with her.
23   BY MS. DONNELL:
24      Q    Where was Officer Watson's conversation with
25   Ms. Taylor?
```

82

```
1       A    It would be about in front of the -- on the
2   sidewalk, a little bit more to the east of where the
3   victim was laying in that doorway.  It'd be in front of
4   her building itself, but on the sidewalk.
5       Q    And do you have a memory of the questions that
6   Officer Watson asked Ms. Taylor, as you sit here today?
7       A    I can't say specifically what the questions
8   were, what his opening question was.  I can't
9   specifically recall that, no.
10      Q    Okay.  Do you remember the general --
11      A    The general would've been --
12      Q    I'm sorry, let me finish my question.  Do you
13   remember the general conversation that Officer Watson
14   had with Ms. Taylor?
15          MR. GRILL:  Objection.  Form.
16      A    He would've conducted a general, like --
17   what -- what did she have to -- he would've opened up
18   the conversation of asking what happened.
19      Q    None of us want you to guess or speculate,
20   so if you don't remember then you don't remember.
21      A    But I'm trying to think of my actual --
22      Q    Well, just let me finish my question, sir.
23   Just let me finish my --
24      A    I'm not going to guess; this is not a time for
25   me to guess.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

83

```
1       Q    Understood.  Understood.  So you started to
2   answer, you would've asked her.  And I'm telling
3   you -- I'm just asking you, if you remember what they
4   spoke about and what he asked her.  And if you remember,
5   great.  If you don't, but none of -- your attorney
6   doesn't want you to guess or speculate, it's only if you
7   have an actual memory.  Do you understand?
8           MR. GRILL:  Answer this question, and let's
9       take a break for a minute after this question.
10      A    I -- I can't recall specifically what -- what
11   he was -- the manner, what he -- he started out the
12   conversation with.  What I wanted to see is what the
13   recruit was capable of doing.
14          MR. GRILL:  Okay.  Let's take a break for a
15      minute.  If you can go, please, we can talk for a
16      second?
17          MS. DONNELL:  Sure.
18          MR. GRILL:  Or maybe we can talk --
19          MS. DONNELL:  Why don't I step out?
20          MR. GRILL:  Yeah.
21          (OFF THE RECORD)
22          COURT REPORTER:  Okay.  We are back on record
23      for the deposition of Martin Radtke being conducted
24      by videoconference.  My name is Taylor Veneman.
25      Today is March 28, 2022, the time is 1:04 p.m.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

84

```
1   Eastern Standard.
2   BY MS. DONNELL:
3       Q    Okay.  Officer Radtke, we were talking about
4   your observation of Officer Watson's interview with
5   Ms. Taylor on the scene before we took a break, right?
6       A    Yes, ma'am.
7       Q    Okay.  And you understand my questions are
8   about what your -- right now about what you actually
9   remember of that interview, okay?
10      A    Yes.
11      Q    Okay.
12      A    Yes.
13      Q    All right.  Do you have a memory of your
14   observation of Officer Watson's communication with
15   Ms. Taylor that evening?
16      A    I can't recall exactly.
17      Q    Okay.  Do you recall, as you sit here today,
18   whether you have an opinion whether he, Officer Watson,
19   did a good job of interviewing Ms. --
20      A    Could you speak just a little louder?
21      Q    Sure.
22      A    I'm having a little problem there.
23      Q    No problem.  Thanks for telling me.  Do you,
24   as you sit here today, have a memory about whether you
25   think your recruit, Officer Watson, did a good job, an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



**Page 85**

1  adequate job, or a bad job, in his interview of Ms.
2  Korna [sic] Taylor?
3      MR. GRILL:  Objection -- hang on.  Objection.
4  Form.  Go ahead.
5      A   Taking into consideration how little
6  experience he's had previous to this, I -- I think he
7  was able to get a decent enough, acceptable form, case
8  report because in my estimation he did answer the seven
9  questions.
10     Q   Do you recall if you gave him any pointers or
11 training after his interviews or the scene that night
12 about what he could have done better?
13     MR. GRILL:  Objection.  Form, foundation.
14     A   We didn't have much time to review it.
15 If I worked with him the next day, we would've done just
16 exactly that.  But this call took us into overtime, so
17 we didn't have the opportunity.
18     Q   So is that your testimony, that you don't
19 recall giving him any pointers or training about what he
20 could have done differently?  Is that your testimony?
21     A   After writing report, afterwards, no, I didn't
22 have the opportunity to.
23     Q   Did you -- do you recall when Officer Watson
24 wrote the report?
25     A   Pardon?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 86**

1      Q   Do you recall when Officer Watson prepared his
2  report?
3      MR. GRILL:  Objection --
4      A   Yes.
5      MR. GRILL:  -- foundation.
6      THE WITNESS:  I'm sorry.
7      MR. GRILL:  Go ahead.
8  BY MS. DONNELL:
9      Q   You do recall that?
10     A   Yes.
11     Q   And when -- what do you recall about that?
12     A   I recall requesting him to write out the whole
13 report.  I wanted him to do this, it was his training
14 exercise.
15     Q   Okay.
16     A   Interview the people, he writes the report.
17     Q   Where -- do you recall where he wrote the
18 report?
19     A   After things settled down, we were in a squad
20 car for a little bit of time to get the report started.
21     Q   So he wrote his report in the squad card,
22 is that your testimony?
23     A   Yes.
24     Q   Okay.  How long did Officer Watson and
25 yourself speak to Ms. Taylor on the street?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 87**

1      A   I don't recall exactly.
2      Q   Generally, how long was it?
3      A   Possibly ten minutes, more or less.
4      Q   And do you know -- or strike that.  Do you
5  recall what Ms. Taylor was wearing?
6      A   No.  No --
7      Q   Okay.
8      A   -- not at all.
9      Q   Do you recall her demeanor at the time that
10 you and Officer Watson were speaking with her?
11     A   Repeat that.
12     Q   Do you recall Ms. Taylor's demeanor at the
13 time that you and Officer Watson were speaking with her?
14     A   Like excitable, that strikes me as excitable.
15     Q   As you sit here today, do you remember the
16 information that Ms. Taylor gave you?  Or do you only
17 remember that because you reviewed the case report?
18     MR. GRILL:  Objection.  Form, compound,
19 argumentative.  Go ahead.
20     A   Well, after reviewing the report the -- the
21 other day, that's where I got some recall of what
22 Ms. Taylor said.
23     Q   Okay.  Before you reviewed the report, would
24 you have been able to remember what Ms. Taylor said to
25 you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 88**

1      A   No.
2      Q   Okay.  But after reviewing the case report and
3  the supplementary report, that refreshed your
4  recollection, is that your testimony?
5      A   Whose supplement report?
6      Q   Oh, you said you read the detective's report?
7      A   Oh.  Yes, I've -- some of that, yes I did.
8      Q   Okay.  So your testimony is that, prior to
9  reviewing the documents, you didn't have a memory of
10 what Ms. Taylor said to you, but now having reviewed
11 those documents, you refreshed your recollection.
12 That's your testimony, right?
13     A   Correct.
14     MR. GRILL:  Object to the form.
15     Q   Okay.  And is it your opinion that Officer
16 Watson summarized the information that Ms. Taylor
17 provided in his case report?
18     A   No, I would not allow him to do a
19 summarization of what her -- of what she had to say.
20     Q   Why not?
21     A   Because it'd be inaccurate.  He would be
22 putting a different spin on it.  What she's got to say
23 is what he's got to put down.
24     Q   Okay.  Maybe I misunderstood.  Okay.  So what
25 -- do you feel that, after reviewing Officer Watson's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

89

```
1     A   case report, you think he put down the information that
2   he received from Ms. Taylor?
3         MR. GRILL:  Hang on.  Form, foundation.
4     Q   You can answer.
5         MR. GRILL:  If you understand that question, go
6   ahead and answer it.
7     A   Yes, I do.
8     Q   Was there any information that she provided
9   that he left out?
10    A   No.
11    Q   Okay.  Do you recall what Ms. Taylor told you
12  and Officer Watson?
13    A   Pardon?
14        MR. GRILL:  Asked.
15    Q   Do you recall what Ms. Taylor told you and
16  Officer Watson?
17        MR. GRILL:  Asked and answered.
18    A   Well, what she said went into the report.
19    Q   After, was Ms. Watson [sic] -- was Ms. Taylor
20  the first witness that you and Officer Watson spoke with
21  on the scene?
22        MR. GRILL:  Asked and answered.
23    A   Yes, she is.
24    Q   Okay.  And then you said you spoke to a male
25  individual as well?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

90

```
1     A   Yes.
2     Q   And when did you speak to the male individual?
3     A   Maybe a few minutes after we talked to
4   Ms. Taylor.  Because he -- I -- I can't recall where he
5   came from, where he came out of.
6     Q   Had you -- were the detectives already on
7   scene or --
8     A   Pardon?
9     Q   Were the detectives already on scene at this
10  point?
11    A   No.
12    Q   So you spoke to Ms. Taylor and the male before
13  Detective McWeeny and Brennan arrived on the scene?
14    A   Correct.
15    Q   Okay.  Did you speak to anybody else, other
16  than those two individuals, before the detectives
17  arrived?
18    A   No.
19    Q   And it was your testimony that the detectives
20  arrived and then the ambulance, right?
21    A   I don't recall exactly.  I -- the detectives
22  came first, yes.
23    Q   Okay.
24    A   Ambulance started arriving, after that,
25  I -- I -- I can't recall.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

91

```
1     Q   Do you know from reviewing the reports, what
2   male individual you spoke with?
3     A   Repeat.
4     Q   What was the name of the male individual you
5   spoke with?
6         MR. GRILL:  The male witness?
7     Q   Male witness, I --
8     A   Actually, think of a French name, Gaston.
9     Q   Okay.
10    A   I don't know what his first name was.
11    Q   Brian Gaston?
12    A   Possibly, I'd have to look at the report and
13  see what we put down.
14    Q   Okay.  And those are the only witnesses that
15  you spoke to that evening along with Officer Watson?
16    A   Correct.
17    Q   Do you, as you sit here today, recall anything
18  that Mr. Gaston said to you and Officer Watson?
19    A   Not exactly.
20    Q   How long was the conversation you and Officer
21  Watson had with Mr. Gaston?
22    A   A lot shorter than one we had with Ms. Taylor.
23    Q   What did Ms. Taylor tell you?
24        MR. GRILL:  Asked and answered, a couple times
25  now.  I've --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

92

```
1     A   Well, she told us what she saw and heard.
2   She provided a description of the -- the offenders.
3     Q   What did Ms. Taylor -- are you finished?
4   Are you still --
5     A   Pardon?
6     Q   Are you still -- I didn't know if you'd
7   finished your answer.
8     A   No, I'm -- no.  She -- she gave us a
9   description of the offenders and what she heard.
10  I believe that was it.
11    Q   Okay.  What did Ms. Taylor tell you she heard?
12    A   She heard two gunshots.
13    Q   Did she tell you where she was when she heard
14  the gunshots?
15    A   No.  No.
16    Q   Did Officer Watson ask her where she was when
17  she heard the gunshots?
18    A   I don't recall.
19    Q   Okay.  Did she tell -- you said she told you
20  what she saw, right?
21        MR. GRILL:  Objection, misstates the testimony.
22    A   She told us what she saw.
23    Q   Okay.  What did she tell you?
24    A   What she told us is that she saw these two
25  subjects walking down the sidewalk.  They passed her.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Redaction Stamp Only

```
 1   She saw them shake -- I don't know if it was one or two
 2   of the offenders, shake hands with the victim.  That's
 3   what she said she saw there.  Then the next thing she
 4   related was that she heard a -- one gunshot.  She dove
 5   for cover and then she heard a second gunshot.  And she
 6   couldn't give us any more information after that.
 7        Q    Okay.  And you said she gave you descriptions
 8   of the individual?
 9        A    Yes.
10        Q    And what were the descriptions she provided?
11        A    Oh, I don't remember.  I'd have to look at the
12   report.
13        Q    Is there anything else you remember her saying
14   to you, other than what you've just testified to?
15        A    She told us what she heard in the conversation
16   between the offenders and the victim.
17        Q    What did she tell you?
18        A    I'd have to take a look at the report to
19   remember.  It's
20        Q    How about Mr. Gaston what did you recall him
21   saying to you -- to Officer Watson?
22        A    All he had to say is that he heard two
23   gunshots.
24        Q    Did he tell you where he was when he heard the
25   gunshots?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Right at this time he was somewhere in the
 2   building.
 3        Q    When the detectives arrived on the scene, did
 4   you convey all that information that you'd received from
 5   Ms. Taylor and Mr. Gaston to Detective McWeeny and
 6   Brennan?
 7             MR. GRILL:  Objection.  Form.
 8        A    Yes.
 9        Q    Why did you -- did you want to make sure you
10   gave them all the information that you had obtained from
11   Ms. Taylor and Mr. Gaston?
12        A    I want to convey our gathering of information
13   to the detectives.  Yes.
14        Q    And why was that?
15        A    To let them know what we had.  What we'd
16   learned, what we'd discovered.
17        Q    And they -- was it your understanding that
18   they were the ones that were taking over the
19   investigation from you at that --
20        A    Pardon?
21        Q    Was it your understanding that the detectives
22   then would then take over the investigation?
23        A    They start their investigation.  I still have
24   some duties remaining on the scene, but they start their
25   investigation up.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And did you want to make sure they had
 2   all the information that you and Officer Watson had
 3   obtained, to make sure they had that going forward with
 4   their investigation?
 5        A    Correct.
 6        Q    And you wouldn't keep anything back from them?
 7   You would make sure all the information had that you
 8   thought was pertinent and relevant would be provided to
 9   them?
10        A    Why would I hold back any information from
11   them?
12        Q    You wouldn't, right?
13        A    That's nonsensical.
14        Q    Okay.  Right.  So my -- of course you would
15   provide all of that to them; right, so they can
16   follow-up on it?
17        A    That's the point of me being a preliminary, to
18   get those facts and pass it along what I got to them, so
19   they can get some more information.
20        Q    Great.  Well, you said you had some additional
21   responsibilities once the detectives arrived.  What were
22   your responsibilities?
23        A    The -- the protection of the crime scene.  Once
24   that's been done, we got to take care of the body, the
25   removal of the body.  And then actually, it comes down
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   to is then the detectives, if they need anything else
 2   with -- to assist them.  If not, then they're basically
 3   releasing us.
 4        Q    What did you do to protect the crime scene at
 5   927 West 54th Street?
 6        A    We strung up some yellow tape.
 7        Q    Did you have yellow tape in your squad car?
 8        A    Pardon?
 9        Q    Did you have yellow tape in your squad car, or
10   did the --
11        A    I always try and make sure I have.
12        Q    Okay.  So you strung up some yellow tape.  What
13   else did you do to protect the crime scene?
14        A    Just to make sure nobody came through there,
15   but it didn't seem like it was going to be that much of
16   a problem.  He -- the victim fell against the -- the one
17   side of the door.  In the photo you could see the
18   burglar gates to the entrance to the first floor
19   apartment, so nobody was going to be coming through
20   there.  From upstairs, it was hard to say, but I'm -- I
21   couldn't reach over because the victim's body was almost
22   door width and I'm not going to step all over them.
23   There was no need to step over to go up to the second
24   floor, otherwise my big footprint up in there will be
25   contaminating.  But we didn't do anything up on the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
97

```
1    second floor, finding anybody there.  We didn't have it
2    because at the time there didn't seem to be a need to go
3    up there.  Not directly over the body, no.
4        Q    Did you -- how long did you stand out at
5    the -- did you -- well, strike that.  Did you stand out
6    by the crime scene to secure it, while the detectives
7    were investigating and the crime scene technicians were
8    collecting evidence?
9        A    We pretty much spent all the time there, right
10   in the crime scene on the street -- on a sidewalk.
11       Q    Did you have any role or responsibility in
12   collecting any of the evidence, or did you leave that to
13   the crime scene technician?
14       A    We leave that to the crime scene.
15       Q    Okay.
16       A    I -- I point out the body, I point out
17   what -- well, if there was any other piece of
18   information or if there was a -- yes, the shell casing,
19   we noticed that.  We gave that information to the
20   detectives, you know.  Basically, we wait until the --
21   crime scene comes over and they assess what they can get
22   as evidence, collect as evidence.
23       Q    Did you know the crime scene technicians that
24   arrived on scene at 927 West 54th Street?
25       A    Not really, because they were a crime scene,
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
98

```
1    they traveled the city.
2        Q    Okay.
3        A    They could've been north side officers.
4        Q    You said you also had roles and responsibility
5    for removal of the victim's body?
6        A    Yes.
7        Q    And what did you do in that regard?
8        A    That's when we -- after the crime scene's been
9    processed and the detectives give us the final approval
10   that we're able to remove the body, we have the squadrol
11   come out.  And they make the removal, taking the body
12   over to the morgue.
13       Q    So you had to call the squadrol to come get
14   the body?
15       A    When we're ready for it.
16       Q    Okay.
17       A    Because there could be a little wait for it.
18       Q    Okay.
19       A    The crime scene is still being processed.
20       Q    How long were you on the scene, if you recall?
21       A    I don't recall.  It was a bit of time, though.
22   It was a bit of time because it was going slow, because
23   a recruit was doing a lot of the -- of the information
24   gathering.  So it went slow.  If I was working with an
25   experienced partner, and I even say if I was by myself,
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
99

```
1    it would've moved a lot faster.  I knew what to ask, I
2    knew how to put it down, and what I need and what I
3    don't need to do.  It would've moved faster.  But
4    because the slowness of the recruit's unfamiliarity with
5    everything, I had to give him the attention and the time
6    to try and learn to do his job.  So it did take a little
7    longer.  So how -- how long we were on the crime scene?
8    I don't recall.
9        Q    Okay.  Did you -- and then you went --
10   earlier, you testified that after you were done, you
11   went back to your squad car and that's where Officer
12   Watson started to prepare his case report?
13       A    Correct.
14       Q    Okay.  Do you know how long it took him to
15   prepare his case report?
16       A    No, I don't accurately recall how long it
17   took.
18       Q    Okay.  What did you do after -- did Officer
19   Watson complete his case report in the squad car that
20   night?
21       A    No.
22       Q    Well, how long did he work on the case report
23   in the squad car?
24       A    It would've been continuing on with the
25   narrative, putting the -- writing down the -- the
```

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
100

```
1    narrative portion.  And I believe if we might have done
2    the notifications on the case report, either we finished
3    it in the car or else we finished it in the station.
4    I don't recall what we did then.  Which -- if we
5    finished it all in the car or if -- yeah, I don't recall
6    what we did.
7        Q    Did you go back to the 9th District?
8        A    Well, eventually we'd have to.
9        Q    What did you do back at the 9th District,
10   if you recall?
11       A    Yeah, we -- we finished the case report,
12   sign it, turn it in, and then fill out our overtime
13   slip.
14       Q    Do you know how much overtime you worked that
15   night?
16       A    I think it was just an hour.
17       Q    Did you review Officer Watson's report before
18   he submitted it for approval?
19       A    Definitely.
20       Q    Okay.
21       A    Definitely.  That was the whole purpose of the
22   exercise.
23       Q    What -- yeah.  What was your purpose in
24   reviewing it?
25       A    To review of the -- see how accurate he was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
101

```
1    taking information down.
2         Q    Did Officer Watson use his notes he had in his
3    pocket notebook?  Did he use his notes to prepare the
4    case report?
5         A    Yes.
6         Q    What -- do you know what he did with his notes
7    after that?
8         A    Repeat?
9         Q    Do you know what Officer Watson did with his
10   notes that he took out on the scene at 927 --
11        A    His little notebook?
12        Q    Yeah.
13        A    No, I don't know what he did.
14        Q    Did you observe him tear any pages out of his
15   notebook?
16        A    I don't recall seeing him do that.
17        Q    Okay.  What did you do with your notebook that
18   you took notes on, your pocket notebook?  Did you keep
19   them and store them?
20        A    I keep them until the -- the notebook is
21   filled up, and then I hold onto them for a period of
22   time, maybe a year or two until they clutter my dresser
23   too much.  Then I dispose of them.
24        Q    Okay.  Do you have any of your notebooks still
25   today?
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
102

```
1         A    Nope.
2         Q    And you say you keep them in your dresser.
3    Was that your dresser at home?
4         A    Yeah.
5         Q    And you'd keep your notebooks for a couple
6    years?
7         A    Yes.
8         Q    Did you ever provide your notebooks to
9    detectives when they were taking over a case from you?
10             MR. GRILL:  Objection.  Form.  Foundation.
11        There's lots of facts that aren't relevant to this.
12        Q    You can answer, sir.
13             MR. GRILL:  Go ahead and answer questions about
14        what you did in other cases.
15        A    Did with what?
16             MR. GRILL:  Go ahead and answer her question if
17        you can.
18        A    I didn't show my -- well the -- the -- when
19   I was talking to the detectives and giving some of the
20   information that I had, they see it.
21        Q    Meaning, they see your notebook?
22        A    Information -- huh?
23        Q    They see your notebook, you mean?
24        A    Well, I'm standing there talking to the man in
25   front of me, and I'm going through the pages, and, "This
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
103

```
1    is what I got.  This is what I have and this is what we
2    do."
3         Q    Okay.
4         A    All right?  So the detective is going to be
5    looking down at the notebook and see what's happening,
6    what I'm saying.  I didn't give the notebook to him
7    because everything that was mentioned in the notebook is
8    written in the report.
9         Q    Okay.
10        A    And this is my emphasis for the recruit -- for
11   the recruit to do.
12        Q    Got it.  Okay.  And then -- okay.  Thank you.
13   Okay.  I'm going to show you what I'm going to designate
14   as Exhibit 1 to your deposition.  And -- well, for the
15   record, it's City_Day 56 to 57.  Okay.
16             (EXHIBIT 1 MARKED FOR IDENTIFICATION)
17             MR. GRILL:  Is there a second page?  Oh, it's
18        on the back.  I got it.
19   BY MS. DONNELL:
20        Q    Okay.  Officer Radtke, I've just handed you
21   what I've designated Exhibit 1 to your deposition.  Do
22   you recognize this document?
23        A    What I'm realizing now is we're going to go
24   into a whole different segment of questioning here, and
25   I'm going to be requesting to take a lunch break.
```

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
104

```
1              MS. DONNELL:  Oh, sure.  Okay.  You want to
2         take a lunch break right now?
3              THE WITNESS:  We're an hour and a half from the
4         last one.  We're going into a whole new series of
5         questioning.
6              MS. DONNELL:  You don't have to -- it's fine.
7              MR. GRILL:  Yeah.  Yeah.
8              MS. DONNELL:  There's no -- nobody's arguing
9         with you.  That's fine.
10             MR. GRILL:  Yeah, we can take a lunch break.
11             MS. DONNELL:  We can go off the record right
12        now.
13             COURT REPORTER:  Okay.  We are going off the
14        record at 1:30 p.m. Eastern Standard.
15             (OFF THE RECORD)
16             COURT REPORTER:  We are back on the record for
17        the deposition of Martin Radtke being conducted by
18        videoconference.  My name is Taylor Veneman.  Today
19        is March 28, 2022.  The time is 2:20 p.m. Eastern
20        Standard.
21   BY MS. DONNELL:
22        Q    Okay.  When we left off, we were going
23   over -- or we were start to go over Exhibit 1.  Do you
24   have Exhibit 1 in front of you?
25        A    Pardon?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1        Q    Do you have Exhibit 1 in front of you?
2        MR. GRILL:  This is the Exhibit 1.
3        A    Oh.  Oh, yes.  Exhibit 1.  Got it.
4        Q    Okay.  So I'm going to ask you some questions
5   about Exhibit 1.  First of all, do you recognize Exhibit
6   1?
7        A    Yes.
8        Q    What is -- do you recognize it to be?
9        A    It is a copy of the case report we turned in
10  that night.
11       Q    Okay.  And the handwriting at the top of
12  the -- at the case report that says, "Homicide," and
13  then it has some numbers and murder across the top.
14  Is that your handwriting or that Officer Watson's?
15       A    That's Officer Watson's.
16       Q    Okay.  Is any of this your handwriting, other
17  than your signature at the bottom where it says M.
18  Radtke?
19       A    No, this is all Watson's handwriting, front
20  and back.
21       Q    How about the signature at the very bottom
22  where it says M. Radtke and a star number, and then
23  there's a signature?  Is that your signature or is that
24  Watson's?
25       A    I don't --
```



```
1        MR. GRILL:  Is there -- where, like which part?
2        Q    Sorry.  At the very, very bottom there's a
3   line that says, "Reporting officer's name, print, star
4   number."  It says, "M. Radtke 13154."  And then there's
5   officer's signature and it looks like there's an M.
6   Radtke.  Do you see that?  Is that your signature?
7        A    I don't know, because the paper clip seems to
8   be hiding a good portion of it.
9        Q    Okay.  I'm going to mark this as Exhibit 2.
10  I only have one copy right now.  I'm trying to get
11  another copy, but it's -- and I'll show it to you first.
12  But this is City_Day 5 and 6, and it's a color copy of
13  the case report.  I'm going to show this to you because
14  I think it's a little clearer.  Is that okay, Andrew?
15       (EXHIBIT 2 MARKED FOR IDENTIFICATION)
16       MR. GRILL:  There you go.  Yeah, it's okay.
17       Q    Okay.  Looking at what I've marked as Exhibit
18  2 to your deposition, is that -- are you able to now get
19  a clearer picture of the bottom line that says,
20  "Officer's signature"?
21       A    No, that's not my signature.
22       Q    Okay.  Thank you.
23       MR. GRILL:  You want this back?
24       Q    Sure.  Well, actually, if it's -- is it easier
25  for you to see this copy, Exhibit 2?  Is that easier for
```



```
1   you to look --
2        MR. GRILL:  It's a littler clearer, to be
3   honest with you.
4        A    Yeah.  Yeah.
5        Q    Okay.  Well, then why don't you hold onto
6   that?
7        MR. GRILL:  I'll get the numbers.
8        Q    Okay.  Yeah, I think it's clearer, too.  Okay.
9   So now having what's in front of you as I designated as
10  Exhibit 2 to your deposition, do you recognize Exhibit 2
11  as another copy of the case report that Officer Watson
12  prepared after -- on May 17, 1991?
13       A    Yes.
14       Q    Okay.  And is this the report that you -- or a
15  copy of the report you reviewed that evening, before he
16  turned it in?
17       A    Yes.
18       Q    And if you look at, I think it's box number
19  97, at the bottom right-hand corner, was the supervising
20  officer that this report turned into, Sergeant Carroll?
21       A    And the question?
22       Q    Is that -- was this report turned into
23  Sergeant Carroll?  Was that the supervising officer?
24       MR. GRILL:  Hang on.  Form, compound, and
25       foundation.
```

```
1        THE WITNESS:  I can --
2        MR. GRILL:  Yeah, go ahead.
3   BY MS. DONNELL:
4        Q    Can you answer who signed -- what was the
5   supervisor who signed off on this report?
6        A    I have no idea.
7        Q    You have no idea?  Okay.  So in box number 97,
8   you can't read who that is?  Or you don't recognize who
9   that is?
10       MR. GRILL:  Box 97?
11       MS. DONNELL:  I think it's 97.
12       MR. GRILL:  I agree.  I just wasn't -- I didn't
13       hear you.
14       MS. DONNELL:  I can go get my readers.
15       MR. GRILL:  It's -- I agree, it looks like it's
16       box 97, so I --
17       THE WITNESS:  Yeah, it's 97.
18       MR. GRILL:  Yeah.
19  BY MS. DONNELL:
20       Q    Do you recognize the signature in box 97, sir?
21       A    No, I don't.
22       Q    Okay.  Okay.  Looking at the top of the case
23  report, in box number six, that has the date of the
24  occurrence and the time; is that right?
25       A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 109**

```
1     Q    And what did Officer Watson say was the date
2  and time of the occurrence?
3     A    What he wrote down?
4     Q    Yep.
5     A    Yeah, 17 May, '91.  05, 005.
6     Q    And that would be in -- 12:05 a.m.?
7     A    Correct.
8     Q    On May 17th?  And then it says the date --
9  right below box number six and box number 11,
10  what's -- what did Officer Watson -- well, what is box
11  number 11 for the case report?
12    A    He wrote down 17 May, '91. 0013.
13    Q    And that's the time the reporting officers
14  arrived, right?
15    A    Yes.
16    Q    Okay.  Do you have any reason to doubt that
17  that was the time that you and Officer Watson arrived on
18  the scene?
19    A    No.
20    Q    And do you know why he put in 12:05 or 0005 as
21  the time of the occurrence?  Do you know where he got
22  that time of occurrence from?
23    A    I don't recall.
24    Q    Is this the case report that you were
25  testifying earlier that Officer Watson prepared in the
```

**Page 110**

```
1  squad car and then completed at the 9th District?
2     A    Repeat that?
3     Q    It -- the report in front of you, the case
4  report that you testified earlier that Officer Watson
5  began by filling out in the squad car and then completed
6  at the 9th District on May 17th?
7     A    Is that a copy of his report?
8     Q    Yes.
9     A    Yes.
10    Q    Okay.  And is that the only report that he
11  prepared that night?
12    A    Yes.
13    Q    And did you prepare any report?
14    A    No.
15    Q    Okay.
16    A    Excuse me.
17    Q    Okay.  The beat of occurrence, it's in box
18  number seven, I believe, in the top right-hand corner.
19  Was that 934? 
20    A    Yes.
21    Q    And was that the beat you guys were working or
22  is that -- what does that reflect, where it occurred?
23    A    That's the beat that it occurred on.
24    Q    Okay.  And then the next box over, Beat 8,
25  that was the beat of the unit assigned, that was your
```

**Page 111**

```
1  box -- that was your beat?  I'm sorry.
2     A    Yes.
3     Q    Okay.  So you and Officer Watson were assigned
4  to Beat 936 that evening, correct?
5     A    Yes.
6     Q    But the occurrence of the homicide at 927 West
7  54th Street, that was located in Beat 934?
8     A    Yes.
9     Q    Okay.  Okay.  Let's look at -- so box number
10  21 has the name of the victim, Jerrod Irving, right?
11    A    Yes.
12    Q    And did you -- so you had the name of -- you
13  had -- sorry, strike that.  You had ascertained the name
14  of the victim while you guys were still on the scene?
15         MR. GRILL:  Objection -- go ahead.  I'll
16    withdraw the objection.
17    A    Repeat the question, I --
18    Q    Did you and Officer -- did you -- sorry,
19  strike that.  Did you ascertain the identity of the
20  victim -- thanks, Melinda.  The identity of the victim
21  when you were on the scene?
22    A    I don't recall how we got the information.
23         COURT REPORTER:  And I'm sorry, Officer Radtke,
24    could you turn the camera a little bit more?  Most of
25    your -- half your face is kind of cut out there.
```

**Page 112**

```
1    Thank you.
2         MS. DONNELL:  Yes, this is Exhibit 2, if you
3    want a color copy over here.  Oh no --
4         MR. GRILL:  Same one, sorry.
5         MS. DONNELL:  Yeah.
6         MR. GRILL:  It's this?
7         MS. DONNELL:  No, it's a two-page.  Oh, huh.
8         MR. GRILL:  Yeah.
9         MS. DONNELL:  Oh, interesting.
10        MR. GRILL:  Yeah.  I think.
11        MS. DONNELL:  Okay.  Sorry.  You can just look
12    at the first page on it.
13        MR. GRILL:  All right.
14  BY MS. DONNELL:
15    Q    I think the second page didn't get it.  But
16  anyway.  You don't remember how -- well, my
17  question is not how you got the information, but did you
18  figure out who the identity of the victim was while you
19  were still on the scene at 927 West 54th Street?
20    A    Repeat that question.
21    Q    Did you obtain the identity of the victim
22  while you were still on the scene at 927 West 54th
23  Street?
24        MR. GRILL:  Are you -- sorry.  Are you asking
25    him specifically, or do you mean generally?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

1  Q   Did you figure out who the victim was?  Did
2  you know the identity of the victim, generally speaking,
3  while you were still out on the scene?
4      MR. GRILL:  Form.  Go ahead.
5      A   I don't think so.
6      Q   Do you remember how you obtained that
7  information?
8      A   I don't.
9      Q   Did you speak to the victim's father when you
10 were at the scene?
11     A   No.
12     Q   How about the victim's mother?
13     A   No.
14     Q   Okay.  Okay.  In box number 31, it indicates
15 two individuals, right?  Forha Taylor and Brian Gaston?
16     A   Yes.
17     Q   Okay.  And are those the two individuals that
18 you and Officer Watson spoke to that night?
19     A   Yes.
20     Q   Okay.  And then he included their addresses,
21 correct?
22     A   Yes.
23     Q   And their identifying information in terms of
24 whether male or female, their race, and their age,
25 right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1      A   Yes.
2      Q   Okay.  And then you -- this report did not
3  include a home phone number for either Ms. Taylor or
4  Mr. Gaston, correct?
5      A   Correct.
6      Q   Okay.  And then what -- do you know what he's
7  put here in box number 35, for the business phone?
8      A   There was none provided from the witnesses.
9      Q   But the -- do you -- are those -- do you know
10 what those abbreviation is in box number 35?
11     A   The DNA?
12     Q   Yes.
13     A   Does not apply.
14     Q   I see.  Is this form the Case Offense form
15 that you were trained on back in 1977, when you're
16 talking about Sergeant Lau training you?
17     A   Yes.
18     Q   Okay.  And so you were familiar how to fill
19 out this form yourself, correct?
20     A   Yes.
21     Q   And that's what you were training Officer
22 Watson on, how to fill out accurately?
23     A   Correct.
24     Q   Okay.  Okay.  And then here it says, under box
25 number 41, "Offender name or describe clothing, et



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1  cetera," correct?
2      A   Yes.
3      Q   Okay.  And what was written in the first line?
4      A   Well, it was double -- double lines in the one
5  space.
6      Q   Okay.  What was in the --
7      A   What do you mean, the first line?
8      Q   The first line.  The first row, is that a
9  better way of saying it?  The first row.
10     A   Oh, you want me to read the description?
11     Q   Yes, please.
12     A   All right.  Looks like it says, "Dark baseball
13 hat, red silk Bulls starter jacket with white lettering
14 on front."
15     Q   Okay.  And then for the home address it says,
16 "U/N/K."  Is that an abbreviation for unknown?
17     A   Yes, unknown for a home address, yes.
18     Q   And then in box number 43 for the first row,
19 what did Officer Watson put down?
20     A   Which box?
21     Q   Box 43.
22     A   He wrote in there, "M 1."
23     Q   What does that stand for?
24     A   That's a male one.
25     Q   And what is the one for the race code?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1      A   Black.
2      Q   Okay.
3      A   And he's got, looks like, "16/20."
4      Q   Is that for the --
5      A   For age.
6      Q   Okay.  So he was somewhere between 16 and 20
7  years in age.  And what did he put for the height?
8      A   Looks like he is got 5'3"/5'6."
9      Q   What did he put for the weight?
10     A   Pardon?
11     Q   What did he put for the weight?
12     A   For weight?  Just medium.
13     Q   What does that mean?
14     A   There was no --
15         MR. GRILL:  Objection.  Foundation, calls for
16 speculation.
17     Q   Well --
18     A   We were not provided with any weight -- any
19 weight description.
20     Q   Were you provided with a build description?
21     A   Pardon?
22     Q   Were you described with any description of the
23 individual's build?
24         MR. GRILL:  Form.
25     A   We were given the description as medium.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    Q    Okay.  So that's what the M-E-D stands for?
2    A    Correct.
3    Q    Okay.  How about for the eyes description?
4    A    Unknown.
5    Q    How about the hair?
6    A    Unknown.
7    Q    How about the complexion?
8    A    It's got written, "DRK," for dark.
9    Q    Okay.  And how about marks and scars?
10   A    I got unknown.
11   Q    What's box number 44 supposed to contain?
12   A    If there was an arrest.
13   Q    Okay.
14   A    -- it would run in -- put the CB number in
15   there.
16   Q    There was no arrest made, correct?
17   A    No arrest made.
18   Q    Okay.  And then how about for box number 45?
19   A    45, I got number 24.
20   Q    That box is for the offender relationship
21   code, correct?
22   A    Correct.
23   Q    And the offender relationship codes are listed
24   just above there, in the box?  And what is 24?
25   A    24 says, "No relation."
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1    Q    Okay.  Why did you and Officer Watson select
2    24 for, for no relation?
3         MR. GRILL:  Objection.  Foundation.
4    A    I don't recall.
5    Q    And actually I didn't ask this before, but you
6    supervised Officer Watson in filling out this case
7    report, correct?
8    A    Yes.
9    Q    Okay.  And you reviewed it before he submitted
10   it, correct?
11   A    Yes.
12   Q    But -- so as you sit here today, you don't
13   know why you so had -- you and Officer Watson selected
14   relationship code 24, no relationship?
15   A    Because we really didn't know what the
16   relationship was.
17   Q    Now what was the description of the
18   second offender that was contained in the case report?
19   A    What's marked in box 41 for second offender,
20   it's dark baseball hat, black silk starter jacket.
21   Q    How about the home address?
22   A    Which?
23   Q    Home address?
24   A    Unknown.
25   Q    How about the sex, race and age?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1    A    Male one, or male Black.  16/20 for age.
2    Q    What about the height?
3    A    That'd be 5'3"/5'6".
4    Q    And what was the weight or build?
5    A    That was just given as medium.
6    Q    Did you have a description of the eyes or the
7    hair?
8    A    No description.  We put down unknown.
9    Q    Okay.  And what about the complexion?
10   A    We were given a description of dark.
11   Q    Okay.  Any marks or scars?
12   A    That was unknown.
13   Q    And how about the offender relationship code
14   for the second offender?
15   A    Again, number 24.
16   Q    Okay.  Which means no relationship, right?
17   A    Right.
18   Q    Okay.  Okay.  The next part says, "Object
19   weapons," right?
20   A    Yes.
21   Q    And you guys have selected the box for used,
22   correct?
23   A    Yes.
24   Q    And then it was identified as the box for a
25   handgun?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

```
1    A    Yes.
2    Q    And then it says, "Firearm features," and it
3    was selected unknown, number seven, right?
4    A    We had no idea what the gun looked like.
5    Q    Okay.  And there was no description of a gun
6    provided either, right?
7    A    We marked down unknown.
8    Q    I know.  Well, no description of a firearm was
9    provided from -- to you by any witnesses, correct?
10   A    Well, we marked off unknown, we don't know.
11   Q    Right.  And that's because nobody -- no
12   witness provided a description to you, correct?  Of the
13   weapon.
14   A    There was no description of the firearm given
15   to us.
16   Q    Okay.  Nobody -- right.  Okay.  Thank you.
17   Okay.  For point of entry, you guys selected "does not
18   apply," correct?
19   A    Yes.
20   Q    And for point of exit, you selected "does not
21   apply," correct?
22   A    Yes.
23   Q    And why was that?
24   A    From what the witness told us, he was sitting
25   in the doorway, which means he wasn't neither going in,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
121

1  nor was he coming out.

2     Q  Okay.  How about over on the gang related

3  affiliations, it says, "Victim," and it has, "JB." Do

4  you see that?

5     A  Yes.

6     Q  And what does that -- do you know what that

7  stands for?

8     A  I believe it was Jet Black.

9     Q  Okay.  And do you know where you got

10  information about the victim's gang affiliation?

11     A  No, I don't.  I don't recall.

12     Q  Okay.  Then it says -- there's a narrative

13  section, right?

14     A  Yes.

15     Q  Can you read for me the narrative section?

16     A  The what?

17     Q  Can you read it for me, please?

18     MR. GRILL:  she wants you to read it.  Read the

19  narrative section.

20     A  Oh, okay.

21     Q  Sorry.

22     A  Yeah, I'm getting like static whispering,

23  like -- like a little whisk.  That's why --

24     Q  Would you like to pause to adjust --

25     A  No, no.  All right.  In summary -- you want me



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
122

1  to read the whole thing?

2     Q  Yes, please.

3     A  "In summary, witness number one stated to ROs

4  at above date and time the above offenders walked past

5  her and spoke with the victim." Oh, shook.  It's

6  blurry there.  "They walked past her and shook the

7  victim's hand while he was sitting on the steps in front

8  of above location.  Offenders stated to victim, 'Do you

9  have any work?  Any work here?'  Victim replied, 'I

10  don't work over here.'  At this time witness one related

11  to ROs that she heard two shots.  Witness one discovered

12  victim lying face up on front steps.  Witness two,

13  through investigation with ROs, stated that he also

14  heard two shots from the second floor apartment."  And

15  then it goes into the crime scene lab at the scene.

16  *Recovered two nine millimeter casings, will inventory.

17  Beats 952, 920, 914, and Beat 4114 at the scene.

18  Notifications made.  First deputy, badge number 16335,

19  Officer Frost, Area 3 Violent Crimes Beat 5312,

20  Detective" -- that's the wrong name. McWayne, I -- got a

21  badge number of 14367.  I think the detective's name is

22  misspelled.

23     Q  Okay.

24     A  "That he was on the scene.  Zone 13 was

25  notified.  The desk -- night district desk was notified,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
123

1  Sergeant McMahon.  Driving lab beat 9603, Rick's number

2  -- star number 6191 and Officer Moran, star 7718.

3  Medical Examiner Turner with a badge number 42 made

4  official" -- that's blurry.  It looks like it gave

5  pronouncement at 0220 hours.  "Beat 972 made removal to

6  ME," medical examiner's "office.  Fire and EMS at

7  ambulance number 36 was at scene and checked for vital

8  signs, which was negative."

9     Q  Thank you.  Okay.  Does Exhibit 2 that's in

10  front of you, the color copy of the case report, does

11  that contain a summary of all the information that Korna

12  Taylor and Brian Gaston provided to you that night on

13  scene?

14     A  Yes, it does.

15     Q  Was there anything they told you that was not

16  included?

17     A  Pardon?

18     Q  Anything they told you that was not included?

19     MR. GRILL:  Objection.  Form, foundation.

20     A  I'm having trouble understanding you.

21     Q  Oh, I'm so sorry.  Yeah, I'll try it again.

22  Was there anything that Ms. Taylor told you that was not

23  included in the case report that we've just gone over?

24     MR. GRILL:  Objection.  Form, foundation, asked

25     and answered.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
124

1     A  No, what's written on the report is what she

2  told us.

3     Q  Did Ms. Taylor tell you that one of the

4  assailants looked like -- was a woman?

5     A  According to our report, no.

6     Q  Is it -- did Ms. Taylor ever tell you that one

7  of the assailants was a woman that looked like a man?

8     A  Again, according to our reports, no.

9     Q  Okay.  If Ms. Taylor had told you that one of

10  the assailants looked like it could have been a woman,

11  would that have been documented?

12     A  Yes.

13     Q  Okay.  How would that have been documented?

14     A  Exactly the way we took the information on the

15  male subject.

16     Q  What if somebody tells you and they're not

17  sure if the individual they saw was a man or a woman,

18  how would you document that?

19     MR. GRILL:  Objection, calls for speculation.

20     A  How do we deal with that?

21     Q  Yeah.  If you have a situation where somebody

22  saw somebody but couldn't tell if it was a man or woman

23  from the distance they were at?

24     A  We go with what the -- what the statement

25  given by the witness.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
125

1    Q  Okay.  So it's your testimony that -- well,

2  strike that.  Okay.  You identified an error in the case

3  report, correct?

4    A  Pardon?

5    Q  You identified an error in the case report,

6  correct?  It wasn't Detective McWayne that appeared, it

7  was Detective McWeeny?

8    A  The recruit wrote down the name that he

9  thought he heard, but it was a difficult name and it

10  could be easily misspelled.

11    Q  Okay.  It was star number 14367 though, right?

12    A  Yes.

13    Q  Okay.  And -- well, I'll show you.  This is

14  going to be Exhibit number 3.  George, I'm -- exhibit

15  number 3 for the deposition is a supplementary report,

16  and I'm -- it's a copy City_Day 62 consecutive through

17  65.  Do you recognize Exhibit 3, Officer Radtke?

18       (EXHIBIT 3 MARKED FOR IDENTIFICATION)

19    A  Yes.

20    Q  And that's the supplementary report that was

21  prepared by the Detective Dan McWeeny, star number

22  14367?

23    A  Yes.

24    Q  Okay.

25      MR. GRILL:  Lack of foundation for this



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
126

1  witness.

2    Q  Well, you see that at the bottom of his

3  report?

4    A  Yes.

5    Q  Okay.  And you have no reason to doubt that he

6  would put his correct star number, right?

7    A  I can't doubt it or prove it because I did not

8  see him write it.  This report was written well after I

9  had left the scene and gone home.

10    Q  Okay.  Well, you're -- you don't doubt that --

11  are you questioning that the star -- well, strike that.

12  Was it Dan McWeeny that showed up on the scene?

13      MR. GRILL:  Foundation.

14    A  I got his name as being on the scene --

15    Q  Okay.

16    A  -- yes.

17    Q  All right.  And you reviewed this report to

18  prepare for your deposition, right?

19    A  Yes.

20    Q  Okay.  And if you look at page 3 of the

21  supplementary report about halfway down.

22      MR. GRILL:  City_Day 63, that the page you're

23  on?

24      MS. DONNELL:  City_Day 64.

25      MR. GRILL:  Okay.  That's page 4.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
127

1      MS. DONNELL:  It's page 3 of the report.

2      MR. GRILL:  Well it says -- oh, right.  Yeah,

3  okay.

4      MS. DONNELL:  Thank you.

5      MR. GRILL:  So let's just do by Bates stamp,

6  that's easier.

7  BY MS. DONNELL:

8    Q  Okay.  Fine.  So page 3 of the supplementary

9  report, Bates stamp 64.  Do you see, halfway down that

10  page?

11    A  Yes.

12    Q  Okay.  And you reviewed this before your

13  deposition, right?

14    A  I did what?

15    Q  You reviewed the supplementary report before

16  your deposition, right?

17    A  Yes.

18    Q  Okay.  And so you know that the detective

19  summarized that they had an interview with you upon

20  arrival of the scene, correct?

21    A  Yes.

22    Q  Okay.  And they relayed that you told them

23  that you responded to a call of a man being shot and

24  upon arrival observed the victim in the above-described

25  condition and after determining that the victim was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022
128

1  deceased, protected the crime scene and made all the

2  proper notifications, right?

3    A  Correct.

4    Q  And Detective McWeeny goes under, writes that,

5  "Officer Radtke also located witnesses to the shooting,

6  held them at the scene until arrival of the

7  investigative personnel," right?

8    A  Correct.

9    Q  "The witnesses were interviewed at the scene

10  by the reporting detective, and the following summary is

11  a summary of those interviews," right?

12    A  Correct.

13    Q  Okay.  But you also had interviewed two

14  witnesses, right?  Prior to the detectives arriving.

15    A  I was part of the interviewing Taylor and

16  Gaston.

17    Q  With Officer Watson, right?

18    A  Correct.

19    Q  Were you part of Detective McWeeny's interview

20  of Korna Taylor?

21    A  I don't recall, because I still had duties at

22  the crime scene that I was trying to help the recruit

23  with.  I don't recall if I was there watching the

24  detective talk to her or I was trying to assist my

25  recruit.  I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 129**

1    Q    Okay.  When you -- the conversation that
2    Officer Watson had with Ms. Taylor, do you remember if
3    Detective McWeeny or Detective Brennan was present for
4    that interview?
5    A    No.
6    Q    Okay.  How about your interview that you
7    testified to that you and Officer Watson had with Brian
8    Gaston, was Detective McWeeny or Detective Brennan
9    present for that?
10   A    No.
11   Q    Okay.  Did you interview an individual by the
12   name of Carl Taylor?
13   A    No.
14   Q    Were you present for the detective interview
15   of Carl Taylor?
16   A    No.
17   Q    On the next page it says that Renee Taylor was
18   interviewed.  Were present for the interview of
19   Renee Taylor?
20   A    No.
21   Q    Were you present for Detective McWeeny and
22   Detective Brennan's interview of Brian Gaston?
23   A    No.
24   Q    Okay.  How about Walter Irving, were you
25   present for the interview of the father of the victim,



**Page 130**

1    Walter Irving.
2    A    No.
3    Q    How about Edward Green, were you present for
4    the interview of Edward Green?
5    A    No.
6    Q    Do you recall Sergeant Carroll of the 9th
7    District being present on the scene while you were
8    there?
9    A    No.
10   Q    Okay.  Do you know who Sergeant Carroll is of
11   the 9th District?
12   A    He's a desk sergeant on a midnight shift.
13   Q    Okay.  But you have no recollection of him
14   being on the scene?
15   A    No.
16   Q    Okay.  So the end of the supple report says
17   that a canvas of the neighborhood was conducted.  Were
18   you and Officer Watson part of the canvas of the
19   neighborhood?
20   A    We were a part of it when we talked to Ms.
21   Taylor and Gaston.
22   Q    Other than those interviews, did you conduct
23   any other interviews as part of a canvas of the scene?
24   A    No, because we were -- I was trying to assist
25   my recruit at the scene, back in the scene.



**Page 131**

1    Q    Okay.  Do you see on the page 4 of the
2    detective supplementary report, which has Bates stamp
3    65, do you see a summary of the interview of Brian
4    Gaston?  Do you see that?
5    A    Got it.
6    Q    It says that he was interviewed and
7    gave basically the same account of the incident as had
8    Renee Taylor.  He added however that he heard from
9    persons in the neighborhood that a white Cadillac was
10   seen in the area of the shooting and that one of the
11   occupants was wearing a red Bulls jacket.  Do you see
12   that?
13   A    Yes.
14   Q    Did Brian Gaston provide that information to
15   you as well?
16   A    No.
17   Q    Okay.  And if he had provided that information
18   to you, would it be in the case report?
19   A    Yes.
20   Q    Okay.  Do you see on page -- I'm going
21   to call your attention to page 3 of the supplementary
22   report.  It has Bates stamp 64 at the bottom.  Do you
23   see there, there's a summary of an interview with Korna
24   Taylor?
25   A    Yes.

**Page 132**

1    Q    Okay.  Why don't you read through it to
2    yourself and then I'm going to ask you some questions
3    about it, okay?
4    A    You want me to read it out loud?
5    Q    No, to yourself.  You can just read it to
6    yourself.  Just let me know when you've had opportunity
7    to review it.
8    A    Question?
9    Q    Oh, I was just waiting for you to tell me if
10   you had a chance to review it, then I'll ask you
11   questions.  Did you get a chance to review it?
12   A    Yes.
13   Q    Okay.  Are you ready?
14   A    Yes.
15   Q    Okay.  So I'm just going ask you some
16   questions about the description of the information
17   provided from Korna Taylor that is in Detective
18   McWeeny's supplementary report, okay?
19   A    All right.
20   Q    Okay.  He said that she told him she
21   observed -- at the time of the shooting she observed the
22   offenders come westbound from Peoria on the south
23   sidewalk of 54th Street.  Do you see that?
24   A    Yes.
25   Q    Did Ms. Korna Taylor provide that information

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
KENTUCKIANA
COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to you?

2      A   I believe in the report, that's exactly what

3  she says.  They walked past her -- that they walked past

4  her.

5      Q   Okay.  Do you see that detail that they were

6  walking westbound from Peoria on the south sidewalk of

7  54th Street, do you see that detail?

8      A   Yes.

9      Q   Okay.  That's not in the case report that you

10 have, correct?

11     A   No.

12     Q   Okay.  Did Ms. Taylor provide that information

13 to you about the direction that they were walking and

14 what side of the street they were walking on?

15     A   If she had, we would've put that in detail

16 into this case report.

17     Q   Okay.  And the next part says that the

18 offenders walked up to the victim who was sitting on the

19 entrance -- hallway entrance of 927 West 54th Street,

20 right?

21     A   That's what it says on the follow-up report,

22 yes.

23     Q   Okay.  And then the supplementary report goes

24 on to say, "One of the offenders shook the victim's hand

25 and the victim stated, 'What's up, Mo?'  And the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1  offender replied, 'Got any money?  Got any work here?'

2  And the victim replied, 'I don't work over here.'"

3  Do you see that?

4      A   Yes.

5      Q   Okay.  Did Ms. Taylor provide that information

6  to you as well?

7      A   Yes.

8      Q   Okay.  How about this part, "What's up, Mo?"

9  That's not -- that's in the supplementary report, but

10 not in your case report, right?

11     A   Because it wasn't said to us at the time.

12     Q   Okay.

13     A   This was said to the detective.

14     Q   Okay.  Ms. Taylor then stated that she heard a

15 shot and she immediately took cover from the shooting.

16 A short time later she heard a second shot.  She added

17 that when the shooting stopped, she returned to the

18 victim and observed him wounded.  Do you see that?

19     A   Yes.

20     Q   Would you -- did those -- the details about

21 what Ms. Taylor did when she heard the shot is not

22 included in your case report, correct?

23     A   What was your question?

24     Q   The details about what Ms. Taylor did when she

25 heard the shots are not in your case report, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1      A   No, because she didn't provide them to us.

2      Q   Okay.

3      A   Again, this is what she told the detective.

4      Q   Okay.  Did Officer Watson ask Ms. Taylor any

5  follow-up questions or did he just -- about what

6  where she was when she heard the shooting?

7      A   Who asked?

8      Q   Did Officer Watson ask any follow-up questions

9  about where Ms. Taylor was when she heard the shots get

10 fired?

11         MR. GRILL:  I'm sorry can you ask that -- what

12     was that question again?

13     Q   Did Officer Watson ask Ms. Taylor any

14 follow-up questions about where she was when she heard

15 the gunshots?

16         MR. GRILL:  In his -- when?  In his presence?

17         MS. DONNELLA:  Correct.

18     A   I don't recall.

19     Q   Okay.  Then it says in the supplementary

20 report that she assisted the victim and waited until the

21 arrival of emergency personnel, CFD, ambulance, and

22 police.  Do you see that?

23     A   Yes.

24     Q   Okay.  That's not in your case report, is it?

25 That detail.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

1      A   Which detail?

2          MR. GRILL:  Form.  Sorry.

3      A   What's not in our report?

4      Q   That Ms. Taylor assisted the victim and waited

5  until the arrival of emergency personnel?

6      A   No, that is not in report.  What she provided

7  was that she saw the victim lying face up on the front

8  steps.

9      Q   Okay.

10     A   She did not give that additional information.

11 That was given to the detective.

12     Q   Okay.  And then it says, "She further added

13 that there were other people on the street at the time

14 of the shooting, but she did not know their names,"

15 right?

16         MR. GRILL:  Are you asking that that was part

17     of the report?

18     Q   That's in the supplementary report sorry.

19 Thank you.  Thanks, Andrew.  Do you see that?

20     A   This is what the -- the detective told -- was

21 told by Ms. Taylor.

22     Q   Okay.  Did you and Officer Watson ask

23 Ms. Taylor if she observed anybody -- any other

24 witnesses that were on the street at the time of the

25 shooting?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I don't recall.

2    Q    It's not in your case report, correct?

3 Or in Officer Watson's case report?

4    A    That's not here, then we didn't know -- she

5 didn't say that then.

6    Q    Does that mean you didn't ask -- you or

7 Officer Watson didn't ask her if she observed anybody

8 else who may have witnessed the crime?

9    A    We didn't ask her because she had first

10 informed us that she walked -- that the offenders walked

11 past her.

12    Q    Okay.  Did you ask Ms. Taylor if she observed

13 anybody else on the street who might have witnessed the

14 homicide?

15    A    I don't recall.  Again, if she had, we

16 would've put it in the report.

17    Q    Well, if you had asked her that question?

18    A    Pardon?

19    Q    If you had asked her that question,

20 you would've put it in your report?

21    A    I'm not sure.

22    Q    I mean, if she told you there were other

23 witnesses you might not have put that in your report?

24        MR. GRILL:  Objection, mischaracterizes the

25 testimony.  You can answer the question.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yeah, I -- I'm -- I'm not sure if we would've

2 put it in the report because we didn't see any other

3 people on the street, she didn't tell us at the time

4 there's anybody on the street.  There didn't seem to be

5 an -- that there were people that she would report of

6 it.

7    Q    Do you know as you sit here today whether you

8 guys asked her if there was any other witnesses?  Do you

9 know as you sit here today, whether you and Officer

10 Watson asked Ms. Taylor if there were any other

11 witnesses?

12        MR. GRILL:  Asked and answered.

13    A    I don't know, you're starting to lose me with

14 that.

15    Q    Okay.  How am I losing you?

16    A    Restate it.

17    Q    Oh, sure, I can restate it.  Did you or

18 Officer Watson ask Ms. Taylor if she observed any other

19 witnesses?

20    A    I'm not sure if we did.  I don't know.

21    Q    Okay.  Did you speak to any witness that

22 observed the actual shooting?

23        MR. GRILL:  Objection form, foundation.

24    Q    You can answer.

25    A    What was the question?  What?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    You did you speak to any witness on

2 March -- on -- I'm sorry, strike that.  Did you speak to

3 any witness on --

4        COURT REPORTER:  Can you hear me?  Ms. Donnell?

5 I can't hear you guys.  The phone dropped.  Can you

6 guys hear me?

7        MS. DONNELL:  Hi.

8        COURT REPORTER:  Can you hear me?

9        MS. DONNELL:  Yeah.  Sorry.  When did we lose

10 you?  We didn't notice.

11        COURT REPORTER:  Yeah, I was trying to -- I

12 didn't know what to do.  The last question you asked

13 was, did he speak to any witness on the day of the

14 shooting?  That's -- well, I can just play it back,

15 but that was -- that was basically the last thing I

16 heard.  If he spoke to any witness -- sorry, go

17 ahead.  You just want me to play it back?

18        MS. DONNELL:  Yeah, play it back.

19        COURT REPORTER:  Okay.  Sorry, I had it cued up

20 because I thought you were going to ask me and now I

21 don't know where it went.  Where did that --

22        (REPORTER PLAYS BACK REQUESTED QUESTION)

23        COURT REPORTER:  Okay.  Maybe I didn't get your

24 last question.  But you were asking if you spoke to

25 any witness that saw anybody else?  If that -- if

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 knew of any other witnesses?

2        MS. DONNELL:  Yeah, okay.

3        COURT REPORTER:  And that was the last thing I

4 got.

5 BY MS. DONNELL:

6    Q    Okay.  How about, can you read -- okay.  Okay.

7 Okay.  Let's try it.  Okay.  We'll keep -- we'll try

8 again.  I think we have to go back over some of it, so I

9 apologize for that.  It is what it is.  Did you speak to

10 any witnesses on the scene who had actually witnessed

11 the shooting, meaning the victim being shot?

12    A    No, we didn't.

13    Q    Okay.  I'm not sure.  Okay.  I'm going to ask

14 you some questions about some -- well, let me strike

15 that.  And you were not given any names of any

16 individuals who the assailants were, correct?

17    A    According to the offender box, we were not

18 given any names, just a clothing description.

19    Q    Okay.  And you were not given any gang

20 affiliation of the offenders either, correct?

21    A    Correct.

22    Q    Okay.  Okay.  I'm going to ask you about some

23 individuals.  If you know who they are, you can just let

24 me know, okay?  Do you know an individual by the name of

25 Nathaniel Anderson?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Preview Unedited Only

141

```
 1     A    No.
 2     Q    How about somebody who goes by the name of
 3   G-Nate?
 4     A    No.
 5     Q    How about Denardo Triplett?
 6     A    No.
 7     Q    Darren Triplett?
 8     A    No.
 9     Q    Gus Robinson?
10     A    No.
11     Q    Street name by somebody named Snake?
12     A    Who?
13     Q    Snake?  Snake?
14        MR. GRILL:  Snake like --
15     A    Oh, the nickname Snake?  No.
16     Q    How about somebody who goes by the nickname
17   Spook?
18     A    No.
19     Q    Tennilla Jones?
20     A    No.
21     Q    Arnold Day?
22     A    No.
23     Q    Anthony Jakes [sic]?
24     A    No.
25        MR. GRILL:  No battery.  It's not charging.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

142

```
 1        MS. DONNELL:  We might have to use your
 2     computer.  As good as I can get -- so looking at
 3     that. Don't know why that would be --
 4        MR. GRILL:  Checking out.
 5   BY MS. DONNELL:
 6     Q    It won't be that much longer.  So if you have
 7   to --
 8     A    Machine's getting tired.
 9     Q    Yeah, totally.  Did you have a general
10   knowledge of the area around the location 927 West 54th
11   Street based on your work in the 9th District?
12        MR. GRILL:  Form.
13     A    I -- I've had knowledge and understanding that
14   it's a very vicious part of the district.  A lot of
15   shootings, gang member activity, a lot of dope selling
16   going on.  I'm sorry.
17     Q    Had you made any arrests at 927 West 54th
18   Street prior to -- at any point in your career prior to
19   March -- I mean May 17, 1991?
20     A    I don't recall.
21     Q    How about the victim, did you know the victim,
22   Jerrod Irving?
23        MR. GRILL:  Objection.  Form.
24     Q    Prior -- I'm sorry.  Did you know him prior to
25   the day he died?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

143

```
 1     A    I -- I don't recall.
 2     Q    Did you know for May 17, 1991 a gang officer,
 3   Jude Evans?
 4     A    I don't recall.
 5     Q    How about Detective Foley?  Did you know
 6   Detective Foley?
 7        MR. GRILL:  Foundation, form.
 8     A    I might have seen him in and around the
 9   district or maybe out in the field coming across him,
10   but I -- I couldn't say for solid sure.
11     Q    How about Detective Ken Boudreau?  Did you
12   know Detective Ken Boudreau?
13     A    Ken who?
14     Q    Boudreau.
15     A    Oh, Boudreau.
16        MR. GRILL:  Foundation.
17     A    Oh, you, Kenny.  Yes, I know Kenny.
18     Q    Okay.  How do you know Kenny?
19     A    The first story was in the 9th District.
20   He used to work the streets.  He was a good officer.
21   A lot of solid arrests.  Was active.  He eventually was
22   taken off of a beat car and put on a tact team.
23   And when he was on a tact team was, that's the last I
24   remember of him.  Because then I took a leave of
25   absence, came back, went to another district, and I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

144

```
 1   guess he was promoted up to detective and he was gone at
 2   that time.
 3     Q    How about Detective or Officer John Halloran?
 4   Did you know Officer John Halloran?
 5        MR. GRILL:  Foundation.
 6     A    I -- I may know him on sight.  I can't say a
 7   hundred percent sure.  I wouldn't say for sure.
 8   Where is he from?
 9     Q    Well, he's a -- he was a detective.  He worked
10   with Ken Boudreau a while out of Area 1.
11     A    Sometimes I see a lot of detectives.  I don't
12   know their names.
13     Q    Okay.  Okay.  Do you recall an individual by
14   the name of Raphael Garcia?
15     A    No.
16     Q    How about Marcos -- Marcos Garcia?
17     A    No.
18        (CONFIDENTIAL PORTION REDACTED)
19        MS. DONNELL:  Okay.  I think I'm done for
20     today, and give me just a minute.  So if you want to
21     just take a short break, I can look at my notes and
22     see if we are ready to conclude, okay?
23        COURT REPORTER:  Okay.  You wanted to go off
24     record then?
25        THE WITNESS:  He spells it differently.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    MS. DONNELL:  We'll just go off the record for,
2    like, couple minutes.
3         COURT REPORTER:  Okay.  We're off the record
4    at 3:27 p.m. Eastern Standard.
5         (OFF THE RECORD)
6         COURT REPORTER:  We are back on the record for
7    the deposition of Martin Radtke, being conducted by
8    videoconference.  My name is Taylor Veneman.  Today
9    is March 20, 2022.  The time is 3:29 p.m. Eastern
10   Standard.
11        MS. DONNELL:  Officer Radtke, I don't have any
12   further -- other questions for you today.  Your
13   deposition's completed.  Would you like to reserve
14   signature?
15        MR. GRILL:  I've got a couple questions.
16        MS. DONNELL:  Okay.  Sure.
17             CROSS EXAMINATION
18   BY MR. GRILL:
19        Q    Officer, when you would make notes on a
20   investigate -- in an -- you know, when you would respond
21   to a scene in that spiral notebook you testified about
22   earlier today, was it your practice to make sure
23   everything in those notes made it into the report,
24   if you were writing the report?
25        MS. DONNELL:  Objection.  Form.  Leading.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         Q    Okay.  Did you have an opportunity to see all
2    of the notes that Officer Watson may have taken in his
3    final notebook in --
4         A    Yes, I did.
5         Q    Did you know whether all of the information
6    that was in those notes, whether it made it into the
7    general case report that was marked as Exhibit 1 and 2?
8         MS. DONNELL:  Objection.  Foundation.
9         A    Yes.  Yes, yes, yes.  His notes were the basis
10   of foundation of our case report.
11        Q    Okay.  I want to show you -- this is Exhibit
12   1, right?
13        MS. DONNELL:  Yes.
14        Q    The non-color copy.  Okay.  So want to put
15   Exhibit 1 -- you just put in mine.  This is Exhibit 1
16   and this one is Exhibit 2.  They're both different
17   copies of the same general offense case report.  Exhibit
18   1 is the black and white one.  Exhibit 2 is the color
19   copy.  Okay.  On Exhibit 2, you see that it's marked
20   Permanent Retention File, right?  You see that big red
21   stamp kind of halfway down the page?
22        A    Yes.
23        Q    Do you see that on Exhibit 1?
24        A    No.
25        Q    Okay.  On Exhibit 1, there's also a -- this is
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    over here, there's a paper clip that's Xeroxed on over
2    your name, right?
3         A    Yes.
4         Q    And that does not appear on Exhibit 2,
5    correct?
6         A    Correct.
7         Q    On Exhibit 1, you see the name handwritten,
8    McWeeny, and a hash sign.  And then the number 14367.
9    You see that in Exhibit 1?
10        A    Yes, I do.
11        Q    And that is basically written underneath the
12   box 24 to 26.  You see that?
13        A    Yes.
14        Q    Okay.  Do you McWeeny's signature on Exhibit
15   2, the color one?
16        A    No, I do not.
17        Q    Okay.  Do you know why Exhibit 1 and Exhibit 2
18   are different in the ways that I just pointed out to?
19        A    I'm not familiar with the system.
20        Q    Okay.  Are you familiar with Detective
21   McWeeny's handwriting?
22        A    No.
23        Q    So you don't know if that --
24        MS. DONNELL:  Objection, leading.
25        COURT REPORTER:  Sorry, I didn't get that last
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    question with the paper rustling.
2    BY MR. GRILL:
3         Q    I'll just ask the question again.  Do you know
4    if the signature for McWeeny on Exhibit 1 is indeed his
5    signature?
6         A    I couldn't say for sure.  I don't know.
7         Q    Okay.  On exhibits, let's use Exhibit 2,
8    because for this point, they're the same.  You testified
9    earlier that in box -- that's kind of cut off, I guess.
10   I guess it would be 98.  Where your signature is on the
11   bottom it says, "Officer signature" and it says M.
12   Radtke.  You see that?
13        A    Yes.
14        Q    And earlier today you testified that that is
15   not your signature, right?
16        A    I couldn't be positive if it was or not.
17        Q    Did you -- do you recall whether you gave
18   Officer Watson permission to sign your name to do this
19   report?
20        MS. DONNELL:  Objection.  Foundation.
21        Q    Do you remember if you did?
22        MS. DONNELL:  Objection.  Foundation.
23        MR. GRILL:  Go ahead.  You can answer.
24        A    Yeah, I gave the recruit the permission to
25   sign it.  And I watched him sign my name to this report.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

149

1    Q    Is that something you remember?

2    A    Yes.

3    Q    Okay.  Can you tell from this report what time

4    it was that you and Officer Watson left the scene of

5    this homicide?  Roughly thereabout what time you guys

6    left?

7    A    It would be the time of completion.

8    Q    And is that time indicated on Exhibit 2

9    somewhere?

10   A    Yes.

11   Q    Where does it indicate that?

12   A    It'd be off of the -- on date and time of

13   completed.  It was -- completion was the 17th of May

14   '91.  0330.

15   Q    So about 3:30 in the morning.

16   MS. DONNELL:  Objection.  Found- -- leading.

17   A    Yes.  3:30 in the morning.

18   Q    Okay.  Can you tell from this report roughly

19   what time it was that you and Officer Watson arrived on

20   scene?

21   MS. DONNELL:  Objection.  Asked and answered.

22   A    On the top of the report, it indicates that we

23   arrived on the scene at about approximately 13 minutes

24   after midnight.

25   Q    Okay.  Did you yourself have any other



150

1    involvement in this investigation beyond what is

2    recorded and documented in this general offense case

3    report?

4    A    Any other further investigation?

5    Q    Yeah.  Did you have any other involvement in

6    this homicide investigation other than what it was that

7    you did on scene on September -- May 17, 1991?

8    A    No.

9    Q    Did you ever interview any witnesses at the

10   police station at any point in regards to this homicide

11   investigation?

12   A    No, not at all.

13   Q    Did you ever testify in the criminal trial

14   that arose out of this homicide?

15   A    I didn't testify at the trial.  I wasn't

16   subpoenaed for it.

17   MR. GRILL:  Okay.  All right.  That's enough.

18   REDIRECT EXAMINATION

19   BY MS. DONNELL:

20   Q    I have a few follow-up questions.  So this is

21   not your signature on the case report, correct?

22   A    Correct.

23   Q    And you authorized your recruit to sign it for

24   you?

25   A    Yes, I had watched him while he signed it.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Was that sort of standard, your training, that

2    you would authorize your field training recruits to sign

3    your reports for you?

4    MR. GRILL:  Objection.  Form.  Foundation.

5    Go ahead.  Now you can answer the question.

6    A    Yes.  It's a procedure because the amount of

7    paperwork, the work is usually divided up between the

8    driver and the passenger.  Passenger does one form, and

9    if there's an arrest, he also does the other.  So as a

10   matter of convenience, we give permission to sign our

11   names up to two different reports.  Because it's a

12   matter of time consumption.  So we give them permission.

13   And I saw the recruit write out the report sitting in a

14   squad car, and I gave him permission to sign and

15   complete the report.

16   Q    So earlier today, when you testified that you

17   couldn't recognize whether that was your signature or

18   not, why didn't you just say it was Officer Watson who

19   signed it?

20   A    Because --

21   MR. GRILL:  Oh whoa, whoa, whoa, whoa, whoa,

22   whoa.  That's argumentative.  You also

23   mischaracterized his testimony.  Go ahead and try to

24   answer your question now.

25   A    The paperclip version blocked out a good

1    number of the letters, and I couldn't say for sure if

2    there was my signature or not.

3    BY MS. DONNELL:

4    Q    Okay.

5    A    Now that it's a clear copy of it, I can see

6    it's not my signature.

7    Q    You saw the clear copy earlier today when I

8    showed it to you, right?

9    A    The -- was it, date one?

10   Q    Exhibit 2.

11   MR. GRILL:  That's in your hand right there

12   with the paper clip.

13   Q    I showed you Exhibit 2 earlier today.

14   A    Pardon?

15   Q    I showed you Exhibit 2 earlier today.

16   Do you remember that?

17   A    Well, that was this afternoon.

18   Q    Yeah.

19   MR. GRILL:  What's your question?

20   Q    Did you recognize your signature earlier

21   today?  That it was not your signature earlier today?

22   MR. GRILL:  You're mischaracterizing

23   your -- his testimony.  You're forgetting the

24   question that you asked him.  But go ahead.

25   And I'm going to put an end to this because you're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 153**

1    arguing with him.  But go ahead and answer this
2    question.
3         MS. DONNELL:  Well, I'm following up on your
4    questions.
5    A    You mean earlier today?
6    BY MS. DONNELL:
7    Q    When I was asking you questions earlier today,
8    did you recognize that it was not your signature?
9         MR. GRILL:  Asked and answered.
10   Q    You can answer.
11   A    Well, we can.  I was given this report after
12   lunch.  I -- I stated that we were going to go into a
13   whole new line of questioning involving the case
14   reports, and I requested to take a break, then came
15   back.  And that's when you start supplying some of these
16   other case reports.  I was not able to recognize my
17   signature under the previous copy that I was given, that
18   has the paper clip blocking the good portion of my -- of
19   the name or -- and a signature at the bottom.
20   Q    Understood.
21   A    And that we gave a clearer copy --
22   Q    That's the copy I gave you earlier today.
23   Did you --
24   A    This is the one you just gave us after lunch.
25   Q    All of it came after lunch.



**Page 154**

1    A    First time I've seen this.
2    Q    Okay.  Did you recognize --
3    A    First time I seen this.
4    Q    Understood.  Did you recognize it was not your
5    signature when I asked you questions?
6         MR. GRILL:  So you're mischaracterizing his
7    testimony.
8         MS. DONNELL:  That's fine.  He can answer the
9    question.
10        MR. GRILL:  Yeah, he already answered it.
11   It's asked and answered.  He told you earlier today
12   that it was not when he looked at this, Heather.
13   So I don't know what -- why you keep going over
14   this.  He's answered the question several times.
15   BY MS. DONNELL:
16   Q    Thank you.  Did you recognize that it was not
17   your signature today?
18        MR. GRILL:  Asked and answered.
19   Q    He can answer it.
20   A    No sooner until you gave me this copy I can
21   make a clear determination that it was the recruit
22   signing my name.
23   Q    Okay.  And was that your standard procedure
24   that you had your recruit sign reports that they
25   prepared under your supervision?



**Page 155**

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

1         MR. GRILL:  Don't answer it.  It's asked and
2    answered.  It's harassing.  You don't have to answer
3    it.
4         MS. DONNELL:  He can answer it.
5         MR. GRILL:  Don't answer it.
6         MS. DONNELL:  You're going to instruct your
7    witness not to answer?
8         MR. GRILL:  Yes.  Because you've asked him,
9    like, three times.  You've asked him this question
10   already and he's answered.
11        MS. DONNELL:  I asked him one time and I'm
12   asking, that was your standard procedure.
13   Well, let me get the question out and then you can
14   say that you're going to pull your witness.  Is that
15   what you're going to do?
16        MR. GRILL:  No, I'm saying he's not going to
17   answer this question because you're just harassing.
18   BY MS. DONNELL:
19   Q    I'm not harassing him.  Officer Radtke, was it
20   your standard procedure when you were training your
21   field training recruit that you would authorize them to
22   sign the report for you?
23        MR. GRILL:  Asked and answered.  Form,
24   foundation.  Mischaracterizes his testimony.
25   Go ahead and try to answer this.

**Page 156**

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022

1    A    Well, I answered this because --
2         MR. GRILL:  Go ahead.
3    A    As I previous stated, through the amount of
4    paperwork from time to time that we allow each partner
5    to sign the other's name.  So yes, from time to time, I
6    will allow the recruit to sign my name.  Because if I
7    was the one doing the case report, he gives me
8    permission to sign his name.
9    BY MS. DONNELL:
10   Q    Okay.
11   A    It is --
12   Q    And I just --
13        MR. GRILL:  He's not done.  Finish your answer.
14   Q    Go ahead.
15   A    It's been a common practice.  It's not
16   unusual.
17   Q    Understood.  I guess my question is, did it
18   happen from time to time or was it all the time?  Or was
19   it just case-specific, depending on the level of work or
20   the volume of the workload?
21        MR. GRILL:  Asked and answered, and form.
22   I don't even understand that question.  Go ahead.
23   If you get it.
24        MS. DONNELL:  These are speaking objections.
25   A    It's not always done, but it's not unusual

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022    157

```
1    when it is done.
2    BY MS. DONNELL:
3         Q    Okay.  Thank you.  Have you had any employment
4    since your retirement from the Chicago Police
5    Department?
6              MR. GRILL:  Hang on a second.  Answer this
7         question.
8         A    What was this?
9         Q    Have you had any employment since your
10   retirement from the Chicago Police Department?
11        A    No.
12             MS. DONNELL:  I'm finished with my questions.
13        Your attorney might have some additional questions.
14             MR. GRILL:  I don't have anything else on that.
15             MS. DONNELL:  I'm not ordering, but would you
16        like to reserve signature when we do?
17             MR. GRILL:  Yeah, we'll reserve signature on
18        that.
19             MS. DONNELL:  Okay.
20             COURT REPORTER:  Okay.
21             MS. DONNELL:  Do you have any questions for the
22        witness?
23             COURT REPORTER:  Yeah, I -- I'll -- just going
24        to say this concludes --
25             MS. DONNELL:  Do you have any questions?
```



The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022    158

```
1              COURT REPORTER:  Oh.
2         MR. YAMIN:  No questions.  Excuse me, ma'am.
3    No questions.
4         COURT REPORTER:  Concludes deposition.
5    3:41 p.m. Eastern Standard.
6         (DEPOSITION CONCLUDED AT 3:41 P.M. (ET))
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

The Deposition of DEFENDANT MARTIN RADTKE, taken on March 28, 2022    159

```
1                    CERTIFICATE OF REPORTER
2
3    I do hereby certify that the witness in the foregoing
4    transcript was taken on the date, and at the time and
5    place set out on the Title page hereof by me after first
6    being duly sworn to testify the truth, the whole truth,
7    and nothing but the truth; and that the said matter was
8    recorded digitally by me and then reduced to typewritten
9    form under my direction, and constitutes a true record
10   of the transcript as taken, all to the best of my skill
11   and ability.  I certify that I am not a relative or
12   employee of either counsel, and that I am in no way
13   interested financially, directly or indirectly, in this
14   action.
15
16
17
18
19
20
21
22   TAYLOR VINEMAN,
23   COURT REPORTER/NOTARY
24   MY COMMISSION EXPIRES ON: 03/03/2029
25   SUBMITTED ON: 01/24/2023
```



Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

111:6 112:19,
22 133:19
142:10,17

**93** 30:8

**934** 110:19
111:7

**936** 111:4

**952** 122:17

**96** 24:6,8,18

**9603** 123:1

**97** 107:19
108:7,10,11,16,
17,20

**972** 123:5

**98** 148:10

**9th** 20:4 23:5,
18,22 24:4,15,
21 25:19,24
26:2,8 30:14
34:24 37:11,14
19 38:4,19
39:7,20,22
41:21 69:18
70:17 100:7,9
110:1,6 130:6,
11 142:11
143:19

**A**

**a.m.** 6:8 109:6

**abbreviation**
114:10 115:16

**Aberdeen** 42:1

**abilities** 47:3

**above-
described**
127:24

**abreast** 93:1

**absence** 37:1
27:5 143:25

**absences**
127:3

**academic**
45:14 46:5

**academy** 22:7
44:19 45:6,8,
11,18 46:1,11,
23,25 47:7,10
48:17 49:25
75:22

**accents** 8:2

**acceptable**
85:7

**access** 69:17
72:21 77:4

**accident**
10:13,14,18,20
11:10,11 12:19,
22

**acclimated**
27:17

**accommodate**
9:12,14

**account** 131:7

**accurate** 24:19
36:5,22 54:20
100:25

**accurately**
71:16,18 99:16
114:22

**action** 4:19
10:2,23 61:23

**active** 29:24
29:24

**actual** 45:11
57:14,20,20,25
32:14,16

**actually** 42:1
57:7,14 70:20,25
108:2 111:15
118:13 119:17
113:4 139:17
148:23 151:5
23 152:24
153:1 155:25
156:2,14,22

**acts** 7:25 8:13

**alive** 70:20,22
24 79:13

**allegation**
61:17,20

**allotment** 18:4

**allowed** 22:20

**Alls** 75:8 93:22

**ambulance**
68:1 69:15,20
70:18 71:20
72:2 80:10,13,
15 90:20,24
123:7 135:21

**amount** 79:14,
151:6 156:2

**Anderson**
140:25

**Andrew** 6:23
62:2 106:14,
130:7,19

**angling** 49:1

**answering**
96:2 9 66:10
91:15

**answers**
5:3 14,22 52:23,
24

**Anthony**
141:23

**anymore**
28:16

**apartment**
96:19 122:14

**apartments**
72:15

**apologize**
76:21 140:9

**apparently**
74:9

**appearance**
6:15

**appeared** 74:3
6:15

**appearing** 7:4

**apply** 114:13
120:18,21

**appointed**
21:25

**apprehend**
42:3 45:1

**apprehending**
44:11 76:1

**approach**
45:13 50:25
29:3,8 60:17
78:10 85:1

**approached**
42:7,9 77:8,10
77:8 83:3 85:11

**approval** 98:9
140:18

**approximate**
100:3

**approximately**
12:8 18:21
19:14 20:1
23:12 31:6
45:18 60:20
78:3,4 149:23

**area** 14:23
17:15,20 30:3,
4,5,10 33:7,17,
22 34:4 35:6
39:5,25 50:17
60:25 68:16
122:19 131:10
142:10 144:10

**areas** 25:4
32:14 34:21,23
39:7

**arguing** 104:8
153:1

**argumentative**
58:15 67:8
87:19 151:22

**Arnold** 6:11
141:21

**arose** 150:14

**arrest** 12:24
42:2,23 43:22
117:12,16,17
151:9

**arrested** 57:9
60:14

**arrests** 143:21

**arrival** 127:20,
24 128:6
135:21 136:5

**arrive** 71:22,23
72:3,5

**arrived** 69:2,6,
8,13,14 72:6,11
73:10 74:9,24
75:6,15 76:7,12
79:1,13 90:13,
17,20 94:3
109:14,17
149:19,23

**arriving** 90:24
128:14

**ascertain** 45:3
117:14

**ascertained**
111:13

**Ashland** 25:14

**aspiration**
28:9

**aspirations**
46:3

**assailants**
124:4,7,10
140:16

**assess** 79:11,
12 97:21

**assessed**
80:1,5,6

**assigned**
12:22 14:12
19:25 20:3
21:20,21 24:20
25:3 32:9 33:18
36:22 37:3 38:4
39:2,9 46:18
58:7 110:25
111:3

**assignment**
23:17 25:1 33:2
36:2

**assignments**
15:25 21:22
22:13 39:25

**assist** 32:20
24:23 130:24

**assisted** 32:24
135:20 136:4

**attempt** 45:2
72:25

**attempted** 45:4
76:25 77:6
78:10 85:1

**attending**
6:15,16

**attention** 80:7
99:5 131:21

**attorney** 90:24
128:14

**attribute** 35:3
157:13

**authorize**
151:2 155:21

**authorized**
150:23

**Avenue** 61:2

**aware** 39:23
46:3

**B**

**baby** 60:15,16,
21,24

**baby's** 60:18

**back** 13:5
17:23 18:16,23
19:12,18 21:18
24:25 26:25
27:6 28:21
29:14 30:1 31:8
34:19 36:2,3
39:14,17 42:3
39:23 41:13,18
39:2,9 46:18
16:48:17 9,11
63:21 68:13,13
67:12,17 72:1,
11 70:17 73:1
11 73:17 76:6
85:16 91:7,11
96:6,10 99:11
104:16 105:20
104:18 126:6
106:23 114:15
130:25 139:14,
17,18,22 140:8
143:25 145:6
153:16

**backyard** 42:4
86:20 98:21,22
72:25

**badge** 122:18,
21 123:3

**bar** 61:10,11

**bartender**
61:3,5,9

**baseball**
26:16,23 83:5
157:13

**based** 142:11

**basic** 45:10

**basically** 8:23
25:5 27:25 30:2
33:24 39:6,11
56:3 80:19 96:7
97:20 98:17
133:4 143:15,
19 95:24,25
96:21 97:3
98:3,16 5,
10,11,14

**bogus** 70:6

**boiler** 13:3

**bone** 13:6

**border** 25:17,1

**bored** 29:10

**boredom**
27:22,23

**bottom** 105:17,
21 106:2,19
107:19 108:2
131:22 148:11
153:19

**Boudreau** 6:11
143:11,12,14,
15 144:10

**bounce** 40:3

**bounced** 39:4
57:20 58:2

**boundaries**
25:2

**boundary** 24:1

**25:10 78:10
108:7,10,16,20
23 109:9,10
120:17,24
111:3 114:14
120:17,22
118:19 121:17
141:1,147:12
148:9

**boxes** 10:10,
24,25

**brand** 27:21

**brand-new**
27:22

**break** 9:12,14
16:18 41:6
60:11 83:9,14
84:5 103:25
104:2,10
144:21 153:14

**breath** 70:6,9

**Brennan**
68:18,19 69:7
73:9 74:3 75:1,
11 90:13 94:6
129:3,8

**Brennan's**
129:22

**Brezezk** 19:1

**Brian** 91:11
113:15 123:12
129:7,22 131:3,
14

**briefly** 9:10

**bruised** 13:8

**build** 1:6 20,23
119:4

**building** 78:11
79:24 82:4 94:2

**buildings**
77:20

**Bulls** 115:13
137:11

**burglar** 96:18

**business**
114:7

**busy** 60:6

**button** 76:17

**C**

**cab** 42:12

**cadet** 40:21

**Cadillac** 131:9

**California**
30:6,11

**call** 11:22 22:4
29:15 43:8
51:15 58:13
59:22 61:6,8,21
16,18 70:11
71:12 76:21
85:16 98:13
122:23 131:21

**called** 33:2
34:10 35:13
37:9 43:4
45:13,20 50:2
61:18 70:16
71:5

**calling** 61:9

**calls** 40:9
59:16 116:15
124:19

**camera** 7:8
111:24

**canvas** 35:22
130:17,18,23

**canvased**
65:10

**capable** 57:10
83:13

**car** 46:16,16
48:5 11 65:2,7
15:5 62:21 68:3
18:24 69:19
38:17 42:10,3
61:14 62:14
70:13 77:13,16

**casings**
122:16

**caused** 22:17

**caution** 7:21

**cautiously**
77:14

**CB** 117:14

**cell** 76:11

**center** 25:6

**Cermak** 25:9

**cetera** 115:1

**CFD** 135:21

**chance** 78:11

**change** 22:17

**changed** 46:3

**charging**
141:20

**chasing** 73:23

**check** 76:19
76:16 97:17

**checked** 123:7

**Checking**
140:4

**Chicago** 6:21
7:4,5 10:6 15:5,
10,15,19,21,23
16:3,16,21
17:23 18:15
20:2,10,14
21:19 157:4,10

**chief** 18:7,14

**city** 7:4 18:13
25:6,11 29:13
32:8 33:25
34:17 37:9 98:1

**City_day**
103:15 106:12
15:16 126:22,
24

**civilian** 10:15

**claim** 11:10

**claimed** 10:21

**claims** 11:17
61:15

**clarification**
16:20

**clarifying**
45:25

**classes** 51:9

**classroom**
28:1 45:11,14
49:11

**clearer** 106:14,
15 107:2,8
152:5,7 154:21

**client** 104:16,
13 107:2,8
109:1,3 123:24

**clip** 106:7
110:1,2 152:12
153:18

**close** 27:22

**clothing**
114:25 140:18

**clutter** 101:22

**Cobra** 40:1

**Cobras** 35:13
40:4

**code** 115:25
117:21 118:14
119:13

**codes** 117:23

**collect** 65:5
97:22

**collected** 50:9

**collecting**
63:9,22 97:8,12

**color** 106:12
112:3 123:10
146:18 147:15

**comments**
65:2

**common**
156:15

**communication**
84:14

**communication**
s 69:17

**compare**
63:23

**compartment**
57:10

**competent**
57:10

**competently**
57:8

**complaint**
13:14

**complete**
99:19 151:15

**completed**
19:24 59:4
100:1,5 143:13
149:13

**completely**
13:7,8

**completion**
149:7,13

**complexion**
117:7 119:9

**complicated**
57:8

**compound**
87:18 107:24

**computer**
59:13 77:3
142:2

**conclude**
144:22

**CONCLUDED**
158:6

**concludes**
157:24 158:4

**condition**
127:25

**conditions**
64:21

**conduct** 32:2
37:6 44:17

**conducted**
41:14 48:3 64:2
82:16 83:23
104:17 130:17
145:7

**conducting**
63:6,11

**CONFIDENTIA**
**L** 114:18

**confirm** 80:11

**connections**
17:12

**consecutive**
125:16

**consideration**
85:5

**constantly**
151:12

**consumption**
151:12

**contact** 18:15
118:18

**contaminating**
79:20 96:25

**continually**
12:18,21 129:2

**continue** 18:5
26:16

**continuing**
28:6 99:24

**convened** 6:5

**convenience**
151:10

**conversation**
73:12 81:22,24
83:2 14:20 96:6
137:23

**conversations**
25:1

**convey** 34:4,
12

**Cook** 60:13
61:16

**copies** 146:17

**copy** 105:9
106:10,11,12,
25 107:11,15
110:7 112:3
123:10 125:16
146:14,19
152:5,7 153:17,
21,22 154:20

**corner** 70:22
107:19 110:18

**corners** 33:11

**Corporation**
13:2,19,23

**correct** 8:15
16:17 20:16,21,
23 21:2 24:11,
16 29:7 31:22
34:8,14 37:6
54:2 73:5 81:21
88:13 90:14
91:16 95:5
99:13 109:7
111:4 113:21
20:23 121:18
22:22 128:17
6:12,18 133:19,
10:13,14,21,23,
25 98:8,8 99:13
122:1 128:1,7
137:2 144:16
140:21 144:8
21:19

**correctly**
157:22

**could've** 96:3

**counsel** 6:17

**count** 27:23

**county** 60:14
61:16,18,21

**couple** 9:24
19:10 42:11
91:24 102:1

**cuffs** 61:13

**custody** 61:12

**cut** 111:25
148:9

**cutting** 18:6

**D**

**Damen** 39:24

**Dan** 6:13
68:10,12,14
69:7 73:9 74:3
75:1 90:13 94:6

**dark** 117:6,7
117:8 118:20
19:13

**Darren** 141:7

**crew** 70:20

**cries** 60:21,22

**crime** 62:11
64:2,3,9,11,13
32:17,22,24
73:13,20,24
35:5 36:23 37:2
63:9,22,24 64:5
69:24 70:18
80:5,11 82:3
96:4,13 97:6,7
10,13,14,21,23,
25 98:8,18 99:8
122:4 129:13
130:17 130:24
131:10,14
132:5 133:18,
21 135:5 136:4
13 141:15
143:25 145:6,
16

**crimes** 22:21
23:18 25:16,23
37:7 48:21 57:9
57:1 122:19

**criminal**
150:13

**CROSS** 145:17

**crying** 60:16,
18

**cube** 60:24

**cubes** 60:24

**cued** 130:19

**Denardo** 141:5

**department**
10:7 15:5,10,
18,24 16:16,21
17:23 20:3
20:3 66:16 77:2
18:15,16,21
157:4,10

**departments**
18:12 48:21

**depend** 53:8

**depending**
33:19 150:19

**depends** 50:16

**deponent** 6:25

**deposed** 9:17,
10 12:13
12:20 61:23

**deposition**
6:10 9:20 10:25
11:21 12:5
13:9,15,18
14:16,24 26:24
41:14 48:3
54:25 55:4,5,7,
10,19 56:7 60:9
61:25 83:23
104:14 108:19
107:10 110:15,
16 145:17,5,8
103:24

**deposition's**
145:13

**depth** 35:19

**deputies** 38:9

**deputy** 122:18

**describe** 10:19
114:25

**describing**
65:16

**description**
44:12 45:2 65:5
92:2,9 115:10
116:19,20,22,
25 117:3
118:17 119:6,8,

130:22

**conducted**
41:14 48:3 64:2
82:16 83:23
104:17 130:17
145:7

**contaminating**
79:20 96:25

**consumption**
151:12

**continually**
12:18,21 129:2

**145:2,15
6:13,5,12
7:6,11,18 11:17
12:11,13 13:11
27:4,7 41:10,13
47:21,25 48:2,
10 58:23 59:7
82:22 104:13,
23 103:10 104:3
146:14,19
152:5,7 153:17,
21,22 154:20

**day** 6:8,11
26:17 29:15
32:22,24,24,7
58:8,10,11
85:15,17 87:3
139:13 141:21
140:1,22

**dead** 79:13

**deal** 76:25
124:20

**decades** 9:24

**deceased**
128:1

**decent** 35:17

**decide** 17:23
22:18

**decided** 36:17

**decision** 22:12

**defendant**
6:10 7:4 10:21,2

**defendants**
6:24

**demeanor**
87:9,12

**criminal**
150:13

**CROSS** 145:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com




**Page 165**

10 120:5,8,12, 14 132:16 140:18

**descriptions** 93:7,10

**designated** 26:4 103:13

**designated** 26:8 103:21 107:9

**desk** 30:1 70:20 71:6 122:25 130:12

**detail** 135:5,7, 15 135:25 136:1

**detailed** 36:23 52:21

**details** 134:20, 24

**detective** 21:8 30:3,10 32:6 56:16 66:19,18, 19 69:7 73:8,9 74:3,21 75:1,11 90:13 94:5 103:4 122:20 125:6,7,21 127:18 128:4, 10,19,24 129:3, 8,14,21,22 131:12 132:17 134:13 135:3 136:11,20 143:5,6,11,12 144:1,3,9 147:20

**detective's** 88:6 122:21

**detectives** 30:7 52:22 53:12 54:13 67:25 68:4,5,16 69:20 70:18 71:16 72:5 78:24 124:12,21 94:3, 12,19 96:1 97:6,20 98:9 102:9,19

128:14 144:11 **detectives'** 55:16 73:25

**determination** 154:21

**determining** 127:25

**Deuce** 33:25

**developing** 28:2

**died** 142:25

**differently** 85:20 144:25

**difficult** 34:21 41:23 125:9

**difficulty** 8:6 9:2

**digest** 56:3

**dinners** 29:14

**DIRECT** 7:20

**direction** 133:13

**directly** 97:3

**discovered** 94:16 122:1

**discussing** 94:15 100:4

**dispatch** 49:5 13 58:15,16 59:17 60:2 61:3 71:10 77:10 77:17

**dispatcher** 63:23

**dispose** 101:23

**distance** 124:23

**district** 6:12,13 20:4 21:21 23:5,6,19,23,25 24:1,5,10,15,21 25:20,24 26:2, 7,8,27:19 29:20 30:1,14,16,18, 146:8,13

19:31:4,8,15 32:10 33:3,17, 21,22 34:5,7, 10,24 35:10 37:11,14,19 38:5,19 39:7,8, 12,14,20,22 41:21 43:21 45:15 46:19 68:16 69:19 70:17 100:7,9 110:1,6 122:25 130:7,11 142:11,14 147:13,16,18

**districts** 20:3 25:6 26:5,8,9

**divided** 151:7

**division** 30:11

**DNA** 114:11

**document** 103:22 124:18

**documented** 101:12

**documents** 52:6,9,12 56:8, 100:2

**Donnell** 6:18 7:1,3,21 26:20, 22 27:3,9 41:8, 17,18 47:14,19, 23 48:7,12 52:4,5,21 58:24 59:2 62:2,6,8 64:17 65:22,24 66:9, 12,15 70:1,10 76:13,15,19,22, 25 77:6 81:23 83:17,19 84:2 86:8 103:19 104:16,8,11,21 108:3,11,14,19 112:2,5,7,9,11, 14 128:24 142:1,5 144:19

147:12 148:1, 24 148:6 149:6, 13,19 151:8,11, 12

147:24 148:25 22 149:16,21 22 149:25 151:3 153:3 154:8, 15 155:4,6,11, 15 155:14 157:2,10,12,15, 19,21,25

21,25

**door** 60:23 96:17,22

**doorway** 71:2 82:1 92:24

**dose** 36:13 143:15

**double** 33:15 116:23

**doubt** 109:16 126:5,7,10

**dove** 93:4

**drawing** 146:17

**dresser** 101:22 102:2,3

**drew** 32:19

**drinking** 61:10

**drive** 77:3

**driver** 102:1 11:12,25 12:23 151:8

**driver's** 77:13

**Driving** 123:1

**DRK** 117:8

**drop** 18:11,14

**dropped** 139:5

**drunken** 61:12

**due** 11:7

**duration** 46:14

**duties** 43:25 94:24 128:21

**duty** 38:13

**E**

**ear** 63:18,19

**earlier** 20:15, 18,22 39:4 99:10 109:25 110:4 122:18 124:3,21

**early** 38:12 39:14

**ears** 13:5

**easier** 8:21 52:12 58:25 106:24,25 127:6

**easily** 125:10

**east** 78:4 82:2

**Eastern** 6:8 41:11,16 48:5 84:1 104:14,19 145:4,9 158:5

**easy** 49:14

**edge** 77:24

**educate** 34:20

**Edward** 130:3, 4

**effective** 19:16

**either** 43:9

**elect** 22:14

**emergency** 32:7,10 135:21 136:5

**emphasis** 103:10

**emphasizing** 50:9

**employed** 19:25

**employee** 18:14

**employment** 157:3,9

**encompass** 25:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**Page 166**

**end** 18:17 19:14 25:7 34:24,25 35:10 61:11 130:16 62:17,13,19 37:22

**ended** 19:14

**enforcement** 15:24 32:5,7, 16,17 133:9

**Englewood** 34:1,7

**enjoyed** 27:16 28:3,4

**entire** 12:12 31:24 46:10,13 59:4

**entrance** 72:23 73:1 96:18 133:19

**entry** 78:11 120:17

**error** 125:2,5

**erupted** 29:12

**essentially** 54:15 63:9 67:3

**estimate** 43:5, 6

**estimation** 93:4 114:14

**et al** 6:11

**Evans** 14:3

**evening** 64:5 84:15 91:15 107:15 111:4

**evenings** 38:2

**eventually** 100:8 143:21

**evidence** 69:22 97:19,21

**EXAMINATI** **N** 7:19 145:17

**Examiner** 123:3

**examiner's** 123:6

**exceptionally** 8:5

**exchange** 73:14

**excitable** 87:14

**Excuse** 110:16 158:2

**executing** 44:9

**falling** 13:7

**exercise** 64:20,22 86:14 100:22

**exhibit** 103:14, 16,21 104:23, 24 105:1,2,3,5 106:9,15,17,25 107:10 112:2 123:9 125:14, 17,18 146:7,11, 15,16,17,18,19, 25,25 147:4,7, 9,14,17 148:4,7 149:8 152:10, 13,15

**exit** 120:20

**expect** 35:11 43:14 57:15,17 63:6 75:19,20

**experienced** 33:2

**experiences** 28:10

**expired** 79:6

**explained** 11:3 61:12 75:22

**expose** 47:23

**exposure** 43:11 57:22

**eyes** 13:5 117:3 119:6

**F**

**face** 68:17 69:1 111:25 122:12 136:7

**faces** 68:22

**facts** 61:6 52:20,25 53:23 76:17 133:9

**fair** 9:15 40:19 62:17

**familiar** 35:9 34:13,14,18 147:19,20

**family** 17:12 37:22

**fast** 32:8

**faster** 95:21

**father** 13:24 18:8 54:8 58:9 146:3

**FBI** 48:20 85:6

**FCO** 27:16

**features** 120:2

**February** 12:25

**federal** 11:17 72:11

**fee** 13:20

**feel** 56:24 88:25

**feeling** 29:18

**fell** 96:16

**fellow** 28:15

**felt** 28:5 29:21 48:22 67:21

**female** 8:24 65:1 73:4 74:25 113:24

**field** 19:24 22:5,13,15 24:20 27:14 30:13 31:7,11

**floor** 96:18,24 97:1 122:14

**focus** 37:15 57:12

**Foley** 143:5,6

**follow-up** 53:6 103:18 131:3 135:5,8,14 144:3,20

**foot** 35:23

**footprint** 96:24

**forgetting** 152:23

**forgot** 26:24 27:1 38:7 45:19,23 64:25 68:8 78:24

**form** 22:19 28:11,23 29:5 34:19 39:10 40:18 50:5,22 52:8 53:7,15,19 54:16 56:1 58:9 59:13 69:5 72:9 77:8 80:8 82:15 83:6 85:4,7,13 87:18 88:14 89:3 94:7 102:10 107:24 113:4 114:14, 19 116:11 123:19 124:8 142:13 143:7 145:25 151:4,8 155:23 156:21

**format** 50:1

**fortunate** 48:23

**fortunately** 46:3

**fortune** 48:18

**forward** 95:3

**found** 34:21 61:11

**Found–** 149:16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**foundation** 21:17 35:17 79:3 85:13 86:5 89:3 102:10 107:25 116:15 118:3 123:19, 24 125:25 126:13 138:23 143:7,16 144:5 148:10 151:4 155:24

**frame** 34:15

**frankly** 29:10

**freezer** 60:15

**French** 91:8

**fresh** 22:6

**front** 42:5 77:18,25 78:9 79:2 82:1,3 102:25 104:24 106:1,19 107:9 110:3 115:14 122:7,12 123:10 136:7

**Frost** 122:19

**FTO** 22:4,21,24 23:21,22 26:12, 13,14 28:11 31:10,17 37:14 40:25 41:3 42:17 45:16 46:6 58:1

**FTOS** 26:6,10 41:1 57:25 58:3

**full** 7:7

**funds** 18:6,23

**G**

**G-A-A-L-L** 14

**G-NATZ** 14:7

**Gaal** 33:13,18

**gang** 23:21 23:1,7,24 25:18 23:3 26:1

**generally** 33:21 67:2 112:25 113:2

**generals** 35:23

**George** 7:2,3 125:14

**get-go** 73:23

**girlfriend's** 60:15

**give** 7:15 11:7 18:5 27:4 29:2 44:22 57:4 75:23 77:24 93:6 98:9 99:5 103:6 136:10 144:20 151:10, 12

**giving** 14:16 12:57:17 85:19 102:19 120:11,13,15 117:3,4,8,8,10, 13 117:3,4,10, 16,23 112:4 124:13,4 116:15,24 118:3 121:18 123:19,24 127:5 124:13 126:13 129:16,17 136:1,16 122:11,2,23 136:1,16

**glad** 7:23

**glanced** 95:7

**goal** 58:24

**good** 7:3,25 7:17 12:18 18:15 28:4 85:7 24:9 26:9 80:25 36:23 37:1 41:17 42:10 44:12 45:2 50:12 51:15,24 79:15 84:19,25 106:8 142:2 143:20 151:25 153:18

**great** 34:14 83:5 95:20

**Green** 130:3,4

**Greenberg** 26:23 27:2

**Grill** 6:21,23 21:17 22:19 26:18,21 28:23 29:1 34:19 35:7,17 37:5 39:10,18 40:18 47:16,24 50:3 55:14 56:5 73:13 82:10,11, 13,16 142:9,18, 13,19 53:7,13, 

**15,19,22 54:3, 6,8,18 55:1,3 56:11 58:14 86:23 93:9 110:23 112:5,4 113:6,17,18 115:4,5 117:1,4 127:11,24 131:5,21 137:2, 19,23 145:12,18 146:3 149:19**

**guessing** 67:7

**gun** 4:2,3 120:4, 5

**gunshot** 93:4, 16

**gunshots** 92:12,14,17 93:23,25 135:15

**Gus** 141:9

**guy** 42:2 60:14, 24 61:4,19

**guys** 110:21 111:14 119:21 120:17 138:8 139:5,6 149:5

**H**

**habit** 34:12

**habits** 27:24 28:2,19 29:3,8

**hair** 31:6 60:20 149:18 119:7

**half** 31:6 60:20 104:3

**halfway** 126:21 127:9 146:21

**Halloran** 144:3,4

**hallway** 133:19 133:21 137:6,14, 17

**hand** 7:14 81:12 122:7 149:16 138:9,10

**handed** 103:20

**handgun** 119:25

**handheld** 69:23 70:12,17 71:8

**habit** 34:12

**guards** 61:21

**guess** 29:17 29:19,24,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---



**handle** 56:25

**handled** 43:21 57:2

**handling** 57:10,12 81:20

**hands** 93:2

**handwriting** 105:11,14,16, 19 147:21

**handwritten** 54:11,15,17,21 147:7

**hang** 53:13 61:2 64:1 66:16 65:9 68:25 81:12 85:3 89:3 127:16 157:6

**happen** 156:18

**happened** 37:7 44:13 61:20 74:20 82:18

**happening** 32:8 33:25 103:5

**happy** 9:8,12

**harassing** 155:2,17,19

**Harbors** 16:25 17:4,13,17 18:19:21

**hard** 14:17,18 43:5,6 48:15 59:7 96:20

**hash** 147:8

**hat** 115:13 118:20

**head** 13:10

**headed** 1:22

**heat** 2:1,18,25 29:14 48:10, 17,22 54:8 53:7 54:15 58:6

**heard** 34:14 60:21 65:18

**92:1,9,11,12, 13,17 93:4,5, 15,22,24 122:11,14 125:9 131:8 134:14,16,21, 25 135:6,9,14 139:16**

**hearing** 7:24, 25 8:13,16,23, 19 147:21

**Heather** 6:18 27:2 81:16 154:12

**heavy** 29:19

**height** 116:7 119:2

**held** 18:23

**helped** 43:22

**helping** 43:12

**here.'** 122:9 134:2

**here?'** 122:9

**hiding** 77:22 106:8

**higher** 8:24 9:3

**highlights** 52:25 53:3

**hire** 16:19

**hiring** 17:2

**history** 15:7

**hit** 19:05

**hold** 7:7 27:5 64:1 66:16 65:9 68:17 89:3 118:20

**home** 102:3

**homicide** 41:20 42:1,23 43:3,8,22 44:5 45:4 56:9,17 57:2,3 105:12 111:6 137:14

**149:5 150:6,10, 14**

**honest** 11:9 107:3

**horse's** 48:23

**hot** 33:7,25

**hour** 29:14 60:20 61:7 69:11 100:16 104:3

**house** 72:24 78:5,9,24

**hundred** 14:7 37:24 123:5

**hundreds** 41:24

**hurt** 58:1

**I**

**ice** 15:19,24

**ID** 79:8

**ideally** 42:17

**IDENTIFICATI ON** 103:16

**identified** 119:24 125:2,5

**identify** 55:9

**identifying** 113:23

**identity** 111:19,20 112:18,21 113:2

**Illinois** 6:13,21

**immediately** 134:15

**important** 52:3 111:6 137:14

**inaccurate** 88:21

**incident** 13:17

**include** 49:20 50:15,20 51:4,7 53:4 114:3

**included** 52:6 55:23 113:20 123:16,18,23 134:22

**incorporate** 54:3

**incorporated** 53:4

**incorporates** 53:5

**independent** 96:7

**individual** 8:7 52:10,12,24 95:2,7,10,19 72:2,4 93:8 84:24 92:4 140:24 144:13

**individual's** 116:23

**individuals** 90:16 113:15, 17 140:16,23

**inexperienced** 31:17

**information** 32:3 49:20 55:18,23 60:1 52:2,5 61:1,4,8 62:17 71:16,17 73:22 74:12,14 79:19 82:18,24 89:18,20,21 131:3,23 150:9

**interviewed** 128:9,13 129:18 131:6

**interviewing** 84:19 128:15

**interviews** 63:11,13 64:1 85:11 128:11 130:22,23

**introduced** 49:23

**inventory** 122:16

**informed** 8:12 18:7 137:10

**initially** 15:6

**injured** 10:20, 24

**inside** 72:14,15 72:24

**instruct** 155:6

**instruction** 46:2

**instructor** 46:25

**instructors** 48:22 50:11

**intent** 63:3

**intention** 63:24

**interaction** 81:4

**interested** 36:16

**interesting** 112:9

**interrupt** 12:15 48:8

**interview** 63:4 81:9,19 84:4,9 85:1 86:16 127:19 128:19 129:4,5,11,14, 18,22,25 130:4 131:3,23 150:9

investigate 37.4 145:20
investigated 31:25
investigating 97:7
investigation 52:6 63:7 94:19,22,23,25 95:4 122:13 150:1,4,6,11
investigations 32:2 37:7
investigative 128:7
involvement 150:1,5
involving 153:13
irritated 60:17
Irving 79:12 111:10 129:24 130:1 142:22
issued 66:17

**J**
jacket 115:13 163:2 151:1
jail 61:14,15,21
Jakes 141:23
James 68:18,19
January 19:15,18 21:15
jaw 13:6
JB 121:3
Jerrod 17:1 142:22
jet 121:8
job 2:22 27:1 57:8 71:14 79:19,25 85:1 99:6

John 144:3,4
joined 26:23
Jones 141:19
Jude 143:3
July 15:6,23 21:24 22:2
June 24,17
jury 11:6,8,15,23

**K**
Ken 143:11,12,13 144:10
Kenneth 6:11
Kenny 143:17,18
Kentuckiana 6:5
Kentucky 6:7
kill 76:12,17
killed 76:23
kind 50:23,24 56:2 61:5 111:25 140:21 148:9
knew 31:19 36:20 58:25 38:3,6 39:2 142:1
know-it-all 
knowing 49:11
knowledge 34:22 35:15 36:6,7,25 37:1 39:19,21,24 40:2 142:10,13
knowledgeable 35:3,19
Korna 85:2 113:15 123:11

**L**
lab 71:21 122:15 123:1,6
lack 39:4 125:25
lateral 24:13,14
Lau 49:1,2,5,21 114:16
Lau's 49:2,8
law 7:15 24
lawsuit 10:5,13 11:4 12:20
laying 10:4 74:14 76:3
lead 117:23
leader 35:16
leaders 33:5 22 40:3
leading 145:25 74:22 149:16
lean 149:16
leaning 70:8
learn 35:25 36:12 63:10 67:4 99:6
learned 94:16
learning 43:17 45:11 59:23
learnings 28:1
leave 15:16,21 16:25 17:2,4 18:25 19:16 21:10 24:7 36:17 53:10 70:23 75:7 97:12,14 143:24
leaving 25:1
led 44:13 45:3

left 19:4,21 30:15 37:13 80:2 87:8 89:9 104:22 126:9 149:4,6
lettering 115:13
letters 152:1
letting 74:21
Levis 6:18
life 30:17
likes 61:1
liking 28:19
limbo 42:19
lines 115:4
lingering 78:21
list 117:23
listen 31:19,22
listened 63:7
listening 63:9
little 107:2
located 64:6 12:17,17 128:5
location 6:15 12:8 142:10
Loevy 6:20 7:1
long 18:17,19 23:11,22 29:16 30:13,17 31:1,4 38:3 45:8 46:10 51:23 58:7 59:9 70:9,16,17 72:2 86:24 87:2 91:20 97:4 98:20 99:7,14,16,22
longer 18:19 24:10 52:22 58:17 59:14 99:7 142:6

looked 55:10,22 56:5,8,13 57:13 79:14 120:4 124:4,7,10 154:12
Look 25:8
looking 115:13
losing 8:25 29:20 138:15
loss 8:23
lot 42:7 50:3,5,9,11 57:21 91:22 98:23 99:1 142:14,15 143:21 144:11
lots 102:11
loud 8:20 132:2
louder 84:20
Louis 33:13
Louisville 11:1
lunch 103:25 104:2,10 153:12,24,25
lying 122:12 136:7

**M**
M-A-R-T-I-N 8:11
M-E-D 117:1
Machine's 142:8
mad 42:24
marathon 116:12,25 119:5
meet 56:3
Melinda 111:20
member 129:15
memorable 129:15
memory 14:24,25 56:14,15 127:14 58:12 62:20,25 63:2,14 64:1 67:6,18 82:5 83:7 84:13,24 88:9
Marty's 85:24 136:3 47:11
men's 9:1
mentioned 13:23 18:22 29:3 42:16

matter 6:10 151:10,12
Mc 68:14
Mcmahon 123:1
Mcwayne 122:20 125:6
male 65:13 74:4 89:24 90:2,12 91:2,4,6,7 112:6 125:21 126:12 128:4 129:3,8,21 147:8 148:4
man 57:6 58:16 75:2 124:9 124:17,22 127:23
manner 63:11
manpower 39:5,6
March 6:8 41:16 48:5 83:25 109:14 139:9 142:19 139:22 143:3
medical 4:5 22 75:23 80:7 123:3,6
medium 116:12,25 119:5
marked 103:16 106:15,17 118:19 120:7,10 125:18 134:7
marks 117:9 119:11
married 37:21
Martin 8:11 41:14 48:5 83:24,104 92:3
Marty 6:24,7 84:7,11
material 55:25

met 14:13
Mickey 35:13 40:1,3
midnight 78:20 130:12 149:24
might've 68:23
military 16:2,5
millimeter 122:16
mind 10:3 30:21 49:13 56:16 80:14,18
mine 146:15
Minnesota 15:11,16 17:1 5,13,18,21,25 18:2
minute 81:14,18,23 139:14
minutes 92:20 69:10 87:3 90:3 123:3,6
mischaracterizes 75:4 79:4 137:24 155:24
mischaracterizing 152:22 154:6 
misspelled 109:25
misspoke 20:15,18,22
misstates 92:21
misunderstood 15:17 88:24
Mo 133:25 134:8
moaning 60:22

mobile 71:21
mold 27:25 28:18 29:4
money 116:17 16:18,23 134:1
month 18:3 24:18 42:8
months 18:2,3 18:4 44:24,25 92:19 78:1,8,11 42:18,21 58:5 71:19
moot 133:4
Moran 123:2
morgue 88:10
morning 7:22,23 88:23 146:15,17
mother 60:21 113:12
mouth 133:14 149:24 74:10
move 15:4 30:7 62:3
moved 30:14 63:7
movement 79:19
moving 71:21 78:12
muffled 60:21
muffling 60:18
murder 105:13

**N**
named 10:2,5,12 141:11
names 68:4,5,23 73:25 136:14 140:15,18 144:12
narrative 51:2,5,13 52:1 99:25 100:1 121:12,15,19
narratives

51:3
Nathaniel 140:25
necessarily 6:10
neat 123:6
needed 26:10
negative 123:8
neighborhood 34:2 130:17,19 131:9
neighborhoods 36:10
newly 43:24
nickname 141:15,16
night 14:10,13 55:15 61:7 62:11 72:16 78:1 85:11 99:20 100:15 105:10 110:11 113:18 122:25 123:12
nobody's 104:8
non-color 146:14
nonsensical 95:13
north 6:20 30,16,16 34:25 35:10 98:3
Northern 6:12
nose 13:6
note 66:21
note-taking 63:10
notebook 66:1,14,16,20,23 67:2 100:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11,15,17,18,20 102:21,23 103:5,6,7 145:21 146:3
notebooks 101:24 102:5,8
notes 64:5,18,19,23 65:8,11,25 66:2,22 67:1,13,16,19,20 68:17 69:2,3,6,10,18 144:21 145:19,23 146:2,6,9
notice 139:10
noticed 67:25 97:19
notifications 100:2 122:18 128:2
notified 122:25
November 16:13,16,21 20:20,23 21:1
nuisance 13:24 14:2
number 6:13 31:19,20 43:15,20 73:15,16 105:22 106:4 107:18 108:7,23 109:9,11 113:14 114:3,7 10:25 115:18 117:11,14,18,19 119:15 120:3 122:3,18,21 123:1,2,3,7 125:11,14,15,21 126:6 147:4 152:1
numbers 73:23 105:7 106:8

**O**
object 22:19 52:15 88:14

119:18
objection 21:17 28:23 34:19 35:17 37:5 39:10 40:18,19 50:22 52:8 53:7,15,19 54:3,18 56:11 58:14 59:18 60:5 67:8 72:12 75:3 79:3 80:8 82:15 85:3,13 86:3 87:18 92:21 94:7 102:10 111:15,16 116:15 118:3 123:19,24 124:19 137:24 138:23 142:23 145:25 146:8 147:24 148:20,22 149:16,21 151:4
objections 156:24
observation 84:4,14
observations 28:14
observe 64:12 18 66:22 101:14
observed 127:24 132:21 134:18 136:8 137:7,12 138:18,22
obtain 117:20
obtained 94:10 128:13
Occasionally 31:16 33:1
occasions 12:20
occupants 131:11
occurred 53:1,4 110:22,23

occurrence 108:24 109:2,21,23 110:17 111:6
October 16:14,15 19:1,12,13,16
offender 44:11,12 45:1,2 57:6,9 61:10,11 76:1 114:25 117:20,23 118:18,19 119:13 134:1 134:1 140:17
offenders 45:3 58:17 65:5,16 122:4 132:6 122:4,8 132:22 133:18,24 134:23 137:21 138:7 140:1,2,9 140:6,9
offense 47:13 48:24 58:3 59:14,16 61:1 150:2
offer 13:24
offered 61:1 141:13 123:6
officer 6:24 8:9 10:6 15:6,9,14,15,16,19,23 16:10,18,18 19:23,25 20:9 21:2,22 22:5,14:14:25 54:14 57:21 59:22 66:17 69:4 71:4 98:3 109:13
Offices 7:1
official 13:4
officially 16:13
one-on-one 28:8
online 6:4
open 63:19
opened 60:23

82:17
opening 43:6
operating 32:25
opinion 84:18 30:25
opportunity 56:10 84:7,14 103:6 104:2 105:17 108:18 112:6 147:12 132:6 146:1
orchestrate 61:6
order 37:21 64:25
ordering 157:15
orders 27:23 44:20
other's 156:5
outcome 11:3
overlap 38:16
overtime 85:16 100:12,14

**P**
p.m. 41:11 48:5 83:25 104:14,19 145:4,9 158:5,6
pad 65:25
pages 101:14 102:25
paper 57:8 66:1 106:7 147:1 148:1 152:12 153:18
paperclip 151:25
paperwork 151:7 156:4
Pardon 17:19 19:9 23:16 31:3 34:3 47:8 61:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

68:11 72:19 76:11 78:6,11 85:25 89:13 90:8 92:5 94:20 96:8 104:25 116:10,21 121:6 122:7 124:1,7 132:18 137:14 142:14
part 23:1 25:6 30:4 33:19 36:3 40:14 46:11 57:5 71:12,14 77:17,18 79:19 106:1 119:18 125:19 130:18,20,23 133:17 146:8 136:16 142:14
partial 11:12
partly 35:7 70:5 71:22
partner 12:24 14:9,12 27:20 33:8 42:5,11 68:9 98:25 156:4
parts 13:7
pass 51:18 95:18
passed 44:18 92:25
passenger 77:12 151:8
passing 62:12 133:1,13
patrol 19:23,25 20:5,6,24 22:21 24:18,23,25 24:24:25 55:5
patrolled 25:5
patrolling 24:15
pause 47:14,19 59:14 65:17 121:24
pay 18:20 70:21
pending 6:10 9:13
people 67:23 72:7,10 73:1 77:20 86:16 136:13 138:3,5
percent 47:16 64:25
perfect 62:6,9
period 37:16 38:11 46:6 58:3 23 67:2 101:3 148:23
Permanent 146:20
permission 148:18,24 151:10,12,15 156:8
person 7:10 14:2 74:25
persons 131:9
pertinent 50:20 81:21 95:8
phone 70:21 71:5 76:11 77:4 114:3,7 139:5
phone's 76:8
phones 71:5

40:6 41:20 44:6 54:10
photo 96:17
photographs 56:7
photos 55:22
pick 25:14
picked 31:9
picking 27:24
picture 106:19
piece 97:17
pitch 8:24 9:3
pitching 36:13
place 12:24
places 36:14
plaintiff 6:19
Plaintiff's 6:16
play 125:14,15,18
PLAYS 23:6 40:11,14,23 103:2,10,13 126:18
pocket 46:19 23 67:2 101:3
point 8:25 9:11 52:8 58:6 77:18 90:10 85:17 99:16 120:17,20 122:13 124:3 142:18 148:8 154:25
pointed 147:18
pointers 85:10,19
police 6:24 8:9 15:6,9,10 16:19,23 16:3,8,16,21 17:1,14 21:19 24:10 26:3 48:17 61:8 135:22 150:10 57:21
poor 41:4
pop 77:22

popping 36:2
portion 5:15 56:3 103:10,16,18 153:18
position 23:20
positive 148:16
possibility 45:1
Possibly 87:3 91:2
practice 145:22 156:15
preliminary 58:17
preparation 24:5
prepare 55:3,7,10,13 56:14 57:14 99:12,15 103:3 110:13 126:18
prepared 86:1 107:12 109:25 110:11 125:21 154:25
preparing 14:2
presence 135:16
present 34:17 15:6,18,24 21,25 130:3,7
pretty 38:6 40:1 45:7 49:10 70:9 97:9
prevalent 35:5
previous 35:10 85:6 153:17 156:3
primarily 34:1 40:9
primary 52:24
print 106:3

51:2 59:16,2 43:2 50:1 88:8 118:14 142:18,24
priorities 43:22
priority 44:19
prisoner 42:13
probationary 41:23
problem 7:24 26:22 59:12,21 27:3 59:10,12 69:16 76:13,15 84:22,23 96:16
problems 8:2
procedure 151:6 154:23 155:12,20
PROCEEDINGS 6:1
process 69:21 72:22
processed 61:14 98:9,19
program 26:4 38:7 40:24 46:13 50:13
promoted 43:24 144:1
promotions 21:5,11
pronouncement 80:16 121:8,18,20 153:7
proper 128:2
property 78:6
protect 96:4,13
protected 128:1
protection 95:23
proud 29:21
prove 126:7
provide 80:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

95:15 102:8
131:14 132:25
133:12 134:5
135:1

**provided** 65:4
88:17 89:8 92:2
93:10 95:8
114:8 116:18,
20 120:6,9,12
123:12 131:17
132:17 138:6

**pull** 27:5 77:18,
19,24 78:8
155:14

**pulled** 78:15

**pulse** 79:17
80:11

**purchase**
66:19

**purpose** 64:20
81:18 100:21,
23

**put** 7:24 18:25
22:14 26:21,22
31:17 36:1 46:5
64:3 61:13,14
65:3 68:17
69:1,19 88:23
89:1 91:13 99:2
109:20 114:7
115:19 116:7,8
116:17 117:14
119:8 126:6
133:15 137:16,
20,23 138:2
143:22 146:14,
15 152:25

**puts** 60:18

**putting** 29:17
60:14 88:22
99:25

**Q**

**quarter** 140:12

**quarters** 30:2

**question** 8:19
9:13 12:13
26:20,24,25

27:6 28:24
36:20 43:1,2
48:8 11,13
52:14,16 53:25
54:6 58:25
64:23 65:25
65:10,18,21
66:4,7,11 81:15
82:8,12,22
83:8 89:9,5
102:16 107:21
111:17 112:17
20 132:8
134:23 135:12
137:17,19,25
138:25 139:12
22:24 148:1,3
151:5,24
152:19,24
153:2 154:9,14
155:9,13,17
156:17,22
157:7

**questioning**
103:24 104:5
126:11 153:13

**questionnaire**
s 52:23

**questions**
8:14 14:23
51:19 54:24
59:8 81:21
82:5,7 84:7,5
85:9 102:13
105:4 152:4,15
16 153:6,9,19
140:14 140:12
15 150:20
152:3,14 154:5
157:3 155:12
157:4

**quick** 52:13
56:2 68:4

**quotes** 65:3

**R**

**R-A-D-T-K-E**
8:9

**race** 113:24

**radio** 29:15
32:11 40:9
57:15 58:13
62:12 69:18,23
70:12,16,17
71:5,9

**radios** 70:14,
15

**Radtke** 6:10,25
7:6,13 8:9 9:18
27:10,11,12,13
41:14,19 48:3
54:23 58:24
70:11 77:7
78:13,23 82:3
103:20 104:17
106:18,22
106:4,6 111:23
125:17 128:8
145:7 G

**raise** 7:13

**ran** 36:13

**Rangers**
35:12,16

**rank** 31:2 31:9

**Raphael**
82:5,7 84:7,5

**rapid** 33:2

**ratio** 28:7

**re-ask** 65:22

**reach** 96:21

**read** 26:25 48:7
88:6 108:8
115:10 121:15,
17 122:10
132:1,4,5 140:6

**ready** 98:15
132:13 144:22

**real** 34:22 36:7
52:13

**realign**
103:23

**reason** 17:17,
20 21:10
109:16 126:5

**reasons** 36:17

**recall** 9:24
10:12,23,25
12:13,18
13:12,17 19:2
21:24 24:2 30:6
31:24 48:16,1
49:3,5,8,51:5
60:7 64:3,24
22:9 19,25
60:1 64:3,24
71:8 22:8,13
73:8,12 74:2
80:22 82:9,11,
23,24 83:9,9
113:6,11,13,15
114:1,9,11,
14,15,20
144:24 145:1,3,
3,6

**recorded**
150:2

**Recovered**
122:16

**recruit** 26:4
27:25 40:23,25
41:2 42:18,19
43:10,14 55:20
56:18 57:10,16,
18 62:15,16
63:17 64:7,9
65:7 67:4,16,24
84:2 124:8
111:11,13,14,17
21 74:22 76:7
76:7 81:9 83:13
84:25 98:23
103:10,11
125:8 128:22,
25 130:25
148:24 150:23
153:13 154:21,
24 155:21
156:16

**record** 8:8,17
8:8 9:11 20:21
26:21,23 36:21
41:9,11,12,13
43:21,25 48:1,2
72:24 145:1
104:11,
14,15,20
104:4 145:1,3,
3,6

**record** 26:4
27:25 40:23,25

**recruit's** 56:16
20:3

**recruits** 22:6
26:6,10 27:17
28:18 29:4,22
42:17 43:7,18
44:16 46:3,4
51:18 59:21
151:2

**recreation** 40:0
138:16,17

**Retention**
146:20

**retire** 30:24

**retired** 9:23
16:21 20:8,10,
13,14,15,23
21:1 31:2,5

**reflect** 110:22

**refreshed**
14:24 88:3,11

**refrigerator**
60:16,23

**refused** 11:6

**regard** 98:7

**regular** 20:5
32:13 33:8
40:16,21,23

**regularly**
33:18 39:2,9

**reinstated**
21:15 37:13

**related** 10:5,17
93:4 121:2
122:10

**relation** 117:25
118:2

**relationship**
117:20,23
119:14,16
119:13,16

**relayed** 127:2

**releasing** 96:3

**relevant** 96:3

**relinquish**
24:12

**remainder**
38:6,19

**remaining**
94:24

**remember**
11:13,18
13:18,20,21
13:6,9,12 16:18,
20 25:2 77:5
85:8,21,24
24:3,27 91:25
33:22,35:1 93:5
23:88:2,3,5,6,
17 89:1,18
51:13 56:9,22
57:2,3 59:14
60:9 63:12
68:6,22 72:4

**reflect** 75:9 77:15
78:1,17 82:10,
13,20 83:3,4
84:9 87:15,17
129:2 143:24
148:21 149:1
152:16

**remembered**
51:17 58:16

**remind** 45:8

**reminded** 15:1

**reminder**
36:18

**remotely** 7:4

**removal** 95:25
98:5,11 123:5

**remove** 16:10

**Renee** 129:17,
19 131:8

**repeat** 7:25
8:5,14 9:8
26:19,20 49:7
53:25 55:11
75:12 87:11
91:3 101:8
110:2 111:17

**reporter** 6:3,5
7:5,11,17,21,4,
6,7,9,10,13
42:2 125:23
107:11 123:24
146:16 147:1,
26:16 135:13
151:3 154:21,
21 153:2,5

**reports** 47:4,6,
9 48:17 49:20
50:1 51:19
52:22 54:2,11,
12,16,20 53:7,
16 56:6 91:1
124:8 151:3,11
153:14,16

**responsibilitie**
s 44:6 95:21,22

**responsibility**
97:11 98:4

**reporting**
106:3 109:13
128:10

**represent** 6:19
7:3

**representing**
6:5,24

**request** 18:24,
25 25:23 26:1
69:19

**requested**
25:25 27:6
37:24 48:1
104:21,22,23
125:22 153:13,
22 137:17,22,
15

**requesting**
86:12 103:23

**required** 40:24

**reserve** 145:13
113:11,12,17

**resistance**
113:11

**resolved** 13:22

**respond** 40:8,
13 41:20 44:5
60:2 145:20

**responded**
59:16 62:11
127:23

**responding**
40:22 56:9
62:21 67:14,23
71:24

**response** 32:9
33:3

**reporting**
106:3 109:13
128:10

**remembered**

**reword** 11:12
134:17

**returned** 19:6

**revamping**
13:1

**review** 45:14
100:12,25
146:7,10,11

**reviewed**
87:17,23 88:10
107:15 118:9
126:17 127:12,
15

**reviewing**
87:20 88:2,9,25
91:1 100:24

**reward** 11:12

**Rick's** 123:1

**rid** 14:1

**ride** 40:12

**right-hand**
107:19 110:18

**ringing** 76:8

**Robinson**
141:9

**role** 22:3 97:11

**roles** 44:5 98:4

**roll** 42:6

**rookie** 42:1,9

**ROS** 122:3,11,
13

**rotate** 46:17

**rotation** 45:20
46:12

**rough** 30:5

**roughly** 25:3
34:15 149:5,18

**Routine** 34:7

**row** 115:8,9,18

**run** 47:17
117:14

**retirement**
157:4,10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

---

**rundown**
73:13 74:11

**rusting** 148:1

**Ryan** 39:17

**S**

**sad** 64:21

**safest** 71:3

**safety** 28:3

**sake** 43:6

**salary** 18:20

**Salle** 13:19

**sat** 13:9

**scars** 117:9
119:11

**scene** 44:7
46:22 55:17
56:8,9 57:6
58:17 60:25
62:21 63:1,13
66:24 67:14
68:1 69:3,4,7,
13,14,21 70:18
72:3,6 73:9
74:4,24 75:11,
15 76:2 79:20
80:2,5 84:5
85:11 89:21
90:7,9,13 94:3,
24 95:23 96:4,
13 97:6,7,10,
13,14,21,23,24,
25 98:19,20
99:18 111:14,
21 112:19,22
113:3,10
122:15,17,24
123:17 124:2
125:20 126:12
128:1,6,8,12,
137:4 143:25
149:4,6,21,2
149:21,2

**scene's** 98:8

**scenes** 41:20
43:4

**screen** 48:9

**search** 32:25

**seasoned**
22:25

**section** 52:1
121:13,15,19

**secure** 97:6

**seek** 11:8

**segment**
103:24

**select** 118:1

**selected**
17:15,17,20
118:13 119:21
120:3,17,20

**selling** 142:15

**send** 26:9

**separately**
59:1

**September**
150:7

**sergeant** 21:5
43:23,24 48:18
49:1,2,5,8,21
107:20,23
114:16 123:1
130:6,10,12

**sergeant's**
21:6

**series** 109:4

**serve** 16:13

**served** 14:1,22
16:3 141:22,25:16
20:13:31:7

**served** 16:5

**service** 16:5

**serving** 18:17

**set** 39:5

**settled** 86:19

**settlement**
11:5 13:25

**sex** 118:25

**shake** 93:1,2

**shape** 28:18
29:4

**shell** 97:18

**sheriff** 61:18

**sheriffs** 60:14
61:17

**shift** 14:22
37:19 38:20

**shifting** 39:6

**shook** 122:5,6
133:24

**shooting**
44:14 45:4
128:5 131:10
132:21 134:15,
17 135:6
138:14,25
139:4,6,20
140:12,22,25:16
140:11

**shootings**
142:18

**short** 47:6
51:23 65:6
124:16 144:21
132:21 138:22
134:15,16,21
140:11

**shorter** 91:22

**shot** 57:6 58:16
62:22 96:3
124:3 129:3
114:14 146:4,5
116:13
150:25 191:17
152:8,20,21
154:5,17
156:7,16,17

**signature**
136:17,21,23
105:5,6,20,21
116:1 152:1:9
117:16 140:4:4
107:3:6 68:11
141:6,17

**signing** 154:22

**signs** 80:17
123:1

**silk** 115:13
118:20

**sir** 7:12 8:10
53:24 63:15
26:1 27:14
34:18,24,25
35:5 36:23
39:7 55:16
77:18 127:23
118:25 119:17
13:18 138:11:9

**sitting** 29:16
120:24 122:7
133:18 151:13

**situation**
124:21

**skills** 54:15

**sliding** 13:1

**slip** 100:13

**slipping** 13:1

**slow** 8:20,22
45:2,3,4

**slower** 9:21

**slowness** 99:4

**small** 60:16
66:21

**smaller** 17:9,
10

**Snake** 141:11,
13,14,15

**snow** 12:25

**soldiers** 35:23

**solemnly** 7:14

**solid** 36:7
143:10,21

**sooner** 154:20

**sort** 115:1

**sought** 21:10

**sound** 9:15

**sounded** 28:17
70:3

**sounds** 8:7
11:14 12:18
28:13

**south** 23:7,8,
11 25:1,2,5,7,8,
17,18 133:2,3
13:24 14:1:25,
35:4,24,25
35:5 36:23
39:7 55:16

**speak** 73:6
81:7,10,13

**speaking**
92:25 73:8 74:2
81:8 87:10,13
113:2 156:24

**speaking**
98:10,13

**spearhead**
91:1

**special** 32:12

**specialist**
21:25 22:2,5,18
24:10 32:1,6,
18,21 35:10
37:6

**specialists**
32:5,25 37:3

**specific** 28:21
32:2,14 57:15

**specifically**
82:7,9 83:10
102:24

**stands** 111:1
121:7

**star** 31:19,20
73:15,16,25
105:22 106:3
122:2,9,17
21 126:6,18,7
39:1:11

**start** 39:13,14,
22 39:22
46:24 94:9
84:23,24

**started** 29:13
35:24 36:11,25
23:13:35:3
89:12

**stop** 74:23

**store** 101:19

**story** 143:19

**straight** 37:23
38:4 48:23 57:7
67:22 138:13

**street** 6:6
13:19 39:15,18

**state** 6:14 7:7
8:7 11:17,19
86:19,21 96:7,9
99:11,19,23
110:1,5 151:14

**statement**
124:24

**States** 6:12

**static** 101:22

**stamp** 127:5
131:2,22
146:21

**stand** 97:4,5

**standard** 6:9
41:11,17 48:6
84:1 104:14,20
145:4,10 151:1
154:23 155:12,
20 158:5

**standing** 63:18
102:24

**station** 58:4
68:24 100:3
150:10

**stationed**
29:23

**statistics** 98:1

**status** 22:21
32:11 92:19

**stay** 34:1,15

**stayed** 36:1,7,
10

**steered** 45:2,7

**step** 83:19

**steps** 44:15,16
105:3,6 122:7,12
122:17:23
21 126:6,18,7

**stern** 49:10

**Steve** 26:23

**stipulate** 7:9

**stood** 56:15
79:25

**state** 6:14 7:7

**stated** 122:3,8,
13,23 122:3
134:14 153:12
156:3

**stating** 48:2

**stay** 34:1,15

**state** 44:15,16

**state** 6:14

**stern**

**summarizatio**
n 88:19

**summarized**
88:16 127:19

**summary** 51:6
52:8,25 53:2,22
111:7 112:19,5
23 132:23
137:1 138:3,10,
12 113:16,23

**summer** 23:4
24:8

**superintenden**
t 31:2

**superintenden**
ts 38:8

**supervised**
118:6

**supervising**
107:19,23

**supervision**
154:25

**supervisor**
108:5

**supple** 130:16

**supplement**
14:25 60:10
88:5

**supplementar**
y 66:8 88:3
125:15,20
126:21 127:8,
15 131:2,21
132:18 133:23
134:9 135:19
136:18

**supplementin**
g 62:10

**supplying**
153:15

**support** 33:2

**supposed**
50:14,19 51:4,7
52:1,6 117:11

**supposedly**
75:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS





surmised 80:9
surprise 78:10
survey 78:11
swear 7:14
switch 41:5,6
sworn 15:6,22
16:8
system 147:19

**T**

tact 143:22,23
taker 21:12
taking 50:6
57:3 61:12
64:18,23 65:8,
11 66:2,22
67:19,20 85:5
94:18 98:11
101:1 102:9
talk 12:14 15:4
47:3 73:1 78:22
83:15,18
128:24
talked 9:10
64:25 65:7 73:7
90:3 130:20
talking 50:17
56:22 59:1,8
63:18 66:5,23
68:3 74:22,25
81:16 84:3
102:19,24
114:16
tape 96:6,7,9,
12
tavern 80:2
Taylor 6:4
26:25 41:15
48:4,7 78:22
80:22 84:8,
83:24 85:4,13
82:7 86:25
87:9,22,22,24
88:10,18 99:2,
11,15,19 90:4,
12 91:22,23

92:3,11 94:5,11
104:18 113:15
114:3 123:12,
22 124:3,6,9
128:15,20
129:2,12,15,17,
19 130:21
131:8,24
132:17,25
133:12 134:5,
14,21,24 135:4,
9,13 136:4,21,
23 137:12
138:10,18
145:8
**Taylor's** 87:12
teach 28:3
teacher 28:5,9
49:10
teacher-
student 28:7
teachers 47:2
teaching 28:6,
8,10,11 50:17
teachings 28:1
tests 25:4
testbed 41:7
thing 7:23 57:5
73:15 76:3
77:2 99:3
122:1 139:15
140:3
things 28:19
35:2 36:12
42:7,8,11 47:11
60:1 63:16
67:22 86:19
thought 27:20
29:5 53:11 57:9
59:6 60:17
64:14 70:1 71:3
76:12,23 95:8
125:9 139:20

terms 113:23
territorial 25:1
territory 25:15
test 21:6,12,13
testified 45:5
93:14 99:10
110:4 129:7
145:21 148:8,
14 151:16
testify 11:20,
23 12:4 150:13,
15
testifying
109:25
testimony
7:14 60:10
62:10 70:16
75:4 79:4 80:24
85:18,20 86:22
88:4,8,22 90:19
92:13,17,21,
20 122:4,10
137:20 151:23,
25 152:2 153:5,
7,8,12,19
there'd 41:7
thereabout
54:14
there's 69:5
75:13 76:3
122:1 139:15
140:3

tickets 59:21
time 6:8 9:22
10:1 14:17,18
17:25 18:4 20:6
24:9 28:8 29:2
34:5 36:13,24
36:24 37:16
38:19 40:24
41:15,16 45:2
47:15 46:13
48:5 50:4 52:16
51:6,8,9,10
61:6,63:20
67:24 71:4,7
77:18 78:19
79:13 80:7
82:24 83:25
86:14 86:20
87:6,94:16
97:2,3 98:21,22
96:1 101:22
100:4 134:11,
16 136:13,24
138:3 144:2
145:9 149:3,5,
7,8,12,19
151:12 154:1,3
154:14 155:9
times 8:5 10:4
14:19 44:1
77:19 91:24
154:14 155:9
tired 29:13
142:8
title 22:8
today 6:5 11:1
29:11 35:4
41:15 48:5
54:25 55:4,7,
18,19 56:22
82:6 83:25
84:17,24 87:15
91:17 101:25
104:18 118:2
138:7,9 144:20
145:8,12,22
148:14 151:16
152:7,13,15,21
153:5,7,22

154:11,17
Today's 6:7
told 74:6 75:2
80:19 89:11,15
90:1 19:22,24
101:13,20,24
130:20 135:3
136:20,21
137:22 154:11
tomorrow
29:12
top 1:14 60:23,
24 105:11,13
108:22 110:18
149:22
totaled 11:6
totally 66:3,6
142:9
touched 79:21
tour 38:13
town 17:9
18:12 36:3
towns 18:1,3,6
track 34:22
train 27:22
60:1
trained 44:16,
19 45:6 46:21
47:6,9 48:16
49:19,20 50:19
114:15
trainee 40:12
training 19:24
22:5,13,15
24:20 26:4
27:14 30:14
31:7,11 37:11,
19 40:7,17,24
43:17,44:16
46:16 49:5,8
57:22 62:15
64:20,22 77:17
80:20 81:18
81:19 86:13
114:16,21
152:1,12 155:20,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21
transfer 24:1,
13,14 25:23
30:22
transferred
23:18,24 30:15
transferring
22:22 23:7
traveled 38:1
trays 60:24
trial 11:15,20,
23 12:4 150:13,
15
tricky 45:10
Triplett 141:5,7
trouble 122:9
truck 42:12
true 41:1
truth 7:15,16
turn 43:23 77:4
100:12 111:24
turned 61:9
75:8 76:14
105:9 107:16,
20,22
Turner 123:3
two-page
112:7
two-week
46:12
type 54:13,14,
15,19
typewritten
54:12
typing 54:14

**U**

Utah 15:16
uncomfortable
20:5
underneath
147:11

understand
18:24 32:3 37:4
66:13 83:7 84:7
96:11,25 128:17
123:20 142:13
understanding
36:24 94:17,21
123:20 142:13
Understood
8:21 9:4 63:12
66:12 83:1
153:20 154:4
156:17
unfamiliarity
99:4
uniform 32:19
33:6
uniformed
32:22
uniformly 50:9
unit 22:21 23:2
29:17 37:8,13
43:17 69:21
73:16 110:25
United 6:12
units 29:10
32:12 71:24
unknown
61:16 115:16
17 117:4,6 63
118:24 149:8
12 120:2 7:16
unusual 41:2
156:16,25
upstairs 96:21
utensil 66:5

version 151:25
versus 6:11
vicious 36:11
142:14
victim 44:10,23
74:19 75:24
76:7,11,21,25
80:6 82:3 93:2,
16 96:16
111:10,14,20
112:18,21
113:1,2 121:3
122:5,8,9,12
127:24,25
129:25 133:18,
25 134:2,18
135:20 136:4,17
140:11 142:21
victim's 96:25
98:5 113:9,19
121:10 122:22
133:25
video 9:3 41:16
vide conform
ce 6:9 41:15
48:4 83:24
Violent 122:19
virtual 59:13
vital 123:7
voice 8:24
voices 9:1
volume 156:20

**V**

vacation 41:2
vaguely 36:8
vehicle 11:25
Veneman
41:15 48:4
83:24 104:18
145:8

walked 77:14
79:24 122:4,6
133:13,17
133:10
walking 42:13
49:11 92:25
133:6,13,14
wall 77:17
Walter 129:24
130:1
wanted 77:16
22:15 26:12
28:17 34:13
36:6 41:24
50:6,11 53:17
54:1 57:4 63:5,
67:16,7:15,19,
20,24 77:16
81:10 81:19,22
92:7 93:13 97:6
wanting 29:3
warmed 67:22
warrant 32:18
warrants
32:25
watch 37:23,24
38:4,10,11
watched
148:25 150:25
watching
128:23
water 18:12
Watson 56:20
56:7,19 57:16
59:15 60:1
62:15 63:3
64:2,18,23
65:10,25 66:22
67:3 73:24
75:10,14 77:7
77:18 80:25
81:10,13,19
82:16 85:18,14,
25 85:23 86:1,
24 87:10,13

88:16 89:12,16
19,20 91:15,18,
21 92:16 93:23
95:2 99:12,19
100:4,11 110:1
110:4 111:3
113:8,16,18,1,6
15,21 15,22 16
136:22 137:7
138:10,18
146:2 148:18
149:4,19
151:18
Watson's
81:24 84:4,14
88:25 100:17
105:14,15,19,
24 137:3
ways 147:16
weapon
120:13
weapons
119:19
wearing 87:5
151:13
week 31:18
weeks 45:13,
14,15,17,19,20
46:8,9,16
weight 29:18,
21 116:9,11,12,
18,19 119:4
Wentworth
29:25
west 6:6 25:5,
12,14,17 60:2
62:16 66:24
69:3 72:15 76:3
78:15 96:5
97:24 111:6
112:19,22
133:19 142:10,
17
westbound
132:22 133:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Western 61:2
When's 9:22
whisk 121:23
whispering
121:22
white 115:13
131:9 146:18
whoa 151:21,
22
Why'd 26:15
width 96:22
withdraw
111:16
withdrawing
137:8,13
140:10
witnessed
137:8,13
140:10
witnesses
63:1,8,13 66:24
73:16 75:25
91:14 114:8
120:9 128:5,9,
14 136:24
137:23 138:6,
11,19 140:1,10
150:9
woman 74:21
124:4,7,10,17,
22
women's 9:1
wondering
28:21
words 74:9
work 10:6 11:8,
11 17:8 22:6
27:21 31:18
32:6 33:5 37:22
34:3 39:8,11
42:19 45:15,21
50:23 52:2,7
59:22 72:2 85:2
76:22 113:2
143:21 151:7
156:16
worked 15:10,
13 33:9 58:10,

11 85:15
100:14 144:9
working 11:9
26:6 27:16,18
29:19,21 36:7
37:1,18,20
38:20 45:16
98:24 110:21
workload
156:20
works 7:11
15:1
worries 76:25
worry 76:22
would've
46:24 78:3
80:19 82:11,16,
17 83:2 85:15
99:1,3,24
133:15 137:16,
20 138:1
wounded
134:18
wounds 79:14
write 47:4,6,9
48:16 54:13
59:21 86:12
126:8 151:13
writes 86:16
writing 47:13
51:2,3,11,17
63:10,24,24,14
66:5 73:14
145:8
written 103:8
153:1 117:8
121:1 126:8
147:11
wrong 122:20
wrote 55:16,17
85:24 86:17,21
109:3,12
115:22 125:8

**X**

Xeroxed 147:1

**Y**

Yamin 158:2
158:2
year 12:8 14:3
16:24,25 24:22,
23 39:20 46:14
101:22
years 9:23 20:1
23:12 30:21
31:6,12 32:21
38:5 102:6
116:7
yellow 96:6,7,
9,12
yesterday
29:11
young 49:11
28:2

**Z**

Zone 122:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com