**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ARNOLD DAY,                          )
                                     )
    Plaintiff,               )          Case No. 19-cv-7286
                                     )
    v.                       )          Hon. Sara L. Ellis
                                     )          District Judge
KENNETH BOUDREAU, *et al.*,          )
                                     )          Magistrate Judge Jeffrey Cummings
    Defendants.              )

# Exhibit 151

## Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

JAMES KLUPPELBERG     )
                     )
     Plaintiff,    )
                     )
   vs.             )   No.13 CV 03963

JON BURGE, LEONARD ROLSTON )
#11935, JOHN SCHMITZ #14634, )
WILLIAM FOLEY #8108, WILLIAM )
KELLY #3644, DETECTIVE URBON )
#15400, THOMAS PTAK #6029, )
MICHAEL DUFFIN #13596, GEORGE )
JENKINS #11828, DETECTIVE )
NELSON #16164, DETECTIVE VEGA )
#3464, DETECTIVE W. MICEK )
#4645, DETECTIVE GUEST )
#10600, DETECTIVE L. TUIDER )
#5648, FRANCES BURNS, WILLIAM )
ALLETTO, as-of-yet UNKNOWN )
EMPLOYEES OF THE CITY OF )
CHICAGO and THE CITY OF )
CHICAGO, )
                     )
     Defendants.   )

The deposition of JAMES HICKEY, taken under oath at 311 North Aberdeen Street, Suite 100, Chicago, Illinois, at 11:50 a.m. on Tuesday, July 29, 2014 pursuant to the Rules of the United States District Court, Northern District of Illinois, before Jamye Giamarusti, C.S.R. No. 084.004183 in and for the County of Cook and State of Illinois, pursuant to Notice.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052140

## Page 2

1  APPEARANCES:

2

3     LOEVY & LOEVY, by

4     MS. ROSHNA KEEN

5     312 North May, Suite 100

6     Chicago, Illinois  60607

7        Appeared on behalf of the Plaintiff;

8

9     THE SOTOS LAW FIRM, P.C., by

10    MR. JEFFREY R. KIVETZ

11    550 East Devon, Suite 150

12    Itasca, Illinois  60143

13       Appeared on behalf of the

14       Individually named Defendants;

15

16    JONES DAY, by

17    MR. CHAKA M. PATTERSON

18    77 West Wacker Drive, Suite 3500

19    Chicago, Illinois  60601

20       Appeared on behalf of the Defendant,

21       The City of Chicago.

22

23         * * * * *

24

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052141

## Page 3

1      (WHEREUPON, Deposition Exhibit

2      No. 1 was marked for

3      identification.)

4      (Witness sworn.)

5      JAMES HICKEY,

6  called as a witness herein, having been first

7  duly sworn, was examined and testified as

8  follows:

9        EXAMINATION

10  BY MS. KEEN:

11    Q.   Good morning.

12    A.   Good morning.

13    Q.   My name is Roshna Keen, and I

14  represent the plaintiff, James Kluppelberg in

15  this matter.

16      Could you please state and spell

17  your name?

18    A.   James K. Hickey, H-I-C-K-E-Y.

19    Q.   Are you currently employed?

20    A.   I am.

21    Q.   By whom?

22    A.   Chicago Police Department.

23    Q.   What is your rank at the CPD?

24    A.   My title is assistant director.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052142

## Page 4

1    Q.   Of any particular unit?

2    A.   Of Research and Development Division.

3    Q.   How long have you held that position,

4  sir, as the Director of R&D?

5    A.   I first had it in 1999.  And two or

6  three years later, I left for other

7  assignments, and I returned in 2008.  So, I've

8  had it twice.  And this time it's been for the

9  last six years.

10    Q.   Before we go any further, I want to

11  show you what's been marked as Exhibit 1.

12      This is the copy of the Notice of

13  Rule 30(b)(6) Deposition pursuant to which we

14  have convened here today.

15      Can you let me know when you

16  finished reviewing it, please.

17    A.   I have previously looked at this

18  document, yes.

19    Q.   Are you here today to testify as the

20  Rule 30(b)(6) representative of the City of

21  Chicago on the topics that are contained in

22  this notice?

23    A.   For topics one through five.

24    Q.   Are you saying that you're not going

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052143

1    to be testifying about topic six in the notice?
2            MR. PATTERSON: That's correct.
3            MS. KEEN: My understanding from your
4    e-mail was that he was going to be testifying
5    as to one through six.
6            MR. PATTERSON: No. I said one
7    through five. I'm certain of it. I said one
8    through five, and we were evaluating six
9    through eight.
10           MS. KEEN: Okay. What is your
11   position today on six through eight?
12           MR. PATTERSON: We are looking for
13   somebody to testify on the first half of six,
14   and we are still evaluating what to do about
15   the second half of six, seven and eight.
16   BY MS. KEEN:
17       Q.   So, let me ask you this question, sir.
18            Have you made any efforts to look
19   for documents that are responsive to any
20   discovery requests that were issued in this
21   litigation?
22           MR. PATTERSON: Objection. He's not
23   here to testify about six.
24           MS. KEEN: Well, if he, just in an

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052144

1    individual capacity as an employee of the
2    police department, did take steps to obtain any
3    documents that were produced in this
4    litigation, then I want to ask him about that.
5            And if what you're saying is I
6    would have to do that not in his capacity as a
7    30(b)(6) witness, but just independently, then
8    I guess I can do that at the end.
9            But in order to even know that, I
10   have to ask him the predicate question of
11   whether he took any steps. I don't want him to
12   have to come back twice, and I assume you don't
13   either.
14           MR. PATTERSON: No, I don't. So,
15   let's do this. If you want to ask him about
16   that in his individual capacity, that's fine.
17           MS. KEEN: Well, the question of
18   whether he looked for everything, I mean, as
19   just a human being who took the steps to look
20   for something. That's what I'm asking about
21   first.
22           If he did, then I would ask him
23   about his efforts individually, not as a
24   representative of the city. Do you understand

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052145

1    what I'm saying?
2            MR. PATTERSON: Yeah. Okay. That's
3    fine. Go ahead.
4    BY MS. KEEN:
5        Q.   Is it Mr. Hickey or Officer Hickey?
6        A.   James.
7        Q.   That's easy.
8            James, did you take any steps to
9    look for documents for the purpose of providing
10   them to the attorneys in this Kluppelberg
11   litigation?
12       A.   And I'm speaking as an individual.
13       Q.   Right. On that question.
14       A.   Regarding the Ramos case -- no,
15   Research and Development does not maintain
16   information regarding specific criminal
17   investigations or death investigations and we
18   don't have anything to do with filing cabinets,
19   where they are maintained, or where they are
20   located.
21       Q.   How about any of the policy documents
22   that were produced in this case? Did you go
23   out and pull any policy documents?
24       A.   I oversaw some gathering of some

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052146

1    documents that were requested.
2        Q.   Okay. For this Kluppelberg case?
3        A.   Yes.
4        Q.   And around when did you oversee that
5    process?
6        A.   In the last few months. I don't know.
7            MS. KEEN: Okay. So, I think maybe
8    the easiest way to do it is at the conclusion
9    of the 30(b)(6) deposition, I'll ask him about
10   whatever steps he took, you know, to oversee or
11   directly obtain documents for this case.
12           MR. PATTERSON: Well, I would object
13   to that. I think it's fair to ask him
14   personally what steps he took.
15           MS. KEEN: Right.
16           MR. PATTERSON: But not what steps he
17   oversaw because I think that bleeds into
18   Topic 6, and he is not the person to testify on
19   Topic 6.
20           Like I said, we will definitely
21   produce somebody on the part of 6 that requests
22   what steps were taken to produce documents in
23   this case, but Jim Hickey is not that person.
24           MS. KEEN: Okay. My position is we

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052147

1   get to ask him about what he did.

2          MR. PATTERSON:  Yes.  I agree with

3   that.

4          MS. KEEN:  And if he oversaw by

5   talking to somebody, that's what he did.

6          MR. PATTERSON:  Okay.  That's fine.

7   I'm not going to make a big deal out of it.

8   That's fine.

9          MS. KEEN:  We can always talk further

10   about that at a break because that's going to

11   be at the end anyway.

12          MR. PATTERSON:  Okay.  That's fine.

13          MS. KEEN:  Okay.

14   BY MS. KEEN:

15     Q.  So, your understanding is that you're

16   here to testify on behalf of the City of

17   Chicago as to topics 1 through 5 of this

18   notice, correct?

19     A.  Correct.

20     Q.  Now, there is a typo in my notice.

21        In topic No. 2, it relates to

22   Area 3 Violent Crimes.  And at the very last

23   sentence of that topic it says:

24          "This request includes but is not

---

1   limited to the use, storage, location and

2   preservation of police reports, memos, notes,

3   witness statements, worksheets, general offense

4   reports, general progress reports,

5   supplementary reports, lineup reports, evidence

6   logs, inventory reports, and any other means of

7   reporting information learned during an arson

8   investigation?"

9          Do you see that?

10     A.  Yes, I do.

11     Q.  It should say Violent Crimes

12   Investigation.

13     A.  The last word should be Violent

14   Crimes?

15     Q.  Rather than arson, it should say

16   Violent Crimes.

17     A.  Okay.

18     Q.  With that correction, are you still

19   the representative the 30(b)(6) representative

20   for the city on Topic 2?

21          MR. PATTERSON:  With the exception of

22   line-up reports, he is.

23          THE WITNESS:  Yes.

24

---

1   BY MS. KEEN:

2     Q.  So, the entirety of Topic 2 as it

3   relates to Violent Crimes with the exception of

4   line-up reports, correct?

5          MR. PATTERSON:  Yes.  Oh, sorry.

6          MS. KEEN:  No, that's okay.

7   BY MS. KEEN:

8     Q.  And that's your understanding as well?

9     A.  Yes, ma'am.

10     Q.  And then the same correction needs to

11   be made to topic four.  I apologize.  I

12   realized this last night.

13        Because topic four relates to

14   Area 3, the word arson should be replaced with

15   Area 3 Investigations.

16          MR. PATTERSON:  In topic four?

17          MS. KEEN:  Yeah.

18   BY MS. KEEN:

19     Q.  With that correction, are you the

20   representative of the City on the entirety of

21   topic four?

22     A.  Yes.

23     Q.  Did you review any documents to

24   prepare for your deposition?

---

1     A.  I did.

2     Q.  Tell me what documents you reviewed.

3     A.  Let's see.  Prior depositions I've

4   given.  I think it was -- no -- in the Fields

5   testimony.

6     Q.  From the trial?

7     A.  From the trial.  I did look at the

8   death investigation that turned into a homicide

9   investigation.

10     Q.  You mean for this case?

11     A.  Yes, ma'am.  I looked at a couple of

12   annual police reports.

13     Q.  What was the relevance of those annual

14   police reports?

15     A.  I was trying to refresh my memory

16   regarding the volume of crimes, violent crime

17   field investigations that were assigned to

18   Area 3 in 1984.

19     Q.  Based on your review of those reports,

20   what was your impression of the volume of

21   crime?

22     A.  It's pretty busy.  There was no

23   surprises.

24     Q.  What else did you look at, if

## Page 13

```
 1   anything?
 2        A.   That's about all.
 3        Q.   Did you review any special orders?
 4        A.   Oh, I'm sorry.  Yeah.  The Detective
 5   Division Special Orders on the topic of
 6   investigative files, but didn't look at them
 7   very hard because I'm pretty familiar with the
 8   topic.
 9        Q.   You wrote some of them, correct?
10        A.   I wrote all of them -- not all of
11   them.  But, yes, I have written some of them.
12        Q.   If you are able to recall, sir, which
13   special orders specifically did you review?
14        A.   Detective Division Notice 82-2,
15   Detective Division Special Order 83-1, as well
16   as 83-2, and one special order Detective
17   Division Special Order from 1986, and I forgot
18   the number on it.
19        Q.   Did you review any memoranda regarding
20   the subject of files and reports?
21        A.   Yes.  I did look at memoranda that
22   were generated on the subject of surveying the
23   violent crime areas and recommendations and
24   discussions that were ongoing that were reduced
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052152

## Page 14

```
 1   to a form of a memoranda, several memorandum.
 2        Q.   Is it your understanding that all of
 3   the documents you reviewed to prepare for
 4   today's deposition have been produced in this
 5   litigation?
 6        A.   Yes.
 7        Q.   And that's a question for you or your
 8   attorney.  I just want to make sure that if
 9   you've looked at something, that I have a copy
10   of it as well.
11        MR. PATTERSON:  Yeah.  Everything that
12   he reviewed has been produced.
13        MS. KEEN:  Okay.  Great.
14   BY MS. KEEN:
15        Q.   Anything else you reviewed?
16        A.   I think that was it.
17        Q.   Okay.  And part of what I'm going to
18   get your help with today is just identifying
19   the different documents, who wrote them, when
20   were they written, that kind of stuff.
21        A.   Okay.
22        Q.   I know you've given some deposition
23   testimony in other cases, correct?
24        A.   Correct.
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052153

## Page 15

```
 1        Q.   On some similar subjects to what are
 2   contained in our notice here.
 3             What other cases have you given
 4   deposition testimony in on the subject of
 5   reports or file keeping within the police
 6   department?
 7        A.   Evans case, Rivera, Fields.  I'm
 8   starting to lose track to be honest with you.
 9             I probably have given depositions
10   on the subject of investigative files to
11   multiple attorneys, Peoples Law Office and
12   others.
13        Q.   You gave testimony at the Palmer
14   hearing, correct?
15        A.   Right.  Early '80s, right.
16        Q.   As you sit here today, do you recall
17   giving that testimony?
18        A.   Right.  It was Judge Shader's
19   courtroom, Milton Shader.
20        Q.   Did you review any transcripts from
21   your Palmer testimony any time recently?
22        A.   Not for this.
23        Q.   Okay.  Have you testified?
24        A.   I mean, for the other ones, I looked
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052154

## Page 16

```
 1   at it, but I -- not for this one.
 2        Q.   You gave the Rivera deposition
 3   somewhat recently, correct?
 4        A.   Correct.
 5        Q.   And the Fields deposition as well was,
 6   relatively speaking, recently, correct?
 7        A.   Correct.
 8        Q.   In the last year or two or couple of
 9   years?
10        A.   Last few months.
11        Q.   Last few months.  Okay.
12        MR. PATTERSON:  Let me just interject.
13   To be clear, Roshna, I think the Fields
14   testimony at trial was given in the last couple
15   months.
16        MS. KEEN:  Okay.
17        MR. PATTERSON:  The Fields deposition
18   was like maybe 2012.
19        MS. KEEN:  Okay.
20        MR. PATTERSON:  2011, 2012, something
21   like that.
22        THE WITNESS:  Thank you.
23   BY MS. KEEN:
24        Q.   So, let's return back to your career
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052155

1    with the department. I know you've been with

2    them a long time. I just want you to briefly

3    walk me through the various posts you had.

4        A.   Sure. I started the Chicago Police

5    Department in June 1971. After the training

6    academy, I was assigned to the Englewood

7    community, 61st and Racine. I spent a couple

8    years there and was assigned to work as a

9    police officer in the juvenile court where I

10   worked until about 1975.

11         And in 1975, I began working for

12   the Special Investigations Unit of the Youth

13   Division, which concentrated its investigations

14   on child pornography and school narcotics.

15       Q.   What rank did you have if you were in

16   the Special Investigations Unit?

17       A.   I was police officer at that time.

18       Q.   Was Special Investigations within --

19       A.   Within the Youth Division.

20       Q.   And what was the Youth Division

21   within?

22       A.   The Bureau of Investigative Services.

23       Q.   So, was that, like, a specialized unit

24   within the Bureau of Investigative Services?

---

1       A.   Yes, it was.

2       Q.   Okay.

3       A.   In August 1977, I was appointed to

4    detective -- appointed as a detective, and I

5    was assigned to Area 1 Homicide and Sex Unit

6    that worked out of 51st and Wentworth and was

7    responsible for crimes which occurred south of

8    the Chicago River to 75th Street, Dan Ryan to

9    the Lake.

10        After that, about 19 -- late

11   1980, I was assigned to detective headquarters.

12       Q.   What did that mean that you were

13   assigned to detective headquarters in terms of

14   your responsibilities?

15       A.   My responsibilities changed

16   dramatically from that of a field detective to

17   that of a detective working downtown at the

18   headquarters building. I worked for the Chief

19   of Detectives.

20       Q.   Who was the chief at that time?

21       A.   William Hanhardt, H-A-N-H-A-R-D-T.

22       Q.   What were your responsibilities for

23   the Chief of Detectives?

24       A.   In the morning, I would come in early

---

1    and review all the major crimes which occurred

2    citywide and then brief the chief in the

3    morning.

4       Q.   What documents were you looking at to

5    permit you to review all the major crimes that

6    had occurred citywide?

7       A.   There was a requirement that each of

8    the then six areas in Bomb & Arson would create

9    a 24-hour log. And each day on each of the

10   three watches or shifts, the supervisor in

11   charge would have to simply summarize the

12   highlights of major investigations that had

13   just occurred or developments, major

14   developments on other cases.

15       Q.   What was the log called?

16       A.   Detective area, 24-hour log, something

17   similar to that.

18       Q.   Was it ever called the Major Incident

19   Log?

20       A.   That's it. Yeah. Major Incident Log.

21   That's it. 24-hour log.

22       Q.   Just so that I am clear, do you recall

23   what it looks like?

24       A.   Sure. It had two columns. On the top

---

1    of it, it had the normal unit identifier. And

2    on the left-hand column, it had the hours for

3    the shift. And in the right-hand column, there

4    was space, free entry, where the supervisor had

5    to write the event, describe the event, usually

6    in less than a paragraph, and so on and so

7    forth.

8        For each of the watches at the

9    end of 24 hours, usually at 5:00 o'clock in the

10   morning, they were hand-carried down to

11   headquarters.

12        We're talking about an era before

13   the fax machine. Hard to imagine, I know.

14   But, yes.

15       Q.   I have worked at places where they

16   have interoffice mail envelopes, so I'm

17   picturing something like that. It was

18   hand-carried to the Chief of Detectives office?

19       A.   Right.

20       Q.   Where was the Chief's office located

21   at that time?

22       A.   1121 South State Street on the 5th

23   floor at the headquarters building.

24       Q.   At that time, what other unit or areas

1    were in 1121 South State Street?

2        A.    All the major leadership was there,

3    including the Superintendent of Police.

4        Q.    When you said that the supervisor in

5    charge had to fill out the Major Incident Log,

6    are you referring to the sergeant supervising

7    each shift?

8        A.    Correct.

9        Q.    Did lieutenants or captains or

10   commanders have any responsibility in filling

11   out that list?

12       A.    Lieutenants tended not to fill it out

13   unless there was no sergeant around.  There

14   were no captains assigned to the Detective

15   Division in this era.  And commanders didn't do

16   it.

17       Q.    How long did you work for the Chief of

18   Detectives after starting in the late '80s?

19       A.    Oh, about three years.

20       Q.    So, what you're describing for me now

21   is your daily routine from about late '80 to

22   sometime in '83?

23       A.    Yes.  And that was simply my morning

24   activities.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052160

1        Q.    Okay.  What is your understanding as

2    to whether copies of the Major Incident Log

3    remained at some point in time?

4        A.    Okay.  Now, we've shifted from the

5    Major Incident Log to the Major Incident

6    Worksheet, or no?

7        Q.    No.  We're not talking about that yet.

8        A.    Okay.

9        Q.    I know that exists.  I have questions

10   about that, but I'm still talking about this

11   24-hour log.

12       A.    Okay.  The original was sent downtown,

13   a copy went to the deputy chief, a copy went to

14   the area commander, a copy stayed with the area

15   Violent Crimes Unit.

16       Q.    What if we're talking about

17   Bomb & Arson?

18       A.    They submitted their own and a copy

19   went to the -- the original went to the chief,

20   a copy went to the deputy chief, a copy went to

21   their commander, and I presume they had an

22   office copy.

23       Q.    Why do you presume that?

24       A.    It's a document that sometimes is

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052161

1    informative, especially for one that has been

2    off for the last two days.  They can come in

3    and see what happened.

4        Q.    Okay.  As of the three years that you

5    were first working in the Chief of Detectives

6    office, what was the retention schedule for the

7    Major Incident Log?

8        A.    I believe it was one year.

9        Q.    Was it one year for all of the copies,

10   or did some copies stick around longer than

11   this?

12       A.    It's the original.  You really can't

13   control, you know, copies of copies.  It speaks

14   to the original and any copies.

15       Q.    Are you saying that the police

16   department's policy was to purge all Major

17   Incident Logs after one year of their

18   existence?

19       A.    Yes.

20       Q.    Were Major Incident Logs or copies of

21   the logs ever placed in individual police files

22   relating to a specific case?

23       A.    I don't believe so.  Could they have

24   been?  Yes, they could have been.  It was not

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052162

1    viewed as pertinent to the subject

2    investigation.

3              It's simply a summary to inform

4    the leadership of events that occurred.  And

5    there are more than -- frequently more than one

6    event per page.

7        Q.    Okay.  So, you're saying it wasn't --

8    well, let me -- I guess let me give you an

9    example and that may -- your answer may be the

10   same and that's fine, but I'll just ask you.

11             If the Major Incident Log

12   contained references to three different

13   homicides that had all occurred within a span

14   of a 24-hour period within the same district,

15   would you expect to see a copy of that Major

16   Incident Log placed into either the permanent

17   retention file or let's call -- let me re-ask

18   that.

19             Would you expect to see in a case

20   where a Major Incident Log had referenced three

21   different homicides that had all occurred

22   within the same 24-hour period in the same

23   geographic area placed into either the RD file

24   or the unit file for each of the three

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052163

1  homicides?

2        MR. PATTERSON: Objection, foundation,

3  incomplete hypothetical.

4        MS. KEEN: Just so that we're clear,

5  I'm talking about this time period of '80 to

6  '83 when you were working in the Chief of

7  Detectives.

8        MR. PATTERSON: Same objection.

9        THE WITNESS: I would not expect it to

10  be placed in individual files.

11  BY MS. KEEN:

12    Q.  Okay. For the reasons that you stated

13  a moment ago?

14    A.  It's a management information sheet,

15  and it was not part of the individual

16  investigation.

17    Q.  Have you ever seen a copy of a Major

18  Incident Log in a unit file?

19        MR. PATTERSON: Objection, foundation.

20        MS. KEEN: Just so that I understand,

21  what's the foundation objection?

22        MR. PATTERSON: You haven't

23  established that there are unit files, what

24  they are, what they contain, et cetera.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052164

---

1        MS. KEEN: Okay. I guess I'm --

2  that's fine. That's such a --

3        MR. PATTERSON: Where they're kept.

4        MS. KEEN: Because of his position,

5  you know, his extensive experience on the

6  subject, which we can get into, but I'm sure

7  he's going to be asked questions in his

8  position as the designee on these topics.

9        I'm going to ask him about

10  whether he's ever seen something occur, you

11  know, in the course of his career. I'll define

12  unit file, and you can let me know if that

13  addresses your concern.

14  BY MS. KEEN:

15    Q.  Let me take a step back.

16        Have you ever seen a Major

17  Incident Log placed into any police file

18  relating to a specific police investigation?

19    A.  I can't recall having seen an

20  event. There may have been. I just can't

21  recall.

22    Q.  Okay. So, other than reviewing the

23  24-hour log, or Major Incident Log, what were

24  your responsibilities?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052165

---

1    A.  Attached to these 24-hour logs,

2  sometimes were supplemental reports, sometimes

3  there were Major Incident Worksheets.

4    Q.  What is a supplemental report?

5    A.  A supplemental report is a -- was at

6  that time a form set, a paper document. And it

7  was the investigation that was submitted by

8  detectives or others that was pertinent to an

9  already reported crime.

10        And just to clarify, I did not

11  get the originals, but only photocopies of

12  those.

13    Q.  Did the Chief of Detectives office get

14  a copy of every Major Incident Worksheet that

15  was prepared?

16    A.  No.

17    Q.  Just ones that were attached to the

18  Major Incident Logs?

19    A.  Correct.

20    Q.  In what circumstances would the Major

21  Incident Worksheet get submitted to the Chief

22  of Detectives as opposed to not submitting it?

23    A.  In the opinion of the supervisor who

24  prepared it.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052166

---

1    Q.  Who prepared the log?

2    A.  The log, would make a judgment call,

3  perhaps the Chief would like to know more about

4  this particular event.

5    Q.  At that time, in other words, from the

6  late '80s to sometime in '83, when you left,

7  was there a requirement that any particular

8  police reports or police documents were

9  supposed to be submitted to the Chief of

10  Detectives other than the Major Incident Log?

11    A.  No.

12    Q.  So, that was the only document that

13  the various areas or specialized units were

14  supposed to submit to the Chief of Detectives

15  as far as --

16    A.  Supplemental reports. I mean, they

17  would give it, but not all supplemental

18  reports.

19    Q.  Can you explain what you mean by that?

20  Or, just tell me more about that.

21    A.  Well, when you do 100,000 case

22  reports, not all of them have the same level of

23  interest. Some crimes simply may be more

24  serious in nature. There's a difference

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052167

1    between a stalking case and a murder case.

2              And the leadership of the police

3    department tended to want to know more about

4    the more serious crimes that occurred.  And

5    sometimes the detailed information was -- has

6    been submitted on a supplementary report.  And

7    they were simply provided a copy.

8        Q.   Okay.  So, I guess there's two

9    categories of information.  There's one

10   category of information which was, as a matter

11   of course, required to be submitted to the

12   Chief's office.

13             And then it sounds like there was

14   a second category of information that the chief

15   would request on a case-by-case basis; is that

16   accurate?

17       A.   I would say no.  I would say most of

18   these additional documents were determined by

19   those that created the area log.  If they had

20   it, they would attach it.

21             So, it wasn't so much a request

22   from the Chief, nor was it a requirement from

23   the Chief.

24       Q.   But the practice was to submit --

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052168

1    well, what was the practice in terms of

2    submitting supplemental reports from an area or

3    specialized unit to the Chief of Detectives?

4        A.   When they thought the Chief would be

5    interested and when they thought the -- if the

6    case report was done, the supplementary report

7    was completed.

8              Most of the time the

9    supplementary report is done hours after the

10   investigation is completed.  So, there's a lag,

11   you know.  The paperwork is the last thing

12   done.

13       Q.   So, you're saying based on the lag,

14   it's unlikely that the supplementary report

15   would have even been completed by the time the

16   Major Incident Log was sent to the Chief?

17       A.   Correct.

18       Q.   But in those cases where there was a

19   supplemental report prepared and it was of a

20   crime or alleged crime that the supervisor

21   thought would be of interest to the Chief,

22   you're saying the practice department-wide was

23   to submit that supplementary report to the

24   Chief; is that accurate?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052169

1        A.   If it was available, and if the

2    individual supervisor determined he was going

3    to send it.  There was no requirement to.

4        Q.   What about handwritten notes during

5    this '80 to '83 period?  What did you tend to

6    see as far as handwritten notes being sent to

7    the Chief's office?

8        A.   None.

9        Q.   You never saw handwritten notes

10   attached to a supp report?

11             MR. PATTERSON:  Objection, asked and

12   answered.

13             MS. KEEN:  You can answer.

14             THE WITNESS:  No.

15   BY MS. KEEN:

16       Q.   Was there a prohibition against

17   submitting handwritten notes to the Chief's

18   office?

19             I don't mean that to be cute at

20   all.  I'm just saying in terms of the filing

21   system.

22       A.   We were silent on the issue.

23       Q.   Okay.  I'm sure you had numerous other

24   responsibilities working at the Chief's office,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052170

1    can you just go over what the remaining

2    responsibilities were that you had?

3        A.   Very simply stated, they tended to be

4    special projects.

5        Q.   What were some of the special projects

6    you had done?

7        A.   Crime statistics.  It was certainly a

8    considerably large one.  The veracity of our

9    crime statistics.  Sometimes we get challenged.

10   And investigative files certainly took up a lot

11   of my time.  And some things as mundane as

12   personnel evaluation, what methods should we

13   use by detective supervisors.

14       Q.   At some point in time, the department

15   began dealing with a street files problem,

16   correct?

17             MR. PATTERSON:  Objection, foundation.

18   BY MS. KEEN:

19       Q.   In the '80s, the department had to

20   deal with the accusation that there was a

21   street files problem, correct?

22             MR. PATTERSON:  Objection, foundation.

23   BY MS. KEEN:

24       Q.   You can answer.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052171

1    A.   Yes.

2    Q.   And you were one of the people that

3 began the task of looking at street files,

4 correct?

5    A.   At the direction of my supervisors.

6    Q.   In connection with that work on street

7 files, you ended up drafting several special

8 orders, correct?

9         MR. PATTERSON:  Objection, foundation.

10        THE WITNESS:  Correct.

11 BY MS. KEEN:

12    Q.   Were you doing all that work on the

13 street files project while you were at the

14 Chief's office in the position you just

15 described to me?

16    A.   Yes.

17    Q.   Okay.  So, that was the investigative

18 file special project you were talking about?

19    A.   Yes.

20    Q.   That's obviously going to be the

21 subject of some of our -- at least some of our

22 questions today, but let me go to your

23 chronology and get that finished.

24    A.   Sure.

1    Q.   After you left the Chief of

2 Detectives, where did you go next?

3    A.   I went to the crime laboratory in

4 1983.  I stayed in the crime lab until probably

5 '87, during which time I made sergeant and

6 lieutenant.

7         When I made lieutenant in 1987, I

8 was reassigned to the Englewood community.

9    Q.   What area was that?

10    A.   This is 61st and Racine.

11    Q.   Was there an area number?

12    A.   No.  007 is the unit number for the

13 Englewood District.

14    Q.   Okay.  So, you were a lieutenant

15 detective, or no?

16    A.   No, no.  They're separate.  Detective

17 is one title; sergeant is another title;

18 lieutenant is a third title.

19         So, in '87, I made lieutenant,

20 went to Englewood.  And really shortly

21 thereafter, probably six months later, I was

22 reassigned to work for the Chief of Patrol.

23    Q.   Okay.  What year would that be?

24    A.   It's still '87.

1    Q.   What were your -- going to the

2 Englewood District when you were lieutenant,

3 just briefly, what were your duties there?

4    A.   Mostly I was a field lieutenant, and I

5 was the fill-in watch commander.

6    Q.   Did you have occasion to investigate

7 crimes while you were a lieutenant in the

8 Englewood District?

9    A.   Oversee.  Patrol is responsible for

10 the preliminary investigation of all crimes and

11 detectives have to follow-up to those reported

12 crimes.

13    Q.   Who were you supervising as the

14 lieutenant in Englewood?

15    A.   Those people in blue shirts and the

16 white shirt sergeants.

17    Q.   Okay.  So, you didn't have any

18 supervisory responsibility over the detectives

19 at that point?

20    A.   No, I did not.

21    Q.   And just briefly, what were you doing

22 in the crime lab?

23    A.   I was administrative sergeant.  I did

24 a lot of budget work and a little crime scene

1 processing.

2    Q.   Did you have occasion to do any actual

3 casework, in other words, investigation of

4 specific crimes while you were in the crime

5 lab?

6    A.   No.  I went to a few crime scenes.

7 But, no.  My job was mostly administrative.

8    Q.   In '87, when you went to the Chief of

9 Patrol, you said?

10    A.   Yes, ma'am.

11    Q.   What was your title then?

12    A.   Lieutenant.

13    Q.   Oh, you stated lieutenant.

14         Okay.  What did you have to do as

15 lieutenant?

16    A.   I did the budget, I made the

17 personnel -- I drafted the personnel movement.

18 We move a lot of people in the Patrol Division.

19 And participated in the planning and the set-up

20 for special events, including those major

21 festivals, such as Puerto Rican Festival,

22 Bud Billiken, et cetera, and any protests that

23 may have arisen, abortion clinics at the time.

24 Those that required some type of special

1 response.

2     Q.    Did you have occasion to oversee a

3 patrol officer's initial investigation into an

4 alleged crime when you were in the Chief of

5 Patrol?

6     A.    No.

7     Q.    Where did you go after that?

8     A.    I went to create -- assist in the

9 creation of a new unit, the Airport Law

10 Enforcement Section.

11         Up until that time, O'Hare

12 Airport was part of the 16th District and

13 midway was part of the 8th District on the

14 southwest side. And the 1st District had

15 administrative control over Meigs Field, which

16 was previously on the lakefront near McCormick

17 Place.

18         At that time, it became a unified

19 command, and it was separated from the

20 districts. I was in charge of creating a new

21 unit at Midway and at then Meigs Field for

22 just -- oversee, you know, police officers and

23 work with the Department of Aviation.

24     Q.    Okay. And you completed that

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052176

---

1 successfully?

2     A.    Yes. And then my next assignment

3 was -- I was directed to create another new

4 unit called the Random Drug Testing Unit.

5         Random Drug Testing tests police

6 officers on an unannounced basis. It is a

7 program which is pretty much verified by the

8 integrity of the police officers. By that I

9 mean, we catch very few police officers who

10 have abused narcotics.

11     Q.    Who asked you to work on the Airport

12 Section and the Random Drug Testing, was that

13 directly from the superintendent?

14     A.    No. The second one was. The Random

15 Drug Testing was from the superintendent. The

16 other one was from the first deputy

17 superintendent.

18     Q.    Is that person the next in command

19 after superintendent?

20     A.    Yes.

21     Q.    I'm sorry. What did you say? That

22 was the first deputy?

23     A.    First deputy.

24     Q.    Do you know how it came about that you

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052177

---

1 got tapped to create these two projects?

2     A.    I was considered a strong writer,

3 organizer, and I think the superintendent liked

4 my involvement in some other activities and he

5 just -- I had no choice. It was not something

6 I volunteered for.

7     Q.    What did you do after the Random Drug

8 Testing Unit?

9     A.    I was assigned to work for a deputy

10 superintendent of the Bureau of Investigative

11 Services.

12     Q.    And at this point in time, what year

13 are we talking?

14     A.    Probably '90 or '91.

15     Q.    Did the organizational structure of

16 the Bureau of Investigative Services change at

17 any point between when you started with the

18 department and when you started working for the

19 deputy superintendent of the Bureau of

20 Investigative Services?

21     A.    It did. It used to only have the

22 Detective Division and the Youth Division. And

23 somewhere along the line, the organization

24 changed and it added Organized Crime Division

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052178

---

1 in the Superintendent Brzeczek era, early

2 1980s.

3     Q.    Is Organized Crime gang crimes?

4     A.    That is one of the subsidiaries,

5 right.

6     Q.    Of Organized Crime?

7     A.    Narcotics, gangs are the two primary.

8 Vice, vice control.

9     Q.    So, organized crime was added

10 during Brzeczek --

11     A.    Common spelling. I don't know.

12     Q.    No, no. I can give it to you later.

13 I never know how to pronounce it to be honest.

14     A.    Brzeczek.

15     Q.    But, in any event, that addition was

16 made when?

17     A.    1981, '82.

18     Q.    You're saying that became part of the

19 Detective Division?

20     A.    No. The Bureau of Investigative

21 Services grew from two divisions of Detective

22 Division and the Youth Division and picked up a

23 third division called Organized Crime.

24     Q.    Once that picked up the third division

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052179

1    of Organized Crime, did it change at all prior
2    to or until up you began working for the deputy
3    superintendent of the Bureau of Investigative
4    Services?
5         A.   Did what change?
6         Q.   The organizational structure of the
7    Bureau of Investigative Services.
8         A.   That was the only change I could think
9    of.
10        Q.   Now, where does Bomb & Arson fit?  And
11   I have a chart here somewhere.  I mean, if you
12   need to look at one, let me know.
13        A.   No.  In the Detective Division.
14        Q.   Okay.  So, Bomb & Arson has always
15   been in the Detective Division?
16        A.   During this era, yes.
17        Q.   When did that change?
18        A.   Under Superintendent Jody Weis, a few
19   years ago.  And then it has since been returned
20   to the Bureau of Detectives since that time.
21        Q.   But for all of the '70s, '80s and
22   '90s, obviously only once Bomb & Arson was
23   created?
24        A.   Right.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052180

1         Q.   But for as long as Bomb & Arson
2    existed -- although, I guess, let me back up.
3              Do you recall the year that
4    Bomb & Arson was created?
5         A.   I don't recall the exact year.  Either
6    the late '80s or late 1980, '81, in that time
7    era.
8         Q.   From when Bomb & Arson was created
9    until the 2000s when Superintendent Weis made a
10   change, Bomb & Arson was always part of the
11   Detective Division, correct?
12        A.   Yes, ma'am.
13        Q.   And the Detective Division was always
14   part of the Bureau of Investigative Services?
15        A.   Correct.
16        Q.   Now, there are a number of areas,
17   correct, in the department?
18        A.   Yes.
19        Q.   And each area in the '80s had a
20   Violent Crimes Section, correct?
21        A.   The Violent Crimes format was created
22   in January, 1981.  So, from 1961 to 1981, there
23   was a crime specific format.  Each of the
24   detective areas each had their own homicide

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052181

1    unit, robbery unit, general assignment unit,
2    burglary unit, auto theft.
3              And their bosses -- they each had
4    a separate supervisor, and that supervisor was
5    downtown at the headquarters building.
6              In January of 1981, it, the
7    Detective Division, moved to a geographic
8    centered model where the areas did not
9    specialize so much in individual crimes, but in
10   community crimes.  All the crimes that occurred
11   in a certain geographical area.
12             And each of the detective areas
13   at that time were broken into three sub units;
14   Violent Crimes, Property Crimes, and Youth
15   Crimes.
16        Q.   This was the '81 change?
17        A.   Correct.
18        Q.   So, the detectives working in Violent
19   Crimes within an area were considered part of
20   the Detective Division?
21        A.   Correct.
22        Q.   Just by going back to the change where
23   you added Organized Crime to the Bureau of
24   Investigative Services.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052182

1         MR. PATTERSON:  And just so the record
2    is clear, not him, but when the Chicago Police
3    Department did that?
4         MS. KEEN:  Right.  Sorry.
5         THE WITNESS:  Beyond my pay rate.
6    BY MS. KEEN:
7         Q.   That was unintended.  I meant when the
8    City added the Organized Crime Section, who was
9    working those cases prior to the formal
10   creation of Organized Crime?
11             Was it going back to this crime
12   specific format you were talking about where it
13   was area detectives that was dealing with the
14   Narcotics, Vice, Gangs?
15        A.   You're losing me.  Who was working
16   what cases?
17        Q.   So, you said that in '80 or '81 when
18   the area detectives changed their model and now
19   went from a crime specific format to actually
20   having Violent Crimes, Property and Youth, it
21   sounds like around that same time is when the
22   Bureau of Investigative Services created a
23   third division which is Organized Crime; is
24   that correct?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052183

1    A.   Yes.

2    Q.   So, what I was wondering is, who was

3 working the Narcotics, Vice, Gang Crimes prior

4 to the creation of the Organized Crime

5 Division --

6    A.   Oh, there had been a Narcotics Section

7 prior to that and a Vice Section prior to that.

8         I'm a little fuzzy as to when the

9 Gangs Unit were created.  I don't know if we

10 had one before then.

11    Q.   But it's your understanding that as to

12 all of the topics -- strike that.

13         It's your understanding that area

14 detectives were investigating Narcotics, Vice,

15 and Gang Crimes issues before --

16    A.   No.

17    Q.   Oh.  So, which set of detectives were

18 dealing with those three areas before the

19 Organized Crime Unit was created?

20    A.   The detectives are primarily

21 responsible for Part 1, UCR Crimes, Uniform

22 Crime Report category crimes.  And they are

23 responsible for others, but not so much.

24         Part 1, just so we get a sense of

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052184

1 what their investigative jurisdiction is,

2 homicide, rape, robbery, burglary, assault,

3 auto theft and in 1979, they added arson, which

4 probably explains when Bomb & Arson came in.

5         So, traditional crimes, these

6 other crimes, Narcotics and Vice, have all been

7 a specialty unit of enforcement and not part of

8 the Bureau of Detectives.

9    Q.   When you say Bureau of Detectives, are

10 you referring to the current name for what used

11 to be Detective Division?

12    A.   Yes, yes.  That's the current name.

13    Q.   And you don't know what the deal was

14 with the gangs; is that right?

15    A.   No, I don't.  I would have to do some

16 research on that.

17    Q.   But you know that once the Organized

18 Crime Unit was created, those detectives dealt

19 with Gang Crimes?

20    A.   Right.  They weren't detectives.

21    Q.   Oh, they weren't?

22    A.   No.  In the Organized Crime, Organized

23 Crime had no detectives.  They had police

24 officers and they had gang specialists, and the

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052185

1 normal sergeants and lieutenants.

2         Detectives only worked in the

3 Detective Division, and youth officers at that

4 time only worked in Youth Units.

5    Q.   Also not detectives?

6    A.   Same pay, but different title.

7    Q.   So, who was investigating arson before

8 Bomb & Arson?

9    A.   I don't positively know.  I don't

10 know.  I would say it would be one of the

11 Part 2 crimes.

12         There is a category of crimes in

13 the Uniform Crime Reporting Program that are

14 not Part 1, those eight or nine crimes that I

15 just described, but are Part 2 crimes that are

16 serious, but a little lesser in volume.

17         For instance, kidnappings,

18 arsons.

19    Q.   I see what you're saying.

20         MR. PATTERSON:  Roshna, just to be

21 clear, because I think we perhaps got a little

22 bit far afield.

23         There was a lot of questions on

24 the creation of the Gang Unit, Organized Crime,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052186

1 Narcotics, and so on.

2         Were you asking those questions

3 in his capacity as the Chicago Police

4 Department or in his individual capacity?

5         MS. KEEN:  Yeah, I mean, I think that,

6 you know, especially to your objection on

7 foundation, I'm trying to understand what the

8 organizational structure is and establish what

9 his familiarity was with the organizational

10 structure, where documents and reports were to

11 go.

12         This is really just foundational.

13 I was actually going to turn to another subject

14 now.

15         MR. PATTERSON:  Okay.  That's fine.

16 BY MS. KEEN:

17    Q.   I guess the last question is, what was

18 the command structure in the Bureau of

19 Investigative Services?

20    A.   The Bureau of Investigative

21 Services --

22    Q.   I'm sorry.  My question relates to the

23 1980s time period.

24    A.   Okay.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052187

1     Q.    Was it the same throughout the 80s?

2     A.    For this time period.

3     Q.    Okay.  Because if it wasn't, I can

4 break it up.

5     A.    No.  It was a tad different in

6 January 1980 -- January 1981 on through '88,

7 anyhow, the Bureau of Investigative Services

8 was headed by a deputy superintendent.

9          The Detective Division, which

10 reported to the Bureau of Investigative

11 Services was headed by a chief.

12          The Organized Crime Division was

13 headed also by a chief and the Youth Division

14 was headed by a commander.

15     Q.    So, when you worked in the Chief of

16 Detective Division, you reported to the Chief

17 of Detectives, correct?

18     A.    Correct.

19     Q.    And he in turn reported to the deputy

20 superintendent of Bureau of Investigative

21 Services?

22     A.    Yes.

23     Q.    And who did the deputy superintendent

24 of BIS, just to use fewer words, report to?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052188

---

1     A.    The Superintendent of Police.

2     Q.    Within the Detective Division, what

3 was the command structure?

4     A.    Reporting to the Chief of Detectives

5 were three deputy chiefs.  One deputy chief was

6 in charge of the south areas, the second deputy

7 chief was in charge of the north areas, and the

8 third deputy chief was in charge of Special

9 Activities.  And it included Bomb & Arson.

10     Q.    Okay.  So, I've heard the terms Area

11 North and Area Central --

12     A.    That's it.

13     Q.    -- and Area South.

14          Is that what you're talking about

15 in here?

16     A.    No.

17     Q.    Okay.  Those are different?

18     A.    Similar, but not the same.

19     Q.    Can you explain.

20     A.    Field Group North and Field Group

21 South were the existing terms.  Each was

22 composed of three separate detective areas.

23     Q.    I got you.

24          MR. PATTERSON:  And, Roshna, just so

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052189

---

1 the record is clear, what time frame?

2 BY MS. KEEN:

3     Q.    January '81 until, you know, the

4 period of -- at least the end of '88, let's

5 say.  Is that your understanding, too?

6     A.    Yes.

7     Q.    Okay.

8     A.    Then there was the Special Activities

9 Group that was in charge of Bomb & Arson, and I

10 am forgetting who else reported to them.

11 Financial Crimes, and I'm at a loss at the

12 moment.

13     Q.    Okay.  What's the deal with Field

14 Group A and B?  Because I've seen that in the

15 documents.

16     A.    Same.  A was south; B was north.

17     Q.    Okay.  So, when you said that there

18 were three deputy chiefs reporting to the

19 Chief, one was Area South, one was Area North.

20          That's the same way of saying one

21 was Field Group South or Field Group B?

22     A.    South was the original term in 1981,

23 and somewhere over the years it morphed into A

24 and B.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052190

---

1     Q.    But north was A and south was B?

2     A.    North was B; south was A.  I believe.

3 I don't know.

4     Q.    You're not sure about that?

5     A.    I'm not sure.  A or B.

6     Q.    Okay.  Who at that time reported to

7 the deputy chief?

8     A.    Detective commanders.  Each of the six

9 detective areas was led by a commander, and the

10 Bomb & Arson Section was led by a commander.

11     Q.    Detective commander, or is it the same

12 thing?

13     A.    Detective.  Commander is a commander.

14     Q.    And then who reported to the

15 commander?

16     A.    Lieutenants, Violent Crimes

17 lieutenant, Property Crimes lieutenant, Youth

18 lieutenant in the detective areas.

19     Q.    And Bomb & Arson detectives?

20     A.    There was a lieutenant or two, and

21 they had technical titles of explosive

22 technicians.  They had various pay grades.

23     Q.    But the command structure that you've

24 described is the same for Bomb & Arson at this

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052191

1　time period?

2　　　A.　Yes.

3　　　Q.　And then below lieutenant was

4　sergeant?

5　　　A.　Sergeant.

6　　　Q.　And then followed by detective?

7　　　A.　Correct.

8　　　Q.　In the case of Bomb & Arson, I'm aware

9　from other depositions in this case, there's

10　you know, arson detectives, and then there's

11　explosive technicians?

12　　　A.　Right.

13　　　Q.　Now, within Bomb & Arson were there

14　people called office detectives or

15　administrative detectives that you're aware of

16　working in this '80s time period?

17　　　A.　I was not aware of that title.　I

18　don't think you'll find it in the literature or

19　directives.

20　　　Q.　What's the title?

21　　　A.　It's probably a description of a

22　detective assigned to perform administrative

23　duties.

24　　　Q.　What was the name of the people who

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779　cmsreporters@comcast.net

DAY 052192

1　were in charge of filing inside Bomb & Arson?

2　What was their title or rank?

3　　　A.　Detective.

4　　　Q.　So, there were certain detectives who

5　had no case investigative obligations and were

6　only required to handle administrative work; is

7　that correct?

8　　　A.　Correct.

9　　　Q.　At any given time, did Bomb & Arson

10　have any such administrative detectives who

11　were there?

12　　　A.　I don't know.

13　　　Q.　What about supervisors of those

14　administrative detectives I'm calling them,

15　were there any, and if so, what was their rank?

16　　　A.　On each watch or shift there tended to

17　be one, sometimes two sergeants who supervised

18　both the working detectives, street detectives,

19　and those performing administrative duties.

20　　　Q.　For purposes of this deposition, is it

21　okay with you if I call them field detectives

22　and administrative detectives, or what

23　nomenclature would you prefer?

24　　　A.　Field gets a little confusing because

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779　cmsreporters@comcast.net

DAY 052193

1　we have a term of art and you'll probably look

2　them up later.

3　　　Q.　Okay.

4　　　A.　Just detectives assigned to

5　investigate crimes.

6　　　Q.　Okay.　As opposed to --

7　　　A.　And administrative personnel.

8　　　Q.　Okay.　Before you went to the Chief's

9　office, you were a detective at Area 1,

10　correct?

11　　　A.　Correct.

12　　　Q.　What kinds of work did you do as an

13　Area 1 detective?

14　　　A.　I was a homicide and sex detective.

15　In addition, we investigated -- I investigated

16　aggravated batteries and simple assaults.

17　　　　　Even though the title of the unit

18　said homicide and sex, there were other crimes

19　that we investigated, the personal crimes.

20　　　Q.　I see.

21　　　A.　With the exception of robbery.

22　　　Q.　Did you attend detective training

23　prior to working as a detective in Area 1?

24　　　A.　I did.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779　cmsreporters@comcast.net

DAY 052194

1　　　Q.　How many cases would you say you

2　investigated when you were an Area 1 detective?

3　　　A.　I don't know.　Because Area 1 was such

4　a high volume unit, I think it was the second

5　busiest of the six areas.

6　　　　　And because homicides tend to

7　occur afternoons, and I was working afternoons,

8　I probably had a homicide once every ten days.

9　　　　　In addition, every day that I

10　came into work, I received one or two other

11　assignments, whether it be a shooting or a

12　stalking or whatever it might be.

13　　　Q.　Do you think you worked on thousands

14　of cases while you were --

15　　　A.　Probably.

16　　　Q.　I'm just asking you this so that I

17　know the answer, but I'm guessing the answer is

18　no.

19　　　　　Have you ever been the subject of

20　any disciplinary proceedings while you were at

21　the department other than for, like, being late

22　for work or something?

23　　　A.　No.

24　　　Q.　All right.　Now, turning to --

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779　cmsreporters@comcast.net

DAY 052195

1    A.   I mean, I received at least one
2 complaint, but no disciplinary.
3    Q.   When was that complaint?
4    A.   12 years ago.
5    Q.   Briefly what was the nature of the
6 complaint?
7    A.   Did I speak to a subordinate about
8 someone else's CR investigation.
9    Q.   All right.  So, turning to the subject
10 of some of the memos and special orders that
11 you prepared.  I just want to --
12         MR. PATTERSON:  Would this be a good
13 time to take a short break?
14         MS. KEEN:  Any time you want.
15         MR. PATTERSON:  Is that okay?
16         MS. KEEN:  Yes.
17              (WHEREUPON, a short break was
18              taken.)
19         MS. KEEN:  Back on the record.
20 BY MS. KEEN:
21    Q.   When you were an Area 1 detective you
22 had occasion to prepare police reports,
23 correct?
24    A.   Yes, ma'am.

1    Q.   What kinds of police reports were
2 available to you as a detective that you filled
3 out regarding a police investigation you were
4 doing?
5         And just so that the record is
6 clear, I think the date range we're talking is
7 from '77 until you started at the Chief of
8 Detectives office in late '80s.
9    A.   Sure.  There was an original case
10 report.  I could fill that out.  I could fill
11 out a supplementary report and those were
12 department forms.  There was a variety of
13 non-department forms used to facilitate the
14 taking of notes.
15         Usually they had the word major
16 crime or major something on the title, but that
17 was not a CPD form.
18         It was just something someone or
19 a group of people had devised over the years to
20 help them record notes.
21    Q.   Generally speaking, was there a
22 process by which CPD would issue a form?  In
23 other words, would that have to come out of a
24 certain part of the department?

1    A.   Right.  All forms of the Chicago
2 Police Department are created in Research and
3 Development.  They are each assigned a unique
4 number, usually in the bottom left-hand corner
5 of the page, and it also has the date that they
6 were created or revised.
7    Q.   Was it unusual for a non-department
8 issued form to become used by area detectives?
9         MR. PATTERSON:  Objection, foundation.
10         MS. KEEN:  That was a bad question.
11 BY MS. KEEN:
12    Q.   I guess what I mean is, were there
13 other instances besides this major form -- I'm
14 going to ask you more details about that major
15 form, but were there other instances where a
16 need would arise, and so people working in the
17 department would take it upon themselves to
18 create a form that they could use on a regular
19 basis?
20    A.   I've seen forms created for
21 administrative purposes, where they're trying
22 to count something or keep track of something.
23 Yes, there are other occasions.
24    Q.   So, the major form you were talking

1 about, are you -- is Major Incident Worksheet
2 one of the major forms you were referring to?
3    A.   No, but I have knowledge about when it
4 became an official form.
5    Q.   When it became an official form, what
6 was it called?
7    A.   A Major Incident Worksheet.
8    Q.   What was the process of going from
9 unofficial to official?
10    A.   All we have to do is make the request,
11 strangely enough, and put it through the chain,
12 make sure it gets -- chain as in chain of
13 command, show your supervisor, they sign off on
14 a request for a new form.
15         We have a form to request a new
16 form.  And when it's approved, it goes to the
17 Records Division to be edited, some suggestions
18 made, perhaps you want certain boxes larger
19 than others.  And after it's made, it goes to
20 the print shop for printing and distribution.
21    Q.   So, even an individual detective could
22 fill out a form requesting a form?
23    A.   If it gets approved by their
24 supervisor, yes.

Q. Who was behind the creation of the formal sheet called Major Incident Worksheet?

A. I was.

Q. What was your reason -- or strike that.

When did you create something called a Major Incident Worksheet?

A. In late 1980, I was part of a special projects group that was working on the reorganization of the Detective Division into this geographical model.

And one of the things I thought there was a need for was more standardization, and a better product. I took the best of the existing forms that I could find and created a standardized form.

Q. Where did you call your sample of forms from, from various areas?

MR. PATTERSON: Objection, foundation.

THE WITNESS: I don't recall from the various areas. I just seen a few over the years, picked them up and looked at them. Most had the same information.

---

BY MS. KEEN:

Q. So, are you saying that you noticed that detectives across the department were starting to come up with their own similar looking forms to use in the course of recording investigation about crimes?

A. In the Detective Division, yes.

Q. What did these forms have in common in terms of what they looked like?

A. 8.5-by-11 pieces of paper with a lot of boxes, pre-identified by those things which most frequently come up in the course of a criminal investigation; the victim's name, address, whether or not there was a gun involved, a place for the serial number, a car, what type of car, VIN number, Vehicle Identification Number, personnel assigned to the crime scene by other units, who was there? Items like that.

Q. How about blank space? Would you frequently see a blank space on there for people to write down their thoughts?

A. No. Mostly it was just filled with boxes. Again, it was really for the purpose of

---

recording those things. You're not real likely to remember in a couple of hours.

Q. What about descriptions, witness descriptions? Were there boxes for witness descriptions that you ever saw?

A. No.

Q. So, one of the things you did as part of the special project was to create standardized reporting processes; is that correct?

A. No. Special projects, I do whatever the bosses told me to, but I was part of this group for the reorganization of the Detective Division. But along the way, we had to change various forms.

Q. Okay.

A. Existing forms and think of -- anticipate what some needs might be.

Q. So, let me just back up, so that I guess I understand.

Was the reorganization of the Detective Division project separate from the special project you had described earlier involving investigative files?

---

A. Separate.

Q. They were separate. Okay.

A. It preceded it.

Q. What started first?

A. The reorganization.

Q. Tell me what was the genesis of that reorganization project?

A. The Superintendent of Police and the Chief of Detectives had decided for a new model.

Q. And this was in '80?

A. '80, right.

Q. Because it was after you got to the Chief of Detectives?

A. It was just about the same time.

Q. And what was their reason for wanting a new model?

A. It wasn't explained to me. It was best practices. I heard that a few times.

Q. What was your understanding though as you were working on a project as to why a change needed to be made?

MR. PATTERSON: Objection, form, foundation.

BY MS. KEEN:

Q.   And I'm asking based on the totality of your conversations with people, your personal experience working on the project.

A.   I think there was a genuine effort to make the Detective Division more responsive to the communities in which we worked, you know, more accountability, more geographical accountability, moving away from overspecialization.

Q.   What do you mean by overspecialization?

A.   Again, those units that I previously identified, the Homicide and Sex Unit, the Robbery Unit, the Burglary Unit, the Auto Theft Unit, it goes on.

Oh, I'm here to report a crime; oh, you got to go next door.

Q.   So, it was taking out some of the over-compartmentalization and making it more community based; is that fair?

MR. PATTERSON:  Objection.

BY MS. KEEN:

Q.   Is that fair to say?

---

A.   It's one of the benefits of the geographic model.

Q.   What changes did you make to -- strike that.

Who was part of the reorganization group?

A.   The Chief of Detectives, the deputy chiefs.

Q.   Of what?

A.   Deputy chiefs of detectives, and there was an individual who formerly was of the Detective Division, but had been moved to the Personnel Division, a commander by the name of Joseph Beasley.  He was involved in it as well. And there were some, you know, lieutenants and sergeants.  It was a pretty large undertaking.

Q.   Were there people in the Patrol Division involved with this group?

A.   Not as much, no.

Q.   Were there people involved from the Youth Division?

A.   They had to be affected.  I don't remember their participation as much.

Q.   Why did they have to affected?

---

A.   Well, they were part of the Bureau of Investigative Services, and they work out of the same building.  It was a pretty natural fit.

Q.   So, was this really a reorganization of the Bureau of Investigative Services, or was it really just relating to the Detective Division?

A.   That's a good question.

I only worked on that which pertained to the Detective Division.  The Bureau of Organized Crime had just been created, so they weren't going to remodel it.

I don't remember much about the Youth Division.  Again, it was beyond my assignment.

Q.   But it was your sense that at least some members of the Bureau of Investigative Services outside of the Detective Division were at least involved in the discussions, correct?

A.   They knew what was going on. Certainly, the deputy superintendent and the Bureau of Investigative Services was involved.

Q.   Okay.  And so other than the

---

structural change you described wherein it went from crime specific assignments to the Area 3 Violent Crimes, Property --

A.   And Youth.

Q.   -- and Youth, were there any other changes that the department made in connection with this reorganization project?

A.   I'm sure we changed forms that needed to be changed.

Q.   Do you remember which forms you looked at?

A.   Well, one of them was the -- I call it the 24-hour log, but the Major Incident Worksheet.

Prior to that, each of the crime specific sections used to create their own 24-hour report, the homicide report, the robbery report, the burglary report, so on and so forth.  And this did away with that and put it on one form.

Q.   I guess I didn't appreciate that.

So, how was it supposed to be created then?  Was it the Area 3 supervisor who did it for all the crimes that occurred within

1  Area 3 in that shift?

2          MR. PATTERSON:  Objection, vague.

3          THE WITNESS:  If we're talking about

4  the Major Incident Worksheet.

5          MS. KEEN:  Yes.

6          THE WITNESS:  I'm sorry.  The

7  area 24-hour report.  I know that's not the

8  official name.

9  BY MS. KEEN:

10     Q.    I think we discussed earlier that it

11  was called the Major Incident Log?

12     A.    Right.  The one with the columns on

13  it.

14     Q.    Right.

15     A.    The area incident log previously had

16  been separate 24-hour reports from the crime

17  specific sections.

18     Q.    Right.  And then what did it change

19  to?

20     A.    And then it became an area specific

21  with the exception of Bomb & Arson, which

22  created its own.

23     Q.    So, in the area specific format, in

24  other words, post-change, what information

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052208

1  would a supervisor put on the Major Incident

2  Log regarding any given shift?

3          MR. PATTERSON:  Objection, foundation.

4          MS. KEEN:  But this is the 30(b)(6)

5  witness on the topic of creation of forms.

6          MR. PATTERSON:  Yeah.  You haven't

7  established that a supervisor did anything with

8  the forms.

9          MS. KEEN:  He testified at length that

10  it was a supervisor who filled out the form.

11          MR. PATTERSON:  Same objection.

12          MS. KEEN:  Well, I mean, if we're

13  going to have to lay a foundation every time we

14  talk about the same topic, it's going to be way

15  long.  But if you're asking me to do that, then

16  I reserve the right to go way past seven hours.

17  BY MS. KEEN:

18     Q.    Okay.  Is it your testimony, sir, and

19  I apologize for asking you again, that it was

20  supervisors who filled out the Major Incident

21  Log?

22     A.    Yes.

23     Q.    When -- and this is both

24  pre-reorganization of the Detective Division

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052209

1  and post-reorganization of the Detective

2  Division, correct?

3     A.    In the pre-world, the one I was most

4  familiar with, was the homicide report because

5  I worked in a homicide unit.

6          When we would have a homicide or

7  a major violent type of crime, we, the

8  supervisor in the area, in each of the areas,

9  would call downtown to the Homicide Section and

10  say:  Hello, Pat Conway, I would like to speak

11  to you and tell you about something new that

12  occurred.

13          That person would take the notes

14  down and create a log, a running log all day

15  long.

16          And in the morning, we finished

17  the report from what happened the night before

18  simply by recording the information from the

19  telephone calls.

20          In the January 1981 post on, it

21  was removed from downtown, no more telephone

22  calls.  It was simply -- the responsibility was

23  given to the area supervisor to record what

24  happened of a major incident in the last eight

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052210

1  hours for their shift.

2          And at the end of a 24-hour

3  period it was hand-carried downtown.

4     Q.    How would the supervisor go about

5  selecting which of the many crimes that had

6  occurred on his watch to put on the Major

7  Incident Log?

8     A.    All the homicides got on there.  Some

9  but not all of the death investigations made

10  it.

11     Q.    What was the dividing -- strike that.

12          How did you determine death

13  investigations?

14     A.    If there was something curious about

15  it, something that may be of interest.

16     Q.    This case involves deaths caused by a

17  fire.  At the time that the fire was set, it

18  was unknown whether or not the fire was arson.

19          So, in that are scenario, would

20  you expect the area supervisor to have recorded

21  information about the deaths on the Major

22  Incident Log?

23     A.    Yes.

24          MR. PATTERSON:  Objection, foundation,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052211

1  form.

2      MS. KEEN:  What's the foundation

3  objection?

4      MR. PATTERSON:  You haven't given

5  him -- well, first of all, you said this case.

6  You haven't identified which case.  We got at

7  least three fires associated with this case.

8      MS. KEEN:  But only one caused the

9  deaths, correct?

10      MR. PATTERSON:  And then you didn't

11  give any facts related to whichever of the

12  three fires you're discussing.

13      MS. KEEN:  Well, there's only one fire

14  that caused deaths, correct?

15      MR. PATTERSON:  Well, how about we use

16  an address, that will be helpful, and a date,

17  since we have those, right?

18      MS. KEEN:  But, you know -- I mean, I

19  appreciate that, but if the witness is clear

20  about what I'm talking about, then these are

21  just objections for a grievance sake.

22      MR. PATTERSON:  No, they're not,

23  because this would not be admissible at trial.

24      MS. KEEN:  It would be admissible.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052212

1      MR. PATTERSON:  It would not because

2  you haven't laid the foundation.

3      MS. KEEN:  It would only be

4  inadmissible if you made a sustained foundation

5  objection.

6      MR. PATTERSON:  Right.  And that's why

7  I need to put it on the record because if you

8  want to introduce this testimony at trial,

9  Judge Lefkow will then make a ruling on the

10  foundation objection.

11      MS. KEEN:  That's fine.  We will go

12  through this painstakingly and state what is

13  obvious to all of us.

14  BY MS. KEEN:

15      Q.  There is a fire that occurred at

16  4448 South Hermitage, that's the subject of

17  this case, correct?

18      A.  Yes.

19      Q.  You were aware that this case involves

20  a fire on Hermitage, correct?

21      A.  Yes.

22      Q.  And you're aware that the fire

23  resulted in the deaths of a mother and her five

24  children, correct?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052213

1      A.  Yes.

2      Q.  Okay.  So, for purposes of this

3  deposition, if it's okay with you, I'll call

4  that the Hermitage fire; is that okay?

5      A.  Okay.

6      Q.  Would you have expected something

7  about the Hermitage fire to be written on a

8  Major Incident Log by an area supervisor?

9      A.  Yes.

10      Q.  Why?

11      A.  Multiple deaths.

12      Q.  Would you have expected something

13  about the Hermitage fire to have been written

14  on the Major Incident Log by the Bomb & Arson

15  supervisor?

16      MR. PATTERSON:  Objection, vague.

17      THE WITNESS:  Yes.

18  BY MS. KEEN:

19      Q.  Would you have expected the fact that

20  a fire had occurred on Hermitage and was under

21  investigation by Bomb & Arson to be recorded on

22  the Major Incident Log by a Bomb & Arson

23  supervisor?

24      A.  Yes.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052214

1      Q.  And why would you expect that?

2      A.  The Bomb & Arson Unit and the area

3  detective have two separate but related

4  responsibilities.

5      One is to conduct a -- the

6  detective area is to conduct a death

7  investigation, whereas the Bomb & Arson

8  detectives are responsible to determine the

9  cause and origin of the fire.

10      Q.  And, therefore, are you testifying

11  that you would expect both units to have

12  created a summary of the incident on the Major

13  Incident Log?

14      A.  I don't know if it would be a summary

15  so much as a -- certainly a high level summary.

16  Okay.  Address, what's known, who from the fire

17  department responded, one house, two house,

18  three houses, how many dead, ages of the

19  deceased.

20      Q.  Okay.  Now, going back to the forms

21  that were modified as part of the

22  reorganization project, when you said that --

23  sorry.  I just need to remind myself.

24      Are you saying that you also

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052215

1 created a separate document called a Major
2 Incident Worksheet as distinct from the Major
3 Incident Log?
4    A.   Yes.
5    Q.   And that's the document that -- well,
6 the predecessor to that was the document that
7 various detectives were using informally to
8 record crime scene information that would have
9 been hard to recall several hours later,
10 correct?
11    A.   They weren't all using it.  Some
12 elected to.  Others just used the old-fashioned
13 blank piece of paper.
14    Q.   So, what other forms did you change or
15 create as part of the reorganization?
16       MR. PATTERSON:  I'm sorry.  Roshna,
17 I'm not trying to be difficult.  But you keep
18 saying you, are you asking him from his
19 personal knowledge, or are you asking him as a
20 representative of the City in the Chicago
21 Police Department.
22       MS. KEEN:  All of this deposition
23 unless otherwise noted is in his capacity as a
24 30(b)(6) witness.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052216

1 BY MS. KEEN:
2    Q.   So, I will rephrase the question to
3 say what other forms did the City change?
4    A.   I don't know what the name of the form
5 was.  But certainly crime statistics is,
6 believe it or not, it was pretty much a hand
7 count back in this era.
8       A crime would come in as one
9 thing, let's say, a robbery, and then it's
10 reclassified to a theft, or maybe unfounded.
11 And we would -- there would be someone in the
12 areas who had to count all of these.  And there
13 was a form to facilitate the counting of crime.
14       So many crimes came in, so many
15 were reclassified to something else, to another
16 type of crime, some were unfounded, how many of
17 these cases do we make arrests.
18       So we had forms.  It would just
19 make it easier to read than a narrative.
20    Q.   Did you or anyone working on behalf of
21 the City create any forms regarding substantive
22 information about a case as part of this
23 reorganization effort?
24       MR. PATTERSON:  Objection, vague.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052217

1 BY MS. KEEN:
2    Q.   And by substantive, I mean,
3 information that would help solve the crime?
4    A.   No.
5    Q.   So, none of the forms regarding
6 detectives' mental impressions about the crime
7 that they were investigating were altered or
8 created during this reorganization project; is
9 that correct?
10    A.   He never had a form to capture
11 detectives' mental impressions.  I mean, I'm at
12 a loss there.
13    Q.   So, the two forms that you had
14 available to you that were department issued
15 when you were a homicide detective were the
16 general case report?
17    A.   Very good.
18    Q.   And the supplementary report, right?
19    A.   Yes.  And there's a variety of general
20 offense case reports, but you're very close.
21    Q.   So, the general case report is one
22 that beat officers might fill out as well,
23 correct?
24    A.   Right.  For the sake of argument,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052218

1 let's call it -- not argument -- information,
2 the original case report.
3    Q.   The original case report.
4    A.   The original case report and
5 supplementary case reports.
6    Q.   Now, was the original case report
7 something that detectives might prepare?
8    A.   In certain circumstances.
9    Q.   What circumstances?
10    A.   In the event of a double crime, a bank
11 robber just commits the bank robbery, he aims
12 the gun at the police officer, the police
13 officer kills the bank robber.  Those are two
14 different crimes.  One is the bank robbery, and
15 the second is the justifiable murder.
16       So, the beat officer in all
17 likelihood would have prepared the bank robbery
18 one, and the second one, even though they're
19 the same place at the same time, you know, our
20 protocol suggested that -- or required that two
21 different reports be made.
22    Q.   So, in the justifiable homicide --
23    A.   And to do that, every report starts
24 with an original report.  So, sometimes the

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052219

1   detectives created original reports.
2       Q.   In the case of supplementary reports,
3   who used those forms, detectives, beat
4   officers, both?
5       A.   Both.
6       Q.   This is now while you were a homicide
7   detective, in other words, pre-reorganization.
8            Why did detectives use
9   supplementary reports?
10      A.   Well, we don't want -- first of all,
11  we want to find all reports that are created
12  and there's a common denominator between an
13  original report and the supplementary report.
14           And believe it or not, it may not
15  even be the victim's name because that might
16  change when you learn more information.
17           So, the common denominator is the
18  case identifier, the number, the records
19  division number.  We call it the RD number.
20      Q.   And so supp reports were, at least
21  from the department's perspective, ways of
22  recording information that could then be filed
23  with the correct RD number, correct?
24      A.   Absolutely.

1       Q.   Okay.  What kinds of information were
2   detectives supposed to create -- strike that.
3            What kind of information were
4   detectives supposed to record in supp reports
5   pre-'81?
6       A.   Anything that was new to the
7   investigation that was not originally reported
8   on the original case report.  It can be
9   additional information, new information.
10      Q.   Were there any general or special
11  orders that related to the use of supp reports
12  prior to 1981?
13           MR. PATTERSON:  Objection, form.
14  BY MS. KEEN:
15      Q.   Let me start with the general orders.
16           Were there any general orders
17  that related to the use of supp reports prior
18  to '81?
19      A.   No.
20      Q.   How about special orders?
21      A.   No.  Well, we had a general order on
22  the subject of preliminary investigations, but
23  mostly the instructions on how to fill it out
24  were found on the cover of the booklet.

1            We would have 25 or 30 blank
2   original case reports and then the cover of
3   this packet of forms was Box 1, victim's name,
4   instructions.  Box 2, put last name first, you
5   know, first name second.  Those type of
6   instructions.
7       Q.   What about for the supplementary
8   report?
9       A.   I don't recall instructions so much.
10  But on the subject of supplementary reports,
11  something everyone must appreciate is that any
12  sworn member of the Chicago Police Department
13  can write a supplementary report on any crime,
14  you know, so long as their supervisor signs off
15  on it, it is an official report that will be
16  retained.
17      Q.   Did you ever have occasion to fill out
18  supp reports when you were an Area 1 detective?
19      A.   Every day.
20      Q.   And that's probably true of the other
21  Area 1 detectives as well, correct?
22           MR. PATTERSON:  Objection, form.
23           THE WITNESS:  Correct.
24  BY MS. KEEN:

1       Q.   What kind of information did
2   detectives tend to put on supplementary reports
3   regarding an investigation of a serious crime
4   prior to '81?
5            MR. PATTERSON:  Objection, form.
6            THE WITNESS:  The information did not
7   change.  I mean, it's information which is
8   pertinent to the investigation.
9   BY MS. KEEN:
10      Q.   You said that detectives took notes in
11  a variety of ways prior to '81, correct?
12      A.   Prior to '83.
13      Q.   Prior to '83.  Okay.  And prior to
14  '83, what kinds of pieces of paper would
15  detectives take notes on?
16      A.   Blank pieces, lined paper.
17      Q.   No particular form that was designed
18  for notetaking, correct?
19      A.   No.
20      Q.   And detectives need to take notes in
21  the course of their work on a serious
22  investigation, right?
23           MR. PATTERSON:  Objection, form.
24           MS. KEEN:  Let me rephrase that.

1  BY MS. KEEN:

2      Q.   Taking notes is part of the job of

3  being a detective, correct?

4      A.   Recording information, taking notes.

5  I don't know how one can conduct a complex

6  investigation without some notetaking.

7      Q.   Why is that?

8      A.   It's simply too hard to remember

9  everyone's contact, telephone information, date

10  of birth, their address, their zip code, their

11  middle name, whatever that might be pertinent

12  to the investigation.

13      Q.   Notes were also used pre-'83 to record

14  mental impressions of a detective, correct?

15          MR. PATTERSON:  Objection, vague.

16          THE WITNESS:  I don't recall notes or

17  anyone being required to write down mental

18  impressions.

19  BY MS. KEEN:

20      Q.   Okay.  Sorry.  I'm not asking about

21  what was required.  I'm just asking about the

22  kinds of documents that detectives created in

23  the course of an investigation pre-'83.  And we

24  had talked a little bit about notes.  And I'm

1  just trying to understand the kinds of things

2  that detectives would take notes about pre-'83.

3      A.   It's the same thing they would take

4  notes on post-'83.

5          Did they use an exclamation point

6  after somebody's comment recording a note?

7  They might have had their own style of

8  notetaking or maybe an asterisk next to

9  something they thought more important.  But

10  it's of a personal nature how you take your

11  notes.

12      Q.   So, there was variety in terms of the

13  kinds of notes that detectives would create

14  regarding an investigation correct?

15          MR. PATTERSON:  Objection.

16  BY MS. KEEN:

17      Q.   You can answer.

18      A.   Of course.

19      Q.   And is it fair to say that

20  detectives -- at least some detectives who were

21  working on complex investigations would write

22  down thoughts or impressions they had about the

23  case in the form of notes?

24      A.   No.  I don't think we wrote down

1  impressions.  The notes were to facilitate

2  report writing.

3      Q.   So, you're saying that detectives

4  didn't write down notes about their impressions

5  of the case?

6          MR. PATTERSON:  Objection, asked and

7  answered.

8          THE WITNESS:  That almost sounds like

9  a diary, you know.  I think so-and-so was mean

10  to me.  I don't know.  I mean, that's -- record

11  what they say.  You might put a question mark

12  down on it, like, this doesn't sound right.

13  But I don't recall anyone writing down an

14  impression.  I think he's lying.

15  BY MS. KEEN:

16      Q.   I think I understand what you're

17  saying.  Would detectives write down -- strike

18  that.

19          Would detectives create notes

20  about what a witness told them in the course of

21  an investigation?

22      A.   Yes.  Frequently, but not all the

23  time.

24      Q.   Frequently, but not all the time.

1          And what was one of the reasons

2  that notes were created regarding witness

3  interviews?

4          MR. PATTERSON:  Objection, asked and

5  answered.

6          THE WITNESS:  So, they could recall

7  later when they wrote their report more

8  accurately what the witness actually said.

9  BY MS. KEEN:

10      Q.   And you're saying that sometimes a

11  detective may indicate something about what the

12  witness said in his own personal shorthand,

13  say, an exclamation point or asterisk or

14  something like that, but that would be the

15  extent of his reflecting his personal

16  impressions in his notes; is that right?

17          MR. PATTERSON:  Objection, asked and

18  answered.

19          THE WITNESS:  Yes.

20  BY MS. KEEN:

21      Q.   In addition to writing down what

22  witnesses said -- strike that.

23          Would detectives take notes

24  regarding names of suspects that they felt

1  should be investigated in connection with a
2  crime?
3      MR. PATTERSON:  Objection, asked and
4  answered.
5      MS. KEEN:  Actually, I haven't asked
6  that.
7      THE WITNESS:  Could you repeat that
8  question, please?
9  BY MS. KEEN:
10     Q.   Would detectives write down names of
11 suspects that they believed should be
12 investigated in connection with a particular
13 crime?
14     MR. PATTERSON:  Same objection.
15 BY MS. KEEN:
16     Q.   You can answer.
17     A.   Certainly, they can write down names.
18 Are they required to?  I suppose no is the
19 answer, but why wouldn't you.
20     Q.   Right.  And so what kinds of
21 information based on your experience throughout
22 the department and also as a homicide
23 detective, what kinds of information did
24 detectives tend to write down about suspects in

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052228

1  their notes?
2      A.   It starts with, do you know who did
3  it?  A name is preferred.  Physical description
4  is a near second.  Nicknames.  What kind of car
5  do they drive?  Have you seen them before?
6  Have you seen them with someone you know
7  before?  Anything that might connect the
8  information to the suspect.
9      Q.   What about if a suspect allegedly made
10 a statement incriminating himself in the crime
11 that's being investigated, would something
12 about the fact of that statement or the content
13 of that statement be jotted down in the notes
14 based on your experience?
15     MR. PATTERSON:  Objection, incomplete
16 hypothetical.
17     THE WITNESS:  Is someone telling the
18 detectives they said this, or is this something
19 the detective heard?
20 BY MS. KEEN:
21     Q.   Yeah.  I'm sorry.  I was just kind of
22 working from your scenario, but I'll give you
23 one.
24         If a detective learns that there

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052229

1  is a suspect out there and a suspect may have
2  made statements incriminating himself in the
3  crime, would you expect to see the detective
4  make a note of not just the suspect's identity,
5  but also the fact that the suspect may have
6  made an incriminating statement?
7      MR. PATTERSON:  Objection, form,
8  incomplete hypothetical.
9  BY MS. KEEN:
10     Q.   You can answer.
11     A.   If they believe the person who is
12 telling them this -- again, I don't know from
13 the example if it is something the detective is
14 talking to the suspect, or if it's being
15 relayed to the detective.
16     Q.   In the first category, or the first
17 scenario, the detective is talking to the
18 suspect, and the suspect makes a statement
19 that's incriminating.
20     A.   Sure.
21     Q.   Would you expect the detective to take
22 notes reflecting that incriminating statement?
23     MR. PATTERSON:  Objection, asked and
24 answered.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052230

1  BY MS. KEEN:
2      Q.   Go ahead.
3      A.   It's part of the story, I think.
4      Q.   So, yes?
5      A.   Yes.
6      Q.   What if the detective learned
7  information through a witness interview about
8  the identity of a possible suspect and the
9  witness relayed that the suspect had made
10 incriminating statements?
11         Would you expect the detective to
12 create notes reflecting not just the identity
13 of the suspect, but also the fact of the
14 incriminating statement?
15     MR. PATTERSON:  Objection, vague,
16 incomplete hypothetical.
17         And, Roshna, again, I'm not
18 trying to be difficult, but you asked him would
19 you expect.  Is that, would the Chicago Police
20 Department expect?
21     MS. KEEN:  Yes.  In all cases, I'm
22 asking him.  And I mean --
23     MR. PATTERSON:  Okay.  I don't want to
24 disrupt your flow.  So, just so the record is

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052231

1 clear, unless you say otherwise, if you ask him
2 a "you" question, you're talking the global you
3 as in "you, the Chicago Police Department."
4         MS. KEEN:  Yes.
5         MR. PATTERSON:  Okay.  Fair enough.
6         THE WITNESS:  Sorry.  And the question
7 on the floor is?
8 BY MS. KEEN:
9     Q.    So, if you were talking to a witness
10 and the witness gave you information about a
11 suspect and said that the suspect may have made
12 an incriminating statement, would you expect
13 notes reflecting the incriminating statement?
14         MR. PATTERSON:  Same objections.
15         THE WITNESS:  Yes, if.  And my
16 qualifier there is, if I believe the witness.
17 I believe the witness is not crazy, you know.
18 If there's something credible, a better word,
19 credible.
20         But I think it would happen.  I
21 mean, you're helping me here.  I mean, someone
22 is helping me with information that will help
23 me resolve the case potentially.  So, yes.
24         MS. KEEN:  Okay.  Can we go off the

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052232

1 record for a minute?
2         (WHEREUPON, a short break was
3         taken for lunch.)
4         MS. KEEN:  Back on the record.
5 BY MS. KEEN:
6     Q.    Was there any requirement prior to
7 1983 that notes that a detective created had to
8 be submitted to a supervisor?
9     A.    No.
10     Q.    Was there any requirement that a
11 detective's notes had to be submitted to
12 anybody?
13     A.    No.
14     Q.    Generally speaking, what happened to a
15 detective's notes prior to 1983?
16     A.    The detective kept the notes until
17 such time as they prepared the supplementary
18 report, at which time they destroyed their
19 notes, threw them in the garbage can or
20 whatever, including myself.
21     Q.    And doing so was not in violation of
22 any existing policy at the time, correct?
23     A.    Correct.
24     Q.    Whose job was it to make sure that all

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052233

1 of the relevant information from the notes made
2 their way into the supp report?
3     A.    The detectives.
4     Q.    Was there any written directives in
5 existence prior to '83, whether it be a special
6 order or general order that discussed the
7 process of migrating information from a note
8 into a supp report?
9         MR. PATTERSON:  Objection, compound.
10         THE WITNESS:  Not directives, but
11 training.
12 BY MS. KEEN:
13     Q.    Okay.  Was there any written
14 material -- I'm going to re-ask the question
15 just to fix it.
16         Were there any written statements
17 of policy pre-'83 that required a detective
18 to -- sorry.
19         Were there any written statements
20 of policy pre-'83 that dealt with the subject
21 of recording information from a detective's
22 notes into a police report that actually gets
23 submitted to somebody?
24     A.    No.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052234

1     Q.    Now, you said there was some training
2 pre-'83 on the subject?
3     A.    Correct.
4     Q.    When was the training on that subject
5 offered to detectives?
6     A.    Pre-service training is for detectives
7 and specifically it's impressed upon
8 detectives.  They are supposed to preserve
9 information, which is both good and bad for the
10 prosecution.  I mean, it's their requirement to
11 find out the truth.  It's their obligation.
12     Q.    So, you're saying that pre-'83, there
13 was training on the subject of recording all
14 relevant information about an investigation?
15     A.    No.  I said not recording information.
16 I said to find out the truth.
17     Q.    Was there any training on the subject
18 of a detective or other officer's obligation to
19 record information relevant to a case on a
20 document that actually gets submitted for file?
21         MR. PATTERSON:  Objection, foundation,
22 form.
23         THE WITNESS:  The detective is
24 expected and was trained on his obligation to

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052235

1  record information, which is pertinent and
2  relevant to the investigation. Not everything,
3  but that which is relevant, that which is
4  important.
5  BY MS. KEEN:
6      Q.   Prior to 1983, when did detectives
7  receive the training you've just described?
8      A.   Prior to their assignment as a
9  detective.
10     Q.   So, in the detective training program?
11     A.   Right.  Pre-service, detective
12 training.  Usually it's about four weeks long,
13 and it was before their assignment to an
14 investigative unit.
15     Q.   Were detectives trained specifically
16 on the subject of putting relevant information
17 into a supp report?
18     A.   It's almost presumed that that which
19 you put in a case report or a supplementary
20 report is relevant.
21          I mean, were they trained?  As a
22 police officer and, again, as a detective,
23 they're trained as to the forms and the
24 narrative.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052236

1          And in the detective training,
2  they were given formats, recommended formats.
3          Why?  To make sure that you
4  address certain factors, date, time, location,
5  perhaps even the weather if it's pertinent,
6  personnel responded.
7          There was a definite -- as a
8  matter of fact we called it the format, the
9  format report.
10         Be as thorough as you can and
11 make sure you try to answer the who, what, and
12 where questions.
13     Q.   Was the format as you call it in place
14 prior to 1983?
15     A.   Yes.
16     Q.   So, even when you were a homicide
17 detective, you were doing supp reports
18 according to the format that you received
19 training on?
20     A.   Even back in the day.
21     Q.   Okay.  Was there training provided to
22 the detectives on the format, or is that
23 something they just figured out on the job?
24     A.   Oh, it was training.  We were given

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052237

1  samples.
2      Q.   In that training, was it told to
3  detectives that they had to put all information
4  relevant to the case in the report and that
5  they had an obligation to do so?
6          MR. PATTERSON:  Objection, compound.
7  BY MS. KEEN:
8      Q.   In that training, was it told to
9  detectives that they had to put all relevant
10 information in that report?
11     A.   Put relevant information in there.
12 What is relevant, of course, is oftentimes
13 subject to honest debate.  I don't want to get
14 caught up in this all relevant.  But if it's
15 relevant, yes, it should be recorded.
16          If it's pertinent and relevant to
17 the investigation, to the person, to the
18 accused, to the suspect's guilt or innocence,
19 it should be recorded.
20     Q.   During the training, were detectives
21 informed that they were obligated to
22 preserve -- strike that.
23          During the detective training,
24 were detectives informed that they were

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052238

1  obligated to record all relevant information?
2      A.   Yes.
3      Q.   This is pre-'83, correct?
4      A.   Right.  Brady vs. Maryland was what
5  year?
6      Q.   '63.
7      A.   Yeah.  So, yes.  That was part of the
8  training?
9      Q.   Was that the training provided not
10 only just to detectives but also to beat
11 officers?
12     A.   Yes.
13     Q.   At some point, the City became aware
14 that in some cases, all relevant information
15 was not being submitted for inclusion in the
16 official police file regarding an
17 investigation, correct?
18     A.   In some investigations, correct.
19     Q.   When did you personally first become
20 aware of the practice of withholding relevant
21 information from the police file that gets
22 turned over to the State's Attorney?
23         MR. PATTERSON:  Objection.  So,
24 Roshna, just help me out.  You now asked him

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052239

1  when he personally became aware.  So, is this
2  now a personal question versus a Chicago Police
3  Department question?
4      MS. KEEN:  It's just exactly what I
5  meant it as.  I'm just asking this witness'
6  personal knowledge, when did he personally
7  first become aware.
8      MR. PATTERSON:  Okay.  So, my
9  objection is that the witness has been asked a
10  personal knowledge question and, therefore, is
11  not answering it in capacity as the Chicago
12  Police Department.
13      Go ahead, Jim.
14      THE WITNESS:  I am not personally
15  aware it has ever been the practice.
16      You asked me if it was the
17  practice not to include relevant information in
18  investigations.  I mean, our policy and our
19  practice is to include information, which is
20  relevant.
21      Are there and have there been
22  occasions when some relevant information didn't
23  make it into investigations?  Yes.
24  BY MS. KEEN:

1      Q.   When did the City first become aware
2  that not all -- strike that.
3          When did the City first become
4  aware that there were occasions when detectives
5  or other investigators for the police
6  department were not disclosing all relevant
7  information through the channels that would
8  allow that information to get into the hands of
9  the prosecutor or the defense attorney?
10      MR. PATTERSON:  Objection, form.
11      THE WITNESS:  The one case that I
12  certainly can remember is a case of George
13  Jones.  And there was a detective by the name
14  of Frank Laverty who submitted a memoranda
15  which appeared to be relevant, yet did not make
16  it into the department supplementary report.
17  So, that's an example of such a case.
18  BY MS. KEEN:
19      Q.   Is it your testimony that the Laverty
20  memorandum was the first memoranda that the
21  City became aware of that was withheld from an
22  official police report that made it into the
23  Permanent Retention Records Division file?
24      MR. PATTERSON:  Objection, foundation,

1  mischaracterizes testimony.
2  BY MS. KEEN:
3      Q.   All right.  Do you have knowledge of
4  when the City became aware of the fact that on
5  some occasions relevant information was not
6  becoming part of the official police file?
7      MR. PATTERSON:  Objection, asked and
8  answered.
9      THE WITNESS:  The George Jones
10  investigation was the first time I was aware
11  that the City was aware of a potentially
12  difficult aspect of investigations.
13  BY MS. KEEN:
14      Q.   What was the potentially difficult
15  aspect?
16      A.   That not all relevant information made
17  it into a supplementary report.  And the City,
18  the police department, caused a review of its
19  practices at that time.
20      Q.   In the specific case of the Laverty
21  memo, did Frank Laverty create a memo that had
22  relevant information in it?
23      A.   Yeah.  I recall he did.
24      Q.   And do you know what's your

1  understanding as to -- strike that.
2          What was the allegation as to why
3  his memorandum wasn't part of the official
4  police file?
5      A.   Are you asking me if I know why that
6  memo did not get included in the official file?
7      Q.   Yeah.
8      A.   I understand that it was held at the
9  level of the area commander, detective
10  commander.
11      Q.   Who was the detective commander at the
12  time?
13      A.   Milton Deas, D-E-A-S, I believe.
14      MR. PATTERSON:  That's right.
15  BY MS. KEEN:
16      Q.   If things had worked as they were
17  supposed to, how would the information
18  contained in that memo have been made a part of
19  the official file?
20      A.   As I said previously, anyone in the
21  Chicago Police Department who has relevant
22  information to add to the investigation not
23  only has the right, but has the obligation to
24  record this on a supplementary report.  And if

1 this report is approved, it goes and becomes
2 part of the Records Division file.
3         What was the second part of your
4 question?
5     Q.  I think that answered it.
6         So, it's not so much that his
7 memo necessarily had to be part of the file,
8 but that a supplementary report reflecting the
9 relevant parts of the memo had to be created
10 and put in the official file, is that how it
11 was supposed to work?
12     A.  Yes.
13     Q.  And in the case of the Laverty memo,
14 the deputy commander --
15     A.  No.  He was a detective commander.
16     Q.  Detective commander held onto the memo
17 and didn't ensure that a supplementary report
18 was created about it, correct?
19         MR. PATTERSON:  Objection, foundation.
20         THE WITNESS:  I understand that he
21 held the memo and it did not become at that
22 time part of the supplementary report or any
23 supplementary report.
24 BY MS. KEEN:

1     Q.  Okay.  I'm going to ask you a few
2 questions about working files prior to '83.
3         So, what are working files in
4 this pre-'83 time period?
5     A.  A working file was known by a few
6 names, running file, working file, street file.
7 It was nothing more than a manila folder which
8 normally contained photocopies of perhaps the
9 original report, perhaps one, two, or all of
10 the supplementary reports, perhaps a rap sheet,
11 criminal history record of someone that they
12 have interviewed or suspected, perhaps some
13 crime scene photographs, mugshots of suspects
14 or people they are looking for to interview.
15         This working file could also
16 contain inter-watch memoranda, memoranda
17 written by one team of detectives to another
18 team of detectives on another watch asking them
19 to do something.  Could you, for example,
20 re-canvas that building?  Could you take a
21 certain person down to the polygraph for
22 examination?
23     Q.  Go talk to a witness?
24     A.  Talk to a witness, talk to a witness

1 again.  There was no format.
2         A working file is more likely to
3 exist when there are multiple teams of
4 detectives working on the same case.
5     Q.  Multiple teams within the police
6 department?
7     A.  Within the detective area.
8     Q.  Within an area?
9     A.  Right.
10     Q.  Were memoranda created by a single
11 detective who wanted the detective taking over
12 the case on the next shift to do certain
13 things?
14     A.  That's what I discovered most often
15 that was the case.
16     Q.  Some of the investigations that area
17 detectives did were complex and required
18 multiple shifts to be solved, correct?
19     A.  Correct.
20     Q.  And so it was the practice of the
21 department to assign a detective from each
22 shift to work the case?
23     A.  Normally not midnights.
24     Q.  You don't want to knock on people's

1 doors at night?
2     A.  Right.  They get irritated.
3     Q.  So, with the exception of the midnight
4 shift?
5     A.  Right.  But even on midnights, if it's
6 important enough or hot enough, it will go
7 24 hours a day.
8         Those cases, when they first come
9 in, they are worked pretty heavily, but a few
10 days later, there's normally a new case that
11 has come in and that gets a higher priority.
12     Q.  What other types of documents would
13 you see -- or strike that.
14         What other types of documents
15 might be contained in a working file?
16     A.  There might be a medical examiner's
17 report, but not all that often.  You would find
18 information in there and documents in there
19 that they thought was needed by the detective
20 on the street in their cars instead of having
21 to call the office and say:
22         What was the address of the
23 second witness?  I knew it was somewhere on
24 Western.  The longest street in Chicago.  Tell

1 me the address.

2 But those items which were not

3 really all that important you probably wouldn't

4 find in there.

5 For instance, I said the medical

6 examiner's report might be in there, but

7 frankly, how important is that to the working

8 detective who's really more interested in

9 finding the next witness or searching for the

10 suspect as opposed to the cause of death. I

11 don't care if he was stabbed or shot. He's

12 dead.

13 Q. I understand what you mean.

14 A. But, you know, can I use it in the

15 next eight hours? Do I need it in the next

16 eight hours? If so, can I make copy of it?

17 Q. Can I use it to solve the case?

18 A. Right.

19 Q. That's the kind of information that

20 would go in a working file?

21 A. Yes.

22 Q. And the genesis of the working file

23 practice, was that something that -- I mean,

24 how did it come about?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052248

1 A. Out of need. You can't go in -- a

2 working detective prefers not going into work

3 every day and making a copy of the same report,

4 of the same case that he worked on yesterday.

5 Anything new in the case? I

6 don't want to see the address. I just want to

7 see the narrative. People have different

8 unusual approaches. I just want to see what

9 so-and-so said. Make me a copy of Page 3.

10 Q. You're saying that's an example of how

11 a document would come into the working file?

12 A. Right. Did you photocopy something?

13 Q. Okay. And that was going to be my

14 next question. Not to get too bogged down in

15 details, but how does a detective get a working

16 file?

17 So, for example, in the team of

18 detectives example that you had, let's say

19 there's two Area 3 detectives working on a

20 case.

21 Would you have expected pre-'83

22 for each of the two area detectives to have his

23 own working file or would they share one?

24 A. Share one.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052249

1 Q. And who would hold the area file?

2 A. Put it on the car seat in between

3 them.

4 Q. And how would people from a preceding

5 or a subsequent shift get information into that

6 actual working file?

7 A. It may be a hand-to-hand trade at the

8 end of the watch.

9 Anybody working on the case that

10 I was working on today? I'm working on it.

11 Okay. Here's what I have. By the way, some of the

12 communications can be oral as well and probably

13 most of them were.

14 I went out there, I couldn't find

15 anybody on that canvas. Nobody answered the

16 door. Okay.

17 Not everything was written

18 either. Was it important? I suppose. But it

19 didn't get written down.

20 Q. Would you ever expect the receiving

21 detective, in other words, the one picking up

22 the new shift to write down, jot down a summary

23 of what the preceding detective told him --

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052250

1 A. No.

2 Q. -- as a note?

3 A. No. Imagine the situation when you're

4 coming in on days when no one worked on the

5 case on midnights. You look around and say, I

6 don't want to make a copy of that entire office

7 file.

8 Oh, on top of the coat rack:

9 What was the homicide victim's name? Jones.

10 Okay. This one says Jones. Oh, it has the

11 same the RD number. I'll take that, see if

12 there's anything interesting.

13 Q. And the "that" in your sentence was

14 the file that existed within the unit or the

15 area, correct?

16 A. Before we called it investigative

17 file, the running file in response to your

18 question. There was no formal place to keep

19 it. Sometimes it was left on a table;

20 sometimes it was left on a coat rack; out in

21 the open in the working area of the detectives.

22 Q. Separate from the working files and

23 still pre-'83, did the area or unit have a more

24 official file for a particular investigation?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052251

1      A.   Right.

2      Q.   Wait.  You're saying -- did you

3   answer?

4      A.   I said yes.

5      Q.   Okay.

6      A.   Again, paper driven world.  And the

7   Records Division would literally make three or

8   four copies, maybe more, four or five copies,

9   and each day, a couple of times a day, would

10  send them to the Area Investigative Unit.

11           The Area Investigative Unit would

12  give one copy to their case management.  We're

13  talking about all cases now.  Then there would

14  be one file, whether it was a Property Crime or

15  a Violent Crime, which would be RD number

16  based.  The Records Division number sequence

17  file.

18     Q.   That was one of the questions I had to

19  ask you.  I couldn't figure out what that was.

20           So, the unit RD numerical

21  sequence number?

22     A.   Right.  It's simply all the cases that

23  had been referred to that detective area for

24  investigation.

1      Q.   So, was that the predecessor to the

2   investigative file?

3      A.   No.  I mean, it was always the -- this

4   RD file was the primary file.  It was the file

5   that you would go to if you wanted information.

6           However, because homicides and

7   death investigations receive more attention

8   than just a shooting, they receive more

9   investigative care, frequently the detective

10  areas would pull those more serious crimes and

11  put them in their own filing cabinet drawer

12  right alongside it, still inside the office.

13     Q.   So, you're saying, in a -- let's call

14  it a serious homicide.

15     A.   Right.

16     Q.   Because all homicides are serious, but

17  this is high profile.  I've read the term

18  "heater case" here.  Let's say it's a heater

19  case.

20           Are you saying that in a heater

21  case the detective might actually pull the unit

22  RD numerical sequence number file and put it in

23  a different file cabinet that he had more

24  readily access to?

1           MR. PATTERSON:  Objection, form.

2           THE WITNESS:  The detective wouldn't

3   do it, whatever person was assigned to the

4   clerical unit, maintained the RD sequence file.

5   That same clerical unit personnel also made a

6   copy.  They called it the homicide drawer, the

7   death investigation drawer, the justifiable

8   homicide drawer.  And, again, those were the

9   drawers most often used.

10  BY MS. KEEN:

11     Q.   I see.  So, it would be a copy of the

12  contents of the unit RD file, not the actual

13  unit RD file that would go into the homicide

14  drawer, correct?

15     A.   The RD file normally would just

16  maintain the original report and maybe a supp

17  report, but in the homicide drawer is

18  everything that was sent to the area of

19  investigative responsibility on that homicide.

20           For instance, you might receive

21  something from the crime laboratory evaluating

22  the latent fingerprints that were recovered, or

23  the crime lab may send photographs.

24           And that would go into the

1   homicide drawer.  I don't know what else to

2   say.

3      Q.   So, then in that scenario, a copy of

4   the crime lab or fingerprint report would not

5   also be placed in the unit RD numerical

6   sequence number?

7      A.   Right.  Again, it's about thickness of

8   the file.

9      Q.   So, unit RD file is really just a slim

10  file to identify that there is a case number

11  open?

12     A.   Right.

13     Q.   It's got this number, and here's one

14  or two reports on it?

15     A.   Right.

16     Q.   The every day use, the meaty file is

17  the one that would have been in the homicide

18  drawer or other appropriate drawer?

19     A.   Right.

20     Q.   And how did the meaty file in the

21  homicide drawer relate to the working file?  Is

22  it the same file, or is it the copy of a same

23  file?

24           MR. PATTERSON:  Objection, vague,

1 compound.
2 THE WITNESS: It's not the same file.
3 It is sometimes photocopies of selected
4 portions.
5 BY MS. KEEN:
6 Q. Which is, the working file or the
7 homicide drawer file?
8 A. The working file would be copies of
9 select information and the homicide -- excuse
10 me. The working file might also contain
11 something that's not in the homicide drawer,
12 and that might be a victim's telephone book.
13 You know, back in the day when
14 they still had paper, you would find a personal
15 telephone book. Not knowing what it means, but
16 the person's name may come up during the course
17 of the investigation. Look him up. Maybe
18 you'll get lucky and get a good address or
19 phone number.
20 Q. Wait. Are you -- who's telephone book
21 was it?
22 A. It might be the victim's.
23 Q. Oh, you mean something that was
24 recovered --

1 A. At the scene.
2 Q. And that might be in the working file?
3 A. Yes.
4 Q. Because it might have names of people
5 she knew, people -- I don't know why I made the
6 victim a female, but...
7 A. Right.
8 Q. So, what other kinds of things would
9 be in the working file but you might not see in
10 the homicide drawer file?
11 MR. PATTERSON: Objection, foundation.
12 THE WITNESS: It might be forms.
13 BY MS. KEEN:
14 Q. Let me just back up.
15 In the time period of pre-'83,
16 what types of documents would you -- strike
17 that.
18 In the pre-1973 period, what
19 types of documents might exist in the working
20 file that a detective used that wouldn't also
21 be seen in the file that was kept in the drawer
22 in the area or unit?
23 A. It might be a form, one particular
24 form. You know, we're a large organization and

1 we have forms for personnel like detectives who
2 are requesting mugshots, you know, from graphic
3 artists.
4 I would like a picture of the
5 next door neighbor or the suspect. I also
6 would like the rap sheet of the victim. I
7 would like to see who he previously was
8 arrested or who she was previously arrested
9 with.
10 It --
11 Q. What about handwritten -- or, sorry.
12 A. It's just items that are generated in
13 the course of having to do business. Some of
14 it might be receipts, you know, requests.
15 Q. Some are original evidence that a
16 detective might have gathered on the shift?
17 A. If it raised to the level of evidence,
18 it should have been inventoried. When you
19 truly don't know its significance, like that
20 phone book, the victim's phone book, that might
21 have simply been placed in the working file.
22 Q. There was no such thing as an
23 investigative file according to the police
24 department pre-'83, correct?

1 A. We did not recognize that term until
2 1983. But, frankly, we had a problem with that
3 term, and I think that was part of our issue in
4 1983. There was a lack of common nomenclature
5 to describe what may exist in certain cases.
6 Q. And that's what I want to go to. I
7 just want to quickly ask you, would you tend to
8 see -- strike that.
9 Would Major Incident
10 Worksheets -- or, actually, strike that.
11 Was the predecessor to the Major
12 Incident Worksheets, in other words, was the
13 form the detectives used kept in working files?
14 MR. PATTERSON: Objection, asked and
15 answered.
16 BY MS. KEEN:
17 Q. Go ahead.
18 A. They could.
19 Q. The unit RD numerical sequence number
20 is different from the RD numbered file that the
21 Records Division kept over at the headquarters,
22 correct?
23 A. They mirrored each very closely, but
24 the detective one was a photocopy. The Records

121

1    Division had the original general offense case,
2    the original supplementary reports.
3        Q.    Now, you said that the working files
4    filled a need, that there was a need for the
5    working files.
6              If I understand you correctly,
7    one of the needs of a working file was to relay
8    information among different detectives who were
9    both working on the same case, correct?
10       A.    Correct.
11       Q.    I'm trying to figure out a clear way
12   to distill my thoughts.
13             So, would you expect to see
14   working files shared between detectives in
15   different units?  So, for example, in this
16   case, you have Area 3 folks working on one as
17   aspect of this fire death at Hermitage, and
18   then you have Bomb & Arson working on another
19   aspect of this fire and death.
20             Would you expect to see the
21   working file exchanged between the Area 3 and
22   the Bomb & Arson detectives pre-'83?
23       MR. PATTERSON:  Objection, foundation,
24   form, incomplete hypothetical.

122

1            THE WITNESS:  First of all, there
2    would not have to be a working file.  I mean,
3    it doesn't have to be one.
4    BY MS. KEEN:
5        Q.    I understand.
6        A.    But, no, because they are physically
7    at two different locations.  Information should
8    be shared, detectives and all police officers
9    have that same obligation.
10             If I have some information on a
11   case that you're working, I am supposed to
12   notify your unit.
13             We have means of doing that.  It
14   could be perhaps submitted in an information
15   report; pick up the telephone.  Pass the
16   information on.
17       Q.    So, it's really the primary use you
18   would -- strike that.
19             The primary -- or strike that.
20             The majority of the instances in
21   which working files were used were in cases in
22   which there were different investigators within
23   the same unit working the same case, correct?
24       MR. PATTERSON:  Objection, form,

123

1    foundation.
2        MS. KEEN:  Go ahead.
3        THE WITNESS:  It's more of an
4    intramural than intra-department.
5    BY MS. KEEN:
6        Q.    So, in other words, is it fair to say
7    that --
8        A.    Same unit is the answer, yes.
9        Q.    So, is it fair to say that you would
10   tend to see working files used to exchange
11   information between investigators within the
12   same unit?
13       A.    Yes.
14       Q.    So that the need for working files
15   existed whenever you had people investigating a
16   serious crime; is that fair to say?
17       MR. PATTERSON:  Objection, form.
18   BY MS. KEEN:
19       Q.    You can answer.
20       A.    A serious crime with multiple teams of
21   detectives assigned to it, over a period of
22   time.  If it's resolved in the first 24 hours,
23   you may not see an investigative file, even if
24   it was a serious crime.

124

1        Q.    So, if an investigation is ongoing and
2    it's taking several days to complete and,
3    therefore, there are multiple different
4    detectives, or investigators I guess is a
5    better word, working on that same
6    investigation, would you have expected to see a
7    working file in that scenario pre-'83?
8        MR. PATTERSON:  Objection, form,
9    foundation, speculation, incomplete
10   hypothetical.
11       MS. KEEN:  I'll just keep refining my
12   question until it passes muster.
13   BY MS. KEEN:
14       Q.    And I'm not trying to be confusing
15   here.  I'm just saying in an example -- talking
16   about working files and the kinds of instances
17   where there was a need for working files and
18   you would tend to see working files being used
19   pre-'83?
20             Is it your understanding that
21   working files were used to exchange information
22   in cases in which there were multiple
23   investigators investigating the same case over
24   the span of multiple shifts?

1          MR. PATTERSON:  Same objections.
2          THE WITNESS:  Yes.  But this
3  subsequent team, or the team that's picking up
4  the investigation is under no obligation to
5  pick up or find a working file.
6                It could simply -- this person's
7  preferred style may be looking at something
8  neater and going to the office file and making
9  a copy for himself of what he needs.
10 BY MS. KEEN:
11      Q.    Okay.  So, I understand your
12 clarification is that there was no requirement
13 to have working files in the first place,
14 correct?
15      A.    Correct.
16      Q.    And there was certainly no obligation
17 for a detective to consult the working file,
18 correct?
19      A.    Correct.
20      Q.    Or to keep a working file?
21      A.    Correct.
22      Q.    So, I'm asking about what your
23 understanding is as to what those instances in
24 which working files were used?

1      A.    Yes.
2      Q.    In cases where cases working files --
3  strike that.
4              Is it your understanding that
5  working files were generally used, not always,
6  but frequently when -- or strike that.
7              Was it your understanding that in
8  at least some cases in which there was an
9  ongoing investigation involving multiple shifts
10 and multiple investigators, that a working file
11 was kept?
12         MR. PATTERSON:  Objection, foundation,
13 speculation, incomplete hypothetical.
14         MS. KEEN:  What are your objections to
15 foundation and speculation given that he's a
16 30(b)(6) witness?
17         MR. PATTERSON:  My objection is you've
18 got a lot of somes, generalities.  And it seems
19 like the -- the right question seems to be that
20 as a 30(b)(6) witness, he can testify to what
21 the policy, practice and procedure of the
22 Chicago Police Department was at that time.
23         MS. KEEN:  That's what I'm asking,
24 What was the practice?

1          MR. PATTERSON:  That's not what you
2  asked him.  Let's read the question back.
3              (WHEREUPON, said Record was read
4               as requested.)
5          MS. KEEN:  That's a perfectly normal
6  question based on this fact, yes.
7              I mean, if you're going to
8  object, then we can't have a 30(b)(6)
9  deposition.
10         MR. PATTERSON:  It's your call,
11 Roshna.
12         MS. KEEN:  No.
13         MR. PATTERSON:  I'm lodging the
14 objection for Judge Lefkow.
15         MS. KEEN:  If you're going to keep
16 objecting, then we're going to call the judge
17 now.  Because you're not letting me take a
18 30(b)(6) deposition.
19         MR. PATTERSON:  Let's call her and
20 read that question and see what she thinks
21 about that question.
22         MS. KEEN:  Fine.  Tell me when you're
23 ready.  And read it back to him so he's really
24 clear.

1              You want to call the judge on
2  this?
3          MR. PATTERSON:  You said you wanted to
4  call the judge.  I'm making an objection.
5          MS. KEEN:  You're not letting me
6  ask --
7          MR. PATTERSON:  He's going to still
8  answer the question, right?
9          MS. KEEN:  Hold on.  This is a
10 30(b)(6) witness.  So, these objections matter.
11             You've been making a lot of
12 foundation objections, more so than I've ever
13 seen in a 30(b)(6) deposition, given that
14 you've presented him as the City's
15 representative.
16             So, I actually think it's
17 inappropriate to be making so many foundation
18 objections.  But let's take this specific
19 question here.
20             I ask him whether he has seen in
21 at least some cases the practice of working
22 files in a particular scenario.
23             If you're going to --
24         MR. PATTERSON:  That is not what you

1  asked him.  Let's read the question back.
2       MS. KEEN:  Why don't you tell me what
3  is infirm about the question so that I can --
4       MR. PATTERSON:  I told you.  You
5  have -- you asked -- you said some general --
6       MS. KEEN:  No, no.  I struck the
7  general.
8       MR. PATTERSON:  Okay.  Let's read the
9  question back so I can understand it.
10           (WHEREUPON, said Record was read as
11                requested.)
12       MS. KEEN:  I think that question is
13  fine.
14       MR. PATTERSON:  Okay.  If you think
15  you're fine, then you should go forward.
16       MR. KIVETZ:  For the record, you think
17  the question is fine.  He's made his objection.
18  You keep going on.
19       MR. PATTERSON:  You keep going.
20       MS. KEEN:  No, I can't risk --
21       MR. KIVETZ:  -- move forward.
22       MS. KEEN:  No.  Because I can't --
23  this may be his trial testimony.
24            I mean, so what is your -- are

1  you still launching your objection?
2            I know that that question is a
3  little muddled because I started over a few
4  times.  But now having heard the final aeration
5  of the question, and I can read it again, do
6  you have an objection?
7       MR. PATTERSON:  Yeah.  I still have
8  the same objection because you are asking him
9  as a 30(b)(6) witness an incomplete
10  hypothetical.  You're asking him to speculate.
11  He's already testified that it was not official
12  policy to have working files, nobody was
13  required to have working files.  Some
14  detectives had working files; others preferred
15  to communicate orally.
16            So, to then say, well, working
17  files were used here and there and elsewhere,
18  it's -- you're asking the City to speculate --
19  you're asking the City to react to an
20  incomplete hypothetical or an incomplete
21  example.
22            But if you think the question is
23  okay, then you should go forward.  He's going
24  to answer the question.  I'm not instructing

1  him not to answer.
2       MS. KEEN:  You can't just protect
3  yourself by throwing an objection out there
4  just in case it sticks.  That's not
5  appropriate.
6       MR. PATTERSON:  Roshna, you can go --
7  he's going to answer the question.
8       MS. KEEN:  I know what I'm allowed to
9  do.  You know that I know what I'm allowed to
10  do.
11       MR. PATTERSON:  So, then why we having
12  this conversation?  I'm just putting an
13  objection on the record.
14       MS. KEEN:  I'm giving you an
15  opportunity to explain your objection for the
16  record so that I can cure if there's a
17  deficiencies.
18       MR. PATTERSON:  I've explained it.
19       MS. KEEN:  So, is your objection
20  foundation or form or all of the above?
21       MR. PATTERSON:  It is foundation and
22  form.
23       MS. KEEN:  Are you saying that this
24  witness is the representative on Topic 3,

1  which, for the record is:
2            "The use, creation, contents of,
3  storage, location, movement and preservation of
4  investigative files kept by and/or at the
5  Chicago Police Department, Bomb & Arson Unit,
6  including but not limited to so-called
7  permanent retention files, area files, official
8  files, unit files, working files street files,
9  running files, clipboard files and Seraphine
10  reports."
11            That's just one topic.  Is he
12  your witness on that topic?
13       MR. PATTERSON:  Yes, he is.  But he's
14  still entitled to questions that have
15  foundation and that are in proper form.
16       MS. KEEN:  What is the lack of
17  foundation objection?
18       MR. PATTERSON:  The lack of foundation
19  is you have not established with this witness
20  when working files are used, what they're used
21  for, when he would expect to see them, etc.
22       MS. KEEN:  I have been asking him
23  about -- if that's your objection, I'm fine.
24  BY MS. KEEN:

1    Q.   Go ahead.  I'll read you back the
2  question.  You can answer.
3    A.   Yes.
4    Q.   Okay.  Sorry about that long pause.
5         MR. KIVETZ:  Just so the record is
6  clear, his entire objections remain on the
7  record.  You're still choosing to continue to
8  go forward; is that correct?
9         MS. KEEN:  Of course.
10         MR. KIVETZ:  Okay.  Well, there was
11  other objections before you said, oh, well if
12  that's the reason for you objection --
13         MR. PATTERSON:  You just asked about
14  the foundation objection.
15         MR. KIVETZ:  That's correct.  You've
16  only determined one thing and decided to move
17  on.  I just wanted to make sure his entire
18  objection is preserved before we move forward
19  and continue to go forward.
20         MS. KEEN:  I didn't go in there and
21  delete the transcript.
22         MR. KIVETZ:  Okay.  Great.  Well, then
23  you --
24         MS. KEEN:  You know what?  What is

1  your form objection?
2         MR. PATTERSON:  The form objection is
3  it's speculative, it's vague, and it's
4  compound.  Because you're asking him to
5  speculate as to what any individual detective's
6  practice is.  And he's already said that as the
7  Chicago Police Department, we don't require
8  working files, we don't, you know -- some
9  officers -- some detectives use them, some
10  didn't.
11         It was a personal style thing.
12  You can communicate orally.  So, he can't sit
13  here and say, oh, this was the standard way to
14  do things or this was the standard situation --
15         MS. KEEN:  No.  That's not what I
16  asked him.
17         MR. PATTERSON:  You did.  Read back
18  the question.
19         MS. KEEN:  I said in at least some
20  cases.
21         Do you know what you're doing?
22  You're actually doing an objection to me being
23  able to ask a 30(b)(6) witness these questions.
24         That's the implication of what

1  you just said.  What you have purported to
2  present and said multiple times in court today
3  in front of Judge Valdez that you're producing
4  someone to answer all of these questions.
5         But at every turn I attempt to
6  ask this witness who knows, is extremely
7  knowledgeable -- the cat is out of the bag.
8  There's all these memos.  No one is pretending
9  that there weren't working files pre-'83.  I'm
10  just trying to ask him about them.
11         You're saying --
12         MR. PATTERSON:  And I'm saying that
13  he's entitled to --
14         MS. KEEN:  Let me finish.
15         MR. PATTERSON:  -- a question that has
16  foundation --
17         MS. KEEN:  Let me finish.
18         MR. PATTERSON:  -- and a question that
19  is in proper form.
20         MS. KEEN:  No.  Stop.  Stop
21  interrupting me on the record.  Stop
22  interrupting me on the record.
23         My -- I mean, that's actually
24  quite rude.

1         What I was getting ready to
2  finish saying was that you -- I have asked for
3  somebody on working files on whether they
4  exist, how were they used.
5         This individual is extremely
6  knowledgeable and, therefore, I think quite
7  rightly you have identified him as your
8  30(b)(6) witness.
9         I have asked him in certain --
10  you know, based on his testimony about why
11  working files were needed, why they were used,
12  the kinds of things that they contained, who
13  would hand-off working files.
14         Based on all of that, I asked if
15  he would expect to see in at least some cases
16  fitting the following criteria that working
17  files were used.
18         You've objected as speculative
19  and lacks foundation.  And that's not well
20  taken.
21         Now, I don't really know if you
22  are trying to prevent me from being able to
23  conduct my 30(b)(6) deposition, or you're
24  saying no, I don't get to ask him questions

1 because I'm going to say they're hypothetical
2 even though they're actually corporate
3 representative testimony questions.
4          Then I don't want -- do we call
5 the judge?  You could revisit your objection,
6 or we can file a motion and say you're not
7 really in good faith allowing me to do this
8 30(b)(6) dep.
9          So, what is your position at this
10 point?
11          MR. PATTERSON:  My position is that my
12 objection is on the record.  He's going to
13 answer the question.  We should move forward.
14          MS. KEEN:  I am going to reserve the
15 right, once the transcript is available, to, if
16 I think I need to, file a motion for protective
17 order and reconvene your dep to be able to ask
18 some of these questions without inappropriate
19 objections so that I don't have to -- I mean,
20 because otherwise this is dragging on and on.
21          With each question, you're making
22 foundation objections, speculation objections,
23 and I just don't think that's the way to go.
24          So, I'll go forward now.  And I

---

1 know you're not going to agree to that, but I'm
2 just making it known for the record that that's
3 my intention to take with the transcript and
4 maybe have to go into court on.
5          MR. PATTERSON:  I absolutely object.
6          MR. KIVETZ:  And so do the individual
7 defendants.
8          MS. KEEN:  Okay.  Somewhere in there
9 was my question.
10          THE COURT REPORTER:  Do you want it
11 read back?
12          MS. KEEN:  No.  I think I know it.
13 BY MS. KEEN:
14     Q.   Go ahead.  You remember my question?
15     A.   Yes.
16     Q.   The answer is yes, you would expect to
17 see working files.  Okay.  Thank you.
18          So, that's true for multiple
19 teams of investigators whether they be
20 Bomb & Arson or Area 3 -- or area detectives,
21 correct?
22     A.   The situation that you described is
23 somehow being a very important case, more
24 important than others, worked on by multiple

---

1 watches.  It's more likely than not that a
2 working file might be used.
3     Q.   Okay.  And your answer is true for
4 investigators in Bomb & Arson?
5     A.   I did not work in Bomb & Arson.  So, I
6 am hesitant to speak to that, but it makes
7 sense.
8     Q.   In other words, the reasons for
9 keeping a working file as you described them,
10 existed just the same for Bomb & Arson
11 investigators as for area investigators,
12 correct?
13     A.   Correct.
14     Q.   And while you do not specifically work
15 in Bomb & Arson, do you have any reason to
16 believe that investigators in other specialized
17 units, not just within the areas, were not
18 keeping working files?
19          MR. PATTERSON:  Objection, vague.
20 BY MS. KEEN:
21     Q.   Go ahead.
22     A.   Detectives.  We're talking about
23 detectives within the Detective Division.  I
24 have reason to believe that they may have used

---

1 some form of a working file.
2     Q.   Everybody -- or all units within the
3 Detective Division?
4     A.   Right.
5     Q.   Okay.  The reason I am shying away
6 from the word detective is because there are
7 people within the Bomb & Arson Unit that aren't
8 detectives, but are still investigators.
9          For example, the explosive
10 technicians, right?
11     A.   Okay.  But --
12     Q.   I guess what I'm asking is putting
13 aside whether or not they were a detective or
14 in the Detective Division, do you believe that
15 investigators in the department working on an
16 investigation of importance that stand in
17 multiple shifts may have used working files?
18     A.   No.
19     Q.   Okay.
20     A.   The only thing that I've ever seen is
21 detective's notes, memoranda being placed in a
22 folder.  You're talking other units.  You're
23 talking public transportation, airport, you
24 know, narcotics, gangs, youths.  I mean,

1  there's a lot of units.
2      Q.   Do you have personal knowledge of
3  whether or not there was a working files
4  practice in the Bomb & Arson Unit at any point
5  in time since it was created?
6          MR. PATTERSON:  Objection, calls for
7  personal knowledge.  Just so the record is
8  clear, he's not testifying as to the Chicago
9  Police Department.
10         THE WITNESS:  When I conducted
11  training for the detectives, not only were the
12  detective area personnel present, but Youth
13  Division was there, and detectives and
14  explosive technicians from the Bomb & Arson
15  Unit were in this training.
16         So, at least from '83 on, they
17  were using investigative files.
18  BY MS. KEEN:
19     Q.   Training regarding the new special
20  orders that were ruled out?
21     A.   Correct.
22     Q.   So, who all was in attendance at the
23  training?  Let me back up.
24         Was there one training or were

1  there multiple trainings on the use of
2  investigative files?
3      A.   There were multiple trainings.  At
4  that time, there were probably a thousand
5  members in the Bureau of Investigative
6  Services, Youth Division, and Detective
7  Division.
8      Q.   I think there was a --
9      A.   Organized Crime was not part of it at
10  that point.
11     Q.   Was not part of a Bureau of
12  Investigative Services?
13     A.   It was part of Investigative Services,
14  but they were not required for investigative
15  files.
16     Q.   Oh, okay.
17         So, they weren't at the training?
18     A.   No, they were not.
19     Q.   But Bomb & Arson were at the
20  trainings?
21     A.   Yes.
22     Q.   Okay.
23     A.   And it was multiple sessions in
24  three-hour blocks.  And it started in January,

1  1983, and went on probably for a couple of
2  months.  And I, myself conducted all of the
3  training.
4          MS. KEEN:  Sorry.  I'm a little
5  unorganized.  We've got about 200 documents
6  from the City, which I have tried to organize
7  on-site here.
8          MR. PATTERSON:  For the record then,
9  we were never asked to move or reschedule the
10  deposition.
11  BY MS. KEEN:
12     Q.   Okay.  Well, let's just get into the
13  documents we have here and you can help me
14  figure them out.
15         So, as a result of this Laverty
16  memo business, there was departmental -- there
17  was some reaction to it, right, in the
18  department?
19     A.   Correct.
20     Q.   What was the first thing that happened
21  in reaction to the Laverty memo?
22     A.   There was a meeting of exempt members
23  of the police department -- excuse me, exempt
24  members of the Detective Division of the police

1  department to discuss the issue and to
2  determine what, if anything, it means.
3          And as part of that -- or from
4  that meeting, there were some site visits.  And
5  also from this meeting, it was apparent that
6  there was a lack of common understanding as to
7  the terminology being used to describe the
8  working files, street files, et cetera.
9      Q.   Okay.  And was this meeting held
10  before or after the Brzeczek teletype?
11     A.   Before.
12     Q.   Who was present at the meeting?
13     A.   Exempt members, the detective area
14  commanders, the detective deputy chiefs, the
15  Chief of Detectives, the deputy superintendent
16  of the Bureau of Investigative Services.
17     Q.   Was the commander of Bomb & Arson
18  present?
19     A.   He was a detective commander.  I don't
20  know if he was invited to the initial meeting
21  or not.
22     Q.   Were there any documents created that
23  reflected when the meeting was held?
24     A.   No.

1    Q.   Are there any documents that were

2  created out of this -- strike that.

3            Were there any documents that

4  memorialized what was discussed at the meeting?

5    A.   I think some of the documents that I

6  may have prepared afterwards make reference to

7  it, but the site visits were done within

8  24 hours of this meeting.

9            So, if you find a memo on a site

10 visit, assume a day or two before is when this

11 exempt meeting occurred.

12   Q.   Okay.  So, I'm going to start showing

13 you some documents and you can tell me if

14 they're the right --

15                    (WHEREUPON, Deposition Exhibit

16                     No. 2 was marked for

17                     identification.)

18 BY MS. KEEN:

19   Q.   I'm handing you Exhibit No. 2, which

20 is P 2457 through P 2461.  What is this

21 document?

22   A.   This document is -- it was co-authored

23 by Sergeant Tom Brady and Sergeant John Tolley.

24 They worked directly for the deputy chiefs of

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052284

1  the Field Group South and the Field Group North

2  detective areas.

3            It was the first attempt to

4  summarize site visits that had been made and to

5  identify a couple alternative strategies as to

6  what should be done or could be done.

7    Q.   Does this document refresh your

8  recollection -- strike that.

9            This document appeared to be

10 undated, correct?

11   A.   I would say it's the result of

12 photocopies that have run off the date in the

13 top right-hand corner where it normally is, but

14 these documents are undated.

15            But this is exactly the document

16 I was referring to that was done within a day

17 or two of the original exempt meeting.

18   Q.   Okay.  And I'm going to show you what

19 I'm marking as Exhibit No. 3.

20                    (WHEREUPON, Deposition Exhibit

21                     No. 3 was marked for

22                     identification.)

23 BY MS. KEEN:

24   Q.   This is P 2464 and 2465.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052285

1    A.   Right.

2    Q.   Is this another summary of -- what is

3  this document?

4    A.   This document is not a site survey,

5  nor did it attempt to be a site survey of the

6  different units.

7            What it is is a meeting of those

8  who were in charge of the Violent Crime Units

9  in the different areas, areas 1 through 6.

10           And I don't know why the two

11 other sergeants were there, Thomas Sadler and

12 Robert Becker.

13           Robert Becker was from Research

14 and Development.

15           Sergeant Sadler may have been

16 from the Bureau of Investigative Services, and

17 myself.

18           But this was the meeting in which

19 was a follow-up to the exempt meeting.  It was

20 a follow-up to the site surveys.

21           It was a meeting at which the

22 Violent Crime Unit commanding officers were

23 called in, and we discussed the issue and

24 specifically included whether or not more

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052286

1  should have been written on supplementary

2  reports.

3    Q.   Okay.  I'm going to ask you about the

4  content of that shortly.  I just want to first

5  understand all of the documents.

6    A.   Okay.

7                    (WHEREUPON, Deposition Exhibit

8                     No. 4 was marked for

9                     identification.)

10 BY MS. KEEN:

11   Q.   Then, of course, Exhibit 4 is the

12 teletype that came out in response to the TRO,

13 correct?

14   A.   Correct.  I believe it was Judge

15 McMillen issued the TRO on this one.

16   Q.   As a result of the Laverty memo,

17 correct?

18   A.   The Area 2 case, right.

19   Q.   Okay.  So, this teletype came after

20 the site visit, correct?

21   A.   Correct.

22   Q.   Now, there's a series of documents

23 that are dated all on April 21st, 1982.

24   A.   Okay.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052287

1        (WHEREUPON, Deposition Exhibit
2            No. 5 was marked for
3            identification.)
4  BY MS. KEEN:
5        Q.   I'm going to show you Exhibit 5, which
6  is CITY-KLUP 3022.
7            Are you familiar with this
8  document?
9        A.   I have seen it before.
10       Q.   Can you just explain what this
11  document is?
12       A.   This document is from John Hinchy, a
13  Deputy Chief in charge of the Special
14  Activities Group.  And it's in the subject of
15  file control, but it references the newly
16  issued Detective Division Notice, 82-2.
17           It seems to reiterate the
18  superintendent of police's instructions that
19  all police department investigative files known
20  as office unit or working files and sometimes
21  referred to as street or running files will be
22  kept intact.
23       Q.   What was the Special Activities Group?
24       A.   Again, there were three deputy chiefs.

1  Two of them were the geographical areas, north
2  and south, and this was the Special Activities
3  Group.  The Bomb & Arson Unit was part of the
4  Special Activities Group.
5        Q.   And we weren't able to recall the
6  other one, right?
7        A.   Yeah.  Financial Crimes was one, and
8  my memory is shaky.
9        Q.   It's been a while.
10           What was the reason for needing
11  to do an additional memorandum after the
12  Detective Division notice came out?
13       A.   I know of none.  Reinforcement.
14       Q.   Reinforcement?
15       A.   This deputy chief's preferred
16  managerial style.
17       Q.   I see.  So, it wasn't from someone
18  higher up than him directing him to reinforce
19  the requirement through additional memorandum,
20  correct?
21       A.   Correct.
22       Q.   What was your -- strike that.
23           How, if at all, did the section
24  commanders of -- strike that.

1            How, if at all, did anyone who
2  supervised the detectives within -- strike
3  that.
4            I'm just going to continue
5  soldiering on with organizing the documents and
6  we'll go over it that way.
7            So 82-2 came out before the
8  teletype?
9        A.   I doubt it.  It probably was after, an
10  hour or two after.
11       Q.   Oh, okay.
12           (WHEREUPON, Deposition Exhibit
13               No. 6 was marked for
14               identification.)
15  BY MS. KEEN:
16       Q.   I'm showing you Exhibit No. 6.  It is
17  Plaintiff 2455 through 2456.
18           How is this document?
19       A.   This document is dated the 21st of
20  April, 1982.  It is a memorandum from John
21  Stibich the Commander of Area 3 Detective
22  Division.  The subject is Working Files.
23           It has a couple subtitles,
24  questions, all three questions:

1            Should working files be kept?
2            What should be included in the
3  working files?
4            What should be done with the
5  working files?
6            It's three topics, and
7  recommendations or reasonings were made to
8  support the area commander's thoughts on these
9  subjects.
10       Q.   So, why did Commander Stibich want to
11  provide the Acting Chief with his
12  recommendations on the subject of Working
13  Files?
14       A.   Each of the detective areas submitted
15  a similar report.  I don't know what caused
16  them to do it.  I suspect it was an oral
17  instruction from the Chief.
18       Q.   How, if at all, does this relate to
19  the document we marked as Exhibit 2, which were
20  also -- it looks like some -- oh, I'm sorry.
21           That was really just a summary of
22  the site visit, right?
23       A.   Right.
24

1            (WHEREUPON, Deposition Exhibit

2            No. 7 was marked for

3            identification.)

4 BY MS. KEEN:

5     Q. Exhibit 7 is Plaintiff 2882 to 2885,

6 and I don't know if these are actually part of

7 the same document.

8     A. The John Stibich memo in Exhibit 7,

9 and the William --

10         MR. PATTERSON: 6.

11         THE WITNESS: I'm sorry. Exhibit 6.

12 And the William Murphy Commander report and the

13 Milton Deas Commander report in Exhibit 7 seem

14 to be written to respond to the same question

15 or instruction from the Chief.

16 BY MS. KEEN:

17     Q. Tell me what's actually happening and

18 what you think should be done.

19     A. Right. We had a problem with

20 terminology.

21     Q. Now, when you did your audit, was that

22 before or after the site survey and memos you

23 prepared?

24     A. I was part of the original site

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052292

---

1 survey. I believe I went to -- well, I don't

2 know what -- I went to Area 3 for sure.

3 There's a report around here somewhere.

4         And when I came back, these two

5 sergeants wrote this summary report. And there

6 was some frustration with that because

7 different people, different detectives and

8 sergeants went to different areas.

9         And after all is said and done,

10 they sent me out to the areas that I hadn't

11 been to so one person could see the same thing

12 at each of the areas. And you come back at

13 least using the same language to describe what

14 it is they saw.

15     Q. So, that audit as it's been called was

16 done after the initial site survey?

17     A. Well, the first one was done on day

18 one by myself. I did two of the areas.

19     Q. Okay.

20     A. And then the summary report. And then

21 I did a site survey of all four, the remaining

22 four areas.

23

24

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052293

---

1            (WHEREUPON, Deposition Exhibit

2            No. 8 was marked for

3            identification.)

4 BY MS. KEEN:

5     Q. Let me show you what I've marked as

6 Exhibit 8. 2462 to Plaintiff's 2463.

7         What is this document?

8     A. This is a memo that's entitled:

9 "Discrepancies Between Detective Area Unit

10 Files and the Records Division Reports of the

11 Same Records Division Number."

12         It's a page and a half -- it's a

13 page and a third memo written by myself. It is

14 undated, but it talks about my site visits to

15 each of the six areas and the sampling of

16 working files, et cetera, that I conducted.

17     Q. When did you prepare this memo?

18     A. Immediately upon having gone over the

19 course of a couple of days. I don't know if it

20 was two or three days.

21     Q. Was this a memorialization of that

22 first visit of two or the last visit of --

23     A. This is of all the areas.

24     Q. So, after you had done your final

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052294

---

1 audit, you prepared this report?

2     A. Correct.

3         MR. PATTERSON: Objection to the term

4 audit.

5         THE WITNESS: In the report, I

6 actually use the word sampling. And there is

7 still another document around here that gives

8 some explicit examples of some of my findings.

9 BY MS. KEEN:

10     Q. Okay. So, I'll call it a sampling.

11         So, was Exhibit 8 created after

12 you completed that final sampling of files?

13     A. Yes.

14         (WHEREUPON, Deposition Exhibit

15            No. 9 was marked for

16            identification.)

17 BY MS. KEEN:

18     Q. Okay. Exhibit 9 is Plaintiffs 2466 to

19 2467. What is this document?

20     A. This is an unsigned memo, which I had

21 prepared on the subject of Elimination Of Unit

22 Cleared/Closed Homicide Cases.

23         It discussed my interactions with

24 each of the detective areas and what they

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052295

1  thought about the informal communication of the
2  working files.  It talks about discrepancies
3  that existed between the running files and the
4  RD files, the Records Division file.
5      Q.   One of the solutions that you're
6  exploring in this document eliminating the unit
7  file, correct?
8           MR. PATTERSON:  Take your time.  Read
9  the whole thing if you need to.
10          MS. KEEN:  Please.
11          THE WITNESS:  All right.  Okay.
12          Paragraph 3 of the memo talks
13  about a possible solution that would terminate
14  the issue of discrepancy is simply not to keep
15  cleared/closed homicide files in the Violent
16  Crimes Units.
17          It suggested the possibility of
18  sending them directly to their Records
19  Division.  End of Paragraph 3.
20  BY MS. KEEN:
21      Q.   Do you believe that you prepared this
22  memo in '82 around the time that you were
23  preparing the other document?
24      A.   Yes.

1      Q.   What was your reason that you --
2  strike that.
3           It appears from earlier in the
4  memo that you were concerned that there would
5  always be discrepancies between the areas unit
6  file and the file in the Records Division,
7  correct?
8      A.   Correct.  One of my observations is
9  that part of the problem was the physical
10  location of files on the same case.  And no
11  matter how well we monitored the placement of
12  information into these files, given time and
13  given volume, they're not going to all
14  perfectly match one another.
15          I'm asking the question in a
16  rhetorical manner.  Maybe we should move the
17  cleared/closed cases out of the detective area
18  and perhaps send them for safekeeping in the
19  Records Division.
20      Q.   Now, why were cleared/closed files --
21  strike that.
22          Let me just back up and ask you,
23  what does cleared/closed mean?
24      A.   The detective has the responsibility

1  for case classification.  For all the crimes
2  that they investigate, there's one of seven, I
3  think there's seven dispositions.
4           One is that the case is cleared.
5  We know who did it.
6           Closed means everyone responsible
7  for that crime has been arrested.  If three
8  people were responsible, it's cleared and
9  closed.
10          If the case is cleared and open,
11  we know who did it, they're being prosecuted,
12  but only one of the three responsible people
13  has been arrested.  So, we're still sort of
14  working on it.  It's still open.
15          And then there are other
16  classifications of unfounded, suspended,
17  clearly exceptionally.  Something bars us from
18  arresting or prosecuting the individual.
19          The State's Attorney won't
20  approve charges, the offender died, or the
21  offender has moved to a country without
22  extradition treaty, an agreement with the
23  United States. So, those are the types of
24  dispositions.

1           Cleared/closed means resolved and
2  everyone responsible has been arrested.
3      Q.   At what point in the investigation --
4  or strike that.
5           When you were doing the sampling
6  of cleared/closed cases in these areas, what
7  stages were the investigations at for the files
8  you looked at?  Were they cleared/closed at
9  that point, or were they still being worked on?
10      A.   All of the above.
11      Q.   So, this memo deals specifically with
12  cleared/closed, right?
13      A.   Sure.
14      Q.   So, can you explain why there would be
15  a discrepancy between the unit file for a
16  cleared/closed case and the Records Division
17  file for that same case?
18      A.   There may well be a memo.  Memos
19  didn't make it to the Records Division file.
20      Q.   Did do this sampling after 82-2 was
21  issued?
22      A.   No.  Before.
23      Q.   Did you do any sampling after 82-2 was
24  issued?

1    A.  No.

2    Q.  Has the City undertaken any sampling

3 of any kind to determine whether relevant

4 information is being withheld from the official

5 file for a case after 82-2 Special Order was

6 issued?

7        MR. PATTERSON: Objection, form,

8 foundation.

9        THE WITNESS: It is a function of

10 supervision to review the work of their

11 subordinates and make sure the files are

12 maintained properly. But you're speaking to

13 something rather deep here. Relevance. If

14 something relevant may not have made it.

15        That's a pretty high bar, you

16 know. I would have to look pretty close.

17        In 82-2, we still did not have

18 General Progress Reports. And up until there

19 was -- we still didn't have to keep our notes

20 either.

21        So, as a supervisor, I would say,

22 Everything relevant in there? Yes. Everything

23 that needs to be in there is in there. Okay.

24        How do you do that? How do you

1 sample something like that? I mean, it's a

2 challenge.

3 BY MS. KEEN:

4    Q.  Right. How would you even go about

5 checking that everything relevant from a note

6 went into a supp report without an individual

7 review of each supp report and corresponding

8 note, correct?

9        MR. PATTERSON: Objection, form,

10 foundation.

11 BY MS. KEEN:

12    Q.  Is that what your point was?

13    A.  Right.

14    Q.  So, let me take a step back and just

15 ask you, you did a sampling wherein you

16 compared the contents of the areas

17 cleared/closed file with the Records Division

18 file for that same case, correct?

19    A.  I didn't sample the Records Division.

20 I know exactly what's in the Records Division

21 file. The original general offense case

22 report, the original supplementary reports,

23 plural. Nothing else.

24    Q.  So, what documents did you look at to

1 prepare Exhibit 9?

2    A.  I went to the areas and I looked at

3 those documents that I found that were called

4 running files, street files, working files and

5 saw that in some of these files, there was

6 miscellaneous documents, sometimes to-froms,

7 subject reports, that I know were not in the

8 Records Division file.

9    Q.  And you knew that because that

10 information was not in the supplementary

11 reports, correct?

12    A.  No. The memos were never placed in

13 the Records Division file without even reading

14 the report; or the memo, I would know, it's not

15 the same.

16    Q.  Right.

17    A.  Now, did the substance of that get in

18 there? I don't know.

19    Q.  I believe that you testified in Palmer

20 that one of the things that you observed in the

21 course of your work on this issue was that

22 information that was in a document in the

23 working files sometimes didn't make it into the

24 supplementary reports, even though that

1 information was relevant, correct?

2        MR. PATTERSON: Objection, improper

3 impeachment.

4 BY MS. KEEN:

5    Q.  I'm not attempting to impeach you.

6 I'm just asking you a question about whether

7 you recall giving that testimony.

8    A.  I believe my comment was oftentimes,

9 sometimes, substantive investigative activity

10 never made it into the official report.

11        For instance, the clearing of

12 suspect A and all the work that went in to even

13 find suspect A.

14        In some instances, there were

15 examples of two reports in a file; the original

16 and the closing arrest report. And they're

17 separated by ten days. And one wonders what

18 happened in that ten days.

19    Q.  Right. And so you would see cases

20 where there was some documentation regarding

21 the work that had been done in the intervening

22 ten days that wasn't made part of the permanent

23 retention file, correct? Or, the Records

24 Division file, I should call it.

1    A.   Correct.

2    Q.   So, you became aware of a practice in

3 some instances of substantive information about

4 a case investigation not being put into the

5 supplemental report, correct?

6    A.   Correct.  It wasn't wrong in and of

7 itself but it also raised questions.  How did

8 you get to suspect B?  How did that story

9 develop?

10   Q.   So, let's take the example of the

11 suspect A being a suspect and then being

12 eliminated.

13   A.   Right.

14   Q.   Can you tell me -- I mean, how often

15 did you see something like that happening, if

16 you can recall?

17   A.   I have no idea to put it in terms of

18 numbers.  But genuine, substantive, good

19 detective efforts were going undocumented as

20 part of the investigative story line.

21   Q.   In that example, the identity of

22 another suspect that had been ruled out by that

23 detective was completely omitted from the

24 official police reports, correct?

1    A.   Correct.

2    Q.   So, say, there was some evidence to

3 later rule that suspect back in, how would that

4 information -- let me re-ask the question.

5         Unless that suspect later

6 became -- unless the suspect who was ruled out

7 later became a suspect again, that suspect's

8 identity would never be disclosed via official

9 police reports for that investigation, correct?

10   A.   Pre-1983, correct.

11   Q.   After the special order 82-2 was

12 issued, did you do sampling of any kind on the

13 subject of files?

14   A.   No.  I had a lot of conversations, a

15 lot of meetings, but no complete effort to

16 sample again.

17   Q.   Did anybody on behalf of the

18 department do any sampling of actual files

19 after the special order 82-2 came out?

20   A.   I'm not aware of any.

21   Q.   Is that something you would have been

22 aware of given your role in the project?

23   A.   Had it been done at the direction of

24 the Chief, I would have heard about it, I would

1 have known about it.  But there's nothing to

2 prohibit anyone below that to order one of

3 their subordinates to do further sampling, and

4 I would not have known about it.

5    Q.   Did the department take any steps to

6 find out if the working file practice had

7 actually stopped at any time after Special

8 Order 82-2 was issued?

9    A.   Well, we saw Deputy Chief Hinchy's

10 effort to reinforce the message.

11   Q.   That the day after the order, right?

12   A.   Right.  Right.

13   Q.   I'm just asking the question, because

14 I don't know the answer.

15        Did the City of Chicago Police

16 Department or anyone within the department take

17 any steps to determine whether the working

18 files practice had actually stopped as a result

19 of the efforts the department had taken to

20 issue a Special Order on the subject in '82?

21        MR. PATTERSON:  Objection, asked and

22 answered.

23        THE WITNESS:  All the files that were

24 intact should remain intact as of the temporary

1 restraining order.  And the issuance of an

2 order by the superintendent.

3         Then came the gray area.  What

4 about my personal notes?  They don't mean that,

5 do they?  Well, neither the temporary

6 restraining order nor the superintendent's

7 direction made mention of personal notes.

8         And there was discussion -- well,

9 it couldn't possibly mean notes, because they

10 didn't say notes.

11        They must be referring to those

12 memoranda and those to do lists.

13        We'll keep them, just as they

14 were.  But if there was a genuine, sincere,

15 what do you think he means, what do they mean

16 about notes?

17 BY MS. KEEN:

18   Q.   And so what was done about that

19 confusion?

20   A.   We had meetings and then we had -- oh,

21 then we went to court.  Milton Shader's

22 courtroom, and Superintendent Brzeczek

23 clarified his standing.  And he said anything

24 generated in the course of an investigation,

1 notes, even if they're written on the back of a
2 notebook should be preserved.
3          Notes? Yes, notes. That was our
4 marching orders to change and clarify what to
5 do with personal notes. They're the
6 work-product related to the investigation.
7     Q.   So, it sounds like in response to the
8 practice of working files and this Laverty memo
9 lawsuit, the department responded by issuing
10 its Special Order and then these substance
11 special orders regarding the use of
12 investigative files, correct?
13    A.   Well, the first one is 82-2,
14 Department Notice 82-2. Preserve those things.
15 We still didn't have a name for them. Preserve
16 them. You know what I'm talking about.
17          Later, after the hearing in
18 federal court, it was clear that the
19 superintendent is announcing a new policy.
20    Q.   This is 83-1?
21    A.   83-1.
22    Q.   And then 83-1 spelled out the filing
23 system and created some names for the file and
24 associated ancillary documents, correct?

1     A.   Correct.
2     Q.   And then there were some subsequent
3 orders, which I'll mark at this point, that
4 related to the same subject of investigative
5 files and those ancillary documents, correct?
6     A.   Correct.
7     Q.   And then the GPR form was created as
8 well, correct?
9     A.   As part and parcel of 83-1.
10    Q.   Did the department take any other
11 steps to ensure that all of the information in
12 working files was getting produced to -- let me
13 ask that question.
14          Other than the special orders
15 that I just talked about regarding
16 investigative files, did the department take
17 any steps to ensure that working files were
18 being kept intact and not being destroyed?
19    A.   We go back to the supervisory
20 responsibility. The Superintendent of Police
21 has issued his policy. The Chief of Detectives
22 has issued a division level order. It's to be
23 followed.
24          Now, I'm not aware of what you're

1 suggesting, what City-wide uniform action items
2 were there. I imagine there was a lot of
3 action items done at the commander, lieutenant,
4 sergeant level. Give me a general progress
5 report with your supp.
6          I know you didn't write that supp
7 using your imagination. Really? Yes. We
8 never used to. Right. We never used to. But
9 do it now. It was a change of a mindset.
10    Q.   The mindset was that -- the earlier
11 mindset was this very familiar practice of not
12 turning over notes, right?
13    A.   Correct.
14    Q.   And keeping information working files
15 that didn't get made part of the Records
16 Division file, correct?
17    A.   Not keeping. Okay. There was no
18 uniform practice of getting rid of running
19 files, street files, working files. Some might
20 just take the entire file and throw it in the
21 garbage.
22    Q.   Right. I just mean of not submitting
23 information from the working files in the
24 permanent file, into the Records Division file,

1 that was a mindset that existed before January
2 of '82, correct?
3     A.   Correct. Before '83.
4     Q.   Before '83.
5          So, I guess all I'm asking is
6 other than direct supervisors to the extent
7 they may have taken steps that you're not
8 personally aware of, did the department
9 management or command staff take any steps to
10 determine whether the working file practice had
11 actually changed as a result of the Special
12 Orders?
13    A.   We had a training program. There was
14 the 1986 Detective Division Special Order
15 issued by George McMahon, which for the first
16 time introduces the word in Section 6, I
17 believe, audit.
18          Exempt commanding officers will
19 audit these records, these investigative files.
20 But I think that is after the fact.
21          I'm not backing down from the
22 fact that supervisors made sure that the
23 Superintendent of Police's direction and the
24 Chief of Detective's direction were being

1 followed.

2 Q. I appreciate that. I'm just trying to
3 understand if anything was done besides that.
4 And I think the answer is, there was some
5 initial training to explain the new rules of
6 83-1, correct?

7 A. Correct.

8 Q. And then there was a special order in
9 '86 correct?

10 A. Correct.

11 Q. Other than that, you're not aware of
12 any steps taken by anyone at the management
13 level in the department to make sure that the
14 working files practice had ceased, correct?

15 A. Right.

16 Q. Now, as far as whether sergeant
17 supervisors, in other words, front line or
18 first line supervisors, if you will, were
19 actually making sure that the Laverty problem
20 didn't happen again and that relevant
21 information wasn't being kept from the official
22 police reports, what steps are you aware of did
23 these front line supervisors take?

24 A. The front line supervisor had to sign

1 off on the general progress report. In the
2 bottom right-hand corner of the general
3 progress report is the supervisor's name and
4 signature.

5 But you know what's interesting
6 about that, and it's different from original
7 case reports and supplementary case reports.

8 An original case report and in
9 supplementary case reports, it says approved.
10 On the general offense case report, it says
11 received.

12 MR. PATTERSON: The general offense
13 case report or general progress report?

14 THE WITNESS: General progress report.
15 Excuse me. Thank you for that clarification.
16 The general progress report says received.

17 BY MS. KEEN:

18 Q. What's the reason for the difference?

19 A. I remember there being a discussion
20 when I created the form. You can't expect
21 someone to read someone's chicken scratch of
22 handwriting and, who knows, personal codes. I
23 don't know how people take their notes. To
24 read them with the same intensity as you do the

1 supplementary report.

2 So, if I were to really place
3 responsibility, I would place responsibility on
4 that individual detective to ensure that that
5 which is relevant, that which is important to
6 the case makes it to the supplementary report.

7 Q. So, if a GPR did not have a
8 supervisor's signature on this, does that mean
9 that the GPR was never turned into a
10 supervisor?

11 A. That's a very good assumption.

12 Q. Are you aware of any reason why a
13 supervisor would receive a GPR but not sign the
14 GPR?

15 A. No. We're very good at signing
16 things. Reading has its challenges, but we're
17 very good at signing.

18 Q. I appreciate that.

19 Let me make sure I know what all
20 these other documents are quickly.

21 MR. PATTERSON: Would this be a good
22 time for a break?

23 MS. KEEN: You know when would be a
24 great time for a break? If you give me -- I'll

1 try to do it quickly in five minutes.

2 As soon as I mark these, then I'm
3 going to organize them during the break.

4 MR. PATTERSON: Okay. Sure.

5 (WHEREUPON, Deposition Exhibit
6 No. 10 was marked for
7 identification.)

8 BY MS. KEEN:

9 Q. This is Exhibit 10 and it's
10 Plaintiff's 2468 through 2471. Can you tell me
11 what this document is and who wrote it?

12 A. This is a document on the subject of
13 To-From Subject Memorandums, sic, s-i-c.

14 I now know that the plural of
15 memorandum is "a." I didn't know that in 1983
16 when I wrote this. So, I apologize.

17 Q. You said in 1983?

18 A. 1982. I'm sorry.

19 Q. Do you remember when in '82?

20 A. It's probably April. Obviously, it's
21 undated, but it's written very close after the
22 time the site visits were conducted.

23 Q. Okay. And I'm sorry. I didn't mean
24 to interrupt you.

1    A.   It was my way of thinking something

2  out and sharing my thoughts in writing.

3    Q.   Who did you share this document with?

4    A.   The Chief of Detectives.

5    Q.   Anybody else?

6    A.   The Deputy Chiefs of Detectives.

7    Q.   Anybody else?

8    A.   Those are the ones I know received it.

9    Q.   I forgot to ask you that about

10  Exhibit 9.  Who did you give Exhibit 9 to?

11    A.   The same people.

12    Q.   Chief of Detectives?

13    A.   And the Deputy Chiefs.

14    Q.   All right.

15    A.   At issue here, it's a discussion of

16  what to do with to-from subject reports and

17  points out the irony that, by our own

18  directives, we have the requirement to generate

19  memoranda on certain types of investigations.

20    Q.   Right.

21    A.   And ask the question, you know, on the

22  last page, should these items become part of

23  the Records Division?  Should these To-From

24  Subject Reports become part of the Records

---

1  Division?

2                   (WHEREUPON, Deposition Exhibit

3                   No. 11 was marked for

4                   identification.)

5  BY MS. KEEN:

6    Q.   So, this is Exhibit No. 11.  It's

7  really badly Bates stamped.  This is

8  Plaintiff's, I believe, 6307, 6308, 6309 and

9  6310, all the way through 6312.

10       But just so that the record is

11  clear in case I got that Bates numbers wrong,

12  it's hard to read, it's a document entitled

13  Chapter 18 Investigative Files.

14       What is this document, sir?

15    A.   This is Chapter 18 of the Detective

16  Division Standard Operating Procedures.

17    Q.   What year is this from?

18    A.   1988.

19    Q.   Did you write this?

20    A.   I did not.

21    Q.   Who wrote this?

22    A.   The Chief of Detectives was John

23  Townsend.  I don't know who drafted it for him.

24  But you will see that it closely mirrors the

---

1  previous Detective Division Special Orders from

2  1983.  In any organization, there is at

3  different times, different schools of thought.

4       In one era they say write special

5  orders on special topics.  Someone else says

6  let's put it all in one place, a couple of

7  years later.  Let's create a manual, a standard

8  operating procedure.

9       Frankly, I'm against standard

10  operating procedures because when you revise

11  them, you have to go into page -- Chapter 18,

12  Page 3, revise Paragraph 2.  It gets very messy

13  and usually it's bound and you rip pages out

14  and you try to insert something on a three-ring

15  notebook as opposed to stand alone topics,

16  which are smaller in size.

17    Q.   Right.

18    A.   But in this era, it was the decision

19  of the Detective Division Chief to have one

20  large bound set of Standard Operating

21  Procedures.

22    Q.   Do you have a copy of the '83 Standard

23  Operating Procedures for the Detective

24  Division?

---

1    A.   There wasn't one.  And that's my

2  point.

3    Q.   Oh, you're saying it was -- okay.

4  Because I was just thinking to myself, I hadn't

5  seen that.

6    A.   Right.

7    Q.   You're saying it was the Special

8  Orders?

9    A.   Special Orders were the governing

10  document.

11    Q.   So, this is the first time it got

12  integrated into this larger document?

13    A.   Right.

14                   (WHEREUPON, Deposition Exhibit

15                   No. 12 was marked for

16                   identification.)

17  BY MS. KEEN:

18    Q.   And I think the last one of this batch

19  is Exhibit 12, which is CITY-KLUP 3140 through

20  3164.  And there's several documents in here.

21       I don't know if I incorrectly

22  combined multiple unrelated documents.  Maybe

23  you can -- oh, yeah, I did.  Sorry.

24                   So, I guess the first three pages

1  of this exhibit are one document, right?

2      A.   Correct.

3      Q.   So, let's actually make Exhibit 12B

4  CITY-KLUPP 3140, 41 and 42.

5      A.   Okay.  What are you calling that one?

6      Q.   The first three pages are Exhibit 12.

7      A.   Okay.

8      Q.   What is this document?

9      A.   This document is one of my earliest

10  attempts to articulate what I thought our

11  procedures should be.

12      Q.   So, did this precede the Special Order

13  82-2?

14      A.   Yes.

15      Q.   Okay.

16      A.   You know what?  I don't know if it

17  preceded the April 1, but it certainly preceded

18  the January, 1983.

19      Q.   Who did you send this to?

20      A.   Again, the Chief of Detectives for

21  sure.  And this probably went also to the

22  Deputy Superintendent Bureau of Investigative

23  Services.

24      Q.   Was the Patrol Division ever involved

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052320

1  in any of these discussions about the whole

2  investigative file and working file issue?

3      A.   No.

4      Q.   The next in this batch that I handed

5  you is actually not -- you can just put that to

6  the side.  I don't need to ask you about it.

7           MR. PATTERSON:  Which one are we

8  putting to the side?  3143.

9           MS. KEEN:  Yes.  Sorry.  These are

10  some of the new documents.  I think I

11  accidentally had these all stapled together.

12  BY MS. KEEN:

13      Q.   Can you just tell me which documents

14  go together?  So, there's a memo on 3144?

15      A.   3144 is a stand alone directive.

16           (WHEREUPON, Deposition Exhibit

17               No. 13 was marked for

18               identification.)

19

20  BY MS. KEEN:

21      Q.   Let's mark that one as 13.

22      A.   This next one, if it is to be

23  Exhibit 14, I think should start with this

24  Investigative File Case Folder on 3148.  That

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052321

1  should be the first document.

2      Q.   Okay.

3      A.   That should be the first document.

4      Q.   Okay.

5           MR. PATTERSON:  So, Jim, would 3148

6  comes first then immediately followed by 3145?

7           MS. KEEN:  We can go off the record.

8               (WHEREUPON, a discussion was held

9                   off the Record.)

10               (WHEREUPON, a short break was

11                   taken.)

12               (WHEREUPON, Deposition Exhibit

13                   No. 14 was marked for

14                   identification.)

15           MS. KEEN:  Back on the record.

16  BY MS. KEEN:

17      Q.   You testified earlier, I believe, that

18  the first meeting within the police department

19  involving --

20           MR. KIVETZ:  I'm sorry.  Can we go off

21  the record for a second?

22               (WHEREUPON, a discussion was held

23                   off the Record.)

24  BY MS. KEEN:

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052322

1      Q.   Before the break, sir, I had asked you

2  some questions about the initial meeting among

3  the command staff regarding the Laverty memo

4  and the potential problem of working files.

5           Do you recall those questions?

6      A.   I do.

7      Q.   And you said that there was a meeting

8  of the Chief of the Detective Division, as well

9  as all of the area commanders, correct?

10           Correct.

11      Q.   So, at the time there was six areas?

12      A.   Correct.

13      Q.   And then subordinate to the area

14  commanders were the area chiefs, correct?

15      A.   No.

16      Q.   I got that backwards.

17      A.   It's chief, deputy chief, and

18  commanders going top to bottom.

19      Q.   So, at this meeting was the Chief of

20  the Detective Division, as well as the area

21  chiefs of all six areas, correct?

22      A.   Three deputy chiefs.

23      Q.   Three deputy chiefs.  We've been over

24  this.  Right.  Okay.  Sorry.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052323

1    So, there's the Chief, the three

2 deputy chiefs the six area commanders.

3   A. Right.

4   Q. And then was there anyone of a lower

5 rank than commander at this meeting?

6   A. I don't believe there was.  There was

7 one other higher and that's Deputy

8 Superintendent of Investigative Services.

9   Q. Right.  And you don't recall whether a

10 specific presence from Bomb & Arson was there,

11 correct?

12   A. I would tend to think not because at

13 first blush this was viewed as an Area Violent

14 Crime issue and not larger than that.

15   Q. Do you have an independent

16 recollection today as to whether someone from

17 Bomb & Arson was there or not at this initial

18 meeting?

19   A. I do not.

20   Q. So, it's possible, but you're not

21 sure?

22   A. It's possible, and I don't know.

23   Q. Do you recall what month this meeting

24 was held in 1982?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052324

---

1   A. It was probably April, but I don't

2 know.

3   Q. Now, you said generally what the topic

4 of the meeting was.  What was the discussion?

5 What was the substance of the discussion at the

6 meeting?

7   A. I wasn't there.  As it was relayed to

8 me, they were talking about the Laverty

9 memorandum and the question of other files.

10 And at that point, I'm told it became a

11 confusing topic because no one agreed upon

12 terminology.

13   Q. When you say other files, you mean

14 whether there were other similar Laverty memo

15 types out there?

16   A. No.  Just whether or not there were

17 working files, street files, running files.

18   Q. Okay.  Around this time, what was the

19 confusion over nomenclature?

20   A. The term.  I mean, one person would

21 call it a personal file, someone else would

22 call it a running file, someone else said, no,

23 no.  I think you mean street files.  I think

24 you mean working file.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052325

---

1   They're all talking around one

2 another trying to describe what possibly is an

3 issue.  And then, of course, it was an

4 agreement that there should be a site survey.

5   Q. Okay.  Was it your understanding that

6 while the different names might have been used

7 within the different areas, they all had a

8 practice of keeping what you have described or

9 defined as working files?

10   A. A practice of using, not always

11 keeping.

12   Q. Okay.  Right.  Fair enough.  In fact,

13 sometimes not keeping?

14   A. Right.

15   Q. They all had a practice of using

16 working files but they might have called it

17 something other than working files, correct?

18   A. Correct.

19   Q. Okay.  And how far back did the

20 working file practice go among police folks

21 doing investigations?

22   A. I don't know.  When I arrived at

23 Area 1 Homicide in August, 1977, it was there.

24   Q. When you were homicide detective, were

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052326

---

1 you aware of the possibly that important

2 information from the working files would not

3 make it into the official file or official

4 police report for a particular investigation?

5   A. I never gave it much thought.  I mean,

6 I was just worried about my investigation and

7 my notes, taking the best notes I could to make

8 the best report I could.

9   Q. You never personally engaged in the

10 practice of keeping important information about

11 the case out of the supplementary report, I

12 would assume, correct?

13   A. I have left memos for other watch

14 personnel, but nothing I thought should have

15 been included in a supplemental report.

16   Q. And you made an effort to include

17 everything relevant to a case in the

18 supplemental report as you understood the term

19 relevant?

20   A. I think most people did.  The practice

21 is mostly favorable and good.  Yes.

22   Q. So, it's mostly favorable and good,

23 but it had the -- there was the opportunity for

24 mishandling of information if one wanted to

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052327

1  mishandle; is that fair to say?

2          MR. PATTERSON:  Objection, vague.

3          THE WITNESS:  I think there is -- in

4  files, there needs to be some discipline, some

5  commonality of investigation.  I think if

6  everyone had their own file on every

7  investigation, it would become very confusing.

8  We would become less efficient.

9  BY MS. KEEN:

10     Q.   It's not just confusing and efficient,

11 but it sounds like the practice of working

12 files created the opportunity for the

13 occasional person to actually withhold evidence

14 that was relevant to an investigation?

15         MR. PATTERSON:  Objection, foundation.

16 BY MS. KEEN:

17     Q.   I mean, isn't that what happened in

18 the Laverty case?

19     A.   To this moment, I don't know why Frank

20 Laverty did not put it on a supplementary

21 report and dare the supervisor to sign it.

22 That was his right.  That was his duty.

23         Why put it on a piece of paper?

24 If you believe this is part of the

---

1  investigation, include it in your supplementary

2  report.

3          Almost anything that's in a

4  supplementary report that's not true can be

5  discounted.  You know, it may be troublesome

6  for a day or two, but it may require further

7  leg work to prove or disprove this suspect A.

8      Q.   Right.  But when going to your point

9  about Laverty not putting the information in

10 the supp report, my understanding of our

11 discussion earlier about the process of putting

12 information into a supp report was that you saw

13 cases where substantive information about the

14 investigation wasn't being put in the supp

15 report?

16     A.   Substantive activity, investigative

17 activity was not included.  And needlessly, in

18 my opinion, not included.

19     Q.   But doesn't that just speak to the

20 fact that it was the mindset of detectives to

21 use these memos and turn the memos in as

22 opposed to bothering to create supp reports

23 that contained all of the information in the

24 memos?

---

1      A.   No.  Most of the report writing was on

2  supps.  I mean, sometimes we get a

3  misunderstanding of these memoranda.  The

4  memoranda tended to be to-do lists.  I want you

5  to, you know, communication to the next watch

6  even if it's eight hours from now.

7      Q.   To-do lists have sort of a pedestrian

8  sound to them, but to-do lists can be quite

9  important for a homicide investigation,

10 correct?

11     A.   Certainly.

12     Q.   So, to-do lists could include the name

13 of suspects that need to be interviewed,

14 correct?

15     A.   You could say I want you to

16 re-interview someone.  I don't like his looks,

17 you know.  Somebody is not telling us the

18 straight story.  That's why I would like you to

19 re-interview this person.  Tell me what you

20 think.

21     Q.   Given that at least some detectives

22 were of the mindset that they didn't put

23 information that was germane to the case into a

24 supp report if it was already written in a

---

1  memo, was there an opportunity for important

2  information to be withheld from the official

3  police reports that got disclosed to

4  prosecutors and criminal defense attorneys?

5          MR. PATTERSON:  Objection, form,

6  foundation.

7          THE WITNESS:  Opportunity sounds like

8  something we want to do or taking advantage of

9  the moment.  I agree with the thought that

10 important parts of an investigation and

11 sometimes even relevant parts of an

12 investigation may not have been included in a

13 supplementary report, but I think to say that

14 it gives certain detectives the opportunity to

15 withhold, I mean, that's down right sinister,

16 and I don't think the average person is like

17 that.

18 BY MS. KEEN:

19     Q.   Fair enough.

20          I guess maybe I should have said

21 it creates the potential, whether deliberate or

22 not, for information to not make it from a

23 detective's personal notes or memos into an

24 official police report?

193

1    A.   I like that.

2    Q.   Okay.  Thank you.

3         So, then as a result of the

4    meeting, what happened?  What happened next on

5    this project?  And by project, I mean, the

6    problem of figuring out whether there was a

7    street files problem and what to do about it?

8    A.   Day one after the meeting, I don't

9    know the date, individuals detectives and

10   sergeants went to the individual six areas and

11   came back and reported their findings.  And

12   those two sergeants wrote a summary report.

13        The summary report still did not

14   satisfy the Chief of Detectives who said, you

15   know, I don't like reports.  They're written by

16   two.  I want one report written by one person

17   who has seen everything and may be able to

18   better evaluate.

19        And I was assigned to be that

20   person, and I made some observations.  And then

21   for the weeks that went on after that, it was

22   what do you want to do about it?

23   Q.   Okay.  So, starting with the first two

24   detectives, that's the Exhibit 2 document we've

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052332

194

1    already looked at, correct?

2    A.   Correct.

3    Q.   And just looking at that briefly as

4    far as the content of the memo, Page 2 talks

5    about a memo board?

6    A.   Right.

7    Q.   And in the case of Area 3, it talks

8    about a hot board.  What was the hot board?

9    A.   Probably the same thing just a

10   different name.  It's a clipboard normally,

11   two-hole punched sitting on the supervisor's

12   desk with copies of case reports, supplementary

13   reports, memos, and Area 3 says, additional

14   bits of information are stapled to the original

15   report.

16        I, for the life of me, can't

17   remember what the additional bits of

18   information might be.

19   Q.   It goes on to say, perhaps this is

20   enlightening:  "This is a duplication of the

21   street file."

22   A.   Right.  It might be a to-do list, it

23   might be a memo.  Even telephone messages are

24   included in an investigative file or street

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052333

195

1    file.  That's something I failed to mention

2    earlier.

3         Hickey, you got a message from

4    someone who doesn't wish to be identified, but

5    he says the guy with the red hood is the one

6    you're looking for.  Okay.  Thank you.

7    Whatever it might be.

8    Q.   Would that have been a phone message

9    slip?

10   A.   Literally.

11   Q.   And that would have been stuck in the

12   working file?

13   A.   Right.

14   Q.   So, there was information being

15   exchanged informally among detectives on a

16   day-to-day basis?

17   A.   Right.

18   Q.   And that's normal of any police

19   department I would assume, right?

20   A.   Or simply call this number.  I don't

21   have a clue what it's about, but here's this.

22   Oh, yeah.  I remember giving you my business

23   card.  Thanks for calling.

24   Q.   Now, at the time that there was --

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052334

196

1    sorry.  Let me just strike that and go back to

2    this.

3         Now, it then talks about street

4    files, also called running files in Area 3 and

5    unit file in Area 4; do you see that?

6    A.   Yes, I do.

7    Q.   And it says that areas using "street

8    files" keep various notes, memos and bits of

9    information on the case in these files, which

10   are used to communicate steps taken, steps to

11   be taken and personal opinions of one detective

12   to another, do you see that?

13   A.   I do.

14   Q.   And was that your experience as well

15   in terms of understanding what street files

16   were?

17   A.   Personal opinions.  I agree with the

18   first couple.  Rare is the instance.  When

19   someone says, I have a personal opinion that

20   the motive is robbery and not sex.

21   Q.   Do you believe that the authors of

22   this memo had a good faith basis for describing

23   street files in the way that they just did in

24   that paragraph?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052335

1          MR. PATTERSON:  Objection, form.
2          THE WITNESS:  The authors compiled
3  this report based on information provided to
4  them by others.
5  BY MS. KEEN:
6      Q.   And this report was actually prepared
7  as a direct result of a decision made at that
8  meeting to go out and do a survey, correct?
9      A.   Correct.
10     Q.   And so they were intending to report
11  back -- or excuse me.  Their assignment was to
12  report back accurately about what they were
13  seeing as the actual practice of working files
14  in the various areas, correct?
15     A.    Correct.
16     Q.   So, do you have -- I mean, I guess --
17  you're saying you haven't seen documents
18  reflecting personal opinions of one detective
19  to another, but you have no reason to dispute
20  that they observed that, correct?
21     A.   I do not.
22     Q.   But you agree with the remainder of
23  this definition of street files?
24     A.   Yes, I do.

1      Q.   And it also says that the street file
2  was maintained for the lifespan of the
3  investigation.
4               Was that your understanding as
5  well?
6      A.   Lifespan of the investigation means
7  until the time of arrest.  That was the term of
8  art, you know.  Not forever.
9      Q.   Was that your understanding as well?
10     A.   Yes.  Disposed of by the detective
11  making the cleared/closing report.
12     Q.   Right.  Now, at the bottom here, it
13  just says Violent Crime Units under the street
14  files heading?
15     A.   Yes.
16     Q.   What's the significance of that.
17     A.   I don't know.
18     Q.   Were there working files kept --
19     A.   I would say, as I look at this memo
20  further, it is under the heading of street
21  files.  They're utilized in each area, they're
22  maintained by detectives, they're maintained
23  until the case is closed, and it looks like
24  they're maintained in Violent Crimes Units.

1      Q.   Was that your understanding as well?
2      A.   Yes.
3      Q.   Now, it goes on to propose some
4  methods of addressing the problem, correct?
5      A.    There are some -- there are two
6  alternative approaches to resolve it, yes.
7      Q.   And those were just recommendations by
8  the authors, correct?
9      A.   Correct.
10     Q.   What happened -- and I know you've
11  talked generally about it, but after they came
12  back, you had -- excuse me.
13               After these two authors, in other
14  words, Brady and Tolley reported their
15  findings, the superintendent or the Chief of
16  Detectives --
17     A.   Chief of Detectives.
18     Q.   -- wanted the same person to do the
19  whole survey, correct?
20     A.   Right.
21     Q.   And so what conversation did you have
22  with the Chief about that?
23          MR. PATTERSON:  Objection, foundation.
24  BY MS. KEEN:

1      Q.   Did you have a conversation with the
2  Chief about that?
3      A.   I did.
4      Q.   Was anyone else present?
5      A.   I don't recall.  I'm sure someone was
6  around, but I don't recall who may have been
7  there, but I was directed to go to each of the
8  areas.
9      Q.   Were you told to go anywhere besides
10  each of the six areas?
11     A.   Not at this time, no.
12     Q.   At some point were you?
13     A.   I recall going to the Youth Division,
14  but I went to other places as well.
15     Q.   Where?
16     A.   I went to the FBI to see how they
17  maintained investigation files.
18     Q.   Within the department, did you go to
19  Bomb & Arson?
20     A.   I don't recall.  Certainly not
21  initially.
22     Q.   Organized Crime?
23     A.   No.
24     Q.   You don't recall or you did not go?

1     A.   I don't recall.  Sorry.  I mean, the
2  conversations went on for months, and I
3  remember vividly the site surveys at the very
4  beginning.
5     Q.   And then when does the teletype
6  happen?  After you finish all of your site
7  surveys?
8     A.   It happened immediately after the
9  temporary restraining order was issued.
10    Q.   I'm just trying to put together --
11    A.   A timeline.
12    Q.   -- my own timeline.
13         MR. KIVETZ:  You're referring to
14  Exhibit 3, correct?
15         MS. KEEN:  Exhibit 4.  Thank you.
16  BY MS. KEEN:
17    Q.   Was the teletype, which we marked as
18  Exhibit 4, before or after Brady and Tolley did
19  a survey?
20    A.   It was after.
21    Q.   Where is your summary of your survey?
22    A.   I don't know.  I saw it yesterday, but
23  I don't see it here.  Let's take a look.
24         MR. PATTERSON:  It's 8 or 9.

1         THE WITNESS:  8 would be the best --
2  yeah, because 8 on Page 2 talks about a
3  sampling by area.
4  BY MS. KEEN:
5     Q.   Were there any documents you looked at
6  yesterday that I haven't provided you with?
7     A.   No.  This -- yeah, there was one.
8  There was one.  It had some RD numbers and by
9  area.
10         MS. KEEN:  Do you remember what Bates
11  number that is?
12         MR. PATTERSON:  Let me try to find it.
13         THE WITNESS:  It would have been in
14  the smaller notebook.
15         MS. KEEN:  Let's go off the record.
16              (WHEREUPON, a discussion was held
17              off the Record.)
18  BY MS. KEEN:
19    Q.   I guess in the meantime, I can ask you
20  about Exhibit 8 and Exhibit 9.
21         So, Exhibit 9 was one of the
22  memos summarizing your sampling?
23    A.   Okay.
24    Q.   Is that right?

1     A.   That's correct.
2     Q.   Okay.  When you said that in Page 2
3  that the Detective Division Violent Crimes Unit
4  needs to both improve its file maintenance
5  procedures and upgrade the quality of written
6  Major Incident Worksheets and memoranda, what
7  did you mean by upgrade the quality of written
8  Major Incident Worksheets and memoranda?
9     A.   I thought they were not as
10  professionally written as they should be.
11  Sometimes they used slang, sometimes there was
12  a character assassination of victim or
13  offender.
14         It was almost street vernacular
15  sometimes.  Other times it was professionally
16  done, but it wasn't as well done or
17  professional as it should be.
18    Q.   Okay.  And based on a review of your
19  memo, it appears that you determined that there
20  were discrepancies wherein information in the
21  unit file of a particular area was not also
22  contained in the Records Division file for that
23  case, correct?
24    A.   Correct.

1     Q.   Okay.  And then --
2         MS. KEEN:  Did you find the --
3         MR. PATTERSON:  I think the only thing
4  that we haven't seen so far, I think, is the
5  Special Orders.
6         MS. KEEN:  Is that what you were you
7  talking about?
8         THE WITNESS:  No.  There's a document
9  that I looked at yesterday.  I probably have
10  it.  Not with me unfortunately.  I'll let you
11  know if I can't find it.  And, I mean, I'll
12  bring it.
13         MR. PATTERSON:  Let's not get into it
14  on the record.  Maybe we'll take a short break.
15  You can describe it if it's not coming to mind.
16         THE WITNESS:  Okay.
17  BY MS. KEEN:
18    Q.   So, as a result of your sampling --
19  well, it seems, like, you were doing sampling
20  not all in one fell swoop, but you were sort of
21  doing it over the span of multiple days; is
22  that right?
23    A.   Multiple days, but not seven days.  It
24  was more of a rush, two or three days.

1  Q.   And then what happened after you were
2  done with the sampling?  Who did you talk to
3  about it?
4  A.   The Chief of Detectives.
5  Q.   Did you talk to anyone higher than the
6  Chief of Detectives in the Bureau of
7  Investigative Services?
8  A.   I don't know if the deputy was
9  present.  Again, this is fact-finding.
10  Q.   You were doing fact-finding?
11  A.   Right.  Of our existing practices and
12  realizing that not everyone not only doesn't
13  call them by the same names, but there's
14  different levels of quality of report writing.
15  Q.   When you reported your findings to the
16  Chief of Detectives, was he concerned by what
17  you were telling him with regard to the
18  discrepancies between the files?
19       MR. PATTERSON:  Objection as to
20  testifying to someone else's knowledge.
21       THE WITNESS:  The department was
22  concerned, so therefore he was.
23  BY MS. KEEN:
24  Q.   What makes you think the department

1  was concerned?
2  A.   By the number of meetings, the
3  high-level nature of the meetings, involvement
4  of Department of Law.
5  Q.   How did the Department of Law get
6  involved?
7  A.   They represent the City in temporary
8  retraining orders.  The hiring of special
9  outside counsel.  Hopkins & Sutter on Madison
10  Street.
11  Q.   How many meetings would you say in the
12  spring, you know, from January until -- or
13  strike that.
14       How many meetings would you say
15  you had in '82 and '83 with command staff about
16  the working files issue?
17  A.   I don't know.  Many.
18  Q.   More than 10?
19  A.   Yes.
20  Q.   More than 50?
21  A.   Probably not.
22  Q.   25?
23  A.   On different days, 25 different days,
24  the topic was certainly discussed.

1  Q.   And at all of these meetings, it
2  always with the Chief of the Detective
3  Division?
4  A.   If he wasn't present, he was involved;
5  met with our legal affairs from the Chicago
6  Police Department, met with Department of Law
7  counsel, met with outside.  This had our full
8  attention.
9  Q.   It was a big deal?
10  A.   Yes.
11  Q.   Was there any attempt to look outside
12  the Detective Division and figure out whether
13  you had a department-wide problem, or was
14  everyone really just looking only at the
15  Detective Division?  And by Detective Division,
16  I'm including Bomb & Arson.
17       MR. PATTERSON:  Objection, compound.
18       MS. KEEN:  Let me re-ask that.
19  BY MS. KEEN:
20  Q.   Did the department make any effort to
21  look at whether they had a working files
22  problem outside of the Detective Division?
23  A.   No.  The issue was brought to us
24  framed in terms of a Detective Division issue.

1  And I raised it, but frankly it remained a
2  Detective Division level problem.
3  Q.   When you say you raised it, what do
4  you mean?
5  A.   At one point in one of these memos, I
6  said perhaps our Research and Development and
7  Auditing Internal Controls Division may get
8  involved or should get involved in the future,
9  because they may have department-wide
10  implications.
11  Q.   So, you were concerned that the street
12  files practice was not limited to the Detective
13  Division folks; is that correct?
14  A.   No.  But I realized that we have so
15  many people, so many units writing reports.  I
16  think I was as much concerned about our Records
17  Division practices, you know, shouldn't there
18  be a more whole statistic.
19       And then you realize it's a
20  difficult topic to put -- it's certainly a
21  challenge to put everything in one filing
22  cabinet.
23  Q.   When you conveyed this idea that maybe
24  we should look at the whole department or maybe

1  there is department-wide ramifications of these
2  practices, what response did you receive from
3  the higher ups?
4      A.   I don't remember any response to it.
5  But after all is said and done, I was a
6  detective working in the Detective Division.  I
7  worked on that which we could resolve.
8      Q.   Okay.  So, the teletype comes out.  Is
9  the teletype the first official directive to
10  police employees regarding the working files?
11     A.   Yes, it is.  That goes out in the name
12 of the superintendant.  We directed from the
13 police department, yes.
14     Q.   And it's sent to supervisor, correct?
15 That's the To line.
16     A.   I'd have to look at it.
17          MR. PATTERSON:  Exhibit 4.
18          THE WITNESS:  Oh, I see.
19 BY MS. KEEN:
20     Q.   So I was looking at the teletype, and
21 it says To: Supervisor.
22     A.   Right.  I can explain that.
23               Given the technology of the
24 era --

1      Q.   Oh, I get it.  It was the supervisor
2  at the teletype room?
3      A.   Right.
4      Q.   So, it's actually addressed to all the
5  commanding officers?
6      A.   Correct.
7      Q.   And who were the commanding officers
8  this was directed to?
9      A.   Officers are all those unit commanding
10 officers.  It's rather vague in general.  It
11 means to everyone.
12     Q.   Department-wide?
13     A.   It does.  It does say that.
14     Q.   So, this teletype went to all the
15 supervisors in the entire Chicago Police
16 Department?
17     A.   The teletype was state of art.  It was
18 our best and fastest means to get a message to
19 all units in the police department.  There was
20 a teletype machine in every unit in the police
21 department.  And we didn't have e-mail, we
22 didn't have fax machines.  This was the way.
23     Q.   So, this went to all supervisors in
24 the whole department?

1      A.   It did.  Yes, it did.
2      Q.   Then following the teletype is when
3  Hinchy sent a reinforcing memo to the Special
4  Activities Group?
5      A.   Correct.
6      Q.   We looked at that, Exhibit 5?
7      A.   Yes, ma'am.
8                    (WHEREUPON, Deposition Exhibit
9                    No. 15 was marked for
10                   identification.)
11 BY MS. KEEN:
12     Q.   Now, take a look at Exhibit 15.  This
13 is Detective Division Notice 82-2.
14          Oh, you know, I looked at the
15 date on here actually.
16     A.   Yeah, the day before.
17     Q.   And this looks like it came out the
18 day before the teletype; is that right?
19     A.   That is correct.
20     Q.   In any event, this was the first --
21 so, this was actually the first written
22 directive on the subject of working files?
23     A.   Right.  But as the title document
24 tells us, it goes to the Detective Division.

1      Q.   Right.  It didn't go to anyone besides
2  the Detective Division?
3      A.   Right.
4      Q.   So, 82-2, would you say it created an
5  official term called Unit Investigative File?
6      A.   It says it defines it and it does.
7  Yes, it does.
8      Q.   Okay.  And it sounds like the thrust
9  of the order is that all Unit Investigative
10 Files that currently exist had to be preserved
11 intact, correct?
12     A.   Yes.
13     Q.   And it then said that it was the
14 Detective Division Unit supervisor's
15 responsibility to monitor the removal,
16 destruction or alteration of any such files,
17 correct?
18     A.   Correct.
19     Q.   There was nothing in 82-2 that
20 required detectives to keep notes that were not
21 in the unit files, correct?
22     A.   Correct.
23     Q.   And it also did not at this time
24 require detectives to submit their notes for

1 inclusion in the Unit Investigative File,

2 correct?

3     A.    Correct.

4     Q.    What was -- did you do any sampling --

5 I know I asked you this before, but having now

6 looked at the date of this Special Order 82-2,

7 did you do any -- strike that.

8           Did the City do any sampling or

9 auditing of any kind regarding contents of

10 files after 82-2 was issued?

11     A.    Nothing that I'm aware of from the

12 Chief of Detectives.  Individual commanders may

13 have.

14     Q.    If they did, it was of their own

15 volition, correct?

16     A.    Correct.

17     Q.    Following the issuance of 82-2, you

18 have some memoranda coming in, some various

19 folks about the working files issue, correct?

20     A.    Correct.

21     Q.    So, if you would, sir, turn to

22 Exhibit 6, again.  Exhibit 6, I think, is a

23 two-page document, correct?

24     A.    Yes, it is.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052352

1     Q.    2455 to 2456.

2           Here you have Commander Stibich

3 who ran Area 3 Detective Division providing

4 memorandum on working files, correct?

5     A.    Correct.

6     Q.    Now, it says that working files are

7 useful for a number of reasons, right?

8     A.    Yes.

9     Q.    Do you agree with Commander Stibich

10 that working files were useful for the purposes

11 of inner-office correspondence?

12     A.    Yes.

13     Q.    Did you agree that working files were

14 useful as a form for different detectives to

15 give their representative viewpoints, opinions,

16 conjectures, suppositions, and "gut feelings"

17 regarding a specific investigation?

18     A.    I disagreed with him.

19     Q.    So, you disagreed in your experience

20 using working files as a homicide detective,

21 correct?

22     A.    I disagreed as to whether it should be

23 a forum.  I mean, this is not a chat room.

24 This is not an early chat room.  This is --

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052353

1     Q.    I understand your point, and I get it.

2 Let me clarify.

3           You agree with him that it was at

4 least in some cases used as such a forum even

5 though you may disagree that it should have

6 been used as a forum; fair to say?

7     A.    Fair.

8     Q.    And you also agree with Stibich that

9 working files were being used to document the

10 credibility of witnesses and/or suspects?

11     A.    Yes.  Sometimes there was evaluations,

12 assessments again of who they thought to be

13 more credible than others.

14     Q.    Now, it also says that working files

15 were useful as a means of eliminating witnesses

16 and/or suspects.  Do you see that?  This is on

17 Page 2.

18     A.    Yes, I do.

19     Q.    And you agree with Stibich's

20 assessment?

21          MR. PATTERSON:  I'm just quickly going

22 to lodge an objection to the form of the

23 question, you agree.

24              If you're asking if the witness

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052354

1 agrees, I'm assuming that is in his individual

2 capacity, not as the Chicago Police Department.

3          MS. KEEN:  Well, I guess as to that

4 question, I will rephrase it.  I didn't hear an

5 objection to the preceding question.

6          MR. PATTERSON:  No, that's fine.

7 BY MS. KEEN:

8     Q.    Staying in your corporate capacity as

9 a 30(b)(6) representative, is it your

10 understanding that one use of working files was

11 as a means of eliminating witnesses and/or

12 suspects?

13     A.    It sometimes was used as that.  And I

14 thought it should not have been, that more

15 substantive investigations, part of the

16 investigations, even if it led to a dead end,

17 should be part of the investigation story.

18     Q.    Should be in the supp report?

19     A.    Yes.

20     Q.    Okay.  Understood.

21          So, talking about what working

22 files are being used for, they were also being

23 used as a listing of leads undertaken,

24 sometimes false, correct?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052355

1     A.   Correct.

2     Q.   We've talked about that.

3     I mean, is there -- sorry.

4     We're were working files -- is it

5 your understanding, as well as Stibich's, as he

6 has in his memo here, that working files would

7 contain a listing of information, which later

8 proved to be erroneous or was given to

9 detectives for self-serving purposes?

10     MR. KIVETZ:  I want to interject here,

11 and I apologize.  But I just want to make sure

12 that we're still staying in his corporate

13 capacity.

14     MS. KEEN:  Yes.

15     MR. KIVETZ:  Because you've gone now

16 back and forth.  So, I wanted to make sure.

17 So, these questions that are continuing forward

18 are solely to his corporate capacity; is that

19 correct?

20     MS. KEEN:  Yeah.  I'm saying what's

21 his position.

22 BY MS. KEEN:

23     Q.   Is that accurate, what Stibich wrote

24 in this memo?  I can ask it that way.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052356

---

1     A.   It was my observations.  I did not see

2 a lot of this.  I saw some of this.

3 Information that later proves to be erroneous

4 can be disproven through a second supplementary

5 report.

6     Q.   So, I think where we're getting caught

7 up is in what should have been done versus what

8 was being done.

9     I understand your position that

10 supplementary reports were, in your view and

11 the City's policy, the appropriate place for

12 these kinds of things; in other words, leads,

13 opinions, and things to be memorialized,

14 correct?

15     A.   Correct.

16     Q.   I'm asking you something different,

17 which is, Stibich makes a statement here that

18 working files were used or could be used for,

19 among other things, containing a listing of

20 information which later proves to be erroneous

21 or was given to detectives for self-serving

22 purposes.

23     Do you dispute that statement in

24 Stibich's memo or do you accept it as true?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052357

---

1     MR. PATTERSON:  In your corporate

2 capacity, correct?

3     THE WITNESS:  It sometimes was used

4 for this purpose.  I think overall that this

5 listing, this entire listing gives the

6 misimpression of the extent to which these

7 memos were being prepared.

8     I mean, it suggests that there

9 was a lot of them on every case.  And it's

10 simply not the case.

11 BY MS. KEEN:

12     Q.   Well, then to be fair, the best person

13 to know how often working files was being used

14 would have been the commander of that area,

15 correct?

16     A.   Correct.

17     Q.   And someone from a different area or

18 from another office altogether would be more

19 removed from the day-to-day filing and report

20 writing practices of that area; fair to say?

21     A.   That is fair.

22     Q.   Now, I mean, this memo to me suggests

23 that the practice of working files in the area,

24 or at least some of the areas, was somewhat

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052358

---

1 entrenched; do you agree?

2     A.   It was a citywide practice and it was

3 used on a regular basis.  Entrenched -- there

4 are probably some who just didn't write

5 anything, just only wrote supps, just their

6 personal notes and supps.  That's it.

7     Q.   So, was there some pushback or

8 resistance to 82-2 after it got issued?

9     MR. PATTERSON:  Objection, vague.

10     MS. KEEN:  Let me be more specific.

11 BY MS. KEEN:

12     Q.   Did anyone from the commander all the

13 way down to the street detective vocalize

14 displeasure with the thrust of the 82-2 Special

15 Order?

16     A.   I think the intent of the preservation

17 order was understood.  You know, preserve.

18 It's pretty clear.  Keep intact.  It's pretty

19 clear.

20     I think where the questions came

21 were in the follow-up.  You don't mean my

22 notes?  That's my personal property.  And it

23 was a genuine misunderstanding of whether or

24 not notes should be included.  But as far as

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052359

1  memoranda, like Laverty's, everybody knew what
2  that was.
3      Q.   So, I guess what I'm saying is, it's
4  sounds like the requirement was clear, but was
5  there resistance to it?  In other words, was
6  there this expression of I don't like having to
7  preserve these documents?
8      A.   It was discussed at all of the coffee
9  tables.  It was the subject of staff meetings.
10  It was the subject of roll call training.  I'm
11  sure there were some who voiced their opinions,
12  but it matters not.  This was a decision of the
13  court.
14     Q.   So, why was 83-1 promulgated despite
15  the fact that 82-2 had come out?  How did that
16  83-1 come about?
17     A.   83-1 is a better document.  It
18  explains procedures.  It is a step-by-step
19  process as to how we were going to implement
20  our new policy expressed by the superintendent
21  which said we were going to save all of our
22  notes.
23          The 82-2 was not very workable.
24  One common control log book was signed every

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052360

1  time you took a file in and out.
2      Q.   So, how did -- so, what were the
3  requirements -- actually, hold on.  Let's take
4  a break.
5              (WHEREUPON, a short break was
6               taken.)
7  BY MS. KEEN:
8      Q.   We were on Exhibit 8, I believe.  So,
9  there's a paragraph here about this Major
10  Incident Worksheets.
11     A.   Yes.
12     Q.   At this point in time, was the actual
13  Major Incident Worksheet form being used?
14     A.   Yes.
15     Q.   It states that it contains a lot of
16  information -- or strike that.
17          It states that it contains
18  remarks which could "well serve to undermine
19  the prosecution of the case."  Do you see that?
20     A.   Yes, I do.
21     Q.   Can you explain what you meant by
22  that?
23     A.   I said the form, the Major Incident
24  Worksheet, 8.5-by-11 on page -- on the front

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052361

1  side of it is nothing but boxes to be filled in
2  of information, most frequently asked types of
3  information.
4          On the back side we would take a
5  typewriter, roll it in our typewriter and type
6  up a brief summary.  I went to the crime scene,
7  the victim was gone.  She was taken to the
8  hospital.  Can't talk to her.  She's
9  unconscious.  She looks bad.  By the way, I
10  pulled her rap sheet.  She looks like a whore.
11          You know, whatever it might be.
12  I mean, provide the information, but in a
13  somewhat callous manner, unprofessional.
14     Q.   On the back of a Major Incident
15  Worksheets?
16     A.   Yes.
17     Q.   And that's something you observed when
18  you were doing the sampling?
19     A.   It's some of the cases.
20     Q.   So, 83-1, again, it covered everybody
21  within the Detective Division, correct?
22     A.   Correct.
23     Q.   And did anyone outside of the
24  Detective Division receive -- or strike that.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052362

1          Was anyone outside of the
2  Detective Division governed by 83-1?
3      A.   No.
4      Q.   Were there any comparable orders for
5  outside of the Detective Division that has the
6  same thrust as 83-1?
7      A.   No.
8      Q.   83-1 covered Bomb & Arson as of
9  January 13, 1983, correct?
10     A.   Correct.
11     Q.   I had a couple of questions about it.
12          It adds in some requirements that
13  82-2 did not have, correct?
14     A.   There's a couple differences.
15          MR. PATTERSON:  Roshna, have you
16  passed out 83-1?
17          MS. KEEN:  Oh, sorry.  No.
18              (WHEREUPON, Deposition Exhibit
19               No. 16 was marked for
20               identification.)
21  BY MS. KEEN:
22     Q.   Exhibit 16 is Plaintiff's 2472 to
23  2476.  One thing that 83-1 does is it actually
24  explains why it's relevant and so important to

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779  cmsreporters@comcast.net

DAY 052363

1  preserve all information obtained in the course
2  of a Violent Crime Field Investigation,
3  correct?
4       A.  Correct.
5       Q.  And I don't believe that was in 82-2,
6  correct?
7       A.  Oh, no.  No, it was not.
8       Q.  Another thing it does is it actually
9  creates an affirmative requirement to submit
10 handwritten notes, correct?
11      A.  Correct.
12      Q.  And that is a new requirement that was
13 not present in 82-2?
14      A.  Right.  82-2 was to implement -- to
15 make sure that we were implementing and doing
16 what we could so the temporary restraining
17 order would be respected.
18      Q.  Got you.
19      A.  I mean, it was a quick and dirty
20 document.
21      Q.  Right.
22      A.  But it came out quickly.
23      Q.  Okay.  So, who is the unit commanding
24 officer that puts responsibility for file

1  keeping and maintenance of the investigative
2  file basically on the commanding officer?
3       A.  Where are you referring?
4       Q.  If you go to Plaintiff 2475,
5  Subsection VC.  I mean, Roman Numeral V,
6  Subsection C.
7       A.  Right.  That's the lieutenant in
8  charge of the Violent Crimes Unit.
9       Q.  The lieutenant?
10      A.  Right.
11      Q.  And then if you flip back to the
12 preceding page, it says supervisors were
13 required to ensure that an Investigative File
14 Case Folder was initiated for each violent
15 crime investigation which culminated with the
16 arrest of the offender and the approval of
17 felony charges, correct?
18      A.  Where are you in this?
19      Q.  Roman Numeral V, Subsection A(2).
20      A.  Okay.  That is correct.
21      Q.  And why was that responsibility placed
22 with the supervisor?
23      A.  They wanted to make sure that any of
24 these cases that are going the felony route

1  have one prepared even if there wasn't one
2  prepared earlier.  So, just assigning
3  accountability for this clerical function.
4       Q.  Okay.  In Subsection 4 of that same
5  section, it talks about cases where there is no
6  Investigative File Case Folder.
7       A.  Right.
8       Q.  Can you just explain briefly why you
9  would have someone submitting a supplementary
10 report where there was no Investigative File
11 Case Folder?
12      A.  Sure.  These are the lesser crimes.
13 It might be a simple battery.  And it's
14 certainly not being worked on by all three
15 watches.  It's a minor investigation.
16      Q.  Okay.  So, you would expect if
17 Bomb & Arson was working on an arson
18 investigation wherein the fire had caused
19 multiple deaths, that based on 83-1, an
20 Investigative File Case Folder would have been
21 initiated?
22      A.  Yes.
23      Q.  Immediately, correct?
24      A.  Correct.

1            (WHEREUPON, Deposition Exhibit
2             No. 17 was marked for
3             identification.)
4  BY MS. KEEN:
5       Q.  Okay.  Now, I'm going to ask you about
6  83-2, because it looks like almost five months
7  later, you revised 83-1, correct?
8       A.  The Chief of Detectives issued a new
9  one, and I drafted it, correct.
10      Q.  Okay.  Right.  So, here, sir, is
11 Exhibit 17.  So, 17 is CITY-KLUP 3149 through
12 3153.  Can you tell me -- strike that.
13           What was your understanding as to
14 why a revised special order was being
15 requested?
16      A.  Tighten up on the procedures and
17 actually improve it where possible.
18      Q.  What feedback was the Chief of
19 Detectives getting after 83-1 was issued
20 regarding compliance with that Special Order?
21      A.  I don't know all the feedback he got,
22 but one of the improvements was the
23 introduction of the 2K instructions for the --
24 the introduction of the Investigative File

1  Control Card.

2          It's really nothing more than a

3  fancy library card.  It allowed for the removal

4  of these investigative files while still

5  maintaining some accountability for them.

6      Q.  Whose idea was this control card?

7      A.  I don't know who actually came up with

8  it, but i designed the form.

9      Q.  It's fair to say that some feedback

10  was getting to the Chief following issuance of

11  83-1 that caused him to believe that a perhaps

12  more strict or at least revised special order

13  was warranted; is that correct?

14      A.  Stronger.  At this time, there's a lot

15  of communication going on between the

16  Department of Law, the outside counsel and the

17  Plaintiff's Counsel, and there was a lot of

18  communication.

19          And, okay, we can do this, we can

20  do that.  We weren't trying to duck it.  We're

21  trying to tighten it and make it better.

22      Q.  Right.  And that's why I was asking

23  because it seems like -- what I wanted to know

24  was, was there a determination by the higher

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052368

---

1  ups that 83-1 didn't go far enough, and that's

2  why we needed to add some provisions in 83-2?

3      A.  No.  I think it's more tweaking.

4      Q.  Sir, there was some substantive

5  changes in 83-2, and I want to ask you about

6  that.

7          One is -- if you go to Page 3 of

8  the document, under Subsection Roman Numeral

9  VB(1).

10      A.  Yes.  We seem to have inserted a new

11  one, a new No. 1.

12      Q.  Yeah.  And it actually requires

13  detectives to create records reflecting all

14  relevant information, correct?

15      A.  To take and maintain complete notes of

16  all relevant --

17      Q.  Where are you?

18      A.  Second Line, No. 1.

19      Q.  Right.

20      A.  Take and maintain complete notes of

21  all relevant matters.

22      Q.  And earlier in that section, it says

23  "record and preserve all relevant information

24  as fully and accurately as possible."

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052369

---

1          Do you see that?

2      A.  Yes.

3      Q.  So, was the intent of this order to

4  actually mandate that detectives start taking

5  and creating notes that reflected relevant

6  information they were gathering in the course

7  of their investigation?

8      A.  I don't think the emphasis was on

9  creating more notes.

10      Q.  It was to create documents that

11  reflected the relevant information they were

12  gathering, whether it be in a note or in

13  another document, correct?

14          MR. PATTERSON:  Take your time.  Read

15  the whole paragraph.

16          THE WITNESS:  Roman Numeral VB(1) is a

17  new statement that was not in 83-1.

18  BY MS. KEEN:

19      Q.  And what did Roman Numeral VB(1) mean?

20      A.  It says -- I can read it.

21      Q.  Yeah.

22      A.  Detectives are required to, record and

23  preserve all relevant information as fully and

24  accurately as possibly -- possible.  It's

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052370

---

1  misspelled, mistyped.

2          Take and maintain complete notes

3  of all relevant matters during the course of

4  their investigation.  This requirement is

5  intended to serve the purposes of department

6  directives to assure that only -- to assure

7  something only that information and materials

8  indicating -- not only.  That's the word.

9  That's the word.  Okay.

10          To assure not only that

11  information and materials indicating the

12  possible guilt of the accused are preserved,

13  but also that the accused may ultimately be

14  granted access to any information and materials

15  that may tend to show his possible innocence or

16  aid in his defense.

17      Q.  So, the one purpose of Special Order

18  83-2 was to create this new affirmative

19  requirement to create records containing

20  relevant information?

21          MR. PATTERSON:  Objection, asked and

22  answered.

23          THE WITNESS:  I would say that this

24  language was suggested to us by someone,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052371

1   whether it be legal counsel, or whoever, I
2   don't know.  But we put it in there.
3   BY MS. KEEN:
4       Q.  And this went out, right?  83-2
5   actually was issued?
6       A.  Absolutely.
7       Q.  And it governed all members of the
8   Detective Division as of May 2nd, 1983,
9   correct?
10      A.  Correct.
11      Q.  There's another paragraph I wanted to
12  ask you about on the next page.  And it says on
13  Paragraph 6, "Any detective who has or receives
14  information relating to a Violent Crimes field
15  investigation not assigned to him will properly
16  forward the information to the assigned
17  detective for investigation and inclusion in
18  the Investigative File Case Folder."
19          Do you see that?
20      A.  I do.
21      Q.  Why was that paragraph necessary?
22      A.  It reinforces our longstanding, but
23  unwritten policy that everyone has an
24  obligation to pass on information.

---

1           I mean, it's not just one person.
2   We are all part of this team called the Chicago
3   Police Department.
4       Q.  I mean, would it happen at times that
5   a detective working a case would obtain
6   information that could have been relevant to
7   another case?
8       A.  I would be surprised if it didn't.
9       Q.  So, based on your experience and
10  knowledge of how things worked in the
11  department, that happened, right, where
12  detectives would work a case and learn
13  something about another case, correct?
14      A.  Certainly.  I'm investigating a
15  violent crime and someone wants to tell me
16  about a narcotics.  Thank you.
17      Q.  Or, how about I'm investigating a
18  crime, the person I suspect may have done this
19  other crime that Detective Joe over there is
20  investigating?
21      A.  Sure.
22      Q.  Did that scenario happen?
23          MR. PATTERSON:  Objection, incomplete
24  hypothetical.

---

1   BY MS. KEEN:
2       Q.  Well, anyway, I think you answered
3   that question.
4           Was this Paragraph No. 6 designed
5   to obligate detectives in that scenario to
6   disclose information they learned in their
7   investigation to the detective assigned to the
8   investigation about which of that information
9   was relevant?
10          MR. PATTERSON:  Objection, vague.
11          THE WITNESS:  I'll answer it.  And
12  I'll say all detectives have the
13  responsibility, even though they're not
14  assigned to a particular case, to forward
15  information that they have received.
16  BY MS. KEEN:
17      Q.  Now, even though this says Violent
18  Crimes Field Investigation, were Bomb & Arson
19  detectives governed by this requirement that if
20  a Bomb & Arson detective obtained information
21  in the course of his Bomb & Arson investigation
22  that was relevant to another Bomb & Arson
23  investigation, that the first Bomb & Arson
24  detective would have to disclose that

---

1   information to the detective assigned to the
2   other investigation?
3           MR. PATTERSON:  Objection, form.
4           MS. KEEN:  Let me re-ask because
5   that's an important question.
6   BY MS. KEEN:
7       Q.  Just extrapolating from what you said
8   a moment ago.
9           If a Bomb & Arson detective
10  received information that related to a
11  Bomb & Arson investigation that another
12  detective was assigned to, was the first
13  Bomb & Arson detective obligated under Special
14  Order 83-2 to turn that information over to the
15  detective assigned to the Bomb & Arson
16  investigation?
17      A.  Yes.
18      Q.  Was the first Bomb & Arson
19  investigator, in other words, the one who
20  received the information, required to create a
21  document memorializing the information he had
22  learned for purposes of providing it to the
23  detective assigned to the case?
24      A.  I believe he could use his discretion

1 and simply communicate that to the individual.

2 Q. Now, when the receiving detective got

3 the information, in other words, the detective

4 assigned to that Bomb & Arson investigation,

5 when that assigned detective got the

6 information, was he obligated to put that

7 information if it was relevant into a

8 supplementary report pursuant to Special Order

9 83-2?

10 A. Yes, if it was relevant. He may have

11 already disproved that information.

12 Yeah. Thanks. We already

13 checked that out. Thank you very much.

14 Q. Okay.

15 A. So, at that point, there's no need to

16 document.

17 Q. Although, in the vain of eliminating

18 possible suspects and running down leads, was

19 it the policy of the department to require

20 eliminated suspects to be identified in supp

21 reports?

22 A. It was not.

23 Q. As of 83-2?

24 A. If a suspect was seriously considered

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052376

1 and was ruled out through investigative

2 activity, there should be some mention of it.

3 Q. In the supp report?

4 A. Correct.

5 Q. Okay. Does 83-2 say anything about

6 what's supposed to go into a supplementary

7 report?

8 MR. PATTERSON: Why don't you review

9 it.

10 THE WITNESS: No, it does not. It

11 talks about placing it in the Investigative

12 Case Folder.

13 BY MS. KEEN:

14 Q. Given that the department was aware

15 that information of substance about cases

16 wasn't going into supplementary reports prior

17 to the temporary restraining order, why didn't

18 the department prepare a special order that

19 told detectives to start putting that

20 information in their supplementary reports if

21 they weren't already doing so?

22 A. I'm sorry. My mind is starting to

23 wander. Can you repeat that.

24 MS. KEEN: Can you just read that

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052377

1 back.

2 (WHEREUPON, said Record was read

3 as requested.)

4 THE WITNESS: Not every bit of

5 information merits inclusion in the

6 supplementary report. Otherwise, it would be a

7 recording.

8 The detectives have discretion to

9 put down the most relevant parts of their

10 investigation.

11 BY MS. KEEN:

12 Q. And I understand and I accept actually

13 the premise that the average run of the mill

14 detective was doing his best to record

15 information, you know, in an accurate and

16 comprehensive way.

17 I'm talking about the scenarios

18 that you saw that you testified about at the

19 Palmer hearing wherein some detectives weren't

20 putting information of substance, or important

21 information in the supp report.

22 And my question to you is given

23 that the department is aware that that was

24 happening, and they have this Palmer litigation

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052378

1 and they're revising their Special Orders, why

2 didn't they create some written directive that

3 said you got to put all this information into

4 your supp reports? You can't keep leaving it

5 out.

6 MR. PATTERSON: Objection, asked and

7 answered, form.

8 THE WITNESS: You know, sometimes

9 there were competing needs. One of the reasons

10 detectives use the back side of a Major

11 Incident Worksheet to describe the narrative is

12 because the supervisor is telling him to go

13 home because it's overtime.

14 And writing a supplementary

15 report takes longer than cranking out a one

16 paragraph synopsis. And you come into work two

17 days after your days off and you kind of go,

18 well, it wasn't so important.

19 BY MS. KEEN:

20 Q. So, the department felt that it would

21 be too overinclusive or onerous to create a

22 special order requiring -- ensuring that there

23 weren't these gaps in the supplementary

24 reports?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052379

1    A.   I don't know why we didn't hammer home
2    writing more supplementary reports.  But to
3    have a supplementary report requirement for
4    every day you work on every case, you're going
5    to get a lot of saw nothing, it rained a lot,
6    and no one was home.
7        Q.   What about just saying a supplementary
8    report has to contain all relevant
9    information that's pertinent to the --
10       A.   We have that.
11       Q.   So, where is that?  What's that order?
12       A.   If you have additional information,
13   it's not an order.  That's the purpose of a
14   supplementary report.  If you have something
15   important, relevant to add to the
16   investigation, please share it.
17       Q.   Were there any changes from 1983,
18   January, onwards -- or strike that.
19            Were there any changes from
20   January, 1982, onwards to any of the written
21   orders that dealt in whole or in part with
22   supplementary reports?
23       A.   I'm not aware of any.
24       Q.   Okay.  Can I ask you one last

---

1    question.
2            This one document because it's
3    related, and I just don't want to -- this is a
4    previously marked Exhibit 13 so you have it.
5    It should be pretty quick.
6            Take a minute and let me know
7    when you're done?
8        A.   I know what this is.
9        Q.   What is this document?
10       A.   This is simply a memo from the Chief
11   of Detectives to the deputy chiefs and exempt
12   members of the Detective Division and to the
13   unit commanding officers of the Detective
14   Division on the subject of investigative files
15   and telling them there's a new order out and
16   the order applies to Violent Crime Field
17   Investigation, but also to all nonviolent
18   felony crimes assigned to field investigation.
19            In other words, a major safe
20   burglary, s-a-f-e, a property crime, a credit
21   card, a major one that's going to result in
22   felony charges -- or, excuse me, a field
23   investigation.
24       Q.   Because it specifically says

---

1    Bomb & Arson Section in there, I was wondering
2    if that was a change from the scope of 83-1?
3        A.   No.  I'll tell you why.  In another
4    document here, Bomb & Arson was specifically
5    brought in for the January, 1983 training.  So,
6    I thought the same thing when I looked at it.
7    And I said, oh, no, they were part of the
8    training originally.  So, they were part of
9    this from the beginning.
10       Q.   So, did this apply -- well, did this
11   apply to the Organized Crime Unit?
12       A.   No, it does not.
13       Q.   It then says a separate directive for
14   nonviolent felony crimes assigned to a field
15   investigation that's forthcoming.  What does
16   that mean?
17       A.   I don't know.  For nonviolent -- I
18   don't know.
19       Q.   Are you aware of a separate directive
20   for Bomb & Arson and other nonviolent felony
21   crimes regarding the subject of an
22   investigative files?
23       A.   No, I'm not.
24       MS. KEEN:  Okay.  I think we're going

---

1    to conclude now.
2            (Whereupon, the deposition was
3            concluded to July 31, 2014.)
4            -0-o-0-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

245

```
 1  STATE OF ILLINOIS  )
 2                     )  SS:
 3  COUNTY OF C O O K  )
 4            The within and foregoing deposition
 5  of the aforementioned witness was taken before
 6  Jamye Giamarusti, C.S.R, at the place, date and
 7  time aforementioned.
 8            There were present during the taking
 9  of the deposition the previously named counsel.
10            The said witness was first duly sworn
11  and was then examined upon oral interrogatories;
12  the questions and answers were reported in
13  shorthand by the undersigned and transcribed
14  via computer-aided transcription.
15            The within and foregoing is a true,
16  accurate and complete record of all of the
17  questions asked of and answers made by the
18  aforementioned witness at the time and place
19  hereinabove referred to.
20            The signature of the witness was not
21  waived and the deposition was submitted
22  pursuant to Rules 207 and 211 (d) of the Rules
23  of the Supreme Court of Illinois to the
24  deponent per copy of the attached letter.
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052384

246

```
 1            The undersigned is not interested in
 2  the within case, nor of kin or counsel to any
 3  of the parties.
 4            Witness my official signature in and
 5  for Cook County, Illinois on this September 2,
 6  2014.
 7
 8            Jamye Giamarusti
 9            Jamye Giamarusti
10            C.S.R. No. 084.004183
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

DAY 052385