**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ARNOLD DAY,                              )
                                         )
    Plaintiff,                       )         Case No. 19-cv-7286
                                         )
    v.                               )         Hon. Sara L. Ellis
                                         )         District Judge
KENNETH BOUDREAU, *et al.*,              )
                                         )         Magistrate Judge Jeffrey Cummings
    Defendants.                      )

# Exhibit 157

1

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

HON. SARA L. ELLIS DISTRICT JUDGE

MAGISTRATE JUDGE JEFFREY CUMMINGS

CASE NO. 19-CV-7286

ARNOLD DAY,

Plaintiff

V.

KENNETH BOUDREAU, ET AL.,

Defendants

DEPONENT:  TENNELLE JONES

DATE:      SEPTEMBER 29, 2022

REPORTER:  SYDNEY LITTLE

2

```
 1                    APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, ARNOLD DAY:
 4   Heather Lewis Donnell, Esquire
 5   Loevy & Loevy
 6   311 North Aberdeen Street
 7   Third Floor
 8   Chicago, Illinois 60607
 9   Telephone No.: (312) 243-5900
10   E-mail: heather@loevy.com
11
12   ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, WILLIAM
13   FOLEY, JUDE EVANS, MICHAEL KILL, DAN MCWEENY, JAMES
14   BRENNAN, ANTHONY WATSON, MARTY RADTKE:
15   Andrew Grill, Esquire
16   Brittany Johnson-Delgado, Esquire
17   Rock Fusco & Connelly, LLC
18   321 North Clark Street
19   Chicago, Illinois 60654
20   Telephone No.: (312) 494-1000
21   E-mail: agrill@rfclaw.com
22          bjohnson@rfclaw.com
23   (Appeared via videoconference)
24
25
```

3

```
 1                APPEARANCES(continued)
 2
 3   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
 4   George Yamin, Esquire
 5   The Sotos Law Firm, P.C.
 6   141 West Jackson Boulevard
 7   Suite 1240A
 8   Chicago, Illinois 60604
 9   Telephone No.: (630) 735-3300
10   E-mail: gyamin@jsotoslaw.com
11   (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                      INDEX
 2
 3                              Page
 4   PROCEEDINGS                   6
 5   DIRECT EXAMINATION MS. DONNELL      7
 6   CROSS EXAMINATION MR. GRILL         48
 7   REDIRECT EXAMINATION MS. DONNELL    152
 8
 9
10
11                    EXHIBITS
12
13                              Page
14   1 - Arrest Report May 16, 1991      21
15       - CITY_DAY 29433
16   2 - Tennelle Jones' Affidavit March 8, 2005  29
17       - DAY005274
18   3 - Tennelle Jones' Affidavit       33
19       February 13, 2009 - DAY000011-000012
20   4 - Tennelle Jones' Arrest Records      128
21
22
23
24
25
```

5

```
 1                   STIPULATION
 2
 3
 4   The deposition of TENNELLE JONES was taken at LOEVY &
 5   LOEVY, 311 NORTH ABERDEEN STREET, THIRD FLOOR, CHICAGO,
 6   ILLINOIS 60607, via videoconference in which all
 7   participants attended remotely, on THURSDAY the 29th day
 8   of SEPTEMBER 2022 at 10:37 a.m.; said deposition was
 9   taken pursuant to the FEDERAL Rules of Civil Procedure.
10   The oath in this matter was sworn remotely pursuant to
11   FRCP 30.
12
13
14   It is agreed that SYDNEY LITTLE, being a Notary Public
15   and Court Reporter for the State of ILLINOIS, may swear
16   the witness and that the reading and signing of the
17   completed transcript by the witness is not waived.
18
19
20
21
22
23
24
25
```

PROCEEDINGS

COURT REPORTER: We are on record. My name is Sydney Little. I'm the videographer and court reporter today. Today is the 29th day of September 2022. The time is 10:37 a.m. We are at the law offices of Loevy & Loevy, 311 North Aberdeen Street, Chicago, Illinois, 60607, to take the deposition of Tennelle Jones, in the matter of Arnold Day versus Kenneth Boudreau, Et Al., pending in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number 19-CV-7286. Will the counsel please identify themselves for the record?

MS. DONNELL: Good morning. Heather Lewis Donnell, and I represent the plaintiff, Mr. Arnold Day.

MR. GRILL: Andrew Grill, I represent the individual police officer Defendants.

MR. YAMIN: And George Yamin, I represent Defendant, City of Chicago.

MS. DONNELL: Also present on the record is Ms. Brittany Johnson, who is also counsel for the individual defendant officers.

COURT REPORTER: Ms. Jones, will you please raise your right hand? Do you solemnly swear or

affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

COURT REPORTER: Thank you. Counsel may begin.

DIRECT EXAMINATION

BY MS. DONNELL:

Q Can you please state and spell your name for the record?

A Tennelle Jones, T-E-N-N-E-L-L-E, last name J-O-N-E-S, Jones.

Q Thank you, Ms. Jones. I'm going to go over some rules, or just procedures for how today's going to proceed. Have you ever been deposed before? Have you ever had to come and sit for a deposition like today?

A No.

Q Okay. So I'm going to ask questions and then you answer to the best of your ability. Courtney [sic] is our court reporter and she's going to take everything down. And so, in order to get a good record, what's important is just if you can wait until I've completed my entire question before you start answering, then we'll get a clean transcript. Does that make sense?

A Yes.

Q And then, you're doing a great job. You have

to give verbal answers because the court reporter has to write down yes, no. She can't transcribe, like, a shake of the head, or an uh-uh or an uh-huh. So if you could just respond with a verbal answer, like yes, no, or your answer, that'll make a clean record, okay?

A Yes.

Q This is important. If you don't understand one of my questions, will you please let me know?

A Yes.

Q And I'm happy to rephrase it or say it again, anything that you need to make sure that you understand what I'm asking, okay?

A Yes.

Q If you need a break, I don't know how long we'll go today. I don't anticipate that my questions will be that long, but I don't know how long the defendants' questions are for you. But we'll take some breaks, but if you ever want a break to get something to drink, go to the bathroom, or just need a break, you let me know, and we can take a break, okay?

A Yes.

Q And I think that's it. I think we'll get started. Ms. Jones, what is your date of birth?

A 12 -- December 12, 1997.

Q December, what date?

A 12, Christmas.

Q December 25th?

A 25th.

Q Okay.

A 1975.

Q 1975. So you're a Christmas baby.

A Yes.

Q Yes, okay. And Ms. Jones, are you currently employed?

A Yes.

Q Where do you work?

A At G2K Logics [sic]. I deliver donuts overnight, Dunkin Donuts overnight.

Q So can you show me that again, you work for G2K Logistics?

A Logistics, yes.

Q Okay. And you are a truck driver for them?

A Yes.

Q And it sounds like G2K Logistics has an account with Dunkin Donuts, so you deliver things to Dunkin Donuts here in the city --

A Yes.

Q -- or in the suburbs?

A Yes.

Q Okay. What shift do you work?

10

1    A    Overnight.
2    Q    What hours do you work from?
3    A    7:00 until 3:00.
4    Q    So you work from 7:00 p.m. to 3:00 a.m.?
5    A    Yes.
6    Q    Did you work that shift last night?
7    A    Yes.
8    Q    Okay.  Did you get any rest between 3:00 a.m.
9         and today, when you were sitting here at your
10   deposition?
11   A    Yes -- yes.
12   Q    You did get some sleep?
13   A    Yes.
14   Q    Do you feel prepared and able to answer
15   questions today, or do you feel sufficiently like you've
16   had enough rest that you can go ahead and have your
17   deposition today?
18   A    Yes.
19   Q    You do?
20   A    Yes.
21   Q    Okay.  How long have you been driving a truck
22   for G2K Logistics?
23   A    I just started back again.  It's my third time
24   because I had lost my license, speeding.  So I had to
25   get them back and start over.

11

1    Q    Okay.  It sounds like you worked for G2K
2    before --
3    A    Yes.
4    Q    -- and you had a problem and lost your
5    license.
6    A    Yes.
7    Q    And then you got rehired by them --
8    A    Yes.
9    Q    -- once you got your license worked out?
10   A    Yes.
11   Q    How long -- when did you first start working
12   with G2K Logistics as a truck driver?
13   A    2019.
14   Q    Okay.  And do you recall how long you worked
15   with G2K Logistics in 2019?  Was it for a year, a couple
16   months, if you remember?
17   A    I believe for a year.
18   Q    Okay.  And then did you have to take a pause
19   or a break, because you had issues with your license?
20   A    Yes, I had to resign and go get another
21   position in a warehouse.
22   Q    Okay.  And so were you working -- what were
23   you -- what position was that?
24   A    Frying munchkins.
25   Q    You were frying munchkins?

12

1    A    Yes.
2    Q    I love munchkins.  Okay, so you worked for a
3    while as a fryer, frying munchkins.  How long were you
4    in that position?
5    A    I think I'll say -- I think I stayed for like
6    two months.  And then I went to another job through a
7    temp service to be -- drive forklifts.  That was a
8    little bit more money, and I had to pay my bills.
9    Q    Okay.  So after about two months frying
10   munchkins, you went and worked as a forklift driver for
11   a temp service?
12   A    Yes.
13   Q    How long did you drive a forklift for the temp
14   service?
15   A    It was this year.  I had a couple of forklift
16   positions.
17   Q    Oh, you've had a couple.
18   A    Yeah.
19   Q    Were you always working for the temp agency?
20   A    Yes.
21   Q    And then they assigned you to various
22   companies --
23   A    Yes.
24   Q    -- as a forklift driver; is that right?
25   A    Yes.

13

1    Q    Okay.  So for a while you worked as a forklift
2    driver through the temp service.  And then you got a job
3    back driving a delivery truck with G2K?
4    A    Yes, I had -- I had got another job, because I
5    couldn't make it.  Something happened, I had caught a
6    flat.  I couldn't make it.  So I had to get another job,
7    you know.  Like if you missing days, you know, somebody
8    else got to fulfill those.
9    Q    So it sounds like you're saying you had to --
10   couldn't keep working as a forklift driver because you
11   --
12   A    Because I had, you know, I had caught a flat
13   or whatever, like certain jobs, you miss a day and --
14   Q    Okay.  I was just going to remind you, I know
15   it's super easy because it's like we're having a
16   conversation.  It's totally natural in a conversation,
17   everybody does it because you know where I'm going, but
18   for Sydney, if you could just wait until I finish my
19   whole question.
20   A    I'm sorry.
21   Q    No, it's fine.  It's really not a problem.  So
22   it sounds like because you missed some days from work as
23   a forklift driver, you had to go do a different job.
24   A    Yes.
25   Q    And what job was that?

14

1      A   Packaging.  Packaging, making croissants.  I
2   was -- I was in varieties of warehouses working, since
3   -- because I had to make ends meet.
4      Q   It sounds like you were working packing
5   croissants, or making croissants?
6      A   Making croissants, putting them on the belt,
7   conveyor belts, and then rolling through.  Assembly
8   line, I was in the assembly line.
9      Q   Okay.  So you worked on an assembly line at a
10  factory that was making croissants.
11     A   Uh-huh.  Yes.
12     Q   And you would put the croissants on the
13  conveyor belt?
14     A   Yes.
15     Q   And then you had that job for a little while.
16     A   Yes.
17     Q   And then what's the next job you have?
18     A   And I went back to -- there's so many.  I
19  don't know.  I can't remember.
20     Q   It's okay.  Again, if you don't remember, and
21  anyone asks you a question and you don't remember, you
22  don't recall, just let us know that you don't remember.
23  So --
24         MR. GRILL:  Heather, sorry to interrupt you.
25  Can you just have the witness speak up just a little

15

1   louder?  I can understand her, but she kind of fades
2   out a little bit.  Just --
3         MS. DONNELL:  Yep.
4         MR. GRILL:  -- document-wise.  That's all.
5   Thanks.
6         MS. DONNELL:  You got it.
7   BY MS. DONNELL:
8      Q   So just have to sometimes speak up.  Your
9   voice is --
10     A   Oh.
11     Q   -- kind of soft.  So sometimes just a little
12  bit -- if you speak up just a little bit.  Okay.  So
13  let's go -- right now you've been working with G2K
14  Logistics --
15     A   Yes.
16     Q   -- driving delivery truck, right?
17     A   Yes.
18     Q   How many months have you been working for them
19  in this most recent stent?
20     A   I -- I just -- I -- well, I started -- this
21  will be like my second week back.
22     Q   Okay.
23     A   And my second, yeah, my second week.
24     Q   Okay.  And how many days a week are you
25  working, driving a truck for the logistics company from

16

1   that 7:00 p.m. to 3:00 a.m. shift?
2      Q   Could you repeat that?
3      A   Oh, yes, certainly.  Thanks for letting me
4   know.  How many days a week are you working for them
5   right now?
6      A   I just did seven days because I had worked on
7   my off day, because I needed the money.
8      Q   Okay.  So you worked your off day and got
9   overtime?
10     A   Yes, yes.  Two days, like, I was -- I was just
11  off Tuesday and Wednesday and I worked Tuesday and
12  Wednesday.
13     Q   Okay.
14     A   And yeah, like that.
15     Q   So is it fair to say you worked for the past
16  seven days in a row?
17     A   Yes, yes.
18     Q   Okay.  And Ms. Jones are you -- do you live in
19  the city of Chicago?
20     A   Yes.
21     Q   Have you lived in the city of Chicago your
22  whole life?  Well, when you -- let me strike that
23  question.  Were you born and raised in Chicago?
24     A   Yes.
25     Q   Okay.  And back when you were a child, what

17

1   part of the city did you live in?
2      A   I was born on the city of west side --
3   Rockwell, Illinois.  The projects, Rockwell.
4      Q   Okay.
5      A   And back in the day, I guess when they was
6   giving out low income, my mother was on the list and
7   that's when she didn't want to be out west no more
8   because she lived out west all her life, and she wanted
9   to move out south.  So that's how I end up out south.
10     Q   And around what age did your mom move you from
11  the west side of Chicago to the south side of Chicago,
12  if you remember?
13     A   I -- I don't remember.
14     Q   Were you a grade school student at that time
15  or were you already in high school?
16     A   I was --
17     Q   If you remember.
18     A   Believe I was a -- I was a juvenile.  I was in
19  grammar school -- grammar school.
20     Q   Okay.  Do you remember where you attended
21  grammar school?
22     A   Sherman -- Sherman Morgan, Sherman or Morgan.
23     Q   Okay.  How about high school?  Did you attend
24  high school?
25     A   Yes, Tilden.

18

1    Q   How many years did you attend Tilden High
2  School?
3    A   I -- I didn't complete Tilden.  I didn't
4  complete.  When I went, I had got locked up.  I didn't
5  go.  I didn't complete high school, but I completed it
6  in juvenile.
7    Q   So it sounds like you attended Tilden for some
8  years until you got locked up --
9    A   Yes.
10   Q   -- and went to a juvenile --
11   A   Juvenile --
12   Q   -- detention center?
13   A   Yes.
14   Q   Okay.  And we'll get to that.  And then is it
15  fair to say you completed your high school education
16  while you were in the juvenile detention facility?
17   A   Yes.
18   Q   Okay.  Was that out in Warrenville?
19   A   Yes.
20   Q   Okay.  So did you get your high school
21  diploma, or GED?
22   A   High school diploma.  High school diploma.
23   Q   And where -- is your high school diploma from
24  Tilden or from --
25   A   Warrenville, IYC Warrenville.

19

1    Q   Okay.
2    A   Yes.
3    Q   So you got your cert -- your high school
4  diploma from Warrenville?
5    A   Yes.
6    Q   Got it.  Okay.  Do you remember how long you
7  spent in Warrenville, in the juvenile detention
8  facility?  Do you remember how long you were out there?
9    A   No.
10   Q   Okay.  But you never went back to Tilden?
11   A   No.
12   Q   Okay.  I'm going to shift gears now and --
13   A   Yes.
14   Q   -- go back to the early 1990s, okay?  Long
15  time ago.
16   A   Oh, okay.
17   Q   Okay.  Back in 1991, do you remember where you
18  were living back then?
19   A   On Peoria, on 52nd and Peoria.
20   Q   Okay.  And who did you live with on 52nd and
21  Peoria back in 1991?
22   A   My mother.
23   Q   What's your mom's name?
24   A   Carol Jones.
25   Q   And did you -- anyone else live with you other

20

1  --
2    A   With a C.  With a C.
3    Q   C, okay.  C-A-R-E-N?
4    A   C-A-R-O-L, Carol.
5    Q   Oh, Carol.  I'm so sorry.  Carol, okay.  Did
6  anybody else live with you and your mom back then?  Did
7  you have any siblings living with you?
8    A   My sister -- my two sisters.
9    Q   And what are you two sisters names?
10   A   Monica Jones.
11   Q   Okay.  Monica Jones and who else?
12   A   Coleen Jones.
13   Q   Okay.  Anybody else other than your mom and
14  your two sisters living with you at 52nd and Peoria back
15  in 1991?
16   A   My mother's boyfriend.
17   Q   Okay.  So back in -- and we're going to focus
18  on May 1991, so let's see.  In May 1991, during this
19  timeframe, were you part of a gang?
20   A   Yes.
21   Q   What gang were you part of?
22   A   Black P. Stone.
23   Q   Okay.  And did you have a title or a role, or
24  a rank, in that gang?
25   A   No.

21

1    Q   What did you consider yourself?
2    A   A foot soldier.
3    Q   Okay.  And did you -- let's see.  Okay.  Also
4  back at this time, did you have a juvenile delinquent
5  record?  Did you get arrested as a juvenile before 1991,
6  if you remember?
7    A   I don't remember.
8    Q   Okay.  But you recall that you -- well, do you
9  recall having some juvenile arrests?
10   A   Yes.
11   Q   Okay.  And do you recall generally what your
12  arrests were for?
13   A   I only remember when I had the shotgun case.
14   Q   Okay.
15   A   Yeah.
16   Q   And what do you recall?  Is that the case that
17  you got locked up and went to Warrenville for?
18   A   I don't recall.
19   Q   Okay.  I'm going to come back to that arrest.
20  Well, actually, let's do it now.  I'm going to show
21  Ms. Jones what I sent over.  It's the arrest report from
22  May 16, 1991.  It has the Bates Stamp, I think, it's
23  covered over so -- I think it's 29433 is the Bates
24  Stamp, but it's the May 16th arrest report.  I'm going
25  to mark this as Exhibit 1 to your deposition.  And just

22

1  one second, I'm going to hand you a document, okay?
2      (EXHIBIT 1 MARKED FOR IDENTIFICATION)
3      A    Okay.
4      Q    Just see if it refreshes your recollection.
5  Hold on one second.  There's a little space in the
6  right-hand corner.  Do you see that -- no, in the
7  middle.  In the middle.
8      A    In the middle?
9      Q    Yeah.
10      MS. DONNELL:  You can turn it -- you can turn
11  your sticker.
12      COURT REPORTER:  Yeah.
13      MS. DONNELL:  There you go.
14      COURT REPORTER:  Okay.
15      MS. DONELL:  That work?
16      COURT REPORTER:  Yeah.
17      MS. DONNELL:  Okay.
18  BY MS. DONNELL:
19      Q    All right.  Ms. Jones, I'm handing you what
20  I've marked as Exhibit 1 to your deposition, and for the
21  record, it has the Bates City Day 29433.  I'm going to
22  let you look over this and ask you -- see if it
23  refreshes your recollection about your arrest back in
24  1991, okay?  Let me know when you've had a chance to
25  look over it and I'll ask you some questions.  Did you

23

1  get a chance to look at it?
2      A    Yes.
3      Q    Okay.  Ms. Jones, do you -- does this refresh
4  your recollection in any way that you got arrested on
5  May 16, 1991 for an aggravated battery charge?
6      MR. GRILL:  Object to the form of the question.
7  Go ahead.
8      Q    Does that remind -- refresh your recollection
9  in any way, of your arrest back on May 16, 1991?
10      MR. GRILL:  Same objection.
11      Q    You can answer, if you --
12      MR. GRILL:  Yeah.
13      A    Yeah.  Yes, I remember.
14      Q    You do remember?  Okay.  And do you see here
15  that you were arrested on May 16, 1991, and according to
16  the police report you were arrested at 11:30.  There's a
17  box right here that says, "Date and time of the arrest."
18  Do you remember being arrested on May 16, 1991?  Do you
19  have any memory of being arrested?
20      MR. GRILL:  Asked and answered.  Go ahead.
21      A    Yes, for this?
22      Q    Yes.
23      A    Yes.
24      Q    What do you remember about your arrest,
25  Ms. Jones?

24

1      A    That they said I did this.  They said I shot
2  somebody.
3      Q    Okay.  Do you -- were you at home when you got
4  arrested, if you remember?
5      A    I don't remember.
6      Q    Okay.  Do you remember that you were taken to
7  the Audy Home?
8      MR. GRILL:  Objection to form.
9      A    I don't remember.
10      Q    Do you know what the Audy Home is?
11      A    Yes.
12      Q    What's the Audy Home?
13      A    Where they detain detainees until they --
14  where they detain detainees, like they detain older
15  detainees.  It's a separation from the juvenile and the
16  --
17      Q    The Audy Home was where the juveniles went who
18  were detained?
19      A    Yes.  Yes.
20      Q    Is that right?
21      A    Yes.
22      Q    And did you spend some time in the Audy Home
23  when you were a juvenile?
24      A    Yes.
25      Q    Okay.  Do you remember how many times you were

25

1  at the Audy Home?
2      A    No.
3      Q    Okay.  Do you have any memory of being there
4  back on May 16, 1991?
5      A    No.
6      Q    Okay.  You just remember being there,
7  generally?
8      A    Yes.
9      Q    Okay.  Okay.  And I think you testified
10  earlier, but was this the charge that later resulted in
11  you being sent up to the Warrenville juvenile detention
12  facility?
13      A    Yes.
14      Q    Okay.  And here it says -- well, let's strike
15  that.  Okay.  Back at this time, back in May 1991, did
16  you know somebody by the name Gerrod Erving?
17      A    Yes.
18      Q    How did you know Gerrod Erving?
19      A    Just being around the area.
20      Q    Okay.
21      A    Being, you know -- growing up around the area.
22      Q    Was he a friend of yours?
23      A    No, I just knew of him.
24      Q    And you knew --
25      A    I considered him as a friend, but I just knew

26

1    of him.  You know, I didn't know all of his deepest
2    secrets or nothing, but I knew of him.
3        Q    So you're saying you didn't know his deep
4    secrets.  You weren't like close friends, but --
5        A    Right.
6        Q    -- you knew him from the neighborhood?
7        A    Yes.
8        Q    Okay.  Did you come to find out that he had
9    been killed?
10       A    Yeah, I heard about -- I believe I heard about
11   it.
12       Q    Do you recall how you learned about it?
13       A    Can't recall.
14       Q    Did you know anything about how Mr. Erving got
15   killed?
16       A    No.
17       Q    Did you have anything to do with his murder?
18       A    No.
19       Q    Okay.  Okay.  Do you know -- or back in 1991
20   did you know my client, Arnold Day, who went by Little
21   A?
22       A    I knew of Arnold Day, as well.
23       Q    How did you know of Arnold Day?
24       A    He was a Black P. Stone.
25       Q    Okay.

27

1        A    Black P. Stone.
2        Q    Did you know an individual back in May 1991
3    who went by the name G-Nate?
4        A    Yes.
5        Q    How did you know G-Nate?
6        A    I knew of G-Nate through the organization that
7    -- through the org -- through the gang, through the --
8    being in the organization.  That's how I met Nate.
9        Q    Okay.
10       A    Yes.
11       Q    Did you spend a lot of time with Nate, G-Nate?
12       A    No.  They was -- they was older than me, you
13   know.
14       Q    Okay.  How about an individual by the name of
15   Ralph Watson?  Back in 1991 did you know Ralph Watson?
16       A    I can't -- cannot recall.
17       Q    You can't recall?  How about a man -- an
18   individual, named Denardo Triplett, who went by G-Nardi?
19   Did you know him?
20       A    I can't recall.
21       Q    Okay.  How about Darin Triplett?  Do you know
22   Darin Triplett?
23       A    I can't recall.
24       Q    How about an individual by the name of Gus
25   Robinson, who went by the name of Snake?  Did you know

28

1    him?
2        A    No.
3        Q    Okay.  At some point in time, did some of --
4    some lawyers for Arnold Day come talk to you?
5        A    Yes.
6        Q    And where did they come talk to you?
7        A    I was -- I -- I was in Dwight.
8        Q    You were in --
9        A    Dwight, Illinois.  I was incarcerated.
10       Q    Okay.
11       A    They found me.
12       Q    How do you know what you -- well, were you at
13   Dwight on more than one occasion?
14       A    Yes.
15       Q    How many times were you at Dwight?
16       A    I started going to Dwight -- I mean, after my
17   Warrenville case, I believe.  It was, like, in August
18   (Inaudible).
19       Q    Did you go straight from Warrenville to
20   Dwight?
21       A    No, I had got out.
22       Q    You got out?
23       A    Uh-huh.
24       Q    But then you picked up a case and got --
25       A    Yes.

29

1        Q    -- sentenced to the Department of Corrections
2    at the Dwight facility?
3        A    Yes.
4        Q    Do you know how long you spent at Dwight, your
5    first time you were there?
6        A    I can't recall.
7        Q    Okay.  But you recall some lawyers for Mr. Day
8    coming out to visit you at Dwight?
9        A    Yes.
10       Q    Okay.  And do you recall preparing an
11   affidavit, which is a document with your signature, for
12   --
13       A    Yes.
14       Q    -- Mr. Day?
15       A    Yes.
16       Q    Okay.  I'm going to mark Ms. Jones' affidavit
17   as Exhibit number 2.
18           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19       MR. DAY:  Which affidavit?
20       MS. DONNELL:  The 2005.
21       MR. DAY:  Okay, thanks.
22       THE WITNESS:  Is it -- is it okay if I --
23       MS. DONNELL:  You can take a drink, yeah,
24   anytime you want.
25       THE WITNESS:  Oh.

30

1      MS. DONNELL:  Yeah, do you want a break?  You
2  don't need a break?  I might need a quick break
3  after -- let's do this.  Actually can we just take a
4  five -- quick break?  I just need to go to the
5  bathroom.  Let's just go off the record for a
6  second.
7      MR. GRILL:  Yeah, sure.
8      (OFF THE RECORD)
9      COURT REPORTER:  We are back on the record for
10  the deposition of Tennelle Jones being conducted by
11  video conference.  My name is Sydney Little.  Today
12  is September 29, 2022, and the time is 11:13 a.m.
13      MS. DONNELL:  Okay, thank you.
14  BY MS. DONNELL:
15      Q   Ms. Jones, in front of you I have what I've
16  designated as Exhibit 2 to your deposition.  It has a
17  Bates Stamp Day 5274.  Do you see that document in front
18  of you?
19      A   Yes.
20      Q   And do you recognize it?
21      A   Yes.
22      Q   And is that your signature, Tennelle Jones?
23      A   Yes.
24      Q   Okay.  And this is the affidavit that was
25  sworn on March 8, 2005.  Do you see the date with the

31

1  stamp down there at the bottom?
2      A   Yes.
3      Q   Do you remember making this affidavit in 2005?
4      A   Yes.
5      Q   Okay.  I'm going to go through it, but do you
6  remember who the lawyers were who came to meet with you?
7  Do you remember their names or who they were?
8      A   No.
9      Q   Were they men or women, or do you remember?
10      A   I don't.
11      Q   Okay.  And do you remember them coming to talk
12  to you before making this affidavit?
13      A   Yes.
14      Q   And do you remember what they talked to you
15  about?
16      A   Yes.
17      Q   Okay.  And did you tell -- well, let's just go
18  through it.  So here at the beginning it says, "My name
19  is Tennelle Jones and I state the following is true to
20  the best of my knowledge;" do you see that at the top?
21      A   Yes.
22      Q   And number one says, "My name is Tennelle
23  Jones.  I am a 29-year-old female who in 1991 lived in
24  Chicago, Illinois;" that's true, right?
25      A   Yes.

32

1      Q   "And in 1991 I was 16 years old;" is that
2  right?
3      A   Yes.
4      Q   And you were going to turn 17 in that
5  December?
6      A   Yes.
7      Q   Okay.  And then number two, it says, "I have
8  no knowledge of who shot Gerrod Erving or Arnold Day
9  being involved in any shooting ever;" do you see that?
10      A   Yes.
11      Q   And is that true, Ms. Jones?
12      A   Yes.
13      Q   You have no knowledge of who shot Mr. Gerrod
14  Erving; is that true?
15      A   Yes.
16      Q   And you have no knowledge of Mr. Day being
17  involved in any shootings; is that right?
18      A   Yes.
19      Q   Okay.  And then number three, it says, "I have
20  never been questioned or interrogated by any members of
21  the Chicago Police Department or any other law
22  enforcement agencies concerning the shooting of Gerrod
23  Erving, nor have I told anyone I have knowledge of the
24  shooting of Gerrod Erving;" is that true?
25      A   Yes.

33

1      Q   So you never told any Chicago police officer
2  that you knew about the Gerrod Erving murder?
3      A   No.
4      Q   You never did that, right?
5      A   Yes.
6      Q   Okay.  And then number four said, "I've been
7  arrested as a juvenile and as an adult before;" do you
8  see that?
9      A   Yes.
10      Q   And that's true, too?
11      A   Yes.
12      Q   And did you make this affidavit voluntarily of
13  your own free will?
14      A   Yes.
15      Q   Nobody forced you to do it?
16      A   No.
17      Q   Okay.  Let's keep moving.  I'm going to mark
18  as Exhibit 3 -- let's see.  Okay, I'm going to mark the
19  -- her next affidavit, I think it's the -- as Exhibit 3,
20  okay?  I have kind of a funny printout.  Maybe I should
21  take a break and see if I can get a better printout of
22  this.
23      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24      MR. GRILL:  Are you looking at the one that's
25  kind of like, the pages are out of order?

34

1    MS. DONNELL: It's Day 11 and it's kind of --
2  even how it printed out is kind of funny. I don't
3  know if there's a better version, do you?
4    MR. GRILL: I -- you -- I can -- you want me to
5  e-mail you one? Is that --
6    MS. DONNELL: Yeah, can you e-mail? Let's just
7  go off the record, if you can e-mail me one that's
8  going to print better. It's Day 11 and 12. It's
9  going to be Exhibit 3.
10    (OFF THE RECORD)
11    COURT REPORTER: We are back on the record for
12  the deposition of Tennelle Jones. My name is Sydney
13  Little. Today is September 29, 2022. The time is
14  11:22.
15  BY MS. DONNELL:
16    Q   Okay. Ms. Jones, I've marked as Exhibit 3,
17  Day 11 and 12, and we're going to get to that, but back
18  to this Exhibit number 2. When you did this affidavit,
19  was that the truth, to the best of your ability, back on
20  March 8, 2005?
21    A   Yes.
22    Q   Okay. Do you remember Mr. Day's lawyers
23  coming back out to talk to you another time when you
24  were at Dwight?
25    A   They came, I believe they came, a couple of

35

1  times. Because they had come like -- they came a couple
2  times.
3    Q   Okay. Do you know how many times for sure?
4    A   No.
5    Q   Every time the lawyers came to talk to you for
6  Mr. Day were you at Dwight, or did they ever come talk
7  to you when you were living in the city?
8    A   I think I was in seg once and -- in seg in
9  Dwight when they came to see me, too.
10    Q   Okay. So one time you were in segregation at
11  Dwight?
12    A   Yes.
13    Q   Okay. Do you only recall talking to them when
14  you were at Dwight?
15    A   Yes, because I stayed in the jail. I was in
16  the jail, yeah.
17    Q   Okay. Do you remember them coming back
18  another time and you doing a second affidavit, which
19  I've marked here as Exhibit 3 to your deposition? It's
20  another handwritten document. Oh, I'm sorry. One more
21  question before we move on. The handwriting here, you
22  signed this affidavit?
23    A   Yes.
24    Q   But you read over it before you signed it,
25  right?

36

1    A   Yes.
2    Q   Okay. Now let's look at Exhibit 3. This is
3  another affidavit. I'm going to have you start with the
4  second page, want to turn to the second page? Do you
5  see your signature on the second page?
6    A   Yes.
7    Q   Is that your signature?
8    A   Yes.
9    Q   Okay. And is the rest of the document in your
10  handwriting? Exhibit 3. Or just your signature? Is
11  this all your handwriting if you know?
12    A   I can't recall.
13    Q   You can't recall. Okay. Well, we're going to
14  read through it. Let's just go through it, and we'll go
15  through it line by line. I'll read it. So the first
16  part says it's an affidavit of Tennelle Jones and it
17  says, "I, Tennelle Jones, first being duly sworn, state
18  under oath and penalty of perjury, as follows;" do you
19  see that?
20    A   Yes.
21    Q   That first paragraph says, "My name is
22  Tennelle Jones. My birthday is 12-25-1975;" do you say
23  that?
24    A   Yes.
25    Q   And that's all true, right?

37

1    A   Yes.
2    Q   Okay. And it says, "I am currently
3  incarcerated at Dwight Correctional Facility, located in
4  Dwight, Illinois." And that was true back in February
5  of 2009 when you signed this?
6    A   Yes.
7    Q   Okay. And then it says, "My IDOC inmate
8  number is B49387;" do you remember that being your IDOC
9  number?
10    A   Yes.
11    Q   Okay. Number four says, "Sometime during 1993
12  I was interviewed by a white, male person who told me he
13  was investigating the murder of Gerrod Erving. This
14  person did not identify himself as a Chicago Police
15  Officer;" do you see that?
16    A   Yes.
17    Q   Do you remember being interviewed by a white,
18  male person who said he was investigating the murder of
19  Gerrod Erving, but didn't identify himself as a Chicago
20  Police Officer? Do you have a memory of that?
21    A   Yes.
22    Q   And what is your recollection of that
23  incident? Do you independently remember that incident?
24    A   All I know is he had a paper and he was a
25  male, Tennelle Jones. And you're not a male, so that's

38

1   why he ain't arresting me.
2       MR. GRILL:  I'm sorry, I -- Heather.  I cannot
3   hear the --
4       MS. DONNELL:  Sure.
5       MR. GRILL:  -- or -- yeah.
6       MS. DONNELL:  I'm going to have her to repeat
7   it.  Sure.
8   BY MS. DONNELL:
9       Q   Do you mind just repeating what you just said,
10  Ms. Jones, and a little bit louder so that Mr. Grill and
11  Mr. Yamin can hear you?
12      A   He came in with a paper and said that they not
13  arresting me because I'm not a male, and they had me
14  down as a male on the paper, saying that I was involved
15  in a murder.  And he didn't really get into it, he just
16  said that he showed my -- a name, my name, but it wasn't
17      -- he said: It's not you.  And I was locked
18  up.
19      Q   Is there anything else -- well, first of all,
20  do you recall seeing a piece of paper?
21      A   Yeah, he showed me.  He showed my name, and he
22  said a male named Tennelle Jones, and I had just got out
23  of juvenile and he was stating like -- I was locked up,
24  basically.  He can't lock me up because it ain't me, I'm
25  not a male, and I was incarcerated.  So that's how it

39

1   went.
2       Q   Is there anything else that you recall this
3   individual saying to you?
4       A   That's all he said.  He didn't really -- he
5   didn't really get into much because I was locked up.  It
6   wasn't really much he could say.
7       Q   Did he ask you any questions that you recall
8   being asked?
9       A   No, he just showed me my name, and I was
10  incarcerated, and left.
11      Q   Do you remember what this man looked like?
12      A   No.
13      Q   Do you remember his -- was he white, or black?
14      A   White guy.
15      Q   Did he come alone, or with anybody else?
16      A   I believe he was with someone.  I don't recall
17  how they -- you know, like can't describe them, like --
18      Q   Do you know where this occurred?  Where were
19  you when this person came to talk to you?
20      A   On 52nd living with my mother, but my mother
21  wasn't there.  It was just my sisters.
22      Q   Okay.  Do you remember, were you expecting
23  someone to come, or did they just come to the door?
24      A   No.
25      Q   Okay.  Did the person who came and talked to

40

1   you, did they ask you any questions about a particular
2   case, or did they just show you this piece of paper that
3   said a male, Tennelle Jones, and then they said that
4   they couldn't arrest you, and they left?  Did you -- did
5   they ask you any questions about anything you knew?
6       A   No.  No, and -- no, no.
7       Q   And did they tell you anything, specifics,
8   about the case they were investigating?
9       A   No.
10      Q   Okay.  So the best of your recollection, you
11  recall being shown a piece of paper that said there was
12  a male, Tennelle Jones.
13      A   Yeah, Tennelle Jones.
14      Q   Anything else you recall seeing on that paper?
15      A   I just -- he showed me my name.  That's all I
16  looked at because I was locked up.  I didn't really tell
17  him nothing.
18      Q   Did the individual leave a business card with
19  you, or any information?
20      A   No.
21      Q   Okay.  So that paragraph said, "I lived at
22  5224 South Peoria, Chicago, Illinois during that time. I
23  knew and recognized many of the police detectives from
24  that area.  I do not recognize the person who came to
25  see me.  I'm not sure where he came from or who he

41

1   represented;" is that true?
2       A   Yes.
3       Q   So you have no idea who this person was; is
4   that right?
5       A   Yes.
6       Q   And they didn't identify themselves as a
7   Chicago Police Officer?
8       A   (No verbal response.)
9       Q   Is that a no?
10      A   No.
11      Q   Okay.  Number 6 says, "I believe I was
12  incarcerated in the juvenile detention center in
13  Warrenville, Illinois between 1991 and 1993.  I told the
14  person who interviewed me that I had recently been
15  released from Warrenville;" did you read that along with
16  me?
17      A   Yes.
18      Q   Was that true?
19      A   Yes.
20      Q   Okay.  Paragraph 7 says, "I asked him what was
21  going on.  He said my name had come up as someone who
22  might have been involved in a murder case.  He then
23  showed me a document that listed me as a male;" do you
24  see that?
25      A   Yes.

42

1    Q   Is that what you recall?
2    A   Yes.
3    Q   Okay. "I told him that I was locked up when
4  Gerrod was killed. He said he knew I had just got out.
5  I then asked him if was going to jail, and he said no;"
6  do you recall, is that what happened?
7    A   Yes.
8    Q   Okay. And that was true?
9    A   Yes.
10   Q   Okay. And it says, "The house where Gerrod
11 was killed, it was known in the neighborhood to have
12 been a hype house. Drug users and minor drug dealers
13 hung out in that house;" do you see that?
14   A   Yes.
15   Q   Is that true?
16   A   Yes.
17   Q   So you remember the address, or you remember
18 the house -- I'm sorry. I'm going to have to refresh my
19 own recollection. The specificness -- hold on one
20 second. I'm tired. At 5304 South Carpenter?
21       MR. GRILL: Objection, form.
22       MS. DONNELL: I'm sorry, I'm saying that wrong.
23 I'm so sorry. I'm sorry -- 927 West 24th Street.
24 I'm sorry. Do you remember that --
25       MR. GRILL: Objection to form.

43

1  BY MS. DONNELL:
2    Q   Do you remember the address, 927 West 54th
3  Street?
4    A   I don't know the address, but I know the
5  building.
6    Q   You know the building, okay. And how do you
7  know that building? Well, what's a hype house?
8    A   Well, people smoke crack.
9    Q   Okay.
10   A   Crack out of it.
11   Q   And there would be minor drug dealers selling
12 drugs out of it, do you remember that?
13   A   Yes.
14   Q   Okay. This affidavit, affidavit number --
15 Exhibit number 3. Did you -- when you signed this and
16 prepared -- sorry, strike that. When you did this
17 affidavit, did you do this of your own free will?
18   A   Yes.
19   Q   And it was true and accurate to the best of
20 your ability?
21   A   Yes.
22   Q   And nobody forced you to do it?
23   A   No.
24   Q   And did anybody make any promises to sign this
25 affidavit?

44

1    A   No.
2    Q   How about Exhibit 2? Did anybody make you any
3  promises to sign Exhibit 2?
4    A   No.
5    Q   Okay, Ms. Jones. How did you know that
6  location at 927 West 54th Street to be a hype house, and
7  for drugs to be sold out of it? How did you know?
8    A   I sold drugs in it.
9    Q   You did?
10   A   (No verbal response.)
11   Q   And back in the 1990s -- in this timeframe,
12 would you have been selling drugs?
13   A   Yes.
14   Q   Okay. Back in May 1991 during this timeframe,
15 right before you got locked up and you up to
16 Warrenville, was there any beefs or wars going on
17 between the Jet Black Stones and the P. Black Stones,
18 that you recall?
19   A   Yes.
20   Q   You do recall?
21   A   Yes.
22   Q   Was that just generally the case all the time?
23   A   Since...
24   Q   I'm sorry, that was a bad question.
25   A   Yeah.

45

1    Q   Well, the Jet Black Stones and the P. Black
2  Stones, did they feud off and on all the time? Was that
3  a frequent occurrence?
4    A   Yes.
5    Q   Okay. So do you have a specific recollection
6  of a particular feud going on in May 1991, or are you
7  saying that was just generally, there was some back and
8  forth with those two gangs?
9    A   Back forth, back and forth.
10   Q   Meaning it was like off and on?
11   A   (No verbal response.)
12   Q   Is that a yes?
13   A   Oh -- yes, yes.
14   Q   Okay.
15   A   Sorry.
16   Q   So do you remember any specific disagreements
17 or fights that were happening between the Jet Black
18 Stones and the P. Black Stones in May 1991, if you can
19 recall?
20   A   No. No.
21       MS. DONNELL: Okay. I don't think I have any
22 other questions at this time for the witness. Would
23 you -- are you guys ready to go, or do you --
24 Ms. Jones, are you okay to -- I'm finished right
25 now, asking you questions. These other lawyers are

1  going to ask you some questions.  Do you want a
2  break before you keep going, or do you want to just
3  keep going?
4      THE WITNESS:  We can go.
5      MS. DONNELL:  We can keep going?  Okay.
6      MR. GRILL:  Just give me two minutes.  I just
7  got to --
8      MS. DONNELL:  You got it.
9      MR. GRILL:  -- organize a couple things.  So if
10  anybody's got to go to the bathroom, go ahead and
11  I'll be right back.
12      MS. DONNELL:  Yeah.
13      MR. GRILL:  Meaning we can go off the record
14  for a minute here.
15      (OFF THE RECORD)
16      COURT REPORTER:  We are back on the record for
17  the deposition of Tennelle Jones.  My name is Sydney
18  Little.  Today is September 29, 2022 and the time is
19  11:39 a.m.
20  BY MS. DONNELL:
21      Q    Ms. Jones, I forgot to ask you, have we met
22  before?
23      A    Yesterday.
24      Q    Okay.  We met yesterday, correct?
25      A    Yeah, yeah.

1      Q    And when did we meet?
2      A    On the phone, on the phone and you came to see
3  me in person.
4      Q    I came to see you in person yesterday.  And
5  was our investigator, Mr. Smith, there, as well?
6      A    Yes.
7      Q    And did we talk about the things that we just
8  talked about here today?
9      A    Yes.
10      MS. DONNELL:  Okay.  That's all I have,
11  Ms. Jones.  Thank you for being here, especially
12  after working so long.  So now Mr. Grill's going to
13  have some questions for you, okay?
14      THE WITNESS:  Okay.
15      MS. DONNELL:  Oh, Andrew, we can't hear you.
16      MR. GRILL:  Probably need to unmute, sorry.  I
17  just didn't want to interrupt you.  Did Ms. Jones
18  say that she also met with you in person?  I missed
19  that part of her answer.
20      MS. DONNELL:  Yes, she did.
21      MR. GRILL:  Okay.
22      MS. DONNELL:  With Mort and I yesterday.
23      MR. GRILL:  Okay.  Thanks for clarifying.
24      MS. DONNELL:  Yeah.
25          CROSS EXAMINATION

1  BY MR. GRILL:
2      Q    All right.  Ms. Jones, can you hear me okay?
3      A    Yes.
4      Q    All right.  If there's any point that you
5  can't hear me, since I'm not in the room with you and
6  Heather there, just let me know, okay?
7      A    Okay.
8      Q    All right.  Did you review any documents
9  before you came in for the deposition today?
10      A    Yes.
11      Q    Okay.  So you reviewed the exhibits that
12  Ms. Donnell was using today in your deposition?
13      MS. DONNELL:  Objection, form, but you can
14  answer.
15      Q    Yeah, I'll be more specific: Did you see your
16  2005 affidavit?  Did you review it before today's
17  deposition?
18      A    Yes.
19      Q    Okay.  And is that a document that Ms. Donnel
20  provided you to review, to get ready for your
21  deposition?
22      A    Yes.
23      Q    Okay.  And how did she get that document to
24  you?  Was it mailed to you in the mail, or e-mailed to
25  you, or did she bring it to you when you guys met?

1      A    She brought it to me.
2      Q    When you guys met in person?
3      A    Yes.
4      Q    All right.  And the same question for the 2009
5  affidavit; is that a document that you reviewed to
6  prepare for your deposition?
7      A    Yes.
8      Q    And is that another document that she brought
9  with you -- her?  I might have to go put my dog outside.
10  Hang on one second.  Is that a document that she brought
11  with her when she met with you?
12      A    Yes.
13      Q    Okay.
14      MR. GRILL:  Hey, Heather, sorry.  For one
15  second, let me just put my dog in the backyard.
16      MS. DONNELL:  No problem.
17      MR. GRILL:  So she doesn't -- we can stay on
18  the record.  This will only take one second.  Hang
19  on. Sorry about that.
20  BY MR. GRILL:
21      Q    All right.  Did Ms. Donnell -- can you hear me
22  still?
23      A    Yes.
24      Q    Okay.  Did Ms. Donnell, when you met with her,
25  show you the arrest report that she used as an exhibit

50

1  today?
2      A   Yes.
3      Q   All right.  Did she show you any other
4  materials, any other documents, other than those three
5  that I just listed off, when you met with her and
6  Mr. Smith?
7      A   No.
8      Q   All right.  That arrest report pertains to the
9  Marcus Qualls attempted murder, aggravated battery with
10  firearm charge that you talked about today, right?
11      A   Yes.
12      Q   Did you see any other police reports, any
13  other law enforcement records of any sort, related to
14  the -- that arrest report, when you met with Ms.
15  Donnell?
16      MS. DONNELL:  Object to the form of the
17  question, but if you understand it you can answer.
18      A   Could you repeat that again?  I don't
19  understand.
20      Q   Yeah, so the arrest report that Ms. Donnell
21  used as an exhibit today was a single, one-page
22  document, right?
23      A   Yes.
24      Q   Okay.  So did you see any other documents when
25  you met with Ms. Donnell that pertained to the Marcus

51

1  Qualls arrest report that she showed you, in your
2  meeting with her?
3      A   You mean something like, another paper like
4  this or something?
5      Q   I can't really see that, what you're holding
6  up there.
7      MS. DONNELL:  She's holding up Exhibit 2.
8      Q   Okay.  Yeah, was that -- that was the only --
9      So maybe this is the easier way to ask you:
10  That was the only document she showed you, that Exhibit
11  2, related to the Marcus Qualls arrest report; is that
12  right?
13      MS. DONNELL:  Object -- I'm sorry.  Objection
14  to the form of the question.  You can answer if you
15  can. He's asking if you saw any other documents,
16  other than these three pages when we met yesterday.
17  Have you seen anything else?  Right, is that what you
18  want to know, Andrew?  I think she's --
19      MR. GRILL:  Yeah.
20      THE WITNESS:  He talking about like police
21  reports?  I don't know.
22      MS. DONNELL:  I think he's talking about any
23  paper.
24      THE WITNESS:  Oh, okay.  Yeah, a police report.
25  BY MR. GRILL:

52

1      Q   What kind of police report?
2      A   When my mama called the police on me.
3      Q   For what?
4      A   A shotgun.
5      Q   Okay.  But that was not something that was
6  connected to the Marcus Qualls case, right?
7      A   No.
8      Q   Okay.  Did you know Marcus Qualls?
9      A   No.  I can -- I cannot recall, because when I
10  was younger everybody had, like, nicknames.  They
11  weren't really using they real name so that's why I
12  cannot recall the name.
13      Q   Okay.  In that arrest report it notes that you
14  told the police that you didn't shoot at him or shoot
15  him, Mr. Qualls, that is, but you were present when that
16  incident happened; is that true?
17      A   I don't recall.
18      Q   Do you recall -- well, here, let's bring it up
19  here.
20      MS. DONNELL:  Are you showing -- do you want
21  her to look at the hard copy, Andrew?
22      MR. GRILL:  Yeah, I can put it up on the
23  screen, too.
24      MS. DONNELL:  Okay.  Whatever she can see
25  better.  I think -- are you showing her something

53

1  else or Exhibit 2?
2      MR. GRILL:  Exhibit 2.
3      MS. DONNELL:  Okay.  I'll just give her that
4  one.
5      MR. GRILL:  So yeah, I can just share my screen
6  here, too.  Where is it?  Here it is.
7  BY MR. GRILL:
8      Q   Okay.  Do you see this?
9      A   Oh, yeah.
10      Q   Yeah, okay.
11      A   Yeah.
12      Q   So right here -- hang on, I got to -- there we
13  go.  So right here at the bottom, this arrest report
14  notes -- do you see where my cursor is here?
15      A   Yes.
16      Q   Okay.  It notes here that the arrestee, so
17  that's you --
18      A   Yeah.
19      Q   -- said that "she was at the scene of the
20  shooting, but did not shoot the victim;" do you see
21  that?
22      MS. DONNELL:  At the victim.
23      MR. GRILL:     "Shoot at the victim," sorry.
24  Thank you.
25  BY MR. GRILL:

54

1    Q   Do you see that?
2    A   Yes.
3    Q   Okay.  Do you remember being present when --
4  you know, it's actually, I believe this happened on May
5  12, 1991.  When a person was shot who was standing near
6  a crowd of people?  Do you remember anything like that
7  happening?
8        MS. DONNELL:  Objection to the form of the
9    question, but you can answer, if you --
10   A   I -- I don't recall.
11   Q   Okay.  So this arrest report, and I'll just
12 put you up here by the top of the Exhibit 2 that I have
13 up on the screen, here.  So it says that a witness told
14 the police that you and a second offender walked toward
15 a crowd of people who were standing on the street, and
16 that you pointed a blue steel revolver in the direction
17 of the crowd and fired six times, and that this person
18 that was with you, had a sawed off shotgun and fired
19 into the crowd, and struck the victim.  Do you remember
20 anything like that being present in May, specifically,
21 May 12th of 1991?  Being present --
22       MS. DONNELL:  Object -- I'm sorry, Andrew.  Go
23   ahead.
24   Q   -- being present when that happened?
25       MS. DONNELL:  Objection, form, foundation.  You

55

1  can answer, if you can.
2    A   I don't recall.
3    Q   What'd I say, 1991?  Yeah.  Okay.  So you
4  testified earlier today that you went to -- you were
5  sentenced actually, and served time out in Warrenville
6  as a result of this incident, right; that was your
7  testimony earlier today?
8    A   Yes.
9    Q   Okay.  Is it your testimony that the -- well,
10 let me ask it this way:  Do you recall whether you plead
11 guilty to this charge that resulted -- that arose from
12 this incident that's described in this arrest report,
13 that you served time on in Warrenville?
14   A   Yes.
15   Q   Okay.  And do you -- did you take -- did you
16 plead guilty to this charge?
17   A   Yes.
18       MS. DONNELL:  Objection, asked and answered.
19   Q   Okay.  And --
20       MS. DONNELL:  You just need to -- sorry.  I'm
21   just going to tell the witness just to pause
22   sometimes because I might need to object so --
23       THE WITNESS:  Oh.
24       MS. DONNELL:  -- just give me a second before
25   you answer Mr. Grill's question.

56

1        THE WITNESS:  Okay, sorry.
2  BY MR. GRILL:
3    Q   And when you plead guilty to this charge, do
4  you remember what the charge was that you plead guilty
5  to?
6    A   Don't recall.
7    Q   Do you recall whether you had a lawyer
8  representing you when you plead guilty?
9    A   No.
10   Q   You don't remember, or you did not have a
11 lawyer?
12   A   I did not have a lawyer.
13   Q   How old were you at this time?
14   A   I don't recall.
15   Q   Okay.
16   A   On the arrest report it says I was 17.
17   Q   Okay.  Now, when you plead guilty, did you
18 plead guilty -- was your plea of guilty a truthful plea
19 of guilty, meaning that you actually committed the
20 offense that you were pleading guilty to?
21       MS. DONNELL:  I'm going to object to the form
22   of the question.  And you can answer if you can.
23   Q   Was your plea of guilty truthful?
24   A   No.
25   Q   Okay.  Is it your testimony that this crime

57

1  that you plead guilty to was a crime that you did not
2  commit?
3    A   Yes.
4    Q   You just think that this crime that you plead
5  guilty to was one that was made up?
6        MS. DONNELL:  Objection to the form of the
7    question.
8    Q   Meaning it's something that never happened.
9        MS. DONNELL:  Again, objection to the form of
10   the question and foundation.  I don't -- do you
11   understand his question?
12       THE WITNESS:  The lady, she lied on me.  The
13   lady lied on me, basically and --
14 BY MR. GRILL:
15   Q   Okay.  The eyewitness?
16       MS. DONNELL:  I don't think she finished.  She
17   may not --
18       MR. GRILL:  Oh, sorry.
19       THE WITNESS:  The lady lied on me and
20   basically, like, back then, I -- it's like I just --
21   she lied.  I just -- just pleaded guilty, just plead
22   guilty.
23 BY MR. GRILL:
24   Q   And when you say the lady lied, you're talking
25 about the eyewitness?

58

1    A    The witness, whoever said that I pointed a
2    gun.
3        Q    Do you know a person named Lisa Redmond?  Does
4    that name ring a bell?
5        A    No.
6        Q    Okay.  Did you ever know the identity of the
7    person that you say lied on you?
8        A    No.
9        Q    Why did you plead guilty to a crime rising out
10    of this incident described in Exhibit 2 if you are
11    innocent?
12        MS. DONNELL:  Objection to the form of the
13    question, asked and answered.  Also, are you -- I
14    just want to make sure, are you providing
15    information that hasn't been turned over to
16    plaintiffs that's been redacted, meaning the
17    witness's name?  Like the information you're asking
18    her about information that you have that has not
19    been disclosed to us?
20        MR. GRILL:  No.
21        MS. DONNELL:  No?
22        MR. GRILL:  I can give you the Bates Stamp
23    actually, CCSA Day Boudreau, Et Al, 19C7286.
24        MS. DONNELL:  Okay.
25        MR. GRILL:  217, and I actually sent this to

59

1    you this morning, too.
2    BY MR. GRILL:
3        Q    So with that, ma'am, is it your testimony that
4    you are innocent, or were innocent, and always have been
5    innocent, of the offense that you plead guilty to that
6    was related to the arrest report in Exhibit 2 that
7    Ms. Donnell showed you?
8        A    Yes.
9        Q    Is it your -- do you believe that the police
10    made this crime up that you were charged with?
11        MS. DONNELL:  Objection, form and foundation,
12    and calls for speculation.
13        MR. GRILL:  I'm asking what she believes.
14        MS. DONNELL:  Okay.  Again, same objections,
15    form, foundation, and calls for speculation.  You
16    can answer if you can.  Do you want him to repeat
17    the question?
18        THE WITNESS:  Yes.
19        MR. GRILL:  Happy to.
20    BY MR. GRILL:
21        Q    Do you believe the police made up this charge
22    that you plead guilty to?
23        MS. DONNELL:  Ob -- form, foundation, and calls
24    for speculation.  You can answer if you can.
25        A    The lady made up that.  The lady made it up.

60

1        Q    So not the police, this lady did?
2        A    Yeah, she made it up.
3        Q    Okay.  How do you know that it was a lady that
4    made up this charge against you?
5        A    Because it say in my police report that a
6    female -- it said, it's got a witness, a lady.
7        Q    And when you went to court on this case, did
8    you ask that a lawyer be appointed for you?
9        MS. DONNELL:  Ob --
10        A    No, I don't -- I don't recall.
11        Q    Okay.  Did you ever hear of an incident like
12    the one that's reported in Exhibit 2 occurring in your
13    neighborhood?
14        MS. DONNELL:  Objection, form, foundation,
15    vague.  You can answer if you can.
16        A    I don't under -- Exhibit -- you talking about
17    this?
18        Q    Exhibit 2, the same one that we were just
19    looking at.
20        A    This?
21        Q    Yeah, this one right here that's on the
22    screen.
23        A    Oh, okay.  That's -- oh.
24        Q    Did you ever hear about anything like this
25    happening in and around your neighborhood in May of

61

1    1991?
2        A    Yes.
3        Q    Okay.  You heard about a person named Marcus
4    Qualls getting shot with a shotgun?
5        A    No.
6        Q    Okay.  Well, what did you hear?
7        A    I heard that some people over there got shot
8    on Princeton, I believe.
9        Q    Okay.
10        A    Princeton.
11        Q    And who did you hear that from?
12        A    Breaking news, or you know...
13        Q    No, I don't know.  Can you explain what you
14    mean?
15        A    Oh, I apologize.
16        Q    That's okay.
17        A    Like word get around, like word -- word --
18    word got around the area, like what happened over there.
19        Q    Okay.  Do you recall when you went to court on
20    this arrest arising out of this shooting that you told
21    the court that you did not want a lawyer, and wanted to
22    represent yourself?
23        MS. DONNELL:  Objection, form, foundation,
24    calls for speculation.
25        A    I don't recall.

62

1    Q   Okay.  Do you recall anything about why it was
2   that you did not have a lawyer representing you when you
3   plead guilty to this aggravated battery?
4        MS. DONNELL:  Objection, form, foundation,
5   calls for speculation.  If you know -- if you
6   remember and can answer, go ahead.
7   BY MR. GRILL:
8    Q   And Ms. Jones, I'm going to tell you: I'm not
9   asking you to guess about it.  I'm asking you if you
10  remember, okay?  Why it was that -- if you remember
11  anything about why it was, according to your testimony,
12  you did not have a lawyer representing you when you
13  plead guilty to this aggravated battery.
14   A   Don't recall.
15   Q   Okay.  Do you know -- so then I've got to ask
16  you again:  Do you know or can you tell me why it was,
17  that you plead guilty to a crime, aggravated battery,
18  that you are telling me now you did not commit or
19  participate in, or even witness?
20       MS. DONNELL:  Objection, form, foundation,
21  asked and answered, and argumentative.
22   Q   Go ahead.
23   A   No.  I don't -- repeat that again.
24   Q   Why did you plead guilty to the aggravated
25  battery if, in light of your testimony today, you were

63

1   not present for or participated in this shooting that's
2   documented in Exhibit 2?
3        MS. DONNELL:  Objection, form, foundation,
4   asked and answered.
5    Q   Why did you plead guilty if you were innocent?
6        MS. DONNELL:  Asked and answered.
7    A   Because -- because I didn't care about going
8   to jail back then.
9    Q   You didn't care about going to jail?
10   A   Didn't care.
11   Q   Okay.  So tell me more about that.  Why did
12  you not care about going to jail in 1991?
13   A   Because I don't -- I don't -- like, the -- on
14  the police report they was basically saying like, she
15  said I did it, and I couldn't beat it.  I couldn't win
16  because she said I did it, which I ain't -- I didn't
17  have no parse in it.  She said I did it, so I said:  Oh,
18  well, then I'm...
19   Q   How did you find out, or when did you first
20  find out that there was an eyewitness saying that you
21  participated in this aggravated battery?
22   A   Due to what the police told me was in this
23  report right now.
24   Q   Okay.  And why did you think you couldn't beat
25  it?

64

1    A   Because the lady said that -- what all she
2   said, and basically I felt like they going off what she
3   said and I just, you know, back when I was little, hey,
4   I didn't care about getting locked up back in the days.
5   That's my answer to the question that you're asking me
6   about this.  I didn't care.  Even though if I wasn't --
7   even though I didn't have nothing to do with it, I
8   didn't care about going to jail.
9    Q   Okay.  So did you have anybody that could
10  vouch for your whereabouts when this shooting happened?
11   A   No.
12   Q   Okay.  Do you know where you were when this
13  shooting happened?
14       MS. DONNELL:  Objection, form, foundation.
15   A   No.
16   Q   Okay.  So tell me though, why you didn't care
17  about getting locked up.  You've made that statement
18  that you didn't care about getting locked up back in the
19  day, but I'm interested in why that was the case.  What
20  was going on with you in 1991 that caused you to feel
21  that way?
22       MS. DONNELL:  Objection, form, and I think it's
23  already been asked and answered, but you can answer.
24       THE WITNESS:  Back -- I liked being bad.
25  BY MR. GRILL:

65

1    Q   You liked being -- I'm sorry, you liked being
2   bad?
3    A   I liked being bad, yes.
4    Q   And what do you mean by "being bad?"  What
5   does that mean to you, back in --
6    A   Stolen --
7    Q   -- 1991?
8    A   -- stolen the cars, man, stolen the cars,
9   stealing cars, people cars, and getting chased by the
10  police.
11   Q   Uh-huh.  Did you ever tell the judge, if you
12  remember, that this was a crime that you did not commit
13  before you plead guilty?
14   A   No.
15   Q   Was there any reason why you felt -- let me
16  strike that question.  Did you think that was an
17  important thing, or that you should've told the judge
18  before you plead guilty, that you did not participate in
19  this aggravated battery?
20       MS. DONNELL:  Objection, form, foundation, and
21  I think this has been asked and answered or gone
22  over, but you can answer if you can.
23       THE WITNESS:  Basically, like I said, before I
24  didn't care about going to jail, and she said that I
25  did it.  I just pleaded guilty to it.

66

1    MR. GRILL: Uh-huh.
2    THE WITNESS: Even though I didn't.
3    BY MR. GRILL:
4    Q   Did you think that an aggravated battery --
5    well, strike that question. Did you have an
6    understanding at the time you plead guilty that this
7    girl was accusing you of having a gun and shooting at
8    people with it; did you understand that?
9    A   Yes.
10    MS. DONNELL: I'm sorry. Objection, asked and
11    answered. Just give me one minute. I might object.
12    You can still answer, but just pause before you
13    answer Mr. Grill's questions. No problem, just --
14    THE WITNESS: Okay.
15    MR. GRILL: I just ask that you just keep it to
16    form, foundation, asked and answered, or something
17    like that, because frankly --
18    MS. DONNELL: That's fine.
19    MR. GRILL: -- my questions are being -- I've
20    not asked these questions more than once, so -- but
21    be that as it may, let's move forward here.
22    BY MR. GRILL:
23    Q   So did you believe at the time you plead
24    guilty, that you were pleading guilty to a serious
25    criminal offense?

67

1    A   Again, back then I didn't care.
2    Q   I understand that. Well, sorry, go ahead. Go
3    ahead.
4    A   I didn't -- I -- I didn't care about that.
5    Q   Right. But my question is, did you
6    understand, separate and apart from whether you cared,
7    did you understand that the charge you were pleading
8    guilty to was a serious criminal offense, that it was a
9    felony?
10    A   Yes.
11    Q   Okay. And you understood that by pleading
12    guilty you'd go to jail, right?
13    MS. DONNELL: Objection. I think this has been
14    asked and answered, but --
15    Q   It hasn't, but go ahead and answer the
16    question, please.
17    MS. DONNELL: Okay. Asked and answered,
18    argumentative at this point. You can answer again,
19    Ms. Jones.
20    BY MR. GRILL:
21    Q   I'm over here, Ms. Jones. Go ahead.
22    A   Could you repeat that, please?
23    Q   Did you have an understanding when you plead
24    guilty that you were likely to go to jail for this
25    aggravated battery?

68

1    MS. DONNELL: Sorry, Andrew. Objection, asked,
2    answered, argumentative.
3    A   Yes.
4    Q   Okay. Have you ever been in jail before, for
5    any amount of time, before this aggravated battery?
6    A   Don't recall.
7    Q   Okay. Were you -- did you care -- did you
8    have an understanding -- strike that question. Did you
9    have an understanding when you plead guilty that you
10    could go to jail for years as a result of your plea of
11    guilty to this aggravated battery?
12    MS. DONNELL: Sorry Andrew, I thought you were
13    done. Asked, answered, argumentative. This
14    question, or a variety of it's been asked about
15    seven times. So I think we should move on. I think
16    the witness has answered this question a number of
17    times for you, Mr. Grill.
18    MR. GRILL: I don't know what you're -- why
19    you're doing this, Heather, but I haven't, and I
20    certainly haven't asked the question that I just
21    asked, and the record shows that. So stop, ma'am.
22    MS. DONNELL: I hope you'll move on because
23    she's answered this, maybe not these exact words,
24    but --
25    MR. GRILL: Yeah, it's --

69

1    MS. DONNELL: -- the same essential meaning,
2    she's answered about seven times and the record --
3    MR. GRILL: Yeah, well, okay. That's not --
4    MS. DONNELL: So go ahead.
5    MR. GRILL: -- that's not the standard,
6    Heather. Okay, Ms. Jones --
7    MS. DONNELL: It is. It gets abusive actually.
8    MR. GRILL: No, it's not. It's not. Okay.
9    It's not, so don't pretend that it is.
10    MS. DONNELL: I'm not, Andrew. We can move --
11    dismiss the witness so that we don't have to do this
12    in front of the witness, but I just am asking you,
13    maybe you can move on to the next area of inquiry.
14    MR. GRILL: I'm going to do this deposition the
15    way I want to do it and you're welcome to try to
16    stop it anytime you want so --
17    MS. DONNELL: If it gets more abusive, I will -
18    - we can do that. We can call the Court. So go
19    ahead.
20    MR. GRILL: Great, let's do that. I love that
21    threat.
22    BY MR. GRILL:
23    Q   Ms. Jones, did you have an understanding at
24    the time you plead guilty, that you could go to jail,
25    potentially for years, as a result of your plea of

70

1  guilty?
2      MS. DONNELL:  Asked, answered, argumentative.
3  Ms. Jones, you can answer one more time.
4      A   Yes.
5      Q   Okay.  Did it matter to you that you could go
6  to jail for years if you plead guilty?
7      MS. DONNELL:  Asked, answered and
8  argumentative.  You have really asked her, this
9  witness, the same --
10     MR. GRILL:  Stop the dep, then, Heather.  I
11 mean, so tired of this.
12     MS. DONNELL:  Let's take a break then because
13 it's not --
14     MR. GRILL:  No, I don't need a break.  If you
15 need a break, we can take one.  I don't need a
16 break.
17     MS. DONNELL:  I don't need a break, but I think
18 we could dismiss the witness so we don't have this
19 fight in front of her so...
20     MR. GRILL:  Ma'am, did you understand -- are
21 you telling the witness not to answer the question,
22 Heather?
23     MS. DONNELL:  I am not doing that, Andrew.
24     MR. GRILL:  Okay.  So then let's get an answer.
25 BY MR. GRILL:

71

1      Q   Do you remember my question?
2      A   Could you please repeat it again?
3      Q   Sure.  We'll have the court reporter read this
4  one back.
5      COURT REPORTER:  One moment.
6      (REPORTER PLAYS BACK REQUESTED TESTIMONY)
7      MR. GRILL:  I can't even hear that, but if it's
8  coming through on your end, I trust.
9      MS. DONNELL:  I'll just repeat the same
10 objections.  Did you hear it?  You can answer if you
11 can.
12     THE WITNESS:  You said -- it didn't matter,
13 basically, if I cared if I went to jail for some
14 years about this.  No, it did not matter.
15 BY MR. GRILL:
16     Q   Okay.  What was it about "being bad" that you
17 liked so much in 1991?
18     MS. DONNELL:  Objection to the form of the
19 question, argumentative.  You can answer.
20     A   Stealing the cars, making the police chase me,
21 getting the joy out of that.
22     Q   Right.  Okay.  So, it gave you joy.  Did it
23 give you any other reasons that you liked being bad?
24     A   Uh-uh.
25     COURT REPORTER:  Was that a no?

72

1      THE WITNESS:      No.
2      Q   You've got to say yes --
3      A   I'm sorry, no, no.
4      Q   Okay.  Who's Wayman Parks?
5      A   I believe that's my daddy.  I believe that's
6  my daddy.  He deceased.
7      Q   When did he die?
8      A   I was a baby.  I was a baby and I -- I was a
9  baby.  I can tell you how he died, but I was a baby.
10     Q   Uh-huh.  When you were arrested for this
11 aggravated battery, do you remember whether, at any
12 point before you plead guilty, you were released from
13 custody?
14     A   No.
15     Q   No, you don't remember, or no, you weren't?
16     A   No, I do not remember.
17     Q   Okay.  And in 1991 you were living with your
18 mother, right, on Peoria Street?
19     A   Yes.
20     Q   Okay.  With your two sisters?
21     A   Yes.
22     Q   You said during Ms. Donnell's examination that
23 you were a member of the Black P. Stones in 1991, right?
24     A   Yes.
25     Q   And that you were a foot soldier; is that

73

1  right?
2      A   Yes.
3      Q   So what year did you join the Black P. Stones
4  if you recall?
5      A   Don't recall.
6      Q   How did you join the Black P. Stones, like,
7  what was -- yeah, how did you become a member?
8      A   What do you mean about how do I -- what you
9  mean how did I become --
10     Q   Just that, how did you become a member of the
11 Black P. Stones?
12     MS. DONNELL:  Objection, foundation.
13     Q   I'm asking this based on your own experience.
14     A   Based on me explaining why I wanted to be gang
15 member.
16     Q   No, well, we can -- that's a separate
17 question, which I'll come back to, but my question right
18 now is how did you become a member of the
19 Black P. Stones?
20     A   I just told you.  I --
21     Q   Then I missed it.  Please tell me again.
22     A   I had explained why I wanted to be in a gang.
23     Q   You had to explain it?
24     A   Yeah, like --
25     Q   Okay.

1    A  They won't just let nobody be in a gang, no.

2    Q  Did you say they just won't let anybody be in

3 the gang?

4    A  You know, like, you can't -- back when I was

5 growing up, you -- why you want to be in a gang?

6    Q  Okay.

7    A  Right.

8    Q  Okay.  Who did you have to explain yourself

9 to, to join the gang?

10    A  Like people higher up, higher than, you

11 know...

12    Q  Like who?

13    A  Like the -- I think the generals.  The -- they

14 was called generals.  They was called generals.

15    Q  What generals did you have to explain yourself

16 to to join the gang?

17    MS. DONNELL:  Objection, foundation.

18    A  I don't recall what I said to get in there,

19 but whatever I said, they let me in.

20    Q  Right.  That wasn't my question.  My question

21 was who were the general or generals you had to explain

22 yourself to --

23    A  I --

24    MS. DONNELL:  Objection, hold on.  Objection

25 foundation.  Just give me a pause before.  I'm

1 saying objection and foundation.  If you know you

2 can answer.

3    THE WITNESS:  I don't know.

4 BY MR. GRILL:

5    Q  How long had you been in the Black P. Stones

6 at the time you were arrested in 1991 for that

7 aggravated battery we were just talking about?

8    MS. DONNELL:  Objection, foundation.

9    MR. GRILL:  Heather, it's based on her own

10 knowledge.  I don't even know what the foundation

11 objection is for unless you're trying to coach her.

12 BY MR. GRILL:

13    Q  Go ahead, Ms. Jones.

14    MS. DONNELL:  I'm not trying to coach her,

15 Andrew.  I don't think you asked the (Inaudible)

16 questions.

17    MR. GRILL:  It's based on her own experience.

18 If you have an objection, it's fine.  You can say a

19 legitimate one, but that's not.

20 BY MR. GRILL:

21    Q  Ms. Jones, how long had you been in the

22 Black P. Stones at the time you were arrested for the

23 aggravated battery that we were just talking about?

24    MS. DONNELL:  Objection, foundation.  You can

25 answer, if you can.

1    A  I don't recall.

2    Q  Okay.  Do you remember how old you were when

3 you joined the Black P. Stones?

4    A  I was 17 when -- I don't recall.

5    Q  You think you'd been in the Black P. Stones

6 for more than a year at the time you were arrested for

7 that aggravated battery?

8    A  I don't recall.

9    Q  Okay.  What sect or group of the

10 Black P. Stones, specifically, were you a member of in

11 1991?

12    A  Black P. Stone.

13    Q  Right.  So you've heard of like the Apache

14 Stones, right?

15    A  Yes.

16    Q  And like the Jet Black Stones, right?

17    A  Yes.

18    Q  And those are all like groups within the

19 Black P. Stones, right?

20    A  Yes.

21    Q  Okay.  So what group were you in?

22    A  The Black P. Stone Nation group, like --

23    Q  Right, I know, but like what sub-group were

24 you a part of?

25    MS. DONNELL:  Objection, foundation.

1    Q  Like were you an Apache Stone?

2    A  No, I just told you what I was, a

3 Black P. Stone.  We say it's initial as B.P.S.N.

4    Q  I know.

5    A  That's it.

6    Q  Right.  So were you a member of any subgroup

7 within the Black P. Stone Nation, such as the Apache

8 Stones, or the Jet Black Stones?

9    MS. DONNELL:  Objection, asked and answered.

10    A  No.

11    Q  Okay.  You've mentioned, or you testified that

12 you were a foot soldier within the Black P. Stone

13 Nation.  What is a foot soldier?

14    A  When you don't have rank.

15    Q  Okay.  What is a foot soldier supposed to do?

16    MS. DONNELL:  Objection, foundation.  But you

17 can answer.

18    A  You're just a -- you foot soldier.

19    Q  Let me ask it this way.  Let's start over.

20    A  Ask me again?

21    Q  So is the foot soldier like the lowest rank in

22 the Black P. Stone Nation?

23    A  Yeah, yeah, yeah, yeah.

24    Q  Okay.  Then what's the next rank above a foot

25 soldier, back in 1991?

78

1      A    It's mufti, general -- yeah, mufti, general.
2   Yeah, that's it, mufti and general.
3      Q    Is there anybody above a general?
4      A    Yeah, yeah.
5      Q    Who is above a general?
6      A    A prince, prince.
7      Q    And who's above a prince, anybody?
8      A    His name's Wakeeta.
9      Q    The prince?
10     A    That's what he was called, yes.
11     Q    Yeah.  Who's above the prince, anybody?
12     A    So he's with the prince right here who up
13  above him, right?
14     Q    Yeah, who's above -- is there a rank higher
15  than the prince?
16     A    General and then mufti.
17     Q    Okay.  So I got foot solider, and then above a
18  foot soldier is a mufti.  Above a mufti is a general.
19  Above a general is a prince; is that right?
20     A    We going up, right?
21     Q    Yep.
22     A    Okay.  Yeah, yeah, yeah, yeah, yeah.
23     Q    Okay.  So then who is above a prince?
24     A    Nobody.
25     Q    Okay.  Not even Jeff Fort?

79

1      A    Jeff?
2      Q    I mean, he would be the boss, right?
3      A    Yeah, I heard about -- I heard -- I heard
4   about Jeff Fort.  I -- I'm not sure with that.
5      Q    Okay.
6      A    I don't recall that, but...
7      Q    Okay.  So with a foot soldier -- well, let me
8   ask you this.  Strike that question.  Who was the
9   general that was, I guess, your general, back in 1991?
10        MS. DONNELL:  Objection, foundation, assumes
11     facts.  You can answer if you can.
12     A    Well, basically, it was a lot of people that
13  was general, but I do not recall their names.  It's a --
14  it was a lot of generals and a lot of muftis, and a lot
15  of soldiers, but one prince.  That's all that I can tell
16  you.
17     Q    That prince being Wakeeta, right?
18     A    Yes, Wakeeta was over everybody, the one that
19  just got out the fed -- federal pen.
20     Q    Yeah.
21     A    Yeah.
22     Q    Did you live on the east or west side of
23  Sherman Park in 1991?
24     A    I stayed on 52nd and Peoria, 52nd and Peoria.
25     Q    So would that be the east or west side of

80

1   Sherman Park?
2      A    I can't recall.
3      Q    Okay.  You knew who -- I believe everybody's
4   testified to this.  You knew who G-Nate was in 1991,
5   right?  G-Nate, you knew who that was in 1991?
6      A    Oh, yes, yes, yes, yes.
7         MS. DONNELL:  You just got quiet there, it was
8      just hard to hear it, so --
9      A    Yes, yes.
10     Q    Okay.  And the G stands for general, right?
11     A    Yes.
12     Q    So that'd been a general, Generate Nate,
13  right?
14     A    Yes.
15     Q    And did you know that his name was Nathaniel
16  Anderson?  Do you understand that to be the case?
17     A    Yeah, I found out that that was -- his name
18  was Nathaniel, like I told you.
19     Q    Yeah.
20     A    Didn't everybody know each other real names
21  like that.  I found that out down the line.
22     Q    Do you know a guy named G-Rock, R-O-C or
23  R-O-C-K, back in 1991?
24     A    Don't recall.
25     Q    Okay.  Did you know what sect -- well, let me

81

1   strike that.  Was G-Nate an Apache Stone?
2      A    To my knowledge, he was a Black Stone.  I
3   don't know about was he an Apache or not.
4      Q    Okay.  Did you know if he was a Jet Black
5   Stone?
6      A    No, he wasn't no Jet Black Stone, no.
7      Q    How are you so sure?
8      A    Because when we had service one day he was
9   over there on the side that I was on.
10     Q    You have to explain what you mean.  I'm not
11  following.
12     A    Like a gathering, we have our gathering.
13     Q    Okay.
14     A    Like he was there, so I knew that he was from
15  around that area.
16     Q    Where was this gathering, in Sherman Park?
17     A    Sometimes Sherman Park, or sometime on 52nd
18  and Aberdeen in somebody basement.
19     Q    Got it.  And there would not be Jet Black
20  Stones at a gathering like this?
21     A    No.  They had their own gathering.  They had
22  their own gathering.
23     Q    And this was in 1991?
24     A    Yes.
25        MS. DONNELL:  Objection, foundation.

82

1    Q   And why wouldn't Jet Black Stones be at a
2  gathering like this?
3       MS. DONNELL:  I'm sorry, can --
4    Q   Based on your experience in the gang and
5  membership, and what you've testified to so far today
6  about that, why would the Jet Black Stones not be at a
7  gathering like the one you're recalling right now where
8  you saw G-Nate?
9       MS. DONNELL:  Objection, form, but you can
10  answer if you can.
11    A   Like that was a different type -- that was a
12  different type of gang, but they all was under the word
13  Stone.
14    Q   Right.
15    A   They had they -- I can't tell you about them.
16  All I could tell you is the Jet Black Stones and Apache
17  Stones, they different, but everybody is a Stone, like
18  that, under the five point star basis, say it like that.
19    Q   Right.
20    A   But they had they -- I -- you know, they had
21  they -- whatever the Jet is, and whatever the --
22  whatever that meant.  I don't know about that, but I
23  just know it was -- everybody was under the five, like
24  CVLs, Travelers, Vice Lords, everybody under the five
25  like that.  I can't really explain what they got going

83

1  on.
2    Q   Okay.
3    A   All I can tell you is about me.
4    Q   Right.  Okay.  And when you say, "they" are
5  you talking about the Jet Black Stones?
6    A   The Jet Black Stones, the Apache Stones, all
7  the -- all the Stones that you could name.
8    Q   Got it.  Okay.  You understood Gerrod Erving
9  was a Jet Black Stone, right, in 1991?
10    A   Yes.
11    Q   And how did you know that?
12    A   Because I knew of him.  We was all in the same
13  neighborhood.
14    Q   Okay.  When the Black Stones and Jet Black
15  Stones were feuding, in your experience, what would it
16  typically be over?
17       MS. DONNELL:  Objection, form, foundation, but
18  you can answer if you can.
19    A   Somebody, you know, basically, I don't like
20  him anyway, you know, stuff like that.  You know, you
21  hear -- you hear these things, so somebody say something
22  smart, they want to fight them.  They was fighting back
23  then.  Fighting.
24    Q   And they had a feud over drug spots where
25  they'd sell drugs out of, as well, correct?

84

1       MS. DONNELL:  Objection, form.  You can answer
2  if you can.
3    A   No.
4    Q   Never?
5    A   No, I don't believe that one.  No, it was just
6  -- like it could be an incident, somebody get into it
7  with somebody family, not knowing that's, you know,
8  situations like that, and that's how it spark up and
9  then it steady go on and on, until somebody talk it out
10  and there'd be a peace treaty.  It could be a peace
11  treaty, and then after that somebody else would get into
12  it.  And then they'd have to start over, all over again,
13  like that.  That's what I knew back then when I was
14  going.
15    Q   This gathering where you saw G-Nate at in
16  1991, do you remember if Arnold Day was there, too?
17    A   I can't recall.
18    Q   Okay.  Did you ever see G-Nate and Arnold Day
19  together?
20    A   No, like I'm sitting here with them, no.
21    Q   Okay.  How many generals were you -- if you
22  can think back to 1991, can you tell me, or ballpark,
23  how many generals in the Black P. Stone Nation there
24  were in, let's say, you know, the area around Sherman
25  Park?

85

1    A   I can't recall.
2    Q   Okay.  So we know of two, right?  We know
3  G-Nate, right?
4    A   Yes.
5    Q   And you know G-Rock, right?
6       MS. DONNELL:  Objection, I don't think -- I
7  think that misstates --
8    Q   Oh, right, no.  You said you didn't.
9       MS. DONNELL:  -- prior testimony.
10    Q   You didn't know G-Rock.  Would you have to
11  report as a foot soldier -- or let me rephase that: Were
12  you under a specific general back in 1991?  Since there
13  was more than one general, was there a specific general
14  that was kind of, for lack of a better term, your boss
15  back in 1991?
16    A   No.
17    Q   Okay.  Are there any other generals that you
18  can remember, other than G-Nate, the names,
19  specifically, back in 1991?
20    A   I know -- no, I can't recall.
21    Q   Okay.  Do you know if G-Nate's alive or dead?
22    A   I heard that he had got killed, him and his
23  son.  Somebody came in his house and killed him and his
24  son.  I was locked up.  They said it was somebody they
25  knew who it was.  I don't know.  That's what I heard

86

1  when I was locked up.
2      Q   Uh-huh.  Could these feuds between the Black
3  Stones and the Jet Black Stones, for example, could
4  those feuds ever turn deadly in your experience?
5      A   Not back then, no, it was just fighting with
6  fists.  Everybody was jumping each other, like chase you
7  and might hit somebody with a bat, but it wasn't really
8  violent.  The violence ain't really -- no, really
9  violent like that, just fighting, jumping on, chasing,
10 running, you get chased, all that.
11     Q   Uh-huh.  Have you ever heard of a term called
12 a nation gun, a nation gun, G-U-N, like a firearm.  You
13 ever hear of that term?
14     A   I don't recall.  Don't recall.
15     Q   do you know if the Black Stones kept guns at,
16 you know, basically 53rd and Aberdeen in 1991?
17     A   No.
18     Q   Did you ever keep guns or hold guns for the
19 Black Stone gang?
20     A   No.
21     Q   Okay.  Was -- do you know if G-Nate was older
22 or younger than you?
23     A   He was older than me.
24     Q   Do you know by like how much?
25     A   I was 17 then.  I believe he should've been --

87

1  if I was 17, I believe he was in his late 20s, or in his
2  20s, I believe, so 30 or some around the time, because
3  they was older than me.
4      Q   Okay.  How do you move up from a foot soldier
5  to a mufti?  How do you move up in rank, back in 1991?
6      A   Don't know nothing about that part.
7      Q   At all?
8      A   Don't know.
9      Q   Can you get in trouble in any way whatsoever
10 with the gang if you talk about, for example, how the
11 gang is organized?
12         MS. DONNELL:  Objection, foundation.
13     A   All I know, if you didn't go to school, you
14 was in trouble.
15     Q   And what does going to school mean?
16     A   School, get your education.
17     Q   Where?
18     A   I had to get my education.
19     Q   Right.  So like --
20     A   You can't be no dumb gangbanger back then.  You
21 have to go to school or you would get beat up, if you
22 didn't go to school.
23     Q   So are you talking about, when you say school,
24 are you talking like school like Tilden High School, or
25 you talking about some other school?

88

1      A   Yeah, yeah.  Grammar school, high school,
2  school, school, like that.
3      Q   Well, you didn't go to school, right?
4      A   Yeah, I --
5          MS. DONNELL:  Objection, form, misstates her
6  testimony.
7      A   -- I had to go to school.
8      Q   Okay.
9      A   Yes, I went to school.
10     Q   Okay.  Did you always attend school, like, did
11 you go every day?
12     A   I had to.
13     Q   Okay.  Like how many days did you miss in
14 school in 1991 before you got arrested?
15         MS. DONNELL:  Objection, foundation.
16     A   I had a mama that didn't play.  Even though I
17 was being bad on my time, my mama didn't play.  You
18 going to go to school.
19     Q   Okay.
20     A   So...
21     Q   Did you have to, as part of your membership in
22 the Black P. Stones, commit crimes for the gang if you
23 were asked to by a higher-ranking gang member?
24         MS. DONNELL:  Objection, foundation.
25     A   No.

89

1      Q   Okay.  Were you ever asked to commit crimes
2  for the gang?
3      A   No.
4      Q   Okay.  Would -- so it's your testimony that
5  the Black P. Stones, that it was important to the gang
6  that its members get an education, and like a formal
7  education, like a regular grammar school or high school,
8  or so?  Is that your testimony?
9      A   Yes.
10     Q   Okay.  And to your knowledge, did people,
11 members of the Black P. Stones, sell drugs for the
12 gangs?
13     A   Yes, yes.
14     Q   Okay.  And then you'd give that money to the
15 gang?
16     A   Not to the gang, but to whoever had that block
17 and whoever, you know.
18     Q   Okay.
19     A   Like a store?  There was a block, like a store
20 like that.
21     Q   Uh-huh.  So had your block that you grew up
22 on?
23     A   Don't recall.
24     Q   Okay.  Who had 53rd and Aberdeen in 1991?
25     A   Don't recall.  Somebody had it, but I don't

1 recall who had it.
2 Q Did Arnold Day have it?
3 A No.
4 Q Okay. Did G-Nate have it?
5 A No.
6 Q Who had the block at 927 West 54th Street in
7 1991?
8 A Johnny, we called him G-Johnny.
9 Q Johnny, G-Johnny?
10 A He deceased now.
11 Q Okay.
12 A I don't know his -- I don't know his whole
13 name, but he was light skinned, braids.
14 Q And he was what?
15 A He was light skinned and he had braids. His
16 name -- we called him G-Johnny.
17 Q G-Johnny. And did you know his real name?
18 A No.
19 Q Okay. Was G-Johnny a Jet Black Stone, an
20 Apache Stone, or a regular Black P. Stone Nation member?
21 A He was --
22 MS. DONNELL: Objection, foundation. If you
23 know, go ahead.
24 A -- he was a Black P. Stone.
25 Q Okay. And what -- you said that the -- let me

1 see what you said here so I get this right. So in your
2 affidavit --
3 MS. DONNELL: Which one, Andrew?
4 MR. GRILL: This is, what, I guess Exhibit 3? I
5 think that was what it was.
6 MS. DONNELL: Okay. I'll make sure she has
7 that.
8 MR. GRILL: Yeah, this 2009 affidavit. Yeah,
9 I'll --
10 MS. DONNELL: Okay. This one.
11 MR. GRILL: -- put it up on the screen here.
12 MS. DONNELL: She has it in front of her, too.
13 MR. GRILL: Yeah, that's why I was just putting
14 it up, and see, so --
15 MS. DONNELL: Okay.
16 MR. GRILL: -- anybody can follow along.
17 BY MR. GRILL:
18 Q So paragraph 9 you say here, Ms. Donnell asked
19 you some questions. "The house where Gerrod was killed,
20 it was known in the neighborhood to be a hype house,"
21 which you'd already told me means a crack house. "Drug
22 users and minor drug dealers hung out at that house."
23 Right, that's what it says, correct?
24 A Yes.
25 Q Okay. So what do you mean by "minor" drug

1 dealers?
2 A As in me, I was selling drugs, up out of that
3 building.
4 Q Right. No, I'm asking like how do you
5 distinguish between a minor drug dealer and, I guess for
6 example, a major drug dealer? Like, yeah, what
7 constitutes in your mind, like, a minor drug dealer, you
8 know, at this rank?
9 A Oh. I believe that that was -- I believe I
10 said that was minor because I was working for General
11 Johnny, G-Johnny from that block. He had that block.
12 Q Uh-huh. Okay. And where did G-Johnny live in
13 1991?
14 A From where, I can't recall. From everywhere.
15 Q Do you know the Taylor family?
16 A Taylor.
17 Q Anyone? Well, let me ask it this way: Do you
18 know the name of the family that owned the building
19 where Gerrod was killed?
20 A No.
21 Q Okay. Did you know anybody that lived in that
22 building in 1991?
23 A The people that was getting high and the
24 people that I was giving the drugs to, to get high.
25 Q Okay. What type of drugs were you giving them

1 to get high with?
2 A I believe I was selling crack and dope, or
3 dope, or both.
4 Q And when you say dope, you mean heroin?
5 A Heroin, yeah -- heroin, heroin, heroin.
6 Q Okay. Do you remember the names of the people
7 in that building that you were selling the drugs to in
8 1991?
9 A No.
10 Q Okay.
11 A No.
12 Q Do you remember if the people in that building
13 were related in any way?
14 A No.
15 Q Okay. Do you know when it was in 1991 that
16 Gerrod was killed? Do you know roughly the date or
17 month that he was killed in?
18 A No.
19 Q Okay. When you think back to when you were
20 arrested for that aggravated battery, how long before
21 your arrest was it that you last sold drugs at the
22 building where Gerrod was killed?
23 MS. DONNELL: Objection, foundation.
24 A I do not recall.
25 Q Okay. How would G-Johnny, in your experience

94

1      -- or let me rephrase that: How would you
2  expect G- Johnny -- actually let me withdraw that, too.
3  When you sold drugs at that house that was on G-Johnny's
4  block, did you have to get G-Johnny's permission or
5  approval in any way to sell drugs out of that house, or
6  in that house?
7      A   No, I was working for -- I was working for
8  G-Johnny.  That was his drugs.
9      Q   Okay.  That was his drug house?
10     A   Yeah.
11     Q   Okay.  And was that his drug house as far as
12 you knew in May of 1991?
13     A   Yes.
14     Q   How do you know that?
15     A   Because he opened up shop right there and we
16 -- and I started sell drugs.
17     Q   How long did he have his shop open selling
18 drugs at that house where Gerrod was killed at?
19     A   I don't recall.
20     MS. DONNELL:  Objection, foundation, but you
21 can answer.
22     Q   Okay.
23     MS. DONNELL:  If you can.
24     Q   And in your experience, would you expect
25 G-Johnny to allow Jet Black Stones to sell drugs on his

95

1  block without his permission?
2      MS. DONNELL:  Objection, foundation.
3      A   The Jet Black Stones wouldn't even come right
4  there because they, the Jet Black Stones, was -- they on
5  the low end across Halsted.  That's the Jet Black Stone,
6  across Halsted, so they wouldn't -- they wouldn't, no,
7  they wouldn't come right there.  That's --
8      Q   Well, they did though, you agree, because
9  that's where Gerrod was killed and he was a Jet Black
10 Stone.
11     MS. DONNELL:  Objection, foundation.
12     Q   So that can't be true, right?
13     MS. DONNELL:  Objection, form and foundation.
14     A   Well, maybe he knew people right there.  I
15 don't know.
16     Q   Okay.
17     A   Because he lived on Carpenter, like, down the
18 street from that incident you're talking about what
19 happened to him.  He lived right down the street from
20 there.
21     Q   Okay.
22     A   So everybody knew some of everybody.
23     Q   Right.  So my question still is: Regardless of
24 where the Jet Black Stones were, in your experience with
25 the gang, being a member in 1991 --

96

1      A   Yes.
2      Q   -- and selling drugs for G-Johnny out of the
3  house where Gerrod was killed, would you expect G-Johnny
4  or how would you expect, I should say, G-Johnny to have
5  reacted to a Jet Black Stone selling drugs on his block
6  without his permission?
7      MS. DONNELL:  Objection, calls for speculation.
8      A   They wouldn't do that.
9      Q   Why?
10     A   Because that was considered disrespectful, and
11 they didn't want to be into it.  That'd be like starting
12 something because the JB, Jet Black Stones, like I told
13 you, are across Halsted.
14     Q   Uh-huh.
15     A   Some of them live in the areas where the
16 Black P. Stones called it for the area.
17     Q   Uh-huh.
18     A   So they was living -- some of them was living
19 through -- living in there.  So it wasn't, you know, it
20 -- it wasn't no problem if they was right there, but
21 they wasn't right there selling drugs.  I can tell you
22 that because I was right there selling drugs.
23     Q   Uh-huh.  So it's your testimony that your
24 experiences with the gang cause you to believe that if a
25 Jet Black Stone was selling drugs without Johnny's

97

1  permission on his block, that that could cause a feud of
2  some sort between the Jet Black Stones and the
3  Black P. Stone Nation; is that right?
4      MS. DONNELL:  Objection to the extent it
5  misstates her testimony, but you can answer if you
6  can.
7      A   Again, they would not do that.
8      Q   Okay.  If a Jet Black Stone was selling drugs,
9  for example, on Johnny's block, in 1991, without
10 Johnny's permission, G-Johnny's permission, could that
11 Jet Black Stone get killed?
12     MS. DONNELL:  Objection, form, calls for
13 speculation, foundation, and incomplete
14 hypothetical, but you can answer if you can.
15     THE WITNESS:  No.
16 BY MR. GRILL:
17     Q   No?  Why not?
18     A   No.
19     Q   Why?
20     A   He would just, basically, if someone -- if
21 someone far as what I have seen growing up, about the
22 drug people who got blocks, you know, state blocks, but
23 you know -- this, you know this my block.  And you know
24 I'm selling drugs out here.  If you want to sell some
25 drugs, you're going to go back over there where you at.

98

1  Sell your drugs over there from where you're from.
2  That's all.
3      Q   Did you ever, in your neighborhood growing up,
4  hear about people getting shot and killed over disputes
5  about where people were selling drugs, anything like
6  that?  You ever hear of anything like that happening in
7  your neighborhood growing up?
8      A   I don't recall.  I don't recall.
9      Q   Yeah.  Okay.  You ever see Arnold Day in that
10  house at any point prior to your arrest for that
11  aggravated battery where Gerrod was killed?  You ever
12  see Arnold Day there?
13     A   No.
14     Q   Okay.  You ever see G-Nate there?
15     A   No.
16     Q   Okay.  How long had you been selling drugs out
17  of the house where Gerrod was murdered before your
18  arrest?
19         MS. DONNELL:  Objection, asked and answered,
20     and foundation.
21     A   I don't recall.
22     Q   Okay.  Do you know if any of the people that
23  were in that house, that lived there, who you sold drugs
24  to, were members of any particular gang in the
25  neighborhood, in 1991?

99

1          MS. DONNELL:  Objection, foundation, calls for
2      speculation.  If you know you can answer.
3      A   No.
4          MS. DONNELL:  Andrew, can we take just a short
5      break?
6          MR. GRILL:  Yeah.
7          MS. DONNELL:  Oh, and maybe -- let's go off the
8      record.
9          (OFF THE RECORD)
10         COURT REPORTER:  We are back on the record for
11     the deposition of Tennelle Jones.  My name is
12     Sydney Little.  Today is September 29, 2022 and the
13     time is 1:07 p.m.
14  BY MR. GRILL:
15     Q   All right.  Ms. Jones, you can hear me still?
16     A   Yes.
17     Q   All right.  Did you have a nice lunch?
18     A   Yes.
19     Q   Okay.  Good.  Did you -- I got to ask you, did
20  you talk with Ms. Donnell about any of your testimony so
21  far today, over the lunch break?
22     A   No.
23     Q   Okay.  And did you review any documents or
24  anything like that over the lunch break?
25     A   Uh-uh.  No.

100

1      Q   Okay.  Great.  When -- I want to just ask a
2  few more questions about the house outside of which
3  Gerrod was killed.  Did you know of any other gang or
4  general, for example, other than G-Johnny, that ever
5  controlled that block that the house was on?
6      A   Run that by me again.
7      Q   Okay.  So you testified earlier that G-Johnny
8  was the general that controlled the block --
9      A   That building, that was --
10     Q   Yeah.
11     A   Yeah.
12     Q   Right.  Okay.  So do you know, was there any
13  other general that ever controlled that block or that
14  building, to your knowledge, other than G-Johnny, before
15  1991 when Gerrod was killed?
16     A   No.
17     Q   Okay.  All right.  Here, let me put this back
18  up on the screen for you.  This will be easier to do.
19  Okay.  All right.
20         MR. GRILL:  So this is, I think, what is this,
21     Exhibit 2, Heather, that 2009 affidavit?
22         MS. DONNELL:  Exhibit --
23         MR. GRILL:  The 2009?
24         MS. DONNELL:  Oh, the 2009 is Exhibit 3.
25         MR. GRILL:  Okay.

101

1  BY MR. GRILL:
2      Q   So this is Exhibit 3.  So I want to draw your
3  attention to paragraph 4, okay?  And it states, just to
4  refresh you, it states here in your affidavit, "Sometime
5  during 1993 I was interviewed by a white male person who
6  told me he was investigating the murder of Gerrod
7  Erving.  This person did not identify himself as a
8  Chicago Police Officer."  So did you believe, though,
9  that this person was a law enforcement officer when this
10  person came to visit you?
11     A   I don't recall.  I don't recall.
12     Q   Okay.  Did this person show you a badge or
13  anything like that, like saying: I'm a cop?
14     A   Like I could tell that he's, you know, they
15  had, you know -- you know, they had they regular clo --
16  you know.
17     Q   Regular clothes, okay.
18     A   That's -- you know how you-all have unmarked
19  uniform, whatever.  You know how you called it, unmarked
20  uniform?
21     Q   Yeah.  So you don't remember if you thought
22  that this person was law -- believed that this person
23  was a law enforcement officer; is that right?
24         MS. DONNELL:  Objection, asked and answered,
25     but you can answer.

1   A   Right.
2   Q   Okay.  Do you know if this person that came to
3   visit you in 1993, this white male person, if this
4   person was working on behalf of Arnold Day as part of
5   his, like, criminal defense?
6   A   Don't recall.
7   Q   Okay.  Did anybody ever come talk to you about
8   testifying as part of Arnold Day's criminal trial?
9   A   Do you mean did the police call me?
10   Q   I'll take it in pieces:  Did anybody
11   representing -- do you have any recollection of anybody
12   representing Arnold Day in his criminal case, so you
13   know, while he's waiting to go to trial for killing
14   Gerrod Erving, do you recall anybody from his defense
15   team, a lawyer, for example, or an investigator, coming
16   to speak with you about what, if anything, you knew
17   about Gerrod's murder?
18       MS. DONNELL:  Objection, form, but you can
19   answer.
20   A   I don't recall.
21   Q   Okay.  Did anybody from the state's attorney's
22   office -- well, let me strike that.  You understand what
23   a state's attorney is, right?
24   A   Yes.
25   Q   Did you know what a state's attorney was in

1   1991, 1992, 1993?
2   A   Yes.
3   Q   All right.  Did anybody from the state
4   attorney's office, to your memory, talk to you or
5   contact you about testifying or being a witness in
6   Arnold Day's criminal trial?
7   A   No.
8   Q   Okay.  How did you find out -- when you think
9   back to 1991, how did you find out where it was that
10   Gerrod Erving was killed?
11       MS. DONNELL:  Objection, foundation, but you
12   can answer if you can.
13   A   You know, growing up, when somebody die it's
14   like a news, it travels.  I heard -- I heard about it
15   when I was locked up -- or when I got out, I recall.
16   Q   Okay.
17   A   If I recall.
18   Q   How long after your arrest for the aggravated
19   battery was it, in your estimation, that you found out
20   that Gerrod had been killed?
21       MS. DONNELL:  Objection, foundation.
22   A   Do -- I don't know.
23   Q   Okay.  Do you believe that you knew that
24   Gerrod had been killed before you plead guilty to that
25   aggravated battery?

1   A   Don't recall.
2   Q   Okay.  Do you believe you found out in 1991
3   that Gerrod had been killed?
4   A   I heard about it.
5   Q   Okay.  And you heard that, you know, just in
6   the community -- or excuse me, you were locked up, but
7   news had gotten to you by that point, right?
8   A   Yes.
9   Q   Okay.  Do you remember if you found it out
10   from a specific person that Gerrod had been killed?
11   A   No.
12   Q   All right.  What year did you get out of jail
13   for the aggravated battery?
14   A   I don't recall.
15   Q   Did you ever serve any time for any crimes
16   after you were released from the juvenile detention
17   facility, I guess, out in Warrenville?  Did you ever go
18   to jail again for anything else?
19       MS. DONNELL:  Objection to the extent she's
20   already testified to --
21       MR. GRILL:  Yeah, I know.
22   BY MR. GRILL:
23   Q   I should've just said, like, I don't remember
24   what you said before, if you'd just remind me.
25   A   Oh.  I don't recall.

1   Q   Okay.  Since after you were arrested for the
2   aggravated battery, and were sitting in the juvenile
3   detention facility, do you have any recollection of
4   Arnold Day trying to contact you for any reason
5   whatsoever while you were in the juvenile detention
6   facility, subsequent to your arrest for the aggravated
7   battery?
8   A   No.
9   Q   Do you have any recollection of anybody
10   connected with Arnold Day trying to get a message to you
11   of any sort on behalf of Arnold Day while you were in
12   the juvenile detention facility?
13       MS. DONNELL:  Objection, assumes facts not in
14   evidence, calls for speculation, foundation, but you
15   can answer.
16       THE WITNESS:  No.
17   BY MR. GRILL:
18   Q   Okay.  Did you ever receive any letters from
19   Mr. Day?
20   A   No.
21   Q   Did you ever receive any letters from anybody
22   connected with, or writing to you on Arnold Day's
23   behalf, while you were in the juvenile detention
24   facility?
25   A   No.

1    Q  Did you receive any phone calls from Mr. Day
2 while you were in the juvenile detention facility?
3    A  No.
4    Q  Did you ever try to call him?
5    A  No.
6    Q  Okay. Did you ever try to get a message of
7 any sort to Arnold Day while you were in the juvenile
8 detention facility?
9    A  No.
10    Q  Between your -- strike that question. Did you
11 know where Arnold Day lived in 1991?
12    A  No.
13    Q  Did you know anybody in his family?
14    A  No.
15    Q  Do you know what rank Arnold Day held in the
16 Black Stones when you were a foot soldier in the Black
17 Stones?
18    A  He didn't have no rank. I believe he was a
19 foot soldier.
20    Q  Why do you believe that?
21    A  Because they wasn't nobody calling him a mufti
22 or a general. That's how you know when somebody got
23 rank. They would say mufti whatever and general such
24 such. He did not have no rank.
25    Q  Do you know if he -- sorry.

1    A  All he was, was Little A.
2    Q  Did you have a nickname?
3    A  Tennelle.
4    Q  That was your nickname, just Tennelle?
5    A  I went by my real name, Tennelle.
6    Q  Okay. How did you know that Arnold Day was a
7 foot soldier in the Black P. Stone Nation in 1991?
8      MS. DONNELL: Objection to asked and answered,
9 but you can answer.
10    A  Repeat that.
11    Q  How did you know Little A was a foot solider
12 in the Black P. Stone Nation in 1991?
13    A  Because, again, they didn't say, Mufti Little
14 A, or General Little A. He was just Little A. Like I'm
15 just Tennelle, like that.
16    Q  Would you ever see Arnold Day, or Little A at
17 any gatherings of the Black P. Stone Nation of
18 gatherings of the gang members?
19    A  No, no.
20    Q  Right. So what I'm trying to figure out is
21 like if there's anything that you observed, either
22 Arnold Day doing or that you did with him, that would
23 prove or establish that Arnold Day actually was a
24 member, a foot solider, in your description, in the
25 Black P. Stone Nation in 1991.

1      MS. DONNELL: Objection, form. You can answer
2 if you can.
3    A  Say that again.
4    Q  Okay. Was there -- did the gang -- did the
5 Black P. Stone Nation have like a special handshake that
6 gang members would use to greet each other with?
7    A  Oh, yeah, yeah, yeah.
8    Q  Okay. And did you ever greet Arnold Day using
9 that handshake?
10    A  No.
11    Q  Okay. What types of things would you see
12 Arnold Day do, prior to your arrest for the aggravated
13 battery, that would tell you that Arnold Day was a
14 member of the Black P. Stone Nation?
15      MS. DONNELL: Objection, form, foundation, but
16 you can answer if you can.
17    A  Because I heard that he was a patsy Stone.
18    Q  Okay. And who did you hear that from?
19    A  Like through the area, through the
20 organization, like, what I was in, a Black P. Stone. I
21 heard.
22    Q  Okay.
23    A  Like everybody I didn't know personally like
24 that, we just knew, you know.
25    Q  Okay. Do you know if Arnold Day ever attained

1 a rank higher than foot soldier within the Black P.
2 Stones?
3    A  No.
4    Q  Okay. Back in 1991, how did you typically
5 dress, like, what types of clothes would you wear?
6      MS. DONNELL: Objection form, vague.
7    A  I could -- my mama was dressing me, first of
8 all, so I just had on what my mama put me on.
9    Q  When you were out representing, you know, I
10 guess, gang banging or being on the street, being a part
11 of the gang, would you wear a dress, for example?
12    A  No.
13    Q  Okay. Would you wear gang colors?
14    A  I believe I had wore gang colors.
15    Q  And what colors would those be?
16    A  Black and red.
17    Q  Okay. Did you ever see Arnold Day wearing
18 colors like that?
19    A  No.
20    Q  Okay. Do you know what a tomboy is?
21    A  That's what I was growing up.
22    Q  Okay. Why would you describe yourself as a
23 tomboy?
24    A  Because I liked doing what the guys was doing,
25 all the young guys doing.

1    Q   Got it.  That's great that I had that up on
2   the screen.  I would appreciate it if somebody had said
3   that, but that's all right.
4        MS. DONNELL:  We're not really -- I mean, what,
5   that the exhibit was up?
6        MR. GRILL:  That's the whole problem with
7   screen sharing.  Sometimes I just put stuff up there
8   you're not supposed to have, but whatever.
9        MS. DONNELL:  I didn't see what you had up
10  there.  You didn't --
11       THE WITNESS:  I seen it.
12       MR. GRILL:  Yes.  Then I guess you knew what my
13  question was going to be so I guess it's like, hey,
14  Tennelle, we --
15       THE WITNESS:  No, no, no.  I seen this, the
16  paper.
17       MS. DONNELL:  We didn't -- Andrew, to be clear,
18  the only thing you were sharing with us was Exhibit
19  3.
20       THE WITNESS:  Yeah, that, that.
21       MR. GRILL:  Oh, good.  I thought I had part of
22  my outline up there.
23       MS. DONNELL:  We don't even know what you're
24  talking about here.
25       THE WITNESS:  Right.

1        MR. GRILL:  I saw it and I'm like, oh, man,
2   I've been sharing this, this whole time.
3        MS. DONNELL:  I don't know what you're even --
4   your outline is it?
5        MR. GRILL:  Great.  No, I have no problem then.
6        MS. DONNELL:  If I saw your outline I would've
7   mentioned it as a courtesy, but it was just Exhibit
8   3.
9        MR. GRILL:  Good.  That was a close call.  All
10  right.  So let me try this dangerous screen sharing
11  one more time.
12  BY MR. GRILL:
13       Q   So here you said that -- this is Exhibit 3
14  again.  Let's see.  Oh, maybe it wasn't in here.  This
15  is what it was.  Okay, yeah.  In paragraph 7, you say
16  here, "He then showed me a document that listed me as a
17  male" in your affidavit.  This is in paragraph 7.  So
18  the document, do you remember what the document was?  I
19  can't -- and I'm sorry if Ms. Donnell asked you this.  I
20  may have missed your answer on this, but if you could
21  tell me again, what was the document that you were
22  shown?
23       A   When I -- when I say document, I said that
24  based -- because that, I guess that's what it was.  So
25  he showed me a paper saying that Tennelle Jones, a male,

1   and that's it.  It said that he couldn't -- I was locked
2   up.  Like basically he couldn't lock me up because I was
3   locked up.  I couldn't tell him nothing.  I didn't know
4   what was going on.
5        Q   So you don't remember what the document was
6   that you were shown?
7        A   I -- I seen my name, and it said a male named
8   Tennelle Jones.
9        Q   Okay.
10       A   That's all I paid -- Tennelle Jones, they said
11  a male, and I was like -- I was locked up, so I don't
12  know what to tell you.
13       Q   You've seen police reports, right?
14       A   Yeah, the one that -- this one that I see in
15  front of me, yeah.
16       Q   Okay.  Was the document that you were shown,
17  did it look like a police report?
18       MS. DONNELL:  Objection, foundation, calls for
19  speculation.
20       A   No, it was -- it was typed.  It was --
21  whatever it was, it was typed out.  It said my name.
22  That's all I can remember.
23       Q   Okay.  Did you know anyone with the nickname
24  of Tattoo in 1991?
25       A   No.

1        Q   Okay.  You said that you did not know a person
2   named Ralph Watson in 1991, right?
3        A   No.
4        Q   That name doesn't ring a bell at all?
5        A   No.
6        Q   Okay.  Did Ms. Donnell ask you, when you were
7   preparing for your deposition, any questions about
8   Ralph Watson?
9        A   I can't recall.
10       Q   Were you shown a statement, a handwritten
11  statement, you know, given by Ralph Watson, that said
12  you were a lookout at the time Gerrod was killed?
13       A   Oh, yeah -- yes.
14       Q   You were shown that statement?
15       A   No, I didn't -- it wasn't shown like, it was,
16  you know, it was explained to me that that's what that
17  person said, that I supposed to been doing and I'm
18  trying to figure out how I was doing this and I wasn't
19  even there.
20       Q   Okay.  And it's your testimony you don't even
21  know who Ralph Watson is; is that right?
22       A   I wasn't there.  I was locked up.
23       Q   No, no.  My question is, though, just so we're
24  clear, perfectly clear:  Your testimony today is that you
25  do not know, or did not know, a person named Ralph

114

1 Watson in 1991; is that fair?
2     MS. DONNELL:  Objection, asked and answered,
3 but you can answer again.
4     A   Yes, I did not know.
5     Q   Okay.  So Ralph Watson, as Ms. Donnell, I
6 guess, told you during your prep, gave a statement to
7 the police that said, among other things, that you were
8 a lookout.  Now, at the time Gerrod was killed, and I
9 understand, of course, that you know, your testimony is
10 that you were locked up at the time Gerrod was killed,
11 but Ralph Watson gave a deposition in this case already,
12 much like you're doing today.  And Ralph said in his
13 deposition, that not only that he knew you, but that you
14 two had a -- at least a minor romantic relationship
15 before Gerrod was killed.  Does that refresh your
16 recollection at all about whether you knew a person
17 named Ralph Watson?
18     MS. DONNELL:  I'm just going to object to the
19 form of the question, but you can answer if you can.
20     A   I don't recall.
21     Q   Okay.  Did you know anyone with the nickname
22 Boogie?
23     A   Yes.
24     MS. DONNELL:  I'm sorry, could you say that
25 again?

115

1     Q   Boogie.
2     A   Yes, I do.
3     Q   Who is Boogie?
4     A   Another Black P. Stone that I knew of, used to
5 steal and rob people.  That's what I heard he used to
6 do.
7     Q   Okay.
8     A   Not -- I never seen him do none of this, you
9 know, like when you live in an area in the hood, stuff
10 travel.  That's what I heard he did, he was doing, back
11 in the day.  That's all I know.
12     Q   Did you ever have a romantic relationship of
13 any sort with Boogie?
14     A   No, no.
15     Q   You ever, like, make out with him, kiss him,
16 anything like that in the past?
17     A   No.
18     Q   You're laughing, why?
19     A   Because you ask me all these corny questions.
20     Q   So why do you seem pretty emphatic about no
21 way that never could've happened?  Why do you say that?
22     A   Because like growing up, when I was growing
23 up, it was a lot of guys liked me, and certain guys I
24 hung out with, they say: Tennelle, I want for them to --
25 I want the tea, nigger, because I know how you is.  I

116

1 ain't going near your mouth -- and I told you ain't --
2 you know, stuff like that.
3     Q   Okay.
4     A   That's why I laughed because it brought me
5 back to, you know, what they used to say.
6     Q   Got it.  Do you know if Ralph Watson was a
7 member of the Black P. Stone Nation in 1991?
8     MS. DONNELL:  Objection, foundation.
9     A   Is that Boogie?  That supposed to be Boogie,
10 right?  Boogie real name Ralph?
11     Q   Well, let me just ask you this way.  Do you
12 know if Boogie was a member of the Black P. Stone
13 Nation?
14     A   Yes.
15     Q   He was?
16     A   Yes.
17     Q   Do you know if he held any rank within the
18 Black P. Stones in 1991?
19     A   No.
20     Q   Do you know if he was a member of the Apache
21 Stones?
22     A   No.
23     Q   No, he wasn't or no, you don't know?
24     A   No, he wasn't.
25     Q   Okay.  Do you know whether he was a member of

117

1 any particular sect, although not the Apache Stones, but
2 like the Apache Stones, in 1991?
3     A   No, he was a Black P. Stone, like what me and
4 Little A were.
5     Q   Okay.  Do you know if Boogie ever sold drugs
6 out of the house where Gerrod was killed?
7     A   No.
8     Q   Okay.  No, he didn't or no, you don't know?
9     A   No, he didn't.
10     Q   How do you know that?
11     A   Because I, like I -- when you asked me
12 earlier, and I told -- I was selling drugs out that
13 building and I was working for Johnny.  Boogie was on
14 the other side, selling drugs on Bishop, across the
15 park, across Sherman Park.  He was from on that side, so
16 no, it was not possible that he could be selling drugs
17 right there.
18     Q   Did you have any dispute or feud or any bad
19 blood between you and Boogie before your arrest for that
20 armed robbery?  You think back?
21     A   No.
22     Q   Not at all?
23     A   No.
24     Q   Okay.  Can you think of any reason why Ralph
25 Watson, why Boogie, might tell the police that you were

118

1 involved in a murder as a lookout when you were in
2 custody at the time?
3     MS. DONNELL: Objection, calls for speculation,
4 foundation. If you know you can answer.
5     A   Well, you know, back in the days, they was
6 lying on anybody to get out of jail and if the police
7 beating you, beating you, and you can't take pressure --
8 and you going sign whatever they say sign. That's what
9 I heard they was doing, get beat to death, and you going
10 sign. So he came up with something. That's all I can
11 figure out, that's how it happened. He came up
12 something. He had to come up with something.
13     Q   Are you saying that you heard from somewhere
14 that Boogie had been beaten by the police into giving a
15 statement against you and Arnold Day?
16     A   I don't recall at the time, but I heard that
17 they was beating the -- I mean, the police was beating
18 up -- beating up the, you know, the detainees.
19     Q   Yeah, but my question is specific, and
20 if you don't know, just say you don't know, but --
21     A   Okay.
22     Q   -- did you hear from any source that Boogie
23 was beaten into giving a statement to the police
24 implicating you as a lookout, and Arnold Day as one of
25 the people responsible for killing Gerrod Erving?

119

1     A   Yes.
2     Q   Who did you hear that from?
3     A   In this, basically, this was what it -- I
4 heard he had cases, and he was trying to get up out on.
5 They was trying to put some cases on him.
6     Q   Who did you hear that from?
7     A   I don't recall.
8     Q   Okay. Is that something you heard recently or
9 is that something you knew back in like 1991, '92?
10     A   I heard that back in 19 -- back in -- back in
11 that, when -- around that time that, you know.
12     Q   Okay.
13     A   Back in '90 whatever, '91.
14     Q   Got it. What's in your mind right now that's
15 making you think that you heard that information back in
16 the early '90s?
17     A   Because they were beating people and making
18 them sign bogus statements that they didn't do, for they
19 wouldn't get locked up for all the things that they did,
20 basically.
21     Q   Is it your -- sorry, go ahead. I thought you
22 were done. Are you done with your answer?
23     A   Yes.
24     Q   Okay. When is the last time that you saw
25 Boogie?

120

1     A   When I was little.
2     Q   Okay. After you got out of jail from the
3 aggravated battery, out of Warrenville, did you remember
4 seeing Boogie at any point after that?
5     A   If I go -- if I ride my bike to 51st, there
6 used to be a restaurant right there, the Curse Train,
7 across the street, 51st and Racine. That's where he
8 hung out at over in that area. Like if I ride my bike
9 over there, give me something from the restaurant. I
10 see him like that, but other than that, I ain't friends
11 like that.
12     Q   What kind of cases did you hear that Boogie
13 was facing back in the early '90s?
14     A   I could tell you what I heard he was known for
15 doing.
16     Q   Yeah, what did you hear?
17     A   Snatching purses, chains, you know how the
18 buses used to be? And you, the window be open, snatch
19 and run, and go. That's what I heard.
20     Q   So robbing people, basically?
21     A   Yes. That was in the store.
22     Q   Okay. And do you know what part of the
23 neighborhood he was typically doing that in?
24     A   I don't recall.
25     Q   Okay. It was in the area, though, around

121

1 where Gerrod was killed, though, right?
2     A   Uh-uh.
3     MS. DONNELL: Objection, form, foundation.
4     Q   No?
5     A   No, because like I told you, he hung across
6 Sherman Park. He wasn't really coming over there where
7 -- he never -- I never seen him around 52nd area and
8 Peoria. I always seen him if I went to the restaurant
9 on 51st and Racine right there.
10     Q   Uh-huh. While you were in the juvenile
11 detention center for the aggravated battery from the
12 time that you were arrested and then up until the point
13 where you were released, did you ever get any messages
14 from Ralph Watson of any sort while you were there, from
15 Boogie?
16     A   No.
17     Q   Did you ever try to get ahold of him in any
18 way, through anybody, while you were in the juvenile
19 detention facility?
20     A   No.
21     Q   Okay. Do you know a person named
22 Krona Taylor?
23     A   They -- do they have a nickname?
24     Q   I don't know if she does.
25     A   No.

122

1    Q    Krona maybe, K-R-O-N-A, Taylor?
2    A    No.
3    Q    All right.  Carl Taylor, does that name ring a
4  bell to you?
5    A    No.
6    Q    Okay.  Did you have any ax to grind, for lack
7  of a better term, at all, with Boogie, back in 1991?
8    A    Could you --
9    Q    Did you have any problem with him at all?
10    A    Oh, no, no, no.
11    Q    Okay.  Do you know who Delores Taylor is?
12    A    No.
13    Q    Brian Gaston, do you know who that is?
14    A    No.
15    Q    Michael Gales, do you know who that is?
16    A    No.
17    Q    Everybody had nicknames that we wasn't -- I
18  didn't know everybody real -- I didn't know nobody real
19  name like that.  I just used my name, Tennelle.
20  Everybody had nicknames.  I didn't pay attention to
21  that.
22    Q    What about Bernard Gales, does that name ring
23  a bell to you?
24    A    No.
25    Q    G-Rock?

123

1    A    No.
2    Q    Okay.  Devito Taylor, do you know who that is?
3    A    No.
4    Q    Edward Robinson?
5    A    No.
6    Q    Hang on one second.  Do you know somebody
7  named Kwame Tate?
8    A    Yes.
9    Q    How do you know him?
10    A    Gang member.
11    Q    What gang?
12    A    He didn't have no rank, if that's what you're
13  going to ask.  He didn't have no rank.  He B.P.S.N,
14  Black P. Stone Nation, no Jet Black, no other stuff.
15  Same thing I was.
16    Q    Got it.  And did you know if he had a
17  nickname?
18    A    Kwame, he went by Kwame.
19    Q    He ever go by the nickname Yum, Y-U-M?
20    A    Oh, that's what he call himself now.  I heard
21  about that.  That's what he call himself now, Yum, but
22  he wasn't Yum back then.  He was Kwame.
23    Q    Okay.  So it sounds like you keep some tabs on
24  Kwame Tate up to this day; is that correct?
25    A    No, I don't keep tabs on nobody.  I'm just --

124

1    Q    Well, how do you know that that's his nickname
2  now?
3    A    Like growing up, you still -- I know some of
4  the people that me and Kwame, like, we hung out.  So I
5  knew Kwame.  We hung out.
6    Q    Okay.  When is the last time you saw Kwame?
7    A    Last year he was -- he got out the fed.  He
8  was driving working for FedEx and they had -- somebody
9  had -- somebody birthday or some, over there on a side
10  street or over there, and I was just stopping by.
11    Q    Uh-huh.
12    A    But it wasn't because I seen him over there
13  when I was over there with one of my other little
14  homies.
15    Q    What little homie?
16    A    Huh?
17    Q    What little homie were you over there with?
18    A    His name Deno.  He live over -- he still live
19  over there.  We call him Deno.
20    Q    Okay.
21    A    He young.  He younger than me.
22    Q    When is the last time you talked to
23  Kwame Tate?
24        MS. DONNELL:  I think that was just asked and
25    answered.

125

1        MR. GRILL:  That was the last time she saw him.
2  BY MR. GRILL:
3    Q    I'm asking now when was the last time you
4  talked to him.
5    A    Well, I spoke to him, gave him a hug, like,
6  "Welcome home. I see you up doing a FedEx thing."
7    Q    Okay.
8    A    That was like, I believe, last year sometime
9  and that was it.
10    Q    What about before then?  When is the last time
11  before then that you'd spoke with Kwame?
12    A    When we was -- when I was -- back in '90 --
13  '91.
14    Q    Okay.  So is this before you were arrested on
15  the aggravated battery or after?
16        MS. DONNELL:  Objection, foundation.
17    A    I don't recall.
18    Q    Okay.  After you were arrested on that
19  aggravated battery, did you speak or do you have a
20  recollection of speaking with Kwame Tate at all?
21    A    No.
22    Q    Do you have any recollection of him trying to
23  contact you?
24    A    No.
25    Q    Okay.  What about anybody that's friends with

126

1    Kwame trying to get a message to you of any sort on
2    behalf of Kwame Tate after you were arrested?
3        MS. DONNELL:  Objection, foundation, calls for
4    speculation.
5        Q    Any memory like that?
6        A    No.
7        Q    Okay.  I'm going to share something here with
8    you.
9        MR. GRILL:  So this got sent over, Heather, to
10   you this morning, so I think I actually have the
11   non- Bates Stamped version, but this is the arrest
12   report, the -- yeah, arrest reports for Ms. Jones,
13   and it's a nine page document.
14   BY MR. GRILL:
15       Q    Ma'am, can you see what I'm sharing with you
16   on my screen?
17       A    Yeah, I see.  It's -- yes, yes.
18       Q    Okay.  So this is an arrest report for a
19   Tennelle C. Jones.  C is your middle name, right?
20       A    Yes.
21       Q    And it's got --
22       MS. DONNELL:  Hey, one second, just Andrew,
23   because you're not -- it's not Bates Stamped, you're
24   showing page 9 of 9?
25       MR. GRILL:  Page 9, yeah.  Yeah, and I'm going

127

1    to go through the information on it so it'll be
2    clear what I'm talking about for the record.
3        MS. DONNELL:  And just for the record, and you
4    already said that, but these are documents that were
5    requested but only produced, you know, an hour
6    before Ms. Jones dep from the city that had been
7    previously requested, but you may proceed.
8    BY MR. GRILL:
9        Q    So it has your date of birth,
10   December 25, 1975, right?
11       A    Yes.
12       Q    Okay.  So this is an arrest for, let's see,
13   strong armed robbery, is what it says here, and it's
14   from May 10, 1990.  Do you remember being arrested on
15   May 10, 1990 for a strong armed robbery?
16       A    No.
17       Q    Okay.  The victim's name is Toya Smith.  Does
18   that name ring a bell?
19       A    No.
20       Q    And it looks like she lived at 1037 East 132nd
21   Street in Chicago.  Does that refresh your memory about
22   whether --
23       A    No.
24       Q    -- you were arrested for the strong armed
25   robbery in 1991?

128

1        A    I don't remember.
2        MS. DONNELL:  Asked and answered.
3        A    Okay.
4        Q    Okay.  This next one, this is on page 8 of
5    this exhibit.  I guess you can mark this Exhibit 4.  So
6    let's see is this the -- well, this is different.  Okay.
7    So this is for an arrest report for Tennelle C. Jones,
8    and this one is for theft, and it occurred on October
9    30, 1990 and the victim was a Yolanda Roach.  Do you
10   remember this arrest?
11       (EXHIBIT 4 MARKED FOR IDENTIFICATION)
12       A    No.
13       Q    Okay.
14       A    No, I don't remember that.
15       Q    Okay.  This is a -- on page 7.  This is an
16   arrest on December 21, 1990 for Tennelle C. Jones for
17   disorderly conduct and, yeah, do you remember being
18   arrested for disorderly conduct on December 21, 1990?
19       A    No.
20       Q    Okay.  The arrest location was at 820 West
21   51st Place.  Do you remember being arrested at that
22   location?
23       A    No.
24       Q    Do you know who lives at that address?
25       A    No.

129

1        Q    Okay.  This is page 6.  Just kind of go in
2    chronological order.  This one is an arrest date on your
3    birthday, December 25, 1990.
4        A    Stole a car.
5        Q    Let's see.  Yep, criminal trespass to vehicle.
6        A    I remember that, yeah.
7        Q    Hey, you got it.
8        A    I remember that now -- now.
9        Q    Okay.
10       A    Yeah.
11       Q    And the victim's name was Rudie Brown.  Did
12   you know who Rudie Brown was?
13       A    I guess the victim car, who I stole the car.
14       Q    Right.  So it's not somebody you know, right?
15       A    No, I don't know that, no.
16       Q    Okay.  And is this a crime that you actually
17   committed?
18       A    Oh, yeah.  Stole a car, yeah.  My -- yeah,
19   yeah, one of the dudes came and got me.  He had stolen a
20   car, but he didn't know how to drive, so I always drive
21   the cars.  He'd go steal them and I'll drive them.
22       Q    Got it.
23       A    Because that's what I liked doing, being
24   chased by the police.
25       Q    Were you chased by the police on that --

130

1     A   Yeah, I was chased by the police.  I gave the
2   police a chase.  Yes, I did.  I told you.  That was back
3   then.  I've changed now.
4     Q   In a car, like a car chase, or were you on
5   foot being chased by police?
6     A   A car chase.
7     Q   Okay.
8     A   But the other dude got away.  He got away.  He
9   ran.  He got away one shoe on, and it was cold out
10  there.  But anyway, moving right along -- but yeah.
11    Q   This is page 5.  This is an arrest on January
12  27, 1991, so about a month later.  And this one is for
13  another criminal trespass to vehicle.  And you were
14  arrested at 5224 -- so I guess you were arrested at home
15  in this one.  Do you remember getting arrested again on
16  January 27, 1991?
17    A   I had so many stolen car case, I don't -- I
18  don't recall.
19    Q   Okay.  So it's your testimony that you recall,
20  though, being arrested for stealing cars more than once?
21    A   I believe I got caught a couple of times.
22    Q   Okay.  What would you do with the cars after
23  you steal them if you didn't get caught?
24    A   I told you I'd make the police chase me and
25  we'd crash and then jump out and run from them and get

131

1   them to chase.
2     Q   Okay.  If you didn't get chased and you didn't
3   crash, what you would do with the stolen car, typically?
4     A   Keep it and ride around in it.
5     Q   Okay.  Anything else?
6     A   Nope.
7     Q   Okay.  All right.  So this one is an arrest
8   from August 15, 1991 and it's for aggravated battery,
9   discharge of a firearm, and the victim is Jumal Jones.
10  Do you remember this arrest?
11    A   Oh, they saying I shot somebody?
12    Q   Well, it's aggravated --
13    A   Oh, aggravated.
14    Q   -- battery, discharge of a firearm.  And that
15  doesn't necessarily mean that you shot somebody.  It
16  just means that you discharged a firearm at the
17  commission of a battery, whether it hit somebody is a
18  different story.  Do you remember something like this,
19  though?
20    A   Yeah.
21    Q   What do you remember about it?
22    A   Scroll up, let me see that.  Scroll up on the
23  -- on this.
24    Q   Down, right here?  So the victim's Jumal
25  Jones, aggravated battery, discharge of a firearm.

132

1     A   Jumal Jones.
2     A   And it has up --
3     A   Where it say it's located at?
4     Q   Huh?
5     A   Three -- I'm trying to see, 53.
6         MS. DONNELL:  What are you -- I'm sorry.
7     Q   Yeah, I'm trying to -- yeah, what do you want
8   me to move to?  I can move this wherever you need me to.
9         MS. DONNELL:  Just to be clear, you listed the
10  date of the arrest, I think, when you said the date
11  of the incident, but this is the just the arrest
12  date that you're referring to.
13        MR. GRILL:  Yeah, the arrest date is
14  August 15, 1991.  I don't think I said the incident
15  date.  That's just the date of the --
16        MS. DONNELL:  I thought you said -- I thought
17  you misstated it, but it's fine.
18  BY MR. GRILL:
19    Q   So you were arrested on August 15, 1991.  I
20  have no idea from this if this aggravated battery,
21  discharge of a firearm happened on exactly that date,
22  but in any event, the victim is a Jumal Jones and he
23  lived at 11223 South Longwood, as of August of 1991.  So
24  do you remember this arrest?
25    A   I believe that's the guy that said -- he said

133

1   I shot at him.  He said I shot at him.  I believe that's
2   the guy that said I shot at him when I was young, but I
3   don't recall shooting at him.  I believe that's the guy.
4     Q   Do you know where the shooting happened?
5     A   I heard it was on --
6     Q   Well, hang on.  Let me withdraw that question
7   and ask a different one.  Are you saying, or is it your
8   belief that this arrest is the one that -- related to
9   the arrest report that we were talking about earlier,
10  that you weren't present for, that you plead guilty to?
11    A   No, no, that's a different -- this is
12  something different.
13    Q   That's what I thought.  Okay, okay.  So that
14  --
15    A   Yeah, that's something different.
16    Q   -- so then I'll re-ask my question.
17    A   Okay.
18    Q   What do you recall or where did this shooting
19  or this crime --
20    A   I heard --
21    Q   -- specifically happened.
22    A   -- I heard that it happened on -- across
23  Halsted, across Halsted, across Halsted.
24    Q   Did you know a person named Jumal Jones?  Does
25  that name ring a bell?

---

134

1    A  No.
2    Q  Okay.
3    A  No, because I, like I said, I didn't --
4  everybody had like nicknames at the time, so I wasn't
5  really in tune with names.
6    Q  Okay.  So is it your testimony that you were
7  not present when this crime happened?
8    A  I wasn't present.
9    Q  Okay.
10    A  I wasn't present.
11    Q  Do you know who was responsible for --
12    A  Not at all.
13    Q  -- for battering Jumal Jones?
14    A  No.
15      MS. DONNELL:  Objection, foundation.
16    A  No.
17    Q  Do you have any knowledge as to what gang
18  Jumal Jones was in?
19      MS. DONNELL:  Objection, foundation, calls for
20  speculation.
21    A  No, because I need a nickname.  I don't -- I
22  don't --
23    Q  And across Racine, that would be Jet Black
24  Stone territory, wouldn't it?
25    A  On the other side, yeah, yeah, yeah.

---

135

1    Q  Okay.  So like where this went down, according
2  to this arrest report, that would've been in Jet Black
3  Stone territory, right?
4    A  Yes.
5      MS. DONNELL:  I'm just going to object that
6  you're misstating the evidence.  There's nothing in
7  here that says where an incident occurred as far as
8  I can tell.
9  BY MR. GRILL:
10    Q  Correct?
11    A  Say that again because you-all done threw me
12  off talking.
13    Q  Okay.  So 11223 South Longwood, that would be
14  in Jet Black Stone territory?
15      MS. DONNELL:  Objection, form, foundation,
16  calls for speculation.
17    A  Like if people -- that's in the hundreds like
18  it was people that probably initiated in the gang,
19  but they stay somewhere else.  You understand what I'm
20  saying or got another address.  So I don't -- you know?
21    Q  Right, no, I'm just asking, like, is this
22  address listed on here, where Jumal Jones lives, is that
23  in --
24    A  No, that ain't --
25    Q  -- is that in Jet Black Stone territory?

---

136

1    A  No, no.  That's in a -- that's like in the
2  100s, and I was in 50s.
3    Q  Okay.  So now I want to -- because I'm trying
4  to clarify exactly what you're talking about --
5    A  Okay.
6    Q  -- in regards to where you believe this
7  incident happened, okay?  So if it wasn't at this 1-1 --
8  or if -- strike that.  The location where you believe
9  you heard this particular crime occurred, was that
10  location in Jet Black Stone territory?
11    A  No.
12    Q  Okay.  Where was the, you know -- based on
13  your recollection, where do you believe that this crime
14  occurred?
15      MS. DONNELL:  Objection, form, foundation, but
16  if you know you can answer.
17    Q  Where did you hear?
18    A  Over there in the Jet Black Stones area.
19    Q  Got it.  That's what I was wondering.  Okay.
20  And you had no information, or didn't hear anything
21  about who might've been involved in committing that
22  crime?
23    A  No.
24    Q  Okay.  And you have no recollection of being
25  arrested for that one, do you?

---

137

1    A  They say they -- on there, I'm looking at it,
2  but --
3    Q  Yeah, it's this one.  Sorry.
4    A  -- that's a record.  I got a record on it
5  so...
6    Q  Yeah, yeah.  And it says that you were put in
7  a holding facility, too, for that.
8      MS. DONNELL:  Objection.
9    Q  Right at the top, see that?
10      MS. DONNELL:  Objection.
11    A  Oh, that's when they --
12      MS. DONNELL:  Objection to the extent you're
13  misstating or your record making representations,
14  but...
15    Q  Okay.  See it says right here at the bottom,
16  disposition, you were detained in the detention center.
17  See that?
18    A  Oh, that's --
19    Q  Yeah.  So when you think back about being
20  detained, do you remember being detained, do you
21  remember being -- does that help refresh your
22  recollection about remembering this arrest?
23    A  No.
24    Q  Okay.  Do you know if Boogie knew Arnold Day?
25    A  I don't recall.

138

1    Q   Do you know if Boogie knew G-Nate?
2    A   I don't recall.
3    Q   Okay.  And it's possible, right, there were
4  all in the same gang, fair?
5        MS. DONNELL:  Objection -- sorry.  Did you
6  finish your question?
7        MR. GRILL:  Yeah, that's my question.
8        MS. DONNELL:  Objection, calls for speculation.
9        THE WITNESS:  What you say?
10  BY MR. GRILL:
11    Q   It's possible that they knew each other.  They
12  were all in the same gang, right?
13    A   Yeah.
14        MS. DONNELL:  Objection, form, foundation,
15  calls for speculation, but the witness already
16  answered.
17    Q   Okay.  This is an arrest on June 18, 1991, now
18  on page 3 of this Exhibit 4, for Tennelle C. Jones.
19  There's your date of birth.
20    A   Oh 15, you see that?  15.
21    Q   Yeah, and this is the UUW weapon shotgun.  You
22  had a shotgun, I guess, according to this.  Do you
23  remember getting arrested in June 1991 for having a gun?
24    A   Yes.
25    Q   Tell me about what you remember about that

139

1  arrest.
2    A   I found the gun, and my mama called the police
3  on me.  And that's what happened.
4    Q   Where'd you find the gun?
5    A   Outside somewhere.
6    Q   And it was a shotgun?
7    A   Yes.
8    Q   How did your mom catch you with the shotgun?
9    A   Because I had it under the bed in a baby
10  blanket and she -- my mama -- my mama cleaned up my room
11  and she found it.
12    Q   Was she mad?
13    A   I forgot to move it from right there.
14    Q   Was she upset with you?
15    A   Yeah.  She called the police on me.  I was
16  upset with her.
17    Q   What were you intending to do with that
18  shotgun?
19    A   Nothing.
20        MS. DONNELL:  Objection, form, calls for
21  speculation.
22    Q   Let me ask it this way.  Let me ask it this
23  way:  Why not call the police and turn the gun over to
24  the police?
25    A   No.

140

1    Q   Why?
2    A   I was keeping it.
3    Q   For what?
4    A   Just to keep it.
5    Q   For what?
6    A   I found it, and I wanted to keep it.
7    Q   Okay.  But was there any particular reason why
8  you wanted to keep it?
9        MS. DONNELL:  Objection, asked and answered.
10    A   I was excited.  I wanted to keep it.  That's
11  it.
12    Q   Okay.
13    A   It's my answer to your question.
14    Q   Did you have ammunition for that shotgun?
15    A   No.
16    Q   Okay.  Where did you find the shotgun outside,
17  specifically?
18        MS. DONNELL:  Objection, form, but you can
19  answer if you can.
20    A   I don't recall.
21    Q   Do you remember if you possibly got that
22  shotgun from this incident on August 15, 1991?
23        MS. DONNELL:  I'm sorry --
24    Q   Or if anybody gave you that shotgun that was
25  connected to this August 15, 1991 incident?

141

1        MS. DONNELL:  Objection, form.
2    Q   For aggravated battery?
3        MS. DONNELL:  Form, foundation.
4    A   No, no one gave me anything.
5    Q   Okay.
6    A   Like I told you before, I found it and I don't
7  recall where I found it at.
8    Q   Okay.  Was that unusual, to find a shotgun
9  just laying around outside, in your experience?
10    A   It wasn't just laying around.  I was playing
11  and it -- I found it.
12    Q   Did you find it in, like, well, let me ask
13  you: Did you steal it?
14    A   No.
15    Q   Okay.  So and you found it outside, right?
16  Like, not inside somebody's house, correct?
17    A   Correct.
18    Q   Okay.  Hang on one second.
19        MR. GRILL:  Can we just take two minutes?  I'm
20  almost done so...
21        MS. DONNELL:  Yep.
22        (OFF THE RECORD)
23        COURT REPORTER:  We are back on the record for
24  the deposition of Tennelle Jones being conducted by
25  Zoom conference.  My name is Sydney Little.  Today

142

1    is September 29, 2022 and the time is 2:02.
2  BY MR. GRILL:
3      Q   Okay.  So let's move up to this one.  Okay.
4      so just to close off this shotgun that you
5  found, it's your testimony no one gave you the shotgun,
6  right?  You found it, correct?
7      MS. DONNELL:  Asked and answered.
8      Q   Right?
9      A   Yes.
10     Q   Okay.  And did you tell anybody that you had
11 the shotgun before your mom found it?
12     A   No.
13     Q   Okay.
14     A   They probably would've took it from me.  No.
15     Q   Why do you say that?
16     A   Because I wasn't supposed to be having no
17 shotgun.
18     Q   Okay.  This is on page 2 of this Exhibit 4.
19 This is an arrest for Tennelle C. Jones that happened on
20 March 20, 1991.  And this one is for residential
21 burglary.  The victim is a Barbara Jackson and she lived
22 at 5223 South Morgan.  Do you remember this arrest?  And
23 it also says you were detained in the detention center
24 for this one, too.
25     A   I can't recall.

143

1      Q   Do you recall robbing houses ever when you
2  were a juvenile?
3      A   No.
4      Q   Okay.
5      A   No.
6      Q   Okay.  This is an arrest -- this is the last
7  one that I have here on this arrest report.  This is on
8  the first page of Exhibit 4.  And this is an arrest for
9  February 9, 1991.  Tennelle C. Jones, that's your date
10 of birth.  This arrest is for possession of stolen motor
11 vehicle again and it looks like you were arrested at
12 6128 South Greenwood.  Do you remember this arrest?
13     A   No.
14     Q   Okay.  All right.  So you know how I was
15 asking all those questions about that August 15, 1991
16 incident that you believe took place down over in Jet
17 Black Stone territory that you were arrested for, but
18 you said you weren't part of?  Is the address 5218 South
19 Union, is that in Jet Black Stone territory?
20     MS. DONNELL:  Objection, foundation.  If you
21 know you can answer.
22     A   Repeat the address again.
23     Q   5218 South Union.  Is that over in Jet Black
24 Stone territory?
25     A   5218 Union.  Yeah, that's -- Union, Union.

144

1  Yeah, that's -- yeah, Tilden on the -- yeah, yeah,
2  that's the Jet, yeah, Jet Black Stone, yeah.
3      Q   Okay.  Do you have any recollection of ever
4  being arrested for a crime that you committed or
5  allegedly committed with G-Nate and Arnold Day?
6      A   No.
7      Q   Okay.  Do you know who a Casandra Taylor is?
8      A   No.
9      Q   Okay.  Senthen Lee, do you know who that is?
10     A   No.
11     Q   Do you know who Jerome Croft, or Jerome Craft
12 is?
13     A   No.
14     Q   Okay.  You testified earlier today that you
15 knew G-Nate, and this a quote from you, "Through the
16 gang, being in the organization, he was over me."  That's
17 what you said earlier today.  So the organization you're
18 referring to there is the Black P. Stone Nation, right?
19     A   Yes.
20     Q   And then when you say, "He was over me" you're
21 saying that because he was a general, so he outranked
22 you as a foot soldier; is that correct?
23     A   We were considered as foot soldiers, but I
24 never seen him, like, we said -- I see him in passing or
25 when it was a, you know, how you have your -- the nation

145

1  thing like that, but I wasn't kicking it, hanging out
2  with him, no.
3      Q   Right, right.  Sorry, go ahead.  Finish your
4  answer.
5      A   No, none of that.  Just seen him in passing or
6  when we have our gatherings or our gang related meetings
7  like that.
8      Q   Right.  So my question was just that when you
9  said that "he," being G-Nate, "was over me" you mean
10 that he was a general and he was over you because he
11 outranked you in the gang.  He held a higher rank than
12 you as a foot soldier, correct?
13     A   Yes, that's what that mean.  That's what I
14 meant by that.
15     Q   Yeah.  That's what I wanted.  Okay.  Just
16 wanted to make sure that we're clear about what you
17 meant there.  Okay.  Did you know anybody in the
18 Micky Cobra gang growing up?
19     A   Uh-uh, but some of them went to Tilden with
20 me.  I ain't know none of them, but I knew that the name
21 you said, they all went to -- some of them went to
22 Tilden.
23     Q   Got it.  Were Mickey Cobras rivals or allies
24 with the Black P. Stone Nation in '91?
25     A   Yeah, we was into it with them, too.

146

1     Q    What do you mean by "into it?"
2     A    We would have fights with them in school.
3     Q    Right, but on the street, were you guys, you
4   know -- were the two gangs, Black P. Stone Nation and
5   the Mickey Cobras, were they allies, or no?
6         MS. DONNELL:  Objection, asked and answered.
7     A    When you say allies, you meant like was we
8   into it like that or some?
9     Q    Yeah, were the gangs, like if you saw a
10   Mickey Cobra, as a member of the Black P. Stone Nation,
11   walking through your neighborhood, around your block,
12   would you consider that person an enemy, simply because
13   they were a Mickey Cobra?
14     A    If they had -- if they was into it with that
15   person, yeah.  But it wasn't like if we see them we'll
16   jump them, no.
17     Q    Okay.
18     A    If he was into it with that person, that how
19   it'd kick off, somebody got into it with somebody.
20     Q    Did you ever carry a gun, outside of this
21   shotgun incident, when you found the shotgun and then
22   your mom found it?  Were there any other times that you
23   can recall where you'd carry a firearm?
24     A    No.
25     Q    Okay.  Had you ever carried a firearm for any

147

1   reason before that incident when you found the shotgun?
2     A    No.
3     Q    Okay.  How about after that?
4     A    No.
5     Q    What am I saying here?  All right.  I'm going
6   to show you one more thing and I think is going to be
7   almost the end.  All right.  So I think this --
8         MS. DONNELL:  Not sure whether I believe you.
9     Q    This is Exhibit 1.  This is the 2005
10   affidavit.  You testified today that when you were in
11   prison, attorneys or people representing or working for
12   Mr. Day came, met with you there on several occasions.
13   And on one of these occasions, you executed this
14   affidavit, right?
15     A    Yes.
16         MS. DONNELL:  And you can -- you have it right
17   there, if you want to look at it.
18     Q    Yeah, if you have it.  Please, yes, if you
19   have the hard copy in front of you, you're free to look
20   at it.  What I want to know though is when the attorneys
21   for Mr. Day, or the people working for Mr. Day first
22   arrived in 2005 at the jail, or at the prison where you
23   were at -- you were at Dwight, actually, is what your
24   testimony was.  Did you know they were coming when they
25   first showed up?

148

1     A    Uh-uh.
2     Q    Is that a --
3     A    I mean, oh, I'm sorry.
4     Q    -- you've got to say yes or no.
5     A    No, no.
6     Q    Okay.  Did you get any heads up whatsoever, a
7   phone call, letter, anything, that these people were
8   coming to talk to you?
9     A    No.
10     Q    What about in 2009 when you executed that
11   second affidavit that is Exhibit 2, I think?  Or no,
12   Exhibit 3, sorry, that Ms. Donnell showed you.  Did you
13   know when the attorneys came that time that they were
14   coming to talk to you, or did they just show up?
15     A    I don't recall.  I don't recall.  I don't
16   recall.
17     Q    Okay.  So let's go back to the 2005, when you
18   were at Dwight when they showed up and you didn't know
19   they were coming.  When they arrived, how many people
20   were there on behalf of Mr. Day?
21     A    Can't recall.
22     Q    Was it more than one?
23     A    I can't recall.
24     Q    Do you remember the gender of any of the
25   people that came to meet with you?

149

1     A    I believe it was a female, female.
2     Q    The first time they met with you, did they
3   have the affidavit already prepared for you to review?
4     A    I don't recall.
5     Q    All right.  And the handwriting that's on that
6   Exhibit 1 in front of you, other than your signature,
7   that is not your handwriting, correct?
8     A    No.
9     Q    No, it's not your handwriting, right?
10     A    No.
11     Q    Okay.  When those people came to talk with you
12   about that affidavit and they came unannounced, did they
13   explain to you what exactly they were doing for Mr. Day?
14         MS. DONNELL:  Objection, form, but you can
15   answer if you can.
16     A    I don't -- I don't -- I don't recall.
17     Q    Did you ask them, what is this affidavit for?
18     A    Yes.
19     Q    What did they tell you?
20     A    I don't recall what they said.  I don't
21   recall.
22     Q    Do you have any understanding as to what this
23   affidavit was for, the 2005 affidavit that's in front of
24   you?
25     A    Yes.

150

1    Q   What is your understanding?
2    A   That whoever they locked up, he was wrongfully
3  convicted.  That's what I understand because I was
4  locked up at the time this supposed to been happening.
5  That's what I understand, so...
6    Q   Did you believe that Arnold Day was wrongfully
7  incarcerated or locked up in 2005?
8    A   Yes.
9    Q   Yes?  And what's that based on, that belief
10 that you have?
11   A   Because I was locked up.
12   Q   Right so why did you believe that --
13   A   I was involved so, yes, he is innocent, and I
14 am too, so I --
15   Q   Right.  So let me be really specific about my
16 question.
17   A   Oh.
18   Q   I want to know why you believe Arnold Day was
19 innocent, I guess, that he should not have been locked
20 up?
21      MS. DONNELL:  Objection, asked and answered,
22   but you can answer again.
23   A   Because again, I was locked up and they said I
24 was involved.  That's how I know he was innocent because
25 I'm innocent.  I wasn't there.

151

1    Q   Right, but you never served time or were
2  sentenced or convicted of any crime in relation that was
3  in connection with Gerrod's killing, right?
4    A   No.
5    Q   Right.  Okay.  So are you in possession of any
6  information that you know for yourself that proves that
7  Arnold Day is indeed innocent of killing Gerrod Erving?
8      MS. DONNELL:  Objection, asked and answered,
9    but you can answer again.
10   A   Same thing.  They said I was there.  I was in
11 jail.  They were saying I was with him.  So it's facts.
12 You see that it's not true, so that's the only answer I
13 can tell you.
14   Q   Right.
15   A   Like didn't do it because they was trying to
16 say it was me and him, and some more people, I guess.
17 And I wasn't involved.  That's the only -- we wasn't a
18 part of that.
19   Q   So you weren't there when Gerrod was killed,
20 right?  Right?
21   A   No.  That's what the paper say.  I was in jail
22 so, I wasn't there.
23   Q   Okay.  Did you ever hear any rumors or
24 anything from anybody about who might've killed Gerrod?
25   A   No, when you find that out, I would like to

152

1  know, too.  I don't know.
2      MR. GRILL:  Okay.  Heather, I think I'm done,
3    but give me a couple minutes to talk to George and
4    Brittany and then assuming I haven't missed anything
5    glaring --
6      MS. DONNELL:  Sure.
7      MR. GRILL:  Okay.
8      (OFF THE RECORD)
9      COURT REPORTER:  We are back on the record for
10   the deposition of Tennelle Jones.  My name is Sydney
11   Little.  Today is September 29, 2022 and the time is
12   2:03 p.m.
13     MR. GRILL:  Okay.  Ms. Jones, thanks for your
14   time today.  I've got no further questions.
15             REDIRECT EXAMINATION
16 BY MS. DONNELL:
17   Q   Ms. Jones, I have just one question for you.
18 Are you part of the Black P. Stone Nation anymore?
19   A   No, and I wish they'd get that off my record.
20 It's on my record.  And then if like -- if like -- if I,
21 like something minor, if I get locked up for something
22 minor, I'm going to have to go and find a judge and all
23 that.  I don't like that.
24     MS. DONNELL:  Okay.  I don't have any other
25   questions.  Andrew, do you have anything else?

153

1      MR. GRILL:  No, that's what I meant.  And
2  you're reserving?
3      MS. DONNELL:  Yes, my witness will reserve
4  signature.
5      MR. GRILL:  Okay.
6      MS. DONNELL:  And the court reporter has her
7  e-mail to send the transcript.
8      (DEPOSITION CONCLUDED AT 2:24 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

154

1            CERTIFICATE OF REPORTER

2              STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof, by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19

20

21

22   SYDNEY LITTLE,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES:  03/18/2026

25   SUBMITTED ON:  11/9/2022