**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| Defendants. | ) | |

# Exhibit 158

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4           HON. SARA L. ELLIS, DISTRICT JUDGE

5           MAGISTRATE JUDGE JEFFREY CUMMINGS

6                 CASE NO. 19-CV-7286

7

8                     ARNOLD DAY,

9                       Plaintiff

10

11                        V.

12

13              KENNETH BOUDREAU, ET AL.,

14                     Defendants

15

16

17

18

19

20

21

22

23   DEPONENT:  JUDE EVANS

24   DATE:      JUNE 2, 2022

25   REPORTER:  KRYSTAL M. BARNES



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 2

```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, ARNOLD DAY:
4   Heather Lewis Donnell, Esquire
5   Loevy & Loevy
6   311 North Aberdeen Street
7   3rd Floor
8   Chicago, Illinois 60607
9   Telephone No.: (312) 243-5900
10  E-mail: heather@loevy.com
11  (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANT OFFICERS:
14  Brittany D. Johnson-Delgado, Esquire
15  Rock Fusco & Connelly, LLC
16  321 North Clark Street
17  Chicago, Illinois 60654
18  Telephone No.: (312) 494-1000
19  E-mail: bjohnson@rfclaw.com
20  (Appeared via videoconference)
21
22
23
24
25
```

Page 3

```
1               APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
4   George Yamin, Esquire
5   The Sotos Law Firm
6   141 West Jackson Boulevard
7   Suite 1240A
8   Chicago, Illinois 60604
9   Telephone No.: (773) 316-7394
10  E-mail: gyamin@jsotoslaw.com
11  (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                      INDEX
2                                            Page
3   PROCEEDINGS                               6
4   DIRECT EXAMINATION BY MS. DONNELL         8
5
6
7                    EXHIBITS
8   Exhibit                                   Page
9   1 - Testimony of William Foley -
10      Officers_Day 001128-001141            66
11  2 - Arrest Report for Arnold Day -
12      City_Day 00025                        72
13  3 - Supplementary Report - City_Day
14      00056-00059                           73
15  4 - Consent to Search form - City_Day 00086  77
16  5 - Trial testimony of Jude Evans -
17      City_Day 000420-000422                80
18  6 - CONFIDENTIAL PORTION
19  7 - CONFIDENTIAL PORTION
20  8 - CONFIDENTIAL PORTION
21
22
23
24
25
```

Page 5

```
1                    STIPULATION
2
3   The VIDEO deposition of JUDE EVANS was taken at LOEVY &
4   LOEVY, 311 NORTH ABERDEEN STREET, 3RD FLOOR, CHICAGO,
5   ILLINOIS 60607, via videoconference in which all
6   participants attended remotely, on THURSDAY, the 2ND day
7   of JUNE 2022, at 10:18 a.m.; said VIDEO deposition was
8   taken pursuant to the FEDERAL Rules of Civil Procedure.
9   The oath in this matter was sworn remotely pursuant to
10  FRCP 30.
11
12  It is agreed that KRYSTAL M. BARNES, being a Notary
13  Public and Court Reporter for the State of ILLINOIS, may
14  swear the witness and that the reading and signing of
15  the completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
1                   PROCEEDINGS
2
3          COURT REPORTER:  My name is Krystal Barnes.
4    I'm the online video technician and court reporter
5    today, representing Kentuckiana Court Reporters,
6    located at 30 South Wacker Drive, the 22nd Floor,
7    Chicago, Illinois 60606.  Today is the 2nd day of
8    June, and the time -- June 2022, and the time is
9    10:18 a.m.  We are convened by videoconference to
10   take the deposition of Jude Evans in the matter of
11   Arnold Day v. Kenneth Boudreau, pending in the
12   United States District Court for the Northern
13   District of Illinois, the Eastern Division, case
14   number 19-cv-7286.  Will everyone but the witness
15   please state your appearance, how you are
16   attending, and the location you are attending from,
17   starting with the plaintiff's Counsel.
18         MS. DONNELL:  Good morning, everybody. Heather
19   Lewis Donnell.  I represent the plaintiff, Arnold
20   Day, and I'm here with the witness and Brittany
21   Johnson-Delgado at the offices of Loevy & Loevy in
22   Chicago.
23         COURT REPORTER:  I'm so sorry.  I couldn't
24   hear the last part.
25         MS. DONNELL:  Sure.  Thank you.  I just -- I'm
```

Page 7

```
1    here in person with the deponent, Mr. Evans, and
2    Brittany Johnson-Delgado, attorney for the
3    individual officers, at our offices in Chicago.
4          MR. YAMIN:  George Yamin.  Defendant -- I
5    represent Defendant City of Chicago.  I'm appearing
6    remotely.
7          MS. JOHNSON-DELGADO:  And Brittney Johnson-
8    Delgado for the individual Defendant officers and
9    for Mr. Evans, and we are here in person.
10         COURT REPORTER:  Perfect.  Mr. Evans, will you
11   please state your full name for the record?
12         THE WITNESS:  Jude Francis Evans.
13         COURT REPORTER:  All right.  And everyone here
14   agrees that this is, in fact, Mr. Evans?
15         MS. DONNELL:  Plaintiff will stipulate.
16         MR. YAMIN:  Yes.
17         MS. JOHNSON-DELGADO:  Agreed.
18         COURT REPORTER:  Perfect.  Can you raise your
19   right hand for me, sir?  Do you solemnly swear or
20   affirm that the testimony you are about to give
21   will be the truth, the whole truth, and nothing but
22   the truth?
23         THE WITNESS:  I do.
24         COURT REPORTER:  Counsel, you may begin.
25                   DIRECT EXAMINATION
```

Page 8

```
1    BY MS. DONNELL:
2          Q    Thank you.  Can you please state and spell
3    your name for the record?
4          A    Jude F. Evans is what I go by.  J-U-D-E, F.
5    E-V-A-N-S.
6          Q    Thank you.  Mr. Evans, have you ever been
7    deposed before?
8          A    Yes, I have.
9          Q    How many prior occasions have you been
10   deposed?
11         A    One that I can remember.
12         Q    Do you recall how long ago that one prior
13   deposition was that you remember?
14         A    It's got to be 35 years -- no, I'm sorry.
15   About 20 -- 25 years.
16         Q    And in the deposition that occurred
17   approximately 25 years ago, were you a party to the
18   action?
19         A    Yes.
20         Q    Were you a defendant?
21         A    Yes.
22         Q    And was the suit related to your work as an
23   on-duty officer of the Chicago Police Department?
24         A    Yes, it was.
25         Q    Do you remember the allegations that were
```

Page 9

```
1    alleged in the lawsuit?
2          A    Yes.
3          Q    What were they?
4          A    A wrongful death.
5          Q    And was that in state or federal court, if you
6    recall?
7          A    I never went to court.
8          Q    Sorry.  Was the lawsuit -- do you know whether
9    the lawsuit was filed in federal court?
10         A    I -- I don't recall where it was.
11         Q    Okay.  Do you know the outcome of that case?
12         A    Settlement for $1,000.
13         Q    Did you have to personally pay the 1,000?
14         A    No.
15         Q    That was the total settlement?
16         A    Yes.
17         Q    The City -- is it your understanding, the City
18   paid that settlement?
19         A    Correct.
20         Q    Other than the deposition you've just
21   testified to, do you recall being deposed in any other
22   capacity as a witness or a party, other than that
23   deposition?
24         A    No.
25         Q    Okay.  I'm sure that the attorneys prepared
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 you for this, but just a few ground rules.  If you could
2 do your best to wait until I've completed my entire
3 question before you start your answer, that will help
4 Krystal get a clear record.  Does that sound good?
5     A    Yes.
6     Q    If you don't understand a question or if you
7 can't hear me, please let me know, and I'm happy to
8 restate or rephrase my question.  Will you do that?
9     A    Yes.
10     Q    If you need a break, let me know.  We're happy
11 to accommodate a break.  I don't anticipate going all
12 day, but if you need a break at any time, let me know.  I
13 just ask that you answer the question that's pending.
14     A    Yes.
15     Q    So did you review any documents to prepare for
16 your deposition today?
17     A    Yes, I did.
18     Q    Can you please identify for me the documents
19 you reviewed to prepare for today?
20     A    The detective's supplementary report.
21     Q    When you say, "the detective's supplementary
22 report," was that one supp report or more than one?
23     A    One supp report.
24     Q    Do you know remember the general contents of
25 that supp report?

1     A    It was about two homicides -- or one -- a
2 homicide and interviewing the victim -- or interviewing
3 witnesses.
4     Q    Okay.  Was that -- what homicide did the supp
5 report pertain to?
6     A    I don't recall.
7     Q    Okay.  So it sounds like you reviewed one
8 supplementary report related to a homicide
9 investigation?
10     A    Correct.
11     Q    Do you remember the detective -- the reporting
12 officers or reporting detectives on that sup report?
13     A    It was William Foley and Kenny Boudreaux.
14     Q    Got it.  Okay.  Other than the supplementary
15 report by Detective Foley and Detective Boudreau, any
16 other documents you looked at?
17     A    Yes, I did.
18     Q    What other documents?
19     A    A Consent to Search form.
20     Q    Sure.  And was that a Consent to Search form
21 by Mr. Kwame Tate?
22     A    Yes.
23     Q    Okay.  What other documents other than supp
24 report by Detective Foley and Boudreau and the Consent
25 to Search form?

1     A    My testimony at Mr. Day's trial.
2     Q    Okay.  Anything else?
3     A    The legal ruling on Mr. Day.
4     Q    And what are you referring when you say, "the
5 legal ruling on Mr. Day?"  What was the -- what are you
6 referring to?
7     A    I don't recall what I read now.
8     Q    Was it an opinion by the Court?
9     A    It -- it could be.  I -- I -- I don't recall
10 what it was.
11     Q    Okay.  Anything else?
12     A    No.
13     Q    Okay.
14     A    Oh.  Yeah -- no.  The arrest report also.
15     Q    The arrest report.  Thank you.
16     A    Yes.
17     Q    Okay.  Did you review anybody's testimony from
18 Mr. Day's criminal trial, other than your own?
19     A    No.
20     Q    Did you review any handwritten statements?
21     A    No, I did not.
22     Q    And other than the one supplementary report,
23 did you review any other supplementary reports or case
24 reports?
25     A    No, not -- not particular to this incident.

1     Q    Okay.  How about pertaining to any other
2 incident, like to prepare for your deposition?
3     A    No, no.
4     Q    Okay.  And then, as you sit here today, do you
5 have an independent memory of your involvement in the
6 arrest of Arnold Day back in February 1992?
7     A    Parts of it, yes, I do.
8     Q    You do?
9     A    Yes.
10     Q    Okay.  And do you have memory of your
11 involvement in actually going to arrest Mr. Day?
12     A    Yes.
13     Q    Okay.  And do you -- so you have an actual
14 memory of that?
15     A    Yes.
16     Q    Okay.  Do you have an actual memory of
17 transporting him to Area 3?
18     A    Yes.
19     Q    Do you have actual memory of being at Area 3
20 with Mr. Day?
21     A    Yes, bringing him to the Violent Crimes unit.
22     Q    Okay.  And prior to preparing for your
23 deposition today, did you have an actual memory of that
24 arrest?
25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did the documents you reviewed to prepare for
2  your deposition refresh your recollection in any way, or
3  it was the same memory you had before looking?
4    A    It was the same memory I had before.
5    Q    Okay.  So the documents you looked at to
6  prepare for your deposition today did not refresh your
7  recollection?
8    A    No, it didn't.
9    Q    Okay.  I'm going to ask you about some
10  meetings you had with your attorney to prepare for
11  today, but I don't want to know the conversations you
12  had with your attorney.  Do you understand that?
13    A    Yes.
14    Q    Okay.  Did you meet with your attorney to
15  prepare for your deposition today?
16    A    Yes, I did.
17    Q    Were those in-person meetings?
18    A    No, it was a Zoom call.
19    Q    Okay.  How many Zoom calls did you have with
20  your attorney to prepare for today?
21    A    One.
22    Q    And when was that?
23    A    Yesterday.
24    Q    How long?
25    A    No, two days ago.  I'm sorry.  The 1st [sic].

1    Q    That's fine.  On Tuesday?
2    A    Tuesday.
3    Q    Got it.  And how long was your Zoom call?
4    A    I -- I don't recall how many hours.  It was
5  just -- couple hours.  I don't know exactly.
6    Q    Who was present other than yourself?
7    A    Brittany Johnson, the other attorneys.  Andrew?
8    Q    Andrew Grill?
9    A    Yes.
10    Q    Anyone else?
11    A    A gang speci -- or Schaefer, and Bloore, and a
12  city attorney.
13    Q    And when you say, "the city attorney," you're
14  referring to Mr. Yamin?
15    A    Yes.
16    Q    Okay.  So the Zoom you had on Tuesday,
17  May 31st, present on that call was Ms. Brittany Johnson-
18  Delgado, Mr. Andrew Grill, and Mr. George Yamin, along
19  with Officers Schaefer and Bloore?
20    A    Correct.
21    Q    Okay.
22         COURT REPORTER:  I'm sorry.  What was that
23    last name?  Schaefer and who?
24         MS. DONNELL:  Bloore.
25         THE WITNESS:  Bloore.

1         COURT REPORTER:  Bloore.  Okay.
2  BY MS. DONNELL:
3    Q    The documents that you told me you looked at
4  to prepare for your deposition today, were those
5  documents shown to you on the Zoom call, or did you
6  receive them in hard copy?
7    A    I received them on an e-mail.
8    Q    Okay.  Other than -- and did you have any
9  other phone calls, meetings with your attorneys to
10  prepare for today, other than the Zoom call you just
11  identified?
12    A    I talked to the attorneys' office earlier that
13  day.  I explained that people I was with over the
14  weekend had COVID, and I couldn't come down for the
15  meeting.
16    Q    Were you the only one that was appearing via
17  Zoom, and everybody else was in person?
18    A    Correct.
19    Q    Understood.  Okay.  Got it.  I'm glad you're
20  still healthy.
21    A    Yeah.  Tested three times.
22    Q    Okay.  Good for you.  Okay.  And then, any
23  other meetings, or calls, or Zoom meetings other than
24  one on Tuesday?
25    A    There was one a couple years ago, before the

1  pandemic, I believe.  We talked about the case and --
2         MS. JOHNSON-DELGADO:  Don't go into what we
3    talked about.
4    A    I -- no, not --
5    Q    I'm just asking you to identify the meetings.
6  I'm not asking you to identify the content of the
7  meetings.
8    A    Yeah.
9    Q    But you're saying you had a phone call with
10  your attorneys a couple years ago?
11    A    Yes, correct.
12    Q    And that phone call, was it -- who was on the
13  call?
14    A    I don't recall.
15    Q    Were there other defendants or officers on the
16  call?
17    A    I don't believe so, but I -- I couldn't be
18  sure.  But I don't -- I don't think so.
19    Q    Okay.  Other than the phone call -- was that
20  phone call just -- well, that phone call was a number of
21  years ago.  Any other meetings or phone calls to prepare
22  for your deposition?
23    A    No.
24    Q    Okay.  Okay.  Where did you graduate -- or did
25  you graduate from high school?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1   A   Yes, I did.
2   Q   And where did you graduate?
3   A   St. Rita.
4   Q   St. Rita?
5   A   Yes.
6   Q   That's here in the city?
7   A   Yes, it is.
8   Q   And after you graduated from St. Rita, did you
9   go on to attend any postsecondary school?
10  A   Not at that time.
11  Q   Okay.  Did you later attend college?
12  A   Yes, I did.
13  Q   And where was that?
14  A   At Loop Junior College.  Loop Junior --
15  Q   Loop Junior College.  Thank you.  When did you
16  attend Loop Junior College?
17  A   In the early '70s.
18  Q   Were you already a member of the police
19  department?
20  A   Yes, I was.
21  Q   Okay.  So you were a part-time student?
22  A   Yes.
23  Q   Did you obtain a degree from Loop Junior
24  College?
25  A   An associate degree.

Page 19

1   Q   What was your associate degree in?
2   A   Criminal justice.
3   Q   And when did you obtain your associate's in
4   criminal justice from the Loop Junior College?
5   A   In the '70s.
6   Q   Okay.  Have you gone on to any other education
7   after you obtained your associate's degree?
8   A   No.
9   Q   When you graduated from St. Rita High School,
10  what year was that?
11  A   1964.
12  Q   Okay.  And I believe you joined the Chicago
13  Police Department in 1970?
14  A   Correct.
15  Q   Okay.  For the six years prior to joining the
16  Chicago Police Department, were you employed?
17  A   Yes, I was.
18  Q   Where were you employed?
19  A   I worked at High-Low Foods.
20  Q   High-Ho Foods?
21  A   High-Low.
22  Q   High-Low Foods.  All right.  Okay.  Where was
23  that High-Low Foods located that you worked at?
24  A   They were -- I worked all over the city.
25  Q   You did?  What job did you have with High-Low

Page 20

1   Foods?
2   A   I was a butcher.
3   Q   And did you have any other employment, other
4   than as a butcher with High-Low Foods, prior to joining
5   Chicago Police Department?
6   A   Yes, I did.
7   Q   What was that?
8   A   I was in the Army for two years.
9   Q   What years were you in the Army?
10  A   '65 to '67.
11  Q   Okay.  Did you do a tour of duty overseas?
12  A   Yes, I did.
13  Q   And where did you serve?
14  A   In Yokohama.
15  Q   Okay.  What services were you a part of?
16  A   The Army.
17  Q   Oh, the Army.  You said that.  I'm sorry.  And
18  what rank were you in the Army when you left?
19  A   Specialist 4.
20  Q   Specialist 4?  And were you honorably
21  discharged?
22  A   Yes, I was.
23  Q   Okay.  Did you remain with the Reserves in any
24  capacity?
25  A   No.

Page 21

1   Q   So other than your service between 1965 and
2   1967, that's all of your military service?
3   A   Correct.
4   Q   Were you -- was that -- when you returned from
5   the Army in 1967, did you obtain employment?
6   A   Yes, I did.
7   Q   And where were you employed?
8   A   City of Chicago.
9   Q   In what capacity?
10  A   I worked for Streets and Sanitation.  I worked
11  for the Park District.
12  Q   What position did you have with Streets and
13  Sanitation?
14  A   I was a garbageman.
15  Q   Thank you.  And how about with the Park
16  District?
17  A   I was a maintenance man at a -- at a garage.
18  Q   Okay.  And then -- let's see.  Was it
19  June 15, 1970, that you joined the Chicago Police
20  Department?
21  A   Yes, it is.
22  Q   When did you first apply to join the Chicago
23  Police Department?
24  A   I don't recall.
25  Q   Was that several years prior to when you



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  were --
2      A   No, it wasn't that long.
3      Q   Okay.  So shortly after you applied, you
4  became a sworn officer?
5      A   Correct.
6      Q   And back in 1970, was it a -- what was the
7  application process for the Chicago Police Department?
8      A   I don't remember what it was.  It was -- it
9  was a written test and a physical.
10     Q   Was there an interview as well?
11     A   I don't recall if there was an interview or
12 not.
13     Q   Okay.  Did you apply to any other law
14 enforcement agencies other than the Chicago Police
15 Department?
16     A   No.
17     Q   Did you have any family members who had served
18 with the Police Department prior to you serving?
19     A   No.
20     Q   Okay.  You were the first member --
21     A   Yes.
22     Q   -- in your family -- I'm sorry.  Just to make
23 sure I get my whole question out.  You don't even know
24 where I'm going.
25     A   I'm sorry.

Page 23

1      Q   It's okay.  It's super easy.  Don't worry.  How
2  long was the academy when you joined?
3      A   I don't recall how long it was.  It was a
4  lengthy process.
5      Q   It was?  The classroom portion?
6      A   Yes.
7      Q   And then when you became a probationary
8  officer, were you assigned to a particular district?
9      A   Yes, I was.
10     Q   Was that the 1st District?
11     A   No, I was assigned to Marquette District, the
12 10th District.
13     Q   Oh, the 10th District.  I'm sorry.  Okay.  And
14 how long were you a probationary officer with the 10th
15 District?
16     A   I believe it was six months.  I -- I don't
17 remember how long.
18     Q   And once you became a full officer, did you
19 stay in the 10th District?
20     A   Yes, I did.
21     Q   How long did you stay and patrol the 10th
22 District?
23     A   I -- I didn't work patrol.  I worked on a tac
24 unit in the 10th District for approximately eight years.
25     Q   So you went right from finishing your

Page 24

1  probationary period to going on a tac unit?
2      A   Correct.
3      Q   Was that unusual?
4      A   I -- I couldn't tell you.  It was -- it
5  happens.  It's
6      Q   Okay.  So for eight years, you served on a tac
7  unit in the 10th District?
8      A   Correct.
9      Q   What was your tactical unit's assignment or
10 responsibility?  Was it one of the housing projects
11 or...
12     A   No.  The tactical unit in the 10th District
13 was street gangs we handled, and narcotics and gun
14 cases, or robbery-in-progress calls.  We went to make
15 arrests.  Basically, that was our job.
16     Q   But it was distinct from a gang specialist
17 unit?
18     A   Yeah, it's completely different.
19     Q   Okay.  And so what hours did the tac unit
20 work?  All shifts?
21     A   All shifts, yeah.  Not -- except for
22 midnights.  It would finish up at 2:30 in the morning.
23     Q   Okay.  And at that time, what was the
24 geographical boundaries for the 10th District?
25     A   It was Roosevelt Road on the north, Ashland

Page 25

1  Avenue on the east, the town of Cicero on the west, and
2  the river on the south.
3      Q   Okay.  What was your next assignment?
4      A   I worked in -- I went to the 22nd District.
5      Q   Did you go -- did you go to the 22nd in July
6  of 1982 or prior to that?
7      A   I don't remember when I went there.
8      Q   Okay.  And where's District 22?
9      A   111th and Monterey.
10     Q   And what was your assignment there?
11     A   I was working tactical.
12     Q   Still tactical?
13     A   Yes.
14     Q   Okay.  Had you put in that change?
15     A   Yes, I did.
16     Q   Why did you put that change?
17     A   To be closer to home.
18     Q   Okay.  How long did you work at -- as a
19 tactical officer at District 22?
20     A   Two or three months.
21     Q   Okay.  And then did you get assigned to the
22 Public Housing South unit?
23     A   Yes.
24     Q   And I have that as being November 1982.  Does
25 that sound right to you?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A    Could be, yes.
2    Q    Okay.  What was the Public Housing Unit South?
3    A    What was it?
4    Q    Yeah.
5    A    It was a unit -- a unit that worked the
6    projects throughout the city of Chicago.
7    Q    All of the housing projects or just some of
8    the southern --
9    A    No.  We -- I -- I've been to all of the
10   housing projects.
11   Q    So you'd go all the way north to Cabrini-Green
12   at that time?
13   A    Sure.  Henry Horner Homes.  Any place that
14   they -- they needed people.
15   Q    Okay.  What -- what shift did you -- well,
16   first of all, how long were you assigned to the Public
17   Housing unit?
18   A    I don't recall how many years it was.
19   Q    Okay.  I have that you were -- became a gang
20   crime specialist in September 1986.
21   A    Yeah, but prior to being a gang crime
22   specialist, I worked in gangs as an off -- like a
23   tactical officer in gangs.
24   Q    Okay.  How long did you -- so you don't know
25   how long you were in the Public Housing unit?

Page 27

1    A    No.  A few years.  I --
2    Q    A few years.  Okay.  And that was any project?
3    You would just get assigned for the shift to a
4    project --
5    A    Yeah, or -- I worked at lot out in the -- the
6    Gardens.  If they needed us at Cabrini-Green, we'd leave
7    there and go all the way to Cabrini and...
8    Q    Okay.
9         MS. JOHNSON-DELGADO:  Let her finish her
10        question before you --
11        THE WITNESS:  Oh, yes.
12   BY MS. DONNELL:
13   Q    It's so easy.  It's --
14   A    I know.  I -- I --
15   Q    I do it all the time.  It's okay, but it
16   does --
17   A    I got a bad habit.
18   Q    It's okay.  It's really fine.  We'll -- as
19   long as --
20        MS. DONNELL:  Krystal, are you doing okay?
21   Okay.
22   Q    Okay.  So you worked for a couple years maybe
23   at that -- with the housing project unit, and during
24   that time, you'd be assigned to various housing projects
25   to -- as an officer?

Page 28

1    A    Correct.
2    Q    Okay.  And what shifts would you work as part
3    of that unit?
4    A    I'll always worked evenings, 6:00 to 2:30 in
5    the morning.
6    Q    Okay.  And then did you put in for the move
7    from District 22 to the Public Housing unit?
8    A    Yes, I did.
9    Q    Why was that?
10   A    District 22 was too quiet.
11   Q    Was too quiet?
12   A    Yeah.
13   Q    Okay.  Not enough police work?
14   A    Well, no, not -- it -- it was very political.
15   It's a lot of policemen's children, firemen's children,
16   and the stuff they wanted you to do was kind of really
17   stupid.  It wasn't police work.
18   Q    Interesting.  Like what?  What would be an
19   example?
20   A    People riding bicycles the wrong way.  People
21   doing this.  Just...
22   Q    So it just seemed silly?
23   A    Yeah, a lot of silly stuff.
24   Q    Okay.  Got you.
25   A    Dress -- wear dress pants all the time.  This

Page 29

1    and that.  You can't believe how many pairs of dress
2    pants I ruined.
3    Q    Oh, you had to wear dress pants?
4    A    Yeah.  We -- the lieutenant wanted everybody
5    dressed to the nines as a tactical officer.  So we all
6    had to dress it.
7    Q    Okay.  So you put in for this move to Public
8    Housing?
9    A    Yes.
10   Q    Okay.  And then did you put in to move to the
11   gang tactical unit?
12   A    Yes, I did.
13   Q    Okay.  And why was that?
14   A    There was openings and -- wanted to go to
15   gangs.
16   Q    Did they -- City provide any training to you
17   when you went to gangs?
18   A    I don't recall.
19   Q    Okay.  You don't recall any formal classroom
20   training?
21   A    We always had training, but I don't recall
22   exactly what it was.
23   Q    How long were you with the gang tactical unit
24   before you joined -- became a gang specialist?
25   A    After I did an oral interview, I think it was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  a couple years.  And then I became a gang specialist.
2      Q     And the gang tactical unit, was that working
3  properties city-wide, or did it have a special
4  geographic region?
5      A     Well, we -- we went where -- everywhere we
6  were needed.  Usually, we worked on the South, but if we
7  were needed up on the North Side, they'd send us.
8      Q     When you were assigned to that gang tactical
9  unit, was there particular gangs that the City was
10 focused on?
11     A     I wasn't, no, until I became a gang
12 specialist.
13     Q     I see.  Okay.  But part of the gang tactical
14 unit, you were just assigned where you were needed, and
15 it wasn't focused on a geographic reason, correct?
16     A     Correct.
17     Q     It wasn't focused on a particular gang back
18 then?
19     A     No, not at that time.
20     Q     Okay.  Then you became a Gang Crimes unit
21 speci -- you've got -- joined the Gang Crimes Unit
22 South, Unit 710, in September of '86.
23     A     Okay.
24     Q     Does that sound right?
25     A     It sounds right.  I don't know for --

1      Q     And what was that unit?
2      A     It was -- it's still part of the Gang South
3  unit that's -- it's -- tactical and gang crime
4  specialists all work together in the same office.
5      Q     And can you describe for me what's the
6  difference between a gang crime specialist, in terms of
7  their duties and responsibilities, and a gang crime
8  tactical officer?
9      A     Gang crime specialist is assigned to street
10 gangs, certain street gangs, and tactical officers go
11 out there and make arrests.
12     Q     Okay.  So is it fair to say that the gang
13 crime specialist sort of focus in to get -- so that they
14 get information and knowledge about a particular gang?
15     A     Correct.
16     Q     And then the tactical gang officers sort of
17 support the gang crime specialists?
18     A     If -- if you need help, yes.
19     Q     Okay.  And then when you first joined the Gang
20 Crimes South Unit, were you assigned a particular gang
21 to focus on?
22     A     As a gang crime specialist, yes.
23     Q     What was that?
24     A     The Del Vikings.
25     Q     The Del Vikings?  D-E-L?

1      A     Yeah.
2      Q     Del Vikings.  Okay.
3      A     That was a gang from the projects, 35th and
4  State.
5      Q     Okay.
6      A     And Gangster Disciples.
7      Q     Okay.  Anybody else?
8      A     No, not at that time.
9      Q     Okay.  What time -- what -- from what years
10 did you focus on the Del Vikings?
11     A     One year, because the -- the gang changed over
12 to Gangster Disciples.
13     Q     They got submerged [sic] into Gangster --
14     A     Yes.
15     Q     -- Disciples?  Okay.  And then how long during
16 your career did you focus on the Gangster Disciples?
17     A     For the rest of my career.
18     Q     Okay.  And at the time that you first became a
19 gang crime specialist, was there a particular area of
20 the city that the Gangster Disciples were focused?
21     A     They were -- they were all over the city.
22     Q     All over.  North Side, South Side, everywhere.
23     A     Right.
24     Q     Okay.
25     A     Suburbs.  Everything.

1      Q     Yeah.  Okay.  How long were you assigned to
2  the Gang Crimes South unit as a gang crime specialist?
3      A     Until I retired in 2001.
4      Q     Okay.  Did you ever go to Narcotics -- Gang
5  Crimes Narcotics at the end of your career?
6      A     I was assigned there, but I was still assigned
7  to 710, to the Gang Crimes unit.
8      Q     I see.  Okay.  And where did you operate out
9  of?  Was there a particular district or area?
10     A     In -- in -- where?
11     Q     As a gang crime specialist?
12     A     All over.  Suburbs, city, out of state.  We
13 were also US Marshals.
14     Q     You were also US Marshals?
15     A     Yeah.
16     Q     Okay.  But did you have a place, you know,
17 like an office where everybody could --
18     A     Yeah, we -- well, I had an office at 51st
19 Street.  I had an office by U of C.  Or the old police
20 station on -- we had the office there.
21     Q     Okay.
22     A     And that's where we basically worked out of.
23     Q     Is that the Homan Square office?
24     A     Homan Square office -- no.  We were at Homan
25 Square for narcotics when they moved off to 35th

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  Street.
2      Q    Okay.
3      A    No.  We were at -- the University of Chicago's
4  got the little old police station there.
5      Q    Oh, I see.
6      A    We were -- we were over there.
7      Q    At the university.  UIC or U of C?
8      A    UIC.
9      Q    UIC.  Okay.  Sorry.  And then the 51st Street,
10  was your office in the Area 1?
11     A    Yeah -- no, our office was downstairs --
12     Q    In the District?
13     A    -- in the Gang Crimes unit office.
14     Q    Okay.  So Area 1 was above you?
15     A    Correct.
16     Q    And you were down with --
17     A    There --
18     Q    -- district?
19     A    We were in the 2nd District.
20     Q    2nd District.  Okay.  Did you ever have an
21  office at Area 3 when it was in California?
22     A    No.
23     Q    Did your -- when you were a gang crime
24  specialist, did you work closely with particular
25  detective areas like Area 1?

Page 35

1      A    Area 1, Area 2, Area 3, Area 4, Area 5,
2  Area 6, depending on what's --
3      Q    What was going on?
4      A    Yes.
5      Q    So there wasn't one that was more prevalent
6  than the others?
7      A    Well, no, not really.  Area -- Area 3, because
8  it -- off Englewood -- a lot of shootings and stuff, but
9  basically all the areas.
10     Q    Okay.  Did you -- over the -- prior to your
11  retirement, were other gangs, other than the Gangster
12  Disciples, that you also focused on?
13     A    Yes.
14     Q    What gangs were those?
15     A    Spanish Gangster Disciples.
16     Q    Spanish Gangster Disciples?  Okay.
17     A    On -- on the east side of Chicago, on Houston
18  Avenue.
19     Q    Okay.  Anyone else?
20     A    No.
21     Q    Were you ever a specialist assigned to
22  investigate and work on the Black Stones?
23     A    No.
24     Q    Do you have any knowledge or information about
25  a dispute between the Jet Black Stones and the Black

Page 36

1  Stones in May of 1991?
2      A    No idea.
3      Q    Is it fair to say, during your career you were
4  focused and knowledgeable about the Gangster Disciples?
5      A    Correct.
6      Q    Okay.  And that included their structure?
7      A    Yes.
8      Q    And how they operated?
9      A    Yes.
10     Q    And how they enforced?
11     A    Correct.
12     Q    In May of 1991, you would have been assigned
13  to Unit 710 as a gang crime specialist, correct?
14     A    Correct -- no -- yes, I was.
15     Q    Do you remember what shift you worked --
16     A    No, I -- I can't recall.
17     Q    Okay.
18          MS. JOHNSON-DELGADO:  Let her finish her
19  question before you --
20          THE WITNESS:  All right.  Again.  Slap -- just
21  slap me, will you, please?
22          MS. JOHNSON-DELGADO:  Don't do that.
23          MS. DONNELL:  No, I don't want to do that.
24  We're not doing that.
25  BY MS. DONNELL:

Page 37

1      Q    Okay.  Prior to the arrest of Mr. Arnold Day
2  on February 4, 1992, did you have any idea who Arnold
3  Day was?
4      A    No, I did not.
5      Q    And how about by his name Little A?  Did you
6  know who Little A was prior to February 4, 1992?
7      A    No, I did not.
8      Q    Is it accurate to say, to the best of your
9  knowledge, that's the only day in which you interacted
10  with Mr. Day?  You didn't arrest or stop him or have any
11  other interaction with him?
12     A    No, I -- nothing with him.
13     Q    Okay.  How about an individual by the name of
14  Anthony Jakes?  Do you know Mr. Jakes?
15     A    No, no idea who is.
16     Q    Okay.  How about Nathaniel Anderson?
17     A    No idea who he is.
18     Q    G-Nate.  He goes by G-Nate?
19     A    No, no idea.
20     Q    Okay.  Denardo Triplett?
21     A    Never heard of him.
22     Q    Darrin Triplett?
23     A    No.
24     Q    Gus Robinson?
25     A    No.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    Q    Went by the name Snake?

2    A    No.

3    Q    How about an individual named Ralph Watson?

4    A    No.

5    Q    How about -- prior to February 1992, did you

6 know Detective Ken Boudreau?  You call him Kenny

7 Boudreau.  Did you know him prior to February 1992?

8    A    Yes, I did.

9    Q    Okay.  When do you remember first meeting Ken

10 Boudreau?

11    A    I -- I don't recall when I first met him.

12    Q    Was it in your capacity as a police officer?

13    A    Yes, it was.

14    Q    Okay.  Prior to this investigation, had you

15 worked with Detective Boudreau on other homicide

16 investigations that he was investigating?

17    A    He handled cases for us that we brought into

18 the area at the time.

19    Q    Okay.  So sometimes a gang officer would bring

20 homicides into the area to investigate?

21    A    Or any kind of case.  Aggravated battery,

22 rape.  We would bring it into the area, and they would

23 assign a detective to it.

24    Q    What does it mean when you guys would bring it

25 into the area?

Page 39

1    A    Well, we arrested an offender on the street

2 that we -- instead of bringing him to our office, we

3 bring him to the area so the detectives could interview

4 him and do the case on him.

5    Q    Okay.  Was it -- did you guys usually turn

6 over the interrogation of suspects to a detective at the

7 area, or did you conduct your own investigations and --

8 I'm sorry.  Let me strike that.  When you arrested

9 somebody as a gang crime specialist and they were a

10 suspect in a homicide, let's say, would you, as a gang

11 officer, be involved in the interrogation, or would you

12 turn it over to detectives?

13         MS. JOHNSON-DELGADO:  Object to form.  Go

14 ahead.

15    Q    You can answer.

16         THE WITNESS:  Oh.

17         MS. JOHNSON-DELGADO:  Oh, yeah.  Sorry.

18    Q    Sorry.  Sorry.  Unless she instructs you not

19 to answer, she's going to -- Ms. Johnson's going to make

20 a record, but then you can go ahead and answer.

21    A    Depending on the situation and the

22 circumstances.

23    Q    Okay.  So sometimes you'd bring people into

24 the gang office and do -- conduct your own --

25    A    Correct.  And have -- if it was a violent

Page 40

1 person or -- probably the closest police station, and

2 have the detectives come to the police station.

3    Q    I see.  And just to be clear, sometimes, as a

4 gang specialist, would you be involved in interviewing

5 witnesses?

6    A    Yes.

7    Q    And would you also be involved in

8 interrogating suspects?

9    A    Yes.

10    Q    And as a gang specialist, when you interviewed

11 a witness, what kind of reports would you guys generate

12 if you interviewed a witness?

13    A    We could do the original report, or we could

14 do a supplementary report.

15    Q    Okay.  And at that time, were you typing your

16 supplementary reports?

17    A    Yes.

18    Q    Okay.  And then how about if you were

19 interrogating a suspect and you obtained a statement

20 from them that was inculpatory?  How would you document

21 that as a gang specialist?

22    A    It would be -- the statement would be taken

23 down.  Have him sign it.  Then, I mean, we'd have the

24 detective present, the one that's taking the statement,

25 unless he just blurted it out.

Page 41

1    Q    Okay.  Did they -- were the gang specialists

2 involved in calling the felony review unit to review

3 them?

4    A    No.

5    Q    No?  Okay.  Okay.  Did you prepare any reports

6 related to the -- well, strike that.  Did you prepare

7 any supplementary reports related to your involvement

8 with Mr. Day?

9    A    No, I did not.

10    Q    Did you prepare the arrest report?

11    A    No, I did not.

12    Q    Did you prepare any reports?

13    A    No, I did not.

14    Q    At that time, back in February 1992, did you

15 keep, like, a steno book or a pocket notebook

16 documenting what you did on any given day?

17    A    No, I did not.

18    Q    Okay.  Did you create any documentation, in

19 any way, regarding your involvement in the arrest of

20 Mr. Day?

21    A    No, I did not.

22    Q    Okay.  Okay.  So Detective Boudreau -- you

23 knew him prior to February 1994, right?

24    A    '92.

25    Q    I'm sorry, '92.  Thank you.  Thank you.  Is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

1 that right?
2      A    Yes, it is.
3      Q    How about Detective John Halan [sic]?  Did you
4 know Detective John Halloran?
5      A    John Halloran?  Yes, I did.
6      Q    Okay.  And you worked with him as well?
7      A    Yes.
8      Q    You knew him to be one of Ken Boudreau's
9 partners?
10      A    Yes.
11           MS. JOHNSON-DELGADO:  Objection, foundation.
12      Q    How about Detective Pack (phonetic)?  Did you
13 know Detective Pack?
14      A    I don't recall him.
15      Q    How about Detective Kill?
16      A    Yes, I knew Kill.
17      Q    How did you know Kill?
18      A    I worked with him in the 10th District when I
19 was on probation.
20      Q    Was he in the academy with you, then?
21      A    No.
22      Q    Okay.
23      A    He was one of the officers assigned to patrol
24 in the 10th District.
25      Q    Okay.  So was he one of, like, your field

Page 43

1 training officers?
2      A    I didn't have field training officers.
3      Q    Okay.  You just went there on probation?
4      A    Yeah.  You just --
5      Q    It was before field training?
6      A    Yes.
7      Q    Got it.  Okay.  Meaning you were a probation
8 area officer before Chicago had implemented a field
9 training officer --
10      A    Correct.
11      Q    Understood.  Okay.  How about Detective Foley?
12 Did you know Detective Foley --
13      A    Yes, I --
14      Q    -- prior -- sorry -- prior to February 1992?
15      A    Yes, I did.
16      Q    How did you know Detective Foley?
17      A    He also worked in the 10th District.
18      Q    When he was on patrol?
19      A    Yes.
20      Q    And how about Detective Dan McWeeny?
21      A    Yes, I knew Dan McWeeny from -- from the area.
22      Q    And you knew him when he was at the Area 2 or
23 Area -- what area?
24      A    I don't recall if it was Area 2 or Area 3.
25      Q    Okay.  Did you ever -- let's see.  Okay.  We'll

Page 44

1 strike that.  How about Detective O'Brian?  Did you know
2 Detective O'Brian?
3      A    Yes, I did.
4      Q    How did you know Detective O'Brian?
5      A    From the area.
6      Q    From Area 2?
7      A    Area -- Area 3.
8      Q    Area 3.
9      A    Or Area 1.  I'm sorry.
10      Q    He was Area 1?  Okay.  Did you know or ever
11 work with Det -- with Commander Jon Burge?
12      A    I knew Jon Burge.  Yes, I did.
13      Q    How did you know Jon Burge?
14      A    I met him in at the area.
15      Q    At Area 2?
16      A    Area -- Area 3, I believe it was.
17      Q    At Area 3?  Okay.  When he was the commanding
18 officer or when he was --
19      A    Yes, when he was commanding officer.
20      Q    Did you work on any investigations with him?
21      A    No, I did not.
22      Q    Okay.  I -- and then Officer Bloore and
23 Officer Schaefer, you -- well, let's -- Officer Bloore.
24 Did you know Officer Bloore when you worked as a gang
25 crime specialist?

Page 45

1      A    Yes.
2      Q    How many years did you worked with Officer
3 Bloore?
4      A    I don't recall how many years.
5      Q    Was it a lot of years?
6      A    It was quite few.
7      Q    And how about Officer Schaefer?  Same thing?
8      A    The same thing.
9      Q    Okay.  Was there a particular group of you
10 that worked together for a number of years?
11      A    Yes, there was.
12      Q    Okay.  Who were the folks you worked with,
13 other than Bloore and Schaefer, for a number of years as
14 a gang crime specialist?
15      A    Officer -- gang crimes?  Casto.
16      Q    Casto?
17      A    C-A-S-T-O.
18      Q    Yes.  And what was Casto's -- is that Steven?
19      A    Steven, yes.
20      Q    Okay.
21      A    Richardson, Thomas.
22      Q    Thomas Richardson?  Okay.
23      A    And Robert Maurice.  Clyde Raymond.
24      Q    How do you -- Clyde Ray?
25      A    Raymond.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1    Q    Raymond?  Okay.  Clyde Raymond.
2    A    James Oliver.  I'm trying to think.  James
3  Darling.  Patrick Fleming.  T Anderson.
4    Q    How do you spell that first name?
5    A    T, just the letter T.
6    Q    T Anderson.
7    A    I think that's about it.
8    Q    Okay.  And you said, typically, you worked,
9  like, 2:30 -- or -- sorry.  You worked 6:00 p.m. to
10  2:30 a.m.?
11   A    Correct.
12   Q    Okay.  Was there a sergeant in charge of your
13  unit?
14   A    Yeah, I -- I don't recall which sergeant.  We
15  had a bunch of different sergeants.
16   Q    Were the sergeants out on the street with you
17  when you guys went out, or were they in the office?
18   A    They went out on the street.
19   Q    They were not on the street?
20   A    They -- yes, they were on street.
21   Q    Oh, they did go on the street?
22   A    Yes.
23   Q    Okay.  Got it.  I forgot to ask you this
24  earlier: Have you had any conversations with Officer
25  Bloore, outside the one were your attorneys were

Page 47

1  present, in which this case was discussed in any way?
2    A    No.
3    Q    How about with respect to Officer Schaefer?
4    A    No.
5    Q    How about with -- well, do you talk to Ken
6  Boudreau?
7    A    No.
8    Q    How about Bloore?  Do you talk to him
9  socially?
10   A    No.
11   Q    Or Schaefer?
12   A    No.
13   Q    Do you have any social friends from your time
14  when you were a police officer?  Like, that you maintain
15  a regular contact with?
16   A    No.
17   Q    Okay.  I also forgot to ask you this: When you
18  retired in the police department in 2001, did you have
19  employment?
20   A    Yes, I did.
21   Q    What employment have you had since your
22  retirement?
23   A    I worked for the Illinois Department of
24  Corrections.
25   Q    Where were you -- were you a correctional

Page 48

1  officer?
2    A    No, I was not.  I was internal investigator.
3    Q    How long were you -- was that a full-time job?
4    A    Yes.
5    Q    How long were you a full-time internal
6  investigator with the Illinois Department of
7  Corrections?
8    A    Eleven years.
9    Q    And was that -- what kind of investigations?
10  Like, employee investigations?
11   A    Employees, murders, rapes, thefts, escapes --
12   Q    Everything?
13   A    -- suicides -- every -- anything.
14   Q    Okay.  And where were you -- was that out of
15  Chicago?
16   A    I had an office in Chicago, I had an office in
17  Joliet, and I had an office in Springfield.
18   Q    Okay.  And so you did that from 2001 to 2012?
19   A    Yes.
20   Q    And then did you retire from the Illinois
21  Department of Corrections?
22   A    Yes, I did.
23   Q    Okay.  Have you been employed since that time?
24   A    No, I have not.
25   Q    Okay.  So you've been fully retired since

Page 49

1  2012?
2    A    No, I'm Grandpa Uber.
3    Q    You're Grandpa Uber?
4    A    Yes.
5    Q    Okay.  So you've been a grandpa involved with
6  your grandkids for the past ten years?
7    A    Yes.
8    Q    Awesome.  Great.  How many grandkids do you
9  have?
10   A    Six.
11   Q    Awesome.
12   A    Four here and two in Florida.
13   Q    Congratulations.  All right.  Okay.  I'm going
14  to shift in to talking about the incident.  Do you want
15  to take a break?
16        MS. DONNELL:  Brittany, do you need a break?
17        MS. JOHNSON-DELGADO:  Do you want to go for an
18  hour and then try to break for, like, a short
19  lunch?
20        MS. DONNELL:  Sure.  Perfect.
21        MS. JOHNSON-DELGADO:  That'll work.
22        MS. DONNELL:  So does anybody need a bathroom
23  break or anything?
24        THE WITNESS:  No, I'm fine.  Thank you.
25  BY MS. DONNELL:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    All right.  Okay.  So now, you told me you
2  have an actual memory of this particular day back on
3  February 4, 1992, right?
4    A    Correct.
5    Q    Okay.  Do you have a memory of the shift you
6  worked -- did you work on February 3, 1982?
7    A    I don't recall.
8    Q    How about February 5, 1992?
9    A    I don't recall that.
10    Q    Okay.  Had you -- well, do you remember
11  anything about the shift you worked on February 4, 1992,
12  other than your arrest of Mr. Day?
13    A    No, I do not.
14    Q    Why is it that you think you have an about
15  actual memory of this particular arrest?  Was there
16  something that stood out to you?
17    A    Yes.
18    Q    What was that?
19    A    A man hiding under a bed.
20        COURT REPORTER:  I'm sorry.  Can you repeat
21    that one more time for me, sir?
22        THE WITNESS:  A man hiding underneath a bed.
23        COURT REPORTER:  Thank you.
24  BY MS. DONNELL:
25    Q    And so other occasions when you had conducted

1  searches in which an individual or a man was hiding
2  under a bed?
3    A    No.
4    Q    This is the only one?
5    A    It's the only one I can remember.
6    Q    Okay.  And that's why you remember it?
7    A    Yes.
8    Q    Okay.  Before we get to that particular point,
9  do you recall your assignment that day?
10    A    I was assigned work with Officer Bloore and
11  Officer Schaefer.  My partner was off that day, so I was
12  the third man in the car.
13    Q    Who was your regular partner at that time?
14    A    Brad Williams.
15    Q    Okay.  And how do you know Brad Williams was
16  off that day?
17    A    Because he wasn't at work.
18    Q    But you remember that, or you know that from
19  looking at documents?
20    A    No, I -- I -- you don't put three guys in a
21  car, usually.
22    Q    Okay.  Usually, it was just two of you?
23    A    Just two of us.
24    Q    Okay.  And then, do you know -- were you --
25  was Bloore, and Schaefer, and yourself assigned to work

1  with Ken Boudreau that day?
2    A    I don't know.  I can't tell you.
3    Q    Were you out looking for Mr. Day?
4    A    We -- I wasn't out looking for Mr. Day.
5    Q    Okay.  How was it that you came to 5234 South
6  Sangamon Street?
7    A    That -- somebody, I don't know, received a
8  call that Officer Foley needed help with an arrest of a
9  gentleman.
10    Q    Do you get that call from Officer Foley?
11    A    No, I did not.
12    Q    Do you know if Detective Moore (phonetic) or
13  Detective -- did Detective Moore get that call for you?
14    A    I don't know who got the call.
15    Q    Okay.  Did -- so is it your testimony that you
16  -- well, what is -- what was your understanding of what
17  Detective Foley needed?
18    A    I have no idea.  I was told we were going to
19  assist Detective Foley at the address on Sangamon.
20    Q    So is it your understanding that Detective
21  Foley gave you guys the address to meet him in?
22    A    Yes.
23    Q    Okay.  Do you have any personal knowledge as
24  to how Detective Foley got that address?
25    A    No idea.

1    Q    But is it your -- prior to February 4, 1992,
2  had you ever been out to this address, 5234 South
3  Sangamon?
4    A    No.
5    Q    Prior to February 4, 1992, when you understood
6  that you guys were supposed to -- you, and
7  Officer Bloore, and Schaefer were supposed to assist
8  Detective Foley, had you, on any other prior shift, made
9  any efforts to locate Arnold Day?
10    A    No.
11    Q    Okay.  So your testimony is that at some point
12  in that shift you learned that Detective Foley needed
13  your assistance at 5234 South Sangamon?
14    A    Correct.
15    Q    And did you have an understanding about why
16  you were supposed to meet Detective Foley at 5234 South
17  Sangamon?
18    A    Not until we got there and I -- we talked to
19  -- we talked to Detective Foley.
20    Q    Okay.  Where -- when you say, "We talked to
21  Detective Foley," you're referring to yourself and
22  Officer Schaefer and Bloore?
23    A    Correct.
24    Q    And where did you meet Detective Foley?
25    A    I don't recall exactly where it was. Someplace

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1  at Sangamon, probably.  I don't recall.
2      Q     Did you -- I mean, your testimony is that you
3  met him somewhere out on the street, down at one of the
4  areas or districts?
5      A     No, I -- probably -- I -- I don't recall where
6  we met him, no.
7      Q     Okay.  So it's accurate to say you have no
8  actual memory of where you met Detective Foley?
9      A     No, I do not.
10     Q     You mean no, you don't have a memory?
11     A     No, I've not.
12     Q     Okay.  And do you remember who was with
13 Detective Foley?
14     A     No, I do not.
15     Q     Was there any other gang crime specialist
16 officers with you other than Bloore and Schaefer?
17     A     No.
18     Q     Okay.  And do you have a memory, as you sit
19 here today, of the information that Detective Foley
20 conveyed to you?
21     A     Detective Foley explained that -- the wanted
22 person's name, and he was wanted for murder.
23     Q     Did Detective Foley explain to you what murder
24 he was seeking to -- well, strike that.  Did you -- did
25 he convey any information about the homicide he was

Page 55

1  investigating?
2      A     No, he did not.
3      Q     Okay.  Did he explain to you any of the
4  evidence that he had that led him to want to find
5  Mr. Day?
6      A     No, he did not.
7      Q     So as you sit here today, you -- well, strike
8  that.  Back in February 4, 1992, before you went to
9  5234 South Sangamon, did you have any information about
10 the facts and circumstances of the homicide that
11 Detective Foley was investigating?
12     A     No, none at all.
13     Q     Okay.  Is that still true today?
14     A     Do I have what?
15     Q     Do you have any knowledge now of the
16 homicide --
17     A     Just what I read on reports.
18     Q     Okay.  But it's accurate to say, just to be
19 clear, back in February of 1992, you had no facts or
20 information related to the homicide of Rafael Garcia,
21 correct?
22     A     I have no information.
23     Q     And you have no information related to the
24 homicide of Jerrod Irving, either?
25     A     No, I did not.

Page 56

1      Q     Okay.  All right.  So do you remember how long
2  the conversation was with Detective Foley before you
3  proceeded to 5234 South Sangamon?
4      A     No, I don't recall.
5      Q     Other what you testified to, that there was a
6  wanted person wanted for murder that he needed
7  assistance with, did Foley -- Detective Foley convey any
8  information to you about what his goals were?
9      A     No, he did not.
10     Q     Did he say he was seeking to arr -- he had
11 probable cause to arrest the individual?
12     A     No, he did not.
13           MS. JOHNSON-DELGADO:  Object to form.
14     Q     Did you have an understanding that you were
15 going to seek to arrest Mr. Day?
16     A     We were to seek to arrest -- if he was in the
17 house, he would be arrested.
18     Q     Okay.  So your understanding of the goal was
19 to arrest Mr. Day if he was located at 5234 South
20 Sangamon?
21     A     Correct.
22     Q     Okay.  Did Detective Foley convey to you whose
23 house was at 5234 South Sangamon?
24     A     No, he did not.
25     Q     Did he convey -- did Detective Foley convey to

Page 57

1  you and the other officers any information with respect
2  to Mr. Day, other than that he was wanted for homicide?
3      A     I don't recall.
4      Q     Did -- there was no actual search warrant,
5  correct?
6      A     I don't know if there was a search warrant or
7  not.
8      Q     You never saw one?
9      A     I've never saw one.
10     Q     And that was true back in February 1992,
11 correct?
12     A     Correct.
13     Q     How about an arrest warrant?  Did you have an
14 arrest warrant back -- did Detective Foley have an
15 arrest warrant back in February 1992?
16     A     I --
17           MS. JOHNSON-DELGADO:  Foundation.
18     Q     You can answer.
19     A     I don't know.
20     Q     Okay.  You didn't see one?
21     A     No, I did not.
22     Q     Okay.  Did Detective Foley have any file --
23 well, strike that.  Did Detective Foley have any files
24 with him that contained reports when you met with him?
25     A     I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1    Q    Okay.  Do you recall approaching 5234 South
2  Sangamon?  Like, do you have an actual memory?
3    A    No.  No.
4    Q    Okay.  Do you know whether you approached from
5  the front of the home or the back?
6    A    I don't remember.
7    Q    Did some officers go to the front and some to
8  the back?
9         MS. JOHNSON-DELGADO:  Objection, foundation.
10    Q    If you know, if you recall?
11    A    I don't recall.
12    Q    Do you have -- as you sit here today, do you
13  have any recollection of how you entered the home at
14  5234 South Sangamon?
15    A    No, I don't recall.
16    Q    Okay.  Did you have any interactions with
17  Mr. Kwame Tate?
18    A    No, I did not.
19    Q    Were you present -- okay.  So -- okay.  And
20  you have no memory of how you got into the home, whether
21  you walked into the front door --
22    A    I -- I don't remember if there was a --
23         MS. JOHNSON-DELGADO:  Objection, asked and
24    answered.  Let her finish --
25         THE WITNESS:  I'm sorry.

Page 59

1         MS. JOHNSON-DELGADO:  Objection, asked and
2    answered.  Go ahead.
3    A    No.
4  BY MS. DONNELL:
5    Q    Did you go into the upstairs of the home?
6         MS. JOHNSON-DELGADO:  Objection, foundation.
7    Go ahead.
8    A    I went to the first floor of the home.
9    Q    You were on the first floor of the home?
10    A    Yes.
11    Q    And then you proceeded down to the basement?
12    A    Correct.
13    Q    Okay.  Do you have a recollection of being in
14  the basement at 5234 South Sangamon?
15    A    Yes, I do.
16    Q    Okay.  What do you recall?
17    A    I recall there was a bedroom.  Searching in
18  the bedroom, I looked under the bed.  I saw a body under
19  the bed, yelled, "He's under here," lifted the bed.
20  Officers Schaefer and Bloore assisted, holding the bed,
21  and I handcuffed Mr. Day.
22    Q    Okay.  Did you enter the bedroom by yourself?
23    A    No.  All -- all -- all four of us, I believe.
24    Q    So you believe that Detective Foley, Officer
25  Schaefer, and Officer Bloore, and yourself all entered

Page 60

1  the bedroom in the basement?
2    A    Correct.
3    Q    And then, your testimony is that you observed
4  a body under the bed, right?
5    A    Correct.
6    Q    Then you yelled, "He's under here," right?
7    A    Yes.
8    Q    And then you proceeded to lift up the bed with
9  the assistance of Officers Schaefer and Bloore?
10    A    Correct.
11    Q    And then you saw Mr. Day; is that right?
12    A    Correct.
13    Q    And then you handcuffed Mr. Day?
14    A    Right.
15    Q    Okay.
16    A    Well, I couldn't see his right arm, so I was -
17  - here's a guy that -- allegedly wanted for murder.  I
18  handcuffed -- I reached, grabbed his arm right away.
19    Q    Okay.  Okay.  Before you entered the bedroom
20  in the basement, was your gun drawn?
21    A    Yes.
22    Q    Were all the other officers' and Detective
23  Foley's gun drawn?
24    A    Yes.
25    Q    Where was Mr. Tate when you guys went down to

Page 61

1  the basement?  Was he on the first floor?
2    A    I don't recall where he was.
3    Q    Was Mr. Tate handcuffed?
4    A    I don't recall.
5    Q    Did you -- as you sit here -- well, strike
6  that.  Did you have any communications with Mr. Tate
7  before you entered the home?
8    A    I did not.
9    Q    Did you observe any of the other officers or
10  Detective Foley have any communications with Mr. Tate
11  before you entered the home?
12    A    Detective Foley was talking to the gentleman
13  at the house.
14    Q    Okay.  Did you -- as you sit here today, do
15  you remember anything that you heard Detective Foley say
16  to Mr. Tate?
17    A    No, I do not recall anything.
18    Q    And do you remember anything -- (phone rings)
19  -- I'm sorry -- that Mr. Tate said to Detective Foley?
20    A    No, I do not.  I don't recall anything.
21    Q    Okay.  Was there anybody else present in the
22  home that you recall?
23    A    I don't remember if there was anyone else in
24  the home.
25    Q    Okay.  When you say that you saw a body under

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1  the bed, what did you -- what do you recall seeing,
2  specifically?
3      A    Sight of a body laying under the bed.
4      Q    Was Mister -- what was Mr. Day wearing?
5      A    I don't recall what he had on.
6      Q    Did you flip the bed over?
7      A    No, we flipped it up.
8      Q    What you mean?  Could you describe -- when you
9  say, "flipped it up," what do you mean?
10     A    Lifted one side of the bed, lifted it up.  They
11 held up while I handcuffed Mr. Tate.
12     Q    What kind of bed?  Was it a bed frame?
13 Describe the bed.
14     A    It was just -- I don't know what to say.  Like
15 one of those steel frames with a half-inch mattress
16 and...
17     Q    Was there a box spring?
18     A    No.  There was spring right in the frame.
19 Built-in, I believe.
20     Q    Was it, like, a metal bed frame that's on
21 wheels?
22     A    I don't know if it had wheels or not.  I don't
23 think so.
24     Q    And I'm checking to ask this:  Is there a box
25 spring?

Page 63

1      A    No, the spring is built into the bed itself.
2      Q    I see.  Okay.  Did you kick Mr. Day in the
3  head?
4      A    No, I did not.
5      Q    Did you stomp on his head?
6      A    No, I did not.
7      Q    Did you strike him in any way?
8      A    No, I did not.
9      Q    Did you observe any weapon with Mr. Day?
10     A    No, I did not.
11     Q    Did you see any drugs when you -- with
12 Mr. Day?
13     A    No, I did not.
14     Q    Now, how about a bullet?  Did you observe a
15 bullet under Mr. Day?
16     A    No, I did not.
17     Q    Did you secure any evidence at 5234 South
18 Sangamon?
19     A    No, I did not.
20     Q    And it's accurate to say, during your search
21 you did not see any drugs?
22     A    I -- I -- I didn't --
23          MS. JOHNSON-DELGADO:  Object to form,
24 foundation.  Also assumes that he was searching.
25     Q    Object to the seeking objection.  But did you

Page 64

1  observe any drugs in 5234 South Sangamon on
2  February 4, 1992?
3      A    No, I did not.
4      Q    Did you observe any guns?
5      A    No, I did not.
6      Q    Any other contraband?
7      A    No, I did not.
8      Q    And did you -- were any evidence techs called
9  out to 5234?
10     A    I don't know.
11     Q    Okay.  And you did not obtain -- you did not
12 secure a bullet at 5234 South Sangamon?
13     A    No, I did not.
14     Q    Okay.  Okay.  What -- after you handcuffed
15 Mr. Day, what did you do next, if you recall?
16     A    Walked to the side of the bedroom while the
17 other officers searched the bedroom.
18     Q    And do you remember anything you observed
19 while the officers were searching the bedroom?
20     A    No, I don't.
21     Q    Do you have any -- so you have no recollection
22 of what the officers did inside the bedroom?
23     A    They searched the bedroom.
24     Q    What do you mean by, "They searched the
25 bedroom"?

Page 65

1      A    Checked areas for weapons and stuff like that.
2      Q    Did they go inside -- was there furniture in
3  the bedroom, like a dresser?
4      A    I think there might have been a -- no, I -- I
5  don't recall.
6      Q    How long were you in the basement bedroom with
7  Mr. Day and the other officers?
8      A    I don't remember.
9      Q    Okay.  What happened next, if you recall?
10     A    After they were done searching, walked Mr. Day
11 out, placed him in the back seat of the squad car, and I
12 got in the back seat with him.  And Officer Bloore and
13 Officer Schaefer got in the front seat of the car.
14     Q    How long was the drive from 5234 South
15 Sangamon to the area?
16     A    I don't remember how long it was.
17     Q    Do you recall any of the conversation -- well,
18 was there a conversation with Mr. Day during the
19 transportation from 52 [sic] South Sangamon to Area 3?
20     A    No, there was not.
21     Q    Nothing?
22     A    Nothing.
23     Q    Okay.  What was Mr. Day wearing?
24     A    I don't recall what he had on.
25     Q    Did you permit him to put on clothes before he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1   left the house?
2           MS. JOHNSON-DELGADO:  Object to foundation.
3   A   I don't remember.
4   Q   Okay.  I'm going to show you some testimony.
5   We'll mark this as Exhibit 1, and Exhibit 1 is -- here
6   you go -- testimony by Detective William Foley on
7   Mr. Day's criminal trial.  I'm going to -- may I have
8   you read --
9           (EXHIBIT 1 MARKED FOR IDENTIFICATION)
10          MS. DONNELL:  Here, I brought one for you,
11  Brittany, as well.
12  Q   I'm going to have you read a portion of it to
13  see if refreshes your recollection, and then I'll ask
14  you if it refreshes your recollection.  So if you could
15  turn to page 001138, there's little Bates stamps at the
16  bottom.
17  A   Uh-huh.
18  Q   And then I'm going to have you read line 16
19  through 18 to see if that testimony refreshes your
20  recollection.  And for the record, Exhibit 1 is
21  Officers_Day 001128 consecutive through 001141.  Have
22  you had an opportunity to review that portion of Mister
23  -- Detective Foley's testimony?  And I see you're
24  reading on to the next page as well.
25  A   Okay.

Page 67

1   Q   Okay.  I asked you just to review that one
2   portion, but you went on to review other pages.  But I'm
3   just going to ask you if reviewing the page and the
4   lines I asked you read --
5   A   Correct.
6   Q   Does that refresh your recollection that
7   Mr. Day was only wearing boxer shorts when you --
8   A   No, it does not.
9   Q   Okay.  You can put that to the side for now.
10  Okay.  Do you recall arriving at Area 3 with Mr. Day?
11  A   Yes.
12  Q   What -- tell me what you remember about --
13  once you arrived at Area 3 with Mr. Day?
14  A   Parked our vehicle.  They took Mr. Day and
15  turned him over to Violent Crimes.
16  Q   And was that upstairs?
17  A   Yes.
18  Q   So you walked Mr. Day up the stairwell?
19  A   Correct.
20  Q   Did Officers Bloore and Schaefer come with
21  you?
22  A   Yes, they did.
23  Q   So all three -- and was Detective Foley in a
24  different car?
25  A   Yes.

Page 68

1   Q   Were there any other detectives with him that
2   you can recall?
3   A   I don't recall.
4   Q   When you say that you walked him up the
5   stairs, where did you put -- you said you turned --
6   strike that.  You said turned Mr. Day over to Area 3
7   Violent Crimes.  What do you mean?  What did you
8   specifically do?
9   A   I don't recall exactly what I did, but I know
10  we turned him over and we left.
11  Q   Was Mr. Day handcuffed when you turned him
12  over?
13  A   Yes, and I -- I don't know what happened, but
14  after they put him them in the cage, I got my handcuffs
15  back.
16  Q   Because he was handcuffed with your handcuffs?
17  A   Yes.
18  Q   Did you put him -- when you say, "put him in a
19  cage," there was cage up in Area 3, correct?
20  A   Correct.
21  Q   Okay.  And back in February of 1992, what did
22  the cage look like?
23  A   I don't recall exactly what it was.
24  Q   There was sort of floor-to-almost-ceiling
25  fencing, right?

Page 69

1           MS. JOHNSON-DELGADO:  Object to foundation.
2   A   I don't recall what it was.
3   Q   Do you recall there being a bench in it?
4           MS. JOHNSON-DELGADO:  Object to foundation.
5   A   No, I don't.
6   Q   You'd put other individuals in the cage at
7   Area 3 prior to that date, right?
8   A   Yes, I have.
9   Q   Do you remember any posters or -- mannequin
10  heads hanging in Area 3?
11          MS. JOHNSON-DELGADO:  Object to foundation.
12  A   No.
13  Q   No?  Do you -- did you ever -- did you take
14  Mr. Day into an interrogation room in Area 3?
15  A   No, I did not.
16  Q   Had you ever done that before?  Take an
17  individual that you guys are bringing into the area and
18  put him into an interrogation room?
19  A   Not that I can recall.
20  Q   You usually put him in the cage?
21  A   Yes.
22  Q   Okay.  Did you have any communications with
23  Detective Foley at Area 3?
24  A   I probably talked to him, yes.
25  Q   When you say you probably talked him, why do



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  you say that?  Is that sort of your practice?
2      A    Yeah, to tell him he's in the cage, and gave
3  him our star numbers for the reports.
4      Q    Okay.  Were you involved -- did you ever go
5  into an interrogation room with Detective Foley with --
6  and Mr. Day?
7      A    No.
8      Q    Do you know that for certain?
9      A    Positively.
10     Q    Okay.  Why is that?
11     A    I have nothing to talk to Mr. Day about.
12     Q    Did you ever ask Mr. Day any questions about
13 his involvement in the homicide?
14     A    No, I did not.
15     Q    Okay.  How about Kwame Tate?  Did you know who
16 Kwame Tate was before --
17         MS. DONNELL:  Oh, sorry, she's --
18         MS. JOHNSON-DELGADO:  Something's weird.
19     (Inaudible) Can you guys still see him?
20         MS. JOHNSON-DELGADO:  Yeah.
21         THE WITNESS:  Okay.
22         MS. JOHNSON-DELGADO:  Okay.  Then you're --
23         THE WITNESS:  That's all right.  I just
24     looked --
25         MS. JOHNSON-DELGADO:  The screen went black.

Page 71

1          MS. DONNELL:  We can see you.
2          THE WITNESS:  Okay.
3      A    No, I have idea who Kwame Tate was.
4  BY MS. DONNELL:
5      Q    Okay.  And you said you were present when
6  Detective Foley was talking to Mr. Tate, but you have no
7  recollection of what was said --
8      A    Correct.
9      Q    Was Mr. Tate transported to Area 3?
10     A    Not that I know of, no.
11     Q    You would agree that you did not observe any
12 criminal conduct on the part of Mr. Tate on
13 February 4, 1992, correct?
14     A    Correct.
15     Q    And would you agree that there was no probable
16 cause to arrest Mr. Tate on February 4, 1992?
17         MS. JOHNSON-DELGADO:  Object to foundation.
18     Q    Nothing you observed on February 4, 1992,
19 indicated any criminal conduct on the part of Mr. Tate?
20         MS. JOHNSON-DELGADO:  Objection, asked and
21     answered.
22     Q    You can answer.
23     A    No criminal action by Mr. Tate.
24     Q    Okay.  And you didn't observe any criminal
25 action on behalf of Mr. Day, either?

Page 72

1      A    Did I -- no, none whatsoever.
2      Q    Okay.  Let's see.  I'm going to hand you now
3  what I'm designating as Exhibit 2 to your deposition.
4  Here you go.  Okay.  Exhibit 2 is Bates stamp City_Day
5  0025.  It's the arrest report for Mr. Arnold Day.  This
6  is one of the documents you reviewed prior to your
7  deposition, correct?
8          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
9      A    Correct.
10     Q    Okay.  Now, do you want a chance to look over
11 it before I ask you questions?
12     A    Sure, one second.
13     Q    Yeah, sure.  Let me know when you're ready.
14     A    Okay.
15     Q    Okay.  Is any of the handwriting on Exhibit 2
16 yours?
17     A    No.
18     Q    Okay.  And other than seeing it in preparing
19 for your deposition today, have you ever seen -- back in
20 February 1992, did you ever see the arrest report for
21 Mr. Day?
22     A    No, I did not.
23     Q    Okay.  And here it says in box -- I believe
24 it's box 47 -- maybe it's 48 -- that you were -- it
25 says, "Arrestee transported to" -- it says, "A/3 VC,"

Page 73

1  for Area 3 Violent Crimes, and then it says, "By Evans";
2  is that right?
3      A    Correct.
4      Q    And that has your star number at that time,
5  14764?
6      A    Correct.
7      Q    And then it says how he was transported.  It
8  was by "Bt. 4125."  That was your beat?
9      A    Yes, that day.
10     Q    And the transportation time was at 10:15 p.m.?
11     A    That's what it says, yes.
12     Q    Okay.  And does that comport with your memory
13 that you were now in the morning hours?
14     A    We were in the morning hours, yes.
15     Q    Why were you working the morning that time?
16     A    I have no idea.  They might have needed extra
17 people.
18     Q    Okay.
19     A    I mean, you know, we would change shifts every
20 so often.
21     Q    Got it.  Okay.  Did you know ASA Jason
22 Danielian?
23     A    No, I do not.
24     Q    Okay.  Next exhibit.  For the record, Exhibit
25 3 has Bates stamp City_Day 00056 consecutive through



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  00059.  Mr. Evans, this is a supplementary report
2  prepared by Detective Foley and Boudreau.  It has the
3  date of February 18, 1992, as the date it was submitted.
4  You can take your -- as much as you want -- time to
5  review, and then let me know when you're ready.
6           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
7      A   Okay.
8      Q   Okay.  Do you recognize Exhibit 3 as the
9  supplementary report you reviewed to prepare for your
10 deposition?
11     A   Yes.
12     Q   Okay.  And here you see the arresting officers
13 are listed: "G/SPL. J. Bloore," which means Gang
14 Specialist Officer J. Bloore; is that right?
15     A   Correct.
16     Q   And then Gang Specialist R. Schaefer?
17     A   Correct.
18     Q   And then you?
19     A   Correct.
20     Q   And then Detective Foley and Detective
21 Boudreau, right?
22     A   Correct.
23     Q   Okay.  Okay.  You'd agree that the
24 circumstances of Mister -- let's see.  Hold on a second.
25 Yeah, the circumstances of the arrest are described on

Page 75

1  page 2, the bottom of City_Day 00057; is that right?
2      A   Yes.
3      Q   Okay.  I want to call your attention to this
4  part of the report where it says -- in the first
5  paragraph under the "Investigation" section, it says,
6  "Additionally, the R/Ds developed information that Day
7  was hiding [in the basement of the building located at
8  5234 South Sangamon."  Do you see that?
9      A   Yes.
10     Q   That does not -- you guys were not involved in
11 developing that information, correct?
12     A   Correct.
13     Q   Okay.  You see the next paragraph, where it
14 says, "Armed with the [information" -- next paragraph --
15 "the R/Ds went to 5234 South Sangamon, 4 February '92,
16 and were admitted to that location by a resident of that
17 location, a Kwame Tate, M/1/18.  Tate was then informed
18 of the nature of this investigation, and at that time,
19 he told the R/Ds that Day was in a downstairs bedroom."
20 Do you see that?
21     A   Yes.
22     Q   Does that refresh your recollection that
23 Mr. Tate informed you that -- where Mr. Day was?
24     A   No.  I know somebody said, "He's in the
25 basement."  I don't know if it was an officer, Foley.  It

Page 76

1  could have been Mr. Tate.  I don't know.
2      Q   So you knew when you went down to the basement
3  that Mr. Day was down there?
4      A   According to what this said, yes.
5      Q   But you don't have an actual memory of that?
6      A   No.
7      Q   Okay.  And then it says, "The R/Ds then
8  obtained a consent to search to that building
9  apprehended and arrested Day under the bed in the
10 basement bedroom at that address."  Did you see that?
11     A   Yes.
12     Q   Do you recall participating and obtaining
13 consent to search from Mr. Tate at 5235 South Sangamon
14 before you entered the building?  Do you have an actual
15 memory of that?
16     A   No, I don't.
17     Q   Okay.  Do you have any memory at all with
18 respect to the execution of the Consent to Search form?
19     A   Yes.  I remember going down the stairs to the
20 basement, to the bedroom.
21     Q   I'm sorry, I wasn't clear.  Do you have any
22 memory of the execution of the Consent to Search form?
23     A   I remember signing a form, but that's all.
24     Q   Do you have any memory as to where you were
25 when you signed the form?

Page 77

1      A   No, I do not.
2      Q   Okay.  You just know you signed it?
3      A   Yes, I do.
4      Q   Do you -- but prior to seeing it -- that
5  Consent to Search form is one of the documents you saw
6  prior to the deposition today, right?
7      A   Correct.
8      Q   And before you saw that document, did you
9  remember that there was a Consent to Search form in this
10 case?
11     A   No.
12     Q   Okay.  So it was really, once you saw the
13 document, you went, "Oh, I signed that."
14     A   Yeah.
15     Q   But even after seeing the document, you have
16 no memory of when that happened?
17     A   No, I do not.
18     Q   And you have no memory of where that happened?
19     A   No, I do not.
20     Q   Okay.  Is there anything that would refresh
21 your recollection, that you can think of?
22     A   No, I do not.
23     Q   I'm going to show you Exhibit 4 now, which is
24 the Consent to Search form, just to see if seeing it
25 again refreshes your recollection in any way.  It's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  Exhibit 4.  It has the Bates stamp City_Day 00086.
2  Mr. Evans, you're welcome to look over that and let me
3  know when you're ready.
4             (EXHIBIT 4 MARKED FOR IDENTIFICATION)
5       A    I'm ready.
6       Q    Okay.  So this is the Consent to Search form.
7  It has a date of 4 February '92 at the top.  Do you see
8  that?
9       A    Yes, I do.
10      Q    And then it appears to have your signature on
11 the second line, underneath Detective Foley's.
12      A    Yes, it is.
13      Q    Is that your signature?
14      A    Yes, it is.
15      Q    Okay.  And this indicates the consent.  It
16 says the consent is for Foley-Bloore Schaefer-Evans,
17 assigned to the Homicide and Gang Crimes to conduct a
18 "search at this time of the premises under my lawful
19 control," and described as 5234 Sangamon, a house,
20 right?
21      A    Yes.
22      Q    Is there any handwriting on this that's yours,
23 other than your signature?
24      A    No -- oh, yeah, Mr. Bloore's signature.
25      Q    That's your signature?

1       A    Yes, it is.  I signed Jack's name.
2       Q    Why?
3       A    Because I said, "Jack, you want me to sign
4  your name?"  "Sure."
5       Q    You remember that?
6       A    Yeah, because we -- when you're doing reports
7  and -- you know, a lot of reports, you'll have to sign
8  other people's names.
9       Q    Did you sign Schaefer's name?
10      A    No, I did not.
11      Q    Do you recognize that to be his signature?
12      A    I don't recognize that signature.  I don't --
13      Q    Okay.  Do you recognize Foley's signature?
14      A    No, I do not.
15      Q    Okay.  But you have -- and again, do you
16 remember where this document was executed?
17      A    No, I do not.
18      Q    Okay.  Okay.  I'm going to go back to
19 Exhibit 3, where we left off.  The next paragraph says,
20 "When arrested the R/Ds recovered a live 9mm bullet
21 under the subject Day."  Do you see that?
22      A    Yes, I do.
23      Q    Does that refresh your recollection in any way
24 of a live 9mm bullet being recovered from under Mr. Day?
25      A    No, it does not.

1       Q    Okay.  Now I'm going to show you what I
2  designated as Exhibit 5 to your deposition.  Exhibit 5
3  has the Bates stamp Officers_Day 000420 to 000422.  And
4  you can look over it, Mr. Evans.  Let me know when
5  you're ready.
6             (EXHIBIT 5 MARKED FOR IDENTIFICATION)
7       A    Okay.
8       Q    Okay.  Do you recognize Exhibit 5 as your
9  testimony in Mr. Day's criminal trial?
10      A    Yes, it is.
11      Q    Do you recall -- actually recall testifying in
12 this criminal trial?
13      A    No, I do not.
14      Q    Okay.  But -- and this is the only testimony
15 you reviewed, correct?
16      A    Correct.
17      Q    Okay.  And you're being called on rebuttal by
18 the State, correct?
19      A    Correct.
20      Q    Okay.
21           MS. JOHNSON-DELGADO:  Foundation.
22           MS. DONNELL:  What's that?
23           MS. JOHNSON-DELGADO:  Object to foundation.
24      "The State."
25 BY MS. DONNELL:

1       Q    Well, you see at the top, it says, "Called as
2  a witness on behalf of the People" of the United States
3  "in rebuttal," right?
4            MS. JOHNSON-DELGADO:  Object to foundation.
5       Q    Do you see that at the top?
6       A    No.
7       Q    Right under your name, Jude Evans.
8       A    "Called as a witness on behalf of the People
9  of the State of Illinois in" -- okay -- "in rebuttal."
10      Q    Yep.
11      A    Okay.
12      Q    Okay.  Were you present for Mr. Day's criminal
13 trial on any day other than this testimony?
14      A    No.
15      Q    Okay.  Sir, do you have any knowledge or
16 information related to whether there was probable cause
17 to arrest Mr. Day for the Rafael Garcia homicide
18      A    I have no --
19           MS. JOHNSON-DELGADO:  Object to foundation.
20      Q    Go ahead.
21      A    I have no information on that.
22      Q    And the same is true with respect to whether
23 Mister -- there was probable cause to arrest Mr. Day for
24 the Jerrod Irving homicide.
25           MS. JOHNSON-DELGADO:  Same objection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1    A    I didn't have any information.
2    Q    Okay.  And you -- it's your testimony that you
3  didn't participate in any interrogation of Mr. Day with
4  respect to the Jerrod Irving homicide?
5    A    I --
6         MS. JOHNSON-DELGADO:  Objection, asked and
7  answered.
8    Q    Go ahead.
9    A    I never spoke to Mr. Day about that.
10   Q    Okay.  Okay.  Let me switch gears now, and I
11 want to ask a few questions about some -- I'm actually
12 -- well, maybe we could take a pause for a second.  Can
13 we go off the record?
14        MS. JOHNSON-DELGADO:  Okay.
15        COURT REPORTER:  We are now off the record.
16 The time is 11:48 a.m.
17             (OFF THE RECORD)
18        COURT REPORTER:  We are back on the record.
19 The time is 12:18 p.m.
20             (CONFIDENTIAL PORTION REDACTED)
21   Q    Okay.  Okay.  I think I just have one more
22 question.  Give me one second.  Okay.  Let me go through
23 my notes.  We can either stay on the record or do it --
24 I don't know.  I just need to look over my notes and see
25 if I'm done, and then I think I'll be done for today.

Page 83

1  Mr. Evans, do you have any knowledge or information
2  about Mr. Day's post-conviction proceedings?
3    A    No, none whatsoever.
4    Q    Have you done any Google researching on
5  Mr. Day's case in the media?
6    A    No, I have not.
7    Q    And do you have any knowledge or information
8  related to his exoneration?
9    A    No, I do not.
10        MS. DONNELL:  Okay.  Thank you for your time.
11 I'm all done today.
12        THE WITNESS:  Thank you very much.
13        MS. DONNELL:  Okay.  George, do you have any
14 questions?
15        MR. YAMIN:  I do not.
16        MS. DONNELL:  Do you want to reserve
17 signature?
18        MS. JOHNSON-DELGADO:  Yeah.
19        MS. DONNELL:  Okay.  Krystal, I'm not ordering
20 today, but the witness is reserving signature for
21 the depositions ordered.  Do you want a copy?
22        MS. JOHNSON-DELGADO:  Yeah.  I'll make one.
23        MS. DONNELL:  Okay.
24        MS. JOHNSON-DELGADO:  We're going to get one
25 anyway.  Oh, you're not ordering?  I'll order it.

Page 84

1  We'll get one.
2         MS. DONNELL:  Okay.  So Brittany's ordering
3  it, and you could give her a copy for the witness
4  to review.  And you have her e-mail.  Sorry, you're
5  on mute.
6         COURT REPORTER:  All right.  How would you
7  like your copy, Ms. Johnson?
8         MS. JOHNSON-DELGADO:  E-tran is fine.
9         COURT REPORTER:  E-tran is fine?  Okay.
10 Perfect.  And then, I will get us off the record.
11 We are now off the record.  The time is 12:32 p.m.
12             (DEPOSITION CONCLUDED AT 12:32 P.M.)

Page 85

1                 CERTIFICATE OF REPORTER
2                   STATE OF ILLINOIS
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded digitally by me and then reduced to
10   typewritten form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability.  I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   KRYSTAL M. BARNES,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES:  02/18/2026
25   SUBMITTED ON:  06/15/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com