**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| Defendants. | ) | |

# Exhibit 159

**May 15, 2023**

**Report for *Arnold Day v. Kenneth Boudreau et al.***

**I. Introduction**

  I have been retained by Loevy & Loevy as an expert consultant on the psychology of interviewing, interrogation, and confessions in reference to a case involving Mr. Arnold Day. In 1994, Mr. Day was convicted of the attempted armed robbery and first-degree murder of sixteen-year-old Mr. Jerrod Irving on May 17, 1991, in Chicago, Illinois. At the time of the alleged offense, Mr. Day was 18-years-old.[1] Mr. Day was sentenced to 60 years for the homicide charge and 15 years for the armed robbery, to be served concurrently.[2] The primary and arguably only evidence against Mr. Day at his trial was his own confession; there was no forensic evidence linking Mr. Day to Mr. Irving's murder, and the only person to implicate Mr. Day in the Irving murder – Mr. Ralph Watson – recanted his witness statement prior to trial and did not testify.[3] Both Mr. Watson and Mr. Day alleged that their statements were false and products of police coercion.[4] Of note, as a result of the same period of custody and interrogation, Mr. Day also signed a written confession statement about the unrelated homicide of Mr. Rafael Garcia who was killed on September 15, 1991. Mr. Day was implicated by 15-year-old Mr. Anthony Jakes who provided a statement that he had served as a lookout while Mr. Day and Mr. Day's friend "Darren" attempted to rob Mr. Garcia. Mr. Jakes identified Mr. Day as the person who shot and killed Garcia.[5] Both Mr. Jakes and Mr. Day were tried together for the Garcia murder with separate juries in September 1993. Both men testified during motions to suppress their statements that their statements were false and a product of physical and psychological coercion. Mr. Day was acquitted by his jury for the Garcia murder after presenting alibi evidence at trial; Mr. Jakes was convicted and sentenced to 40 years.[6]

  Both Mr. Jakes and Mr. Day filed claims of abuse with the Illinois Torture and Relief Commission (TIRC). The TIRC found that Mr. Jakes' allegations that he had been physically abused and threatened by Detective Michael Kill, without intervention by Detective Kenneth Boudreau, during a sixteen-hour period of custody were credible. Similarly, in 2017, the TIRC found Mr. Day's claim of torture credible, relying in part on evidence of a past pattern of abuse by the detectives involved in both Jakes' and Day's cases.[7] In 2018, Jakes' and Day's

---

[1] CITY_DAY 00076-00079
[2] Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022)
[3] Ralph Watson Affidavit (6/29/2007); Statement of Ralph Watson (12/15/92); Ralph Watson Statement to Prosecutor (08/12/92); Irving Trial Transcript
[4] Deposition of Ralph Watson (3/31/2010); Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022); Ralph Watson Affidavit (6/29/2007); OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Letters from Ralph Watson to Ken Boudreau; Transcript of Motion to Suppress Hearing; CITY_DAY 00080-00083
[5] CITY_JAKES 00011-00016
[6] Arnold Day Testimony in the Jakes' Case; CITY_Jakes 00062; Transcript of Motion to Suppress Hearing**;** Irving Trial Transcript; Deposition of Kenneth Boudreau (12/01/2022); Illinois Torture Inquiry and Relief Commission Report in Arnold Day Case (01/18/2017); Illinois Torture Inquiry and Relief Commission Report in Anthony Jakes Case (07/15/2013; 03/24/14); Plaintiff Jakes 031416-031429
[7] Illinois Torture Inquiry and Relief Commission Report in Arnold Day Case (01/18/2017); Illinois Torture Inquiry and Relief Commission Report in Anthony Jakes Case (07/15/2013; 03/24/14)

convictions were vacated, and the cases against them were dismissed. Mr. Day was released from prison on December 20, 2018, after being incarcerated for 26 years.[8] He received a certificate of innocence on April 4, 2019.[9]

I was asked to provide a written opinion and possible expert testimony in relation to the interrogation and confession of Mr. Arnold Day and the interview of and witness statement made by Mr. Ralph Watson. I view my role as an expert witness as one of an educator; specifically, my role is to help educate the trier of fact about the psychology of interrogations and confessions/admissions so that they may be better informed when evaluating the reliability of a given confession or statement. This may include me explaining: the process of interrogation (and the related psychological underpinnings); different types of false confessions; risk factors associated with false confessions/statements; laypersons and juror perceptions of confessions and interrogations; the science of memory, persuasion, and influence; and the methodology for evaluating the reliability of admissions/confessions/statements. In addition, I can identify the types of interrogation techniques that were used and what risk factors for false confessions/statements (if any) may be present in a particular case, and I can assist in guiding triers of fact of what they might consider in a particular case with respect to a reliability analysis about a given statement. Although it is never my role to offer an ultimate opinion as to whether a particular confession or statement is true or false or opine on the credibility of any person involved with the case, I can and do form an opinion about whether a particular interview/interrogation process is likely to have produced a statement or confession that triers-of-fact can confidently rely upon.

In this report, I first review my qualifications and background (Part II) and the materials reviewed in this case (Part III). I then provide an overview of the scientific literature relevant to the issues of police interrogation and false confessions/admissions/statements (Part IV) and known risk factors for false confessions/admissions/statements (Part V). In Part VI, I discuss the nature and power of false confessions/admissions/statements, and in Part VII I introduce a framework by which factfinders can systematically evaluate a statement that was a product of interrogation. Parts IV-VII are by no means a comprehensive and exhaustive review of the scientific literature; however, they are meant to provide a context for the subsequent sections of my report (Part VIII), in which I identify the specific issues that based on my review of the case materials appear to be relevant in Mr. Day's case and provide some guidance to fact-finders with respect to how to conduct a reliability analysis of Mr. Day's and Mr. Watson's statements (Part IX) . In the last section of the report (Part X), I provide my summary and conclusions.

## II. Professional Qualifications

I am currently a Professor of Criminal Justice at Roger Williams University. I received my Bachelor of Arts degree in Psychology from the University of Virginia (1999), and my Masters (2001) and Ph.D. in Psychology (with a legal psychology specialization) from Florida International University (2004). I am an experimental psychologist with an emphasis in social and cognitive psychology. My primary areas of research and expertise are investigative interviewing, interrogations, and confessions, in the law enforcement, military, and human intelligence domains. I have been conducting research in the area of investigative interviewing,

---

[8] Response to Interrogatories by Day (Exhibit 9 of Arnold Day Deposition; 12/15/22); Dismissal of Charges Against Arnold Day; Orders Vacating Conviction and Nolle Pros Motion
[9] Order Granting Arnold Day Certificate of Innocence (04/04/2019)

interrogations, and confessions since 2002, have published approximately 20 scholarly peer-reviewed articles and chapters on these topics, and I created one of the most oft used and influential laboratory paradigms for studying true and false confessions.[10] I regularly give presentations to academic and practitioner audiences, and I train local, state, and federal law enforcement officers in science-based methods of interviewing and interrogation training. Since 2007, I have received over $2.4 million for my research on investigative interviewing, interrogations, and confessions from the U.S. Department of Defense and the U.S. Department of Justice via the High-Value Detainee Interrogation Group. My regular hourly rate for this case is $315/hour.

### III. Case Materials Reviewed

I have received and reviewed the following materials pertaining to this case:

Deposition of Arnold Day (12/15/2022) & Exhibits 1-4, 7, 9, 11, 17-18, 20-23, 25
Arnold Day Errata Documents (12/15/2022 Deposition)
Deposition of Arnold Day Notes
Deposition of Arnold Day (11/17/2021)
Arnold Day Errata Sheet (11/17/2021 Deposition)
Deposition of Arnold Day (03/04/2008)
Arnold Day Testimony in the Jakes' Case (DAY 042505-042519)
Deposition of Kenneth Boudreau (12/01/2022) & Exhibits 1-18
Deposition of Kenneth Boudreau in *Hood v. City of Chicago, et al.*, No. 16-cv-1970 (11/30/2017)
Deposition of Jude Evans (06/02/2022) & Exhibits 1-8
Jerrod Irving Homicide File (CITY_DAY 00001-00048)
Jerrod Irving Crime Scene Photos (CITY_DAY 00159-00176)
Rafael Garcia Homicide File (CITY_JAKES 00001-00195)
Rafael Garcia Crime Scene Photos (CITY_JAKES 00491-00523)
Deposition of Ralph Watson (12/07/2021)
Letters from Ralph Watson to Ken Boudreau
Ralph Watson Statement to Defense (12/15/1992)
Ralph Watson Statement to Prosecutor (08/12/1992)
Irving Trial Transcript (DAY 029520-029562; DAY 029589-029773; DAY 029880-030246)
Complaint (Day v. Boudreau et al.)
Crime Laboratory Report Firearm (08/08/1991)
Detective John Griffin's Supplementary Report (07/04/1991)
Affidavit of Thomas Anderson (n.d.)
Affidavit of Lennard Erving (07/19/2010)
Affidavit of Tennille Jones (02/13/2009)
Affidavits of Edward Robinson (04/24/2009 & 04/6/2009)
Affidavits of Krona Taylor (01/15/2007 & 02/05/2009)
Affidavit of Danardo Triplett (07/15/2007)
Affidavit of Darren Triplett (07/15/2007)
Affidavit of Ralph Watson (6/29/2007)
Deposition of Carl Murray (11/09/2022)

---

[10] Russano, Narchet, Meissner & Kassin (2005)

Transcript of Motion to Suppress Hearing (DAY 029774-029879)
Deposition of Krona Taylor (08/31/2021) & Exhibits 1-5
Gus Robinson's Statement (09/17/1991)
Criminal Disposition Sheet (12/18/2018 – DAY 005306)
Dismissal of Charges Against Arnold Day (12/20/2018 – DAY 005310)
Orders Vacating Conviction and Nolle Pros Motion (12/18/2018 – DAY 005311 & DAY
   005313)
Illinois Torture Inquiry and Relief Commission Report in Arnold Day Case (01/18/2017)
Illinois Torture Inquiry and Relief Commission Report in Anthony Jakes Case (07/15/2013;
   03/24/2014)
Order Granting Arnold Day Certificate of Innocence (04/04/2019)
Dr. Richard Leo's Report in the Anthony Jakes Case (03/31/2022)
Differences Between a S&W 439 and an Intratec Tec-9 Pistol
Thomas Pack's Testimony in Motion to Suppress Hearing (9/18/1992)
Thomas Pack's Trial Testimony (9/9/1993)
Plaintiff Jakes 031044
Tennille Jones JV Records 000001-000127
Tennille Jones Arrest Report
Darren Tripplet's IDOC Record
Plaintiff Jakes 031416-031429
Officer Defendants' Responses to Plaintiff's First Set of Requests for Admission

## IV. General Background on Interrogations and False Confessions and False Witness Statements[11]

      Making a false confession or admission[12] is inherently counterintuitive in that being held criminally responsible for a crime you did not commit is fundamentally counter to one's self-interest. Most people cannot possibly imagine themselves confessing to a crime they did not commit (absent perhaps torture or a desire to protect a loved one), and therefore, the phenomenon of false confessions is quite difficult for most people (including police officers, jurors, judges, attorneys, and laypersons) to understand. Much of what we know about the risk

---

[11] Scientific understanding of the psychology of interrogation, coerced confessions, and false statements (whether they be primary false confessions, secondary false confessions, or false witness statements) draws not only on empirical research specifically focused on these topics, but on the larger psychological literature that encompasses the scientific study of human behavior, which includes but is not limited to basic principles of social psychology (e.g., persuasion, influence, and compliance), cognitive psychology (e.g., principles of memory, perception, and metacognition), developmental psychology (e.g., brain development, age differences in cognition and decision-making), and clinical and abnormal psychology (e.g., overcoming resistance, how mental illness or intellectual disability affects decision-making and suggestibility). In this case, at issue are two different types of potential false statements – a primary false confession (Mr. Day) and a false witness statement (Mr. Watson). Although the majority of this section of this report is focused on discussing the literature on interrogation and primary false confessions, as discussed later in this section, the research on suspect interrogations and primary false confessions is directly relevant and applicable to the elicitation of false witness statements.

[12] A confession is generally considered a full admission of guilt, where admissions generally refer to more limited, but still incriminating, statements. The process by which confession and admissions are elicited do not differ, and the research on confessions is applicable to admissions.

factors for false confession is beyond the common knowledge of jurors, and expert testimony can help educate jurors and other fact-finders about these issues so that they make more informed decisions (see Woody & Forrest, 2020 for a thorough discussion of these issues). Although there is no way to know the true prevalence rate of false confessions,[13] the existence of false confessions within the American and international legal systems is quite well-documented.[14] The growing number of DNA exonerations in this country affords us the unique ability to examine the contributing factors to wrongful convictions. In 375 DNA exoneration cases between 1989 and 2020 that have been documented by the Innocence Project, false confessions or admissions were given in approximately one out of every four cases (29%), making false confessions a leading cause of wrongful conviction in this country.[15] Out of the 3,299 exonerations documented by the National Registry of Exonerations, false confessions played a role in 12% of those cases.[16] Although counterintuitive, the data demonstrate that false confessions are more likely to occur in homicide cases. False confessions occurred in 23% of exonerations involving homicide cases in the National Registry of Exoneration database, and false confessions played a role in a whopping 62% of DNA exonerees convicted of murder.[17] Moreover, the false confession phenomenon appears to be a particular problem in Chicago (Cook County). False confessions played a role in 33% of *all* Chicago exoneration cases, and in 54% of cases involving exonerees convicted of murder in Chicago. Moreover, 22% of all known documented false confessions nationwide (64/292) involve Chicago cases in which individuals falsely confessed to homicide.[18]

Another way to document the existence of false confessions is to ask people to self-report whether they have ever provided (or taken) a false confession. Self-reported false confession rates in community samples range from 1.2% to 13.8%, and from 0% to 28% in samples of prisoners and those with serious mental illness.[19] Even police officers recognize the problem of false confessions; in one study, North American police investigators estimated that nearly 5% of innocent suspects provide false admissions or false confessions.[20] While none of these metrics allow us to determine a prevalence rate of false (vs. true confessions),[21] it is clear that false

---

[13] Many false confessions go undetected or unchallenged because of the inability to identify exonerating evidence (e.g., DNA evidence in the case either never existed or currently does not exist) or procedural or practical issues that prevent a false confessor from establishing their innocence (e.g., they lack the knowledge or ability to pursue legal challenges, cases that end in false guilty pleas that are difficult to challenge, etc.) (Kassin, 2022).

[14] Bedau & Radelet (1987); Drizin & Leo (2004); Kassin, Drizin, Grisso, Gudjonsson, Leo & Redlich (2010)

[15] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[16] http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx#

[17] As of July 9, 2018. See https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; One explanation for the counter-intuitive statistic that false confession rates are high in the most serious of cases is that it is in precisely those cases that police may be more likely to use problematic techniques. The pressure to close a case involving a serious violent crime, coupled with media attention that may accompany such crimes, likely increases investigators' motivation to be more aggressive in pursuing incriminating statements (Kassin, 2022).

[18] Gross, Possley, Roll & Stephens (2020)

[19] See Gudjonsson (2010) for a review; Redlich, Summers & Hoover (2010)

[20] Kassin et al. (2007)

[21] False versus true confession prevalence rates are unknowable for a variety of reasons. First, to establish a prevalence rate of true and/or false confessions, we would first need to know how many confessions

confession occur with some degree of problematic regularity, and most researchers and legal scholars in the area believe known false confession cases represent only a small fraction of the total population of false confession cases.

Although not *the* leading cause of wrongful conviction, false confessions are particularly pernicious because of the power and nature of confession evidence. Confession evidence is widely considered to be one of the most powerful forms of evidence against a defendant, superseding damaging character evidence, eyewitness testimony/identifications, and even exculpatory DNA evidence (when that DNA evidence can be 'explained away' by the prosecution).[22] As such, when a false confession becomes evidence in a criminal trial, it arguably becomes the most damning evidence against a defendant possible, and it is highly likely to lead to a wrongful conviction. In one examination of 125 documented cases of proven false confessions, in a subset of those cases that went to trial ($n = 37$), false confessions led to wrongful convictions in 81% of the cases.[23] This phenomenon is due in large part to the fact that legal decision-makers (including jurors, police officers, and polygraph examiners) are not able to reliably distinguish between true and false confessions on their face.[24] This is because false confessions typically look quite similar to true confessions – which is to say that they are typically detailed narratives that contain specific details, including details that reference people, locations, times, motives, and expressions of remorse. Moreover, many false confessions contain non-public details about the crime that only the true perpetrator should know; for example, approximately 52% of false confessions by DNA exonerees included non-public details.[25] The existence of non-public details in a false confession is particularly dangerous because these details are generally viewed as an indication that a confession is true by police, prosecutors, judges, juries, and other fact-finders. However, the presence of non-public details in a false confession case by definition does not speak to the guilt of the confessor, but rather to the

---

occur every year. Law enforcement officers (and other investigators who take confessions such as private security personnel or school resource officers) do not systematically document every interrogation they conduct. Second, researchers would need to be able to objectively establish ground truth in each of these cases/interrogations independent of the confession – an impossible task even if given access to all case materials (e.g., in many cases, there will be no objective way to veracity of the confession), which is in and of itself a highly improbable scenario. The fact that a known prevalence rate of false confessions cannot be established does not mean that it is not a recognizable problem that can and should be acknowledged. Efforts by some critics to undermine the scientific study of false confessions because a prevalence rate cannot be established reveals a fundamental lack of understanding of the nature and state of the science as well as methodological naivete.

[22] Appleby & Kassin (2016); Kassin & Neumann (1997); It is not uncommon in cases of wrongful conviction for confession evidence to "trump" DNA evidence. For example, in the case of Mr. Jeffrey Deskovic, who served nearly 16 years for a rape and murder he did not commit, it was known at the time of trial that the semen found on the victim did not match Mr. Deskovic. Because of Mr. Deskovic's confession, the prosecution forged ahead with the criminal trial and 'explained away' the semen by suggesting that the victim must have had consensual sex with someone else prior to her rape and murder (see Leo & Drizin, 2010, and http://www.westchesterda.net/Jeffrey%20Deskovic%20Comm%20Rpt.pdf).

[23] Drizin & Leo (2004)

[24] Honts, Forrest & Stephanescu (2019); Honts, Kassin & Craig (2014); Kassin, Meissner & Norwick (2005),

[25] Appleby, Hasel & Kassin (2013); Garrett (2010); https://innocenceproject.org/dna-exonerations-in-the-united-states/

contamination that occurred during an interrogation (see Dependent Corroboration section of this report for a more detailed discussion of this phenomenon).

To understand the phenomenon of false confessions/admissions and interrogations, researchers (including myself) rely on three primary bodies of literature: 1) case studies of documented wrongful conviction cases involving false confessions or admissions, 2) fundamental principles of developmental, social, cognitive, abnormal, and clinical psychology drawn from over 100 years of research on such topics as memory and communication, persuasion and compliance, suggestibility, decision-making, and learning and reinforcement principles, and 3) specific studies relevant to the topics of interviewing, interrogation, and confessions in the forensic context, including observational studies, survey research, field research, content analyses, and laboratory studies.[26] Taken together, these bodies of literature have sufficiently advanced our knowledge about this field to the extent that in 2010 the American Psychology-Law Society (a division of the American Psychological Association) published a White Paper which summarized the state of the knowledge at that time and represents generally accepted views and findings in the field,[27] and the American Psychological Association has submitted at least eleven amicus curiae briefs in various cases presenting generally accepted research findings related to interrogation and confessions.[28]

Most confessions or admissions, whether true or false, are a product of an interrogation.[29] Police officers (and most other members of the criminal justice system) should have two related goals: obtain true confessions from the guilty[30] while minimizing the number of false confessions procured from the innocent.[31] Researchers generally distinguish between three types of false confessions.[32] A *voluntary* false confession is one in which an innocent person confesses to something he or she did not do absent any external pressures.[33] *Compliant* false confessions are ones in which innocent people confess to crimes they did not commit because they are acquiescing to the pressures of an external situation and for some instrumental gain (e.g., they may want to escape an unpleasant interrogation or they believe that by confessing they will

---

[26] Kassin (2007); Kelly & Russano (in press); Russano, Kelly & Meissner (2020)

[27] Kassin et al. (2010)

[28] https://www.apa.org/about/offices/ogc/amicus/index-issues

[29] I tend to more frequently use the term 'interrogation' to refer to the interview of a suspect, as opposed to a witness or victim (although I oftentimes use the term interchangeably). Moreover, I will use the term interrogation regardless of whether the suspect is in police custody (custodial interrogation) or not (non-custodial interrogation). In my experience it is not uncommon for law enforcement officers to reject the term interrogation (likely because they believe it is negatively valanced), opting instead to use the term interview with all types of interviewees, including suspects. Importantly, the label used to describe a particular interaction is far less important than the substance, tenor, and techniques utilized during that interaction.

[30] Confessions speed the process of justice in several ways. First, confessions are considered to be extremely powerful evidence of guilt (i.e., because most people cannot imagine falsely confessing themselves, they assume that is a person confessed, that person must be guilty). Second, confessions encourage guilty pleas, thereby reducing the amount of time and resources that need to be dedicated to a case. Finally, as discussed, confessions admitted at trial are highly likely to lead to convictions.

[31] Not only can false confessions have potentially tragic consequences for an innocent suspect (i.e., wrongful conviction), but when a false confession is believed, the actual perpetrator remains at large.

[32] Kassin & Wrightsman (1985)

[33] The most commonly cited reason for providing a voluntary false confession is to protect someone else (see Gudjonsson, 2003; 2010).

receive some benefit or avoid some threatened harm). Finally, an *internalized* false confession is one in which an actually innocent person confesses to a crime because he or she actually starts to question his or her own innocence.[34] Although these categories can be useful structure for organizing the way that we think about false confessions, any given false confession may be difficult to categorize as definitively belonging in a certain category, as a given confession can exhibit characteristics from multiple categories (e.g., fleeting signs of internalization may be present during a confession that otherwise looks to be of the compliant type).

Prior to the 1930s, the so-called "third degree" (i.e., the infliction of physical and mental pain) was commonplace in American interrogation rooms, as documented by the 1931 Wickersham Commission report.[35] Criticisms of these techniques centered not only on the concern that confessions procured via the "third degree" might be involuntary but also *unreliable* (i.e., could not be relied upon as truthful), and court rulings began limiting police officers' abilities to rely on such practices.[36] Modern-day interrogations are now designed to be psychologically-based in nature, and the dominant method of interrogation in the United States is *accusatorial* in nature.[37] Accusatorial interrogation generally involves three components: *custody and isolation* (e.g., often being interviewed in a small room and without a source of social support within the room); *confrontation* (e.g., an investigator who has come to believe that a suspect is guilty confronts a suspect with this belief and refuses to entertain the suspect's denials, which heightens the anxiety of the suspect), and *minimization* (which involves attempting to persuade the suspect to 'tell the truth' in the form of an admission, often by providing face-saving excuses). By virtue of its guilt-presumptive nature, accusatorial interrogation typically involves the use of many closed-ended questions, as well as leading/suggestive questions.[38]

Although the exact type and amount of interrogation training investigators receive varies considerably,[39] the *Reid Technique of Interviewing and Interrogation* (hereafter 'the Reid technique') has made an indelible impact on the process of interrogation in this country. It typifies the manner in which modern-day interrogation in the United States has been almost uniformly been conducted, at least until very recently.[40] I detail the Reid technique here as an example of the classic accusatorial approach, and because most modern-day law enforcement interrogations incorporate components that are consistent with the Reid technique, even if

---

[34] Internalized false confessions are almost always a product of highly suggestive interrogations, in which a suspect becomes convinced that his or her memory of not committing the offense is untrustworthy (e.g., due to the passage of time, alcohol/drug use, repression), and the suspect is also confronted with false evidence of his or her guilt (Gudjonsson, 2003; Kassin et al., 2010). Examples of documented cases of internalized false confessions include those of Michael Crowe, Marty Tankleff, and Peter Reilly.

[35] Leo (2004)

[36] Sheridan (2011)

[37] Costanzo & Redlich (2010); Kassin (2022); (Leo (2008)

[38] Kassin et al. (2010); Kassin & Gudjonsson (2004); Leo (2008); Meissner et al. (2014)

[39] Kassin et al. (2007); Kostelnik & Reppucci (2009). Many detectives report not having received any formal training at all on how to conduct interrogations; rather, many report learning on-the-job, often by observing more seasoned investigators who pass along their skill set (Cleary & Warner, 2016).

[40] See generally Leo (2008). In recent years, some agencies have started to move away from interrogation techniques based upon the Reid approach—and its core tenants of guilt-presumptive questioning and confrontation — in part because of concerns that some components of the Reid techniques may lead to false and/or unreliable confession statements (e.g., Brandon & Meissner, in press; Clarke, 2018).

investigators have never received formal training in the Reid method and/or are unaware of whether and to what extent their approaches are similar to Reid.[41]

The aforementioned shift away from third-degree tactics to modern-day accusatorial-style interrogation (which has remained fairly consistent since the 1970s) can be attributed in large part to the pioneering and well-intentioned work of Mr. Fred Inbau, who first published his training manual, *Lie Detection and Criminal Interrogation,* in 1942.[42] This work formed the foundation for the first edition of the Reid manual, *Criminal Interrogation and Confessions*, published in 1962.[43] Interrogation manuals (and corresponding training programs) became a critically important, and perhaps the most influential way, of formally training investigators to conduct interrogations, and historically there have been relatively few documented alternatives to the Reid technique in North America.[44] Those alternatives that do or did exist tend to teach either Reid directly, or a program that is essentially a reformulated version of a Reid-style approach.[45] Headquartered in Chicago, Reid and associates began offering courses in 1974, and they claim to have trained more than 500,000 investigators to date.[46] The Reid technique is the most widely used and influential questioning technique in the world (and certainly in North America), and their manual has been cited by the U.S. Supreme Court.[47] As previously discussed, many investigators who have not directly been Reid trained have likely been influenced by the method, given that interrogation skills are handed down from investigator to investigator via on-the-job training and observation.[48]

Although the technique has evolved somewhat over time,[49] the basic Reid technique is generally divided into two phases: a non-accusatorial pre-interrogation interview and an accusatorial interrogation.[50] The primary purpose of the non-accusatorial pre-interrogation interview is for the investigator to decide whether the suspect is being truthful or deceptive. Reid and associates teach investigators to look for specific verbal and non-verbal indicators of deception. The ability of investigators to reliably distinguish between true and false denials is of critical importance to the Reid technique because Reid advises that only suspects who an investigator believes to be deceptive (i.e., guilty) should be subjected to accusatorial interrogation techniques. In other words, Reid assumes that investigators can systematically and reliably identify innocent persons during the pre-interrogation interview with a high degree of accuracy (via a pattern of verbal and non-verbal responses) and weed them out of the process – therefore, few, if any, innocent persons should be subjected to an accusatorial interrogation. However, this assumption is fundamentally flawed.

A wealth of scientific research indicates that people, including police officers, are *no better than chance* at detecting deceit (with an average accuracy rate of 53%).[51]

---

[41] Kassin et al. (2007)
[42] Inbau (1942); Leo (2004)
[43] http://archive.reid.com/faq/
[44] Leo (2004)
[45] For example, in 1984, another successful training firm, Wicklander-Zulawski & Associates, began training the Reid Method of Interview and Interrogation (https://www.wzacademy.com/about-us).
[46] http://archive.reid.com/success_reid/r_success.html; http://reid.com/resources/whats-new/2011-book-recognizes-john-e-reid-and-associates-as-the-leader-in-interview-and-interrogation-training
[47] Inbau, Reid, Buckley & Jayne (2013); Kozinski (2018); Stansbury v. California (1994)
[48] Cleary & Warner (2016)
[49] Leo (2004)
[50] Inbau et al. (2013)
[51] Aamodt & Custer (2006); Granhag & Stromwall (2004); Memon, Vrij, & Bull (2003); Vrij (2008)

Counterintuitively, investigators with more experience and who reported more training in detecting deception tend to be *less* accurate at distinguishing between truth-tellers and liars. Despite low accuracy rates, police officers tend to exhibit over-confidence in their ability to detect deceit.[52] Poor performance at detecting deceit (and the accompanying over-confidence effect) is not particularly surprising from a research perspective. By and large, the cues that investigators are taught are indicators of deceit are in fact *not* reliable cues to deception. For example, Reid and associates (as well as other interrogation schools/manuals)[53] teach that certain non-verbal (e.g., lack of eye contact, grooming behaviors, closed posture, shifting in a chair) and verbal (e.g., offering specific denials, using qualifying phrases such as 'generally' or 'not often' or 'to the best of my knowledge', using indicators of so-called rehearsed language such as noncontracted denials, 'I did not kill her') responses are cues that a person is lying.[54] Unfortunately, such cues are not reliable indicators of deceit[55] – and relying on them can not only confuse investigators, but may in fact lead them to the incorrect conclusion. In one study examining the effectiveness of Reid cues to deceit, truth-tellers exhibited more Reid indicators of deceit than liars, suggesting reliance on such cues may lead real-world investigators to not only identify truth-tellers as liars, but vice versa.[56] Taken together, this creates a potentially dangerous situation in which confident investigators use non-diagnostic cues to identify liars and proceed to an accusatorial phase comforted by the notion that the suspects they are interrogating are most likely or definitely guilty.

Given the mindset that only guilty/deceptive persons should be subjected to an accusatorial interrogation, most interrogation researchers agree that the fundamental goal of a U.S. law enforcement interrogation is to secure incriminating statements, an admission, or a full confession.[57] An accusatorial interrogation typically begins by isolating the suspect in small room, an environment that is designed to create feelings of hopelessness and anxiety and keep the suspect isolated from social support (such as family and friends). The process of interrogation ultimately involves trying to convince a suspect that it is in his or her best interest to cooperate by confessing – in other words that the benefits of confessing outweigh the benefits of continued denial. In practice, this often means convincing suspects that the only reasonable way out of the situation they currently find themselves in is to admit wrongdoing. The modern-day Reid technique involves a nine-step process[58] which includes firmly and directly accusing a

---

[52] Meissner & Kassin (2002, 2004)
[53] Narchet, Coffman, Russano & Meissner (2004)
[54] Inbau et al. (2013)
[55] DePaulo, Lindsay, Malone, Muhlenbruck, Charlton & Cooper (2003)
[56] Vrij, Mann, & Fisher (2006); see also Sporer & Schwandt (2007)
[57] Kassin et al. (2010). One section of the current version of the Reid manual does state that the primary purpose of an interrogation is to learn the truth, and it acknowledges that innocent persons may occasionally be interrogated. However, elsewhere in the manual, it states "the purpose for interrogation is to persuade a suspect who the investigator believes to be lying about involvement in a crime to tell the truth" (Inbau, Reid, Buckley & Jayne, 2001, p. 419). Given that the investigator believes the suspect is lying, the "truth" in this instance translates to an admission or confession. In practice, most interrogation researchers agree that, in light of the process and flow of an interrogation itself (e.g., shutting down of denials, overcoming suspect objections), the practical goal of an interrogation is the elicitation of incriminating statements.
[58] The nine-step process was codified in the third edition of *Criminal Interrogation and Confessions* (Inbau, Reid & Buckley, 1986). However, previous editions advocated use of most of the same techniques, including the theming aspects of the interrogation.

suspect of having committed the crime and convincing him/her of the futility of denying it (i.e., direct positive confrontation),[59] offering sympathy and developing and suggesting 'themes' that make it easier for the suspect to confess, shutting down denials and overcoming suspect objections, keeping the suspect focused on the interrogator and handling any signs of psychological withdrawal, presenting an 'alternative question' (in which two incriminating options are presented to the suspect, but one is face-saving), and finally securing an oral and then written confession statement.[60] This nine-step process is not necessarily linear nor is every step necessarily implemented in a given interrogation (i.e., steps may not always occur in order, and certain steps may be emphasized more than others, occur more than once, or not occur at all, depending on the nature of the specific interrogation and the individual suspect).

The 'theming' aspect of the interrogation process is particularly important. Theming typically involves providing face-saving excuses, rationalizations, or justifications for committing the crime that are supposed to map on to the suspect's preexisting rationalizations for committing the crime. These excuses, rationalizations, and justifications - which can be operationalized in many forms, from explicit statements to implied suggestions via leading questions or innuendo - often involve *minimization* strategies in which the interrogator downplays the moral seriousness of the crime (e.g., his behavior is common; his actions could have been much worse) or provides moral justifications for the suspect's behavior (e.g., he was provoked by the victim; he needed the money; minimizing the suspect's role by blaming an alleged co-conspirator). Other themes may involve the use of *maximization* tactics, which are techniques/themes that tend to play up the seriousness of the situation (e.g., exaggerate the seriousness of the crime, the potential charges, or the seriousness of the suspect's intent).

Of interest is the relationship of common theming approaches to the willingness of a suspect to confess. Reid and associates acknowledge that "every successful interrogation technique must offer the guilty person a real or perceived benefit to telling the truth."[61] The interrogation process is often portrayed as an opportunity for the suspect to tell 'his side of the story.' Reid and associates note that legally investigators are not permitted to tell a suspect that s/he will receive more lenient treatment by the criminal justice system if s/he confesses, however, they state that investigators hope that the suspect draws this conclusion on his or her own (and the themes are designed to encourage this).[62] In fact, Reid and colleagues are correct in their assumption that certain themes communicate information to suspects about their likely treatment within the criminal justice system. Research supports the notion that certain common minimization tactics are the functional equivalent of direct promises of leniency whereas certain common maximization tactics are the functional equivalent of direct threats of harsher punishment; in other words, minimization and maximization techniques that manipulate a suspect's perceptions of the consequences of confessing pragmatically imply leniency in

---

[59] To accomplish this, investigators sometimes confront a suspect with true evidence of guilt, lie about having evidence of guilt, or bluff about evidence.

[60] Inbau et al. (2013)

[61] Inbau et al. (2013, p. 368)

[62] The logic here is that the suspect will grasp on to the moral justification or excuse suggested by the theme (e.g., My child is unruly and this is just a case of parental discipline taken too far), and the suspect will come to believe that since the investigator understands why s/he behaved the way s/he did, other people (e.g., prosecutors, jurors, judges) will similarly understand, and therefore, s/he will be treated more leniently (Inbau et al., 2013).

exchange for a confession and harsher punishment in response to continued denial.[63] Moreover, minimization and maximization techniques that manipulate a suspect's perception of the consequences of confessing have been shown in experimental laboratory research to *increase the likelihood of false confessions* in comparison to techniques that do not manipulate perception of consequences.[64]

Case studies, surveys of experienced investigators, and experimental laboratory research supports the notion that accusatorial methods may be successful at eliciting admissions and confessions from guilty people; however, it is also true, that that same body of literature suggests that certain accusatorial techniques and approaches are successful at eliciting admissions and confessions from *innocent* people.[65] For example, techniques such as direct positive confrontation, and the presentation of false evidence, when coupled with minimization and maximization tactics that manipulate a suspect's perceptions of the consequences of denying or confessing, have been shown in laboratory experiments to elevate the risk of false confessions[66] – and these techniques are frequently present in documented cases of false confessions.[67]

The extant literature review provided thus far is relevant not only to suspect interviewing and primary false confessions (i.e., admissions made directly by an innocent person), but also to interviewing that results in a false witness statement (i.e., testimony from a third party that provides false incriminating information). This is because any person, regardless of whether they are ultimately deemed a perpetrator, accomplice witness, or non-involved but cooperating witness, who is subjected to an interview process that looks and feels like an accusatorial interrogation is at risk for providing a false statement. Witnesses (and even victims) are sometimes subjected to an accusatorial-style interaction, with the same problematic techniques that are commonly employed with suspects. In fact, the Reid manual specifically advises investigators to treat reluctant witnesses and informants as suspects, and to interrogate them using the same methods used with suspects. Reid advises reassuring the witness or informant that that police will help protect the person from retaliation, and if all else fails, they should capitalize on the person's desire to protect himself by accusing "…the subject of committing the crime (or of being implicated in some way) and proceed with an interrogation as though the person was, in fact, considered to have involvement in the crime."[68] Reid asserts that this false accusation should motivate the offender to cooperate with police by providing evidence against the actual suspect(s).[69] As such, it is clear that the accusatorial interrogation experience is not reserved solely for suspects, and all of the risk factor categories associated with primary false confessions (i.e., confirmation bias, individual vulnerabilities, and situational risk factors) are similarly risk factors for providing false witness statements. In fact, false witness statements may be easier to

---

[63] Horgan, Russano, Meissner & Evans (2012); Kassin & McNall (1991); Luke & Alceste (2020); Russano et al. (2005)

[64] Horgan et al. (2012); Meissner et al. (2014); Horgan et al. (2012) found that in addition to increasing the false confession rate, techniques that manipulate perception of consequences decreased the true confession rate as compared to techniques that did not manipulate perception of consequences.

[65] For example, see Bedau & Radelet (1987); Drizin & Leo (2004); Horgan et al. (2012); Kassin et al. (2007); Kassin & Kiechel (1996); Klaver, Lee & Rose (2008); Meissner et al. (2014); Narchet, Meissner & Russano (2011); Ofshe & Leo (1997a, 1997b); Perillo & Kassin (2011); Russano et al. (2005)

[66] Kassin & Kiechel (1996); Horgan et al. (2012); Narchet et al. (2011); Russano et al. (2005)

[67] Ofshe & Leo (1997a, 1997b); In addition, Kassin et al. (2007) found that law enforcement investigators commonly report the use of such techniques.

[68] Inbau et al., 2013, p. 337

[69] Inbau et al. (2013)

procure than a false confession. When suspects incriminate themselves, they are likely to face severe consequences, and therefore they should be more motivated to withstand interrogation to the extent possible. In contrast, witnesses should be less motivated to withstand an interrogation since the act of providing a false witness statement incriminates someone else rather than themselves. This trend is likely exacerbated in situations where witnesses are led to believe that a failure to incriminate the other person would mean they themselves might face legal consequences. In essence, when risk factors for false statements are present, when considering the likely reliability of a witness' statement versus a suspect's statement, a coerced witness' statement is even more likely to be unreliable than a coerced suspect's statement.[70] Like primary false confessions, false witness statements (given by jailhouse informants, accomplice witnesses, or cooperating witnesses) are a known contributing factor to wrongful convictions. Data from the Innocence Project indicate that these types of false statements played a role in approximately 17% of DNA exoneration cases, and 21% of cases involving people who were exonerated from death row between 1973 and 2004.[71]

Although accusatorial interrogation remains the predominant interrogation style in the United States, the tides, however slowly, appear to be turning to a more information-gathering, science-based approach to interviewing and interrogation. New training models in science-based practices are growing in popularity, and as of March 2017, Wicklander-Zulawski & Associates, a large private firm that previously trained investigators in the Reid method, announced that they would cease training Reid and adopt a non-confrontational approach.[72] Science supports this change; a 2014 meta-analysis comparing accusatorial methods and information-gathering methods[73] found that while information-gathering methods decrease the likelihood of false confessions (while maintaining or increasing the likelihood of true confessions), accusatorial methods increase the rate of both true and false confessions.[74]

## V. Risk Factors for False Confessions

It is the opinion of this interrogation scientist that the goal for the criminal justice system ought to be to identify and use science-based, diagnostic interrogation approaches;[75] in other words, we should strive to identify and use techniques that maximize the likelihood of true confessions/admissions while simultaneously minimizing the likelihood of false confessions/admissions. Researchers have long been studying the factors associated with false confessions, and there is a growing body of literature identifying diagnostic approaches that maximize the ratio of true to false confessions as well as those techniques that disproportionately

---

[70] Sheridan (2011)

[71] Warden (2004); https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; https://www.innocenceproject.org/informing-injustice/

[72] Brandon & Meissner, in press; Brandon et al. (2019); Brandon, Wells & Seale (2018) https://olis.leg.state.or.us/liz/2017R1/Downloads/CommitteeMeetingDocument/110332

[73] The information-gathering approach is more common in the United Kingdom, and countries such as Australia, Norway, Sweden, and New Zealand. This approach emphasizes a hypothesis-testing frame of mind (i.e., a truth-focus as opposed to a confession-focus), developing rapport, the use of open-ended questions, and the avoidance of the use of leading/suggestive questions and deception (see Meissner et al., 2014, and Russano, Kelly & Meissner, 2020 for descriptions of this approach).

[74] Meissner et al. (2014)

[75] Meissner, Hartwig & Russano (2010); Kelly & Russano (in press)

heighten the risk of false confession.[76] The existing research on interrogations and confessions have allowed us to identify three major categories of risk for false confessions: 1) confirmation bias or 'tunnel vision', 2) individual vulnerabilities, and 3) situational risk factors associated with the nature of the interrogation itself.[77]

### Confirmation Bias

Confirmation bias or "tunnel vision" occurs when a person forms an initial opinion, and subsequently processes new information in a way that confirms his or her initial opinion. This occurs when information that is consistent with the initial opinion is given significant attention or weight, information that is inconsistent with that opinion is dismissed, ignored, or given little weight, and ambiguous information is interpreted in a way that supports the initial opinion. Tunnel vision is also closely related to the concept of belief perseverance – the phenomenon that people tend to have difficulty changing their beliefs despite being exposed to evidence that directly contradicts or refutes those beliefs.[78] Investigator tunnel vision is a well-established phenomenon in social science research, and it is the consequence of investigators honing in on a particular suspect, becoming convinced that the suspect is guilty, focusing in and attending to information that appears to support that the suspect is guilty, and ignoring or giving less weight to potentially exculpatory evidence.[79] Confirmation bias can trigger a process of behavioral confirmation in which investigators behave in a guilt-presumptive accusatorial manner (i.e., we know you did it, there is no point in denying it) and ask questions in such a way (e.g., leading and suggestive in nature) that results in a suspect acting in ways that appear to confirm the investigators' prior belief in the suspect's guilt (e.g., acting defensive and nervous, incorporating specific incriminating details into their narrative that were provided via leading questioning strategies). Confirmation bias has been demonstrated to increase the risk of false confession via the use of accusatorial, guilt-presumptive tactics. It is important to note that a guilt-presumptive accusatorial interview does not necessarily mean that investigators raise their voices or treat the suspect with disrespect – in fact, many guilt-presumptive, accusatorial interviews occur under the umbrella of what lay persons would interpret as a friendly (i.e., "good cop") approach. However, the impact of confirmation bias and other psychological processes remain regardless of the outward veneer under which they occur (and in many ways, what appear to be "friendly" interviews are more dangerous to an innocent person than an interview where investigators outwardly show frustration and anger because it lulls the suspect into a false sense of security).

### Individual Risk Factors

---

[76] Russano et al. (2005); Narchet et al. (2011); Horgan et al. (2012); Evans, Meissner, Ross, Houston, Russano & Horgan (2013); Meissner et al. (2014)
[77] Meissner & Russano (2003)
[78] Burke (2006); Ross & Lepper (1980); Nickerson (1998); Trope & Liberman (1996)
[79] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Nickerson (1998) and Trope & Liberman (1996); A belief in a suspect's guilt can also lead investigators to behave in ways that elicit what they interpret to be deceptive behavior from suspects, thereby confirming the investigator's belief in the suspect's guilt (Kassin, Goldstein & Savitsky, 2003; Narchet et al., 2011).

*Individual (aka dispositional) vulnerabilities* refer to characteristics pertaining to the person that make them more vulnerable to providing a false confession or statement. Individual vulnerabilities can be divided into two sub-types: trait vulnerabilities and state vulnerabilities. Trait vulnerabilities are relatively stable characteristics about a person, such as age, mental capacity, and mental illness. State vulnerabilities refer to more transient conditions that can elevate a person's risk to providing a false statement, such as fatigue and physical state (e.g., intoxication, drug withdrawal, pain level).[80]

**_Trait vulnerabilities._** In terms of trait vulnerability, generally speaking, younger persons, people with cognitive deficits, and persons suffering from mental illness are more likely to provide false confessions, due in part to heightened suggestibility and a lesser ability to cope with the stress of interrogation.[81] The younger a person is, the more at risk they are for providing a false confession or statement.[82] Juveniles and young adults are overrepresented in false confession cases. In Drizin and Leo's (2004) study of false confessors, 35% of false confessors were under the age of 18, and 55% of those juvenile false confessors were under the age of 15. Similarly, out of the 29% of DNA exonerations cases in which there was a false confession, 49% of those confessions were provided people under the age of 22.[83] When examining the first 3,060 exonerations documented by the National Registry of Exonerations since 1989, juveniles were 3.4 times more likely to provide a false confession than adults.[84]

A wealth of self-report data also supports the notion that youth is a risk factor for false confessions in the interrogation room; younger people self-report providing false confessions and waiving their rights at a higher rate than older persons.[85] In a survey of nearly 25,000 European juveniles, 14% reported having falsely confessed to authorities.[86] Gudjonsson et al. (2016) found that in a sample of over 21,000 Icelandic youth, 14.7% reported having made a false confession, with younger adolescents (aged 14 to 16) nearly twice as likely to report having falsely confessed (20%) than 17 to 24 year olds (10.3%).[87] Finally, in a study of incarcerated youth in California, 17.1% of juveniles claimed to have made a false confession to authorities, and self-reported self-confessions were associated with longer interrogation duration (greater than two hours).[88] A number of studies have also found that younger juveniles are more likely to say they would falsely confess in response to hypothetical interrogation scenarios, with younger adolescents saying that they would falsely confess at a higher rate than older juveniles.[89] Finally,

---

[80] Woody & Forest (2020)

[81] Drizin & Leo (2004); Garrett (2011); Gudjonsson (2003; 2018); Inbau et al. (2013); Kassin & Gudjonsson (2004); Kassin et al. (2010); Schatz (2018); To the best of my knowledge, age and mental illness are not likely factors at issue in this case, so I have not expounded on the background literature relevant to these categories.

[82] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[83] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[84] Zelle, Riggs Romaine & Goldstein (2014); See also Kassin et al. (2010)

[85] For example, see Gudjonsson, Sigurdsson, Asgeirsdottir & Sigfusdottir (2006); Gudjonssson, Sigurdsson & Sigfusdottir (2009a); Gudjonsson et al. (2016); Haney-Caron, Goldstein & Mesiarik (2018); Malloy, Shulman & Cauffman (2014); Viljoen, Klaver & Roesch (2005)

[86] Gudjonssson, Sigurdsson & Sigfusdottir (2009a)

[87] Gudjonsson et al. (2016)

[88] Malloy et al. (2014)

[89] For example, see Goldstein, Condie, Kalbeitzer, Osman & Geier (2003); Grisso et al. (2003); Haney-Caron et al. (2018)

laboratory research supports the finding that juveniles are more likely to falsely confess than older persons. Redlich and Goodman (2003) found that youths were more likely to falsely confess than adults to crashing a computer during a laboratory study, and younger children were more likely to confess than older children, particularly when confronted with false evidence of their guilt. In a more recent study, adolescents (ages 14 to 17) were more likely to falsely confess to cheating during an academic task than college students.[90]

Juveniles are also more likely to waive their Miranda rights than adults, which by definition means they are more likely to land up in an interrogation that puts them at greater risk for providing a false confession.[91] One of the reasons that juveniles may waive their rights at a higher rate than adults is poor comprehension of those rights. Numerous studies have documented the very stable finding that adolescents are less likely to understand their Miranda rights than adults.[92] Moreover, the younger the adolescent, the greater the deficit in comprehension, with children under the age of 15 demonstrating particularly poor understanding.[93] Even when adolescents seem to have a basic factual understanding of their rights (e.g., they understand that they literally have the right to have an attorney present), they tend to not understand what the practical implications of those rights are and how exercising those rights might serve a protective function (e.g., they do not understand what an attorney would actually do for them). They are also more likely to focus on the perceived short-term benefits of waiving their rights (e.g., that they will tell their story and be allowed to go home) as opposed to the possible long-term consequences of doing so (e.g., providing an incriminating statement). The younger the adolescent, the more pronounced these effects.[94]

Although our legal system generally considers an 18-year-old a legal adult, from a scientific perspective, there is ample evidence that even individuals in their late teens and early twenties are not the biological, psychological, or emotional equivalent of older adults. Brain development can help us understand why this is so; for example, the process by which different regions of the brain communicate and the parts of the brain (e.g., the prefrontal cortex) that control decision-making, impulse control, judgement, memory, and attention do not fully develop until the early twenties or beyond.[95] These biological realities can disadvantage younger persons within the interrogation room. Compared to older adults, younger people are more susceptible to suggestion, are more likely to acquiesce to pressure from authority, are more likely to engage in risk-prone behavior, and are more likely to prioritize short-term benefits over long-term consequences.[96] As such, particularly when subjected to an accusatorial interview, younger adolescents and young adults are more likely to provide false confessions/statements than older adolescents and older adults. Unfortunately, research indicates that the majority of law enforcement officers are generally insensitive to developmental maturity issues, and adolescents and younger adults are routinely subjected to the same types of interrogation techniques as older adults.[97] At least on paper, Reid acknowledges that youths are more at risk for providing a false

---

[90] Pimental, Arndorfer & Malloy (2015)
[91] For example, see Viljoen et al. (2005)
[92] See Kassin et al. (2010) for a review of the literature
[93] Goldstein & Goldstein (2010)
[94] Zelle, Riggs Romaine & Goldstein (2014); See also Kassin et al. (2010)
[95] Johnson, Blum & Giedd (2009)
[96] See Woody & Forest (2020) and Kassin et al. (2010) for reviews of the relevant literature.
[97] Cleary & Warner (2016); Feld (2006); Kostelnik & Reppucci (2009); Malloy et al. (2014); Meyer & Reppucci, 2007; Reppucci, Meyer & Kostelnik, 2010

confession than adults; yet, at the same time they endorse the use of a "confrontational approach" that includes theming with children ages 10 and up.[98]

Persons with low intelligence or I.Q. are also overrepresented amongst false confessors.[99] In a 2017 analysis of 245 false confessors, 23.7% had an intellectual disability (compared to 1 to 3% of the general population).[100] People with cognitive impairment, and particularly those who fall in the mental retardation range,[101] are more easily influenced by others, are more likely accept blame for negative outcomes, and have more difficulty maintaining focus and attention for long stretches of time.[102] People with lower IQ have a strong desire to please authority figures, are more likely to acquiesce to leading questions, and they tend to prioritize short-term outcomes/needs over long-term ones.[103] They are generally quite poor at anticipating the long-term consequences of their decisions, particularly as it relates to the interrogation process,[104] and they are less able to cope with the pressures of police interrogation.

Like cognitive impairment, mental illness is an individual trait risk factor for making an unreliable statement. Criminal defendants with mental illness self-report that they have falsely confessed in their lifetime at nearly double the rate of those without mental illness,[105] and people with mental illness are overrepresented in documented cases of false confessions.[106] Of the 365 false confessors as documented by the National Registry of Exoneration, 33% were either mentally ill or intellectually disabled.[107] Several studies have identified mental illness as significant predictor of self-reported false confession.[108]

   ***State vulnerabilities.*** In terms of state vulnerabilities, a person's physical condition, even when the interrogation is not the cause of the condition, is important to consider when evaluating the risk of procuring a false confession/statement. For example, fatigue or sleep deprivation is a

---

[98] http://www.reid.com/pdfs/MarchApril2018InvTip.pdf; Inbau et al. (2003); In written documentation, Reid suggests caution with the presentation of false evidence, and other forms of trickery and deceit, for youthful suspects *with low social maturity or cognitive challenges*, leaving the door open for its use on adolescents investigators perceive not to fit into these vulnerable categories (http://www.reid.com/pdfs/MarchApril2018InvTip.pdf, pg. 19). When I personally completed the Reid course, my instructor Mr. Michael Masokas (who happened to be the interrogator who years prior elicited a false confession from 16-year-old Juan Rivera) made no mention of treating juveniles different than adults. When I found an opportunity to ask whether the technique should be altered for juveniles, Mr. Masokas responded by suggesting that the two things investigators should avoid with youthful subjects was prolonged interrogation and the presentation of false evidence.

[99] Drizin & Leo (2004); Garrett (2010); Gudjonsson (2003); Kassin et al. (2010); Leo (2008); Perske (2008)

[100] Schatz (2018)

[101] American Psychiatric Association (1994)

[102] Everington & Fulero (1999); Perske (2004)

[103] e.g., Finlay & Lyons (2002); Leo (2008); Perlman, Ericson, Esses, & Isaacs (1994); Shaw & Budd (1982)

[104] Clare & Gudjonsson (1995); Everington & Fulero (1999); Fulero & Everington (2004); Gudjonsson (2003)

[105] Redlich (2007)

[106] Drizin & Leo (2004); Garrett (2010; 2011); Gudjonsson (2003); Kassin et al. (2010); Leo (2008)

[107] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[108] Gudjonsson (2018); Gudjonsson et al. (2006); Rogers, Harrison, Hazelwood & Sewell (2007); Redlich, Kulish & Steadman (2011); Redlich, Summers & Hoover (2010)

known risk factor for false confessions. Research has shown in a variety of contexts that being deprived of sleep depletes a person's cognitive resources to the point that people become error-prone, decision-making abilities become impaired, suggestibility to outside influence is heightened, and the ability to maintain focus and attention suffers.[109] In the interrogation/interview context, suspects are sometimes deprived of quality sleep intentionally (see Situational Risk Factors section below). In other cases, a subject may be sleep deprived by virtue of the amount of sleep the person had prior to active police questioning. However, the deleterious effects of fatigue and sleep deprivation on a person's psychological functioning occur regardless of where the responsibility for that state lies; in other words, investigators should be mindful about how well-rested (or not) a suspect is at the start and throughout the entire period of the custody and interrogation process. Similarly, physical discomfort or pain (regardless of the cause) can deplete an individual's resources to withstand the pressures of an accusatorial interrogation. Short-term consequences are more salient than distal ones, and humans tend to focus on their immediate needs.[110] It is fundamental human nature to prioritize the short-term benefit of ending a fatigue state or physical discomfort over the long-term consequences of falsely confessing to a crime one did not commit, especially given that accusatorial interrogation is designed to downplay the consequences of confession and maximize the consequences of continued denial. Furthermore, most innocent people believe that their actual innocence will become clear to investigators at a later time and thus fail to appreciate the weighty ramifications of providing a false admission.[111] In summary, investigators should be aware that fatigue, physical discomfort, or pain can increase the risk of false confessions/statements and exercise caution if any of these factors are present.[112]

*Situational Risk Factors*

Although individual risk factors can increase the likelihood of a false statement, it is important to understand that false statements can be elicited from typical individuals with no dispositional vulnerabilities (e.g., older adults with no cognitive limitations or mental illness). Of 365 false confessors documented by the National Registry of Exoneration, 50% were eighteen years or older without mental illness and intellectual disability.[113] Of the DNA exoneration cases that involved false confessions/statements, only 9% of false confessors had documented mental health or cognitive limitations, and 69% were provided by subjects 18 years or older.[114] Even without any individual risk factors present, situational risk factors – namely factors that increase

---

[109] Blagrove (1996); Frenda, Berkowitz, Loftus & Fenn (2016); Harrison & Horne (2000); Pilcher & Huffcut (1996)

[110] e.g., see Herrnstein (1970); Herrnstein, Rachlin & Laibson (1997); Rachlin (2000); for a discussion of individual differences, see Reynolds (2006)

[111] Kassin (2005) refers to this as the 'phenomenology of innocence.' Innocent persons believe that their innocence will eventually come to light, and so even if they make a false confession to benefit themselves in the short-term (e.g., to escape an unpleasant interrogation session), police investigators will eventually realize through further investigation and/or evidence that they are actually innocent.

[112] Gudjonsson (2018); Kassin et al. (2010); Leo (2008)

[113] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[114] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

the likelihood of false confessions/admissions are that are associated with the nature of the interrogation itself – can cause false confessions/statements.[115]

***Prolonged custody, isolation, and interrogation.*** Most police interrogations last between 30 minutes and 2 hours,[116] with law enforcement officers in the U.S. citing the mean interrogation length as 1.6 hours.[117] Law enforcement manuals, including the Reid manual, caution against prolonged interrogation, citing it as a risk factor for coerced and/or false confessions.[118] At least one Reid-trained former investigator considers any interrogation lasting over six hours de facto coercive, and the Reid manual suggests that rarely should an interrogation last more than three or four hours.[119] Lengthy, prolonged custody, isolation, and interrogation is commonplace in false confession cases, and therefore it is a recognized risk factor for false confessions/statements. One issue that often comes up when discussing length of interrogation is the difficulty in distinguishing between length of custody versus length of active questioning. This is because law enforcement officers rarely keep and provide exact records distinguishing between these two metrics (although as mandated recording of all questioning becomes commonplace, this will help to ameliorate this gap in knowledge). In one study of 125 proven false confessions, length of interrogation could only be approximated in 35% of cases, and within those cases, it was difficult in many cases to distinguish between length of active questioning and length of time in custody. In that study, the average length was 16.3 hours, with 16% lasting less than 6 hours, 34% lasting between 6 and 12 hours, and 39% lasting between 12 and 24 hours.[120]

However, a hyperfocus on trying to distinguish between total length of custody versus length of active questioning, is misguided and missing the point. That is because length of active questioning should not and cannot be considered in isolation. From a psychological perspective, it is the *entire length of custody, isolation, and questioning* that is associated with conditions that increase the risk of a false confession/statement, not simply the sum total of the number of minutes of active questioning.[121] Simply put, the clock does not stop each time the investigators leave the room. The reason for this is that prolonged custody and questioning is usually accompanied by isolation of the interviewee from meaningful social support and contact with the outside world (e.g., friends, family members, attorneys), which is a form of psychological deprivation. It is standard practice in the U.S. to interrogate suspects in a small, barely furnished room, with nothing adorning the walls, and with minimal to no noise coming from the outside.[122] This environment helps heighten a person's sense of isolation and anxiety. Prolonged incommunicado custody and isolation deprives people of their fundamental needs for affiliation

---

[115] For the sake of brevity and relevance, I have limited my discussion of the background literature primarily to those situational risk factors that appear to have been at issue in this case.

[116] Baldwin (1993); Irving (1980); Leo (1996); Wald, Ayres, Hess, Schantz & Whitebread (1967); Kassin, Russano, Amrom, Hellgren & Kukucka (2019)

[117] Kassin et al. (2007)

[118] Inbau et al. (2001, 2013)

[119] Blair (2005)

[120] Drizin & Leo (2004)

[121] In the cases this expert has personally consulted on, subjects are rarely subjected to continuous interrogation of the course of hours. Rather, it is far more typical to see periods of prolonged custody and isolation with intermittent questioning.

[122] Inbau et al. (2001, 2013); The *Reid* manual explicitly recommends that investigators to create this type of physical environment.

and social support,[123] which are particularly critical in times of stress, (e.g., during a prolonged accusatorial interrogation process).

In examining length as a risk factor, one should consider the entire length of custody and isolation, and the totality of the conditions under which a person was held and questioned. It is not uncommon in documented false confession cases for a subject to be held in custody for a prolonged period but questioned intermittently during that period. Cumulative active interrogation length is not the only or the most important consideration; it is not sufficient to only "count" the active questioning periods when considering risk level because there are cumulative and deleterious effects of the isolation and detention that cannot be disentangled from the time periods during which the questioning occurred. What occurred during breaks in questioning – for example, whether the person was allowed to sleep or rest in an environment conducive to sleep, whether they were permitted to speak with a family member or friend, whether their basic needs of food, drink, medication, and bathroom were provided for – are critical considerations in determining just how great of a risk factor total elapsed custody, isolation, and interrogation time is in each case. In general, however, as total time elapses, a person's need and desire to escape an aversive situation (i.e., prolonged custody, isolation, and interrogation) intensifies, and many individuals (even innocent ones) will prioritize the short-term benefit of escaping the immediate situation by cooperating with investigators and providing an incriminating statement.[124]

### _Physical abuse/threats of physical harm/physical discomfort/deprivation of basic necessities._ Prior to the 1930's, physical abuse of suspects during interrogations was fairly routine.[125] However, reform spurred on by the Wickersham Commission and case law decisions swept the country, and certainly by 1996, the courts, police training manuals, and legal guidelines had unequivocally declared physical abuse inappropriate and illegal in the context of a police interrogation or interview. The concern regarding physical abuse involved not only the issue of voluntariness (whether physical abuse causes a suspect's will to be overborne) but also _reliability_ (the concern that physical abuse might lead to false statements). Threats of harm, physical abuse, and deprivations of basic needs such as food, drink, sleep and use of the bathroom are generally considered to be de facto coercive and the resulting statements likely unreliable.[126] The fact that a false confession or false statement can be procured through physical abuse or threats of physical abuse should not come as a surprise to anyone and is non-controversial; humans tend to prioritize their immediate needs and short-term consequences (ending or avoiding physical pain) over long-term ones (the more abstract consequences of providing a false statement).[127] According to the Reid manual, "if physical coercion was involved, even a 30-minute interrogation may warrant" a claim of coercion or duress.[128] Similarly, threats of future physical abuse or harm is considered psychologically manipulative and coercive, and the courts have long recognized that confessions procured through threats of harm are not admissible in court.[129] Once again, the rationale for this is not simply based on the

---

[123] Baumeister & Leary (1996)
[124] Leo (2004); Kassin (2023); Leo (2008); Woody & Forest (2020)
[125] Leo (2004)
[126] Brown v. Mississippi (1936); Leo (2004); Sheridan (2011); Stein v. New York (1953)
[127] e.g., see Herrnstein (1970); Herrnstein, Rachlin & Laibson (1997); Rachlin (2000); for a discussion of individual differences, see Reynolds (2006)
[128] Inbau et al. (2001, p. 423)
[129] Leo (2004; 2008)

issue of voluntariness, but over legitimate concerns that confessions procured in this manner may be unreliable (i.e., false). In one analysis of exonerations cataloged by the National Registry of Exonerations, Gross and colleagues concluded that 36% of false confessions were a result of the threat or use of violence; in Chicago, that number jumped to violence being used or threatened in 69% of exonerations involving false confessions.[130]

      ***Guilt-presumptive approach: Direct positive confrontation, shutting down denials, and poor questioning techniques***. As previously discussed, research comparing accusatorial interrogation methods and non-accusatorial, information-gathering methods has demonstrated that accusatorial interrogations overall are associated with a greater risk of false confession.[131] One of the hallmark features of a classic accusatorial approach is the use of direct positive confrontation, where an investigator directly accuses a person of being guilty with a strong degree of certainty. It is often accompanied with the message that the investigation is complete, that the investigators already know that the suspect was involved, that they have all the evidence they need to prove that, but they do not know *why* the person did it, and therefore the purpose of the interrogation is to give the suspect an opportunity to explain his side of the story. Direct positive confrontation serves to ramp up the person's anxiety level and, coupled with the ignoring or shutting down of repeated assertions of innocence, it communicates the message that there is no point in trying to maintain one's innocence. For guilty persons, the hope is that they will see the futility in continuing to lie to the investigators. For innocent persons, however, it creates feelings of hopelessness and the feeling that protestations of their actual innocence are futile.[132] It also is designed to make these individuals believe that the only viable path of escape is to provide an inculpatory statement; in other words, that confessing or false incriminating someone else is their only way out of the situation they find themselves in.

      Another feature common to accusatorial interrogations is poor questioning techniques, with a particular overreliance on suggestive and leading questions. The research literature on questioning techniques (for witnesses, victims, and suspects alike) is clear that responses to open-ended questions are more likely to be accurate (e.g., "What happened?") than specific questions ("Did you stab him?"). Moreover, leading/suggestive questions (i.e., those that communicate what the answer might be to the person who is being asked the question), forced-choice questions (e.g., yes-no questions; asking a person to choose between a few provided options), and repetitive questioning[133] increase the risk of eliciting inaccurate details and reports.[134] One of the primary concerns surrounding the use of leading/suggestive questions or statements is that (either intentionally or unwittingly) investigators may communicate details about the crime to the interviewee, details that will likely be consistent with the investigator's theory of the crime and the facts known to investigators at the time of the interrogation (a process called "contamination"). The use of these problematic techniques muddies the waters for later factfinders, who cannot be sure whether a statement that contains non-public details

---

[130] Gross et al. (2020)
[131] Meissner et al. (2014)
[132] Inbau et al. (2001, 2013)
[133] Repetitive questioning not only causes mental fatigue and frustration, but it communicates to the person being questioned that the answer they gave previously was incorrect or unsatisfactory.
[134] Mitchell & Johnson, 2000; Toglia, Read, Ross & Lindsay, 2006

contains those details because the interviewee possessed actual guilty knowledge or because those details were suggested to him via the questioning process.[135]

*__Presentation of false evidence.__* The presentation of false evidence of guilt (a form of trickery and deception) is a known, demonstrable risk factor for false confessions. False evidence presentation can take different forms, including explicit claims of false evidence (e.g., we have video that identifies you at the scene of the crime; you failed a polygraph) to implicit claims that often involve bluffing (e.g., we found DNA on that item and testing it to see if it matches you). It is important to note that implicit and explicit evidence ploys have similar psychological effects on innocent suspects.[136] Analyses of documented false confession cases in the U.S. indicate that the presentation of false evidence occurred in a large majority of these cases and contributed to the wrongful convictions of innocent suspects.[137] In addition, a wealth of basic social psychological research demonstrates that people are susceptible and vulnerable to false feedback in terms of their emotional state, judgment, memory, and decision-making processes.[138] Finally, laboratory studies of interrogation and confessions indicate that the presentation of false evidence increases the likelihood of false confession.[139] When an innocent person is confronted with false evidence, it often has the intended effect. That is, innocent persons become convinced that the evidence makes them appear guilty, there is no point to continuing to deny it (and in fact, there may be a severe cost to doing so), and they are going to be held responsible for committing the crime no matter what they say. False evidence presentation is typically coupled with the suggestion that if the suspect provides a statement, he or she may be treated more leniently.[140] This perfect storm can lead innocent persons to falsely confess if they see no other viable way out of the precarious situation they find themselves in.

Strategic presentation of *true* evidence, on the other hand, is recognized as a useful part of a science-based interview process that can maximize the likelihood of eliciting a reliable statement.[141] However, fundamental to the use of true evidence during the course of an interrogation is consideration of the likely reliability of that evidence. That is because not all forms of "evidence" are equally strong, credible, or trustworthy, either due to the inherent nature of the type of evidence or because of the way that the evidence was collected. For example, faulty eyewitness identification is one of the leading contributors to wrongful convictions;[142] the nature of human memory making eyewitness identification evidence inherently less reliable than, for example, the results from appropriately conducted DNA analyses. Moreover, methods of collecting evidence can exacerbate inherent reliability problems. If, for example, an investigator uses suggestive lineup procedures with an eyewitness, the reliability of a resulting identification

---

[135] See Part VI of this report for a detailed discussion of the issue of contamination.

[136] Perillo & Kassin, 2011; Woody & Forest, 2020

[137] Drizin & Leo (2004); Leo & Ofshe (1998); Gross et al. (2020)

[138] Gudjonsson & Sigurdsson (1999); Kassin et al. (2007)

[139] Kassin & Kiechel (1996); Horselenberg, Merckelbach, & Josephs (2003); Horselenberg et al. (2006); Perillo & Kassin (2011); Redlich & Goodman (2003); Russano et al. (2005); Meyer & Youngjohn (1991); Nash & Wade (2009); Stewart, Woody & Pulos (2018)

[140] See next paragraph for effects of this technique.

[141] For a review of some strategic evidence disclosure methods, see Granhag & Hartwig (2015), Luke & Granhag (2022), Meissner, Surmon-Böhr, Oleszkiewicz & Alison (2017), and Sukumar, Wade & Hodgson (2016).

[142] www.innocenceproject.org/eyewitness-identification-reform/

is determined not only by the inherent difficulty of the memory task, but also the nature of the identification task process. Another example would be when a witness statement implicating a particular subject was procured with problematic questioning procedures, or when confirmation bias impacted an investigator's choice of interrogation techniques or a polygrapher's interpretation of the charts.

The reasons it is important for investigators to carefully consider the reliability of what may appear to them to be true evidence before confronting a subject with it during an interrogation is because unreliable "true" evidence (i.e., the investigators are telling the truth about evidence they have but it turns out it is not objectively reliable/true) can have the same psychological impact as the intentional presentation of false evidence (i.e., investigators lying or bluffing about having evidence). In other words, for an innocent person, the psychological impact of being told that an eyewitness has identified them, a witness has implicated them, or that they failed a polygraph is the same regardless of whether the detective believes the evidence he is using is true or he is intentionally being deceptive. In the end, the presentation of evidence that an investigator possesses and believes to be true but is actually false is the functional equivalent of fabricating that same evidence when it comes to increasing the risk of eliciting a false confession/statement.

*__Threats and promises (explicit and implied).__* Explicit and implicit threats of harsher punishment for continued denial and explicit and implicit promises or implications of leniency in exchange for an incriminating statement is a significant and powerful risk factor for eliciting false confessions/statements.[143] Statements elicited as a result of <u>explicit threats</u> of negative consequences (e.g., being charged with a more serious crime)[144] or more severe punishment (e.g., receiving the death penalty instead of life in prison) if one does not confess or via <u>explicit promises</u> of some benefit or leniency in exchange for cooperation (e.g., being allowed to go home; getting a lighter sentence) are generally considered inherently coercive (i.e., not voluntary). That is not only because of their coercive nature, but also because coerced confessions are more likely to be unreliable (i.e., false).[145] <u>Implied</u> threats and promises, which often come in the form of minimization (e.g., downplaying the role that the individual played in the crime, suggesting that the crime wasn't premeditated, minimizing the seriousness of the offense, suggesting the offense is common, implied leniency in the form of suggesting the person will be 'better off' if they confess or suggesting that this is the person's opportunity to "help himself out" or "tell his side of the story") and maximization techniques (e.g., exaggerating the seriousness of the offense or the consequences of continued denial) have the same functional effect.[146] As previously discussed, research demonstrates that certain minimization and maximization techniques (and associated themes) *imply* leniency in exchange for confessing and *imply* harsher punishment if the person continues to deny; in essence, they are the functional psychological equivalent of direct threats and direct promises in the mind of the person being subjected to these techniques. Moreover, research demonstrates that techniques that communicate leniency in exchange for a statement and harsher punishment in light of continued

---

[143] Gross et al. (2020); Horgan et al. (2012); Kassin et al. (2010); Klaver et al. (2008); Russano et al. (2005); Narchet, Meissner & Russano (2011)
[144] Lynumn v. Illinois (1963)
[145] Brown v. Mississippi (1936); Leo (2004); Horgan et al. (2012); Sheridan (2011)
[146] Leo (2004); Sheridan (2011)

denial, whether that communication is explicit or implied, increase the risk of false confessions/statements.[147]

## VI. The Nature and Power of False Confessions/Statements

One would hope that if a false confession/admission is elicited from a suspect, various legal decision-makers examining the veracity and reliability of the statement (i.e., prosecutors, judges, jurors) would be able to recognize it as such and prevent that false statement from leading to a wrongful conviction. Unfortunately, research indicates that people cannot reliably distinguish between true and false confessions, just by observing, reading, or viewing the statement.[148] Why might that be? In addition to our generally dismal performance at detecting deception using non-science-based cues and approaches, the reason why it is so difficult to recognize a false confession when we see one is because false confessions typically *look* and *feel* like true confessions. That is, they typically consist of narratives that are chock full of specific details that mirror the type of detail provided in true confessions. In one content analysis of proven false confession cases, 100% of the false confession cases included details about the time and place of the crime, visual details about the crime, and details about the victim's behavior. Almost all (95%) referenced co-perpetrators, witnesses, or other people. A large majority contained details about what the victim allegedly said (80%) and what the victim looked like (75%), as well as reflections on what the suspect was feeling (85%) and the motive for the crime (80%). Approximately 60% contained references to minimization themes, such as shifting the blame to a co-conspirator, 40% contained expressions of remorse, 50% included statements of voluntariness, and 44% had error corrections.[149] Not surprisingly, detailed false confessions and admissions are compelling to jurors and other legal decision-makers, precisely because they contain the type of detail and so-called 'credibility cues' (i.e., expressions of remorse, motive, statements of voluntariness, error corrections, statements about having been treated well) that we would expect to see in true confessions. For these compelling narratives to be produced, scripting and rehearsal is commonplace in documented false confession cases.[150] Once taken, false confessions are highly likely to lead to plea bargains,[151] and most false confessors who go to trial are convicted.[152]

---

[147] Gross et al. (2020); Horgan et al. (2012); Klaver et al. (2008); Luke & Alceste (2020); Russano et al. (2005); Narchet, Meissner & Russano (2011); See Vallano, Guyll, Ditchfield & Slapinski (2022) for a discussion of how minimization may be especially problematic when combined with a rapport-building approach.

[148] Aamodt & Custer (2006); Granhag & Stromwall (2004); Honts, Kassin & Craig (2014); Kassin et al. (2005); Memon et al. (2003); Vrij (2008); Much of the research that is germane to people's poor performance at distinguishing between true and false confessions is specific to viewing confession statements – not the entire interrogation process leading up to the confession statement, and it does not concern an interrogators' own observations that the admission is unreliable based upon what they know about the case and interrogations they have conducted.

[149] Appleby et al. (2013)

[150] Appleby et al. (2013); Kassin (2012); Leo (2008)

[151] Based on the National Registry of Exonerations database, false confessors are three times more likely to plead guilty than innocent exonerees who did not falsely confess (NRE.Guilty.Plea.Article4.pdf (umich.edu)).

[152] Drizin & Leo (2004)

Notably, a false confession or statement can trigger a process that leads to an **illusion of corroboration**. This is because once a false confession or statement is taken, it has the power to influence and corrupt other evidence. This phenomenon leads to *corroboration inflation*, which refers to "a tendency for confessions to produce an illusion of support from other evidence."[153] Research demonstrates that knowledge that a person has provided an incriminating statement can shape both lay witnesses' memories for the crime/perpetrator as well as the forensic examiners' evaluations of trace evidence and polygraph examiners' interpretation of a suspect's veracity.[154] In one analysis, the vast majority (78%) of DNA exoneration cases involving false confessions contained other errors that contributed to the wrongful conviction (e.g., invalid forensic science, mistaken eyewitness identification). In 65% of the cases that contained multiple errors, the false confession **preceded** the collection of the other evidence (allowing for the confession to corrupt the other evidence and provide an illusion of corroboration).[155] This domino effect can feed a dangerous cycle of confirmation bias, in which decision-makers push forward with a case by focusing on possibly tainted evidence that is consistent with their theory of the case, and downplaying the significance of information that is inconsistent with their theory.

## VII. Facets of a Reliability Analysis

Given all of the above, fact-finders and observers cannot simply read or listen to a confession and make a judgment call about its veracity or reliability; instead they must engage in a systematic, in-depth analysis when considering its likely reliability (and therefore its probative value).[156] When conducting an analysis of the likely reliability of a post-admission narrative (i.e., the details provided by the suspect beyond an admission that the person was involved), there are three key conceptually overlapping questions triers-of-fact should consider: 1) to what extent is the post-admission narrative consistent with, or inconsistent with, the objective evidence/facts of the case, and to what extent is that narrative complete?; 2) did the post-admission narrative contain non-public details (i.e., details that were withheld from the public by the police) that only the true perpetrator would know, *but which were not unintentionally or intentionally leaked by investigators?*; and 3) did the post-admission narrative lead to independent corroborating evidence (i.e., did the person provide details not known to the police at the time of the confession but that were later corroborated)? The more consistent and complete the post-admission narrative, the more non-public details provided (that could not be or were not the product of contamination), and the more independent corroborating evidence the statement led to, the greater the likelihood that the statement is reliable.

I will now discuss each of the three specific facets of a reliability analysis that experts such as myself use to provide guidance to factfinders on how to assess the reliability of a statement;[157] this framework may be of use to triers of fact as they evaluate the reliability of a statement in the larger context of a case, evidence, and trial.

---

[153] Kassin (2012), p. 440
[154] Dror & Charlton (2006); Elaad, Ginton & Ben-Shakhar (1994); Hasel & Kassin (2009)
[155] Kassin, Bogart & Kerner (2012)
[156] Even with this process, there is no way to know with 100% certainty whether a statement is true or false without other independent objective evidence that clearly exonerates or implicates the suspect. There is simply no "crystal-ball" method of merely examining a statement and determining its veracity.
[157] This analysis can be applied in equal measure to suspect admissions/confessions and witness statements.

**Accuracy and Completeness of the Narrative.** In general, the more consistent the details of a statement are with the known, objective facts/evidence in a case, and the more complete the statement is, the more likely it is that the statement is reliable. When examining consistency, one should consider the extent to which the subject provided accurate details, keeping in mind how accurate details are defined. For the purpose of a reliability analysis, accurate details are those that are corroborated by other *objective* evidence. Providing details that cannot be corroborated[158] or can only be corroborated by another source that might also be inaccurate[159] is not nearly as informative for the purpose of a reliability analysis as details that can be or have been verified via more objective or reliable evidence. It is also important to recognize that the presence of accurate details alone is not a foolproof indicator of veracity because the accurate details may have been learned via various sources, such as other witnesses, media reports, or from investigators during the questioning process (see "Dependent Corroboration: Presence of Non-Public Details" for an in-depth discussion of this issue). It is also informative to consider the extent to which the subject provided *inaccurate* or *inconsistent* details, as this weighs against the likely reliability of the statement. Inaccurate details can be especially informative if the inaccurate detail was something that the investigators believed at the time of the interrogation but later turned out to be objectively false as it suggests contamination likely occurred. Finally, one should consider the *completeness* of the narrative. In other words, are there any noticeable gaps or details that are missing in the person's story that it seems they should have been able to provide? Relatedly, to what extent did they fail to account for known evidence/facts?

**_Dependent Corroboration: Presence of Non-Public Details._** One of the features that make false confessions so compelling is that they often contain details about the crime that police have withheld from the public that only the true perpetrator would know (aka

---

[158] Examples of details that cannot be verified are statements made by the victim or perpetrator prior to the victim's death (assuming they were the only ones present and there is no recording of the event), details of what the victim or perpetrator did (that cannot be verified by forensic evidence), and the thoughts, feelings, or motives of the perpetrator. Reid refers to these types of the details as *rational corroboration* (Inbau et al., 2013), an arguably ironic word choice given that these types of details do not actually corroborate anything (since there is no way to objectively verify the accuracy of these details). Inbau et al. acknowledge that this type of "corroboration" is far weaker than dependent or independent corroboration. From a reliability analysis standpoint, these types of details are essentially useless (yet they can be dangerously compelling and misleading to factfinders).

[159] For example, in a situation that involves two alleged co-conspirators, if one of the suspects provides a statement containing details about what the victim said or did before he died, and those statements are corroborated by the other co-conspirator, that sort of corroboration has limited utility if you cannot eliminate the possibility that the second co-conspirator's statement is a product of contamination (i.e., from being exposed to the details that the first co-conspirator provided). It is tempting to view the statements made by the two alleged co-conspirators as corroborating one another and therefore an indicium of reliability. However, assuming there was no objective recording of the victim's words, if contamination occurred, then all that the statements do is provide an illusion of corroboration because there is simply no way to establish through objective, untainted evidence that the statements attributed to the victim are accurate.

'inside information').[160] If police and prosecutors withhold certain details from the public/media **as well as from the suspect during interrogation** (and knowledge of those details cannot be attributed to another source), and an interviewee is able to provide those details, this is a strong indicia of reliability. In other words, it is an indication that the person possesses guilty knowledge of the crime either as a witness or perpetrator. Withholding certain details about the crime so that investigators can test the credibility of a subject is standard police practice,[161] and when 'inside information' is present in a person's statement or confession, it should rightfully increase an investigator's confidence that the statement being provided is true (assuming an untainted collection process). When a person provides non-public details, that is generally referred to as *dependent corroboration*.[162] However, non-public details in a statement are only an indicium of reliability *if the details were not intentionally or unintentionally leaked to the subject by investigators*. If non-public details about the crime are leaked to a suspect, researchers refer to this as *contamination*.[163] Contamination can be intentional (e.g., purposefully telling a suspect 'we found a black rope around the victim's neck so we know she was strangled') or unintentional (e.g., unwittingly providing details via leading or suggestive questions). The process of contamination (i.e., the communication of non-public details) can be overt (i.e., information communicated directly via words) or subtle (e.g., via intonation, tone, facial responses, and other non-verbal behavior while asking questions or reacting to suspect's response). Contamination can also occur in other ways such as overhearing other knowledgeable parties talking (e.g., victims, witnesses, investigators) or by being exposed to crime scene photos or other evidence.

The fundamental problem when contamination occurs is that non-public details that have been leaked that appear in a subject's statement **are no longer probative**, in that there is no way to tell after the fact whether the person knew those details because s/he possessed actual guilty knowledge or because those details were leaked to him/her. Therefore, the presence of non-public details consistent with objective facts/evidence are only probative if we can eliminate contamination as a possible source of the information. When investigators choose to memorialize the entirety of an interview/interrogation by recording it, we have an objective record of what occurred during the interaction, and we can determine with certainty whether investigators contaminated the statement. However, when investigators do not record at all or record only portions of their interactions with a subject, we cannot eliminate the possibility of contamination.

It is particularly problematic when non-public details appear in false confession cases precisely because the non-public details are often pointed to as strong indicators that the statement is true (in fact, investigators are often trained to make sure to include non-public details in confession statements because it makes the statements more compelling to judges/juries).[164] Contamination is a known and recognized problem in proven false confession cases. An examination of 66 DNA exoneration cases between 1989 and 2014 involving false confessions indicates that contamination occurred in 94% of those cases. The non-public details in the confessions were used as evidence of the

---

[160] DeClue & Rogers (2015); Garrett (2010; 2015)
[161] Inbau et al. (2013)
[162] Inbau et al. (2013)
[163] See Leo (2008) and Leo & Drizin (2010) for an overview of the contamination error.
[164] Inbau et al. (2001, 2013); Leo (2008)

reliability of the suspects' confessions, and of those cases that went to trial, in all but one, police officers denied having revealed these non-public details to the suspects.[165] Although it is possible that investigators deliberately lie at trial about not having revealed non-public details to subjects, it is also quite likely that investigators are often simply unaware of the fact that they leaked those non-public details (e.g., in the form of leading questions, reinforcement of certain responses, etc.). Therefore, investigators may truly believe Rogers did not contaminate a person's statement or confession even when they did.

**Independent Corroboration: Details Unknown to Police but Later Corroborated.**
The gold standard for establishing the reliability of a statement is to see if the statement led to *independent corroboration*. This occurs when a person provides details in his/her statement *that were not known to investigators at the time of the statement* and *those details could later be independently verified via objective evidence*. Examples of independent corroboration would be if a suspect told investigators where he disposed of the murder weapon or the victim's possessions (and investigators subsequently located those items where the suspect indicated they would be) or if the suspect provided information about a location where (unbeknownst to police) part of the crime occurred, and investigators were able to recover forensic evidence that verified the details of what occurred in that location (e.g., bullets recovered, DNA from the victim, etc.). Triers of fact should consider independent corroboration a strong indicium of reliability.

## VIII. Specific Risk Factors Identified in the Arnold Day Case

In this section of the report, I will identify the known risk factors associated with false confessions/statements that appear to have been present in Mr. Day's case based on my review of the case materials provided to me.[166] My analysis will focus primarily on Mr. Day's confession and Mr. Watson's statement with respect to the Jerrod Irving case, although the circumstances surrounding and leading up to Mr. Day's confession to the Garcia homicide are inextricably linked to the investigation of the Irving homicide and therefore will be addressed as needed.[167]

### *Confirmation Bias*

When assessing whether and to what extent confirmation bias might have played a role in a case, we can look for signs that a guilt-presumptive mindset potentially shaped investigator behavior. There are numerous examples throughout the course of the investigations involving Mr. Day that various investigators may have experienced confirmation bias (and relatedly, belief perseverance) based on how they purportedly conducted interviews/interrogations. One of the hallmark features of confirmation bias is a guilt-presumptive approach to interviewing and

---

[165] DeClue & Rogers (2015); Garrett (2010; 2015)

[166] I do not assume a position on Day's guilt or innocence, nor the ultimate veracity of the statements he and Watson provided. What I do in this report is identify the risk factors that if present that would have increased the likelihood of a false statement/confession if Day is in fact innocent, and Watson lacked knowledge, and I form an opinion as to whether the totality of the interrogation processes used likely would have produced statements that triers-of-fact can confidently rely upon.

[167] I discuss issues specific to the Garcia case when applicable to understanding the larger context in which the statements in the Irving case were elicited.

interrogation. Recall that confirmation bias, or tunnel vision, can lead to a process of behavioral confirmation – a social psychological phenomenon in which our beliefs or expectations about a person causes us to act toward that person in ways that elicit behavior from that person that confirms our initial beliefs or expectations.[168] Empirical research has demonstrated that this process can put innocent persons at risk in the interrogation room. Investigators who form a belief that the suspect is guilty conduct more accusatorial, confirmatory, guilt-presumptive interrogations. Suspects who are interrogated in this way (as compared to a more neutral, information-gathering style) are in turn more likely to be perceived and judged as guilty, and innocent subjects more likely to falsely confess.[169]

Based on Mr. Day and Mr. Watson accounts, investigators interrogated them a guilt-presumptive approach. To understand how such a presumption might have developed, it is helpful to understand how Mr. Day first became a suspect in the Irving homicide, which in turn necessitates an understanding of how Mr. Day became a suspect the investigation of the Garcia homicide. Mr. Garcia was shot on September 15, 1991 at approximately 11:55pm.[170] By 3:45am (approximately 4 hours after the shooting), an employee of Star Food & Liquors told Officers White and Hargrove that the shooting was meant for an individual called 'Snake' who was a passenger in the victim's car, that a 'Thomas' was a shooter, and that 'Thomas' was sent by a man named 'Troy'.[171] At approximately 12:30pm on September 16th, Officer Thomas Pack received a telephone tip from an anonymous called that 15-year-old Anthony Jakes might have information about the Garcia homicide.[172] Tactical Unit Officers Pack and Michael DeLacy located Jakes at his aunt's home and transported him to Area 3 for questioning. Upon arrival, Mr. Jakes was searched and subsequently arrested for possession of narcotics.[173] He was then questioned by Detectives Duckhorn and O'Riley about the Garcia homicide. He denied any knowledge about the incident in this interview, and then again in a subsequent interview by Detectives Michael Kill and Kenneth Boudreau. Mr. Jakes did provide the names of several people he was with in the area that night. Dets. Kill and Boudreau then attempted to locate these individuals (and any other potential witnesses), while Mr. Jakes remained at Area 3. During their canvass of the area, the detectives spoke to a witness who chose not to be identified. That witness said he was in the vicinity of the Garcia homicide when he heard two to three gunshots and from a distance saw a subject run away. The witness then went to the scene of the homicide, and he heard a female ask if 'Snake' was okay. Officers subsequently saw a person they knew as 'Snake', aka Mr. Gus Robinson, and they transported Mr. Robinson to Area 3 to be interviewed.[174]

---

[168] See Darley & Fazio, 1980, and Snyder, Tanke & Bercheid, 1977 for explanations of this basic phenomenon.

[169] Hill, Memon & McGeorge (2008); Kassin et al. (2003); Liden, Grans & Juslin (2018); Meissner & Kassin (2004); Narchet et al. (2011)

[170] CITY_JAKES 0004

[171] CITY_JAKES 0003

[172] Thomas Pack's Testimony in Motion to Suppress Hearing (9/18/1992); Thomas Pack's Trial Testimony (9/9/1993)

[173] According to Dr. Leo's expert report in the Jakes' case, Mr. Jakes alleged that the tin foil packet was planted on him by police. Moreover, according to the report, the substance was later determined to not be narcotics (Dr. Richard Leo's Report in the Anthony Jakes Case; 03/31/2022).

[174] CITY_JAKES 000111-000116

Mr. Robinson purportedly told Dets. Kill and Boudreau that at approximately 11:50pm on September 15, 1991, he had just parked his car at 1102 W. 51st Street when Mr. Jakes approached him and asked him to be a lookout while Mr. Jakes, 'Little A', and 'Little A's' friend robbed a white dude who was in the Queen's Submarine Shop. Mr. Robinson said he refused, drove around the block, and heard three gunshots before driving home.[175] According to a 9/17/1991 Chicago Police Department Supplementary Report, Mr. Jakes was then interrogated again by Dets. Kill and Boudreau. After purportedly being advised of his rights and being told that "if charged he would be charged as an adult and if prosecuted he would be prosecuted and received [sic] the sentence as an adult",[176] detectives told Mr. Jakes about the statement Mr. Robinson had provided. Mr. Jakes eventually signed a written confession statement taken by ASA Brian Grossman and witnessed by Detective Louis Caesar and Youth Officer Ken Burke at 4:30am on September 17, 1991. In that statement, Jakes said that he, his friend 'Little A', and 'Darren' were standing outside of Queen's Submarine Shop when they decided to rob a Mexican man. Mr. Jakes said that Little A asked him to be a lookout, and as Mr. Jakes went to the corner to watch for police, he ran into Mr. Robinson. He told Mr. Robinson they were planning to rob a man, and asked Mr. Robinson if he wanted to participate, but Mr. Robinson declined and drove away. Mr. Jakes then said he went back to the Submarine Shop, and when the Mexican man came out of the shop, Little A and Darren approached him. Little A said "this is a stick up" and pointed a .380 caliber gun at him. The Mexican man ran into his car, backed it up, and hit another car. Mr. Jakes said he then saw Little A go up to the passenger side window and shoot at the Mexican man four times. Mr. Jakes said at that point he turned and ran toward home and heard approximately three more shots as he ran away.[177]

As discussed in Section I of this report, Mr. Jakes claimed his written statement was a product of physical and psychological coercion during his 16-hour period of combined custody, isolation, and interrogation. The detectives involved with his interrogations denied any such behavior. The TIRC eventually found that Jake's allegations of torture were credible.[178] What is important about Mr. Jakes' statement with respect to the Irving homicide is that as a result of Mr. Jakes' statement, Mr. Day (aka 'Little A') became a suspect in the Garcia homicide. Police unsuccessfully attempted to locate Mr. Day for questioning over the next five months.[179] However, Mr. Day did not appear to become a suspect in the May 17, 1991 murder of Mr. Jerrod Irving until police questioned Mr. Ralph Watson on January 20, 1992. On that day, Mr. Watson was detained in the Cook County Jail on unrelated armed robbery charges.[180] Detective Boudreau retrieved Mr. Watson from the jail and brought him to Area 3, sometime between

---

[175] CITY_JAKES 000111-000116; Mr. Gus Robinson signed a written statement detailing these events which was taken by ASA Brian Grossman and witnessed by Detective Michael Kill. The written statement is dated September 17, 1991 at 3:50am (CITY_JAKES 00094-00095). The total length of Mr. Robinson's custody and interrogation is unclear from the record, although Detective Boudreau recalled during a 2021 deposition that he arrived back at the station with Mr. Robinson at approximately 9:30pm, indicating the combined period of custody and interrogation was greater than six hours (04/13/2021 Deposition of Kenneth Boudreau, Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022).

[176] CITY_JAKES 00015

[177] CITY_JAKES 000111-000116; CITY_JAKES 00090-00093

[178] Illinois Torture Inquiry and Relief Commission Report in Anthony Jakes Case (07/15/2013; 03/24/14); For a full analysis of Mr. Jake's confession and false confession risk factors, see report by Dr. Richard Leo (03/31/2022).

[179] CITY_JAKES 00016; Arnold Day Testimony in the Jakes' Case; Irving Trial Transcript

[180] Deposition of Kenneth Boudreau (12/01/2022); Ralph Watson Statement to Defense (12/15/1992)

9:30am and 10:30am.[181] According to Mr. Watson, after being placed in a lineup related to other armed robbery cases, Det. Boudreau and his partner Det. John Halloran[182] began questioning him about several different murders, including the Irving homicide.[183] Mr. Watson testified that Det. Boudreau specifically asked him whether he knew Little A and an individual named 'G-Nate' (aka Mr. Nathaniel Anderson) and suggested to Mr. Watson that Mr. Day and Mr. Anderson were involved in the murder of Mr. Irving.[184] Mr. Watson eventually signed a written statement indicating he was a witness to the Irving homicide. In his statement, he implicated Mr. Anderson and Mr. Day (and also named a 'Darren' and a 'Tennille' as having been present) and specifically named Mr. Day as the shooter.[185] Prior to Mr. Day's trial for the Irving homicide, Mr. Watson recanted his statement, claiming that Dets. Boudreau and Halloran had convinced him to falsely implicate Mr. Day and Mr. Anderson via promises to assist him with his charges and threats of additional charges if he did not cooperate (see 'Situational Risk Factors' section of this report for a fuller understanding of Mr. Watson's account of his interrogation).[186] If the detectives questioning Mr. Watson did indeed pressure Mr. Watson to implicate Mr. Day and Mr. Anderson, and fed him details about the crime as Mr. Watson claimed, this would be an indication that investigators may have formed a belief in Mr. Day and Mr. Anderson's guilt, and that confirmation bias may have led investigators to use techniques that would elicit the information they needed from Mr. Watson to confirm that belief.[187]

---

[181] Deposition of Ralph Watson (12/07/2021)

[182] Mr. Watson referred to Det. Boudreau's partner as "Richard"; however, Det. Boudreau testified his partner that day was Det. Halloran, and it was he and Det. Halloran who questioned Mr. Watson (Ralph Watson Statement to Defense, 12/15/92; Deposition of Ralph Watson, 12/07/2021; Deposition of Kenneth Boudreau (12/01/2022); 04/13/2021 Deposition of Kenneth Boudreau (Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022); Affidavits of Edward Robinson (04/23/09 & 04/6/2009)).

[183] Ralph Watson Statement to Defense (12/15/92); In his 2022 deposition, Detective Boudreau testified that he could not remember how the Irving homicide came up during his interview of Mr. Watson, however he agreed that he might have brought it up to Mr. Watson (Deposition of Kenneth Boudreau, 12/01/2022).

[184] Deposition of Ralph Watson (12/07/2021)

[185] CITY_DAY 00038-00044

[186] Ralph Watson Statement to Defense (12/15/1992); Ralph Watson Statement to Prosecutor (08/12/1992); Deposition of Ralph Watson (12/07/2021)

[187] Buttressing Mr. Watson's account of what occurred that day is the testimony of Mr. Edward Robinson. Mr. Edward Robinson was transported from the Cook County Jail to Area 3 for questioning on January 20, 1992 at the same time as Mr. Watson. Mr. Edward Robinson also claimed that he was questioned by Dets. Boudreau and Halloran about the Irving homicide. He described a highly coercive interrogation during which he was slapped, beaten, and kicked, and he said that he was offered a deal that if he implicated Mr. Day in the murder of Mr. Irving, Mr. Edward Robinson would not be charged with a series of armed robberies he had also been questioned about. Mr. Edward Robinson said he refused to accept the deal because he did not have any information about the Irving homicide. In a 2009 affidavit, Mr. Edward Robinson swore that when he and Mr. Watson were in a bullpen awaiting transport back the jail, he asked Mr. Watson if he had also been asked about Mr. Day's involvement in a murder. Mr. Watson responded that he had been offered a deal on armed robberies, and that he had taken the deal and falsely implicated Mr. Day in the Irving homicide. Mr. Watson also told Mr. Edward Robinson that he did not believe his false statement would lead to Mr. Day being charged because Mr. Day was not involved in the incident (Affidavits of Edward Robinson (04/23/09 & 04/6/2009). If one believes Mr. Edward Robinson's account, it supports the notion that Dets. Boudreau and Halloran had formed a belief that Mr.

What is clear from the record is that Dets. Boudreau and Foley began their interrogation of Mr. Day with the belief that Mr. Day was involved in both the Garcia and Irving homicides. Like Mr. Jakes and Mr. Watson, Mr. Day described an extremely guilt-presumptive interrogation, in which he was repeatedly accused of being involved in the homicides, and his denials were rebuffed and disbelieved. He claimed that it was only after he was physically assaulted by Det. Foley that he decided to acquiesce to his interrogators demands and agree to provide false confessions (see 'Situational Risk Factors' section of this report for a more detailed description of Mr. Day's account of his interrogation).[188] If this approach was taken, it is the very definition of a guilt-presumptive interrogation in which the goal was not to find out the truth – whatever that might be – but rather to elicit incriminating statements that would confirm what investigators walked into the room believing.

There are other glimpses into the investigative process that suggest confirmation bias might have taken insidious root in this case. For example, in the Garcia homicide investigation, there appears to have been little to no follow-up on the information provided by the store employee implicating a 'Troy' and a 'Thomas'. Det. Boudreau testified that he did not make any effort to locate Troy or Thomas, he did not interview the store employee who initially provided that information, and there is nothing in the record to suggest he made a concerted effort to locate the Darren mentioned in Mr. Robinson's account. It appears instead that Det. Boudreau took Mr. Robinson's statement at face value (i.e., that Mr. Jakes had approached him to be a lookout for the robbery, but otherwise Mr. Robinson was not involved in the robbery and was not the target). Det. Boudreau testified that "…we learned from Gus Robinson what occurred. And there was no Troy, there was no [sic] else there only Troy. Gus wasn't the target as these anonymous people wanted to seem."[189] Given Mr. Robinson was mentioned by two witnesses as the possible target, and if that were true Mr. Robinson may have had reason to deflect attention away from his involvement, it is interesting that Mr. Robinson's statement seemed to receive relatively little scrutiny. This was especially surprising once Dets. Boudreau and Foley interrogated Mr. Day. According to a 02/07/1992 Supplemental Report, when Mr. Day made his first admission, Mr. Day identified Mr. Robinson as the shooter, and he made no mention of Darren.[190] At that point, investigators were faced with statements from two people who were each implicating one another.[191] After being confronted with inconsistencies between his and Mr. Robinson's account, Mr. Day purportedly admitted to being the shooter. There is no indication in the record provided to me that investigators re-interviewed Mr. Robinson at that time and confronted him with the inconsistencies between Mr. Day's and Mr. Robinson's accounts once they had secured a confession from Mr. Day. This suggests that once they had formed a theory

---

Day was involved in the Irving homicide, and they interrogated in a guilt-presumptive manner, as is consistent with the process of investigator confirmation bias.

[188] Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022); Irving Trial Transcript; Transcript of Motion to Suppress Hearing

[189] 04/13/2021 Deposition of Kenneth Boudreau (Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022, pp. 122-123)

[190] CITY_JAKES 00017-00019; 04/13/2021 Deposition of Kenneth Boudreau (Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022)

[191] In exchange for his testimony against Mr. Jakes, contempt charges against Mr. Robinson were dropped (Plaintiff Jakes 031044). Incentivized witness testimony is a risk factor for false statements and a known, contributing factor to wrongful convictions. For example, data from the Innocence Project indicate that these types of false statements played a role in approximately 17% of DNA exoneration cases (Warden, 2004; Wetmore et al., 2014; https://www.innocenceproject.org/dna-exonerations-in-the-united-states/)

on the case based on Mr. Robinson's account, and they were seeking information that was consistent with that theory – namely an account from Mr. Day that was consistent with Mr. Robinson's story. When faced with contradictory information (e.g., that Mr. Robinson was actively involved as the shooter or was the target), it appears they downplayed, disbelieved, and/or discredited those accounts. If this occurred, it is a hallmark feature of how confirmation bias works.

Similarly, throughout the course of the investigation of the Irving homicide, investigators appeared to place more weight on information that was consistent with their theory of the case (i.e., that Mr. Day killed Mr. Irving) compared to information that was inconsistent, and they appeared less rigorous in their attempt to investigate inconsistencies. For example, detectives knew early on that Ms. Krona Taylor was an eyewitness who reported seeing two people approach Mr. Irving while he was sitting on the steps and one of them shake his hand. She also said she heard a brief verbal exchange about money and work before hearing two gunshots. She then saw Mr. Irving laying face up on the steps.[192] According to a Supplementary Report dated May 17, 1991, Ms. Taylor told investigators that she would be able to identify the people she saw.[193] Importantly, Ms. Taylor knew Mr. Day, and at no point did she ever identify Mr. Day as one of the people she saw that night (who police presumed were the perpetrators, as evidenced by their description of the people as "the offenders" in police reports). This is especially noteworthy because according to Ms. Taylor, she was subjected to a prolonged, coercive interview on May 17, 1991, during which she was deprived of food and drink, and was repeatedly accused of withholding knowledge about the homicide. She said she was scared of and intimidated by the detectives questioning her. Despite this, she did not implicate or identify

---

[192] CITY_DAY 00005-00006; Affidavit of Lennard Erving (07/19/10); The original police report taken a few hours after Mr. Irving's homicide detailing Ms. Taylor's account indicates she reported seeing two black males between the ages of 16 and 20, medium build, dark complexion, between 5'3 and 5'6 (CITY_DAY 00005). Ms. Taylor, however, in her deposition and a sworn affidavit, said she recalled seeing, and reporting to police, one male and one female (Deposition of Krona Taylor, 08/31/2021; Affidavits of Krona Taylor (01/15/07 & 02/05/09). She further stated in her affidavit that she had heard rumors after the murder that Mr. Anderson and a female named Antoinette had killed Jerrod (which would be a form of 'post-event information'), and that she believed that they would fit the description of the people she saw that night. I make no credibility assessments regarding the sex of the individuals Krona saw that night or who she saw that night. It is noteworthy from a memory perspective, however, that she has steadfastly and confidently maintained that Mr. Day was not one of the individuals she saw that night. She testified at her deposition that she was certain that the boy she saw was not Mr. Day because the person she saw had a stockier build than Mr. Day and because she knew the voices she heard did not belong to Mr. Day. If her description of one of the offenders did change over time (i.e., from male to female), this would also not be particularly surprising based on how memory works. Memory is a constructive process, and information that we learn after an event ('post-event information') can be incorporated into our memories. Specifically, when people are exposed to post-event information, that information can be incorporated without intention into our memories, regardless of whether that information is accurate or inaccurate (in the latter case, this is called the 'misinformation effect'). Later it can be difficult to remember the source of a particular piece of that information ('source confusion') (see Lane & Houston, 2021 for an overview of these basic memory principles).

[193] CITY_DAY 00013-00015; Thirty years later in her deposition, Ms. Taylor did not recall telling police that night that she would be able to identify the people she saw (Deposition of Krona Taylor, 08/31/2021). A GPR report dated on 5/17/1991 documenting a second interview indicates that while Ms. Taylor purportedly provided descriptions of the persons she saw (see footnote 192), she did not see their faces (CITY_DAY 00107).

Mr. Day. There is no indication in the record that the fact that the sole eyewitness did not identify Mr. Day caused investigators to reevaluate their theory of the case. In fact, once Mr. Day was identified as a suspect, there is no evidence that Ms. Taylor was ever asked to identify Mr. Day from a photo array or show-up, nor was she re-interviewed and asked about the possibility of Mr. Day being the offender. Moreover, Ms. Taylor was not called to testify at Mr. Day's trial. In her 2007 affidavit, she swore that had she been called to testify that she would have testified that Mr. Day was not the people she saw that night, and she was 100% sure that Mr. Day did not shoot Mr. Irving.[194]

Another example of what may have been confirmation bias affecting the investigatory process involves a glaring inconsistency between the objective evidence in the case and Mr. Day's statement. Mr. Day told investigators he shot Mr. Irving with a Tec-9 9MM pistol. However, a ballistics report dated August 8, 1991 (six months prior to Mr. Day's interrogation) matched the cartridge casings found at the Irving crime scene to a 9MM caliber Smith & Wesson Model 439 semi-automatic pistol found in the possession of a Mr. Antonio Thomas (who indicated he owned the gun). A copy of that ballistics report was sent to Area 3 Violent Crimes.[195] At some point investigators became aware of this information (we know with certainty that this was a known fact at the time of trial per Det. Boudreau's deposition testimony), and yet there is no indication in the records I have been provided that investigators followed up on this critical discrepancy by, for example, interviewing Mr. Thomas.[196] This lack of attention and downplaying of information that is inconsistent with investigator's theory of the case is a hallmark feature of confirmation bias.

Another example of what might have been confirmation bias driving perception of evidence in this case and investigator behavior involves what seems to have been a lack of concern over the some of the details in Mr. Watson's story, both in terms of content and consistency with Mr. Day's account. For example, Mr. Watson indicated that a 'Darren' and a 'Tennille' were present during the Irving homicide, with Tennille serving as a lookout, yet Mr. Day's account of the homicide itself does not include any mention of Darren or Tennille. Moreover, there is no indication in the record that investigators made a concerted effort to identify and interview either Darren or Tennille to verify Mr. Watson's (or Mr. Day's) account. Had police attempted to locate and speak with Darren Triplett and Tennille Jones (the two people who many people believe were likely the Darren and Tennille being referenced by Mr. Watson), they would have learned that Mr. Watson's account was not possible; both Darren and Tennille were incarcerated at the time of the Irving homicide.[197]

### Individual Risk Factors

Although most of the risk factors present in the case fall under the category of situational risk factors, there is one individual vulnerability, namely *youth*, that is relevant in this case.

---

[194] Deposition of Krona Taylor (08/31/2021); Affidavits of Krona Taylor (01/15/07 & 02/05/09)
[195] Crime Laboratory Report Firearm (08/08/1991); Exhibit 13 of Deposition of Kenneth Boudreau (12/01/2022); Detective John Griffin's Supplementary Report (07/04/1991)
[196] Deposition of Kenneth Boudreau (12/01/2022)
[197] 04/13/2021 Deposition of Kenneth Boudreau (Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022); Affidavit of Tennille Jones, 02/13/2009); Affidavit of Darren Triplett, 07/17/2007); Tennille Jones JV Records 000001-000127; Darren Tripplet's IDOC Record; Officer Defendants' Responses to Plaintiff's First Set of Requests for Admission; Tennille Jones Arrest Report

Although neither Mr. Day nor Mr. Watson were legal juveniles, both Mr. Day and Mr. Watson were only 18 years old at the time of their interrogations (and neither had graduated from high school).[198] Moreover, the statement that appeared to be a catalyst for a chain of events that eventually led to Mr. Day's interrogation about the Garcia and Irving homicides was taken by 15-year-old Anthony Jakes. As discussed in Section V of this report, younger people (including adolescents and young adults) are over-represented amongst known false confessors, and areas of the brain that are responsible for decision-making, judgement, and risk assessment do not fully develop until the early twenties.[199] Thus, both Mr. Day's and Mr. Watson's status as young adults represent a vulnerability that increases the likelihood that they would provide false statements.

### Situational Risk Factors

According to accounts by Mr. Day and Mr. Watson, numerous situational risk factors were present in this case that are associated with a higher likelihood of eliciting a false statement.

***Prolonged custody, isolation, and interrogation.*** There is no clear record of what time Mr. Watson (and Mr. Edward Robinson) were transported to Area 3 on January 20, 1992. We know with certainty that Mr. Watson was in custody by 5:15pm because he was placed under arrest at that time by Dets. Halloran, Boudreau, Ball and Anderson on an aggravated battery with a firearm charge.[200] We also know that his signed statement recorded by ASA Noonan was taken at 11:30pm (it is unclear whether that was the start or stop time of the statement being taken).[201] At a bare minimum, Mr. Watson experienced 6 hours and 15 minutes of combined custody and interrogation time.[202] Mr. Watson wrote in his signed affidavit that "Boudreau rehearsed the story with me for hours at the police station," and in his deposition said he thought he was in the interrogation room for up to 7 hours.[203]

Mr. Day was arrested at his friend Mr. Kwame Tate's home at approximately 10:00am on February 4, 1992.[204] ASA Jason Danielian testified that he began questioning Mr. Day at 4:30pm and was still writing up the written statement at 6:45pm. At a minimum then, this suggests at least 8 hours and 45 minutes of combined custody, isolation, and interrogation.[205] Mr. Day testified that active questioning happened for at a minimum 3 hours, but possibly more than 4

---

[198] Arnold Day's Trial Testimony (1993); CITY_JAKES 00178-00181
[199] Johnson et al. (2009)
[200] CITY_DAY 00087
[201] CITY_DAY 00080-CITY_DAY 00083
[202] Mr. Edward Robinson swore in his affidavit that he and Mr. Watson were picked up form the Cook County Jail around dawn and returned around 7 or 8pm that evening, raising the possibility was the period of custody and interrogation was greater than 6 hours and 15 minutes (Affidavits of Edward Robinson (04/23/09 & 04/6/2009). In his 2021 deposition, Mr. Watson estimated that he was first picked up at the Cook County Jail between 9:30 and 10:30am. He believes he was in the bullpen for about an hour before being placed in some lineups, and then was placed in the bullpen again for some period of time before he was brought to an interview room (Deposition of Ralph Watson, 12/07/2021).
[203] Affidavit of Ralph Watson (06/29/2007); Deposition of Ralph Watson (12/07/2021)
[204] CITY_JAKES 00017-00019; Mr. Day estimated his arrest occurred earlier, at approximately 8:30am (Deposition of Arnold Day, 03/04/2008).
[205] Irving Trial Transcript

hours.[206] Given the length of custody and interrogation, both Mr. Day and Mr. Watson were at heightened risk for providing false statements, particularly if you credit their accounts of other coercive techniques being used such as physical abuse (Mr. Day) and explicit threats and promises (Mr. Watson).

***Physical abuse/threats of physical harm/physical discomfort/deprivation of basic necessities.*** Mr. Day asserts that he experienced physical abuse, threats of physical harm, physical discomfort, and deprivation of basic necessities throughout his custody and interrogation. When Mr. Day was located at Mr. Tate's home on the morning of the arrest, he was found hiding under a mattress in the basement. He was unarmed and dressed only in his boxer shorts.[207] According to Mr. Day, Tactical Officer Jude Evans flipped the mattress up and stomped Mr. Day in the back of the head.[208] Mr. Day also says that at one point during his interrogation Det. Foley yelled at him, slammed his hand on the desk, grabbed Mr. Day, shoved him against the wall, and grabbed him by the neck/choked him (while Mr. Day was handcuffed to a ring on the wall). He said that as Det. Foley did this, he was telling him that he knew Mr. Day had killed Mr. Irving, and that if Mr. Day did not cooperate, Det. Foley would throw him out of the window, and no one would tell on Det. Foley. Mr. Day said that Det. Boudreau witnessed the abuse and threats and did not intervene.[209] It also appears that Mr. Day was not well fed during his interrogation. At best, he was provided with soda, oranges, and some Oreo cookies in an 8 hour and 45-minute time period, although Mr. Day disputes that he was provided the oranges.[210] Moreover, according to Mr. Day, he was handcuffed to a ring on the wall except for when he was interviewed by ASA Danielian, raising the concern that physical discomfort was a factor as well.

There is no dispute that physical abuse and threats of violence can cause false confessions. As previously discussed, these tactics are illegal not only because of voluntariness concerns but also because of concerns that they will lead to unreliable statements. Police training

---

[206] Deposition of Arnold Day (03/04/2008)

[207] Deposition of Arnold Day (03/04/2008); Deposition of Jude Evans (06/22/2022)

[208] Irving Trial Transcript; OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022)

[209] Irving Trial Transcript; OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Depositions of Arnold Day (03/04/2008 & 12/15/2022); Mr. Day's allegations of abuse/torture were found to be credible by the TIRC. As rationale for the decision, they cited that: 1) Mr. Day was acquitted of the Garcia homicide, which casts doubt on the reliability of his confession in that homicide which was taken under the same circumstances and at the same time as his confession to the Irving homicide; 2) Mr. Day has consistently claimed he was tortured and this confession was false since 1993; 3) Mr. Watson recanted his statement prior to Mr. Day's trial and was not willing to testify at trial; 4) Ms. Taylor stated she knew Mr. Day, and he was not one of the people she saw approach Mr. Irving that night; 5) there were inconsistences between Mr. Day's confession and the physical evidence; and 6) practice and pattern evidence, noting "there exists, for both Detective Boudreau and Detective Foley, a substantial body of evidence suggesting that the officers may have engaged in systematic conduct aimed at obtaining confessions through coercion….Numerous individuals have claimed that Detective Boudreau used physical force and other improper interrogation measures to obtain confessions….Detective Foley has been the subject of many complaints of police misconduct." (Illinois Torture Inquiry and Relief Commission Report, 01/18/17).

[210] CITY_DAY 00076-00079; Mr. Day testified he did not eat the Oreos because they contained animal shortening (Deposition of Arnold Day; 03/04/2008)

manuals emphatically caution against the use of these tactics and recognize that even a brief interrogation that involves physical abuse can lead to a coerced and/or unreliable statement.[211] Physical pain and discomfort leads to myopic thinking, with a focus on our short-term needs as opposed to long-term outcomes. To the extent that Mr. Day experienced physical abuse, threats of physical harm, physical discomfort, and/or deprivation of basic necessities, that would have placed him at dramatically high risk for providing a false confession – and Mr. Day himself directly attributes his decision to sign what he contends is a false confession to the physical abuse he says he experienced.[212]

> ***Guilt-presumptive approach: Direct positive confrontation, shutting down denials, and poor questioning techniques***. Unfortunately, we do not have an objective record of what occurred during Mr. Watson's and Mr. Day's interrogations. The questioning sessions were not recorded, and to my knowledge, no one chose to take and/or keep detailed notes of exactly what was said and by whom.[213] As such, there is no objective, comprehensive, and contemporaneous record of the hours of questioning and interview/interrogation techniques that ultimately led to Mr. Day's and Mr. Watson's statements.

> However, according to Mr. Day's description of what occurred, Dets. Boudreau and Foley used a guilt-presumptive, accusatorial interrogation approach (and at least in the case of Det. Boudreau, likely consistent with his Reid training),[214] which included the use of direct positive confrontation, shutting down denials, and poor questioning techniques. More specifically, Mr. Day said that Dets. Boudreau and Foley repeatedly told him that they knew Mr. Day had killed Mr. Irving (including while Det. Foley was physically assaulting him) and refused to believe his protestations of innocence. With respect to poor questioning strategies, Mr. Day said that the details and narrative contained in the written statement he signed were suggested to him throughout the course of the interrogation, by detectives confronting him with their theory of the case, informing him that Mr. Watson had named him as the murderer and showing him Mr. Watson's statement, and through leading and suggestive questions.[215] Detective Boudreau admitted at trial that after Mr. Day denied any knowledge of the Irving homicide, he showed Mr. Day Mr. Watson's statement.[216] Mr. Watson also described Dets. Boudreau and Halloran refusing to believe his denials. Specifically, he said that in response to denying any knowledge of the Irving homicide, Det. Boudreau threatened to charge him with a stack of unsolved robberies. Mr. Watson also described an extremely suggestive questioning process in which Det. Boudreau told him specifically what details to say, "including who was

---

[211] Inbau et al. (2001, 2013); Leo (2008)

[212] Irving Trial Transcript; OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022)

[213] Oddly enough, even the type of reports (a General Progress Report) we would typically expect to see generally documenting what occurred during an interview were missing with respect to the Irving homicide. Det. Boudreau could not explain why such GPRs do not exist and indicated it was troubling that he did not see any GPRs in the case file (Deposition of Kenneth Boudreau, 12/01/2022).

[214] Deposition of Kenneth Boudreau in *Hood v. City of Chicago, et al.*, No. 16-cv-1970 (11/30/2017)

[215] Irving Trial Transcript; OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022); Irving Trial Transcript; Transcript of Motion to Suppress Hearing

[216] Trial Testimony of Kenneth Boudreau (1994)

there, what kind of gun was used, and where it took place,"[217] and showed him a crime scene photo of Irving's bloody body.[218]

Recall that a guilt-presumptive approach to interrogation that involves direct positive confrontation and shutting down denials creates anxiety and a sense of hopelessness that there is no way out of the interrogation situation other than to cooperate by providing an incriminating witness or confession statement, even for innocent persons. Furthermore, one of the primary concerns surrounding the use of leading/suggestive questions and statements is that (either intentionally or unwittingly) investigators may contaminate a person's statement by communicating details about the crime or investigators' theory of the case to the suspect. If such problematic techniques were used during Mr. Watson's and Mr. Day's interrogations, it makes it difficult for factfinders to determine whether the details provided in their statement were present because they possessed actual guilty knowledge or because those details were simply a product of contamination and investigator influence during the questioning. As a result, the probative value of the inclusion of such details in their statements is weak at best.

***Presentation of false/unreliable evidence.*** Although legally permissible under most circumstances,[219] the presentation of false evidence unequivocally increases the risk of eliciting a false statement from an innocent person or a person that lacks guilty knowledge. It is especially pernicious when paired with other problematic techniques, such as implying leniency in exchange for a confession. Mr. Watson testified that Det. Boudreau told him that they knew he, Mr. Anderson, and Mr. Day had something to do with Mr. Irving's homicide, and that all his people were telling Det. Boudreau that Mr. Watson had something to do with it.[220] Det. Boudreau testified in his 2022 deposition that he had no information prior to his interview of Mr. Watson that Mr. Watson had any knowledge of the Irving homicide.[221] Therefore, if Det. Boudreau told Mr. Watson that other people had implicated him, that would constitute the presentation of false evidence.

Based on my review of the case materials, Dets. Boudreau and Foley confronted Mr. Day with Mr. Watson's statement with respect to the Irving homicide,[222] and with Mr. Jakes' and another "witness" statement (presumably Mr. Robinson) with respect to the Garcia homicide. In his testimony at his Motion to Suppress hearing, Mr. Day testified that Detective Evans told him that they knew he did it because they had multiple people saying he did it.[223] If Mr. Robinson's, Mr. Jakes', and/or Mr. Watson's statement were elicited via problematic techniques or under problematic circumstances – and therefore were likely to be unreliable - then confronting Mr. Day with these statements during his interrogation may have constituted the functional equivalent of the presentation of false evidence.

***Threats and promises (explicit and implied).*** Explicit and implicit threats of harsher punishment for continued denial and explicit and implicit promises or implications of leniency or

---

[217] Affidavit of Ralph Watson (06/29/2007); Deposition of Ralph Watson (12/07/2021); Ralph Watson Statement to Prosecutor (08/12/1992); Ralph Watson Statement to Defense (12/15/1992)
[218] Deposition of Ralph Watson (12/07/2021)
[219] Frazier v. Cupp (1969); Leo (2008)
[220] Deposition of Ralph Watson (12/07/2021)
[221] Deposition of Kenneth Boudreau (12/01/22)
[222] Testimony of Kenneth Boudreau (1994)
[223] Transcript of Motion to Suppress Hearing

a benefit in exchange for an incriminating statement is a significant and powerful risk factor for eliciting false confessions/statements.[224] Threats and promises are often presented in concert (e.g., if you continue to deny, things will be much worse for you [threat], but if you tell us the truth, you can help yourself out [promise]). Mr. Watson has consistently maintained since before Mr. Day's trial that he provided a false statement because of explicit and implicit promises made to him by Dets. Boudreau and Halloran. He says that Det. Boudreau threatened to charge him with a stack of unsolved armed robberies and that he would never see the streets again if he did not implicate Mr. Day in the Irving homicide. In letters he wrote to Det. Boudreau in 1992, he referenced Det. Boudreau telling him during his interrogation that Det. Boudreau would help him if he signed the statement, even though he had nothing to do with the incident. In his 2021 deposition, Mr. Watson said Det. Boudreau told him that he if wanted to help himself, then Mr. Watson needed to tell him that he had something to do with the murder; if not, Det. Boudreau could and would charge him with more cases. Mr. Watson also said that Det. Boudreau's partner that day (who he refers to as Richard but according to Det. Boudreau was Det. Halloran) repeatedly told him to help himself, and that Det. Boudreau could help him by talking to the right people. If Dets. Boudreau and Halloran used these tactics, they are clear-cut examples of implicit threats and promises as well as direct threats and promises (and courts have generally excluded confessions elicited via directs threats and promises because of concerns that they may result in coerced and/or false confessions).[225] In the end, from a psychological perspective, it does not matter if the promises/threats were implied or direct – both would have increased the likelihood of a false statement from Mr. Watson if he came to believe he would receive leniency in exchange for a confession (or harsher punishment if he continued to deny). According to Mr. Watson, this is precisely what occurred. Mr. Watson testified that he understood what they were telling him to mean that if he did not provide the statement that he wanted, he would receive additional charges, and if he did cooperate, he would receive leniency in the form of fewer charges and Det. Boudreau helping him. In short, according to Mr. Watson, he took what he perceived to be a deal that was in his best interest in exchange for implicating Mr. Day in the Irving homicide.

Although threats and promises appeared to be less of an issue during Mr. Day's interrogation, there is at least one indication in the case materials that an implied promises of leniency or benefit may have been communicated to Mr. Day. During the Motion to Suppress hearing, Mr. Day testified that Det. Foley and other officers told him that he helped them in the Irving case and gave them information about guns and drug transactions, they would talk to the judge.[226]

Compliant false confessions and statements are generally provided for some sort of instrumental gain or benefit. That gain or benefit can come in the form of wanting or needing to escape an aversive situation (e.g., prolonged custody and interrogation that involves physical abuse and external pressure) or the belief that you will receive some a reward or benefit (e.g., not being charged, being charged with fewer offenses, receiving a lighter sentence). If Mr. Watson or Mr. Day were subjected to the highly accusatorial interrogation approach they describe, there is every reason to believe they would have been very likely to provide a statement for the instrumental benefit of escaping the interrogation situation and/or and because they came to

---

[224] Horgan et al. (2012); Kassin (2022); Klaver et al. (2008); Luke & Alceste (2020); Russano et al. (2005); Narchet, Meissner & Russano (2011)
[225] e.g., see DiPietro (1993), Grano (1979), Wigmore (1970) & White (2001)
[226] Transcript of Motion to Suppress Hearing

believe they would receive leniency in exchange for a statement. Communicating to an innocent person/witness that the quickest way to end an aversive interrogation and avoid harsher punishment is to provide at statement significantly increases the risk of eliciting a false statement.[227]

## IX. Reliability Analysis

As discussed in Section VII of this report, a post-hoc reliability analysis of a confession or witness statement can assist triers of fact in determining the likely reliability and/or probative value of a given statement. In addition to the framework I provided in Section VII, I offer some examples of issues to consider with respect to Mr. Watson's and Mr. Day's statements within each category of the framework to guide factfinders on the process of how to conduct such an analysis.

### *Accuracy and Completeness of the Narrative*

Factfinders should consider the extent to which Mr. Watson and Mr. Day were able to provide details of the crime consistent with the known, objective evidence in the case.[228] In general, the more consistent the details, the more likely it is the statement is reliable. However, it is critical to keep in mind that consistent details provided are only probative if the presence of those details were not or could not have been a product of contamination. Factfinders should also consider the extent to which Mr. Watson and Mr. Day provided *inconsistent* details, as this would weigh against the reliability of the statement, as well as the extent to which their narratives were complete (i.e., they provided the type and amount of critical details that they presumably should have been able to provide if they were telling the truth to form a relatively complete picture of what occurred).

Mr. Watson's statement included the following details that were consistent with **objective** verified evidence in the case: Mr. Irving was killed shortly after midnight on May 17, 1991, Mr. Irving was killed at 927 W. 54th Street, several gunshots were fired, and Mr. Irving was found with part of his body in the hallway on the ground floor.[229] Importantly, all of these accurate details were either public knowledge and/or known to detectives at the time they questioned Mr. Watson, which means factfinders cannot dismiss the possibility that prior knowledge or contamination was the source of Mr. Watson's knowledge of these details (see Dependent Corroboration section below). One important potential inconsistency between Mr. Watson' statement and the objective known evidence is the inclusion of Darren and Tennille in the Mr. Watson's story. If Darren Triplett and Tennille Jones were the people being referenced in Mr. Watson's account, both were incarcerated at the date of Irving's murder.[230] In terms of

---

[227] Horgan et al. (2012); Kassin et al. (2010); Kassin & McNall (1991); Russano et al. (2005); Luke & Alceste (2020)

[228] Remember that any details that cannot be verified or have only been verified through other potentially problematic means (e.g., a witness statement elicited under conditions that might elicit an unreliable statement) are not useful in a reliability analysis (see section VII).

[229] CITY_DAY 00080-00083

[230] Affidavits of Krona Taylor (01/15/07 & 02/05/09)

[230] Affidavits of Tennille Jones (02/13/2009); Affidavit of Darren Triplett (07/17/2007); Tennille Jones JV Records 000001-000127; Darren Tripplet's IDOC Record; Officer Defendants' Responses to Plaintiff's First Set of Requests for Admission; Tennille Jones Arrest Report

completeness of Mr. Watson's account, Mr. Watson did not provide a number of basic details that would have provided a more complete picture of what occurred that night (and potentially provided dependent corroboration). For example, he did not provide clothing descriptions of any of the people involved (including Mr. Irving), nor did he specify the color or specific make of the guns he purportedly saw Mr. Anderson and Mr. Day carry that night.

Mr. Day's statement included the following details that were consistent with **objective** verified evidence in the case: Mr. Irving was killed at 927 W. 54th Street, Mr. Irving was killed around midnight on May 17, 1991, multiple gunshots were fired, Mr. Irving was shot on the ground floor, and a gun that fired 9MM caliber bullets was likely the murder weapon. Again, all these accurate details were either public knowledge and/or known to detectives when they interrogated Mr. Day, making it impossible to eliminate prior knowledge or contamination as the source of these details (see Dependent Corroboration section below). There are three inconsistencies with the objective evidence of note in Mr. Day's statement. The first is that Mr. Day's statement indicated that he used a Tec-9 9MM to shoot Mr. Irving. However, this appears to be a provably false detail. A 9MM bullet and two 9MM cartridge casings were recovered from the scene of the Irving homicide.[231] According to a Chicago Police Crime Laboratory Report, the cartridge casings were matched to 9MM caliber Smith & Wesson Model 439 semi-automatic pistol that was recovered in the possession of a Mr. Antonio Thomas on July 4, 1991.[232] What is particularly interesting is that Dets. Boudreau and Halloran likely would have been aware that 9MM cartridge casings had been found, but according to Det. Boudreau, he was not aware that the physical evidence from the scene had matched a S&W 439 and not a Tec-9[233] – making the information provided in Mr. Day's statement consistent with their knowledge at the time but *inconsistent* with the objective evidence.

The second inconsistency was noted in the TIRC report. There are several written corrections contained within Mr. Day's statement. Prior to corrections being made, the statement reads that Mr. Day "walked into the front door" before shooting Mr. Irving, and then "ran out of the building." That was changed to Mr. Day "walked up to the front door" and "ran away from the building." Prior to the corrections, the statement was factually inconsistent with the fact that Mr. Irving was found lying over the threshold of the first-floor doorway, with his lower torso extending out over the porch and his upper torso lying in the hallway.[234] If Mr. Irving had been shot when Mr. Day was inside the building, Mr. Irving's entire body would logically have been inside the hallway. Of note, law enforcement officers are taught to intentionally insert mistakes into a written statement so that the error can be corrected and initialed by the subject.[235] These corrections become a compelling argument to judges and juries that the subject was an engaged, active participant in providing the statement.[236] In essence, intentional insertion of errors is a

[231] CITY_JAKES 00137-00140
[232] Crime Laboratory Report Firearm (08/08/1991); Exhibit 13 of Deposition of Kenneth Boudreau (12/01/2022)
[233] 04/13/2021 Deposition of Kenneth Boudreau (Exhibit 1 to Deposition of Kenneth Boudreau, 12/01/2022
[234] Illinois Torture Inquiry and Relief Commission Report in Arnold Day Case (01/18/2017); CITY_DAY 00076-CITY_DAY 00079
[235] Inbau et al. (2001, 2013); Leo (2008); The TIRC report also notes that former prosecutors have confirmed the practice of intentional error corrections to TIRC investigators (Illinois Torture Inquiry and Relief Commission Report in Arnold Day Case (01/18/2017)).
[236] Inbau et al. (2001, 2013)

psychological ploy to make a statement appear voluntary and reliable. Whether the errors included in the written statements in this case were intentional and who initiated those corrections is unclear.[237] However, given this insidious practice, and given that error corrections are commonly found in proven false confession cases,[238] factfinders should proceed with extreme caution when interpreting error corrections as an indicium of reliability and/or voluntariness.[239] A final potential inconsistency involves the gunshot wounds. Dr. Barry Lifschultz testified that the gunshot wound to Mr. Irving's face was likely fired at very close-range or was a contact gunshot wound; however, there was no evidence that the gunshot wound to the neck was fired at close range.[240] Mr. Day does not account for being at these different ranges when he purportedly fired at Mr. Irving.

 In terms of the completeness of Mr. Day's statement, he failed to provide many key details that one might have expected him to be able to provide. For example, although he included in the statement that he and Mr. Anderson decided to rob some Jet Blackstones, Mr. Anderson was not mentioned in the rest of the statement. He does not account for Mr. Anderson's actions or location.[241] He does not describe what he, the victim, or anyone else was wearing that night. He does not describe where he went and what he did after he shot Mr. Irving, nor did he reveal what he purportedly did with the murder weapon. Had any of these details been elicited, they may have served as dependent corroboration or led to independent corroboration.

 While there was some consistency between Ms. Taylor's initial account to police and Mr. Mr. Day's and Mr. Watson's statements on very basic and public facts about the murder[242] (e.g.,

---

[237] Mr. Day testified that he did not initiate the corrections; ASA Danielian testified that Mr. Day did make them (Irving Trial Transcript).

[238] A content analysis of 20 proven false confession cases revealed that 44% of handwritten or typed confessions had one or more error corrections (Appleby et al., 2013).

[239] Another practice that is designed to bolster the credibility of subject statements are what are sometimes referred to as 'cleansing statements' (Leo, 2008; Appleby et al., 2013). At the end of both Mr. Day's confession and Mr. Watson's statement is language indicating that they had been treated well by both police and the ASA, that no threats or promises were made, and in Mr. Day's case, he was provided with basic necessities (such as food and bathroom breaks). On its face, it might appear that the inclusion of such statements increases the likelihood that the statement is reliable; however, once again, caution is warranted. It is not uncommon for this type of language to be deliberately included in written statements as a way to sanitize the interrogation/interview process after the fact in order to make the statement appear more compelling and voluntary to outside observers. In Appleby et al.'s content analysis, 50% of the confessions contained explicit statements that the confession was given voluntarily. It is important to note, at least in false confession cases, that this language is typically inserted only at the end stages of an interrogation, at which point the suspect has already agreed to confess because s/he has come to believe that it is in his or her own best interest (Leo, 2008).

[240] Testimony of Dr. Barry Lifshultz (1994)

[241] Not only does this create a lack of completeness to his account, but it also creates inconsistencies with Mr. Watson's statement as well as Ms. Taylor's statement of what she observed that night.

[242] To a casual observer, it might appear that the general consistencies (e.g., time, location, several shots, decision to rob a Jet Blackstone) between Mr. Watson's statement and Mr. Day's statement would serve as a form of dependent corroboration. However, neither statement meets the criteria of objective independent evidence because the reliability of each of their statements are questionable due to the interrogation approaches that were purportedly used. In addition, none of the details other than the ones already discussed were independently corroborated with objective evidence (e.g., the intention to rob a Jet Blackstone). Mr. Day provided his statement *after* being exposed to Mr. Watson's statement by one of the detectives who took Mr. Watson's statement. Therefore, the fact that Mr. Day provided a statement that

the time and location of the murder, several shots were fired), there were also a number of inconsistencies between Mr. Watson's and Mr. Day's statements and the first account provided by Ms. Taylor.[243] For example, although Ms. Taylor reported that she saw two people approach Mr. Irving, Mr. Day does not mention anyone but himself approaching Mr. Irving. Ms. Taylor reported that Mr. Irving was sitting on the porch when he was approached by the two individuals, whereas Mr. Day said he saw Mr. Irving coming down the stairs from the second floor. Ms. Taylor said she saw one of the individuals shake Mr. Irving's hand before Mr. Irving said "What's up Mo?", and then she heard an exchange about money and work. Notably, she made no mention of seeing a gun or anything else in their hands. Mr. Watson, on the other hand, said that Mr. Anderson walked across the street with his gun pointed at Mr. Irving and said "Low it like you owe it", and then he heard "What's up Mo", "Give me the drugs" and "I don't have it, Little Wop has it."

In sum, although Mr. Watson and Mr. Day provided some details that were generally consistent with objective evidence in the case, we cannot eliminate the possibility that that consistency was a function of contamination by investigators (either verbally or via crime scene photos) or because the details were public knowledge in the community (e.g., via public chatter or the media). In addition, both statements contained inconsistencies with objective evidence and lacked completeness with respect to a number of crime relevant details.

### Dependent Corroboration

Dependent corroboration are details provided by the subject that are consistent with objective evidence that investigators knew to be true at the time of the interview but were withheld from the public. The presence of such non-public details (or "inside information") in a statement weighs toward the likely reliability of that statement, but *only* if their presence cannot be attributed to a contaminated interview process. Factfinders should carefully examine Mr. Day's and Mr. Watson's statements to identify if they provided any non-public details, and if so, determine the likelihood that those non-public details were suggested to them through a suggestive interrogation process.

Many (and perhaps all) of the verifiably accurate details provided by Mr. Watson were in the public realm, including the location and timing of the homicide, that several gunshots were fired, and the positioning of Mr. Irving's body. This is because numerous witnesses were present at the scene. Because of this, public knowledge cannot be eliminated as a potential source of

---

was broadly consistent with Mr. Watson's once he decided to confess is not at all surprising, and the incorporation of consistent details might easily be attributed to contamination. In sum, what appears to be dependent corroboration between Mr. Watson's and Mr. Day's statements on the surface is actually highly likely to be simply an illusion of corroboration. Finally, there are significant number of substantive inconsistencies between Mr. Day's and Mr. Watson's statements (e.g., Mr. Watson say Darren and Tennille were involved, Mr. Day does not include them in his statement; Mr. Watson said that Mr. Irving was on the porch before he was approached, Mr. Day said he was coming down the stairs from the second floor; Mr. Watson said that Mr. Anderson pointed a gun at Mr. Irving, Mr. Day never mentions where Mr. Anderson was or what he was doing when Mr. Day shot Mr. Irving). These notable inconsistencies weigh against any corroborating value of the two statements.

[243] It is reasonable to question the extent to which Ms. Taylor's statement should be considered objective evidence because of the fallibility of eyewitness memory in general. That said, it is included here under the limited assumption that the description she provided within hours of the incident, and not in the context of the accusatorial interview she said she experienced the following day, is more likely to be reliable, and may provide some limited utility in a reliability analysis.

information. However, even if one assumes that Mr. Watson was unaware of these details prior to entering the interview room (and they were in essence 'non-public' to Mr. Watson), they were known to Dets. Boudreau and Halloran at the time of Mr. Watson's interrogation and when his written statement was taken. Therefore, the inclusion of these details in his statement becomes less informative because we cannot eliminate the possibility that contamination occurred, especially given the suggestive nature of the questioning process (including being shown at least one crime scene photo) that Mr. Watson described. In fact, Mr. Watson described being directly told all of these details by detectives; if that occurred, contamination cannot be eliminated as the source of these details, and the presence of those details becomes non-probative with respect to determining the reliability of the statement.[244]

Similarly, the accurate details provided by Mr. Day were either in the public realm (i.e., location, timing, multiple gunshots) or known to detectives at the time of Mr. Day's interrogation (i.e., location, timing, multiple gunshots, 9MM caliber bullets). The only detail that Mr. Day provided that could be objectively verified and was non-public was that a weapon that fires 9MM caliber bullets was apparently used. However, given Mr. Day's description of his interrogation, which included being exposed to and fed all of the details that were included in his written confession statement (which included being exposed to the details of Mr. Watson's statement), factfinders cannot confidently eliminate contamination as the source of that piece of information. Moreover, even though Mr. Day correctly indicated that 9MM bullets were used, his statement that he used a Tec-9 is demonstrably false, and it is noteworthy that a S&W 439 (the actual weapon linked to the cartridge casings) is unlikely to be confused with a Tec-9 pistol based on its physical characteristics.[245]

### Independent Corroboration

Factfinders should consider whether Mr. Watson's and Mr. Day's statements did or did not result in independent corroboration. Independent corroboration occurs when a person provides a detail that was unknown to investigators at the time of the interview, and investigators are subsequently able to find evidence to verify that information. If, for example, Mr. Day had told investigators that he gave the weapon he used to Mr. Antonio Thomas, and that weapon had been subsequently determined to have been found in Mr. Thomas' possession, that would have been strong independent corroboration. Similarly, if investigators had located Darren and Tennille and used diagnostic questioning techniques to elicit uncontaminated corroborating accounts, those statements could have served as independent corroboration. To my knowledge, neither Mr. Watson nor Mr. Day provided a single detail in their statements that led to any independent corroborating evidence; rather there was a notable lack of independent corroboration. No trace of DNA linking either to the murder scene; no forensic evidence found in Mr. Irving's or Mr. Tate's home; no uncontaminated identification by Ms. Taylor. Beyond the details that were in the public realm or were known to investigators at the time of questioning, all of the details provided by Mr. Watson (e.g., what Mr. Day, Mr. Anderson, and Mr. Irving purportedly said; Darren and Tennille's involvement) and Mr. Day (e.g., that Mr. Irving came

---

[244] Affidavit of Ralph Watson (06/29/2007); Deposition of Ralph Watson (12/07/2021); Ralph Watson Statement to Prosecutor (08/12/1992); Ralph Watson Statement to Defense (12/15/1992)

[245] Irving Trial Transcript; OPS Complaint (Exhibit 5 of Arnold Day Deposition; 12/15/2022); Depositions of Arnold Day (03/04/2008, 11/17/21 & 12/15/2022); Irving Trial Transcript; Transcript of Motion to Suppress Hearing; Difference between a S&W 439 and a Intratec Tec-9 Pistol

down the stairs; that he heard shots fired as he approached the door) could not or were not independently corroborated, and therefore are not informative with respect to the reliability of their statements.

Taken together, a reliability analysis of both Mr. Watson's and Mr. Day's statements reveals an absence of reliability indicators. The few details they provided that were consistent with the known objective facts/evidence in this case were either in the public domain or were known to police at the time of questioning. Both described questioning sessions where contamination was rampant, rendering what might have been minor bits of possible dependent corroboration meaningless. Mr. Watson and Mr. Day both had verifiably false details in their statements (i.e., for Mr. Watson that Darren and Tennille were involved; for Mr. Day that he used a Tec-9) which weigh strongly against reliability. Moreover, neither Mr. Watson nor Mr. Day provided a single detail that led to any clearly reliable independent corroborating evidence (a pattern symptomatic of false confession cases).

## X. Summary and Conclusion

Investigator accounts differ dramatically from Mr. Day's and Mr. Watson's accounts of their time in custody. It is the purview of the factfinder in this case to determine which version of events to believe. Assuming, however, that Mr. Day's and Mr. Watson's accounts are true, I believe there is evidence of a concerning pattern of investigator confirmation bias that likely began when investigators decided to accept Mr. Robinson's version of events about the Garcia homicide. This led to a series of interviews during which investigators used a guilt-presumptive approach that was likely to elicit information consistent with the theory of the case investigators had developed. The two incriminating statements directly relevant to the Irving homicide were provided by two 18-year-olds, who experienced a combined period of custody, isolation, and detention that heightened the risk of providing false statements. Mr. Watson and Mr. Day describe interrogation tactics that can cause false statements including physical abuse (Mr. Day), threats of physical harm (Mr. Day), and deprivation of food (Mr. Day), presentation of false evidence (Mr. Day and Mr. Watson), and explicit and implied threats and promises (Mr. Day and Mr. Watson). Furthermore, both reported being exposed to and fed crime-relevant details through a highly leading and suggestive questioning process.

When evaluating the likely reliability of Mr. Watson's statement and Mr. Day's confession, triers of fact should keep in mind that each risk factor does not exist in a vacuum; rather, the effects of the risk factors are cumulative and perhaps multiplicative. The risk factors should be considered with a totality of the circumstance approach in mind. The use of non-diagnostic interview techniques with very young adults, both individually and especially in combination, would have rendered both Mr. Watson's and Mr. Day's statements at great risk of being unreliable. Whenever investigators use techniques to procure a statement that increase the likelihood of a false statement, the probative value of the resulting statement is lessened or even destroyed – and factfinders are left with the difficult challenge of determining whether the statement is true or false and how much weight should be attached to it.

It is my opinion to a reasonable degree of scientific certainty in the field of psychology that the questioning conditions and techniques Mr. Watson and Mr. Day each described could lead an innocent person (or one that lacks guilty knowledge) to provide a false statement in an armed robbery and homicide case. Moreover, a reliability analysis of each statement reveals a

lack of indicators of reliability; the consistent details that were provided were either public knowledge or could have been a product of contamination (and therefore do not provide clear dependent corroboration), both statements were relatively brief/incomplete (despite hours of questioning) and did not contain a substantive number of verifiable details one might expect them to be able to provide, and neither statement led to independent corroboration. Moreover, both statements contained demonstrably false details (a key indicator of unreliability). It is my opinion that statements procured under the conditions described by Mr. Watson and Mr. Day cannot and should not be relied upon to determine Mr. Day's guilt or innocence or Mr. Watson's knowledge (or lack thereof) about the crime.

The opinions expressed in this report are based in part on the case specific materials I have reviewed. Should any new or additional information become available, my opinions about this case may change.

Thank you,

*Melissa Russano*

Melissa B. Russano, Ph.D.[246]

---

[246] My full legal name is Melissa Beth Russano Rodriguez, however, I generally do not use Rodriguez professionally except for legal purposes (Russano is my maiden name, and the name I have established myself under professionally).

**ATTESTATION**

The statements made in this report are true and correct to the best of my knowledge, and I offer these opinions to a reasonable degree of professional certainty. If asked to testify, I could testify consistently with the opinions offered in this report. This report is signed under penalty of perjury pursuant to 28 U.S.C. § 1746.

_6/19/24_
Date

_[signature]_
Signature

## XI. References

Aamodt, M. G., & Custer, H. (2006). Who can best catch a liar? A meta-analysis of individual differences in detecting deception. *Forensic Examiner*, *15,* 6-11.

Abram, K. M., Teplin, L. A., & McClelland, G. M. (2003). Comorbidity of severe psychiatric disorders and substance use disorders among women in jail. *American Journal of Psychiatry, 160,* 1007–1010.

Appleby, S. C., Hasel, L. E., & Kassin, S. M. (2013). Police-induced confessions: An empirical analysis of their content and impact. *Psychology, Crime & Law, 19,* 111-128.

Appleby, S. C., & Kassin, S. M. (2016). When self-report trumps science: Effects of confessions, DNA, and prosecutorial theories on perceptions of guilt. *Psychology, Public Policy, and Law, 22,* 127-140.

Baldwin, J. (1993). Police interview techniques: Establishing truth or proof? *British Journal of Criminology, 33,* 325–352.

Baumeister, R. F., & Leary, M. R. (1996). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin, 117,* 497–529.

Bedau, H. A., & Radelet, M. L. (1987) Miscarriages or justice in potentially capital cases. *Stanford Law Review, 40,* 21-179.

Blagrove, M. (1996). Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied, 2,* 48–59.

Blair, J. P. (2005). A test of the unusual false confession perspective: Using cases of proven false confessions. *Criminal Law Bulletin, 41,* 127-144.

Brandon, S. E., Arthur, J. C., Ray, D. G., Meissner, C. A., Kleinman, S. M., Russano, M. B., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational psychology: A new field to support national security and public safety* (pp. 263-285). Santa Barbara, CA: ACB-CLIO.

Brandon, S. E., & Meissner, C. A. (2023, in press). From research to practice: The High-Value Detainee Interrogation Group. To appear in G. Oxburgh, T. Myklebust, M. Fallon, & M. Hartwig (Eds.), *Interviewing and interrogation: A review of research and practice since World War II.* TOAEP.

Brandon, S. E., Wells, S., & Seale, C. (2018). Science-based interviewing: Information elicitation. *Journal of Investigative Psychology and Offender Profiling, 15,* 133-148.

Brown v. Mississippi, 297 U.S. 278 (1936).

Burke, A. S. (2006). Improving prosecutorial decision making: Some lessons of cognitive science. *William and Mary Law Review, 47,* 1587-1633.

Cialdini, R. B. (2007). *Influence: the psychology of persuasion.* Rev. ed.; 1st Collins Business Essentials ed. New York, Collins.

Clare, I. C. H., & Gudjonsson, G. H. (1995). The vulnerability of suspects with intellectual disabilities during police interviews: A review and experimental study of decision-making. *Mental Handicap Research, 8*, 110-128.

Clark, M. (2018, April 19). *Controversial police interrogation technique that often results in false confessions abandoned by influential training consultant.* Retrieved from https://www.criminallegalnews.org/news/2018/apr/19/controversial-police-interrogation-technique-often-results-false-confessions-abandoned-influential-training-consultant/

Cleary, H. M. D., & Warner, T. C. (2016). Police training in interviewing and interrogation methods: A comparison of techniques used with adult and juvenile suspects. *Law and Human Behavior, 40,* 270-284.

Costanzo, M., & Redlich, A. (2010). Use of physical and psychological force in criminal and military interrogations. In J. Knuttsson, & J. Kuhns (Eds.), *Policing around the world: Police use of force.* Santa Barbara: Praeger Security International.

Darley, J. M., & Fazio, R. H. (1980). Expectancy confirmation processes arising in the social interaction sequence. *American Psychologist, 35*, 867–881.

DeClue, G., & Rogers, C. S. (2015). The Inside Information Checklist (IIC). *The Police Chief*, *82,* 50-56.

DePaulo, B. M., Lindsay, J. L., Malone, B. E., Muhlenbruck, L., Charlton, K. & Cooper, H. (2003). Cues to deception. *Psychological Bulletin, 129,* 74–118.

DiPietro, A. L. (1993). Lies, promises, or threats: The voluntariness of confessions. *FBI Law Enforcement Bulletin, 62,* 27-31.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review, 82,* 891-1007.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification, 56,* 600–616.

Elaad, E., Ginton, A., & Ben-Shakhar, G. (1994). The effects of prior expectations and outcome knowledge on polygraph examiners' decisions. *Journal of Behavioral Decision Making, 7,* 279–292.

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88.

Everington, C., & Fulero, S. (1999). Competence to confess: Measuring understanding and suggestibility of defendants with mental retardation. *Mental Retardation, 37,* 212–220.

Feld, B. C. (2006). Police interrogation of juveniles: An empirical study of policy and practice. *Journal of Criminal Law & Criminology, 97,* 219-316.

Finlay, W., & Lyons, E. (2002). Acquiescence in interviews with people who have mental retardation. *Mental Retardation, 40*, 14-29.

Frazier v. Cupp, 394 U.S. 731 (1969).

Frenda, S. J., Berkowitz, S. R., Loftus, E. F., & Fenn, K. M. (2016). Sleep deprivation and false confessions. *PNAS Proceedings of the National Academy of Sciences of the United States of America, 113*, 2047–2050.

Fulero, S. M., & Everington, C. (1995). Assessing competency to waive Miranda rights in defendants with mental retardation. *Law and Human Behavior, 19*, 533–543.

Fulero, S. M., & Everington, C. (2004). Mental retardation, competency to waive Miranda rights, and false confessions. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 163-179). New York: Kluwer Academic.

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review, 62,* 1051-1119.

Garrett, B. L. (2011). *Convicting the innocent: Where criminal convictions go wrong.* London: Harvard University Press.

Garrett, B. L. (2015). Contaminated confessions revisited. *Virginia Law Review Association, 101,* 395-454.

Goldstein, N., Condie, L., Kalbeitzer, R., Osman, D., & Geier, J. (2003). Juvenile offenders' Miranda rights comprehension and self-reported likelihood of false confessions. *Assessment, 10,* 359–369.

Goldstein, A. M., & Goldstein, N. E. S. (2010). *Evaluating capacity to waive Miranda rights*. New York, NY: Oxford University Press.

Granhag, P. A., & Hartwig, M. (2015). The strategic use of evidence (SUE) technique: A conceptual overview. In P. A. Granhag, A. Vrij, & B. Verschuere (Eds.), *Deception detection: Current challenges and new approaches* (pp. 231–251). Hoboken, NJ: Wiley.

Granhag, P. A., & Strömwall, L. A. (2004). *The detection of deception in forensic contexts.* Cambridge, Cambridge University Press.

Grano, J. D. (1979). Voluntariness, free will, and the law of confessions. *Virginia Law Review, 65,* 859-945.

Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., Lexcen, F., Reppucci, N. D., & Schwartz, R. (2003). Juveniles' competence to stand trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior, 27,* 333–363.

Gross, S. R., Possley, M. J., Roll, K. J., & Stephens, K. H. (2020). Government misconduct and convicting the innocent: The role of prosecutors, police and other law enforcement. *University of Michigan Public Law Research Paper,* 21-003. Available at http://dx.doi.org/10.2139/ssrn.3698845

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook.* Chichester, England: Wiley.

Gudjonsson, G. H. (2010). The psychology of false confessions: A review of the current evidence. In G. D. Lassiter & C. A. Meissner (Eds.) *Police Interrogations and False confessions: Current Research, Practice and Policy Recommendations* (pp. 31-47). Washington, DC: American Psychological Association.

Gudjonsson, G. H. (2018). *The psychology of false confessions: Forty years of science and practice.* Hoboken, New Jersey: John Wiley & Sons, Inc.

Gudjonsson, G. H., & Sigurdsson, J. F. (1999). The Gudjonsson Confession Questionnaire Revised: Factor structure and its relationship with personality. *Personality and Individual Differences, 27*, 953-968.

Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (2006). Custodial interrogation, false confession, and individual differences: A national study among Icelandic youth. *Personality and Individual Differences, 41,* 49-59.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009a). Interrogations and false confessions among adolescents in seven countries in Europe: What background and psychological factors best discriminate between false confessors and non-false confessors? *Psychology, Crime and Law, 15,* 711-728.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009b). False confession among 15- and 16-year olds in compulsory education and their relationship with adverse life events. *Journal of Forensic Psychiatry and Psychology, 20,* 950-963.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D., Asgeirsdottir, B. B., Gonzalez, R.

A., & Young, S. (2016). A national epidemiological study investigating risk factors for police interrogation and false confession among juveniles and young persons. *Social Psychiatry and Psychiatric Epidemiology, 51,* 359-367.

Haney-Caron, E., Goldstein, N. E., & Mesiarik, C. (2018). Self-perceived likelihood of false confession: A comparison of justice-involved juveniles and adults. *Criminal Justice and Behavior, 45,* 1944-1976.

Harrison, Y., & Horne, J. A. (2000). The impact of sleep deprivation on decision making: A review. *Journal of Experimental Psychology: Applied, 6,* 236–249.

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science, 20,* 122–126.

Herrnstein, R. J. (1970). On the law of effect. *Journal of the Experimental Analysis of Behavior, 7,* 243–266.

Herrnstein, R. J., Rachlin, H., & Laibson, D. I. (Eds.). (1997). *The matching law: Papers in psychology and economics.* New York: Russell Sage Foundation.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal and Criminological Psychology, 13*, 357–371.

Honts, C. R., Forrest, K., & Stepanescu, A. (2019). Polygraph examiners unable to discriminate true and false juvenile confessions. *Polygraph & Forensic Credibility Assessment: A Journal of Science and Field Practice, 48,* 1-9.

Honts, C. R., Kassin, S. M., & Craig, R. A. (2014). 'I'd know a false confession if I saw one': A constructive replication with juveniles. *Psychology, Crime & Law, 20,* 695-704.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime and Law, 9*, 1-18.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Ygram Peters, G-J., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime and Law, 12*, 61-75.

Inbau, F. E. (1942). *Lie detection and criminal interrogation*. Baltimore: Williams & Wilkins.

Inbau, F. E., Reid, J., & Buckley J. P. (1986). *Criminal interrogation and confessions* (3rd ed.).

Baltimore: Williams & Wilkins.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal interrogation and confessions* (4th ed.). Gaithersberg, MD: Aspen.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Criminal interrogation and confessions* (5th ed.). Burlington, MA: Jones & Bartlett.

Irving, B. (1980). *Police interrogation. A case study of current practice. Research Studies No 2.* London: HMSO.

Johnson, S. B., Blum, R. W., & Giedd, J. N. Adolescent maturity and the brain: The promise and pitfalls of neuroscience research in adolescent health policy. *Journal of Adolescent Health, 45,* 216-221.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist, 60,* 215–228.

Kassin, S. M. (2007). Expert testimony on the psychology of confessions: A pyramidal model of the relevant science. In E. Borgida & S. Fiske (Eds.), *Psychological Science in Court: Beyond Common Knowledge* (pp. 195-218). Oxford, England: Blackwell Publishing.

Kassin, S. M. (2012). Why confessions trump innocence. *American Psychologist, 67,* 431-445.

Kassin, S. M. (2022). *Duped: Why innocent people confess – and why we believe their confessions*. Landham, MD: Prometheus.

Kassin, S. M., Bogart, D., & Kerner, J. (2012). Confessions that corrupt: Evidence from the DNA exoneration case files. *Psychological Science, 23,* 41–45.

Kassin, S. M., Drizin, S., Grisso, T., Gudjonsson, G., Leo, R., & Redlich, A. (2010). Police induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3-38.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27,* 187–203.

Kassin, S. M., & Gudjonsson, G. H. (2004). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5,* 35–69.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science, 7,* 125–128.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A-M., & La

Fon, D. (2007). Police interviewing and interrogation: A Self-report survey of police practices and beliefs. *Law and Human Behavior, 31,* 381-400.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29,* 211-227.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15,* 233–251.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the ''fundamental difference'' hypothesis. *Law and Human Behavior, 21,* 469–484.

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67–94). Beverly Hills, CA: Sage.

Kelly, C., & Russano, M. B. (in press, 2023). The science of interviewing: How do we know what we know? To appear in G. Oxburgh, T. Myklebust, M. Fallon, & M. Hartwig (Eds.), *Interviewing and interrogation: A review of research and practice since World War II.* TOAEP.

Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13,* 71–88.

Kostelnik, J. O., & Reppucci, N. D. (2009). Reid training and sensitivity to developmental maturity in interrogation: Results from a national survey of police. *Behavioral Sciences & the Law, 27,* 361–379.

Kozinski, W. (2018) The Reid interrogation technique and false confessions: A time for change. *Seattle Journal for Social Justice, 16,* 301-345.]

Lane, S. M., & Houston, K. A. (2021). Understanding eyewitness memory: Theory and applications. New York University Press.

Leo, R. A. (1996). Inside the interrogation room. *Journal of Criminal Law and Criminology, 86,* 266-303.

Leo, R. A. (2004). The third degree and the origins of psychological interrogation in the United

States. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment (pp. 37-84).* New York: Kluwer Academic.

Leo, R. A. (2008). *Police Interrogation and American Justice.* Cambridge, MA: Harvard University Press.

Leo, R. A. & Drizin, S. A. (2010). The three errors: Pathways to false confession and wrongful conviction. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 9-30). Washington, DC: APA.

Leo, R. A., & Ofshe, R. J. (1998). The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation. *Journal of Criminal Law and Criminology, 88*, 429-496.

Liden, M., Grans, M., & Juslin, P. (2018). The presumption of guilt in suspect interrogations: Apprehension as a trigger of confirmation bias and debiasing techniques. *Law and Human Behavior, 42,* 336-354.

Luke, T. J., & Alceste, F. (2020). The mechanisms of minimization: How interrogation tactics suggest lenient sentencing through pragmatic implication. *Law and Human Behavior, 44,* 266-285.

Luke, T. J., & Granhag, P. A. (2022). The shift of strategy (SoS) approach: Using evidence strategically to influence suspects' counter-interrogation strategies. *Psychology, Crime and Law.* Advanced online copy.

Lynumn v. Illinois, 372 U.S. 528 (1963).

Malloy, L. C., Shulman, E. P., & Cauffman, E. (2014). Interrogations, confessions, and guilty pleas among serious adolescent offenders. *Law and Human Behavior,* 38, 181-193.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45.

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!" Investigator bias in judgments of truth and deception. *Law and Human Behavior, 26,* 469–480.

Meissner, C. A., & Kassin, S. M. (2004). "You're guilty, so just confess!" Cognitive and confirmational biases in the interrogation room. In G. D. Lassiter. (Ed.), *Interrogations, confessions, and entrapment* (pp. 85–106). New York: Kluwer Academic.

Meissner, C. A., Redlich, A. D., Michael, S. W., Evans, J. R., Camilletti, C. R., Bhatt, S., &

Brandon, S. (2014). Accusatorial and information-gathering interrogation methods and their effects on true and false confessions: A meta-analytic review. *Journal of Experimental Criminology, 10*, 459-486.

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Meissner, C. A., Surmon-Böhr, F., Oleszkiewicz, S., & Alison, L. J. (2017). Developing an evidence-based perspective on interrogation: A review of the U.S. Government's High-Value Detainee Interrogation Group research program. *Psychology, Public Policy, and Law, 23*(4)*,* 438-457.

Memon, A., Vrij, A., & Bull, R. (2003). Psychology and law: Truthfulness, accuracy and credibility (2nd ed.). Chichester: Wiley.

Meyer, J. R., & Reppucci, N. D. (2007). Police practices and perceptions regarding juvenile interrogation and interrogative suggestibility. *Behavioral Sciences & the Law, 25,* 757–780.

Meyer, R. G., & Youngjohn, J.R. (1991). Effects of feedback and validity expectancy on response in a lie detector interview. *Forensic Reports, 4*, 235-244.

Mitchell, K. J., & Johnson, M. K. (2000). Source monitoring: Attributing mental experiences. In E. Tulving & F. I. M. Craik (Eds.), *The Oxford handbook of memory* (pp. 179–195). New York, NY: Oxford University Press.

Mortimer, A., & Shepherd, E. (1999). Frames of mind: Schemata guiding cognition and conduct in the interviewing of suspected offenders. In A. Memon and R. Bull (Eds), *Handbook of the psychology of interviewing* (p. 293-315). Chichester: Wiley.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Nash, R.A., & Wade, K.A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology, 23,* 624-637.

Nickerson, R. S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology*, *2*, 175–220.

Ofshe, R. J., & Leo, R. A. (1997a). The social psychology of police interrogation: The theory and classification of true and false confessions. *Studies in Law, Politics, and Society, 16,* 189–251.

Ofshe, R. J., & Leo, R. A. (1997b). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review, 74,* 979–1122.

Perillo, J. T., & Kassin, S. M. (2011). Inside interrogation: The lie, the bluff, and false confessions. *Law and Human Behavior, 35*, 327-337.

Perlman, N.B., Ericson, K., Esses, V., & Isaacs, B. (1994). The developmentally handicapped witness: Competency as a function of question format. *Law and Human Behavior, 18*, 171-187.

Perske, R. (2004). Understanding persons with intellectual disabilities in the criminal justice system: Indicators of progress? *Mental Retardation, 42,* 484–487

Perske, R. (2008). False confessions from 53 persons with intellectual disabilities: The list keeps growing. *Intellectual and Developmental Disabilities, 46,* 468-479.

Pilcher, J. J., & Huffcut, A. (1996). Effects of sleep deprivation on performance: A meta-analysis. *Sleep, 19,* 318–326.

Pimental, P. S., Arndorfer, A., & Malloy, L. C. (2015). Take the blame for someone else's wrongdoing: The effects of age and reciprocity. *Law and Human Behavior, 39,* 219-231.

Rachlin, H. (2000). *The science of self-control.* Cambridge, MA: Harvard University Press.

Redlich, A. D. (2007). Double jeopardy in the interrogation room: Young age and mental illness. *American Psychologist, 62,* 609–611.

Redlich, A.D., & Goodman, G.S. (2003). Taking responsibility for an act not committed: The influence of age and suggestibility. *Law and Human Behavior, 27,* 141-156.

Redlich, A. D., Kulish, R., & Steadman, H. J. (2011). Comparing true and false confessions among persons with serious mental illness. *Psychology, Public Policy and Law, 17,* 394-418.

Redlich, A. D., Summers, A., & Hoover, S. (2010). Self-reported false confession and false guilty pleas among offenders with mental illness. *Law and Human Behavior, 34,* 79-90.

Reppucci, N. D., Meyer, J., & Kostelnik, J. (2010). Custodial interrogation of juveniles: Results of a national survey of police. In G. D. Lassiter & C. A. Meissner (Eds.), *Decade of behavior/Science conference grant. Police interrogations and false confessions: Current research, practice, and policy recommendations* (p. 67–80). American Psychological Association.

Reynolds, B. (2006). A review of delay-discounting research with humans: Relations to drug use and gambling. *Behavioural Pharmacology, 17*, 651-667.

Rogers, R., Harrison, K., Hazelwood, L, & Sewell, K. (2007). Knowing and intelligent: A study of Miranda warnings in mentally disordered defendants. *Law & Human Behavior, 31*, 401-418.

Ross, L., & Lepper, M. R. (1980). The perseverance of beliefs: Empirical and normative considerations. In R. Shweder & D. Fiske (Eds.), *New directions for methodology of social and behavioral science: Fallible judgement in behavioral research, Vol. 4* (pp. 17-36). San Francisco: Jossey-Bass.

Russano, M. B., Kelly, C., & Meissner, C. A. (2020). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *The Routledge International Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486.

Schatz, S. J. (2018). Interrogated with intellectual disabilities: The risks of false confessions. *Stanford Law Review, 70,* 643-690.

Shaw, J.A., & Budd, E.D. (1982). Determinants of acquiescence and nay saying of mentally retarded persons. *American Journal of Mental Deficiency, 87*, 108-110.

Sheridan, S. (2011). Excluding coerced witness testimony to protect a criminal defendant's right to due process of law and adequately deter police misconduct. *Fordham Urban Law Journal, 38,* 1221-1265.

Sigurdsson, J. F., & Gudjonsson, G. H. (2001). False confessions: The relative importance of psychological, criminological and substance abuse variables. *Psychology, Crime and Law, 7,* 275–289.

Snyder, M., Tanke, E. D., & Berscheid, E. (1977). Social perception and interpersonal behavior: On the self-fulfilling nature of social stereotypes. *Journal of Personality and Social Psychology, 35*, 656–666.

Sporer, S. L., & Schwandt, B. (2007). Moderators of nonverbal indicators of deception: A meta-analytic synthesis. *Psychology, Public Policy and Law, 13*, 1-34.

Stansbury v. California, 511 U.S. 318 (1994).

Stein v. New York 346 U.S. 156 (1953).

Stewart, J. M., Woody, W. D., & Pulos, S. (2018). The prevalence of false confessions in research studies: A meta-analysis. *Behavioral Sciences and the Law, 36,* 12-31.

Suedfeld, P. (1990). *Psychology and torture.* Washington, DC: Hemisphere.

Sukumar, D., Wade, K. A., & Hodgson, J. S. (2016). Strategic disclosure of evidence: Perspectives from psychology and law. *Psychology, Public Policy, and Law, 22*, 306–313.

Tavris, C., & Aronson, E. (2007). *Mistakes were made (but not by me): Why we justify foolish beliefs, bad decisions and hurtful acts.* New York: Harcourt.

Toglia, M. P., Read, J. D., Ross, D. F., & Lindsay, R. C. L. (2006). *The Handbook of Eyewitness Psychology: Volume I, Memory for Events.* Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers.

Trope, Y. & Liberman, A. (1996). Social hypothesis testing: Cognitive and motivational mechanisms. In E. Higgins & A. Kruglanski (Eds.) *Social psychology: Handbook of basic principles* (p. 239-270). Guilford Press: New York, NY.

Vallano, J. P., Guyll, M., Ditchfield, R., & Slapinski, K. (2022). An experimental manipulation of rapport and moral minimization within a criminal interview. *Psychology, Public Policy, and Law, 28*(4), 515–531.

Viljoen, J., Klaver, J., & Roesch, R. (2005). Legal decisions of preadolescent and adolescent defendants: Predictors of confessions, pleas, communication with attorneys, and appeals. *Law and Human Behavior, 29*, 253–278.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities* (2nd ed.). Chichester: John Wiley and Sons.

Vrij, Mann, & Fisher (2006). An empirical test of the Behaviour Analysis Interview. *Law & Human Behavior, 30,* 329-345.

Wald, M., Ayres, R., Hess, D. W., Schantz, M., & Whitebread, C. H. (1967). Interrogations in New Haven: The impact of Miranda. *The Yale Law Journal, 76,* 1519–1648.

Warden, R. (2004). The snitch system: How incentivized witnesses put 38 innocent Americans on death row. Chicago, IL: Northwestern University School of Law, Center on Wrongful Convictions.

Wetmore, S. A., & Neuschatz, J. S., & Gronlund, S. D. (2014) On the power of secondary confession evidence. *Psychology, Crime & Law, 20*, 339-357.

White, W. S. (2001). *Miranda's waning protections: Police interrogation practices after*

*Dickerson.* Ann Arbor, MI: University of Michigan Press.

Wigmore, J. H. (1970). *Evidence* (Vol. 3) (revised by J. H. Chadbourn). Boston: Little, Brown.

Woody, W. D., & Forrest, K. D. (2020). *Understanding police interrogation*. New York, NY: New York University Press.

Zelle, H., Riggs Roamine, C. L., & Goldstein, N. E. S. (2014). Juveniles' Miranda comprehension: Understanding, appreciation, and totality of circumstances factors. *Law and Human Behavior, 39,* 281-293.

Appendix A

CURRICULUM VITAE

MELISSA BETH RUSSANO

CONTACT INFORMATION

94 Reed Avenue                                    Telephone:  774-254-4792
North Attleboro, MA 02760                         E-mail: mrussano119@gmail.com

EDUCATION

2004            Ph.D. in Psychology
                Florida International University
                Dissertation Topic: *True and False Confessions to an Intentional Act: A Novel Experimental Paradigm*

2001            M.S. in Psychology
                Florida International University
                Thesis Topic: *Close Relationships, Equity Theory, and Forgiveness*

1999            B.A. in Psychology, Minor in Spanish
                University of Virginia
                Graduated with Highest Distinction
                Distinguished Majors Thesis Topic: *Maternal versus Fetal Rights: Substance Use during Pregnancy*

PROFESSIONAL EXPERIENCE

2016 – Present  Professor of Criminal Justice
                School of Justice Studies, Roger Williams University

2010 – 2016     Associate Professor of Criminal Justice
                School of Justice Studies, Roger Williams University

2004 – 2010     Assistant Professor of Criminal Justice
                School of Justice Studies, Roger Williams University

2002 – 2004     Instructor/Lecturer
                Department of Psychology, Florida International University

2000 - 2002     Graduate Research Assistant, Psychology & Law Laboratory, Department of Psychology, Florida International University; NSF Grant: *Investigator bias in identification procedures: Mechanisms and safeguards*; PIs: Margaret Bull Kovera, Ph.D., & Brian L. Cutler, Ph.D.

1999 – 2000     Teaching Assistant; Department of Psychology; Florida International University; Courses: Abnormal Psychology; Attitudes and Social Behavior

GRANTS, AWARDS, & HONORS

2018-2022      U.S. Department of Justice, Federal Bureau of Investigation ($335,713). *Are Some Law Enforcement Interrogation Techniques More Diagnostic than Others?: An Experimental Investigation with a Community Sample* (co-PI with K. Houston at Texas A&M International University).

2017-2021      U.S. Department of Justice, Federal Bureau of Investigation ($594,763). *Training Assessment and Field Validation of Science-Based Interrogation Techniques with Law Enforcement Agencies* (PI with C. Meissner at Iowa State University).

2019-2021      U.S. Department of Justice, Federal Bureau of Investigation ($62,229). *Improving Intelligence Interviewing: A Quasi-Experimental Study with Correctional Investigators* (PI with C. Kelly at St. Joseph's University).

2015-2017      U.S. Department of Justice, Federal Bureau of Investigation ($223,445). *Training of Science-Based Methods of Interrogation: A Follow-Up Analysis* (PI with C. Meissner at Iowa State University).

2015-2017      U.S. Department of Justice, Federal Bureau of Investigation ($108,170). *Interpreter-Facilitated Interrogations: Identifying Strategies for Maximizing Success* (co-PI with K. Houston at Texas A&M International University).

2014-2015      U.S. Department of Justice, Federal Bureau of Investigation ($104,178). *Assessing Accusatorial vs. Informational-Gathering Approaches to HUMINT Collection via an Interpreter* (PI with K. Houston at Texas A&M International University).

2013-2014      U.S. Department of Justice, Federal Bureau of Investigation ($116,240). *Investigating Interpreter-Target Rapport and Interpreter Placement in the HUMINT Context* (co-PI with K. Houston at the University of Texas at El Paso).

2012-2013      U.S. Department of Justice, Federal Bureau of Investigation ($82,279). *Structured Interviews of Experienced Analysts and Linguists* (Principal Investigator).

2011-2012      U.S. Department of Justice, Federal Bureau of Investigation ($55,840). *Structured Interviews of High-Value Detainee Interrogators* (Principal Investigator).

2010 - 2011      U.S. Department of Justice, Federal Bureau of Investigation ($187,776). *Structured Interviews on Interrogative Practices/Efficacy Involving Interrogators across U.S. Military and Federal Agencies* (Principal Investigator).

| 2008 – 2011 | U.S. Department of Defense ($413,359). *Phase 2: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2007 – 2009 | U.S. Department of Defense ($191,390). *Phase 1: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2006 | Roger Williams University Outstanding Woman on Campus |
| 2005 | Roger Williams University Justice System Training & Research Institute ($8,536). *Police interrogation practices: A survey of law enforcement* (co-PI with F. Narchet at the University of New Haven). |
| 2001 | American-Psychology Law Society (Division 41 of APA) Grant-in-Aid ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys, prosecutors, and jurors.* |
| 2001 | Florida International University Graduate Student Association Grant ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys.* |

## PUBLICATIONS

Kelly, C., & Russano, M. B. (in press). The science of interviewing: How do we know what we know? In G. Oxburgh et al (Eds.), *Interviewing and Interrogation: A Review of Research and Practice since World War II.* Torkel Opsahl Academic EPublisher.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., & Stocks, E. L. (2020). Juror perceptions of intoxicated suspects' interrogation-related behaviors. *Criminal Justice & Behavior, 47,* 222-246. doi: 10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2019). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B**.,** Miller, J. C., & Redlich, A. D. (2019). On the road (to admission): Engaging suspects with minimization. *Psychology, Public Policy, and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019).

Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology: A New Field to Support National Security and Public Safety* (pp. 263-285). Santa Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi: 10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend of mine": Investigating the utilization of an interpreter in an investigative interview. *Psychology, Crime and Law, 23,* 413-426. doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatory and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of

investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings.

*Monitor on Psychology, 31(3)*, 7.

<u>CONFERENCE PRESENTATIONS</u>

Russano, M. B., Meissner, C. A., Rothweiler, J. & Jones, M. S. (2023, March). *Training assessment and field validation of a practitioner developed science-based interviewing and interrogation course.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Houston, K. A., & Russano, M. B. (2023, March). *Suspect decision-making and understanding resistance motivations during accusatorial and information-gathering interrogations.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Sparacino, M., Carlson, V., Evans, J. R., Russano, M. B., & Houston. K. (2023, March). *Recall of interpreted interrogations.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Sparacino, M., Carlson, V. Evans, J.R., **Russano, M. B.,** & Houston, K. (2022, June). *The reliability of interpreter memory.* Paper presented at the Global Forensic Justice Center's Virtual 11th Annual Forensic Science Symposium.

Carlson, Victoria. H., Sparacino, M. C. M., Evans, J. R., **Russano, M. B.,** & Houston, K. A. (2022, March). *Interpreters' memories for their interpreted interactions.* Paper presented at the American Psychology-Law Society Conference, Denver, CO.

Houston, K. A., & Russano, M. B. (2020, March). *Modeling and understanding confession decisions in interpreter-facilitated interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Lowder, B., Russano, M. B., Meissner, C. A., & Atkinson, D. (2020, March). *Disparate effects of accusatorial techniques during real-world interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Atkinson, D., Russano, M. B., Meissner, C. A. (2020, March). *Evaluating a science-based interrogation training program using a between-participants design.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B. (2019, November). *Researcher and practitioner collaborations: Lessons learned.* Panel discussion at the 9th Annual High-Value Detainee Interrogation Group Research Symposium, McLean, VA.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2019, March). *Training science-based methods of interrogation: Do training effects persist over time?.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Houston, K. A., & Russano, M. B. (2019, March). *Interpreter-facilitated interrogations:*

*Identifying strategies for maximizing success.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Perez, G., Mindthoff, A., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E.L., Vallano, J. P., & Woody, W. D. (2019, March). *Examining juror demographics and beliefs as predictors of interrogations and confessions perceptions.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B. (2018, October). *What Works Reviews: The Cognitive Interview.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, October). *Does it work? Evaluating a science-based interrogation training program.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., & Russano, M. B. (2018, October). *Interpreter-facilitated interrogations: Strategies for maximizing success.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, March). *Training science-based methods of interrogation to state and local law-enforcement officers: A training evaluation and field validation study.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2018, March). *Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Houston, K. A., & Russano, M. B. (2018, March). *Evaluating advanced methods of interpreter utilization.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Mindthoff, A., Perez, G., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018, March). *Examining jurors' perceptions of interrogations and confessions: Are jurors finally starting to believe that false confessions exist?* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Phillips, E., Meissner, C. A., & Russano, M. B. (2017, July). *What Works? A systematic review of interview and interrogation practices.* Paper presented at the International Investigative Interviewing Research Group Conference, Monterey, CA.

Russano, M. B., Meissner, C. A., Atkinson, D., & Dianiska, R. E. (2017, March).

*Training science-based methods of interrogation with Air Force Office of Special Investigations.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Houston, K. A., Russano, M. B., & Alexander, J. A. (2017, March). *Comparing the effects of an interpreter during accusatorial vs. rapport-based, information gathering interviews.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Meissner, C. A., Russano, M. B., & Atkinson, D. (2017, Jan). *Science- based methods of interrogation: A training evaluation and field assessment.* Paper presented at the Society for Applied Research in Memory & Cognition Conference, Sydney, Australia.

Russano, M. B. (2016, October). *What Works: The Cognitive Interview.* Paper presented at the 6th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Meissner, C. M., & Russano, M. B. (2016, May). *A field validation of the cognitive interview as a science-based approach to suspect interrogations.* Paper presented at the Fishschrift ~ Applied Cognition and the Cognitive Interview: A Conference in Honor of Dr. Ron Fisher, Miami, FL.

Houston, K. A., Russano, M. B., Alexander, J., & Garcia, S. (2016, March). *Assessing accusatorial vs. information-gathering approaches to HUMINT collection via an interpreter.* Paper presented at the American Psychology-Law Society Conference, Atlanta, GA.

Narchet, F. M., Russano, M. B., Yasuhara, K., Newcity, L., & Axelrod, R. (2015, November). *An analysis of modern-day police interrogation manuals.* Paper presented at the American Society of Criminology 2015 Annual Conference, Washington, D.C.

Meissner, C. A., & Russano, M. B. (2015, October). *A training validation and field assessment of science-based methods of interrogation.* Paper presented at the 5th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., Russano, M. B., & Ricks, P. (June, 2015). *What is rapport? Questions of measurement and definition.* Paper presented at the 2015 conference of the Society for Applied Research in Memory and Cognition, Victoria, Canada.

Houston, K. A., Russano, M. B., & Ricks, P. (2015, March). *Interpreter facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the American Psychology-Law Society Conference, San Diego, CA.

Sneyd, D., & Russano, M. B. (2015, March). *Perceptions of revenge porn: The effect of gender, method of transmission, and revenge motivation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. A. (2015, March). *A 360° degree perspective of the interrogative process: Factors associated with a successful interrogation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Houston, K. A., Russano, M. B., & Ricks, E. (2014, October). *Interpreter-facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the 4th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. A. (2014, September). *Effectiveness of interrogation techniques: Perceptions of experienced interrogators, analysts and interpreters.* Poster presented at the 14th Annual Conference of the European Society of Criminology, Prague, Czech Republic.

Russano, M. B., & Narchet, F. M. (2014, March). *Letting them speak: Analyst and interpreter insights on the interview process.* Paper presented at the HIG Research Symposium, *Intelligence Interviewing: From Science to Practice*, Washington, D.C.

Russano, M. B., & Narchet, F. M. (2014, March). *Analysts and HUMINT interrogations: Role and perceptions.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., & Narchet, F. M. (2014, March). *Interpreters and HUMINT interrogations: Perceptions and insights.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., and Narchet, F. M. (2013, October). *Analysts and HUMINT Interrogations: Role and Perceptions.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, October). *Interpreters during HUMINT Interrogations: Perceptions and Insights.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, March). *Interrogation practices and beliefs: Does high-value target experience matter?* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B., Narchet, F. M., Meissner, C., & Kleinman, S. M. (2012, March). *Structured interviews of expert military and intelligence interrogators: Training, rapport & lie detection.* Paper presented at the American Psychology-Law Society Conference, San Juan, Puerto Rico.

Russano, M. B., Narchet, F. M., Meissner, C. & Kleinman, S. M. (2011, November). *systematic study of interrogative practices across U.S. military and federal agencies.* Paper presented at the American Society of Criminology 2011 Annual

Conference, Washington, D.C.

Russano, M. B., Narchet, F. M., & Correira, B. (2011, March). *Effect of crime type, citizenship status, ethnicity and location of interrogation on perceptions of enhanced interrogation.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Fountain, E. N., Schreiber Compo, N., Carlucci, M., & Russano, M. B. (2011, March). *Training to detect deception: Identifying physical signs of cognitive load.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., Russano, M. B. & Horgan, A. J. (2011, March). *The elicitation of guilty knowledge in intelligence interrogation settings: A novel experimental paradigm.* Paper presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., & Russano, M. B. (2010, June). *The effectiveness of inquisitorial and accusatorial interrogation techniques at obtaining true and false confessions and information.* Paper presented at the European Association of Psychology and Law Conference, Gothenburg, Sweden.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2010, March). *"Should I just confess?": The perceived consequences of confessing and confession diagnosticity.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Meissner, C.A., Russano, M. B., & Horgan, A. J. (2010, March). *The diagnostic efficacy of inquisitorial interrogative methods and their corollary benefit for credibility assessment.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Narchet, F. M., & Russano, M. B. (2009, November). *The effect of crime type and citizenship on perceptions of torture.* Paper presented at the American Society of Criminology 2009 Annual Conference, Philadelphia, Pennsylvania.

Horgan, A. J., Russano, M. B., Meissner, C. A., Evans, J. R., & Michael, S. W. (2009, March). *The ironic effects of the perception of consequences on beliefs about confession.* Poster presented at the 2009 American Psychology-Law Society Conference, San Antonio, TX.

Russano, M. B., & Narchet, F. M. (2008, March). *Police officers' beliefs about the interrogation process.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Narchet, F. M., Russano, M. B., & Griffin, J. (2008, March). *The effect of crime type on perceptions of "enhanced" interrogation techniques.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Peterson, E., & Russano, M. B. (2008, March). *The effect of false confession type of juror*

*decision-making.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Russano, M. B., & Narchet, F. M. (2007, September). *The future of research on interrogations and confessions.* Paper presented at Interrogations & Confessions: A Conference Exploring Current Research, Practice and Policy, El Paso, TX.

Russano, M. B. (2007, June). *The psychology of police interrogations.* Paper presented at the 2007 Rhode Island Bar Association's Annual Meeting, Providence, RI.

Russano, M. B., & Narchet, F. M. (2007, March). Police officers' self-reported use of interrogation techniques. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Narchet, F. M., & Russano, M. B. (2007, March). Police officer training and perceptions of false confessions. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Russano, M. B., & Narchet, F. M. (2006, November). *Who's telling the truth? Police officers' perceptions of lying and truth-telling.* Paper presented at the American Society of Criminology 2006 Annual Conference, Los Angeles, CA.

Narchet, F. M., & Russano, M. B. (2006, June). *"Okay, I did it!": Theories of confession.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2006 Annual Conference, Bristol, RI.

Russano, M. B., Shpurik, M., Kassin, S. M., & Berman, G. (2006, March). *An experimental study of defense attorneys' perceptions of interrogations and confessions.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Mitchell, T. L., Russano, M. B., & Narchet, F. M. (2006, March). *The influence of race and crime on legal decision-making.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2006, March). From the hot seat: An interrogation from the perspective of the suspect. Paper presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Russano, M. B., & Narchet, F. M. (2005, June). *The psychology of police interrogations and confessions.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2005 Annual Conference, Bristol, RI.

Russano, M. B., Narchet, F. M., & Meissner, C. A. (2005, March). *Investigating the effects of presenting false evidence on true and false confessions.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. A. (2005, March). *A*

*qualitative analysis of modern day police interrogation manuals.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2005, March). *Modeling the role of investigator bias and interrogation techniques on the likelihood of confession.* Paper presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Russano, M. B., Narchet, F. M., & Meissner, C. M. (2004, November). *The effectiveness of three police interrogation techniques within a novel experimental paradigm.* Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Russano, M. B., Meissner, C.A., & Kassin, S. M. (2004, March). *True and false confessions to an intentional act: The effects of two common police tactics.* Paper presented at the American Psychology-Law Society 2004 Biennial Conference, Scottsdale, Arizona.

Russano, M. B., Meissner, C. A., & Kassin, S. M. (2003, July). *True and false confessions to an intentional act: Preliminary results from a novel paradigm.* Poster presented at the 2003 International Psychology & Law Conference, Edinburgh, Scotland.

Russano, M. B., Dickinson, J. J., Cass, S., Kovera, M. B., & Culter, B. (2002, March). *Testing the effects of lineup administrator knowledge in simultaneous and sequential lineups.* Poster presented at the American Psychology-Law Society 2002 Biennial Conference, Austin, Texas.

Russano, M. B., & Kovera, M. B. (2001, August). *Psychologists' evaluations of valid and flawed psychological science.* Poster presented at the 109th Annual Convention of the American Psychological Association, San Francisco.

Russano, M. B., & Land, D. J. (2000, March). *Maternal versus fetal rights: Substance use by pregnant women.* Poster presented at the 108th Annual Convention of the American Psychological Association, Washington, D.C.

INVITED TALKS/COLLOQUIA

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (July, 2021). Virtual.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2019). Washington, DC.

Roger Williams University School of Law, Roundtable Presentation (March, 2019).

Bristol, RI.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2018). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2017). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2016). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2015). Washington, DC.

Federal Bureau of Investigation, Language Services Division (July, 2014). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2012). Washington, DC.

High-Value Detainee Interrogation Group Research Committee, Federal Bureau of Investigation (February, 2012). Washington, DC.

Rhode Island's Working Group on Electronic Recording of Custodial Interrogations (September, 2011). Providence, RI.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2011). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (March, 2011). Miami, FL.

Rhode Island Senate Judiciary Committee (March, 2007). Providence, RI.

Rhode Island House of Representatives Judiciary Committee (March, 2007). Providence, RI.

Rhode Island Public Defender Conference on False Confessions: Confessions – False & Otherwise: How to Spot and Deal with Them (June, 2006). Providence, RI

Rhode Island House of Representatives Judiciary Committee (March, 2006). Providence, RI.

Rhode Island Senate Judiciary Committee (April, 2006). Providence, RI.

Rhode Island Continuing Legal Education Program for Criminal Defense Attorneys (October, 2005). Providence, RI.

Purchase College (March, 2004)

Westfield State College (March, 2004)

San Francisco State University (February, 2004)

Penn State McKeesport (February, 2004)

TEACHING EXPERIENCE

    Introduction to Psychology
    Introduction to Criminal Justice
    Research Methods in Psychology
    Research in Criminal Justice
    Research Methods in Criminal Justice
    Legal Psychology
    Social Psychology
    Human Behavior in Perspective
    Drugs, Society & Behavior
    Psychology and the Law
    Witnesses, Suspects and Investigative Interviewing [graduate level]
    Psychology and the Legal System [graduate level]
    Survey of Research Methods [graduate level]
    Critical Issues in Criminal Justice [graduate level - team-taught]
    Criminal Justice System Overview [graduate level - team-taught]

DEPARTMENTAL AND UNIVERSITY SERVICE

    RWU Mentor for the Intercultural Leadership Ambassador Program (Fall 2023-Present)
    RWU Academic Integrity Appeals Committee (Spring 2023)
    RWU Academic Appeals Policy Committee (Fall 2022-Present)
    Criminal Justice Living Learning Community Faculty Mentor (Fall 2014-Spring 2019)
    Co-Advisor to the John Jay Society (Fall 2014-Spring 2019)
    RWU Sabbatical Committee (Fall 2020)
    RWUFA Contract Committee (October 2018-October 2019)
    RWU Testing and Tracing Committee (Spring 2020-Summer 2020)
    RWU Human Subjects Review Board (June 2014-June 2018)
    RWUFA Elections Committee (October 2017-October 2018)
    RWU Faculty Association Secretary (October 2015-October 2017)
    RWUFA Executive Committee (October 2015-October 2017)
    RWU External Grants Policy Committee (Fall 2013-Spring 2016)
    RWU Healthcare Advisory Committee (Fall 2012-Spring 2013)
    Advisor to the RWU Paintball Club (Fall 2014-Spring 2015)
    Honors Advisory Council (Fall 2012 – Spring 2013)
    School of Justice Studies Curriculum Committee (Fall 2004 – Spring 2019; Chair – Fall 2007 – Fall 2010)
    School of Justice Studies Academic Standards Committee (Fall 2004 – Spring 2022t; Chair: Fall 2009 - Spring 2011 & Fall 2017 – Spring 2022)
    School of Justice Studies Assistant Dean Search Committee (2017-2018)
    School of Justice Studies Dean Search Committee (2016-2017)

School of Justice Studies School Faculty Review Committee (2015-2016; 2016-2017; 2019-2020)
Faculty Senate Steering Committee (Fall 2012 – Spring 2013)
University Academics Appeals Committee (Fall 2008)
School of Justice Studies Faculty Search Committee (Co-Chair; Fall 2008 – Spring 2009)
RWU Associate Provost Search Committee (Fall 2008)
RWU Student Evaluation of Teaching Ad-Hoc Committee (Spring 2008 – Fall 2008)
Roger Williams 2020: Strategic Planning Taskforce 1 (May 2007 – November 2007)
School of Justice Studies Faculty Search Committee (Fall 2006 – Spring 2007)
Faculty Senate (Fall 2005 – Fall 2008)
Faculty Senate Academic Standards and Polices (August 2008 – Spring 2011)
Faculty Senate Curriculum Committee (Fall 2005 – May 2008)
RWU Academic Technology Committee (Fall 2004 – Spring 2005)

PROFESSIONAL SERVICE

*Law and Human Behavior* Editorial Board (September 2017 – May 2021)
*Behavioral Sciences and the Law* Editorial Board (March 2017 – November 2019)
Student Editorial Board, *Law & Human Behavior* (2001-2002)
Ad-hoc reviewer for *Applied Cognitive Psychology, Applied Psychology in Criminal Justice, Criminal Justice and Behavior, Journal of Applied Research in Memory & Cognition, Journal of Experimental Criminology, Journal of Experimental Psychology: Applied, Law & Human Behavior, Psychological Reports: Perceptual and Motor Skills, Psychology, Crime and Law, Journal of Criminal Justice & Popular Culture, International Journal of Police Science and Management,* Worth Publishers (textbook reviews), SAGE Publications (textbook reviews), *National Science Foundation, Centre for Research and Evidence on Security Threats, Netherlands Foundation for Scientific Research, American Psychology-Law Society Early Career Professional Grants-in-Aid Program*
Program Chair for Interrogations, Confessions and Deception for the 2013 American-Psychology-Law Society Conference in Portland, OR
Ad-hoc reviewer for the American Psychology-Law Society 2002, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 & 2014 conferences
Ad-hoc reviewer for the American Psychological Association 2004 and 2007 Conferences

PROFESSIONAL AFFILIATIONS

American Psychology–Law Society
American Psychological Association
Association for Psychological Science
International Investigative Interviewing Group

Appendix B

**List of Publications**

Kelly, C., & Russano, M. B. (in press). The science of interviewing: How do we know what we know? In G. Oxburgh et al (Eds.), *Interviewing and Interrogation: A Review of Research and Practice since World War II*. Torkel Opsahl Academic EPublisher.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., & Stocks, E. L. (2020).  Juror perceptions of intoxicated suspects' interrogation-related behaviors. *Criminal Justice & Behavior, 47,* 222-246. doi: 10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2019). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B**.**, Miller, J. C., & Redlich, A. D. (2019). On the road (to admission): Engaging suspects with minimization. *Psychology, Public Policy, and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology: A New Field to Support National Security and Public Safety* (pp. 263-285). Santa Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi: 10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend of mine": Investigating the utilization of an interpreter in an investigative interview. *Psychology, Crime and Law, 23,* 413-426*.* doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31(3)*, 7.

Appendix C

**Testimony Provided**

*State of New York vs. Claude Bird* (2014) – Trial Testimony
*Carl Chatman vs. City of Chicago, et al.* (2016) – Deposition Testimony
*Commonwealth of Massachusetts v. Gabriel Burgos* (2017) – Pretrial Hearing Testimony
*People of the State of Illinois vs. Dannie Kendrick* (2019) – Trial Testimony
*Cathy Woods vs. City of Reno, et al.* (2019) – Deposition Testimony
*Commonwealth of Massachusetts vs. Ralph Wilson* (2020) – Pretrial Hearing Testimony
*Tyrone Hood vs. City of Chicago, et al.* (2020) – Deposition Testimony
*Adam Gray vs. City of Chicago, et al.* (2020) – Deposition Testimony
*Commonwealth of Massachusetts vs. Kenton Thomas* (2021) – Motion to Suppress Hearing
*Sam Hadaway v. City of Milwaukee et al.* (2023) – Deposition Testimony