**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**THE OFFICER DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
<u>FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

SUMMARY OF THE FACTS ................................................................................... 2

LEGAL STANDARD................................................................................................ 16

ARGUMENT ............................................................................................................. 17

    I.   All Defendants are entitled to summary judgment for any alleged misconduct related to the Garcia homicide. ............................................................................................. 17

        A. Day has no Due Process claim based upon his arrest and prosecution for the Garcia homicide because he was acquitted. .............................................................. 17

        B. All of Day's federal and state law claims related to his interrogation, arrest, and prosecution for the Garcia homicide are time barred. ................................................ 17

    II. Officer Evans Was Not Involved In Day's Questioning At The Police Station And, Therefore, Is s Entitled To Summary Judgment on Counts I and II. ............................... 19

    III. Day's Due Process Fabrication Claims in Count III Fail As A Matter Of Law. ........ 21

        A.  Day has no cognizable due process witness coercion claim............................... 21

        B. . Officer Evans and Det. McWeeny are entitled to summary judgment on Count III with respect to Day's claim that his confession was fabricated because they were not personally involved in Day's interviews and could not have known the confessions were false.................................................................................................................... 23

        C.  Plaintiffs cannot maintain a §1983 claim based on the alleged fabrication of Watson's statement or Det. Boudreau's trial testimony regarding Watson. ............. 24

        D.  Day's due process claim based on the alleged fabrication of Jakes' statement implicating Day in the Garcia homicide fails as a matter of law. ............................. 25

        E.  Day's due process claim based on allegedly fabricated police reports fails as a matter of law........................................................................................................... 26

    IV. Day's *Brady* Claims In Count III Fail As A Matter Of Law Because There Is No Evidence That Any Defendant Concealed Exculpatory Evidence. .................................. 27

        A. Day has no cognizable *Brady* claim for failing to disclose that evidence was allegedly fabricated or coerced................................................................................ 28

        B. Each of Day's *Brady* claims fail. ........................................................................ 29

            1.   There is no viable *Brady* claim based on allegedly "missing" notes regarding Det. McWeeny's interview of Krona Taylor. ............................. 29

            2.   There is no viable *Brady* claim based on Watson's statement. .................. 31

            3.   Day's *Brady* claim based on the alleged suppression of information regarding alternative suspects Spook and Mark fails as a matter of law. .. 33

            4.   Day's *Brady* claim based on Edward Robinson's statement fails as a matter of law....................................................................................................... 35

ii

5. Day has no *Brady* claim based on the failure to disclose the alleged coercion of his own confession. ............................................................... 35

6. There is no *Brady* claim based on alleged suppression of generic, non-descript evidence, testimony or "street files." ............................................ 36

V. There Is No Due Process Violation For Failing To Investigate Or Follow Up On Other Leads. .............................................................................................................................. 37

VI. Officer Evans Is Entitled To Summary Judgment On Plaintiff's State Law Malicious Prosecution Claim In Count VII. ......................................................................................... 38

VII. All Defendants Are Entitled To Summary Judgment On Count IV Because Day Cannot Establish That He Was Seized And He Does Not Have Standing To Bring A Claim For Unlawful Pretrial Detention Under The Fourth Amendment. ......................... 39

VIII. There Is No Evidence To Support Day's Conspiracy Or Failure To Intervene Claim. 41

A. Officer Evans and Det. McWeeny are entitled to summary judgment on Day's federal and state law claim for conspiracy claims in Counts VI and IX............ 41

B. The Failure To Intervene Claim In Count V Is Not Cognizable And Even It If Was, It Fails Against Officer Evans Because There Is No Evidence To Support A Failure To Intervene Claim Against Him. ...................................................... 43

VII. Day's IIED Claim In Count VIII Fails As A Matter Of Law. ....................................... 44

CONCLUSION ........................................................................................................................ 45

# CASES

*Accord Odogba v. Wisconsin Dept. of Justice*, 22 F. Supp. 3d 895 (E.D. Wis. 2014) ................ 25

*Alexander v. McKinney*, 692 F. 3d 553 (7th Cir. 2012) .................................................... 22

*Anderson v. City of Rockford*, 932 F. 3d 494 (7th Cir. 2019) .......................................... 35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 21

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................................................... 41

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ...................................... passim

*Beaman v. Freesmeyer*, 2019 IL 122654 ........................................................................ 43

*Beauchamp v. City of Noblesville, Ind.*, 320 F. 3d 733 (7th Cir. 2003) .......................... 42

*Bianchi v. McQueen*, 818 F. 3d 309 (7th Cir. 2016) ...................................................... 22

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007) ...................... 46

*Boss v. Pierce,* 263 F.3d 734 (7th Cir. 2001) ................................................................. 32

*Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) ........................................................ 44

*Briscoe v. LaHue*, 460 U.S. 325 (1983) ......................................................................... 30

*Brown*, 2022 WL 4602714 (2022) ................................................................................ 29

*Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009) .......................................................... 25

*Canen v. Chapman*, 847 F.3d at 407 (7th Cir. 2017) ..................................................... 30

*Carmody v. Bd. Of Trs. of Univ. of Ill.*, 893 F.3d 397 (7th Cir. 2018) ........................... 24

*Coghlan v. Beck*, 2013 IL App (1st) 120891 .................................................................. 45

*Cusick v. Gualandri*, 573 F. Supp. 3d 1256 (N.D. Ill. Nov. 22, 2021) ........................... 22

*Davis v. Owens*, 973 F. 2d 574 (7th Cir. 1992) ............................................................. 43

*de Lima Silva v. Wisconsin Department of Corrections*, 917 F.3d 546 (7th Cir. 2019) .............. 25

*Doxtator v. O'Brien*, 39 F. 4th 852 (7th Cir. 2022) ........................................................ 48

*Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603 (7th Cir. 2002) ................................... 24

*Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971 (N.D. Ill. 2013) ................................ 47

*Evans v. City of Chicago*, 434 F. 3d 916 (7th Cir. 2006) ................................................ 23

*Ewell v. Toney*, 853 F.3d 911 (7th Cir. 2017) ............................................................... 44

*Fields v. Wharrie ("Fields II")*, 740 F.3d 1107 (7th Cir. 2014) ............................... 27, 28

*Foster v. Ward*, 182 F. 3d 1177 (10th Cir. 1999) .......................................................... 42

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003) ........................................................... 40

*Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651 (7th Cir. 2010) ................................ 21

*Goudy v. Cummings, et al.*, 922 F.3d (7th Cir. 2019) .................................................... 34

iv

*Haliw v. City of South Elgin*, 2020 WL 1304697 (N.D. Ill. March 3, 2020) ................................ 47

*Harold Hill v. City of Chicago,* 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) ........ 25, 35, 39, 41, 42

*Harper v. Albert,* 400 F.3d 1052 (7th Cir. 2005) ................................................... 48, 49

*Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007) ................................................................. 33

*Hobbs v. Cappelluti*, 899 F. Supp. 2d 738 (N.D. Ill. 2012) ................................................ 48

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ............................................. 47

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022) ................................................................. 30, 41

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012) ...................................................... 21

*Leibich v. Delguidice*, 2022 U.S. Dist. LEXIS 53167 (N.D. Ill. Mar. 24, 2022) ...................... 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) .......... 45

*Manuel v. City of Joliet, Ill*. ("*Manuel I*"), 137 S. Ct. 911 (2017) ............................... 23

*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102 (1999) ................................... 46

*McDonald v. Village of Winnetka*, 371 F.3d 992 (7th Cir. 2004) ....................................... 21

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) .......................................... passim

*Morris v. City of Rockford*, 2022 U.S. Dist. LEXIS 187306 (N.D. Ill. Oct. 13, 2022) ............... 23

*Mosley v. City of Chicago*, 2009 U.S. Dist. LEXIS 87105 (N.D. Ill. Sept. 22, 2009) ................. 23

*Mwangangi v. Nielsen*, 48 F. 4th 816 (7th Cir. 2022) ...................................................... 48

*Nugent v. Hayes*, 88 F. Supp. 2d 862 (N.D. Ill. Feb. 14, 2000) ........................................ 43

*Patrick v. City of Chicago*, 81 F.4th 730 (7th Cir. 2023) ........................................ 44, 45

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) ........................................ 29, 31

*Pepper v. Vill. of Oak Park*, 430 F.3d 805 (7th Cir. 2005) ...................................... passim

*Petty v. City of Chicago,* 2012 WL 1965416 .................................................. 27, 28, 29

*Phillips v. City of Chicago*, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018) .............................. 28

*Public Finance Corp v. Davis*, 66 Ill.2d 85, 90 (1976) .................................................. 49

*Ramos v. City of Chicago*, 716 F.3d 1013 (7th Cir. 2013) ................................................ 44

*Regains v. City of Chicago*, 918 F. 3d 529 (7th Cir. 2019) ................................................ 22

*Saunders-El v. Rhode*, 778 F.3d 556 (7th Cir. 2015) .................................................. 37, 40

*Savory v. Cannon*, 947 F. 3d 409 (7th Cir. 2020) ........................................................ 23

*Savory v. Lyons*, 469 F. 3d 667 (7th Cir. 2006) ........................................................... 23

*Simon v. Northwestern Univ.*, 183 F. Supp. 3d 908 (N.D. Ill. 2016) .................................... 24

*Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2009) ............................................................ 45

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006) ................................. 41

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015) ........................................................ 30

*Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) ........................................................ 21

*Thompson v. Clark*, 596 U.S. 36 (2022) ......................................................................... 44

*Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011) ................................................. 23

*Turner v. Hirschbach Motor Lines*, 854 F.3d 926 (7th Cir. 2017) ............................... 46

*U.S. v. Price,* 418 F.3d 771 (7th Cir. 2005) ......................................................... 35, 39, 42

*U.S. v. Roberts*, 534 F3d 560 (7th Cir. 2008) ................................................................. 41

*U.S. v. Warren,* 454 F.3d 752 (7th Cir. 2006) ...................................................... 35, 39, 42

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) .............................................. 34

*United States v. Warren*, 454 F.3d 752 (7th Cir. 2006) ................................................. 34

*Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011) ....................................................... 24

*Wallace v. City of Chicago*, 440 F. 3d 421 (7th Cir. 2006) ...................................... 40, 41

*Williamson v. Ortiz*, No. 18-cv-2028, 2018 U.S. Dist. LEXIS 134703 (N.D. Ill. Aug. 9, 2018). 23

*Yang v. Hardin,* 37 F.3d 282 (7th Cir. 1994) ................................................................. 48

## STATUTES

42 U.S.C. §1988(a) ........................................................................................................ 22

735 ILCS 5/13-202 ......................................................................................................... 22

745 ILCS 10/8-101 ......................................................................................................... 23

## RULES

Fed. R. Civ. P. 56(a) ...................................................................................................... 21

## INTRODUCTION

This lawsuit arises out of Day's conviction for the 1991 murder of Jerrod Erving. Erving was shot dead near the front entrance of a building at 927 W 54th Street in Chicago on May 17, 1991. (JSOF, ¶¶ 7-9). On February 4, 1992, Day confessed to two separate murders while being questioned by Chicago Police Detectives Ken Boudreau and William Foley at Area 3 Headquarters. (JSOF, ¶¶ 91, 150). One was Erving's and the other was Rafael Garcia, who was killed approximately four months after Erving, on September 16, 1991. (JSOF, ¶¶ 74, 91, 150). In 1993, Day was tried for the Garcia murder but acquitted. (JSOF, ¶ 98). In 1994, however, Day was convicted of the Erving murder after a jury trial and sentenced to 60 years in prison. (JSOF, ¶ 185). In 2018, the convictions were vacated without opposition from the State. (JSOF, ¶ 186). This lawsuit followed.

In this case, Day sued former detectives Dan McWeeny ("Det. McWeeny"), Kenneth Boudreau ("Det. Boudreau"), Michael Kill ("Det. Kill"), William Foley ("Det. Foley") and James Brennan ("Det. Brennan"), and former police officers Anthony Watson, Martin Radtke, and Jude Evans ("Officer Evans").[1] (JSOF, ¶ 5). Day brings §1983 claims for coerced confession under the Fifth and Fourteenth Amendments (Counts I and II), fabrication of evidence and suppression of exculpatory and/or impeachment evidence (Count III), pretrial deprivation under the Fourth Amendment (Count IV), and failure to intervene and conspiracy (Counts V and VI), and state law claims for malicious prosecution, intentional infliction of emotional distress ("IIED") and civil conspiracy (Counts VII, VIII and IX).[2] (*See* Dkt. 1). Although most of Day's lawsuit is based on

---

[1] Det. McWeeny passed away on March 6, 2025, and the parties are in the process of identifying the personal representative of his estate. Dets. Kill, Foley and Brennan died before the initiation of this lawsuit. For ease of reference, this motion and memo of law will refer to McWeeny, Kill, Foley and Brennan instead of their estates.
[2] The *Monell* claims against the City of Chicago have been bifurcated.

his conviction for the Erving murder, some of his claims on his prosecution for the Garcia homicide, even though he was acquitted of that murder.

During the parties' discussions regarding summary judgment pursuant to the Court's standing order, Plaintiff agreed to dismiss Det. Kill, Det. Brennan, Officer Watson, and Officer Radtke with prejudice, and agreed to dismiss Counts I, II, IV, V and VII as to Det. McWeeny with prejudice. The parties filed a Stipulation to Dismiss pursuant to Rule 41 reflecting these concessions by Plaintiff. (*See* Dkt. 255).

The remaining individual defendants (Det. Foley, Det. Boudreau, Det. McWeeny, and Officer Evans) now move for summary judgment as follows:

- On behalf of all remaining Defendants on any claim predicated on misconduct related to the Garcia homicide investigation;

- On behalf of Officer Evans on Day's coerced confession claims in Counts I and II;

- On behalf of all remaining Defendants on the Due Process fabrication and suppression claims in Count III;

- On behalf of Det. Boudreau, Det. Foley and Officer Evans on the Fourth Amendment pretrial detention claim in Count IV;

- On behalf of Officer Evans on the failure to intervene claim in Count V;

- On behalf of Det. McWeeny and Officer Evans on the federal and state law conspiracy claims in Counts VI and IX, respectively;

- On behalf of Officer Evans on the malicious prosecution claim in Count VII; and

- On behalf of Det. McWeeny and Officer Evans on the IIED claim in Count VIII.

## <u>SUMMARY OF THE FACTS</u>

On February 4, 1992, Day confessed to the May 17, 1991, murder of 16-year-old Jet Blackstone gang member, Jerrod Erving, and the September 16, 1991, murder of Rafael Garcia.

(JSOF, ¶¶ 91, 150). Day had been a member of the Blackstone street gang for approximately four years at the time of his arrest. (JSOF, ¶ 3). Day, whose nickname was "Little A", held the rank of "Officer" in the gang. (JSOF, ¶ 4). His responsibility as a Blackstone "Officer" was to enforce orders, handed down by the gang's generals, to kill people for "ratting out or speaking to the police about crimes that other Blackstones committed." (*Id.*) Day would use violence to enforce the gang's rules on anyone in the community if a general ordered him to do so. (*Id.*). According to Day, rival gang members could be shot for selling drugs in Blackstone territory. (*Id.*) Day had known Erving since the "mid '80's" and knew that Erving hung out with Jet Blackstones and may have been one. (*Id.*).

### May 17, 1991 Jerrod Erving <br> is Shot and Killed <br> in the Doorway of 927 W. 54th Street

Shortly after midnight on May 17, 1991, Officer Watson and Officer Radtke responded to a dispatch report of a man shot at 927 West 54th Street.[3] (JSOF, ¶ 7). When they arrived, they saw the lower portion of Erving's torso lying on the ground outside the doorway of 927 W. 54th Street. (JSOF, ¶ 9). A woman named Krona Taylor ("Krona") approached them outside 927 W. 54th Street and spoke to the officers about the shooting for approximately ten minutes. (JSOF, ¶ 10). According to Officers Watson and Radtke, Krona told them that while Erving was sitting on the steps in front of 927 W. 54th Street, two Black males walked past her and shook Erving's hand. (JSOF, ¶ 11). The two Black males had a dark complexion and medium weight, stood 5'3" to 5'6" tall, were 16 to 20 years-old, and both were wearing dark baseball hats; one had on a red silk Chicago Bulls Starter jacket with white lettering on the front; and the other was wearing a black

---

[3] There are two Watsons in this case, Defendant Officer Anthony Watson ("Officer Watson") and witness Ralph Watson ("Watson"). Officer Watson has a limited role and will be referred to as "Officer Watson" herein, to distinguish him from Ralph Watson, who will be referred to as "Watson."

silk Starter jacket. (*Id.*) One of the two Black males stated to Erving, "Did you have any money; any work here" and that Erving replied, "I don't work over here." (*Id.*) Krona said that she then heard two gunshots and found Erving lying face up on the front steps. (*Id.*)

### Initial On-Scene Investigation

Evidence technicians photographed the scene and recovered and inventoried two 9mm fired cartridge casings and 9mm fired bullet. (JSOF, ¶ 15). No firearm was found at the crime scene and no fingerprints suitable for identification were detected on the two fired cartridge casings. (*Id.*)

Detectives James Brennan and Daniel McWeeny were "first watch" detectives assigned to the Erving homicide. (JSOF, ¶ 16). The "first watch" started at midnight and ended at approximately 8:00 a.m. (*Id.*) They arrived on-scene about 15 minutes after Officer Watson and Radtke. (*Id.*) Brennan and McWeeny interviewed Krona at the scene. (JSOF, ¶ 18). She told them that she was on the street at the time of the shooting and could identify the offenders, and she provided the detectives with the same description she had given to Officer Watson and Radtke. (*See* JSOF, ¶¶ 11, 19-20). McWeeny documented his on-scene interview of Krona in his Major Crime Progress Report. (JSOF, ¶¶ 18-19). He turned the report in at 9:00 a.m. and then turned the investigation over to detectives working on the second watch and the third watch who were responsible for conducting further investigation and went home. (JSOF, ¶ 29). The second watch started at 8:00 a.m. and ended at approximately 4:30 p.m. and the third watch started at approximately 4:00 p.m. and ended at midnight. (*Id.*)

### May 17, 1991, 11:00 a.m. - Krona Taylor is questioned during the Second Watch

Later that day, on May 17, 1991, at around 11:00 a.m. during the second watch, Krona was interviewed at the police station by two male homicide detectives. (JSOF, ¶¶ 30-33). She testified

4

in her deposition that the detectives who interviewed her had medium builds but could not provide any description beyond that and would not be able to recognize either detective today.  (JSOF, ¶ 33).   According to Krona, these detectives asked her if she knew who killed Erving and she told them that she did not know.  (JSOF, ¶ 34).  Krona also claims that the detectives said, "we going to keep you in here until you tell us more what we need to know," "screamed" at her and slammed their hands on the desk because they wanted her to "give them more."  (JSOF, ¶¶ 34-35).  Krona testified in her deposition that she understood this to mean that the detectives wanted her to tell them who killed Erving.  (JSOF, ¶ 35).  Krona said that she felt that she was not free to leave and believed that the only way to end the interrogation was to give the detectives names, so she "threw out a couple names to get the detectives off my back, but I did not know the names of the actual offenders." (*Id*.)

### May 18, 1991 – Search for Suspects

When Det. McWeeny returned to work the next day, he received information "probably from a policeman" who had obtained information from an unknown third party about potential suspects "Spook" and "Mark."  (JSOF, ¶ 42).  Det. McWeeny documented this information about Spook and Mark/Marcus in a GPR, which was disclosed to Plaintiff's criminal defense attorney before the criminal trial began.  (*See* JSOF, ¶¶ 47, 23).  Krona testified in her deposition that around 4:00 or 5:00 a.m., on the morning of May 18, 1991, the two unidentified detectives who questioned her earlier drove her to look for the people who shot Erving.  (JSOF, ¶ 57).  Krona picked the area of 56th and Green to drive to and search.  (*Id*.)  Krona testified in her deposition that she was very scared that someone might see her so she stooped down in the car so that no one could see her. (*Id*.)  The detectives dropped Krona off at her home after she was unable to locate either perpetrator.  (*Id*.)

5

Krona testified that after Erving was killed, she was "really scared" of being seen with the police because she "didn't want to be affiliated like [she] was a snitch within the sights of the gangs that was around there" and if she was seen with the police, she was worried that people might think that she "might be a snitch." (JSOF, ¶ 58). She testified that she, "was basically scared because [she] didn't want nothing [sic] to do with the gang" and did not want to be involved in this murder investigation because of "gang stuff going on around there" involving the Blackstones. (*Id.*)

### The Murder Weapon used in the Erving Homicide is Recovered in Connection with a June 1991 Homicide

On June 13, 1991, Lamark Taylor was shot and killed at 1545 W. 63rd Street, in Chicago by Antonio and Andre Thomas. (JSOF, ¶ 63). Police recovered a Smith & Wesson, model PT439 9mm pistol with an obliterated serial number from Antonio Thomas. (*Id.*) On August 8, 1991, the Chicago Police crime laboratory concluded that the two 9mm cartridge casings recovered at the scene of the Erving homicide were fired from the gun recovered from Antonio Thomas. (JSOF, ¶¶ 65, 66). Antonio and Andre Thomas were interviewed by the Cook County State's Attorney's Office on June 10, 1992. (JSOF, ¶ 69). They said they obtained the gun in June 1991 (which was after the Erving homicide) but denied knowledge of Erving's murder. (JSOF, ¶ 71). Day's criminal defense attorney, Stuart Katz, admitted in his deposition that before Day's criminal trial began, he most likely had the firearms report that matched the bullets and shell casings collected at the scene of the Erving homicide to the weapon recovered from Antonio Thomas. He also knew that there was a gun found in another case that matched the shell casings from the Erving homicide. (JSOF, ¶ 72).

## September 16, 1991 - Murder of Rafael Garcia

Shortly after midnight on September 16, 1991, Rafael Garcia was shot and killed in front of the Queens Submarine restaurant at 1206 W. 51st Street. (JSOF, ¶ 74). Dets. Boudreau and Kill were assigned to investigate the Garcia homicide. (JSOF, ¶ 75). Police received an anonymous tip from an employee at the Star Food & Liquors informing them that the shooting was meant for a man named "Snake" who was a passenger in the victim's car at the time of the shooting. (JSOF, ¶ 76). Det. Boudreau knew "Snake" as Gus Robinson from prior encounters in the neighborhood and knew where to find him. (*Id.*) Dets. Boudreau and Kill located Robinson and interviewed him at Area 3. (JSOF, ¶ 78). According to Det. Boudreau, Robinson told him that Anthony Jakes approached him at about 11:50 p.m. on September 15, 1991, outside the Queens Submarine Shop and asked if he would act as a lookout while Jakes, Arnold Day, and "his friend" robbed a man when he came out of the sandwich shop. (JSOF, ¶ 80). At his deposition, Robinson invoked his right to remain silent, including in response to accusations that he was present when Garcia was killed and that he, Jakes, and Day participated in killing Garcia. (JSOF, ¶ 82).

Dets. Boudreau and Kill located Jakes and questioned him about the Garcia murder on September 16, 1991. (JSOF, ¶ 83). At his deposition, Jakes testified that he told Dets. Boudreau and Kill that he did not know anything about the Garcia murder and that Det. Kill then slapped him, knocked him to the floor, kicked him, stomped on his back, burned him with a cigarette, and threatened to push him out the window. (JSOF, ¶ 86). Jakes testified that the detectives then "…just started telling me stuff" about the Garcia murder and, because of this abuse, Jakes gave a statement in which he admitted to being the lookout in the Garcia murder and identified Day as the shooter. (JSOF, ¶¶ 86, 89-90).

On March 9, 1992, Day and Jakes were indicted as co-defendants for First Degree Murder for the murder of Garcia under Case No. 92-CR-5073. (JSOF, ¶ 94). On November 5, 1992, Day's attorney, Stuart Katz, appeared in court on Day's behalf for Jakes' motion to suppress hearing and acknowledged in open court that he was in possession of a copy of co-defendant Jakes' motion to suppress alleging that he was not read *Miranda* warnings and that his confession was obtained because of physical coercion. (JSOF, ¶ 96).

### Ralph Watson's November 1991 Interview at Area 3

On November 29, 1991, Ralph Watson was brought to Area 3 on a writ where he was questioned by Det. Boudreau and his partner, Detective John Halloran, about a series of armed robberies Watson had committed between November 12 and November 29, 1991. (JSOF, ¶ 100). On January 20, 1992, Dets. Boudreau and Halloran picked up Watson at Cook County Jail and brought him to Area 3 to speak to him about an armed robbery investigation. (JSOF, ¶ 102). Det. Boudreau also asked Watson if he had any information regarding several unsolved murders that took place near where Watson had committed the armed robberies, one of which was the Erving murder. (JSOF, ¶¶ 104, 106). According to Det. Boudreau, Watson admitted to being a member of the Blackstone street gang and said that on or about May 14 or 15, a Blackstone general named Nathaniel "G-Nate" Anderson and a Blackstone enforcer named Arnold "Little A" Day robbed the drug house located at 927 W. 54th Street that belonged to a rival gang known as the Jet Blackstones. As a result of this robbery, the Jet Blackstones declared war on the Blackstone Nation. (JSOF, ¶ 113). Watson went on to tell Det. Boudreau that late in the evening of May 16, 1991, he was standing on the corner of 53rd and Aberdeen selling drugs when he saw "G-Nate come up to the corner and pointed to Little A, Darren and Tennille and told them to follow him." (*Id.*) Watson told Det. Boudreau that he followed all of them to the building located at 927 W. 54th Street and

stayed in the background. (*Id*.)  Darren and Tennille acted as lookouts while G-Nate and Day walked across the street.  (*Id*.)  Watson told Det. Boudreau that he heard G-Nate and Day talk to Erving and demand drugs from him, but Erving said he did not have any drugs.  (*Id*.)  At that point Watson stated that he saw both G-Nate and Little A shooting at Erving.  (*Id*.)  According to Watson's deposition testimony, he gave Det. Boudreau this information because Boudreau "soothed him" into it and he thought Det. Boudreau "may have that type of influence [to help him with the armed robberies]."  (JSOF, ¶ 116).  Watson also testified in his deposition that if the Blackstones discovered that he cooperated with the police against any other Blackstone gang member, the gang might kill him.  (JSOF, ¶ 121).  Watson was subsequently interviewed by Cook County Assistant State's Attorney Kevin Noonan ("ASA Noonan"), in Det. Boudreau's presence, and ASA Noonan reduced Watson's account to a handwritten statement signed by Watson. (JSOF, ¶ 117).

### Day Is Arrested On February 4, 1992

On February 4, 1992, at approximately 10:00 a.m., Dets Foley, Officer Evans, and two gang specialists, located Day in the basement of his friend and fellow Blackstone, Kwame Tate's house.  (JSOF, ¶ 130).  Coincidentally, on the same day he was brought in for questioning in the Erving homicide, there was also an outstanding October 1991 warrant for Day's arrest for delivery of a controlled substance.  (JSOF, ¶ 132).  According to Day, Officer Evans came into the basement bedroom, flipped the bed over that Day was hiding under, "stomp[ed] on the back of [his] head", and handcuffed him.  (JSOF, ¶ 133).  Day was transported to Area 3, put into an interview room and handcuffed to the wall by the window.  (JSOF, ¶¶ 134-35).

### Day Is Questioned At Area 3 On February 4, 1992

Day testified at his criminal trial that about five minutes after he arrived at the police station, Officer Evans came into the room with Det. Foley and said that "they knew" he had killed Erving and that "they got people to point me out." (JSOF, ¶ 137). Day said that he told the officers he did not know what they were talking about and was then left alone in the room for "a nice little amount of time." (JSOF, ¶¶ 139, 142). According to Day's criminal trial testimony, Det. Boudreau then came into the room, alone, and began asking him questions about the Erving murder. (JSOF, ¶ 142). Day said that he told Det. Boudreau that he was not involved in the murder, but Det. Boudreau had Watson's statement in his hands and told Day that Watson had told them he was involved in the crime. (*Id.*) Day testified at his deposition that when he was alone with Det. Boudreau in the interrogation room, he was fed all the facts about the Erving homicide that he later "regurgitated" to the Assistant State's Attorney regarding the Erving homicide. (*Id.*)

Cook County Assistant State's Attorney Jason Danielian ("ASA Danielian") arrived at Area 3 at approximately 3:00 p.m. and spoke with Dets. Boudreau and Foley. (JSOF, ¶ 145). He then entered Day's interview room to talk to Day around 4:30 p.m. (JSOF, ¶ 146). According to Day, when ASA Danielian asked about Erving's murder, he told ASA Danielian that he "didn't know what he was talking about." (*Id.*) Day testified at his criminal trial that it seemed as if ASA Danielian "got mad" because ASA Danielian "wouldn't talk to him and then left out the room." (*Id.*) Day testified that when he refused to confess to ASA Danielian, Det. Foley threatened him, grabbed him by the neck, and shoved him against the wall while Det. Boudreau watched. (JSOF, ¶ 147). Det. Foley told Day that he knew Day had killed Erving, that he would throw Day out the window and that nobody would tell on him. (*Id.*) Det. Foley then told Day that he "better cooperate with them." (*Id.*) Although Det. Boudreau never physically abused him, Day claimed

that Det. Boudreau was present for the abuse and did not stop it. (JSOF, ¶ 148). According to

Day, ASA Danielian then reentered the room and asked Day whether he was ready to cooperate.

(JSOF, ¶ 150). Day then gave a statement to ASA Danielian about the Erving murder. (*Id.*)

Murder charges against Day for the Erving homicide were approved on February 4, 1992, by ASA

Nancy Donahoe. (JSOF, ¶ 153). On March 9, 1992, Day was indicted for First Degree Murder

and Attempted Armed Robbery of Jerrod Erving under *People of the State of Illinois v. Arnold

Day*, criminal case no. 92 CR 5074. (*Id.*)

### Ralph Watson Writes Two Letters to Det. Boudreau

While incarcerated at Cook County Jail, Watsonsent Det. Boudreau two handwritten

letters. (JSOF, ¶ 119). One letter states, in part: "…I heard about Mr. Day getting caught. Did

any of my information help in any way?...If what I wrote down on that paper ever get out I will be

killed as soon as I get to the pentienary [sic]. If Larry the one on the case with me find out about

that he will tell one person another person will tell someone on the street and my head will be on

a chopping block. I need help bad Ken…" (*Id.*) The other letter states, in part: "…it seem like

they are going to try to hurt me. I need you to come visit me and talk to me bad because what I

signed might have been my life away…. I heard about Mr. Day getting caught did any of my

information help in any way? Rich told me he is going to help me in any way he could…Ken man

it hard. But you have been more than a friend. Thanks Ken I love you and Rich." (*Id.*) Watson

testified that he wrote the letters to Det. Boudreau because he was concerned that, after going to

court, he may have also been indicted for the Erving murder. (JSOF, ¶ 121). Det. Boudreau

testified in his deposition that he did not recall ever meeting with Watson after January 20, 1992.

(JSOF, ¶ 120).

**Ralph Watson Is Incarcerated At**
**Joliet Correctional Center from May 1992 To February 2004**

Watson was incarcerated at East Joliet Correctional Center ("JCC") in May 1992 and housed in the same gallery as Denardo Triplett ("Triplett"), whom Watson knew from around his neighborhood. (JSOF, ¶ 123). They became cell mates within 4-6 months of Watson's arrival at JCC. (*Id*.) Watson knew that Triplett knew Day. (JSOF, ¶ 124). Watson testified that he told Triplett that he gave a false statement about Day because he did not want Triplett thinking "I wasn't a good Stone." (*Id*.) According to Watson's deposition testimony, Triplett's reaction to hearing that Watson had made a false statement against Day was to say, "Man, man, that's messed up. What you going to do?" (*Id*.) Triplett told Watson "[f]rom now on man, just say that you wasn't there, you didn't do it, because you going to put yourself in something, man, that you don't got nothing to do it." (*Id*.)

**Ralph Watson Recants Identification of Day**

On August 12, 1992, Watson was brought to the courthouse on a writ and interviewed by a prosecutor in the presence of Det. Boudreau at which time he told the prosecutor and Day's defense attorney that he did not witness the Erving murder and that Det. Boudreau provided him with the information that appears in his handwritten statement. (JSOF, ¶¶ 127-28).

**Day Is Tried and Convicted of the Felony**
**Drug Charge From the "No Bail' Arrest Warrant**

On April 12, 1993, Day was found guilty of the drug charge docketed under criminal case no. 91 CR 23002 after a bench trial before Judge Thomas Durkin. (JSOF, ¶154). On September 8, 1993, he was sentenced to seven years in the Illinois Department of Corrections but was given credit for the 586 days served in custody between February 4, 1992, and September 8, 1993, for the drug case under criminal case number 92 CR 23002. (*Id*.). After his conviction of the Erving

homicide, Day's seven-year sentence was ordered to run concurrent with his sentence for the Erving homicide under criminal case number 92 CR 5074. (*Id*.). Day was in custody on case number 91 CR 23002 from February 4, 1992, until the conclusion of his trial for the Erving homicide on June 23, 1994, and his conviction on this drug charge stands today. (*Id*.).

## Garcia Homicide Trial

On September 10, 1993, a jury convicted Jakes of killing Garcia and acquitted Day of all charges related to Garcia's Murder. Day never filed a lawsuit based on his arrest and prosecution for the Garcia murder, but he does try to make claims in this case about that investigation. (JSOF, ¶ 98).

## Trial Evidence About Watson's Statement to Det. Boudreau

Before Day's trial, the State indicated that it intended to elicit testimony that police talked to Watson in the course of their investigation before arresting Day. (JSOF, ¶ 158). Day's attorney, Stuart Katz, moved in *limine* to bar the State from eliciting testimony that detectives spoke with Watson and then proceeded to look for Day, arguing that would imply that Watson identified Day as the offender. (*Id*.) The Court denied Katz's motion, finding that although the State would be precluded from putting in the details of Watson's statement, it would not be precluded from introducing that the detectives talked to someone and then proceeded somewhere after. (*Id*.)

During its opening statement, the State told the jury that during the course of the Erving murder investigation, Det. Boudreau had a conversation with Watson before detectives went looking for Day. (JSOF, ¶ 160). Prosecutors also told the jury that Day confessed after Det. Boudreau showed him Watson's handwritten statement. (*Id*.) Neither Watson's statement nor any details from his statement nor any reports documenting his statement were admitted into evidence or published to the jury. (*See* JSOF, ¶¶ 158, 164).

13

It is also undisputed that neither Watson nor Krona testified at Day's criminal trial, and nothing these individuals told police was introduced at trial. (*See* JSOF, ¶¶ 61, 156-164). Nor were any reports prepared by police admitted into evidence. (JSOF, ¶ 23).

During closing arguments, the State argued, "'[w]e have talked to Ralph Watson.' And [Day] was caught. The police had the goods on him. The game was up. They had him. They confronted him with Ralph Watson, and [Day] gave a statement." (JSOF, ¶ 163). None of the police reports documenting Watson's statements to Det. Boudreau were introduced at trial or published to the jury. (JSOF, ¶ 164). On June 23, 1994, Plaintiff was convicted of first-degree murder and attempted armed robbery. (JSOF, ¶ 185). He was sentenced to 60 years in prison. (*Id*.)

## Krona Taylor Is Contacted After Day's Conviction

Mort Smith, an investigator working on behalf of Day, visited Krona in 2007 and again in 2009 and got her to sign an affidavit each time. (JSOF, ¶ 176). The 2007 and 2009 affidavits are identical except for the language in paragraph 29 of each affidavit. (JSOF, ¶ 176). Paragraph 29 of the 2007 affidavit states: "I took my cousin Lateesha with me the next day when I went to court. When I got up to the courtroom, someone who works there told me that I was a day late **and that they had already gotten Arnold for 60 years**." (JSOF, ¶ 176, emphasis added) Krona Dep., 114:24-115:5). Paragraph 29 in the 2009 affidavit states, "I took my cousin Lateesha with me the next day when I went to court. When I got up to the courtroom, someone who works there told me I was a day late **and that Arnold had already been convicted**." (JSOF, ¶ 176, emphasis added). In both affidavits, Krona said the following: while she was sitting on the stoop of her home with Erving, in front of the doorway he was killed in, she saw two people – a boy and a girl – walking down 54th Street towards her house. (JSOF, ¶ 177). The boy was short, medium-to-heavy-set,

14

dark-skinned, and wearing a red jacket. (*Id*.) The girl was also short and dark-skinned, but she was skinny. (*Id*.) She knew what Little A [Arnold Day] looked like and the boy was not Little A. (*Id*.) There was no one else on the street that night within 3 houses of her house. (*Id*.) As the boy and girl got close, Krona ran upstairs and watched through the open front door. (*Id*.) From where she was, she could hear the boy come up to Jerod [sic] and say 'what's up mo,' 'what you got,' 'you got any money and the girl said 'what's up.'" (*Id*.) About five to six seconds later, Krona heard shots and ran inside her house. (*Id*.) When she came back out, she saw Jerrod's body slumped back in the hallway. (*Id*.) The crime scene was very chaotic, and Krona was very scared. (*Id*.) She spoke with a detective but could not remember the name of the detective. (*Id*.) He asked basic questions like who lived in the house. (*Id*.) Each affidavit states Krona is 100% certain that Arnold Day did not commit this murder. (*Id*.)

Krona testified in her deposition that she never told a police officer that she could identify the offenders. (JSOF, ¶ 184). Instead, she told the police that a boy and a girl were involved in killing Erving, not two males. (*Id*.)

### Edward Robinson's Affidavit

On July 8, 2003, Day sent a letter to inmate Edward Robinson through an intermediary, Monica Jones, who was not in prison in 2003. (JSOF, ¶ 167). The letter asked Robinson to sign an affidavit that Day made for him, stating that Boudreau also tried to convince Robinson to lie about Day's involvement in Erving's murder. (JSOF, ¶ 168). On April 6, 2009, Edward Robinson executed an affidavit stating that he was at Area 3 on January 20, 1992, being questioned by Detectives Boudreau and Halloran about armed robberies and that the detectives asked if he knew anything about the involvement of Arnold Day in the shooting death of Erving. (JSOF, ¶ 170). Robinson averred that he told the detectives that he did not know anything about the shooting death

15

of Erving. (*Id.*) Robinson's affidavit further states that "Detective Boudreau told me that if I assisted in the investigation of Gerrod [sic] Erving's death by identifying Arnold Day as the shooter, he would make the armed robbery charges he had been talking about disappear." (*Id.*) Robinson's affidavit states that he refused to assist police in the Erving homicide investigation and that he was put in a holding cell with Watson to wait for transport back to Cook County jail. (JSOF, ¶ 171). It is undisputed that Robinson did not testify at Day's criminal trial, and no evidence regarding his alleged interactions with Dets. Boudreau and Halloran was introduced at trial. (JSOF, ¶ 173).

### Plaintiff's Conviction Is Vacated and He Is Granted a Certificate of Innocence

On December 18, 2018, Plaintiff's conviction was vacated and, on a motion by the State, the charges against him were dismissed. (JSOF, ¶ 186). On April 4, 2019, Plaintiff was granted a Certificate of Innocence. (JSOF, ¶ 187).

### LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). While the court must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) "that duty does not extend to drawing inferences that are supported only by speculation or conjecture." *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In the end, summary judgment is the "put up or shut up moment in litigation, by which we mean that the non-moving party is required to marshal

and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).

## ARGUMENT

**I.      All Defendants are entitled to summary judgment for any alleged misconduct related to the Garcia homicide.**

### A.      Day has no Due Process claim based upon his arrest and prosecution for the Garcia homicide because he was acquitted.

To the extent any of Day's Due Process claims are based upon his interrogation, arrest, and prosecution for the Garcia homicide, these claims are not cognizable because Day was acquitted of the Garcia homicide.   A plaintiff's acquittal forecloses a due process claim.   *Bianchi v. McQueen*, 818 F. 3d 309, 320 (7th Cir. 2016); *Cusick v. Gualandri*, 573 F. Supp. 3d 1256, 1265 (N.D. Ill. Nov. 22, 2021).   Indeed, "it would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of the trial is to effectuate due process." *Alexander v. McKinney*, 692 F. 3d 553, 557 (7th Cir. 2012) (emphasis in original).   Here, Day was acquitted of the Garcia homicide on September 10, 1993. (JSOF, ¶ 98). Accordingly, Day cannot maintain any due process claims in this lawsuit based on misconduct that allegedly occurred with respect to the Garcia homicide investigation.   *See Cusick*, 573 F. Supp. 3d at 1265-66 (dismissing plaintiff's Fourteenth Amendment due process claims based upon manufacturing false evidence/witness statements and withholding exculpatory information because plaintiff was acquitted at trial).

### B.      All of Day's federal and state law claims related to his interrogation, arrest, and prosecution for the Garcia homicide are time barred.

In addition to being foreclosed by his acquittal of the Garcia homicide, any claim Day is attempting to bring based on his interrogation, arrest, and prosecution for the Garcia homicide is time barred.   To determine the statute of limitations period for §1983 actions, federal courts look

to the applicable limitations period for personal injury cases in the state where the injury occurred. 42 U.S.C. §1988(a); *Regains v. City of Chicago*, 918 F. 3d 529, 533 (7th Cir. 2019).  The statute of limitations for personal injury actions in Illinois is two years, which means it is also two years for federal §1983 claims brought in Illinois. 735 ILCS 5/13-202; *Regains*, 918 F. 3d at 533. Although the limitations period for §1983 claims is based upon state law, federal law determines when such claims begin to accrue.  *Savory v. Lyons*, 469 F. 3d 667, 672 (7th Cir. 2006).  For the state law claims in Counts VII through IX, the statute of limitations is only one year. 745 ILCS 10/8-101; *Mosley v. City of Chicago*, 2009 U.S. Dist. LEXIS 87105, * 30 (N.D. Ill. Sept. 22, 2009) (citing *Evans v. City of Chicago*, 434 F. 3d 916, 934 (7th Cir. 2006) ("Illinois imposes a one-year statute of limitations for tort claims against governmental entities and their employees.").

Day was acquitted of the Garcia homicide on September 10, 1993. (JSOF, ¶ 98).  Therefore, he had at the latest, one year from that date to bring a state law claim and no more than two years from that date to bring any Section 1983 claims based on the Garcia homicide investigation.  *See e.g., Tillman v. Burge*, 813 F. Supp. 2d 946, 969 (N.D. Ill. 2011) (where a conviction rests primarily on a coerced confession, the claim accrues once the prisoner's conviction is formally impugned); *Manuel v. City of Joliet, Ill.* ("*Manuel I*"), 137 S. Ct. 911, 921 (2017) (Fourth Amendment deprivation of liberty claim accrues once the criminal proceedings against the plaintiff have been terminated in his or her favor); *Williamson v. Ortiz*, No. 18-cv-2028, 2018 U.S. Dist. LEXIS 134703, at *7 (N.D. Ill. Aug. 9, 2018); *Savory v. Cannon*, 947 F. 3d 409, 417 (7th Cir. 2020) (fabrication and suppression of evidence claims accrue after the conviction is invalidated).  *Leibich v. Delguidice*, 2022 U.S. Dist. LEXIS 53167, * 16 (N.D. Ill. Mar. 24, 2022) (failure to intervene and conspiracy claims accrue on the same date as the underlying constitutional violation on which they are premised); *Morris v. City of Rockford*, 2022 U.S. Dist. LEXIS 187306, * 10-11 (N.D. Ill.

Oct. 13, 2022) (state law malicious prosecution claim accrues when the criminal proceeding is terminated in the plaintiff's favor and IIED claim accrues when the last injurious act occurred or conduct abated) (citations omitted); *Simon v. Northwestern Univ.*, 183 F. Supp. 3d 908, 919-20 (N.D. Ill. 2016) (claims for conspiracy are governed by the statute of limitations for the underlying tort).

Day did not file this lawsuit until November 5, 2019 (Dkt. 1), approximately 26 years after his acquittal of the Garcia murder. Thus, any claims based on wrongs allegedly committed in the Garcia murder are time-barred, and Day cannot use this lawsuit as an as an end run around the statute of limitations. As such, the remaining Defendant Officers are entitled to summary judgment on all claims in Day's Complaint based on his arrest, interrogation, and prosecution for the Garcia homicide.

## II.     Officer Evans Was Not Involved In Day's Questioning At The Police Station And, Therefore, Is s Entitled To Summary Judgment on Counts I and II.

Counts I and II of Day's Complaint allege that Dets. Boudreau and Foley and Officer Evans forced Day to incriminate himself in the Erving homicide in violation of Day's Fifth and Fourteenth Amendment rights. (Dkt. 1, ¶¶125-127, 141-142). However, the undisputed facts – including Day's admissions in his deposition – establish that Officer Evans had no personal involvement in obtaining Day's confession. Accordingly, Officer Evans is entitled to summary judgment on Counts I and II.

Personal involvement in an alleged constitutional deprivation is a predicate requirement for §1983 liability. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (the individual defendant must have caused or participated in a constitutional deprivation); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011); *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002)). To be held liable under §1983 the individual defendant must have caused or participated

19

in the alleged constitutional deprivation. *Pepper*, 430 F.3d at 810. Here, Day "must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Carmody v. Bd. Of Trs. of Univ. of Ill.*, 893 F.3d 397, 401-02 (7th Cir. 2018). Moreover, participation in an investigation alone is not enough to establish personal involvement in a constitutional deprivation. *See e.g.*, *de Lima Silva v. Wisconsin Dep't of Corrections*, 917 F.3d 546, 564 (7th Cir. 2019) (finding no personal involvement of two named Defendants in employment discrimination suit where there was no evidence that they were involved in the decision to discharge plaintiff despite their participation in the personnel investigation); *Harold Hill v. City of Chicago*, 2009 WL 174994, *5 (N.D. Ill. Jan. 26, 2009) (finding particular defendants had no involvement in Fifth Amendment deprivation where undisputed evidence establishes they had no interaction or contact with plaintiff during his arrest and interrogation).. The mere fact that Evans may have known Day was being questioned is insufficient, without more, to create a genuine issue of material fact on these claims. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *accord Odogba v. Wisconsin Dept. of Justice*, 22 F. Supp. 3d 895, 911 (E.D. Wis. 2014); *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (stating that an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye").

Here, Dets. Foley and Boudreau are the only individuals Day has ever accused of misconduct with respect to his interrogation and confession regarding the Erving murder. According to Day, Dets. Boudreau and Foley conducted the interrogation, during which Det. Boudreau allegedly fed Day details about the underlying homicide and Det. Foley threatened Day and physically abused him in Det. Boudreau's presence. (*See* JSOF, ¶¶ 138-143). At his deposition, Day testified that the only reason he confessed was because of Dets. Boudreau and Foley. (JSOF, ¶ 151). Day also confirmed that Officer Evans did not threaten, abuse, or question

20

him when he was being transported to Area 3, nor did Officer Evans confront him with any type of evidence. (*See* JSOF, ¶¶ 134, 138). According to Day, Officer Evans was not present during the interrogation with Dets. Boudreau and Foley when Day alleges that the coercion/fabrication occurred. (*See* JSOF, ¶¶ 141-143). Day does not contend that Officer Evans interrogated him, that Officer Evans participated in the interrogation with Dets. Boudreau and Foley, or that Officer Evans was even was present when Day gave his handwritten statement to the ASA. (*See* JSOF, ¶ 138-150). According to Day, the only reason he falsely confessed was because Det. Foley choked him one time for a few seconds and threatened to throw him out of a window. (*See* JSOF, ¶¶ 148, 151). Even Day's police practice's expert, Roger Clark, conceded that the only alleged interaction Day had with Officer Evans at Area 3 was not improper. (JSOF, ¶ 140). In short, Officer Evans was not personally involved in coercing Day's confession, and therefore Officer Evans is entitled to summary judgment on Counts I and II.

### III.    Day's Due Process Fabrication Claims in Count III Fail As A Matter Of Law.

Day contends his due process fabrication claim in Count III is based on the following: (a) his confession; (b) Watson's statement; (c) Jakes's statement implicating Day in the Garcia homicide; and (d) "police reports" indicating that Day and Watson had provided voluntary and truthful statements about the Erving murder. (*See* Dkt. 1, ¶¶32, 127; Exhibit 50, pp. 3-8). None of these theories can survive summary judgment.

#### A.    Day has no cognizable due process witness coercion claim.

Day alleges that Defendants violated his due process rights by coercing a false statement from Ralph Watson and Anthony Jakes and did not attempt to corroborate Watson's statement. *See* Exhibit 50, pp. 4-5. There is no due process claim for coercing a witness statement. While Day can make a claim alleging the statements were fabricated—i.e., obtained by Defendants who

knew them to be false and introduced at trial—Day's rights are not violated by *coercing* a witness statement. "[A] claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due process rights." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017). As the Seventh Circuit has explained, there is a critical difference between coercing witnesses to testify and fabricating their testimony. *Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1110 (7th Cir. 2014) ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it").

In *Petty v. City of Chicago*, plaintiff alleged that the police officers coerced a witness into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will for over 13 hours, badgering him, and pressuring him to identify plaintiff as an assailant. 754 F.3d 416, 423 (7th Cir. 2014). Yet there was no allegation that the officers knew the evidence they coerced was false. *Id.* As a result, the court concluded Petty's claim was "a 'coercion' case for which there is no cognizable due process claim, as opposed to an 'evidence fabrication' case where there is a cognizable claim." *Id.* at 422-23. And "'because coerced testimony may in fact be true, the due process right to a fair trial isn't implicated absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it.'" *Avery*, 847 F.3d at 439 *quoting Fields II*.

Day's due process claims for the coercion of witness statements are not actionable and summary judgment must be granted.

**B.    Officer Evans and Det. McWeeny are entitled to summary judgment on Count III with respect to Day's claim that his confession was fabricated because they were not personally involved in Day's interviews and could not have known the confessions were false.**

As set forth in Section I above, there is no evidence that Officer Evans had any personal involvement in obtaining Day's confession to the Erving or Garcia homicides, and Day has already agreed to dismiss Counts I and II as to Det. McWeeny.  *See Pepper*, 430 F.3d at 810.

Not only is Day unable to show that Evans and McWeeny were personally involved, but Day also cannot show that Evans or McWeeeny knew his confession was false, another element of the claim.  *See Phillips v. City of Chicago*, 2018 WL 1309881, at *25–26 (N.D. Ill. Mar. 13, 2018) *citing Petty*, 754 F.3d at 422 ("[A] prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'") *quoting Fields*, 740 F.3d at 1112.  In *Petty*, the plaintiff alleged that police "coerced [a witness] into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify [the plaintiff] as one of the assailants."  754 F.3d at 423.  The Seventh Circuit nevertheless affirmed dismissal of the plaintiff's fabrication claim, noting the absence of any allegation that the defendants "created evidence that they knew to be false, which is the hallmark of a fabrication case."  *Phillips,* 2018 WL 1309881, at *25, *discussing Petty*, 754 F. 3d at 423.

Here, Day cannot establish that either Officer Evans or Det. McWeeny "created evidence that they knew to be false" – because it is undisputed that they had no personal involvement in obtaining the confession.  Day alleges that only Det. Boudreau and Foley were involved in the fabrication of his confession.  (*See* JSOF, ¶¶ 142, 145-147).  There is no evidence that Officer Evans or Det. McWeeny knew or had any reason to know that Day's confession was allegedly false.  Nor could they know.  Det. McWeeny's involvement in the Erving homicide investigation

23

ended more than eight months ***before*** Day was even questioned, and Day admits that Officer Evans did not interrogate him and was not present for the alleged abuse or feeding of facts about the Erving homicide. (*See* JSOF, ¶¶ 46, 130). Even assuming Officer Evans and Det. McWeeny knew Day was held for eight or nine hours or allegedly denied food or water or threatened (and there is no evidence they knew any of it), that knowledge still would not have been enough to put them on notice that Day's confession was false. *See Petty*, 754 F. 3d at 423. Accordingly, Officer Evans and Det. McWeeny are entitled to judgment as a matter of law on Day's fabrication claim in Count III predicated upon his confession.

### C. Plaintiffs cannot maintain a §1983 claim based on the alleged fabrication of Watson's statement or Det. Boudreau's trial testimony regarding Watson.

Plaintiff alleges that Watson's statement was fabricated, but he fails to show that the statement was used against him at trial to secure his conviction. Watson did not testify at Day's criminal trial, his statements to police were not introduced at trial and no police report documenting Watson's statements was admitted into evidence or otherwise used at trial by either the State or Day in his defense. As a result, Day's due process claim based on the alleged fabrication of Watson's statement fails as a matter of law. A plaintiff has no due process fabrication claim if the fabricated evidence was not used at trial. *Moran*, 54 F.4th, at 499 (court holding that the allegedly fabricated evidence — the police report and the detectives' pretrial testimony — could not have influenced the jury's verdict if it was not used at trial) *citing Patrick v. City of Chicago*, 974 F.3d 824, 834-35 (7th Cir. 2020); *see also Brown*, 2022 WL 4602714, at *24 (court noting that in *Patrick*, the Seventh Circuit clarified that in a fabricated evidence theory of liability, the fabricated evidence must be used against the plaintiff in his criminal trial).

Day tries to avoid this outcome by alleging that Det. Boudreau falsely testified at Day's criminal trial that he was able to elicit Day's confession only after confronting Day with Watson's

statement. (Dkt. 1, ¶59). But Day's claim based on Det. Boudreau's trial testimony also fails as a matter of law because police officers have absolute immunity from suit under §1983 for giving allegedly false testimony at trial proceedings, even when that testimony deprives a party of his right to a fair trial. *Briscoe v. LaHue*, 460 U.S. 325 (1983). This is true regardless of whether the testimony is itself false or implies something false. *See Jones v. York*, 34 F.4th 550, 553 (7th Cir. 2022) *citing Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2015) (en banc) ("Witnesses in a § 1983 trial have absolute immunity from liability based on their testimony at trial."). "[T]his protection covers the preparation of testimony as well as its actual delivery in court." *Canen v. Chapman*, 847 F.3d at 407, 415 (7th Cir. 2017).

Day also cannot avoid testimonial immunity under *Briscoe* by going back to square one and arguing that Watson's handwritten statement was fabricated, because, as set forth above, it is undisputed that neither the statement nor the substance of anything Watson told Det. Boudreau was used at trial. (*See* JSOF, ¶¶ 156-158, 164). Similarly, Day cannot rely on *Avery*, 847 F.3d at 441, to circumvent *Briscoe* because it is also undisputed that Det. Boudreau never attempted to authenticate Watson's statement or the police report containing Watson's statement at trial (JSOF, ¶ 164). *See Jones*, 34 F.4th at 553 (court holding that plaintiff could not circumvent *Briscoe* by citing *Avery*, because the defendant officer did not attempt to authenticate fabricated evidence at trial).

**D.    Day's due process claim based on the alleged fabrication of Jakes' statement implicating Day in the Garcia homicide fails as a matter of law.**

Day cannot maintain any claims in this lawsuit based on alleged misconduct related to the Garcia homicide investigation for the reasons set forth in Section I above. Even if Day could, the alleged fabrication of Jakes' statement implicating Day in the Garcia murder cannot support a basis for liability for a due process claim here because Jakes's statement was not part of Day's criminal

25

trial for the Erving homicide. Jakes did not testify at Day's criminal trial for the Erving murder. The State did not introduce Jakes' statement or present any information relayed by Jake at that trial. Det. Boudreau did not refer to Jakes or any statement Jakes gave to police at Day's trial for the Erving homicide. In short, Jakes was never a part of Day's criminal trial for the Erving murder. Consequently, Day cannot maintain a due process fabrication claim based on Jakes' statement implicating Day in the Garcia homicide. *Moran*, 54 F.4th, at 499 (court holding that the allegedly fabricated evidence could not have influenced the jury's verdict if it was not used at trial) *citing Patrick*, 974 F.3d at 834-35.

    **E.    Day's due process claim based on allegedly fabricated police reports fails as a matter of law.**

Day alleges that the Defendant Officers fabricated police reports about his confession to the Erving homicide and Watson's statement. Day does not specify which reports he is referring to or pinpoint in particular any substantive false statements within these unidentified reports. Regardless of his failure to identify the specific evidence with particularity, his due process fabrication claim predicated upon these "police reports" fails as a matter of law because none of the police reports related to the Erving homicide investigation that documented Day's incriminating statements, Jakes' statements or Watson's statements were used at trial or admitted into evidence. (JSOF, ¶¶ 23, 164). That dooms Day's due process claim based on allegedly fabricated police reports, and therefore the remaining Defendant Officers are entitled to judgment as a matter of law on Court III's due process fabrication claim predicated on allegedly fabricated police reports. *See Moran*, 54 F.4th, at 499 (court holding that the allegedly fabricated evidence could not have influenced the jury's verdict if it was not used at trial)

Alternatively, even if there were some questions asked at Day's trial about police reports, Day alleges that only Dets. Boudreau and Foley had any involvement in obtaining his confession

and that only Det. Boudreau was involved in obtaining Watson's statement. There is no evidence to support a claim that Officer Evans or Det. McWeeny were involved in creating any false police reports related to those statements. Accordingly, Evans and McWeeny are entitled to summary judgment on Count III based on allegedly fabricated police reports. *Pepper*, 430 F.3d at 810.

### IV. Day's *Brady* Claims In Count III Fail As A Matter Of Law Because There Is No Evidence That Any Defendant Concealed Exculpatory Evidence.

To attach § 1983 liability for his *Brady* claims, Day must prove: (1) there was in fact undisclosed exculpatory evidence, (2) that the defendant at issue concealed the undisclosed evidence from the prosecution, and (3) that prejudice resulted. *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022). Evidence is considered suppressed when (i) the prosecution fails to disclose the evidence in enough time for a criminal defendant to make use of it, and (ii) the evidence was not available to the criminal defendant through reasonable diligence. *Anderson,* 932 F.3d at 504-05. Evidence is not suppressed if it is known to the criminal defendant. *Avery,* 847 F.3d at 443. "Reasonable diligence" examines whether the criminal defendant had access to the exculpatory evidence through other means. *Boss v. Pierce,* 263 F.3d 734, 741 (7th Cir. 2001). The materiality element is often referred to as "prejudice." *Id.* at 566.

Day bases his *Brady* claim in Count III on the following assertions: : (1) an alleged failure to disclose notes from Det. McWeeny's interview of Krona, which Day thinks "would have demonstrated that [she]…did not identify [Day] as being a participant in Erving's murder" (Exhibit 50, p. 3); (2) the suppression of information Day thinks would have identified witnesses who had knowledge of two alternative suspects, Spook and Mark, and documents showing steps to investigate this lead (Exhibit 50, p. 3); (3) the alleged failure to disclose the unlawful manner used to obtain Watson's statement or that Watson's statement was untrue (Exhibit 50, p. 5); (4)

the alleged failure to disclose the unlawful manner Det. Boudreau used in his attempt to obtain a statement from Edward Robinson, (Exhibit 50, p. 5); (5) an alleged failure to disclose the unlawful methods used to obtain Day's own confession (Exhibit 50, p. 6); and (6) the suppression of non-specific "street files." (*See* JSOF, ¶¶ 24, 39, 85, 111, 126, 165). As set forth below, each of these alleged *Brady* violations fails as a matter of law.

### A. Day has no cognizable *Brady* claim for failing to disclose that evidence was allegedly fabricated or coerced.

Withholding information about the circumstances of witness interviews is not suppression of evidence for purposes of *Brady*, and the Seventh Circuit has refused to extend *Brady* to encompass the theory that a police officer suppresses evidence by giving the prosecution a false account of an interview. *See Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008); *Harris v. Kuba*, 486 F.3d 1010, 1016-17 (7th Cir. 2007). As the Seventh Circuit explained in *Saunders-El*, 778 F.3d at 562:

> In the end, [plaintiff] seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing [fabricating evidence], not for failing to disclose any existing piece of *evidence* to the prosecution. But our case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution.

The same is true for the alleged misconduct Day believes should have been disclosed. 778 F.3d at 562. Accordingly, to the extent Day's *Brady* claim is based on the failure to disclose any alleged misconduct in obtaining or fabricating the statements of Watson or Krona or attempting to obtain or fabricate Robinson's statement, the claims fail as a matter of law.

**B.    Each of Day's *Brady* claims fail.**

**1.    There is no viable *Brady* claim based on allegedly "missing" notes regarding Det. McWeeny's interview of Krona Taylor.**

Day hypothesizes that Det. McWeeny took notes of Krona's interview, which were suppressed, that "would have demonstrated that [she]…did not identify [Day] as being a participant in Erving's murder" (Exhibit 50, p. 3).  Day does not allege that any Defendant Officer other than Det. McWeeny was personally involved in interviewing Krona.  (*See* JSOF ¶ 24).  As such, Det. Foley, Det. Boudreau and Officer Evans are entitled to summary judgment on Day's *Brady* claim in Count III with respect to the alleged missing notes from Krona's interview. *Pepper*, 430 F.3d at 810.

Det. McWeeny is entitled to summary judgment as well because the claim is based entirely on Day's speculation that additional undisclosed notes were created by Det. McWeeny during Krona's interview, that these additional notes contained exculpatory information, and that those exculpatory notes were somehow concealed by Det. McWeeny.  Day has no evidence to support any of this guesswork and has no proof that there were ever such notes taken by Det. McWeeny, and he cannot speculate about the existence of undocumented *Brady* "information" any more than he can speculate about documents he thinks were made and then suppressed.  Rather, to get past summary judgment on a *Brady* claim, Day *must* identify the specific exculpatory evidence he believes was suppressed and who suppressed it.  *See United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (no *Brady* violation because defendant was "unable to point to any specific evidence, exculpatory or otherwise, withheld by the government").  Compare *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (government withheld knowledge that a specific witness had lied); *Goudy*, 922 F.3d at 840-41 (finding a video recording of a lineup should have been produced instead of an affidavit describing it).  In *Rodriguez* and *Goudy*, and unlike this case,

there was specific, known *Brady* material that was not turned over. Here, on the other hand, Day cannot identify any specific exculpatory knowledge or information that any Defendant knew of and withheld regarding Krona.

Moreover, the undisputed facts establish that nothing is missing. The file inventory identifies 11 general progress reports, which are all accounted for in the investigative file. (JSOF, ¶ 27). When "there is no proof of a document's existence, governmental officials cannot be held liable under *Brady*." *Hill v. City of Chicago,* 2009 WL 174994, at *4 (N.D. Ill. 2009). Day cannot prove the existence of any notes that were not turned over to prosecutors, let alone that the notes contained exculpatory information, which is why even his own expert was forced to admit that he has "no way to know" if any of the material he thinks might have been missing from the investigative file would constitute *Brady* material. (Exhibit 72: Clark Dep., 284:11-293:10). *See Warren,* 454 F.3d at 759 (no *Brady* violation where defendant was "unable to point to any specific evidence, exculpatory of otherwise, withheld by the government."); *U.S. v. Price,* 418 F.3d 771, 785 (7th Cir. 2005) (no *Brady* violation where no document existed corroborating defendant's claim).

In addition, there is no evidence that Krona and Det. McWeeny ever discussed Day, let alone discussed whether Day was involved. It is undisputed in this case that police did not become aware of Day's potential involvement in the Erving homicide until January 1992, eight months *after* Det. McWeeny's interview with Krona, when Det. Boudreau interviewed Ralph Watson in connection with a different case. By that time, Det. McWeeny was no longer involved in the Erving homicide investigation. That means Det. McWeeny would have had no reason to ask Krona about Day, and Krona maintains she never said anything to Det. McWeeny about Day. *Anderson v. City of Rockford*, 932 F. 3d 494, 504-05 (7th Cir. 2019) ("Evidence is suppressed for Brady

purposes if the prosecution failed to disclose evidence that it or law enforcement ***was aware of***....") (emphasis added). Day can only guess that Krona said anything to Det. McWeeny about him, that such information was exculpatory and documented in a note or that any Defendant suppressed it.

Lastly, none of the reports documenting Krona's statements or knowledge of the crime indicate that she ever mentioned Day's name or said he had any involvement in the crime. Rather, the reports documenting Krona's statements show that she did *<u>not</u>* implicate Day. If there are no reports that say Krona implicated Day, and the only known reports regarding Krona's knowledge never mention Day, then there is no basis for Day to now claim that police suppressed reports that show Krona did not identify him. Day, his defense attorneys, and the prosecutors would have already known Krona did not identify him from the only reports known to have existed. *See Moran*, 54 F. 4th at 492 ("a plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it).

### 2. There is no viable *Brady* claim based on Watson's statement.

Day alleges that Det. Boudreau failed to disclose the allegedly coercive way he interrogated Watson to get a statement implicating Day. (JSOF, ¶ 126-129). First, Det. Foley, Det. McWeeny and Officer Evans are entitled to summary judgment on this claim because they were not personally involved in the alleged misconduct with respect to Watson because they were not part of the interview of Watson in which he gave a statement, nor is there evidence they knew of any alleged coercion. *Pepper*, 430 F.3d at 810.

Second, Det. Boudreau is entitled to summary judgment on this claim. In addition to being an improper *Brady* claim, as set forth above, it also fails because (a) Watson's statement was not used a trial and (b) Det. Boudreau's alleged coercion of Watson's statement was already known to prosecutors before Day's trial started.

31

### a) Watson's statement was not used at trial.

Neither the State nor Day called Watson as a witness at Day's criminal trial, and neither Watson' statement nor any police report containing his statement was used a trial. Nor did Boudreau attempt to authenticate Watson's statement or the report containing Watson's statement. That means that any alleged coercion was not material to Day's case. Because the statement was never introduced at trial, the alleged impeachment evidence of coercion of the statement was not material. *Moran*, 54 F.4th, at 499; *Avery* 847 F.3d at 443. In fact, Day's attorney testified that he would not have called Watson as a witness under any circumstances because he did not want to risk any of Watson's inculpatory statements being admitted into evidence. (JSOF, ¶ 159).

There is no duty under *Brady* to "accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El*, 778 F. 3d at 562. . *Id.* In *Avery*, the Seventh Circuit held that where testifying witnesses were coerced into giving the inculpatory statements against the plaintiff, the officers had a duty to disclose those coercive tactics. 847 F.3d at 443-44 The court did not hold, however, that there was a duty to reveal coercive methods used to obtain statements that were not introduced at trial. *Id.* Here, it is undisputed that Watson never testified at the criminal trial, that nothing he said was admitted at the trial, and that Boudreau never attempted to authenticate any evidence containing Watson's statement at trial.

### b) Det. Boudreau's alleged coercion of Watson's statement was known to prosecutors long before Day's trial started.

Even assuming there was an obligation to disclose the allegedly coercive nature of Det. Boudreau's January 20, 1992, interview with Watson, Day's claim would still fail because it is undisputed that Day knew before trial that Watson had recanted and blamed a perceived inducement from Det. Boudreau as the reason he gave a statement implicating Day. Simply put, Day knew of the evidence he needed to impeach Watson before trial. *Avery* 847 F.3d at 443

(""[T]he material question is whether Avery was aware of *the impeachment evidence*"). In *Avery*, the plaintiff was unaware of alleged coercive tactics used with witnesses who implicated him in the crime. *Id.* Here, by contrast, it is undisputed that Day knew, before his trial started, that Watson had recanted and blamed Det. Boudreau for coercing him into giving a false statement. (*See* JSOF, ¶ 128). Day knew this because Watson explained it to both the prosecutors and Day's criminal defense attorney before Day's trial began. (JSOF, ¶¶ 127-128). Watson told the prosecutor he provided a false statement because he believed he would get less years on other pending armed robbery claims against him, despite Det. Boudreau not explicitly telling him this. (*See* JSOF, ¶¶ 127-129). Watson then repeated his recant to Day's criminal defense attorney, Stuart Katz, the day before Day's criminal trial began. (*See* JSOF, ¶ 128). Because it is undisputed that prosecutors and the defense knew Watson had recanted and had claimed he was offered an inducement in exchange for allegedly false testimony implicating Day, Day's *Brady* claim fails as a matter of law. *See Moran*, 54 F. 4th at 492-93 (an officer cannot be held liable for failing to disclose exculpatory evidence if the prosecution obtained that evidence from another source); *Avery*, 847 F. 3d at 443 (evidence is not suppressed if it is known to the criminal defendant).

Accordingly, Day has no viable *Brady* claim in Count III based upon the alleged coercive tactics employed by Det. Boudreau to obtain Watson's statement.

### 3. Day's *Brady* claim based on the alleged suppression of information regarding alternative suspects Spook and Mark fails as a matter of law.

Day also alleges that Det. McWeeny suppressed reports and notes about the witness(es) who allegedly had knowledge of two alternative suspects in the Erving homicide known only as "Spook" and "Mark." (*See* JSOF, ¶¶ 39-54). First, summary judgment should be granted for Det. Boudreau, Det. Foley and Officer Evans on this claim because Day does not contend that they

were personally involved in suppressing any evidence about two supposed alternative suspects named Spook and Mark. *Pepper*, 430 F.3d at 810.

Second, Det. McWeeny is also entitled to summary judgment on this claim. Not only is Day unable to identify a single note or report Det. McWeeny created that allegedly contained any exculpatory or impeachment information provided by witnesses about Spook and Mark, but he is also unable to say what exculpatory information was in these unidentified documents or who was responsible for suppressing them. It is undisputed that the only document in existence about Spook and Mark is a GPR that Det. McWeeny created on May 18, 1991, which was *not* suppressed. (*See* JSOF, ¶ 47). This GPR does not identify who provided the information about Spook and Mark, but Det. McWeeny testified that if he had known the source of the information, he would have included it in the GPR. (*See* JSOF, ¶¶ 42-43). Day's vague speculation that there should also be notes and documents relating to the investigation of Spook and Mark fails because Day has no evidence to show that any such notes or documents (a) existed, (b) contained *Brady* material, or (c) that Det. McWeeny (or any other Defendant) was aware of it and concealed it. In fact, Day has no evidence to show that Det. McWeeny was even aware of the source of the Spook and Mark lead. When "there is no proof of a document's existence, governmental officials cannot be held liable under *Brady*." *Hill v. City of Chicago,* 2009 WL 174994, at *4 (N.D. Ill. 2009). *See U.S. v. Warren,* 454 F.3d 752, 759 (7th Cir. 2006) (no *Brady* violation where defendant was "unable to point to any specific evidence, exculpatory of otherwise, withheld by the government."); *U.S. v. Price,* 418 F.3d 771, 785 (7th Cir. 2005) (no *Brady* violation where no document existed corroborating defendant's claim).

Lastly, it is undisputed that Det. McWeeny's GPR regarding Spook and Mark was disclosed to the prosecutor, which means the key fact – the existence of Spook and Mark as

possible alternative suspects (*see* JSOF, ¶ 23) – was not suppressed.  *See Moran,* 54 F. 4th at 492 ("a plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it.").  Accordingly, all Defendants are entitled to summary judgment on Plaintiff's *Brady* claim in Count III based upon suppression of reports and notes about the witness(es) who allegedly had knowledge of "Spook" and "Mark."

### 4. Day's *Brady* claim based on Edward Robinson's statement fails as a matter of law.

Day alleges that Det. Boudreau failed to disclose the way in which he unsuccessfully *attempted* to coerce Robinson into falsely implicating Day in the Erving homicide.  First, Day alleges this misconduct only against Det. Boudreau.  (JSOF, ¶ 165; Exhibit 50, pp. 5, 14).  Accordingly, Det. Foley, Det. McWeeny and Officer Evans are entitled to summary judgment on this claim.  *Pepper*, 430 F.3d at 810.

The claim also fails as to Det. Boudreau.  As set forth above, there is no duty under *Brady* to disclose the circumstances of an interview or to create exculpatory evidence. *See Gauger*, 349 F. 3d at 360, *overruled in part on other grounds by Wallace*, 440 F. 3d at 423; *Saunders-El*, 778 F. 3d at 562.

### 5. Day has no *Brady* claim based on the failure to disclose the alleged coercion of his own confession.

Day alleges that Dets. Boudreau and Foley withheld the manner in which they coerced his confession and fed him facts.  (Exhibit 50, p. 6; *see also* JSOF, ¶¶ 141-151).  Day does not allege that Officer Evans or Det. McWeeny were personally involved in this conduct and therefore the Court should grant summary judgment in favor of them on this claim.  *Pepper*, 430 F.3d at 810.  As set forth above, neither Officer Evans nor Det. McWeeny were involved in interrogating Day or obtaining his confession to the Erving or Garcia homicides.

Second, Day has no *Brady* claim based on the supposed failure of either Det. Boudreau or Det. Foley to disclose their alleged misconduct on how his own confession was elicited. Day already knew that information long before trial and the Seventh Circuit has squarely foreclosed this type of *Brady* claim. *See Avery*, 847 F. 3d at 443 (evidence is not suppressed if it is known to the criminal defendant) *citing Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).; *see also Sornberger v. City of Knoxville, Ill*., 434 F.3d 1006, 1028 (7th Cir. 2006); *Wallace v. City of Chicago*, 440 F.3d 421, 429-30 (7th Cir. 2006) ("A section 1983 plaintiff cannot base his *Brady* claim on a defendant's failure to disclose plaintiff's own false confession."). Because Day was fully aware of these alleged acts, his *Brady* claim fails as a matter of law.

### 6. There is no *Brady* claim based on alleged suppression of generic, non-descript evidence, testimony or "street files."

Day's last *Brady* theory is a generic allegation that all remaining Defendants – Det. Boudreau, Det. Foley, Officer Evans and Det. McWeeny– withheld, suppressed or destroyed "street files" or other non-descript evidence yet to be discovered by Day. (*See* Dkt. 1, ¶¶ 155-156, JSOF, ¶ 111). The claim fails as a matter of law. Mere speculation that Defendants destroyed or suppressed unknown documents or police reports cannot support a *Brady* claim. *See Hill*, 2009 WL 174994, at *4 (finding plaintiff's speculation that a certain police report existed and was suppressed insufficient to establish a *Brady* claim); *U.S. v. Roberts*, 534 F3d 560, 572 (7th Cir. 2008) (plaintiff must provide some evidence other than mere speculation or conjecture that evidence was exculpatory and suppressed by the Government). Day has not identified a single piece of exculpatory or impeachment evidence that was in a so called "street file," let alone a piece of evidence that was not turned over to prosecutors or Day's criminal defense attorneys. (*See* JSOF, ¶ 27). He also cannot establish that any evidence was destroyed or destroyed in bad faith. Under *Arizona v. Youngblood*, a law enforcement officer violates a defendant's due process rights

36

if he "fail[s] to preserve potentially useful evidence" and does so in bad faith. *Jones*, 34 F.4th at 559 (7th Cir. 2022) *citing Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). To prove a *Youngblood* violation, a plaintiff must show that "(1) the [law enforcement officer] acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the [defendant] was unable to obtain comparable evidence by other reasonably available means." *Id.* (citation omitted). When "there is no proof of a document's existence, governmental officials cannot be held liable under *Brady*." *Hill v. City of Chicago,* 2009 WL 174994, at *4 (N.D. Ill. 2009). Day cannot prove the existence of any notes, much less that the unknown notes contained material exculpatory information or that such notes were destroyed in bad faith. *See U.S. v. Warren,* 454 F.3d 752, 759 (7th Cir. 2006) (no *Brady* violation where defendant was "unable to point to any specific evidence, exculpatory of otherwise, withheld by the government."); *U.S. v. Price,* 418 F.3d 771, 785 (7th Cir. 2005) (no *Brady* violation where no document existed corroborating defendant's claim). Accordingly, all Defendants are entitled to summary judgment on Day "street files" *Brady* claim.

## V.     There Is No Due Process Violation For Failing To Investigate Or Follow Up On Other Leads.

Day alleges that Defendants also violated his due process rights by failing to conduct an adequate investigation, corroborate Watson's statement to police or investigate the murder weapon's use in another crime by different individual. Summary judgment should also be granted for all remaining Defendants Officers these theories.

As to the failure to corroborate Watson's statement, there is no constitutional requirement that a witness's testimony be corroborated. *Beauchamp v. City of Noblesville, Ind.*, 320 F. 3d 733, 743 (7th Cir. 2003) ("in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness

or victim is not telling the truth."); *Foster v. Ward*, 182 F. 3d 1177, 1193 (10th Cir. 1999) (stating that "there is no constitutional requirement that [a witness's] testimony be corroborated"). Day's allegations that his due process rights were violated by a failure to adequately investigate generally or specifically as to the murder weapon also fails. It is also "not the duty of police to perform the perfect investigation and 'one suspected of committing a crime has no constitutional right to an investigation by police which will uncover all exculpatory evidence.'" *Nugent v. Hayes*, 88 F. Supp. 2d 862, 868 (N.D. Ill. Feb. 14, 2000) (quoting *Davis v. Owens*, 973 F. 2d 574, 577 (7th Cir. 1992)). The Fourteenth Amendment does not guarantee a certain level of investigation – it is a due process, fair trial right, not a right to a certain quality of investigation. Any due process theory based on the quality of investigation therefore fails.

### VI. Officer Evans Is Entitled To Summary Judgment On Plaintiff's State Law Malicious Prosecution Claim In Count VII.

Officer Evans was not personally involved in causing the commencement or continuance of Day's criminal proceedings. To establish his state law malicious prosecution claim, Day must present evidence that Defendant Officers had a significant role in causing his prosecution. *See Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 46 ("[L]iability for malicious prosecution requires an examination of whether the defendant's conduct is both the cause in fact and a proximate cause of the commencement or continuation of the original criminal proceedings."). Here, charges were initiated against Day for the Erving homicide based upon Watson's statement and Day's confession. Det. Boudreau secured Watson's statement and Det. Boudreau and Det. Foley questioned Day prior to his giving a confession to ASA Danielian. Although Officer Evans was part of a team of officers who arrested Day on February 4, 1992, he did not sign any criminal complaints against Day charging him with the Erving homicide and there is no evidence that Evans interacted with any prosecutors in connection with the decision to charge Day with Erving's murder or that Evans

38

testified before the grand jury that indicted Day, and Evans did not testify at Day's criminal trial. (JSOF, ¶¶ 130-141); *see generally* Exhibit 48, Criminal Trial Transcripts (People v. Day); Exhibit 120, Indictment. There is no evidence that Officer Evans played any role in causing the commencement or continuation of the criminal proceedings against Day under Illinois law. Officer Evans therefore cannot be held liable as a matter of law for the claim of malicious prosecution.

**VII.    All Defendants Are Entitled To Summary Judgment On Count IV Because Day Cannot Establish That He Was Seized And He Does Not Have Standing To Bring A Claim For Unlawful Pretrial Detention Under The Fourth Amendment.**

Day's Fourth Amendment malicious prosecution/pretrial detention claim fails, because it is undisputed that on the date Day was brought to Area 3 by Evans and Foley for questioning on the Erving homicide, February 4, 1992, there was already a separate and lawful basis for his seizure and detention – a 1991, "no bail" arrest warrant – for his entire pretrial detention for the Erving homicide, from the moment he was brought to Area 3 on February 4, 1992, though the date he was convicted of the Erving homicide on June 23, 1994. (JSOF, ¶¶132, 154). As a result, Day cannot establish that he was "seized" pursuant to legal process for the Erving homicide, a required element of his Fourth Amendment claim, or that any Defendant was personally involved in obtaining the arrest warrant on the drug charge. *Thompson v. Clark*, 596 U.S. 36, 42, 44 (2022) (the claim is sometimes called "unreasonable seizure pursuant to legal process").

For the same reason, Day also has no standing to bring a Fourth Amendment malicious prosecution, because he has no redressable injury. It is undisputed that, as a result of the "no bail" arrest warrant, there was a separate and lawful basis for his seizure during his entire pretrial detention for the Erving homicide. "'[A] section 1983 plaintiff may not receive damages for time spent in custody, if that time was credited to a valid and lawful sentence.'" *Patrick v. City of Chicago*, 81 F.4th 730, 737 (7th Cir. 2023) *citing Ewell v. Toney*, 853 F.3d 911, 917 (7th Cir.

2017) citing *Bridewell v. Eberle*, 730 F.3d 672, 677 (7th Cir. 2013); *Ramos*, 716 F.3d at 1020. If a section 1983 plaintiff cannot seek damages related to his detention, then he has no injury that a favorable decision by a federal court may redress. *Patrick*, 81 F.4th at 737; *citing Ewell*, 853 F.3d at 917. And without a redressable injury, there is no Article III standing to pursue the claim. *Id.*; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (noting that to establish standing a plaintiff must demonstrate: an injury in fact, a causal connection between the injury and the conduct complained of, and that redressability of the injury by a favorable decision is likely).

On the date Day was brought to Area 3 by Evans and Foley for questioning on the Erving homicide, February 4, 1992, there was, coincidentally, already a valid warrant for his arrest on a separate and unrelated felony drug charge. (JSOF, ¶132). Day was convicted on that drug charge on April 12, 1993, and sentenced to seven years in prison on September 8, 1993, and received credit for 589 days already served going back to February 4, 1992. (JSOF, ¶154). Day was convicted of the Erving homicide after a jury trial on June 23, 1994, while he was already serving his seven-year sentence for his conviction on the drug charge. (JSOF, ¶¶154, 185). His sentence on the drug charge was then ordered to run concurrently with his sentence on the Erving homicide conviction. (*Id.*). The drug conviction has never been vacated. (*See* JSOF, ¶ 154). Thus, from the moment Evans and Foley "seized" Day and brought him to Area 3 for questioning on the Erving homicide, through the date of his guilty verdict for the Erving homicide, Day was lawfully detained pursuant to the arrest warrant and his subsequent conviction for the drug offense, and he therefore cannot recover damages for time in custody despite his claim that the Erving murder prosecution lacked probable cause. *See Patrick*, 81 F4th at 737.

**VIII.  There Is No Evidence To Support Day's Conspiracy Or Failure To Intervene Claim.**

**A.  Officer Evans and Det. McWeeny are entitled to summary judgment on Day's federal and state law claim for conspiracy claims in Counts VI and IX.**

Conspiracy is not an independent basis of liability under Section 1983 or state law.  *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2009) (conspiracy is not an independent basis of liability in § 1983 actions) (citations omitted) and *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59 ("conspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails") (citations omitted).  Under Illinois law, a civil conspiracy requires, "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused the injury to the plaintiff.  *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999)).  An agreement is a "necessary and important" element of this cause of action, and "[a] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy."  *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017).

Here, Day's federal and state law conspiracy claims against Officer Evans and Det. McWeeny fail because there is no evidence to suggest that either of these Defendants caused or contributed to any constitutional deprivation or other tort.  Day has alleged a conspiracy in only the most generic, boilerplate terms and failed to produce evidence of a conspiracy involving Officer Evans and Det. McWeeny.  Day has no proof that Officer Evans and Det. McWeeny were part of a conspiracy.  For example, there are no facts to suggest that Det. McWeeny engaged in any

misconduct. The only allegation against Det. McWeeny is that he fabricated reports regarding Krona and alternative suspects "Spook" and "Mark," but as outlined more fully above, those claims fail. There is no evidence in the record to suggest that McWeeny engaged in any other alleged misconduct. Day does not claim that Officer Evans was involved in any of the alleged misconduct that occurred during his questioning at Area 3 and is not making any other claim against Officer Evans with respect to any of the alleged misconduct that occurred during the investigation of other witnesses and/or evidence.

There Day cannot establish an agreement with others to violate his constitutional rights or violate Illinois law violation by Officer Evans or Det. McWeeny. Accordingly, Officer Evans and Det. McWeeny are entitled to summary judgment on Day's conspiracy claims in Counts VI and IX.

Finally, Defendants are also entitled to qualified immunity on Day's § 1983 conspiracy claims because "it cannot be said that the law [was] clearly established on this point. . . [t]hat is, reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)." *Haliw v. City of South Elgin*, 2020 WL 1304697, *4 (N.D. Ill. March 3, 2020) (finding liability is not clearly established for conspiracies amongst police officers of a single municipality because the law was unsettled on whether the intra-corporate conspiracy doctrine applies to § 1983 claims) (*comparing Jackson v. City of Cleveland*, 925 F.3d 793, 819-20 (6th Cir. 2019) (the intra-corporate conspiracy doctrine applies to § 1983 just as it does to § 1985 claims because both create "cause[s] of action against any 'person' who deprives a plaintiff of his rights[.]"), *with Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971, 985 (N.D. Ill. 2013) ("The Seventh Circuit has yet to decide whether the doctrine applies to § 1983 conspiracy claims, and district courts in this Circuit are split on whether it does."). At issue in *Haliw* was an alleged conspiracy to frame the plaintiff in 2017.

42

Here, the issue is an alleged conspiracy among Defendant Officers in 1991. If the law was unsettled in 2017, it was certainly unsettled in 1991 and Defendant Officers are entitled to qualified immunity on the federal conspiracy claims.

**B.**     **The Failure To Intervene Claim In Count V Is Not Cognizable And Even It If Was, It Fails Against Officer Evans Because There Is No Evidence To Support A Failure To Intervene Claim Against Him.**

Day alleges that Defendants failed to intervene to prevent constitutional misconduct. But Judge Easterbrook has questioned whether failure to intervene is cognizable under §1983. "'Failure to intervene' sounds like vicarious liability.'" *Mwangangi v. Nielsen*, 48 F. 4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring). "The Supreme Court has held many times that §1983 supports only direct, and not vicarious, liability." *Id.* Seventh Circuit decisions allowing failure-to-intervene claims do not explain "why this theory of liability is consistent with *Iqbal*, *Vance*, and similar decisions." *Id*. at 834 (citing *Doxtator v. O'Brien*, 39 F. 4th 852, 865 (7th Cir. 2022)). Easterbrook concluded that *Doxtator* relied only on cases which predate *Iqbal* and *Vance*. *Id.* Defendant Officers recognize current precedent allows for a failure to intervene claim but, respectfully, contend this theory is incongruent with *Iqbal* and *Vance* and runs afoul of the personal involvement requirement of §1983 by placing vicarious liability on a police officer for failing to stop another's conduct. As such, judgment should be granted in their favor. Defendant Officers raise this argument to preserve this issue for a potential appeal.

Setting aside whether failure to intervene is even a viable claim under 1983, Evans is entitled to summary judge on this claim because Day cannot establish that Officer Evans committed any misconduct or had any knowledge of the alleged misconduct committed by other Defendants. "[I]n order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *See Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir.

2005). A plaintiff may state a claim for failure to intervene by showing that "any constitutional violation has been committed by a law enforcement official; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994) (emphasis omitted); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 754 (N.D. Ill. 2012).

There is no proof that Officer Evans was aware of any misconduct and no facts to suggest Officer Evans could have reasonably intervened to stop this alleged behavior. Accordingly, Day's claim against Evans for failure to intervene fails. *See Celafu v. Village of Oak Grove*, 211 F.3d 416, 423 (7th Cir. 2000); *Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005) (Plaintiff's failure to establish an underlying constitutional violation warrants dismissal of their dependent failure to intervene claim).

## VII.    Day's IIED Claim In Count VIII Fails As A Matter Of Law.

A cause of action for IIED must be premised on conduct that is so extreme and outrageous it goes beyond all possible bounds of decency. *Public Finance Corp v. Davis*, 66 Ill.2d 85, 90 (1976). If a plaintiff cannot establish that a defendant engaged in the conduct that caused the underlying harm complained of, the claim for IIED must fail. As with his § 1983 conspiracy and failure to intervene claims, Day's state law claim for IIED is based on the same circumstances surrounding his allegedly fabricated and coerced confession. (Dkt. 1). As such, the claim fails against all remaining Defendants except Dets. Boudreau and Foley for the same reason his conspiracy claim fails. As outlined above, there is no viable claim or evidence to suggest that anyone besides Dets. Boudreau and Foley caused or contributed to a constitutional deprivation. Because Day's IIED claim derives from his constitutional claims, this claim must be dismissed as to Defendant Evans and McWeeny.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court enter an Order granting Defendants summary judgment as set forth herein, and for any further and additional relief the Court deems just and appropriate.

Respectfully submitted,
KENNETH BOUDREAU, JUDE EVANS,
DANIEL MCWEENY, ESTATE OF
WILLIAM FOLEY

__*s/ Patrick R. Moran*_____
One of their attorneys

Eileen E. Rosen
Patrick R. Moran
Andrew J. Grill
Brittany D. Johnson-Delgado
*Special Assistant Corporation Counsel*
Attorneys for Officer Defendants
ROCK FUSCO & CONNELLY LLC
333 W Wacker, 19th Floor
Chicago, Illinois 60606
T: 312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
agrill@rfclaw.com
bjohnson@rfclaw.com