**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | District Judge Hon. Sara L. Ellis |
| | ) | |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Jon Loevy
Gayle Horn
Heather Lewis Donnell
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

SUMMARY OF MATERIAL FACTS........................................................................2

Plaintiff Had No Involvement in the Erving Murder................................................3

"Spook" and Marcus Chatman Emerge as Early Suspects ......................................3

Additional Suspect: Antonio Thomas, Andre Thomas, and John Hooks Connected to the Erving

Murder Weapon......................................................................................................5

The Unmistakable Indicators of an Erving Homicide "Street File" .........................6

Defendant Boudreau Fabricates Evidence to Implicate Plaintiff in the September 1991 Murder of

Rafael Garcia ........................................................................................................7

Boudreau Fabricates Ralph Watson's Statement to Implicate Plaintiff in the Erving Homicide.

..............................................................................................................................8

Ralph Watson Twice Recants His False and Fabricated Statement .........................9

Defendants Arrest and Coerced Plaintiff Into Falsely Confessing to the Killing Erving and Garcia

..............................................................................................................................9

The Erving Homicide Investigation is Marked by More Coercion and Another Attempt to

Fabricate Evidence................................................................................................10

Plaintiff is Acquitted of the Garcia Murder but Convicted for Erving Murder .......11

Plaintiff is Exonerated and Granted a Certificate of Innocence...............................11

LEGAL STANDARD................................................................................................11

ARGUMENT ...........................................................................................................12

I.      Evans was Personally Involved in Plaintiff's Coerced Confession .............................12

        A.  Evans Threatened Plaintiff Both at Tate's Home and in Area 3............................12

B.  Evans Need Not Be in the Interrogation Room to be Liable. ...............................13

II.   Plaintiff Single Due Process Claim Encompasses His–Fabrication and Brady Theories of

Liability ...........................................................................................................15

III.  Plaintiff's Fabrication Claim Requires a Trial on the Merits .....................................16

A. Defendants' Strawmen on Theories Plaintiff is Not Bringing.....................................16

B. Boudreau is Liable for Fabricating Ralph Watson's Statement ..................................17

i.   Watson's Statement was Used to Deprive Plaintiff of Liberty.............................17

1.   The Law Does Not Require that Watson's Statement Be Introduced at Trial

........................................................................................................18

2.   Watson's Statement Was Introduced at Plaintiff's Criminal Trial ...........22

ii.  Boudreau Cannot Insulate Himself From Liability By Testifying to His Fabrication

..............................................................................................................25

C. Defendants are Liable for Fabricating Police Reports about Plaintiff's Fabricated

Confession and Watson's Fabricated Statement...........................................................25

IV.   A Jury Must Decide Plaintiff's Brady Theory of Liability...........................................27

a.   A Jury Must Decide if Defendant McWeeny Suppressed Evidence Relating to

Alternative Suspects "Spook" and Mark ................................................................27

b.   A Jury Must Also Decide if Defendants Suppressed Exculpatory Evidence in a Street

File  ...............................................................................................................32

V.    Plaintiff's Fourth Amendment Unlawful Detention Claim Survives Summary Judgment

Against Boudreau, Foley, and Evans.......................................................................36

a.   Plaintiff's Arrest and Arraignment Constitute "Seizure" and "Legal Process" ..

................................................................................................................37

      b.  Plaintiff Has a Redressable Injury for Defendants' Violation of his Fourth Amendment Right. ........................................................................................39

          i.  Plaintiff can obtain redress through nominal damages, punitive damages, and compensatory damages. ...............................................................39

              1.  Plaintiff can obtain redress through compensatory damages...39

              2.  Plaintiff can obtain redress though punitive damages. ............40

              3.  Plaintiff can obtain redress through nominal damages. ...........41

VI.    Plaintiff's State Law Malicious Prosecution Claim Survives Against Evans. ...........44

VII.   A Reasonable Jury Could Find that Evans Conspired with Defendants to Deprive Plaintiff of His Constitutional Rights. .........................................................................46

      a.  There is sufficient evidence for a reasonable juror to infer that Evans conspired with Boudreau and Foley to deprive Plaintiff of his constitutional rights. .....47

      b.  Defendants are not entitled to qualified immunity of Plaintiff's conspiracy claims. ..........................................................................................48

VIII. Plaintiff States a Cognizable Failure to Interview Claim and It Survives Against Evans. .................................................................................................50

IX.    A Jury Must Decide Plaintiff's Intentional Infliction of Emotional Distress Claim. ..51

X.     Defendants' Requests for Summary Judgment on Claims Plaintiff Has Not Brought Are Moot ..................................................................................................52

XI.    The City is Not Entitled to Summary Judgment on Plaintiff's Claims........................53

CONCLUSION.................................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co,* 398 U.S. 144 (1970)................................................................49

*Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226
(N.D. Ill. Nov. 26, 2019)..................................................................................................30, 31

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019).......................................18, 19, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................11

*Antonelli v. Foster*, 104 F.3d 899 (7th Cir. 1997)....................................................................38

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)...................................................................50

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ....................................18, 19, 24, 25

*Bailey v. United States*, 568 U.S. 186 (2013) ........................................................................ 37

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015)...............................................27, 46, 47

*Betts v. City of Chicago, Ill.*, 784 F. Supp. 2d 1020 (N.D. Ill. 2011) ......................................40

*Blackburn v. State of Ala.*, 361 U.S. 199 (1960)......................................................................50

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001)........................................................................ 31

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986) ...............................................................21

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................27

*Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) ................................................................43

*Brinegar v. United States*, 338 U.S. 160 (1949) .................................................................. 50

*Brooks v. Walls*, 279 F.3d 518 (7th Cir. 2002) ..................................................................... 19

*Calhoun v. DeTella*, 319 F.3d 936(7th Cir. 2003) ......................................................39, 41, 43

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019).......................................................................15

*Carey v. Piphus*, 435 U.S. 247 (1978) .......................................................................40, 41, 43

*Carroccia v. Anderson*, 249 F. Supp. 2d 1016 (N.D. Ill. 2003)............................................. 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................11

*Chiaverini v. City of Napolean, Ohio*, 602 U.S. 556 (2024).............................. 38, 39

*Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408 (N.D. Ill. Aug. 26, 2015) .... 20

*Daugherty v. Page*, 906 F.3d 606 (7th Cir. 2018) ...................................................46

*Davis v. United States*, 512 U.S. 452 (1994) ..........................................................21

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) .............................................. 16

*Doxator v. O'Brien*, 39 F.4th 852 (7th Cir. 2022) .................................................. 51

*Erwin v. Cnty. of Manitowoc*, 872 F.2d 1292 (7th Cir. 1989) ................................ 41

*Ewell v. Toney*, 853 F.3d 911 (7th Cir. 2017)......................................................... 43

*Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) 14, 17, 45

*Fields v. City of Chicago*, No. 10 CV 1168 (N.D. Ill. 2016)....................................33

*Fields v. Wharrie*, 740 F.3d 1102 (7th Cir. 2014) ................................16, 20, 32, 50

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ...................................................41, 52

*Gibson v. City of Chicago* No. 19 C 4152, 2020 WL 4349855 (N.D. Ill. July 29, 2020) .......14

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019) .................................................... 53

*Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010)............................................27, 31

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019)................................................ 15

*Haliw v. City of South Elgin*, 2020 WL 1304697 (N.D. Ill. March 3, 2020)........................ 49

*Hamilton v. City of New York*, No. 15 CV 4574, 2019 WL 1452013 (E.D.N.Y. March 19, 2019) ........................................................................ 21

*Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 100 S. Ct. 1987 (1980) ........................................................................46, 48, 49

*Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).........................................51

*Heck v. Humphrey*, 512 U.S. 477, 484 (1994)........................................................40

*Henry v. Ramos*, 1997 WL 610781 (N.D. Ill., Sept. 28, 1997)................................................. 52

*Hewitt v. Helms*, 482 U.S. 755 (1987) ........................................................................................42

*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) .............35

*Humphrey v. City of Anderson*, No. 119 C 00764, 2020 WL 3060363
(S.D. Ind. June 8, 2020) ............................................................................................................20

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ............................................................................ 22

*Hygh v. Jacobs*, No. 88-CV-406, 1990 WL 179006 (N.D.N.Y. Nov. 16, 1990)................... 44

*In Re Helmstetter*, 44 F.4th 676 (7th Cir. 2022) .....................................................................39

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ..................................................... 36

*Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903818 (N.D. Ill. March 24, 2025) ........24, 26

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ............................................. 35, 46, 49

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022)........................................................................... 25

*Kerr v. City of Chicago*, 424 F.2d 1134 (7th Cir. 1970)........................................................ 14

*Larson v. Valente*, 456 U.S. 228 (1982) ............................................................................... 39

*Liggins v. City of Chicago*, 2021 WL 2894167 (N.D. Ill. July 9, 2021)................................ 49

*Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007)............................................ 40

*Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985) ................................................................... 21

*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006)..........................................................52

*Manuel v. City of Joliet, Ill.,* 580 U.S. 357 (2017)..................................................................37

*Marshall v. Buckley*, 644 F. Supp. 2d 1075 (N.D. Ill. 2009)..................................................40

*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102 (1999) .................................... 47

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)................................................ 40

*Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450
 (N.D. Ill. April 8, 2024) ........................................................................................................19, 24

*Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325 (1960).......................................................... 48

*Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978).............................. 49

*Moore v. City of Chicago*, 2011 WL 1231318 (N.D. Ill. 2011)..........................................52

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ......................................................18, 19

*Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022) .......................................................50, 51

*Nesbitt v. Villanueva*, No. 09 C 6080, 2012 WL 14350 (N.D. Ill. Jan. 4, 2012) ...................12

*Newsome v. James,* 968 F. Supp. 1318 (N.D. Ill. 1997)........................................................ 46

*Nieves v. McSweeny*, 241 F.3d 46 (1st Cir.2001) ....................................................................38

*Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), *rev'd in part*, 755 F.2d 560 (7th Cir. 1985) .............................................................................................................................35

*Palmer v. City of Chicago*, 755 F.2d 560, 572 (7th Cir. 1985)............................................... 35

*Patrick v City of Chicago*, 974 F.3d 824 (7th Cir. 2020).........................................................18

*Patrick v. City of Chicago*, 81 F.4th 730 (7th Cir. 2023) ...................................................... 43

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ..................................20, 22

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)....................................................................... 12

*Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002) ..........................................................39

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) ..................................................................47

*Ramos v. City of Chicago,* 716 F.3d 1013 (7th Cir. 2013) .................................................42, 43

*Rivera v. Guevara*, No. 12 CV 04428 (N.D. Ill. 2018)...........................................................33

*Scherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988) ..................................................................46

*Serino v. Hensley*, 735 F.3d 588 (7th Cir. 2013) .....................................................................37

*Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020).............. *48*

*Sheet Metal Workers' Local 73 Welfare Fund Bd. of Trustees v. DeGryse*, 579 F. Supp. 2d 1063 (N.D. Ill. 2008) .............................................................................................................17, 30

*Smith v. City of Chicago*, 913 F.2d 469, 471 (7th Cir. 1990) ........................................... 42, 43

*Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015) ...............................................11

*Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 4401528 (N.D. Ill. Sept. 27, 2021)........26

*Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2009) ...............................54

*Thompson v. Clark*, 596 U.S. 36 (2022) ................................................................37

*Torres v. Madrid*, 592 U.S. 306 (2021) ................................................................37

*Tuduj v. Newbold*, 958 F.3d 576 (7th Cir. 2000) ................................................. 17, 29, 31, 38

*U.S. v. Boyd*, 55 F.3d 239 (7th Cir. 1995)................................................................21

*United States v. Mota*, 685 F.3d 644 (7th Cir. 2012)................................................................31

*United States v. Price*, 418 F.3d 771 (7th Cir. 2005)................................................................36

*United States v. Roberts*, 534 F.3d 560 (7th Cir. 2008)................................................ 36

*United States v. Warren*, 454 F.3d 752 (7th Cir. 2006) ................................................36

*Urban v. United States,* No. 03 C 6630, 2005 WL 1819954 (N.D. Ill. June 9, 2005)........... 32

*Uzuegbunam v. Preczewski,* 592 U.S. 279 268 (2021) ................................................41,43

*Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231
 (N.D. Ill. Sept. 30, 2023) ................................................................ 26

*Walker v. City of Chicago*, No. 1:21-CV-02648, 2025 WL 343471
(N.D. Ill. Jan. 30, 2025) ................................................................25

*Wallace v. Kato,* 549 U.S. 384 (2007) ................................................................ 37

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)................................................ *passim*

*Williams v. Chrans*, 50 F.3d 1356 (7th Cir. 1995)................................................................19

*Williams v. City of Chicago*, 315 F. Supp. 3d 1060 (N.D. Ill. 2018)................................... 20

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) ................................................14

*Wilson v. Smith*, No. 22 C 04413, 2024 WL 4753670 (N.D. Ill. Nov. 12, 2024)................. 37

*Wright v. City of Savannah*, No. CV417-195, 2021 WL 1603612 (S.D. Ga. Feb. 24, 2021)  43

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ................................................................49

**Statutes**

42 U.S.C. § 1983 ........................................................................................... *passim*

## INTRODUCTION

Plaintiff alleges that he was wrongfully convicted of the murder of Jerrod Erving. The story of why Plaintiff spent decades in prison for a crime that he did not commit starts and stops with Defendants. Among other things, Plaintiff alleges that Defendants beat a confession from him, which was false and fabricated, and also fabricated a witness statement from Ralph Watson. Meanwhile, the Defendants failed to disclose evidence of possible alternative perpetrators— notably, who was pointing the finger at those perpetrators—to the prosecutor and the criminal defense.

Defendants have moved only for partial summary judgment: Defendants Boudreau and Foley do not challenge Plaintiff's claim that they coerced and fabricated a confession from him. In other words, there will be a trial in this case. The Defendants are hoping to narrow the scope of that trial, but none of their arguments have merit. To start, the Defendants have moved for summary judgment on claims that the Plaintiff is simply not alleging. And even where the claims are at issue, the Defendants' motion rests on a misapplication of the law and skewed version of the facts in violation of basic summary judgment principles. Defendants choose to ignore Plaintiff's evidence disputing their accounts of the criminal investigation, including Plaintiff's testimony and the testimony of others. While the Defendants are free to argue this version of the facts at trial, they cannot do so here. When credited, that evidence demonstrates that Defendants' conduct crossed a constitutional line and that there are genuine disputes of fact warranting a trial in this case.

## SUMMARY OF MATERIAL FACTS

Plaintiff Arnold Day spent 26 years imprisoned for the murder of Jerrod Erving–a crime he did not commit. PSOAF[1] ¶ 85. Although he worked to piece his life together since his release, including working at a steel factory and getting married, it will not erase the nightmare he experienced. PSOAF ¶ 85.

On February 4, 1992, Plaintiff was wrongfully arrested and charged with the murder of Jerrod Erving. JSOF[2] ¶¶ 2, 153. The murder was investigated by Chicago Police Department ("CPD") detectives Dan McWeeny, Jude Evans, William Foley, and Kenneth Boudreau—officers who have troubling histories of police misconduct. JSOF ¶¶ 5, 16; PSOAF ¶¶ 87-92. Over a dozen individuals have alleged that in the years before and after the Erving homicide investigation, one or more of these officers physically abused or threatened them during a police investigation. PSOAF ¶¶ 87-92. For example, in March 1992, Boudreau and another detective interrogated a man named Harold Hill about a homicide. PSOAF ¶ 88. During the interrogation, Boudreau punched, slapped and intimidated Hill, insisted Hill participated in the homicide, and fed Hill facts about the crime. PSOAF ¶ 88. By the end of the interrogation, Hill falsely confessed. PSOAF ¶ 88. Also, Foley had a complaint sustained against him for slapping and beating child Johnny Plummer during a 1992 interrogation. PSOAF ¶ 90. Complaints of physical abuse were also lodged against Evans between 1988 and 1991. PSOAF ¶ 92.

Consistent with this disconcerting pattern of misconduct, similar tactics were used against Plaintiff during the Erving investigation, the result of which was Plaintiff's wrongful conviction and decades long incarceration. JSOF ¶¶ 133, 136-139, 142, 146-152; PSOAF ¶¶ 8, 85.

---

[1] Plaintiff uses the acronym "PSOAF" to refer to Plaintiff's additional statement of facts.
[2] Plaintiff uses the acronym "JSOF" to refer to the parties' joint statement of material facts. Doc. 263.

**Plaintiff Had No Involvement in the Erving Murder**

On the evening of May 17, 1991, a woman named Krona Taylor was outside 927 West 54th Street talking to Jerrod Erving. JSOF ¶ 12. While outside, Taylor saw a boy and girl coming down 54th street. JSOF ¶¶ 12-13; PSOAF ¶ 1. At the time, 54th Street was lit by at least one streetlight. PSOAF ¶ 1. The two individuals walked down 54th Street on the same side of the street as Taylor and Erving. JSOF ¶ 12. As the individuals approached, Taylor went inside the house and went upstairs. JSOF ¶ 12-13. From her vantage point, Taylor could hear the two individuals conversing with Erving. JSOF ¶ 13; PSOAF ¶ 2. She heard the boy and girl greet Erving. JSOF ¶ 13. Taylor did not recognize the individuals' voices as belonging to anyone she knew. PSAOF ¶ 6. Shortly thereafter, Taylor heard gunshots and saw Erving laying on the hallway floor with blood on the ground. JSOF ¶ 12; PSOAF ¶ 4.

At the time of the Erving murder, Taylor knew Plaintiff, having met him years earlier. PSOAF ¶ 5. Taylor was familiar with Plaintiff's appearance and his voice. PSOAF ¶ 5, 6. The man Taylor saw and heard on the night of Erving's murder was not Plaintiff. PSOAF ¶ 7. Taylor is 100% sure Plaintiff did not murder Erving. PSOAF ¶ 8.

**"Spook" and Marcus Chatman Emerge as Early Suspects**

On May 17, 1991, Defendant Detective Dan McWeeny and Detective James Brennan were assigned to investigate the Erving homicide. JSOF ¶ 16. McWeeny interviewed Taylor. JSOF ¶ 19. Taylor told McWeeny what she witnessed and provided a description of both perpetrators. JSOF ¶¶ 19-20; PSOAF ¶ 12. Per McWeeny's General Progress Report ("GPR"), the suspects were two Black men, between the ages of 16 and 20 years old, both had medium builds and were dark skinned. JSOF ¶ 19. One of the suspects wore a Bulls jacket. JSOF at ¶ 19. McWeeny recorded the suspect descriptions in a supplemental report. PSOAF ¶ 12. Although

Taylor told police the offenders were male and female, McWeeny memorialized that both suspects were male. JSOF ¶¶ 13, 19.

The very next day, McWeeny authored a GPR reflecting that at an unnamed source identified "Spook" and "Mark" as suspects. JSOF ¶ 42, 47; PSOAF ¶ 9. "Spook" and "Mark" matched the suspect descriptions that Taylor had given McWeeny. PSOAF ¶¶ 10-12. Like the described perpetrators, "Spook" and "Mark" were both dark skinned, Black, 16-20 years old, and one of them ("Spook") wore a Bulls jacket. PSOAF ¶ 10. McWeeny's report also reflects that Taylor stated that before the shooting, one of the perpetrators shook Erving's hand. PSOAF ¶ 13. McWeeny's GPR attributes that same action to "Mark": "Jerrod shook Mark's hand". PSOAF ¶ 13. McWeeny's GPR also reflects that "Mark" and "Spook" were associated with 55 + 57 Peoria and Sangamon. PSOAF ¶ 14. Another handwritten note in the file includes information from an unidentified person that appears to describe where "Spook" and "Mark" were standing in relation to the victim before the gunshots fired. (describing "Mark left side", "Spook right side", "the one with the bulls jacket had a racoon tail baseball cap with racoon tail Called the police heard two gunshots." PSOAF ¶ 25. No supplemental report exists in the investigative file identifying the person or persons who provided McWeeny with the information in McWeeny's GPR. PSOAF ¶ 16.

Defendants pursued "Spook" and "Mark" as suspects in the Erving murder.. PSOAF ¶17. On the same day McWeeny authored his GPR about "Spook" and "Mark", a name check inquiry was conducted for Marcus Chatman. JSOF ¶ 50. The investigative file also contains an undated and unattributed GPR showing that Chatman lived at 5533 S. Peoria—close to the area that Mark and Spook were associated with; an area McWeeny believed was a drug selling location. JSOF ¶¶ 49-50; PSOAF ¶ 19. Chatman was also associated with drugs; his criminal history showed

that in January 1991, Chatman had been arrested for drug possession. JSOF ¶ 50. The file also contains a mugshot of Marcus Chatman. JSOF ¶ 52. In the 1990s, it was McWeeny's practice to pull photographs of people he was investigating to show witnesses and/or determine if had the correct person. JSOF ¶ 52. The investigative file also contains mugshots of males, who like "Spook", had dark skin. PSOAF ¶ 23. No supplemental report exists in the investigative file documenting why or for what purpose these mugshots were pulled, to whom they were shown— in particular, if they were shown to Krona Taylor—or even who pulled them. PSOAF ¶ 23.

As further evidence that McWeeny and others were pursuing "Spook" and "Mark" as the perpetrators of the Erving homicide, the file also contains a stop order for Marcus Chatman. PSOAF ¶ 20. According to the Detective Division Standard Operating Procedures ("SOP"), a stop order can be requested under limited circumstances. PSOAF ¶ 20. In the absence of a warrant, a stop order can be obtained when a suspect has been identified but insufficient evidence exists to obtain a warrant, and the suspect is being sought for interrogation, a line-up, or other investigation. PSOAF ¶ 20. There is no supplemental report explaining why there is a stop order for Chatman, in violation of the Standard Operating Procedures requiring such memorialization when a stop order is issued. PSOAF ¶ 20.

### Additional Suspect: Antonio Thomas, Andre Thomas, and John Hooks Connected to the Erving Murder Weapon

Spook and Mark were not the only suspects that the Defendants developed. In addition, the Defendants developed evidence that connected the Erving homicide to another crime for which Antonio Thomas, Andre Thomas and John Hooks had been arrested. In particular, evidence technician Patrick Moran recovered and inventoried two 9mm fired cartridge cases and a 9mm fired bullet from the Erving crime scene. JSOF ¶ 15. No firearm was found at the crime scene. JSOF ¶ 15.

5

On August 8, 1991, the Erving ballistics evidence was matched to a Smith & Wesson collected in connection with an investigation into the murder of Lamark Taylor. JSOF ¶ 65. Antonio Thomas, Andre Thomas, and John Hooks were arrested in connection with that crime. PSOAF ¶ 44. The crime lab report memorializing the match between the Erving ballistics evidence and the Smith and Wesson was sent to Area 3, but the report does not appear in the investigative file for the Erving homicide. JSOF¶ 65; PSOAF ¶ 47. Per Boudreau, when someone is found in possession of a weapon associated with a homicide, homicide detectives would follow up on the information to determine if the person(s) is connected with the homicide. PSOAF ¶ 45. Boudreau testified that after the Erving murder weapon was linked to the suspects in the Lamark Taylor murder, homicide detective Griffin followed up on the lead, but there are no documents in the Erving investigative file reflecting that follow up. PSOAF ¶ 47. The failure to include such reporting contravened the governing Standard Operating Procedures. PSOAF ¶ 47; JSOF ¶ 70.

### The Unmistakable Indicators of an Erving Homicide "Street File"

Chicago Police Department had a widespread practice maintaining "street files," a practice that existed in 1991 during the Erving homicide investigation. PSOAF ¶ 29. A "street file" was a file that often contained materials regarding alternative suspects or leads in an investigation. PSOAF ¶ 30. The investigative file for the Erving murder investigations bears striking indicators of a street file. PSOAF ¶ 37-39.

For example, the investigative file contains GPRs and handwritten notes about Spook and Mark, but no corresponding supplementary report that would identify the source of the information. PSOAF ¶ 37.That was contrary to the policies and procedures that were put in place following the discovery of CPD detectives' use of street files. PSOAF ¶ 33. Indeed, the identity

6

of the person pointing the finger at Spook and Mark—two alternative suspects—was quintessential evidence police officers were trained to record. It was also quintessential information that CPD detectives kept in street files. PSOAF ¶ 30. The investigative file also contains no supplemental reports memorializing the basis for the stop order for Chatman, the purpose and use of the mugshots of Chatman and the dark skinned Black men nor does it include Detective Griffin's follow-up information about the Lamark Taylor murder suspects' connection to the Erving murder. PSOAF ¶ 37. All of that information too—which pointed at alternative offenders—is the very type of information that would be in a street file. PSOAF ¶ 30. Indeed, the inventory for the investigative file is missing as many as four GPRs from the file; those missing documents could be explained by the street file in this case; that is, that they were placed in the street file and not in the investigative file as they were supposed to be. PSOAF ¶¶ 30, 37, 39.

### Defendant Boudreau Fabricates Evidence to Implicate Plaintiff in the September 1991 Murder of Rafael Garcia

Four months after the Erving homicide, on the night of September 15, 1991, Rafael Garcia was shot and killed in front of a submarine shop at 1206 W. 51st Street. JSOF ¶ 74. Plaintiff had no involvement in the shooting. JSOF ¶ 74. At the time of the shooting, Plaintiff was at the home of Eleanor Robinson with family friend Carl Murray and Dorothea Robinson. JSOF ¶ 74.

Defendant Boudreau and Detective Kill were assigned to investigate the Garcia murder. JSOF ¶ 74. As part of their investigation, Boudreau and Kill interrogated 15-year-old Anthony Jakes. JSOF ¶¶ 83-84, 86-90. Despite his young age, no youth officer, parent, or guardian was present for the interrogation, in violation of CPD General Orders. JSOF ¶ 87. Boudreau and Kill asked Jakes about the Garcia homicide and Jakes told them he had no knowledge about Garcia's murder. JSOF ¶ 83, 86. In response, Kill, in Boudreau's presence, slapped Jakes, threatened to

push him out the window and burn him with a cigarette. JSOF ¶ 86. The threats and abuse continued throughout the interrogation. JSOF ¶¶ 86, 90. Unable to withstand the abuse, Jakes agreed to provide a statement to Boudreau and Kill implicating himself and Plaintiff in the Garcia murder. JSOF ¶ 90. The information used to implicate Jakes and Plaintiff was fed to Jakes by Boudreau and Kill. JSOF ¶¶ 86, 90.

### Boudreau Fabricates Ralph Watson's Statement
### to Implicate Plaintiff in the Erving Homicide

On January 20, 1992, Boudreau and his partner took Ralph Watson to Area 3. JSOF ¶ 120. Boudreau placed Watson in the interrogation room and informed Watson that he needed Watson to help him on some murders that had occurred in the area. JSOF ¶ 104. Boudreau offered to help Watson with his open cases in exchange for his help on the murders. JSOF ¶¶ 105, 109.  At the time, Watson had been charged with four armed robbery cases. JSOF ¶ 109.

Boudreau asked Watson for information about the Erving murder. JSOF ¶ 106. Watson truthfully told Boudreau that he did not know anything about it, and no evidence existed showing that Watson had any information about the homicide. JSOF ¶¶ 106-107. In response, Boudreau threatened to "put more cases" on Watson if he did not provide information. JSOF ¶ 109. Watson understood that any help from Boudreau to reduce the number of cases or time Watson was facing on his open cases required Watson to say he had something to do with the Erving murder and to provide information about it. JSOF ¶¶ 105, 109.

Watson accepted Boudreau's promises and gave a false statement about the Erving murder. JSOF ¶ 116. Having no involvement or knowledge of the Erving murder, Watson's statement reflected a story Boudreau came up with and rehearsed for hours with Watson. JSOF ¶¶ 107, 114. When felony review Assistant State Attorney ("ASA") Kevin Noonan interviewed

Watson, Watson parroted Boudreau's account and falsely identified Plaintiff as Erving's killer. JSOF ¶¶ 113-114, 117, 127.

Watson's statement was false and demonstrably so. JSOF ¶¶ 114-115. In Watson's statement, Watson stated that individuals named Darren and Tennille were present and assisted with the shooting. JSOF ¶ 113-114, 117. However, both Darren and Tennille were in custody at the time of the Erving murder. JSOF ¶ 115.

### Ralph Watson Twice Recants His False and Fabricated Statement

Months later, on August 12, 1992, a prosecutor interviewed Watson about the Erving murder. JSOF ¶ 127. Watson told the prosecutor that his statement about the murder was false and the result of Boudreau's inducements. JSOF ¶ 127. Watson told the prosecutor he did not witness the murder and Boudreau provided him with the information that appeared in his statement. JSOF ¶ 127. Watson recanted again a year later, repeating the same information he provided the prosecution during the August 1992 interview. JSOF ¶ 128.

### Defendants Arrest and Coerced Plaintiff Into Falsely Confessing to the Killing Erving and Garcia

On February 4, 1992, Defendants Jude Evans and William Foley, along with two gang specialists, arrested Plaintiff. JSOF ¶ 136. During his arrest, Evans stomped on Plaintiff's head even though Plaintiff was unarmed and not resisting. PSOAF ¶ 55. Once at the station, Plaintiff was handcuffed in an interview room. JSOF ¶ 137. There, Evans and Foley repeatedly came in and accused Plaintiff of being involved in the Erving murder. JSOF ¶ 137-138; PSOAF ¶ 58. When Plaintiff asserted his innocence, they threatened him. PSOAF ¶ 58. Boudreau also came into the room and tried to get Plaintiff to confess. JSOF ¶ 142; PSOAF ¶ 60. Plaintiff told Boudreau he was not involved in the Erving murder. JSOF ¶ 142. Undeterred, Boudreau told Plaintiff facts about the Garcia and Erving murders. JSOF ¶ 143, PSOAF ¶ 60. During this time,

9

Plaintiff was not given anything to eat or allowed to use the bathroom. JSOF ¶ 149; PSOAF ¶ 60. When Plaintiff continued to resist the coercive efforts to confess, Foley choked Plaintiff and, like Det. Kill did to Jakes, threatened to throw Plaintiff out the window. JSOF ¶¶ 86, 146-148, Fearing for his life, Plaintiff agreed to falsely confess. JSOF ¶¶ 147, 148, 151, PSOAF ¶ 61. Plaintiff then gave back to back confessions to felony review ASA Jason Danielian implicating himself as the shooter in both the Erving and Garcia murders. JSOF ¶ 150. Like Watson, Plaintiff's statements were based on the information Boudreau provided. JSOF ¶¶ 143, 146. Following his false confessions, Plaintiff was arrested and arraigned on charges stemming from the Erving murder. PSOAF ¶¶ 64-66.

### The Erving Homicide Investigation is Marked by <br> More Coercion and Another Attempt to Fabricate Evidence

During the Erving homicide investigation, Watson and Plaintiff were not the only persons subject to coercive techniques and/or inducements to make a false statement. JSOF ¶¶ 30-32, 34-35, 37, 170-172. Similar methods were used on Krona Taylor and a man named Edward Robinson. JSOF ¶¶ 30-32, 34-35, 37, 170-172. Shortly after the murder, detectives interviewed Taylor at the station. JSOF ¶ 30-31. They asked her to identify the perpetrators and when Taylor truthfully said she could not, the detectives screamed at her, called her a "bitch", and intimidated her. JSOF ¶¶ 32, 34-35. Taylor remained at the station for 16 hours. JSOF ¶ 37. At the time of Taylor's coercive interrogation, McWeeny was assigned to the Erving investigation. JSOF ¶ 38.

Edward Robinson was taken to Area 3 at the same time as Ralph Watson. JSOF ¶ 170. Boudreau was also investigating Robinson for suspected involvement in armed robberies. JSOF ¶¶ 170-172. While there Boudreau and another detective questioned Robinson about the Erving murder. JSOF ¶ 170. Robinson stated he had no knowledge about Erving's death. JSOF ¶ 170-

171. Boudreau then offered to make Robinson's armed robbery charges "disappear" if Robinson

agreed to identify Plaintiff as Erving's shooter. JSOF ¶ 170. Robinson refused to lie. JSOF ¶

171.

### Plaintiff is Acquitted of the Garcia Murder but Convicted for Erving Murder

Plaintiff went to trial on the Garcia murder and was acquitted. JSOF ¶¶ 97-98. In 1994,

Plaintiff was tried for the Erving murder. PSOAF ¶ 66. Plaintiff was convicted and sentenced to

60 years in prison. JSOF ¶ 185.

### Plaintiff is Exonerated and Granted a Certificate of Innocence

On December 18, 2018, Plaintiff's conviction was vacated and the State dismissed the

charges against him. JSOF ¶ 186-186. After 26 years of wrongful incarceration, Plaintiff was

released. PSOAF ¶ 85 On April 4, 2019, Plaintiff was subsequently granted a certificate of

innocence. JSOF ¶ 187.

### LEGAL STANDARD

On summary judgment, the moving party bears the initial burden of showing no genuine

dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]ith the court

drawing all inferences in the light most favorable to the non-moving party, the moving party

must discharge its burden of showing that there are no genuine issues of material fact and that he

is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir.

2015). Credibility determinations are for the jury, and all reasonable inferences must be drawn in

the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

11

## ARGUMENT

**I.    Evans was Personally Involved in Plaintiff's Coerced Confession**

Evans is moving for summary judgment on Plaintiff's Fifth and Fourteenth Amendments coerced confession claims (Counts I and II), arguing that he was not personally involved in securing Plaintiff's confession. The problem with Evans's contention is two-fold: First, Evans has failed to take the facts in the light most favorable to Plaintiff, disclaiming any of the misconduct alleged against him in the record. Second, Evans's argument that he had to be in the interrogation room at the time of the confession to be liable is unsupported by the law.

**a.    Evans Threatened Plaintiff Both at Tate's Home and in Area 3**

Evans argues that he cannot be held personally liable because there are no facts in the record demonstrating his involvement in Plaintiff's interrogation at Area 3. That is incorrect; it ignores evidence in the record to the contrary, in contravention of well-settled summary judgment principles. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *Nesbitt v. Villanueva*, No. 09 C 6080, 2012 WL 14350, at *4 (N.D. Ill. Jan. 4, 2012) (same).

In particular, Defendants improperly ignore all of the following in the record: Evans went with Foley to arrest Plaintiff at Kwame Tate's home PSOAF ¶¶ 53-54. When he got there, rather than lawfully securing Plaintiff, Evans "stomp[ed] on the back of [Plaintiff's] head" and then handcuffed him. JSOF ¶133; PSOAF ¶¶55, 61, 81. Plaintiff testified that his head "hurt." PSOAF at ¶55. Plaintiff was then taken to Area 3, where he was handcuffed to the wall in an interrogation room. JSOF ¶135.

Later, Evans and Foley came into the interrogation room and threaten[ed] [him] about the death of Jerrod [Erving]." PSOAF ¶58; *see also* JSOF ¶137. Plaintiff professed his innocence and told Evans and Foley that "he did not know what they were talking about." PSOAF ¶58.

Foley told Plaintiff that they knew that Plaintiff killed Erving and that they had people who were pointing him out. JSOF ¶137.

On at least two, but possibly as many as five occasions, Foley and Evans left Plaintiff's interrogation room and came back, repeatedly threatening and accusing Plaintiff of the Erving homicide. JSOF ¶138; PSOAF ¶58. Plaintiff explained that it was the "[s]ame process over and over again, threatening [him]." *Id.* at ¶58. At some point after Foley and Evans left, Boudreau came into the interrogation room. JSOF ¶¶ 141, 142. Boudreau talked to Plaintiff about the "same thing, trying to get [Plaintiff] to confess". PSOAF ¶60. During this entire time, Plaintiff was handcuffed to the wall, not able to use the washroom and not given anything to eat. PSOAF ¶60.

As the above facts demonstrate, Evans began the coercive techniques by physically assaulting Plaintiff at Tate's home, and continued by repeatedly threatening Plaintiff during Plaintiff's interrogation at Area 3. That misconduct, combined with the later coercion by Foley, caused Plaintiff to falsely confess. JSOF ¶151; *see* JSOF ¶152 (threats and physical violence introduced risk factors shown to increase the likelihood of a false confession); PSOAF ¶¶ 53-61.

**b. Evans Need Not Be in the Interrogation Room to be Liable.**

In the alternative, Evans argues that he cannot be liable because he was not present for Plaintiff's confession. That argument has no merit.

Case law does not require that Defendants be present when Plaintiff confessed to hold them liable for that coerced confession. That is because the legal question is not whether any particular officer took the coerced confession, but instead whether the actions of that officer were the proximate cause of that confession. *See Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012) (the existence of multiple proximate causes means a tortfeasor's conduct "need not be

close in space…. to be a proximate cause") (citation omitted).. This applies here, where the test for voluntariness requires a jury to analyze the "totality of the circumstances", which includes conduct that occurred prior to the actual confession. *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001); *see also See Kerr v. City of Chicago*, 424 F.2d 1134, 1138 (7th Cir. 1970) (voluntariness considers "all relevant fact"). Indeed, "a totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will." *Wilson*, 260 F.3d at 946.

The analysis in *Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *6 (N.D. Ill. July 29, 2020) is instructive. In *Gibson*, the plaintiff sued officers for coercing his false confession. The defendant similarly claimed lack of personal involvement." *Id*. at *6. *Gibson* rejected that argument, finding that even though defendants were not in the room when the plaintiff confessed, they could be held liable for taking the " steps that Gibson alleges caused his coerced confession." *Id*.; *Cf. Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *18-21 (N.D. Ill. Jan. 24, 2024) (finding defendants could be liable for fabricated confession even when they did not participate in the interrogation based on their involvement in the case, which for some defendants included, "us[ing] coercive tactics" in the interrogations of other co-plaintiffs, or being "present for . . . at least one of [that other defendant's] interrogation sessions" or where the plaintiff had told the defendants that "he was innocent").

So too here. Evans can be held liable for his coercive arrest, interviewing, and threats to Plaintiff—"the steps" that caused Plaintiff's coerced coercion. *See Gibson*, 2020 WL 4349855, at *6. Evans' causation argument to the contrary misses the mark. In support of his argument, Evans misconstrues an agreed facts to lay blame only at Foley's feet. Citing to paragraphs 148

and 151 of the JSOF, Evans argues that "the only reason [Plaintiff] falsely confessed was because Det. Foley choked him one time for a few seconds and threatened to throw him out the window." Doc. 267 at 21. But that is not what the agreed upon facts explain. To the contrary, the facts state that Plaintiff "confessed because of the abuse he suffered from Detective**s** and testified that the *tipping point* was Detective Foley choking him and threatening to throw him out the window." JSOF ¶151 (emphasis added). In other words, Plaintiff has testified that he confessed as a result of all of the Defendants "continuing abuse," even if it was Foley who ultimately pushed him over the edge. PSOAF ¶53-61 (Plaintiff specifically identifying Evans's stomping on his head one of the coercive acts that caused him to confess); JSOF ¶¶ 151, 152 (threats and physical violence introduced risk factors shown to increase the likelihood of a false confession). Evans' coercive conduct towards Plaintiff precludes the grant of summary judgment.

## II. Plaintiff Single Due Process Claim Encompasses His–Fabrication and *Brady* Theories of Liability

Contrary to Defendants' mischaracterization, Day asserts a single count for the violation of his due process rights under the Fourteenth Amendment in Count III of his Complaint. *See Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (clarifying that due process theories "do not give rise to separate *claims* under section 1983."); *see also Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019).

Defendants do not challenge Plaintiff's theory that Boudreau and Foley fabricated his confession. At a minimum, then, Plaintiff's due process claim will proceed to trial and therefore as the Seventh Circuit has instructed, the Court should not parse out the additional theories of liability. *Goudy*, 922 F.3d at 844 (holding that once it is established at summary judgment that a trial is required on due process theories, the court need not parse each due process theories of liability). For the same reason, the City's motion for summary judgment, which wrongly asserts

that all Defendants are moving on Plaintiff's due process claim, (Doc. 257) is premature and must be denied. Regardless, and as set forth more fully below, those theories also require a trial on their merits.

### III.     Plaintiff's Fabrication Claim Requires a Trial on the Merits

Much of Defendants' argument on Plaintiff's fabrication claim focuses on claims that Plaintiff has not (and has never) raised. As to the claims Plaintiff has actually raised, for purposes of summary judgment, Defendants have not challenged Plaintiff's allegation that his confession was fabricated, beyond their claim that neither Evans nor McWeeny should be held liable – a contention that Plaintiff is not disputing. With regard to Ralph Watson, Defendants have argued that they cannot be liable because it was not introduced at trial and Boudreau is immune from his testimony about it. Those arguments fall flat as described more fully below.

#### a.   Defendants' Strawmen on Theories Plaintiff is Not Bringing

Defendants are moving for summary judgment on three theories of fabrication that Plaintiff has not raised. First, Defendants argue that they are entitled to summary judgment on Plaintiff's fabrication claim based on the witness coercion of Anthony Jakes and Ralph Watson. Doc. 267 at 21-22. Plaintiff has not raised such a claim, but has explained that that coercion is evidence of fabrication and will be relevant at trial. *Fields v. Wharrie*, 740 F.3d 1102, 1122 (7th Cir. 2014); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*) ("[f]abrication can also be proven circumstantially" including by defendants' use of coercion).

Second, Defendants argue that they cannot be liable for their fabrication of Anthony Jakes's statement in the Garcia homicide because Plaintiff was acquitted of the Garcia homicide and because Jakes's fabricated statement was not used against Plaintiff in the Erving trial. Doc. 267 at 25-26. Again, Plaintiff has not raised a stand-alone claim for fabrication of Jakes's

statement, but that statement—and the coercion and fabrication used to create it—is relevant under Federal Rule of Evidence 404(b) as evidence of these Defendants' *modus operandi*.

Third, McWeeny and Evans have argued that they cannot be liable for Plaintiff's fabricated confession because they were not in the interrogation room when the other Defendants fabricated it. Doc. 267 at 23-24. While that argument stretches the law well beyond its intended boundary, it is an argument for another day as Plaintiff is not proceeding against either Evans or McWeeny for his fabricated confession. *See Ezell*, 2024 WL 278829, at *19 (defendants liable for fabricated confession even when not present for the confession). Instead, Plaintiff's fabricated confession claim is brought against Boudreau and Foley—neither of whom has moved for summary judgment on this theory of liability and cannot do so in their reply. *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2000) ("arguments not raised in an opening brief are waived"); *Sheet Metal Workers' Local 73 Welfare Fund Bd. of Trustees v. DeGryse*, 579 F. Supp. 2d 1063, 1069 (N.D. Ill. 2008) (same). For that reason, this theory survives, albeit against different Defendants.

### b. Boudreau is Liable for Fabricating Ralph Watson's Statement

As to Plaintiff's actual theories of fabrication, Boudreau argues that he cannot be liable for Ralph Watson's fabricated statement. For purposes of summary judgment, Defendants do not dispute that Ralph Watson's statement was fabricated. They argue, however, that Boudreau is not liable for that fabrication because Watson's statement was not introduced at trial and because Boudreau cannot be liable for his trial testimony about Watson's statement. Neither argument has merit.

### i. Watson's Statement was Used to Deprive Plaintiff of Liberty

First, Defendant Boudreau argues that he cannot be liable because Watson's statement was not introduced at trial. That argument not only misstates the law, but also the factual record in this case.

### 1. The Law Does Not Require that Watson's Statement Be Introduced at Trial

To start, the Seventh Circuit does not require that fabricated evidence be used at trial for a due process violation to occur. Instead, the Seventh Circuit pattern jury instruction offers that fabricated evidence can violate due process if "introduced against Plaintiff" either "at his criminal trial" or "in his criminal case." Seventh Circuit Civil Pattern Inst. 7.14. Indeed, the Seventh Circuit has consistently held that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is used to deprive the defendant of her liberty in *some way*. *Whitlock*, 682 F.3d at 580 (emphasis added); *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting the above-language from *Whitlock*); *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (same).

Defendants cite *Patrick v City of Chicago*, 974 F.3d 824 (7th Cir. 2020) and *Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) for the proposition that the evidence must be admitted at the criminal trial to be actionable. But neither case changed well-settled law in the Seventh Circuit. Instead, without mentioning any of *Whitlock*, *Avery* or *Anderson*, *Patrick* held that the jury instruction in *Patrick* was incomplete (but ultimately harmless error) because it did not include a requirement that the fabricated evidence be material and be introduced in the criminal trial. *Patrick*, 974 F.3d at 835. The sole citation *Patrick* offered for that ruling was Seventh Circuit Pattern Instruction 7.14, which, as noted above, does not require evidence to be introduced at trial; rather, it can also be introduced "in a criminal case." Seventh Circuit Civil Pattern Jury Inst. 7.14.

18

*Moran* is similarly unavailing for Defendants. It is largely devoid of analysis on the operative issue: In two sentences it disposed of the plaintiff's fabrication claim, citing to *Patrick* and finding that because a piece of evidence was not introduced at trial, it was not material. *Moran*, 54 F.4th at 499.

Indeed, neither *Moran* nor *Patrick* could have overturned the precedent established in *Whitlock*, *Avery* and *Anderson* because one panel of the Seventh Circuit cannot overrule another panel, let alone three such panels. *See Williams v. Chrans*, 50 F.3d 1356, 1368 (7th Cir. 1995); *see also Brooks v. Walls*, 279 F.3d 518, 522. Rather, "[o]verruling requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)." *Brooks*, 279 F.3d 522. *Patrick* did not propose to overrule any decision (nor did *Moran*), and the *Patrick* panel did not circulate its opinion to the full court before release. *Id*. So *Whitlock*, *Avery* and *Anderson* remain the law of this Circuit—and they are incompatible with Defendants' claim that fabricated evidence must be introduced in the criminal trial to be actionable.

Rather, the operative and governing language is that evidence must be used to deprive a plaintiff of his liberty in "some way." *Whitlock*, 682 F.3d at 580 (emphasis added); *see also Avery*, 847 F.3d at 439; *Anderson*, 932 F.3d at 510. That can be because the evidence is directly introduced in a criminal trial or because the evidence is simply introduced in a criminal case. Seventh Circuit Pattern Inst. 7.14. Stated differently, "[a] fair reading of Seventh Circuit jurisprudence, from *Whitlock* to *Moran*, reveals that the 'the due process violation occurs once the material fabricated evidence is introduced in some way . . . that results in the criminal defendant's conviction and ultimately deprives him of his liberty." *Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450, at *3 (N.D. Ill. April 8, 2024) (quoting *In re Watts*

*Coordinated Pretrial Proc.*, No. 19-CV-1717, 2022 WL 9468206, at *6-7 (N.D. Ill. Oct. 14, 2022)).

The use of Watson's statement to arrest Plaintiff easily fits that definition. Defendant Boudreau testified that the basis for probable cause to charge Plaintiff with the Erving homicide was "Ralph Watson's statement and Day's . . . statement." Ex. 86 (Boudreau Dep.) at 284:3-18; *see also* PSOAF ¶73. Watson's statement was the only evidence that implicated Plaintiff, other than Plaintiff's false confession. PSOAF ¶72. Because Watson's fabricated statement was used to detain and prosecute Plaintiff, it deprived Plaintiff of liberty in "some way." *Whitlock*, 682 F.3d at 580; *see Fields v*, 740 F.3d at 1112 ("*Fields II*") ("[T]he fabrication of evidence of evidence harmed the defendant before and not just during the trial, because it was used to help indict him"); *see also see also Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1075 (N.D. Ill. 2018) ("If [the plaintiff] has pled that the fabricated evidence . . . furthered the prosecution, he has done enough"); *Humphrey v. City of Anderson*, No. 119 C 00764, 2020 WL 3060363, at *7-8 (S.D. Ind. June 8, 2020) (""[T][he fabrication of evidence can cause harm to a defendant before trial."); *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (permitting fabrication claim where plaintiff alleged that fabricated evidence was used to secure his arrest and indictment).

It also deprived Plaintiff of his liberty insofar as it made it impossible for Plaintiff to call Watson as a witness to corroborate Plaintiff's allegations of coercion and to undermine the integrity of the investigation. Rule of Evidence 404(b); *see Patrick v. City of Chicago, 213 F. Supp. 3d 1033, 1050 (N.D. Ill. 2016)*(finding plaintiff defeated summary judgment on fabrication where fabricated evidence "prevented Plaintiff from presenting evidence that would call into question the reliability" of co-defendants and Plaintiff's confession). In particular, if Defendant

Boudreau had not fabricated Watson's statement inculpating Plaintiff, then Plaintiff could have called Watson to testify that the very same Defendants that Plaintiff was alleging coerced his confession tried the same on Watson. Indeed, the "prosecution's case [might] have collapsed *entirely* had the truth come out about the behavior and treatment of" Watson (alongside Plaintiff). *U.S. v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995); *see also Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation."); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial because withheld *Brady* evidence "carried with it the potential . . . for the discrediting . . . of the police methods employed in assembling the case").

On that score, Plaintiff's criminal defense attorney Stuart Katz testified that he could not call Watson as a witness because he "would have been opening the door to the [S]tate then putting in his original statement where he named Arnold." Ex. X (Katz Dep.) at 104:14-105:8. In other words, he could not call Watson to testify that the police tried to coerce and fabricate a statement from him inculpating Plaintiff because doing so would permit the State to put in Watson's fabricated statement inculpating Plaintiff in the crime. In that he said-he-said battle, invariably the Defendants—as police officers—would have won regardless of the truth. *See Hamilton v. City of New York*, No. 15 CV 4574, 2019 WL 1452013, at *17 (E.D.N.Y. March 19, 2019) (police generally credited over civilians); *see also Davis v. United States*, 512 U.S. 452, 475 n.7 (1994) (Souter, J., concurring) ("As a practical matter . . . .when an inculpatory statement has been obtained as a result of an unrecorded, incommunicado interrogation, these officers rarely lose 'swearing matches' against criminal defendants at suppression hearings."). As a

result, and in this way, Watson's fabricated statement precluded Plaintiff from putting on a defense. *See Patrick*, 213 F. Supp. 3d at 1050.

### 2. Watson's Statement Was Introduced at Plaintiff's Criminal Trial

Regardless, Watson's statement was used against Plaintiff in his criminal trial. The Defendants try to downplay this by arguing that Watson's statement itself was not admitted at trial. That claim has no merit.

To start, there is no requirement that the Watson statement itself be admitted for a fabrication claim to succeed. Fabricated evidence also violates due process when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case (including by preventing the criminal defendant from calling a witness at trial), or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018). Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

Nor are the Defendants on firmer footing arguing that the substance of Watson's statement was not admitted. As demonstrated below, while no one read in the statement to the jury, Watson and his attendant statement were repeatedly discussed as a reason why the Defendants were looking for Plaintiff for the Erving homicide and as the explanation for why Plaintiff confessed to a crime he did not commit. To that end, Watson's statement was introduced in opening statement when the State told the jury that Boudreau spoke to Ralph Watson about whether "he had any knowledge of any homicide that occurred in the area where [he] lived;" "took a handwritten statement from him" about that homicide; and then "proceeded to look for [Plaintiff]" for the Erving homicide. JSOF ¶ 160. The State also informed the jury that although Plaintiff initially denied any involvement in the crime, "after [Plaintiff] was shown

22

[Ralph's] handwritten statement . . . Arnold Day proceeded to tell detective Buedro (*sic*), yes, I was there that night." *Id*.

The same attention was given to Watson during Boudreau's testimony. Boudreau testified that he spoke to Watson and took a handwritten statement from him about something other than the robberies that Watson was being investigated for; and that after taking that statement, Boudreau immediately began looking for Plaintiff in connection with the Erving homicide. JSOF ¶ 161. Boudreau also testified that Plaintiff confessed after being confronted with Watson's statement. *Id*. So obvious was the substance of Watson's statement, that Katz made a motion for mistrial based on that, arguing that "[t]he exaggerated amount of emphasis placed on Mr. Watson's statement in his opening statement" and "[t]he amount of time spent on Mr. Watson's statement during officer Boudreau's testimony" meant that "the jury[] would have to be total morons not to understand what the statement was." PSOAF ¶75. D215:21-D216:8.

After that motion was denied, the State put any rest to doubt what was being telegraphed. During its cross-examination of Plaintiff, and over Plaintiff's objection, the prosecutor again raised Watson's statement, expressly asking Plaintiff:

> Q.            During that conversation, did [Boudreau] tell you that Ralph Watson had given them your name?
>
> Mr. Katz:      Objection
>
> The Court:     Overruled.
>
> The Witness:  Yes he did.
>
> Q.            That Ralph Watson had given your name as the individual who committed the murder of Jerrod Erving, right?
>
> A.            Correct.

E113:1-10.

Based on this and the other testimony that had been elicited from Boudreau, the State closed on the trial evidence, arguing that Watson's statement meant that Plaintiff "was caught. The police had the goods on him. The game was up . . . They confronted him with Ralph Watson and [Plaintiff] gave a statement." JSOF ¶ 163.

Given the foregoing, no credence should be given to Defendants' claim that because the four corners of Watson's statement were not introduced, any fabrication claim fails. On that score, *Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903818 (N.D. Ill. March 24, 2025) is instructive. There, like here, the defendants argued that the plaintiff could not prove that evidence—"the Guevara lineup report"—was used against the plaintiff at trial "because the physical lineup report was not admitted as an exhibit at trial and the defense, not the prosecution, elicited information from Guevara about the lineup at trial." *Id*. at *18. This Court rejected that argument, finding that "the prosecution . . . utilized the substance of the Guevara lineup report in its affirmative case and during closing arguments;" "witnesses and defense counsel also mentioned the written Guevara lineup report at trial;" and "defense counsel used it to refresh the memory of witnesses at trial." *Id*. Based on that, this Court found that the report was "used" at trial within the meaning of the fabrication jurisprudence. *Id*.

So too here: The State discussed Watson's statement in opening and closing arguments, and examined both Boudreau and Plaintiff on it. Indeed, the State did far more than "mention" the statement, it expressly informed the jury (over Plaintiff's objection) that "Ralph Watson had given [Plaintiff's] name as the individual who committed the murder of Jerrod Erving." PSOAF ¶ 76. As such, Watson's statement was "introduced" in "some way" which resulted in Plaintiff's conviction. *Whitlock*, 682 F.3d at 580; *Avery*, 847 F.3d at 439; *Anderson*, 932 F.3d at 510; *Mendoza*, 2024 WL 1521450, at *3.

### ii. Boudreau Cannot Insulate Himself From Liability By Testifying to His Fabrication

Second, Defendants argue that Boudreau cannot be liable for Boudreau's testimony about Watson's fabricated statement because Boudreau is entitled to testimonial immunity. That argument has been repeatedly rejected by the courts. Plaintiff is not holding Boudreau liable for his testimony, but instead that testimony is relevant because it completes the tort of fabrication; it is the very "introduction at trial" that Defendants complained was missing in this case. "It would be odd indeed if trial testimony could immunize already-fabricated evidence simply by introducing the evidence *through* trial testimony. Indeed, introduction at trial is a *required* element of an evidence-fabrication claim." *Walker v. City of Chicago*, No. 1:21-CV-02648, 2025 WL 343471, at *3 (N.D. Ill. Jan. 30, 2025) (emphasis in original).

Defendants' citation to *Avery* supports Plaintiff—and not Defendants. In *Avery*, the Seventh Circuit clarified that police officers who fabricate evidence cannot immunize themselves by authenticating it at trial. *Avery*, 847 F.3d at 441. "In other words, police officers cannot purify fabricated evidence by invoking *Briscoe*'s absolute-immunity rule." *Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022). Accordingly, Boudreau cannot immunize himself from liability for Watson's fabricated statement simply because he subsequently testified about it at Plaintiff's criminal trial. *Id.*

### c. Defendants are Liable for Fabricating Police Reports about Plaintiff's Fabricated Confession and Watson's Fabricated Statement

Again, for purposes of summary judgment, Defendants do not dispute that Plaintiff's confession and Watson's statement were fabricated. Instead, Defendants argue that they cannot be liable for "police reports relating to the Erving homicide investigation that documented Day's incriminating statements . . . or Watson's statement[]" because they were not "used at trial or admitted into evidence." Doc. 267 at 26. That argument fails for all of the reasons above.

Taking a step back, Plaintiff's false and fabricated confession was memorialized not only in the handwritten statement taken by ASA Danielian, but also in Foley's and Boudreau's subsequent supplementary police report. JSOF ¶ 150; PSOAF ¶78. That supplementary report recounts Boudreau's and Foley's interrogation of Plaintiff, in which Plaintiff allegedly gave them a fabricated confession. PSOAF ¶78. Boudreau then testified about that exact interrogation and the attendant details of Plaintiff's fabricated confession at trial. PSOAF ¶78. Further, ASA Danielian testified that prior to obtaining Plaintiff's false confession, he reviewed police reports which, in part, helped him understand the investigation and presumably guided his questioning of Plaintiff. PSOAF ¶79. Given the foregoing, there is no legitimate dispute that the supplementary report was used against Plaintiff at trial. *See Johnson*, 2025 WL 903818, at \*18; *see also Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at \*12 (N.D. Ill. Sept. 30, 2023) (explaining that while a police report memorializing "the Mejia identifications may not have been admitted into evidence, the alleged fabrications (the Mejia identifications themselves . . . .) were used at trial against Velez"); *Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 4401528, at \*7 (N.D. Ill. Sept. 27, 2021) (holding a police report was used against defendant at trial where the contents of the fabricated report were used at trial).

So too for Watson's fabricated statement. That statement was also memorialized in Foley's and Boudreau's supplementary police report. PSOAF ¶78. And the most salient part of Watson's statement—the fact that he identified Plaintiff as the perpetrator of the Erving homicide—was introduced at trial, including through the State's opening and closing argument, Boudreau's testimony and the State's cross-examination of Plaintiff. *See* Section II above; *see also Johnson*, 2025 WL 903818, at \*18; *Velez*, 2023 WL 6388231, at \*12; *Taylor*, 2021 WL

4401528, at *7 (N.D. Ill. Sept. 27, 2021). For that reason, the Defendants' argument on this score fails too.

### IV.    A Jury Must Decide Plaintiff's *Brady* Theory of Liability

In addition to fabrication theories of liability on Plaintiff's due process claim, Plaintiff has evidence that the Defendants suppressed material information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Those theories too require a trial for their resolution.

#### a.    A Jury Must Decide if Defendant McWeeny Suppressed Evidence Relating to Alternative Suspects "Spook" and Mark

A jury must decide Plaintiff's *Brady* theory that McWeeny withheld exculpatory information pertaining to two alternative suspects—Spook and Mark. JSOF ¶¶39-54. *See, e.g.*, *Beaman v. Freesmeyer*, 776 F.3d 500, 509–10 (7th Cir. 2015) (generally "evidence inculpating another suspect [i]s *Brady* material."); *Goudy v. Basinger*, 604 F.3d 394, 400-01 (7th Cir. 2010) (withheld evidence inculpating an alternative suspect may be considered material, even if that evidence did not necessarily point to the defendant's innocence). Here, McWeeny withheld the identity of the witness who identified the two alternative suspects—"Spook" and Mark—which in turn deprived Plaintiff of the opportunity to develop an alternative suspect defense. Even though the names and physical descriptions of these suspects were known, Plaintiff was deprived of the ability to develop evidence that pointed the finger at them.

McWeeny's May 18, 1994 GPR identified "Spook" and "Mark" as not only being with the victim at the time of the shooting, but also, and more importantly, matching the assailants' physical descriptions provided by the eyewitness, Krona Taylor. JSOF ¶¶44-45; PSOAF ¶¶ 10-12. McWeeny's GPR described "Spook" as wearing "a Bull's jkt [jacket]"—just as Taylor had claimed one of the assailants was wearing—and stated that "Jerrod shook Mark's hand"—which Taylor had stated one of the assailants did just before shots were fired. JSOF ¶¶44-45, 51;

27

PSOAF ¶¶ 11-13. McWeeny testified that the information in this GPR came from a third person, possibly a confidential informant. JSOF ¶42. The problem with McWeeny's GPR, however, was that he never identified the source of this information; that is, who told him that Spook and Mark were possible perpetrators. As a result, Plaintiff had no witness to call at trial (and no person to follow-up with) to point the finger at Spook and Mark.

According to Plaintiff's police practices expert, Roger Clark, McWeeny's failure to memorialize the source of the information in his GPR was "[o]ne of the most glaring failures" in the documentation of the investigatory steps taken in the Erving homicide investigation. PSOAF ¶ 27. Indeed, McWeeny admitted that he knew that documentation of his investigatory steps in a homicide investigation was important. JSOF ¶ 43. Indeed, the CPD's General Order 83-2 and the Detective Division SOPs required it. PSOAF ¶ 28; JSOF ¶ 47. Yet, no supplementary report exists in the homicide file memorializing the identity of the witness who provided the information to McWeeny about Spook and Mark nor is the identity of that witness memorialized in McWeeny's GPR. PSOAF ¶¶ 15-16.

This was particularly problematic because Spook and Mark were not fleeting names in the investigation. Rather, McWeeny and other officers clearly treated "Spook" and Mark as suspects in the Erving murder and they set about investigating these two individuals. PSOAF ¶ 17. To that end, an unknown detective obtained a physical description of "Spook" and Mark, and approximate address. JSOF ¶53. They also located a possible name and address for someone that could be Mark in an undated and unattributed GPR. JSOF ¶ 48 (individual named Marcus Chatman and lists "55th Place & Peoria"). On the same day McWeeny authored the GPR about Spook and Mark, a detective conducted a name check on Marcus Chatman. JSOF ¶ 50. Just as the "Mark" on McWeeny's GPR was associated with "55+57 Peoria and Sangamon," (a location

28

that McWeeny believe referred to where drugs were sold), Chatman whose name was run had a similar association as he who lived at 5522 S. Peoria. JSOF ¶¶ 49, 52; PSOAF ¶ 19. Chatman was also had a criminal history, including prior drug arrests. JSOF ¶ 50.The file also contains a mug shot of Marcus Chatman. JSOF ¶52. McWeeny testified that he would pull a photograph to show witnesses so that he could determine if he had the right suspect or not. *Id.*

The investigative file also contains another GPR referencing Spook, and another handwritten note reflecting Spook's clothing and Spook's and Mark's positioning during the Erving murder. PSOAF ¶¶ 25, 26. The GPR and the note does not reflect the officers who received the information. PSOAF ¶¶ 25, 26. What is a glaring omission from the file are any supplementary reports identifying who McWeeny (and other officers) spoke to that provided all the information regarding "Spook" and Mark and who they showed the photograph to. PSOAF ¶¶ 27, 37. In other words, while Plaintiff could identify the alternative suspects, absent Spook and Mark coming clean about their involvement in the Erving homicide, Plaintiff had no way to present this alternative perpetrator theory to the jury. That was because McWeeny withheld the identity of the witness(es) with knowledge about Spook and Mark's involvement in the crime. Without the identity of that person, Plaintiff was deprived of the ability to develop admissible evidence about the alternative suspects. For example, he could not question McWeeny's to determine if they were an eyewitness, or, in the alternative, track down the primary source of the witness's knowledge.

Defendants raise two arguments regarding this *Brady* theory of liability, both of which are unavailing.[3] First, Defendants claim that Plaintiff has failed to identify the exculpatory

---

[3] Defendants only raised two arguments regarding this *Brady* theory and therefore have waived all others including that the information could have been obtained through due diligence and that the information was cumulative and/or not material. Raising new arguments in reply is untimely and should be barred. *Tuduj v. Newbold*, 958 F.3d 576, 579

information that McWeeny withheld. Def. Br. 34. But Plaintiff has identified the exculpatory information that was withheld—McWeeny withheld the identity of the witness(es) who identified "Spook" and Mark as perpetrators of the Erving homicide; as well as the person(s) who described Spook and Mark's possible location and clothing at the time of the shooting. PSOAF ¶ 27.

Second, the Defendants argue that because Plaintiff does not dispute that McWeeny's GPR was disclosed to the prosecutors, the claim fails. *Id.* As explained above, that GPR was missing critical information: the identity of the witness(es) pointing the finger at Spook and Mark. Withholding this critical information deprived Plaintiff and his defense counsel of the witness(es) who could have testified at trial as to the alternative suspect defense. *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at **7-9 (N.D. Ill. Nov. 26, 2019).

The court's decision in *Andersen* is instructive here. In that case, the defendants disclosed in a supplementary report some information that pointed to an alternative suspect, who had been interviewed by the police and subjected to a polygraph exam. 2019 WL 6327226 at *7. However, the detectives withheld that an unidentified witness had told them that the alternative suspect "was known to pull knives" on the victim. *Id*. In other words, the police withheld the name of the witness (and that witness's attendant information) who could testify to create the critical link between the alternative suspect and the crime. *Id.* at *7-8. For that reason, the court denied summary judgment on the *Brady* theory finding that the *Brady* material was not cumulative and it was material because the detectives did not disclose the information about the alternative suspect or the source of that information. *Id. Anderson* rejected the defendants' arguments, analogous to those the Defendants make here, "that there is no proof that a report of any such

_____

(7th Cir. 2000) ("arguments not raised in an opening brief are waived"); *Sheet Metal Workers' Local 73 Welfare Fund Bd. of Trustees v. DeGryse*, 579 F. Supp. 2d 1063, 1069 (N.D. Ill. 2008) (same).

conversation exists, that officers are not required to create exculpatory evidence, and that the failure to draft a report is not a *Brady* violation." *Id.* "This is a misstatement of the law." *Id.* That is because, the court explained, "[t]he failure to 'record and report the substance' of an exculpatory conversation is 'a serious violation of the government's duty to turn over all evidence favorable to the accused.'" *Id.* at *8 (quoting in part *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012)).

      The same result should apply here. While McWeeny disclosed partial information pertaining to the two alternative suspects—he failed to identify the actual source of that information, withholding the key information that would have permitted Plaintiff's trial counsel to identify a testifying witness to put on an alternative suspect defense. That was particularly so because the case against Plaintiff was thin. The State relied on Watson's false statement, (but did not call Watson at trial) and Plaintiff's confession. *See supra* Section III(b)(i)(2) , PSOAF ¶ 72. No physical evidence tied Plaintiff to the murder. PSOAF ¶ 71. Eyewitness testimony showing that someone else the crime had a reasonable likelihood of changing the result of the trial.[4]

---

[4] While Defendants did not raise a due diligence argument and therefore waived it, *Tuduj*, 958 F.3d at 579, it would fail even if they had done so. Just as is in *Andersen*, it is not clear how Plaintiff's counsel would have obtained the source of the information even exercising due diligence because it is reasonable to assume that McWeeny would not have revealed this information to him, nor could Plaintiff's counsel get inside McWeeny's head to ascertain the source of the information. *Andersen*, 2019 WL 6327226, at *8 ("[I]t is not clear how [trial counsel] could have obtained this information through reasonable diligence. She could not interview a witness unknown to her, and we cannot assume that LaGace would have revealed this information, even if she had located him."); *see also Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001) ("Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses."); *Goudy*, 604 F.3d at 400–01 (suppressed evidence inculpating another suspect may be material, even when that evidence did not necessarily point to the defendant's innocence).

### b. A Jury Must Also Decide if Defendants Suppressed Exculpatory Evidence in a Street File

A jury must also decide Plaintiff's claim that Boudreau, Foley, Evans and McWeeny suppressed exculpatory information in a "street file." Defendants contend that Plaintiff's claim is too speculative because (and without a hint of irony) he has not been able to pinpoint with specificity the information that was withheld. Doc. 267 at 36-37. Taking the record in the light most favorable to Plaintiff, there are sufficient facts for a jury to find that a street file existed and was withheld.

"Street files," also known as "running files," were secret files that detectives maintained as their personal files and took on the streets but did not disclose to prosecutors. JSOF ¶111; PSOAF ¶¶ 29. According to the CPD's own internal memorandums that investigated the existence of the street file practice when it came to light in the early 1980s, those files were frequently used to investigate alternative suspects, who were later not pursued. JSOF ¶ 111; PSOAF ¶ 29. Instead, that evidence would be put in a street file—and not in an official report that was put in the permanent retention file or investigative file and turned over to the prosecutors. JSOF ¶111; PSOAF ¶¶ 29, 31.

Contrary to the Defendants' argument, Plaintiff's claim that a street file existed here and was withheld is not pure speculation. First, it would be perverse if Plaintiffs could not bring a street file claim because Defendants were so successful at burying that file (and its contents) that no one can find it. *Cf. Fields v. Wharrie*, 740 F.3d 1107, 1113 (7th Cir. 2014) (prosecutor cannot immunize himself from liability by using fabricated evidence at trial and then claiming absolute immunity). Indeed, that is not the law: It is axiomatic that a claim like this can be proven via circumstantial evidence. *Cf. Urban v. United States,* No. 03 C 6630, 2005 WL 1819954, at *2-3 (N.D. Ill. June 9, 2005) ("Unless someone can testify that they destroyed a specific document,

proof that a document is lost or destroyed will ordinarily take the form of circumstantial evidence"). There is likewise circumstantial evidence that some of the Defendants kept street files with potentially material exculpatory information. (*See, e.g.*, Dkt. 558 ¶ 222.) Such evidence may support a finding that the Officer Defendants withheld exculpatory evidence in violation of their *Brady* obligations. *See, e.g.*, *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020). Given such disputes of material fact, summary judgment cannot be granted in the Officer Defendants' favor. *See Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22 (N.D. Ill. Sept. 30, 2022) (finding "circumstantial evidence" of street files "with potentially material exculpatory information" sufficient to warrant trial on that claim even though a street file was never located).

As an initial piece of that evidence, the City cannot dispute that it had a street file practice that existed through the time of this investigation. The verdicts in *Fields v. City of Chicago*, No. 10 CV 1168 (N.D. Ill. 2016), and *Rivera v. Guevara*, No. 12 CV 04428 (N.D. Ill. 2018), establish that the street file policy, which was acknowledged back in the 1980s, continued well into the 1990s and beyond. PSOAF ¶¶ 34-36.

Moreover, there is evidence of what would be in that street file. As explained above, material evidence related to two alternative suspects "Spook" and Mark was withheld from Plaintiff—namely the identity of the witnesses that Plaintiff could have called at trial to show that "Spook" and Mark were the ones who murdered Jerrod; and the witness(es) who provided the physical and clothing descriptions of "Spook" and Mark that matched Taylor's description of the perpetrators. That information should have, per CPD policy, been recorded in a supplemental report(s). PSOAF ¶¶ 28. No reports are in the investigative file. PSOAF ¶ 37.

But McWeeny's May 18, 1991 GPR, and the missing attendant supplemental reports, are not the only evidence that points toward the existence of a street file here. There are other telltale signs that the detectives were investigating "Spook" and Mark but did not include that investigation in any official report. That evidence includes two unattributed GPRs signed by Sgt. Bonke, as well as a handwritten note by signed by Sgt. Bonke, that include (1) specific information by a witness about where "Spook" and Mark were located at the time of the shooting: "Mark left side" and "Spook right side;" JSOF ¶51, PSOAF ¶ 25; (2) a physical description and approximate address for "Spook" and information about the victim, JSOF ¶ 53, PSOAF ¶ 25; and (3) information about a Marcus Chatman, who resided at "55ᵗʰ and Peoria." JSOF ¶ 48. There are no corresponding supplemental reports for any of these notes. PSOAF ¶ 37. The presence of a stop order for Marcus Chatman also suggests, based on CPD policy, that Chatman was a suspect. PSOAF ¶ 20. There should be an attendant supplemental report explaining the basis for the Chatman stop order. PSOAF ¶ 20. In addition, there is circumstantial evidence that Defendant McWeeny showed a photograph of Marcus Chatman to a witness and other dark skinned Black men for identification but failed to document doing so. JSOF ¶¶46-47, 52; PSOAF ¶¶ 21, 23. As Mr. Clark explained in his report, it would be reasonable to expect an investigator to run down leads such as alternative suspects like "Spook" and Mark. JSOF ¶111. "One possible explanation for the failure to see that documentation is that it was placed in a 'street file' consistent with CPD's then-practice." *Id.* Indeed, McWeeny testified that if he followed up on the information he obtained about "Spook" documented in his May 18, 1991, GPR, he would have documented his follow up in a report. JSOF ¶ 47.

The investigative file is missing additional information pertaining to other alternative suspects Antonio Thomas, Andre Thomas, and John Hooks. PSOAF ¶¶ 38, 40-47. These

individuals were arrested for a separate homicide, and the gun used in that homicide (and found in Thomas's home) was the Erving murder weapon, PSOAF ¶¶ 40-47. A homicide detective followed up on this lead but neither the requisite supplemental report memorializing the follow-up, nor the ballistics report alerting Defendants to the link between the Erving murder weapon and the alternative suspects is in the investigative file. PSOAF ¶¶ 40-47. Boudreau knew about detective following up on the lead, but no report reflects his knowledge. JSOF ¶ 70.

Given the foregoing, Defendants' citation to *Hill* is unavailing. As an initial matter, the factual and legal landscape surrounding street files has changed dramatically since *Hill*. At the time *Hill* was decided, the presumption was that the City's street file policy changed after the *Palmer* litigation and with the entry of General Orders in 1983 and 1986 that were supposed to address the problem. *See*, *e.g.*, *Palmer v. City of Chicago*, 755 F.2d 560, 572, 578 (7th Cir. 1985) (finding that it was "sheer speculation" that subclass of plaintiffs would be harmed in the future by street files and that the State's Attorney and Superintendent were responsible for crafting policies); *Hill*, 2009 WL 174994 at *3 (citing to *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), and *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), *rev'd in part*, 755 F.2d 560 (7th Cir. 1985)). Sixteen years later, that presumption has been disproven twice: Two juries have found that the City had a street file policy, including in the relevant time period. POAF ¶¶ 34, 36.

Even setting that aside, however, *Hill* is distinguishable. In *Hill*, the court found that the plaintiff's street file claim was too speculative to proceed to trial. *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009). Given the above detailed missing evidence, the undisputed CPD policy requiring supplemental reports memorializing these critical investigative steps, and Plaintiff's police practices expert opining that Defendants' failure to

document deviated from accepted police practices, there is sufficient evidence to conclude a street file existed. PSOAF ¶ ¶ 27, 39 *See, e.g.*, *Jimenez v. City of Chicago*, 732 F.3d 710, 722 (7th Cir. 2013) (expert testimony on defendants' departure from accepted norms can be evidence of malintent to demonstrate constitutional violations).

Defendants' other authorities are similarly distinguishable because the *Brady* claim was waived or because those cases lacked direct or circumstantial evidence of to support the claim.. *United States v. Roberts*, 534 F.3d 560, 572-73 (7th Cir. 2008) (*Brady* claimed was waived and insufficient evidence to support claim that file was missing photographs or their exculpatory value if they did exist); *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (no evidence the government withheld evidence of defendant being deactivated as a confidential informant); *United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005) (defendants' claim that they lacked evidence of promise made to government witness for his testimony lacked any basis). For the reasons set forth above, that is not true here.

The Court should deny Defendants' motion for summary judgment on Plaintiff's street file claim and this claim should be decided by a jury at trial.

## V. Plaintiff's Fourth Amendment Unlawful Detention Claim Survives Summary Judgment Against Boudreau, Foley, and Evans.

Plaintiff's Fourth Amendment claim goes by various names—unlawful detention, detention without probable cause, and malicious prosecution. No matter the label, the essence of the claim remains the same: Plaintiff's Fourth Amendment right is violated if the evidence shows he was seized and detained without probable cause pursuant to legal process. Defendants ask for summary judgement on this claim but notably do not challenge the heart of Plaintiff's claim— that there was no probable cause for his detention. Rather, Defendants keep to the margins, arguing instead that Plaintiff's claim should be dismissed because Plaintiff was never seized

36

pursuant to legal process on charges arising from the Erving murder, and even if he was, Plaintiff has no damages and thus, has no redressable injury. Both arguments have no merit.

### a. Plaintiff's Arrest and Arraignment Constitute "Seizure" and "Legal Process"

Defendants first argue that Plaintiff has not met the threshold requirement of his Fourth Amendment claim because he was not seized pursuant legal process for the Erving murder. They use this argument to also disclaim any personal involvement in causing Plaintiff's detention for the Erving murder. This argument has neither factual nor legal support.

The Fourth Amendment protects citizens from unreasonable seizures. *See Manuel v. City of Joliet, Ill.,* 580 U.S. 357, 364 (2017). "The general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (citation omitted). As such, proof that Plaintiff was detained without probable cause boils down to three elements. Plaintiff must show that he was (1) seized; (2) pursuant to legal process; (3) without probable cause. *See Manuel,* 580 U.S. at 368; *Thompson v. Clark*, 596 U.S. 36, 43 (2022).

Defendants only focus on the first two elements: seizure and legal process. For the Fourth Amendment, an arrest provides satisfactory evidence that Plaintiff was seized. *See Wilson v. Smith*, No. 22 C 04413, 2024 WL 4753670, at *7 (N.D. Ill. Nov. 12, 2024) ("It is well established that an arrest is a seizure for Fourth Amendment purposes."); *Torres v. Madrid*, 592 U.S. 306, 312 (2021) ("the arrest of a person is quintessentially a seizure."). The legal process element can be met by showing that Plaintiff was arraigned on charges. *Wallace v. Kato,* 549 U.S. 384, 391 (2007) (identifying the arraignment on charges as a "legal process" transforming a false imprisonment claim into an unlawful detention claim); *Serino v. Hensley*, 735 F.3d 588, 593–94 (7th Cir. 2013) (when a person is subjected to a warrantless arrest, the arrestee "becomes

subject to legal process afterward, at the time of arraignment) (citing *Nieves v. McSweeny*, 241 F.3d 46, 54 (1st Cir.2001)). Both elements have been met.

The facts of Plaintiff's seizure are readily apparent and undisputed. Off the bat, in the parties' joint statement of undisputed facts, the parties agree Plaintiff was arrested on February 4, 1992 for the Erving murder. JSOF ¶ 2. An arrest form identifies Evans, Foley, and Boudreau as the arresting officers. JSOF at ¶ 153; PSOAF at ¶ 65. This foreclosed any argument that Plaintiff was not seized and that Defendants were not personally involved in Plaintiff's arrest.

The evidence of legal process is equally straightforward. The court docket reveals that following Plaintiff's arrest, Plaintiff was arraigned. *See* PSOAF at ¶ 66. Even if there was no arraignment, it is undisputed that Plaintiff was indicted for the Erving murder—another form of legal process. *See* JSOF at ¶¶ 153; *Antonelli v. Foster*, 104 F.3d 899, 901 (7th Cir. 1997) (identifying an indictment as an example of legal process).

Instead of grappling with these facts, Defendants appear to ask the Court to find that Plaintiff was not seized pursuant to legal process for the Erving murder because on the same day Plaintiff was also arrested on a warrant for an unrelated case. Doc. 267 at 39. Unsurprisingly, Defendants cite no case supporting this interpretation of the law. *Id.* That is because it is not the law. The Fourth Amendment claim is violated whenever a citizen is seized subject to legal process without probable cause. That happened here. That Plaintiff was arrested on an unrelated warrant does not erase the fact that he was also arrested, charged, and arraigned for the Erving homicide. *See Chiaverini v. City of Napolean, Ohio*, 602 U.S. 556 (2024) (analysis of the unlawful detention claim requires examination of each basis for a citizen's seizure).[5]

---

[5] As noted at the outset, Defendants' challenge to Plaintiff's Fourth Amendment claim does not address issues relating to probable cause and thus any arguments about this element are waived. *See Tuduj*, 958 F.3d at 579. Specifically, Defendants do not argue that Plaintiff's Fourth Amendment claim is shaken because an alternative basis for probable cause to detain Plaintiff

### b. Plaintiff Has a Redressable Injury for Defendants' Violation of his Fourth Amendment Right.

Defendants next argue that Plaintiff has no standing to bring a claim for malicious prosecution under the Fourth Amendment because, in their incorrect view, Plaintiff has no damages due to the fact he was held and later sentenced on an unrelated charge during his pre-trial detention. This specious argument is based on an incorrect understanding of the relief available to Plaintiff and reliance on erroneously decided case law and therefore fails.

### i. Plaintiff can obtain redress through nominal damages, punitive damages, and compensatory damages.

To establish standing the plaintiff must show that he has "suffered an injury in fact which is fairly traceable to the challenged action of the defendant and likely . . . to be redressed by favorable decision." *See Payton v. Cnty. of Kane*, 308 F.3d 673, 677 (7th Cir. 2002).

Defendants challenge only Plaintiff's ability to demonstrate redressability. That requirement is met where the injury will be likely be "redressed by a favorable decision." *See In Re Helmstetter*, 44 F.4th 676, 679 (7th Cir. 2022). The favorable decision need not remedy every injury. *See Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982).

Here, Plaintiff has sought various remedies, including compensatory damages, punitive damages, and nominal damages—the availability of which dooms Defendants' attack. *See* Doc. 1 at 49 (prayer for relief); *Calhoun v. DeTella*, 319 F.3d 936, 943 (7th Cir. 2003) (a request for "such other relief" can be construed as a request for nominal damages).

### 1. Plaintiff can obtain redress through compensatory damages.

---

existed. Even if they did, the existence of probable cause for the unrelated case would not present any legal hurdle. As the Supreme Court affirmed in *Chiaverini*, the Fourth Amendment requires that each basis for a seizure to be supported by probable cause. 602 U.S. at 562-65.

Defendants' argument focuses on the availability of compensatory damages so Plaintiff starts there. There can be no dispute that compensatory damages provide redress. *See Carey,* 435 U.S. at 254 (the "basic purpose" of a § 1983 damages award is to provide compensation for injuries). On a federal malicious prosecution claim, in addition to general damages, Plaintiff can seek compensation for other damages associated with his arrest and imprisonment, including damages for discomfort or injuries to his health, emotional injuries, and harm to his reputation. *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Marshall v. Buckley*, 644 F. Supp. 2d 1075, 1083 (N.D. Ill. 2009); *Carey v. Piphus*, 435 U.S. 247, 263 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Defendants treat the same Plaintiff's detention for a "separate and unrelated felony drug charge" (Doc. 267 at 40) as Plaintiff being detained without probable cause for murder—a charge for which he faced the death penalty and a crime for which he is wholly innocent. JSOF at ¶¶ 154, 187; PSOAF at ¶¶ 70, 85.  On this fact alone, a reasonable juror could find that Defendants causing Plaintiff to be branded a murderer and threatened with capital punishment as an innocent man created unique emotional and reputational damages that are not attributable to his incarceration on a drug charge. *See Limone v. United States*, 497 F. Supp. 2d 143, 227 (D. Mass. 2007) (finding that it was emotionally distressful to be framed for a capital crime); *Betts v. City of Chicago, Ill.*, 784 F. Supp. 2d 1020, 1025 (N.D. Ill. 2011) (observing that a juror could find that being falsely arrested is demoralizing). Compensatory damages provide a basis for relief.

### 2.  Plaintiff can obtain redress though punitive damages.

But even if compensatory damages were not available, Plaintiff can receive punitive damages if he prevails on his Fourth Amendment malicious prosecution claim. "[W]hen a jury finds a constitutional violation under a § 1983 claim, it may award punitive damages even with it

40

does not award compensatory damages." *See Erwin v. Cnty. of Manitowoc*, 872 F.2d 1292, 1299

(7th Cir. 1989); *Calhoun*, 319 F.3d at 942 ("Nothing prevents an award of punitive damages for

constitutional violations when compensatory damages are unavailable."). This is so because

punitive damages serve a different function than compensatory and nominal damages. While

nominal damages provide a remedy when other relief is foreclosed and compensatory damages

seek to make a plaintiff whole, punitive damages are "designed to punish and deter wrongdoers

for deprivations of constitutional rights." *Calhoun*, 319 F.3d at 942. A jury could find that

Defendants were recklessly or callously indifferent to his Fourth Amendment right when they

coerced him into falsely confessing, used false and fabricated evidence to commence a

prosecution without probable cause, and continued that wrongful prosecution by suppressing

evidence of their coercion. *See supra* Sections I, III; *see infra* Section VI; *see also Fox v. Hayes*,

600 F.3d 819, 845 (7th Cir. 2010) (upholding a jury award of punitive damages for the plaintiff's

false arrest and malicious prosecution claims). As punitive damages serve to punish Defendants,

they also offer a form of redress. *Carey*, 435 U.S. at 257, n. 11 (acknowledging punitive damages

as a form of redress).

### 3. Plaintiff can obtain redress through nominal damages.

Finally, failing all else, nominal damages are available to Plaintiff and also provide redress. The

Supreme Court in *Uzuegbunam v. Preczewski* has found that the award of nominal damages

satisfies Article III's redressability prong. 592 U.S. 279 (2021) In reaching this conclusion, the

court recognized the long-held legal principle that "*every* legal injury necessarily causes

damage" and that courts have routinely held that where there is no evidence of other damages,

nominal damages serve as an appropriate remedy. *Uzuegbunam,* 592 U.S. at 286 (emphasis

original). The award of nominal damages ensures that when a legal right is violated there is some

41

form of redress to "vindicate and maintain the right." *Id.* at 290 (citation omitted). Since nominal damages are paid to the plaintiff, they "affect the behavior of the defendant towards the plaintiff and thus independently provide redress." *Id.* at 291 (quoting *Hewitt v. Helms*, 482 U.S. 755 (1987)). "True, a single dollar often cannot provide full redress, the ability to effectuate a partial remedy satisfies the redressability requirement." *Id.* (citation omitted) (internal quotation marks omitted).

There is no reason for a different finding here. Taking for a moment as true Defendants' erroneous argument that Plaintiff suffered no actual injury for his unlawful detention on the Erving homicide, this is precisely the type of circumstance nominal damages were designed to address. Indeed, courts have found that nominal damages are available on similar facts. In *Smith v. City of Chicago*, 913 F.2d 469 (7th Cir. 1990), the plaintiff was convicted of rape and following his release from prison he sued the investigating officers for fabricating evidence that he alleged led to him being detained without probable cause. *Id.* at 469-71. Before the civil trial, the trial court granted the defendants' motion *in limine* and limited the plaintiff's recovery to nominal damages. *Id.* at 472. The plaintiff appealed and the Seventh Circuit held that the recovery was "properly limited to nominal damages" because the plaintiff would have still been arrested even in the absence of the defendants' alleged fabrications. *Id.* at 474.

Nevertheless, Defendants still argue no damages are available to Plaintiff. Although Defendants appear to cite multiple Seventh Circuit cases in support, Doc. 267 at 39-40, all the cited cases rely on erroneous reasoning espoused in *Ramos v. City of Chicago,* 716 F.3d 1013 (7th Cir. 2013). In *Ramos* the court reasoned that because the plaintiff would have been incarcerated on an unrelated charge regardless of the alleged malicious prosecution, the plaintiff could not recover damages. *Id.* at 1019. As an initial matter, this reasoning is *dicta* because the

42

court observed that the plaintiff had failed to even articulate a Fourth Amendment violation and had also waived argument about damages. *See Ramos*, 716 F.3d 1019.

Moreover, and most importantly, this reasoning cannot be squared with the well-established legal rule that permits the award of nominal damages. *See Uzuegbunam,* 592 U.S. at 286-89 (citing a string of cases dating back to the 1800s that permit the award of nominal damages when no other damages are available); *see also Carey v. Piphus,* 435 U.S. 247, 266 (1978) (holding that consistent with common law traditions, when an "absolute" right— including constitutional rights—are violated, the deprivation is "actionable for nominal damages without proof of actual injury"). Indeed, the *Ramos* proposition runs afoul of the Seventh's Circuit's acknowledgement of the availability of nominal damages: "We long ago decided that, at a minimum, a plaintiff who proves a constitutional violation is entitled to nominal damages." *See Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003); *see id.* (citing a string of cases awarding nominal damages).

The three other cases Defendants cite—*Patrick, Ewell,* and *Bridewell*—only repeat, without examination, *Ramos*'s error. *See Bridewell v. Eberle*, 730 F.3d 672, 677 (7th Cir. 2013) (citing *Ramos* without examination); *Ewell v. Toney*, 853 F.3d 911, 917 (7th Cir. 2017) (citing *Bridewell* and *Ramos* without examination); *Patrick v. City of Chicago*, 81 F.4th 730, 737 (7th Cir. 2023) (string cite to *Ewell*, *Bridewell*, and *Ramos* without examination). However, repetition does not make the error true. The law is clear: even if the Court assumes the false premise that Plaintiff cannot prove an actual injury, Plaintiff can obtain redress through nominal damages. *See Smith,* 913 F.2d at 474, *Calhoun*, 319 F.3d at 942; *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1025 (N.D. Ill. 2003) (allowing the recovery of nominal damages due process violation); *Wright v. City of Savannah*, No. CV417-195, 2021 WL 1603612, at *5 (S.D. Ga. Feb. 24, 2021)

(nominal damages should be awarded where the plaintiff could not prove damages from the arrest beyond the constitutional violation); *Hygh v. Jacobs*, No. 88-CV-406, 1990 WL 179006, at *1-3 (N.D.N.Y. Nov. 16, 1990) (nominal damages should be awarded because compensatory damages were unavailable for the malicious prosecution claim).

For the reasons set forth above, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim.

## VI.     Plaintiff's State Law Malicious Prosecution Claim Survives Against Evans.

Plaintiff has also brought a malicious prosecution claim under Illinois law against Boudreau, Foley, and Evans. Defendants make no arguments about the sufficiency of evidence, and by their silence, Defendants concede that Plaintiff has sufficient evidence to support his state law claim. Instead, they try to take Evans out of the mix by arguing that Evans was not personally involved causing Plaintiff's wrongful prosecution to begin or continue. Doc. 267 at 38. This argument is improper because it asks the Court to construe facts in Defendants' favor, and/or disbelieve facts in the record—facts that are unfavorable to Evans. When the record is properly construed, Plaintiff's state law malicious prosecution claim survives against Evans as well.

Defendants argue that Evans was not involved in the commencement or continuation of Plaintiff's prosecution because Evans did not sign the criminal complaint, interact with prosecutors who approved charges, or testify at the grand jury or Plaintiff's criminal trial. Doc. 267 at 39. But that is a misstatement of the record, at best. Evans was present for and arrested Plaintiff at Tate's house. JSOF at ¶ 130. Additionally, Evans was involved in Plaintiff's coerced (and fabricated) confession. On that score, during Plaintiff's arrest, Evans, in Foley's presence, kickstarted Defendants' coercive conduct by stomping on Plaintiff's head causing Plaintiff's head to hurt. PSOAF ¶¶ 55, 56. The coercion continued when Plaintiff got to the police station.

44

There, Foley and Evans threatened Plaintiff and accused him of being involved in the Erving murder. PSOAF ¶¶ 57-59. Foley and Evans falsely and manipulatively told Plaintiff that people were pointing Plaintiff out at the shooters. JSOF ¶¶ 137, 138. Plaintiff asserted his innocence, but Evans and Foley repeatedly threatened and accused Plaintiff of being guilty. PSOAF ¶ 58; JSOF ¶ 137-139.

Having been primed to falsely confess, Boudreau next stepped into the room to "try to get [Plaintiff] to confess about [Erving]". PSOAF ¶ 60. Boudreau bombarded Plaintiff with questions, showed and read Watson's false and fabricated statement to Plaintiff, and fed Plaintiff facts about the Erving homicide. PSOAF ¶ 60; JSOF ¶ 142. Foley ended the interrogation by choking Plaintiff and threatening to throw Plaintiff out the window. JSOF ¶¶ 147, 151. Plaintiff feared for his life and falsely confessed shortly thereafter. JSOF ¶ 151.

Nor is it accurate for the Defendants to argue that Evans did not testify. The primary evidence against Plaintiff was his coerced and fabricated confession, and Watson's coerced and fabricated statement. Evans was used to rebut the former. Evans testified at the motion to suppress to refute Plaintiff's allegations of coercion; and then Evans testified at trial, again to rebut Plaintiff's allegation that Evans stomped on his head during his arrest. PSOAF ¶¶ 68, 82, 84. At the close of trial, Plaintiff was convicted and sentenced to 60 years. JSOF ¶ 185.

Given the foregoing, Evans is not the sideline character Defendants attempt to portray. The correctly analyzed record shows that Evans not only primed the pump needed to obtain Plaintiff's false confession, Evans also contributed to the continuation of Plaintiff's prosecution and eventual wrongful conviction. Based on these facts, a reasonable jury could find that Evans was involved in causing Plaintiff's malicious prosecution. *See Ezell*, 2024 WL 278829, at *16-17, 26 (finding that a reasonable jury could find that defendants were personally involved in

plaintiff's detention and prosecution when there was an inference that one of the defendants participated in coercing the plaintiff's confession and other defendants failed to use their knowledge to prevent the plaintiff's subsequent prosecution and conviction); *Newsome v. James,* 968 F. Supp. 1318, 1324 (N.D. Ill. 1997) (liability can be imposed when the defendant got the "ball rolling in the unwarranted prosecution"); *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 44, 131 N.E.3d 488, 499 (an officer can be liable when he "engage[s] in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.").

### VII.   A Reasonable Jury Could Find that Evans Conspired with Defendants to Deprive Plaintiff of His Constitutional Rights

Defendants' request for summary judgment on Plaintiff's Section 1983 and state law conspiracy claims rest on two arguments: a purported lack of evidence that Evans entered into any agreement to violate Plaintiff's constitutional rights, and an assertion of qualified immunity. Both arguments are meritless.

Under Section 1983 civil conspiracy can be demonstrated when two or more individuals agree to deprive a person of their constitutional rights, whether expressly or impliedly, and overt acts committed in furtherance of this agreement result in the deprivation of those rights. *See Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015); *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018); *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). It is not required for each participant in the conspiracy to "know all the details of the plan designed to achieve the objective or have the same motives for desiring the intended conspiratorial result." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 100 S. Ct. 1987 (1980); *see also Jones*, 856 F.2d at 992. Plaintiff need only show that each person knows the "general objective" of the plan and does their part to further the goal. *Id.* Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy."

46

*Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). Similarly, under Illinois law, civil conspiracy is shown when two or more people agree to act in a concerted manner to accomplish an unlawful purpose or a lawful purpose by unlawful means. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999) (citation omitted). A tortious act must be committed in furtherance of the agreement. *Id.* (citation omitted).

Circumstantial evidence, and attendant inferences, can provide sufficient evidence to prove a civil conspiracy. *See Beaman*, 776 F.3d at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy . . . ."); *see also McClure,* 188 Ill. 2d at 134 (1999) ("A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.") (internal quotation marks omitted) (citation omitted). Where there is "evidence from which a reasonable jury could infer the existence of a conspiracy" summary judgment should be denied. *Beaman*, 776 F.3d at 510-511 (citation omitted).

### a. There is sufficient evidence for a reasonable juror to infer that Evans conspired with Boudreau and Foley to deprive Plaintiff of his constitutional rights.

Defendants do not deny that there is sufficient evidence of a conspiracy to deprive Plaintiff of his constitutional rights. They only argue that there is no evidence Evans joined Boudreau's and Foley's conspiracy. This argument again relies on construing the record in Defendants' favor. As argued above, there is evidence Evans participated in coercing Plaintiff to falsely confess, detaining Plaintiff without probable cause, and causing him to be maliciously prosecuted. *See supra* Sections I, V, VI. It is from the evidence that a reasonable juror could find that Evans conspired with Foley and Boudreau to deprive Plaintiff of his constitutional rights.

47

It is true that Evans was not present when Boudreau and Foley ultimately fabricated Plaintiff's statement, but Evans' absence from part of the action does not save him. As the Seventh Circuit observed, "each participant in a conspiracy need not know the exact limits of the illegal plan. . . ." *Hampton,* 600 F.2d at 624. It is sufficient that Evans shared the "general conspiratorial objective" to coerce Plaintiff in violation of his constitutional rights and took an overt step to do so. *Id.* at 621; *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *22 (N.D. Ill. June 4, 2020) ("If the defendants understand the general objectives of the conspiratorial scheme, accept them, and agree, either explicitly or implicitly to do their part to further those objectives, they are liable as conspirators.").

As with almost all conspiracies, there is no direct evidence of an explicit agreement, but the circumstantial facts considered together, as a jury will at trial, paint a picture of a team effort to violate Plaintiff's constitutional rights. *See Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 (1960) (circumstantial evidence may be more certain, satisfying and persuasive than direct evidence). There is genuine dispute of fact about whether Evans agreed to violate Plaintiff's constitutional rights and given this dispute the court must permit a jury to decide Evan's involvement in Boudreau's and Foley's conspiracy. *See Hampton*, 600 F.2d at 621 ("The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.").

### b. Defendants are not entitled to qualified immunity of Plaintiff's conspiracy claims.

Defendants next argue that they are qualifiedly immune from being held liable for Plaintiff's Section 1983 claim because the law establishing liability for Section 1983 conspiracy

48

was purportedly unsettled in 1991. This argument fails for multiple reasons. First, the courts have long acknowledged liability for conspiracy under section 1983. *See Adickes v. S. H. Kress & Co,* 398 U.S. 144, 152 (1970); *Hampton*, 600 F.2d at 620-35 (analyzing evidence to establish a § 1983 conspiracy claim); *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) (upholding a jury finding that officers conspired to "railroad" the plaintiff).

Second, Defendants' argument is premised on the improper application of the intra-corporate conspiracy doctrine in a section 1983 case. Defendants rely on *Haliw v. City of South Elgin*, but even the *Haliw* court admitted that its import of the doctrine in the section 1983 case had dubious legal support. 2020 WL 1304697 at *4 (N.D. Ill. March 3, 2020) ("There is reason to doubt, however, that this corporate-based and antitrust-based doctrine should apply to civil-rights conspiracy claims under § 1983."). The court's expression of doubt was correct. Defendants do not cite a single Supreme Court or Seventh Circuit case applying the doctrine in the section 1983 context and for good reason—none exist. That is because, as the *Haliw* court recognized, for the purpose of imposing liability under section 1983, there are fundamental and important differences between conspiring officers and corporate employees. *Id.* In the corporate and antitrust setting, where the intra-corporate conspiracy doctrine developed, the reasoning is that agreements made by corporate employees in their official capacity are attributable to the corporate principle. *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Not so for individual police officers. In the section 1983 setting, each officer operates independently—an entity onto himself. *See Haliw*, 2020 WL 1304697 at *4. Hence the prohibition of holding a municipality liable solely for the acts of its employees. *See Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691-95 (1978). For these reasons, this doctrine has no place here. *See Liggins v. City of Chicago*, 2021 WL 2894167, at *5 (N.D. Ill. July 9, 2021) ("[D]istrict courts have

overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intra-corporate conspiracy doctrine.").

Third, and finally, Defendants incorrectly focus on the law establishing liability for conspiracy to justify their immunity claim. Qualified immunity does not look to when liability was clearly established, but rather when Defendants should have known the conduct was unlawful based on clearly established law. *Armstrong v. Daily*, 786 F.3d 529, 555 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right.") (emphasis original); *see also Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("[W]hen the question is whether to grant immunity to a public employee, the focus is on his conduct not on whether that conduct gave rise to a tort in a particular case"). In 1992 it was clearly established that Defendants could not violate Plaintiff's constitutional rights. *See Blackburn v. State of Ala.*, 361 U.S. 199, 205 (1960) (noting that it is well-established that mentally and/or physically coercive interrogations are unconstitutional); *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (highlight the long-prevailing standards that require probable cause to "safeguard citizens from . . . unfounded charges of crime"). Defendants' qualified immunity claim should be denied.

**VIII. Plaintiff States a Cognizable Failure to Intervene Claim and It Survives Against Evans.**

Defendants move for summary judgment on Plaintiff's failure-to-intervene claim. Defendants begin by asking this Court to upset well-settled precedent and find that failure to intervene is not a viable theory under section 1983. Doc. 267 at 43. However, the same case Defendants cite recognizes this very claim as cognizable. *See Mwangangi v. Nielsen*, 48 F.4th

50

816, 831 (7th Cir. 2022) (citing *Doxator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022)). Defendants' argument provides no legitimate basis to dismiss this claim.

Seemingly acknowledging that this is a losing argument, Defendants also argue that Evans cannot be liable for his failure to intervene because there is no evidence Evans was aware of any misconduct or had a reasonable ability to intervene to stop the behavior. This recycled argument fails for the same reasons all of Plaintiff's claims against Evans must survive. To be found liable for a failure to intervene, the evidence must show that the defendant had a "realistic opportunity to step forward" and prevent another officer from violating a plaintiff's constitutional rights. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). As discussed above, viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that Evans could have intervened to stop Defendants from detaining Plaintiff without probable cause, coercing Plaintiff into falsely confessing, and causing Plaintiff to be maliciously prosecuted. *See supra* Sections I, V, VI. At bottom, the facts that underlie Evans' argument are disputed. Evans argues lack of knowledge and presence, but the evidence the Court is required to credit at this stage indicates that Evans was aware, and at times, was present for the unconstitutional conduct. This Court cannot resolve these disputes at summary judgment; they must be decided by a jury. *See Mwangangi*, 48 F.4th at 832 ("[W]hether the bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact."). Summary judgment should be denied.

## IX. A Jury Must Decide Plaintiff's Intentional Infliction of Emotional Distress Claim.

In cursory and conclusory fashion Evans and McWeeny argue that they are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim. In support, Evans and Mcweeny wrongly claim that no evidence shows they violated Plaintiff's

51

constitutional rights or committed any other torts. For the reason explained about, the summary judgment record contains evidence proving the opposite. *See supra* Sections I, III, IV, V, VI. A reasonable juror could find that McWeeny suppressed *Brady* evidence; and that Evans coerced Plaintiff's confession, caused Plaintiff to be detained and maliciously prosecuted without probable cause, and conspired with Defendants Boudreau, McWeeny and Foley to frame Plaintiff for a crime he did not commit. The result of McWeeny's and Evans' actions is that Plaintiff was wrongfully incarcerated for 26 years. JSOF at ¶ 185-187, PSOAF at ¶ 85.

"For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Plaintiff's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for McWeeny and Evans on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill., Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

## X. Defendants' Requests for Summary Judgment on Claims Plaintiff Has Not Brought Are Moot.

Defendants create make-work by arguing for summary judgment for a host of claims Plaintiff has not brought. Contrary to Defendants' motion, Plaintiff has not alleged a claim failure to investigate or any claims based on his interrogation, arrest or prosecution for the murder of Rafael Garcia. As to evidence of Defendant's failure to investigation, Plaintiff understands that this is not an independent claim. While irrelevant for the matters to be decided in this motion, Plaintiff contends that evidence of Defendants' failure to investigate or follow up

52

on leads will be relevant at trial to show Defendants' intention to violate Plaintiff's due process rights. For example, Defendants' failure to follow up on leads that could have led them to find the actual killer could be interpreted as an effort not to develop evidence that could show they framed Plaintiff. *See Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019) (opining that a jury could interpret officers' failure to adequately investigate and follow up on leads as evidence of the officers' bad faith and a result of the officers' intent to cover up their due process violations). So too with evidence relating to the Garcia murder. Though irrelevant to summary judgment, it will be relevant to contextualizing and proving the intent and knowledge elements of Plaintiff's due process claims. For these reasons, Plaintiff is not contesting these portions of Defendants' motion.

## XI.  The City is Not Entitled to Summary Judgment on Plaintiff's Claims

The City has separately moved for summary judgment, arguing (a) that if Counts III and IV are dismissed against the Individual Defendants in their entirety so too should the *Monell* claim based on those constitutional violations and (b) that if the Individual Defendants are not liable for violating Plaintiff's rights during the Garcia homicide investigation, the City also cannot be liable. Doc. 257 at ¶¶4, 5. Neither of those arguments have any merit.

As to the former, the Individual Defendants have not moved to dismiss Count III (due process) on Plaintiff's theory that his confession was fabricated by Defendants Boudreau and Foley. While Plaintiff recognizes that the introduction to the Individual Defendants' brief indicates that they are moving on Count III as to all Defendants, the text of their memorandum proves otherwise. Indeed, the *only* Defendants that seek summary judgment on Plaintiff's fabricated confession claim are Defendants McWeeny and Evans. Doc. 267 at 23-24 (explaining

53

that McWeeny and Evans are not liable because they were not personally involved).[6] Defendants Boudreau and Foley did not move on this theory of liability. As such, there invariably will be a trial on this claim, and any invocation of summary judgment is premature.

That is true for Count IV (unlawful detention) as well. While there must be an underlying constitutional violation in order for municipal liability to attach, longstanding Seventh Circuit law does not require that that constitutional violation be committed by the named defendants provided that the verdicts are not inconsistent. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2009).

With regard to the City's second proposition, as noted above, Plaintiff has not lodged a claim against any Defendant for the violation of his constitutional rights during the Garcia homicide. While evidence of that misconduct is undoubtedly relevant to proving the claims that Plaintiff has brought, Plaintiff has never stated that his arrest, interrogation or prosecution for the Garcia homicide was a basis for defense liability. As such, the City's argument on that point is of no moment.

At bottom, although the *Monell* claim has been bifurcated from discovery, the claims against the City remain live notwithstanding the outcome of the Individual Defendants' summary judgment motion. That is not only for the reasons identified above, but also because the Individual Defendants have not even moved for summary judgment on Plaintiff's coerced confession claims (Counts I and II), yet another basis for municipal liability.

---

[6] Lest there be any doubt, the header for this section of the Defendants' brief reads: ""Officer Evans and Det. Mcweeny are entitled to summary judgment on Count III with respect to Day's claim that is confession was fabricated because they were not personally involved in Day's interviews and could not have known the confessions were false." Doc. 267 at 23.

## CONCLUSION

For the reasons explained above, Defendants' partial motion for summary judgment should be denied, and all of Plaintiff's claims should be decided by a jury.

**ARNOLD DAY**

By: *s/ Renee Spence*
    *One of His Attorneys*

Arthur Loevy
Jon Loevy
Gayle Horn
Heather Lewis Donnell
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

55