**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | District Judge Hon. Sara L. Ellis |
| | ) | |
| KENNETH BOUDREAU, *et al.*, | ) | Magistrate Judge Jeffrey Cummings |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS[1]**

### **Plaintiff Was Not Involved in Jerrod Erving's Murder**

1.      On May 17, 1991, Krona Taylor was outside 927 West 54th Street talking to Jerrod Erving. Ex. 17 (Krona Taylor Dep., Aug. 31, 2021) at 38:4-39:17. While outside, Taylor saw a boy and girl walking down 54th Street. Ex. 17 (Taylor Dep.) at 40:20-41:16. At the time, 54th Street had at least one streetlight. Ex. 17 (Taylor Dep.) at 41:17-42:8.

2.      As the individuals got closer, Taylor went inside 927 W. 54th Street and went upstairs to the living room. Ex. 17 (Taylor Dep.) at 47:24-48:22. From the living room, Taylor could hear what was going on downstairs. Ex. 17 (Taylor Dep.) at 49:8-16.

3.      Taylor heard the boy and girl talk to Erving. Ex. 17 (Taylor Dep.) at 49:17-50:4; Ex. 17 (Taylor Affidavit) at ¶ 11.

---

[1] For the purpose of ease and efficiency, all of the exhibits cited in Plaintiff's additional statement of facts refer to the Exhibits 1-166, filed by Defendants in support of the Parties' Joint Statement of Material Facts. Doc. 263, Doc. 264 (and attached exhibits 1-166). Plaintiff's additional exhibits are continuously numbered and begin at Exhibit 167.

4.     Seconds later, Taylor heard gunshots. Ex. 17 (Taylor Dep.) at 53:25-54:5. Afterwards, Taylor looked downstairs and saw Erving laying in the hallway with blood around him on the ground. Ex. 17 (Taylor Dep.) at 55:3-17.

5.     During her deposition and in an affidavit, Taylor testified that at the time of Erving murder, she knew Plaintiff. Ex. 17 (Taylor Dep.) at 21:1-5; Ex. 32 (Affidavit of Krona Taylor, Jan. 15, 2007) at ¶ 2. Taylor further testified that she met Plaintiff in 1989 and over the years, she saw and talked to Plaintiff "a bunch." Ex. 17 (Taylor Dep.) at 22:4-24:1; Ex. 32 (Taylor Affidavit) at ¶ 2. From 1989 through 1991, Taylor saw Plaintiff. Ex. 17 (Taylor Dep.) at 22:8-26:9.

6.     Taylor testified that the male perpetrator Taylor saw on the night of Erving's murder did not match Plaintiff's appearance. Ex. 17 (Taylor Dep.) at 105:2-106:13; Ex. 32 (Taylor Affidavit) at ¶ 34. Taylor testified that the male's build was not "close" to Plaintiff's build. Ex. 17 (Taylor Dep.) at 45:22-46:15. Taylor further testified that the male perpetrator's voice also did not match Plaintiff's. Ex. 17 (Taylor Dep.) at 106:14-22; Ex. 32 (Taylor Affidavit) at ¶ 34.

7.     Taylor testified that the male she saw that night was not Plaintiff. Ex. 17 (Taylor Dep.) at 45:22-46:6; Ex. 32 (Taylor Affidavit) at ¶ 8.

8.     Taylor is 100% certain that Plaintiff did not murder Erving. Ex. 17 (Taylor Dep.) at 105:2-106:22, 109:25-110:13; Ex. 32 (Taylor Affidavit) at ¶ 34.

### McWeeny Obtains Information about the Identities of the Suspected Perpetrators - "Spook" and Mark–But He Withheld The Identity of the Witness(es) Who Gave Him This Information

9.     On May 18, 1999, McWeeny authored a General Progress Report ("GPR") reflecting information he learned about "Spook" and "Mark" ("McWeeny GPR").  Ex. 21

(McWeeny Dep.) at 247:18-248:11; Ex. 30 (McWeeny GPR, May 18, 1991). The McWeeny GPR reflects the follow-up investigation conducted on the Erving murder. Ex. 21 (McWeeny Dep.) at 248:4-11.

10.     The McWeeny GPR documents physical descriptions of Spook and Mark. Spook was described as a dark complected Black male, with a medium build, between the ages of 16-20 years old, 5'7"-5'8," and sold drugs. Similarly, Mark was described as a dark complected Black male, with a medium build, between the ages of 16-20 years old, 5'7"-5'8." Ex. 30 (McWeeny GPR).

11.     The McWeeny GPR states that Spook was wearing a Bulls jacket and Jerrod shook Mark's hand. Ex. 21 (McWeeny Dep.) at 252:23-253:6; 260:3-7; Ex. 30 (McWeeny GPR).

12.     McWeeny testified that he had received information from Krona Taylor on the day of the murder (May 17) that described one of the assailants as being 16-20 years old and wearing a Bulls jacket that he recorded in his supplementary report. Ex. 21 (McWeeny Dep.) at 251:3-6; 252:19-253:15; Ex. 30 (McWeeny GPR); Ex. 24 (McWeeny Supplemental Report, May 17, 1991) at 3.

13.     Similarly, Krona Taylor had told McWeeny the day of the murder that one of the assailants "shook Jerrod's hand" before he was shot. Ex. 21 (McWeeny Dep.) at 259:23-260:7; Ex. 30 (McWeeny GPR); Ex. 24 (McWeeny Supplemental Report, May 17, 1991) at 3.

14.     The McWeeny GPR further reflects that Mark and Spook were associated with 55 + 57 Peoria and Sangamon. Ex. 30 (McWeeny GPR). McWeeny believed that this address reflected where the drugs were sold. Ex. 21 (McWeeny Dep.) at 246:14-24.

15.     But McWeeny's GPR does not identify the source of the information relating to Spook and Mark to McWeeny and McWeeny testified that he did not recall who provided it to him. Ex. 21 (McWeeny Dep.) 245:8-10; Ex. 30 (McWeeny GPR).

16.     And there is no supplementary report found in the homicide file that McWeeny prepared to document the information he obtained about Spook and Mark reflected in his GPR. *See generally* Ex. 115 (Investigative File); Ex. 128 (Permanent Retention File).

### McWeeny and Other Detectives Took Steps to Investigate "Spook" and Mark but Did not Properly Document

17.     McWeeny testified that he would have followed up on the lead of "Spook" and Mark as suspects. Ex. 21 (McWeeny Dep.) at 254:11-18; 260:8-12. Indeed, there is evidence that McWeeny and other detectives were investigating "Spook" and Mark as suspects in the Investigative File. Ex. 115 (Investigative File).

18.     According to Plaintiff's police practices expert, Roger Clark, "a reasonable investigator would have run down the leads" for Spook and Mark, "and you would expect to see documentation of those steps in the file." Ex. 114 (Clark Report) at 33.

19.     On the same day as McWeeny's GPR, a name check was conducted for Marcus Chatman, which resulted in an arrest form documenting a Marcus Chatman, who lived at 5533 S. Peoria, and a criminal history showing he had been arrested for drug possession. JSOF ¶ 50; Ex. 30 (McWeeny GPR); Ex. 131 (Marcus Chatman Arrest Form); Ex. 132 (Marcus Chatman Criminal History).

20.     The investigative file also contains a stop order for Marcus Chatman. Ex. 115 (Investigative File) at CITY_DAY000109. According to the Detective Division Standard Operating Procedures ("SOP"), a stop order can be requested under limited circumstances. Ex. 167 (1988 Det. Div. SOP) at CITY_DAY 27130. In the absence of a warrant, a stop order can be

obtained when a suspect has been identified but insufficient evidence exists to obtain a warrant, and the suspect is being sought for interrogation, a line-up, or other investigation. Ex. 167 (1988 Det. Div. SOP) at CITY_DAY 27130 (emphasis added). The SOPs also require there to be a there to be supplementary report in the investigative file explaining why a stop order for this individual was issued. Ex. 167 (1988 Det. Div. SOP) at CITY_DAY 27130. No such report exists in the investigative file for Marcus Chatman's stop order. Ex. 167(1988 Det. Div. SOP) at CITY_DAY 27130; Ex. 129 (1992 Detective Division SOP) at CITY_DAY0028813; Ex. 115 (Investigative File).

21.  The investigative file also contains a mug shot of Marcus Chatman. JSOF ¶ 52; Exhibit 134 (Marcus Chatman Mug Shot). McWeeny testified that in the 1990s when he was investigating an individual, he would pull their photograph to show to witnesses to determine whether he had the correct person. JSOF ¶ 52; Ex. 21 (McWeeny) Dep. 103:10-16.

22.  There is no GPR or supplementary report documenting McWeeny showing the mugshot of Marcus Chatman to Krona Taylor or any other person to see if they could identify him as one of the assailants. *See generally* Ex. 115 (Investigative File); Ex. 128 (Permanent Retention File).

23.  The file contains the mugshots of four other individuals, some of whom are dark skinned (as Spook was described), but no supplementary report exists in the investigative file to document why these mugshots were pulled, for what purpose, who they were shown to, including if they were shown to Krona. JSOF ¶¶ 20 (Krona telling McWeeny she could identify the suspects), 54. *See generally* Ex. 115 (Investigative File); Ex. 128 (Permanent Retention File)

24.  An undated GPR memorialized information about a Marcus Chatman who lived at "55 & Peoria." JSOF ¶ 48; Ex. 130 (Undated GPR).

25.     An undated and unattributed GPR signed by Sgt. Bonke includes information that appears to describe where "Spook" and Mark were standing in relation to Jerrod Erving before he was shot. The handwritten note includes: "Mark left side", "Spook right side", "the one with the bulls jacket had a racoon tail baseball cap with racoon tail. Called the police heard two gunshots." Ex. 133 (Bonke Handwritten Note). The handwritten note does not reflect the identity of the person providing the information. Ex. 133 (Bonke Handwritten Note).

26.     In addition, an August 27, 1991 GPR that is unsigned and unattributed to a detective contains information about Spook, including physical descriptions of him, his approximate address and information about Jerrod Erving. JSOF ¶ 53; Ex. 135 (August 27, 1991 GPR). This GPR also does not reflect the identity of the person providing the information. *See* Ex. 135 (August 27, 1991 GPR).

27.     According to Plaintiff's police practices expert, Roger Clark, Defendants' failure to "completely and consistently document investigative steps and leads" about Spook and Mark was "[o]ne of the most glaring failures" to document the investigatory steps taken in the Erving homicide investigation. Ex. 114 (Clark Report) at 9. According to Clark, "[i]nvestigators are also taught to document the steps of their investigations, what information they learned when they learned the information, and **who** gave them the information . . . because it could help identify additional witnesses and develop leads." Ex. 114 (Clark Report) at 9 (emphasis added). Clark further opined that the failure to completely document the information about "Spook" and "Mark", including information about the source of the information, deprived the prosecutor and Plaintiff's counsel of an opportunity to follow up on the lead and assess the reliability of the information obtained during the investigation. Ex. 114 (Clark Report) at 9-10.

28.     Indeed, Chicago Police Department's ("CPD") policies related to documenting investigatory steps also required detectives to memorialize all the pertinent information obtained in their investigation in official reports, including transcribing information from GPRs into supplementary reports. Ex. 151 (Hickey Dep.) at 76:22-77:22 (explaining that SO 83-2 required a detective to include information that they believed to be pertinent and relevant from a GPR in a supplemental report as of March or April 1984); Ex. 168 (Special Order 83-2); Ex. 129 (1992 Detective Division SOP) at CITY-JAKES 00724 ("Detectives will…transcribe relevant information which initially had been recorded upon General Progress Reports, major incident worksheets, and other miscellaneous investigative documents onto a case report or Supplementary Report following the proper format."); Ex. 167 (1988 Detective Division SOP) at DAY027202-03 (same). *See also* JSOF ¶ 47.

### Circumstantial Evidence Supports A Jury Finding A "Street File" Existed in the Erving Homicide Investigation That was Not Disclosed

29.     The City had a widespread practice of maintaining parallel files referred to as "street files", "running files", "unit files" or "working files" that detectives kept that had investigative information that did not always make it into official reports. Ex. 151 (Hickey Dep.) at 106:5-22; Ex. 169 (To/From re Records Survey & Rec.) at DAY052713; Ex. 170 (To/From re: Working Files) at DAY 05272; Ex. 171 (Hickey Trial Test. *Rivera*) at 3223:3-12.

30.     By the City's own admission, information in a street file often consisted of material regarding alternate suspects or leads in an investigation. Ex. 169 (To/From re Records Survey & Rec.) at DAY052713; Ex. 170 (To/From re: Working Files) at DAY 052721; Ex. 151 (Hickey Dep.) at 164 ("[O]ftentimes, sometimes, substantive investigative activity never made it into the official report. For instance, the clearing of suspect A and all the work that went in to even find suspect A…"); *Id.* at 165:22-166:10.

31.     The City was notified of its file-keeping problem in 1982 when an officer came

forward and reported that there were investigative reports about an alternative suspect that were

in the street file that had never made it into an official report and disclosed to the criminal

defendant. Ex. 151 (Hickey Dep.) at 102:11-105:23; Ex. 176 (Brasfield Report *Rivera*) at DAY

50836-39.

32.     In 1983, the Chicago Police Department promulgated Detective Division Special

Orders ("SO") 83-1 and 83-2, which the City claimed would bring to an end the Street Files

practice going forward. Ex. 172 (Hickey Dep. (Kluppelberg, 10/17/14)) at 169:7-173:10, 228:1-

230:3. The federal court found that there were obvious deficiencies in the City's initial response,

and in 1986 the Department revised its policy again (via a Detective Division Special Order). Ex.

173 (April 27, 1983 Order in *Palmer, et al. v. City of Chicago*, No. 82 cv 2349 (N.D. Ill. Apr. 23,

1983)); Ex. 168 (Det. Div. Special Order 83-2); Ex. 174 (Detective Division Special Order 83-1);

*see also* Ex. 175 (Brasfield  *Kluppelberg* Report at DAY051590-91; Ex. 176 (Brasfield *Rivera*

Report) at DAY50853-66.

33.     The 1983 and 1986 Special Orders directed detectives to use the GPR form to

document all handwritten notes, inter-watch memorandum, interview notes, etc. and to store *all*

police reports, documents, and notes obtained by detectives in one centralized file, the

"investigative file case folder." These Orders further directed detectives to create supplementary

reports containing the investigative information contained in GPRs and any handwritten notes,

inter-watch memorandum, interview notes, etc. These Orders also directed detectives to keep an

Investigative File Inventory Sheet that would provide an index to all the investigative materials

collected in the investigative file case folder, and to forward a copy of that inventory to the

Records Division when charges were placed. Ex. 174 (Special Order 83-1); Ex. 168 (Special Order 83-2); Ex. 177 (Special Order 86-2); Ex. 176 (Brasfield *Rivera* Report) at DAY50863-69.

34.     The directives and general orders did not stop the practice and detectives continued to keep secret files for decades after. On December 15, 2016, the jury in *Fields v. City of Chicago*, No. 10 C 1168 found for the plaintiff and against the City on Mr. Fields' *Monell* claim that the City had a street file practice, which involved evidence from 1983-1989 and 1999-2006. The Court entered judgment against the City. The City appealed and the Seventh Circuit affirmed the jury's verdict, holding that "the district court did not err in determining that there was a legally sufficient evidentiary basis for a reasonable jury to find for Fields on the issue of *Monell* liability." Ex. 178 (*Fields* Verdict). Ex. 179 (*Fields* Judgment); *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020), *rehearing and hearing en banc denied* (Jan. 25, 2021).

35.     The City was also collaterally estopped from contending that it did not have a street file practice from 1983 to 1991 in *Kluppelberg v. Burge*, No. 13 c 3963, for an arson investigation in 1984 based on the jury's verdict in *Fields*. Ex. 180 (Aug. 7, 2017 Collateral Estoppel Order in *Kluppelberg*).

36.     Similarly, in June 2018, the jury returned a verdict against the City on the plaintiff's *Monell* claim for its street file practice that caused exculpatory information to be withheld from the plaintiff in *Rivera v. Guevara*, No. 12 cv 04428. The homicide investigation at issue in *Rivera* occurred in 1988 and the *Monell* timeframe included from 1985-1991. Ex. 181 (June 29, 2018 *Rivera* Order Entering Verdict); Ex. 182 (*Rivera* Jury Instructions) at 26 (instruction on claim 4 for City's policy); Ex. 176 (Brasfield Report *Rivera*) at DAY050844.

37.     As set forth above, the investigative file is missing documentation in a GPR or supplementary report: (1) the witness(es) that provided McWeeny the information about

"Spook" and Mark in his May 18, 1991 GPR; (2) the witness(es) who provided the unidentified detectives information about "Spook" and Mark in the two unsigned GPRs; (3) a supplementary report documenting why a stop order was run on Marcus Chatman and why he was wanted in connection with the Erving homicide; (4) what witness(es) were shown the mugshot of Marcus Chatman; and (5) the witness(es) shown the mug shots of other individuals found in the file. SOAF ¶¶9-28; Ex. 114 (Clark Report) at 33.

38.    The investigative file is also missing information that the Defendants learned about the ballistics in the Erving homicide. Specifically, and as described more fully below in SOAF ¶¶40-47, none of the information about the ballistics match between the gun used in the Lamark Taylor, for which Andre Thomas, Antonio Thomas and John Hooks were arrested, and the gun used in the Erving homicide, are in the investigative file. SOAF 44; Ex. 115 (investigative file).

39.    One possible explanation for the "failure to see that documentation is that it was placed in a 'street file' consistent with the CPD's then practice." Ex. 114 (Clark Report) at 33.

### Police Find the Erving Murder Weapon

40.    Evidence technician Patrick Moran collected ballistics evidence from the Erving crime scene and submitted it to the crime lab. Ex. 22 (Evidence Report); Ex. 23 (Moran Testimony) at D138:17-D139:5, D140:2-11; Ex. 26 (Crime Lab Report, May 21, 1991)

41.    A crime lab report from August 8, 1991 reflects that the ballistics evidence was re-examined and found to match a Smith and Wesson 9mm caliber pistol. Ex. 63 (Crime Lab Report, Aug. 8, 1991); Ex. 64 (Treacy Dep., Feb. 10, 2023) at 146:9-19, 148:4-9, 158:10-21, 177:8-178:5.

42.     The Smith and Wesson was associated with a June 1991 murder of Lamark Taylor. Ex. 60 (L. Taylor Murder Supplemental Report) at 2 (reflecting RD number P274054), 3 (reflecting inventory number 88507); Ex. 61 (Inventory Receipt for the Smith and Wesson); Ex. 63 (Crime Lab Report, Aug. 8, 1991).

43.     Police went to 8008 South Paulina, Apartment 3N to execute an arrest warrant for suspect Antonio Thomas. Ex. 60 (L. Taylor Murder Supplemental Report) at 6. When the police entered the apartment, they encountered a man named John Hooks reaching for a Smith and Wesson pistol. Ex. 60 (L. Taylor Murder Supplemental Report) at 6. They also saw Antonio Thomas emerge from the rear of the apartment. Ex. 60 (L. Taylor Murder Supplemental Report) at 6. Police arrested Hooks and Thomas, and inventoried the Smith and Wesson. Ex. 60 (L. Taylor Murder Supplemental Report) at 3, 6.

44.     Three individuals–Antonio Thomas, Andre Thomas, and John Hooks–were arrested pursuant to the Lamark Taylor murder investigation. Ex. 60 (L. Taylor Murder Supplemental Report) at 2.

45.     Boudreau testified when a crime lab linked a gun to a murder, a homicide detective would want to follow up on this lead; in particular, to see if the person found in possession of the gun had anything to do with the case. Ex. 86 (Boudreau Dep.) at 222:12-2, 224:12-23.

46.     The firearm evidence was submitted to the crime lab by Detective Griffin. Ex. 183 (Firearm Receipt and Worksheet, July 2, 1991). Boudreau testified that he knew homicide detective Detective Griffin followed up on the lead stemming from the analysis connecting the Erving murder weapon to suspects in the Lamark Taylor murder. Ex. 86 (Boudreau Dep.) at 222:12-2; 224:12-23.

47.     There are no documents in the investigative file relating to the ballistics match between the Taylor homicide and the Erving homicide, or any follow up on the lead. *See generally* Ex. 115 (Investigative File); Ex. 114 (Clark Report) at 14, 33. The SOPs at the time required detectives to record and preserve all relevant information during their investigation, and in turn, transcribe the relevant information on to a case report or supplementary report. Ex. 167 (1988 Det. Div. SOP) at CITY_DAY 27202-03.

### Boudreau Fabricates Evidence to
### Falsely Implicate Plaintiff in the Garcia Murder

48.     On September 16, 1991, Rafael Garcia was shot and killed at 1206 W. 51st Street. Ex. 34 (Darren Doss Dep., Sept. 13, 2021) at 36:18-41:19, 43:13-45:11, 49:14-52:4, 55:2-59:2, 61:16-70:1; Ex. 35 (General Offense Case Report (Doss)); Ex. 36 (Report of Death (Garcia)).

49.     At the time of the shooting, Plaintiff was at Eleanor Robinson's house. Ex. 47 (Day Trial Testimony (Garcia homicide) at CCSAO Subpoena, 005923:18-005927:15; Ex. 44 (Day Jakes Dep) at 167:3-175:24; Ex. 141 (Carl Murray Dep.) at 71:22-76:12.

50.     As part of the Garcia murder investigation, Defendant Boudreau and Detective Kill interrogated 15-year-old Anthony Jakes. Ex. 41(Boudreau (Jakes) Dep.) at 123:21-124:21; Ex. 144 (Jakes post-conviction testimony, Aug. 4, 2015) at 46:9-10 (Jakes had just turned fifteen years old a month and half earlier).

51.     Through the use of threats, and physical and psychological abuse, Boudreau and Detective Kill coerced Jakes into falsely implicating Plaintiff and himself in the Garcia murder. Ex. 75 (Jakes Dep.) at 425:14-17; 441:18-455:7; Ex. 40 (Jakes Mtn. to Suppress Test.) at B39:21-B49:8; Ex. 144 (Jakes Post-Conviction Hearing Testimony) at 94:24-95:2, 95:14-96:15, 97:14-100:12,104:5-14; Ex. 146 (Jakes's Statement).

52.    Based on Jakes' false confession, Defendant Boudreau issued a stop order against Plaintiff. Ex. 107 (Stop Order) at CITY_JAKES 777; Ex. 41 (Boudreau Dep. (Jakes)) at 230:4-8.

**Defendant Evans's Role in Coercing Plaintiff's Fabricated Confession**

53.    On February 4, 1992, at approximately 10:00 a.m., Det. Foley and Officer Evans, along with two gang specialists, located Plaintiff at 5234 S. Sangamon St. in the basement of his friend Kwame Tate's ("Tate") house. Ex. 3 (Day Trial Test. (Erving murder)) at E70:19-20; Ex. 10 (Day Dep.) at 414:3-5; Ex. 11 (Day Dep. (*Hill v. City, et al.*)) at 89:5-92:2; Ex. 48 (Criminal Trial Trans.) at D155:5-D156:18; Ex. 44 (Day Dep. (Jakes)) at 228:12-231:6; Ex. 102 (Mtn. to Suppress Trans.) at A5:20-A6:16; JSOF ¶ 130.

54.    Prior to going to arrest Plaintiff, Evans and Foley met to discuss Plaintiff's imminent arrest. Ex. 158 (Evans Dep.) at 52:5-19, 53:5-23, 54:18-22.

55.    Evans came into the basement bedroom, flipped the bed over that Plaintiff was hiding under, "stomp[ed] on the back of [Plaintiff's] head," and handcuffed him. Ex. 3 (Day Trial Test. (Erving murder)) at E73:23-E74:15; Ex. 11 (Day Dep. (*Hill v. City, et. al.*)) at 96:22-97:16; Ex. 44 (Day Dep. (Jakes)) at 242:5-243:5); JSOF ¶ 133. Plaintiff testified that his head "hurt" as a result. Ex. 3 (Day Trial Test. (Erving murder)) at E74:16-18. At the time, Plaintiff was not armed and not resisting. Ex. 3 (Day Trial Test. (Erving murder)) at E-73:3-E:74:20; Ex. 102 (Mtn. to Suppress Trans.) at A8:1-A9:14.

56.    Foley accompanied Evans to the basement. Ex. 158 (Evans Dep.) at 59:13-60:24; Ex. 102 (Evans Mtn to Suppress Test.) at A8:11-A9:6.

57.    Plaintiff was transported to Area 3, where he was eventually put into an interrogation room and handcuffed to a wall. Ex. 3 (Day Trial Test. (Erving murder)) at E74:13-E77:9, E82:13-18; Ex. 47 ( Day Trial Test. (Garcia homicide)) at 7:4-11; Ex. 48 (Criminal Trial

Trans.) at D177:12-D178:9, E76:21-E77:9; Ex. 11 (Day Dep. (*Hill v. City, et al.*)) at 101:4-11; Ex. 44 (Day Dep. (Jakes)) at 255:12-14; Ex. 102 (Mtn. to Suppress Transcripts) at B21:14-16; JSOF ¶¶ 134-135.

58.     On at least two, but possibly as many as five occasions, Foley and Evans left Plaintiff's interrogation room and came back, threatening and accusing Plaintiff of the Erving homicide. JSOF ¶¶ 137-38; Ex. 3 (Day Trial Test. (Erving murder)) at E79:17-E80:5. Plaintiff explained that it was the "[s]ame process over and over again, threatening [him]." Ex. 3 (Day Trial Test.) at E80:8-12. Plaintiff told Foley and Evans that he did not know what they were talking about. Ex. 3 (Day Trial Test. (Erving murder)) at E78:2-14; E79:4-8, E80:22-E81:1.

59.     Having never experienced this type of treatment before, Plaintiff felt scared. Ex. 102 (Mtn. to Suppress Trans.) at B27:19-B29:2. B33:4-21.

60.     At some point after Foley and Evans left, Defendant Boudreau came into the interrogation room. JSOF ¶¶ 141, 142. Boudreau talked to Plaintiff about the "same thing, trying to get [Plaintiff] to confess". Ex. 3 (Day Trial Test. (Erving murder)) at E81:5-20. At some point, Boudreau had Ralph Watson's written statement and showed and read it to Plaintiff. Ex. 3 (Day Trial Test. (Erving murder)) at E111:10-E113:10. During this entire time, Plaintiff was handcuffed to the wall, not able to use the washroom and not given anything to eat. Ex. 3 (Day Trial Test.) at E82:22-E23:14.

61.     Plaintiff has alleged that the totality of the coercion—starting with Defendant Evans stomping on his head through Defendant Foley choking him and threatening him—caused him to falsely confess. JSOF ¶ 133, 151; *see id*. JSOF ¶ 152 (Plaintiff's confession expert opining that the use of threats and physical violence introduced risk factors shown to increase the

likelihood of a false confession); Ex. 50 (Plaintiff's Second Supplemental Response to Defendant Radtke's Interrogatories) at 6; Ex. 184 (Motion to Suppress Pleading) at 4-5.

### Plaintiff Gives Back-to-Back False Confessions to ASA Danielian

62.     On February 4, 1992, Plaintiff gave two handwritten statements to felony review Assistant State Attorney ("ASA") Jason Danielian. Ex. 10 (Day Dep.) at 351:5-24; Ex. 45 (1992 02 04 Day Statement to ASA Danielian); Ex. 185 (1992 02 04 Day ASA Statement (Erving)).

63.     Both handwritten statements indicate they were taken at "1630 hours." Ex. 45 (1992 02 04 Day Statement to ASA Danielian) at Plaintiff Jakes 36240; Ex. 185 (1992 02 04 Day ASA Statement (Erving)) at CITY_DAY 00076.

64.     In both statements, Plaintiff implicated himself as the shooter. Ex. 45 (1992 02 04 Day Statement to ASA Danielian) at Plaintiff Jakes 36242; Ex. 185 (1992 02 04 Day ASA Statement (Erving)) at CITY_DAY 00078. Both statements are false and fabricated. SOAF ¶¶1-8, 85, Ex. 47 (Day Trial Test. (Garcia)) at 19:18-23:15; JSOF ¶ 92-93, 143.

### Plaintiff is Arraigned on the Erving Murder

65.     An arrest form signed by Foley reflects that Boudreau, Foley and Evans were arresting officers for Plaintiff's arrest for the Erving Murder. Ex. 115 (Investigative File) at City_Day 84.

66.     The criminal docket for Plaintiff's criminal prosecution for the Erving murder reflects that Plaintiff was arraigned. Ex. 186 (Criminal Docket for Case No. 927-05074) at Day 30315 ("Durkin PP © [defendant] arraigned–png"); *see generally* Ex.120 (Indictment) (reflecting Case No. 927-05074 for the Erving murder).

## Plaintiff Moves to Suppress His False Confession

67.     Before trial, Plaintiff moved to suppress his confession, citing as one of the basis the physical, psychological, and mental coercion used to obtain his statement. Ex. 184 (Motion to Suppress Pleading) at ¶¶ 2-6. *See e.g.* Ex. 102 (Mtn. to Suppress Trans.) at B19:13-B20:7, B25:8-B26:14, B27:2-B28:2. In particular, Plaintiff identified Evans "forcibly stepp[ing]" on him as an example of the physical abuse used to coerce him. Ex. 184 (Motion to Suppress) at ¶ 5.

68.     Evans, Boudreau, and Foley each testified and denied that Plaintiff was threatened or physically abused. Ex. 102 (Mtn. to Suppress Trans.) at A7:7-9, A10:10-16, A16:7-22, A17:6-11, A23:10-14, A23:19-21, B6:23-B8:2.

69.     Plaintiff's motion was denied. Ex. 102 (Mtn. to Suppress Trans.) at B53:9-21.

## Defendants Use Ralph Watson's Fabricated Statement to Arrest and Prosecute Plaintiff

70.     On June 21, 1994, Plaintiff went to trial to fight the charges stemming from the Erving murder. *See generally e.g.* Ex. 48 (Criminal Trial Trans). Plaintiff faced the death penalty if convicted. Ex. 48 (Criminal Trial Trans.) at D11:19-22.

71.     No physical evidence tied Plaintiff to the murder. Ex. 48 (Criminal Trial Trans.) at D117:6-8; D140:12-17, D162:5-8, D164:5-8, D164:15-23, E189:5-10.

72.     The evidence used to implicate Plaintiff was Plaintiff's false confession and Ralph Watson's statement. Ex. 48 (Criminal Trial Trans.) at D102:7-D103:98, D103:20-D104:1, D106:17-23, D107:6-D109:6, D110:2-D111:19, D181:18-D193:11, D215:11-D216:12, E30:6-E41:15; E110:20-E113:10, E122:8-E138:23, E179:16-24, E214:9-E216:18, E217:6-23. However, the State did not call Watson as a witness at trial. Ex. 48 (Criminal Trial Trans.) at D3:11-D4:10, E218:20-E19:13.

73.    Defendant Boudreau testified that the basis for probable cause to charge Plaintiff with the Erving homicide was "Ralph Watson's statement and Day's . . . statement." Ex. 86 (Boudreau Dep.) at 284:3-18.

74.    Watson's statement was also referenced in the State's opening argument and during Boudreau's testimony at Plaintiff's criminal trial. Ex. 48 (Criminal Trial Trans.) at D102:7-104:1, D106:10-D107:15, D168:15-173:23, D181:8-184:7; JSOF ¶¶ 160-162.

75.    After Boudreau testified, Stuart Katz, Plaintiff's criminal defense attorney, made a motion for a mistrial. Ex. 48 (Criminal Trial Trans.) at D215:11-12. Katz argued that the State had violated the trial court's order, which precluded the State from introducing the substance of Watson's statement. Ex. 48 (Criminal Trial Trans.) at D215:11-D216:12. In particular, Katz argued that "[t]he exaggerated amount of emphasis placed on Mr. Watson's statement in his opening statement" and "[t]he amount of time spent on Mr. Watson's statement during officer Boudreau's testimony" meant that "the jury[] would have to be total morons not to understand what the statement was." Ex. 48 (Criminal Trial Trans.) at D215:21-D216:8. The trial court denied Katz's motion for a mistrial. Ex. 48 (Criminal Trial Trans.) at D218:19-20.

76.    Watson's statement was also used during the State's cross-examination of Plaintiff. E110:4-E112:10. For example, the following colloquy occurred:

Q.         During that conversation, did [Boudreau] tell you that Ralph Watson had given them your name?
             Mr. Katz:     Objection
             The Court:     Overruled.
             The Witness:   Yes he did.
Q.         That Ralph Watson had given your name as the individual who committed the murder of Jerrod Irving, right?
A.         Correct.
Ex. 48 (Criminal Trial Trans.) at E113:1-10.

77.     The State argued in closing that Watson's statement meant that Plaintiff "was caught. The police had the goods on him. The game was up . . . They confronted him with Ralph Watson and [Plaintiff] gave a statement." Ex. 48 (Criminal Trial Trans.) at E179:16-24; JSOF ¶ 163.

## Police Reports Memorialize Plaintiff's Fabricated Confession and Watson's Fabricated Statement

78.     Defendants Foley and Boudreau memorialized their interrogation of Plaintiff in a supplementary report. Ex. 187 (2/18/92 Supp. Report) at CITY DAY 56-59; Ex. 86 (Boudreau Dep.) at 154:2-156:12 (Foley prepared the report but he would have reviewed it before it was finalized). That supplementary report details Plaintiff's fabricated confession. Ex. 187 (2/18/92 Supp. Report) at CITY DAY 59; Ex. 86 (Boudreau Dep.) at 154:2-156:12 (Foley prepared the report but he would have reviewed it before it was finalized); Ex. 10 (Plaintiff Dep.) at 310:1-312:3 (confession was false and fabricated by Defendants Boudreau and Foley); Ex. 50 (Plaintiff's Second Supplemental Response to Defendant Radtke's Interrogatories) at 6-7 (Plaintiff's confession was false and fabricated by Defendants); JSOF ¶ 143.  Boudreau then testified about that interrogation and the attendant details of Plaintiff's fabricated confession at trial. Ex. 48 (Criminal Trial Trans.) at D182:4-D184:7.

79.     ASA Danielian testified that prior to obtaining Plaintiff's false confession, he reviewed police reports which, in part, helped him understand the investigation and presumably guided his questioning of Plaintiff. Ex. 48 (Criminal Trial Tran.) at E26:1-8, E34:16-10, E42:9-E43:8

80.     Ralph Watson's fabricated statement was also memorialized in Defendant Foley's and Defendant Boudreau's supplementary police report. Ex. 187 (2/18/92 Supp. Report) at CITY DAY 56-59; Ex. 86 (Boudreau Dep.) at 154:2-156:12 (Foley prepared the report but he would

have reviewed it before it was finalized); Ex. 80 (Watson Dep.) at 55:7-56:17 (statement was

fabricated by Defendant Boudreau); Ex. 94 (Watson Aff.) at ¶¶ 8-13; JSOF ¶ 114.

### Evans and Foley Falsely Testify that Plaintiff was Not Abused

81.     Plaintiff testified at his trial and told the jury Evans stomped on the back of his

head during his arrest. Ex. 48 (Criminal Trial Trans.) at E73:23-E74:12, E104:3-24. Plaintiff also

testified that Foley and Evans threatened him, and Foley choked him. Ex. 48 (Criminal Trial

Trans.) at E77:21-E:81:4, E85:7-E87:7.

82.     The State called Foley and Evans as rebuttal witnesses. Ex. 48 (Criminal Trial

Trans.) at E150:20-E155:3.

83.     Foley testified that he never choked Plaintiff or threatened to throw him out of the

window if he did not give a statement. Ex 48 (Criminal Trial Trans.) at E154:12-23.

84.     Evans testified that he never stomped on Plaintiff' head when he arrested

Plaintiff. Ex. 48 (Criminal Trial Trans.) at E152:21-23. Evans testified he never mistreated

Plaintiff. Ex. 48 (Criminal Trial Trans.) at E152:24-E153:1.

### Plaintiff was Wrongfully Incarcerated for 26 Years

85.     Plaintiff remained in custody from the date of his arrest–February 4, 1992—until

he was wrongfully convicted and sentenced on August 1, 1994. JSOF ¶ 2; Ex. 188 (Sentencing

Trans.) at H44 13-21. Ex. 189 (Order of Sentence and Commitment) (reflecting 909 days of

credit for time served); Ex. 153 (Order Granting Certificate Of Innocence) at Officers Day 2.

Plaintiff was released from prison in 2018. Ex. 50 (Plaintiff's Second Supp. Response to Radtke

Int.) at Interrogatory No. 19. Plaintiff is absolutely innocent of the murder of Jerrod Erving. Ex.

153 (Order Granting Certificate of Innocence) at Officers Day 2. Ex. 10 (Day Dep.) at 353:15-19

("But I'm letting you know right now I'm innocent.·I always have been innocent."). Since his

release, Plaintiff has been working, including at a steel factory for three-and-a-half years, and he has gotten married. Ex. 10 (Day Dep.) at 7:18-9:3; Ex. 4 (Day Dep. (Jakes)) at 226:18-218:11 (was working at Goodwill for two-and-a-half years after his release).·

## **Defendants' History of Police Misconduct**

86.     Boudreau, Foley, and Evans have a history of misconduct featuring similar abusive conduct that occurred during the Erving homicide investigation. Ex. 114 (Clark Report) at 28.

87.     For example, in March 1992, Harold Hill was interrogated by Boudreau and Detective Halloran about a homicide. Ex. 192 (Supplementary Report re Harold Hill).  During the interrogation, Boudreau punched, slapped, and intimidated Hill, all the while repeatedly insisting Hill was part of the homicide. Ex. 190 (Hill Dep., July 24, 2007) at 286:3-340:24. Boudreau fed Hill facts about the crime. Ex. 190 (Hill Dep.) at 286:3-340:24, 365:8-369:22. By the end of the interrogation, Hill falsely confessed. Ex. 190 (Hill Dep., July 24, 2007) at 369:23-372:2; Ex. 192 (Supplementary Report re Harold Hill) at 2-4.

88.     Other examples of similar tactics/alleged misconduct during interrogations have been described by Clayborn Smith, Harold Hill, Tyrone Reyna (age 15), Miguel Morales, Nicolas Escamilla, Terrill Swift, Edward Robinson, Jerry Gillespie, Derrick Flewellen, and Antoine Ward. Ex. 114 (Clark Report) at 29.

89.     A complaint against Foley reflects that in 1992, a child named Johnny Plummer was taken into custody and interrogated about a murder. Ex. 114 (Clark Report) at 29; Ex. 191 (C.R. 194392) at CITY_DAY 04273. During the interrogation, Foley and another detective slapped Plummer, kicked him about his body, beat him with a piece of wood with a key at the end, and told him he committed the crime. Ex. 114 (Clark Report) at 29; Ex. 191 (C.R. 194392)

at CITY_DAY 04273, CITY_DAY 04278-82. Johnny made an incriminating statement as a result of the interrogation. Ex. 114 (Clark Report) at 29. The complaint was sustained against Foley but he was not fired. Ex. 114 (Clark Report) at 29; Ex. 191 (C.R. 194392) at CITY_DAY 04284.

90.     Similar allegations of abuse were lodged against Foley: 1990 - accused of beating Wonda Bell's son when he didn't answer questions or answer them appropriately; 1988 - beat and threatened Tyrone Sanders at gunpoint during an interrogation; 1988 - threatened and abused Dawn Gramont to fabricate evidence against James Kluppelberg; 1986 - beat, kicked, and threatened Anthony Willis at gunpoint before and during his interrogation. Ex. 114 (Clark Report) at 29.

91.     Between 1988 and 1991, three individuals accused Evans of being physical with them in a manner similar to the Plaintiff's allegation of Evans stomping on his head. Ex. 114 (Clark Report) at 29.

Respectfully submitted,

**ARNOLD DAY**

By: *s/ Renee Spence*
      *One of His Attorneys*

Arthur Loevy
Jon Loevy
Gayle Horn
Heather Lewis Donnell
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900