**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7286 |
| | ) | |
| v. | ) | Hon. Sara L. Ellis |
| | ) | District Judge |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | Magistrate Judge Jeffrey Cummings |
| Defendants. | ) | |

# Exhibit 188

Ñk12.6H

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF )
ILLINOIS, )
                          )
         Plaintiff, )
                          )
     vs. )     92 CR 5074
                          )
ARNOLD DAY, )
                          )
         Defendant. )

REPORT OF PROCEEDINGS HAD at the SENTENCING

HEARING of the above-entitled matter, before the

Honorable THOMAS P. DURKIN, Judge of the Circuit Court

of Cook County, on the 1ST day of AUGUST, A.D., 1994.


     PRESENT:                 HON. JACK O'MALLEY,
                             State's Attorney of Cook Co.
                             BY: MR. JOHN DILLON, and
                             MR. NEAL GOODFRIEND,
                             Asst. State's Attorneys,
                                 on behalf of the State;

                             MS. RITA FRY,
                             Public Defender of Cook Co.
                             BY: MR. STUART KATZ,
                             Asst. Public Defender,
                                 on behalf of Defendant.

Mary Catherine McGreal Redmon, CSR
Official Shorthand Reporter
Circuit Court of Cook County


               H-1

DAY 030198

Ñk12.6H

```
 1        THE CLERK:  Sheet 12.  Arnold Day.

 2        THE COURT:  Morning.

 3                              (Witness sworn.)

 4              ASA JOHN MULDOON,

 5   called as a witness in the above-entitled cause, having

 6   been first duly sworn, was examined and testified as

 7   follows:

 8

 9                  DIRECT EXAMINATION

10

11                  BY

12

13                  MR. GOODFRIEND:

14        THE COURT:  Once you are comfortable state your full

15   name.

16        A     John Muldoon.  M-U-L-D-O-O-N.

17        THE COURT:  Proceed.

18   BY MR. GOODFRIEND:

19        Q     Mr. Muldoon, where are you employed?

20        A     The Cook County State's Attorney's office?

21        Q     What position do you have in the Cook County

22   State's Attorney's Office?

23        A     Assistant State's Attorney.

24        Q     How long have you been an Assistant State's
```

H-3

Ñk12.6H

```
 1    Attorney?

 2         A     Since November of 1983.

 3         Q     Directing your attention to November of 1989,

 4    were you in the Felony Review unit at that time?

 5         A     Yes, I was.

 6         Q     On November 1st of 1989 were you working during

 7    the daytime hours?

 8         A     Yes, I was.

 9         Q     Pursuant to your duties on November 1st, 1989,

10    did you get involved in a Armed Robbery investigation of

11    an offense that occurred the day before?

12         A     Yes, I did.

13         Q     And that offense occurred at a grocery store at

14    1350 West 51st Street on October 31st, 1989, about 2:00

15    in the afternoon, is that correct?

16         A     Yes.

17         Q     Pursuant to your duties did you go to a certain

18    police station to investigate this offense?

19         A     Yes, I did.

20         Q     What police station was that?

21         A     The 9th District police station at 35th and

22    Lowe?

23         Q     Now, in terms of your investigation regarding

24    this Armed Robbery did you speak with witnesses and
```

H-4

1    victims Sofia Medina and Maria Medina?

2         A    Yes, I did.

3         Q    After speaking with these witnesses from the

4    store, did you speak with an individual who's in custody

5    by the name of Arnold Day?

6         A    Yes, I did.

7         Q    Do you see Arnold Day in Court today?

8         A    Yes, I do.

9         Q    Would you please point to him and describe what

10   he is wearing?

11        A    He is wearing a tan shirt and tan pants sitting

12   over there.

13        MR. GOODFRIEND:  Judge, could the record reflect

14   in-Court identification of the defendant, Arnold Day?

15        THE COURT:  May it, Mr. Katz?

16        MR. KATZ:  Yes, Your Honor.

17   BY MR. GOODFRIEND:

18        Q    Now, where did this conversation take place at

19   the 9th District?

20        A    In the Tactical office up on the second floor.

21        Q    Approximately what time was it on November 1st,

22   1989, that you spoke with the defendant Arnold Day?

23        A    Between 4:30 and 5:00 o'clock.

24        Q    Who else was present besides yourself and Mr.

H-5

Nk12.6H

1    Day?

2         A    There were some Tac Officers, Pack and Anderson

3    and also a Youth Officer McAvoy.

4         Q    Now, at the beginning of that conversation did

5    you introduce yourself to the defendant?

6         A    Yes, I told him my name and I told him that I

7    was an Assistant State's Attorney, that I was a lawyer

8    but not his lawyer and that I was working with the

9    police.

10        Q    Did you advise him of anything at that time?

11        A    I told, I advised him of his Miranda warnings.

12        Q    Did you do that from memory or from a

13   preprinted form?

14        A    From memory.

15        Q    And did he indicate to you that he understood

16   those warnings?

17        A    Yes, he did.

18        Q    Was the defendant willing to talk to you?

19        A    Yes.

20        Q    Did you have a conversation with him regarding

21   the Armed Robbery of that grocery store which had

22   occurred the day before?

23        A    Yes.  I also told him that I believe it was, he

24   was a juvenile at the time and I told him that he was

H-6

Ñk12.6H

1   subject to adult jurisdiction even though he was a

2   juvenile at the time.

3       Q    And did the defendant during that conversation

4   indicate to you whether he had participated in the Armed

5   Robbery of that food store?

6       A    Yes, he did.

7       Q    What did he tell you that he did?

8       A    He told me that he stood outside as the lookout

9   while a couple of other guys went in there to rob the

10  store.

11      Q    Did the defendant indicate to you whether he

12  received anything for being the lookout?

13      A    He received, he told me that he received, I

14  believe $3; a small amount of food stamps.

15      MR. GOODFRIEND:  Judge, I have no further questions.

16      THE COURT:  Cross?

17      MR. KATZ:  No cross, Your Honor.

18      THE COURT:  You may step down, Mr. Muldoon.

19

20                      (Witness excused.)

21

22      THE COURT:  Call your next witness.

23      MR. DILLON:  Judge, there would be a stipulation.

24          If called to testify at this hearing, Your

                        H-7

Ñk12.6H

1   Honor, Officer Alston, A-L-S-T-O-N, were called to

2   testify, he would testify that he is currently employed

3   as a correctional Officer with the Cook County Department

4   of Correction.

5          He would testify that on January 11 of 1993, he

6   was employed again as a correctional Officer.  He had an

7   occasion to be working the 4:00 o'clock in the afternoon

8   until 12:00 o'clock in the morning shift.

9          He would testify that he was assigned to Tier

10  G1 at the Cook County jail.  He would testify

11  approximately 10:50 on the evening of January 11 of 1993,

12  a search was conducted of Tier G1.  He would testify upon

13  searching Cell 16A which is the cell which belonged to

14  Arnold Day, whom he would identify in open Court, a home

15  made knife was found in his personal effects.

16         He would testify at that time that after

17  confronting Arnold Day in regards to the homemade knife

18  the defendant admitted to him that in fact he was the

19  owner of that knife.

20         It would further be stipulated that he received

21  7 days as a result of this insurrection but never served

22  that time.

23         So stipulated?

24      MR. KATZ:  So stipulated.


H-8

Ñk12.6H

1          MR. DILLON:  Judge, with that the people would rest

2     in aggravation.

3          THE COURT:  All right.  Mitigation, counsel?

4          MR. KATZ:  Yes, Your Honor.

5               At this time I believe there would be a

6     stipulation between the defendant and the state that if

7     called to testify, Neal Goodfriend would take the stand

8     and would testify that on the date that Arnold Day was

9     convicted of this offense and was talking to the

10    pre-sentence investigation Officer that he called Mr.

11    Goodfriend over and said to him, this is not verbatim but

12    that he didn't mean any disrespect, referring to the

13    statement he made to Mr. Goodfriend as he was leaving the

14    Courtroom in the custody of Deputy Bennett.

15              So stipulated?

16         MR. GOODFRIEND:  So stipulated, Judge.

17         MR. KATZ:  At this time, Your Honor, I'd like to

18    call Deputy Douglas Cobbs.

19                              (Witness sworn.)

20

21

22

23

24

H-9

Ñk12.6H

1                DEPUTY D. COBBS,

2    called as a witness in the above-entitled cause, having

3    been first duly sworn, was examined and testified as

4    follows:

5

6              DIRECT EXAMINATION

7

8              BY

9

10           MR. KATZ:

11     THE COURT:  Please be seated.  Make yourself

12    comfortable.  Once you are state your full name.

13     A    Douglas Cobbs, Junior.

14    BY MR. KATZ:

15     Q    Mr. Cobbs, how are you employed?

16     A    I work for the Cook County sheriff's Department

17    of Correction.

18     Q    And where do you, where are you currently

19    assigned?

20     A    Division 1.  Maximum security.

21     Q    And what Tier do you work on?

22     A    A and B, C and D, E and F.  G and H.

23     Q    How long have you been over there in Division

24    1?

DAY 030206

1      A      Going on 4 years.

2      Q      And during the course of that time have you

3   come to know Arnold Day as an inmate over there?

4      A      Yes.

5      Q      How long have you known Arnold, Mr. Day?

6      A      In passing it depends on what assignment that I

7   am on.  You know I might have assignment for maybe a

8   month, maybe 2 months, depending on how they rotate us.

9      Q      Over the past couple of years have you seen him

10  there?

11     A      Yes.

12     Q      And during the course of that time you actually

13  worked on the Tier in which he has been assigned, is that

14  correct?

15     A      Yes, sir.

16     Q      During the course of time that you have dealt

17  with Mr. Day have you ever seen him engaged in any type

18  of physical fights?

19     A      No, sir.

20     Q      Has he ever been a discipline problems towards

21  you?

22     A      No.

23     Q      Did you ever see him in any kind of problems

24  with the other inmates?

H-11

Ñk12.6H

1       A    No.

2       Q    Does he or has he ever held a job?

3       A    Yes, he was a catwalk worker as I recall for
4  several months, yes, sir.

5       Q    And during the course of that employment in the
6  jail did he ever have any problems?

7       A    No, he did as he was asked to do and that was
8  it.

9       Q    Have you ever seen him disrespectful towards
10  any of the other guards?

11      A    I beg your pardon, counsel?

12      Q    Have you ever seen him disrespectful towards
13  any of the other guards?

14      A    Not to my knowledge.

15      Q    Has he ever failed to obey any directive by you
16  or any of the other guards?

17      A    Not to my knowledge.  Not by me specially, no.

18      Q    In general does he keep his cell neat?

19      A    Yes.

20      Q    How is his personal hygiene?

21      A    He is quite clean.

22      Q    In general do you have any problems or
23  complaints about him as an inmate?

24      A    No, sir.


                              H-12

Ñk12.6H

1     Q    Would you say that in your opinion, in your

2    experience as a jail guard he's adjusted well to life in

3    a correctional setting?

4     A    I would say he functions quite well in the

5    system, yes, sir.

6     MR. KATZ:  I have no further questions.

7     THE COURT:  Cross?

8

9                 CROSS EXAMINATION

10

11                    BY

12

13               MR. GOODFRIEND:

14

15    Q    Sir, does Mr. Day belong to any street gang?

16    A    Not to my knowledge.

17    Q    During the time that you have had him in your

18    location, has he ever expressed any remorse for any of

19    the crimes that he's been charged with?

20    A    He wouldn't have opportunites to do that with

21    me, counsel, because I don't discuss that with inmates.

22    Q    Now, a few minutes ago we had introduced some

23    evidence regarding this defendant having a homemade knife

24    in his cell and you were present in Court, weren't you?

H-13

1      A    No.

2      Q    You were sitting here?

3      A    Well, yes, just a second ago, yes, sir.

4      Q    Did you hear the evidence that was agreed to as

5  to this defendant was in possession of a homemade knife

6  in his cell back in 1993?

7      A    If that is what he attested to then --

8      Q    Okay.  Now assume that this defendant, Arnold

9  Day, had a homemade shank in his cell back back on

10  January 11, 1993.  Would that effect your opinion as to

11  whether he is a dangerous individual in a prison setting?

12      A    We find shanks in there on a constant basis.

13  Constant, so --

14      Q    Okay.  But the fact that a shank was found in

15  his possession and that he admitted that it was his,

16  would that effect your opinion on the dangerousness of

17  Arnold Day in a prison setting?

18      A    Okay.  I don't quite understand the question

19  when you say dangerous so --

20      Q    Well, do you consider --

21  THE COURT:  I take it you'd just as soon not have

22  shanks when you are around, wouldn't you?

23      A    Yes, sir.

24  THE COURT:  All right.  That's a form of dangerous.

H-14

1     A    Okay.  The way I am looking at dangerous, Your
2  Honor, is when they use them.
3     THE COURT:  Well, that is, having a collection is
4  probably, we'd all agree, a wonderful thing.
5         But having those kinds of collections in the
6  jail do you think it's dangerous?
7     A    Well I would prefer they didn't have them,
8  okay.
9     THE COURT:  Okay.
10    MR. GOODFRIEND:  Judge, I have nothing further.
11    THE COURT:  Redirect?
12    MR. KATZ:  No.
13    THE COURT:  Thanks, Deputy Cobbs.  Please step down.
14
15                    (Witness excused.)
16
17    MR. KATZ:  Your Honor, my other mitigation witness
18  has not shown up yet.
19    THE COURT:  Let's pass it.
20    MR. KATZ:  Thanks.
21                    (Whereupon this case was
22                     passed and later recalled with
23                     proceedings had as follows:)
24


H-15

1          THE CLERK:  Recall, Arnold Day.

2          THE COURT:  Court's back in session, please remain

3     seated.

4               Mr. Day is present personally and by counsel.

5               Please call your next witness.

6          MR. KATZ:  Thank you, Your Honor.  My next witness

7     is Minnie Gibson.

8                               (Witness sworn.)

9                    MINNIE GIBSON,

10    called as a witness in the above-entitled cause, having

11    been first duly sworn, was examined and testified as

12    follows:

13

14                    DIRECT EXAMINATION

15

16                    BY

17

18                    MR. KATZ:

19         THE COURT:  Would you please state your full name

20    and spell it?

21         A    Minnie B.  Gibson, G-I-B-S-O-N.

22         THE COURT:  Okay, you may proceed.

23    BY MR. KATZ:

24         Q    Mrs. Gibson, how are you related to Arnold Day?

Ñk12.6H

```
1        A    Huh?

2        Q    How are you related to Arnold Day?

3        A    I am Arnold Day's second cousin.  Arnold Day

4   and, Arnold Day Grandmama and my, my mama, my mama was

5   one of the older sisters.  Arnold Day Grandmama was the

6   youngest sister.  They was 2 sisters.

7        Q    How does he call you?  How does he refer to

8   you?

9        A    Huh?

10       Q    What does he call you?

11       A    He calls me Grandmom.

12       Q    During the course of his life who did Arnold

13  live with?

14       A    Me.

15       Q    I am sorry?

16       A    Me.

17       Q    You?  And --

18       A    His mother.

19       Q    And his mother.  All right.  What happened to

20  his mother?

21       A    She died.

22       Q    When did she die?

23       A    About several years ago, 2, 3 years ago she

24  died.
```

H-17

Ñk12.6H

1      Q     And do you know what she died from?

2      A     From the doctors said from infected liver.

3      THE COURT:  Who is Martha Tate, ma'am?

4      A     Martha Tate?  I don't know Martha Tate.

5      THE COURT:  I got a letter from a Martha Tate.

6      A     Martha Tate.

7      THE COURT:  From 52nd and Sangamon.

8      MR. KATZ:  Martha Tate, I believe, is a family

9   friend, Your Honor.  I don't believe Miss Gibson is

10  familiar with her.

11     A     Oh.

12  BY MR. KATZ:

13     Q     Mrs. Gibson, did Arnold's mother have any

14  problems that contributed to her liver failure?

15     A     She went in the hospital, last time she went in

16  the hospital she wouldn't tell me what was wrong with

17  her.

18     THE COURT:  Did they have a problem with alcohol I

19  think he means, ma'am?

20     A     Yes, she had a problem with alcohol.

21  BY MR. KATZ:

22     Q     How long did Arnold live with you?  Was it his

23  whole life?

24     A     His whole life.  He was born in my home.  I

H-18

1   raised him from a baby.  I helped his mother from the

2   first out.

3        Q    And did you provide discipline for him?

4        A    Huh?

5        Q    Did you provide the discipline for him or did

6   his mother?

7        A    Well I, I don't like to, I don't like to whoop.

8   I like to sit down and talk.  But she whooped him too

9   hard.

10       Q    During the time that he lived with you, was he

11  a good boy in your home?

12       A    He was.

13       Q    Did he ever create discipline problems for you?

14       A    No, he never give me no problems.

15       Q    Was he ever disrespectful to you?

16       A    No.

17       Q    Did he go to school when he was supposed to

18  when he was younger?

19       A    Yes.  He went to school, went to school it was

20  cold and rainy and it was a little bitty fellow about 4

21  years old and and so I sent him to school and he come

22  home and the rain and cold.  He looked up and me and he

23  said, "what you want to send me out there in that cold

24  for?"

H-19

1          Because he was so small.

2      Q   Mrs. Gibson, were there other children Arnold

3   the house?

4      A   Oh yes.  His baby Auntie.

5      Q   I am sorry?

6      A   His younger Auntie.  See when my Auntie died

7   she left 14 children and I had them 14 children.  I don't

8   have no children of my own.  They sent me Melvin was 4

9   years old.  They send me Matilda.  That is Arnold's mama,

10  3 years old.  And they sent me they baby sister, she was

11  2 years old and I had to be a mother for children and I

12  had to raise those children and I raised them to the best

13  of my own knowledge.

14     Q   And when Arnold was young --

15     A   No, he was one raised child.

16     Q   So he was like an only child?

17     A   Yes.

18     Q   Was his father ever Arnold?

19     A   Not so -- his father once or twice.  But she

20  told me to forget the father.  Me and her was going to

21  raise the child up herself and that is what we did.

22     Q   So you raised him without any male?

23     A   Yes.  She was good on the working, she, she

24  had, they had to go to Du Sable.  They went to Du Sable

H-20

Ñk12.6H

1   high school and then after then she got a few years in

2   Malcom X high school and any time she'd go she'd go to

3   for a job and they sent her right out on the job and she

4   get it.  She served --

5       Q    All right.  Do you remember when his mother

6   first started drinking heavily?

7       A    It was about a couple of years before she died

8   when they had taken on it the first time.

9       Q    And during that period of time did she provide

10  a strong parental force on Arnold?  Was she a good parent

11  to Arnold while she was drinking?

12      A    She wasn't.  She was still, you know, good but

13  some things.

14           She told me -- I, I didn't never said nothing

15  about it.  One day Arnold was picked up from school and I

16  didn't go.  I had been gone all the time you know getting

17  him and when he was picked up from school and went to

18  jail but she went that day and when she come back she

19  told me she said, "mama, it's the police up putting my

20  child in jail and say he got a black boy is paying him

21  off.  He is paying him off to witness against my son."

22           And she said when he started home say the

23  police caught him again and put him back in the jail but

24  everytime they put him in there the Judge turned him

H-21

Ñk12.6H

1      loose.

2              But the police said he was bothering his son.

3      The police didn't say he had no gun or no knife.  It was

4      better than his son and his son was a working boy.

5          MR. KATZ:  I have no further questions.

6          THE COURT:  Do you have any questions?

7          MR. DILLON:  No questions, Your Honor.

8          THE COURT:  You may step down, thank you, Miss

9      Gibson.

10

11                      (Witness excused.)

12

13          THE COURT:  Call your next witness.

14          MR. KATZ:  Your Honor, I expected another live

15     witness, a person by the name of Elenore Robinson.  She

16     has no showed up.

17              We have an agreement that if the Court will

18     recall Elenore Robinson testified as an alibi witness and

19     as part of her testimony she testified that she was a

20     close family friend with Arnold Day, she considered

21     Arnold part of her family.  That he spent a good deal of

22     time at her house, had a good relationship with her, her

23     children.  Spent a good deal of time with her children

24     and that she considered him to be a good person.

                           H-22

1          I believe the State will stipulate to that in

2     lieu of her testimony being live here.

3          THE COURT:  So stipulated, state?

4          MR. DILLON:  So stipulated.

5          MR. KATZ:  Your Honor, you also as you have noted

6     you have the letter from Martha Tate who's a family

7     friend of Mr. Day.  We'd ask the Court to consider that.

8          And the only other thing I would have in

9     mitigation, there is some minor corrections to the PSI.

10         THE COURT:  All right.  Let's take care of those.

11         MR. KATZ:  Direct your your attention to age 2.

12         Mr. Day tells me the 9th grade in education,

13    not 8.  I believe that is a typo.

14         THE COURT:  That is correct.

15         MR. KATZ:  And there is further I believe they refer

16    to his being enrolled in a GED program.  I believe that

17    is further on the Pre-Sentence Investigation.

18         On page 3 they note this case and plea of

19    guilty to Armed Robbery.  We know that plea was to

20    robbery for which he received 4 years Department of

21    Correction.

22         MR. GOODFRIEND:  Judge, we can also scratch unlawful

23    use of weapon.

24         THE COURT:  All right.  I am scratching both the use --

H-23

Ñk12.6H

1       MR. KATZ:  On page 4 under education he actually

2   graduated from Drake Elementary School, not William

3   Sherman.  And as an addition he asked me to add into it

4   the fact that he attends services at the jail.  The

5   religious services that he is allowed the privilege which

6   I believe the Pre-Sentence Investigation left out.

7       THE COURT:  All right.  I have added Islamic

8   services.

9       MR. KATZ:  Thank you.

10      With that there are no further corrections and

11  we'd rest in mitigation.

12      We would, however, ask the Court if it would be

13  possible for Mr. Day to address the Court in elocution.

14      THE COURT:  Oh, not impossible.  He's got an

15  absolute right to.

16      MR. KATZ:  As opposed to taking the stand as a live

17  witness.

18      THE COURT:  Sure.  No problem.

19      Mr. Day, are there any witnesses that you want

20  Mr. Katz to call that he has not called for you?

21      A   They have not showed up, Your Honor.

22      THE COURT:  Well, if you are looking for a

23  continuance to have them in here I will be happy to grant

24  it.

H-24

1          The one the State has agreed as to what her

2     testimony would be, Elenore Robinson, that is what a

3     stipulation is.

4          But if you want a continuance to bring her in,

5     this is a serious matter.  Do you want a continuance to

6     bring in some additional witnesses?  I will be happy to

7     grant it?

8          A    No, sir.

9          THE COURT:  So there are no additional witnesses

10    that you want Mr. Katz to call?

11         A    No, sir.

12         THE COURT:  All right.  You may make your statement.

13         A    Your Honor, I wanted to address the Court and I

14    want for the record to reflect that I have been locked up

15    for 2 and a half years on this things, you know, and

16    more.

17         I wanted to address you know, everybody in this

18    Courtroom that is listening to me right now today you

19    know, that.

20         But what happened, what took place in this

21    Courtroom, it didn't happen, but it's one that I wanted

22    to state that everybody in this Courtroom believe in God

23    and there is only one God and he knows the truth about

24    this whole situation.

H-25

1    And I just wanted to let the victims family

2 know that Rob was a friend of mine.  I went to school

3 with him you know, and his older brother, Renardo is a

4 friend of mine also.  We spent time together in the jail

5 when he was over there with me about a year or so ago.

6    And I want to tell my grandmother that I love

7 you with all my heart you know.  Don't worry about it.

8 It's going to be to be all right.

9    And I want to address the State you know, I had

10 nothing personal.  No personal afflictions towards them.

11 I understand they was just doing they job.

12    I want to also thank Mr. Stuart Katz from the

13 Public Defender's Office for handling my case in the

14 manner that he did and I want to thank you, Your Honor,

15 for giving me the ability to speak right now.

16    THE COURT:  Well you are certainly right that Mr.

17 Katz conducted himself in the highest standards of the

18 defense bar whether retained or appointed and I certainly

19 echo your remarks in that regard.

20    Miss Tate's letter to me was so poignant that I

21 am going to put it in the record.

22    On June 28, 1994:  Dear Judge Thomas P.

23 Durkin, I am writing on behalf of Arnold Day, a young man

24 I have known for 15 years.  He's just like a son to me.

H-26

Ñk12.6H

1   His mother passed away some years ago.  I feel like I am

2   his mother.  Arnold grow up with my children.

3          Dear Judge, if you can please find it in your

4   heart please please don't take this young man's life

5   away.  I don't believe that Arnold did what he was found

6   guilty of.  He would not take someone's life.

7          I am so sad I cry all the time for our young

8   black men.  When will this madness stop?  All of the

9   killing on the street and in the system, I have 2 sons,

10  one 20 and one 19.  God forgive me but if I had it to do

11  all over again, I would not bring a child into this

12  world.  It is breaking my heart to see the things that

13  our children must go through.

14         So much of these young men never get out of

15  this neighborhood.  Never get a job.  Never get out of

16  this City.  It is this, is this what's lives all about.

17  They never see what the world would have to offer.

18         All they see is abandoned buildings, drugs,

19  guns, the idle day facing our youngsters each and every

20  day.  I want to scream but there is no one to hear me.

21         What is this life all about?  I can't

22  understand.  I wish there was something I could do for

23  all our young black children.

24         So dear Judge Durkin, please please, search

H-27

1    your heart and please don't take Arnold's life away.

2             Judge, I don't know you, Judge, I know you

3    don't know me at all, but I am a 45 year old parent

4    concerned about all of our children, no matter what color

5    they are.  I don't know if I will live to see Arnold on

6    the outside again, that is in the hand of you and the

7    good Lord.  I pray for you and the decision you must

8    make.

9             I have lived in this neighborhood for 19 years,

10   have seen so much of our children die too soon.  I ask

11   the Lord when will this end and I cry each and every day.

12            Dear Judge, I don't know what more I can say, I

13   will pray for us all, please have mercy.  Sincerely

14   Martha Tate.

15            As I said what struck me is the poignancy and

16   the beauty of that letter is so remarkable in that the

17   same feeling is shared by the people for the defense as

18   was expressed by the family of the victim in this case.

19            And to be honest I feel the same way.  I wish I

20   had a solution.  When you wake up in the morning and you

21   read about some 2 or three-year-old child who gets killed

22   in a cross fire, when you hear about some parents who

23   can't allow their children to leave the house, never mind

24   go out in the backyard and play but they have to keep

H-28

Ñk12.6H

1 their children in the house, what is going on?

2   Obviously in the worse of the neighborhoods in

3 the City there are very very good people who are trying

4 to live their lives trying to make something better of

5 themselves and whether the actions of the federal

6 government enforcing males, in forcing males from the

7 household by essentially failed welfare policies are

8 responsible for this or displacements of populations

9 because of the industrial revolution or because of the

10 overwhelming availability of drugs I don't know.

11   But certainly something has to be done.  So

12 these kinds of things don't happen.

13   It amazes me because you see time and time and

14 time again the number of females in the community who are

15 wonderful, sucessful.  They grow up in the same community

16 and they go out and get jobs.  There is no shortage of

17 available work.

18   But we have high school drop outs who regard

19 themselves as too good to take a job for $5 an hour.  I

20 suppose it's not surprising when you go out and make a

21 couple of hundred dollars A Day dealing $10 bags of

22 crack.

23   Something has to be done so I share the

24 feelings of both the victims and the family of the

H-29

DAY 030225

Ñk12.6H

1    defendant in this case.

2            I suppose the only answer that you can do is to

3    do something about it on a case by case basis.

4            In any event I have said enough for the state

5    and defense to make their argument in aggravation and

6    mitigation if you wish.

7            You may proceed.

8        MR. GOODFRIEND:  Thank you, Judge.

9            Judge, people have choices in life.  I think

10   Your Honor just referred to the choices that some people

11   make whether they are going to earn an honest $5 an hour

12   and build their way up some organization or corporation

13   such as McDonalds or any other type of job where you have

14   got to start at the bottom.

15           It brings to mind an athlete by the name of Bob

16   Love who played basketball and made hundreds of thousands

17   of dollars; probably not the same type of money that

18   athletes make today but Bob Love had a disability, a

19   stuttering disability.

20           However he began working at the bottom and

21   worked on his stuttering problem and is now a successful

22   managerial individual within a large corporation.  He in

23   effect paid his dues twice in society.  He slaved away on

24   the basketball Court to become a basketball star then in

H-30

Ñk12.6H

1     his second life as a worker started at the very bottom,

2     on his disability and made he himself a success.

3           People have those choices. Arnold Day had

4     those choices.

5           He made his choices. He picked the easy money,

6     he picked the durg selling. Arnold Day picked to belong

7     to a gang and move up the gang echelon. Arnold Day

8     picked guns to enforce his gang affiliation and gang

9     territory. Arnold Day took guns and went to take money

10     from innocent individuals. He took a path towards

11     terrorizing others. He took a path towards violence

12     towards others and he took a path towards destroying

13     lives on the South side of Chicago.

14           We see in a 2 year period as an adult in terms

15     of the criminal law, he had no respect for the law, he

16     had no respect for human life.

17           Going back in his criminal career we see that

18     his first adult arrest was a bond forfeiture warrant back

19     in May of 1989 then in October of 1989 a criminal

20     trespass to land bond forfeiture Sol.

21           He then participateed in a robbery. Sometimes

22     the record doesn't always reflect how severe the facts

23     are, that is why we elected to bring witnesses in

24     regarding the robbery that occurred back on October 31st,

H-31

Ñk12.6H

1   1989.

2        This is the robbery in which the defendant

3   served 4 years in the Illinois Department of Corrections.

4   He was the lookout.  His 2 partners went into this

5   grocery store, one of them had a shotgun which he placed

6   at an 18 year old woman; the other co-conspirator had a

7   gun which he ultimately fired at the mother of that

8   clerk.  The shotgun was fired into the ceiling, and

9   Arnold Day received $39 worth of food stamps for being a

10   look out.

11        That is how he started and the way his violence

12   in the criminal system, after serving his time he was

13   paroled on May 1st, 1991, within 16 days he was back

14   involved with his street gang, selling drugs and he was

15   the murderer of Jerrod Irving and he told us what the

16   motive was; that he had met with Nate Anderson, a fellow

17   Blackstone and they decided to rob the JDs in retaliation

18   and this defendant was the trigger man.

19        This defendant was the one who took the life

20   from Jerrod Irving.  This defendant was the one who fired

21   the Tech 9 3 or 4 times.

22        This defendant left Jerrod Irving laying in a

23   pool of blood on the street or in the hallway of the

24   building at 927 West 54th Street, a short distance from

H-32

Ñk12.6H

1  Jerrod's home.

2         What is even -- well, what is somewhat

3  compelling in this case is that the victim's parents had

4  to come and see him in that situation.

5         We heard from Mrs. Irving on the last Court

6  date about that feeling and she told us and I quote from

7  her victim impact statement, burying a child is a task

8  that no parent ever expects to do in the time that child

9  is conceived.  You have hopes and dreams of that child

10  becoming a mature strong and successful adult.

11         When your child is maliciously murdered for no

12  other reason than the fact that he was there at the

13  scene, when you must see the baby you carried for 9

14  months laying murdered in a doorway, never again to hear

15  them call out to you, never again able to put your arms

16  around them, never to see them become an adult, you are

17  left wondering forever what might he have been if given

18  the chance?

19         It was a vicious murder because this defendant

20  took the gun and placed it within 18 inches of the face

21  of Jerrod Irving and basically blew his brains out with

22  that shot that entered around the nose, went through the

23  face, the base of the skull, the brain and finally exited

24  the head and the top of the middle.

H-33

Ñk12.6H

1    A second shot which helped destroy his life

2    went through the victim's neck.

3    That was what the defendant did within 16 days

4    of his release from parole.

5    He continued dealing drugs and he was arrested

6    for dealing on August 8 of 1981.

7    That is a case which was tried before this

8    Courtroom for which the defendant received 7 years in the

9    Illinois Department of Corrections.

10    It should also be noted in that record and the

11    file before the Court that while he was out on bond he

12    failed to show up for Court on that delivery of a

13    controlled substance case on 10, 30, 1991.  He was a BFW.

14    Part of the reason he might have been a BFW is

15    because in that interim period between committing the

16    delivery and forfeiting his bond he committed another

17    murder.

18    There was evidence that was admitted in this

19    sentencing hearing that came from the other prosecution

20    in this case of the Defendant's involvement in a murder

21    of Raphael Garcia --

22    THE COURT:  Let me interject on that.

23    It strikes me that we have a unique situation

24    in that I am aware of the other case and the record in

H-34

1   this Court reflects the stipulation that in fact the

2   testimony would be thus.

3          There was an objection to its admissibility

4   based on the fact that the defendant was found not guilty

5   by the jury in this case.

6          However, there is going to be nothing in this

7   record for the Appellate Court to review so I would

8   suggest if you take the statement of the defendant which

9   was admitted by stipulation, mark it and make it part of

10  the Court file, the statement from the other case --

11  MR. GOODFRIEND:  I think we have already done that,

12  Judge, but we will advise any appellate persons that that

13  full record which has been referred to can be found in

14  the case number 92-5073.

15         The defendant in his statement in that case

16  involving the homicide of Raphael Garcia indicated that

17  he was once again involved in his money making process,

18  selling drugs and he decided he got hungry and he went to

19  the submarine shop at Racine and 51st Street and saw the

20  victim who was an older man, the victim was Raphael

21  Garcia.

22         This defendant saw that Mr. Garcia had what he

23  said was a nutroll, and he had money and some jewelry on

24  him and this defendant decided to rob Mr. Garcia.

H-35

Ñk12.6H

1         It so happens that Mr. Garcia tried to get away

2    and the defendant proceeded to shoot him.

3         Mr. Garcia suffered a number of gunshot wounds

4    including a gun shot wound in the back.

5         That is what Arnold Day is about.  He was

6    finally arrested in February of 1992 and it was the time

7    that the Police Department put a rest to his committing

8    crimes, at least on the outside.

9         He was no longer a danger to the community on

10    the outside.  He was no longer selling drugs on the

11    outside and at least he was no longer participating in

12    gang warfare in the City of Chicago.

13         However even his behavior since he's been in

14    the system has not been perfect.  On January 11, 1993, a

15    homemade knife or a shank was found in his possession at

16    the jail.  He was at least given 7 days; whether he

17    served it or not it really doesn't matter of course.

18         After trial he did threaten myself outside the

19    presence of the Courtroom but in the presence of one of

20    the deputies.

21         I think that just shows what kind of person

22    Arnold Day is.

23         Judge, in terms of what you have before you he

24    has destroyed the lives of individuals by taking their

H-36

1    lives.  He's also destroyed the lives and affected the

2    lives of the families of his murder victims as well as

3    all the people that he sold drugs to when he was selling

4    drugs out in the neighborhood.

5         There is no remorse expressed by him.  There is

6    no sense of assuming responsibility.

7         One of the problems with our society today is

8    that people don't accept responsibility for their

9    actions.  Mr. Day in no way has accepted responsibility

10   for any of his actions.

11        Based upon the evidence that you have before

12   you, he is eligible for the death penalty and we are

13   asking this Court to sentence him to that ultimate

14   punishment and give him the death penalty.

15        However, should the Court feel that it's not

16   appropriate in this case we are asking the Court to take

17   into consideration all the evidence that you have before

18   you.  Take into evidence the other 4 bond forefeitures

19   that are of record.

20        Take into evidence the robbery that he

21   committed along with his partners back in 1989, the

22   murder or his participation in the murder of Raphael

23   Garcia, his destroying the life of Jerrod Irving, his

24   actions in the jail, his actions outside of the

H-37

DAY 030233

Ñk12.6H

1    Courtroom, and if the Court decides not to sentence this

2    defendant to the death penalty we are asking that this

3    Court sentence the defendant to life in prison without

4    parole so that he may not be in a position to destroy

5    anymore lives on the outside.

6           Thank you, Judge.

7      THE COURT:  Mr. Katz, you may proceed.

8      MR. KATZ:  Thank you, Your Honor.

9           Your remarks earlier you noted some problems

10   with society.  I agree with you.  I don't know what

11   causes one individual to be good and one individual to be

12   bad when raised in certain situations.

13          Certainly Mr. Day did not grow up in what we'd

14   call a normal functioning family.  If anything it was

15   largely disfunctional with no male figure there to

16   provide him with any sense of discipline or as a role

17   model.  A mother who was an alcoholic raised by a woman

18   he referred to as his grandmother, Minnie Gibson, who's

19   obviously cared enough to come to Court and to be here as

20   well as other family members.

21          Some people can grow up in that kind of

22   situation, and go onto live productive lives; others

23   don't find the way.  I don't know why.  I don't believe

24   we can find an explanation.

H-38

Ñk12.6H

1        But those are certainly some of the

2   circumstances under which Arnold Day grew up.  He fell in

3   obviously with the gangs which unfortunately is a common

4   circumstance in the area in which he lives and it was

5   obviously the involvement of the gangs and the drugs that

6   led him to where we are today.

7        Mr. Goodfriend said he had no respect for life.

8   I think his background shows just the opposite.  He has a

9   warm relationship with his grandmother.  He has strong

10  relationships with other people in the neighborhood even

11  though they are not actually related by blood, such as

12  the Robinsons and, who he's spent a lot of time with:

13  Elenore, her daughter, Dorothia who was a witness at the

14  first trial in 5073.  The Tates.

15       I think it's interesting to note that there is

16  at least 2 people who have either testified or written

17  letters to this Court who have expressed to you a

18  maternal parental instinct and feeling towards the young

19  man who is not their son.

20       In fact his relationship with these people

21  shows that he does have respect for life.  That he can

22  form acceptable, viable relationships with other people.

23       The incident that we are here for obviously

24  involved some type of fight between the Blackstones and

H-39

Ñk12.6H

1   the Jet Blackstones.  The shooting took place at a Jet

2   Blackstone house.

3          Obviously we are not going to solve the gang

4   problem here in this Court.  Sentencing somebody to death

5   is not going to solve the gang problem that occurs out in

6   our streets nor is it going to bring Jerrod Irving back.

7          Mr. Day obviously is going to serve some sort

8   of penalty which this Court is going to impose on him.  I

9   am sure it will be appropriate.

10         As for his future, if anything he has shown an

11  ability to adapt to jail life.  The fact that he's been

12  in jail for 2 years and has only had one written

13  reprimand, one written disciplinary action I think is

14  pretty remarkable considering the pressure cooker of the

15  County of Cook jail.

16         We often see people who have multiple and

17  constant disciplinary actions but that a knife was found,

18  I would point out that it wasn't being used, it wasn't

19  being threatened against anybody and considering the

20  conditions over there self-defense is certainly not an

21  unlikely reason to own some type of knife.

22         That he has never in his time at Cook County

23  jail or as far as we know from Illinois Department of

24  Corrections ever harmed another inmate or a guard or had

H-40

Ñk12.6H

1   any type of disciplinary problem.

2          In fact just the opposite as Deputy Cobbs

3   pointed out.  He has been an excellent inmate.

4   Respectful to guards, the other inmates, works or has

5   worked at the jail and attend services.

6          Your Honor, all these things can be taken into

7   consideration in making your decision.  They all

8   constitute nonstatutory mitigating factors.

9          I don't believe the death penalty is

10  appropriate in this case, I don't believe it's

11  appropriate for Arnold Day.  I don't believe that life

12  imprisonment is appropriate for Arnold Day.

13         This is a young man that I have been dealing

14  with for sometime now, he's been nothing but respectful.

15  Cooperative.  He's a bright young man.  He is getting an

16  education in the jail.  I hope that he will continue to

17  do that when he goes to the Illinois Department of

18  Corrections.  He is participating in religion.  I believe

19  he has a future as a productive member of our society and

20  that if one day he is released he'll be a good citizen.

21  I don't believe he deserves or needs life imprisonment.

22  I certainly don't believe he needs to receive the death

23  penalty and I believe that if he receives a term of years

24  somewhere down the road society will benefit from it.

H-41

DAY 030237

Ñk12.6H

1        Thank you.

2        THE COURT:  Anything else you'd like to say, Mr.

3   Day?

4        A    I would like to say is that Abraham is the

5   father of faith as everybody know in the Bible and I want

6   to let my grandmother know that I got faith.  And by

7   whatever going to happen.

8        That's all, Your Honor.

9        THE COURT:  Well, Malcom X, who's certainly one of

10  the more prominent African American Muslims, said that

11  there is no shame in having been a criminal.  The shame

12  is continuing to be a criminal.

13       And unfortunately Mr. Day has chosen that route

14  after his release from the penitentiary.  He had an

15  opportunity to go a different way, I take it at that

16  point he had probably come to realize that he didn't want

17  to spend time in the penitentiary but he chose a

18  different route.

19       There is substantial reliable evidence of his

20  participation in the other murder.  I am constrained to

21  regard that as an extremely serious aggravating factor

22  because of, constrained against doing that because of the

23  fact that the defendant was found not guilty by a jury on

24  that case.

H-42

Ñk12.6H

1        And that is very troublesome to me in spite of

2    the fact that the United States Supreme Court says it is

3    acceptable evidence, very troublesome to me that that

4    should be used.  He did win this case and I take that

5    into consideration.

6        He is a bright articulate young man who

7    presents himself well and of course that is even more the

8    difficulty of what we have here because it isn't a

9    question of any intellectual deficit that caused him to

10   enter the life that he did.  It was something that he

11   chose.

12       And he had an opportunity to do other things,

13   chose not to do it.  Easy bucks associated with the drug

14   business and as a way of making money, participation as a

15   gang member in all of the nefarious activities of the

16   gangs was apparently more attractive to him than the the

17   grund and grind of a 40 hour week that the rest of us

18   have to engage in in order to earn our livings.

19       The question, the questions to be answered is

20   will he receive the death penalty?  No.

21       There is certainly evidence of family

22   disfunction that would indicate that this defendant

23   should not be sentenced to death.  He is a danger to the

24   community.  The Constitution mandates that all sentences

H-43

1   imposed by a Court should be imposed with an eye to

2   restoring the defendant to useful citizenship.

3           He is approximately 22 years of age today, can

4   I say that he will never, ever be a useful citizen?  No,

5   I cannot.

6           And so I also reject as a sentence natural life

7   without parole.

8           I take into consideration the extreme

9   seriousness of the Defendant's conduct, however, it's the

10  judgment of the Court that he will be sentenced to 60

11  years in the Illinois Department of Corrections to be

12  followed by 3 years mandatory supervised release.

13          The defendant has been in custody since what

14  day?

15      A    February the 4th, 1992.

16      THE COURT:  February 12?

17      MR. DILLON:  4th.

18      THE COURT:  February 4th, 1992.  365 times 2 to

19  February 4, '94.  And additional 179.

20          He is entitled to credit for 909 days

21  considered served.

22          You have the right to appeal of judgment of

23  this Court, Mr. Day, and I know you want to do that.

24          Within the next 30 days you have to file a

H-44

1    written notice of Appeal.  I assume you are not in a

2    position to hire your own lawyer, is that correct?

3        A    That is correct.

4        THE COURT:  Please raise your right hand and be

5    sworn.

6                             (Defendant sworn.)

7

8                    DIRECT EXAMINATION

9

10                   BY

11

12                   THE COURT:

13       Q    State your name?

14       A    Arnold Day.

15       Q    Do you have any money to hire a lawyer?

16       A    No, sir.

17       THE COURT:  Court finds the defendant is indigent

18   for appeal purposes.  The stay of mit is vacated in his

19   other case.

20            Good luck to you, sir.

21       MR. GOODFRIEND:  Judge, 2 other matters.  One is in

22   terms of the second offense that he was convicted for in

23   this case, the Attempt Armed Robbery, we'd ask that the

24   Court impose a sentence.

H-45

1        THE COURT:  All right.  All right.  The State is

2   correct.

3            On June 22 the defendant was found guilty of

4   all counts.  Insofar as the attempt Armed Robbery,

5   defendant is sentenced to 15 years in the Illinois

6   Department of Corrections to be followed by 2 years

7   mandatory supervised release.  That will be concurrent

8   with the other sentence.

9        MR. GOODFRIEND:  Judge, the other question I had was

10   and request actually would be that the 60 years be

11   consecutive to the 7 on delivery of controlled substance.

12        THE COURT:  All right.  That request is denied.

13        MR. KATZ:  Your Honor, we'd ask that the office of

14   the State Appellate Defender be appointed.

15        THE COURT:  I don't make that decision.  It's up to

16   the presiding Judge.  Good luck to you, sir.

17        MR. KATZ:  Thank you, Your Honor.

18

19            (Whereupon this was all the proceedings

20              had at the hearing of the above-entitled

21              cause of action on said date.)

22

23

24

H-46

DAY 030242

Ñk12.6H

1   STATE OF ILLINOIS   )
                       ) SS:

2   COUNTY OF COOK     )

3        I, MARY CATHERINE REDMON, CSR, OFFICIAL

4   SHORTHAND REPORTER OF THE CIRCUIT COURT OF COOK COUNTY,

5   ILLINOIS, DO HEREBY CERTIFY THAT I REPORTED IN SHORTHAND

6   THE PROCEEDINGS HAD AT THE HEARING OF THE ABOVE-ENTITLED

7   MATTER, AND THAT THE FOREGOING IS A TRUE AND CORRECT

8   REPORT OF PROCEEDINGS HAD AT SAID CAUSE.

9

10

11   OFFICIAL SHORTHAND REPORTER
      CIRCUIT COURT OF COOK COUNTY

12   COUNTY DEPARTMENT-CRIMINAL DIVISION

13

14

15

16

17

18

19

20

21

22

23

24

H-47

997

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT CRIMINAL DIVISION

FILED
DEC 29 1994
AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

THE PEOPLE OF THE )
STATE OF ILLINOIS )
)
vs. )          NO. 92 - 5074
)
ARNOLD )
DAY )

REPORT OF COMPLIANCE

I, Thomas G. McEnery, Supervisor of the Official Court Reporters

of the Circuit Court of Cook County, County Department, Criminal Division,

do hereby state that on the _29th_ day of _DECEMBER_ A.D. 1994

the original Report of Proceedings and carbon copy (ies) in the above entitled

cause were filed with the Clerk of the Criminal Division.

Copy to SAD.

_Thomas Mc Enery_
Thomas G. McEnery,
Supervisor

Received by _____
Deputy Clerk, Criminal Division

679 pgs

DAY 030244

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS**
**COUNTY OF COOK** } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME FOUR OF A FOUR VOLUME . . . . . .

. . RECORD CONSISTING OF THEREPORT OF PROCEEDINGS.  NO PRAECIPE HAVING BEEN FILED IN . .

. . THE APPELLATE COURT UNDER APPELLATE COURT NO. 94 2870. . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and

. . . . . . . . . . . . . ARNOLD DAY . . . . . . . . . . . . WAS . . . . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, JANUARY . . . . . . . . . 23 . . . , 19 95 .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
**Clerk**

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

DAY 030245

DAY 030246