UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARNOLD DAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 7286 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| KENNETH BOUDREAU, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Arnold Day spent more than two decades in prison for a crime he did not commit. After a judge vacated his conviction and granted him a Certificate of Innocence, Day filed this suit against the City of Chicago ("City") and multiple officers of the Chicago Police Department ("CPD") asserting various state and federal law claims.[1] In two separate motions now before the Court, Defendants Det. McWeeny, Det. Boudreau, Det. Foley, and Officer Evans (the "Individual Defendants") and the City move for summary judgment. For the reasons fully set out in this Opinion, the Court grants in part and denies in part Defendants' respective motions for summary judgment.

## BACKGROUND

### I. Day's Statement of Additional Facts

Before reciting the facts relevant to resolution of the motions for summary judgment, the Court must address Day's Statement of Additional Facts ("PSAF"). The Court's summary

---

[1] Day originally named as individual defendants Kenneth Boudreau, William Foley, Jude Evans, Michael Kill, Dan McWeeny, James Brennan, Anthony Watson, and Marty Radtke. On April 17, 2025, however, the parties stipulated to dismiss with prejudice (1) all claims against Defendants James Brennan, Michael Kill, Anthony Watson, and Marty Radtke; and (2) Counts I, II, IV, V and VII as alleged against Defendant Daniel McWeeny. Doc. 255. Additionally, on June 18, 2025, the Court granted Day's motion to substitute and substituted the personal representative of Defendant McWeeny's estate, Geri Lynn Yanow, for deceased Defendant McWeeny. Doc. 281.

judgment procedures differ from Local Rule 56.1, in that this Court requires parties to submit a joint statement of undisputed facts. Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice; *see also Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures). The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material. Judge Ellis, Summary Judgment Practice. These additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process. *See id.* ("The parties may not file—and the Court will not consider—separate statements of undisputed facts.").

Here, after the submission of the parties' Joint Statement of Undisputed Material Facts, Doc. 263 ("SUF"), Day filed an unopposed motion for leave to file "91 paragraphs for his Statement of Additional Material Facts," attaching the proposed facts as an exhibit. Doc. 274 at 2. The Court granted Day's motion and allowed Day to file a statement of at most 91 disputed facts, but it reminded Day that "the statement of additional facts should be facts that the parties agree are in dispute." Doc. 276. The Court further cautioned that, "[i]n giving these proposed facts a cursory review, the Court has concerns that some of these facts are not disputed and should have been included in the parties' joint statement of material facts." *Id.*

Day filed the PSAF with his response to Defendants' motions for summary judgment, and the Individual Defendants argue that the Court should strike the entirety of the PSAF because Day violated this Court's summary judgment procedures. After carefully and extensively reviewing the entirety of the PSAF and the parties' briefing, this Court will disregard portions of the PSAF that make legal arguments, assert legal conclusions, or do not include any

factual statements. *See Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at *8 (N.D. Ill. Mar. 1, 2016) ("[L]egal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiff's Rule 56.1 submissions."). The Court will also disregard the portions of the PSAF that restate facts already contained in the SUF or recite facts that are not supported with citations to admissible evidence. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement."). The Court, however, will not strike the entirety of the noncompliant paragraphs because, in rare cases, they contain properly supported and disputed assertions. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (disregarding portions of noncompliant paragraphs in order to preserve the properly supported assertions in the paragraphs).

That being said, this Court sternly admonishes Day for filing his voluminous PSAF in obvious disregard for the Court's summary judgment procedures, despite warnings from the Court. His filing blatantly subverts the purposes of this Court's summary judgment procedures and egregiously ignores this Court's directions to the parties. The Court warns Day that future instances of noncompliance with the Court's procedures will result in sanctions, up to and including, dismissal of this case.

II.     **Factual Background**[2]

    A.     **Murder of Jerrod Erving**[3]

        1.     **On-Scene Investigation**

Shortly after midnight on May 17, 1991, Officers Marty Radtke and Anthony Watson responded to dispatch reports of a shooting at 927 West 54th Street.  Radtke and Watson were the first officers to arrive on-scene at approximately 12:13 a.m., where they saw Jerrod Erving lying on the ground outside of the doorway of the house.  Radtke and Watson then notified the violent crimes division and crime laboratory of the CPD of their findings.  Detectives Dan McWeeny and James Brennan arrived on-scene at approximately 12:30 a.m.  Detectives conducted multiple on-scene interviews, and Erving's father informed them that Erving had been selling drugs and getting involved with gangs in the year prior.

Another witness, Krona Taylor, was one of the residents of 927 West 54th Street who saw Erving shortly before the shooting occurred.  The police reports documenting her on-scene interviews state that she saw two black men walk up to Erving and shake his hand shortly before the shooting.  She described both men as being between sixteen and twenty years of age with dark complexions, average weights, and heights between 5'3" and 5'6."  She also stated that one man was wearing a red silk Chicago Bulls jacket with white lettering and a dark baseball hat, while the second man was wearing a black silk jacket and a dark baseball hat.  She later testified in 2021, however, that these reports were inaccurate and that she never told detectives that she saw two men approach Erving.

---

[2] The Court derives the facts set forth in this section from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1 and the Court's summary judgment procedures.  The Court considers all facts in the light most favorable to Day, the non-movant.

[3] The parties' briefings and accompanying exhibits are inconsistent when spelling Jerrod Erving's name, alternating between "Erving" and "Irving."  The victim's brother, Lennard Erving, testified that his name was spelled "Erving," Doc. 264-114 at 6:19–20, so the Court will follow suit.

Evidence technician Patrick Moran and his partner arrived on-scene at 1:15 a.m., at which point Moran began photographing the scene. Moran recovered and inventoried (1) two 9mm fired cartridge casings, one from the hallway floor near Erving's head and one from the sidewalk six feet west of 927 West 54th Street and (2) a 9mm fired bullet on the 10th step from the ground floor. There were no fingerprints suitable for identification purposes recovered on the cartridge casings, nor were any firearms found at the scene.[4]

### 2. Witness Coercion

Multiple witnesses have stated that CPD detectives, including Det. Boudreau, coerced them or attempted to coerce them into giving statements falsely implicating Day in the Erving shooting.

### a. Krona Taylor

As mentioned above, Taylor spoke to detectives on-scene regarding her observations on the night of the shooting. The next day, however, two homicide detectives visited Taylor's house asking to speak with her again. The detectives were generally respectful, and Taylor agreed to voluntarily accompany them to the police station.

The detectives placed Taylor in an interview room and asked her again if she knew who shot Erving. She reportedly told them that she did not know who the shooter was, but she stated that she saw a boy and a girl walk down the street and speak to Erving shortly before the shooting. According to Taylor, the detectives became "pretty angry" at this, and told her that they were "going to keep [her] in here until" she told them "what [they] need[ed] to know." SUF

---

[4] Officers later recovered the Erving murder weapon during an investigation into the June 13, 1991 homicide of a man named Landmark Taylor. The CPD crime lab linked the recovered weapon to the Erving homicide, but there is no indication that detectives in the Erving investigation followed up on this. Day's criminal defense attorney was also aware of the recovered murder weapon prior to Day's trial and "most likely" had the crime lab's firearms report. SUF ¶ 72 (citation omitted). The judge presiding over Day's trial excluded any evidence concerning the gun, however, because there was "no witness who would testify that he had the weapon on May 17, 1991." SUF ¶ 73 (citation omitted).

¶ 34 (quoting Doc. 264-17 at 76:13–15). She also said that they called her a "bitch" and acted in a generally intimidating way. *Id.*; *see also id.* ¶ 35 ("Krona testified that the detectives 'screamed' at her and slammed their hands on the desk because they wanted her to 'give them more[.]'" (quoting Doc. 264-17 at 81:4–82:19)). The detectives then left and returned to question her multiple times. *Id.* ¶ 34 ("The two detectives would leave me alone in the room for hours. Every once in a while, they would come in and threaten me again." (quoting Doc. 264-32 ¶ 18)). Taylor believed at the time that the only way she would be free to leave was if she gave the detectives the names and locations of possible suspects. Because of this, when the detectives returned to speak with her again at 4:00 a.m., she "threw out a couple names to get the detectives off [her] back." SUF ¶ 35 (citing Doc. 264-17 at 83:8–84:12, 86:24–87:23; Doc. 264-32 ¶ 19).

Prior to Day's criminal trial, Taylor provided a statement to his criminal defense attorney, Stuart Katz. In this statement, she claimed that the police "made [her] go to the police station to say what they wanted." Doc. 264-51 at 1. She further stated that she "did not see who did the shooting" and "did not see anyone approach or talk to" Erving. SUF ¶ 60 (citing Doc. 264-17 at 131:12–14, 147:7–15, 182:12–20; Doc. 264-51; Doc. 264-52 at 181:2–16). Taylor did not testify at Day's trial and neither of the parties introduced her statements into evidence.

### b. Ralph Watson

On November 29, 1991, police arrested Ralph Watson on a writ after witnesses identified him as one of the perpetrators of a series of armed robberies. Det. Boudreau and his partner, Det. John Halloran brought Watson to the station for questioning where he confessed to multiple armed robberies.

On January 20, 1992, approximately two months after Watson's first interrogation, Boudreau conducted another interrogation with Watson to ask him about four murders, including

the Erving homicide. Watson initially disclaimed any knowledge of the Erving murder, but

Boudreau told him:

> Look, if you want to help yourself and if you want to help you,
> because I could put more cases on you if I wanted to, and I will.
> What I need you to do is say you had something to do with this
> murder and to tell me everything that happened.

*Id.* ¶ 109 (citing Doc. 264-80 at 43:18–22). Watson believed that this was a "promise . . . to not

give [him] more cases and to help [him] get out in the four cases that [he] had at the time." *Id.*

(citing Doc. 264-80 at 70:11–23, 220:19–221:6). As a result, Watson agreed to give a false

statement implicating Day in the Erving murder. Boudreau "came up" with the story and

rehearsed it with Watson "for hours." *Id.* ¶ 114 (citing Doc. 264- 94 ¶¶ 8–13). Cook County

Assistant State's Attorney ("ASA") Kevin Noonan subsequently interviewed Watson, after

which Watson signed a handwritten statement.

After Watson returned to jail, he sent Boudreau two letters expressing concerns that he

had been indicted for more charges than he expected. In the first letter, Watson wrote:

> 'Ken I went to court 2/13/92 and they told me I had three (3)
> indictments instead of two (2) . . . I don't know where the other
> indictment came from. The only thing I could think about is where
> you told me to help you clear that murder and it could help me out.
> Ken, I did ever (sic) thing to help myself and you. I even signed
> paper that I had nothing to do with. . . .

*Id.* ¶ 119. The second letter was similar, with Watson writing:

> Ken, I went to court 2/14/92 and they told me that I have 3
> indictment instead of 2 and the only case I can see is where you
> told me if I help you clear up that murder that it would help me. I
> pray that I don't have no murder case, cause I didn't have nothing
> to do with it. You told me to sign and it could help me. So I took
> your word . . . I even signed papers that I didn't have nothing to do
> with just to help me . . . I heard about Mr. Day getting caught did
> any of my information help in any way?

*Id.* In his later deposition, Watson confirmed that the murder he referred to in these letters was the Erving homicide and the "signed papers" was the false statement he signed for Boudreau and ASA Noonan.

In 1992, Watson told his cell mate at Joliet Correctional Center that he had given a false statement implicating Day in the Erving murder. A prosecutor later interviewed Watson in the presence of Boudreau on August 12, 1992. Watson informed them that his statement about Day was false and made up by Boudreau, and he confirmed that he gave the statement because Boudreau promised to help him. He reiterated this same information to Day's criminal defense attorney on December 15, 1993. Watson did not testify at Day's criminal trial, but the prosecutor asked both Boudreau and Day about Watson's statement.

### c.    Edward Robinson

Boudreau and Halloran also investigated a man named Edward Robinson for suspected involvement in the armed robberies committed by Watson. Robinson executed an affidavit in 2009 stating that, like Watson, the detectives asked him about his knowledge of the Erving homicide during his interrogation. He averred that Boudreau told him that he "would make the armed robbery charges he had been talking about disappear" if Robinson "assisted in the investigation . . . by identifying Arnold Day as the shooter." *Id.* ¶ 170. Unlike Watson, however, Robinson refused to cooperate. He did not testify at Day's trial, and Day did not learn of Robinson's interrogation by Boudreau and Halloran until after his conviction.

### 3.    Identification of Alternative Suspects

Day alleges that detectives spoke to witnesses who identified alternative suspects, including two individuals called "Spook" and "Mark." He further alleges that certain detectives

investigated these leads but suppressed information and documents regarding this aspect of the homicide investigation and the alternative suspects.

Specifically, after Det. McWeeny returned to work the first watch shift on May 18, 1991, he wrote a report mentioning Spook and Mark. In this report, McWeeny wrote that Spook was wearing a red Bulls jacket on the night of the shooting and that Mark shook Erving's hand, which matched Taylor's on-scene statements. McWeeny also wrote that Spook and Mark were "at 55 + 57 Peoria and Sangamon." *Id.* ¶ 49 (quoting Doc. 264-30 at 1). It is unclear, however, from where this information came. The report does not identify the source of this information, nor does it state that this information came from a confidential informant. When asked about this during his deposition, McWeeny stated that the information came "from a person who received the information from a third person." *Id.* ¶ 42. He could not remember who this person was but testified that he (1) would have included their name and address if they had given him the information directly and (2) would have specified if the information came from a confidential informant. At the same time, he testified that he could not rule out whether the information came from a confidential informant.

According to McWeeny, it was his practice to follow up on information that could lead to the identity of the perpetrators of a homicide or was related to a witness who might have witnessed the shooting. However, he testified that he could not recall following up on the information about Spook and Mark or working on the case after May 18, 1991. He clarified, however, that if he had followed up on these alternative suspects, he would have documented that in a report.

Based on the police records, it appears that detectives may have followed up on these alternative suspects to some extent. For example, Sgt. Bonke wrote notes on an undated piece of

9

paper, including: "Mark left side," "Spook right side," "the one with the bulls jacket had a racoon tail baseball cap with racoon tail," and "called the police heard two gunshots." *Id.* ¶ 51 (quoting Doc. 264-136 at 1). And on August 27, 1991, an unknown officer wrote a report for the Erving investigation that memorialized certain information about Spook, including a physical description and approximate address. *Id.* ¶ 53. Various other documents indicate that detectives may have identified Marcus Chatman as "Mark." The investigative file also contained a mugshot of Marcus Chatman.

Detectives may have also had additional leads about alternate suspects, because the investigative file included mugshots of Calvin Mitchell, Terry Philpot, Theodore Robinson, and an unidentified individual. Day's police practices expert, Roger Clark, opined that police investigators use mugshots to help them identify witnesses or suspects. However, in this case, no reports memorialize any connection between Erving's shooting and any of the four photographed individuals.

### 4. Day's Arrest and Interrogation

On February 4, 1992, Det. Foley, Officer Evans, and two gang specialists arrested Day in the basement of his friend's house, where he had been hiding from the police. Day testified that Evans stomped on his head and kicked him during the arrest, even though he did not have weapons on him and had nothing in his hands at the time. After his arrest, the police transported Day to the police station around 10:30 a.m. and handcuffed him to the wall in an interview room.

Day ultimately confessed to shooting Erving, but he has accused Boudreau, Foley, and Evans of coercing his confession with physical and mental abuse. Day testified that Foley and Evans both threatened him and told him that witnesses had implicated him in the shooting. Day asserted his innocence and told the officers that he did not know what they were talking about,

but Foley and Evans returned to the interview room multiple times to continue questioning Day. Boudreau later began interrogating him and "fed [him] all the facts about the Erving homicide." *Id.* ¶ 142.

ASA Jason Danielian arrived at the station at approximately 3:00 p.m., at which point he spoke with Boudreau and Foley. An hour and a half later, ASA Danielian spoke to Day with Boudreau in the room. However, ASA Danielian left the room after Day reiterated that he did not know anything about the Erving murder. After this, Foley told Day that he "better cooperate with them" and then grabbed Day's neck, shoved him against the wall, and threatened to throw Day out the window. *Id.* ¶ 147. Day testified at trial that "physically he was like choking me. But mentally I was just scared for my life." *Id.* (quoting Doc. 264-3 at E86:10–14). As a result, Day told Foley that he would cooperate. While Boudreau never physically abused Day, Day testified that Boudreau was present for Foley's abuse and did nothing to stop it. Day also testified that the detectives would not provide him with anything to eat or allow him to use the restroom.

ASA Danielian then reentered the room and asked if Day was ready to cooperate, and Day confessed to shooting Erving. Day has testified that "he confessed because of the abuse he suffered from Detectives" and said that "the tipping point was Detective Foley choking him and threatening to throw him out the window." *Id.* ¶ 151 (citations omitted).

### 5.     Criminal Trial and Subsequent Exoneration

On March 9, 1992, a grand jury returned an indictment against Day charging him with first degree murder and attempted armed robbery for the Erving shooting under Case No. 92-cr-5074. Ultimately, Day was convicted and sentenced to 60 years in prison for first degree murder and attempted armed robbery.

11

The Circuit Court of Cook County, Illinois vacated Day's conviction on December 18, 2018 and the State declined to proceed and *nolle prosequied* his charges. The court granted Day a Certificate of Innocence on April 4, 2019.

### B.  Murder of Rafael Garcia

Shortly after midnight on September 16, 1991, Rafael Garcia was shot and killed in front of the Queens Submarine restaurant at 1206 West 51st Street. The same day as the shooting, police received an anonymous call from an employee at the Star Food & Liquors informing them that the intended victim was a man called Snake, who had been a passenger in Garcia's car at the time of the shooting. The caller further said that the shooter was a man named Thomas whom a drug-dealer named Troy had sent. Boudreau was familiar with Snake, whose name was Gus Robinson, from prior encounters and knew where to find him. Dets. Boudreau and Kill located Robinson and interviewed him at the police station. During this interview, Robinson informed the detectives that Anthony Jakes had approached him at 11:50 p.m. on September 15, 1991 to ask if he would act as a lookout during a robbery. He further said that the plan was for Jakes, "Little A" (Day), and a friend to rob a man when he came out of the Queens Submarine shop.

After the interview with Robinson, Boudreau and Kill began interrogating Anthony Jakes at approximately 4:45 p.m. Jakes, who was fifteen years old at the time, initially denied any involvement in the Garcia murder. Detectives left Jakes at the police station for a few hours to speak with other witnesses, but then returned to the interrogation at approximately 10:45 p.m. Jakes eventually admitted to serving as a lookout in the Garcia homicide and identified Day as the shooter. Jakes has since testified that he did not have any knowledge about the Garcia murder and gave a false statement because of the detectives' "physical and psychological threats

12

and threats [that] if he did not cooperate, the beatings would continue." *Id.* ¶ 90 (citations omitted).

During Day's February 4, 1992 interrogation about the Erving homicide, detectives also asked Day about the Garcia homicide. As with the Erving homicide, Day confessed to the Garcia homicide but has since testified that this confession was false and fed to him by Boudreau and Foley. He has claimed that the "same interrogation tactics that caused [him] to falsely confess to the Erving homicide also caused him to falsely confess to the Garcia homicide." *Id.* ¶ 93.

On March 9, 1992, a grand jury returned indictments against Day and Jakes as co-defendants for first degree murder for the Garcia shooting under Case No. 92-cr-5073. At the conclusion of the trial, Day was acquitted of all charges related to Garcia's murder.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

13

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of

Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    Claims based on Day's interrogation, arrest, and/or prosecution regarding the Garcia homicide.

All Defendants move for summary judgment on Day's claims to the extent that they are

related to his interrogation, arrest, and prosecution for the Garcia homicide, arguing that (1) the

due process claims are not cognizable because Day was acquitted of the Garcia homicide and

(2) all the claims are time-barred by the applicable statutes of limitations. In response, Day

accuses Defendants of "creat[ing] make-work" because his claims are not based on his

interrogation, arrest, or prosecution for the Garcia homicide. Doc. 277 at 52.

Upon close reading of the complaint, the Court agrees with Defendants that at least some

of the claims appear to be based on events related to the Garcia homicide. For example, Day's

coerced and false confession claim under the Fifth Amendment is expressly based in part on the

Individual Defendants' "unconstitutional and unlawful interrogation of Plaintiff that caused him

to make involuntary and false statements implicating himself in the murder of ***Rafael Garcia and***

Jerrod Irving." Doc. 1 ¶ 126 (emphasis added); *see also id.* ¶ 132 (referencing "the Garcia and

Irving homicide investigation" under Count I). Day's conspiracy claim is based on the theory

14

that, "[a]fter the murders of **Rafael Garcia and** Jerrod Irving, the [Individual] Defendants . . .

agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff

of his constitutional rights." *Id.* ¶ 194 (emphasis added). Day alleges in support of his malicious

prosecution claim that the Individual Defendants were aware that "no true or reliable evidence

implicated Plaintiff in the **Rafael Garcia and** Jerrod Irving murders." *Id.* ¶ 210 (emphasis

added). And the remainder of the complaint frequently references the Garcia homicide and the

resulting investigation and prosecution. *See id.* ¶¶ 24–29, 36, 42–44, 53–54, 56, 78–83.

Because Day does not dispute that these claims are not cognizable and time-barred, the

Court grants summary judgment on all claims to the extent that they are based on Day's

interrogation, arrest, or prosecution for the Garcia homicide.[5]

## II.     Constitutional Claims

### A.     Coerced Confession Claims (Counts I and II)

Day brings coerced confession claims under the Fifth and Fourteenth Amendments,

alleging that the Individual Defendants used physical and psychological coercion and torture to

force him to incriminate himself in the Erving homicide. The Fifth Amendment, made

applicable to the States by the Fourteenth Amendment, prohibits the use of coerced confessions

at pre-trial hearings and at trials in criminal cases. *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir.

2018). The Fourteenth Amendment allows for a substantive due process claim based on "police

torture or other abuse that results in a confession." *Chavez v. Martinez*, 538 U.S. 760, 773

(2003). The Individual Defendants do not contend that Day lacks sufficient evidence for a

reasonable jury to find that his confession was the product of coercion or that the prosecutor used

---

[5] Day nevertheless argues that evidence regarding Day's interrogation, arrest, or prosecution for the Garcia homicide "will be relevant to contextualizing and proving the intent and knowledge elements of Plaintiff's due process claims." Doc. 277 at 53. The Court does not analyze this evidentiary issue at the summary judgment stage.

it during his criminal trial. Instead, they argue only that the Court should grant summary judgment to Defendant Evans because he had no personal involvement in obtaining Day's coerced confession.

To be liable under § 1983, an individual defendant must have been personally involved in the alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). This does not mean, however, that the defendant must have personally participated in the violation of the plaintiff's constitutional rights. *Id.* at 833–34; *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act."). In the context of coerced confession claims, an individual defendant may be liable even where they "didn't themselves elicit the confession or otherwise introduce (or acquiesce to) it at trial." *Brown v. City of Chicago*, No. 19 CV 4082, 2025 WL 2785426, at *18 (N.D. Ill. Sept. 30, 2025). That said, "mere participation in an investigation that involved other officers behaving unconstitutionally" is not enough. *Coleman v. City of Chicago*, No. 17-CV-08696, 2025 WL 2410325, at *38 (N.D. Ill. Aug. 20, 2025). There must still be an "affirmative link" between the individual defendants and the coercion itself. *Brown*, 2025 WL 2785426, at *18.

Here, Day has presented sufficient evidence to create an issue of material fact as to whether Evans was personally involved in obtaining Day's confession. It is undisputed that "Day testified that Boudreau, Evans and Foley were involved in questioning him at Area Three and that they coerced his confession through physical and mental abuse." SUF ¶ 136. Specifically, Evans was one of the officers who arrested Day on the morning of February 4, 1991. Day was scared when he heard the police arrive to arrest him and therefore hid under a

16

bed. Day testified that Evans found him hiding, flipped over the bed, and "stomped on the back of his head" before handcuffing him. *Id.* ¶ 133. Day was not resisting and did not have any weapons on him at the time. According to Day's police practices expert, Roger Clark, this use of force was unjustified and "could serve no other purpose than to intimidate Mr. Day," thus "undermin[ing] the goal of obtaining a truthful and reliable witness statement." Doc. 264-117 at 26. And Day's confession expert, Melissa Russano, has opined that physical harm is "generally considered to be de facto coercive." Doc. 264-162 at 20.

Once Day was in the interrogation room at the police station, Evans and Foley both came into the room and "threatened him." SUF ¶ 137; *see also* Doc. 264-47 at 33:3–4 ("Officer Evans started threatening me about a murder."); Doc. 264-48 at E77:16–E80:12 (testifying that Foley and Evans "came in threatening me" and "telling me that they know I killed Jerrod" "over and over again"); Doc. 264-50 at 6 (asserting in interrogatory response that Evans "participated in his interrogation"). They told Day that "they had people pointing him out, saying he did it." SUF ¶ 138 (quoting Doc. 264-3 at E80:13–20). Evans and Foley did this "more than twice" over the course of about thirty minutes. *Id.* (citations omitted). According to Day's confession expert, when "an investigator directly accuses a person of being guilty with a strong degree of certainty," this "serves to ramp up the person's anxiety level and, coupled with the ignoring or shutting down of repeated assertions of innocence, it communicates the message that there is no point in trying to maintain one's innocence." Doc. 264-162 at 21, 37–38. She further opines that this tactic leads innocent people to "believe that the only viable path of escape is to provide an inculpatory statement; in other words, that confessing or false incriminating someone else is their only way out of the situation they find themselves in." *Id.* at 21.

17

Viewing the above evidence in the light most favorable to Day, a jury could reasonably find that Evans' use of physical force and interrogation tactics "affirmatively linked" him to Day's coerced confession. *Brown*, 2025 WL 2785426, at *18 ("[T]he jury could reasonably conclude that Defendants were personally responsible for creating a coercive interrogation setting, such as depriving [plaintiff] of food and sleep, isolating him in a single room and denying him a phone call, and using interrogation tactics designed to elicit an incriminating statement. This is sufficient to affirmatively link them to [plaintiff's] coercion claim."); *see also Coleman*, 2025 WL 2410325, at *38–39 (holding that individual defendants could be liable for their use of coercive activity, including "physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will"); *Smith v. City of Chicago*, 785 F. Supp. 3d 356, 391 (N.D. Ill. 2025) ("[T]he Court cannot grant summary judgment in McWeeny's favor when . . . McWeeny himself 'coach[ed Smith] as to the details of the confession' by insisting to Smith that he committed the murders while participating in the interrogation with the other officer."); *Amor v. John Reid & Assocs.*, No. 20 C 1444, 2024 WL 4299004, at *12 (N.D. Ill. Sept. 26, 2024) (denying summary judgment on coerced confession claim where officers "falsely told Amor he failed the polygraph test").

The Individual Defendants' arguments to the contrary are unpersuasive. Rather than grappling with the above-mentioned evidence, they ignore it entirely. Instead, they present only selective moments from Day's arrest and interrogation when Evans was either not acting in a coercive manner or was absent. Doc. 267 at 19–21. They emphasize, for example, that Evans did not "threaten, abuse, or question [Day] when he was being transported to Area 3," did not "confront [Day] with any type of evidence," and "was not present during the interrogation with Dets. Boudreau and Foley when Day alleges that the coercion/fabrication occurred." *Id.* at 20–

21. But the fact that Evans did not act coercively during the *entirety* of his interactions with Day does not mean that he could not have been personally involved in coercing Day's confession. And courts in this district have routinely held that an officer need not be present during the confession itself to be liable for coercion under § 1983. *See Brown*, 2025 WL 2785426, at *18 ("It is thus not dispositive that Defendants didn't themselves elicit the confession."); *Amor*, 2024 WL 4299004, at *12 ("The fact that Masokas and Newey were not present when Amor confessed is not dispositive because they took steps that purportedly caused Amor's coerced confession."); *Smith*, 785 F. Supp. 3d at 392 (rejecting defendants' argument that "because Smith's confession occurred approximately fourteen hours after his interactions with McWeeny that McWeeny cannot be personally involved in coercing his confession").

Not only do the Individual Defendants cherry-pick facts to support their arguments, but they also make various factual misrepresentations. To start, they inexplicably claim that "Dets. Foley and Boudreau are the only individuals Day has ever accused of misconduct with respect to his interrogation and confession regarding the Erving murder." Doc. 267 at 20. The record, however, makes clear that this is not true. *See, e.g.*, SUF ¶ 136 ("Day testified that Boudreau, Evans and Foley were involved in questioning him at Area Three and that they coerced his confession through physical and mental abuse."); Doc. 264-47 at 33:3–4 ("Officer Evans started threatening me about a murder."); Doc. 264-48 at E-77 (testifying that Foley and Evans "came in threatening me" and "telling me that they know I killed Jerrod" "over and over again"). The Individual Defendants also argue that "Day does not dispute . . . that Evans was not present for any of the interrogations." Doc. 291 at 9. Again, the record clearly contradicts this. Doc. 277 at 12–13 ("Evans . . . repeatedly threaten[ed] Plaintiff during Plaintiff's interrogation at Area 3."); *see also* Doc. 264-50 at 6 ("Defendants Boudreau, Defendant Evans, and Defendant Foley

participated in [Day's] interrogation.").  Finally, the Individual Defendants assert that "Day testified that the only reason he confessed was because of Dets. Boudreau and Foley."  Doc. 266 at 20–21; Doc. 291 at 9.  None of the cited testimony supports this.  *See* Doc. 264-10 at 310:1–311:13, 369:16–373:19.  While Day may have testified that "the tipping point" for his confession "was Detective Foley choking him and threatening to throw him out the window," SUF ¶ 151, that does not mean that Boudreau and Foley's actions were the *only* reason he falsely confessed.  The Court cautions the Individual Defendants that this approach to summary judgment is not only ineffective but also undermines their credibility with the Court.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564–65 (7th Cir. 2014) (expressing "disappointment" with defendant's misrepresentations and cautioning the parties that "this approach to summary judgment practice . . . quickly destroys their credibility with the court.").

The Court thus denies summary judgment on Counts I and II.

### B.      Due Process Claim (Count III)

Day also brings a due process claim, alleging that Defendants violated his due process rights by deliberately fabricating falsified evidence and withholding exculpatory or impeaching evidence.  Defendants move for partial summary judgment on this claim, arguing that (1) Day has failed to present sufficient evidence to maintain certain theories of liability, and (2) Defendants Evans and McWeeny were not personally involved in some of the alleged due process violations.  Prior to addressing these substantive arguments, however, the Court resolves three preliminary issues raised by the parties' briefings.

First, Day argues that if any part of his due process claim will proceed to trial, then this Court should "not parse out the additional theories of liability" and should instead advance all his due process claims, with each sub-theory of liability, to trial.  Doc. 277 at 15.  Day

misunderstands this Court's responsibility at the summary judgment stage.[6]  Summary judgment
is intended to narrow the issues for trial.  *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir.
2015) ("At the summary-judgment stage, the court can properly narrow the individual factual
issues for trial by identifying the material disputes of fact that continue to exist." (emphasis
omitted)).  Courts routinely and appropriately assess sub-theories of fabrication and suppression
claims to determine which sub-theories are adequately factually supported to advance to trial.
*See, e.g.*, *Moran v. Calumet City*, 54 F.4th 483, 493–99 (7th Cir. 2022) (reviewing the different
"baskets" of evidence that the plaintiff claimed the defendants suppressed or fabricated
individually); *Camm v. Faith*, 937 F.3d 1096, 1108–10 (7th Cir. 2019) (reviewing three
"baskets" of evidence that the plaintiff alleged were suppressed and finding that one of those
baskets could not support his *Brady* claim).

 Second, the Individual Defendants argue that the Court should grant summary judgment
on Day's due process claim to the extent that it is based on (1) the coercion of Watson and Jakes
and (2) the failure to conduct an adequate investigation.  Day does not contest these portions of
the motion, so the Court grants summary judgment to the Individual Defendants on Day's due
process claims to the extent that they are based on these theories.[7]

---

[6] *Goudy v. Cummings*, on which Day relies, does not stand for the proposition that district courts cannot
or should not review sub-issues of liability.  922 F.3d 834 (7th Cir. 2019).  Rather, in *Goudy*, the Seventh
Circuit reversed a finding that a plaintiff could not survive summary judgment on any fair trial claim and,
in choosing to not address one sub-theory of liability regarding the plaintiff's right to a fair trial, the court
stated that "the district court is free to consider this issue" in light of the court's guidance.  *Id.* at 844.

[7] Day argues that evidence of coercion and failure to investigate are nevertheless relevant to his due
process claims.  While the Court does not resolve these evidentiary issues at this point, it clarifies that the
above ruling should not be read as precluding all evidence of the Individual Defendants' coercion and/or
failure to investigate.  *See, e.g.*, *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ("The point is not that
coercion is legally irrelevant; far from it—coercion (which in an extreme case could amount to torture)
may be an essential tool in 'persuading' a witness to fabricate testimony.").

Third, the City argues that, if the Court grants summary judgment on Count III in its entirety to the Individual Defendants, it should also grant summary judgment on this count to the City as a matter of law.  Because the Individual Defendants have not moved for summary judgment on Count III in its entirety,[8] the City's argument is moot.

Having resolved these preliminary issues, the Court turns to Defendants' arguments relating to Day's various due process theories of liability.

### 1.    Evidence Fabrication

The first prong of Day's due process claim is based on the theory that Defendants fabricated false evidence implicating him in the Erving homicide.  Fabricated evidence can violate an individual's Fourteenth Amendment due process rights, and "[t]he essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process."  *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020).  The plaintiff must prove that the defendant "(1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his criminal trial, and (4) it was material to his conviction."  *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12

---

[8] Defendants seemingly disagree with this, arguing in their reply that the Individual Defendants have moved on Count III in its entirety.  Doc. 289 at 1–2.  *But see* Doc. 267 at 2 (stating that the Individual Defendants are moving for summary judgment "[o]n behalf of all remaining Defendants on the Due Process fabrication and suppression claims in Count III").  While the Court agrees that the Individual Defendants have moved for summary judgment on the *Brady* theory of liability in its entirety, the same is not true for the fabrication theory of liability.  In particular, the Individual Defendants do not argue that the Court should grant summary judgment to Boudreau and Foley with respect to Day's theory that they fabricated his confession.  The City responds to this issue by pointing out that the Individual Defendants make other due process arguments which are "applicable to Defendants Foley and Boudreau." Doc. 289 at 2.  This is unavailing, however, because none of those other arguments relate to the theory that Boudreau and Foley fabricated Day's confession.  And the Individual Defendants' bare assertion that this theory cannot "survive summary judgment," Doc. 267, is insufficient because the Court does not consider unsupported arguments.  *See Puffer v. Allstate Ins. Co*., 675 F.3d 709, 718 (7th Cir. 2012) (holding that a party waives an argument if it is "underdeveloped, conclusory, or unsupported by law"); *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir.2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments.").

(N.D. Ill. Mar. 29, 2022) (citing *Patrick*, 974 F.3d at 835). And, as discussed above, individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.

In his complaint and interrogatory responses, Day specified that the fabricated evidence includes (1) his own confession; (2) Watson's statement to Boudreau and ASA Noonan; and (3) various police reports.[9] The Individual Defendants argue that "[n]one of these theories can survive summary judgment," Doc. 267 at 21, and the Court addresses each of these categories of evidence in turn.

### a. Day's Confession

The Individual Defendants first argue that the Court should grant summary judgment in favor of Defendants Evans and McWeeny to the extent that the due process claim is based on their fabrication of Day's confession. Plaintiff does not respond substantively to this argument and instead represents that he is not proceeding against these Defendants based on this theory of liability. The Court therefore grants summary judgment to Defendants Evans and McWeeny on the fabrication claim to the extent it is based on Day's confession.

### b. Watson's Statement

Day also alleges that Boudreau fabricated Watson's statement identifying him as the shooter in the Erving homicide. The Individual Defendants do not contend that Day lacks sufficient evidence from which a jury could find that Boudreau knowingly fabricated Watson's false statement. Rather, they argue that Day has failed to show that the statement was used against him at trial to secure his conviction.

The Seventh Circuit has consistently held that "an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence 'is later used to deprive the [criminal]

---

[9] Day also previously alleged that Defendants fabricated Jakes' statement in the Garcia investigation. However, the Court's grant of summary judgment on all claims to the extent that they are based on Day's interrogation, arrest, or prosecution for the Garcia homicide resolves this issue.

defendant of her liberty in some way.'" *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). "[I]f an officer (or investigating prosecutor) fabricates evidence and then puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Id.* In other words, "[t]he essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick*, 974 F.3d at 835. The Seventh Circuit "recently clarified the contours of constitutional claims based on allegations of evidence fabrication" and strongly suggested that fabricated evidence must have been "used against [plaintiff] at his criminal trial." *Id.* (emphasis added); *see also Moran*, 54 F.4th at 499 (holding that the district court correctly granted summary judgment on due process claim because "the evidence we assume was fabricated . . . was not introduced at trial"); *Zambrano v. City of Joliet*, 141 F.4th 828, 831 (7th Cir. 2025) ("As the district court recognized, in order to succeed on his due process claim based on the fabrication of evidence, Zambrano must provide evidence which would allow a jury to conclude that . . . the evidence was used at Zambrano's criminal trial.").[10]

The Court finds that Day has provided sufficient evidence to create a triable issue of material fact as to whether the prosecution used Watson's statement against Day at trial to secure his conviction. Although neither party directly introduced the handwritten statement itself into

---

[10] Day urges the Court to disregard *Patrick* and *Moran*, arguing that they are "unavailing," "largely devoid of analysis," and cannot overturn *Whitlock*'s holding that evidence must be used to deprive a plaintiff of his liberty in "some way." Doc. 277 at 19 (quoting *Whitlock*, 682 F.3d at 580). Because the Court finds that the prosecution used this evidence against Day at his criminal trial, it does not resolve this issue. However, the Court notes that it does not find Day's argument persuasive. *See Coleman*, 2025 WL 2410325, at *20 (rejecting similar argument and finding that "the nonuse of one plaintiff's confession at the other's trial forecloses a fabrication claim based on due process" because the holding of *Moran* "controls this case").

evidence, the prosecutor brought it up multiple times throughout the course of the trial. During
Boudreau's direct examination, the prosecutor asked Boudreau about his January 20, 1992
interrogation of Watson and confirmed that they spoke about topics "other than the armed
robbery investigation." Doc. 264-48 at D171:6–11. The trial court did not permit Boudreau to
testify about the substance of that conversation but allowed him to testify that he took a
handwritten statement from Watson. *Id.* at D171:23–D172:1 (testifying that "a handwritten
statement" was "taken from Ralph Watson in [his] presence"). Boudreau further testified that,
after taking this statement, he "continued to look for the Defendant Mr. Arnold Day." *Id.* at
D171:23–D172:19. The handwritten statement came up again later in Boudreau's direct
examination when the prosecutor questioned him about Day's interrogation:

> Q. After the defendant told you he had no knowledge concerning
> the Jerrod murder or that he was nowhere in the area, what did you
> do at that time, detective?
>
> A. At that time I showed him Ralph Watson's statement.
>
> Q. After showing the defendant Ralph Watson's statement can you
> tell me did you then have another conversation with the defendant?
>
> A. Yes, sir, I did.
>
> Q. Can you tell me what you said to the defendant and what the
> defendant said to you at that time?
>
> A. I asked the defendant, can you explain this: at which time he
> related to me that he was not truthful with me. And then he
> offered where he was at that date and time.
>
> Q. Can you please tell the ladies and gentlemen of the Jury what
> Arnold Day told you at that time?
>
> A. At that time Mr. Day explained to me that he . . . pointed his
> Tech-9 machine gun at [Erving] and pulled the trigger and started
> to fire. And at that time Jerrod Erving fell down in the hallway
> there.

25

*Id.* at D181:18–D183:23.

The Individual Defendants argue that Boudreau's trial testimony cannot establish that the prosecution used Watson's statement against Day at his criminal trial "because police officers have absolute immunity from suit under § 1983 for giving allegedly false testimony at trial proceedings." Doc. 267 at 25 (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)). However, the Seventh Circuit rejected this very argument in *Avery v. City of Milwaukee*, explaining that police officers who fabricate evidence cannot "retroactively immunize" themselves by testifying about the fabricated evidence at trial. 847 F.3d 433, 441–43 (7th Cir. 2017); *see also Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *8 (N.D. Ill. Mar. 19, 2021) ("So although an officer is immune from liability for his testimony alone, he is not immune from testimony that repeats or authenticates the content of the fabricated evidence." (citation omitted)). Additionally, Boudreau's testimony was not the only time the prosecution used Watson's statement at Day's criminal trial.

The prosecutor also used Watson's statement during Day's own cross-examination. After Day testified on direct that detectives coerced him into confessing, the prosecutor sought to rebut that testimony by "showing that it was the presentation of Ralph Watson's statement to the Defendant that caused him to change his mind and ultimately give a handwritten confession to the offense." Doc. 264-97 at 9:12–22. The prosecutor asked Day if Boudreau "show[ed] him a statement that Ralph Watson had given the police" and used the statement to refresh his recollection. Doc. 264-48 at E111:10–E112:13; *see also id.* at E146:5–12 (confirming that the document was Watson's statement). Day then testified that, during his interrogation, Boudreau "had this paper in his hand, and he was reading it to [Day]." Doc. 264-48 at E111:14–17. The prosecutor then elicited the following testimony:

> Q. During that conversation, did [Det. Boudreau] tell you that
> Ralph Watson had given them your name?
>
> A. Yes, he did.
>
> Q. That Ralph Watson had given your name as the individual who
> committed the murder or Jerrod Erving, right?
>
> A. Correct.

*Id.* at E113:1–10 (objections omitted).

The above evidence is sufficient for a jury to reasonably find that the prosecution used Watson's statement against Day at his criminal trial. *See Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the *contents* of the fabricated report certainly were. Indeed, the December 14 Report was discussed at length during Officer Glinski's cross- and redirect examinations, including by reference to the document itself, which was used to refresh Officer Glinski's recollection."). Because of this, the Court does not address Day's additional arguments regarding how the prosecution used Watson's statement against him in his criminal trial. The Court denies summary judgment on Day's due process claim to the extent that he bases it on this theory.

### c. Police Reports

Day also alleges that the Individual Defendants fabricated police reports about his confession and Watson's statement. Doc. 277 at 25; *see also* Doc. 1 ¶ 155 (alleging that the Individual Defendants "fabricated police reports and other evidence falsely implicating Plaintiff"). The Individual Defendants argue that the Court should grant summary judgment on this theory because no evidence exists that the prosecution used any of the police reports related to the Erving investigation against Day at his trial.

27

As a preliminary issue, although the complaint alleges that the Individual Defendants fabricated "police reports," Doc. 1 ¶ 155, Day's arguments at summary judgment focus solely on the fabrication of Boudreau and Foley's February 18, 1992 supplementary police report ("2/18/92 Report"), which memorialized Watson's statement implicating Day in the Erving homicide and Day's own confession. Given this, the Court finds that Day has abandoned any fabrication claim based on the fabrication of any other police reports. *See Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (holding that plaintiff abandoned a claim because it "did not defend that claim in its reply to [defendant's] motion for summary judgment"). The Court therefore addresses only whether Day has presented sufficient evidence to create an issue of material fact as to the 2/18/92 Report.

Reviewing the evidence closely, no evidence in the record suggests that the State used the 2/18/92 Report against Day at his criminal trial. Although Boudreau and Day both testified about Day's confession and Watson's statement, there is no evidence that any witness testified specifically about the 2/18/92 Report. Nor does it appear that either party introduced the 2/18/92 Report into evidence. Rather, the only evidence Day provides to establish that the prosecution used the 2/18/92 Report against him is ASA Danielian's testimony that, on February 4, 1992, "he reviewed police reports which, in part, helped him understand the investigation and presumably guided his questioning of Plaintiff." Doc. 277 at 26. From this testimony, Day argues that "there is no legitimate dispute that the supplementary report was used against Plaintiff at trial." *Id.* This argument is untenable, however, because Boudreau and Foley submitted the 2/18/92 Report two weeks *after* ASA Danielian reviewed the then-existing police reports related to the Erving homicide. *See* Doc. 264-86 at 158:8–19 (testifying that the report "wasn't submitted until February 18th"). And even if ASA Danielian had reviewed the 2/18/92 Report prior to

28

interrogating Day, Day does not explain how this would allow a jury to reasonably find that the State used the report against Day *at his criminal trial*.

The cases Day cites do not support a different conclusion. In *Taylor*, the court held that a fabricated police report had been used against the plaintiff in his criminal trial because the report itself "was discussed at length during [the officer's] cross- and redirect examinations, including by reference to the document itself, which was used to refresh [the officer's] recollection." 2021 WL 4401528, at *7. That is not the case here. Day has provided no evidence that any witness discussed the 2/18/92 Report itself at trial or that a party used the 2/18/92 Report to refresh any witness' recollection. Similarly, in *Velez v. City of Chicago*, witnesses at trial testified about the substance of the allegedly fabricated lineup identifications themselves. No. 1:18-CV-08144, 2023 WL 6388231, at *12 (N.D. Ill. Sept. 30, 2023). Although the court briefly mentioned police reports documenting the lineup identifications, the court did not hold that the police reports themselves were fabricated and used against the plaintiff at his criminal trial. *Id.*

The Court, therefore, grants summary judgment to the Individual Defendants on Day's fabrication claim to the extent that Day bases it on police reports, including the 2/18/92 Report.

### 2. *Brady* Violations

The second prong of Day's due process claim is based on the theory that the Individual Defendants wrongfully suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). "Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel under *Brady v. Maryland*." *Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019) (citing *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016)). To assert a *Brady* claim, Day must allege that (1) the police officers suppressed evidence; (2) the evidence was favorable to him;

29

and (3) the evidence was material, i.e. that a reasonable probability exists that prejudice ensued. *Anderson v. City of Rockford*, 932 F.3d 494, 504–05 (7th Cir. 2019).

Courts consider evidence suppressed for *Brady* purposes if the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Further, withheld evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Coleman*, 925 F.3d at 349 (quoting *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008)). The "materiality of suppressed evidence is considered collectively, not item by item," to assess if "the defendants are liable for causing [the plaintiff] to receive an unfair trial in violation of his due process rights." *Goudy*, 922 F.3d at 838.

Day has previously asserted that the Individual Defendants wrongfully suppressed the following categories of evidence: (1) notes from McWeeny's interviews with Taylor; (2) information regarding alternative suspects; (3) the Individual Defendants' fabrication and attempted fabrication of various evidence against Day, including statements from Day, Watson, and Edward Robinson; and (4) street file evidence.[11] The Individual Defendants argue that all of these alleged *Brady* violations fail as a matter of law, but Day does not respond to their arguments regarding the notes from McWeeny's interviews with Taylor or the fabrication and attempted fabrication of evidence against Day. Day has therefore abandoned his *Brady* claim based on the alleged suppression of this evidence, *Keck Garrett*, 517 F.3d at 487, and the Court

---

[11] The parties agree that street files "were secret files that detectives took out on the street but were not disclosed to the prosecutor." SUF ¶ 111. These files "were often used to investigate the existence of alternative suspects or suspects who were eliminated." *Id.*

grants summary judgment for the Individual Defendants regarding these aspects of Day's *Brady* claim.

Thus, the Court analyzes only whether Day has provided sufficient evidence to create issues of material fact as to whether the Individual Defendants wrongfully suppressed information regarding alternative suspects or street file evidence.

### a.    Alternative Suspects

Day first alleges that McWeeny suppressed exculpatory or impeaching evidence regarding two alternative suspects in the Erving homicide.[12]  As background, McWeeny documented information about alternative suspects, Spook and Mark, in a police report dated May 18, 1991 ("5/18/1991 General Progress Report").  Day does not allege that Defendants suppressed this report but instead takes issue with the fact that the report did not identify a source for the information about Spook and Mark.  He argues that McWeeny "withheld the identity of the witness(es) with knowledge about Spook and Mark's involvement in the crime" and therefore deprived him of "the ability to develop admissible evidence about the alternative suspects."  Doc. 277 at 29.  Specifically, he claims that the suppression of these identities meant that he "had no witness to call at trial (and no person to follow-up with) to point the finger at Spook and Mark."  *Id.* at 28.

Critically, however, Day has not presented any evidence that would allow a jury to conclude that McWeeny was in possession of the allegedly suppressed information.  During his deposition, McWeeny testified that the information about alternative suspects in his 5/18/1991 General Progress Report came "from a person who received the information from a third person."  SUF ¶ 42; *see also* Doc. 264-21 at 255:1–5 ("I did not get the information about the

---

[12] Day does not allege that Defendants Boudreau, Foley, or Evans were personally involved in suppressing evidence about the two alternative suspects.

Mark and Spook, that does not come to me . . . the information on this here came to me from a person who got it from a third person . . . this is definitely a third person GPR."); *id.* at 257:15–18 ("I don't know who gave me that information. It could have been a policeman, it could have been a civilian."). He further testified that, if he had received the information directly from the source, he would have included the individual's name and address in the report. SUF ¶ 43. Day does not address this testimony in his response, nor does he present any evidence from which a jury could reasonably infer that the unknown third party told McWeeny the identity of the witness(es) who had provided the information about Spook and Mark. And even if he had, Day presents no evidence—beyond his own speculation—that this information would have been exculpatory. He therefore has not met his burden on summary judgment to establish the existence of an issue of material fact. *See United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008) ("More significantly, Mr. Roberts did not present any evidence that the Government is in possession of any of these missing photographs; nor does he provide any reason to believe that the photographs, if discovered, would be exculpatory. Consequently, Mr. Roberts' *Brady* claim must fail.").

### b.     Street File

Day next alleges that the Individual Defendants suppressed exculpatory information contained in a street file. The Individual Defendants move for summary judgment on this theory, arguing that "Day has not identified a single piece of exculpatory or impeachment evidence that was in a so called 'street file,' let alone a piece of evidence that was not turned over to prosecutors or Day's criminal defense attorneys." Doc. 267 at 36. The Court agrees.

To start, Day concedes that there is no direct evidence that a street file ever existed with regard to the Erving homicide investigation. And although he argues that there is "circumstantial

evidence that some of the Defendants kept street files with potentially material exculpatory information," Doc. 277 at 33, his support for this assertion is a non-existent docket entry, *id.* (citing Doc. 558 ¶ 222). Seemingly recognizing this lack of evidence, Day argues that "it would be perverse if Plaintiffs could not bring a street file claim because Defendants were so successful at burying that file (and its contents) that no one can find it." Doc. 277 at 32. However, the law is clear that "if there is no proof of a document's existence, governmental officials cannot be held liable under *Brady*." *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) (collecting cases).

Day's reference to the City's general "street file practice" does nothing to solve this issue. Doc. 277 at 33. In his response, Day cites to the verdicts in *Fields v. City of Chicago*, No. 10 CV 1168 (N.D. Ill. 2016), and *Rivera v. Guevara*, No. 12 CV 04428 (N.D. Ill. 2018), as support for the proposition that this street file practice "existed through the time of this investigation." Doc. 277 at 33. However, he ignores that the underlying criminal trials in *Fields* and *Rivera* took place in 1986 and 1990, prior to the Erving investigation. *See Rivera*, 319 F. Supp. 3d at 1063. As the court in *Rivera* noted, "[w]idespread practices do not necessarily persist indefinitely." *Id.* And even if the City did have a general street file practice during the relevant time, the inference that a street file existed *in the Erving investigation* is pure speculation. *See Hill*, 2009 WL 174994, at *4 (holding that "mere speculation" that exculpatory evidence "may have existed" did not create a genuine issue of material fact for trial).

Equally unavailing is Day's speculation that a street file may have existed because the investigative file did not contain certain information which "should have, per CPD policy, been recorded." Doc. 277 at 33. Numerous courts have rejected similar arguments, as they again are based on mere speculation. *See Roberts*, 534 F.3d at 572 (holding that *Brady* claim must fail

33

where accident report appeared to be missing certain information but there was no evidence that the government was in possession of the missing information); *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) ("Mr. Shields does not point to any specific evidence that was suppressed by the Government. Instead, he theorizes that, following the filing of the claim, the police department initiated an investigation during which it created documents that show that Officer Coglianese did in fact plant evidence on the plaintiff. There is no reason to think that Mr. Shields's speculation is accurate."); *Hill*, 2009 WL 174994, at *4 (holding that plaintiff's "mere speculation that a [report] may have existed" because "Defendants would have taken key steps" during the investigation "yet the resulting documentation was never produced during the criminal process" could not be the basis for a *Brady* claim).

Additionally, even if Day had presented evidence that a street file existed in this case, no evidence exists that would allow a reasonable jury to conclude that the contents of that street file would have been exculpatory or impeaching. Again, although Day claims that "there is evidence of what would be in that street file," he offers only speculation based on the allegedly "missing" information in the investigative file. This is not enough to survive summary judgment. *See Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *9 (N.D. Ill. Sept. 23, 2019) ("[I]t is undisputed that the Officer Defendants maintained a 'street' or 'working' file . . . . But because no such file has been produced in this case, Taylor's position that the file would contain *Brady* material is purely speculative. And mere speculation that exculpatory evidence may have existed cannot support a *Brady* claim."). Nor does Day provide any evidence that the Individual Defendants personally possessed and suppressed any such street file evidence. *See Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813, at *28 (N.D. Ill. Mar. 24, 2025) ("Johnson has not

presented evidence that any other Individual Defendant possessed any handwritten or street file evidence that the official permanent retention or investigative files did not contain.").

Because Day has not provided sufficient evidence to create issues of material fact as to whether the Individual Defendants wrongfully suppressed information regarding alternative suspects or street file evidence, the Court grants summary judgment to the Individual Defendants on Day's due process claim to the extent that it is based on a *Brady* theory of liability.

### C.  Unlawful Detention Claim (Count IV)

Day alleges that the Individual Defendants used fabricated evidence to detain him without probable cause and deprive him of his liberty.  The Court treats this claim as one for unreasonable pretrial detention without probable cause under the Fourth Amendment.  *See Manuel v. City of Joliet*, 580 U.S. 357, 366–68 (2017).  The Individual Defendants argue that Day lacks Article III standing to bring this claim, and the Court agrees.[13]

In October 1991, a Cook County circuit court issued a "no bail" warrant for Day's arrest for the delivery of a controlled substance.  This charge was unrelated to the Erving homicide, and the warrant was still outstanding when officers first interrogated Day for the Erving homicide. The circuit court ultimately found Day guilty of the drug charge and sentenced him to seven years in the Illinois Department of Corrections on September 8, 1993.  He was, however, given credit for the 586 days he spent in custody between February 4, 1992 and September 8, 1993. Thus, it is undisputed that Day was in custody for this unrelated case for the entire time he spent in pretrial detention for the Erving homicide.

---

[13] Although the City did not raise a standing argument in its separate motion, the Court *sua sponte* addresses Day's standing to pursue this claim against the City.  *See US Metro Bank v. 3511-15 Ravenswood LLC*, No. 24-CV-3526, 2025 WL 2549265, at *1 (N.D. Ill. Apr. 3, 2025) ("Courts must raise concerns with standing *sua sponte* when they arise." (citing *Murthy v. Missouri*, 603 U.S. 43, 44 (2024)).

Seventh Circuit law is clear that "a section 1983 plaintiff may not receive damages for time spent in custody, if that time was credited to a valid and lawful sentence." *Ewell v. Toney*, 853 F.3d 911, 917 (7th Cir. 2017) (citing *Bridewell v. Eberle*, 730 F.3d 672, 677 (7th Cir. 2013); *Ramos v. City of Chicago*, 716 F.3d 1013, 1020 (7th Cir. 2013)). And a § 1983 plaintiff who cannot seek damages related to their detention "has no injury that a favorable decision by a federal court may redress" and "does not have Article III standing to pursue this claim." *Patrick v. City of Chicago*, 81 F.4th 730, 737 (7th Cir. 2023). Day argues that these cases are "erroneously decided" and "cannot be squared with the well-established legal rule that permits the award of nominal damages." Doc. 277 at 39–43. But the Court cannot disregard the Seventh Circuit's decisions, which control this case.

Because Day received credit towards a valid and lawful sentence for the time he spent in pretrial detention, he lacks Article III standing to pursue his unlawful detention claim and the Court grants summary judgment to all Defendants on Count IV.[14]

### D.      Failure to Intervene Claim (Count V)

Day also brings a failure to intervene claim against Defendants Boudreau, Foley, and Evans. He alleges that the Individual Defendants all had a reasonable opportunity to intervene and prevent the violations of Day's constitutional rights but failed to do so. The Individual Defendants make two arguments in support of summary judgment on this claim but neither argument is persuasive.

First, this Court acknowledges and rejects the Individual Defendants' argument that a "failure to intervene" is not a cognizable claim under § 1983 because the Seventh Circuit recognizes such a theory of liability. *See, e.g.*, *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th

---

[14] While the parties disagree as to whether Day could maintain this *Monell* claim even if the Court dismissed Count IV against the Individual Defendants, the Court does not resolve this issue given Day's lack of standing.

Cir. 2022) (analyzing failure-to-intervene claim); *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (same); *Abdullahi v. City of Madison*, 423 F.3d 763, 773–74 (7th Cir. 2005) (same); *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 477–78 (7th Cir. 1997); *Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *3 (N.D. Ill. Mar. 4, 2014) ("The Seventh Circuit acknowledges a 'failure to intervene' basis for a constitutional violation under the Eighth Amendment." (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)). The Court follows this binding precedent.

Second, the Individual Defendants argue that Defendant Evans is entitled to summary judgment on this claim because Day has presented no evidence that Evans knew of and could have reasonably intervened to stop misconduct. An officer who is present and fails to prevent another law enforcement officer from infringing on the constitutional rights of a citizen is liable under § 1983 if that officer: (1) knew that the citizen's rights were being infringed; and (2) had a "realistic opportunity" to intervene. *Doxtator*, 39 F.4th at 864–65. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (quoting *Abdullahi*, 423 F.3d at 774).

Day has presented sufficient evidence to create an issue of material fact as to whether Evans is liable for failing to intervene to prevent the coercion of Day's confession. Although Evans was not present during Boudreau and Foley's interrogation or when Day gave his confession to ASA Danielian, it is undisputed that Evans played a part in Day's arrest and portions of his interrogation. As discussed previously, Day testified that Evans and Foley both threatened him and accused him of homicide during his interrogation. A reasonable jury could conclude, based on this evidence, that Evans "knew one or more of his colleagues were

determined to extract [Day's] confession without regards to protecting his constitutional rights and had an opportunity to warn them to stop." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1168 (N.D. Ill. 2022); *see also Coleman*, 2025 WL 2410325, at *42 ("[B]ecause a jury could conclude that Halloran was personally involved in coercing Coleman's confession, it could likewise conclude that he was aware Coleman's confession was coerced.").

For this same reason, a reasonable jury could find that Evans had a realistic opportunity to intervene before or during Day's criminal trial. While the Individual Defendants argue that there are "no facts to suggest Officer Evans could have reasonably intervened to stop this alleged behavior," Doc. 267 at 43, the Court disagrees. Evans was present for at least part of Day's interrogation with Foley, which is sufficient to create a material issue of fact as to whether Evans could have reasonably intervened in Day's criminal case. *See Fulton v. Bartik*, No. 20 C 3118, 2024 WL 1242637, at *28 (N.D. Ill. Mar. 22, 2024) ("In this case, for example, any officer who was aware that a confession, statement, or report was false or the product of fabrication or coercion (or both) could have intervened at least until plaintiffs' criminal proceedings concluded."); *Coleman*, 2025 WL 2410325, at *42 ("If the jury credits Coleman's account, it could find that Halloran had the opportunity to intervene to prevent the harm from occurring by speaking up about the coercion before or during the trial.").

The Court therefore denies summary judgment on Count V.

### E.    Conspiracy to Deprive Day of his Constitutional Rights (Count VI)

Day alleges that the Individual Defendants conspired to deprive him of his constitutional rights under § 1983. To hold an officer liable for conspiracy under § 1983, a plaintiff must prove: (1) the defendants reached an agreement to deprive him of his constitutional rights, and (2) the defendants took overt acts in furtherance of actually depriving him of those rights.

38

*Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman*, 776 F.3d at 511); *see also Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016) ("[T]he existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence.").

The Individual Defendants first argue that Day has not presented sufficient evidence to create issues of material fact as to whether Evans and McWeeny conspired to deprive Day of his constitutional rights. Day responds only to the arguments regarding Evans, and the Court therefore finds that he has abandoned his conspiracy claims against McWeeny. *Keck Garrett*, 517 F.3d at 487.

With regards to Evans, the Court concludes that Day has presented sufficient circumstantial evidence to create an issue of material fact as to whether he was involved in a conspiracy to coerce Day's confession and maliciously prosecute him. It is undisputed that "Day testified that Boudreau, Evans and Foley were involved in questioning him at Area Three and that they coerced his confession through physical and mental abuse." SUF ¶ 136. Evans later testified about Day's arrest and interrogation during a motion to suppress hearing and at his criminal trial. A reasonable jury could find, based on these facts, that Evans agreed with Boudreau and Foley to deprive Day of his constitutional rights and that they committed overt acts in furtherance of this conspiracy. *See* ; *Coleman*, 2025 WL 2410325, at *42 ("[A] jury could find that Halloran agreed with other defendants to build a case against [plaintiffs] by coercing their statements. A jury can make that inference—even in the absence of 'affirmative

39

evidence of such an agreement'—based on a defendant's own participation in the alleged misconduct."); *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *25 (N.D. Ill. July 13, 2017) (denying summary judgment on § 1983 conspiracy claim where defendants "worked together using coercive techniques to attempt (without success) to get [a witness] to identify Plaintiff as one of the perpetrators"); *Williams v. City of Chicago*, No. 08 C 6409, 2011 WL 133011, at *1 (N.D. Ill. Jan. 14, 2011) ("The existence of a mutual understanding can be inferred from evidence of joint conduct that is unlikely to have occurred absent the existence of a conspiratorial agreement." (citation omitted)).

The Individual Defendants separately argue that qualified immunity protects them on the federal conspiracy claim. Qualified immunity shields a defendant officer from liability for violations of § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time'" of the alleged violation. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Unlawfulness is clearly established if, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Id.* at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In response to a defendant asserting qualified immunity, the plaintiff must prove that qualified immunity does not apply. *See Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017).

The Individual Defendants argue that they are entitled to qualified immunity based on the intra-corporate conspiracy doctrine, which "holds that 'a conspiracy cannot exist solely between the members of the same entity.'" *Stone v. Bd. of Trs.*, 38 F. Supp. 3d 935, 949 (N.D. Ill. 2014) (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999)). As support, they rely on *Haliw v. City of South Elgin*, which justified its decision to grant the

40

defendants qualified immunity based on the intra-corporate conspiracy doctrine because "the legal landscape is foggy on whether it violates the Constitution for officers of a police department to conspire only with one another." No. 19 C 1515, 2020 WL 1304697, *4 (N.D. Ill. March 3, 2020).

The Court is not persuaded by the Individual Defendants' argument. Although the Seventh Circuit has not explicitly addressed the intra-corporate conspiracy doctrine, it has on several occasions—including as early as 1984—upheld or reinstated conspiracy claims "involving only police officers from the same department." *Liggins v. City of Chicago*, No. 20 C 4085, 2021 WL 2894167, at *5 (N.D. Ill. July 9, 2021) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (affirming jury determination of conspiracy among Chicago police officers); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253–61 (7th Cir. 1984) (upholding damage award for conspiracy among Milwaukee police officers)). Moreover, several courts in this District have questioned *Haliw*'s reasoning, instead denying qualified immunity to police officers raising the defense on the basis of the intra-corporate conspiracy doctrine. *See Walker v. City of Chicago*, 559 F. Supp. 3d 747, 752–53 (N.D. Ill. 2021) ("[D]oubts about the applicability of the intracorporate conspiracy doctrine in § 1983 cases do not support a finding of qualified immunity."); *Liggins*, 2021 WL 2894167, at *6 ("The Court believes what must be clearly established is limited to the *underlying constitutional right* that the Defendants conspired to violate."); *Harris v. City of Chicago*, No. 20 C 4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020) ("Recent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers."). This Court agrees with those courts'

41

reasoning that uncertainty regarding the availability of the intra-corporate conspiracy doctrine defense does not entitle Defendants to qualified immunity because it does not challenge whether the law clearly established the underlying right that the Individual Officers allegedly violated by participating in the conspiracy.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (holding that officials are exempt from liability if their "conduct does not violate *clearly established statutory or constitutional rights*" (emphasis added)).

The Court therefore grants summary judgment on Count VI for Defendant McWeeny, but denies it as to Defendants Evans, Boudreau, and Foley.

## III.  State Law Claims

### A.  Malicious Prosecution Claim (Count VII).

Day also brings a malicious prosecution claim under Illinois state law, alleging that the Individual Defendants knowingly caused his improper prosecution for the Erving murder without probable cause.  To establish a malicious prosecution claim under Illinois law, a plaintiff must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) the damages resulting to the plaintiff."  *Moran*, 54 F.4th at 499 (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996)).

The Individual Defendants challenge only the first element, arguing that Evans cannot be liable because he was not personally involved in causing the commencement or continuance of Day's criminal proceedings.  The Illinois Supreme Court has explained that, for this element, "the relevant inquiry is whether the [defendant] proximately caused the commencement or continuance of [that] proceeding."  *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 33.  The Court

42

must conduct a "commonsense assessment" to determine whether defendants "played a significant role in [the defendant]'s criminal case." *Id.* ¶ 45. "This significant role assessment necessarily includes those persons whose participation in the criminal case was so 'active and positive' to 'amount to advice and co-operation' or those persons who 'improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.'" *Id.*

Day has presented sufficient evidence to create an issue of material fact as to whether Evans played a significant role in Day's criminal case. Day testified that Evans stomped on his head when arresting him and later used coercive tactics during his interrogation at the police station. But that is not the extent of Evans' involvement in the commencement and continuation of Day's criminal case. Prior to trial, Day moved to suppress his allegedly coerced confession and Evans testified at the suppression hearing. *See* Doc. 264-102 at A7:7–9 (testifying that he did not "step on" Day during his arrest); *id.* at A11:17–24 (testifying that he did not interrogate Day). Evans also testified at Day's criminal trial. During trial, the prosecutor called Evans to rebut Day's testimony that Evans had stomped on his head during his arrest and threatened him during his interrogation. Evans subsequently testified that he did not mistreat Day "in any way" during the arrest and did not have "any further contact with [] Day outside of his arrest and bringing him to [the police station.]" *Id.* at E152:21–153:8. Courts in this district have denied summary judgment on similar facts. *See Coleman*, 2025 WL 2410325, at *41 (concluding that a jury could find officer liable for malicious prosecution where officer "participated in coercing" plaintiff's confession, which "was the heart of the case against him"); *Walker*, 2021 WL

1058096, at *12 (holding that, where officer "provided some of the (allegedly false) evidence used against [plaintiff], there's a material dispute about his role in initiating the prosecution").

The Individual Defendants' arguments on this issue again largely rely on minimizing or misrepresenting the above evidence. For example, they again argue that Evans "was not present for any of the interrogations" and claim that Day testified that the reason he confessed was "Foley and Boudreau, **not** Evans." Doc. 291 at 9. The record, however, does not support these arguments. The Individual Defendants also inexplicably claim that Evans did not testify at Day's criminal trial, which is simply not correct. *Compare* Doc. 267 at 39 ("Evans did not testify at Day's criminal trial." (citing Doc. 264-48)), *with* Doc. 264-48 at E150:20–E153:15 (transcript of Evans testifying at Day's criminal trial).

The Individual Defendants also argue that there is no evidence that Evans interacted with prosecutors or signed criminal complaints against Day. However, they provide no authority to support the proposition that these actions are required for malicious prosecution claims under Illinois law. *Cf. Walker*, 2021 WL 1058096, at *12 ("Though the record isn't clear about which officers spoke to the prosecutor before she decided to indict [defendants], an officer may be liable even if he did not 'actively deceive prosecutors.'" (quoting *Beaman*, 2019 IL 122654, ¶ 43)); *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975 (1988) ("Liability for malicious criminal prosecution is not confined to situations where the defendant signed a complaint against the plaintiff.").

For these reasons, the Court denies summary judgment on Count VIII.

### B.    Intentional Infliction of Emotional Distress Claim (Count VIII)

Day also brings an intentional infliction of emotional distress ("IIED") claim under Illinois law. The Individual Defendants argue that the Court should grant summary judgment on

44

this claim in favor of Defendants McWeeny and Evans because it "derives from [Day's] constitutional claims" and there is "no viable claim or evidence to suggest that anyone besides Dets. Boudreau and Foley caused or contributed to a constitutional deprivation." Doc. 267 at 44.

Under Illinois law, to recover on a claim for IIED, a plaintiff must prove: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct in fact caused severe emotional distress. *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (citing *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 447 (2005). To assess whether a defendant's conduct was outrageous such that it goes "beyond all bounds of decency and [is] considered intolerable in a civilized community," courts examine the degree of power the defendant held over the plaintiff; whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge; and whether the defendant reasonably believed that his objective was legitimate. *See Cairel*, 821 F.3d at 835–36 (describing Illinois law).

A jury could reasonably find Evans liable for coercing Day's confession and maliciously prosecuting him. Because of this, a jury could reasonably also find Evans liable for IIED. *See Washington*, 2022 WL 4599708, at *25 (denying summary judgment on IIED claim because "[i]f a jury is persuaded by Plaintiffs' evidence as to their other substantive claims" for fabricating evidence, withholding exculpatory evidence, and employing unduly suggestive identification procedures, "the jury may similarly find the Officer Defendants liable for IIED"); *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("If, as alleged, defendants fabricated false or misleading evidence of [the plaintiff's] guilt . . . that behavior is sufficiently 'outrageous' to support a claim for intentional infliction of emotional distress.").

On the other hand, the Court finds that Day has not presented sufficient evidence for a jury to reasonably find McWeeny liable for IIED. There is no evidence that McWeeny violated Day's constitutional rights by suppressing exculpatory or impeachment evidence, and Day has voluntarily dismissed or abandoned all other claims against him.

The Court therefore grants summary judgment on Count VIII in favor of McWeeny and denies summary judgment on Count VIII as to all other Individual Defendants.

### C.     Civil Conspiracy (Count IX)

Day also brings a civil conspiracy claim against the Individual Defendants under state law. A civil conspiracy claim under Illinois law has similar elements: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004).

The Individual Defendants argue that Day has not presented sufficient evidence to show that Defendants Evans or McWeeny were part of a civil conspiracy. However, for the same reasons discussed with regard to Day's federal conspiracy claim, the Court concludes that Day has presented sufficient evidence to create an issue of material fact as to Evans' participation in a civil conspiracy but has not presented sufficient evidence to maintain this claim against McWeeny. The Court therefore grants summary judgment on Count IX for McWeeny but denies it as to Evans.

### D.     *Respondeat Superior* and Indemnification Claims (Count X and XI)

The City argues that the Court should grant summary judgment for it on Day's *respondeat superior* and indemnification claims because Day's underlying claims have no merit.

46

*Respondeat superior* and indemnification are derivative liability claims that rise or fall with the claims against the Individual Defendants. *See Brown v. City of Chicago*, 709 F. Supp. 3d 558, 580 (N.D. Ill. 2023) (citing *Moran*, 54 F.4th at 500). Because the Court allows claims to proceed against at least some of the Individual Defendants, the City must remain a Defendant for indemnification and *respondeat superior* purposes. Thus, the Court denies the City's motion for summary judgment on the *respondeat superior* and indemnification counts.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions for summary judgment [257, 259]. The Court enters summary judgment for all Defendants on Day's claims to the extent that they are based upon his interrogation, arrest, and prosecution for the Garcia homicide. The Court further enters summary judgment for all Defendants on Day's unlawful detention claim (Count IV) and enters summary judgment for McWeeny on Day's conspiracy and intentional infliction of emotional distress claims (Count VI, VIII, and IX). With regard to Day's due process claim (Count III), the Court enters summary judgment for all Defendants on the following theories of liability: witness coercion, failure to investigate, fabrication of police reports, and the suppression of exculpatory or impeachment evidence. The Court further enters summary judgment on the due process claim for Evans on the theory that he fabricated Day's confession. However, the Court denies summary judgment on Day's due process claim to the extent that it is based on the fabrication of Watson's witness statement. The Court also denies summary judgment for Evans on Day's coerced confession, failure to intervene, malicious prosecution, conspiracy, and IIED claims (Counts I, II, V, VI, VII, VII, and IX). Finally, the Court denies summary judgment for the City on the indemnification and *respondeat superior* claims (Counts X and XI).

Dated: December 18, 2025

SARA L. ELLIS
United States District Judge